012149

extent provided in Section 18-406 of the Delaware Act. No Member, Director or Officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Member, Director or Officer of the Company or any combination of the foregoing. Nothing in this Agreement shall limit the liabilities and obligations of the Members, or entitle any Member to indemnification hereunder from the Company with respect to any claims made under, when acting in any capacity for or on behalf of the Company other than those expressly described above. For the avoidance of doubt, nothing in this Agreement shall limit the liability of any Member to any other Member for breach of this Agreement.

8.2 Right to Indemnification. Subject to the limitations and conditions as provided in this Article VIII, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative or in the nature of an alternative dispute resolution in lieu of any of the foregoing ("Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of which such Person is the legal representative, is or was a Member, a Director or Officer or, in each case, a representative thereof (each, an "Indemnified Person") shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, reasonable attorneys' and experts' fees) actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation ("Loss"), unless (a) such Loss shall have been finally determined by a court of competent jurisdiction to have resulted from such Person's fraud, intentional misconduct or, in the case of any Member, willful breach of this Agreement or, in the case of any Director or Officer, knowing and intentional breach of this Agreement or (b) in the case of an Officer, such Loss shall have been finally determined by a court of competent jurisdiction to have resulted from such Person's failure to act in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company or other failure to comply with such Officer's duties pursuant to Section 5.6, or such Officer had reasonable cause to believe his or her conduct was unlawful. Indemnification under this Article VIII shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article VIII, including the rights to advancement granted under Section 8.3, shall be deemed contract rights, and no amendment, modification or repeal of this Article VIII shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal. The foregoing indemnification is for the benefit of the Persons identified above acting in the capacities described above and not in any other capacity. For the avoidance of doubt and notwithstanding anything in this Article VIII to the contrary, nothing in this Agreement shall provide for any indemnification of any Member or any legal representative thereof in respect of any Proceeding by any other Member against such Member for breach of this Agreement.

8.3 Advance Payment. The right to indemnification conferred in this Article VIII shall include the right to be paid or reimbursed by the Company for the reasonable documented, out-of-pocket, third-party expenses incurred by a Person (other than an Officer of the Company in respect of claims by the Company against such Officer in such Officer's capacity as such) entitled to be indemnified under Section 8.2 who was, or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; *provided*, *however*, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct

necessary for indemnification under this Article VIII and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Article VIII or otherwise.

8.4 Indemnification of Employees and Agents. The Company, at the direction of the Board, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses under Sections 8.2 and 8.3.

8.5 Appearance as a Witness. Notwithstanding any other provision of this Article VIII, the Company may pay or reimburse reasonable out-of-pocket expenses incurred by a Director, Member, Officer, employee or agent in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

8.6 Nonexclusivity of Rights. The right to indemnification and the advancement and payment of expenses conferred in this Article VIII shall not be exclusive of any other right that a Member, Director, Officer or other Person indemnified pursuant to this Article VIII may have or hereafter acquire under any Law (common or statutory) or provision of this Agreement.

8.7 Insurance. The Board may obtain and maintain, at the Company's or a Partnership Group Company's expense, insurance to protect the Members, Directors, Officers, employees and agents from any expense, liability or loss arising out of or in connection with such Person's status and actions as a Member, Director, Officer, employee or agent. In addition, the Board may cause the Company to purchase and maintain insurance, at the Company's expense, to protect the Company and any other Member, Director, Officer or agent of the Company who is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of a foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article VIII.

8.8 Savings Clause. If this Article VIII or any portion hereof shall be invalidated on any ground by any court or other Governmental Authority of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article VIII as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the full extent permitted by any applicable portion of this Article VIII that shall not have been invalidated and to the fullest extent permitted by applicable law.

8.9 Fund Indemnitors. The Company hereby acknowledges that certain Indemnified Persons have certain rights to indemnification, advancement of expenses or insurance provided by The Blackstone Group L.P. and certain of its Affiliates or GSO and certain of its Affiliates (collectively, the "Fund Indemnitors", and the Indemnified Persons benefitting from such rights to indemnification, and other rights, from the Fund Indemnitors, the "Fund Indemnified Persons"). The Company hereby agrees (a) that it is the indemnitor of first resort (*i.e.*, its obligations to the Fund Indemnified Persons are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Fund Indemnified Persons are secondary), (b) that it shall be required to advance the full amount of expenses incurred by an applicable Fund Indemnified Person and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights any Fund Indemnified Person may have against the Fund Indemnitors, and (c) that it irrevocably waives, relinquishes

and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of any Fund Indemnified Person with respect to any claim for which a Fund Indemnified Person has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of a Fund Indemnified Person against the Company. The Company acknowledges and agrees, notwithstanding anything herein to the contrary, that the Fund Indemnitors are express third-party beneficiaries of the terms of this Section 8.9.

## ARTICLE IX
## UNITS, TRANSFERS, AND OTHER EVENTS

9.1 Unit Certificates.

(a) Units in the Company may be evidenced by certificates in a form approved by the Board ("Certificates") but there shall be no requirement that the Company issue certificates to evidence the Units. Any Certificate will bear the following legend reflecting the restrictions on the Transfer of such securities:

> "THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "33 ACT"), AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION UNDER THE 33 ACT OR IN A TRANSACTION WHICH, IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, QUALIFIES AS AN EXEMPT TRANSACTION UNDER THE 33 ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER.
>
> THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO THE TERMS OF THAT CERTAIN AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, DATED AS OF MARCH 1, 2017, AS AMENDED FROM TIME TO TIME, BY AND AMONG THE COMPANY AND THE MEMBERS IDENTIFIED THEREIN, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER. A COPY OF SUCH LIMITED LIABILITY COMPANY AGREEMENT HAS BEEN FILED WITH THE SECRETARY OF THE COMPANY AND IS AVAILABLE UPON REQUEST."

(b) If Certificates have been issued, upon any Transfer of all or a portion of the Units hereunder, the Transferor shall surrender the Certificate(s) representing the Units so Transferred to the Company for cancellation. If a Certificate represents a greater portion of the Transferor's Units than that intended for Transfer, upon surrender of such certificate for cancellation the Company shall issue to the Transferor a new Certificate which represents the Units being retained by such Transferor. Upon a determination by the Board, the Company shall issue to each Transferee who is Transferred Units pursuant to this Agreement and who is admitted to the Company as a Substitute Member in accordance with Section 9.7, a Certificate evidencing the Units held by such Transferee. Such Certificate shall indicate the Units then owned by such Transferee and shall represent the Units owned by such Transferee from time to time thereafter as set forth in the then effective Exhibit A hereto, regardless of the Units indicated in the Certificate.

Upon receipt of written notice or other evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any Certificate and, in the case of any such loss, theft or destruction upon receipt of the Member's unsecured indemnity agreement, or in the case of any other holder of a Certificate or Certificates, other indemnity reasonably satisfactory to the Board or in the case of any such mutilation upon surrender or cancellation of such Certificate, the Company will make and deliver a new Certificate, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Certificate.

9.2 Record Holders. The Company shall keep a register or other records which reflect the Units and any Certificates. Except as otherwise required by law, the Company shall be entitled to, and shall only, recognize the exclusive right of a Person registered on its books as the record holder of a Unit, whether or not represented by a Certificate, to receive distributions in respect of such Unit, to vote as the owner of such Unit and to be entitled to the benefits, and subject to the obligations, of this Agreement with respect to such Unit.

9.3 Restrictions on Transfers of Units.

(a) General Transfer Restrictions. No Member shall Transfer any interest in any Units except in accordance with this Section 9.3. The Class A Member shall not Transfer any interest in any Class A Units in a single transaction or series of related transactions without the prior written consent of the Class B Member, other than to Permitted Transferees (provided, that in the case of a Transfer of Class A Units to a Permitted Transferee that is not already a party hereto, such Permitted Transferee agrees in writing to be bound by this Agreement). The Class B Member shall not Transfer any interest in any Class B Units in a single transaction or series of related transactions without the prior written consent of the Class A Member (which consent shall not be unreasonably withheld, conditioned or delayed, provided that the Class A Member may withhold such consent if any such Transfer would result in the Class B Member and its Permitted Transferees owning less than a majority of the outstanding Class B Units), other than to Permitted Transferees, *provided, however*, that following the occurrence and during the continuance of an Investor Redemption Event, the Class B Member may Transfer any interest in any Units without the consent of the Class A Member or the Board. Subject to Section 9.4, any Transfers by a Member, other than to Permitted Transferees and except as set forth in the provisions of the immediately preceding sentence, shall require the prior approval of the Board.

(b) Prohibited Transfers. Notwithstanding anything to the contrary in this Article IX, no Transfer of Units shall be permitted or made if such Transfer would:

(i) violate the then applicable federal or state securities laws or rules and regulations of the Securities Exchange Commission, any state securities commission or any other Governmental Authority with jurisdiction over such Transfer;

(ii) terminate the existence or qualification of the Company under the laws of the jurisdiction of its formation;

(iii) cause the Company to be treated as an association taxable as a corporation or otherwise not to be treated as a partnership for U.S. federal income tax purposes;

(iv) cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended, or subject the Company , any of its Subsidiaries or any of the Partnership Group Companies to the Investment Advisers Act of 1940, as amended, or the Employee Retirement Income Security Act of 1974, as amended; or

(v) violate any other provision of this Agreement.

Any Transfer of Units in violation of this Agreement or applicable Law shall be void *ab initio*, and the Company has the power to rescind such Transfer.

9.4 Disposition Transactions. In connection with any Disposition Transaction (including by any consolidation, conversion, merger or other business combination involving the Partnership in which Equity Securities are exchanged for or converted into cash, securities of a corporation or other business organization or other property, and any sale of all or substantially all of the assets of the Partnership), (a) none of the Members, the Company or the Partnership Group Companies shall enter into any definitive documentation relating to such Disposition Transaction unless the Partnership has delivered to the Class B Member a written undertaking that expressly provides that upon or prior to the closing of such Disposition Transaction, an amount of cash equal to the Base Preferred Return Amount shall be paid in respect of each Preferred Unit in redemption or liquidation of all outstanding Preferred Units, (b) the Class B Member shall not be obligated to be subject to any non-competition, non-solicitation, or similar restrictive covenants that may be binding on GSO or any of its Affiliates in connection with any Disposition Transaction and (c) upon the consummation of any Disposition Transaction, the Partnership shall have paid or shall concurrently pay an amount of cash equal to the Base Preferred Return Amount with respect to each Preferred Unit in redemption in full or liquidation of all outstanding Preferred Units. No Disposition Transaction may be consummated if the redemption of the outstanding Preferred Units contemplated by the immediately preceding sentence is not consummated in accordance with the terms hereof.

9.5 Exit Transactions.

(a) If (i) a Redemption Non-Payment shall have occurred, shall not have been cured within fifteen (15) Business Days thereof and shall be continuing; (ii) after the first anniversary of the Effective Date, the Partnership shall have failed to pay the Quarterly Distribution Amount in cash to the Preferred Units in any two quarters, regardless of whether consecutive, and such failure is continuing; (iii) the Class A Member shall have caused the Company or any Partnership Group Company to take any action that requires Special Approval without first obtaining such Special Approval, *provided* that such failure has not been cured by the Class A Member within the earlier of (A) thirty (30) days following receipt of written notice of such failure from the Class B Member and (B) thirty (30) days after any Officer becomes aware of such failure; *provided further* that such cure period shall not apply if the Class A Member has caused the Company or any Partnership Group Company to take any action that requires Special Approval pursuant to Sections 5.7(b)(ii) (*provided* that such failure relates to an aggregate amount of Indebtedness that is greater than $10.0 million), 5.7(b)(iii), 5.7(b)(iv) (with respect to the acquisition of any assets outside the Core Area of the AMI), 5.7(b)(v), 5.7(b)(vi), 5.7(b)(ix) (*provided* that such failure relates to a sale of business or assets at a price that is greater than $5.0 million), 5.7(b)(x), 5.7(b)(xi) (*provided* that such failure represents a variance from the hedging plan established in compliance with Section 6.7 of the Partnership Agreement of greater than five percent (5%) of volumes or relates to derivative transactions other than those permitted



012155

to be entered into pursuant to Section 6.7 of the Partnership Agreement), 5.7(b)(xv), 5.7(b)(xvi), 5.7(b)(xvii), 5.7(b)(xviii), 5.7(b)(xix), 5.7(b)(xx), 5.7(b)(xxi), 5.7(b)(xxii), 5.7(b)(xxvii) or 5.7(b)(xxix) in connection with the foregoing; (iv) Sanchez Parent suffers (A) a Specified Event of Default (as such term is defined in the Joint Development Agreement) under a Specified Credit Agreement (as such term is defined in the Joint Development Agreement) and such Specified Event of Default is continuing or (B) an event of default under the Indenture or other agreement governing any Indebtedness for borrowed money of Sanchez Parent and its Subsidiaries (other than the Company and the Partnership Group Companies) in an amount greater than $50.0 million and such event of default has caused the repayment of such Indebtedness to have been accelerated or (v) SN Maverick (or any successor operator under the Joint Development Agreement that is an Affiliate of Sanchez Parent) becomes a Defaulting Operator (as such term is defined in the Joint Development Agreement) and as such has been removed as Operator (as such term is defined in the Joint Development Agreement) pursuant to the Joint Development Agreement or SN Maverick (or any successor operator under the Joint Development Agreement that is an Affiliate of Sanchez Parent) has resigned as Operator at any such time as an Operator Default Event (as such term is defined in the Joint Development Agreement) exists such that SN Maverick (or any successor operator under the Joint Development Agreement that is an Affiliate of Sanchez Parent) can then be removed as a Defaulting Operator pursuant to the Joint Development Agreement (any event in clauses (i), (ii), (iii), (iv) or (v) of this Section 9.5(a), an "Investor Redemption Event"), then, in each such case, the Class B Member shall be entitled to cause (and the Class A Member and the Company agree to facilitate, as reasonably requested by the Class B Member):

(1) a consolidation or merger of the Company, any of its Subsidiaries or any of the Partnership Group Companies with or into any other business entity or other corporate reorganization;

(2) a sale of all or any portion of the outstanding Units held by the Members; or

(3) a transaction in which all or substantially all of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies are sold, leased or otherwise disposed of

(each of the transactions described in Sections 9.5(a)(1), 9.5(a)(2) and 9.5(a)(3) are referred to herein as an "Exit Transaction"), *provided* that, solely with respect to an Investor Redemption Event described in Section 9.5(a)(ii) above (i.e. resulting from the Partnership's failure to pay the Quarterly Distribution Amount in cash to the Preferred Units in any two quarters (regardless of whether consecutive) and such failure is continuing), the Investor Representative (as such term is defined in the Partnership Agreement) shall only be permitted to cause the Partnership to enter into a definitive agreement for an Exit Transaction after three months following the date upon which such Investor Redemption Event in Section 9.5(a)(ii) occurred.

(b) If the Class B Member elects to pursue an Exit Transaction: (i) following good faith consultation with the Board, the Class B Member may exclusively identify, negotiate, structure and otherwise pursue the Exit Transaction, which Exit Transaction may be structured and accomplished as determined by the Class B Member in its sole discretion, whether as a merger, consolidation, sale of all or any portion of the Units, corporate reorganization, sale of assets or



012156

otherwise; and (ii) the Exit Transaction shall be effected on the terms and conditions negotiated by the Class B Member, including any terms imposing on the Members' obligations with respect to reasonable and customary indemnities, escrows, holdbacks or other contingent obligations that are applicable to all Members equally. In connection with any Exit Transaction, each of the Members shall, if requested by the Class B Member, waive any dissenters' rights, appraisal rights or similar rights that such Member may have in connection therewith; *provided, however,* that the Class B Member shall use its reasonable good faith efforts to maximize the Exit Transaction Consideration payable to the holders of Common Units. In addition, the Company shall, and the Company shall cause its Subsidiaries and the Partnership Group Companies to, take such action as the Class B Member may reasonably request in connection with any proposed Exit Transaction, including engaging an investment banker or other advisor in connection with such Exit Transaction, providing such financial and operational information as the Class B Member may request and causing employees and other representatives of the Company, its Subsidiaries or the Partnership Group Companies to cooperate (including by participating in management presentations, preparing marketing materials and making diligence materials available in an electronic data room) with the Class B Member in any marketing process in connection with any proposed Exit Transaction. Notwithstanding anything to the contrary herein or in the Partnership Agreement, the Units of the Company and the general partnership interest in the Partnership may only be sold for nominal consideration and the holders of the Units shall not be entitled to receive any consideration in any such Exit Transaction in excess of the Capital Contributions made by such members to the Company as of the Effective Date.

(c) If the Class B Member elects to pursue an Exit Transaction, then the Sanchez Investor and its Affiliates shall use their commercially reasonable efforts to obtain as promptly as practicable: (i) the consents or amendments required under the applicable contracts and leases to which the Sanchez Investor or any of its Affiliates is a party that would be necessary to transfer the assets or properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies (including the approval of Sanchez Parent or any of its Affiliates of such transfer under the Joint Development Agreement or any Operating Agreement); and (ii) the consents or amendments to, or the direct assignment of, any purchase, marketing, transportation, storage, processing or sales contract; *provided* that the Sanchez Investor and its Affiliates shall not be required to expend any amounts in connection with the foregoing unless such expenditures will be reimbursed by the Partnership Group Companies or the potential acquirer in an Exit Transaction, in each case upon the consummation of such Exit Transaction; *provided further,* that the Sanchez Investor and its Affiliates shall have no liability pursuant to the immediately preceding clause (ii) of this Section 9.5(c) if a Governmental Authority or Blackstone Newco prevents the Sanchez Investor or its Affiliates from providing such consents, amendments or assignments.

(d) In addition, the Sanchez Investor and its Affiliates shall use their commercially reasonable efforts in order to provide any potential acquirer in an Exit Transaction with reasonable access upon at least five (5) days' notice to all reasonably necessary information and properties to permit it to perform due diligence with respect to the proposed Exit Transaction, including access to permits, contracts and infrastructure associated with the properties, but only to the extent that such access is requested prior to the closing of such Exit Transaction; *provided*, that, if so requested by the Sanchez Investor or its Affiliates, such potential acquirer may be required to enter into customary access agreements prior to being provided with such access.

(e) The Class B Member shall regularly consult and cooperate with the Board with respect to the status of the sale process for such Exit Transaction; *provided, however,* that the Board and the Class A Member shall have no consent, voting or appraisal rights with respect to the final terms of an Exit Transaction and shall have no right to object to an Exit Transaction that is completed in a manner consistent with this Section 9.5.

(f) At least fifteen (15) Business Days prior to consummating an Exit Transaction, the Class B Member shall deliver to each of the other Members written notice that shall state (i) that the Exit Transaction has been structured in a manner that complies with this Section 9.5, (ii) the amount and form of consideration to be received by the Company or its Members in the Exit Transaction ("Exit Transaction Consideration") and (iii) all other material terms and conditions of the Exit Transaction (including the identity of the purchaser) and current drafts of the definitive documents related thereto.

(g) Each other Member hereby makes, constitutes and appoints the Class B Member, with full power of substitution and re-substitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Members required to give effect to this Section 9.5, including any vote or approval required under Section 18-209 of the Delaware Act and any waiver contemplated by Section 9.5(b). The proxy granted pursuant to this Section 9.5(g) is a proxy coupled with an interest and is irrevocable.

(h) Each of the Members required to participate in an Exit Transaction (collectively, the "Participating Sellers"), whether in its capacity as a Participating Seller, Member or otherwise, and the Company, its Subsidiaries, the Partnership Group Companies and the Board, shall take or cause to be taken all such actions as may be reasonably necessary or desirable in order expeditiously to consummate such Exit Transaction and any related transactions, including (i) making reasonable and customary representations and warranties, (ii) executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, (iii) furnishing information and copies of documents, (iv) filing applications, reports, returns, filings and other documents or instruments with Governmental Authorities and (v) otherwise using reasonable best efforts to fully cooperate with the Class B Member. Without limiting the generality of the foregoing, each Participating Seller agrees to execute and deliver such agreements as may be reasonably specified by the Class B Member to which all Participating Sellers will also be party, including agreements to (x) make reasonable and customary individual representations, warranties, covenants and other agreements as to the unencumbered title to its Units and the power, authority and legal right to Transfer such Units, (y) provide other reasonable and customary representations, warranties and indemnities, *provided* that any indemnification for representations and warranties regarding any of the Partnership Group Companies and their respective assets and operations shall be limited to any escrow of proceeds that is established in connection with the Exit Transaction or be limited to the proceeds actually received by the Participating Sellers in the Exit Transaction, and (z) be severally (on a pro rata basis in proportion to the related Exit Transaction Consideration to be received by each Member) liable (whether by purchase price adjustment, escrows, holdbacks, indemnity payments, contingent obligations or otherwise) in respect of representations, warranties, covenants and agreements in respect of the Company, its Subsidiaries and the Partnership Group Companies; *provided, however,* that (i) any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all



012158

Participating Sellers (in proportion to the relative Exit Transaction Consideration to be received by each Member), (ii) no Class A Member shall be liable for any amount in excess of its pro rata share of any indemnification obligation (based on Exit Transaction Consideration) in excess of any amounts placed in escrow and (iii) no Class A Member shall be obligated to be subject to any non-competition, non-solicitation, or similar restrictive covenants that may be binding on GSO or any of its Affiliates in connection with any Exit Transaction.

(i) The closing of an Exit Transaction shall take place at such time and place as the Class B Member shall specify by notice to each Participating Seller no later than five (5) Business Days prior to the closing of such Exit Transaction. At the closing of an Exit Transaction, each Participating Seller shall deliver any documentation evidencing the Units to be sold (if any) by such Participating Seller and the assignment thereof, free and clear of any liens, against delivery of the applicable consideration.

(j) In connection with any Exit Transaction, the Participating Sellers shall receive the Exit Transaction Consideration in accordance with the order of priority specified in Section 4.1(d) of the Partnership Agreement, after any payments required under the Senior Debt Agreements and deduction of the proportionate share of (A) the reasonable, documented, third-party out-of-pocket expenses associated with such sale or Exit Transaction, including the reasonable, documented out-of-pocket legal fees of the Company, its Subsidiaries, the Partnership Group Companies, the Class B Member and each Participating Seller, and reasonable, documented out-of-pocket brokers fees and other commissions and any other expenses incurred by the Class B Member in connection with such Exit Transaction, (B) amounts paid into escrow or held back, in the reasonable determination of the Class B Member, for indemnification or post-closing expenses and (C) amounts subject to post-closing purchase price adjustments; *provided, however,* that upon the determination of such purchase price adjustments, indemnification or post-closing expenses and upon release of any such escrow or hold back, as applicable, the remaining amount of the Exit Transaction Consideration, if any, shall be distributed to the Participating Sellers so that the total amount distributed is in accordance with the order of priority specified in Section 4.1(d) of the Partnership Agreement.

(k) Subject to the last sentence of Section 9.5(b), the consideration to be paid to each Member in an Exit Transaction shall be calculated by treating such Exit Transaction as a liquidation of the Company in which all of the assets of the Company (including goodwill) were sold in exchange for the Exit Transaction Consideration (including any deemed assumption of liabilities), as the case may be, and the proceeds of that sale, together with the profits, losses, items of income, gain, loss and deduction, and distributions were applied, allocated and distributed in accordance with the principles and priorities set forth in Section 4.1(d) of the Partnership Agreement.

(l) No action may be taken under this Section 9.5 if such action would result in the breach of any Senior Debt Agreement, Replacement Credit Agreement or any other agreement relating to material Indebtedness of the Partnership Group; *provided*, *however*, that the Company and the Members shall use their commercially reasonable efforts to obtain a waiver of any such breach or otherwise amend or cause to be amended the terms of any such agreement in a manner which permits such action; and *provided further*, *however*, that this Section 9.5(l) shall not apply

if the proceeds from any Exit Transaction are sufficient to, and are used to, pay in full any outstanding borrowings under any such applicable agreements.

(m) Notwithstanding anything to the contrary provided herein, if an Investor Redemption Event has occurred and given rise to the Class B Member's rights under this Section 9.5 and (i) has been cured by the Company prior to the earlier of (A) one hundred eighty (180) days following the first occurrence of such Investor Redemption Event and (B) the execution of a bona fide binding definitive purchase agreement with a bona fide purchaser or (ii) all Preferred Units have been redeemed in full for an amount of cash equal to the Base Preferred Return Amount per Preferred Unit prior to the execution of a bona fide binding definitive purchase agreement with a bona fide purchaser, then the provisions of this Section 9.5 will be suspended and the Exit Transaction process shall terminate, provided that, in such case, the Partnership shall pay the reasonable and documented fees and expenses of any investment bank or other advisors (including legal counsel) engaged by the Class B Member prior to such suspension and termination.

9.6 Expenses. The Transferor and Transferee of any Units or other interest in the Company shall be jointly and severally obligated to reimburse the Company for all reasonable out-of-pocket expenses (including attorneys' fees and expenses) incurred by the Company for any Transfer or proposed Transfer, regardless of whether consummated.

9.7 Transfers Generally; Substitute Members.

(a) Additional Procedural Conditions to Transfers. Without limiting Section 9.3(a), any Transfer of Units shall be valid hereunder only if:

(i) The Transferor and the Transferee execute and deliver to the Company such documents and instruments of conveyance as may be reasonably requested by the Board to effect such Transfer and to confirm the agreement of the Transferee to be bound by the provisions of this Agreement;

(ii) The Transferor and the Transferee provide to the Board the Transferee's taxpayer identification number and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns; and

(iii) The Company is reimbursed by the Transferor and/or the Transferee for all costs and expenses that the Company reasonably incurs in connection with the Transfer as required by Section 9.6.

(b) Rights and Obligations of Transferees and Transferors. Subject to Section 9.7(c), the Transferee of any Transfer permitted pursuant to this Agreement shall be a Transferee only, and only shall receive, to the extent Transferred, the Economic Interest associated with the Units so Transferred, and such Transferee shall not be entitled or enabled to exercise any other rights or powers of a Member, such other rights, and all obligations relating to, or in connection with, such Units remaining with the Transferring Member. The Transferring Member shall remain a Member even if it has Transferred all of its Units to one or more Transferees until such time as all such Transferees are admitted to the Company as Substitute Members pursuant to Section 9.7 (c), as applicable. In the event any Transferee desires to make a further Transfer of all

or any portion of its Units, such Transferee shall be subject to all of the provisions of this Agreement to the same extent and in the same manner as the Member who initially held such Units.

(c) Admission of Transferee as Substitute Member. Subject to the other provisions of this Article IX, a Transferee shall be admitted to the Company as a Substitute Member following a Transfer of Units in accordance with this Article IX upon satisfaction of all of the following conditions, upon which the Transferee shall have all of the rights and powers, and be subject to all of the restrictions and liabilities, of a Member under the Delaware Act and this Agreement with respect to the Units Transferred: (i) the Transferee shall become a party to this Agreement as a Member by executing a joinder or counterpart signature page to this Agreement and executing such other documents and instruments as the Board may reasonably request for the sole purpose of confirming such Transferee's admission as a Member and agreement to be bound by the terms and conditions of this Agreement and (ii) the Transferee pays or reimburses the Company for all reasonable costs that the Company incurs in connection with the admission of the Transferee as a Member as required by Section 9.6.

(d) Effect on Transferor and Company. Upon the admission of a Transferee as a Substitute Member, (i) the Transferor shall (A) cease to be a Member with respect to the portion of the Units so Transferred and (B) be released from any obligations arising after the date of such Transfer with respect to the Units so Transferred and (ii) the Transferee will become a Member hereunder with respect to such Units with all the rights and obligations of a Member held by the Transferor in respect of such Units immediately prior to the time of Transfer.

9.8 Closing Date. Any Transfer and any related admission of a Person as a Member in compliance with this Article IX shall be deemed effective on such date that the Transferee or successor in interest complies with the requirements of this Agreement.

9.9 Effect of Incapacity. Except as otherwise provided herein, the Incapacity of a Member shall not dissolve or terminate the Company. In the event of such Incapacity, the executor, administrator, guardian, trustee or other personal representative of the Member that has experienced such Incapacity shall be deemed to be the assignee of such Member's Economic Interest and may, subject to the terms and conditions set forth in this Article IX, become a Substitute Member.

9.10 No Appraisal Rights. No Member shall be entitled to any valuation, appraisal or similar rights with respect to such Member's Units, whether individually or as part of any class or group of Members, in the event of a merger, consolidation, sale of the Company or other transaction involving the Company or its securities unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction.

9.11 Effect of Non-Compliance.

(a) Improper Transfers Void. ANY ATTEMPTED TRANSFER NOT STRICTLY IN ACCORDANCE WITH THE PROVISIONS OF THIS ARTICLE IX WILL BE VOID *AB INITIO* AND OF NO FORCE OR EFFECT WHATSOEVER, *PROVIDED*, THAT ANY SUCH ATTEMPTED TRANSFER MAY BE A BREACH OF THIS AGREEMENT, NOTWITHSTANDING THAT SUCH ATTEMPTED TRANSFER IS VOID.

(b) Other Consequences. Without limiting the foregoing, if any Unit or Certificate representing a Unit is purported to be Transferred in whole or in part in contravention of this Article IX, the Person to whom such purported Transfer was made shall not be entitled to any rights as a Member whatsoever, including, without limitation, any of the following rights:

(i) to participate in the management, business or affairs of the Company;

(ii) to receive any reports pursuant to Section 6.2 hereof or obtain information concerning the Company pursuant to Section 6.3 or any other provision hereof;

(iii) to inspect or copy the Company's books or records;

(iv) to receive any Economic Interest in the Company; or

(v) to receive upon the dissolution and winding up of the Company the net amount otherwise distributable to the Transferor pursuant to Section 10.2(c)(iii) hereof.

## ARTICLE X
## DISSOLUTION, LIQUIDATION AND TERMINATION

10.1 Dissolution. The Company will dissolve and its affairs will be wound up only upon the approval of the Board and, if applicable, the Class B Member in accordance with Section 5.7.

10.2 Liquidation and Termination. On dissolution of the Company, a majority of the Board may appoint one or more other Persons as liquidator(s). The liquidator will proceed diligently to wind up the affairs of the Company and liquidate the Company's assets and make final distributions as provided herein. The costs of liquidation will be borne as a Company's expense. Until final distribution, the liquidator will continue to operate the Company properties with all of the power and authority of the Members. Subject to Section 18-804 of the Delaware Act, the steps to be accomplished by the liquidator are as follows:

(a) Accounting. As promptly as possible after dissolution and again after final liquidation, the liquidator will cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b) Payments. The liquidator will pay from Company funds all of the debts and liabilities of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c) Disposition of Assets. The Company will dispose of all remaining assets as follows:

(i) the liquidator may sell any or all Company property, and any resulting gain or loss from each sale will be computed and allocated to the Members pursuant to Section 4.2;

(ii) with respect to all Company property that has not been sold, the fair market value of that property will be determined and the Capital Accounts of the Members will be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable Transfer of that property for the fair market value of that property on the date of distribution; and

(iii) thereafter, Company property will be distributed among the Members in accordance with Section 4.1. All distributions made pursuant to this clause (iii) will be made by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation).

(d) Distributions. All distributions in kind to the Members will be made subject to the liability of each distributee for its allocable share of costs, expenses and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses and liabilities will be allocated to the distributee pursuant to this Section 10.2.

(e) Cancellation of Filing. On completion of the distribution of Company assets as provided herein, the Company will be terminated, and the Board (or such other Person or Persons as may be required) will cause the cancellation of any other filings made as provided in Section 1.6 and will take such other actions as may be necessary to terminate the Company.

**ARTICLE XI**
**DEFINITIONS**

11.1 Definitions. As used in this Agreement, the following terms have the following meanings:

"Accredited Investor" has the meaning set forth in Section 2.3(i).

"Additional Preferred Units Notice" has the meaning set forth in Section 5.8.

"Additional Sanchez Activities" has the meaning set forth in Section 5.10(g)(i).

"Additional Units" has the meaning set forth in Section 3.1(a).

"Affiliate" of any Person means any other Person, directly or indirectly, Controlling, Controlled by or under common Control with such particular Person. For the purposes of this Agreement, The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P. or its Affiliates that are not part of

the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an "Affiliate" of GSO or its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., but any fund or account managed, advised or subadvised by or Controlled by GSO or its Affiliates within the credit-related businesses of The Blackstone Group L.P. shall be considered an Affiliate of GSO. For the avoidance of doubt, (i) GSO or its Affiliates or any fund or account managed, advised or subadvised by or Controlled by GSO or its Affiliates shall not be considered an Affiliate of the Partnership or the Company, and (ii) Affiliates of the Sanchez Investor shall include any member of the Sanchez Group.

"Affiliate Threshold" has the meaning set forth in Section 5.7(b)(xiii).

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as it may be amended, modified, supplemented or restated from time to time.

"Allocation Regulations" means Treasury Regulation §§1.704-1(b), 1.704-2 and 1.704-3, as such regulations may be amended and are in effect from time to time and any corresponding provisions of succeeding regulations.

"AMI" has the meaning given to such term in the Joint Development Agreement.

"AMI Acquisition" has the meaning given to the term "Acquisition" in the Joint Development Agreement.

"AMI Participation Opportunity" has the meaning given to such term in the Sanchez Letter Agreement.

"Anadarko Closing" has the meaning set forth in the Securities Purchase Agreement.

"APC/KM PSA" means that certain Purchase and Sale Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP, SN Maverick, the Partnership and Blackstone Newco, dated January 12, 2017, as it may be amended, modified, supplemented or restated from time to time.

"Available Cash" has the meaning given to such term in the Partnership Agreement.

"Bankruptcy Event" means, with respect to any Person, the occurrence of one or more of the following events: (a) such Person (i) admits in writing its inability to pay its debts as they become due, (ii) files, or consents or acquiesces by answer or otherwise to the filing against it of a petition for relief or reorganization or rearrangement, readjustment or similar relief or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, dissolution, reorganization, moratorium or other similar law of any jurisdiction, (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, (v) is adjudicated as bankrupt or as insolvent or to be liquidated, (vi) gives notice to any Governmental Authority of insolvency or pending insolvency, or (vii) takes corporate action for the purpose of any of the foregoing; or (b) a court of Governmental Authority of competent

jurisdiction enters an order appointing, without consent by such Person, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of such Person, or a petition or involuntary case with respect to any of the foregoing shall be filed or commenced against such Person.

"Base Preferred Return Amount" has the meaning given to such term in the Partnership Agreement.

"Basic Documents" has the meaning assigned to such term in the Securities Purchase Agreement.

"Blackstone Newco" means Aguila Production, LLC.

"Board of Directors" or "Board" has the meaning set forth in Section 5.1.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in Houston, Texas.

"Capital Account" has the meaning set forth in Section 4.3.

"Capital Contribution" means, with respect to any Member, the total amount of money contributed to the capital of the Company by such Member, whether as an initial Capital Contribution or as an additional Capital Contribution.

"Cause" means, with respect to the Independent Director, (a) acts or omissions by such Independent Director that constitute willful disregard of such Independent Director's duties under this Agreement, bad faith or gross negligence, (b) that such Independent Director has engaged in or has been charged with, or has been convicted of, fraud or other acts constituting a crime under any law applicable to such Independent Director, (c) that such Independent Director is unable to perform his or her duties as Independent Director due to disability or incapacity or (d) that such Independent Director no longer meets the definition of Independent Director.

"CEO" has the meaning set forth in Section 5.6.

"Certificates" has the meaning set forth in Section 9.1.

"Change of Control" has the meaning set forth in the Indenture.

"Citi" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. or any of their respective affiliates, as may be applicable.

"Class A Member" means any Member holding Class A Units with regard to such Person's particular limited liability company equity interest designated by Class A Units.

"Class A Unit" means a limited liability company Equity Interest in the Company designated as a "Class A Unit" and which shall provide the holder thereof with the rights and obligations specified with respect to a Class A Unit in this Agreement.

"Class B Member" means any Member holding Class B Units with regard to such Person's particular limited liability company equity interest designated by Class B Units.

"Class B Unit" means a limited liability company Equity Interest in the Company designated as a "Class B Unit" and which shall provide the holder thereof with the rights and obligations specified with respect to a Class B Unit in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Common Unit" has the meaning given to such term in the Partnership Agreement.

"Company" has the meaning set forth in the preamble to this Agreement.

"Confidential Information" has the meaning set forth in Section 12.2.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of, the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise. The terms "Controlled" and "Controlling" shall have correlative meanings.

"Core Area" has the meaning given to such term in the Joint Development Agreement.

"Credit Agreement" means the credit agreement governing the up to $500 million senior secured, first-lien, reserve-based revolving credit facility, among the Partnership, as borrower, and JPMorgan Chase Bank, N.A. and Citi, as joint lead arrangers and joint book runners, JPMorgan Chase Bank, N.A. as administrative agent, and JPMorgan Chase Bank, N.A., Citi and the syndicate of banks and financial institutions named therein as the lenders, as amended or modified from time to time.

"Credit Agreement Agent" means the administrative agent under the Credit Agreement or a Replacement Credit Agreement.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 *et seq.*, as it may be amended from time to time, and any successor statute thereto.

"Delaware Certificate" has the meaning set forth in the Recitals hereto.

"Demand Facility" has the meaning given to such term in that certain Project Lightning Fee Letter, dated January 12, 2017, among J.P. Morgan, Citi and the Partnership, as in effect on the date thereof.

"Director" or "Directors" has the meaning set forth in Section 5.3(a)(i).

"Disposition Transaction" has the meaning given to such term in the Partnership Agreement.

"Distributions" has the meaning given to such term in the Partnership Agreement.

"Drilling Commitment Agreement" has the meaning given to such term in the Securities Purchase Agreement.

"Dual Closing" has the meaning set forth in the Securities Purchase Agreement.

"Economic Interest" means a Person's right to share in the income or loss or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member including, without limitation, the right to vote, consent or otherwise participate in the management of the Company, the right to designate Directors to the Board, or, except as specifically provided in this Agreement or required under the Delaware Act, any right to information concerning the business and affairs of the Company.

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Equity Interests" has the meaning given to such term in the Partnership Agreement.

"Equity Securities" has the meaning given to such term in the Partnership Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Existing Producing Wells" has the meaning given to such term in the Joint Development Agreement.

"Exit Transaction" has the meaning set forth in Section 9.5(a)

"Exit Transaction Consideration" has the meaning set forth in Section 9.5(f).

"FIRPTA" means the Foreign Investment in Real Property Tax Act of 1980.

"Fiscal Year" has the meaning set forth in Section 1.5.

"Fund Indemnified Persons" has the meaning set forth in Section 8.9.

"Fund Indemnitors" has the meaning set forth in Section 8.9.

"GAAP" has the meaning set forth in Section 6.1.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States of America, the United States of America or a foreign entity or government.

"GSO" means GSO Capital Partners LP, a Delaware limited partnership.

"GSO Director" has the meaning set forth in Section 5.3(a)(i).

"GSO Group" means the GSO Investor and its Affiliates, other than the Company, the Partnership and their respective Subsidiaries.

"GSO Investor" has the meaning set forth in the preamble to this Agreement.

"GSO Partner" means GSO ST Holdings LP.

"Hedge Agreements" has the meaning given to such term in the definition of "Indebtedness".

"Hedging Activity" has the meaning given to such term in the Partnership Agreement.

"Hydrocarbons Marketing Agreement" means the Hydrocarbons Purchase and Marketing Agreement, dated as of the Effective Date, by and between SN Maverick and the Partnership.

"Incapacity" means with respect to any Person, the bankruptcy (as defined in the Delaware Act), liquidation, dissolution or termination of such Person.

"Indebtedness" means, with respect to any specified Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for a deferred purchase price (other than trade payables incurred in the ordinary course of such Person's business, consistent with past practice), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person under capital leases, (e) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, regardless of whether drawn, (f) all obligations of such Person created or arising under any conditional sale or title retention agreement, (g) all net obligations of such Person payable under any rate, currency, commodity or other swap, option or derivative agreement (collectively, "Hedge Agreements"), (h) all obligations secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property owned by such Person, regardless of whether such Person has assumed or become liable for the payment of such obligation and (i) all obligations of others guaranteed by such Person.

"Indemnified Person" has the meaning set forth in Section 8.2.

"Indenture" means that certain Indenture, dated as of June 27, 2014, among the Sanchez Parent, the subsidiary guarantors named therein and U.S. Bank National Association, as trustee, as amended or supplemented on or prior to the date hereof, but without giving effect to any amendment or supplement entered into after the date hereof and regardless of whether the Indenture remains in effect.

“Independent Director” means an individual who (1) has prior experience as an independent director, independent manager or independent member with at least three (3) years of employment experience, (2) is either provided by (x) CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, or Lord Securities Corporation or (y) if none of those companies is then providing professional Independent Directors, a nationally recognized company reasonably approved by the Credit Agreement Agent that provides professional Independent Directors and other corporate services in the ordinary course of its business, and (3) is duly appointed as an Independent Director and is not, and has never been, and will not while serving as Independent Director be, any of the following:

(a) a member, partner, equityholder, manager, director, officer or employee of the Company or the Partnership Group Companies or Affiliates thereof;

(b) a creditor, supplier or service provider (including provider of professional services) to the Company, any Partnership Group Company, the Member or any of their respective equityholders or Affiliates (other than a nationally-recognized company that routinely provides professional Independent Directors and other corporate services to the Company, the Member or any of its Affiliates in the ordinary course of its business);

(c) a family member of any such member, partner, equityholder, manager, director, officer, employee, creditor, supplier or service provider; or

(d) a Person that controls (whether directly, indirectly or otherwise) any of (a), (b) or (c) above.

“Investor Redemption Event” has the meaning set forth in Section 9.5(a).

“Joint Development Agreement” means the Joint Development Agreement, dated as of the Effective Date, among the Partnership, Blackstone Newco and SN Maverick, as it may be amended, modified, supplemented or restated from time to time.

“Joint Properties” means the properties in which Sanchez Parent and its Affiliates (other than, for the avoidance of doubt, the Partnership Group Companies), on the one hand, and any of the Partnership Group Companies, on the other hand, jointly own working interests.

“KNOC Closing” has the meaning set forth in the Securities Purchase Agreement.

“KNOC PSA” has the meaning set forth in the Securities Purchase Agreement.

“Law” means any federal, state and local statute, law (including common law and the Delaware Act), rule, regulation, code, order, ordinance, license, writ, injunction, judgment, award (including awards of any arbitrator) and decree and other legally enforceable requirement enacted, adopted, issued or promulgated by any Governmental Authority.

“Liens” means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or other encumbrance of any kind, or any

conditional sale contract, title retention contract or other contract or agreement to give any of the foregoing.

"Loss" has the meaning set forth in Section 8.2.

"Member" means each Person identified as a holder of Units on Exhibit A hereto as of the date hereof who has executed this Agreement or a counterpart hereof and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"Membership Interest" means a Member's ownership interest in the Company, which may be expressed as one or more Units, including such Member's right to share in distributions, profits and losses and the right, if any, to participate in the management of the business and affairs of the Company, including the right, if any, to vote on, consent to or otherwise participate in any decision or action of or by the Members, the right to designate Directors to the Board, and the right to receive information concerning the business and affairs of the Company, in each case to the extent expressly providing in this Agreement or otherwise required by the Delaware Act.

"Minority Director" has the meaning set forth in Section 5.4(b).

"MSA" means the Management Services Agreement, dated as of the Effective Date, by and between Sanchez Oil and Gas Corporation and the Partnership, as it may be amended, modified, supplemented or restated from time to time.

"NYMEX Pricing" means, as of any date of determination with respect to any month (i) for crude oil, the closing settlement price for the Light, Sweet Crude Oil futures contract for each month, and (ii) for natural gas, the closing settlement price for the Henry Hub Natural Gas futures contract for such month, in each case as published by New York Mercantile Exchange (NYMEX) on its website currently located at www.nymex.com or any successor thereto (as such pricing may be corrected or revised from time to time by the NYMEX in accordance with its rules and regulations).

"Officer" means each Person designated as an officer of the Company pursuant to Section 5.6 for so long as such Person remains an officer pursuant to the provisions of Section 5.6.

"Operating Agreement" has the meaning given to such term in the Joint Development Agreement.

"Operating Committee" has the meaning given to such term in the Joint Development Agreement.

"Original LLC Agreement" has the meaning set forth in the Recitals hereto.

"Participating Sellers" has the meaning set forth in Section 9.5(h).

"Partnership" has the meaning set forth in Section 1.9.

"Partnership Agreement" means the Partnership's Amended and Restated Agreement of Limited Partnership, as it may be amended from time to time.

"Partnership Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period of the Partnership as may be established by the Company. It is understood and agreed that the first Partnership Fiscal Quarter shall be deemed the period of time commencing on the Effective Date and concluding on the date that is the last day of the Fiscal Quarter during which the Effective Date occurs.

"Partnership Fiscal Year" means the calendar year ending on December 31, or such other annual accounting period for the Partnership as may be established by the Company.

"Partnership Group Companies" has the meaning set forth in Section 1.9.

"Partnership Representative" has the meaning set forth in Section 7.1.

"PDP PV-10" means the net present value, discounted at ten percent (10%) per annum, of the future net revenues (using NYMEX forward curve pricing for the next five (5) years as of the date of determination and flat prices from the fifth calendar year thereafter) expected to accrue to the Partnership's collective interest in any Proved Developed Producing Reserves (as defined in the Partnership Agreement) (in each case determined as of the last day of the most recent Partnership Fiscal Year or Partnership Fiscal Quarter for which a reserve report prepared under Section 5.7 of the Partnership Agreement is available) during the remaining expected economic lives of such reserves. Each calculation of such expected future net revenues shall take into account the mark-to-market value of all Hedge Agreement of the Partnership Group Companies relating to the Partnership's production and shall be made as of the date requested in accordance with the then existing standards of the Society of Petroleum Engineers, *provided* that in any event (a) appropriate deductions shall be made for severance and ad valorem taxes, and for operating, gathering, transportation and marketing costs required for the production and sale of such reserves, (b) the pricing assumptions used in determining PDP PV-10 for any particular reserves shall be based upon the Strip Price for the next five (5) years and (c) the cash-flows derived from the pricing assumptions set forth in clause (b) above shall be further adjusted to account for the historical basis differential.

"PDP PV-10 Ratio" means, as of any date of determination, the ratio of (i) PDP PV-10 (determined as of the last day of the most recent Partnership Fiscal Year or Partnership Fiscal Quarter for which a reserve report prepared by an independent reservoir engineering firm is available) to (ii) the sum of the outstanding Indebtedness of the Partnership Group Companies and the Base Preferred Return Amount (as defined in the Partnership Agreement) (disregarding for purposes of this determination clause (ii) in the definition of Base Preferred Return Amount), in each case determined as of the last day of the most recent Partnership Fiscal Year or Partnership Fiscal Quarter (as each are defined in the Partnership Agreement) for which financial statements of the Partnership are available.

"Percentage Interest" means, as of the date of determination (a) with respect to any Member and particular class or series of Unit, that percentage corresponding with the ratio that such Member's relative number of Units within such class or series bears to the total outstanding number of Units of such class or series held by all Members and (b) with respect to any Member and all Units, that percentage corresponding with the ratio that such Member's relative Membership Interests represented by its Units bears to the total Membership Interests of all Members represented by their outstanding Units, in each case, as set forth in Exhibit A.

"Permitted Lien" means (i) Liens for taxes not yet due and payable or which are being actively contested in good faith by appropriate proceedings with appropriate reserves therefor; (ii) mechanics', materialmens', carriers', workmens', warehousemens', repairmens' or landlords' Liens or other like Liens and security obligations that are not delinquent; (iii) matters of record, zoning, building or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, in each case, which do not materially interfere with the ordinary conduct of business of the Company and its Subsidiaries and do not materially detract from the value or use of the property subject thereto, (iv) Liens securing Indebtedness incurred under any Senior Debt, including pursuant to the Credit Agreement or Replacement Credit Agreement or any other Senior Debt Agreement and (v) Liens permitted under any Senior Debt, including the Credit Agreement or Replacement Credit Agreement or any other Senior Debt Agreement or Replacement Credit Agreement.

"Permitted Transferee" means, with respect to any Person, (i) any of such Person's Affiliates (it being understood that in the case of (a) the GSO Investor, such Affiliate must be an entity or fund managed, advised or sub-advised by or Controlled by GSO or its Affiliates, and (b) the Sanchez Investor, such Affiliate must be wholly owned, directly or indirectly, by Sanchez Parent for purposes of being deemed a Permitted Transferee), or (ii) any transferee in connection with an Exit Transaction.

"Person" means an individual or a corporation, partnership, limited liability company, trust, estate, unincorporated organization, association, "group" (as such term is defined in Section 13(d) of the Exchange Act) or other entity.

"Preferred Unit Closings" has the meaning set forth in the Securities Purchase Agreement.

"Preferred Units" has the meaning given to such term in the Partnership Agreement.

"Proceeding" has the meaning set forth in Section 8.2.

"Quarterly Distribution Amount" has the meaning given to such term in the Partnership Agreement.

"Redemption Non-Payment" has the meaning given to such term in the Partnership Agreement.

"Renounced Business Opportunity" has the meaning set forth in Section 5.10(d).

"Replacement Credit Agreement" means a credit agreement that provides for revolving loans to the Partnership and is established among the Partnership and one or more commercial banks and other commercial lenders in replacement of the current Credit Agreement, which credit agreement shall be on terms and conditions that are generally considered market for a company similarly situated to the Partnership and that, in the aggregate, are at least as favorable to the Partnership as the Credit Agreement; *provided* that the financial covenants, voluntary prepayments, mandatory prepayments, and provisions relating to events of default, interest costs (including upfront lender fees and discounts), call protection or costs associated with voluntary or mandatory repayment, and restricted payments (including restrictions on Distributions) shall each be at least as favorable to the Partnership as the Credit Agreement; *provided, further,* that such credit agreement shall in no way limit or restrict the payment of distributions or redemption of the Preferred Units other than as permitted by the terms of the Partnership Agreement as in effect on the Effective Date.

"Sale Transaction" has the meaning given to such term in the Joint Development Agreement.

"Sanchez Director" has the meaning set forth in Section 5.3(a)(i).

"Sanchez Group" means the Sanchez Parent and its Affiliates, Sanchez Investor, SPP, Sanchez Oil & Gas Corporation, Blackstone Newco, and any Person Controlled by any one or more of the foregoing (other than the Company, the Partnership and their respective Subsidiaries).

"Sanchez Investor" has the meaning set forth in the preamble to this Agreement.

"Sanchez Letter Agreement" means that certain Letter Agreement between SN Maverick, Sanchez Parent and the Partnership, dated as of the Effective Date.

"Sanchez Parent" means Sanchez Energy Corporation, a Delaware corporation.

"Sanchez Vehicle" means SN Maverick or Sanchez Parent or any of its Affiliates (other than the Company or its Subsidiaries or any Partnership Group Company) that holds title to any of the properties acquired by SN Maverick at the "Closing" (as defined in the APC/KM PSA) pursuant to the APC/KM PSA or any Joint Properties.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Purchase Agreement" has the meaning set forth in the Recitals hereto.

"Senior Debt" means credit or other debt facilities or issuances, including, but not limited to, the credit facility provided pursuant to the Credit Agreement.

"Senior Debt Agreements" means the Credit Agreement and any other credit agreement, note purchase agreement, indenture or other agreements evidencing Senior Debt, collectively, and any documents related thereto.

"Separate Closing" has the meaning set forth in the Securities Purchase Agreement.

"SN Maverick" means SN EF Maverick, LLC, a Delaware limited liability company.

"Special Approval" has the meaning set forth in Section 5.7(b).

"SPP" means Sanchez Production Partners LP, a Delaware limited partnership.

"Springfield Gathering Agreements" means (i) the Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of January 1, 2016, between Springfield Pipeline LLC, a Texas limited liability company ("Springfield"), and Anadarko Onshore (as defined in the Securities Purchase Agreement) and (ii) the Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of January 1, 2016, between Springfield and Anadarko Onshore, of which, to the extent related to the properties acquired by SN Maverick and the Partnership at the Anadarko Closing or Dual Closing, as applicable, the rights and obligations of Anadarko Onshore with respect to operations from and after such Anadarko Closing or Dual Closing, as applicable, will be assigned by Anadarko Onshore to Sanchez Parent.

"Strip Price" means, at any time, (i) for the remainder of the current calendar year, the average NYMEX Pricing for the remaining contracts in the current calendar year, (ii) for each of the succeeding three (3) complete calendar years, the average NYMEX Pricing for the twelve (12) months in each such calendar year, and (iii) for the succeeding fourth complete calendar year, and for each calendar year thereafter, the average NYMEX Pricing for the twelve (12) months in such fourth calendar year.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of limited liability, partnership or other similar ownership interests thereof with voting rights at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or Control, directly or indirectly, the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity.

"Substitute Member" means any Transferee that has been admitted as a Member of the Company pursuant to Section 9.7(c) by virtue of such Transferee receiving all or a portion of a Member's Units from a Member.

"Tag Right" has the meaning given to such term in the APC/KM PSA.

"Tag Right Interests" has the meaning given to such term in the APC/KM PSA.

"Tax Matters Member" has the meaning set forth in Section 7.1.

"Test Level" means (i) for any quarter in 2017, 1.0x, (ii) for any quarter in 2018, 1.10x, (iii) for any quarter in the period commencing January 1, 2019 and ending December 31, 2021, 1.25x, and (iv) for any quarter in the period commencing January 1, 2022 and ending December 31, 2023, 1.40x.

"Transfer" means any direct or indirect sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, gift, grant of a security interest or other direct or indirect disposition or encumbrance (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof, including derivative or similar transactions or arrangements whereby a portion or all of the Economic Interest in, or risk of loss or opportunity for gain with respect to, Units is transferred or shifted to another Person; *provided* that any indirect transfer of Equity Interests in Sanchez Parent that does not result in a Change of Control shall not be deemed a "Transfer" for purposes of this Agreement.

"Transferee" means a Person that acquires all or any portion of a Member's Units as a result of a Transfer.

"Transferor" means a Person that Transfers all or any portion of such Person's Units as a result of a Transfer.

"Unit" means a limited liability company Equity Interest in the Company comprising a Member's Membership Interest in the Company and designated as a Class A Unit, Class B Unit or any other class of Units designated by the Board.

"UnSub Representative" has the meaning given to such term in the Joint Development Agreement.

11.2 Construction. Whenever the context requires, (a) the gender of all words used in this Agreement includes the masculine, feminine, and neuter and (b) terms "hereof," "herein," "hereby" and derivative or similar words refer to this Agreement, and such words do not refer to the Delaware Act or any particular section, clause or provision of this Agreement. All references to a Person include such Person's successors and permitted assigns. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits are to exhibits attached hereto, each of which is made a part hereof for all purposes. The use herein of the word "include" or "including," when following any general statement, term or matter, will not be construed to limit such statement, term or matter to the specific items or matters set forth following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather will be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The term "or" is not exclusive. The definitions set forth or referred to in Section 11.1 will apply equally to both the singular and plural forms of the terms defined and derivative forms of defined terms will have correlative meanings. Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such

provision will be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person. All accounting terms used herein and not otherwise defined herein will have the meanings accorded them in accordance with GAAP and, except as expressly provided herein, all accounting determinations will be made in accordance with GAAP. The parties acknowledge that this Agreement has been negotiated by such parties with the benefit of counsel and, accordingly, any principle of law that provides that any ambiguity in a contract or agreement shall be construed against the party that drafted such contract or agreement shall be disregarded and is expressly waived by all of the parties hereto.

## ARTICLE XII
## MISCELLANEOUS

12.1 Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by (a) depositing such writing with a reputable overnight courier for next day delivery, (b) depositing such writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or (c) delivering such writing to the recipient in person, by courier or by electronic mail transmission; and a notice, request or consent given under this Agreement is effective upon receipt against the Person who receives it. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on Exhibit A, or such other address as that Member may specify by notice to the other Members. Any notice, request or consent to the Company or the Board must be given to the Board or, if appointed, the secretary of the Company at the Company's chief executive offices. Whenever any notice is required to be given by Law or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

12.2 Confidential Information. Each Member recognizes and acknowledges that it has received and may in the future receive certain confidential and proprietary information and trade secrets of Sanchez Parent and its Subsidiaries, the Company and its Subsidiaries, the Partnership Group Companies and the Members (including their respective predecessors) (the "Confidential Information"). Except as otherwise consented to by the Company in writing, each Member agrees that it will not, during or after the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, use any Confidential Information for any purposes other than in connection with its investment in the Company or disclose any Confidential Information for any reason or purpose whatsoever, except for disclosures: (i) to authorized directors, managers, officers, representatives, agents and employees of such Member or its Affiliates (other than portfolio companies of the GSO Investor), the Company, its Subsidiaries or the Partnership Group Companies and as otherwise may be proper in the course of performing such Member's obligations, or enforcing such Member's rights, under this Agreement and the agreements expressly contemplated hereby, *provided*, that each such Person is informed of the confidential nature of such Confidential Information, agrees to hold such Confidential Information confidential and that the disclosing Member remains liable for any breach of this provision by such Persons; (ii) made to the limited partners, owners, co-investors, and prospective investors in funds managed, advised or sub-advised by the Class B Member or its Affiliates; *provided* that if such limited partners, owners, co-investors, and prospective investors are receiving Confidential Information (other than with respect to high-level summary information regarding the operations of the Company, any of its Subsidiaries or any of the Partnership Group Companies (*e.g.*, total production volumes, total revenues, etc.)), such receiving Person shall be subject to confidentiality obligations to the GSO Investor or its Affiliates; (iii) to any bona fide prospective purchaser of the equity or assets of the Company, any of its Subsidiaries, any of the Partnership Group Companies or their respective Affiliates or the Units held by such Member, to prospective financing sources, or a prospective merger partner of such Member, the Company, its Subsidiaries, the Partnership

Group Companies or any of their respective Affiliates and, except in connection with transactions contemplated under Section 9.5 and except as may be precluded by contractual restrictions on disclosure, following prior written notice of such disclosure to the Company or the Partnership, *provided*, that such purchaser, financing sources, or merger partner agrees in writing to be bound by the provisions of this Section 12.2 or other confidentiality agreement that includes confidentiality and use provisions at least as restrictive as the provisions herein; (iv) to attorneys, accountants and other professionals of such Member or its Affiliates; (v) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation or in connection with any disclosure to regulatory or Governmental Authority that regulates the Class B Member, *provided*, that the Member shall provide to the Company prompt notice of any such requirement to enable the Company to seek an appropriate protective order or confidential treatment (except no such opportunity shall be afforded in the case of any law, rule or regulation or a routine audit or examination by, or a blanket document request from, a governmental or regulatory entity that does not reference the Company or this Agreement or if notifying the Company in advance of such disclosure is prohibited by applicable law) and shall disclose only that portion of such Confidential Information so required to be disclosed and (vi) by Sanchez Parent in connection with any publicly filed reports to the extent (A) relating to the Partnership Group Companies' operations and assets and (B) the disclosure of such information is required by applicable law or regulation to be included therein. For purposes of this Section 12.2, the term "Confidential Information" shall not include any information that (x) a Person learns from a source other than the Company, its Subsidiaries or the Partnership Group Companies, or any of their respective representatives, employees, agents or other service providers, (y) is disclosed to the public or is available in the public domain or (z) was in a Person's possession prior to disclosure hereunder; *provided* such information is not known by such Person to be subject to an obligation of confidentiality owed to the other Members. Furthermore, the Members understand that Members and their representatives who have access to the Confidential Information may retain mental impressions of some aspects of the Confidential Information and the Members agree that neither the Members nor any of their representatives shall have any liability hereunder for use of such mental impressions in evaluating other business opportunities, except as otherwise expressly provided in this Agreement or any ancillary agreement thereto.

12.3 Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein are intended by the Members as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Members acknowledges and agrees that in executing this Agreement (i) the intent of the parties in this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 12.3 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Members stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 12.3.

12.4 Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations hereunder or with

012179

respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person hereunder or with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default hereunder or with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

12.5 Amendment or Modification. Except for amendments authorized by Section 2.1, this Agreement and any provision hereof may be amended, waived (except as otherwise provided herein), or modified from time to time only by a unanimous written instrument signed by the Members; *provided* any modifications, amendments or waivers (including by any restatement or supplements) (a) effecting the obligations to appoint, and the rights of, an Independent Director, including without limitation under Sections 5.3(a)(i), 5.3(c), 5.3(e), 5.4(b) and 5.7(c) that adversely affect the Lenders (as defined in the Credit Agreement) under the Credit Agreement, (b) to the definitions of "Independent Director" and "Cause", and (c) to Sections 5.13, 12.5 and 12.6 shall require the prior written consent of the Credit Agreement Agent, and the Credit Agreement Agent shall be a third party beneficiary hereunder to enforce such provisions.

12.6 Binding Effect. Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and permitted assigns and all other Persons hereafter holding, having or receiving an interest in the Company, whether as Transferees, Substitute Members or otherwise. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than the Credit Agreement Agent for the matters described in Section 12.5.

12.7 Consent to Jurisdiction; Waiver of Trial by Jury.

(a) Each Member and the Company irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court of Chancery of the State of Delaware, and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement or the agreements delivered in connection herewith or the transactions contemplated hereby or thereby or for recognition or enforcement of any judgment relating thereto, and each of the parties hereby irrevocably and unconditionally (i) agrees not to commence any such action or proceeding except in such courts, (ii) agrees that any claim in respect of any such action or proceeding may be heard and determined in the Court of Chancery of the State of Delaware, (iii) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in the Court of Chancery of the State of Delaware, and (iv) waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in the Court of Chancery of the State of Delaware. Each Member and the Company agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Member and the Company irrevocably consents to service of process in the manner provided for notices in Section 12.1. Nothing in this Agreement will affect the right of any Member or the Company to serve process in any other manner permitted by applicable law.

(b) EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO

INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.8 Governing Law. This Agreement shall be construed in accordance with and governed by the internal laws of the State of Delaware, without regard to the principles of conflicts of law (whether of the State of Delaware or otherwise) that would result in the application of the laws of any other jurisdiction. In the event of a direct conflict between the provisions of this Agreement and any provision of the Delaware Certificate or any mandatory provision of the Delaware Act, the applicable provision of the Delaware Certificate or the Delaware Act shall control.

12.9 Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

12.10 Waiver of Certain Rights. Each Member irrevocably waives any right it may have to demand any distributions or withdrawal of property from the Company except as provided herein or to maintain any action for dissolution (whether pursuant to Section 18-802 of the Delaware Act or otherwise) of the Company or for partition of the property of the Company and confirms that such waivers are a material term of this Agreement.

12.11 Notice to Members of Provisions. By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions hereof (including, without limitation, the restrictions on the transfer set forth in Article IX) and (b) all of the provisions of the Delaware Certificate.

12.12 Counterparts. This Agreement may be executed in multiple counterparts, any of which may be delivered via facsimile or PDF, with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

12.13 Headings. The headings used in this Agreement are for the purpose of reference only and will not otherwise affect the meaning or interpretation of any provision of this Agreement.

12.14 Remedies. The Company and the Members shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement (including costs of enforcement) and to exercise any and all other rights existing in their favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the Company or any Member may in its or his sole discretion apply to any court of law or equity of competent jurisdiction for specific performance or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation or threatened violation of the provisions of this Agreement.

12.15 Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction,

but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

12.16 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Member may be a partnership or limited liability company, each Member hereto, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Members shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Member (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any Member (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member (or, in each case, any financing source for any of the foregoing) of any of the foregoing, but in each case not including the Members, whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such party against such Persons, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any such Persons, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith or in connection or contemplation hereof, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

[*Separate Signature Page Attached*]

IN WITNESS WHEREOF, the Company and the Members have executed this Agreement as of the Effective Date.

**COMPANY:**

**SN EF UNSUB GP, LLC**

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Chief Executive Officer

**MEMBERS:**

**SN UR HOLDINGS, LLC**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**GSO ST HOLDINGS ASSOCIATES LLC**

By: /s/ Marisa Beeney
Name: Marisa Beeney
Title: Authorized Signatory

Exhibit A

Members, Capital Contributions and Units Held

| Member | Capital Contribution | Capital Account Balance | Units | Percentage Interest |
|---|---|---|---|---|
| **Sanchez Investor** | $990 | $990 | 99 Class A Units | 99% |
| **GSO Investor** | $10 | $10 | 1 Class B Units | 1% |
| **Total** | $1,000 | $1,000 | 100 Units | 100% |

Members' Address for Notices

**Sanchez Investor**

c/o Sanchez Energy Corporation
SN UR Holdings, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

**With a copy to (which shall not constitute notice):**

Kirkland & Ellis LLP
600 Travis, Suite 3300
Houston, TX 77002
Attn: John D. Pitts
Email: john.pitts@kirkland.com

**GSO Investor**

GSO ST Holdings Associates LLC
c/o GSO Capital Partners
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Email: Robert.horn@gsocap.com

**With a copy to:**

c/o GSO Capital Partners
345 Park Avenue, 31st Floor
New York, NY 10154
Email: GSO Legal@gsocap.com
GSOValuationsGroup@gsocap.com

**With a copy to (which shall not constitute notice):**

Andrews Kurth Kenyon LLP
600 Travis Street, Suite 4200
Houston, TX 77002
Attn: G. Michael O'Leary
Jon W. Daly
Email: moleary@andrewskurth.com
jondaly@andrewskurth.com

| | |
|---|---|
| **The Company** | SN EF UnSub GP, LLC<br>1000 Main Street, Suite 3000<br>Houston, TX 77002<br>Attention: Gregory Kopel<br>Email: gkopel@sanchezog.com |
| | **With copies to:** |
| | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, TX 77002<br>Attention: Gregory Kopel<br>Email: gkopel@sanchezog.com |
| | and |
| | GSO ST Holdings Associates LLC<br>c/o GSO Capital Partners<br>1111 Bagby Street, Suite 2050<br>Houston, TX 77002<br>Attention: Robert Horn<br>Email: Robert.horn@gsocap.com |

Case 4:23-cv-00055 Document 8-3 Filed on 01/04/23 in TXSD Page 40 of 250

Exhibit B

Board Designations

**Sanchez Directors**:

Patricio D. Sanchez
Cameron W. George
Daniel Furbee

**GSO Directors**:

Robert Horn
Anthony Borreca

Exhibit C

Officers

President and Chief Executive Officer: Patricio D. Sanchez

Chief Financial Officer and Treasurer: Cameron W. George

Chief Operating Officer: Daniel Furbee

Secretary: Alfredo Gutierrez

Exhibit D

<u>Approved Successor Independent Auditors and Independent Reservoir Engineers</u>

Approved Independent Auditors

1. Pricewaterhouse Coopers, LLP
2. Deloitte LLP
3. Ernst & Young Global Limited

Approved Independent Reservoir Engineers

4. DeGolyer & MacNaughton
5. Netherland Sewell & Associates
6. Cawley, Gillespie & Associates

Exhibit E

Form of Purchase Agreement

(Attached.)

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (this "***Agreement***"), is entered into on [●] (the "***Closing Date***") by and between SN EF UnSub, LP, a Delaware limited partnership (the "***Partnership***") and GSO ST Holdings LP, a Delaware limited partnership ("***Preferred Unit Purchaser***"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in accordance with Article I.

**R E C I T A L S:**

WHEREAS, on **[●]**, 2017, the Partnership, Sanchez Energy Corporation, SN EF UnSub GP, LLC ("***General Partner***"), SN EF UnSub, LP, SN EF UnSub Holdings LLC, GSO ST Associates LLC and the Preferred Unit Purchaser entered into that certain Securities Purchase Agreement (the "***Original SPA***");

WHEREAS, pursuant to Section 3.1(c)(ii) of the Partnership Agreement or Section 5.8 of the GP LLC Agreement, upon the occurrence of certain events, then each of the Preferred Unit Purchaser and the Class B Member, respectively, may elect in its sole discretion to cause the Partnership to issue additional Preferred Units to Preferred Unit Purchaser;

WHEREAS, the the Preferred Unit Purchaser and the Class B Member have delivered an Additional Preferred Units Notice (as defined in the Partnership Agreement and GP LLC Agreement) to the Partnership and General Partner on [●], whereby the Preferred Unit Purchaser and Class B Member have elected to cause the Partnership to sell [●] Preferred Units to the Preferred Unit Purchaser; and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Closing, the Partnership will issue to the Preferred Unit Purchaser [●] newly issued Preferred Units in consideration for a contribution to the Partnership by the Preferred Unit Purchaser of $[●][1].

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 Definitions. As used in this Agreement, the following terms have the meanings indicated:

"***Affiliate***" of any Person means any other Person, directly or indirectly, Controlling, Controlled by or under common Control with such particular Person. For purposes of this Agreement, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an "Affiliate" of GSO or its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., but any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates within the credit-related businesses of The Blackstone Group L.P.shall constitute an Affiliate of GSO, and (ii) none of GSO or its Affiliates or any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates shall constitute an Affiliate of the Partnership or the General Partner.

[1] Note to Draft: To equal agreed Preferred Unit Purchase Price as of closing.

"***Agreement***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Business Day***" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in Houston, Texas.

"***Class B Member***" has the meaning set forth in the GP LLC Agreement.

"***Closing***" means the issuance and sale of the Preferred Units to the Preferred Unit Purchaser in consideration for $[●] in accordance with Section 2.01.

"***Closing Date***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Commission***" means the United States Securities and Exchange Commission.

"***Common Units***" means "Common Units", as defined in the Partnership Agreement.

"***Contract***" means any contract, agreement, indenture, note, bond, mortgage, deed of trust, loan, instrument, lease, license, commitment or other arrangement, understanding, undertaking, commitment or obligation, whether written or oral.

"***Control***" has the meaning set forth in the Partnership Agreement.

"***DRULPA***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C §17-101 et seq. as amended from time to time and any successor to DRULPA.

"***Equity Interests***" means (i) equity interests (including capital stock, membership interests and partnership interests) of any applicable Person, (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into equity interests, and (iii) warrants, options or other rights to purchase or otherwise acquire or receive equity interests.

"***GAAP***" means generally accepted accounting principles in the United States.

"***General Partner***" has the meaning set forth in the recitals.

"***Governmental Authority***" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"***GP LLC Agreement***" means the Amended and Restated Limited Liability Company Operating Agreement of the General Partner, dated as of [●], as amended from time to time.

"***GSO***" means GSO Capital Partners LP, a Delaware limited partnership.

"***Hydrocarbon Marketing Agreement***" has the meaning set forth in the Partnership Agreement.

"***Indebtedness***" has the meaning set forth in the Partnership Agreement.

"***Joint Development Agreement***" has the meaning set forth in the Partnership Agreement.

"***Knowledge of Partnership***" means the actual knowledge, after due inquiry, of the current duly appointed officers of the General Partner.

"***Law***" means any federal, state, local or foreign order, writ, injunction, judgment, settlement, award, decree, statute, law (including common law), rule or regulation.

"***Lien***" means any mortgage, claim, encumbrance, pledge, lien (statutory or otherwise), security agreement, conditional sale or trust receipt or a lease, consignment or bailment, preference or priority, assessment, deed of trust, charge, easement, servitude or other encumbrance upon or with respect to any property of any kind.

"***Material Agreement***" means the Partnership Agreement, the GP LLC Agreement, any Senior Debt Agreement or Replacement Credit Agreement (as applicable), the Joint Development Agreement, the MSA and the Hydrocarbon Marketing Agreement.[2]

"***MSA***" has the meaning set forth in the Partnership Agreement.

"***Original SPA***" has the meaning set forth in the recitals.

"***Partnership***" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"***Partnership Agreement***" means the Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of [●], as amended from time to time.

"***Permits***" means any approvals, authorizations, consents, licenses, permits, variances, waivers, grants, franchises, concessions, exemptions, orders, registrations or certificates of a Governmental Authority.

"***Person***" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Authority.

"***Preferred Unit Purchaser***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Preferred Units***" means "Preferred Units", as defined in the Partnership Agreement.

"***Purchased Preferred Units***" means those Preferred Units issued pursuant to Section 2.01.

"***Replacement Credit Agreement***" has the meaning set forth in the Partnership Agreement.

"***Securities Act***" means the Securities Act of 1933, as amended from time to time, and the rules and regulations of the Commission promulgated thereunder.

"***Senior Debt Agreement***" has the meaning set forth in the Partnership Agreement.

"***Subsidiary***" has the meaning set forth in the Partnership Agreement.

[2] Note to Form: To revise so that at the time of execution, this definition includes agreements of similar materiality to those listed.

**ARTICLE II**
**AGREEMENT TO SELL AND PURCHASE**

Section 2.01 Contribution and Issuance. At the Closing, on the terms set forth in this Agreement, the Preferred Unit Purchaser shall contribute and fund to the Partnership by wire transfer of immediately available funds an amount equal to $[●] in consideration for the issuance by the Partnership to the Preferred Unit Purchaser of [●] Preferred Units. The Partnership shall use the proceeds from such contribution solely to repay outstanding Indebtedness of any of the Partnership and its Subsidiaries under the Senior Debt Agreements or any other agreements governing any material Indebtedness of the Partnership or any of its Subsidiaries (including a Replacement Credit Agreement) so as to remedy the applicable condition(s) that gave rise to event giving the Preferred Unit Purchaser and Class B Member the right to elect to purchase the Preferred Units hereunder.

Section 2.02 Closing. On the terms and subject to the conditions hereof, the consummation of the funding of $[●] by the Preferred Unit Purchaser shall take place on the Closing Date at the offices of Kirkland and Ellis LLP located at 600 Travis Street, Suite 3300, Houston, Texas 77002.

Section 2.03 Further Assurances. From time to time after the Closing Date, without further consideration, each of Partnership and the Preferred Unit Purchaser shall use its reasonable best efforts to take, or cause to be taken, all actions necessary or appropriate to consummate the transactions contemplated by this Agreement.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**
**RELATED TO THE PARTNERSHIP**

As of the Closing, the Partnership represents and warrants to the Preferred Unit Purchaser as follows:[3]

Section 3.01 Existence and Power. The Partnership has been duly formed and is validly existing as a limited partnership under the Laws of the jurisdiction of the State of Delaware, has the full limited partnership power and authority to own or lease its properties and assets and to conduct its business, and is duly registered or qualified as a foreign limited partnership, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on the Partnership. All limited partnership action required to be taken by the Partnership for the execution and delivery by the Partnership of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly taken. The Partnership has all requisite power and authority to issue, sell and deliver the [●] Preferred Units to be issued to the Preferred Unit Purchaser.

[3] Note to Form: Disclosure schedules to be added/removed at the time of the transaction in the sole discretion of the Partnership.

Section 3.02 Authority; Enforceability. This Agreement has been duly and validly authorized and executed by the Partnership and constitutes the legal, valid and binding obligations of the Partnership, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 3.03 Capitalization; Issuance of Units.

(a) As of the Closing Date, the Partnership's authorized Equity Interests consist solely of those interests set forth on Schedule 3.03(a), which such interests have been duly authorized and validly issued in accordance with the governing documents of the Partnership and applicable Law.

(b) Immediately following the Closing, the outstanding Equity Interests of the Partnership shall consist of those interests set forth on Schedule 3.03(b). The Purchased Preferred Units have been duly authorized and validly issued in accordance with the Partnership Agreement and applicable Law, free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the Partnership Agreement or under applicable state and federal securities Laws, fully paid and the Preferred Units will be non-assessable (except as such non-assessability may be affected by Sections 17-303, 17-607 and 17-804 of DRULPA).

(c) Except as set forth in this Agreement, the Partnership Agreement and the GP LLC Agreement, (i) there are no Persons entitled to preemptive, statutory or other similar contractual rights to subscribe for any general partner interest of the Partnership, Common Units, Preferred Units or any other Equity Interests of the Partnership and (ii) there are no options, warrants or other rights to purchase, agreements or other obligations to issue, or rights to convert any obligations into or exchange any securities for, membership interest, general partner interest, limited partner interest or any other ownership interests in the Partnership.

Section 3.04 Subsidiaries(a) of the General Partner and the Partnership. Except as set forth on Schedule 3.04, the Partnership does not have any Subsidiaries and does not own, directly or indirectly, any Equity Interests in any other Person.

Section 3.05 Litigation. As of the Closing Date, there are no legal or governmental proceedings pending to which the Partnership is a party or to which any property or asset of the Partnership is subject or which challenges the validity of this Agreement or the Partnership Agreement or the right of the Partnership to enter into this Agreement or to consummate the transactions contemplated hereby and, to the Knowledge of Partnership, no such proceedings are threatened by any Governmental Authorities or others.

Section 3.06 No Conflicts. None of (a) the offering, issuance and sale by the Partnership of the Preferred Units and the application of the proceeds therefrom, (b) the execution, delivery and performance by the Partnership of this Agreement, or (c) the consummation of the transactions contemplated hereby (i) constitutes or will constitute a violation of the other organizational documents of the Partnership, (ii) constitutes or will constitute a breach or violation of, or a default (or an event which, with notice or lapse of time or both, would constitute such a default) under, any Contract to which the Partnership is a party or by which it or any of its properties may be bound or (iii) violates or will violate any statute, Law, Permit or regulation or any order, judgment, decree or injunction of any court or Governmental Authority or body having jurisdiction over the Partnership or any of its properties in a proceeding to which it or its property is or was a party, except, in cases of clauses (ii) and (iii) above, for any such conflict, breach, violation or default that would not, individually or in the aggregate, have a material adverse effect on the Partnership.

Section 3.07 Approvals. Except as set forth on Schedule 3.07, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with (a) the execution, delivery or performance by any of the Partnership of this Agreement or (b) the Partnership's issuance at the Closing of the [●] Preferred Units issued to the Preferred Unit Purchaser.

Section 3.08 Investment Company Status

The Partnership is not, and upon the application of the net proceeds therefrom, will not be, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC promulgated thereunder.

Section 3.09 No Registration Required

Assuming the accuracy of the representations and warranties of the Purchasers contained in this Agreement and their compliance with the agreements set forth in this Agreement, the sale and issuance at the Closing of the Preferred Units pursuant to this Agreement is exempt from the registration requirements of the Securities Act, and neither the Partnership nor, to the Knowledge of Partnership, any authorized representative acting on behalf of the Partnership has taken or will take any action hereafter that would cause the loss of such exemption.

Section 3.10 Certain Fees. Except as set forth on Schedule 3.10, no fees or commissions are or will be payable by the Partnership, and the Preferred Unit Purchaser and its Affiliates shall not be subject to any liability or other obligation with respect, to brokers, finders or investment bankers in connection with or relating to the issuance of the the Preferred Units upon the consummation of the transactions contemplated by this Agreement.

Section 3.11 No Integration

The Partnership has not, directly or indirectly through any representative, made any offers or sales of any security or solicited any offers to buy any security that is or will be integrated with the issuance and sale of the Preferred Units in a manner that would require the offer and sale of any Preferred Units to be registered under the Securities Act.

Section 3.12 Material Agreements. Except as set forth on Schedule 3.12, (a) no Partnership Group Company is in material breach of, or material default under, any Material Agreement and (b) no event has occurred which, with the delivery of notice or the lapse of time or both, would result in a Partnership Group Company being in material breach of, or material default under, any Material Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PREFERRED UNIT PURCHASER

As of the Closing Date, the Preferred Unit Purchaser represents and warrants to the Partnership as follows:

Section 4.01 Existence. The Preferred Unit Purchaser is duly organized and validly existing as a limited partnership and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

Section 4.02 Authorization, Enforceability. The Preferred Unit Purchaser has all necessary legal power and authority to enter into, deliver and perform its obligations under this Agreement. The execution, delivery and performance by the Preferred Unit Purchaser of this Agreement and the consummation by it of the transactions contemplated hereby have been duly and validly authorized by all necessary legal action of the Preferred Unit Purchaser, and no further consent or authorization of the Preferred Unit Purchaser is required. This Agreement constitutes a legal, valid and binding obligation of the Preferred Unit Purchaser; except as, the enforceability hereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity and except as the rights to indemnification may be limited by applicable Law (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.03 No Breach. None of the execution, delivery or performance by the Preferred Unit Purchaser of this Agreement and the consummation by the Preferred Unit Purchaser of the transactions contemplated hereby will (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any material agreement to which the Preferred Unit Purchaser is a party or by which the Preferred Unit Purchaser is bound or to which any of the property or assets of the Preferred Unit Purchaser is subject, (b) conflict with or result in any violation of the provisions of the organizational documents of the Preferred Unit Purchaser, or (c) violate any statute, order, rule or regulation of any court or Governmental Authority or body having jurisdiction over the Preferred Unit Purchaser or the property or assets of the Preferred Unit Purchaser, except in the case of clauses (a) and (c), for such conflicts, breaches, violations or defaults as would not prevent the consummation of the transactions contemplated by this Agreement.

Section 4.04 Approvals. Except as set forth on Schedule 4.04, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with the execution, delivery or performance by the Preferred Unit Purchaser of this Agreement.

Section 4.05 Certain Fees. No fees or commissions are or will be payable by the Preferred Unit Purchaser to brokers, finders or investment bankers with respect to the purchase of the Purchased Preferred Units or the consummation of the transactions contemplated by this Agreement, in each case, for which the Partnership may be liable.

Section 4.06 Restricted Securities. Except for possible permitted transfers subject to the terms of the Partnership Agreement, the Preferred Unit Purchaser is acquiring the Purchased Preferred Units for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable securities Laws. The Preferred Unit Purchaser has such knowledge, sophistication and experience in financial and business matters so as to be capable of evaluating the merits and risks of its proposed investment in the Purchased Preferred Units and is capable of bearing the economic risk of such investment. The Preferred Unit Purchaser is an "accredited investor" as that term is defined in Rule 501 of Regulation D (without regard to Rule 501(a)(4)) promulgated under the Securities Act. The Preferred Unit Purchaser acknowledges and understands that its acquisition of the Purchased Preferred Units has not been registered under the Securities Act in each case in reliance on an exemption therefrom and that the Partnership is relying upon the truth and accuracy of the Preferred Unit Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Preferred Unit Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Preferred Unit Purchaser to acquire the Purchased Preferred Units and the Purchased Preferred Units will, upon such acquisition, be characterized as "restricted securities" under state and federal securities Laws. The Preferred Unit Purchaser further acknowledge and understand that (x) the Purchased Preferred Units may not be sold, transferred, offered for sale, pledged,

hypothecated or otherwise disposed of except pursuant to an effective registration statement under the Securities Act or pursuant to an available exemption from the registration requirements of the Securities Act, and in compliance with other applicable state and federal securities Laws and (y) when issued at the Closing, the Purchased Preferred Units will bear a legend substantially as set forth below:

> "These securities have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any state or other jurisdiction. These securities may not be sold or offered for sale, pledged or hypothecated except pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from registration thereunder, in each case in accordance with all applicable securities laws of the states or other jurisdictions, and in the case of a transaction exempt from registration, such securities may only be transferred if the transfer agent for such securities has receive documentation satisfactory to it that such transaction does not require registration under the Securities Act."

## ARTICLE V
## MISCELLANEOUS

Section 5.01 No Liability. The representations and warranties set forth in Articles III and IV shall terminate as of the Closing. Both the Preferred Unit Purchaser and the Partnership hereby expressly acknowledge and agree that from and after the Closing, neither the Preferred Unit Purchaser nor the Partnership shall be liable for any inaccuracy or any breach of any representation made therein.

Section 5.02 Interpretation. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause," and words of similar import, refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to the lawful currency of the United States of America. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the Closing Date. Unless expressly provided to the contrary, the word "or" is not exclusive. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Appendices, Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes. Reference herein to any federal, state, local or foreign Law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "day" or "days" shall mean calendar day, unless denoted as a Business Day. The words "will" and "will not" are expressions of command and not merely expressions of future intent or expectation. When used in this Agreement, the word "either" shall be deemed to mean "one or the other", not "both". Unless otherwise noted, references herein to a "party" are references to the applicable party to this Agreement.

Section 5.03 Amendments and Waivers.

(a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party, or in

the case of a waiver, by the party against whom the waiver is to be effective.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided will be cumulative and not exclusive of any rights or remedies hereunder or at law or in equity; accordingly, no exercise of any right or remedy shall be construed as an election of remedies by any party.

Section 5.04 Binding Effect. This Agreement shall be binding upon the parties and their respective successors and permitted assigns, and shall remain in full force and effect after the Closing. Except as expressly provided in this Agreement, this Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and permitted assigns.

Section 5.05 Communications. All notices and demands provided for hereunder shall be in writing and shall be given by registered or certified mail, return receipt requested, telecopy, air courier guaranteeing overnight delivery or personal delivery to the following addresses

(a) If to the Preferred Unit Purchaser:

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

with a copy to (which shall not constitute notice):

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

(b) If to the Partnership:

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

with a copy to (which shall not constitute notice):

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

or to such other address as the parties hereto may designate in writing. All notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; upon actual receipt if sent by certified or registered mail, return receipt requested, or regular mail, if mailed; upon actual receipt of the overnight courier copy, upon confirmation of receipt if sent via email; and upon actual receipt when delivered to an air courier guaranteeing overnight delivery.

Section 5.06 Entire Agreement. This Agreement constitutes the entire agreement among the parties and supersedes any prior understandings, negotiations, agreements or representations among the parties or any of their respective affiliates of any nature, whether written or oral, to the extent they relate in any way to the transactions contemplated hereby or thereby.

Section 5.07 Governing Law; Submission to Jurisdiction. This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement), will be construed in accordance with and governed by the laws of the State of Delaware without regard to principles of conflicts of laws. Any action against any party relating to the foregoing shall be brought in any federal or state court of competent jurisdiction located within the State of Delaware, and the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within the State of Delaware over any such action. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

Section 5.08 Waiver of Jury Trial. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, AND AGREES TO CAUSE ITS AFFILIATES TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 5.09 Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same agreement.

Section 5.10 Successors and Assigns. The provisions of this Agreement will be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns. No party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement (including any transfer by way of merger or operation of law) without the consent of the other party, and any such purported assignment in violation of this Section 5.10 shall be void *ab initio*. Notwithstanding the foregoing, the Preferred Unit Purchaser may assign its rights and obligations under this Agreement without

the prior approval of the other party to this Agreement to any fund or account managed, advised or sub-advised by GSO or any of its Affiliates; provided that any such assignment shall not relieve the Preferred Unit Purchaser of any of its obligations hereunder.

Section 5.11 Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal or unenforceable provision.

Section 5.12 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any party may be a partnership or limited liability company, each party hereto, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that, no Persons other than the parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any party (or any of their successors or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the parties, whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such party against such persons and entities, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any such Persons, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

Section 5.13 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership or by any creditors of any Subsidiary or Affiliate of the Partnership.

Section 5.14 Remedies Generally. The parties hereto agree that irreparable damage, for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the provisions of this Agreement were not performed in accordance with its specific terms and that any remedy at law for any breach of the provisions of this Agreement would be inadequate. Accordingly, the parties hereto acknowledge and agree that each such party shall be entitled to an injunction, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each party hereby agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy

for any reason at Law or equity. The parties hereto acknowledge and agree that any other party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 5.14 shall not be required to provide any bond or other security in connection with any such injunction.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto execute this Agreement, effective as of the Effective Date.

**SN EF UNSUB, LP**

By: SN EF UNSUB GP, LLC, its general partner

By: ____________________
Name:
Title:

**GSO ST HOLDINGS LP**

By: GSO ST ASSOCIATES LLC, its General Partner

By: ____________________
Name:
Title:

Exhibit F

LTM EBITDA Levels

| | maximum levels for each applicable calendar year ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 | 12/31/22 | 12/31/23 | 12/31/24 | 12/31/25 | Thereafter |
| Ratio of (x) the sum of outstanding indebtedness of the Partnership Group Companies and the Base Preferred Return Amount to (y) LTM EBITDA (as defined in the Credit Agreement) | 3.0x | 3.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x |

# Exhibit G

EX-10.9 21 sn-20170331ex1098e1ee4.htm EX-10.9

**Exhibit 10.9**

**JOINT DEVELOPMENT AGREEMENT**

**By and Among**

**GAVILAN RESOURCES, LLC,**

**SN EF MAVERICK, LLC,**

**SN EF UNSUB, LP,**

**and**

**SANCHEZ ENERGY CORPORATION, but solely with respect to Section 2.2, Section 4.2, Section 4.5 and Article VII**

**Dated as of March 1, 2017**

---

012207

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1 | SPECIFIC DEFINITIONS | 1 |
| 1.2 | CONSTRUCTION | 1 |
| ARTICLE II WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES | | 2 |
| 2.1 | WORKING INTEREST | 2 |
| 2.2 | REPRESENTATIONS AND WARRANTIES | 2 |
| ARTICLE III OPERATING COMMITTEE; BUDGETS AND WORK PLAN | | 2 |
| 3.1 | MANAGEMENT BY OPERATING COMMITTEE | 2 |
| 3.2 | FUNCTION OF THE OPERATING COMMITTEE | 2 |
| 3.3 | OPERATING COMMITTEE | 4 |
| 3.4 | MEETINGS OF THE OPERATING COMMITTEE | 5 |
| 3.5 | QUORUM AND VOTING | 6 |
| 3.6 | DEADLOCK MECHANISMS | 7 |
| 3.7 | BUDGETS AND WORK PLAN; AFES AND APPROVED OPERATIONS | 8 |
| 3.8 | OPERATORSHIP UNDER THE OPERATING AGREEMENT | 11 |
| 3.9 | DEFAULT | 18 |
| ARTICLE IV TRANSFER; EXIT OPPORTUNITIES | | 19 |
| 4.1 | RESTRICTIONS ON THE TRANSFER OF INTERESTS | 19 |
| 4.2 | TAG-ALONG RIGHT | 21 |
| 4.3 | RIGHT OF FIRST OFFER | 24 |
| 4.4 | INITIAL PUBLIC OFFERING | 26 |
| 4.5 | SALE TRANSACTION | 26 |
| ARTICLE V ADDITIONAL COVENANTS | | 34 |
| 5.1 | INFORMATION RIGHTS | 34 |
| 5.2 | AREA OF MUTUAL INTEREST | 35 |
| 5.3 | SPACING PROTECTIONS | 38 |
| 5.4 | COOPERATION | 40 |
| ARTICLE VI TERM AND TERMINATION | | 40 |
| 6.1 | TERM AND TERMINATION | 40 |
| 6.2 | EFFECT OF TERMINATION | 41 |
| ARTICLE VII GENERAL PROVISIONS | | 41 |
| 7.1 | ENTIRE AGREEMENT | 41 |
| 7.2 | WAIVERS | 41 |
| 7.3 | ASSIGNMENT; BINDING EFFECT | 42 |
| 7.4 | GOVERNING LAW; SEVERABILITY | 42 |
| 7.5 | FURTHER ASSURANCES | 42 |
| 7.6 | COUNTERPARTS | 42 |
| 7.7 | CONFIDENTIAL INFORMATION | 43 |
| 7.8 | NO THIRD PARTY BENEFICIARIES | 44 |
| 7.9 | NON-SOLICITATION | 45 |
| 7.10 | NOTICES | 45 |
| 7.11 | REMEDIES | 47 |
| 7.12 | DISPUTES | 48 |

| | | |
|---|---|---|
| 7.13 | EXPENSES | 49 |
| 7.14 | NO RECOURSE | 49 |
| 7.15 | CONFLICT | 50 |
| 7.16 | SUBCHAPTER K | 50 |
| 7.17 | RELATIONSHIP OF SN AND SN UNSUB | 50 |
| 7.18 | OPERATING COMMITTEE; AFFILIATES | 51 |
| 7.19 | FORCE MAJEURE | 51 |

| | |
|---|---|
| Annex I | Definitions |
| Annex II | Representatives |
| Annex III | Working Interests |
| Annex IV | Approved Financial Advisor Arbiters |
| Annex V | Existing Producing Wells |
| Annex VI | Existing Drilled and Uncompleted Wells |
| Annex VII | Restricted Areas |

| | |
|---|---|
| Exhibit A | [Intentionally omitted] |
| Exhibit B | Form of Operating Agreement |
| Exhibit C | Area of Mutual Interest |
| Exhibit D | Form of Assignment |
| Exhibit E | Form of Memorandum of Joint Development Agreement |
| Exhibit F | Form of Notice of Termination of the Joint Development Agreement |

1. JOINT DEVELOPMENT AGREEMENT

This **JOINT DEVELOPMENT AGREEMENT** (this "Agreement"), is entered into as of March 1, 2017 (the "Effective Date"), by and between SN EF Maverick, LLC, a Delaware limited liability company ("SN"), SN EF UnSub, LP, a Delaware limited partnership ("SN UnSub"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Blackstone"), and, solely for the purposes of Section 2.2, Section 4.2, Section 4.5 and Article VII, Sanchez Energy Corporation, a Delaware corporation ("Sanchez Energy"). Each of SN, SN UnSub, Sanchez Energy (with respect to the provisions of this Agreement to which it is a party) and Blackstone are referred to herein individually as a "Party" and collectively as the "Parties."

**RECITALS**

**WHEREAS**, the Parties and, solely for the purposes of Section 15.22 thereof, Sanchez Energy, entered into that certain Purchase and Sale Agreement, dated as of January 12, 2017, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko") and the Parties (the "Purchase Agreement"), pursuant to which the Parties collectively purchased all of the Working Interests of Anadarko comprising an undivided fifty percent (50%) Working Interest in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas, as described in more detail in Annex III; and

**WHEREAS**, the Parties desire to enter into this Agreement in connection with the transactions and conveyances contemplated by the Purchase Agreement to, among other things, provide for certain capital planning, operatorship, transfer, and economic rights between the Parties with respect to the development, operation, and maintenance of the Assets and the Parties' interests therein.

**NOW, THEREFORE**, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1 Specific Definitions.** Capitalized terms used in this Agreement shall be given the meanings ascribed to such terms on Annex I.

**1.2 Construction.** Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular shall include the plural, and the plural shall include the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections, or

subdivisions thereof shall refer to the corresponding article, section, or subdivision thereof of this Agreement unless specific reference is made to such articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words “include,” “includes” and “including” shall be deemed to be followed by the words “without limitation,” and the words “hereof,” “herein,” “hereunder,” and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear.

**ARTICLE II**
**WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES**

**2.1** **Working Interest.** As of the Effective Date, the Parties each own the Working Interests in each of the Leases as set forth on Annex III.

**2.2** **Representations and Warranties**. Each of the Parties, severally and not jointly, solely in respect of itself and not another Party, hereby represents and warrants to the other Parties as follows as of the Effective Date: (a) such Party is duly formed, validly existing, and in good standing under the laws of its jurisdiction of formation, (b) such Party has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver and perform this Agreement, (c) such Party has duly executed and delivered this Agreement and this Agreement is legal, valid, and binding with respect to such Party and is enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, or similar laws affecting creditors’ rights generally, (d) except to the extent contemplated herein, no permit, consent, approval, authorization or order of, and no notice to or filing with, any Governmental Authority or Third Party (collectively, “Consents”) is required in connection with the execution, delivery, or performance by such Party of this Agreement, or to consummate any transactions contemplated hereby that have not been obtained or waived prior to the Effective Date, and (e) *provided*, that the Consents are obtained, the authorization, execution, delivery, and performance of this Agreement by such Party does not, and will not, breach or conflict with or constitute a default under (A) such Party’s organizational documents or (B) any agreement or arrangement to which such Party is a party or by which it is otherwise bound.

**ARTICLE III**
**OPERATING COMMITTEE; BUDGETS AND WORK PLAN**

**3.1** **Management by Operating Committee**. The Parties hereby establish an operating committee composed of representatives (each, a “Representative”) from the Parties duly appointed in accordance with this Article III (the “Operating Committee”). The Operating Committee shall exercise its rights and carry out its duties over the Assets in compliance with this Agreement.

**3.2** **Function of the Operating Committee**. The Parties agree that, among the Parties, the timing, scope and budgeting of operations on the Assets (other than with respect to the Initial Budget and Work Plan) and amendments to the Initial Budget and Work Plan shall be ultimately



012211

approved by the Operating Committee. To the extent permitted or allowed under the applicable Operating Agreement, the Operator shall, in its own discretion and in accordance with the applicable Operating Agreement, propose, approve, and undertake any actions or decisions pursuant to such applicable Operating Agreement unless Unanimous Consent of the Operating Committee is required under this Agreement. The Operating Committee shall have no authority over the ownership of any interest in an Asset, which authority shall remain exclusively with the Party holding such ownership interest, subject to the other terms of this Agreement, including Article IV. The matters set forth below shall require the Unanimous Consent of the Operating Committee, and each Party agrees that it will not take or knowingly facilitate, and will cause its Controlled Affiliates and shall use its reasonable best efforts to cause its other Affiliates not to take or knowingly facilitate, any action under any applicable Operating Agreement or otherwise with respect to the Assets contemplated by clauses (a) through (h) of this Section 3.2 without the Unanimous Consent of the Operating Committee.

(a) approving any Subsequent Budget and Work Plan;

(b) making any amendments or modifications of the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan; *provided*, that, any increase to the aggregate amount of expenditures in the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan (as applicable) shall not require Unanimous Consent of the Operating Committee so long as such increase would not exceed the approved budgeted amount by more than ten percent (10%) and is otherwise consistent with the applicable Approved Budget;

(c) approving any AFE with respect to an Approved Operation to the extent that all AFEs issued for such Approved Operation exceed one hundred twenty percent (120%) of the budgeted amount for such Approved Operation in an Approved Budget; *provided*, *however*, that any AFEs so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(d) approving any E&D Operations or S&A Operations proposed by a Third Party unless previously authorized pursuant to an Approved Budget; *provided*, *however*, that any such E&D Operations or S&A Operations that are so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(e) designating a new Operator (other than as provided in Section 3.8(e) or Section 3.8(f));

(f) commencing or settling litigation related to the Assets that affect or would reasonably be expected to affect all Parties with respect to their ownership of the Working Interests, if the claims or settlements at issue exceed, or would reasonably be expected to exceed, a total of $2,000,000 in the aggregate or otherwise involve any equitable relief, or request for equitable relief, related to the Assets;

(g) amending this Agreement or any applicable Operating Agreement; and

(h) approving or amending of any Material Contracts.

(i) In the event that the Operating Committee approves any matter under Section 3.2 by Unanimous Consent, each Party shall take, and shall cause its Affiliates to take, such actions within such Party's Control under an applicable Operating Agreement that are reasonably necessary to effectuate such approved matter (and shall not knowingly take any action that could reasonably be expected to subvert, or otherwise materially interfere with the effectuation of such approved matter, including by encouraging Third Party Working Interest holders under an Operating Agreement to submit alternative or competing proposals against those proposals approved by the Operating Committee pursuant to this Section 3.2). Without limiting the generality of the foregoing but subject to Section 3.7(c), each Party will vote its respective Working Interests under an applicable Operating Agreement in favor of, and make appropriate elections with respect to, and the Operator will make proposals for the activities contemplated by, matters that have been approved by the necessary consents required by this Section 3.2 as provided hereunder, and are otherwise in accordance with the terms of this Agreement and any applicable Operating Agreement. Once a matter is approved pursuant to the applicable Operating Agreement, the Joint Exploration Agreement, and the Participation Agreement, the provisions of such other agreements shall control the implementation of such matter other than as expressly set forth in this Agreement.

**3.3 Operating Committee.**

(a) *Composition.*

(i) The Operating Committee shall consist of six (6) natural persons.

(ii) SN shall have the right to appoint two (2) Representatives and SN UnSub shall have the right to appoint one (1) Representative (each, a "Sanchez Representative"), *provided*, *however*, at any time following a Qualified Foreclosure Transfer, the Qualified Foreclosure Transferee shall have the right to appoint one (1) Representative (the "Qualified Foreclosure Transferee Representative") and SN shall have the right to appoint two (2) Representatives (which such two (2) Representatives shall then be the only Sanchez Representatives hereunder), and SN UnSub will no longer have the right to appoint a Representative. Notwithstanding anything in this Agreement to the contrary, (a) SN shall have the right to direct the vote of each Sanchez Representative appointed by SN, (b) SN UnSub will have the right to direct the vote of the Sanchez Representative appointed by SN UnSub, and (c) the Qualified Foreclosure Transferee shall have the right to direct the vote of the Qualified Foreclosure Transferee Representative. Notwithstanding anything to the contrary in this Agreement, at any time that SN is in Default, the Sanchez Representative appointed by SN UnSub shall be an investment professional affiliated with GSO for so long as GSO owns any interest in SN UnSub.

(iii) Blackstone shall have the right to appoint three (3) Representatives (each, a "Blackstone Representative"). Notwithstanding anything in this Agreement to the contrary, Blackstone shall have the right to direct the vote of each Blackstone Representative.

(iv) The initial Representatives are set forth on Annex II.

(v) Each Representative may vote by delivering his or her written proxy to another Representative. A Representative shall serve until such Representative resigns or is removed as provided in Section 3.3(b).

(b) *Resignation; Removal and Vacancies*. Any Representative may resign at any time by giving written notice to the Operating Committee. The resignation of any Representative shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any Sanchez Representative may be removed at any time, with or without cause, by (and only by) SN (if such Sanchez Representative was appointed by SN) or SN UnSub (if such Sanchez Representative was appointed by SN UnSub). Any Blackstone Representative may be removed at any time, with or without cause, by (and only by) Blackstone. Any Qualified Foreclosure Transferee Representative may be removed at any time, with or without cause, by (and only by) the Qualified Foreclosure Transferee. The removal of a Representative shall be effective only upon receipt of notice thereof by the remaining Representatives and by SN, SN UnSub, Blackstone, or the Qualified Foreclosure Transferee, as applicable. Any vacancy in the number of Representatives occurring for any reason shall be filled promptly by the appointment of a new Representative by (i) SN, with respect to a Sanchez Representative appointed by SN, (ii) SN UnSub, with respect to a Sanchez Representative appointed by SN UnSub, (iii) Blackstone, with respect to a Blackstone Representative, and (iv) the Qualified Foreclosure Transferee, with respect to the Qualified Foreclosure Transferee Representative. The appointment of a new Representative is effective upon receipt of notice thereof by or at such time as shall be specified in such notice to the remaining Representatives.

**3.4 Meetings of the Operating Committee.**

(a) Regular meetings of the Operating Committee shall be held on a regular basis, but not less than monthly, at such times or places as may be determined by the Operating Committee. Special meetings of the Operating Committee may be called by any of the Representatives, subject to the requirements listed under Section 3.4(b). Each Party shall use reasonable best efforts, in good faith, to cause its designated Representatives to attend each regular or special meeting of the Operating Committee. The Operating Committee and the Operator shall hold bi-monthly conference calls on the 1st and the 15th of each month (or if any such dates are not a Business Day, the immediately following Business Day) to discuss the daily drilling operations, the production reports required to be provided pursuant to Section 5.1(a) and other operational updates during regular business hours, and the Operator shall otherwise provide the Parties with full access to, and shall make its personnel available upon reasonable prior notice to discuss with the Operating Committee such matters; *provided*, that upon the reasonable request by any Party, the Operating Committee and Operator will hold additional conference calls not to exceed one conference call per week.

(b) Notice of the time and place of any regular meeting of the Operating Committee shall be in accordance with the meeting schedule approved by the Operating

Committee or as otherwise agreed to by the Parties. Special meetings of the Operating Committee may be called by any Party by providing notice to the Representatives at least three (3) days prior to such meeting. Special meetings of the Operating Committee to deal with emergencies may be called by a Party providing at least twelve (12) hours' notice prior to the meeting, so long as each Representative provides written confirmation of receipt of notice or waives notice (including by attending the emergency meeting). Written notice of meetings of the Operating Committee, including the purpose of the meeting for special (including emergency) meetings, shall be given to each Representative with the notice of the meeting. Any Representative may waive notice of any meeting by the execution of a written waiver prior or subsequent to such meeting. The attendance of a Representative at any meeting shall constitute a waiver of notice of such meeting, except where a Representative attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction or voting of any business or matter because the meeting has not been lawfully called or convened. Notice may be given by electronic mail to an electronic mail address provided in writing by a Representative, by facsimile to a facsimile number provided in writing by a Representative, by personal delivery, or by national reputable courier service such as Federal Express or United Parcel Service to an address specified in writing by a Representative.

(c) The Operating Committee may adopt whatever rules and procedures relating to its activities as it may deem appropriate; *provided*, that such rules and procedures shall not be inconsistent with or violate the provisions of this Agreement; and *provided*, *further*, that such rules and regulations shall permit Representatives to participate in meetings (and the representatives of the Parties to observe) by telephone, video conference or the like, or by written proxy, and such participation shall be deemed attendance for purposes of determining whether a Quorum is present.

(d) At each regular meeting of the Operating Committee, the Operator shall update the Operating Committee on the operational performance of the Assets being operated by the Operator, including by presenting relevant quality, health, safety and environmental metrics regarding operations.

**3.5 Quorum and Voting.**

(a) At all meetings of the Operating Committee, the presence of a majority of the Representatives (including at least one (1) Sanchez Representative appointed by SN, one (1) Blackstone Representative and either the Sanchez Representative appointed by SN UnSub or the Qualified Foreclosure Transferee Representative, as applicable) shall be necessary and sufficient to constitute a quorum of the Operating Committee for the transaction of business (a "Quorum").

(b) Each Representative shall be entitled to one (1) vote on each matter to be voted upon by the Operating Committee.

(c) All actions and approvals of the Operating Committee listed in Section 3.2(a)-(h) shall be approved and passed at a meeting at which a Quorum is present by Unanimous Consent.

(d) Any Representative may participate in a meeting of the Operating Committee via conference telephone or any communications equipment that allows all Representatives and other individuals participating in the meeting to communicate with each other.

(e) Any action required or permitted to be taken at any meeting of the Operating Committee may be taken without a meeting or a vote, if consents in writing, setting forth the action so taken, are signed by Representatives constituting Unanimous Consent. Each written consent shall bear the date and signature of each Representative who signs the consent.

**3.6 Deadlock Mechanisms.**

(a) If any matter or proposal requiring Unanimous Consent for approval by the Operating Committee (i) is brought before the Operating Committee and such matter or proposal is not approved by Unanimous Consent or (ii) would have been brought before the Operating Committee, but for the fact that a Quorum was not present at three (3) consecutive meetings called for the purpose of approving such matter or proposal, then any Representative(s), by written notice to the other Representatives may call a meeting of the Operating Committee to reconsider such matter or proposal. Such meeting shall be held when, where and as reasonably specified in such notice, but not less than three (3) Business Days nor more than seven (7) Business Days after such notice has been delivered. If such meeting is called and held as provided in the immediately preceding sentence and the matter or proposal is offered at such meeting again and (A) is not approved by Unanimous Consent or (B) a Quorum is not present at such Operating Committee meeting, then any Representative(s) may within three (3) Business Days thereafter, declare a deadlock (a "Deadlock") by giving written notice to the other Representatives containing a brief description of the nature of the issue subject to such Deadlock (a "Deadlock Notice"). A Deadlock may also be declared as provided in Section 5.3(e)(ii). All Deadlocks shall be subject to the provisions of Section 3.6(b) and, if applicable, mediation, in accordance with Section 3.6(c).

(b) Within ten (10) Business Days after the receipt of a Deadlock Notice, a designated senior executive from each Party shall meet in good faith effort to reach an accord that will end the Deadlock. If a decision is not made by common accord that ends the Deadlock within ten (10) Business Days after the date of such meeting, any Representative(s) may declare a final Deadlock (a "Final Deadlock") by providing written notice to the other Representative (a "Final Deadlock Notice"). Notwithstanding anything in this Agreement to the contrary, if the designated senior executive of any Party is unwilling or unable to meet with the designated senior representative of any other Party, then any Representative(s) may immediately invoke the provisions of Section 3.6(c).

(c) If within ten (10) Business Days following receipt of a Final Deadlock Notice, the matter or proposal subject to such Final Deadlock remains in contention, then any Representative may subject the matter or proposal to non-binding mediation, which process shall be conducted as promptly as reasonably practicable, and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such non-binding mediation.

**3.7 <u>Budgets and Work Plan; AFEs and Approved Operations.</u>**

(a) *Initial Budget and Work Plan.* On the Effective Date, the Parties approved an Initial Budget and Work Plan (as may be amended from time to time by Unanimous Consent under Section 3.2(a), the "Initial Budget and Work Plan"), which sets forth estimates of the amounts to be incurred by the Operator (subject to authorization required under an applicable Operating Agreement) to conduct (x) the activities approved in such Initial Budget and Work Plan and (y) other operations related to the Assets contemplated by such Initial Budget and Work Plan, in each case, from the Effective Date through the second (2nd) anniversary of the execution of the Purchase Agreement (such activities and operations being the "Initial Approved Operations"). Each AFE issued by the Operator to implement an Approved Operation shall be deemed an Approved AFE in accordance with Section 3.2(c) and each Party shall consent to such Approved AFEs under any applicable Operating Agreement. Operator shall promptly issue supplements to any Approved AFE that it reasonably anticipates will exceed the estimated expenditures thereunder by one hundred twenty percent (120%) of the budgeted amount subject to approval by Unanimous Consent of the Operating Committee.

(b) *Subsequent Budgets and Work Plans*.

(i) The Operator shall prepare and submit to the Operating Committee for approval no later than October 1, 2018, and every October 1 thereafter, (A) a proposal for E&D Operations and S&A Operations to be conducted by the Operator during the subsequent twelve (12) month period and (B) a proposed budget (together, a "<u>Subsequent Budget and Work Plan</u>") which sets forth in reasonable detail the projects and activities (the "<u>Subsequent Proposed Operations</u>") and estimated amounts expected to be incurred by the Operator during the subsequent twelve (12) month period to conduct (x) the Subsequent Proposed Operations and (y) other estimated operating expenses related to the Assets. For the avoidance of doubt the expiration of an Approved Budget shall not affect any Approved Operation in such Approved Budget which is not yet complete. In the event that there is more than one Operator as a result of a Division of Operatorship or any other reason, then the applicable Post-Division Operators shall cooperate in good faith to submit such proposals to the Operating Committee as contemplated above.

(ii) The Operating Committee shall work in good faith to approve or disapprove of the Subsequent Budget and Work Plan no later than forty-five (45) days prior to the expiration date of the Approved Budget then in effect. Upon approval, the Subsequent Budget and Work Plan shall become the Approved Budget (all Subsequent Proposed Operations, as may be approved or amended by the Operating Committee, shall become "<u>Subsequent Approved Operations</u>").

(iii) If the Operating Committee approves the Subsequent Budget and Work Plan, then the Operator shall (A) use its reasonable best efforts to propose to Working Interest holders under any applicable Operating Agreement and put into effect such Subsequent Approved Operations in accordance with the Approved Budgets and (B) incur

costs and expenses in accordance with the Approved Budget, in each case to the extent such actions are approved by the required vote under the applicable Operating Agreement.

(iv) If the Operating Committee fails to approve a Subsequent Budget and Work Plan by the expiration date of the Approved Budget then in effect, and such Approved Budget is (A) the Initial Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith (as among the Representatives and between the Operating Committee and the Operator, as applicable) for a six (6) month period following the expiration of the Initial Budget and Work Plan, or (B) any Subsequent Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith for a three (3) month period following the expiration of the applicable Approved Budget (as applicable, the "Budget Negotiation Period"). During the Budget Negotiation Period, until a Subsequent Budget and Work Plan is approved by the Operating Committee and agreed to by the Operator, the most recent Approved Budget shall remain in effect as between the Parties, subject to a ten percent (10%) increase for each line item of the then-existing Approved Budget during the Budget Negotiation Period, after which all activities shall cease if a Subsequent Budget and Work Plan is not approved; *provided*, that, during the Budget Negotiation Period, the Operator shall use its reasonable best efforts to (A) for the first three months during a Budget Negotiation Period, continue to engage in E&D Operations and S&A Operations which were approved pursuant to Approved Budgets (but for the avoidance of doubt, except as specifically approved by the Operating Committee pursuant to Section 3.2, the Operator shall not be authorized to engage in any E&D Operations or S&A Operations not included in an Approved Budget) (*provided*, that after such Budget Negotiation Period, no new E&D Operations and S&A Operations may be initiated regardless of whether they were previously included in an Approved Budget), (B) take such actions as may be necessary to comply with the APC Well Commitment and satisfy continuous drilling obligations and otherwise maintain the Leases in accordance with their terms, and (C) incur costs and expenses in the ordinary course of business in amounts consistent with the most recent Approved Budget, including with respect to producing wells pursuant to any applicable Operating Agreement, in each case to the extent such actions are approved by the required vote or are otherwise permissible under the applicable Operating Agreement.

(c) *Approval of Additional Activities.* From time to time, SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee may present to the Operating Committee, E&D Operations and S&A Operations proposed to be undertaken with respect to the Assets that were not included in an Approved Budget.

(i) For any new E&D Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional E&D Proposal"), SN, SN UnSub or Blackstone or, if applicable, the Qualified Foreclosure Transferee, shall present to the Operating Committee and the Operator (A) proposed revisions to the Approved Budget in respect of such activities, (B) the surface location and objective formation of each vertical and lateral wellbore included in the Additional E&D Proposal, (C) the proposed spud and completion dates for each such wellbore, (D) relevant seismic/geophysical and reservoir

Case 4:23-cv-03095 Document 32-7 Filed on 04/19/24 in TXSD Page 57 of 250

data, anticipated oil, gas, and liquids ratios, initial production and estimated ultimate recovery figures, decline curves, and the drilling and completion design for each proposed well, (E) the total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by well, (F) an AFE in respect of such Additional E&D Proposal, and (G) any other information reasonably requested by the Operating Committee and the Operator. The Operating Committee and the Operator shall evaluate such Additional E&D Proposal and such portion of the Additional E&D Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the applicable Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.2 and Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(ii) For any new S&A Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional S&A Proposal"), SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee shall present to the Operating Committee and the Operator, (A) proposed revisions to the Approved Budget in respect of such activities, (B) the proposed date of commencement of such activities and the proposed development and construction program for each included project (including the proposed timing and project scheduling), (C) the anticipated upside/cost saving for each included project and total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by project, (D) an AFE in respect of such Additional S&A Proposal, (E) any relevant data from any prior or comparable operations undertaken by SN, Blackstone or, if applicable, the Qualified Foreclosure Transferee or third parties relevant to the cost/benefit analysis of the proposed project(s), and (F) any other information reasonably requested by the Operating Committee or the Operator. The Operating Committee and the Operator shall evaluate such Additional S&A Proposal and such portion of the Additional S&A Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(d) *Timely Payment Commitment*. Notwithstanding anything in the applicable Operating Agreements to the contrary, on or before the 15th day of each month, Operator shall provide the other Party(ies) an invoice ("Monthly Invoice") for (i) such Party(ies) proportionate share of all projected cash outlays for the following month ("Estimated Cash Outlays") and (ii) any adjustments to the previously sent invoices so that the amount ultimately paid by a Party for a given month is equal to the actual amounts expended by Operator for such month ("True-Up Amount") (e.g., Operator will send a Monthly Invoice on or before June 15 and such Monthly Invoice will consist of the Estimated Cash Outlays for July plus or minus a True-Up Amount (if any) to reconcile the Estimated Cash Outlays for May). Each Party shall pay the Monthly Invoice on or before the last day of the month in which the Monthly Invoice was delivered to such Party.

(e) *APC Well Commitment; Other Required Actions.* Unless otherwise approved by the Operating Committee by Unanimous Consent, Operator will propose wells necessary to the meet the APC Well Commitment and avoid any financial penalty thereunder and shall be authorized to take any other action to the extent necessary to meet any continuous drilling obligations under any Lease. To the extent Operator does not propose such wells when required pursuant to the foregoing sentence, any Party is permitted to propose wells under any applicable Operating Agreements in order to ensure such APC Well Commitment is satisfied to the extent that failure to propose wells at such point in time would reasonably be likely to result in financial penalty under the APC Well Commitment. Further, any Party shall be permitted to propose the taking of any other action reasonably required to meet any continuous drilling obligations under any Lease.

**3.8 Operatorship Under the Operating Agreement.**

(a) As of the Effective Date, the Parties acknowledge and agree that SN is designated as the operator of the Assets pursuant to, and in accordance with, the Operating Agreements (in such capacity, "Sanchez Operator"). As contemplated by this Agreement, Blackstone or its designee, including a buyer or its designee in connection with a Sale Transaction may succeed to SN's status as operator of some or all of the Assets (in such capacity, "Blackstone Operator") and, in that event, Sanchez Operator may thereafter succeed to Blackstone Operator's status as operator of some or all of the Assets. Sanchez Operator and Blackstone Operator shall be referred to interchangeably as the "Operator," and each reference to the "Operator" herein means either Sanchez Operator or Blackstone Operator, depending on which of such parties holds the operatorship of the Assets in question following the receipt of all Required Operatorship Consents. For the avoidance of doubt, the term "Operator" does not include any successor Third Party operator of the Assets other than Blackstone Operator once such successor Third Party operator has obtained all Required Operatorship Consents with respect to any applicable Lease, Wellpad or other Asset. None of the Operating Committee or the Parties, by virtue of their ownership of an interest in the Assets, shall have any power, authority, or any Control over the day-to-day operation or management of the Assets, which authority and obligations reside with the Operator pursuant to the Operating Agreements. The Operator shall use its reasonable best efforts to execute an Approved Budget as agreed upon by the Parties pursuant to this Agreement and act under each Operating Agreement consistently with this Agreement, including with respect to carrying out the development plan and budget as set forth in an Approved Budget; *provided*, *however*, notwithstanding anything to the contrary herein, if this Agreement and the express requirements of the Operator under an Operating Agreement directly conflict, the Operator shall comply with such Operating Agreement to the extent necessary to avoid violating the terms of such Operating Agreement; *provided*, *further*, that Operator shall use reasonable best efforts to follow the estimated detailed drilling and completion specifications set forth in each Approved Budget but immaterial deviations shall not require an amendment of the applicable Approved Budget or an approval by Unanimous Consent of the Operating Committee nor shall such immaterial deviations be considered a default or breach of the Operator's obligations under this Agreement.

(b) Notwithstanding anything to the contrary in this Agreement, including the Operating Committee's actions pursuant to Section 3.2, if any Party reasonably believes there is any emergency involving actual or imminent loss of life, material damage to any of the Assets or the environment, or substantial and immediate financial loss, such Party may, in the sole exercise of its discretion, act for and on behalf of the Parties (including by causing the Operator to take such actions) in any manner reasonably necessary or useful under the circumstances without the necessity of giving prior notice to the other Parties or receiving any approval or consent from the Operating Committee or any Party. In the event that any Party takes any action pursuant to this Section 3.8(b) without the prior approval of the Operating Committee, such Party shall promptly (but in all events within twenty-four (24) hours) notify the Operating Committee of the taking of such actions.

(c) Without the prior written consent of Blackstone, SN UnSub, and if applicable, the Qualified Foreclosure Transferee, except as required to implement a transfer of operatorship required by this Agreement, SN (in its capacity as Sanchez Operator) shall not resign or attempt to resign as the operator under any Operating Agreement or take or omit to take any action that would effectively or constructively result in the termination of its status as operator under any Operating Agreement.

(d) In the event of a transfer of operatorship under any Operating Agreement in accordance with Section 3.8(f), the Alternate Operator or its designee as successor operator shall, as a condition to such transfer, be deemed to become a party to this Agreement as Operator under such Operating Agreement and be bound by the terms hereof in the same capacity as Operator, *mutatis mutandis*, and if not a Party to this Agreement, such operator shall be required to execute a joinder of this Agreement to such effect, and the Defaulting Operator shall be automatically discharged from all further obligations as the Operator under this Agreement with respect to any such Operating Agreement and the Assets subject to such Operating Agreement.

(e) *Division of Operatorship.* The following rights and procedures shall apply if (i) the Operating Committee is unable to approve a Subsequent Budget and Work Plan within the Budget Negotiation Period or (ii) either Blackstone or SN otherwise elects to cause a Division of Operatorship pursuant to this Section 3.8(e) for any reason during a Budget Negotiation Period or, as applicable, in the event that an Equitable Partition is to be consummated pursuant to Section 4.5, then, upon the expiration of such Budget Negotiation Period or at any time during such Budget Negotiation Period:

(i) Either Blackstone or SN shall have the right to cause a division of operatorship (a "Division of Operatorship") pursuant to which, subject to the terms of the applicable Operating Agreements and the other provisions of this Section 3.8(e), the rights to operatorship pursuant to applicable Operating Agreements for the Wellpads shall be divided between Blackstone Operator and Sanchez Operator on a geographic Wellpad-by-Wellpad basis approximating an alternating, checkerboard pattern (or such other pattern as may be mutually agreed by SN and Blackstone), such that once the Division of Operatorship is completed, such Division of Operatorship shall (A) result in Blackstone Operator and Sanchez Operator each having rights to operatorship pursuant to applicable

Operating Agreements over a number of Wellpads that constitute approximately fifty percent (50%) of the aggregate Fair Market Value of (x) the Working Interests underlying all the Wellpads and (y) the Existing Producing Wells and related offset locations and sections, and (B) evenly (or as evenly as commercially practicable) distribute to Blackstone Operator and Sanchez Operator: (1) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (2) producing wells and current production, (3) remaining reserves, (4) potential future well locations, and (5) operatorship of the Existing Producing Wells and related offset locations and sections (an "Equitable Division") and (6) in the case of an Alternative Equitable Partition, such other criteria set forth in Section 4.5(a). Upon the election of any Party to cause a Division of Operatorship, SN and Blackstone shall negotiate in good faith for a period of forty-five (45) days to designate by area, and based on substantially equal geographic divisions, all Wellpads under the Leases based on customary industry practices and their respective reserve reports covering the previous twelve (12) month period and agree upon an Equitable Division. If, following such forty-five (45) day period, SN and Blackstone are unable to agree upon an Equitable Division, each of them shall retain an independent, Third Party financial advisor or investment bank with expertise in valuing oil and gas assets in the Eagle Ford Shale (a "Financial Advisor") to determine an Equitable Division which will largely be based on such Party's engineering and geological reserve reports for the last twelve (12) month period and taking into account the then current strip pricing forecast. Sanchez and Blackstone shall each present the results of its Financial Advisor and provide its associated reserve reporting, including reasonable supporting information, after a period of thirty (30) days to the other Party and each such Party shall have ten (10) days to review the proposal of such other Party. If SN and Blackstone are unable to agree upon an Equitable Division after the period described in the preceding sentence, then SN and Blackstone shall choose within ten (10) Business Days a third Financial Advisor and an engineering and geological advisor to audit the reserve reports of SN and Blackstone (the "Reserve Auditor") from among the entities listed on Annex IV (or if SN and Blackstone are unable to agree on a Reserve Auditor and/or the third Financial Advisor within a reasonable timeframe, they shall cause the other Financial Advisors to choose a third Financial Advisor and Reserve Auditor from among the entities listed on Annex IV within the subsequent five (5) Business Day period) to determine an Equitable Division which shall (A) be based on the provisions set forth in this Section 3.8(e), (B) reflect the Equitable Division proposals by the two (or three, in the case of an Equitable Partition) Financial Advisors (unless such proposal is not consistent with the terms herein in which case such proposal will be rejected and not considered), (C) be rendered as promptly as practicable (but in any event no later than thirty (30) days after the appointment of such Financial Advisor and Reserve Auditor), and (D) be binding on the Parties. The Parties shall cooperate to provide all relevant information reasonably requested by such third Financial Advisor in connection with the determination of a final Equitable Division, including the audit of the Reserve Auditor of the reserve reports provided by SN and Blackstone. With respect to each applicable Operating Agreement, the Party (or its designee) who had operatorship prior to the Division of Operatorship shall be referred to as the "Pre-Division Operator," the Party who is awarded

operatorship pursuant to such Division of Operatorship (or where applicable pursuant to an Equitable Partition) shall be referred to as the "Post-Division Operator," and the other Party to such Division of Operatorship shall be referred to as the "Post-Division Non-Operator." For the avoidance of doubt, in the case of an Equitable Partition pursuant to Section 4.5(a), the provisions of this Section 3.8(e)(i) shall be deemed and interpreted to include SN UnSub as a participant in the Equitable Partition evaluation and determination process, such that GSO (acting on behalf of SN Unsub, as contemplated in Section 4.5 (i)) shall have full rights to participate equally with SN and Blackstone in determining the Equitable Partition in a manner consistent with the terms and conditions of Section 4.5(a) and this Section 3.8(e), including the right to appoint a Financial Advisor and Reserve Auditor.

(ii) Following the final resolution of an Equitable Division pursuant to Section 3.8(e)(i) or an Equitable Partition pursuant to Section 4.5, each Party shall use its reasonable best efforts to take or cause to be taken all actions required to obtain as promptly as practicable any necessary consents or amendments required for a change in operatorship (the "Required Operatorship Consents") under the Leases, Operating Agreements and any other Material Contracts, including all purchase, marketing, transportation, storage, processing and/or sales contracts, related to the Wellpads or Leases reasonably identified by a Party and any other actions reasonably necessary or desirable to effect a Division of Operatorship or an Equitable Partition, including any required notices or filings with applicable Governmental Authorities. If any such required consent or amendment for a Wellpad or Lease is not obtained by the time an Equitable Division or an Equitable Partition, respectively, has been finalized pursuant to Section 3.8(e)(i), then the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment and until such consent or amendment is obtained (or until such other time as the Post-Division Operator reasonably determines that it has the right and capability to assume operatorship), the Pre-Division Operator shall maintain formal rights of operatorship for such Wellpad or Lease and the Post-Division Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad or Lease based on customary terms and conditions, whereby the Post-Division Operator shall have the right to physically conduct all operations, and/or (B) direct the Pre-Division Operator in its exercise of all rights of a reasonable operator with respect to such Wellpad or Lease as though the Post-Division Operator had been appointed as successor operator for such Wellpad or Lease, to the extent (in either case (A) or (B)) reasonably consistent with the Pre-Division Operator's duties as operator under the applicable Operating Agreement, in which case the Pre-Division Operator shall remain the operator with respect to the applicable Asset and carry out all directions of the Post-Division Operator and not take any action under an Operating Agreement unless approved by the Post-Division Operator or required under the applicable Operating Agreement.

(iii) Upon the consummation of an Equitable Division, the Parties shall use their reasonable best efforts to (A) (1) cause all existing Operating Agreements to be terminated to the extent any such Operating Agreements apply to multiple Wellpads

allocated to both SN and Blackstone in connection with an Equitable Division and (2) execute and cause Third Party Working Interest holders in such Wellpads to execute, in place of each terminated Operating Agreement, the Form Operating Agreement (and agree to any reasonable modifications that may be requested by any such Third Party Working Interest holder to such Form Operating Agreement that are reasonably necessary to obtain any required approval), attached hereto as Exhibit B, for each individual Wellpad allocated to a Party pursuant to a Division of Operatorship or (B) with respect to any Wellpad that is subject to an Operating Agreement relating only to such Wellpad, take such action as may be necessary to obtain the required approval to transfer operatorship rights to the applicable Post-Division Operator as successor operator under such Operating Agreement. Additionally, each Post-Division Operator shall provide the other Parties on an annual basis with an approved one (1) year budget and work plan and a three (3) year budgeted forecast regarding the development of each Party's respective Assets for which such Post-Division Operator has been allocated rights of operatorship pursuant to a Division of Operatorship or an Equitable Partition.

(iv) Notwithstanding anything else to the contrary in this Agreement, at any time that a Non-Defaulting Party or its designee has rights to operatorship over one hundred percent (100%) of the Leases or Wellpads, or following the date upon which any Operator Default Event (as defined below) has occurred and is not cured as provided in Section 3.9, the Defaulting Party or its Affiliates shall no longer have the right to elect to cause a Division of Operatorship pursuant to this Section 3.8(e).

(v) Following a Division of Operatorship or an Equitable Partition, if a Post-Division Operator under any Operating Agreement elects to sell or otherwise transfer all of its interest in the assets covered by such Operating Agreement to a Third Party, and if such Third Party desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Non-Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for such Third Party to be selected as the successor operator, including a Third Party buyer in connection with a Sale Transaction or following an Equitable Partition. In all other circumstances in which a Post-Division Operator resigns (other than as a result of a transfer of operatorship to an Affiliate) or is removed as operator under an Operating Agreement, if the Post-Division Non-Operator desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for the Post-Division Non-Operator as successor operator. This Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten (10) years.

(vi) Promptly following the date of this Agreement, upon the request of Blackstone, the Parties shall use their good faith efforts to engage the Third Party owners of Working Interests in the Leases and enter into new joint operating agreements for each Wellpad consistent in all material respects with the existing Operating Agreements, in

addition to any modifications upon which the Parties may agree, in order to facilitate an orderly Division of Operatorship if and when pursued pursuant to this Agreement.

(vii) Blackstone will indemnify SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee, for all damages incurred by such Parties (a) to the Consenting Parties or any other parties whose consent is required under any applicable Operating Agreements arising out of any litigation brought by the Consenting Parties under the Consent Agreement as a result of the consummation of an Equitable Division or an Equitable Partition and (b) to counterparties from whom a Required Operatorship Consent is required in connection with effecting a Division of Operatorship or an Equitable Partition without having obtained any Required Operatorship Consents, which in either case shall include all reasonable legal expenses. In connection with any such litigation pursuant to which Blackstone is obligated to indemnify SN and SN UnSub under this Section 3.8(e)(vii), Blackstone shall have the right to control the defense on behalf of Blackstone, SN, SN UnSub and their respective Affiliates and SN, SN UnSub or, if applicable, the Qualified Foreclosure Transferee, and their respective Affiliates shall reasonably cooperate in connection with such defense; *provided*, that the appointment of counsel by Blackstone shall be subject to the consent of SN, not to be unreasonably withheld, conditioned or delayed, and SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee shall have the right to participate in connection with the defense of any such litigation. In connection with the consummation and implementation of an Equitable Division or an Equitable Partition, the Parties will use their respective commercially reasonable efforts to cooperate with the Consenting Parties to provide for an orderly transition of operatorship and consult with the consenting parties in connection with the implementation of such transition, in each case, in order to maintain an amicable working relationship with the Consenting Parties.

(f) *Transfer of Operatorship Generally*. Effective immediately upon the occurrence of any of the following: (i) Operator is removed as operator pursuant to the terms of any applicable Operating Agreement, (ii) Operator suffers a Specified Event of Default under a Specified Credit Agreement, (iii) Operator resigns as operator under any applicable Operating Agreement with or without the consent of the other parties thereto, (iv) Operator commits an act of gross negligence or willful misconduct with respect to its duties under an applicable Operating Agreement ("Negligent Operator Action"); *provided*, that notice of any Negligent Operator Action must be given to Operator detailing the alleged acts by Operator and Operator shall have a thirty (30) day period from receipt of such notice to cure any such Negligent Operator Action, unless the Negligent Operator Action concerns an ongoing operation being conducted, in which case, Operator must cure such Negligent Operator Action within forty-eight (48) hours of its receipt of the notice; (v) SN or any of its Affiliates breaches in any material respect its obligations under Section 4.5 or (vi) either Party while acting as Operator has committed a Default under this Agreement (any such event described in the preceding clauses (i) through (vi), collectively, an "Operator Default Event"), the operatorship of the applicable Assets (which, in cases (i), (iii), and (iv) above, for avoidance of doubt, shall mean only those Assets covered by the applicable Operating Agreement) and the right to serve as, or to designate, the operator of such Assets under the applicable Operating Agreement(s) shall, subject to the terms of such Operating Agreement(s),



012225

be transferred to Blackstone (if SN is then the Operator) or SN (if Blackstone is then the Operator), as applicable (the "Alternate Operator") or its designated Affiliate or a qualified Third Party operator capable of operating the Assets and selected by the Alternate Operator (a "Third Party Operator"). The Operator who is replaced as a result of such Event of Default (the "Defaulting Operator") shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to) use their reasonable best efforts to (i) take all actions required (at the reasonable direction of the Alternate Operator to effectuate such transfer, including voting its and its Affiliates' interests for an election of the Alternate Operator, its designee or a Third Party Operator, including through one or a series of related transactions, in each case to the extent permitted under the applicable Operating Agreement, (ii) obtain any necessary consents or amendments otherwise required for a change in operatorship under the Leases and applicable Operating Agreements and any other applicable Material Contracts including all Required Operatorship Consents, and (iii) carry out any other actions reasonably necessary to effect such transfer of operatorship. In the event the operatorship of an Asset is transferred to the Alternate Operator, its designee or a Third Party Operator pursuant to this Section 3.8(f), the Alternate Operator shall (and shall cause the successor operator, if other than the Alternate Operator, to), defend, indemnify and hold harmless the Defaulting Operator from all claims, Losses and damages raised by any Third Party related to the applicable Operating Agreements with respect to which operatorship has been transferred to the extent resulting from, pertaining to or arising from the operation of the applicable Assets by the Alternate Operator, its designee or the Third Party Operator from and after the date of such transfer of operatorship of the applicable Assets. The Alternate Operator shall (and shall cause the successor operator, if other than such Alternate Operator to) also use its reasonable best efforts to comply with all requirements of an operator under the applicable Operating Agreement or applicable law. In connection with any transfer of operatorship pursuant to this Section 3.8, the Parties shall use their reasonable best efforts to ensure that the new Operator shall have access to all assets relating to the Assets in which the Parties all hold an ownership interest in the same manner as the Defaulting Operator had prior to any such operatorship transfer, to the extent that a Division of Operatorship has not occurred or this Agreement has not been terminated. If any required consent or amendment required to effect the transfer of operatorship under any applicable Operating Agreement or any required consent or amendment for any other Material Contract related to a Lease or Wellpad for which operatorship is to be transferred, in each case as contemplated by this Section 3.8(f), is not obtained, including all Required Operatorship Consents, then until such consent or amendment is obtained (or until such other time as the Alternate Operator reasonably determines that it has the right and capability to assume operatorship), (i) the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment, (ii) the Defaulting Operator shall maintain formal rights of operatorship for such applicable Lease or Wellpad, and (iii) the Alternate Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad based on customary terms and conditions, whereby the Alternate Operator shall have the right to physically conduct all operations, and/or (B) direct the Defaulting Operator in its exercise of all rights of an operator with respect to such Wellpad as though such Alternate Operator had been appointed as successor operator for such Wellpad to the extent reasonably consistent with the Defaulting Operator's express duties as operator under the applicable Operating Agreement, in which case the Defaulting Operator shall remain the operator

with respect to the applicable Asset and carry out all directions of the Alternate Operator and not take any action under an Operating Agreement unless approved by the Alternate Operator or expressly required under the applicable Operating Agreement. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the transfer of operatorship and the rights related thereto described in this Section 3.8(f) shall be triggered automatically upon the occurrence of an Operator Default Event and shall not be affected in any respect by any change in, or cure of, an Operator Default Event.

**3.9 Default.**

(a) *Remedy Upon Default*. For so long as SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee is in Default (a "Defaulting Party"), (i) its rights under Section 3.2 (Function of the Operating Committee), Section 3.7(b) (Subsequent Budgets and Work Plans), Section 3.8(e) (Operatorship) (such that a Defaulting Party shall not have the right to elect to cause a Division of Operatorship), Section 4.1(a) (Permitted Transfers) (such that a Defaulting Party shall not have a right to Transfer its Asset Interest to a Third Party even after the expiration of the three year limitation in Section 4.1(a), without the prior written consent of the Parties not in Default (the "Non-Defaulting Parties") and *provided*, *however*, that such Default shall not affect rights regarding Permitted Liens), Section 4.2 (Tag-Along Rights), Section 4.3 (Right of First Offer), Section 4.5 (Sale Transaction) (such that if Blackstone is the Defaulting Party, it shall not have a right to compel the other Parties to participate in a Sale Transaction,), and Section 5.2 (Area of Mutual Interest) shall be suspended and any control rights associated with such provisions shall revert to the benefit of the Non-Defaulting Parties in percentages equal to their proportionate share of an AMI acquisition pending such cure or resolution of such Default and in connection therewith, the Representative(s) appointed by the Defaulting Party shall lose all voting rights with respect to the Operating Committee, and the affirmative vote of the Representatives who have not lost voting rights shall be the only votes required for any action to be taken by the Operating Committee (and shall be deemed to constitute Unanimous Consent); *provided*, that, (i) such rights shall not be suspended in the event the Party alleged to be in Default is contesting such allegation in good faith, pursuant to a binding arbitration process in accordance with Section 7.12(c), which shall be conducted as promptly as reasonably practicable (and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such process), and (ii) the Operating Committee shall not have the authority to bind the Defaulting Party and its Affiliates to Subsequent Budgets and Work Plans or to any increases to the then-existing Approved Budget except to the extent that all such increases in the aggregate do not exceed such Approved Budget by more than ten percent (10%). A Default shall not be deemed to be continuing after the Defaulting Party has (i) cured such Default, (ii) entered into and satisfied its obligations under a binding written settlement with the Non-Defaulting Parties related to such Default, or (iii) satisfied its obligations, if any, arising from any arbitration or judicial proceeding related to such Default.

(i) Any reasonable, documented legal fees and other out-of-pocket costs of each Party to a dispute governed under this Section 3.9 shall be borne solely by the non-prevailing Party, as determined in connection with the relevant proceedings and, the prevailing Party in such proceedings shall be entitled, in addition to such other relief

as may be granted, to reimbursement of such reasonable legal fees and costs from the non-prevailing Party.

(ii) Any monetary award granted to a Party in connection with a dispute governed under this Section 3.9 shall include interest accruing daily at a rate of 1.1% per month, compounding monthly, from the date upon which it is determined the applicable state of Default began, until the Party in Default has satisfied in full its obligations arising from the arbitration proceedings (including the payment of such interest amount).

(b) *Remedy Not Exclusive*. The rights of the Non-Defaulting Party set forth in this Section 3.9 or elsewhere in this Agreement shall be in addition to such other rights and remedies that may exist at Law, in equity or under contract on account of such Default.

**ARTICLE IV**
**TRANSFER; EXIT OPPORTUNITIES**

**4.1 Restrictions on the Transfer of Interests.**

(a) *Permitted Transfers*. Each Party may Transfer all or part of such Party's rights, title and interest to any Asset or related assets in the Core Area acquired after the Effective Date and held directly or indirectly by any of the Parties (an "Asset Interest"), including such Party's Working Interests, only in accordance with applicable Law and the provisions of this Agreement, including this Article IV. Prior to the third (3rd) anniversary of the Effective Date, except for transfers to Permitted Transferees and Foreclosure Transfers, none of the Parties shall be permitted to Transfer all or any portion of such Party's Asset Interests without the prior written consent of the non-transferring Parties (each, a "Non-Transferring Party"), which consent may be given or withheld in the sole discretion of such Party. Any purported Transfer in breach of the terms of this Agreement shall be null and void *ab initio,* and the Non-Transferring Party shall not recognize any such prohibited Transfer. Any Party who Transfers or attempts to Transfer any Asset Interests (the "Transferring Party") except in compliance herewith shall be liable to, and shall indemnify and hold harmless, the Non-Transferring Parties for all costs, expenses, damages, and other Liabilities resulting therefrom. No Party shall place or allow to be placed any Lien on any of its Asset Interests other than Permitted Liens. "Permitted Liens" means (i) Liens granted by the Parties and/or subsidiary guarantors under any Applicable Credit Agreement or any security document (including any mortgaged or deeds of trust) entered into in connection therewith (so long as such Applicable Credit Agreement and such security documents are not, after the Effective Date, amended, restated, modified, renewed, refunded, replaced or refinanced in a manner that restricts the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive (including in a manner that would adversely impact the exercise of any Party's rights under this Article IV) than the restrictions imposed by such Applicable Credit Agreement or security document on the Effective Date (or provided for by the applicable form of security document in a form agreed to as of the Effective Date as set forth in such Applicable Credit Agreement)) (ii) Liens under or required by an applicable Operating Agreement, (iii) statutory Liens securing amounts not yet due and payable or which are being contested in good faith, (iv) judgment Liens that are bonded for appeal or will be paid by insurance, (v) all overriding royalty

and net profits interests affecting the Assets on the Effective Date, (vi) Liens securing hedging related to the Assets, (vii) Liens related to debt financing arrangements that do not restrict the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive than the restrictions imposed by Liens that were in place on the Effective Date under other debt arrangements of such Party or its Affiliates, (viii) Liens related to marketing or midstream arrangements, (ix) any volumetric production payment transaction affecting a Party's Asset Interest, *provided* such volumetric production payment transaction shall be released in connection with a Sale Transaction, (x) all cashiers', landlords', workmens', repairmens', mechanics', materialmens', warehousemens' and carriers' Liens and other similar Liens imposed by Law, in each case, incurred in the ordinary course of business, (xi) pledges, deposits or other Liens securing the performance of bids, trade contracts, leases or statutory obligations in each case, incurred in the ordinary course of business, (xii) purchase money Liens incurred in the ordinary course of business, (xiii) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of any of the Asset Interests, (xiv) encumbrances in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution (which in no event shall burden any Working Interests), or (xv) encumbrances arising out of, under or in connection with applicable securities Laws (which in no event shall burden any Working Interests and which shall be removed prior to the consummation of any Sale Transaction) or custodial arrangements with custodians of securities (which in no event shall burden any Working Interests).

(b) *Effect of Permitted Transfer*. Any Permitted Transferee must satisfy and comply with all requirements of a transferee of a Working Interest under any applicable Operating Agreement. Any Permitted Transferee to which any Asset Interests are Transferred hereunder shall be bound by, and sign on to and join, this Agreement, and shall become a Party for all purposes hereof and be bound by all provisions to which the Party that Transferred Asset Interests to it was or remains bound, *provided* that if a Permitted Transferee does not acquire all or substantially all Asset Interests of a Transferring Party hereunder, then it should obtain no rights under Article III. No Transfer of an Asset Interest shall relieve the Transferring Party of any obligations accruing prior to such Transfer under this Agreement or the applicable Operating Agreement. In a Foreclosure Transfer with respect to the Asset Interests of UnSub (a "Qualified Foreclosure Transfer"), the UnSub Agent or any designated special purpose vehicle established by the UnSub Agent, and in each case, any Permitted Transferee thereof (the "Qualified Foreclosure Transferee") (a) shall be bound by, and sign on to and join, this Agreement, (b) shall become a Party (and replace SN UnSub as a Party) for all purposes hereof and (c) each other Party shall be deemed to consent to the Qualified Foreclosure Transferee becoming a Party; *provided*, *however*, that if such Foreclosure Transfer covers less than all or substantially all of SN UnSub's Asset Interests, then unless otherwise agreed by SN UnSub and the Permitted Transferee, such Qualified Foreclosure Transferee shall not succeed to SN UnSub's rights under Article III. Except as provided in Section 6.2 or in a Foreclosure Transfer, if a Transfer is made to a Third Party in manner permitted by this Agreement or otherwise with the consent of the Non-Transferring Parties, then this Agreement shall terminate upon the consummation of such Transfer but only

with respect to the Asset Interest transferred (and this Agreement will remain in effect with respect to the remainder of the Asset Interests).

(c) *Expenses.* The Transferring Party shall bear all costs and expenses incurred in connection with any Transfer of all or any portion of its Asset Interests. Any transfer or similar taxes arising as a result of such Transfer shall be paid by the Transferring Party.

(d) *Certain Indirect Transfers*. Except for Transfers to Permitted Transferees, no Party shall indirectly Transfer any Asset Interests to the extent such Party is not permitted to Transfer Asset Interests directly pursuant to the terms hereof and any indirect Transfer shall be structured and consummated in such a manner that the Non-Transferring Party shall be provided the same rights and protections as it would have had if such Transfer were structured as a direct Transfer of such Asset Interests pursuant to the terms hereof; *provided*, *however*, that the sale of any Equity Interest in a Qualified Foreclosure Transferee to the extent necessary or desirable to comply with Law (including any bank regulatory requirements) shall not be subject to the restrictions set forth in Section 4.1(a). Notwithstanding anything in this Agreement to the contrary, a Transfer resulting from any change in control or transfer of ownership interests in Sanchez Energy shall not be treated as a Transfer under this Article IV unless such Transfer constitutes a Change of Control in which case Section 4.2 shall apply.

**4.2 Tag-Along Right.**

(a) Other than in connection with an IPO as contemplated by Section 4.4 and in connection with a Foreclosure Transfer, if at any time after the third (3rd) anniversary of the Effective Date and prior to an IPO of such Party (as defined herein), a Party proposes to Transfer all or any portion of its Asset Interests, whether in a single or series of related transactions, that constitute greater than thirty-five percent (35%) of such Party's total Asset Interests held as of the Effective Date to a Third Party purchaser or purchasers (a "Proposed Sale"), after complying with Section 4.3, the Transferring Party shall furnish to the other Parties (the "Non-Initiating Parties") a written notice of such Proposed Sale (the "Tag-Along Notice") and provide the Non-Initiating Parties the opportunity to participate in such Proposed Sale on the terms described in this Section 4.2 to the extent of their respective ownership interests in the assets to be transferred in such Proposed Sale. The Tag-Along Notice will include:

(i) the material terms and conditions of the Proposed Sale, including (A) the Asset Interests to be Transferred, (B) the name of the proposed transferee (the "Proposed Transferee"), (C) the proposed amount and form of consideration (including the proposed price on a per Working Interest percentage basis based on an allocation of value by applicable Leases, Wellpads, and other applicable Assets, which will include an allocation to individual producing wells and undeveloped acreage based on the bona fide third party offer), and (D) the proposed Transfer date, if known, which date shall not be less than forty-five (45) Business Days after delivery of such Tag-Along Notice*;* and

(ii) an invitation to the Non-Initiating Party to participate in such Proposed Sale at the same per Working Interest percentage price per applicable Asset, for



012230

the same form of consideration and on the same terms and conditions as those offered to the Transferring Party in the Proposed Sale. The Transferring Party will deliver or cause to be delivered to the Non-Initiating Party copies of all transaction documents relating to the Proposed Sale as promptly as practicable after they become available.

(b) A Non-Initiating Party must exercise the tag-along rights provided by this Section 4.2 within twenty (20) Business Days following delivery of the Tag-Along Notice by delivering a notice (the "Tag-Along Offer") to the Transferring Party indicating its desire to exercise its tag-along rights hereunder. If the Non-Initiating Party does not make a Tag-Along Offer within twenty (20) Business Days following delivery of the Tag-Along Notice, the Non-Initiating Party shall be deemed to have waived its rights under this Section 4.2 with respect to such Proposed Sale, and the Transferring Party shall thereafter be free to Transfer the applicable Asset Interests (as defined in Section 4.5(a)) to the Proposed Transferee without the participation of such Non-Initiating Party, for the same form of consideration set forth in the Tag-Along Notice, at a per Working Interest percentage price no greater than the per Working Interest percentage price per applicable Asset set forth in the Tag-Along Notice, and on other terms and conditions which are not more favorable to the Transferring Party than those set forth in the Tag-Along Notice. If one or more Non-Initiating Parties elects to participate in the Proposed Sale pursuant to this Section 4.2, (i) the consideration to be received by the Parties in such sale (a "Tag-Along Transaction") will be calculated by taking the aggregate proceeds from such Tag-Along Transaction and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Leases, Wellpads, and other applicable Assets and other interests included by the Parties (collectively, the "Tag Interests"), as agreed by the Parties or as otherwise determined pursuant to the valuation process set forth in Section 4.5(c), taking into account (in either case) the Parties' proportionate ownership of the Working Interests in the properties transferred pursuant to the Tag-Along Transaction, the allocation of value among the Working Interests included in the sale as determined with the Third Party buyer (but only to the extent that all Parties approved in writing such allocation prior to execution of the applicable agreement), and any other relevant information, ***provided***, that the total Fair Market Value of the aggregate interests to be sold for purposes hereunder will be equal to the sale price determined by the purchaser of the interests included by the Parties in the Proposed Sale; and (ii) the Non-Initiating Parties shall agree to make to the Proposed Transferee the same representations and warranties, covenants and indemnities as the Transferring Party agrees to make in connection with the Proposed Sale (which may be modified as necessary as to form to the extent one Party is Transferring Working Interests and the other Party is Transferring Equity Interests holding Working Interests, and such other distinctions as may be applicable to the Parties or their interests in the Leases, Wellpads, and other applicable Assets); ***provided***, that (A) no Party shall be liable for the breach of any covenant by any other Party, (B) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, and (C) in no event shall a Non-Initiating Party be responsible for any Liabilities or indemnities in connection with such Proposed Sale in excess of the proceeds received by such Non-Initiating Party in the Proposed Sale.

(c) In the event that the consideration received in connection with a Proposed Sale consists of securities that are not registered under the Securities Act, and any Non-Initiating Party exercises its tag-along rights hereunder in connection with such Proposed Sale, if the

Transferring Party is entitled to registration rights in respect of such securities, the Transferring Party shall ensure that each Non-Initiating Party, as applicable, will receive pro rata piggy back registration rights on any registration in which the Transferring Party is entitled to register such securities (together with a pro rata number of the total demand registrations granted to the Transferring Party).

(d) The offer of a Non-Initiating Party contained in any Tag-Along Offer shall be irrevocable, and, to the extent such Tag-Along Offer is accepted, such Non-Initiating Party shall be bound and obligated to Transfer in the Proposed Sale on the same terms and conditions, with respect to each Asset Interest Transferred, as the Transferring Party; *provided*, *however*, that if the terms of the Proposed Sale change with the result that the per Working Interest percentage price shall be less than the per Working Interest percentage price set forth in the Tag-Along Notice, the form of consideration shall be different or the other terms and conditions (other than, for the avoidance of doubt, inside tax basis associated with such interests, if applicable) shall be materially less favorable to such Non-Initiating Party than those set forth in the Tag-Along Notice, such Non-Initiating Party shall be permitted to withdraw the offer contained in the applicable Tag-Along Offer by written notice to the Transferring Party and upon such withdrawal shall be released from such Party's obligations.

(e) If a Party exercises its rights under this Section 4.2, the closing of the sale of each Party's Asset Interest in the Tag-Along Transaction will take place concurrently, other than in connection with a Change of Control. If the closing with the Proposed Transferee (whether or not the Non-Initiating Party has exercised its rights under this Section 4.2) shall not have occurred by 5:00 p.m. Eastern Time on the date that is one-hundred and twenty (120) days after the date of the Tag-Along Notice, as such period may be extended to obtain any required regulatory approvals, and on terms and conditions not more favorable to the Transferring Party than those set forth in the Tag-Along Notice, all the restrictions on Transfer contained herein shall again be in effect with respect to such Asset Interest and proposed Transfer.

(f) The costs of any transactions contemplated by this Section 4.2 shall be deducted pro rata from the proceeds to be paid to each Party in connection with such transaction, other than in connection with a Change of Control, in which case each Party participating in a Tag Transaction shall bear its own costs and expenses.

(g) Notwithstanding anything in this Agreement to the contrary, the Parties agree that a Change of Control with respect to Sanchez Energy shall be treated as a Transfer pursuant to this Section 4.2, provided that (i) a Tag Notice in such circumstances shall be given no later than two (2) Business Days following the public announcement of definitive documentation providing for a Change of Control, (ii) such Change of Control may be consummated prior to the consummation of the acquisition of the Non-Initiating Party's Tag Interests (which at the election of the Non-Initiating Party may be effected as an asset sale or as the sale of Equity Interests of an entity directly or indirectly owning the Assets of the Non-Initiating Party (provided that the Proposed Transferee shall not be required to assume any indebtedness for borrowed money and such entity shall have had no material business operations since its formation other than as related to the Assets)), (iii) the Proposed Transferee and the Non-Initiating Party shall enter into a purchase



012232

agreement providing for the acquisition of the Non-Initiating Party's Tag Interests no later than twenty five (25) Business Days after the Non-Initiating Party's acceptance of a Tag Offer, which purchase agreement shall be substantially similar in all material respects to the terms and conditions of the Purchase Agreement, and (iv) the purchase price to be paid for the Non-Initiating Party's Tag Interests shall be determined based on the Fair Market Value of such Tag Interests in accordance with Section 4.5(f), subject to any applicable purchase price adjustments set forth in the purchase agreement referenced in the foregoing clause (iii). Sanchez Energy shall use its reasonable best efforts to cause a proposed transferee to comply with the terms of this Section 4.2(g); provided that in any consensual transaction between Sanchez Energy and a proposed transferee that results in a Change of Control, including a transaction where the board of directors of Sanchez Energy approve such transaction, Sanchez Energy shall cause such transferee to comply with this Section 4.2(g).

**4.3 Right of First Offer.**

(a) Other than in connection with an IPO as contemplated by Section 4.4, or in connection with a Foreclosure Transfer, and subject to the terms of any applicable Operating Agreement, if any Party proposes to Transfer any of the Asset Interests held by such Party, including Blackstone pursuant to Section 4.5 (a "ROFO Transferor") to a Third Party purchaser, the ROFO Transferor agrees that, before entering into negotiations with a Third Party, the Transferring Party will first provide notice (a "ROFO Notice") to the other Parties (the "ROFO Recipients") that the ROFO Transferor proposes to pursue such a transaction. Each such ROFO Notice will invite the ROFO Recipient to submit to the ROFO Transferor an offer in writing (a "ROFO Offer"), which offer shall (i) be irrevocable and in good faith, (ii) be for all cash (except SN may choose to fund a ROFO Offer with cash or SN Common Stock or a combination thereof) (any such ROFO Offer including SN Common Stock as consideration an "SN Equity Financed Offer")), (iii) specify in reasonable detail the material terms and conditions of such offer (including as set forth in Section 4.3(b) with respect to a SN Equity Financed Offer), (iv) shall provide for a closing date of no longer than ninety (90) days from the execution of a definitive purchase agreement and provide for no holdback or escrow of purchase price, and (v) shall remain open for acceptance by the ROFO Transferor for thirty (30) days after the ROFO Transferor's receipt of such ROFO Offer, to purchase from the ROFO Transferor one hundred percent (100%) of the Asset Interests that are the subject of the ROFO Notice, which at the sole election of the ROFO Transferor may be structured as a purchase of Working Interests or Equity Interests of an entity holding Asset Interests (the "ROFO Interests"). The ROFO Offer shall be submitted to the ROFO Transferor within thirty (30) days after the ROFO Recipient's receipt of the ROFO Notice and shall include a proposed definitive purchase agreement that such ROFO Recipient is prepared to execute upon the acceptance by the ROFO Transferor of the ROFO Offer. Upon the receipt by the ROFO Transferor of any ROFO Offer, the ROFO Transferor and the applicable ROFO Recipient shall negotiate in good faith for a period of thirty (30) days regarding the ROFO Offer. In the event the Parties are unable to reach agreement during such period, the ROFO Transferor may elect by notice to such ROFO Recipient submitted at any time during the 30-day period following such negotiation period to accept or reject the ROFO Offer (it being understood that a failure of the ROFO Transferor to submit an unqualified acceptance notice within such 30-day period shall constitute a rejection of the ROFO Offer). If the ROFO Transferor timely submits an

acceptance notice, the ROFO Transferor and the applicable ROFO Recipient shall in good faith negotiate a definitive purchase and sale agreement (which shall include the terms and conditions set forth in the ROFO Offer) and use their reasonable best efforts to consummate the purchase and sale of the ROFO Interests as promptly as practicable and in any event within ninety (90) days from the execution of a definitive purchase agreement. If only one ROFO Recipient timely submits a ROFO Offer, the ROFO Transferor may effectuate the sale of all the ROFO Interests to such ROFO Recipient alone. If neither ROFO Recipient timely submits a ROFO Offer or any ROFO Offer is rejected (or deemed rejected as described above) by the ROFO Transferor, the ROFO Transferor may effectuate a sale of all the ROFO Interests to a Third Party so long as (i) if a ROFO Offer was made, the Transfer price is at least one hundred percent (100%) of the offer price set forth in such ROFO Offer (taking into account Section 4.3(b) below) and the other terms and conditions offered to the Third Party are not materially more favorable to the Third Party than those of such ROFO Offer; and (ii) the execution of definitive documentation for the sale of such ROFO Interests to such Third Party shall occur no later than two hundred and seventy (270) days after a rejection (or deemed rejection) of such ROFO Offer.

(b) In connection with any SN Equity Financed Offer:

(i) the determination of the value of SN Common Stock included in a SN Equity Financed Offer shall (i) apply an appropriate illiquidity discount, which may take into account, as applicable, the discounts applied to comparable private placements or block trades of comparable size as compared to the applicable market price of such securities and/or discounts applied to publicly traded common equity used as acquisition currency by relevant valuation methodologies customarily used by leading financial valuation firms in similar circumstances and (ii) be discounted for any adverse liquidity effects that are attributable to the payment of any applicable taxes associated with the receipt of such SN Common Stock, in each case (i) and (ii), as reasonably determined by the ROFO Transferor, *provided*, that no discount with respect to clause (ii) shall apply if the SN Equity Financed Offer includes a portion of cash consideration equal to or greater than the expected aggregate amount of tax payable by the ROFO Transferor, including Blackstone and any of its direct and indirect equity owners as a result of the consummation of such SN Equity Financed Offer and assuming that the aggregate amount of such tax shall be computed using an assumed tax rate equal to the highest maximum combined marginal federal, state and local income tax rates applicable to an individual or corporate taxpayer resident in New York, NY;

(ii) the ROFO Offer shall provide for a fixed value, including a fixed value for the portion of consideration represented by SN Common Stock, payable upon closing, unless otherwise agreed to by the ROFO Transferor;

(iii) if the ROFO Transferor would beneficially own on a pro forma basis (calculated in accordance with clause (vi) below) more than twenty percent (20%) of the outstanding SN Common Stock, Sanchez Energy shall provide representation rights for the Sanchez Energy Board of Directors to the ROFO Transferor approximately equal to its pro

forma beneficial ownership percentage of SN Common Stock following the consummation of any ROFO Offer pursuant to documentation reasonably acceptable to Blackstone;

(iv) no Event of Default (as such term may be then defined under the SN Credit Agreement) shall have occurred under the SN Credit Agreement;

(v) Sanchez Energy shall have a rating equal to or higher than "B3" (or the equivalent) by Moody's or its successors, or an equivalent rating by S&P or Fitch, Inc. (or either of its successors);

(vi) the resulting share issuance will not cause the ROFO Transferor to beneficially own more than thirty-five percent (35%) of outstanding SN Common Stock on a pro forma basis excluding any SN Common Stock owned prior to the Effective Date or issued to Blackstone or GSO pursuant to this Agreement after the Effective Date;

(vii) the SN Common Stock shall be listed on the New York Stock Exchange or the NASDAQ Stock Market (or their respective successors); and

(viii) the SN Common Stock to be issued to the ROFO Transferor shall be entitled to the benefits of a registration rights agreement substantially similar in form and substance to the Registration Rights Agreement.

**4.4 Initial Public Offering**. Notwithstanding anything to the contrary herein, at any time following the third (3rd) anniversary of the Effective Date, any Party shall have the right to consummate an initial public offering of a vehicle that includes its respective Working Interests in the Assets at the time such IPO is initiated ("IPO"). The Party planning to carry out the IPO (the "IPO Party") may elect to exercise such right by delivering written notice of such election (an "IPO Notice") to the other Parties (each a "Non-IPO Party"). Each Non-IPO Party shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to), following receipt of an IPO Notice, cooperate and take such actions as are reasonably requested by the IPO Party or its Affiliates to help facilitate any such IPO, and the IPO Party shall reimburse each Non-IPO Party and its Affiliates for their reasonable out-of-pocket costs and expenses incurred in connection therewith.

**4.5 Sale Transaction.**

Subject to the limitations and conditions set forth in this Section 4.5 and the Right of First Offer set forth in Section 4.3:

(a) If at any time after the third (3rd) anniversary of the Effective Date (or within nine (9) months following the termination of this Agreement), Blackstone elects, pursuant to a Bona Fide Offer, to pursue a Transfer to a Third Party (other than GSO or any of its Affiliates) pursuant to the terms of such Bona Fide Offer (the "Sale Transaction Transferee") of all or substantially all of the Working Interests and other Assets acquired by Blackstone pursuant to the Purchase Agreement and all related assets in the Core Area acquired after the Effective Date and



012235

then held directly or indirectly by Blackstone and its Affiliates (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads) (other than with respect to Excluded AMI Transactions (as defined in Section 5.2)), or all of the Equity Interests of any entity directly or indirectly owning all of such Working Interests and other Assets and related assets (a "Sale Transaction," which shall include a Sale Transaction Equitable Partition and the consummation of the sale contemplated thereby, but not an Alternative Equity Partition), and *provided*, that (i) Blackstone is not the Operator of all of the Assets, (ii) SN or any of its Affiliates is the Operator of any of the Assets and (iii) SN, SN UnSub and any of their respective Affiliates that then own any interests in the Asset Interests have not unconditionally agreed in writing to vote their applicable interests to support the designation of the Third Party who has made such Bona Fide Offer as operator under the applicable Operating Agreements, Blackstone shall, subject to Section 4.5, including Sections 4.5(h) and 4.5(i), have the right to compel Sanchez Energy, SN, SN UnSub, and their respective Affiliates to sell or otherwise convey to the Sale Transaction Transferee all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of SN and its Affiliates related to the Leases and/or Wellpads ("SN Operatorship Rights")) within an area of land comprising seventy-five percent (75%) of the Fair Market Value of the Core Area (the "Included Percentage") (*provided*, that if the transfer of such land would result in Sanchez Energy transferring all or substantially all of its assets pursuant to applicable Law, then such applicable percentage of Fair Market Value shall be such lesser percentage that would not constitute all or substantially all of the assets of Sanchez Energy pursuant to applicable Law, but in no event shall such percentage be lower than sixty-six percent (66%)) (it being agreed that for purposes of this Section 4.5, the Core Area shall not include any acreage for which a Party or any of its Affiliates does not then own Working Interests) (such area, the "Included Sale Transaction Area," and the remainder of the Core Area, the "Excluded Sale Transaction Area" and such remaining percentage, the "Excluded Percentage") to be determined as provided below in this Section 4.5(a), and in connection and contemporaneously with such Sale Transaction, Blackstone shall convey (and if applicable, cause its Affiliates to convey) all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads ("Blackstone Operatorship Rights")) within the Excluded Sale Transaction Area to SN and SN UnSub. Upon the election by Blackstone to pursue a Sale Transaction, SN, SN UnSub, and Blackstone shall negotiate in good faith for a period of forty-five (45) days to agree upon and designate the Included Sale Transaction Area and the Excluded Sale Transaction Area, based on substantially proportionate geographic divisions and customary industry practices and their respective reserve reports covering the previous twelve (12) month period, such that the Included Sale Transaction Area comprises the Included Percentage and the Excluded Sale Transaction Area comprises the Excluded Percentage, respectively, of the aggregate Fair Market Value of the Core Area (a "Sale Transaction Equitable Partition") in addition to an alternative partition such that the Included Sale Transaction Area comprises Assets in the Core Area equal to fifty percent (50%) of the aggregate Fair Market Value of the Core Area (or if at such time the relative ownership percentages of SN and its Affiliates and Blackstone and its Affiliates in the Core Area are not 50%/50%, then the percentage of the Fair Market Value owned in the Core Area by Blackstone and its Affiliates as compared to SN and its Affiliates) (such percentage, the "Blackstone Percentage") and the Excluded Sale Transaction Area comprises

that percentage of Assets in the Core Area equal to one hundred percent (100%) less the Blackstone Percentage (an "Alternative Equitable Partition" and together with a Sale Transaction Equitable Partition, each an "Equitable Partition"). An Equitable Partition shall (i) proportionately distribute to SN and SN UnSub, on the one hand, and the Sale Transaction Transferee or Blackstone, as applicable, on the other hand, in the same proportion and with substantially similar characteristics as each Party held in the Core Area, prior to the Equitable Partition, the following: (A) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (B) producing wells and current production (including substantially similar decline profiles and cash flow profiles), proved developed non-producing acreage and undeveloped acreage, (C) remaining reserves, (D) potential future well locations, and (E) allocation of exposure to demand charges, minimum volume commitments and commodity charges (and other similar costs and obligations) under the midstream and marketing agreements in place in the Core Area; (ii) seek to allocate the entirety of a Lease and the acreage governed by an applicable joint operating agreement into either the Included Sale Transaction Area or the Excluded Sale Transaction Area; (iii) take into account any other relevant factors, including, if applicable, a prior Division of Operatorship, and any restrictions on assignment of the applicable Working Interests and other Assets and, subject to the other express provisions of this Section 4.5, seek to mitigate any such restrictions if they are reasonably likely to impede or delay an Equitable Partition and (iv) in the case of an Alternative Equitable Partition, in no event shall SN UnSub have lower values of PDP PV-10 or projected cash flow from PDP reserves after such Alternative Equitable Partition (*provided*, that any assignments and conveyances among the Parties under an Alternative Equitable Partition shall be on terms substantially similar to the assignment and conveyance terms under the Purchase Agreement). If, following such forty-five (45) day period, SN, SN UnSub, and Blackstone are unable to agree upon an Equitable Partition, then the Equitable Partition shall be decided by Financial Advisors and Reserve Auditor(s) using the same process as provided for an Equitable Division pursuant to Section 3.8(e)(i), *mutatis mutandis* (but with such modifications as may be necessary to determine a Sale Transaction Equitable Partition and an Alternative Equitable Partition in accordance with this Section 4.5, including in order to include SN UnSub as a party to such process), and after the final determination of the Equitable Partition by the Financial Advisors and upon the execution of definitive documentation as required to carry out the Sale Transaction or the Alternative Equitable Partition, as applicable, pursuant to this Section 4.5, the Parties hereto and their Affiliates shall use their respective reasonable best efforts to effectuate the applicable Equitable Partition as promptly as practicable (for no additional consideration other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied). In order to facilitate an efficient and orderly Sale Transaction process, Blackstone may elect to initiate (and cause Sanchez Energy to participate in) the determination of the Equitable Partition upon the delivery by Blackstone of a ROFO Notice, and from such time as a ROFO Notice is provided until the time that a Sale Transaction or Alternative Equitable Partition is consummated as provided for in this Section 4.5, neither SN nor its Affiliates shall initiate a Division of Operatorship. In the event that Blackstone is unable to cause Sanchez Energy, SN, SN UnSub and/or their respective Affiliates to participate in a Sale Transaction as a result of any of the limitations set forth in this Section 4.5, then Blackstone shall have the right to effectuate an Alternative Equitable Partition, whereby Blackstone shall be entitled to all Assets of

the Parties in the Included Sale Transaction Area and SN and SN UnSub shall be entitled to all Assets of the Parties in the Excluded Sale Transaction Area (in each case as such areas are determined pursuant to this Section 4.5(a) with respect to an Alternative Equitable Partition, for no consideration payable other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied), and the Parties shall use their respective reasonable best efforts to effect such Alternative Equitable Partition as promptly as practicable. In connection with the effectuation of an Alternative Equitable Partition and to the extent a Sale Transaction has not been consummated, the Parties shall use their respective reasonable best efforts to cause Blackstone or its designee (or if applicable a Sale Transaction Transferee) to become operator under each joint operating agreement applicable to the Assets included in the Included Sale Transaction Area and cause SN or its designee to become operator under each joint operating agreement applicable to the Assets included in the Excluded Sale Transaction Area, and in the event that such operatorship is not vested in the applicable party prior to the time that a Sale Transaction Equitable Partition (which shall be consummated as of the closing of a Sale Transaction or as promptly as practicable thereafter) or Alternative Equitable Partition is otherwise ready to be completed, then the principles of Section 3.8(e) shall apply, *mutatis mutandis*, as though the party to whom operatorship should be transferred were the Post-Division Operator and the Party or its Affiliate that is the operator under an applicable joint operatorship were the Pre-Division Operator (including, without limitation, Section 3.8(e)(ii)), and, if necessary, the Pre-Division Operator shall maintain a sufficient minimal interest so as to not effect an automatic resignation of operatorship under the applicable operating agreements.

(b) Each of Blackstone, Sanchez Energy, SN and SN UnSub and each of their applicable Affiliates shall consent to such Sale Transaction or to carry out an Alternative Equitable Partition and will cooperate in good faith and use reasonable best efforts to obtain all necessary approvals and authorizations from its and its subsidiaries' shareholders (including holders of any preferred equity interests), Board of Directors or other governing bodies, joint venture partners and lenders (including, for the avoidance of doubt, consent from lenders to an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, and regardless of whether any restriction or limitation in any financing arrangement that is otherwise permitted by this Section 4.5), as applicable, and will cooperate in good faith and use reasonable best efforts to remove all Permitted Liens (other than the Permitted Liens described in clauses (iv) and (xii) of the definition thereof) from the applicable Assets and other interests to be conveyed in a Sale Transaction or Alternative Equitable Partition and to take or cause to be taken all other reasonable actions, including seeking any necessary consents required for assignment of interests in the Assets and related interests to be conveyed in a Sale Transaction or Alternative Equitable Partition or a change in operatorship to the applicable purchaser in a Sale Transaction or in an Alternative Equitable Partition or any other actions reasonably necessary or desirable to cause the consummation of such Sale Transaction on the terms of the Bona Fide Offer and in order to maximize the value to be realized by the Parties in connection with a Sale Transaction or otherwise to effect an Alternative Equitable Partition. For the avoidance of doubt, the preceding sentence shall not be construed to require Sanchez Energy, SN or SN UnSub to restructure its ownership of the Assets, provided that, subject to the terms of this Agreement, none of Blackstone, Sanchez

Energy, SN and SN UnSub nor any of their Affiliates shall take any action for the purpose of preventing or materially impeding the consummation of a Sale Transaction or an Alternative Equitable Partition. Notwithstanding anything in Section 4.5 or this Agreement to the contrary, (i) Blackstone's rights to compel a Sale Transaction or an Alternative Equitable Partition and (ii) the obligations of Sanchez Energy, SN, SN UnSub, and their respective Affiliates to consent to such transaction, are subject to (a) compliance by SN, SN UnSub and their respective Affiliates with the requirements under each of their debt financing arrangements as of the Effective Date (as the same may be amended and together with any new debt financing arrangement, in each case that shall have been established in good faith and for valid business purposes and on market terms); *provided*, that Sanchez Energy, SN, SN UnSub and their respective Affiliates shall use their respective reasonable best efforts to ensure that any new debt financing arrangement or amendment of an existing financing arrangement entered into after the Effective Date shall not expressly restrict an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, (b) compliance with all of the provisions of this Section 4.5 or (c) required landowner consents, midstream consents or other third party consents.

(c) [Intentionally Omitted]

(d) Subject to the limitations and conditions of this Section 4.5, the Parties will execute the agreement negotiated by Blackstone in connection with such a Sale Transaction (a "Sale Transaction Agreement") and will take such other actions as may be reasonably requested by Blackstone to effect such Sale Transaction; *provided*, *however*, that (i) Sanchez Energy, SN, SN UnSub or their Affiliates bound hereby, as applicable, shall only be required to make the same (or substantially similar in all material respects) representations, warranties and covenants and the same indemnities as Blackstone agrees to make in connection with the Sale Transaction (unless expressly contemplated otherwise in this Section 4.5), except that in no event shall any Party be required to agree to any non-competition or non-solicitation covenant in connection with the Sale Transaction or to make any representation or warranty that would be inaccurate when made without the ability to provide disclosure against such representation or warranty, (ii) no Party shall be liable for the breach of any covenants of any other Party, (iii) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, (iv) any liability relating to representations and warranties (and related indemnities) or other indemnification obligations in connection with the Sale Transaction and related to the Assets shall be shared by the Parties pro rata on a several (but not joint) basis in proportion to the proceeds received by each Party in the Sale Transaction, (v) no Party shall have aggregate liability relating to the representations and warranties (and related indemnities) or other indemnification obligations in excess of the purchase price (nor shall any Party have aggregate liability with respect to the breach of non-fundamental or tax-related representations and warranties (and related indemnities) in excess of twenty-five percent (25%) of the purchase price to be received in the Sale Transaction by such Party without such Party's consent, which may be withheld by such Party in its sole discretion) and (vi) any escrow or other holdback of proceeds shall be allocated on a pro rata basis among the applicable Parties.

(e) In connection with a Sale Transaction, the form of consideration will consist of either (i) all cash or (ii) cash and not more than twenty-five (25%) in value of publicly traded securities, subject to the following: in connection with such a Sale Transaction (i) if the form of consideration is a combination of cash and securities, the portion of such consideration that is cash shall be the greater percentage of (A) seventy-five (75%) percent cash and (B) the percentage of cash necessary for Sanchez Energy, SN and its Affiliates to meet any debt financing covenants which are then in existence (up to one hundred percent (100%) cash requirements) (*provided*, that Blackstone or its applicable Affiliate may elect to take a higher percentage of equity consideration in a Sale Transaction than the other participating sale parties in order to satisfy the requirements of this clause (i)), (ii) subject to the preceding clause (i), all Parties shall be allocated the same form of consideration, or if any Parties are given an option as to the form and amount of consideration to be received, all Parties will be given the same option and (iii) the consideration to be received by the Parties in a Sale Transaction will be calculated by taking the aggregate proceeds from such Sale Transaction (excluding all out-of-pocket costs incurred by the Parties in connection with such Sale Transaction, which shall be borne by the Parties in proportion to their respective rights to the aggregate sale proceeds; *provided*, that any agreements with accountants, attorneys, investment bankers or other such professional service firms in connection with a Sale Transaction shall be negotiated at arms-length and be at prevailing market rates and *provided*, *further*, that SN shall have the right to consent to any investment bank hired to direct the Sale Transaction process, such consent not to be unreasonably withheld, conditioned or delayed) and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Assets and other interests included by Blackstone, SN and SN UnSub and their respective Affiliates in the Sale Transaction (collectively, the "Drag Interests"), as agreed by the Parties or as otherwise determined pursuant to an Equitable Partition.

(f) For purposes of Section 4.5(e) and Section 4.2(b), in the event the applicable Parties (for purposes of this paragraph, collectively, the "Dispute Parties") disagree as to the relative Fair Market Value of the Drag Interests or Tag Interests, as applicable, included by each Party and cannot resolve such dispute (after good faith negotiations lasting no more than ten (10) Business Days) (it being agreed that an Equitable Partition determined in accordance with Section 4.5(a) shall be final and binding on the Parties), then any Dispute Party may elect for the Dispute Parties to engage one mutually-agreeable reputable national or regional investment bank or valuation firm with experience in the valuation of oil and gas interests in the Eagle Ford Shale (the "Valuation Firm") to determine the relative Fair Market Value (on a percentage basis) of the Drag Interests or Tag Interests, as applicable, included by each Party. In the event that Blackstone has not effected a Division of Operatorship, any determination of the Fair Market Value shall assume that Blackstone holds rights to operatorship of such portion of the Assets as though an Equitable Division had been consummated. The Valuation Firm shall be selected by the Dispute Parties from among the parties included on Annex IV and if the Dispute Parties are unable to agree then SN in the case of a Sale Transaction or Blackstone in the case of a Proposed Sale shall choose. The Dispute Parties shall each cooperate fully with the Valuation Firm, including by providing all reasonably requested information, data and work papers of such Dispute Party and shall make available personnel and accountants to explain any such information, data or work papers. The Parties shall cause the Valuation Firm to render its determination as soon as reasonably practicable

but in no event later than fifteen (15) Business Days after the Valuation Firm was engaged; *provided*, *however*, if the dispute relates to Tag Interests, the Parties shall cause the Valuation Firm to render its determination no later than the second (2nd) Business Day prior to the expiration of the Tag-Along Offer. The Valuation Firm's determination of the relative value of the Drag Interests (the "Final Valuation") shall be final and binding on the Dispute Parties, and any proceeds to be received in such indirect approved sale shall be split between the Dispute Parties based upon the relative valuation percentages set forth in the Final Valuation. The fees and costs of the Valuation Firm shall be split equally between the Parties based on their respective proportionate amount of Working Interests to be conveyed in the applicable transaction, and the Parties shall provide, and shall cause their Controlled Affiliates, and shall use their reasonable best efforts to cause their other Affiliates to provide, all information available to them that may be reasonably requested by the Valuation Firm.

(g) In connection with a Sale Transaction, if reasonably requested by the applicable buyer, Sanchez Energy, if the Sanchez Operator remains the Operator for any Wellpads or Leases, shall use its commercially reasonable efforts to enter into a customary transition services agreement with the purchaser at the closing of such Sale Transaction, or Sanchez Energy shall cause any applicable Affiliate or entity then providing management services to Sanchez Energy and capable of providing transition services to enter into such agreement, which transition services agreement shall be substantially similar in all material respects to the transition services agreement with Affiliates of Anadarko pursuant to the Purchase Agreement, *provided*, that the term shall be no more than two months and Sanchez Energy or its Affiliate shall be entitled to earn a mark-up of ten percent (10%) over cost on all services provided thereunder.

(h) Notwithstanding anything contained in this Section 4.5 to the contrary but, with respect to SN UnSub, subject to Section 4.5(i), (i) there shall be no liability or obligation on behalf of Blackstone or its Affiliates if such entities determine, for any reason, not to consummate a Sale Transaction or an Equitable Partition, and Blackstone shall be permitted to discontinue at any time any Sale Transaction or Equitable Partition initiated by Blackstone by providing written notice to SN and SN UnSub and (ii) Blackstone may not cause Sanchez Energy, SN, SN UnSub and their respective Affiliates to participate in a Sale Transaction unless the consideration received by Sanchez Energy, SN, SN UnSub and their respective Affiliates in such Sale Transaction (including distributions of cash on hand at SN and SN UnSub that are made to SN and UnSub in connection with such sale) would be greater than or equal to the sum (the "Required Return Sum"), without duplication, of (A) (x) the amount of capital which was invested, borrowed, used or otherwise provided in connection with the financing, acquisition, ownership or operation of the Assets, and any related assets (including for the avoidance of doubt, any assets being retained by SN or Unsub in the Sale Transaction) less all distributions previously made on account of any equity capital invested by Parties other than GSO (or its Affiliates), (y) payments by the relevant Person and its Affiliates arising under or related to the redemption, repayment or refinancing of any securities, credit facilities, financial vehicles, debentures, notes, guarantees or liabilities procured to carry out any and all transactions contemplated under the Purchase Agreement or this Agreement, in each case, that are required as a result of the consummation of a Sale Transaction and (z) disbursements, fees or costs reasonably incurred or to be incurred by the relevant Person and its Affiliates to suspend, reassign, demobilize, stack, terminate, sell off and restructure all

applicable personnel, equipment and operations related, directly or indirectly, to the Assets in connection with such Sale Transaction, (B) the amount of capital GSO (or its Affiliates) invested in SN UnSub, (C) the Base Preferred Return Amount as required under the SN UnSub Partnership Agreement and (D) the outstanding indebtedness for borrowed money of SN and SN UnSub upon such applicable date of determination (net of any cash and cash equivalents of SN and SN UnSub as of such date) to the extent that a buyer in connection with a Sale Transaction does not assume or directly repay such outstanding indebtedness; *provided*, for purposes of the foregoing subparts (A) through (D), that such equity or debt that is amended, incurred or established following the Effective Date is done so in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such equity or debt; *provided*, *further*, that with the written consent of GSO, the Required Return Sum will be adjusted downward equitably to reflect the percentage of Assets actually to be transferred in a Sale Transaction by SN and SN UnSub as compared to the Assets acquired by SN and SN UnSub pursuant to the Purchase Agreement. In addition, (i) a fair and reasonable allocation of the proceeds from a proposed Sale Transaction between SN and SN UnSub shall be made in the reasonable judgment, in good faith and for valid business purposes, of Sanchez Energy, SN and SN UnSub (in accordance with their then existing debt arrangements) and (ii) in no event shall SN or SN UnSub be compelled to enter into a Sale Transaction unless, after the application of the proceeds from such Sale Transaction, after satisfying the conditions in the foregoing subpart (i), the proceeds payable to SN UnSub shall be an amount sufficient to return to its equity holders one hundred percent (100%) of the equity invested in SN UnSub.

(i) Notwithstanding anything in this Section 4.5 or this Agreement to the contrary, prior to the Redemption Date, without the prior written consent of GSO, SN UnSub shall not (and shall not be required to), and no Party shall cause SN UnSub to participate in any transfer or disposition (or enter into definitive documentation providing for any transfer or disposition) of any of its Working Interests or other Assets (or any portion thereof) under this Section 4.5 (other than an Alternative Equitable Partition), and Blackstone shall not have the right to compel a Sale Transaction with respect to SN UnSub's Working Interests and Assets (or any portion thereof), unless (i) such transfer or disposition complies with the terms and conditions of SN UnSub's debt financing arrangements applicable as of the Effective Date and such other debt financing arrangements that as amended, or as incurred or established following the Effective Date in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such debt, (ii) the Preferred Units receive an amount of cash equal to the Base Preferred Return Amount with respect to each Preferred Unit in redemption in full of all outstanding Preferred Units, pursuant to and in compliance with the SN UnSub GP LLC Agreement and SN UnSub Partnership Agreement, less any debt incurred, Preferred Units or Common Units issued by SN UnSub in connection with funding of properties outside of the AMI and (iii) GSO has the right to act on behalf of, and enforce all rights of, SN UnSub in connection with this Section 4.5. For the avoidance of doubt and for purposes of clarity, an Alternative Equitable Partition is intended to provide SN UnSub with substantially similar characteristics and value, after giving effect to such Alternative Equitable Partition, as SN UnSub held in the Core Area prior to the Alternative Equitable Partition, in accordance with the procedures in Section 4.5(a).

**ARTICLE V**
**ADDITIONAL COVENANTS**

**5.1 Information Rights.**

(a) Notwithstanding anything to the contrary in the Operating Agreements (but, for the avoidance of doubt, in addition to the information and data required to be provided to the Parties pursuant any Operating Agreement), Operator shall provide the Parties, in electronic format, with the following information and reports with respect to the Assets reasonably promptly after such information becomes available to Operator or could have been prepared without incurring unreasonable time and cost by Operator or any of its Affiliates:

(i) daily volumes for oil, gas, condensate, and water, choke size and tubing, casing, and flowing pressure;

(ii) monthly lease operating expense statement;

(iii) monthly oil, gas, and condensate sales reports;

(iv) drilling and workover reports, which shall include the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and hydrocarbon information, casing and cementation tallies, and estimated cumulative costs;

(v) daily drilling (including completion, stimulation, testing, artificial lifting, daily mud reports, mud logging, directional drilling, etc.) reports;

(vi) copies of all completion and plugging reports;

(vii) to the extent permissible, copies of all seismic data and reports, well tests, core data, microseismic, and associated analysis reports;

(viii) to the extent Operator prepares or receives such information, (A) geological and geophysical, reservoir engineering, drilling and well completion studies, development schedules, and annual progress reports on development projects and (B) well performance reports;

(ix) copies of written notices provided by Governmental Authorities or any Third Party regarding material violations or potential material violations of applicable Law;

(x) copies of all material reports provided by Operator to, or filings made by Operator with, any Governmental Authority relating to material violations or potential material violations of applicable Law;

(xi) copies of any material correspondence between Operator and any Governmental Authority relating to material violations or potential material violations of applicable law;

(xii) to the extent not included in clauses (i)-(xi) above, all material information, data, projections, interpretative data and analysis, operating plans, records, and analysis utilized by Operator in preparing (including the basis for proposing) a Subsequent Budget and Work Plan; and

(xiii) to the extent not included in clauses (i)-(xii) above, as soon as reasonably practicable following a request from a Party, all information reasonably requested by a Party for any purposes, including in connection with satisfying or complying with information requests and disclosure requirements in respect of financing or other capital market activities, including requests from current and prospective lenders and investors, rating agencies, securities exchanges, and Governmental Authorities.

(b) The information described in Section 5.1(a) shall be stored on a commercially available secure, third-party electronic database and document sharing platform and made available to each Party ("VDR"). Such VDR shall be Intralinks, Merrill Datasite, or another VDR platform that is mutually agreeable to the Parties. The VDR shall be maintained by Operator and such expenses shall be shared equally amongst the Parties.

**5.2 Area of Mutual Interest.**

(a) The Parties hereby establish an Area of Mutual Interest ("AMI"), commencing on the Effective Date of this Agreement and covering lands depicted on Exhibit C attached hereto, plus a 4-mile halo in any direction from the perimeter of such lands (excluding, however, any properties owned by SN and its Affiliates as of the Effective Date within the lands depicted on Exhibit C, which shall not be included within the AMI nor otherwise be subject to this Agreement). The AMI shall terminate and have no further force and effect on the earlier of (i) the date that is five (5) years after the Effective Date, or (ii) the date on which this Agreement is terminated in its entirety in accordance with Section 6.1.

(b) For purposes of this Section 5.2, an "Acquisition" shall mean any acquisition of, or agreement or option to acquire, rights, title or interests to any oil and gas properties covering lands within the AMI by a Party or any of its Affiliates (which in the case of Blackstone, for the avoidance of doubt, shall include HoldCo), subject to Section 5.2(h), between the Effective Date and the expiration of the AMI pursuant to Section 5.2(a). Such Acquisition whether acquired directly or indirectly, shall include without limitation, oil and gas leases, options to lease, farm-ins, options to farm-in, acreage contributions, bottom hole agreements or exploratory agreements. If an Acquisition includes lands located within the AMI and lands located outside the boundaries of the AMI, the Acquisition shall be deemed to include only the lands located inside the AMI, unless the Parties agree otherwise.

(c) All Acquisitions must be reported by the acquiring Party to the non-acquiring Parties thirty (30) days prior to the actual closing date of such Acquisition. Such notification shall include, but is not be limited to, a description of the interest acquired, the area covered, the terms of the Acquisition and the cost (including brokerage fees), and a copy of the proposed agreement for the Acquisition.

(d) For purposes of this Section 5.2, the proportionate shares of Blackstone, SN, and SN UnSub or the Qualified Foreclosure Transferee, if applicable, in the right to participate in an Acquisition shall be fifty percent (50%), thirty percent (30%), and twenty percent (20%), respectively. Each non-acquiring Party will have twenty (20) days after receipt of the notice to furnish the acquiring Party with written notice of its election to acquire, or cause its subsidiary to acquire, its proportionate share of the Acquisition for its proportionate share of the purchase price (or cash equal to fair equivalent value if the Acquisition was made for non-cash consideration); *provided*, *however*, that if Blackstone or its Affiliates is the acquiring Party, SN UnSub may assign its right to participate in such Acquisition to SN, or SN may assign its right to participate in such Acquisition to SN UnSub, in which case SN and SN UnSub shall provide a joint written notice evidencing SN's (or SN UnSub's) election to acquire both shares and SN UnSub's (or SN's) agreement to such election; *provided*, *further*, that if SN, SN Unsub or their respective Affiliates is the acquiring party, Blackstone shall have the right to assign its right to participate in such Acquisition to HoldCo, or, subject to the prior written consent of SN in its sole discretion, any other Affiliate. Failure of a Party to provide a written notice of its election within the twenty (20) day period will be deemed an election not to acquire its proportionate share of the Acquisition which will thereafter no longer be subject to the AMI provisions under this Agreement or any applicable Operating Agreement. Further, if neither non-acquiring Party elects to acquire its proportionate share of an Acquisition, the properties acquired in such Acquisition shall not be subject to this Agreement.

(e) If a non-acquiring Party elects to acquire its proportionate share (or, if applicable, SN elects to acquire both its share and SN UnSub's share or SN UnSub elects to acquire both its share and SN's share) of the Acquisition, such non-acquiring Party shall promptly (within ten (10) days of giving its notice) pay for its proportionate share(s) of the Acquisition, and the acquiring Party, within three (3) Business Days of receipt of that payment from the non-acquiring Party for its share(s) of the Acquisition cost, shall deliver (or cause its Affiliates to deliver) to the non-acquiring Party an assignment of the non-acquiring Party's proportionate share(s) of the Acquisition. Assignments pursuant to the AMI shall not contain any reservations in favor of the acquiring Party (or its Affiliates), other than the reservations burdening the Acquisition as of the date of the Acquisition by the acquiring Party (or its Affiliates). Such assignments shall be prepared in accordance with Exhibit D and be properly executed and notarized for recording purposes.

(f) The acquiring Party shall have the right to serve as operator pursuant to an applicable Operating Agreement for an Acquisition that such acquiring Party brings to the other Party pursuant to this Section 5.2 (to the extent permitted by such Operating Agreement); *provided*, that, prior to the occurrence of an Operator Default Event of SN, SN shall be entitled to serve as Operator for any Acquisitions within the Core Area and any oil and gas leasehold interests

covering lands within the Core Area shall be subject to the terms and conditions of this Agreement as though it were an Asset (and shall be deemed to be included in the definition of "Asset" for all purposes hereunder) and added to Annex III accordingly.

(g) If any Party is in Default, any other Party may (*provided*, that such other Party is not in Default) elect, by written notice, to have the terms of this Section 5.2 not restrict the activities of such other Party or any of its Affiliates during the period that the Default is continuing (*provided*, that a Party may thereafter continue to own and develop assets acquired during the applicable period) and any assets acquired by a Non-Defaulting Party during a Default shall be offered only to the other Non-Defaulting Party under this Section 5.2 and the Defaulting Party shall not be deemed to own or in any way otherwise be entitled to any rights or benefits in respect thereof.

(h) Notwithstanding the foregoing, the provisions set forth in this Section 5.2 shall not in any way limit or apply to (i) the activities of any Affiliate of SN or SN UnSub not Controlled by SN or SN UnSub, as applicable (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy), or (ii) (A) the activities of any Affiliate of Blackstone in its business other than the private equity investments made by the "Blackstone Capital Partners VI," "Blackstone Capital Partners VII," "Blackstone Energy Partners I," and/or "Blackstone Energy Partners II" investment funds (collectively, the "Blackstone Funds") affiliated with or managed by Blackstone Management Partners L.L.C., (B) the activities of GSO Capital Partners L.P. or any investment funds or vehicles managed by GSO Capital Partners L.P. or any portfolio companies or other investments of GSO Capital Partners L.P., or (C) the acquisition by any investment funds or vehicles managed by Blackstone Management Partners L.L.C. or any of its Affiliates to the extent such transaction represents the acquisition of any securities of an entity owning an interest in the AMI if such class of securities being acquired are listed on a national securities exchange and such acquisition does not provide for voting interests in excess of twenty-five percent (25%) of such entity, *provided*, that in each of clauses (ii)(A), (B) and (C), (y) Blackstone does not Control or have the right to Control any of the Persons mentioned in clauses (ii)(A), (B) or (C) above, and (z) any of such Persons does not act at the direction of or with encouragement from Blackstone with respect to any matters contemplated by this Section 5.2. For the avoidance of doubt, if any of the actions prohibited under clauses (y) or (z) above occurs, the respective Persons mentioned in clauses (ii)(A), (B) or (C) above shall be subject to, and their activities shall be limited in accordance with, this Section 5.2; provided, however, that for the avoidance of doubt, portfolio companies of GSO Capital Partners L.P. for which neither GSO Capital Partners L.P. nor its Affiliates have majority board control shall not be subject to the AMI provisions of this Section 5.2 notwithstanding the foregoing. The transactions and other activities excluded by this Section 5.2(h) from the other provisions of this Section 5.2 shall be referred to herein as "Excluded AMI Transactions."

(i) Agreement Memorandum. The Parties hereby agree to execute and promptly file a memorandum of this Agreement in the real property records of Maverick, Dimmit, Webb, and LaSalle Counties substantially in the form attached hereto as Exhibit E.

**5.3 Spacing Protections.**

(a) *Limited Restricted Zone.* With respect to each well drilled on lands in the AMI after the Effective Date but prior to the Redemption Date, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Limited Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Limited Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Limited Spacing Restrictions").

(b) *Full Restricted Zone*. Except for Exception Wells as provided below, with respect to each well drilled on lands in the AMI after the Effective Date but prior to the earlier of (x) the fifth (5th) anniversary of the Effective Date, (y) the Redemption Date, or (z) mutual agreement of the Parties to modify these restrictions, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Full Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Full Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Full Spacing Restrictions").

(c) *Illustration*. Illustrations of the Limited Restricted Zone and Full Restricted Zones are shown in Annex VII attached hereto.

(d) *Exceptions to Full Spacing Restrictions*. Notwithstanding the foregoing, the Operator may drill and complete up to thirty (30) wells (the "Exception Wells") in the areas in the AMI shown in Annex VII that do not comply with the Full Spacing Restrictions as long as such Exception Wells comply with the Limited Spacing Restrictions.

(e) *Modifications to Full Restricted Zone*.

(i) *Notice*. Any Party may request that the Full Restricted Zone be modified by giving written notice to the other Parties if (1) twenty (20) Exception Wells have been drilled and completed, (2) at least six (6) Exception Wells have been drilled and completed in each AMI Test Area subject to the proposed modification of the Full Restricted Zone (the "Test Wells"), and (3) the Test Wells have been producing for at least six (6) months. Such written notice shall include a description of the proposed modifications to the Full Restricted Zone and reasonably detailed technical information and data from such requesting Party's consulting reservoir engineers supporting such modifications to the Full Restricted Zone (the "Proposed Modifications"). Each Party shall work in good faith to review the Proposed Modifications and all supporting information. The Proposed Modifications may not contain spacing restrictions that are less restrictive or protective in either the horizontal or vertical plane than those in the Limited Restricted Zone. If the other Parties (and their respective consulting engineers) agree that the Proposed Modifications will not lead to any material reduction in value to each Party's respective Asset base, then the Full Spacing Restrictions shall be modified pursuant to the Proposed Modifications until such time that the Parties agree to subsequent Proposed Modification.

(ii) *Failure to Agree*. If the other Parties (and their respective consulting engineers) fail to agree that the Proposed Modifications will not lead to any reduction in value to each Party's respective Asset base within 30 days after the date of the first notice provided in Section 5.3(e)(i), then any Party may within seven (7) Business Days thereafter, declare a Deadlock by providing a Deadlock Notice to the other Parties. Thereafter, such Deadlock shall be subject to the provisions of Section 3.6(b) and, if applicable, non-binding mediation, in accordance with Section 3.6(c). For the avoidance of doubt, as it relates to this Section 5.3, any decision on behalf of SN UnSub prior to the Redemption Date shall require the approval of the Class B Member of SN UnSub.

(iii) *Amendment*. Prior to drilling offset wells pursuant to such Proposed Modifications, then this Annex VII shall be amended to reflect the Proposed Modifications to the Full Restricted Zone agreed to by the Parties hereunder.

(f) *Covenants Running with the Land and Assumption*. The obligations of the Parties in this Section 5.3 are covenants running with the land and shall be binding upon the Parties and their successors and assigns. For the avoidance of doubt, the Parties agree that the obligations in this Section 5.3 will burden the lands in the AMI and create a privity of estate between the Parties. It is the Parties' express intent that such obligations will not be subject to rejection in the event of any bankruptcy involving any Party or any successor or assign to any of the leases, lands,

or wells that are subject to this Agreement. Each Party agrees to cause its successors and assigns to expressly assume the obligations under this Section 5.3 in connection with any Transfer of all or part of its Assets.

(g) *Existing Producing Wells and Drilled and Uncompleted Wells*. The restrictions listed in this Section 5.3 shall apply solely to wells that are drilled and completed within the Limited Restricted Zone or the Full Restricted Zone of an Existing Wellpad and shall not apply to the Existing Drilled and Uncompleted Wells.

(h) *Applicability to Blackstone.* Notwithstanding anything in Section 5.3, Blackstone shall not be subject to either the Full Spacing Restrictions or the Limited Spacing Restrictions in Section 5.3 after 5 years following the Effective Date.

**5.4 Cooperation**. The Parties agree to cooperate, and to cause their Affiliates to cooperate, with one another in connection with the arrangement of any debt financing related to the Assets as may be reasonably requested by a Party. Any reasonable, out-of-pocket expenses incurred by a Party and its Affiliates in providing reasonable cooperation to a Party in accordance with this Section 5.4 shall be reimbursed by the Party seeking such cooperation.

## ARTICLE VI
## TERM AND TERMINATION

**6.1 Term and Termination**. Subject to Section 6.2, the term of this Agreement shall commence on the Effective Date and continue until the earliest of:

(a) termination by mutual written agreement of each Party;

(b) the eighth anniversary of the Effective Date;

(c) with respect to any interest in the Assets transferred (other than pursuant to a Permitted Transfer or a Foreclosure Transfer) to a Third Party (which for the avoidance of doubt shall not include Sanchez Production Partners LP, Sanchez Oil & Gas Corporation or its Affiliates, any Permitted Holder or any other entity Controlled by any Permitted Holder), upon the consummation of such transfer but only with respect to the interest transferred (and this Agreement will remain in effect with respect to the remainder of the Assets), subject to Section 4.1(b) and the provisions that survive pursuant to Section 6.2 and which are assigned in connection with a Transfer pursuant to Section 7.3;

(d) termination by any Party in its sole discretion after a Division of Operatorship or an Alternative Equitable Partition is completed, but only within thirty (30) days after the consummation of the Alternative Equitable Partition or final Equitable Division resulting therefrom; and

(e) termination by a Non-Defaulting Party in its sole discretion following a Default, but only within thirty (30) days after such Default.

Following the termination of this Agreement in accordance with this Section 6.1, upon the written request of any Party, the Parties agree to execute and file for record a notice of termination of this Agreement in the form attached hereto as Exhibit G.

**6.2 Effect of Termination**. The expiration or termination of this Agreement, for any reason, shall not release any Party from any obligation or liability to any other Party, including any payment obligation, that (i) has already accrued hereunder, (ii) comes into effect due to the expiration or termination of the Agreement, or (iii) otherwise survives the expiration or termination of this Agreement. Notwithstanding anything in this Agreement to the contrary, (i) the right of Blackstone to pursue a Sale Transaction and/or an Equitable Division pursuant to Section 4.5 (and the provisions set forth in Article VII as they may relate to Section 4.5) shall survive termination due to Division of Operatorship for the later of (A) a period of nine (9) months following the consummation of such Division of Operatorship (it being understood that in the event an Alternative Equitable Partition is to be completed, then the parties shall complete such Alternative Equitable Partition regardless of whether such nine (9) month period has expired) or (B) five (5) months after determination of a final and binding Equitable Partition in accordance with Section 4.5; (ii) the information rights set forth in Section 5.1 shall survive a termination due to a Division of Operatorship indefinitely or until neither Blackstone, SN, nor any of their Affiliates (or any designee thereof) operates any of the Assets, (iii) Section 3.8(e)(i) shall survive for a period of six months following a termination resulting from a sale by SN, or any other Affiliate thereof serving as Operator, to a Third Party, or following a termination under Section 6.1(d), (iv) Section 3.8(e)(ii) and Section 3.8(e)(iii) and the penultimate sentence of Section 3.8(e) shall survive termination indefinitely until all Required Operatorship Consents are obtained (including to the extent a Division of Operatorship is effected following termination of the Agreement pursuant to the immediately preceding clause (iii)), provided that the last sentence of Section 3.8(e)(iii) shall survive the termination of this Agreement in any event for a period of ten years; (v) the provisions of Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten years; and (vi) the spacing restrictions in Section 5.3 shall survive termination until the dates set forth in Section 5.3 .

## ARTICLE VII
## GENERAL PROVISIONS

**7.1 Entire Agreement**. This Agreement, the Operating Agreements and the Purchase Agreement, constitute the entire agreement with respect to the subject matter covered hereby and supersede (i) all prior oral or written proposals, term sheets or agreements, (ii) all contemporaneous oral proposals or agreements, and (iii) all previous negotiations and all other communications or understandings between the Parties with respect to the subject matter hereof.

**7.2 Waivers**. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement shall be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, shall not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

**7.3** **Assignment; Binding Effect**. Subject to the terms and conditions hereunder, each Party may assign its rights or interests under this Agreement, or delegate any duties hereunder, without the prior written consent of the other Party, *provided*, that such assignment or delegation is made in connection with the conveyance by a Party or its Affiliate of (i) all its interest in an Asset to a Third Party, (ii) all or some of its interests in an Asset to an Affiliate, in each case in accordance with the terms of this Agreement or (iii) otherwise in connection with a Sale Transaction, including, for the avoidance of doubt, all rights set forth in Section 3.8(e)(ii) (including with respect to the survival period of such provision as set forth under Section 6.2). This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns; *provided*, *however*, that in the case of only a partial assignment by a Party of their rights or interests under this Agreement to an Affiliate or Permitted Transferee, such Affiliate or Permitted Transferee shall not succeed to such transferring Party's rights under Article III, unless otherwise agreed by the Parties and such Affiliate or Permitted Transferee.

**7.4** **Governing Law; Severability.**

(a) **This Agreement has been executed and delivered and shall be construed, interpreted and governed pursuant to and in accordance with the laws of the State of Texas, without regard to any conflict of Laws principles which, if applied, might permit or require the application of the Laws of another jurisdiction.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by applicable Law.

**7.5** **Further Assurances**. Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use its reasonable best efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

**7.6** **Counterparts**. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, shall be deemed an original, and all of which shall constitute but one and the same instrument.

**7.7 <u>Confidential Information.</u>**

(a) The Parties acknowledge that they and their respective appointed Representatives (if any) shall receive information from or regarding Assets in the nature of trade secrets or that otherwise is confidential information or proprietary information (as further defined below in this <u>Section 7.7(a)</u>, "<u>Confidential Information</u>"), the release of which would be damaging to the Parties or Persons with which the Parties conduct business. Each Party shall hold in strict confidence, and shall require that such Party's appointed Representatives (if any) hold in strict confidence, any Confidential Information that such Party or such Party's appointed Representative receives, and each Party shall not, and each Party shall require that such Party's appointed Representatives agree not to, disclose such Confidential Information to any Person other than another Party or Representative, or use such information for any purpose other than to evaluate, analyze, and keep apprised of the Assets and such Party's interest therein, except for disclosures (i) to comply with any Laws (including applicable stock exchange or quotation system requirements), ***provided***, that, if permitted by applicable Law, a Party or Representative must notify all the Parties promptly of any disclosure of Confidential Information which is required by Law, and any such disclosure of Confidential Information shall be to the minimum extent required by Law, (ii) to Affiliates, partners, members, stockholders, investors, directors, officers, employees, agents, attorneys, consultants, lenders, professional advisers or representatives of the Party or Representative or their Affiliates; *provided*, that such Party or Representative shall be responsible for assuring such Affiliates,' partners,' members,' stockholders,' investors,' directors,' officers,' employees,' agents,' attorneys,' consultants,' lenders,' professional advisers' and representatives' compliance with the terms hereof (and such Party or Representative, as applicable, shall be liable for any non-compliance by such Persons as if such Persons were bound as a Party hereto), except to the extent any such Person who is not an Affiliate, partner, member, stockholder, director, officer or employee has agreed in writing addressed to all the Parties to be bound by customary undertakings with respect to confidential and proprietary information similar to this <u>Section 7.7(a)</u>, (iii) to Persons to which that Party's Asset Interests may be Transferred as permitted by this Agreement, but only if the recipients of such information have agreed to be bound by customary confidentiality and non-use undertakings similar to this <u>Section 7.7(a)</u>, (iv) of information that a Party or Representative also has received from a source independent of another Party or Representative and that such Party or Representative reasonably believes such source obtained such information without breach of any obligation of confidentiality to another Party, Representative or any of their Affiliates, (v) that have been or become independently developed by a Party, a Representative or their Affiliates, or on their behalf without using any of the Confidential Information, (vi) that are or become generally available to the public (other than as a result of a prohibited disclosure by such Party or Representative or Persons for which such Party or Representative is responsible for under clause (ii) above), (vii) in connection with any proposed Transfer of all or part the Working Interests of a Party, the proposed sale of all or substantially all of a Party or its direct or indirect parent or the proposed debt or equity financing of a Party or its direct or indirect parent, to Persons to which such interest may be directly or indirectly transferred or which may provide such debt or equity financing (and their respective advisors or representatives), but only if the recipients of such information have agreed to be bound by customary undertakings with respect to confidential and proprietary information similar to this

Section 7.7(a) (unless, in the case of advisors or representatives, such Persons are otherwise bound by a duty of non-disclosure and non-use with respect to confidential and proprietary information), (viii) to Third Parties to the extent necessary for a Person to provide services in connection with its capacity as Operator, as applicable, or (ix) to the extent the non-disclosing Parties shall have consented to such disclosure in writing. The Parties agree that breach of the provisions of this Section 7.7(a) by such Party or such Party's appointed Representative (if any) would cause irreparable injury to the non-disclosing Parties for which monetary damages (or other remedy at Law) would be inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Party or Representative to comply with such provisions and (ii) the uniqueness of the Assets and the confidential nature of the Confidential Information. Accordingly, the Parties agree that the provisions of this Section 7.7(a) may be enforced by any Party by temporary or permanent injunction (without the need to post bond or other security, therefor), specific performance or other equitable remedy and by any other rights or remedies that may be available at law or in equity. The term "Confidential Information" shall include any information pertaining to the identity of the Parties and the Assets, which is not available to the public, whether written, oral, electronic, visual form or in any other media, including, such information that is proprietary, confidential or concerning the Parties ownership and operation of the Assets or related matter, including any actual or proposed operations or development project or strategies, other operations and business plans, actual or projected revenues and expenses, finances, contracts and books and records. Notwithstanding the foregoing, Blackstone and its Affiliates may make disclosures to its direct and indirect limited partners and members such information (including Confidential Information) as is customarily provided to current or prospective limited partners in private equity funds sponsored or managed by Affiliates of Blackstone, *provided*, that if such Persons are receiving Confidential Information such Persons are bound by customary undertakings with respect to confidential and proprietary information similar to this Section 7.7(a). In the event that a Party wishes to issue a press release relating in any respect to the Assets that in the opinion of such Party does not contain Confidential Information, each Party shall be consulted and have a reasonable amount of time to review and comment upon such proposed press release prior to its issuance. Notwithstanding anything herein to the contrary, in the event a Party has approved or been consulted with respect to any disclosures as required hereunder, the other Party, its Representatives or its Affiliates shall be entitled to make disclosures substantially similar (as to form and content) to those prior disclosures that the non-disclosing Party has approved or been consulted with respect to, as applicable.

(b) The Parties acknowledge and agree that none of the Parties shall furnish or otherwise provide a copy of this Agreement (or any part hereof) to any Person (other than the Parties, their Representatives, and Affiliates, and their respective representative(s) and adviser(s)), unless (i) otherwise agreed in writing by each of the Parties, (ii) required by applicable Laws (and if required by applicable Laws, a copy of the applicable portions of this Agreement shall be furnished only to the extent necessary to comply with such applicable Laws), (iii) by any Party, as required to implement any of the hedging arrangements and financings, and (iv) in compliance with clauses (i)-(ix) of Section 7.7(a), as if this Agreement were Confidential Information.

**7.8** **No Third Party Beneficiaries**. Except as set forth in Section 7.14, except for the UnSub Agent in respect of the Cure Right and rights of a Qualified Foreclosure Transferee, and

except for the rights of GSO under Section 4.5 (which may be enforced by GSO) the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns. Except for the foregoing, this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities, or obligations are owed by a Party, or (b) any liquidator, trustee, or creditor acting on behalf of any Party, and no such creditor or any other Person shall have any rights under this Agreement.

**7.9** **Non-Solicitation**. For a period from and after the date hereof until the date that is sixty (60) months after the termination of this Agreement Blackstone shall not, and Blackstone shall cause entities that are Controlled Affiliates of the Blackstone Funds not to, directly or indirectly, (i) solicit, induce or encourage any such employee or officer of the SN, SN UnSub or any of their respective Affiliates to leave their respective positions of employment with SN, SN UnSub and/or or any of their respective Affiliates, (ii) hire or employ any of such employees or officers, whether as a consultant or otherwise, or (iii) hire or employ any such former employee or officer, whether as a consultant or otherwise, within six (6) months of such person's final employment date with SN, SN UnSub or or any of their respective Affiliates; *provided*, that this Section 7.9 shall not preclude Blackstone or any of its Affiliates from soliciting for employment or hiring any such employee, agent or contractor who has been terminated (and not rehired) by SN, SN UnSub or any of their respective Affiliates. Notwithstanding anything in this Agreement to the contrary, a breach of this Section 7.9 shall not be considered for purposes of determining a Default hereunder unless the breach was effected with the knowledge of a private equity professional of the Blackstone Funds and the action underlying such breach would violate the terms of this Section 7.9, or alternatively if Sanchez Energy is able to establish a sustained pattern of breaches of this Section 7.9, and in each case provided that Blackstone take such steps necessary to immediately terminate such employee unless otherwise waived in writing by Sanchez Energy.

**7.10** **Notices**. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement shall be in writing and sent to the address of the Party (or Person) set forth below, or to such other more recent address of which the sending Party actually has received written notice:

(a) if to SN, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: Greg Kopel
Electronic Mail: gkopel@sanchezog.com

and with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 43rd Floor
Houston, TX 77002
Fax: 713-236-0822

Attn: David Elder
Michael J. Byrd
Electronic Mail: delder@akingump.com
mbyrd@akingump.com

(b) if to SN UnSub, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Tel: 713.756.2782

with a copy to:

GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

With a copy to:

Christopher Richardson
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: crichardson@andrewskurth.com

(c) if to Blackstone, to:

Gavilan Resources, LLC
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia
Electronic Mail: acconcia@blackstone.com

and with copies to:

Blackstone Management Partners L.L.C.
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia

Electronic Mail: acconcia@blackstone.com

and

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention: Andrew Calder, P.C.
Rhett Van Syoc
Electronic Mail: andrew.calder@kirkland.com
rhett.vansyoc@kirkland.com

and

(d) if to the UnSub Agent, to:

JPMorgan Chase Bank, N.A.
712 Main Street, 12th Floor South
Houston, TX 77002
Attention:Darren Vanek
Electronic Mail: darren.m.vanek@jpmorgan.com

and with a copy to (which shall not constitute notice):

Each such notice or other communication shall be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

**7.11** **Remedies**. Except as provided herein, the rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party shall be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties further agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

**7.12 Disputes.**

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES SHALL BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL

CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c) Notwithstanding anything contained in Section 7.12(a), in the event a Party wishes to contest whether it is in Default (the "Contesting Party"), such Party shall provide the Non-Defaulting Parties with its written objection within fifteen (15) days after receipt of a notice of Default (the "Objection Notice"). In such event, a representative of the Contesting Party and each of the Non-Defaulting Parties shall meet and use good faith efforts to mutually agree on a resolution. If such representatives are unable to resolve the disagreement within fifteen (15) days after receipt of the Objection Notice, then the disagreement shall be resolved by arbitration, which arbitration proceedings shall be held in Houston, Texas and conducted pursuant to the Rules for Commercial Arbitration promulgated by the American Arbitration Association, to the extent such rules do not conflict with the terms of this Section 7.12(c). In connection therewith, the arbitrator shall be selected by mutual agreement of the parties to such dispute, or absent such agreement, within ten (10) Business Days of becoming aware that such agreement cannot be made as to the selection of the arbitrator, by the American Arbitration Association. The arbitrator shall not have worked as an employee, consultant, independent contractor or outside counsel for any of the Parties to such dispute or any of their respective Affiliates during the ten (10) year period preceding the arbitration or have any financial interest in the dispute or any assets or businesses of the parties to such dispute. The arbitrator's determination shall be made within fifteen (15) Business Days after submission of the matters in dispute and, absent manifest error, shall be final and binding upon the Parties to such dispute, without right of appeal. In making its determination, the arbitrator shall be and remain at all times wholly impartial, and, once appointed, the arbitrator shall have no *ex parte* communications with any of the Parties to the dispute concerning the arbitration or the underlying dispute.

**7.13 Expenses**. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**7.14 No Recourse**. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees, and acknowledges

that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder, or member of any Party (or any of their successors or permitted assignees), or any Affiliate thereof, or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, general or limited partner, stockholder, manager, or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract, or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation, or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

**7.15** **Conflict**. In the event of a conflict between the terms of this Agreement and the terms of any Operating Agreement applicable to the Assets, the terms of this Agreement shall control as among the Parties.

**7.16** **Subchapter K**. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code

**7.17** **Relationship of SN and SN UnSub**. Notwithstanding anything herein to the contrary, (a) the obligations under this Agreement of SN, on the one hand, and SN UnSub, on the other hand, are several and such obligations shall not be deemed "joint and several," (b) SN shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN UnSub, and (c) SN UnSub shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN. Furthermore, and for the avoidance of doubt, no Party shall be responsible in any way for the performance of the obligations of any other Party under this Agreement. Nothing contained herein, and no action taken by any Party pursuant thereto, shall be deemed to constitute or form a partnership, association, joint venture or any other kind of group or entity, or create a presumption that a Party is in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement. Each Party shall be entitled to independently protect and enforce its rights, in equity, contract or law, including, the rights arising out of this Agreement, and it shall

not be necessary for any other Party to be joined as an additional party in any proceeding for such purpose.

**7.18** __Operating Committee; Affiliates__. To the extent that this Agreement expressly purports to require any Representative of a Party or the Operating Committee to take any action or refrain from taking any action, each such Party agrees to use its reasonable best efforts to cause its Representative(s) and the Operating Committee, as applicable, to take such action or refrain from taking such action, as applicable. To the extent this Agreement purports to require a Party to require any of its Affiliates to take any action or refrain from taking any action, each such Party shall only be required to use its reasonable best efforts to cause an Affiliate not Controlled by it (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy) to take such action or refrain from taking such action, as applicable.

**7.19** __Force Majeure__. If any Party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than the obligation to indemnify or make money payments or furnish security, that Party shall give to all other Parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the Party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as used in this Section, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other event, circumstance or cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the Party claiming suspension. The affected Party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the Party concerned.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed this Joint Development Agreement as of the date first set forth above.

**SANCHEZ ENERGY CORPORATION:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF MAVERICK, LLC:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UNSUB GP, LLC,
its general partner

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Chief Executive Officer

**GAVILAN RESOURCES, LLC:**

By: /s/ Angelo Acconcia
Name: Angelo Acconcia
Title: President

**Annex I**

**Defined Terms**

As used in this Agreement, the following terms have the following meanings:

"Acquisition" has the meaning set forth in Section 5.2(b).

"Additional E&D Proposal" has the meaning set forth in Section 3.7(c)(i).

"Additional S&A Proposal" has the meaning set forth in Section 3.7(c)(ii).

"AFE" means a written description and cost estimate of a proposed activity or operation accompanying a proposal for such activity or operation made pursuant to an Operating Agreement and forwarded to the Operating Committee by Operator pursuant to an Operating Agreement. Any AFE that proposes more than one operation shall be considered a separate AFE as to each operation only for those operations for which the Parties are permitted to make separate elections under the terms of the relevant Operating Agreement.

"Affiliate" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; *provided*, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in the Partnership or the General Partner result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Alternate Operator" has the meaning set forth in Section 3.8(f).

"Alternative Equitable Partition" has the meaning set forth in Section 4.5(a).

"AMI" has the meaning set forth in Section 5.2(a).

"Anadarko" has the meaning set forth in the recitals.

"APC Well Commitment" means wells required to be drilled pursuant to that certain Development Agreement, dated as of the date hereof, by and among Anadarko, SN, SN UnSub and Blackstone.

"Applicable Credit Agreement" means, in the case of (i) SN, the Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez Energy, as borrower, Royal Bank of Canada, as administrative agent and the other financial institutions party thereto from time to time, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "SN Credit Agreement"), (ii) SN UnSub, that certain Credit Agreement, among SN UnSub, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent, and an issuing bank, the banks, financial institutions and other lending institutions from time to time parties as lenders thereto, dated as the date hereof, as amended, restated, amended and restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "UnSub Credit Agreement"), (iii) Blackstone, (x) that certain Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent and (y) that certain Second Lien Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and Citibank, N.A., as administrative agent and collateral agent, and (iv) a Third Party Operator, any of such Third Party Operator's debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "Third Party Credit Agreement"), and (v) a Qualified Foreclosure Transferee, any of such Qualified Foreclosure Transferee's debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time.

"Approved AFE" means an AFE approved by the Operating Committee pursuant to Section 3.2(g) or deemed approved under Section 3.7(c).

"Approved Budget" means the Initial Budget and Work Plan, any Subsequent Budget and Work Plan approved under Section 3.7(b)(ii), and any amendment to the Initial Budget and Work Plan or approved Subsequent Budget and Work Plan approved as provided under Section 3.2.

"Approved Operation" means an Initial Approved Operation and any Subsequent Approved Operation.

"Area of Mutual Interest" has the meaning set forth in Section 5.2(a).

"Asset Interest" has the meaning set forth in Section 4.1(a).

"Assets" means collectively, the right, title and interest in and to the assets included in the term "Asset" as used in the Purchase Agreement.

"Base Preferred Return Amount" has the meaning give to such term in the SN UnSub Partnership Agreement as in effect as of the Effective Date.

"Blackstone" has the meaning set forth in the preamble.

"Blackstone Funds" has the meaning set forth in Section 5.2(h).

"Blackstone Operator" has the meaning set forth in Section 3.8(a).

"Blackstone Operatorship Rights" has the meaning set forth in Section 4.5(a).

"Blackstone Percentage" has the meaning set forth in Section 4.5(a).

"Blackstone Representative" has the meaning set forth in Section 3.3(a)(iii).

"Board of Directors" means the board of directors of SN.

"Bona Fide Offer" means a bona fide offer received by Blackstone from a Third Party that was obtained or marketed by Blackstone through a bona fide arms-length process (it being understood that such process need not be a broadly marketed process, but could be a direct negotiation and offer from a single party) designed to achieve the fair market value for the Working Interests, Assets and/or other related assets, or Equity Interests, as applicable, related to such offer. For the avoidance of doubt, a Bona Fide Offer will be deemed not to include a Foreclosure Transfer.

"Budget Negotiation Period" has the meaning set forth in Section 3.7(b)(iv).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"BX Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Capital Expenditures" means any expenditure by a Party that is required to be capitalized for purposes of such Party's financial statements in accordance with GAAP.

"Change of Control" means, with respect to Sanchez Energy, any of the following transactions: (a) a merger, consolidation or other reorganization, unless securities representing more than thirty-five percent (35%) of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly and in substantially the same proportion, by the Persons who beneficially owned Sanchez Energy's outstanding voting securities immediately prior to such transaction; or (b) any transaction or series of transactions pursuant to which any "person" or "group" (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934) becomes directly or indirectly the beneficial owner of any of Sanchez Energy's securities possessing more than sixty-five percent (65%) of the total combined voting power of Sanchez's securities (as measured in terms of the power to vote with respect to the election of its board of directors) outstanding immediately after the consummation of such transaction or series of transactions, whether such transaction involves a direct issuance from Sanchez Energy or the acquisition of outstanding securities held by one or more of Sanchez Energy's existing stockholders; excluding, in each case of (a) or (b) above, any transaction with a Permitted Transferee or a Permitted Holder.

"Confidential Information" has the meaning set forth in Section 7.7(a).

"Consents" has the meaning set forth in Section 2.2.

"Consent Agreement" means that certain Consent to Assignment of Interest dated December 24, 2016, from Briscoe Ranch, Inc. et al. to Sanchez Energy and Anadarko E&P Onshore LLC.

"Consenting Parties" means Briscoe Ranch, Inc., Miramar Holdings, L.P., Rancho la Cochina Minerals, Ltd., Janey Briscoe Marmion GST Trust, and El Pescado Minerals, Ltd.

"Contesting Party" has the meaning set forth in Section 7.12(c).

"Control" (including its derivatives and similar terms) means, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Core Area" means the area marked in blue on Exhibit C.

"Cure Right" has the meaning set forth in the definition of "Default".

"Deadlock" has the meaning set forth in Section 3.6(a).

"Deadlock Notice" has the meaning set forth in Section 3.6(a).

"Default" means, in respect of any Party, the failure by such Party or any of its Affiliates to remedy, within thirty (30) days of receipt of a Default Notice from any other Party, the material non-performance or material non-compliance with a material provision of this Agreement by such Party or any of its Affiliates (provided, however, that UnSub and SN shall not be considered to be "Affiliates" for the purposes of this definition of "Default", such that a Default by SN (or by SN's

Affiliates other than SN UnSub) shall not be deemed to be a default by SN UnSub, and a Default by SN UnSub shall not be deemed to be a Default by SN); provided, however, in the event of a failure by UnSub, the UnSub Agent shall also have the right (but not the obligation) to remedy any such failure within such thirty (30) day time period (the "Cure Right").

"Default Notice" means a written notice from a Party containing a detailed description of the basis of a claim that another Party has materially failed to perform or materially failed to comply with this Agreement, including specific references to the provisions in this Agreement that such Party has materially failed to comply with or perform; *provided*, *however*, in the event of an alleged failure by UnSub, such written notice shall also be delivered to the administrative agent under the UnSub Credit Agreement (the "UnSub Agent") substantially concurrently with delivery to UnSub.

"Defaulting Operator" has the meaning set forth in Section 3.8(f).

"Defaulting Party" has the meaning set forth in Section 3.9(a).

"Dispute Parties" has the meaning set forth in Section 4.5(f).

"Division of Operatorship" has the meaning set forth in Section 3.8(e)(i).

"Drag Interests" has the meaning set forth in Section 4.5(e).

"E&D Operations" means all activities and operations related to subsurface exploration and development of the Assets (including all drilling, reworking, plugging back, shutting-in, completing, re-completing, re-fracturing, stimulation, acidization, enhanced recovery operations, plugging and abandonment operations) as well as construction of wellpads and installation and operation of wellsite facilities.

"Effective Date" has the meaning set forth in the preamble.

"Equitable Division" has the meaning set forth in Section 3.8(e)(i).

"Equitable Partition" has the meaning set forth in Section 4.5(a).

"Equity Interest" means (a) with respect to a corporation, any and all shares of capital stock and any commitments with respect thereto, (b) with respect to a partnership, limited liability company, trust or similar Person, any and all units, equity interests or other partnership/limited liability company interests, and any commitments with respect thereto, and (c) any other direct or indirect equity ownership or participation in a Person.

"Estimated Cash Outlays" has the meaning set forth in Section 3.7(d).

"Excluded AMI Transactions" has the meaning set forth in Section 5.2(h).

"Excluded Percentage" has the meaning set forth in Section 4.5(a).

"Excluded Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Existing Drilled and Uncompleted Wells" means the oil and gas wells listed in Annex VI.

"Existing Producing Wells" means the oil and gas wells listed in Annex V.

"Existing Wellpad" means, as of any date of determination, each then-existing wellpad with average daily production in excess of 300 BOE/D over the prior twelve-month period under the Leases pursuant to which the Parties (including their respective Affiliates) retain any Working Interests.

"Fair Market Value" means the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller, conveyance of operatorship associated with any specified interest or property or a control premium.

"Final Deadlock" has the meaning set forth in Section 3.6(b).

"Final Deadlock Notice" has the meaning set forth in Section 3.6(b).

"Final Valuation" has the meaning set forth in Section 4.5(f).

"Financial Advisor" has the meaning set forth in Section 3.8(e)(i).

"Foreclosure Transfer" means any assignment, transfer, conveyance, exchange or any other alienation resulting from any judicial or non-judicial foreclosure by the holder of a security interest or other encumbrance or any Transfer to the holder of a security interest or other encumbrance in connection with a workout, bankruptcy, restructuring or similar arrangement, including in each case to the extent effectuated pursuant to Sections 363 or 1129 of the U.S. Bankruptcy Code.

"Form Operating Agreement" means the form of AAPL Joint Operating Agreement attached hereto as Exhibit B.

"Full Restricted Zone" means, for each Existing Producing Well, a three dimensional area in the shape of a rectangular prism, defined by the following: the rectangular subsurface zone extending perpendicularly (i) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (ii) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

"Full Spacing Restrictions" has the meaning set forth in Section 5.3(b)(iv).

"Future Wellpads" means all prospective wellpads for acreage under the Leases on which there are no Existing Wellpads based on customary industry practices and the reserve report for each Party covering the previous twelve (12) month period.

"GAAP" means those generally accepted accounting principles and practices that are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor).

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means ST Holdings L.P.

"HoldCo" means Gavilan Resources HoldCo, LLC (f/k/a Aguila Production HoldCo, LLC).

"Included Percentage" has the meaning set forth in Section 4.5(a).

"Included Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Initial Approved Operations" has the meaning set forth in Section 3.7(a).

"Initial Budget and Work Plan" has the meaning set forth in Section 3.7(a).

"IPO" has the meaning set forth in Section 4.4.

"IPO Notice" has the meaning set forth in Section 4.4.

"IPO Party" has the meaning set forth in Section 4.4.

"Joint Exploration Agreement" means the Joint Exploration Agreement, dated to be effective as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended from time to time.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Leases" means, collectively, the oil, gas and mineral leases and subleases, royalties, overriding royalties, net profits interests, carried and convertible interests, and other rights included in the term "Leases" as used in the Purchase Agreement.

"Liabilities" means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Lien" shall have the meaning ascribed to "Encumbrance" in the Purchase Agreement.

"Limited Restricted Zone" means, for each Existing Producing Well, two overlapping three dimensional areas, each in the shape of a rectangular prism, defined by the following: (i) the rectangular subsurface zone extending perpendicularly (A) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 90 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well; and (ii) the rectangular subsurface zone extending perpendicularly (A) 275 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

"Limited Spacing Restrictions" has the meaning set forth in Section 5.3(a)(iv).

"Losses" mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys' fees, experts' fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

"Material Contracts" means any contract related to E&D Operations or S&A Operations or otherwise relating to the Assets, including drilling and completion agreements, gathering agreements, processing agreements, transportation agreements, supply agreements, disposal agreements, electric supply agreements or marketing or sales agreements, in each case which individually, or with respect to any series of related contracts, are worth more than $1,000,000; provided, however, that contracts which are contemplated by any marketing agreements by and between SN or UnSub, as applicable, or any of their Affiliates, on the one hand, and Blackstone and any of its Affiliates, on the other hand, shall not be deemed Material Contracts hereunder.

"Monthly Invoice" has the meaning set forth in Section 3.7(d).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Negligent Operator Action" has the meaning set forth in Section 3.8(f).

"Non-Defaulting Party" has the meaning set forth in Section 3.9(a).

"Non-Initiating Party" has the meaning set forth in Section 4.2(a).

"Non-IPO Party" has the meaning set forth in Section 4.4.

"Non-Transferring Party" has the meaning set forth in Section 4.1(a).

"Objection Notice" has the meaning set forth in Section 7.12(c).

"Operating Agreement" means any Joint Operating Agreement for any of the Leases and, to the extent applicable, the Joint Exploration Agreement and Participation Agreement as it may relate to a Party's ownership of any interest in a Lease.

"Operating Committee" has the meaning set forth in Section 3.1.

"Operator" has the meaning set forth in Section 3.8(a).

"Operator Default Event" has the meaning set forth in Section 3.8(f).

"Participation Agreement" means that certain Maverick Basin Area Participation Agreement, dated effective January 1, 2011, by and between Anadarko and Eagle Ford TX LP.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 7.14.

"Permitted Holders" means (a) Antonio R. Sanchez, III and A.R. Sanchez, Jr., (b) any spouse or descendant of any individual named in (a), or (c) any other natural person who is related to, or who has been adopted by, any such individual or such individual's spouse referenced in (a)-(b) above within the second degree of kinship, or (d) any Person Controlled, directly or indirectly, by any of the Persons referenced in clauses (a)-(c) above, individually or collectively by one or more of such Persons.

"Permitted Liens" has the meaning set forth in Section 4.1(a).

"Permitted Transferee" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person. For purposes of this Agreement, (i) Sanchez Production Partners LP and its Controlled Affiliates shall be deemed to be a Permitted Transferee of SN, except with respect to Section 4.2 for which purposes Sanchez Production Partners LP and its Controlled Affiliates shall not be deemed to be a Permitted Transferee of Sanchez, (ii) Permitted Holders shall be a Permitted Transferee of SN; and (iii) SN and SN UnSub shall each be treated as a Permitted Transferee of each other.

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Post-Division Non-Operator" has the meaning set forth in Section 3.8(e)(i).

"Post-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Pre-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Preferred Units" has the meaning give to such term in the SN UnSub Partnership Agreement.

"Proposed Modifications" has the meaning set forth in Section 5.3(e)(i).

"Proposed Sale" has the meaning set forth in Section 4.2(a).

"Proposed Transferee" has the meaning set forth in Section 4.2(a)(i).

"Purchase Agreement" has the meaning set forth in the recitals.

"Qualified Foreclosure Transfer" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee Representative" has the meaning set forth in Section 3.3(a)(ii).

"Quorum" has the meaning set forth in Section 3.5(a).

"Redemption Date" means the date of redemption of all outstanding Preferred Units in cash under the SN UnSub Partnership Agreement, as such agreement may be amended from time to time, issued as of the Effective Date pursuant to that certain Securities Purchase Agreement dated as of January 12, 2017, by and among Sanchez Energy, SN UR Holdings, LLC, a Delaware limited liability company; SN EF UnSub Holdings, LLC, a Delaware limited liability company; SN UnSub; SN EF UnSub GP, LLC, a Delaware limited liability company; GSO ST Holdings Associates LLC, a Delaware limited liability company; and GSO ST Holdings LP, a Delaware limited partnership.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the date hereof, by and between HoldCo and Sanchez Energy.

"Representative" has the meaning set forth in Section 3.1.

"Required Operatorship Consents" has the meaning set forth in Section 3.8(e)(ii).

"Required Return Sum" has the meaning set forth in Section 4.5(h).

"Reserve Auditor" has the meaning set forth in Section 3.8(e)(i).

"ROFO Interests" has the meaning set forth in Section 4.3(a).

"ROFO Notice" has the meaning set forth in Section 4.3(a)

"ROFO Offer" has the meaning set forth in Section 4.3(a).

"ROFO Recipient" has the meaning set forth in Section 4.3(a).

"ROFO Transferor" has the meaning set forth in Section 4.3(a).

"S&A Operations" means any and all activities and operations associated with development and operation of the Assets other than E&D Operations, including, without limitation, procurement, construction, and operation of non-wellsite surface facilities such as water supply, storage, gathering and disposal facilities; electric power facilities; lease roads, frac ponds, and central tank batteries; gathering, treating, compression, dehydration, stabilization, and fractionation facilities; in each case, insofar as such operations are not otherwise dedicated to third-parties pursuant to existing contractual commitments burdening the Assets.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor thereto.

"Sale Transaction" has the meaning set forth in Section 4.5(a).

"Sale Transaction Agreement" has the meaning set forth in Section 4.5(d).

"Sale Transaction Equitable Partition" has the meaning set forth in Section 4.5(a).

"Sale Transaction Transferee" has the meaning set forth in Section 4.5(a).

"Sanchez Energy" means Sanchez Energy Corporation, a Delaware corporation, or for purposes of Section 4.3, any issuer of SN Common Stock.

"Sanchez Operator" has the meaning set forth in Section 3.8(a).

"Sanchez Representative" has the meaning set forth in Section 3.3(a)(ii).

"SN" has the meaning set forth in the preamble.

"SN Common Stock" means shares of common stock of Sanchez Energy, par value $0.01 per share, and any class of stock or other securities resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any liquidation, dissolution or winding up of Sanchez Energy, and any shares or other securities issued in respect of SN Common Stock in connection with any exchange for or replacement of such shares of SN Common Stock, recapitalization, merger, consolidation, conversion or similar transaction.

"SN Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"SN Equity Financed Offer" has the meaning set forth in Section 4.3(a).

"SN Operatorship Rights" has the meaning set forth in Section 4.5(a).

"SN UnSub" has the meaning set forth in the preamble.

"SN UnSub Partnership Agreement" means that certain Amended and Restated Agreement of Limited Partnership of SN UnSub, dated as of the Effective Date.

"SN UnSub GP LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated as of the Effective Date.

"Specified Credit Agreement" means if Operator is (i) SN, the SN Credit Agreement, (ii) BX, the BX Credit Agreement, or (iii) a Third Party, a Third Party Credit Agreement.

"Specified Event of Default" means an Event of Default as such may be defined from time to time under a Specified Credit Agreement, and as a result of such Event of Default, Operator's obligations thereunder have been accelerated prior to their stated maturity and the obligations which have been so accelerated exceed $20,000,000.

"Subsequent Approved Operations" has the meaning set forth in Section 3.7(b)(ii) and Section 3.7(c).

"Subsequent Budget and Work Plan" has the meaning set forth in Section 3.7(b)(i).

"Subsequent Proposed Operations" has the meaning set forth in Section 3.7(b)(i).

"Tag-Along Notice" has the meaning set forth in Section 4.2(a).

"Tag-Along Offer" has the meaning set forth in Section 4.2(b).

"Tag-Along Transaction" has the meaning set forth in Section 4.2(b).

"Tag Interests" has the meaning set forth in Section 4.2(b).

"Test Wells" has the meaning set forth in Section 5.3(e)(i).

"Third Party" means any Person other than a Party or one of their Affiliates or a Permitted Holder.

"Third Party Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Third Party Operator" has the meaning set forth in Section 3.8(f).

"Transfer" (including its derivatives and similar terms) means, with respect to an Asset Interest, a direct or indirect, voluntary or involuntary, sale, assignment, transfer, conveyance,

exchange, bequest, devise, gift or any other alienation, including, except to the extent constituting Permitted Liens, any pledge or grant of a security interest (in each case, with or without consideration and whether by operation of Law or otherwise, including, by merger or consolidation) of any rights, interests or obligations with respect to all or any portion of such Asset Interest.

"Transferring Party" has the meaning set forth in Section 4.1(a).

"True-Up Amount" has the meaning set forth in Section 3.7(d).

"Unanimous Consent" means (x) the affirmative vote of all of the Representatives of a Party not then in Default in attendance at a duly called and convened meeting of the Operating Committee, which for the avoidance of doubt (assuming no Party is in Default) shall include the affirmative vote of at least one (1) Sanchez Representative appointed by SN, at least one (1) Blackstone Representative, and, either (1) Sanchez Representative appointed by SN UnSub or, if applicable, the Qualified Foreclosure Transferee Representative, or (y) the affirmative written consent in lieu of a meeting executed by all of the Representatives of Parties not in Default then constituting the Operating Committee.

"UnSub Agent" has the meaning set forth in the definition of "Default Notice".

"UnSub Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Valuation Firm" has the meaning set forth in Section 4.5(f).

"VDR" has the meaning set forth in Section 5.1(b).

"Wellpads" means, collectively, the Existing Wellpads and the Future Wellpads.

"Working Interest" means with respect to any lease or well or wellpad relating to the Assets, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease or well.

* * *

---

012274

**Annex II**
**Representatives**

**Sanchez Representatives:**
Tony Sanchez III
Eduardo Sanchez
Chris Heinson

**Blackstone Representatives:**
Angelo Acconcia
Gary Levin
Dave Roberts

**<u>Annex III</u>**
**Working Interests**

(*see attached*)

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Gross WI | 1% WI | Gaurnt WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| [illegible] | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cu Net | WI | [illegible] WI | [illegible] WI | Sanchez WI | Current Depths 8/1/2016 | Comments Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Dimmit Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET UX | THE SUPERIOR OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | |
| [illegible] ET UX | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unitholder WI | SN WI | Gastar WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Dimmit La Salle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| SARAH M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Above San Miguel | assignment | Y | [illegible] | [illegible] | [illegible] |
| HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RANDALL J SHAMMEL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 2.271 | 0.757 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| JANET LOUISE ARDANET | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 2.271 | 0.757 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| PATRICIA McALLISTER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 1.136 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 2.271 | 0.757 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 1.271 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| BECKY DEHAAN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| CONLEY EUGENE HUEBSE ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 0.284 | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 0.284 | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 0.284 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KAREN RENEE WALL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 0.284 | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Olmos | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | partial assn | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | partial assn | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Webb Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |

Items highlighted in yellow were excluded from the Closing because the relevant consent was not obtained.

---

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cu Net | WI | UnSub WI | SN WI | Gasdoc WI | Current Depths 8/1/2016 | Comments Act. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Dimmit Webb | 4564.[illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | across released | Y | [illegible] | [illegible] | [illegible] |
| DOUGLAS M HAMER FLORES ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Dimmit Webb | 4564.[illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | across released | Y | [illegible] | [illegible] | [illegible] |
| [illegible] RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | partial assn [illegible] | N | [illegible] | [illegible] | [illegible] |
| SARA CAROLINE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | 5.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM H [illegible] FAMILY LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | released | Y | [illegible] | [illegible] | [illegible] |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| DONNA RUTH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| SARAH JANE HENDERSON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 471 | [illegible] | [illegible] |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 471 | [illegible] | [illegible] |
| [illegible] DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | across released | Y | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | 311.457 | [illegible] | 77.[illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | across released | Y | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| LELA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUBREY [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 10.000 | 1.250 | 0.417 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SARAH [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 10.000 | 1.250 | 0.417 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 1.250 | 0.417 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

012281

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | WI | Unitzd WI | SN WI | Gastar WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RALPH H [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KENNETH A [illegible] ET AL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GLADYS ELAINE MASSIE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLAUDE F MASSIE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRIAN K [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JESICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHAUNA LOIS GATES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KAREN H GATES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARVIN SMITH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA PYATT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GEORGE F [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAY M GATES II | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MILDRED PATTERSON ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LUCILLE J [illegible] ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENNIS PAT HARVEY ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HAROLD M [illegible] ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARIE FRITZ SCHOONOVER ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LIZ E W [illegible] ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface [illegible] Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below [illegible] | | Y | [illegible] | [illegible] | [illegible] |

012282

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths | Comments | Assignment Restrictions | Book | Page | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled (Eagle Ford) | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] LIGHT [illegible] TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| GEORGE E LIGHT [illegible] AND SARAH LIGHT TRUSTS | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled (Eagle Ford) | acres released | Y | [illegible] | [illegible] | [illegible] |
| GEORGE E LIGHT [illegible] ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| GEORGE E LIGHT [illegible] & SARAH LIGHT TRUST [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| GEORGE E LIGHT [illegible] BILLIE RAE LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| BROOKE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] approx. 3,030 gross acres [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARGARET MITCHELL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DONNA M MERRILL ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| CONSTANCE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] CHILDRENS TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| MAUREEN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTIN SHEEHAN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAUL L SHEEHAN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM R SHEEHAN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SHEEHAN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | RR | Unidiv WI | SN WI | Sanchez WI | Current Depths 8/1/2016 | Comments A/L & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHARON BENCHAL HERERA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GALA WEST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVE GROTZ | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| REBECCA ANN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOROTHY LYNNE HOSTER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARGARET WILCOX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| BRANDON CHRISTOPHER WILCOX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| SANDRA D WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| TRACI W MEDLIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| KARL E WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH FAIRFIELD WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| CHERI MATLOCK | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BERNARD PRIECE ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RAY WILLIAMS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA FELTON LINDSAY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANDREA CARROLL SIMMONS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | [illegible] WI | DV WI | Gastar WI | Current Depths 8/1/2016 | Comments Ext. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] MCLEOD [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHARON CHANEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] STUART | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] L MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] L MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN RICHARD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA L LANE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN [illegible] SUSAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NELDA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARY L [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] TOPHAM | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY ELEANOR PATTERSON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

012285

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 4/1/2016 | Comments Am. v. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths [illegible] | Comments Asmt. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | Sanchez WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| EDNA HILL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JANET SCHALLHORN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] TAYLOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DEB ANN SCHALLHORN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | La Salle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA ANN HOLLAND [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH MARSHALL HOLLAND [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT CHARLES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT CHARLES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] NELL WILLIAMS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RONALD [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JULIE ANN HARRIS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DEBRA HARRIS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | Gavilan WI | Current Depths 9/1/2016 | Comanche Act. s. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 1.270 | 0.635 | 0.50000000 | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 721 | [illegible] |
| RETA SUE SANDERS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 1.270 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALICE LAMB COMPTON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 1.270 | 0.635 | 0.50000000 | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 710 | [illegible] |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RUBY LEE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHERRI LYNN WEATHERHEAD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VONNETA ANN LEONARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY HELEN WINDHAM SEARS ETUX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILL ALTON BENNICKS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | Base of San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] ALTON BENNICKS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| WILL ALTON BENNICKS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| EVELYN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| ALYCE KOEHLER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| DONALD DITTEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| PAUL A DITTEN ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | 1.667 | 0.50000000 | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GLADYS LIDTTEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| FRANK VANCE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| FLORA PETERSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| IRENE DITTEN LEWIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |

012289

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] WI | [illegible] WI | [illegible] | Current Depths 8/1/2016 | Comments [illegible] Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| BLANCHE C. KOETTING | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] BAPTIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| DAN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] INVESTMENTS LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

012290

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co-Net | WI | [illegible] WI | SN WI | Gastar WI | Current Depths 9/1/2016 | Comments Act. & Description | Assignment Restriction | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JENNIFER BOXBY GEORGE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 17.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 439 | 637 | [illegible] |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 441 | [illegible] | [illegible] |
| BETTY BOXBY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 15.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA BOXBY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM KEITH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MEREDITH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 13.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID [illegible] | ANADARKO E&P OFFSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 13.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| ANNE GATLIN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] CONTRACTING INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| FREDRICK [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| ANNE GATLIN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] INVESTMENTS LTD | [illegible] RESOURCES COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |



| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | [illegible] | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 6/1/2016 | Comments Act. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments Act. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| SALLY BARNWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBBIE E CLARK | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| LYNN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| K KENT FELDMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM NEWTON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT WRIGHT WILLIAMS [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARGARET [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CRYSTAL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| KATHRYN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ROYALTIES LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM J [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TIMOTHY W [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CYPRESS ATLANTIC LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |

012294

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | [illegible] Net | WI | [illegible] WI | SN WI | Gastar WI | Current Depths 9/1/2016 | Consent Art. n Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUSAN L WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES TYLER STEWART | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JANET RUTH STEWART [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID [illegible] FRETWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWARD L FRETWELL JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTHA LEA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STUART BUMPAS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALLISON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] BUMPAS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] BUMPAS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENNIS E LANDBERG | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GARY L LANDBERG | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS K BRANUM ET UX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANIMAL HUMANE SOCIETY OF [illegible] COUNTY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

012295

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unsub WI | OA WI | [illegible] WI | Current Depths 8/1/2016 | Comments Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Denver | 40.140 | 5.018 | 1.673 | 0.12500000 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 573 | 31746 |
| RITA JO FRALICK | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Denver | 40.140 | 1.673 | 0.558 | 0.04166667 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 598 | 31789 |
| REGINA LYNN NOVOSAD-SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Denver | 40.140 | 1.673 | 0.558 | 0.04166667 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 578 | 31747 |
| SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Denver | 40.140 | 15.205 | 5.140 | 0.33333333 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 563 | 31744 |
| RENEE DAWN MELISSA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Denver | 40.140 | 1.477 | 0.593 | 0.04333333 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 583 | 31748 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Denver | 40.140 | 20.070 | 6.690 | 0.50000000 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 560 | 31745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | TX | Denver | 10.000 | 10.000 | 5.000 | 1.00000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 895 | 31862 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 01/11/2013 | 01/11/2019 | TX | Denver | 10.000 | 10.000 | 3.333 | 0.33333333 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | | Y | 497 | 777 | 30808 |
| NANCY VAN ZLYKE | ANADARKO E&P COMPANY LP | 09/18/2013 | 09/18/2015 | TX | Denver | 10.000 | 0.885 | 0.445 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | Y | 498 | 512 | 31864 |
| JANICE CAROL WEATHERMAN | ANADARKO E&P ONSHORE LLC | 07/18/2013 | 07/18/2018 | TX | Denver | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 617 | 31880 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/18/2013 | 07/18/2018 | TX | Denver | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 614 | 31880 |
| LILA B STAUGHTON | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Denver | 10.000 | 1.667 | 0.834 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 626 | 31870 |
| RAND ROBERT BOUSMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Denver | 10.300 | 1.667 | 0.834 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 625 | 31871 |
| BARBARA MEISTER CUMMING | ANADARKO E&P ONSHORE LLC | 08/16/2013 | 08/16/2018 | TX | Denver | 10.000 | 0.590 | 0.148 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 620 | 31867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/16/2013 | 08/16/2018 | TX | Denver | 10.000 | 0.295 | 0.148 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 622 | 31868 |
| CAROL M MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | TX | Denver | 10.000 | 0.295 | 0.148 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 624 | 31869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | 07/23/2018 | TX | Denver | 10.000 | 0.885 | 0.443 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 506 | 795 | 32360 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Denver | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 506 | 750 | 32234 |
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Denver | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 672 | 33416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Denver | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 675 | 33417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Denver | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 676 | 33424 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Denver | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 684 | 33425 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/09/2013 | 12/09/2018 | TX | Denver | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 662 | 33419 |
| ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Denver | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 665 | 33411 |
| GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | 12/13/2016 | TX | Denver | 40.000 | 40.000 | 20.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | Y | 175 | 679 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/08/2014 | 02/08/2017 | TX | Denver | 77.510 | 115.440 | 11.012 | 0.10000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | Need to check Title. | Y | 508 | 157 | 32953 |
| RONY UHLMAN ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2030 | TX | Denver | 20.000 | 10.000 | 1.070 | 0.11111111 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | | N | 494 | 657 | 31007 |
| DALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2030 | TX | Denver | 20.000 | 0.560 | 0.187 | 0.11111111 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | | N | 500 | 1 | 32006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 02/20/2014 | 02/20/2021 | TX | Denver | 10.000 | 4.720 | 1.573 | 0.33333333 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | | N | 512 | 176 | 33510 |
| WILL MCGARRITT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | TX | Denver | 20.000 | 4.720 | 1.573 | 0.33333333 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | | Y | 512 | 166 | 33519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | 05/20/2019 | TX | Denver | 10.000 | 1.250 | 0.417 | 0.33333333 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | | N | 518 | 8 | 34404 |
| EDWARD ROBERTSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2019 | TX | Denver | 10.000 | 0.200 | 0.067 | 0.33333333 | 0.08666667 | 0.10000000 | 0.16666667 | All Depths | | N | 517 | 425 | 34407 |

012296

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | [illegible] WI | UN WI | [illegible] WI | Current Depths 9/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | Undivided WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Act. n Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 1 | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | Unitized WI | UN WI | Geolan WI | Current Depths 8/1/2016 | Comments Art. ii Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] BASSORE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOAN DOLAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DANA BASSORE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES JOSEPH GILBERT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY L [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JEFFREY JOHN MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| FITZSIMMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| FITZSIMMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| WESLEY E [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLARA KAY [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| FRANCES [illegible] JOHNSTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GLORIA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVEN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID [illegible] WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cu Net | WI | Unclub RR | NRI | Burden | Current Depths 6/1/2016 | Comment/Act. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DELIA DAUGHERTY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENISE SUTTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] RESOURCES OPERATING LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BENITA LOU POWELL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LONA L ARCHER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] TURNER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] BR | SM WI | [illegible] WI | Current Depths 9/1/2016 | Comment Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2013 | 04/21/2018 | TX | Dimmit | [illegible] | 0.424 | 0.070 | 0.33333333 | 0.16666667 | 0.10000000 | 0.16666667 | All Depths | | N | 545 | 537 | 19442 |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 09/14/2010 | 09/14/2013 | TX | Dimmit | 75.000 | 0.725 | 0.181 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 455 | 548 | 15946 |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.611 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 545 | 619 | 19479 |
| CLAUDINE [illegible] | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 10.000 | 0.208 | 0.060 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 123 | 18274 |
| MODENA PARKS [illegible] | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 117 | 18271 |
| PATRICIA PARKS [illegible] | ANADARKO E&P ONSHORE LLC | 04/16/2015 | 04/16/2018 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 105 | 18268 |
| [illegible] | ANADARKO E&P ONSHORE LLC | 04/11/2015 | 04/11/2018 | TX | Dimmit | 10.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 120 | 18273 |
| LEN B EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.125 | 0.042 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 102 | 18267 |
| CALUB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 126 | 18275 |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 10.000 | 0.250 | 0.083 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 124 | 18272 |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.250 | 0.083 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 97 | 18266 |
| WESLEY BURKE POWELL | ANADARKO E&P ONSHORE LLC | 04/24/2015 | 04/24/2018 | TX | Dimmit | 10.000 | 0.250 | 0.083 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 111 | 18270 |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/25/2015 | 04/25/2018 | TX | Dimmit | 10.000 | 0.625 | 0.208 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 108 | 18269 |
| DEBORAH J PUTNAM | ANADARKO E&P ONSHORE LLC | 04/23/2015 | 04/23/2018 | TX | Dimmit | 10.000 | 0.625 | 0.208 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 547 | 115 | 19605 |
| DANNY WAYNE CHOUNE JR. ET AL | ANADARKO E&P ONSHORE LLC | 01/05/2015 | 01/05/2018 | TX | Dimmit | 160.000 | 8.337 | 1.111 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 542 | 275 | 18053 |
| AARON BAGGORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 10.000 | 0.510 | 0.085 | 0.40000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 544 | 756 | 18759 |
| LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | 11/11/2019 | TX | Dimmit | 10.000 | 0.260 | 0.130 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 544 | 759 | 18760 |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.417 | 0.208 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 207 | 18837 |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.417 | 0.208 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 204 | 18826 |
| STEVEN N LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 216 | 18832 |
| WILLIAM B [illegible] JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.573 | 0.286 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 213 | 18829 |
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 1.094 | 0.547 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 210 | 18888 |
| [illegible] HOLDINGS LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | 05/01/2018 | TX | Dimmit | 80.000 | 80.000 | 40.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 549 | 244 | 18387 |
| FRANK E GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | 05/20/2018 | TX | Dimmit | 10.000 | 0.069 | 0.023 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 547 | 113 | 19605 |
| STEPHEN LABORTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.125 | 0.042 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 547 | 118 | 19602 |
| WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 09/14/2015 | 09/14/2021 | TX | Dimmit | 70.000 | 0.729 | 0.140 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 548 | 422 | 19852 |
| [illegible] | ANADARKO E&P ONSHORE LLC | 04/22/2015 | 04/22/2018 | TX | Dimmit | 10.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 548 | 477 | 19853 |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 09/10/2015 | 09/10/2018 | TX | Dimmit | 10.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 549 | 476 | 19817 |
| MARTIN [illegible] TRUST | ANADARKO E&P ONSHORE LLC | 12/05/2014 | 12/05/2017 | TX | Dimmit | 10.000 | 0.625 | 0.208 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 548 | 471 | 19811 |
| BARBARA RUTH [illegible] | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2017 | TX | Dimmit | 10.000 | 0.208 | 0.069 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 548 | 474 | 19812 |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | 06/08/2018 | TX | Dimmit | 10.000 | 0.069 | 0.023 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 550 | 372 | 19827 |
| WAYNE MOODY | ANADARKO E&P ONSHORE LLC | 04/23/2015 | 04/23/2018 | TX | Dimmit | 10.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 550 | 366 | 19831 |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths 9/1/2016 | Comments [illegible] Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

012303

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | UnSub WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Act. v. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | 09/29/2018 | TX | Dimmit | 80.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2018 | TX | Dimmit | 80.000 | 0.667 | 0.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | 10/27/2018 | TX | Dimmit | 80.000 | 1.250 | 0.625 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 563 | 557 | 40854 |
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.179 | 0.090 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | 03/01/2021 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | 10/20/2020 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | 07/19/2019 | TX | Dimmit | 1639.310 | 273.218 | 204.914 | 0.75000000 | 0.15000000 | 0.22500000 | 0.37500000 | All Depths | | Y | 577 | 454 | 42708 |

012304

**Annex IV**
**Approved Financial Advisor Arbiters**

Financial Advisors:
Evercore
Jefferies
Citigroup
Royal Bank of Canada
J.P. Morgan
Credit Suisse
Morgan Stanley
Tudor, Pickering, Holt & Co.

Reserve Auditors:
Ryder Scott
W.D. Von Gonten & Co.
Netherland Sewell & Associates
Cawley, Gillespie & Associates
DeGolyer and MacNaughton

**Annex V**
**Existing Producing Wells**

(*see attached*)

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BEINHORN RANCH 10H | 4212733880 |
| BEINHORN RANCH 11H | 4212734113 |
| BEINHORN RANCH 12H | 4212734114 |
| BEINHORN RANCH 13H | 4212734260 |
| BEINHORN RANCH 14H | 4212734259 |
| BEINHORN RANCH 15H | 4212734261 |
| BEINHORN RANCH 16H | 4212734997 |
| BEINHORN RANCH 17H | 4212734998 |
| BEINHORN RANCH 18H | 4212734999 |
| BEINHORN RANCH 19H | 4212734330 |
| BEINHORN RANCH 1H | 4212733624 |
| BEINHORN RANCH 20H | 4212734328 |
| BEINHORN RANCH 21H | 4212734115 |
| BEINHORN RANCH 22H | 4212734329 |
| BEINHORN RANCH 23H | 4212734383 |
| BEINHORN RANCH 24H | 4212734384 |
| BEINHORN RANCH 25H | 4212734385 |
| BEINHORN RANCH 26H | 4212734386 |
| BEINHORN RANCH 27H | 4212735001 |
| BEINHORN RANCH 28H | 4212735000 |
| BEINHORN RANCH 29H | 4212735018 |
| BEINHORN RANCH 2H | 4212733644 |
| BEINHORN RANCH 30H | 4212735020 |
| BEINHORN RANCH 31H | 4212735019 |
| BEINHORN RANCH 32H | 4212735022 |
| BEINHORN RANCH 33H | 4212735032 |
| BEINHORN RANCH 34H | 4212735033 |
| BEINHORN RANCH 35H | 4212735035 |
| BEINHORN RANCH 36H | 4212735034 |
| BEINHORN RANCH 37H | 4212736214 |
| BEINHORN RANCH 38H | 4212736219 |
| BEINHORN RANCH 39H | 4212736220 |
| BEINHORN RANCH 3H | 4212733664 |
| BEINHORN RANCH 40H | 4212736221 |
| BEINHORN RANCH 41H | 4212736223 |
| BEINHORN RANCH 42H | 4212736224 |
| BEINHORN RANCH 43H | 4212736225 |
| BEINHORN RANCH 44H | 4212736226 |
| BEINHORN RANCH 4H | 4212733690 |
| BEINHORN RANCH 5H | 4212733760 |
| BEINHORN RANCH 6H | 4212733761 |
| BEINHORN RANCH 7H | 4212733871 |
| BEINHORN RANCH 8H | 4212733872 |
| BEINHORN RANCH 9H | 4212733879 |
| BEINHORN RANCH UNIT A 10H | 4212736291 |
| BEINHORN RANCH UNIT A 11H | 4212736289 |
| BEINHORN RANCH UNIT A 12H | 4212736294 |
| BEINHORN RANCH UNIT A 1H | 4212736275 |
| BEINHORN RANCH UNIT A 2H | 4212736276 |
| BEINHORN RANCH UNIT A 3H | 4212736277 |
| BEINHORN RANCH UNIT A 4H | 4212736278 |
| BEINHORN RANCH UNIT A 5H | 4212736282 |
| BEINHORN RANCH UNIT A 6H | 4212736286 |
| BEINHORN RANCH UNIT A 7H | 4212736287 |
| BEINHORN RANCH UNIT A 8H | 4212736290 |
| BEINHORN RANCH UNIT A 9H | 4212736288 |
| BOYD, GG 1H | 4212733750 |
| BRISCOE CARLA RANCH 10H | 4212733733 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH 11H | 4212733735 |
| BRISCOE CARLA RANCH 12H | 4212733736 |
| BRISCOE CARLA RANCH 13H | 4212733875 |
| BRISCOE CARLA RANCH 14H | 4212733876 |
| BRISCOE CARLA RANCH 15H | 4212733874 |
| BRISCOE CARLA RANCH 16H | 4212734133 |
| BRISCOE CARLA RANCH 17H | 4212734134 |
| BRISCOE CARLA RANCH 18H | 4212734135 |
| BRISCOE CARLA RANCH 19H | 4212733889 |
| BRISCOE CARLA RANCH 1H | 4212733681 |
| BRISCOE CARLA RANCH 20H | 4212733890 |
| BRISCOE CARLA RANCH 21H | 4212733891 |
| BRISCOE CARLA RANCH 22H | 4212733885 |
| BRISCOE CARLA RANCH 23H | 4212733893 |
| BRISCOE CARLA RANCH 24H | 4212733894 |
| BRISCOE CARLA RANCH 25H | 4212733895 |
| BRISCOE CARLA RANCH 26H | 4212734948 |
| BRISCOE CARLA RANCH 27H | 4212734949 |
| BRISCOE CARLA RANCH 28H | 4212734969 |
| BRISCOE CARLA RANCH 29H | 4212734959 |
| BRISCOE CARLA RANCH 2H | 4212733666 |
| BRISCOE CARLA RANCH 30H | 4212734960 |
| BRISCOE CARLA RANCH 31H | 4212734961 |
| BRISCOE CARLA RANCH 32H | 4212734967 |
| BRISCOE CARLA RANCH 33H | 4212734962 |
| BRISCOE CARLA RANCH 34H | 4212734963 |
| BRISCOE CARLA RANCH 3H | 4212733705 |
| BRISCOE CARLA RANCH 4H | 4212733706 |
| BRISCOE CARLA RANCH 5H | 4212734946 |
| BRISCOE CARLA RANCH 6H | 4212734947 |
| BRISCOE CARLA RANCH 7H | 4212733855 |
| BRISCOE CARLA RANCH 8H | 4212733856 |
| BRISCOE CARLA RANCH 9H | 4212733857 |
| BRISCOE CATARINA N UNIT A 10H | 4212735923 |
| BRISCOE CATARINA N UNIT A 1H | 4212735930 |
| BRISCOE CATARINA N UNIT A 2H | 4212735931 |
| BRISCOE CATARINA N UNIT A 3H | 4212735932 |
| BRISCOE CATARINA N UNIT A 4H | 4212735933 |
| BRISCOE CATARINA N UNIT A 5H | 4212735934 |
| BRISCOE CATARINA N UNIT A 6H | 4212735919 |
| BRISCOE CATARINA N UNIT A 7H | 4212735920 |
| BRISCOE CATARINA N UNIT A 8H | 4212735921 |
| BRISCOE CATARINA N UNIT A 9H | 4212735922 |
| BRISCOE CATARINA NORTH 100H | 4212736732 |
| BRISCOE CATARINA NORTH 101H | 4212736733 |
| BRISCOE CATARINA NORTH 102H | 4212736734 |
| BRISCOE CATARINA NORTH 103H | 4212736735 |
| BRISCOE CATARINA NORTH 10H | 4212733930 |
| BRISCOE CATARINA NORTH 11H | 4212733932 |
| BRISCOE CATARINA NORTH 12H | 4212733931 |
| BRISCOE CATARINA NORTH 133H | 4212736869 |
| BRISCOE CATARINA NORTH 134H | 4212736870 |
| BRISCOE CATARINA NORTH 135H | 4212736866 |
| BRISCOE CATARINA NORTH 136H | 4212736867 |
| BRISCOE CATARINA NORTH 13H | 4212733937 |
| BRISCOE CATARINA NORTH 14H | 4212733938 |
| BRISCOE CATARINA NORTH 15H | 4212733939 |
| BRISCOE CATARINA NORTH 16H | 4212733947 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 17H | 4212733948 |
| BRISCOE CATARINA NORTH 18H | 4212733949 |
| BRISCOE CATARINA NORTH 19H | 4212735063 |
| BRISCOE CATARINA NORTH 1H | 4212733687 |
| BRISCOE CATARINA NORTH 20H | 4212734155 |
| BRISCOE CATARINA NORTH 21H | 4212734156 |
| BRISCOE CATARINA NORTH 22H | 4212734157 |
| BRISCOE CATARINA NORTH 23H | 4212734128 |
| BRISCOE CATARINA NORTH 24H | 4212734129 |
| BRISCOE CATARINA NORTH 25H | 4212734130 |
| BRISCOE CATARINA NORTH 26H | 4212734174 |
| BRISCOE CATARINA NORTH 27H | 4212734175 |
| BRISCOE CATARINA NORTH 28H | 4212734176 |
| BRISCOE CATARINA NORTH 29H | 4212734206 |
| BRISCOE CATARINA NORTH 2H | 4212733995 |
| BRISCOE CATARINA NORTH 30H | 4212734208 |
| BRISCOE CATARINA NORTH 31H | 4212734209 |
| BRISCOE CATARINA NORTH 32H | 4212735064 |
| BRISCOE CATARINA NORTH 33H | 4212735070 |
| BRISCOE CATARINA NORTH 34H | 4212735066 |
| BRISCOE CATARINA NORTH 35H | 4212734221 |
| BRISCOE CATARINA NORTH 36H | 4212734222 |
| BRISCOE CATARINA NORTH 37H | 4212734223 |
| BRISCOE CATARINA NORTH 39H | 4212734226 |
| BRISCOE CATARINA NORTH 3H | 4212734001 |
| BRISCOE CATARINA NORTH 40H | 4212734228 |
| BRISCOE CATARINA NORTH 41H | 4212734229 |
| BRISCOE CATARINA NORTH 42H | 4212734230 |
| BRISCOE CATARINA NORTH 43H | 4212734231 |
| BRISCOE CATARINA NORTH 44H | 4212734343 |
| BRISCOE CATARINA NORTH 45H | 4212734344 |
| BRISCOE CATARINA NORTH 46H | 4212734375 |
| BRISCOE CATARINA NORTH 47H | 4212734376 |
| BRISCOE CATARINA NORTH 48H | 4212734377 |
| BRISCOE CATARINA NORTH 49H | 4212734378 |
| BRISCOE CATARINA NORTH 4H | 4212733804 |
| BRISCOE CATARINA NORTH 50H | 4212734563 |
| BRISCOE CATARINA NORTH 51H | 4212734564 |
| BRISCOE CATARINA NORTH 52H | 4212734565 |
| BRISCOE CATARINA NORTH 53H | 4212734566 |
| BRISCOE CATARINA NORTH 54H | 4212734567 |
| BRISCOE CATARINA NORTH 55H | 4212734568 |
| BRISCOE CATARINA NORTH 56H | 4212734578 |
| BRISCOE CATARINA NORTH 57H | 4212734579 |
| BRISCOE CATARINA NORTH 58H | 4212734580 |
| BRISCOE CATARINA NORTH 59H | 4212734581 |
| BRISCOE CATARINA NORTH 5H | 4212733805 |
| BRISCOE CATARINA NORTH 60H | 4212734582 |
| BRISCOE CATARINA NORTH 61H | 4212734583 |
| BRISCOE CATARINA NORTH 62H | 4212734866 |
| BRISCOE CATARINA NORTH 63H | 4212734869 |
| BRISCOE CATARINA NORTH 64H | 4212734870 |
| BRISCOE CATARINA NORTH 65H | 4212734871 |
| BRISCOE CATARINA NORTH 66H | 4212734874 |
| BRISCOE CATARINA NORTH 67H | 4212734875 |
| BRISCOE CATARINA NORTH 68H | 4212734876 |
| BRISCOE CATARINA NORTH 69H | 4212734891 |
| BRISCOE CATARINA NORTH 6H | 4212733806 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 70H | 4212734890 |
| BRISCOE CATARINA NORTH 71H | 4212734894 |
| BRISCOE CATARINA NORTH 72H | 4212734936 |
| BRISCOE CATARINA NORTH 73H | 4212734930 |
| BRISCOE CATARINA NORTH 74H | 4212734932 |
| BRISCOE CATARINA NORTH 75H | 4212734933 |
| BRISCOE CATARINA NORTH 76H | 4212735159 |
| BRISCOE CATARINA NORTH 77H | 4212735168 |
| BRISCOE CATARINA NORTH 78H | 4212735169 |
| BRISCOE CATARINA NORTH 79H | 4212735170 |
| BRISCOE CATARINA NORTH 7H | 4212733825 |
| BRISCOE CATARINA NORTH 80H | 4212735171 |
| BRISCOE CATARINA NORTH 81H | 4212735172 |
| BRISCOE CATARINA NORTH 82H | 4212735173 |
| BRISCOE CATARINA NORTH 83H | 4212735174 |
| BRISCOE CATARINA NORTH 84H | 4212735816 |
| BRISCOE CATARINA NORTH 85H | 4212735817 |
| BRISCOE CATARINA NORTH 86H | 4212735818 |
| BRISCOE CATARINA NORTH 87H | 4212735819 |
| BRISCOE CATARINA NORTH 88H | 4212735820 |
| BRISCOE CATARINA NORTH 89H | 4212735821 |
| BRISCOE CATARINA NORTH 8H | 4212733826 |
| BRISCOE CATARINA NORTH 90H | 4212736722 |
| BRISCOE CATARINA NORTH 91H | 4212736723 |
| BRISCOE CATARINA NORTH 92H | 4212736724 |
| BRISCOE CATARINA NORTH 93H | 4212736725 |
| BRISCOE CATARINA NORTH 94H | 4212736726 |
| BRISCOE CATARINA NORTH 95H | 4212736727 |
| BRISCOE CATARINA NORTH 96H | 4212736728 |
| BRISCOE CATARINA NORTH 97H | 4212736729 |
| BRISCOE CATARINA NORTH 98H | 4212736730 |
| BRISCOE CATARINA NORTH 99H | 4212736731 |
| BRISCOE CATARINA NORTH 9H | 4212733829 |
| BRISCOE CATARINA RANCH 100H | 4212735430 |
| BRISCOE CATARINA RANCH 101H | 4212735431 |
| BRISCOE CATARINA RANCH 102H | 4212735471 |
| BRISCOE CATARINA RANCH 103H | 4212735472 |
| BRISCOE CATARINA RANCH 104H | 4212735473 |
| BRISCOE CATARINA RANCH 105H | 4212735474 |
| BRISCOE CATARINA RANCH 106H | 4212735475 |
| BRISCOE CATARINA RANCH 107H | 4212735476 |
| BRISCOE CATARINA RANCH 108H | 4212735199 |
| BRISCOE CATARINA RANCH 10H | 4212733677 |
| BRISCOE CATARINA RANCH 11H | 4212734363 |
| BRISCOE CATARINA RANCH 12H | 4212734364 |
| BRISCOE CATARINA RANCH 13H | 4212733680 |
| BRISCOE CATARINA RANCH 14H | 4212734365 |
| BRISCOE CATARINA RANCH 15H | 4212734366 |
| BRISCOE CATARINA RANCH 16H | 4212733790 |
| BRISCOE CATARINA RANCH 17H | 4212733791 |
| BRISCOE CATARINA RANCH 18H | 4212733792 |
| BRISCOE CATARINA RANCH 19H | 4212733780 |
| BRISCOE CATARINA RANCH 1H EAGLEF | 4212733398 |
| BRISCOE CATARINA RANCH 20H | 4212733781 |
| BRISCOE CATARINA RANCH 21H | 4212733782 |
| BRISCOE CATARINA RANCH 22H | 4212734315 |
| BRISCOE CATARINA RANCH 23H | 4212734316 |
| BRISCOE CATARINA RANCH 24H | 4212734317 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 25H | 4212734318 |
| BRISCOE CATARINA RANCH 26H | 4212734319 |
| BRISCOE CATARINA RANCH 27H | 4212734320 |
| BRISCOE CATARINA RANCH 28H | 4212734367 |
| BRISCOE CATARINA RANCH 29H | 4212734368 |
| BRISCOE CATARINA RANCH 2H | 4212733612 |
| BRISCOE CATARINA RANCH 31H | 4212734388 |
| BRISCOE CATARINA RANCH 32H | 4212734389 |
| BRISCOE CATARINA RANCH 33H | 4212734390 |
| BRISCOE CATARINA RANCH 34H | 4212734432 |
| BRISCOE CATARINA RANCH 35H | 4212734433 |
| BRISCOE CATARINA RANCH 36H | 4212734436 |
| BRISCOE CATARINA RANCH 37H | 4212734434 |
| BRISCOE CATARINA RANCH 38H | 4212734439 |
| BRISCOE CATARINA RANCH 39H | 4212734440 |
| BRISCOE CATARINA RANCH 3H | 4212733646 |
| BRISCOE CATARINA RANCH 40H | 4212734441 |
| BRISCOE CATARINA RANCH 41H | 4212734443 |
| BRISCOE CATARINA RANCH 42H | 4212734442 |
| BRISCOE CATARINA RANCH 43H | 4212734444 |
| BRISCOE CATARINA RANCH 44H | 4212734446 |
| BRISCOE CATARINA RANCH 45H | 4212734448 |
| BRISCOE CATARINA RANCH 46H | 4212734754 |
| BRISCOE CATARINA RANCH 47H | 4212734755 |
| BRISCOE CATARINA RANCH 48H | 4212734756 |
| BRISCOE CATARINA RANCH 49H | 4212734757 |
| BRISCOE CATARINA RANCH 4H | 4212733684 |
| BRISCOE CATARINA RANCH 50H | 4212734758 |
| BRISCOE CATARINA RANCH 51H | 4212734774 |
| BRISCOE CATARINA RANCH 52H | 4212734775 |
| BRISCOE CATARINA RANCH 53H | 4212734778 |
| BRISCOE CATARINA RANCH 54H | 4212734777 |
| BRISCOE CATARINA RANCH 55H | 4212734776 |
| BRISCOE CATARINA RANCH 56H | 4212735214 |
| BRISCOE CATARINA RANCH 57H | 4212735215 |
| BRISCOE CATARINA RANCH 58H | 4212735216 |
| BRISCOE CATARINA RANCH 59H | 4212735188 |
| BRISCOE CATARINA RANCH 5H | 4212735292 |
| BRISCOE CATARINA RANCH 60H | 4212735190 |
| BRISCOE CATARINA RANCH 61H | 4212735184 |
| BRISCOE CATARINA RANCH 62H | 4212735183 |
| BRISCOE CATARINA RANCH 63H | 4212735185 |
| BRISCOE CATARINA RANCH 64H | 4212735186 |
| BRISCOE CATARINA RANCH 65H | 4212735193 |
| BRISCOE CATARINA RANCH 66H | 4212735194 |
| BRISCOE CATARINA RANCH 67H | 4212735195 |
| BRISCOE CATARINA RANCH 68H | 4212735196 |
| BRISCOE CATARINA RANCH 69H | 4212735197 |
| BRISCOE CATARINA RANCH 6H | 4212733749 |
| BRISCOE CATARINA RANCH 70H | 4212735198 |
| BRISCOE CATARINA RANCH 71H | 4212735217 |
| BRISCOE CATARINA RANCH 72H | 4212735218 |
| BRISCOE CATARINA RANCH 73H | 4212735219 |
| BRISCOE CATARINA RANCH 74H | 4212735293 |
| BRISCOE CATARINA RANCH 75H | 4212735296 |
| BRISCOE CATARINA RANCH 76H | 4212735297 |
| BRISCOE CATARINA RANCH 77H | 4212735298 |
| BRISCOE CATARINA RANCH 78H | 4212735299 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 79H | 4212735300 |
| BRISCOE CATARINA RANCH 7H | 4212733723 |
| BRISCOE CATARINA RANCH 80H | 4212735301 |
| BRISCOE CATARINA RANCH 81H | 4212735302 |
| BRISCOE CATARINA RANCH 82H | 4212735303 |
| BRISCOE CATARINA RANCH 83H | 4212735304 |
| BRISCOE CATARINA RANCH 84H | 4212735305 |
| BRISCOE CATARINA RANCH 85H | 4212735331 |
| BRISCOE CATARINA RANCH 86H | 4212735332 |
| BRISCOE CATARINA RANCH 87H | 4212735330 |
| BRISCOE CATARINA RANCH 88H | 4212735345 |
| BRISCOE CATARINA RANCH 89H | 4212735346 |
| BRISCOE CATARINA RANCH 8H | 4212733724 |
| BRISCOE CATARINA RANCH 90H | 4212735340 |
| BRISCOE CATARINA RANCH 91H | 4212735341 |
| BRISCOE CATARINA RANCH 92H | 4212735342 |
| BRISCOE CATARINA RANCH 93H | 4212735343 |
| BRISCOE CATARINA RANCH 94H | 4212735344 |
| BRISCOE CATARINA RANCH 95H | 4212735425 |
| BRISCOE CATARINA RANCH 96H | 4212735427 |
| BRISCOE CATARINA RANCH 97H | 4212735426 |
| BRISCOE CATARINA RANCH 98H | 4212735428 |
| BRISCOE CATARINA RANCH 99H | 4212735429 |
| BRISCOE CATARINA RANCH 9H | 4212733674 |
| BRISCOE CATARINA SOUTH 10H | 4212734455 |
| BRISCOE CATARINA SOUTH 11H | 4212734456 |
| BRISCOE CATARINA SOUTH 12H | 4212734457 |
| BRISCOE CATARINA SOUTH 13H | 4212734459 |
| BRISCOE CATARINA SOUTH 14H | 4212734458 |
| BRISCOE CATARINA SOUTH 15H | 4212734460 |
| BRISCOE CATARINA SOUTH 16H | 4212735312 |
| BRISCOE CATARINA SOUTH 17H | 4212735313 |
| BRISCOE CATARINA SOUTH 18H | 4212735314 |
| BRISCOE CATARINA SOUTH 19H | 4212735316 |
| BRISCOE CATARINA SOUTH 1H | 4212733783 |
| BRISCOE CATARINA SOUTH 20H | 4212735322 |
| BRISCOE CATARINA SOUTH 21H | 4212735323 |
| BRISCOE CATARINA SOUTH 22H | 4212735324 |
| BRISCOE CATARINA SOUTH 23H | 4212735325 |
| BRISCOE CATARINA SOUTH 24H | 4212735362 |
| BRISCOE CATARINA SOUTH 25H | 4212735363 |
| BRISCOE CATARINA SOUTH 26H | 4212735364 |
| BRISCOE CATARINA SOUTH 27H | 4212735365 |
| BRISCOE CATARINA SOUTH 28H | 4212735459 |
| BRISCOE CATARINA SOUTH 29H | 4212735515 |
| BRISCOE CATARINA SOUTH 2H | 4212733784 |
| BRISCOE CATARINA SOUTH 30H | 4212735460 |
| BRISCOE CATARINA SOUTH 31H | 4212735461 |
| BRISCOE CATARINA SOUTH 32H | 4212735463 |
| BRISCOE CATARINA SOUTH 33H | 4212735462 |
| BRISCOE CATARINA SOUTH 34H | 4212735481 |
| BRISCOE CATARINA SOUTH 35H | 4212735484 |
| BRISCOE CATARINA SOUTH 36H | 4212735510 |
| BRISCOE CATARINA SOUTH 37H | 4212735511 |
| BRISCOE CATARINA SOUTH 38H | 4212735513 |
| BRISCOE CATARINA SOUTH 39H | 4212735512 |
| BRISCOE CATARINA SOUTH 3H | 4212733785 |
| BRISCOE CATARINA SOUTH 40H | 4212735532 |

012312

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA SOUTH 41H | 4212735533 |
| BRISCOE CATARINA SOUTH 42H | 4212735534 |
| BRISCOE CATARINA SOUTH 43H | 4212735535 |
| BRISCOE CATARINA SOUTH 44H | 4212735536 |
| BRISCOE CATARINA SOUTH 45H | 4212735557 |
| BRISCOE CATARINA SOUTH 46H | 4212735561 |
| BRISCOE CATARINA SOUTH 47H | 4212735562 |
| BRISCOE CATARINA SOUTH 48H | 4212735563 |
| BRISCOE CATARINA SOUTH 49H | 4212735693 |
| BRISCOE CATARINA SOUTH 4H | 4212733769 |
| BRISCOE CATARINA SOUTH 50H | 4212735694 |
| BRISCOE CATARINA SOUTH 51H | 4212735695 |
| BRISCOE CATARINA SOUTH 52H | 4212735696 |
| BRISCOE CATARINA SOUTH 53H | 4212735698 |
| BRISCOE CATARINA SOUTH 54H | 4212735700 |
| BRISCOE CATARINA SOUTH 55H | 4212735699 |
| BRISCOE CATARINA SOUTH 56H | 4212735701 |
| BRISCOE CATARINA SOUTH 57H | 4212735706 |
| BRISCOE CATARINA SOUTH 58H | 4212735707 |
| BRISCOE CATARINA SOUTH 59H | 4212735708 |
| BRISCOE CATARINA SOUTH 5H | 4212733770 |
| BRISCOE CATARINA SOUTH 60H | 4212735709 |
| BRISCOE CATARINA SOUTH 61H | 4212736439 |
| BRISCOE CATARINA SOUTH 62H | 4212736440 |
| BRISCOE CATARINA SOUTH 63H | 4212736441 |
| BRISCOE CATARINA SOUTH 64H | 4212736442 |
| BRISCOE CATARINA SOUTH 65H | 4212736443 |
| BRISCOE CATARINA SOUTH 66H | 4212736444 |
| BRISCOE CATARINA SOUTH 67H | 4212736417 |
| BRISCOE CATARINA SOUTH 68H | 4212736418 |
| BRISCOE CATARINA SOUTH 69H | 4212736419 |
| BRISCOE CATARINA SOUTH 6H | 4212733771 |
| BRISCOE CATARINA SOUTH 70H | 4212736420 |
| BRISCOE CATARINA SOUTH 71H | 4212736421 |
| BRISCOE CATARINA SOUTH 72H | 4212736410 |
| BRISCOE CATARINA SOUTH 73H | 4212736411 |
| BRISCOE CATARINA SOUTH 74H | 4212736412 |
| BRISCOE CATARINA SOUTH 75H | 4212736413 |
| BRISCOE CATARINA SOUTH 76H | 4212736414 |
| BRISCOE CATARINA SOUTH 77H | 4212736393 |
| BRISCOE CATARINA SOUTH 78H | 4212736394 |
| BRISCOE CATARINA SOUTH 79H | 4212736395 |
| BRISCOE CATARINA SOUTH 7H | 4212733952 |
| BRISCOE CATARINA SOUTH 80H | 4212736396 |
| BRISCOE CATARINA SOUTH 81H | 4212736397 |
| BRISCOE CATARINA SOUTH 82H | 4212736426 |
| BRISCOE CATARINA SOUTH 83H | 4212736427 |
| BRISCOE CATARINA SOUTH 8H | 4212733951 |
| BRISCOE CATARINA SOUTH 9H | 4212733953 |
| BRISCOE CATARINA WEST 10H | 4212733682 |
| BRISCOE CATARINA WEST 116H | 4212736645 |
| BRISCOE CATARINA WEST 117H | 4212736646 |
| BRISCOE CATARINA WEST 118H | 4212736647 |
| BRISCOE CATARINA WEST 119H | 4212736648 |
| BRISCOE CATARINA WEST 120H | 4212736649 |
| BRISCOE CATARINA WEST 121H | 4212736654 |
| BRISCOE CATARINA WEST 125H | 4212736651 |
| BRISCOE CATARINA WEST 126H | 4212736652 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 127H | 4212736653 |
| BRISCOE CATARINA WEST 128H | 4212736655 |
| BRISCOE CATARINA WEST 129H | 4212736656 |
| BRISCOE CATARINA WEST 12H | 4212733753 |
| BRISCOE CATARINA WEST 130H | 4212736657 |
| BRISCOE CATARINA WEST 131H | 4212736658 |
| BRISCOE CATARINA WEST 132H | 4212736659 |
| BRISCOE CATARINA WEST 13H | 4212733762 |
| BRISCOE CATARINA WEST 14H | 4212733763 |
| BRISCOE CATARINA WEST 15H | 4212733777 |
| BRISCOE CATARINA WEST 16H | 4212733778 |
| BRISCOE CATARINA WEST 17H | 4212733779 |
| BRISCOE CATARINA WEST 18H | 4212734166 |
| BRISCOE CATARINA WEST 19H | 4212734167 |
| BRISCOE CATARINA WEST 1H (EAGLEF | 4212733421 |
| BRISCOE CATARINA WEST 20H | 4212734169 |
| BRISCOE CATARINA WEST 21H | 4212734170 |
| BRISCOE CATARINA WEST 22H | 4212734171 |
| BRISCOE CATARINA WEST 23H | 4212734172 |
| BRISCOE CATARINA WEST 24H | 4212734335 |
| BRISCOE CATARINA WEST 25H | 4212734336 |
| BRISCOE CATARINA WEST 26H | 4212734337 |
| BRISCOE CATARINA WEST 27H | 4212734338 |
| BRISCOE CATARINA WEST 28H | 4212734340 |
| BRISCOE CATARINA WEST 29H | 4212734339 |
| BRISCOE CATARINA WEST 2H | 4212733615 |
| BRISCOE CATARINA WEST 30H | 4212734682 |
| BRISCOE CATARINA WEST 31H | 4212734684 |
| BRISCOE CATARINA WEST 32H | 4212734685 |
| BRISCOE CATARINA WEST 33H | 4212734686 |
| BRISCOE CATARINA WEST 34H | 4212734687 |
| BRISCOE CATARINA WEST 35H | 4212734689 |
| BRISCOE CATARINA WEST 36H | 4212734690 |
| BRISCOE CATARINA WEST 37H | 4212734693 |
| BRISCOE CATARINA WEST 38H | 4212734694 |
| BRISCOE CATARINA WEST 39H | 4212734695 |
| BRISCOE CATARINA WEST 40H | 4212734696 |
| BRISCOE CATARINA WEST 41H | 4212734697 |
| BRISCOE CATARINA WEST 42H | 4212734717 |
| BRISCOE CATARINA WEST 43H | 4212734720 |
| BRISCOE CATARINA WEST 44H | 4212734718 |
| BRISCOE CATARINA WEST 45H | 4212734719 |
| BRISCOE CATARINA WEST 46H | 4212734722 |
| BRISCOE CATARINA WEST 47H | 4212734725 |
| BRISCOE CATARINA WEST 48H | 4212734726 |
| BRISCOE CATARINA WEST 49H | 4212734727 |
| BRISCOE CATARINA WEST 4H | 4212733629 |
| BRISCOE CATARINA WEST 50H | 4212734728 |
| BRISCOE CATARINA WEST 51H | 4212735780 |
| BRISCOE CATARINA WEST 52H | 4212735781 |
| BRISCOE CATARINA WEST 53H | 4212735782 |
| BRISCOE CATARINA WEST 54H | 4212735783 |
| BRISCOE CATARINA WEST 55H | 4212735784 |
| BRISCOE CATARINA WEST 56H | 4212735785 |
| BRISCOE CATARINA WEST 57H | 4212735786 |
| BRISCOE CATARINA WEST 58H | 4212735787 |
| BRISCOE CATARINA WEST 59H | 4212735788 |
| BRISCOE CATARINA WEST 5H | 4212733637 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 60H | 4212735789 |
| BRISCOE CATARINA WEST 61H | 4212735790 |
| BRISCOE CATARINA WEST 62H | 4212735793 |
| BRISCOE CATARINA WEST 63H | 4212735794 |
| BRISCOE CATARINA WEST 64H | 4212735795 |
| BRISCOE CATARINA WEST 65H | 4212735796 |
| BRISCOE CATARINA WEST 66H | 4212735825 |
| BRISCOE CATARINA WEST 67H | 4212735834 |
| BRISCOE CATARINA WEST 68H | 4212735836 |
| BRISCOE CATARINA WEST 69H | 4212735835 |
| BRISCOE CATARINA WEST 6H | 4212733648 |
| BRISCOE CATARINA WEST 70H | 4212735837 |
| BRISCOE CATARINA WEST 71H | 4212735859 |
| BRISCOE CATARINA WEST 72H | 4212735860 |
| BRISCOE CATARINA WEST 73H | 4212735861 |
| BRISCOE CATARINA WEST 74H | 4212735862 |
| BRISCOE CATARINA WEST 75H | 4212735882 |
| BRISCOE CATARINA WEST 76H | 4212735883 |
| BRISCOE CATARINA WEST 77H | 4212735885 |
| BRISCOE CATARINA WEST 78H | 4212735886 |
| BRISCOE CATARINA WEST 79H | 4212735888 |
| BRISCOE CATARINA WEST 7H | 4212733643 |
| BRISCOE CATARINA WEST 80H | 4212735889 |
| BRISCOE CATARINA WEST 81H | 4212735890 |
| BRISCOE CATARINA WEST 82H | 4212735891 |
| BRISCOE CATARINA WEST 8H | 4212733685 |
| BRISCOE CATARINA WEST 90H | 4212736881 |
| BRISCOE CATARINA WEST 93H | 4212736884 |
| BRISCOE CATARINA WEST 96H | 4212736887 |
| BRISCOE CATARINA WEST 9H | 4212733801 |
| BRISCOE CHIP EAST RANCH 10H | 4212734152 |
| BRISCOE CHIP EAST RANCH 11H | 4212734478 |
| BRISCOE CHIP EAST RANCH 12H | 4212734479 |
| BRISCOE CHIP EAST RANCH 13H | 4212734480 |
| BRISCOE CHIP EAST RANCH 14H | 4212734153 |
| BRISCOE CHIP EAST RANCH 15H | 4212734481 |
| BRISCOE CHIP EAST RANCH 16H | 4212734482 |
| BRISCOE CHIP EAST RANCH 17H | 4212734483 |
| BRISCOE CHIP EAST RANCH 18H | 4212734507 |
| BRISCOE CHIP EAST RANCH 19H | 4212734508 |
| BRISCOE CHIP EAST RANCH 1H | 4212733768 |
| BRISCOE CHIP EAST RANCH 20H | 4212734509 |
| BRISCOE CHIP EAST RANCH 21H | 4212734510 |
| BRISCOE CHIP EAST RANCH 22H | 4212734511 |
| BRISCOE CHIP EAST RANCH 23H | 4212734512 |
| BRISCOE CHIP EAST RANCH 24H | 4212734522 |
| BRISCOE CHIP EAST RANCH 25H | 4212734523 |
| BRISCOE CHIP EAST RANCH 26H | 4212734524 |
| BRISCOE CHIP EAST RANCH 27H | 4212736184 |
| BRISCOE CHIP EAST RANCH 28HR | 4212736283 |
| BRISCOE CHIP EAST RANCH 29H | 4212736186 |
| BRISCOE CHIP EAST RANCH 2H | 4212733772 |
| BRISCOE CHIP EAST RANCH 30H | 4212736188 |
| BRISCOE CHIP EAST RANCH 31H | 4212736206 |
| BRISCOE CHIP EAST RANCH 32H | 4212736207 |
| BRISCOE CHIP EAST RANCH 33H | 4212736236 |
| BRISCOE CHIP EAST RANCH 34H | 4212736237 |
| BRISCOE CHIP EAST RANCH 3H | 4212733773 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CHIP EAST RANCH 4H | 4212733852 |
| BRISCOE CHIP EAST RANCH 5H | 4212733853 |
| BRISCOE CHIP EAST RANCH 6H | 4212733854 |
| BRISCOE CHIP EAST RANCH 7H | 4212734095 |
| BRISCOE CHIP EAST RANCH 8H | 4212734096 |
| BRISCOE CHIP EAST RANCH 9H | 4212734151 |
| BRISCOE CHIP EAST UNIT B 1H | 4212736168 |
| BRISCOE CHIP EAST UNIT B 2H | 4212736169 |
| BRISCOE CHIP EAST UNIT B 3H | 4212736170 |
| BRISCOE CHIP EAST UNIT B 4H | 4212736171 |
| BRISCOE CHIP EAST UNIT B 5H | 4212736172 |
| BRISCOE CHIP EAST UNIT B 6H | 4212736173 |
| BRISCOE CHIP EAST UNIT E 1H | 4212737052 |
| BRISCOE CHIP EAST UNIT E 2H | 4212737053 |
| BRISCOE CHIP EAST UNIT E 3H | 4212737054 |
| BRISCOE CHUPADERA RANCH 1 | 4247939786 |
| BRISCOE CHUPADERA RANCH 10H | 4247941266 |
| BRISCOE CHUPADERA RANCH 11H | 4247941267 |
| BRISCOE CHUPADERA RANCH 12H | 4247941985 |
| BRISCOE CHUPADERA RANCH 13H | 4247941986 |
| BRISCOE CHUPADERA RANCH 14H | 4247941987 |
| BRISCOE CHUPADERA RANCH 15H | 4247941988 |
| BRISCOE CHUPADERA RANCH 16H | 4247941989 |
| BRISCOE CHUPADERA RANCH 17H | 4247941990 |
| BRISCOE CHUPADERA RANCH 18H | 4247941994 |
| BRISCOE CHUPADERA RANCH 19H | 4247941998 |
| BRISCOE CHUPADERA RANCH 20H | 4247942001 |
| BRISCOE CHUPADERA RANCH 21H | 4247942000 |
| BRISCOE CHUPADERA RANCH 22H | 4247942002 |
| BRISCOE CHUPADERA RANCH 23H | 4247942003 |
| BRISCOE CHUPADERA RANCH 24H | 4247942686 |
| BRISCOE CHUPADERA RANCH 25H | 4247942687 |
| BRISCOE CHUPADERA RANCH 26H | 4247942689 |
| BRISCOE CHUPADERA RANCH 27H | 4247942691 |
| BRISCOE CHUPADERA RANCH 28H | 4247942692 |
| BRISCOE CHUPADERA RANCH 29H | 4247942693 |
| BRISCOE CHUPADERA RANCH 2H | 4247941322 |
| BRISCOE CHUPADERA RANCH 30H | 4247942694 |
| BRISCOE CHUPADERA RANCH 31HR | 4247943008 |
| BRISCOE CHUPADERA RANCH 32H | 4247942696 |
| BRISCOE CHUPADERA RANCH 33H | 4247942697 |
| BRISCOE CHUPADERA RANCH 34H | 4247942700 |
| BRISCOE CHUPADERA RANCH 35H | 4247942701 |
| BRISCOE CHUPADERA RANCH 36H | 4247942702 |
| BRISCOE CHUPADERA RANCH 37H | 4247942703 |
| BRISCOE CHUPADERA RANCH 38H | 4247942704 |
| BRISCOE CHUPADERA RANCH 39H | 4247942705 |
| BRISCOE CHUPADERA RANCH 3H | 4247941212 |
| BRISCOE CHUPADERA RANCH 40H | 4247942706 |
| BRISCOE CHUPADERA RANCH 41H | 4247942707 |
| BRISCOE CHUPADERA RANCH 42H | 4247942708 |
| BRISCOE CHUPADERA RANCH 43H | 4247942711 |
| BRISCOE CHUPADERA RANCH 4H | 4247941211 |
| BRISCOE CHUPADERA RANCH 5H | 4247941219 |
| BRISCOE CHUPADERA RANCH 6H | 4247941220 |
| BRISCOE CHUPADERA RANCH 7H | 4247941226 |
| BRISCOE CHUPADERA RANCH 8H | 4247941255 |
| BRISCOE CHUPADERA RANCH 9H | 4247941256 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 100H | 4228334450 |
| BRISCOE COCHINA EAST RANCH 101H | 4228334453 |
| BRISCOE COCHINA EAST RANCH 102H | 4228334469 |
| BRISCOE COCHINA EAST RANCH 103H | 4212736101 |
| BRISCOE COCHINA EAST RANCH 104H | 4212736102 |
| BRISCOE COCHINA EAST RANCH 105H | 4212736117 |
| BRISCOE COCHINA EAST RANCH 106H | 4212736105 |
| BRISCOE COCHINA EAST RANCH 107H | 4212736106 |
| BRISCOE COCHINA EAST RANCH 108H | 4212736108 |
| BRISCOE COCHINA EAST RANCH 109H | 4212736109 |
| BRISCOE COCHINA EAST RANCH 10H | 4212733678 |
| BRISCOE COCHINA EAST RANCH 110H | 4212736110 |
| BRISCOE COCHINA EAST RANCH 111H | 4212736112 |
| BRISCOE COCHINA EAST RANCH 112H | 4212736115 |
| BRISCOE COCHINA EAST RANCH 113H | 4212736116 |
| BRISCOE COCHINA EAST RANCH 114H | 4212736086 |
| BRISCOE COCHINA EAST RANCH 115H | 4212736087 |
| BRISCOE COCHINA EAST RANCH 116H | 4212736088 |
| BRISCOE COCHINA EAST RANCH 117H | 4212736090 |
| BRISCOE COCHINA EAST RANCH 118H | 4212736092 |
| BRISCOE COCHINA EAST RANCH 119H | 4212736093 |
| BRISCOE COCHINA EAST RANCH 11H | 4212733837 |
| BRISCOE COCHINA EAST RANCH 120H | 4212736094 |
| BRISCOE COCHINA EAST RANCH 121H | 4212736095 |
| BRISCOE COCHINA EAST RANCH 122H | 4212736097 |
| BRISCOE COCHINA EAST RANCH 123H | 4212736098 |
| BRISCOE COCHINA EAST RANCH 124H | 4212736099 |
| BRISCOE COCHINA EAST RANCH 125H | 4212736100 |
| BRISCOE COCHINA EAST RANCH 126H | 4212736103 |
| BRISCOE COCHINA EAST RANCH 127H | 4228334853 |
| BRISCOE COCHINA EAST RANCH 128H | 4228334854 |
| BRISCOE COCHINA EAST RANCH 129H | 4228334855 |
| BRISCOE COCHINA EAST RANCH 12H | 4212733838 |
| BRISCOE COCHINA EAST RANCH 130H | 4228334856 |
| BRISCOE COCHINA EAST RANCH 131H | 4228334857 |
| BRISCOE COCHINA EAST RANCH 132H | 4228334858 |
| BRISCOE COCHINA EAST RANCH 13H | 4212733839 |
| BRISCOE COCHINA EAST RANCH 163H | 4212736709 |
| BRISCOE COCHINA EAST RANCH 164H | 4212736708 |
| BRISCOE COCHINA EAST RANCH 165H | 4212736710 |
| BRISCOE COCHINA EAST RANCH 16H | 4212733914 |
| BRISCOE COCHINA EAST RANCH 17H | 4212733916 |
| BRISCOE COCHINA EAST RANCH 188H | 4228335665 |
| BRISCOE COCHINA EAST RANCH 189H | 4228335666 |
| BRISCOE COCHINA EAST RANCH 18H | 4212733968 |
| BRISCOE COCHINA EAST RANCH 190H | 4228335667 |
| BRISCOE COCHINA EAST RANCH 19H | 4212733990 |
| BRISCOE COCHINA EAST RANCH 1H | 4212733620 |
| BRISCOE COCHINA EAST RANCH 20H | 4212733994 |
| BRISCOE COCHINA EAST RANCH 21H | 4212733991 |
| BRISCOE COCHINA EAST RANCH 22H | 4212735204 |
| BRISCOE COCHINA EAST RANCH 23H | 4212735203 |
| BRISCOE COCHINA EAST RANCH 24H | 4212735081 |
| BRISCOE COCHINA EAST RANCH 25H | 4212735072 |
| BRISCOE COCHINA EAST RANCH 26H | 4212735086 |
| BRISCOE COCHINA EAST RANCH 27H | 4212735087 |
| BRISCOE COCHINA EAST RANCH 28H | 4212735205 |
| BRISCOE COCHINA EAST RANCH 29H | 4212735206 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 2H | 4212733621 |
| BRISCOE COCHINA EAST RANCH 30H | 4212735207 |
| BRISCOE COCHINA EAST RANCH 31H | 4212734098 |
| BRISCOE COCHINA EAST RANCH 32H | 4212734107 |
| BRISCOE COCHINA EAST RANCH 33H | 4212735208 |
| BRISCOE COCHINA EAST RANCH 34H | 4212735223 |
| BRISCOE COCHINA EAST RANCH 35H | 4212735210 |
| BRISCOE COCHINA EAST RANCH 36H | 4212735211 |
| BRISCOE COCHINA EAST RANCH 37H | 4212735213 |
| BRISCOE COCHINA EAST RANCH 38H | 4212735228 |
| BRISCOE COCHINA EAST RANCH 39H | 4212735229 |
| BRISCOE COCHINA EAST RANCH 3H | 4212733667 |
| BRISCOE COCHINA EAST RANCH 40H | 4228334138 |
| BRISCOE COCHINA EAST RANCH 41H | 4228334147 |
| BRISCOE COCHINA EAST RANCH 42H | 4228334154 |
| BRISCOE COCHINA EAST RANCH 43H | 4228334156 |
| BRISCOE COCHINA EAST RANCH 44H | 4228334157 |
| BRISCOE COCHINA EAST RANCH 45H | 4228334158 |
| BRISCOE COCHINA EAST RANCH 46H | 4228334163 |
| BRISCOE COCHINA EAST RANCH 47H | 4228334164 |
| BRISCOE COCHINA EAST RANCH 48H | 4228334165 |
| BRISCOE COCHINA EAST RANCH 49H | 4228334166 |
| BRISCOE COCHINA EAST RANCH 4H | 4212733668 |
| BRISCOE COCHINA EAST RANCH 50H | 4228334167 |
| BRISCOE COCHINA EAST RANCH 51H | 4228334168 |
| BRISCOE COCHINA EAST RANCH 52H | 4228334173 |
| BRISCOE COCHINA EAST RANCH 53H | 4228334174 |
| BRISCOE COCHINA EAST RANCH 54H | 4228334175 |
| BRISCOE COCHINA EAST RANCH 55H | 4228334176 |
| BRISCOE COCHINA EAST RANCH 56H | 4228334177 |
| BRISCOE COCHINA EAST RANCH 57H | 4228334225 |
| BRISCOE COCHINA EAST RANCH 58H | 4228334226 |
| BRISCOE COCHINA EAST RANCH 59H | 4228334227 |
| BRISCOE COCHINA EAST RANCH 5H | 4212733669 |
| BRISCOE COCHINA EAST RANCH 60H | 4228334228 |
| BRISCOE COCHINA EAST RANCH 61H | 4212734486 |
| BRISCOE COCHINA EAST RANCH 62H | 4212734487 |
| BRISCOE COCHINA EAST RANCH 63H | 4212734488 |
| BRISCOE COCHINA EAST RANCH 64H | 4212734489 |
| BRISCOE COCHINA EAST RANCH 65H | 4212734492 |
| BRISCOE COCHINA EAST RANCH 66H | 4212734494 |
| BRISCOE COCHINA EAST RANCH 67H | 4228333013 |
| BRISCOE COCHINA EAST RANCH 68H | 4228333015 |
| BRISCOE COCHINA EAST RANCH 69H | 4228333016 |
| BRISCOE COCHINA EAST RANCH 6H | 4212733670 |
| BRISCOE COCHINA EAST RANCH 70H | 4228333017 |
| BRISCOE COCHINA EAST RANCH 71H | 4228333018 |
| BRISCOE COCHINA EAST RANCH 72H | 4228333019 |
| BRISCOE COCHINA EAST RANCH 73H | 4228334307 |
| BRISCOE COCHINA EAST RANCH 74H | 4228334308 |
| BRISCOE COCHINA EAST RANCH 75H | 4228334309 |
| BRISCOE COCHINA EAST RANCH 76H | 4228334310 |
| BRISCOE COCHINA EAST RANCH 77H | 4228334312 |
| BRISCOE COCHINA EAST RANCH 78H | 4228334313 |
| BRISCOE COCHINA EAST RANCH 79H | 4228334362 |
| BRISCOE COCHINA EAST RANCH 7H | 4212733662 |
| BRISCOE COCHINA EAST RANCH 80H | 4228334363 |
| BRISCOE COCHINA EAST RANCH 81H | 4228334364 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 82H | 4228334365 |
| BRISCOE COCHINA EAST RANCH 83H | 4228334392 |
| BRISCOE COCHINA EAST RANCH 84H | 4228334393 |
| BRISCOE COCHINA EAST RANCH 85H | 4228334394 |
| BRISCOE COCHINA EAST RANCH 86H | 4228334395 |
| BRISCOE COCHINA EAST RANCH 87H | 4228334396 |
| BRISCOE COCHINA EAST RANCH 88H | 4228334399 |
| BRISCOE COCHINA EAST RANCH 89H | 4228334400 |
| BRISCOE COCHINA EAST RANCH 8H | 4212733671 |
| BRISCOE COCHINA EAST RANCH 90H | 4228334401 |
| BRISCOE COCHINA EAST RANCH 91H | 4228334402 |
| BRISCOE COCHINA EAST RANCH 92H | 4228334403 |
| BRISCOE COCHINA EAST RANCH 93H | 4228334404 |
| BRISCOE COCHINA EAST RANCH 94H | 4228334406 |
| BRISCOE COCHINA EAST RANCH 95H | 4228334407 |
| BRISCOE COCHINA EAST RANCH 96H | 4228334408 |
| BRISCOE COCHINA EAST RANCH 97H | 4228334409 |
| BRISCOE COCHINA EAST RANCH 98H | 4228334410 |
| BRISCOE COCHINA EAST RANCH 99H | 4228334451 |
| BRISCOE COCHINA EAST RANCH 9H | 4212733672 |
| BRISCOE COCHINA STATE UNIT A-1H | 4228332330 |
| BRISCOE COCHINA STATE UNIT B-1H | 4228332331 |
| BRISCOE COCHINA WEST RANCH 101H | 4212736914 |
| BRISCOE COCHINA WEST RANCH 102H | 4212736916 |
| BRISCOE COCHINA WEST RANCH 103H | 4212736917 |
| BRISCOE COCHINA WEST RANCH 104H | 4212736915 |
| BRISCOE COCHINA WEST RANCH 105H | 4212736918 |
| BRISCOE COCHINA WEST RANCH 11H | 4212733759 |
| BRISCOE COCHINA WEST RANCH 12H | 4212733859 |
| BRISCOE COCHINA WEST RANCH 16H | 4212734116 |
| BRISCOE COCHINA WEST RANCH 17H | 4212734118 |
| BRISCOE COCHINA WEST RANCH 18H | 4212734117 |
| BRISCOE COCHINA WEST RANCH 19H | 4212734831 |
| BRISCOE COCHINA WEST RANCH 1B | 4212735773 |
| BRISCOE COCHINA WEST RANCH 1E | 4212735779 |
| BRISCOE COCHINA WEST RANCH 1H | 4212733658 |
| BRISCOE COCHINA WEST RANCH 20H | 4212734833 |
| BRISCOE COCHINA WEST RANCH 21H | 4212734832 |
| BRISCOE COCHINA WEST RANCH 22H | 4212734445 |
| BRISCOE COCHINA WEST RANCH 23H | 4212734447 |
| BRISCOE COCHINA WEST RANCH 24H | 4212734449 |
| BRISCOE COCHINA WEST RANCH 25H | 4212734450 |
| BRISCOE COCHINA WEST RANCH 26H | 4212734451 |
| BRISCOE COCHINA WEST RANCH 27H | 4212734452 |
| BRISCOE COCHINA WEST RANCH 28H | 4212734834 |
| BRISCOE COCHINA WEST RANCH 29H | 4212734836 |
| BRISCOE COCHINA WEST RANCH 2H | 4212733696 |
| BRISCOE COCHINA WEST RANCH 30H | 4212734837 |
| BRISCOE COCHINA WEST RANCH 39H | 4212734472 |
| BRISCOE COCHINA WEST RANCH 3H | 4212733699 |
| BRISCOE COCHINA WEST RANCH 40H | 4212734473 |
| BRISCOE COCHINA WEST RANCH 41H | 4212734474 |
| BRISCOE COCHINA WEST RANCH 42H | 4212734475 |
| BRISCOE COCHINA WEST RANCH 43H | 4212734476 |
| BRISCOE COCHINA WEST RANCH 44H | 4212734477 |
| BRISCOE COCHINA WEST RANCH 47H | 4212735548 |
| BRISCOE COCHINA WEST RANCH 48H | 4212735549 |
| BRISCOE COCHINA WEST RANCH 49H | 4212735550 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA WEST RANCH 4H | 4212733700 |
| BRISCOE COCHINA WEST RANCH 50H | 4212735551 |
| BRISCOE COCHINA WEST RANCH 51H | 4212735552 |
| BRISCOE COCHINA WEST RANCH 52H | 4212735624 |
| BRISCOE COCHINA WEST RANCH 53H | 4212735626 |
| BRISCOE COCHINA WEST RANCH 54H | 4212735627 |
| BRISCOE COCHINA WEST RANCH 55H | 4212735628 |
| BRISCOE COCHINA WEST RANCH 56H | 4212735630 |
| BRISCOE COCHINA WEST RANCH 57H | 4212735629 |
| BRISCOE COCHINA WEST RANCH 58H | 4212735631 |
| BRISCOE COCHINA WEST RANCH 59H | 4212735632 |
| BRISCOE COCHINA WEST RANCH 5H | 4212733903 |
| BRISCOE COCHINA WEST RANCH 60H | 4212735633 |
| BRISCOE COCHINA WEST RANCH 61H | 4212735634 |
| BRISCOE COCHINA WEST RANCH 62H | 4212735636 |
| BRISCOE COCHINA WEST RANCH 63H | 4212735635 |
| BRISCOE COCHINA WEST RANCH 64H | 4212735640 |
| BRISCOE COCHINA WEST RANCH 65H | 4212735642 |
| BRISCOE COCHINA WEST RANCH 66H | 4212735643 |
| BRISCOE COCHINA WEST RANCH 67H | 4212735644 |
| BRISCOE COCHINA WEST RANCH 68H | 4212736138 |
| BRISCOE COCHINA WEST RANCH 69H | 4212736139 |
| BRISCOE COCHINA WEST RANCH 6H | 4212733904 |
| BRISCOE COCHINA WEST RANCH 70H | 4212736148 |
| BRISCOE COCHINA WEST RANCH 71H | 4212736140 |
| BRISCOE COCHINA WEST RANCH 72H | 4212736141 |
| BRISCOE COCHINA WEST RANCH 73H | 4212736142 |
| BRISCOE COCHINA WEST RANCH 74H | 4212736143 |
| BRISCOE COCHINA WEST RANCH 75H | 4212736144 |
| BRISCOE COCHINA WEST RANCH 76H | 4212736145 |
| BRISCOE COCHINA WEST RANCH 77H | 4212736146 |
| BRISCOE COCHINA WEST RANCH 7H | 4212733905 |
| BRISCOE COCHINA WEST RANCH 88H | 4212736263 |
| BRISCOE COCHINA WEST RANCH 89H | 4212736264 |
| BRISCOE COCHINA WEST RANCH 90H | 4212736265 |
| BRISCOE COCHINA WEST RANCH 91H | 4212736266 |
| BRISCOE COCHINA WEST RANCH 92H | 4212736267 |
| BRISCOE COCHINA WEST RANCH 93H | 4212736268 |
| BRISCOE COCHINA WEST RANCH 94H | 4212736269 |
| BRISCOE COCHINA WEST RANCH 95H | 4212736270 |
| BRISCOE EAST DELGADO UNIT A 10H | 4212735752 |
| BRISCOE EAST DELGADO UNIT A 11H | 4212735753 |
| BRISCOE EAST DELGADO UNIT A 12H | 4212735754 |
| BRISCOE EAST DELGADO UNIT A 13H | 4212735755 |
| BRISCOE EAST DELGADO UNIT A 14H | 4212735756 |
| BRISCOE EAST DELGADO UNIT A 15H | 4212735757 |
| BRISCOE EAST DELGADO UNIT A 1H | 4212735716 |
| BRISCOE EAST DELGADO UNIT A 2H | 4212735717 |
| BRISCOE EAST DELGADO UNIT A 3H | 4212735718 |
| BRISCOE EAST DELGADO UNIT A 4H | 4212735719 |
| BRISCOE EAST DELGADO UNIT A 5H | 4212735720 |
| BRISCOE EAST DELGADO UNIT A 6H | 4212735724 |
| BRISCOE EAST DELGADO UNIT A 7H | 4212735725 |
| BRISCOE EAST DELGADO UNIT A 8H | 4212735726 |
| BRISCOE EAST DELGADO UNIT A 9H | 4212735727 |
| BRISCOE ECKHARDT-SWONKE UNIT 1H | 4212735241 |
| BRISCOE ECKHARDT-SWONKE UNIT 2H | 4212735243 |
| BRISCOE ECKHARDT-SWONKE UNIT 3H | 4212735244 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE ECKHARDT-SWONKE UNIT 4H | 4212735245 |
| BRISCOE ECKHARDT-SWONKE UNIT 5H | 4212735246 |
| BRISCOE ECKHARDT-SWONKE UNIT 6H | 4212735249 |
| BRISCOE ECKHARDT-SWONKE UNIT 7H | 4212735250 |
| BRISCOE FRIDAY RANCH 18H | 4212734158 |
| BRISCOE FRIDAY RANCH 19H | 4212734193 |
| BRISCOE FRIDAY RANCH 1H | 4212733689 |
| BRISCOE FRIDAY RANCH 20H | 4212734194 |
| BRISCOE FRIDAY RANCH 21H | 4212734195 |
| BRISCOE FRIDAY RANCH 22H | 4212734196 |
| BRISCOE FRIDAY RANCH 23H | 4212735385 |
| BRISCOE FRIDAY RANCH 24H | 4212735389 |
| BRISCOE FRIDAY RANCH 25H | 4212734807 |
| BRISCOE FRIDAY RANCH 26H | 4212734810 |
| BRISCOE FRIDAY RANCH 27H | 4212734808 |
| BRISCOE FRIDAY RANCH 28H | 4212734812 |
| BRISCOE FRIDAY RANCH 29H | 4212734813 |
| BRISCOE FRIDAY RANCH 2H | 4212733708 |
| BRISCOE FRIDAY RANCH 30H | 4212734815 |
| BRISCOE FRIDAY RANCH 31H | 4212734817 |
| BRISCOE FRIDAY RANCH 32H | 4212734816 |
| BRISCOE FRIDAY RANCH 33H | 4212734818 |
| BRISCOE FRIDAY RANCH 34H | 4212734820 |
| BRISCOE FRIDAY RANCH 35H | 4212735387 |
| BRISCOE FRIDAY RANCH 36H | 4212735388 |
| BRISCOE FRIDAY RANCH 37H | 4212735392 |
| BRISCOE FRIDAY RANCH 38H | 4212735391 |
| BRISCOE FRIDAY RANCH 39H | 4212735393 |
| BRISCOE FRIDAY RANCH 3H | 4212733709 |
| BRISCOE FRIDAY RANCH 40H | 4212735394 |
| BRISCOE FRIDAY RANCH 41HR | 4212736456 |
| BRISCOE FRIDAY RANCH 42HR | 4212736457 |
| BRISCOE FRIDAY RANCH 43H | 4212736166 |
| BRISCOE FRIDAY RANCH 44H | 4212736167 |
| BRISCOE FRIDAY RANCH 45H | 4212736208 |
| BRISCOE FRIDAY RANCH 46HR | 4212736356 |
| BRISCOE FRIDAY RANCH 47H | 4212736218 |
| BRISCOE FRIDAY RANCH 4H | 4212733720 |
| BRISCOE FRIDAY RANCH 5H | 4212733721 |
| BRISCOE FRIDAY RANCH 6H | 4212733722 |
| BRISCOE FRIDAY RANCH 7H | 4212733755 |
| BRISCOE FRIDAY RANCH 8H | 4212733756 |
| BRISCOE FRIDAY RANCH 9H | 4212733757 |
| BRISCOE FRIDAY RANCH UNIT A 1H | 4212736196 |
| BRISCOE FRIDAY RANCH UNIT A 2H | 4212736197 |
| BRISCOE FRIDAY RANCH UNIT A 3H | 4212736198 |
| BRISCOE FRIDAY RANCH UNIT A 4H | 4212736199 |
| BRISCOE FRIDAY RANCH UNIT A 5H | 4212736200 |
| BRISCOE FRIDAY RANCH UNIT A 6H | 4212736201 |
| BRISCOE FRIDAY RANCH UNIT B 10H | 4212734273 |
| BRISCOE FRIDAY RANCH UNIT B 11H | 4212734275 |
| BRISCOE FRIDAY RANCH UNIT B 12H | 4212734274 |
| BRISCOE FRIDAY RANCH UNIT B 13H | 4212734276 |
| BRISCOE FRIDAY RANCH UNIT B 14H | 4212734309 |
| BRISCOE FRIDAY RANCH UNIT B 15H | 4212734310 |
| BRISCOE FRIDAY RANCH UNIT B 16H | 4212734311 |
| BRISCOE FRIDAY RANCH UNIT B 17H | 4212734313 |
| BRISCOE FRIDAY RANCH UNIT C 10H | 4212736898 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE FRIDAY RANCH UNIT C 11H | 4212736899 |
| BRISCOE FRIDAY RANCH UNIT C 1H | 4212736901 |
| BRISCOE FRIDAY RANCH UNIT C 2H | 4212736902 |
| BRISCOE FRIDAY RANCH UNIT C 3H | 4212736903 |
| BRISCOE FRIDAY RANCH UNIT C 4H | 4212736904 |
| BRISCOE FRIDAY RANCH UNIT C 5H | 4212736905 |
| BRISCOE FRIDAY RANCH UNIT C 6H | 4212736906 |
| BRISCOE FRIDAY RANCH UNIT C 7H | 4212736895 |
| BRISCOE FRIDAY RANCH UNIT C 8H | 4212736896 |
| BRISCOE FRIDAY RANCH UNIT C 9H | 4212736897 |
| BRISCOE FRIDAY SMITH 1H | 4212733984 |
| BRISCOE FRIDAY SMITH 2H | 4212733985 |
| BRISCOE FRIDAY SMITH 3H | 4212733986 |
| BRISCOE METCALF UNIT 1H | 4212737136 |
| BRISCOE METCALF UNIT 2H | 4212737138 |
| BRISCOE METCALF UNIT 3H | 4212737137 |
| BRISCOE METCALF UNIT 4H | 4212737139 |
| BRISCOE METCALF UNIT 5H | 4212737140 |
| BRISCOE METCALF UNIT 6H | 4212737141 |
| BRISCOE SPRINGMAN UNIT A 1H | 4212735278 |
| BRISCOE SPRINGMAN UNIT A 2H | 4212735279 |
| BRISCOE SPRINGMAN UNIT A 3H | 4212735280 |
| BRISCOE SPRINGMAN UNIT A 4H | 4212735281 |
| BRISCOE SPRINGMAN UNIT A 5H | 4212735283 |
| BRISCOE SPRINGMAN UNIT A 6H | 4212735282 |
| BRISCOE SPRINGMAN UNIT A 7H | 4212735284 |
| BRISCOE SPRINGMAN UNIT B 1H | 4212735285 |
| BRISCOE SPRINGMAN UNIT B 2H | 4212735286 |
| BRISCOE SPRINGMAN UNIT B 3H | 4212735287 |
| BRISCOE SPRINGMAN UNIT B 4H | 4212735288 |
| BRISCOE SPRINGMAN UNIT B 5H | 4212735289 |
| BRISCOE SPRINGMAN UNIT B 6H | 4212735290 |
| BRISCOE THON UNIT 1H | 4212735405 |
| BRISCOE THON UNIT 2H | 4212735407 |
| BRISCOE THON UNIT 3H | 4212735408 |
| BRISCOE THON UNIT 4H | 4212735406 |
| BRISCOE THON UNIT 5H | 4212735409 |
| CAGE 1TV | 4232333297 |
| CAGE 2TV | 4232333332 |
| CAGE 3TV | 4232333336 |
| CAGE 4RB | 4232333355 |
| CAGE 5TV | 4232333376 |
| CAGE 6TV | 4232333377 |
| CAGE 7TV | 4232333383 |
| CAGE 8TV | 4232333384 |
| CAGE 9TV | 4232333412 |
| CHAPARRAL WILDLIFE STATE 10H | 4212734800 |
| CHAPARRAL WILDLIFE STATE 11H | 4212734802 |
| CHAPARRAL WILDLIFE STATE 12H | 4212734805 |
| CHAPARRAL WILDLIFE STATE 13H | 4212734803 |
| CHAPARRAL WILDLIFE STATE 19H | 4212736430 |
| CHAPARRAL WILDLIFE STATE 20H | 4212736431 |
| CHAPARRAL WILDLIFE STATE 21H | 4212736432 |
| CHAPARRAL WILDLIFE STATE 22H | 4212736433 |
| CHAPARRAL WILDLIFE STATE 23H | 4212736434 |
| CHAPARRAL WILDLIFE STATE 24H | 4212737047 |
| CHAPARRAL WILDLIFE STATE 25H | 4212737048 |
| CHAPARRAL WILDLIFE STATE 26H | 4212737050 |

012322

## Existing Producing Wells

| WELL NAME | API |
|---|---|
| CHAPARRAL WILDLIFE STATE 27H | 4212737049 |
| CHAPARRAL WILDLIFE STATE 28H | 4212737051 |
| CHAPARRAL WILDLIFE STATE 4H | 4212734793 |
| CHAPARRAL WILDLIFE STATE 5H | 4212734794 |
| CHAPARRAL WILDLIFE STATE 6H | 4212734795 |
| CHAPARRAL WILDLIFE STATE 7H | 4212734796 |
| CHAPARRAL WILDLIFE STATE 8H | 4212734797 |
| CHAPARRAL WILDLIFE STATE 9H | 4212734798 |
| DENTONIO STATE 22 UNIT 10H | 4212735712 |
| DENTONIO STATE 22 UNIT 11H | 4212735714 |
| DENTONIO STATE 22 UNIT 12H | 4212735715 |
| DENTONIO STATE 22 UNIT 1H | 4212735679 |
| DENTONIO STATE 22 UNIT 2H | 4212735680 |
| DENTONIO STATE 22 UNIT 3H | 4212735681 |
| DENTONIO STATE 22 UNIT 4H | 4212735682 |
| DENTONIO STATE 22 UNIT 5H | 4212735686 |
| DENTONIO STATE 22 UNIT 6H | 4212735687 |
| DENTONIO STATE 22 UNIT 7H | 4212735688 |
| DENTONIO STATE 22 UNIT 8H | 4212735689 |
| DENTONIO STATE 22 UNIT 9H | 4212735711 |
| DENTONIO WHITE 23 UNIT 10H | 4212734923 |
| DENTONIO WHITE 23 UNIT 11H | 4212734924 |
| DENTONIO WHITE 23 UNIT 12H | 4212734931 |
| DENTONIO WHITE 23 UNIT 13H | 4212734927 |
| DENTONIO WHITE 23 UNIT 14H | 4212734926 |
| DENTONIO WHITE 23 UNIT 15H | 4212734928 |
| DENTONIO WHITE 23 UNIT 1H | 4212734549 |
| DENTONIO WHITE 23 UNIT 2H | 4212734550 |
| DENTONIO WHITE 23 UNIT 3H | 4212734551 |
| DENTONIO WHITE 23 UNIT 4H | 4212734552 |
| DENTONIO WHITE 23 UNIT 5H | 4212734553 |
| DENTONIO WHITE 23 UNIT 6H | 4212734554 |
| DENTONIO WHITE 23 UNIT 7H | 4212734938 |
| DENTONIO WHITE 23 UNIT 8H | 4212734940 |
| DENTONIO WHITE 23 UNIT 9H | 4212734941 |
| DIAMOND H RANCH 10H | 4212734751 |
| DIAMOND H RANCH 11H | 4212735057 |
| DIAMOND H RANCH 12H | 4212735201 |
| DIAMOND H RANCH 13H | 4212735403 |
| DIAMOND H RANCH 14H | 4212735646 |
| DIAMOND H RANCH 15H | 4212735647 |
| DIAMOND H RANCH 16H | 4212735648 |
| DIAMOND H RANCH 17H | 4212735649 |
| DIAMOND H RANCH 18H | 4212735651 |
| DIAMOND H RANCH 19H | 4212736475 |
| DIAMOND H RANCH 1H | 4212733561 |
| DIAMOND H RANCH 20H | 4212736482 |
| DIAMOND H RANCH 21H | 4212736483 |
| DIAMOND H RANCH 22H | 4212736474 |
| DIAMOND H RANCH 23H | 4212736484 |
| DIAMOND H RANCH 2H | 4212733693 |
| DIAMOND H RANCH 3H | 4212733819 |
| DIAMOND H RANCH 4H | 4212733892 |
| DIAMOND H RANCH 5H | 4212734314 |
| DIAMOND H RANCH 6H | 4212734150 |
| DIAMOND H RANCH 7H | 4212734408 |
| DIAMOND H RANCH 8H | 4212734410 |
| DIAMOND H RANCH 9H | 4212734610 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| DIAMOND H STATE 10H | 4212736436 |
| DIAMOND H STATE 11H | 4212736338 |
| DIAMOND H STATE 12H | 4212736339 |
| DIAMOND H STATE 13H | 4212736340 |
| DIAMOND H STATE 15H | 4212734896 |
| DIAMOND H STATE 16H | 4212735101 |
| DIAMOND H STATE 17H | 4212735192 |
| DIAMOND H STATE 18H | 4212735093 |
| DIAMOND H STATE 19H | 4212735655 |
| DIAMOND H STATE 1H | 4212733657 |
| DIAMOND H STATE 20H | 4212735652 |
| DIAMOND H STATE 21H | 4212735653 |
| DIAMOND H STATE 22H | 4212735654 |
| DIAMOND H STATE 2H | 4212733694 |
| DIAMOND H STATE 3H | 4212733786 |
| DIAMOND H STATE 4H | 4212733878 |
| DIAMOND H STATE 5H | 4212734312 |
| DIAMOND H STATE 6H | 4212734144 |
| DIAMOND H STATE 7H | 4212734395 |
| DIAMOND H STATE 8H | 4212734403 |
| DIAMOND H STATE 9H | 4212734603 |
| DIAMOND H STATE UNIT A 1H | 4212735396 |
| DIAMOND H STATE UNIT A 2H | 4212735398 |
| DIAMOND H STATE UNIT B 10H | 4212737092 |
| DIAMOND H STATE UNIT B 11H | 4212737094 |
| DIAMOND H STATE UNIT B 12H | 4212737093 |
| DIAMOND H STATE UNIT B 13H | 4212737095 |
| DIAMOND H STATE UNIT B 1H | 4212737075 |
| DIAMOND H STATE UNIT B 2H | 4212737076 |
| DIAMOND H STATE UNIT B 3H | 4212737080 |
| DIAMOND H STATE UNIT B 4H | 4212737077 |
| DIAMOND H STATE UNIT B 5H | 4212737081 |
| DIAMOND H STATE UNIT B 6H | 4212737082 |
| DIAMOND H STATE UNIT B 7H | 4212737083 |
| DIAMOND H STATE UNIT B 8H | 4212737084 |
| DIAMOND H STATE UNIT B 9H | 4212737085 |
| DIAMOND H STATE UNIT D 10H | 4212737063 |
| DIAMOND H STATE UNIT D 11H | 4212737064 |
| DIAMOND H STATE UNIT D 7H | 4212737061 |
| DIAMOND H STATE UNIT D 8H | 4212737057 |
| DIAMOND H STATE UNIT D 9H | 4212737062 |
| FOGMT 10SP | 4212735238 |
| FOGMT 11SP | 4212735242 |
| FOGMT 12SP | 4212735240 |
| FOGMT 13SP | 4212734995 |
| FOGMT 14SP | 4212735002 |
| FOGMT 15SP | 4212735003 |
| FOGMT 16SP | 4212735419 |
| FOGMT 17SP | 4212735420 |
| FOGMT 18SP | 4212736350 |
| FOGMT 19SP | 4212736351 |
| FOGMT 1SP | 4212733411 |
| FOGMT 20SP | 4212736352 |
| FOGMT 21SP | 4212736353 |
| FOGMT 22SP | 4212736354 |
| FOGMT 23SP | 4212736355 |
| FOGMT 24SP | 4212735438 |
| FOGMT 25SP | 4212735441 |

## Existing Producing Wells

| WELL NAME | API |
|---|---|
| FOGMT 26SP | 4212735439 |
| FOGMT 27SP | 4212735440 |
| FOGMT 28SP | 4212735926 |
| FOGMT 29SP | 4212735927 |
| FOGMT 2SP | 4212733460 |
| FOGMT 30SP | 4212735928 |
| FOGMT 31SP | 4212735929 |
| FOGMT 32SP | 4212735948 |
| FOGMT 33SP | 4212735949 |
| FOGMT 34SP | 4212735950 |
| FOGMT 35SP | 4212735910 |
| FOGMT 36SP | 4212735911 |
| FOGMT 37SP | 4212735909 |
| FOGMT 38SP | 4212736581 |
| FOGMT 39SP | 4212736582 |
| FOGMT 3SH | 4212733592 |
| FOGMT 40SP | 4212736583 |
| FOGMT 41SP | 4212736584 |
| FOGMT 42SP | 4212736585 |
| FOGMT 43SP | 4212736517 |
| FOGMT 44SP | 4212736518 |
| FOGMT 45SP | 4212736519 |
| FOGMT 46SP | 4212736520 |
| FOGMT 47SP | 4212736521 |
| FOGMT 4SP | 4212733628 |
| FOGMT 54SP | 4212737018 |
| FOGMT 55SP | 4212737211 |
| FOGMT 5SH | 4212733654 |
| FOGMT 6SH | 4212733695 |
| FOGMT 7SP | 4212733910 |
| FOGMT 8SP | 4212734491 |
| FOGMT 9SP | 4212734490 |
| FOGMT E 1SP | 4212734996 |
| FOGMT E 2SP | 4212734992 |
| FOGMT F 1SP | 4212734993 |
| FOGMT G 1SP | 4212734994 |
| FOGMT UNIT A 10H | 4212736669 |
| FOGMT UNIT A 1H | 4212736660 |
| FOGMT UNIT A 2H | 4212736661 |
| FOGMT UNIT A 3H | 4212736662 |
| FOGMT UNIT A 4H | 4212736663 |
| FOGMT UNIT A 5H | 4212736664 |
| FOGMT UNIT A 6H | 4212736665 |
| FOGMT UNIT A 7H | 4212736666 |
| FOGMT UNIT A 8H | 4212736667 |
| FOGMT UNIT A 9H | 4212736668 |
| LA BANDERA RANCH 10H | 4212737135 |
| LA BANDERA RANCH 1H | 4212733618 |
| LA BANDERA RANCH 2H | 4212733634 |
| LA BANDERA RANCH 3H | 4212733673 |
| LA BANDERA RANCH 4H | 4212733740 |
| LA BANDERA RANCH 5H | 4212733809 |
| LA BANDERA RANCH 6H | 4212733909 |
| LA BANDERA RANCH 7H | 4212734204 |
| LA BANDERA RANCH 8H | 4212734402 |
| LA BANDERA RANCH 9H | 4212734629 |
| LA BANDERA RANCH UNIT A 1H | 4212735117 |
| LA BANDERA RANCH UNIT A 2H | 4212735091 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| LA BANDERA RANCH UNIT A 3H | 4212735113 |
| LA BANDERA RANCH UNIT A 4H | 4212735555 |
| LA BANDERA RANCH UNIT A 5H | 4212735556 |
| LA BANDERA RANCH UNIT A 6H | 4212735558 |
| LA BANDERA RANCH UNIT A 7H | 4212736331 |
| LA BANDERA RANCH UNIT A 8H | 4212736332 |
| LA BANDERA RANCH UNIT B 1H | 4212736586 |
| LA BANDERA RANCH UNIT B 2H | 4212736587 |
| LA BANDERA RANCH UNIT B 3H | 4212736588 |
| LA BANDERA RANCH UNIT B 4H | 4212736589 |
| LA BANDERA RANCH UNIT B 5H | 4212736590 |
| LA BANDERA RANCH UNIT B 6H | 4212736531 |
| LA BANDERA RANCH UNIT B 7H | 4212736532 |
| LA BANDERA RANCH UNIT B 8H | 4212736533 |
| LA BANDERA RANCH UNIT B 9H | 4212736534 |
| LLOYD BRISCOE 1H | 4232333452 |
| LLOYD BRISCOE 2H | 4232333451 |
| LLOYD BRISCOE 3H | 4232333450 |
| MAUND RANCH 18 UNIT 1H | 4212736795 |
| MAUND RANCH 18 UNIT 2H | 4212736796 |
| MAUND RANCH 18 UNIT 3H | 4212736799 |
| MAUND RANCH 18 UNIT 4H | 4212736800 |
| MAUND RANCH 18 UNIT 5H | 4212736801 |
| MAUND RANCH 18 UNIT 6H | 4212736803 |
| MAUND RANCH 18 UNIT 7H | 4212736804 |
| MAUND RANCH 18 UNIT 8H | 4212736805 |
| MAUND RANCH 18 UNIT 9H | 4212736806 |
| MAUND RANCH 19 UNIT 2H | 4212733999 |
| MAUND RANCH 19 UNIT 3H | 4212734387 |
| MAUND RANCH 19 UNIT 4H | 4212734264 |
| MAUND RANCH 19 UNIT 5H | 4212735553 |
| MAUND RANCH 19 UNIT 6H | 4212735554 |
| MAUND RANCH 23 UNIT 10H | 4212735496 |
| MAUND RANCH 23 UNIT 11H | 4212735497 |
| MAUND RANCH 23 UNIT 12H | 4212735498 |
| MAUND RANCH 23 UNIT 1H | 4212735432 |
| MAUND RANCH 23 UNIT 2H | 4212735433 |
| MAUND RANCH 23 UNIT 3H | 4212735435 |
| MAUND RANCH 23 UNIT 4H | 4212735437 |
| MAUND RANCH 23 UNIT 5H | 4212735436 |
| MAUND RANCH 23 UNIT 6H | 4212735434 |
| MAUND RANCH 23 UNIT 7H | 4212735494 |
| MAUND RANCH 23 UNIT 8H | 4212735493 |
| MAUND RANCH 23 UNIT 9H | 4212735495 |
| MAUND RANCH 26 UNIT 10H | 4212736133 |
| MAUND RANCH 26 UNIT 1H | 4212736124 |
| MAUND RANCH 26 UNIT 2H | 4212736123 |
| MAUND RANCH 26 UNIT 3H | 4212736125 |
| MAUND RANCH 26 UNIT 4H | 4212736126 |
| MAUND RANCH 26 UNIT 5H | 4212736127 |
| MAUND RANCH 26 UNIT 6H | 4212736128 |
| MAUND RANCH 26 UNIT 7H | 4212736129 |
| MAUND RANCH 26 UNIT 8H | 4212736130 |
| MAUND RANCH 26 UNIT 9H | 4212736131 |
| MAUND RANCH 27 UNIT 1H | 4212737107 |
| MAUND RANCH 27 UNIT 2H | 4212737108 |
| MAUND RANCH 27 UNIT 3H | 4212737103 |
| MAUND RANCH 27 UNIT 4H | 4212737104 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| MAUND RANCH 27 UNIT 5H | 4212737105 |
| MAUND RANCH 27 UNIT 6H | 4212737106 |
| MAUND RANCH 27 UNIT 7H | 4212733866 |
| MAUND RANCH 27 UNIT 8H | 4212737109 |
| MAUND RANCH 27 UNIT 9H | 4212737110 |
| RANCHO ENCANTADO 10H | 4212734911 |
| RANCHO ENCANTADO 11H | 4212734915 |
| RANCHO ENCANTADO 12H | 4212734161 |
| RANCHO ENCANTADO 13H | 4212734162 |
| RANCHO ENCANTADO 14H | 4212734943 |
| RANCHO ENCANTADO 15H | 4212734944 |
| RANCHO ENCANTADO 16H | 4212734945 |
| RANCHO ENCANTADO 17H | 4212734181 |
| RANCHO ENCANTADO 18H | 4212734182 |
| RANCHO ENCANTADO 19H | 4212734183 |
| RANCHO ENCANTADO 1H | 4212733729 |
| RANCHO ENCANTADO 20H | 4212734184 |
| RANCHO ENCANTADO 21H | 4212734185 |
| RANCHO ENCANTADO 22H | 4212734211 |
| RANCHO ENCANTADO 23H | 4212734213 |
| RANCHO ENCANTADO 24H | 4212734214 |
| RANCHO ENCANTADO 25H | 4212734215 |
| RANCHO ENCANTADO 26H | 4212734217 |
| RANCHO ENCANTADO 27H | 4212734218 |
| RANCHO ENCANTADO 28H | 4212734331 |
| RANCHO ENCANTADO 29H | 4212735328 |
| RANCHO ENCANTADO 30H | 4212735329 |
| RANCHO ENCANTADO 31H | 4212735334 |
| RANCHO ENCANTADO 32H | 4212735335 |
| RANCHO ENCANTADO 33H | 4212735336 |
| RANCHO ENCANTADO 34H | 4212735981 |
| RANCHO ENCANTADO 35H | 4212735982 |
| RANCHO ENCANTADO 36H | 4212735985 |
| RANCHO ENCANTADO 37H | 4212735987 |
| RANCHO ENCANTADO 38H | 4212735988 |
| RANCHO ENCANTADO 3H | 4212733833 |
| RANCHO ENCANTADO 4H | 4212733834 |
| RANCHO ENCANTADO 5H | 4212733835 |
| RANCHO ENCANTADO 6H | 4212733964 |
| RANCHO ENCANTADO 7H | 4212733961 |
| RANCHO ENCANTADO 8H | 4212733965 |
| RANCHO ENCANTADO 9H | 4212734910 |
| RANCHO ENCANTADO UNIT A 39H | 4212737069 |
| RANCHO ENCANTADO UNIT A 40H | 4212737068 |
| RANCHO ENCANTADO UNIT A 41H | 4212737066 |
| RANCHO ENCANTADO UNIT A 42H | 4212737067 |
| RANCHO ENCANTADO UNIT A 43H | 4212737065 |
| ROGERS DENTONIO 16 UNIT 1H | 4212734425 |
| ROGERS DENTONIO 16 UNIT 2H | 4212734426 |
| ROGERS DENTONIO 16 UNIT 3H | 4212734431 |
| ROGERS DENTONIO 16 UNIT 4H | 4212735412 |
| ROGERS DENTONIO 16 UNIT 5H | 4212735416 |
| ROGERS DENTONIO 16 UNIT 6H | 4212735417 |
| ROGERS DENTONIO 16 UNIT 7H | 4212735413 |
| ROGERS DENTONIO 16 UNIT 8H | 4212735414 |
| ROGERS DENTONIO 16 UNIT 9H | 4212735415 |
| ROGERS DENTONIO 31 UNIT 1H | 4212737035 |
| ROGERS DENTONIO 31 UNIT 2H | 4212737036 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| ROGERS DENTONIO 31 UNIT 3H | 4212737037 |
| ROGERS DENTONIO 31 UNIT 4H | 4212737038 |
| ROGERS DENTONIO 31 UNIT 5H | 4212737039 |
| ROGERS DENTONIO 31 UNIT 6H | 4212737040 |
| ROGERS DENTONIO 32 UNIT 10H | 4212736006 |
| ROGERS DENTONIO 32 UNIT 1H | 4212735997 |
| ROGERS DENTONIO 32 UNIT 2H | 4212735998 |
| ROGERS DENTONIO 32 UNIT 3H | 4212735999 |
| ROGERS DENTONIO 32 UNIT 4H | 4212736000 |
| ROGERS DENTONIO 32 UNIT 5H | 4212736001 |
| ROGERS DENTONIO 32 UNIT 6H | 4212736002 |
| ROGERS DENTONIO 32 UNIT 7H | 4212736003 |
| ROGERS DENTONIO 32 UNIT 8H | 4212736004 |
| ROGERS DENTONIO 32 UNIT 9H | 4212736005 |
| ROGERS DENTONIO 33 UNIT 10H | 4212736022 |
| ROGERS DENTONIO 33 UNIT 11H | 4212736023 |
| ROGERS DENTONIO 33 UNIT 1H | 4212736013 |
| ROGERS DENTONIO 33 UNIT 2H | 4212736014 |
| ROGERS DENTONIO 33 UNIT 3H | 4212736015 |
| ROGERS DENTONIO 33 UNIT 4H | 4212736016 |
| ROGERS DENTONIO 33 UNIT 5H | 4212736017 |
| ROGERS DENTONIO 33 UNIT 6H | 4212736018 |
| ROGERS DENTONIO 33 UNIT 7H | 4212736019 |
| ROGERS DENTONIO 33 UNIT 8H | 4212736020 |
| ROGERS DENTONIO 33 UNIT 9H | 4212736021 |
| ROGERS DENTONIO RANCH 12H | 4212734249 |
| ROGERS DENTONIO RANCH 13H | 4212734251 |
| ROGERS DENTONIO RANCH 14H | 4212734136 |
| ROGERS DENTONIO RANCH 15H | 4212734137 |
| ROGERS DENTONIO RANCH 16H | 4212734252 |
| ROGERS DENTONIO RANCH 1H | 4212733636 |
| ROGERS DENTONIO RANCH 2H | 4212733679 |
| ROGERS DENTONIO RANCH 3H | 4212733845 |
| ROGERS DENTONIO RANCH 4H | 4212733846 |
| ROGERS DENTONIO RANCH 5H | 4212733847 |
| ROGERS DENTONIO RANCH 6H | 4212733864 |
| SOUTH SPUR RANCH 1H | 4212733633 |
| SOUTH SPUR RANCH 2H | 4212733865 |
| SOUTH SPUR STATE 1H | 4212733660 |
| SOUTH SPUR STATE 2H | 4212733686 |
| SOUTH SPUR STATE 3H | 4212733827 |
| SOUTH SPUR STATE 4H | 4212733828 |
| SOUTH SPUR STATE 5H | 4212734465 |
| SOUTH SPUR STATE 6H | 4212734464 |
| SOUTH SPUR STATE 7H | 4212734466 |
| SOUTH SPUR UNIT A 1H | 4212734104 |
| SOUTH SPUR UNIT A 2H | 4212734216 |
| SOUTH SPUR UNIT A 3H | 4212734453 |
| SOUTH SPUR UNIT A 4H | 4212734675 |
| SOUTH SPUR UNIT A 5H | 4212734677 |
| SOUTH SPUR UNIT A 6H | 4212734676 |
| SOUTH SPUR UNIT A 7H | 4212735478 |
| SOUTH SPUR UNIT A 8H | 4212735479 |
| SOUTH SPUR UNIT A 9H | 4212735480 |
| STANLEY RANCH 10H | 4247941428 |
| STANLEY RANCH 11H | 4247941429 |
| STANLEY RANCH 12H | 4247941430 |
| STANLEY RANCH 13H | 4247941431 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| STANLEY RANCH 14H | 4247941432 |
| STANLEY RANCH 15H | 4247941433 |
| STANLEY RANCH 16H | 4247941434 |
| STANLEY RANCH 17H | 4247941422 |
| STANLEY RANCH 18H | 4247941424 |
| STANLEY RANCH 19H | 4247941423 |
| STANLEY RANCH 1H | 4247940742 |
| STANLEY RANCH 20H | 4247941426 |
| STANLEY RANCH 21H | 4247941129 |
| STANLEY RANCH 22H | 4247941130 |
| STANLEY RANCH 23H | 4247941131 |
| STANLEY RANCH 24H | 4247941231 |
| STANLEY RANCH 25H | 4247941241 |
| STANLEY RANCH 26H | 4247942383 |
| STANLEY RANCH 27H | 4247942384 |
| STANLEY RANCH 28H | 4247942293 |
| STANLEY RANCH 29H | 4247942161 |
| STANLEY RANCH 2H | 4247940940 |
| STANLEY RANCH 30H | 4247942449 |
| STANLEY RANCH 31H | 4247942450 |
| STANLEY RANCH 3H | 4247941051 |
| STANLEY RANCH 43H | 4247941907 |
| STANLEY RANCH 44H | 4247941960 |
| STANLEY RANCH 45H | 4247942456 |
| STANLEY RANCH 46H | 4247942458 |
| STANLEY RANCH 47H | 4247942457 |
| STANLEY RANCH 48H | 4247941719 |
| STANLEY RANCH 49H | 4247941723 |
| STANLEY RANCH 4H | 4247941053 |
| STANLEY RANCH 50H | 4247941722 |
| STANLEY RANCH 51H | 4247941727 |
| STANLEY RANCH 52H | 4247941728 |
| STANLEY RANCH 53H | 4247941729 |
| STANLEY RANCH 54H | 4247941696 |
| STANLEY RANCH 55H | 4247941693 |
| STANLEY RANCH 56H | 4247941695 |
| STANLEY RANCH 57H | 4247941683 |
| STANLEY RANCH 58H | 4247941684 |
| STANLEY RANCH 59H | 4247941685 |
| STANLEY RANCH 5H | 4247941054 |
| STANLEY RANCH 60H | 4247941660 |
| STANLEY RANCH 61H | 4247941661 |
| STANLEY RANCH 62H | 4247941663 |
| STANLEY RANCH 63H | 4247942875 |
| STANLEY RANCH 6H | 4247941421 |
| STANLEY RANCH 7H | 4247941435 |
| STANLEY RANCH 8H | 4247941436 |
| STANLEY RANCH 9H | 4247941437 |
| STUMBERG RANCH 10H | 4212734233 |
| STUMBERG RANCH 11H | 4212734235 |
| STUMBERG RANCH 12H | 4212734234 |
| STUMBERG RANCH 16H | 4212734369 |
| STUMBERG RANCH 17H | 4212734370 |
| STUMBERG RANCH 18H | 4212734371 |
| STUMBERG RANCH 19H | 4212734611 |
| STUMBERG RANCH 1H | 4212733717 |
| STUMBERG RANCH 20H | 4212734612 |
| STUMBERG RANCH 21H | 4212734613 |

**Existing Producing Wells**

| WELL NAME | API |
|---|---|
| STUMBERG RANCH 22H | 4212734614 |
| STUMBERG RANCH 23H | 4212734615 |
| STUMBERG RANCH 24H | 4212734616 |
| STUMBERG RANCH 25H | 4212734619 |
| STUMBERG RANCH 26H | 4212734620 |
| STUMBERG RANCH 27HR | 4212734710 |
| STUMBERG RANCH 28H | 4212734623 |
| STUMBERG RANCH 29H | 4212734624 |
| STUMBERG RANCH 2H | 4212733719 |
| STUMBERG RANCH 30H | 4212734665 |
| STUMBERG RANCH 31H | 4212734668 |
| STUMBERG RANCH 32H | 4212734666 |
| STUMBERG RANCH 33H | 4212734667 |
| STUMBERG RANCH 34H | 4212734670 |
| STUMBERG RANCH 35H | 4212734669 |
| STUMBERG RANCH 36H | 4212735772 |
| STUMBERG RANCH 37H | 4212735774 |
| STUMBERG RANCH 38H | 4212735775 |
| STUMBERG RANCH 39H | 4212735776 |
| STUMBERG RANCH 3H | 4212733725 |
| STUMBERG RANCH 40H | 4212735827 |
| STUMBERG RANCH 41H | 4212735829 |
| STUMBERG RANCH 42H | 4212735830 |
| STUMBERG RANCH 43H | 4212735831 |
| STUMBERG RANCH 44H | 4212735832 |
| STUMBERG RANCH 45H | 4212735833 |
| STUMBERG RANCH 46H | 4212735838 |
| STUMBERG RANCH 47H | 4212735839 |
| STUMBERG RANCH 48H | 4212735840 |
| STUMBERG RANCH 49H | 4212735841 |
| STUMBERG RANCH 4HR | 4212733933 |
| STUMBERG RANCH 50H | 4212735842 |
| STUMBERG RANCH 51H | 4212735843 |
| STUMBERG RANCH 52HR | 4212737120 |
| STUMBERG RANCH 5H | 4212733934 |
| STUMBERG RANCH 6H | 4212733935 |
| STUMBERG RANCH 7H | 4212733979 |
| STUMBERG RANCH 8H | 4212733977 |
| STUMBERG RANCH 9H | 4212733978 |
| STUMBERG RANCH UNIT A 1H | 4212735519 |
| STUMBERG RANCH UNIT A 2H | 4212735520 |
| STUMBERG RANCH UNIT A 3H | 4212735521 |
| STUMBERG RANCH UNIT A 4H | 4212735540 |
| STUMBERG RANCH UNIT A 5H | 4212735541 |
| STUMBERG RANCH UNIT A 6H | 4212735542 |
| STUMBERG RANCH UNIT A 7H | 4212735543 |
| STUMBERG RANCH UNIT B 1H | 4212735611 |
| STUMBERG RANCH UNIT B 2H | 4212735612 |
| STUMBERG RANCH UNIT B 3H | 4212735613 |
| STUMBERG RANCH UNIT B 4H | 4212735614 |
| STUMBERG RANCH UNIT B 5H | 4212735615 |
| STUMBERG RANCH UNIT B 6H | 4212735616 |
| STUMBERG RANCH UNIT B 7H | 4212735617 |
| STUMBERG RANCH UNIT C 11H | 4212736836 |
| STUMBERG RANCH UNIT C 12H | 4212736837 |
| STUMBERG RANCH UNIT C 13H | 4212736835 |
| STUMBERG RANCH UNIT C 14H | 4212736838 |
| STUMBERG RANCH UNIT C 15H | 4212736839 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| TOVAR WEST-LLOYD 34 B UNIT 1H | 4232333420 |
| TOVAR WEST-LLOYD 34 UNIT 1H | 4232333351 |
| TOVAR WEST-LLOYD 63 A UNIT 1H | 4232333389 |
| TOVAR WEST-LLOYD 63 B UNIT 1H | 4232333400 |
| TOVAR WEST-LLOYD 69 A UNIT 1H | 4232333411 |
| TOVAR WEST-LLOYD 75 A UNIT 1H | 4232333360 |
| TOVAR WEST-LLOYD 77 UNIT 1H | 4232333348 |
| TOVAR WEST-LLOYD 79 A UNIT 1H | 4232333390 |
| TOVAR WLC A UNIT 1H | 4232333415 |
| TOVAR WLC A UNIT 2H | 4232333417 |
| TOVAR WLC A UNIT 3H | 4232333416 |
| TOVAR WLC A UNIT 4H | 4232333435 |
| TOVAR WLC A UNIT 5H | 4232333436 |
| TOVAR WLC A UNIT 6H | 4232333437 |
| TOVAR WLC B UNIT 1H | 4232333438 |
| TOVAR WLC B UNIT 2H | 4232333439 |
| TOVAR WLC B UNIT 3H | 4232333440 |
| WORTHEY RANCH 10H | 4247941107 |
| WORTHEY RANCH 11H | 4247941500 |
| WORTHEY RANCH 12H | 4247941501 |
| WORTHEY RANCH 13H | 4247941502 |
| WORTHEY RANCH 14H | 4247941482 |
| WORTHEY RANCH 15H | 4247941483 |
| WORTHEY RANCH 16H | 4247941484 |
| WORTHEY RANCH 17H | 4247941132 |
| WORTHEY RANCH 18H | 4247941133 |
| WORTHEY RANCH 19H | 4247941134 |
| WORTHEY RANCH 1H | 4247940755 |
| WORTHEY RANCH 20H | 4247941376 |
| WORTHEY RANCH 21H | 4247941377 |
| WORTHEY RANCH 22H | 4247941378 |
| WORTHEY RANCH 23H | 4247941487 |
| WORTHEY RANCH 24H | 4247941488 |
| WORTHEY RANCH 25H | 4247941489 |
| WORTHEY RANCH 26H | 4247941515 |
| WORTHEY RANCH 27H | 4247941517 |
| WORTHEY RANCH 28H | 4247941518 |
| WORTHEY RANCH 29H | 4247941521 |
| WORTHEY RANCH 2H | 4247940941 |
| WORTHEY RANCH 30H | 4247942341 |
| WORTHEY RANCH 31H | 4247942342 |
| WORTHEY RANCH 32H | 4247942344 |
| WORTHEY RANCH 34H | 4247942437 |
| WORTHEY RANCH 35H | 4247942438 |
| WORTHEY RANCH 36H | 4247942440 |
| WORTHEY RANCH 37H | 4247942436 |
| WORTHEY RANCH 38H | 4247941356 |
| WORTHEY RANCH 39H | 4247942339 |
| WORTHEY RANCH 3H | 4247941119 |
| WORTHEY RANCH 40H | 4247942340 |
| WORTHEY RANCH 41H | 4247942347 |
| WORTHEY RANCH 42H | 4247942346 |
| WORTHEY RANCH 43H | 4247941906 |
| WORTHEY RANCH 44H | 4247942160 |
| WORTHEY RANCH 45H | 4247942484 |
| WORTHEY RANCH 46H | 4247942485 |
| WORTHEY RANCH 47H | 4247942486 |
| WORTHEY RANCH 48H | 4247942487 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| WORTHEY RANCH 49H | 4247942488 |
| WORTHEY RANCH 4H | 4247941120 |
| WORTHEY RANCH 50H | 4247942489 |
| WORTHEY RANCH 51H | 4247942491 |
| WORTHEY RANCH 53H | 4247942480 |
| WORTHEY RANCH 54H | 4247942482 |
| WORTHEY RANCH 55H | 4247942483 |
| WORTHEY RANCH 56H | 4247942016 |
| WORTHEY RANCH 57H | 4247942131 |
| WORTHEY RANCH 5H | 4247940971 |
| WORTHEY RANCH 6H | 4247941108 |
| WORTHEY RANCH 7H | 4247941194 |
| WORTHEY RANCH 8H | 4247940983 |
| WORTHEY RANCH 9H | 4247941019 |

**Annex VI**
**Existing Drilling and Uncompleted Wells**

(*see attached*)

**Existing Drilled and Uncompleted Wells**

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH UNIT A 1H | 4212736445 |
| BRISCOE CARLA RANCH UNIT A 2H | 4212736446 |
| BRISCOE CARLA RANCH UNIT A 3H | 4212736447 |
| BRISCOE CARLA RANCH UNIT A 4H | 4212736450 |
| BRISCOE CARLA RANCH UNIT A 5H | 4212736449 |
| BRISCOE CARLA RANCH UNIT B 1H | 4212736464 |
| BRISCOE CARLA RANCH UNIT B 2H | 4212736465 |
| BRISCOE CARLA RANCH UNIT B 3H | 4212736466 |
| BRISCOE CARLA RANCH UNIT B 4H | 4212736468 |
| BRISCOE CARLA RANCH UNIT B 5H | 4212736467 |
| BRISCOE CARLA RANCH UNIT B 6H | 4212736469 |
| BRISCOE CARLA RANCH UNIT B 7H | 4212736470 |
| BRISCOE CATARINA NORTH 104H | 4212736819 |
| BRISCOE CATARINA NORTH 105H | 4212736820 |
| BRISCOE CATARINA NORTH 106H | 4212736810 |
| BRISCOE CATARINA NORTH 107H | 4212736809 |
| BRISCOE CATARINA NORTH 108H | 4212736811 |
| BRISCOE CATARINA NORTH 109H | 4212736812 |
| BRISCOE CATARINA NORTH 110H | 4212736813 |
| BRISCOE CATARINA NORTH 111H | 4212736814 |
| BRISCOE CATARINA NORTH 112H | 4212736815 |
| BRISCOE CATARINA NORTH 113H | 4212736816 |
| BRISCOE CATARINA NORTH 114H | 4212736817 |
| BRISCOE CATARINA NORTH 115H | 4212736818 |
| BRISCOE CATARINA NORTH 116H | 4212736821 |
| BRISCOE CATARINA NORTH 117H | 4212736822 |
| BRISCOE CATARINA NORTH 118H | 4212736823 |
| BRISCOE CATARINA NORTH 119H | 4212736826 |
| BRISCOE CATARINA NORTH 120H | 4212736828 |
| BRISCOE CATARINA NORTH 121H | 4212736827 |
| BRISCOE CATARINA NORTH 122H | 4212736829 |
| BRISCOE CATARINA NORTH 123H | 4212736830 |
| BRISCOE CATARINA NORTH 124H | 4212736831 |
| BRISCOE CATARINA NORTH 125H | 4212736832 |
| BRISCOE CATARINA NORTH 126H | 4212736833 |
| BRISCOE CATARINA NORTH 127H | 4212736834 |
| BRISCOE CATARINA NORTH 128H | 4212736862 |
| BRISCOE CATARINA NORTH 129H | 4212736863 |
| BRISCOE CATARINA NORTH 130H | 4212736864 |
| BRISCOE CATARINA NORTH 131H | 4212736865 |
| BRISCOE CATARINA NORTH 132H | 4212736868 |
| BRISCOE CATARINA WEST 83H | 4212736874 |
| BRISCOE CATARINA WEST 84H | 4212736875 |
| BRISCOE CATARINA WEST 85H | 4212736876 |
| BRISCOE CATARINA WEST 86H | 4212736877 |
| BRISCOE CATARINA WEST 87H | 4212736878 |
| BRISCOE CATARINA WEST 88H | 4212736879 |
| BRISCOE CATARINA WEST 89H | 4212736880 |
| BRISCOE CATARINA WEST 91H | 4212736882 |
| BRISCOE CATARINA WEST 92H | 4212736883 |
| BRISCOE CATARINA WEST 94H | 4212736886 |
| BRISCOE CATARINA WEST 95H | 4212736885 |
| BRISCOE CATARINA WEST 97H | 4212736888 |
| BRISCOE COCHINA EAST RANCH 133H | 4228334859 |
| BRISCOE COCHINA EAST RANCH 134H | 4228334860 |
| BRISCOE COCHINA EAST RANCH 135H | 4228334861 |
| BRISCOE COCHINA EAST RANCH 136H | 4228334862 |
| BRISCOE COCHINA EAST RANCH 137H | 4228334863 |

## Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 138H | 4228334864 |
| BRISCOE COCHINA EAST RANCH 139H | 4228334865 |
| BRISCOE COCHINA EAST RANCH 140H | 4228334866 |
| BRISCOE COCHINA EAST RANCH 141H | 4228334867 |
| BRISCOE COCHINA EAST RANCH 142H | 4228334868 |
| BRISCOE COCHINA EAST RANCH 143H | 4228334869 |
| BRISCOE COCHINA EAST RANCH 144H | 4228334870 |
| BRISCOE COCHINA EAST RANCH 145HR | 4228335149 |
| BRISCOE COCHINA EAST RANCH 146H | 4228334872 |
| BRISCOE COCHINA EAST RANCH 147H | 4228334873 |
| BRISCOE COCHINA WEST RANCH 100H | 4212736330 |
| BRISCOE COCHINA WEST RANCH 10H | 4212734822 |
| BRISCOE COCHINA WEST RANCH 13H | 4212734823 |
| BRISCOE COCHINA WEST RANCH 14H | 4212734825 |
| BRISCOE COCHINA WEST RANCH 15H | 4212734824 |
| BRISCOE COCHINA WEST RANCH 31H | 4212734882 |
| BRISCOE COCHINA WEST RANCH 32H | 4212734883 |
| BRISCOE COCHINA WEST RANCH 33H | 4212734889 |
| BRISCOE COCHINA WEST RANCH 34H | 4212734884 |
| BRISCOE COCHINA WEST RANCH 35H | 4212734885 |
| BRISCOE COCHINA WEST RANCH 36H | 4212735038 |
| BRISCOE COCHINA WEST RANCH 37H | 4212735039 |
| BRISCOE COCHINA WEST RANCH 38H | 4212735041 |
| BRISCOE COCHINA WEST RANCH 45H | 4212735042 |
| BRISCOE COCHINA WEST RANCH 46H | 4212735492 |
| BRISCOE COCHINA WEST RANCH 78H | 4212736250 |
| BRISCOE COCHINA WEST RANCH 79H | 4212736253 |
| BRISCOE COCHINA WEST RANCH 80H | 4212736254 |
| BRISCOE COCHINA WEST RANCH 81H | 4212736255 |
| BRISCOE COCHINA WEST RANCH 82H | 4212736256 |
| BRISCOE COCHINA WEST RANCH 83H | 4212736257 |
| BRISCOE COCHINA WEST RANCH 84H | 4212736258 |
| BRISCOE COCHINA WEST RANCH 85H | 4212736259 |
| BRISCOE COCHINA WEST RANCH 86H | 4212736260 |
| BRISCOE COCHINA WEST RANCH 87H | 4212736261 |
| BRISCOE COCHINA WEST RANCH 8H | 4212734821 |
| BRISCOE COCHINA WEST RANCH 96H | 4212736326 |
| BRISCOE COCHINA WEST RANCH 97H | 4212736327 |
| BRISCOE COCHINA WEST RANCH 98H | 4212736328 |
| BRISCOE COCHINA WEST RANCH 99H | 4212736329 |
| BRISCOE COCHINA WEST RANCH 9H | 4212734826 |
| CARLA SOUTH SPUR UNIT A 1H | 4212736476 |
| CARLA SOUTH SPUR UNIT A 2H | 4212736480 |
| CARLA SOUTH SPUR UNIT A 3H | 4212736481 |
| ROGERS DENTONIO 31 UNIT 10H | 4212737044 |
| ROGERS DENTONIO 31 UNIT 11H | 4212737045 |
| ROGERS DENTONIO 31 UNIT 7H | 4212737041 |
| ROGERS DENTONIO 31 UNIT 8H | 4212737042 |
| ROGERS DENTONIO 31 UNIT 9H | 4212737043 |
| SOUTH SPUR RANCH 3H | 4212736374 |
| SOUTH SPUR RANCH 4H | 4212736375 |
| SOUTH SPUR UNIT B 10H | 4212736684 |
| SOUTH SPUR UNIT B 1H | 4212736676 |
| SOUTH SPUR UNIT B 2H | 4212736677 |
| SOUTH SPUR UNIT B 3H | 4212736678 |
| SOUTH SPUR UNIT B 4H | 4212736679 |
| SOUTH SPUR UNIT B 5H | 4212736680 |
| SOUTH SPUR UNIT B 6H | 4212736681 |

Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| SOUTH SPUR UNIT B 7H | 4212736682 |
| SOUTH SPUR UNIT B 8H | 4212736683 |
| SOUTH SPUR UNIT B 9H | 4212736936 |
| STUMBERG RANCH 53H | 4212737219 |
| STUMBERG RANCH 54H | 4212737222 |
| STUMBERG RANCH 55H | 4212737220 |
| STUMBERG RANCH 56H | 4212737221 |
| STUMBERG RANCH UNIT C 10H | 4212736700 |
| STUMBERG RANCH UNIT C 1H | 4212736690 |
| STUMBERG RANCH UNIT C 2H | 4212736691 |
| STUMBERG RANCH UNIT C 3H | 4212736692 |
| STUMBERG RANCH UNIT C 4H | 4212736693 |
| STUMBERG RANCH UNIT C 5H | 4212736694 |
| STUMBERG RANCH UNIT C 6H | 4212736696 |
| STUMBERG RANCH UNIT C 7H | 4212736697 |
| STUMBERG RANCH UNIT C 8H | 4212736698 |

**<u>Annex VII</u>**
**Restricted Areas**



**Exhibit A**

[Intentionally omitted]

**Exhibit B**

**Form Operating Agreement**

(*see attached*)

**Exhibit B**

**to Joint Development Agreement, dated as of December 29, 2016,**
**by and among [SN Restricted Sub, SN Unsub, and Blackstone NewCo]**

**A.A.P.L. FORM 610 - 1989**

# MODEL FORM OPERATING AGREEMENT

**HORIZONTAL MODIFICATIONS**

**OPERATING AGREEMENT**

**DATED**

_____________ , _________ ,
*Year*

**OPERATOR** ______________________________

**CONTRACT AREA** See Exhibit "A" attached

**COUNTY ~~OR PARISH~~ OF** [Maverick, Dimmitt, Webb, LaSalle] **, STATE OF** Texas

**COPYRIGHT 2013 – ALL RIGHTS RESERVED**
**AMERICAN ASSOCIATION OF PROFESSIONAL LANDMEN, 4100 FOSSIL CREEK BLVD. FORT WORTH, TEXAS, 76137, APPROVED FORM.**
**A.A.P.L. NO. 610 - 1989 (Horz.)**

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**TABLE OF CONTENTS**


| Article | Title | Page |
|---|---|---|
| **I.** | **DEFINITIONS** | 1 |
| **II.** | **EXHIBITS** | 3 |
| **III.** | **INTERESTS OF PARTIES** | 4 |
| | ~~A. OIL AND GAS INTERESTS~~ | 4 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 4 |
| | C. SUBSEQUENTLY CREATED INTERESTS | 4 |
| **IV.** | **TITLES** | 5 |
| | A. TITLE EXAMINATION | 5 |
| | B. LOSS OR FAILURE OF TITLE | 6 |
| | ~~1. Failure of Title~~ | 6 |
| | ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due~~ | 6 |
| | 3. ~~Other~~ All Losses | 7 |
| | ~~4. Curing Title~~ | 7 |
| **V.** | **OPERATOR** | 7 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 7 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 8 |
| | 1. Resignation or Removal of Operator | 8 |
| | 2. Selection of Successor Operator | 8 |
| | 3. Effect of Bankruptcy | 8 |
| | C. EMPLOYEES AND CONTRACTORS | 9 |
| | D. RIGHTS AND DUTIES OF OPERATOR | 9 |
| | 1. Competitive Rates and Use of Affiliates | 9 |
| | 2. Discharge of Joint Account Obligations | 9 |
| | 3. Protection from Liens | 9 |
| | 4. Custody of Funds | 9 |
| | 5. Access to Contract Area and Records | 9 |
| | 6. Filing and Furnishing Governmental Reports | 10 |
| | 7. Drilling and Testing Operations | 10 |
| | 8. Cost Estimates | 10 |
| | 9. Insurance | 10 |
| **VI.** | **DRILLING AND DEVELOPMENT** | 10 |
| | ~~A. INITIAL WELL~~ | 10 |
| | B. SUBSEQUENT OPERATIONS | 11 |
| | 1. Proposed Operations | 11 |
| | 2. Operations by Less Than All Parties | 11 |
| | 3. Stand-By Costs | 14 |
| | 4. Deepening | 14 |
| | 5. Sidetracking | 15 |
| | 6. Order of Preference of Operations | 16 |
| | 7. Conformity to Spacing Pattern | 16 |
| | 8. Paying Wells | 16 |
| | 9. Spudder Rigs | 16 |
| | 10 Multi-Well Pads | 17 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK | 17 |
| | 1. Completion | 17 |
| | 2. Rework, Recomplete or Plug Back | 18 |
| | D. OTHER OPERATIONS | 18 |
| | E. ABANDONMENT OF WELLS | 18 |
| | 1. Abandonment of Dry Holes | 18 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)


| Article | Title | Page |
|---|---|---|
| | 2. Abandonment of Wells That Have Produced | 19 |
| | 3. Abandonment of Non-Consent Operations | 20 |
| | F. TERMINATION OF OPERATIONS | 20 |
| | G. TAKING PRODUCTION IN KIND | 20 |
| | (Option 1) Gas Balancing Agreement | 20 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | 21 |
| **VII.** | **EXPENDITURES AND LIABILITY OF PARTIES** | 22 |
| | A. LIABILITY OF PARTIES | 22 |
| | B. LIENS AND SECURITY INTERESTS | 22 |
| | C. ADVANCES | 23 |
| | D. DEFAULTS AND REMEDIES | 24 |
| | 1. Suspension of Rights | 24 |
| | 2. Suit for Damages | 24 |
| | 3. Deemed Non-Consent | 24 |
| | 4. Advance Payment | 25 |
| | 5. Costs and Attorneys' Fees | 25 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 25 |
| | F. TAXES | 25 |
| **VIII.** | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 26 |
| | A. SURRENDER OF LEASES | 26 |
| | B. RENEWAL OR EXTENSION OF LEASES | 26 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 27 |
| | D. ASSIGNMENT; ~~MAINTENANCE OF UNIFORM INTEREST~~ | 27 |
| | E. WAIVER OF RIGHTS TO PARTITION | 28 |
| | ~~F. PREFERENTIAL RIGHT TO PURCHASE~~ | 28 |
| **IX.** | **INTERNAL REVENUE CODE ELECTION** | 29 |
| **X.** | **CLAIMS AND LAWSUITS** | 29 |
| **XI.** | **FORCE MAJEURE** | 29 |
| **XII.** | **NOTICES** | 30 |
| **XIII.** | **TERM OF AGREEMENT** | 30 |
| **XIV.** | **COMPLIANCE WITH LAWS AND REGULATIONS** | 31 |
| | A. LAWS, REGULATIONS AND ORDERS | 31 |
| | B. GOVERNING LAW | 31 |
| | C. REGULATORY AGENCIES | 31 |
| **XV.** | **MISCELLANEOUS** | 32 |
| | A. EXECUTION | 32 |
| | B. SUCCESSORS AND ASSIGNS | 32 |
| | C. COUNTERPARTS | 32 |
| | D. SEVERABILITY | 32 |
| **XVI.** | **OTHER PROVISIONS (Attached)** | 33 |
| | ~~A. CONFLICT OF TERMS~~ | 33 |
| | ~~B. OPERATOR'S DUTY~~ | 33 |
| | ~~C. PRIORITY OF OPERATIONS – HORIZONTAL WELLS~~ | 33 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between ________________________________________, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**
**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder. An AFE is not a contractual commitment. Rather it is only an estimate, made in good faith.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a / well capable of producing ~~producer of~~ Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the ~~D~~deepest Zone proposed in the associated AFE, whichever is the lesser. ~~When used in connection with a Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) to the Displacement to which the Lateral was drilled pursuant to a previous proposal.~~ "Deepen" shall not refer or apply to operations for the Extension of a Lateral.

E. The term "Displacement" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall otherwise mean the length of a Lateral.

F. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

G. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

H. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located. When used in connection with a Horizontal Well, the term "Drillsite" shall mean



012343

(i) the surface hole location, and (ii) the Oil and Gas Leases or Oil and Gas Interests within the Drilling Unit on or under which the wellbore, including the Lateral, is located.

I. The term "Horizontal Rig Move-On Period" shall mean the number of days after the date of rig release of a Spudder Rig until the date a rig capable of drilling a Horizontal Well to its Total Measured Depth has moved on to location.

J. The term "Horizontal Well" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean a well containing one or more Laterals which are drilled, Completed or Recompleted in a manner in which the horizontal component of the Completion interval (1) extends at least one hundred feet (100') in the objective formation(s) and (2) exceeds the vertical component of the Completion interval in the objective formation(s).

~~K. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.~~ [Intentionally Omitted.]

L. The term "Lateral" shall mean that portion of a wellbore / of a Horizontal Well between the point at which the wellbore initially penetrates the objective Zone and the Terminus. ~~that deviates from approximate vertical orientation to approximate horizontal orientation and all wellbore beyond such deviation to Total Measured Depth~~.

M. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

N. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

O. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

P. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

Q. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

R. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone. When used in connection with a Horizontal Well, the term "Plug Back" shall mean an operation to test or Complete the well at a stratigraphically shallower Zone in which the operation has been or is being Completed and which is not in an existing Lateral.

S. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

T. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any ~~routine repair or maintenance work~~ Workover or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

U. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties. When used in connection with a Horizontal Well, the term "Sidetrack" shall mean the

directional control and deviation of a well outside the existing Lateral(s) so as to change the Zone or the direction of a Lateral from the approved proposal unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.

V. The term "Spudder Rig" shall mean a drilling rig utilized only for drilling all or part of the vertical component of a Horizontal Well; a rig used only for setting conductor pipe shall not be considered a Spudder Rig.

W. The term "Terminus" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean the furthest point drilled in the Lateral.

X. The term "Total Measured Depth," when used in connection with a Horizontal Well, shall mean the distance from the surface of the ground to the Terminus, as measured along and including the vertical component of the well and Lateral(s). When the proposed operation(s) is the drilling of, or operation on, a Horizontal Well, the terms "depth" or "total depth" wherever used in this agreement shall be deemed to read "Total Measured Depth" insofar as it applies to such well.

Y. The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal Well.

Z. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas. See Article XVI for additional definitions.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**
**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

X A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement.

(6) Burdens on production.

~~B. Exhibit "B," Form of Lease.~~

X C. Exhibit "C," Accounting Procedure.

X D. Exhibit "D," Insurance.

X E. Exhibit "E," Gas Balancing Agreement.

X F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

X G. Exhibit "G," Tax Partnership.

X H. Other: Form of Memorandum of Operating Agreement

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**
**INTERESTS OF PARTIES**

~~**A. Oil and Gas Interests:**~~

~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations / conducted hereunder ~~on the Contract Area~~ shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter. See also Article XVI.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area / except Subsequently Created Interests created by other parties hereto. ~~up to, but not in excess of, __________ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.~~

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

**ARTICLE IV.**
**TITLES**

**A. Title Examination**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys / and outside landmen for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) / title curative and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

/ The Operator ~~Each party~~ shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests / included in the Contract Area ~~contributed by such party~~. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, / landmen, or consultants which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct



012347

charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions. No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney / or the Operator or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

~~2.~~ Loss by Non-Payment or Erroneous Payment of Amount Due~~: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

~~4.~~ Curing Title~~: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.~~

**ARTICLE V.**
**OPERATOR**

**A. Designation and Responsibilities of Operator:**

________________________________________ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations / conducted hereunder ~~on the Contract Area~~ as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators,

Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this 27 agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred / in connection with operations authorized or approved hereunder except such as may result from gross negligence or willful misconduct. See also Article XVI.

**B. Resignation or Removal of Operator and Selection of Successor:** **See Article XVI.**

~~1.~~ Resignation or Removal of Operator: ~~Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

~~Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non- Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.~~

~~2.~~ Selection of Successor Operator: ~~Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.~~

~~3.~~ Effect of Bankruptcy: ~~If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a~~

~~majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."~~

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined / by the Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by aAffiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non- Operator funds as herein specifically provided. ~~Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.~~

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each / Consenting Party ~~Non-Operator~~ or its duly authorized representative, at ~~the Non-Operator's~~ its sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account / hereunder, ~~on the Contract Area~~ and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner / unreasonably interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Consenting Party ~~Non-~~Operator upon request copies of

any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C." or other agreement of the parties. See also Article XVI.

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder~~, including but not limited to the Initial Well~~:

(a) Operator will promptly advise Non-Operators of ~~the date on which the well is spudded, or~~ the date on which drilling operations are commenced.

(b) Operator will send to / the Consenting Parties ~~Non-Operators~~ such reports, test results and notices regarding the progress of operations on the well as they ~~Non-Operators~~ shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator may ~~shall~~ adequately test all Zones encountered / that fall within the Contract Area and which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

~~**A. Initial Well:**~~

~~On or before the _______ day of _______, _______, Operator shall commence the drilling of the Initial Well at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)): and shall thereafter continue the drilling of the well (horizontally if a Horizontal Well) with due~~

~~diligence to The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area ~~other than the Initial Well~~, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the case of a proposal for Sidetracking or Deepening as to a Vertical Well), specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation as outlined in an AFE. A proposal for the drilling of or other operations for a Horizontal Well shall: (1) state that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s), (v) utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3) include estimated drilling and Completion costs as set forth in an AFE. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may

be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations ~~on the Contract Area~~ pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) <u>Relinquishment of Interest for Non-Participation.</u> The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non- Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty

and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i)___100____% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non- Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in ~~the well from the beginning of~~ the proposed operations; and

(ii)___300____% of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated ~~therein~~in the proposed operation. See Article XVI.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non- consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____300_____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non- Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non- Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to

Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back, / Extension or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial



012356

Objective"). / A Vertical ~~Such w~~Well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

~~This Article VI.B.4 shall not apply to Deepening operations within an existing Lateral of a Horizontal Well.~~

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth

at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C." See Article XVI with respect to Extension operations.

~~This Article VI.B.5, "Sidetracking," shall not apply to operations in an existing Lateral of a Horizontal Well.~~

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone , unless agreed to by all Consenting Parties in the well, or approved as an exception to the then-existing spacing patterns by the appropriate regulatory agency.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, / Extension or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

9. Spudder Rigs.

(a) Within Approved Horizontal Well proposals (*i.e.* proposals which include an approved AFE). If an approved Horizontal Well proposal provides that a Spudder Rig shall be utilized, and Operator desires to extend the proposed Horizontal Rig Move-On Period, Operator may obtain one or more extensions, each for a period of time not to exceed 10 days only upon notice and the affirmative vote of not less than 51 % in interest of the Consenting Parties to the drilling of the proposed well.

(b) Not Within Approved Horizontal Well proposals. If an approved Horizontal Well proposal does not provide that a Spudder Rig may be utilized, and Operator subsequently desires to utilize a Spudder Rig, Operator may utilize a Spudder Rig upon notice to the Drilling Parties (which notice shall include a Horizontal Rig Move-On Period) and the affirmative vote of not less than 51 % in interest of the Consenting Parties. Extension(s) of the Horizontal Rig Move-On Period may be requested by Operator in the same manner as provided in Article VI.B.9.(a) immediately above.

(c) Failure to meet Horizontal Rig Move-On Period. If a rig capable of drilling a Horizontal Well to its Total Measured Depth has not commenced operations within the Horizontal Rig Move-On Period, or any approved extension(s) thereof, unless 51 % in interest of the Consenting Parties agree to abandon the operation, Operator shall re-propose the well in the manner provided in Article VI.B of this agreement. Any party who was a Non-Consenting Party to the original drilling proposal shall be entitled to a new election. Costs of the operation, incurred both before and after such re-proposal, shall be borne as follows:

(1) Operator shall promptly reimburse all unused funds previously advanced for the drilling of the well to each party who advanced such unused funds;

(2) If the well's drilling operations are subsequently resumed, all costs, whether incurred before or after the re-proposal, shall be borne by the Consenting Parties to the re-proposed well; and, the Consenting Parties shall proportionately reimburse each party who consented to the original proposal but did not consent to the re-proposal such party's share of costs incurred prior to the re-proposal.

(3) If the well's drilling operations are not subsequently resumed pursuant to a re-proposal as herein provided, all costs incurred prior to the re-proposal, and all costs of abandonment, shall be borne and paid by the original Consenting Parties.

(d) Commencement of Operations. For purposes of Article VI.B., and subject to the provisions of this sub-section 9, the date a Spudder Rig commences actual drilling operations shall be considered the commencement of drilling operations of the proposed well.

10. Multi-well Pads. If multiple Horizontal Wells are drilled or proposed to be drilled from a single pad or location, the costs of such pad or location shall be allocated, and/or reallocated as necessary, to the Consenting Parties in ~~of~~ each of the wells thereon.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐√Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completion and equipping of a Horizontal ~~the~~ Well, including tankage and/or surface facilities. For any Horizontal Well subject to this Agreement, Completion operations shall be included in the proposed drilling operations for such well.

☐√Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of a Vertical Well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall

constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

Notwithstanding anything to the contrary, including the selection of Option 2 above, or anything else in this agreement, Option 1 shall apply to all Horizontal Wells.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of One Hundred Thousand Dollars ($ 100,000 ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of One Hundred Thousand Dollars ($ 100,000 ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform / Workovers ~~repair work~~ or undertake the installation of artificial lift equipment ~~or ancillary production facilities such as salt water disposal wells~~ or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by ~~e~~ y those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least 75 % of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled / Sidetracked, or Deepened pursuant to Article VI.B~~.2.~~, any well which has been drilled / Sidetracked, or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties/ then owning an interest in the well.. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within / thirty (30) days, or if a rig is on location, forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within / thirty (30) days, or forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) / (as applicable)after delivery of notice of the proposed plugging shall take over the well as of the end of such ~~forty-eight (48) hour~~ notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any / party may propose that a well which has been completed as a producer ~~shall not~~ be plugged and abandoned / which shall require ~~without~~ the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well. Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material / but free and clear of Subsequently Created Interests, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production~~. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non- abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B~~." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.





https://www.sec.gov/Archives/edgar/data/1528837/000155837017004047/sn-20170331ex... 12/13/2018

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion, / Extension or plugging of a well, ~~including but not limited to the Initial Well,~~ such operation shall not be terminated without consent of parties bearing 51 % of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to
such operation, as appropriate.

**G. Taking Production in Kind:**

☐☒ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion- ate share of total Gas / production available for ~~sales~~ to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

~~☐ Option No. 2: No Gas Balancing Agreement:~~

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non- taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of~~

~~such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

**ARTICLE VII.**
**EXPENDITURES AND LIABILITY OF PARTIES**

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of

said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests, ~~or~~ fees / or other financial obligations hereunder, or upon the improper use of funds by ~~the Operator~~ / a party, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within / thirty (30) ~~fifteen (15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment

shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged ~~as a dry hole~~, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting / Consenting ~~p~~Parties in proportion to their interests, and the non-defaulting / Consenting ~~p~~Parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non- Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the / Operator for and on behalf of the joint account, unless otherwise agreed by the parties in writing from time to time. ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least ~~five (5)~~ ten (10) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non- Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless ~~all~~ it ~~parties~~ agrees to



012367

abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**
**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment / acquired by the parties hereunder and used exclusively for the surrendered lease, ~~which may be located thereon~~ and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby / or lands pooled therewith, such lease to be on ~~the~~ a form / mutually agreed by the parties. ~~attached hereto as Exhibit "B."~~ Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation / to be conducted hereunder ~~on the Contract Area~~, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they / Operator has ve received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. / Except as otherwise provided herein, the transferring party shall be relieved of liability for the cost and expense of operations attributable to the transferred interest which are conducted after the expiration of the 30-day period above; *provided* that Nno assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an approved operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations. . / The transferee shall be jointly and severally liable with its transferor for payment of its share of the costs and expenses attributable to an approved operation in which its transferor had agreed to participate.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co- owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F. Preferential Right to Purchase:**

☐ (Optional: Check if applicable)

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after notice is

~~delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interest to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**
**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income. / For federal income tax purposes, the parties agree that any gas imbalances will be reported under the cumulative gas balancing method as defined in Treasury Regulations § 1.761-2(d)(3).

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

Operator may settle any single / or related aggregate uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed One Hundred Thousand Dollars Dollars ($ 100,000 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount / Operator shall promptly notify Non-Operators, and, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

**ARTICLE XI.**
**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon,

the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

**ARTICLE XII.**
**NOTICES**

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, ~~telegram, telex, telecopier or any other form~~ or facsimile, postage or charges prepaid / each of which may also be delivered by attachment to electronic mail ("Email Notice"), and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the ~~telecopy,~~ facsimile / number or email address ~~or telex machine~~ of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier ~~or telegraph~~ service, or upon transmittal by ~~telex, telecopy or~~ facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, ~~telex, telecopy or other~~ facsimile / or Email Notice within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.
/ Each Email Notice shall clearly state that it is a notice or response to a notice under this agreement. An Email Notice shall be deemed delivered only when affirmatively acknowledged by email reply from the recipient (automatic delivery receipts do not qualify). If the receiving party fails or declines to affirmatively acknowledge an Email Notice, then the transmitting party shall be required to deliver notice and confirm receipt by one of the other methods provided above.

**ARTICLE XIII.**
**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐√ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise

~~☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is~~

capable of production, and for an additional period of ________ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re- completing, Plugging Back or Reworking operations are commenced within____________________days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited o matters of performance, non- performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of Texas shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from / liability above and beyond its proportionate share of any and all losses, damages, injuries, Claims and causes of action arising out of, incident to our resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of / any governmental agency having jursidiction the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence / or willful misconduct. Each No-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

**ARTICLE XV.**
**MISCELLANEOUS**

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area. ~~or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the following:~~

☐ Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would ~~have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive all revenues which would have been received by each such person under this agreement as if such person had executed the same~~.

☐ Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each ~~party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an election under (i)~~.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**E. Conflict of Terms:**

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Articles I through XV of this agreement, and the provisions of Article XVI, the provisions of Article XVI shall govern.

**ARTICLE XVI.**
**OTHER PROVISIONS (Attached)**

~~**A. Conflict of Terms:**~~

~~Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern.~~

~~**B. Operator's Duty:**~~

~~Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.~~

~~**C. Priority of Operations – Horizontal Wells:**~~

~~Notwithstanding Article VI.B.6 or anything else in this agreement to the contrary, it is agreed that where a Horizontal Well subject to this agreement has been drilled to the objective Displacement and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal Well, the following elections shall control the order of priority enumerated hereafter:~~

~~First: Testing, coring or logging;~~

~~Second: Complete drilling operations of all proposed Laterals;~~

~~Third: Extend or Deepen a Lateral;~~

~~Fourth: Kick out and drill an additional Lateral in the same Zone;~~

Fifth: Plug Back the well to a Zone above the Zone in which a Lateral was drilled; if there is more than one proposal ~~to Plug Back, the proposal to Plug Back to the next deepest prospective Zone shall have priority over a proposal to Plug Back to a shallower prospective Zone;~~

~~Sixth: Sidetrack; and~~

~~Seventh: Plug and abandon as provided for in Article VI.E~~

Provided, however, that if, at the time the Consenting Parties are considering any of the above, the hole is in such a condition that a reasonably prudent operator would not conduct the particular contemplated operation involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal Well in the objective Zone, such operation shall be eliminated from the priorities set forth above.

IN WITNESS WHEREOF, this agreement shall be effective as of the________________________ day of__________, _______. ____________________________________, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles____________, have been made to the form.

Case 4:23-cv-00058 Document 53-2 Filed on 10/16/23 in TXSD Page 172 of 224

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**ATTEST OR WITNESS:**

**OPERATOR**

By

Type or print name

Title

Date

Tax ID or S.S. No.

**NON-OPERATORS**

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

______________________________

Date ______________________________

Tax ID or S.S. No. ______________________________

~~ACKNOWLEDGMENTS~~

~~Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.~~

~~Individual acknowledgment:~~
~~State of~~ ______________ ~~)~~
~~) ss.~~
~~County of~~ ______________ ~~)~~

~~This instrument was acknowledged before me on~~

______________________________ ~~by~~ ______________________________.

~~(Seal, if any)~~

______________________________

~~Title (and Rank)~~ ______________________________

~~My commission expires~~ ______________________________

~~Acknowledgment in representative capacity:~~
~~State of~~______________ ~~)~~
~~) ss.~~
~~County of~~______________ ~~)~~

~~This instrument was acknowledged before me on~~

______________________________ ~~by~~ ______________________________ ~~as~~ ______________
______________________________ ~~of~~ ______________________________

~~(Seal, if any)~~

______________________________

~~Title (and Rank)~~ ______________________________

~~My commission expires~~ ______________________________

**Article XVI to Operating Agreement**

**(Other Provisions)**

A. Additional Definitions:

1. The term "**Affiliate**" shall mean, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; ***provided***, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in [the Partnership or the General Partner] result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.
2. The term "**Agreement**" and the phrase "**this agreement**" shall each mean this Operating Agreement, as amended from time to time.
3. The term "**Associated Agreements**" means, collectively, the JDA, MSA, JEA and LLCA, inclusive of all exhibits and schedules, and all other contracts, documents, and instruments entered into by and among the parties in connection with operations and activities under this Agreement, in each case, to the extent in effect and applicable as of the time of reference hereunder.
4. The term "**Business Day**" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Houston, Texas and New York, New York are open for business.
5. The term "**Control**" (including its derivatives and similar terms) shall mean, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.
6. The term "**Extension**" or "**Extend**" shall mean an operation related to a Horizontal Well whereby a Lateral is drilled in the same Zone to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) the Displacement to which the Lateral was drilled pursuant to a previous proposal.
7. The term "**JDA**" shall mean that certain Joint Development Agreement dated as of March 1, 2017, by and between SN EF Maverick, LLC ("**SN**"), Aguila Production, LLC ("**Aguila**"), and SN EF UnSub, LP ("**UnSub**"), as the same may be amended from time to time.
8. The term "**JEA**" shall mean that certain Joint Exploration Agreement, dated as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended.
9. The term "**LLCA**" shall mean the Limited Liability Company Agreement of Aguila Production, LLC, as the same may be amended from time to time.

10. The term "**MSA**" shall mean that certain Management Services Agreement, dated as of March 1, 2017, by and among SN, Aguila, and Unsub, as the same may be amended from time to time.

11. The term "**RRC**" shall mean the Railroad Commission of Texas or its applicable successor agency or agencies.

12. The term "**Workover**" shall mean routine maintenance and repair work performed on a well but does not include a Rework operation.

B. Amendments to Exhibit "A": The Operator shall amend Exhibit "A" from time to time in order to correct mistakes therein or to reflect changes in ownership within the Contract Area. Operator's duty to amend Exhibit "A" shall be subject to the following:

1. If such amendment is a correction of the initial Exhibit "A," it shall be effective retroactively as of the effective date of this Agreement. If such amendment reflects a change occurring after the effective date of this Agreement, it shall be effective retroactively as of the effective date of such change. In either event, if the amendment changes the interests of any parties in the Contract Area, the accounts of the affected parties shall be thus adjusted.

2. If a proposed amendment to Exhibit "A" involves only one of the parties, Operator shall amend Exhibit "A" upon the written consent of such affected party.

3. If a proposed amendment to Exhibit "A" results in an increase or decrease in the percentage of ownership of one or more parties, Operator shall amend Exhibit "A" upon the written consent of all affected parties.

4. If any party affected by a proposed amendment to Exhibit "A" fails to give written consent to such amendment, Operator may nevertheless make such amendment in order to conform Exhibit "A" to ownership as reflected in an opinion issued by a licensed attorney, who is neither any employee of a party that is affected by the amendment, nor of any Affiliate of such party. Such amendment shall be binding upon the parties until and unless determined otherwise pursuant to Article XVI.B.6.

5. Whenever an amendment is made to Exhibit "A," Operator shall promptly furnish each party with a copy of the amended Exhibit "A," together with a copy of the attorney's opinion upon which such amendment is based, when applicable, irrespective of whether such party is affected by the amendment.

6. Any party who has not consented to an amendment to Exhibit "A" may pursue litigation as to the validity of the basis for the amendment in a court of competent jurisdiction, by joining all other affected parties as parties to such litigation. If such litigation results in a determination which is contrary to the amendment, Operator shall conform Exhibit "A" to such determination, retroactive to the effective date determined pursuant to Article XVI.B.1 and the accounts of the affected parties shall be thus adjusted.

C. Operator's Limited Agency Authority:

Notwithstanding the provisions of Article V.A., Non-Operators hereby designate and appoint Operator as their agent and attorney-in-fact for the sole purpose of executing, filing for RRC approval, and recording a declaration of pooling or communitization agreement to effectuate the pooling or communitization of the Oil and Gas Leases (to the extent permitted under the terms and conditions thereof) and/or Oil and Gas Interests to conform with the spacing rules or a spacing order of the RRC. However, said agency authority shall only be exercised by Operator after providing written notice (including a copy of the proposed pooling declaration or communitization agreement) to the Non-Operators, and shall be binding upon any Non-Operator failing to provide to Operator a written objection within ten (10) Business Days after receipt of such notice.

D. Third Party Operator:

The Operator shall own an interest in the Contract Area except as provided in this Article XVI.D and subject to the provisions of Article XVI.E.5. A qualified non-owning operator ("**Third Party Operator**") may serve as Operator to the extent authorized by, and subject to the applicable terms and conditions of, (i) the JDA, and/or (ii) a separate agreement of the parties hereto. Unless the JDA or such separate agreement provides otherwise, as a condition precedent to serving as Operator hereunder, the putative Third Party Operator must agree to be bound by all terms and conditions of this Agreement that would be applicable to it as Operator.

E. Resignation or Removal of Operator and Selection of Successor:

1. *Voluntary Resignation*: The Operator may resign at any time by giving written notice thereof to the Non-Operators.

2. *Deemed Resignation of Operator*: If, after the effective date of this agreement, (i) Operator terminates its legal existence, (ii) Operator and its Affiliates no longer own an interest in the Contract Area, or (iii) Operator is no longer capable of serving as Operator, then Operator shall be deemed to have resigned without any action by Non-Operators, except for the selection of a successor Operator. A change of a corporate name or business entity type of Operator shall not be deemed a resignation of Operator.

3. *Effect of Bankruptcy*: If Operator becomes insolvent, bankrupt, or is placed in receivership, it shall be deemed to have resigned without any action of Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor-in-possession, or by a trustee in bankruptcy, shall be deemed a resignation by Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator, and the federal bankruptcy court shall be selected as a member of the operating committee and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

4. *Removal of Operator*: Except as provided in Article XVI.E.5, an Operator that has not voluntarily resigned and is not deemed to have resigned may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such vote shall not be effective until a written notice has been delivered to Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall include, but not be limited to, Operator's (i) gross negligence or willful misconduct, (ii) material breach of or inability to meet the standards of operation contained in Article V.A, (iii) material failure to perform its obligations or duties under this Agreement, or (iv) without limiting the generality of the foregoing, Operator's intentional conduct of an approved operation in a manner that substantially deviates from the specifications of the AFE and/or proposal associated with such approved operation on more than two (2) occasions in any 365-day period other than as permitted in Article XVI.H.2.

5. *Third Party Operator*: Unless the parties have agreed otherwise, a Third Party Operator may be removed at any time, with or without cause, by the affirmative vote of parties owning a majority interest based on ownership as shown on Exhibit "A." Moreover if good cause (as defined in Article XVI.E.4) exists for

removal of such Third Party Operator, the Third Party Operator may be removed by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of any Non-Operator that (i) is an Affiliate of such Third Party Operator, and/or (ii) initiated the appointment of the Third Party Operator under Article XVI.D.

6. *Selection of Successor Operator*: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected by the affirmative vote of one (1) or more parties owning a majority interest based on ownership as shown on Exhibit "A" including the vote(s) of the former Operator and/or any transferee(s) of the former Operator's interest, to the extent that they are owners within the Contract Area; *provided*, however, if any Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. In the event that such vote results in a tie, the candidate supported by the former Operator or the majority of its transferee(s) shall become the successor Operator. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor Operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

7. *Effective Time of Resignation or Removal of Operator*: In the event of the resignation or removal of Operator, pursuant to any of Articles XVI.E.1-5, such resignation shall become effective upon the earlier of:

   a. the time and date that a successor Operator has been selected pursuant to Article XVI.E.6, and assumes the duties of Operator; or

   b. 7:00 A.M. on the first day of the calendar month following the expiration of ninety (90) days after (i) the giving of notice of resignation by Operator, (ii) the event deemed to be Operator's resignation, or (iii) action by the Non-Operators to remove Operator.

   Thereafter, the former Operator shall be bound by the terms hereof as a Non-Operator to the extent it continues to be a party hereto.

F. Proposals for Vertical Wells: Any proposal for the drilling of, or other operation in, a Vertical Well shall include:

1. Notice that the proposed operation is for a Vertical Well;

2. Drilling and Completion plans specifying the proposed:

   i. depth;

   ii. surface location, and if deviated, bottom hole location;

   iii. objective Zone;

   iv. utilization and scheduling of rig(s) for drilling and Completion;

   v. stimulation operations, staging, and sizing; and

3. Estimating drilling and Completion costs as set forth in the AFE.

G. Non-Consenting Party's Access to Location and Records:

1. *Generally*: With the exception of information required to be furnished by Operator pursuant to Article VI.B.2(d) or Article XVI.G.2, a Non-Consenting Party is neither entitled by virtue of this agreement to, nor may compel Operator or any Consenting Party to provide, access to the well location, or information and reports (or parts thereof) solely relating to such non-consented operation, until the earlier of full recoupment by the Consenting Parties of the amounts provided for in Article VI.B.2(b)(i) or two (2) years following the date the non-consented operation was commenced. Thereafter, Operator shall promptly furnish such access, information, and reports upon receipt of a written request from the Non-Consenting Party.

2. *Payout Audit*: Except as provided in Article VII.D.1, prior to a payout, a Non- Consenting Party shall be entitled to review the joint account records pertaining to a non-consented operation to the extent necessary to conduct an audit of the payout account. Any such review shall be conducted in accordance with Exhibit "C" or other agreement of the parties.

H. Operator's Implementation of Approved Proposals:

1. *Drilling Horizontal Wells*: For any Horizontal Well drilled under this Agreement, Operator shall drill such well to the Objective Zone(s) and drill the Lateral in the Zone(s) to the proposed Displacement unless drilling operations are terminated pursuant to Article VI.F or modified pursuant to this Article XVI.H.

2. *Extensions*: If, in the event that during actual drilling operations on the Lateral of a Horizontal Well, and prior to reaching the Displacement specified in the approved proposal for such well (the "**Approved Displacement**") Operator desires to Extend the Lateral more than twenty percent (20%) (measured in feet) beyond the Approved Displacement, Operator shall give the Consenting Parties written notice of such intent to Extend, together with the estimated costs, not less than 24 hours before Operator anticipates reaching the Approved Displacement. Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the Extension within 48 hours of receipt of such notice, Operator shall not Extend the Lateral beyond the Approved Displacement and will proceed with Completion in accordance with the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the Extension shall be deemed approved and binding upon all Consenting Parties.[1]

[1] NTD: This Extension provision was added in the 2015 JOA form recently approved by the AAPL.

3. *Other Deviations*: If Operator, in its reasonable judgment, determines that a deviation from an approved proposal other than an Extension is necessary or appropriate based upon information derived from facts and circumstances determined subsequent to the commencement of the operations relating to such proposal (including, without limitation, revision of the original proposed Completion staging and design), Operator shall immediately upon making such determination notify the Consenting Parties of the proposed modification (including all appropriate detail on the basis, cost, and design thereof). Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the proposed modification within 48 hours of receipt of such notice, Operator shall not undertake the modification and will proceed with the operation as specified in the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the proposed modification shall be deemed approved and binding upon all Consenting Parties.[2]

H. Non-Operator Materials: Each Non-Operator hereby agrees to provide Operator with all documentation, affidavits, reports or other materials in its possession as required by Operator to perform those tasks to be undertaken by Operator hereunder, or as may be required by regulations and laws of the governmental authorities having jurisdiction over operations in the Contract Area. Non-Operator Liability for Site Visits:

J. Non-Operator Liability for Site Visits:

EACH NON-OPERATOR SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS OPERATOR, ITS AFFILIATES, AND ITS AND THEIR RESPECTIVE MANAGERS, DIRECTORS, OFFICERS, MEMBERS, PARTNERS, EMPLOYEES, REPRESENTATIVES, AGENTS, CONTRACTORS AND SUBCONTRACTORS FROM AND AGAINST ANY AND ALL LIABILITY FOR INJURY TO SUCH NON-OPERATOR'S OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS, RESULTING FROM OR IN ANY WAY RELATING TO THE PRESENCE OF ANY SUCH OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS AT OR IN THE VICINITY OF ANY WELL LOCATION OR PRODUCTION FACILITY ON THE CONTRACT AREA OR FROM ANY SUCH PERSON'S TRAVELING TO OR FROM SUCH LOCATION OR FACILITY, OTHER THAN ANY SUCH INJURY AND RESULTING LIABILITY CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR.

K. Liability of Non-Consenting Parties:

Notwithstanding anything herein to the contrary, any party who elects or is deemed to have elected not to participate in any proposed operation, as set out in this Agreement, shall not be relieved of (i) any obligations accruing prior to its election or deemed election not to participate or (ii) any obligation with respect to any other operation in which such party is participating or has participated.

L. Right to Set-Off or Recoupment; Netting:

Operator (or any non-defaulting Non-Operator if Operator is the party in default) may take any action to which it may be entitled or pursue any remedy to collect the amounts in default, together with all damages suffered by the non-defaulting parties as a result of the default plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in the COPAS Accounting Procedure attached as Exhibit "C" (without duplication of any interest charges permitted under the Development Agreement), together with reasonable attorneys' fees and court costs related thereto. Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have and be entitled to exercise all rights and remedies of recoupment, setoff and any similar doctrines, and the exercise of such rights and remedies shall be in addition to all other rights and remedies. Without limiting the foregoing, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the additional right to notify the purchaser or purchasers of the defaulting party's Oil and Gas production, and recoup or collect any amounts in default out of the proceeds from the sale of the defaulting party's share of Oil and Gas production until the amount owed has been paid in full. In addition, Operator (or any non-defaulting Non-Operator if Operator is the party in default) may, by notice to a defaulting party, suspend the right of such defaulting party to take and sell or dispose of its share of Oil and Gas production until such default has been cured. With respect to any amount owed pursuant to this Agreement by a defaulting party, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the right, from time to time, to recoup from, and to offset against, proceeds from the sale of such defaulting party's share of Oil and Gas production until payment in full of all amounts owing by such defaulting party, and to remit to such defaulting party a net check in the amount of any such net proceeds to which the defaulting party is then entitled. Any purchaser of such production shall be entitled to rely on Operator's (or any non-defaulting Non-Operator if Operator is the party in default) statement concerning the amount owed by the defaulting party. For the avoidance of doubt, in the event Operator is the party in default, any Non-Operator may cause Operator, by delivering notice to Operator, to exercise the remedies set forth in this Article XVI.L. with respect to Operator's interest covered by this Agreement.

M. Separate Measurement Costs:

In the event separate measurement of production is required, the party creating the necessity for such separate measuremnt shall alone bear the cost of purchase, installation and operation of such measurement facilities.

N. Agreement Subject to Associated Agreements:

The rights, obligations and remedies of the parties under this Agreement are subject to a the provisions of the Associated Agreements, to the extent that such remain in effect as of the time of reference hereunder. To the extent there is a conflict between the terms of this Agreement and any provisions of the Associated Agreements that remain effective, the terms of the Associated Agreements shall control.

O. Headings:

The headings of the several articles and sections of this Agreement are for convenience only, and shall not control or affect the meaning or construction of the terms and provisions of this Agreement.

P. Confidentiality of Information:

No party to this Agreement shall use, publish, disseminate or otherwise disclose, directly or indirectly, any trade secrets, proprietary information or confidential information, including, without limitation, the identity of a party or Affiliates thereof (collectively, the "Confidential Information") that should come into the possession of such party other than: (i) as necessary for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements; (ii) to an Affiliate or representative; (iii) in presentations made by Operator in the ordinary course of business at investor or industry conferences; ***provided*** that Operator shall not use the name of any Non-Operator or its Affiliates or disclose any provisions of this Agreement or the Associated Agreements in such conferences; or (iv) to the extent a party is required to disclose such Confidential Information (A) pursuant to applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), (B) due to a subpoena or court order or other legal process or (C) in order to enforce its rights under this Agreement or the Associated Agreements; provided that each party may disclose Confidential Information to its prospective and current direct or indirect investors or equity or debt financing sources, advisors and bona fide prospective transferees so long as such parties are subject to a customary confidentiality agreement or duty of confidentiality with respect to the Confidential Information. Each party shall, and shall cause each of its Affiliates, and its and their respective directors, officers, members, partners, investors, employees, representatives and agents (i) to comply with this Article XVI.P, (ii) to refrain from using any Confidential Information other than for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements and (iii) to refrain from disclosing any Confidential Information to a person known to be a competitor of the other party (for the avoidance of doubt, this clause (iii) should not restrict any disclosure in accordance with the proviso in the immediately preceding sentence). If a party is required by law or court order to disclose information that would otherwise be Confidential Information under this Agreement, such party shall immediately notify, to the extent permitted under applicable law, the other parties of such notice and provide each party the opportunity to resist such disclosure by appropriate proceedings.

Q. Media Releases:

1. The parties shall consult with each other with regard to all press releases and other public announcements concerning this Agreement or operations on the Contract Area. Except as expressly permitted in Article XVI.P, without the prior written approval from the other parties hereto, no party will issue, or permit

any Affiliate or representative of it to issue, any press releases or otherwise make, or cause any agent or Affiliate of it to make, any public statements with respect to this Agreement, the Associated Agreements or the activities contemplated hereby or thereby, in each case except where such release or statement is (i) required by applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), or (ii) limited to previously released publicly available information, which press releases or statements will not be restricted by this Article XVI.Q. Notwithstanding anything to the contrary in Article XVI.Q.1 or Article XVI.P, in the event of any emergency which imminently and materially endangers property, lives or the environment, Operator may issue such press releases or public announcements as it deems reasonably necessary in light of the circumstances and will promptly provide Non-Operators with a copy of any such press release or announcement, if commercially feasible, prior to such press releases or public announcements being released or made.

2. Notwithstanding anything contained herein to the contrary, except as may be required by applicable law or the applicable rules and regulations of any governmental agency or stock exchange, no party shall issue any press release or make any other public announcement (excluding announcements (which shall not include technical data) to limited partners or investors of a party given in the ordinary course of business of such party) that makes reference to the name of another party or such party's Affiliates without the prior written consent of such party, which consent shall not be unreasonably withheld. In no event shall any of the principals or officers of a party be identified in any press releases or public announcements by another party without such party's consent.

R. Memorandum of Operating Agreement:

The parties agree to execute simultaneously herewith the Memorandum of Operating Agreement in the form and language set forth in Exhibit "H", which is attached hereto and made a part hereof. The parties agree to execute amendments of same, from time to time, to accurately reflect the Contract Area covered by this Agreement and the current working interests of the parties. Such memoranda may be recorded as deemed appropriate by any party, including in the records of the relevant counties and in any other jurisdictions where the filing of a financing statement (or similar instrument) is necessary to perfect the security interests granted in this Agreement.

S. Severability:

It is the intent of the parties that the provisions contained in this Agreement shall be severable. If any provisions of this Agreement, in whole or in part, are held invalid, illegal or incapable of being enforced as a matter of law or public policy, such holding shall not affect the other portions of this Agreement, and all other such portions shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

T. Governing Law; Venue; Jury Waiver:

THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION (EXCEPT THAT, WITH RESPECT TO ISSUES RELATING TO REAL PROPERTY FOR PROPERTIES LOCATED IN A

SPECIFIC STATE, THE LAWS OF SUCH STATE SHALL GOVERN). THE PARTIES AGREE THAT THE APPROPRIATE, EXCLUSIVE AND CONVENIENT FORUM FOR ANY DISPUTES BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT, THE ASSOCIATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE IN ANY FEDERAL OR STATE COURT WITH SUBJECT MATTER JURISDICTION LOCATED IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS SOLELY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY ASSOCIATED AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE OTHER PARTY. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH PARTY WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**Exhibit " C "**
**ACCOUNTING PROCEDURE**
**JOINT OPERATIONS**

Attached to and made part of that certain Operating Agreement dated [ ] , by and among [ ] as Operator, and [ ], as Non- Operators
.

**I. GENERAL PROVISIONS**

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

**1. DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** / has the meaning set forth in the Agreement. ~~means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50% ) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.~~

**"Agreement"** means the operating agreement~~, farmout agreement, or other contract~~ between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to: 44

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
- part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

~~**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication~~

facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

**2. STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within / thirty (30) ~~fifteen (15)~~ days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within / thirty (30) ~~fifteen (15)~~ days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within / thirty (30) ~~fifteen (15)~~ days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or Discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

COPAS 2005 Accounting Procedure
Recommended by COPAS

**4. ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or
(3) a government/regulatory audit, or
(4) a working interest ownership or Participating Interest adjustment.

**5. EXPENDITURE AUDITS**

A. Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter “written exceptions”) shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with The additional deadlines in Section I.5.B or I.5.C, the Operator’s waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator’s response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company’s follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company’s position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month’s written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator’s office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party’s written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations

COPAS 2005 Accounting Procedure
Recommended by COPAS

copas

reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

~~E. ☐ ***(Optional Provision – Forfeiture Penalties)*** *If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non- Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*~~

**6. APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of __all__ (__100%__) / of the Parties ~~or more Parties, one of which is the Operator, having a combined working interest of at least percent ( %)~~, which approval shall be binding on all Parties, ~~provided, however, approval of at least one (1) Non-Operator shall be required~~.

C. AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

**II. DIRECT CHARGES**

The Operator shall charge the Joint Account with the following items:



012394

1. **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2. **LABOR**

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2) Operator's employees directly employed on ~~Shore Base Facilities, Offshore Facilities, or other~~ facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3) Operator's employees providing First Level Supervision,

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, ~~or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category~~.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of

transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 (“Charging of Training Costs to the Joint Account”) for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator’s current cost of established plans for employee benefits, as described in COPAS MFI-27 (“Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation”), applicable to the Operator’s labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator’s actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 (“Awards to Employees and Contractors”) for personnel whose salaries and wages are chargeable under Section II.2.A.

**3. MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4. TRANSPORTATION**

A. Transportation of the Operator’s, Operator’s Affiliate’s, or contractor’s personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator’s warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator’s warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property.. The Operator shall consistently apply the selected alternative.

(2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

**5. SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

**6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities~~,~~ ~~Shore Base Facilities, Offshore Facilities,~~ and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed __twelve__ percent (__12__%) per annum; provided, however, depreciation shall not be charged when the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7. AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $__100,000.00__ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $__100,000.00__ in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8. DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9. LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

/ Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys / and landment for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable / to the Joint Account ~~to the extent permitted as a direct charge in the Agreement~~.

**10. TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.