# Exhibit L

**A.A.P.L. FORM 610 - 1989**

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

**January 1** , **2010** ,
year

OPERATOR **ANADARKO E&P COMPANY LP**

CONTRACT AREA **See Exhibit "A"**

**MAVERICK BASIN PROJECT**

**WORTHEY LEASE**

COUNTY ~~OR PARISH~~ OF **WEBB** , STATE OF **TEXAS**

COPYRIGHT 1989 – ALL RIGHTS RESERVED AMERICAN ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK BLVD. FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

307201

## TABLE OF CONTENTS


| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 1 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | **TITLES** | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | ~~1. Failure of Title~~ | ~~3~~ |
| | ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due~~ | ~~3~~ |
| | 3. Other Losses | 3 |
| | ~~4. Curing Title~~ | ~~3~~ |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion – **[Option No. 2]** | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | ~~11~~ |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

Case 22-90308 Document 81-34 Filed in TXSB on 06/06/22 Page 185 of 524


**TABLE OF CONTENTS**


D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: .......... 15
E. WAIVER OF RIGHTS TO PARTITION: .......... 15
~~F. PREFERENTIAL RIGHT TO PURCHASE: .......... 15~~
**IX. INTERNAL REVENUE CODE ELECTION** .......... 15
**X. CLAIMS AND LAWSUITS** .......... 15
**XI. FORCE MAJEURE** .......... 16
~~**XII. NOTICES** .......... 16~~
**XIII. TERM OF AGREEMENT [Option No. 1]** .......... 16
**XIV. COMPLIANCE WITH LAWS AND REGULATIONS** .......... 16
A. LAWS, REGULATIONS AND ORDERS: .......... 16
B. GOVERNING LAW: .......... 16
C. REGULATORY AGENCIES: .......... 16
**XV. MISCELLANEOUS** .......... 17
A. EXECUTION: .......... 17
B. SUCCESSORS AND ASSIGNS: .......... 17
C. COUNTERPARTS: .......... 17
D. SEVERABILITY .......... 17
**XVI. OTHER PROVISIONS** .......... 17

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between **Anadarko E&P Company LP**, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**

**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. ~~The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.~~

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas. **S. See Article XVI for additional defined terms.**

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**

**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

__x__ A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

(6) Burdens on production.

_____ B. Exhibit "B," Form of Lease. **There is no Exhibit "B".**

__x__ C. Exhibit "C," Accounting Procedure.

__x__ D. Exhibit "D," Insurance.

__x__ E. Exhibit "E," Gas Balancing Agreement.

__x__ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

__x__ G. Exhibit "G," ~~Tax Partnership~~ **Geological Well Data Requirements.**

__x__ H. ~~Other:~~**Exhibit "H", Form of Memorandum of Operating Agreement, Mortgage and Financing Statement**

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**

**INTERESTS OF PARTIES**

**A. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, ______ **25%** ______ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," --such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

**ARTICLE IV.**

**TITLES**

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys / and landmen for title examination / and/or curative work (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

~~Each party~~ / Operator shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests ~~contributed by such party~~. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys / and landmen which are associated with hearings before governmental agencies, / or with securing curative matters and so forth as provided above and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

~~1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,~~

~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and~~

~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above~~, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

~~4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.~~



012856

## ARTICLE V.
## OPERATOR

**A. Designation and Responsibilities of Operator:**

__Anadarko E&P Company LP__ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as provided ~~to the type of operation to be undertaken in accordance with the election procedures contained~~ in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of a party or ~~two (2) or more~~ parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder~~, including but not limited to the Initial Well~~:

(a) Operator / **shall put forth a good faith effort to notify** ~~will promptly advise~~ Non-Operators / **in advance** of the date on which the well is / **scheduled to be** spudded, or the date on which drilling operations / **to be** ~~are~~ commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: / **If prepared by Opertor, and upon** ~~Upon~~ request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A. ~~Initial Well:~~**

~~On or before the ______ day of ____________________, _________, Operator shall commence the drilling of the Initial Well at the following location:~~

~~and shall thereafter continue the drilling of the well with due diligence to~~

~~The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area~~ other than the Initial Well~~, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone



012858

under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the / the surface and bottom hole locations, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall ~~have~~ / respond within thirty (30) days after receipt of the notice ~~within which~~ to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. <u>Operations by Less Than All Parties:</u>

(a) <u>Determination of Participation.</u> If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) <u>Relinquishment of Interest for Non-Participation.</u> The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) __200__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) __400__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __200__ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage **and the proportionate share of plugging and abandoning which each party would have paid if the well had been plugged at the time each party participated in an operation on the well.**

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. **No less often than once each calendar quarter thereafter, during the time the** ~~Each month thereafter, during the time the~~ Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding ~~month~~ **quarter**. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C." **The provisions of this subparagraph VI.B.5. will not apply to wells drilled as horizontal wellbores.**

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ ~~Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.~~

☑ / Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Fifty Thousand _____ Dollars ($__ 50,000.00 __) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of _____ Fifty Thousand _____ Dollars ($__ 50,000.00 __). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least __ 50 __% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be



012862

Case 22-30508 Document 6-3 Filed in TXSB on 08/26/22 Page 19 of 184


plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within ~~sixty~~ thirty(30) ~~(60)~~ days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within thirty ~~sixty~~ (30) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing __51__ % of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☑ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators within 30 days of / ~~upon reasonable~~ request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ ~~Option No. 2: No Gas Balancing Agreement:~~

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.



012864

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement **(including a photographic or other reproduction hereof)** / or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within **thirty** / ~~fifteen~~ **(30)** / ~~(15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered



012865

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.~~ Operator and billed to the joint account. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.23.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

~~Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.~~

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby;. / **Such lease is to be in a form mutually agreeable to the assigning party and the parties receiving the assignment.** ~~such lease to be on the form attached hereto as Exhibit "B."~~ Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.



012867

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~**F. Preferential Right to Purchase:**~~

~~☐ (Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed **Fifty Thousand** Dollars (**$ 50,000.00**) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.



012868

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

~~All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.~~

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within __________ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination

Upon termination of this agreement **as to all or any portion of the Contract Area** and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Texas_____ shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.
## MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. ~~Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.~~

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS



012870

## ARTICLE XVI.
## SPECIAL PROVISIONS

**Priority of Agreements**

1) This Agreement is subject to the terms and provisions of that certain Joint Exploration Agreement by and between Anadarko E&P Company LP and TXCO Energy Corp. (the "JEA"). In the event of conflict between the JEA and this Agreement, the provisions of the JEA shall control.

2) In the event of conflict between the provisions of this Article XVI and any other provision of this Agreement or its Exhibits, the provisions of this Article XVI. shall control.

**Notice**

1) Requirements. Each party giving or making any notice, request, demand, or other communication (each, a "Notice") pursuant to this Agreement shall give such Notice in writing and shall use one of the following methods of delivery: personal delivery, Registered or Certified Mail (in each case, return receipt requested and postage prepaid), nationally recognized overnight courier (with all fees prepaid), facsimile, or electronic transmission.

2) Addresses. Any party giving a Notice shall address such Notice to the receiving party (the "Addressee") at the address and to the individual provided on Exhibit "A" attached hereto or at such other address and/or to such other individual as previously designated by the Addressee in a Notice.

a. Except as specifically provided elsewhere in this Agreement, a Notice is effective only if the party giving or making such Notice has complied with paragraphs 1 and 2 of this Article XVI.B and if the Addressee has received, or been deemed to have received the Notice.

b. A Notice is deemed to have been received as follows:

i. If a Notice is delivered in person, upon receipt as indicated by the date on the signed receipt;

ii. If a Notice is sent by Registered or Certified Mail, upon the earlier of (1) receipt as indicated by the date on the signed receipt or (2) five days after such Notice is deposited in the mail;

iii. If a Notice is sent by nationally recognized overnight courier, upon receipt as indicated by the date on the signed receipt;

iv. If a Notice is sent by facsimile, upon receipt by the party giving or making such Notice of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the Addressee's facsimile number;

v. If a Notice involving an item that causes a response period or other time period set forth in this Agreement (a "time-sensitive matter") to commence is sent by electronic transmission (as defined below), upon the notifying party's receipt of a response from the Addressee by electronic transmission or other written or facsimile recognition of receipt of such electronic transmission;

vi. If a Notice involving an item other than a time-sensitive matter is sent by electronic transmission (as defined below), when transmitted if transmitted prior to 9:00 a.m. on a business day, and otherwise on the next business day following transmission; and

vii. If the Addressee rejects or otherwise refuses to accept a Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given to the party attempting to give or make such Notice, then upon the rejection, refusal, or inability to deliver.

Notwithstanding the foregoing subsections i. through vii above, except as expressly provided to the contrary in subsection v above, if a Notice is received after 5:00 P.M. on a business day where the Addressee is located, or on a day that is not a business day where the Addressee is located, such Notice is deemed received at 9:00 A.M. on the next business day where the Addressee is located.

3) Electronic Transmissions. Each of the parties hereto agrees that: any Notice transmitted by electronic transmission shall be treated in all manner and respects as an original written document; and any such Notice shall be considered to have the same binding and legal effect as a Notice sent by other approved means. Each of the parties further agrees that they will not raise the transmission of a consent or document by electronic transmission as a defense in any proceeding or action in which the validity of such consent or document is at issue and hereby forever waives such defense. For purposes of this Agreement, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process. With respect to any Notice delivered by electronic transmission and involving a time-sensitive matter, the Addressee covenants and agrees to use its best efforts to promptly respond to any such Notice such that the Notice shall be deemed to have been received as set forth in clause "v." above.

**Other Party Acting As Operator**

If any party other than Operator is authorized pursuant to this Agreement or the JEA to perform duties contemplated by this Agreement as the duty of Operator, the party performing such duties shall be accorded all rights and privileges provided to Operator under this Agreement and such party shall fully comply with the terms and provisions of this Agreement with respect to such duties, as if such party had been designated Operator hereunder, for so long as such party is acting in such capacity.

**Proposal to Plug And Abandon**

Notwithstanding anything herein to the contrary, if no written response to a proposal to plug and abandon a well which has been completed as a producer is received by the party making such proposal within thirty (30) days of the date of the receipt of the proposal, it will be conclusively deemed for all purposes that an affirmative election to plug and abandon the well has been made.

**Priority of Operations**

When a well authorized under the terms of this agreement as a vertical well has been drilled to the objective depth authorized in the AFE ("authorized depth"), and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter: (1) a proposal to do additional logging, coring, or testing; (2) a proposal to attempt to complete the well at the authorized depth in the manner set forth in the AFE (i.e. in accordance with the casing, stimulation and other completion programs set forth in the AFE); (3) a proposal to attempt to complete the well at the authorized depth in a manner different than as set forth in the AFE; (4) a proposal to plug back and attempt to complete the well at a depth shallower than the authorized depth, with priority given to objectives in ascending order up the hole; (5) a proposal to drill the well to a depth below

the authorized depth, with priority given to objectives in descending order; (6) a proposal to sidetrack the well to a new target objective for a vertical or deviated hole, with priority given first in ascending order to targets above the authorized depth, and then in descending order to targets below the authorized depth; (7) a proposal to drill a horizontal well, with priority given first to a lateral drain hole at the authorized depth, and then to objectives in ascending order above the authorized depth, and then to objectives in descending order below the authorized depth; and (8) plugging and abandoning the well.

When a well authorized under the terms of this agreement as a horizontal well has been drilled to the authorized depth, and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter: (1) a proposal to do additional logging, coring, or testing; (2) a proposal to attempt to complete the well at the authorized depth in the manner set forth in the AFE (i.e., in accordance with the casing, stimulation and other completion programs set forth in the AFE); (3) a proposal to attempt to complete the well at the authorized depth in a manner different than as set forth in the AFE; (4) a proposal to extend the length of the lateral drain hole for a specified number of feet in the direction it is drilling, with priority given to the shortest additional length proposed by any of the participating parties; (5) a proposal to drill a new lateral drain hole in a different direction at the authorized depth; (6) a proposal to drill a new lateral drain hole at a different depth, with priority given in ascending order to objectives above the authorized depth, and then in descending order to objectives below the authorized depth; (7) a proposal to plug back and attempt to complete the well at a depth shallower than the authorized depth, with priority given to objectives in ascending order up the hole; (8) a proposal to deepen the well below the authorized depth; (9) a proposal to sidetrack the well to a new target objective, with priority given first in ascending order to objectives above the authorized depth, and then in descending order to objectives below the authorized depth; and (10) plugging and abandoning the well.

In drilling a horizontal well, the Operator shall have the right at its sole discretion to cease drilling at any time, for any reason, after it has drilled to the objective formation and has drilled laterally for a distance which is at least equal to fifty percent (50%) of the length of the total horizontal displacement (displacement from true vertical) proposed in the AFE; if in such event the well will be deemed to be at its "authorized depth" as that term is used in this agreement.

If at the time the parties are considering a proposed operation, the well is in such condition, in the Operator's judgment, that a reasonably prudent operator would not conduct such operation for fear of mechanical difficulties, placing the hole, equipment or personnel in danger of loss or injury, or fear of loss of the well for any reason without being able to attempt a completion at the authorized depth, then the proposal shall be given no priority to any proposed operation except for plugging and abandoning the well.

**Public Announcement**

There shall be no public announcements or press releases with respect to the existence of this Agreement, the negotiations between the parties in relation to this Agreement, the execution of this Agreement, the contents of this Agreement, the relationship of the parties in respect of this Agreement, or any matters governed by this Agreement without prior written approval of the text of such announcements or press release by both parties. Prior to making any such public announcement or statement, Operator and Non-Operator shall consult with each other and exercise their best efforts to: (i) agree upon the text of any joint public announcement or statement to be made by both parties; or (ii) obtain approval of the other party to the text of a public announcement or statement to be made solely by one party; and the parties agree that any agreement or approval shall not be unreasonably withheld, conditioned or delayed. Nothing contained herein shall preclude any party from making such disclosures as may be required by any federal or state law or regulation or by any stock exchange on which the shares of the party and/or its affiliated companies are listed.

**Confidentiality of Information**

All geophysical, geological or engineering data acquired by the parties under this Agreement as a result of joint operations conducted hereunder shall be kept confidential by the parties unless the release of such information to a third party is agreed upon by the parties or is required by law. Any release of information to a third party must have the prior written consent of all parties hereto and said third party must agree in writing to be bound by the provisions of this paragraph.

Subject to the provisions of Article XVI.0 (Public Announcements), nothing herein shall prohibit any party from disclosing whatever information in such manner as may be required by statute, rule or regulation, including the rules or regulations of any stock exchange on which any securities of such party or any affiliates are traded; nor shall any party be prohibited by the terms hereof from disclosing information acquired under this Agreement to any financial institution or investors providing or proposing financing to the disclosing party.

**Royalties, Overriding Royalties and Other Payments**

If a Non-Operator fails to take its share of production in kind, Operator shall pay or cause to be paid all royalties, overriding royalties, payments out of production, or other amounts or charges which may be or become payable out of production and shall charge all such payments to the account of the Party responsible therefore.

Conversely, during such time as a Non-Operator is taking its share of production in kind, such Non-Operator shall pay or cause to be paid all royalties, overriding royalties, payments out of production, or other amounts or charges which may be or become payable out of such Non-Operator's share of production, unless otherwise agreed to by Operator or the terms of the Leases prohibit such action.

**Payment of Taxes**

At and during such time or times as any Non-Operator is exercising the right to take in kind or separately dispose of its proportionate share of the production as set forth in Article VI.G, such Non-Operator shall pay or arrange for the payment of all production, severance, gathering, sales or similar taxes imposed upon such party's share.

At and during such time or times as Operator is purchasing or selling Non-Operator's proportionate part of the production, as set forth in said Article VI.G, Operator shall pay or arrange for the payment of all such production, severance, gathering, sales, or similar taxes imposed upon such party's share.

**Advance Billing.**

In addition to all rights and powers of the Operator under Article VII, Operator has the following additional rights.

1) <u>Dry Hole Costs</u> – Operator has the right to demand and receive from the parties (or any of them) in its discretion, payment in advance of their respective share or shares of the entire estimated amount of the expenses to be incurred in operations for drilling, Deepening, Sidetracking and testing of a well, up to the casing point, in the amount of the "dry hole costs" set forth on the applicable AFE. Such right may be exercised by submitting to each such party an itemized invoice of the estimated expense. Such invoice shall be submitted no earlier than thirty (30) days prior to the estimated date of spudding the applicable well and the party invoiced shall pay Operator its proportionate share of such estimated expense within thirty (30) days after receipt of such estimate and invoice, or be deemed to have gone non-consent on the proposed operations (regardless of the election the party may have otherwise made).

2) <u>Completion Costs</u> - Operator has the right to demand and receive from the parties payment in advance of their respective share or shares of the entire

estimated amount of the expenses to be incurred in operations for the Completion and equipping of a well in the amount of the "Completion Costs" set forth on the applicable AFE. Such right may be exercised by submitting to each such party an itemized invoice of the estimated expense. Such invoice shall be submitted no earlier than three (3) days prior to the estimated date of commencing the completion operations, unless a drilling rig is on location, in which case such notice shall be submitted no earlier than twenty-four (24) hours prior to the estimated date of commencing the Completion operations. The party invoiced shall pay Operator its proportionate share of such estimated expense within thirty (30) days after receipt of such estimated invoice, or be deemed to have gone non-consent on the proposed operations (regardless of the election the party may have otherwise made).

3) Adjustments - Proper adjustment shall be made between such advance payments and the actual expenses incurred to the end that each party shall bear and pay its proportionate share of the actual expenses incurred, and no more.

**Required Wells and Operations.**

Notwithstanding anything to the contrary stated herein, the non-consent provisions pertaining to the drilling of any well drilled hereunder shall not be applicable to any well or operation which is necessary in order to perpetuate an expiring or terminating Lease or Leases or interest therein, nor shall it be applicable to any well or operation which is necessary in order to earn an additional lease or leases or interest therein pursuant to any farmout or other agreement. A well or other operation commenced within ninety (90) days prior to the date the Lease or Leases (or portions thereof) would expire in the absence of such operations and a well or other operation which must be drilled or conducted to earn or maintain a lease or farmout right shall constitute a "required well" or a "required operation". As to any such "required well" or "required operation" proposed by any party in which any other party elects not to participate, the non-participating party shall release and relinquish all of the non-participating party's interest in and to the lease or leases, farmout agreements or interest therein which would be perpetuated or earned by such "required well" or "required operation". The interest in such relinquished Leases shall be assigned by the non-participating party to the participating party and such interest shall be free of any Subsequently Created Interest(s) which may have placed thereon by the non-participating party. If at any time there is more than one location proposed for the drilling of a required well, the parties agree that the location proposed for a required well with the shallowest formation within the Contract Area, which would serve to perpetuate or earn the subject Lease or interest, shall take precedence.

Nothing herein, however, shall ever be construed so as to require an assignment of any such nonparticipating party's interest in any wells or units then producing in which it has an interest.

Such relinquishment of Leases shall not relieve the relinquishing party from any obligation, liability or responsibility theretofore incurred.

**Right to Propose Operations.**

Notwithstanding anything to the contrary contained herein, only parties with a current working interest in a well may propose a drilling, completing, recompleting, reworking, deepening, sidetracking or plugging back operation to such well.

**Termination of Agreement as to Certain Lands.**

If, during the term hereof, any Lease becomes owned by less than all parties to this agreement, then such Lease shall be excluded from this agreement from and after the date on which less than all parties own such Lease, and if, at the time such Lease is excluded from this agreement, it is then owned by more than one party to this agreement, it shall be subject to a separate Operating Agreement in the form of this agreement, with the parties

who then jointly own such Lease being the only parties to such separate Operating Agreement. In addition, and notwithstanding any other provisions of this agreement to the contrary, including but not limited to the definition of "Contract Area" contained in Article I.C. of this agreement, the parties agree that the Contract Area shall be contracted from time to time during the term of this agreement in order to delete therefrom any Lease or any part thereof, as to lands or depths or both, that has: (i) been released; (ii) expired or terminated (and not thereafter been jointly acquired by all of the parties pursuant to Article VIII. B above); and/or (iii) become owned by less than all parties to this agreement, with the effect of such contraction being that the lands located within the Contract Area and which are attributable to such Lease shall thereafter be excluded from the Contract Area during the remaining term of this agreement; provided that in the event any Lease that has been excluded from this agreement as aforesaid becomes jointly owned by all parties to this agreement during the term hereof, then such Lease shall, again, become subject to this agreement and the Contract Area shall be revised to so account for such Lease

**[END OF ARTICLE XVI]**

IN WITNESS WHEREOF, this agreement shall be effective as of the **1st** day of **January**, **2010**.

~~_______________, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _______________, have been made to the form.~~

**ATTEST OR WITNESS:**

**OPERATOR**

**ANADARKO E&P COMPANY LP**

By ____________________

Laurie A. McNamara
Type or print name

Title Land Manager

Date 3/2/2010

Tax ID or S.S. No. ____________________

**NON-OPERATORS**

**ST. MARY LAND & EXPLORATION COMPANY**

By ____________________

Greg T. Leyendecker
Type or print name

Title Vice President & Regional Manager

Date 1-7-2010

Tax ID or S.S. No. ____________________

____________________

By ____________________

____________________
Type or print name

Title ____________________

Date ____________________

Tax ID or S.S. No. ____________________

____________________

By ____________________

____________________
Type or print name

Title ____________________

Date ____________________

Tax ID or S.S. No. ____________________



012877

## ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ______________ )

) ss.

County of ____________ )

This instrument was acknowledged before me on

____________________________________________ by ____________________________________________

(Seal, if any) ____________________________________________

Title (and Rank) ______________________________

My commission expires: ________________________

Acknowledgment in representative capacity:

State of ______________ )

) ss.

County of ____________ )

This instrument was acknowledged before me on

____________________________________________ by ______________________________________ as

_____________ of ________________________________________________________________________ .

(Seal, if any) ____________________________________________

Title (and Rank) ______________________________

My commission expires: ________________________



012878

# EXHIBIT "A"

To that certain Joint Operating Agreement dated January 1, 2010, by and between Anadarko E&P Company, LP, as Operator, and St. Mary Land & Exploration Company, as Non-Operator, in Webb County, Texas.

## I. LANDS SUBJECT TO THIS AGREEMENT:

Those lands described in the lease described in V below.

## II. RESTRICTIONS AS TO DEPTHS, FORMATIONS AND OPERATIONS:

None.

## III. ADDRESS OF THE PARTIES FOR NOTICE PURPOSES:

**Anadarko E&P Company LP**
1201 Lake Robbins Drive
The Woodlands, Texas 77380
P.O. Box 1330
Houston, Texas 77251-1330
Attn: Land Department
Office 832/636-1000
Fax 832/636-0559
Mark.Heathcote@Anadarko.com

**St. Mary Land & Exploration Company**
777 North Eldridge Parkway
Suite 1000
Houston, Texas 77079
Attn: Land Department
Office 281/677-2800
Fax 281/677-2810
kkindrick@stmaryland.com

## IV. INTEREST OF THE PARTIES:

| PARTY | WORKING INTEREST |
|---|---|
| ST. MARY LAND & EXPLORATION COMPANY | 37.00% |
| ANADARKO E&P COMPANY LP | 63.00% |
| | 100.0% |

## V. OIL AND GAS LEASE SUBJECT TO THIS AGREEMENT:

1. Oil and Gas Lease dated effective March 1, 2009, by and between Worthey Properties, Ltd., a Texas Limited Partnership, as Lessor, and St. Mary Land & Exploration Company, as Lessee, covering 5,470.072 acres of land, more or less, a Memorandum of Oil and Gas Lease being recorded in Volume 2750, Page 95 of the Official Records of Webb County, Texas.

Case 23-30508 Document 681-12 Filed in TXSB on 08/26/22 Page 121 of 1684

# EXHIBIT "B"

Attached to and made a part of that Operating Agreement dated January 1, 2010, by and between Anadarko E&P Company LP, as Operator and St. Mary Land & Exploration Company, as Non Operator.

THERE IS NO EXHIBIT "B" TO THIS AGREEMENT

copas

# EXHIBIT " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

Attached to and made part of <u>that certain Joint Operating Agreement dated January 1, 2010, by and between Anadarko E&P as Operator and St. Mary Land & Exploration Company, as non-operator.</u>

## I. GENERAL PROVISIONS

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

### 1. DEFINITIONS

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



012881

copas

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties

## 2. STATEMENTS AND BILLINGS

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or
(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or
(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or
(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4. ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or
(3) a government/regulatory audit, or
(4) a working interest ownership or Participating Interest adjustment.

**5. EXPENDITURE AUDITS**

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

*E.* ☐ ***(Optional Provision – Forfeiture Penalties)***
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

## 6. APPROVAL BY PARTIES

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of ___Two___ (__2__) or more Parties, one of which is the Operator, having a combined working interest of at least __Sixty-One__ percent (__61__%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C. AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1. RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2. LABOR**

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2) Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3) Operator's employees providing First Level Supervision,

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

**3. MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4. TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

**5. SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

**6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed ___Ten___ percent (___10___%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7. AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ 75,000 If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ 50,000 in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8. DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9. LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys and land brokers for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10. TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*)

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1. OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

A. TECHNICAL SERVICES

(i) Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

☑ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 7,000 (prorated for less than a full month)

Producing Well Rate per month $ 700

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. ~~OVERHEAD—PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate ____________ percent (____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

~~(b) Operating Rate ____________ percent (____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

**2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) ___5___% of total costs if such costs are less than $100,000; plus

(2) ___3___% of total costs in excess of $100,000 but less than $1,000,000; plus

(3) ___2___% of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) ___3___% of total costs if such costs are less than $100,000; plus

(2) ___2___% of total costs in excess of $100,000 but less than $1,000,000; plus

(3) ___1___% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

### 3. AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

### 1. DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

## 2. TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property

### B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

D. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV 2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**3. DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4. SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

**2. NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**EXHIBIT D**

Attached to and made a part of the certain Joint Operating Agreement, dated January 1, 2010, by and between, Anadarko E&P Company, LP, as Operator and St. Mary Land & Exploration Company, as Non-Operator.

**INSURANCE**

A. Operator shall at all times while performing under this Agreement carry and charge to the Joint Account insurance for the those electing to be covered under the Operator's insurance, which unless otherwise agreed, shall consist of the following coverage:

1) Comprehensive General Public Liability

| | |
|---|---|
| Combined Single Limit | $15,000,000 aggregate |
| For Bodily Injury and Property Damage | $15,000,000 per occurrence |

The above subject to a deductible of $2,000,000 per occurrence

2) Operator's Extra Expense (Control of Well)

| | |
|---|---|
| Onshore wells | $20,000,000 |

The above subject to a deductible of $1,000,000 per occurrence

B. Operator and Non-operators, in relation to their respective employees and motor vehicles, shall at all times while performing under this Agreement carry the following minimum amounts of insurance:

1) Workman's Compensation in accordance with Federal law and the laws of the State in which operations will be conducted and any other applicable jurisdiction.

2) Employer's Liability:

| | | |
|---|---|---|
| a. | Bodily Injury by Accident | $1,000,000 each accident |
| b. | Bodily Injury by Disease | $1,000,000 policy limit |
| c. | Bodily Injury by Disease | $1,000,000 each employee |

3) Comprehensive Automobile Public Liability:

| | | |
|---|---|---|
| a. | Bodily Injury | $2,000,000 per occurrence |
| b. | Property Damage | $2,000,000 per occurrence |

C. No other insurance will be required other than as set forth above. Premiums associated with the insurance for the benefit of the joint account shall be charged to the joint account.

D. The insurance provided for herein for the benefit of the joint account provides for certain deductibles to be borne by the insured parties. In the event a claim is made by the Operator on behalf of the joint account, and the insurance proceeds are subject to reduction as a result of a deductible provision, said deductible amount shall be a direct charge to the joint account.

E. Non-Operator shall elect whether to be covered under Operator's insurance or to carry its own insurance. If no election has been made as of the date that is seven days prior to the spud date of a well, Non-Operator will be deemed to have elected not to be covered by Operator's insurance. If Non-Operator elects to carry its own insurance, upon the request of Operator Non-Operator shall provide a certificate of insurance confirming its insurance coverage.

NOTE: Instructions For Use of Gas Balancing Agreement MUST be reviewed before finalizing this document.

**EXHIBIT "E"**

**GAS BALANCING AGREEMENT ("AGREEMENT")**

**ATTACHED TO AND MADE PART OF THAT CERTAIN**

**OPERATING AGREEMENT DATED** January 1, 2010

**BY AND BETWEEN** Anadarko E&P Company LP, Operator

**AND** St. Mary Land & Exploration Company, as non-operator **("OPERATING AGREEMENT")**

**RELATING TO THE** CONTRACT AREA REFERENCED IN THE OPERATING AGREEMENT ~~**AREA,**~~

Webb **COUNTY/PARISH, STATE OF** Texas.

**1. DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

1.02 "Balancing Area" shall mean **(select one):**

☑ each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

~~☐ all of the acreage and depths subject to the Operating Agreement.~~

☐ ____________________

1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.16 ☐ **(Optional)** "Winter Period" shall mean the month(s) of __________ in one calendar year and the month(s) of __________ in the succeeding calendar year.

**2. BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in ~~**(Alternative 1)** ☐ Mcfs or **(Alternative 2)**~~ ☐ MMBtus.

2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

**3. RIGHT OF PARTIES TO TAKE GAS**

3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other

012897

requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following atleast __thirty__ (__30__) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying __twenty-five__ percent (__25__%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than __fifty__ percent (__50__%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ (Optional — Seasonal Limitation on Makeup — Option 1) Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the ________ (____) months immediately preceding the Winter Period.~~

~~4.2 ☐ (Optional — Seasonal Limitation on Makeup — Option 2) Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than ________ percent (____%) of its Full Share of Current Production for Makeup Gas during the Winter Period.~~

~~4.3 ☐ (Optional) Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to ________ percent (____%) of such Overproduced Party's Full Share of Current Production.~~

**5. STATEMENT OF GAS BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within forty-five (45) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

~~6.2 ☐ (Alternative 1 — Entitlements) Each Party shall pay or cause to be paid all Royalty due with respect to Royalty~~

012898

~~owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of Current Production.~~

~~6.2.1 ☐ (Optional - For use only with Section 6.2 – Alternative 1 – Entitlement) Upon written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

6.2 ☑ **(Alternative 2 - Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

**7. CASH SETTLEMENTS**

7.1 Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

~~7.3 ☐ (Alternative 1 – Direct Party-to-Party Settlement) Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.~~

7.3 ☑ **(Alternative 2 - Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.

~~7.3.1 ☐ (Optional – For use only with Section 7.3, Alternative 2 – Settlement Through Operator) Any Party shall have the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ☑ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

~~7.4 ☐ (Alternative 2 – Most Recent Sales Basis) The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1 ☑ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

7.5.2 ☑ **(Optional - Valuation for Processed Gas - Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.

~~7.5.2 ☐ (Optional – Valuation for Processed Gas – Option 2) For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.~~

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the



012899

Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.

~~7.7 Interest compounded at the rate of ______________ percent (______%) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.~~

7.8 In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.9 ☑ **(Optional - For Balancing Areas Subject to Federal Price Regulation)** That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.

~~7.10 ☐ **(Optional - Interim Cash Balancing)** At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.~~

**8. TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after thirty (30) days' prior written notice to the Operator and shall last no longer than forty-eight (48) hours.

**9. OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**10. LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

**11. AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited **but such access shall be limited to no more than two (2) weeks**. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

**12. MISCELLANEOUS**

12.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3 Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives

and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service ~~(select one) ☐ as if such Party were taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same relate to entitlement method tax computations; or ☐~~ based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations.

**13. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

~~13.2 ☐ **(Optional — Cash Settlement Upon Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least __________ (________) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within __________ (________) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.~~

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

**~~14. OTHER PROVISIONS~~**

012901

Case 22-90308 Document 6832-12 Filed in TXSB on 08/26/22 Page 53 of 1284


**~~15. COUNTERPARTS~~**

~~This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a __________ percent (_____%) therein fail(s) to execute this Agreement on or before __________, this Agreement shall not be binding upon any Party and shall be of no further force and effect.~~

IN WITNESS WHEREOF, this Agreement shall be effective as of the _______ day of __________, _____.

**ATTEST OR WITNESS:**

____________________

____________________

**OPERATOR**

____________________

BY: ____________________

____________________

Type or print name

Title ____________________

Date ____________________

Tax ID or S.S. No. ____________________

NON-OPERATORS

____________________

____________________ BY: ____________________

____________________ ____________________

Type or print name

Title ____________________

Date ____________________

Tax ID or S.S. No. ____________________

____________________

____________________ BY: ____________________

____________________ ____________________

Type or print name

Title ____________________

Date ____________________

Tax ID or S.S. No. ____________________

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ____________________ )
) ss.
County of __________________ )

This instrument was acknowledged before me on ____________________________________________

__________________________________________ by ____________________________________________

(Seal, if any) ____________________________________________

Title (and Rank) ____________________________________________

My commission expires. ____________________________________________

Acknowledgment in representative capacity:

State of ____________________ )
) ss.
County of __________________ )

This instrument was acknowledged before me on ____________________________________________

__________________________________________ by ____________________________________________ as

____________________ of ____________________________________________.

(Seal, if any) ________________

Title (and Rank) ____________________________________________

My commission expires: ____________________________________________



012903

**EXHIBIT "F"**

Attached to and made a part of the certain Operating Agreement ("Agreement") dated January 1, 2010, by and between Anadarko E&P Company LP, as Operator and St. Mary Land & Exploration Company, as Non-Operator.

The term "Contractor" as used herein shall mean the party designated or acting as Contractor, Operator, or Seller in the foregoing agreement, of which this supplement is a part.

During the performance of this contract, Contractor agrees as follows:

**FEDERAL CONTRACT REQUIREMENTS**

A. Equal Opportunity Clause (41 CFR 60-1.4)

Unless otherwise exempted in accordance with Section 204 of Executive Order 11246 or Title 41 of the Code of Federal Regulations, or unless the obligations under Executive Order 11246 or Title 41 are revoked, replaced, or changed, during the performance of this Agreement, Contractor agrees as follows:

(1) Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination, rates of pay or other forms of compensation; and selection for training, including apprenticeship. Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this non-discrimination clause.

(2) Contractor will, in all solicitations or advertisements for employees placed by or on behalf of Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3) Contractor will send to each labor union or representative of workers with which Contractor has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer advising the labor union of workers' representative of Contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965 and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) Contractor will comply with all provisions of Executive Order 11246 of September 24, 1965 and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) Contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965 and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of Contractor's non-compliance with the non-discrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) Contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance; provided,

however, that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

B. <u>Equal Opportunity for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250)</u>

The regulations in this part apply to all government contracts and subcontracts in excess of $10,000 for the purchase, sale, or use of personal property or non-personal services (including construction).

(1) The Contractor will not discriminate against any employee or applicant for employment because he or she is a special disabled veteran or veteran of the Vietnam Era in regard to any position for which the employee or applicant for employment is qualified. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified individuals without discrimination based upon their status as a special disabled veteran or veteran of the Vietnam era in all employment practices, including the following:

i. recruitment, advertising, and job application procedures;

ii. hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff and rehiring;

iii. rates of pay or any other form of compensation and changes in compensation;

iv. job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

v. leaves of absence, sick leave, or any other leave;

vi. fringe benefits available by virtue of employment, whether or not administered by the Contractor;

vii. selection and financial support for training, including apprenticeship, and on-the-job training under 38 U.S.C. 3687, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training;

viii. activities sponsored by the Contractor including social or recreational programs; and

ix. any other term, condition, or privilege of employment.

(2) The Contractor agrees to immediately list all employment openings which exist at the time of the execution of this contract and those which occur during the performance of this contract, including those not generated by this contract and including those occurring at an establishment of the Contractor other the one wherein the contract is being performed, but excluding those of independently operated corporate affiliates, at an appropriate local employment service office of the state employment security agency wherein the opening occurs. Listing employment openings with the U.S. Department of Labor's America's Job Bank shall satisfy the requirement to list jobs with the local employment service office.

(3) Listing of employment openings with the local employment service office pursuant to this clause shall be made at least concurrently with the use of any other recruitment source or effort and shall involve the normal obligations which attach to the placing of a *bona fide* job order, including the acceptance of referrals of veterans and nonveterans. The listing of employment openings does not require the hiring of any particular job applicants or from any particular group of job applicants, and nothing herein is intended to relieve the Contractor from any requirements in Executive orders or regulations regarding nondiscrimination in employment.

(4) Whenever the Contractor becomes contractually bound to the listing provisions in paragraphs 2 and 3 of this clause, it shall advise the state employment security agency in each state where it has establishments of the name and location of each hiring location in the state: *Provided*, That this requirement shall not apply to state and local governmental contractors. As long as the Contractor is contractually bound to these provisions and has so advised the state

agency, there is no need to advise the state agency of subsequent contracts. The Contractor may advise the state agency when it is no longer bound by this contract clause.

(5) The provisions of paragraphs 2 and 3 of this clause do not apply to the listing of employment openings which occur and are filled outside of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands.

(6) As used in this clause:

i. *All employment openings* includes all positions except executive and top management, those positions that will be filled from within the Contractor's organization, and positions lasting three days or less. This term includes full-time employment, temporary employment of more than three days' duration, and part-time employment.

ii. *Executive and top management* means any employee:

(a) Whose primary duty consists of the management of the enterprise in which he or she is employed or of a customarily recognized department or subdivision thereof; and

(b) who customarily and regularly directs the work of two or more other employees therein; and

(c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) who customarily and regularly exercises discretionary powers; and

(e) who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his or her hours of work in the work week to activities which are not directly and closely related to the performance of the work described in (a) through (d) of this paragraph 6.ii.; *Provided*, that (e) of this paragraph 6.ii. shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he or she is employed.

iii. *Positions that will be filled from within the Contractor's organization* means employment openings for which no consideration will be given to persons outside the Contractor's organization (including any affiliates, subsidiaries, and parent companies) and includes any openings which the Contractor proposes to fill from regularly established "recall" lists. The exception does not apply to a particular opening once an employer decides to consider applicants outside of his or her own organization.

(7) The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

(8) In the event of the Contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

(9) The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Deputy Assistant Secretary for Federal Contract Compliance Programs, provided by or through the contracting officer. Such notices shall state the rights of applicants and employees as well as the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified employees and applicants who are special disabled veterans or veterans of the Vietnam era. The Contractor must ensure that applicants or employees who are special disabled veterans are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually

disabled individual, or may lower the posted notice so that it might be read by a person in a wheelchair).

(10) The Contractor will notify each labor organization or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, and is committed to take affirmative action to employ and advance in employment qualified special disabled veterans and veterans of the Vietnam era.

(11) The Contractor will include the provisions of this clause in every subcontract or purchase order of $10,000 or more, unless exempted by the rules, regulations, or orders of the Secretary issued pursuant to the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the Deputy Assistant Secretary for Federal Contract Compliance Programs may direct to enforce such provisions, including action for noncompliance.

C. Equal Opportunity For Workers With Disabilities (41 CFR 60.741.5)

Except as provided in 41 CFR 741.40 (Affirmative Action Program Requirement), this provision applies to all non-exempt contracts and subcontracts which exceed $10,000.

(1) The Contractor will not discriminate against any employee or applicant for employment because of physical or mental disability in regard to any position for which the employee or applicant for employment is qualified. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified disabled individuals without discrimination based upon their physical or mental disability in all employment practices, including the following:

i. recruitment, advertising, and job application procedures;

ii. hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff and rehiring;

iii. rates of pay or any other form of compensation and changes in compensation;

iv. job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

v. leaves of absence, sick leave, or any other leave;

vi. fringe benefits available by virtue of employment, whether or not administered by the Contractor;

vii. selection and financial support for training, including apprenticeship, professional meetings, conferences and other related activities, and selection for leaves of absence to pursue training;

viii. activities sponsored by the Contractor including social or recreational programs; and

ix. any other term, condition, or privilege of employment.

(2) The Contractor agrees to comply with the rules, regulations and related orders of the Secretary of Labor issued pursuant to the Rehabilitation Act of 1973, as amended.

(3) In the event of the Contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the act.

(4) The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Deputy Assistant Secretary for Federal Contract Compliance Programs, provided by or through the contracting officer. Such

notices shall state the rights of applicants and employees as well as the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified employees and applicants with disabilities. The Contractor must ensure that applicants and employees with disabilities are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually disabled individual, or may lower the posted notice so that it might be read by a person in a wheelchair).

(5) The Contractor will notify each labor organization or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of section 503 of the Rehabilitation Act of 1973, as amended, and is committed to take affirmative action to employ and advance in employment individuals with physical or mental disabilities.

(6) The Contractor will include the provisions of this clause in every subcontract or purchase order in excess of $10,000, unless exempted by the rules, regulations, or orders of the Secretary issued pursuant to the section 503 of the Rehabilitation Act of 1973, as amended, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the Deputy Assistant Secretary for Federal Contract Compliance Programs may direct to enforce such provisions, including action for noncompliance.

AAPL – FORM 610RS 1989

**EXHIBIT "H"**

**Attached to and made a part of that certain Operating Agreement dated January 1, 2010, by and between Anadarko E&P Company LP, as Operator and St. Mary Land & Exploration Company, as Non-operator.**

**MODEL FORM RECORDING SUPPLEMENT TO OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between Anadarko E&P Company LP, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated Janaury 1, 2010 (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

   A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

   B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

   C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

   D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

   E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding

royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8. This instrument may be executed in several counterparts, each of which when so executed shall be deemed to be an original, and all of which together shall constitute but one and the same instrument; and for recordation purposes, the separate signature pages and acknowledgement certificates applicable to the separate signature pages may be affixed to the body of one of such original counterparts without the necessity of recording the entirety of each separate counterpart.

IN WITNESS WHEREOF, this agreement shall be effective as of the 1st day of January, 2010.

**OPERATOR**

**ATTEST OR WITNESS**

**ANADARKO E&P COMPANY LP**

By: Laurie A. McNamara

**Type or Print Name**

Title: Agent & Attorney-In-Fact

Date:

Address: 1201 Lake Robbins Dr., The Woodlands, TX 77380

**NON-OPERATORS**

**ATTEST OR WITNESS**

**ST. MARY LAND & EXPLORATION COMPANY**

By:

**Type or Print Name**

Title: Greg T. Leyendecker , Vice President

Date:

Address: 777 North Eldridge Parkway Suite 1000, Houston, Texas 77079

**ATTEST OR WITNESS**

By:

**Type or Print Name**

Title:

Date:

Address:

## ACKNOWLEDGMENTS

**NOTE:**

The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

### Individual Acknowledgment

State of ____________________ §

§ ss.

County of __________________ §

This instrument was acknowledged before me on ______________________________________________

by ______________________________________________________________________________

(Seal, if any) ________________________________

Title (and Rank) ______________________

My commission expires: ________________

### Acknowledgment in Representative Capacity

State of __TEXAS__________ §

§ ss.

County of Montgomery ________ §

This instrument was acknowledged before me on ______________________________________________

by ____________________________________ as Agent and Attorney-in-Fact of

Anadarko E&P Company LP ______________________________________________.

(Seal, if any) ________________________________

Title (and Rank) ______________________

My commission expires: ________________



012915

**Acknowledgment in Representative Capacity**

State of Texas §

§ ss.

County of Harris §

This instrument was acknowledged before me on ____________________

by ____________________ as ____________________ of

ST. MARY LAND & EXPLORATION COMPANY.

(Seal, if any) ____________________

Title (and Rank) ____________________

My commission expires: ____________________

**Acknowledgment in Representative Capacity**

State of Texas §

§ ss.

County of ____________ §

This instrument was acknowledged before me on ____________________

by ____________________ as ____________________ of

____________________.

(Seal, if any) ____________________

Title (and Rank) ____________________

My commission expires: ____________________

# Land > Contract > Agreement & Amendment

D0001389899

Sender Name: Tiffany Vogel
Date Created: 10/04/2010
Barcode Expires: **11/03/2010**
Department: Land Record
Security: Non-Privileged
BLACK AND WHITE DOCUMENT

| Attribute | Value |
|---|---|
| Description | ORIG EXECUTED JOA - WORTHEY LEASE |
| Document Date | 01/01/2010 |
| New Lease Packet | No |
| New Well Handoff | No |
| Contract Number | 307201 |
| Contract Type | JOINT OPERATING AGREEMENT |
| Group Code | LND |
| Prospect Name | MAVERICK BASIN EXPLORATION (APC)/A-40007411 |
| State County | TEXAS:WEBB(479) |

Create another submittal sheet:

New | Based On This One

012917

# Exhibit M

May 1, 2020

Sanchez Energy Corporation
SN UR Holdings, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

SN EF UnSub GP, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

RE: Notice of Investor Redemption Event Pursuant to Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC (“UnSub”) dated March 1, 2017 (the “LLCA”), Termination of Tolling Agreement dated August 10, 2019 (the “Tolling Agreement”) and Appointment of Additional Directors. Unless otherwise indicated, any capitalized term used in this notice has the meaning given to such term in the LLCA or the Tolling Agreement

Mr. Kopel:

Pursuant to the terms of the LLCA, following an Investor Redemption Event which has occurred, the Board of UnSub is automatically increased to seven (7) Directors, with the two additional Directors being designated by the Class B Member. Pursuant to the terms of the Tolling Agreement, GSO ST Holdings Associates LLC and GSO ST Holdings LP (collectively “GSO”) sent a notice to terminate the Tolling Agreement on April 24, 2020. In accordance with the above, the Class B Member hereby designates James Bennett and Robert Baker as the two additional Directors to the Board of UnSub without the need for any further action by the Board or the Members.

Nothing in this letter, and no other action or inaction by us or any of our Affiliates, representatives, or any other Person related to the matters set forth in this letter or related to UnSub or our investment in UnSub or any matters related thereto, shall be construed as a waiver or modification or amendment of, or shall waive, modify, amend or otherwise affect, any rights or remedies in law, at equity or otherwise, we or our Affiliates may have in any way related to UnSub or any of its Affiliates, representatives, or any other Person (whether under the Basic Documents or otherwise) and all such rights and remedies are hereby expressly reserved and retained in all respects.

**CLASS B MEMBER**:

GSO ST Holdings Associates LLC,
a Delaware limited liability company

By: ______________________________
Name: Marisa Beeney
Title: Authorized Signatory

Copy Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77002
Attention: John D. Pitts
Email: john.pitts@kirkland.com

# Exhibit N

## Filed Under Seal

# Exhibit O

# Filed Under Seal

# Exhibit P

EX-10.5 17 sn-20170331ex1059897c4.htm EX-10.5

**Exhibit 10.5**

---

**FIRST LIEN CREDIT AGREEMENT**

dated as of March 1, 2017

among

SN EF UNSUB, LP,
as the Borrower,

the several Lenders

from time to time party hereto,

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent, Collateral Agent,
and an Issuing Bank

---

JPMORGAN CHASE BANK, N.A.,
CITIGROUP GLOBAL MARKETS INC.
CAPITAL ONE, NATIONAL ASSOCIATION
RBC CAPITAL MARKETS
as Joint Lead Arrangers and Joint Bookrunners,

BMO HARRIS BANK, NA
ING CAPITAL LLC,
SUNTRUST ROBINSON HUMPHREY, INC.,
as Joint Bookrunners

---

[1] RBC Capital Markets is the global brand name of the corporate and investment banking business of Royal Bank of Canada and its affiliates.

---

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| Section 1. | Definitions. | 1 |
| 1.1 | Defined Terms. | 1 |
| 1.2 | Other Interpretive Provisions | 41 |
| 1.3 | Accounting Terms | 42 |
| 1.4 | Rounding | 43 |
| 1.5 | References to Agreements, Laws, Etc | 43 |
| 1.6 | Times of Day | 43 |
| 1.7 | Timing of Payment or Performance | 43 |
| 1.8 | Classification of Loans and Borrowings | 43 |
| 1.9 | Hedging Requirements Generally | 43 |
| 1.10 | Certain Determinations | 43 |
| 1.11 | Pro Forma and Other Calculations | 43 |
| Section 2. | Amount and Terms of Credit | 45 |
| 2.1 | Commitments | 45 |
| 2.2 | Minimum Amount of Each Borrowing; Maximum Number of Borrowings | 45 |
| 2.3 | Notice of Borrowing | 45 |
| 2.4 | Disbursement of Funds | 46 |
| 2.5 | Repayment of Loans; Evidence of Debt | 46 |
| 2.6 | Conversions and Continuations | 47 |
| 2.7 | Pro Rata Borrowings | 47 |
| 2.8 | Interest | 47 |
| 2.9 | Interest Periods | 48 |
| 2.10 | Increased Costs, Illegality, Etc | 48 |
| 2.11 | Compensation | 50 |
| 2.12 | Change of Lending Office | 50 |
| 2.13 | Notice of Certain Costs | 50 |
| 2.14 | Borrowing Base | 50 |
| 2.15 | Defaulting Lenders | 50 |
| Section 3. | Letters of Credit | 55 |
| 3.1 | Letters of Credit | 55 |
| 3.2 | Letter of Credit Applications | 56 |
| 3.3 | Letter of Credit Participations | 57 |
| 3.4 | Agreement to Repay Letter of Credit Drawings | 58 |
| 3.5 | New or Successor Issuing Bank | 59 |
| 3.6 | Role of Issuing Bank | 60 |
| 3.7 | Cash Collateral | 61 |
| 3.8 | Applicability of ISP and UCP | 61 |
| 3.9 | Conflict with Issuer Documents | 61 |
| 3.10 | Letters of Credit Issued for Restricted Subsidiaries | 61 |
| 3.11 | Increased Costs | 61 |
| Section 4. | Fees; Commitments. | 62 |
| 4.1 | Fees | 62 |
| 4.2 | Voluntary Reduction of Commitments | 62 |
| 4.3 | Mandatory Termination of Commitments | 63 |

| | | |
|---|---|---|
| Section 5. | Payments. | 63 |
| 5.1 | Voluntary Prepayments | 63 |
| 5.2 | Mandatory Prepayments | 64 |
| 5.3 | Method and Place of Payment | 65 |
| 5.4 | Net Payments | 65 |
| 5.5 | Computations of Interest and Fees | 68 |
| 5.6 | Limit on Rate of Interest | 68 |
| Section 6. | Conditions Precedent to Closing Date | 68 |
| 6.1 | Conditions Precedent to Closing Date | 68 |
| Section 7. | Conditions Precedent to Subsequent Credit Events. | 71 |
| Section 8. | Representations, Warranties and Agreements | 72 |
| 8.1 | Corporate Status | 72 |
| 8.2 | Corporate Power and Authority; Enforceability | 72 |
| 8.3 | No Violation | 72 |
| 8.4 | Litigation | 72 |
| 8.5 | Margin Regulations | 72 |
| 8.6 | Governmental Approvals; Other Consents | 72 |
| 8.7 | Investment Company Act | 73 |
| 8.8 | True and Complete Disclosure | 73 |
| 8.9 | Tax Matters | 73 |
| 8.10 | Compliance with ERISA | 73 |
| 8.11 | Subsidiaries; Equity Interests | 74 |
| 8.12 | Environmental Laws | 74 |
| 8.13 | Properties | 74 |
| 8.14 | Solvency | 75 |
| 8.15 | Security Documents | 75 |
| 8.16 | Gas Imbalances, Prepayments | 75 |
| 8.17 | Marketing of Production | 75 |
| 8.18 | Hedge Agreements | 75 |
| 8.19 | PATRIOT Act | 75 |
| 8.20 | Anti-Corruption Laws and Sanctions | 76 |
| 8.21 | No Material Adverse Effect | 76 |
| 8.22 | Financial Statements | 76 |
| 8.23 | Insurance | 76 |
| 8.24 | Use of Proceeds | 76 |
| 8.25 | Foreign Operations | 76 |
| 8.26 | Senior Debt Status | 76 |
| 8.27 | EEA Financial Institutions | 76 |
| Section 9. | Affirmative Covenants | 76 |
| 9.1 | Information Covenants | 76 |
| 9.2 | Books, Records and Inspections | 81 |
| 9.3 | Maintenance of Insurance | 82 |
| 9.4 | Payment of Taxes and Obligations under Management Services Agreement, Side Letter Agreement and Marketing Agreement | 82 |
| 9.5 | Maintenance of Existence; Compliance | 82 |
| 9.6 | Compliance with Statutes, Regulations, Etc | 82 |
| 9.7 | ERISA | 82 |
| 9.8 | Maintenance of Properties | 83 |

| | | |
|---|---|---|
| 9.9 | Additional Guarantors, Grantors and Collateral | 83 |
| 9.10 | Use of Proceeds | 84 |
| 9.11 | Further Assurances | 84 |
| 9.12 | Reserve Reports | 85 |
| 9.13 | Title Information | 86 |
| 9.14 | Compliance with Environmental Laws | 86 |
| 9.15 | Deposit Account, Securities Account and Commodity Account Control Agreements | 87 |
| 9.16 | Minimum Hedged Volumes | 87 |
| 9.17 | Separateness | 87 |
| 9.18 | Proceeds of Loans | 89 |
| 9.19 | Post-Closing Obligations | 89 |
| Section 10. | Negative Covenants. | 90 |
| 10.1 | Limitation on Indebtedness | 90 |
| 10.2 | Limitation on Liens | 92 |
| 10.3 | Limitation on Fundamental Changes | 94 |
| 10.4 | Limitation on Sale of Assets | 94 |
| 10.5 | Limitation on Investments | 96 |
| 10.6 | Limitation on Restricted Payments | 98 |
| 10.7 | Limitations on Debt Payments and Amendments | 100 |
| 10.8 | Negative Pledge Agreements | 101 |
| 10.9 | Limitation on Subsidiary Distributions | 102 |
| 10.10 | Hedge Agreements | 103 |
| 10.11 | Financial Covenants | 104 |
| 10.12 | Use of Proceeds | 105 |
| 10.13 | Restrictions on Amendments to Material Documents and GSO Preferred Equity Documentation | 105 |
| 10.14 | Transactions with Affiliates | 105 |
| 10.15 | End of Fiscal Years; Fiscal Quarters | 106 |
| 10.16 | Change in Business; Foreign Operations | 106 |
| 10.17 | Gas Imbalances, Prepayments | 106 |
| Section 11. | Events of Default | 106 |
| 11.1 | Payments | 106 |
| 11.2 | Representations, Etc | 106 |
| 11.3 | Covenants | 106 |
| 11.4 | Default Under Other Agreements | 106 |
| 11.5 | Bankruptcy, Etc | 107 |
| 11.6 | ERISA | 107 |
| 11.7 | Guarantee and Credit Agreement | 108 |
| 11.8 | Security Documents | 108 |
| 11.9 | Judgments | 108 |
| 11.10 | Change of Control | 108 |
| 11.11 | Status as Unrestricted Subsidiary | 108 |
| 11.12 | Application of Proceeds | 108 |
| 11.13 | Equity Cure | 109 |
| Section 12. | The Agents | 110 |
| 12.1 | Appointment | 110 |
| 12.2 | Delegation of Duties | 111 |
| 12.3 | Exculpatory Provisions | 111 |

| | | |
|---|---|---|
| 12.4 | Reliance by Agents | 111 |
| 12.5 | Notice of Default | 112 |
| 12.6 | Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders | 112 |
| 12.7 | Indemnification | 113 |
| 12.8 | Agents in Its Individual Capacities | 113 |
| 12.9 | Successor Agents | 113 |
| 12.10 | Withholding Tax | 114 |
| 12.11 | Security Documents and Collateral Agent under Security Documents and Guarantee | 114 |
| 12.12 | Right to Realize on Collateral and Enforce Guarantee | 115 |
| 12.13 | Administrative Agent May File Proofs of Claim | 115 |
| 12.14 | Credit Bidding | 116 |
| Section 13. | Miscellaneous | 116 |
| 13.1 | Amendments, Waivers and Releases | 116 |
| 13.2 | Notices | 119 |
| 13.3 | No Waiver; Cumulative Remedies | 119 |
| 13.4 | Survival of Representations and Warranties | 119 |
| 13.5 | Payment of Expenses; Indemnification | 119 |
| 13.6 | Successors and Assigns; Participations and Assignments | 121 |
| 13.7 | Replacements of Lenders under Certain Circumstances | 125 |
| 13.8 | Adjustments; Set-off | 126 |
| 13.9 | Counterparts | 127 |
| 13.10 | Severability | 127 |
| 13.11 | Integration | 127 |
| 13.12 | GOVERNING LAW | 127 |
| 13.13 | Submission to Jurisdiction; Waivers | 127 |
| 13.14 | Acknowledgments | 127 |
| 13.15 | WAIVERS OF JURY TRIAL | 128 |
| 13.16 | Confidentiality | 128 |
| 13.17 | Release of Collateral and Guarantee Obligations | 129 |
| 13.18 | USA PATRIOT Act | 130 |
| 13.19 | Payments Set Aside | 130 |
| 13.20 | Reinstatement | 130 |
| 13.21 | Disposition of Proceeds | 130 |
| 13.22 | Collateral Matters; Hedge Agreements | 130 |
| 13.23 | Agency of the Borrower for the Other Credit Parties | 131 |
| 13.24 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 131 |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Reserve Report Certificate |
| Exhibit B | Form of Notice of Borrowing |
| Exhibit C | Form of Guarantee |
| Exhibit D | Form of Mortgage/Deed of Trust |
| Exhibit E | Form of Collateral Agreement |
| Exhibit F | Form of Assignment and Assumption |
| Exhibit G | Form of Promissory Note |
| Exhibit H | Form of Intercompany Note |
| Exhibit I | Form of Solvency Certificate |
| Exhibit J | Form of Non-Bank Tax Certificate |
| Exhibit K | Form of Notice of Purchase Election |
| Exhibit L | Form of GSO Preferred Equity Documentation |
| Exhibit M-1 | Legal Opinion of Kirkland & Ellis LLP |
| Exhibit M-2 | Legal Opinion of Kirkland & Ellis LLP |
| Exhibit M-3 | Legal Opinion of Akin Gump Strauss Hauer & Feld |
| Exhibit N-1 | Form of the Joint Development Agreement |
| Exhibit N-2 | Form of the Management Services Agreement |
| Exhibit N-3 | Form of the Borrower's LPA |
| Exhibit N-4 | Form of the Parent LLCA |
| Exhibit N-5 | Form of the Development Agreement |
| Exhibit N-6 | Form of the Marketing Agreement |
| Exhibit N-7 | Form of the Side Letter Agreement |

SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Commitments |
| Schedule 1.1(e) | Closing Date Subsidiary Guarantors |
| Schedule 8.4 | Litigation |
| Schedule 8.11 | Subsidiaries |
| Schedule 8.13 | Properties |
| Schedule 8.16 | Closing Date Gas Imbalance |
| Schedule 8.17 | Closing Date Marketing Agreements |
| Schedule 8.18 | Closing Date Hedge Agreements |
| Schedule 9.9 | Closing Date Affiliate Transactions |
| Schedule 10.1 | Closing Date Indebtedness |
| Schedule 10.2(d) | Closing Date Liens |
| Schedule 10.5(c) | Closing Date Investments |
| Schedule 10.8 | Closing Date Negative Pledge Agreements |
| Schedule 13.2 | Notice Addresses |

**FIRST LIEN CREDIT AGREEMENT**, dated as of March 1, 2017, among SN EF UNSUB, LP, a Delaware limited partnership (the "Borrower"), the banks, financial institutions and other lending institutions from time to time parties as lenders hereto (each, a "Lender" and, collectively, the "Lenders"), JPMORGAN CHASE BANK, N.A., as administrative agent and collateral agent for the Lenders and an Issuing Bank, CITIBANK, N.A., as an Issuing Bank and each other Issuing Bank from time to time party hereto.

WHEREAS, on the date hereof, the Borrower will acquire certain oil and gas properties, rights and related assets identified on Exhibit C-2 of the Purchase and Sale Agreement (the "Acquired Assets") from the Sellers (as defined below) pursuant to the Purchase and Sale Agreement (together with all exhibits, schedules and disclosure letters thereto, the "Purchase and Sale Agreement") dated as of January 12, 2017 by and between Anadarko E&P Onshore LLC, a Delaware limited liability company and Kerr-McGee Oil & Gas Onshore LP, a Delaware limited partnership, as sellers, (collectively, the "Sellers") and the Borrower, SN EF Maverick, LLC and Aguila Production, LLC, as buyers (together with any permitted assignees under the Purchase and Sale Agreement (collectively, the "Buyers"; the acquisition of the Acquired Assets, the "Acquisition"));

WHEREAS, to fund the Acquisition, the Borrower will use (a) proceeds from the Loans, (b) the GSO Preferred Equity Proceeds and (c) proceeds from the Sanchez Cash Contribution;

WHEREAS, (a) the Borrower has requested that at any time and from time to time on or after the Closing Date and prior to the Maturity Date, the Lenders provide Loans to the Borrower subject to the Available Commitment and (b) the Borrower has requested that each Issuing Bank issue Letters of Credit (subject to the Available Commitment), at any time and from time to time prior to the L/C Maturity Date, in an aggregate Stated Amount at any time outstanding not to exceed the Letter of Credit Commitment;

WHEREAS, on the Closing Date, the proceeds of the Loans will be used by the Borrower to (a) pay a portion of the purchase price in respect of the Acquisition, (b) pay Transaction fees and expenses, (c) fund any working capital adjustment payable pursuant to the Purchase and Sale Agreement and (d) for the Borrower's general corporate or partnership purposes;

WHEREAS, following the Closing Date, (a) the proceeds of the Loans will be used by the Borrower for the Borrower's and its Restricted Subsidiaries' general corporate or partnership purposes, including capital expenditures, investments, permitted acquisitions and working capital purposes; and (b) the Letters of Credit will be used by the Borrower and its Restricted Subsidiaries (i) for general corporate and partnership purposes, (ii) to support deposits required under purchase agreements pursuant to which the Borrower or one or more Restricted Subsidiaries may acquire Oil and Gas Properties and (iii) to backstop obligations under contracts entered into from time to time incident to the Borrower's business;

WHEREAS, the Lenders and the Issuing Banks are willing to make available to the Borrower such revolving credit and letter of credit facilities upon the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

SECTION 1. DEFINITIONS.

1.1 Defined Terms.

As used herein, the following terms shall have the meanings specified below:

"ABR" shall mean for any day a fluctuating rate *per annum* equal to the highest of (a) the Federal Funds Effective Rate plus 0.50%, (b) the Prime Rate in effect on such day and (c) the LIBOR Rate for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%, provided that, for the purpose of this definition, the LIBOR Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such LIBOR Rate shall take effect at the opening of business

on the day specified in the public announcement of such change in the Prime Rate, the Federal Funds Effective Rate or such LIBOR Rate, respectively.

"ABR Loan" shall mean each Loan bearing interest based on the ABR.

"Acquired Assets" shall have the meaning provided to such term in the recitals of this Agreement.

"Acquisition" shall have the meaning provided to such term in the recitals of this Agreement.

"Additional Material Contract" shall have the meaning provided by Section 10.13(b).

"Adjusted Total Commitment" shall mean, at any time, the Total Commitment less the aggregate amount of Commitments of all Defaulting Lenders.

"Administrative Agent" shall mean JPMorgan Chase Bank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent appointed in accordance with the provisions of Section 12.9.

"Administrative Agent's Office" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify in writing to the Borrower and the Lenders.

"Administrative Questionnaire" shall mean, for each Lender, an administrative questionnaire in a form approved by the Administrative Agent.

"Advisor" shall have the meaning provided in Section 13.16.

"Affected Commodity Hedge" shall have the meaning provided in Section 2.14(f)(i).

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative thereto.

"Agent-Related Party" shall mean, with respect to any Agent, its Affiliates and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Agent and of such Agent's Affiliates.

"Agents" shall mean the Administrative Agent and the Collateral Agent.

"Agreement" shall mean this Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Alternative Equitable Partition Redetermination" shall have the meaning provided in Section 2.14(b).

"Anti-Corruption Laws" shall mean all laws, rules and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Equity Amount" shall mean, at any time (the "Applicable Equity Amount Reference Time"), an amount equal to, without duplication,

(a) the amount of any capital contributions made in cash to, or any proceeds of an equity issuance received by, the Borrower during the period (i) from and including the later of (A) the Business Day immediately following the Closing Date

and (B) the date that is 180 days prior to the Applicable Equity Amount Reference Time (ii) through and including the Applicable Equity Amount Reference Time (such time period, the "Applicable Equity Amount Reference Period"), in each case including proceeds from the issuance of Qualified Equity Interests or Qualified Preferred Equity of any direct or indirect parent of the Borrower;

minus

(b) the sum, without duplication, of:

(i) the aggregate amount of any Indebtedness incurred by the Borrower or any Restricted Subsidiary pursuant to Section 10.1 (b), during the Applicable Equity Amount Reference Period;

(ii) the aggregate amount of any Investments made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5(h) during the Applicable Equity Amount Reference Period;

(iii) the aggregate amount of any Restricted Payments made by the Borrower or any Restricted Subsidiary pursuant to Section 10.6(g) during the Applicable Equity Amount Reference Period; and

(iv) the aggregate amount of prepayments, repurchases, redemptions and defeasances made by the Borrower or any Restricted Subsidiary pursuant to Section 10.7(a)(iv) during the Applicable Equity Amount Reference Period.

"Applicable Equity Amount Reference Period" shall have the meaning provided to such term in the definition of Applicable Equity Amount contained in this Section 1.1.

"Applicable Equity Amount Reference Time" shall have the meaning provided to such term in the definition of Applicable Equity Amount contained in this Section 1.1.

"Applicable Margin" shall mean, for any day, with respect to any ABR Loan or LIBOR Loan, as the case may be, or the Commitment Fee Rate, the rate *per annum* set forth in the grid below based upon the Borrowing Base Utilization Percentage in effect on such day:

| Borrowing Base Utilization Grid | | | | | |
|---|---|---|---|---|---|
| Borrowing Base Utilization Percentage | *≤ 25%* | *>25% and ≤ 50%* | *>50% and ≤ 75%* | *>75% and ≤ 90%* | *>90%* |
| LIBOR Loans | 2.75% | 3.00% | 3.25% | 3.50% | 3.75% |
| ABR Loans | 1.75% | 2.00% | 2.25% | 2.50% | 2.75% |
| Commitment Fee Rate | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

Each change in the Commitment Fee Rate or Applicable Margin shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change.

"Applicable Reserve Report" shall have the meaning provided in Section 10.10(d).

"Approved Counterparty" shall mean (a) any Hedge Bank and (b) any other Person whose long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher.

"Approved Fund" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" shall mean (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company Petroleum Consultants, L.P., (c) Cawley, Gillespie & Associates, Inc., (d) DeGoyler and McNaugton and (e) at the Borrower's option, any other independent petroleum engineers selected by the Borrower and acceptable to the Administrative Agent.

"ASC" shall mean the Financial Accounting Standards Board Accounting Standards Codification, as in effect.

"Assignment and Assumption" shall mean an assignment and acceptance substantially in the form of Exhibit F or such other form as may be approved by the Administrative Agent.

"Attorney Costs" shall mean all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"Authorized Officer" shall mean as to any Person with respect to it or its manager, managing member or general partner ,the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operations Officer, any Vice President (including Executive and Senior Vice Presidents), the Treasurer, any equivalent officer of any of the foregoing and any other senior officer designated as such in writing to the Administrative Agent by such Person. Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"Auto-Extension Letter of Credit" shall have the meaning provided in Section 3.2(b).

"Available Commitment" shall mean, at any time, (a) the Loan Limit at such time minus (b) the aggregate Total Exposures of all Lenders at such time.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Price Deck" shall mean the Administrative Agent's forward curve for each of oil, natural gas and other Hydrocarbons, as applicable.

"Bankruptcy Code" shall have the meaning provided in Section 11.5.

"Benefited Lender" shall have the meaning provided in Section 13.8(a).

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

"Board of Directors" shall mean, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning provided in the introductory paragraph hereto.

"Borrower's LPA" shall mean the Amended and Restated Agreement of Limited Partnership of the Borrower, dated as January 12, 2017, by and among Parent, Holdings and GSO ST Holdings LP, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Borrowing" shall mean the incurrence of one Type of Loan on a given date (or resulting from conversions on a given date) having, in the case of LIBOR Loans, the same Interest Period (provided that ABR Loans incurred pursuant to Section 2.10(b) shall be considered part of any related Borrowing of LIBOR Loans).

"Borrowing Base" shall mean, at any time, an amount equal to the amount determined in accordance with Section 2.14, as the same may be adjusted from time to time pursuant to the provisions thereof.

"Borrowing Base Adjustment Provisions" shall mean (a) Sections 2.14(e), 2.14(f), 2.14(g), 2.14(h) and (b) any other provisions hereunder which adjust the amount of the Borrowing Base.

"Borrowing Base Deficiency" occurs if, at any time, the aggregate Total Exposure of all Lenders exceeds the Borrowing Base then in effect. The amount of the Borrowing Base Deficiency is the amount by which the aggregate Total Exposure of all Lenders exceeds the Borrowing Base then in effect.

"Borrowing Base Properties" shall mean the Oil and Gas Properties constituting Proved Reserves of the Credit Parties included in the Initial Reserve Report and thereafter in the Reserve Report most recently delivered pursuant to Section 9.12.

"Borrowing Base Utilization Percentage" shall mean, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the aggregate Total Exposures of all Lenders on such day, and the denominator of which is the Borrowing Base in effect on such day.

"Borrowing Base Value" shall mean, with respect to any Oil and Gas Property of a Credit Party or any Hedge Agreement of a Credit Party in respect of commodities, the value attributed to such asset in connection with the most recent determination of the Borrowing Base (which Borrowing Base was approved by each Lender or the Required Lenders, as applicable, in accordance with Section 2.14).

"Business Day" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City or Houston, Texas are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"Buyers" shall have the meaning provided to such term in the recitals of this Agreement.

"Capital Lease" shall mean, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of that Person; provided that any lease that would be characterized as an operating lease in accordance with GAAP on the Closing Date (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capital Lease) for purposes of this Agreement regardless of any change in GAAP following the Closing Date that would otherwise require such lease to be re-characterized (on a prospective or retroactive basis or otherwise) as a Capital Lease.

"Cash Collateralize" shall have the meaning provided in Section 3.7(c).

"Cash Management Agreement" shall mean any agreement entered into from time to time by the Borrower or any of the Borrower's Restricted Subsidiaries in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Cash Management Bank" shall mean any Person that either (a) at the time it provides Cash Management Services or (b) at any time after it has provided any Cash Management Services, is a Lender or an Agent or an Affiliate of a Lender or an Agent.

"Cash Management Obligations" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"Cash Management Services" shall mean (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services.

"Casualty Event" shall mean, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"Change in Law" shall mean (a) the adoption of any law, treaty, order, policy, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender with any guideline, request, directive or order enacted or promulgated after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); provided that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) and all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated in connection therewith shall be deemed to have gone into effect after the Closing Date regardless of the date adopted, enacted or promulgated and shall be included as a Change in Law.

"Change of Control" shall mean and be deemed to have occurred if:

(a) (i) neither (A) the Sanchez Permitted Holders, in the aggregate nor (B) GSO owns, in each case, directly or indirectly, beneficially, at least 50.1% of the (1) aggregate ordinary voting power (through ownership of voting securities, by contract or otherwise) represented by the issued and outstanding Equity Interests of the Parent and (2) the Class A Units (as defined in the Parent LLCA); or (ii) neither (A) the Sanchez Permitted Holders, in the aggregate nor (B) GSO has the right or ability by voting power, contract or otherwise to elect or designate at least a majority of the Directors (as defined in the Parent LLCA) of the Board of Directors of the Parent;

(b) Permitted Holders, individually or in the aggregate, cease to own, directly or indirectly, beneficially, at least 50.1% of the economic interest (through ownership of securities, by contract or otherwise) represented by the issued and outstanding Equity Interests of Borrower;

(c) (i) a "change of control" (as defined in the documentation governing any Indebtedness of the Borrower or its Restricted Subsidiaries of the type set forth in clauses (a) and (b) of the definition of Indebtedness), in each case to the extent then constituting Material Indebtedness shall have occurred or (ii) the owners of any Qualified Preferred Equity (other than GSO Controlled Preferred Equity Interests) have the right to cause the Redemption of such Qualified Preferred Equity to occur;

(d) a sale of all or substantially all assets of the Credit Parties; provided that any sale made in compliance with Section 10.4(p) shall not constitute a Change of Control;

(e) (i) Parent ceases to be the sole general partner of Borrower or (ii) Holdings ceases to own 100% of the Common Units (as defined in the Borrower's LPA) of Borrower;

(f) a Sanchez Indenture Change of Control occurs; provided that it shall not be a Change of Control pursuant to this clause (f) so long as (i) GSO beneficially owns and controls a majority of Class B Units (as defined in the Parent LLCA) and (ii) at least the majority of the Directors of the Board of Directors of the Parent have been designated by GSO; provided that GSO shall have thirty (30) Business Days from the date of such Sanchez Indenture Change of Control to satisfy clause (ii) so long as (A) GSO beneficially owns and controls a majority of the Class B Units and (B) the Board of Directors of the Parent is expanded within twenty-two (22) Business Days of such date pursuant to Section 5.3(d) of the Parent LLCA, such that GSO has the right to designate at least the majority of the Directors of the Board of Directors of the Parent; or

(g) neither (i) Sanchez nor (ii) GSO beneficially owns and controls a majority of Class B Units (as defined in the Parent LLCA).

"Closing Date" shall mean March 1, 2017.

"Closing Date Financials" shall have the meaning provided in Section 6.1(n).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning provided for such term in each of the Security Documents and shall include any and all assets securing or intended to secure any or all of the Obligations; provided that with respect to any Mortgages, "Collateral," as defined herein, shall include "Mortgaged Property" as defined therein.

"Collateral Agent" shall mean JPMorgan Chase Bank, N.A., as collateral agent under the Security Documents, or any successor collateral agent appointed in accordance with the provisions of Section 12.9.

"Collateral Agreement" shall mean the Collateral Agreement of even date herewith by and among the Borrower, the other grantors party thereto and the Collateral Agent, for the benefit of the Secured Parties, substantially in the form of Exhibit E hereto.

"Collateral Coverage Minimum" shall mean that the Mortgaged Properties represent at least 90% of the PV-9 of the Borrowing Base Properties.

"Commercial Tort Claim" shall have the meaning assigned to such term in the UCC.

"Commitment" shall mean (a) with respect to each Lender that is a Lender on the Closing Date, the amount set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Commitment" and (b) in the case of any Lender that becomes a Lender after the Closing Date, the amount specified as such Lender's "Commitment" in the Assignment and Assumption pursuant to which such Lender assumed a portion of the Total Commitment, in each case as the same may be changed from time to time pursuant to the terms of this Agreement. The aggregate amount of the Commitments as of the Closing Date is $500,000,000.

"Commitment Fee" shall have the meaning provided in Section 4.1(a).

"Commitment Fee Rate" shall mean, for any day, with respect to the Available Commitment on such day, the applicable rate *per annum* set forth next to the row heading "Commitment Fee Rate" in the definition of "Applicable Margin" in Section 1.1 and based upon the Borrowing Base Utilization Percentage in effect on such day.

"Commitment Percentage" shall mean, at any time, for each Lender, the percentage obtained by dividing (a) such Lender's Commitment at such time by (b) the amount of the Total Commitment at such time; provided that at any time when the Total Commitment shall have been terminated, each Lender's Commitment Percentage shall be the percentage obtained by dividing (i) such Lender's Total Exposure at such time by (ii) the aggregate Total Exposures of all Lenders at such time (with such Total Exposure, and the component thereof, calculated using any applicable Lender's Commitment Percentage immediately prior to the termination of the Total Commitment).

"Commodity Account" has the meaning assigned to such term in the UCC.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"Confidential Information" shall have the meaning provided in Section 13.16.

"Consolidated Current Assets" shall mean, as at any date of determination, without duplication, the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries on such date, plus the Available Commitment, but excluding (a) all non-cash assets under Accounting Standards Codification Topic No. 815, Derivatives and Hedging, (b) assets to the extent resulting from non-cash gains required under Accounting Standards Codification Topic No. 410, Asset Retirement and Environmental Obligations and (c) the current portion of current and deferred income taxes or any amounts payable as tax distributions.

"Consolidated Current Liabilities" shall mean, as at any date of determination, without duplication, the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries on such date, but excluding, without duplication, (a) all non-cash obligations under Accounting Standards Codification Topic No. 815, Derivatives and Hedging, (b) the current portion of current and deferred income taxes or any amounts payable as tax distributions, (c) the current portion of any Loans, Hedging Obligations and other Indebtedness for borrowed money, (d) current liabilities consisting of deferred revenue, (e) any non-cash liabilities recorded in connection with stock-based or similar incentive-based compensation awards or arrangements and (f) liabilities to the extent resulting from non-cash losses or charges required under Accounting Standards Codification Topic No. 410, Asset Retirement and Environmental Obligations.

"Consolidated Depreciation, Depletion and Amortization Expense" shall mean, with respect to any Person for any period, the total amount of depreciation, depletion and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of deferred financing fees, debt issuance costs and commissions, and amortization of unrecognized prior service costs and actuarial gains and losses to pensions and other post-employment benefits of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated EBITDAX" shall mean, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

(a) increased (without duplication) by the following, in each case to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(i) provision for taxes based on income or profits or capital, including, federal, state, franchise, excise, property and similar taxes and foreign withholding taxes (including the amount of distributions actually made to any Parent Entity in respect of such period in accordance with Section 10.6(c)(i)) plus

(ii) Consolidated Interest Expense for such period (in addition to, without duplication, (x) bank fees and other deferred financing fees and (y) costs of surety bonds in connection with financing activities), plus amounts excluded from Consolidated Interest Expense as set forth in clauses (i)(q) through (y) in the definition of Consolidated Interest Expense, plus

(iii) Consolidated Depreciation, Depletion and Amortization Expense for such period, plus

(iv) any other non-cash charges, including any write-offs or write-downs reducing Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (A) the Borrower may determine not to add back such non-cash charge in the current period and (B) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDAX to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), plus

(v) extraordinary, unusual and non-recurring items; provided that, any items falling within the scope of clause (a)(vi) shall be subject to the add back provided therein with respect thereto and shall not be added back pursuant to this clause (a)(v), plus

(vi) restructuring expenses and the amount of "run rate" cost savings, operating expense reductions and savings from synergies related to acquisitions, Dispositions, restructurings, cost savings initiatives and other similar initiatives that are reasonably identifiable, factually supportable and certified by the Borrower to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within twelve (12) months after such restructuring, acquisition, Disposition, cost saving initiative or other similar initiative; provided that (x) the aggregate amount pursuant to this clause (vi) in such period shall not exceed 10% of Consolidated EBITDAX for such period and (y) no amount shall be added pursuant to this clause (vi) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDAX, whether through a *pro forma* adjustment or otherwise, for such period, plus

(vii) any after-tax loss from the early extinguishment or conversion of Hedge Agreements; plus

(viii) any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or stockholders agreement, to the extent that such costs or expenses are (A) funded with cash proceeds contributed to the capital of such Person or (B) net cash proceeds of an issuance of Equity Interests of such Person (other than Disqualified Stock (excluding Qualified Preferred Equity)) and, in each case not used for any other purposes, including a Cure Amount pursuant to Section 11.13(a), plus

(ix) (A) costs and expenses incurred in connection with the Transactions and (B) costs and expenses incurred in connection with any Investments pursuant to Section 10.5(g) (which are consummated), Dispositions, issuances of Equity Interests of such Person or its Restricted Subsidiaries and Refinancings of the Facility or Specified Additional Debt after the Closing Date, plus

(x) exploration expenses or costs (to the extent the Borrower adopts the "successful efforts" method of accounting), and

(b) decreased (without duplication) by the sum of (i) all non-cash gains and (ii) any net after-tax gain from the early extinguishment or conversion of Hedge Agreements, in each case, to the extent included in determining Consolidated Net Income for such period.

For the avoidance of doubt, Consolidated EBITDAX shall be calculated, including *pro forma* adjustments, in accordance with Section 1.11.

"Consolidated Interest Expense" shall mean, with respect to any Person for any period, without duplication, the sum of:

(i) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of obligations under Hedge Agreements or other derivative instruments pursuant to GAAP), (d) the interest component of obligations under Capital Leases, and (e) net payments, if any, made (less net payments, if any, received), pursuant to interest rate Hedge Agreements with respect to Indebtedness, and excluding (q) any prepayment premium or penalty, (r) annual agency fees paid to the administrative agents and collateral agents under any credit facilities or other debt instruments or document, (s) costs associated with Hedge Agreements and breakage costs in respect of Hedge Agreements related to interest rates, (t) any expense resulting from the discounting of any Indebtedness in connection with the application of recapitalization accounting or, if applicable, recapitalization or purchase accounting in connection with the Transactions or any acquisition (or purchase of assets), (u) penalties and interest relating to taxes and any other fees related to the Transactions or any acquisitions (or purchases of assets) after the Closing Date, (v) any "additional interest" with respect to any securities, (w) amortization or expensing of deferred financing fees, amendment and consent fees, debt issuance costs, commissions, fees and expenses, (x) any amortization or expensing of bridge, commitment and other financing fees and any other fees related to the Transactions or related to any acquisitions (or purchases of assets) after the

Closing Date and (y) any accretion of accrued interest on discounted liabilities (other than Indebtedness except to the extent under clause (t) above)); plus

(ii) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(iii) interest income of such Person and its Restricted Subsidiaries for such period.

For purposes of this definition, interest on obligations in respect of Capital Leases shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such obligations in accordance with GAAP.

"Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (or loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, and otherwise determined in accordance with GAAP; provided, however, that, without duplication:

(a) the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP, shall be excluded;

(b) any net after-tax effect of gains or losses on disposal, abandonment (including asset retirement costs) or discontinuance of disposed, abandoned or discontinued operations, asset dispositions or the sale or other disposition of any equity interests of any Person, as applicable, in each case, other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded; provided that any exclusion for the discontinuance of discontinued operations held for sale shall be at the option of the Borrower pending the consummation of such sale;

(c) the net income for such period of any Person that is an Unrestricted Subsidiary or joint venture shall be excluded; provided that Consolidated Net Income of a Person that is an Unrestricted Subsidiary or a joint venture shall be included to the extent the amount of dividends, distributions or other payments that are actually paid in cash or Permitted Investments to such Person or any of its Restricted Subsidiary from income generated by such Unrestricted Subsidiary or joint ventures in respect of such period;

(d) any net after-tax effect of income (loss) from the early extinguishment or conversion of Indebtedness, shall be excluded;

(e) any non-cash equity or phantom equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation rights, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration, or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any of its direct or indirect parent companies, shall be excluded;

(f) any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with the novation of any Hedge Agreements entered into in connection with the Closing Date, shall be excluded;

(g) accruals and reserves that are established or adjusted within twelve months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within twelve months after the closing of any acquisition that are so required to be established as a result of such acquisition) in accordance with GAAP shall be excluded;

(h) any expenses, charges or losses to the extent covered by insurance (including business interruption insurance) or indemnity and actually reimbursed, or, so long as such Person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer or indemnifying party and only to the extent that such amount is in fact reimbursed within 365 days of the date of such determination (net of any amount so added back in any prior period to the extent not so reimbursed within the applicable 365-day period), shall be excluded;

(i) without duplication, an amount equal to the amount of distributions actually made to any parent or equity holder of such Person in respect of income taxes (or franchise taxes imposed in lieu of income taxes) for such period in accordance with Section 10.6(c)(i) shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(j) any net unrealized gain or loss (after any offset) resulting in such period from Hedge Agreements and the application of Accounting Standards Codification Topic No. 815, Derivatives and Hedging, shall be excluded; and

(k) contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) shall be excluded.

It is understood that all cash dividends and other cash distributions paid (excluding items eliminated in consolidation) on any series of GSO Preferred Stock, Qualified Preferred Equity or Disqualified Stock shall be excluded from Consolidated Net Income to the extent that would otherwise reduce the income of such Person and its Restricted Subsidiaries.

"Consolidated Total Assets" shall mean the total assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the most recent consolidated balance sheet of the Borrower (and, in the case of any determination relating to any incurrence of Indebtedness or any Investment or other acquisition, on a Pro Forma Basis including any property or assets being acquired in connection therewith).

"Consolidated Total Indebtedness" shall mean, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries on such date, in an amount that would be reflected on a balance sheet of the Borrower and its Restricted Subsidiaries prepared on such date on a consolidated basis in accordance with GAAP consisting of Indebtedness set forth in clauses (a), (b), (d) (in respect of unreimbursed amounts), (e) and (j) (in respect of the foregoing items) of the definition of Indebtedness.

"Consolidated Total Net Leverage Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated Total Indebtedness as of the last day of the Test Period for such date of determination, net of Unrestricted Cash as of such date up to $25,000,000, to (b) Consolidated EBITDAX for the Test Period for such date of determination (it is understood that the Consolidated Total Net Leverage Ratio shall be determined on a Pro Forma Basis and in accordance with Section 1.11(e) for the applicable Test Periods).

"Contractual Requirement" shall have the meaning provided in Section 8.3.

"Controlled Account" shall mean a Deposit Account, Securities Account or Commodity Account in the name of the Borrower or another Credit Party that is subject to a deposit account control agreement, securities account control agreement or commodity account control agreement, respectively, in form and substance reasonably satisfactory to the Collateral Agent and the account bank, securities intermediary, or commodity intermediary as applicable, for such Deposit Account, Securities Account or Commodity Account.

"Controlled Investment Affiliate" shall mean, as to any Person, any other Person, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower and/or other companies.

"Copyright" shall have the meaning assigned to such term in the Collateral Agreement.

"Credit Documents" shall mean this Agreement, the Guarantee, the Security Documents, each Letter of Credit, any promissory notes issued by the Borrower under this Agreement and any Customary Intercreditor Agreement with respect to the Facility entered into after the Closing Date to which the Collateral Agent is party.

"Credit Event" shall mean and include the making (but not the conversion or continuation) of a Loan and the issuance of a Letter of Credit.

"Credit Party" shall mean each of the Borrower and the Guarantors.

"Cure Amount" shall have the meaning provided in Section 11.13(a)(i).

"Cure Deadline" shall have the meaning provided in Section 11.13(a)(i).

"Cure Right" shall have the meaning provided in Section 11.13(a)(i).

"Current Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated Current Assets to (b) Consolidated Current Liabilities.

"Customary Intercreditor Agreement" shall mean a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and/or the Collateral Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations. Such agreement shall be posted to the Lenders not less than five (5) Business Days before execution thereof and, if the Required Lenders shall not have objected in writing to such changes within five (5) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (including with such changes) is reasonable and to have consented to such intercreditor agreement (including with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof.

"Default" shall mean any event, act or condition that constitutes an Event of Default or with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" shall have the meaning provided in Section 2.8(c).

"Defaulting Lender" shall mean any Lender whose acts or failures to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default."

"Deposit Account" shall have the meaning assigned to such term in the UCC.

"Development Agreement" shall mean the Development Agreement dated as of the date hereof among Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP, SN EF Maverick, LLC, the Borrower and Aguila Production, LLC, and solely for the purposes of Section 4.15 thereof, Sanchez, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Dispose" or "Disposed of" shall have a correlative meaning to the defined term of "Disposition".

"Disposition" shall have the meaning provided in Section 10.4.

"Disqualified Institution" shall mean (a) those Persons that have been specified in writing by the Borrower to the Administrative Agent prior to January 12, 2017, (b) any competitor of the Borrower and its Subsidiaries and any Affiliates of such competitor identified to the Administrative Agent in writing by the Borrower from time to time that are operating companies (or Affiliates of operating companies), other than their respective financial investors that are not operating companies and other than any Affiliate that is a bona fide diversified debt fund that invests in syndicated loans ("Bona Fide Debt Funds") or (c) affiliates of such Persons set forth in clauses (a) and (b) (in the case of Affiliates of such Persons set forth in clause (b), other than Bona Fide Debt Funds) that are reasonably identifiable solely on the basis of the similarity of such Affiliate's name; provided that (A) the Borrower shall be permitted to remove a Person as a Disqualified Institution by providing written notice to the Administrative Agent and (B) no Person shall retroactively become a Disqualified Institution if such Person that has previously (x) become a Lender or a Participant or committed to (or been approached to) become a Lender or a Participant or (y) entered into a trade to become a Lender or a Participant.

"Disqualified Stock" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation, scheduled redemption or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Secured Cash Management Agreements) and the termination of the Commitments and, to the extent not Satisfactorily Cash Collateralized or Backstopped, outstanding Letters of Credit, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Secured Cash Management Agreements) and the termination of the Commitments and, to the extent not Satisfactorily Cash Collateralized or Backstopped, outstanding Letters of Credit), (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in the case of each of clauses (a), (b), (c) and (d), prior to the date that is ninety-one (91) days after the Maturity Date at the time of issuance of such Equity Interests; provided, that if such Equity Interests are issued pursuant to any plan for the benefit of future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower or its Subsidiaries or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members), such Equity Interests shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; provided, further, that any Equity Interests held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any of its Restricted Subsidiaries or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower (or the compensation committee thereof), in each case pursuant to any stock subscription or shareholders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability.

"Distressed Person" shall have the meaning provided in the definition of "Lender-Related Distress Event" contained in this Section 1.1.

"Dollar-Denominated Production Payments" shall mean production payment obligations recorded as liabilities in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

"Domestic Subsidiary" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Drawing" shall have the meaning provided in Section 3.4(b).

"EEA Financial Institution" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

Case 4:23-cv-00587 Document 63-24 Filed on 04/19/23 in TXSD Page 94 of 300

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Engineering Reports" shall have the meaning provided in Section 2.14(c)(i).

"Environmental Claims" shall mean any and all of the following written actions, suits, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or proceedings arising under or based upon any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "Claims"), (i) any and all Claims by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief regarding the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"Environmental Law" shall mean any applicable Federal, state, foreign or local statute, law, legally-binding rule, regulation, ordinance, code and common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or human health or safety (to the extent relating to human exposure to Hazardous Materials).

"Environmental Permit" shall mean any permit, approval, identification number, license or other authorization required under any applicable Environmental Law for the operations of the Borrower and each of the Subsidiaries.

"Equity Contribution" shall mean the sum of (a) the GSO Preferred Equity Proceeds in an amount not less than $478,000,000 (as such amount may be reduced to give effect to any purchase price adjustments in accordance with Section 3.3 of the Purchase and Sale Agreement) and (b) the Sanchez Cash Contribution.

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing, excluding any debt security that is convertible or exchangeable into any Equity Interests (provided that any instrument evidencing Indebtedness convertible or exchangeable into Equity Interests, whether or not such debt securities include any right of participation with Equity Interests, shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower would be deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA or Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) a Reportable Event with respect to a Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the failure of the Borrower or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; (d) a failure to satisfy the minimum funding standard under Section 412 of the Code

or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (e) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA or that is in endangered or critical status, within the meaning of Section 305 of ERISA; (f) the occurrence of any event or condition that would reasonably be considered to constitute grounds under ERISA for the termination of, the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, or the commencement of proceedings by the PBGC to terminate a Plan; (g) the appointment of a trustee to administer, any Plan; (h) the imposition of any liability under Title IV of ERISA, including the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of the Borrower or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (i) a determination that any Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); or (j) the occurrence of a non-exempt prohibited transaction with respect to any Plan maintained or contributed to by any Borrower (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in material liability to the Borrower, except in each of (a) – (j) with respect to Foreign Plans.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Accounts" shall mean (a) each account all or substantially all of the deposits in which consist of amounts utilized to fund payroll, employee benefit or tax obligations of the Borrower and its Restricted Subsidiaries, (b) fiduciary accounts, (c) "zero balance" accounts, (d) trust and suspense accounts of the Borrower and the Guarantors holding royalty obligations, (e) accounts of the Borrower and the Guarantors constituting cash collateral accounts permitted under Section 10.2 (provided that any such account subject to control agreements in favor of the Collateral Agent, for the benefit of the Secured Parties, or otherwise constituting cash collateral in favor of the Collateral Agent, for the benefit of the Secured Parties shall not be an Excluded Account) and (f) other accounts selected by the Borrower and its Subsidiaries so long as the aggregate average daily maximum balance in any such other account over a 30-day period does not at any time exceed $1,000,000; provided that the aggregate daily maximum balance for all such bank accounts excluded pursuant to clauses (a) through (f) on any day shall not exceed $5,000,000.

"Excluded Assets" shall mean (a) motor vehicles and other assets subject to certificates of title (except to the extent the security interest in such assets can be perfected by the filing of an "all assets" UCC financing statement), (b) Commercial Tort Claims with an individual value less than $250,000, (c) any asset specifically requiring perfection through control, control agreements, or other control arrangements (other than (i) Equity Interests (either certificated or uncertificated) that may be perfected by control, (ii) cash, cash equivalents, Deposit Accounts, Securities Accounts and Commodity Accounts that may be perfected by a deposit account control agreement, securities account control agreement or commodity account control agreement or (iii) as may be required by Section 3.7 hereof), (d) assets (i) subject to Liens expressly permitted by Section 10.2(c) to the extent that the grant of Liens to secure the Obligations would be prohibited by an enforceable contractual provision under the Indebtedness secured by such Liens, (ii) over which the granting of Liens to secure the Obligations would be prohibited by any Requirement of Law or to the extent that such Liens would require obtaining the consent of any governmental or regulatory authority (in each case, except to the extent such prohibition is unenforceable or rendered ineffective after giving effect to applicable provisions of the UCC or other Requirements of Law and, in each case, other than proceeds thereof to the extent the assignment of such proceeds is expressly deemed effective under the UCC or other Requirements of Law notwithstanding such prohibitions), (e) any foreign collateral or credit support, (f) Excluded Equity Interests (other than in respect of Equity Interests in Immaterial Subsidiaries constituting Collateral), (g) those assets as to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of obtaining a Lien are excessive in relation to the benefit to be obtained by the Secured Parties therefrom, (h) letter of credit rights (other than to the extent a lien thereon can be perfected by filing a

customary UCC financing statement, provided that the value of the assets excluded pursuant to this clause (h) shall not exceed $1,000,000 in the aggregate, (i) any right, title or interest in any license, contract or agreement but only to the extent that such a grant would violate the terms of Requirements of Law or of such license, contract or agreement, or result in a breach of the terms of, or constitute a default under (which could not be waived by the Borrower, its parent or subsidiaries and which was not the result of an effort to circumvent the collateral requirements under the Credit Documents), any such license, contract or agreement (in each case, except to the extent such prohibition is unenforceable or rendered ineffective after giving effect to applicable provisions of the UCC or other Requirements of Law, in each case, other than proceeds thereof to the extent the assignment of such proceeds is effective under the UCC notwithstanding such prohibitions) and (j) buildings and manufactured mobile homes (each as defined in the applicable flood insurance regulations), in each case, in an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968; provided that, in each case, the Collateral shall include the proceeds of any of the foregoing unless such proceeds themselves would constitute Excluded Assets.

"Excluded Equity Interests" shall mean (a) any Equity Interests with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of pledging such Equity Interests in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (b) any Equity Interests to the extent the pledge thereof would be prohibited by any Requirement of Law or to the extent that such Liens would require obtaining the consent of any governmental or regulatory authority (in each case, except to the extent such prohibition is unenforceable or rendered ineffective after giving effect to applicable provisions of the UCC or other Requirements of Law and, in each case, other than proceeds thereof to the extent the assignment of such proceeds is expressly deemed effective under the UCC or other Requirements of Law notwithstanding such prohibitions), (c) in the case of any Equity Interests of any non-Wholly owned Subsidiary of the Borrower that does not own Borrowing Base Properties to the extent the pledge of such Equity Interests is prohibited by Specified Contractual Requirements existing on the Closing Date or at the time such Subsidiary is acquired to the extent (i) that a pledge thereof to secure the Obligations is prohibited by any Specified Contractual Requirement, (ii) any Specified Contractual Requirement prohibits such a pledge without the consent of any other party; provided that this clause (ii) shall not apply if (A) such other party is a Credit Party or a Wholly owned Subsidiary or (B) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary to obtain any such consent)) and for so long as such Specified Contractual Requirement or replacement or renewal thereof is in effect, or (iii) a pledge thereof to secure the Obligations would give any other party (other than a Credit Party or a Wholly owned Subsidiary) to any Specified Contractual Requirement governing such Equity Interests the right to terminate its obligations thereunder (provided that, in the case of Equity Interests, such Specified Contractual Requirements shall, for this purpose, not include (A) customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable Requirements of Law, (B) any such Specified Contractual Requirements entered into in contemplation of such Subsidiary being acquired, or (C) any term, covenant, condition or provision that (1) could be waived by the Borrower or its Affiliates or (2) that was the result of an effort to circumvent the collateral requirements of the Credit Documents); provided further, that this exclusion shall not apply to the proceeds of such Equity Interests to the extent that assignment of such proceeds would be effective under the Uniform Commercial Code, (d) the Equity Interests of any Immaterial Subsidiary (unless a security interest in such Subsidiary may be perfected by filing an "all assets" UCC financing statement) and any Unrestricted Subsidiary and (e) Margin Stock.

"Excluded Subsidiary" shall mean (a) each Immaterial Subsidiary, for so long as any such Subsidiary constitutes an Immaterial Subsidiary pursuant to the terms hereof, (b) each Domestic Subsidiary that is not a Wholly owned Subsidiary (for so long as such Subsidiary remains a non-wholly owned Restricted Subsidiary), (c) each Domestic Subsidiary that is prohibited by any applicable Specified Contractual Requirement (provided that such Specified Contractual Requirements shall, for this purpose, not include (i) customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable Requirements of Law, (ii) any such Specified Contractual Requirements entered into in contemplation of such entity becoming a Restricted Subsidiary, (iii) any term, covenant, condition or provision that (A) could be waived by the Borrower or its Affiliates or (B) that was the result of an effort to circumvent the requirements of the Credit Documents) or Requirement of Law from guaranteeing or granting Liens to secure the Obligations on the Closing Date or at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect and was not entered into in contemplation of such Subsidiary becoming a Restricted Subsidiary or that would require a material or non-ministerial consent, approval, license or authorization of a Governmental Authority to guarantee or grant Liens

to secure the Obligations on the Closing Date or at the time such Subsidiary becomes a Restricted Subsidiary (unless such consent, approval, license or authorization has been received)), (d) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of providing a Guarantee of the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom and (e) each Unrestricted Subsidiary.

"Excluded Swap Obligation" shall mean with respect to any Guarantor and Parent and Holdings, (a) any Hedging Obligation if, and to the extent that, and only for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor, Parent or Holdings of a security interest to secure, as applicable, such Hedging Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's, Parent's or Holdings' failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of, or grant of such security interest by, as applicable, such Guarantor, Parent or Holdings becomes or would become effective with respect to such Hedging Obligation or (b) any other Hedging Obligation designated as an "Excluded Swap Obligation" of such Guarantor, Parent or Holdings as specified in any agreement between the relevant Credit Parties and counterparty applicable to such Hedging Obligations, and agreed by the Administrative Agent. If a Hedging Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder or under any other Credit Document, (i) Taxes imposed on or measured by its net income (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code or any similar provision of state, local or foreign law), branch profits Taxes and franchise Taxes imposed on it, in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction, or as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document), (ii) U.S. federal withholding Tax imposed on any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document that is required to be imposed on amounts payable to or for the account of a Lender (including any Issuing Bank), other than to the extent such Lender is an assignee pursuant to a request by the Borrower under Section 13.7, pursuant to laws in force at the time such Lender acquires an interest in a Loan, Letter of Credit or Commitment (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Credit Party with respect to such withholding Tax pursuant to Section 5.4, (iii) any Tax attributable to the Administrative Agent's, any Lender's or any other recipient's failure to comply with Section 5.4(d), (e), (g) or (h), and (iv) any U.S. federal withholding Tax imposed under FATCA.

"Expected Cure Amount" shall have the meaning provided in Section 11.13(a)(i)(C).

"Expiration Date" shall mean the earlier of (a) 11:59 p.m., New York City time, on or prior to March 31, 2017, and (b) the consummation of the Acquisition with or without any Borrowings hereunder (except to the extent the result of a Defaulting Lender).

"Facility" shall mean this Agreement and the Commitments and the extensions of credit made hereunder.

"Fair Market Value" shall mean, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a Disposition of such asset at such date of determination assuming a Disposition by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower in good faith.

"Farm-In Agreement" shall mean an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of one or more exploratory or development wells (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well or wells as all or a part of the consideration provided in exchange for an ownership interest in an Oil and Gas Property.

"Farm-Out Agreement" shall mean a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code and any law, regulation, rule, promulgation or official agreement implementing an official government agreement with respect to the foregoing.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average rate of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Financial Officer" shall mean with respect to it or its manager, managing member or general partner, the Chief Financial Officer, Chief Accounting Officer, principal accounting officer, Controller, Treasurer or Assistant Treasurer.

"Financial Performance Covenants" shall mean the covenants of the Borrower set forth in Section 10.11.

"Flood Insurance Regulations" shall have the meaning provided in the definition of "Mortgaged Property" contained in this Section 1.1.

"Foreign Plan" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States.

"Fronting Fee" shall have the meaning provided in Section 4.1(c).

"Fund" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"Governmental Authority" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"Granting Lender" shall have the meaning provided in Section 13.6(g).

"GSO" shall mean, collectively, GSO Capital Partners, LP and funds, managed, advised or sub-advised by GSO Capital Partners LP and their respective Affiliates, but shall exclude (a) any of its operating portfolio companies (it is understood that a company whose only material asset is ownership, directly or indirectly, of Equity Interests in the Borrower shall not be an operating portfolio company for purposes of this definition) and (b) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or controlled by The Blackstone Group, L.P. and their affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.

"GSO Controlled Preferred Equity Interests" shall mean GSO Preferred Equity Interests and any Qualified Preferred Equity issued on or after the Closing Date to GSO or any other Person so long as only GSO has the right or ability (by voting power, contract or otherwise) to control the right of Redemption with respect to such Qualified Preferred Equity, including the exercise of such right.

"GSO Preferred Equity Documentation" shall mean the definitive documentation in respect of the GSO Preferred Equity Interests.

"GSO Preferred Equity Interests" shall mean the non-convertible Preferred Stock issued by the Borrower to GSO which is (a) classified as equity or mezzanine equity under GAAP, (b) pursuant to GSO Preferred Equity Documentation in form and substance consistent with and on terms consistent with Exhibit L as amended, restated, replaced or otherwise modified after the Closing Date in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof and (c) issued on the Closing Date.

"GSO Preferred Equity Proceeds" shall mean the gross proceeds from the issuance of the GSO Preferred Equity Interests.

"Guarantee" shall mean the Guarantee made by the Guarantors in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C.

"Guarantee Obligations" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guarantors" shall mean each Domestic Subsidiary listed on Schedule 1.1(e) that becomes a party to the Guarantee on the Closing Date (except to the extent released therefrom in accordance with the terms hereof) and each other Domestic Subsidiary that becomes a party to the Guarantee after the Closing Date pursuant to Section 9.9 or otherwise; provided that, for the avoidance of doubt, the Borrower in its sole discretion may cause any Restricted Subsidiary that is not required to be a Guarantor hereunder or pursuant to the Security Documents to provide a Guarantee by causing such Restricted Subsidiary to execute a Guarantee and such Restricted Subsidiary shall be Guarantor and Credit Party for all purposes hereunder except to the extent released from such Guarantee in accordance with the terms hereof.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, natural gas or natural gas liquids, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas and (b)

any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law, or that would otherwise reasonably be expected to result in liability under any applicable Environmental Law, due to their dangerous or deleterious characteristics.

"Hedge Agreements" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swap, credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement. Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"Hedge Bank" shall mean any Person (other than the Borrower or any of its Subsidiaries) that (a) at the time it enters into a Hedge Agreement is a Lender or Agent or an Affiliate of a Lender or Agent, or (b) at any time after it enters into a Hedge Agreement it becomes a Lender or Agent or an Affiliate of a Lender or Agent.

"Hedging Obligations" shall mean, with respect to any Person, any obligation to pay or perform under any Swap.

"Highest Lawful Rate" shall mean, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Holdings" shall mean SN EF UnSub Holdings, LLC, a Delaware limited liability company.

"Hydrocarbon Interests" shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profits interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Immaterial Subsidiary" shall mean any Subsidiary that is not a Material Subsidiary.

"Immediate Family Members" shall mean with respect to any individual, such individual's (i) parent, stepparent, grandparent, mother-in-law or father-in-law, (ii) spouse or qualified domestic partner (or ex-spouse or ex-qualified domestic partner) and lineal descendants thereof (including by adoption), (iii) lineal descendants (including by adoption) and spouses thereof, (iv) siblings (including by adoption), spouses thereof and lineal descendants thereof (including by adoption) and (v) spouse's or qualified domestic partner's siblings (including by adoption), spouses thereof and lineal descendants thereof (including by adoption) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

“Impacted Interest Period” shall have the meaning provided to such term in the definition of LIBOR Rate contained in this Section 1.1.

“Indebtedness” of any Person shall mean the following, if and only to the extent (other than with respect to clause (g) below) the same would constitute indebtedness or a liability in accordance with GAAP, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be required to be shown as a liability on the balance sheet of such Person (other than (i) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (ii) obligations resulting under firm transportation contracts or take or pay contracts), (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) the principal component of all obligations in respect of Capital Leases and all purchase money obligations of such Person, (f) net Hedging Obligations of such Person, (g) all indebtedness (excluding prepaid interest thereon) of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (h) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase in respect of Disqualified Stock (excluding (i) accrued dividends that have not increased the liquidation preference of such Disqualified Stock and (ii) Qualified Preferred Equity), and (i) Dollar-Denominated Production Payments and Volumetric Production Payments and (j) without duplication, all Guarantee Obligations of such Person in respect of the items described in clauses (a) through (i) above; provided that Indebtedness shall not include (1) trade and other similar ordinary-course payables and accrued expenses (which are not more than 90 days past the due date of payment unless the subject of a good faith dispute), (2) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (3) Production Payments and Reserve Sales other than those described in clause (i) above, (4) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business, and (5) any obligation in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an Oil and Gas Property.

For purposes hereof, the amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (g) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the greater of (A) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith and (B) the maximum amount for which such Person may be liable in respect of such Indebtedness.

“Indemnified Liabilities” shall have the meaning provided in Section 13.5(b).

“Indemnified Taxes” shall mean all Taxes imposed on or with respect to any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document other than (a) Excluded Taxes and (b) Other Taxes.

“Indemnitees” shall have the meaning provided in Section 13.5(b).

“Industry Investment” shall mean Investments and/or expenditures made in the ordinary course of, and of a nature that is or shall have become customary in, the Oil and Gas Business as a means of actively engaging therein through agreements, transactions, interests or arrangements that permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of Oil and Gas Business jointly with third parties, including: (a) ownership interests (directly or through equity) in oil and gas properties or gathering, transportation, processing, or related systems; and (b) Investments and/or expenditures in the form of or pursuant to operating agreements, processing agreements, Farm In Agreements, Farm Out Agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling arrangements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), and other similar agreements (including for limited liability companies) with third parties.

"Information" shall have the meaning provided in Section 8.8(a).

"Initial Reserve Report" shall mean, collectively the reserve engineers' reports (a) evaluating the Proved, Developed, Producing Reserves and (b) evaluating the proved, developed non-producing and proved, undeveloped reserves, in each case, of the Acquired Assets and the oil and gas properties of the Borrower and its subsidiaries, each prepared by Ryder Scott Company Petroleum Consultants, L.P., dated as of July 1, 2016.

"Intercompany Note" shall mean the Intercompany Subordinated Note, dated as of the Closing Date, substantially in the form of Exhibit H executed by the Borrower and each other Subsidiary of the Borrower.

"Interest Period" shall mean, with respect to any Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"Interim Redetermination" shall have the meaning provided in Section 2.14(b).

"Interim Redetermination Date" shall mean the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.14.

"Interpolated Rate" shall have the meaning provided to such term in the definition of LIBOR Rate contained in this Section 1.1.

"Investment" shall have the meaning provided in Section 10.5.

"Investment Grade Rating" shall mean a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other rating agency selected by the Borrower.

"IRS" shall have the meaning provided in Section 5.4(e)(i).

"ISP" shall mean, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" shall mean, with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the applicable Issuing Bank and the Borrower (or any Restricted Subsidiary) or in favor of the applicable Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" shall mean (a) JPMorgan Chase Bank, N.A. and any of its Affiliates, (b) Citibank, N.A. and any of its Affiliates and (c) if requested by the Borrower and reasonably acceptable to the Administrative Agent, any other Person who is a Lender at the time of such request and who accepts such appointment (it being understood that, if any such Person ceases to be a Lender hereunder, such Person will remain an Issuing Bank with respect to any Letter of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender). References herein and in the other Credit Documents to an Issuing Bank shall be deemed to refer to the Issuing Bank in respect of the applicable Letter of Credit or to all Issuing Banks, as the context requires. Any Lender may, from time to time, become an Issuing Bank under this Agreement with the protections and rights afforded to Issuing Banks hereunder by executing a joinder, in a form reasonably satisfactory to (and acknowledged and accepted by) the Administrative Agent and the Borrower, indicating such Lender's "Letter of Credit Commitment" and upon the execution and delivery of any such joinder, such Lender shall be an Issuing Bank for all purposes hereof.

"Joint Development Agreement" shall mean the Joint Development Agreement dated as the date hereof by and between SN EF Maverick, LLC, a Delaware limited liability company, the Borrower and Aguila Production, LLC, a Delaware limited liability company and, solely for the purposes of Section 2.2, Section 4.5, and Article VII thereof, Sanchez, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Junior Debt" shall have the meaning provided in Section 10.7(a).

"Junior Liens" shall mean Liens on the Collateral (other than Liens securing the Obligations) that are subordinated in all respects to the Liens granted under the Credit Documents pursuant to a Customary Intercreditor Agreement (it being understood that Junior Liens are not required to be *pari passu* with other Junior Liens, and that Indebtedness secured by Junior Liens may have Liens that are senior in priority to, or *pari passu* with, or junior in priority to, other Liens constituting Junior Liens).

"L/C Borrowing" shall mean an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing. All L/C Borrowings shall be denominated in Dollars.

"L/C Maturity Date" shall mean the date that is five Business Days prior to the Maturity Date.

"L/C Obligations" shall mean, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unpaid Drawings, including all L/C Borrowings. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"L/C Participant" shall have the meaning provided in Section 3.3(a).

"L/C Participation" shall have the meaning provided in Section 3.3(a).

"Lead Arranger" shall mean each of JPMorgan Chase Bank, N.A., Citigroup Global Markets Inc., Capital One, National Association and RBC Capital Markets, in its capacity as a joint lead arranger and joint bookrunner in respect of the Facility.

"Lender" shall have the meaning provided in the introductory paragraph to this Agreement.

"Lender Default" shall mean (a) the refusal or failure of any Lender to make available its portion of any incurrence of Loans or participations in Letters of Credit, which refusal or failure is not cured within two Business Days after the date of such refusal or failure; (b) the failure of any Lender to pay over to the Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, unless the subject of a good faith dispute; (c) a Lender has notified the Borrower or the Administrative Agent that it does not intend or expect to comply with any of its funding obligations or has made a public statement to that effect with respect to its funding obligations under the Facility; (d) the failure by a Lender to confirm in a manner reasonably satisfactory to the Administrative Agent that it will comply with its obligations under the Facility, which failure is not cured after the date of such failure or (e) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"Lender-Related Distress Event" shall mean, with respect to any Lender, that such Lender or any Person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; or such Distressed Person becomes the subject of a Bail-In Action; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof; provided, further, that the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or an entity that directly or indirectly controls a Lender under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation) shall not result in a Lender being deemed a Distressed Person, so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs

of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Letter of Credit" shall have the meaning provided in Section 3.1(a).

"Letter of Credit Application" shall have the meaning provided in Section 3.2(a).

"Letter of Credit Commitment" shall mean $50,000,000, as the same may be reduced from time to time pursuant to Section 3.1.

"Letter of Credit Exposure" shall mean, with respect to any Lender, at any time, the sum of (a) the principal amount of any Unpaid Drawings in respect of which such Lender has made (or is required to have made) payments to the applicable Issuing Bank pursuant to Section 3.4(a) at such time and (b) such Lender's Commitment Percentage of the Letters of Credit Outstanding at such time (excluding the portion thereof consisting of Unpaid Drawings in respect of which the Lenders have made (or are required to have made) payments to the applicable Issuing Bank pursuant to Section 3.4(a)), minus the amount of cash or deposit account balances held by the Administrative Agent to Cash Collateralize outstanding Letters of Credit and Unpaid Drawings under Section 3.7.

"Letter of Credit Fee" shall have the meaning provided in Section 4.1(b).

"Letters of Credit Outstanding" shall mean, at any time, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding Letters of Credit and (b) the aggregate principal amount of all Unpaid Drawings in respect of all Letters of Credit.

"LIBO Screen Rate" shall have the meaning provided to such term in the definition of LIBOR Rate contained in this Section 1.1.

"LIBOR Loan" shall mean any Loan bearing interest at a rate determined by reference to the LIBOR Rate (other than an ABR Loan bearing interest by reference to the LIBOR Rate by virtue of clause (c) of the definition of ABR).

"LIBOR Rate" shall mean, for any Interest Period with respect to any Borrowing of a LIBOR Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event that such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as shall be selected by the Administrative Agent in its reasonable discretion), in each case (the "LIBO Screen Rate") as of 11:00 A.M. (London time) two (2) Business Days prior to the commencement of such Interest Period; provided that if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars, then the LIBOR Rate shall be the Interpolated Rate at such time; provided further that if the LIBO Screen Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement. "Interpolated Rate" shall mean, at any time, the rate *per annum* determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which that LIBO Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available in Dollars) that exceeds the Impacted Interest Period, in each case, at such time; provided that if the Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Lien" shall mean, with respect to any asset, (a) any mortgage, preferred mortgage, deed of trust, lien, notice of claim of lien, hypothecation, pledge, charge, security interest or similar encumbrance in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or (c) Production Payments and Reserve Sales and the like payable out of Oil and Gas Properties; provided that in no event shall an operating lease be deemed to be a Lien.

"Liquidity" shall mean, as of any date of determination, the sum of (a) the Available Commitment on such date and (b) the aggregate amount of Unrestricted Cash of the Borrower and the Restricted Subsidiaries at such date, less the amount of any Borrowing Base Deficiency existing on such date of determination.

"Loan" shall have the meaning provided in Section 2.1(a).

"Loan Limit" shall mean, at any time, the lesser of (a) the Total Commitment at such time and (b) the Borrowing Base at such time (including as it may be reduced pursuant to Section 2.14(h)).

"Majority Lenders" shall mean, at any date, (a) Non-Defaulting Lenders having or holding a majority of the Adjusted Total Commitment at such date, or (b) if the Total Commitment has been terminated or for the purposes of acceleration pursuant to Section 11, Non-Defaulting Lenders having or holding a majority of the outstanding principal amount of the Loans and Letter of Credit Exposure (excluding the Loans and Letter of Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Management Services Agreement" shall mean the Management Services Agreement dated as of the date hereof by and between the Borrower and Sanchez O&G, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Margin Stock" shall have the meaning assigned to such terms in Regulation U.

"Marketing Agreement" shall mean the Hydrocarbons Purchase and Marketing Agreement dated as of the date hereof between SN EF Maverick, LLC, a Delaware limited liability company and the Borrower, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Material Adverse Effect" shall mean a material adverse change in, or material adverse effect on (a) the business, assets, operations, properties or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the ability of the Credit Parties, taken as a whole, to perform their material obligations under the Credit Documents, (c) the validity or enforceability of any material Credit Document or (d) the rights and remedies of the Administrative Agent and the Lenders under the Credit Documents.

"Material Contracts" shall mean, collectively, the material commercial contracts of the Borrower and its Restricted Subsidiaries, limited to (a) the Joint Development Agreement, (b) the Management Services Agreement, (c) the Borrower's LPA, (d) the Parent LLCA, (e) the Development Agreement, (f) the Marketing Agreement, (g) the Side Letter Agreement and (h) any Additional Material Contract that replaces any of the foregoing.

"Material Indebtedness" shall mean Indebtedness (other than Loans and Letters of Credit) of any one or more of the Borrower or any Restricted Subsidiary in an aggregate principal amount exceeding $25,000,000.

"Material Subsidiary" shall mean, at any date of determination, each Restricted Subsidiary of the Borrower (a) whose Total Assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the Test Period were equal to or greater than $5,000,000, (b) whose revenues (when combined with the revenues of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than $5,000,000, in each case determined in accordance with GAAP or (c) that owns Borrowing Base Properties; provided that if, at any time and from time to time after the Closing Date, Restricted Subsidiaries that are not Material Subsidiaries have, in the aggregate, (i) Total Assets (when combined with the assets of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than $10,000,000 or (ii) revenues (when combined with the revenues of such

Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than $10,000,000, in each case determined in accordance with GAAP, then the Borrower shall, at the request of the Administrative

Agent or on the date on which financial statements for such quarter are delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Restricted Subsidiaries as "Material Subsidiaries."

"Maturity Date" shall mean the fifth anniversary of the Closing Date, or, if such anniversary is not a Business Day, the Business Day immediately following such anniversary.

"Maximum Letter of Credit Commitment" shall mean with respect to each Issuing Bank, the amount set forth opposite such Issuing Bank's name in Schedule 1.1(a) hereto, as such schedule may be amended or modified from time to time by the Borrower, each Issuing Bank affected by such amendment or modification thereto and by the Administrative Agent.

"Minimum Borrowing Amount" shall mean, with respect to any Borrowing of Loans, $500,000 (or, if less, the entire remaining Available Commitments at the time of such Borrowing).

"Minority Investment" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Equity Interests.

"Moody's" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"Mortgage" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed, assignment of as-extracted collateral, fixture filing or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property, substantially in the form of Exhibit D (with such changes thereto as may be necessary to account for local law matters) or otherwise in such form as agreed between the Borrower and the Collateral Agent.

"Mortgaged Property" shall mean any Property owned by a Credit Party which is subject to the Liens existing or purported to exist under the terms of a Mortgage; provided that notwithstanding any provision in this Agreement, any Mortgage, or any other Security Document to the contrary, in no event shall any "Building" (as defined in the applicable Flood Insurance Regulation) or "Manufactured (Mobile) Home" (as defined in the applicable Flood Insurance Regulation) be included in the definition of "Mortgaged Property" and no "Building" or "Manufactured (Mobile) Home" shall be encumbered by any Mortgage. As used herein, "Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq*.), as the same may be amended or recodified from time to time, (iv) the Flood Insurance Reform Act of 2004 and (v) the Biggert-Waters Flood Reform Act of 2012, and any regulations promulgated thereunder.

"Multiemployer Plan" shall mean a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Necessary Cure Amount" shall have the meaning provided in Section 11.13(a)(i)(C).

"New Borrowing Base Notice" shall have the meaning provided in Section 2.14(d).

"Non-Consenting Lender" shall have the meaning provided in Section 13.7(b).

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Extension Notice Date" shall have the meaning provided in Section 3.2(b).

"Non-U.S. Lender" shall mean any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"Notice of Borrowing" shall mean a request of the Borrower in accordance with the terms of Section 2.3(a) and substantially in the form of Exhibit B or such other form as shall be approved by the Administrative Agent (acting reasonably).

"Notice of Conversion or Continuation" shall have the meaning provided in Section 2.6(a).

"Notice of Purchase Election" shall have the meaning provided in Section 13.6(b)(vii).

"Obligations" shall mean (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party or of Parent or Holdings arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit or under any Secured Cash Management Agreement or Secured Hedge Agreement, in each case, entered into with the Borrower or any of its Restricted Subsidiaries, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or any Affiliate thereof in any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) any amounts advanced or expended by the Administrative Agent in connection with the "Cure Right" under and as defined in each of the Management Services Agreement and/or Joint Development Agreement. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries and of Parent or Holdings to the extent they have obligations under the Credit Documents) include the obligation (including Guarantee Obligations) to pay, or secure the payment of, principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document. Notwithstanding the foregoing, Excluded Swap Obligations shall not constitute Obligations. For the avoidance of doubt (a) the obligations of the Borrower or any Restricted Subsidiary under any Secured Hedge Agreement and under any Secured Cash Management Agreement shall be secured and guaranteed pursuant to the Security Documents and the Guarantee only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement and the other Credit Documents shall not require the consent of the holders of Hedging Obligations under Secured Hedge Agreements or of the holders of Cash Management Obligations under Secured Cash Management Agreements.

"Oil and Gas Business" shall mean:

(a) the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

(b) the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties and products produced in association therewith; and the marketing of oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and minerals obtained from unrelated Persons; and

(c) any business or activity relating to, arising from, or necessary, appropriate, incidental or ancillary to the activities described in the foregoing clauses (a) and (b) of this definition.

"Oil and Gas Properties" shall mean (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization agreements, pooling agreements and declarations of pooled or unitized units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of any Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use

or useful in connection with the operating, working or development of any Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Ongoing Hedges" shall have the meaning provided in Section 10.10(a).

"Organizational Documents" shall mean (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" shall mean any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar Taxes arising from any payment made hereunder or made under any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document; provided that such term shall not include any of the foregoing Taxes that result from an assignment, grant of a participation pursuant to Section 13.6(c) or transfer or assignment to or designation of a new lending office or other office for receiving payments under any Credit Document ("Assignment Taxes") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor/participating Lender and/or the assignee/Participant and the taxing jurisdiction (other than a connection arising solely from any Credit Documents or any transactions contemplated thereunder), except to the extent that any such action described in this proviso is requested or required by the Borrower.

"Overnight Rate" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent or the applicable Issuing Bank, as the case may be, in accordance with banking industry rules on interbank compensation.

"Parent" shall mean SN EF UnSub GP, LLC, a Delaware limited liability company.

"Parent Entity" shall mean any Person that is a direct or indirect parent company (which may be organized as a partnership) of the Borrower.

"Parent LLCA" shall mean the Amended and Restated Limited Liability Company Operating Agreement dated as of January 12, 2017 of Parent, the general partner of the Borrower, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Participant" shall have the meaning provided in Section 13.6(c)(i).

"Participant Register" shall have the meaning provided in Section 13.6(c)(ii).

"Patent" shall have the meaning assigned to such term in the Collateral Agreement.

"PATRIOT Act" shall have the meaning provided in Section 13.18.

"Payment in Full" shall mean the time at which the Total Commitment and each Letter of Credit have terminated (unless such Letters of Credit have been Satisfactorily Cash Collateralized or Backstopped on or prior to the termination of the Total Commitment) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations incurred hereunder (other than Hedging Obligations under Secured Hedge Agreements, Cash Management Obligations under Secured Cash Management Agreements or contingent indemnification obligations not then due and payable) are paid in full in cash.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Additional Debt" shall mean any unsecured senior, senior subordinated, subordinated loans or notes or other unsecured funded debt or any Junior Debt issued or incurred by the Borrower or a Guarantor, (a) the terms of which do not provide for any scheduled repayment, mandatory redemption or sinking fund obligation prior to the 91st day after the Maturity Date as in effect on the date of determination (other than (i) customary offers to purchase upon a change of control, AHYDO payments, customary asset sale or casualty or condemnation event and customary acceleration rights after an event of default and (ii) Indebtedness incurred pursuant to a customary bridge facility if the Indebtedness pursuant to such customary bridge facility converts at maturity to Indebtedness which does not provide for any scheduled repayment, mandatory redemption or sinking fund obligation (except to the extent permitted pursuant to clause (i)) prior to the 91st day after the Maturity Date as in effect on the date of determination), (b) the covenants, events of default, guarantees and other terms of which (other than interest rate, fees, funding discounts and redemption or prepayment premiums reasonably determined by the Borrower to be "market" rates, fees, discounts and premiums at the time of issuance or incurrence of any such Indebtedness), taken as a whole, are determined by the Borrower to be no more restrictive on or less favorable to the Borrower and its Restricted Subsidiaries than the terms of this Agreement (as in effect at the time of such issuance or incurrence), taken as a whole, except to the extent such terms are (i) consistent with then-prevailing market terms (as in effect at the time of such issuance or incurrence) as determined by the Borrower in consultation with the Administrative Agent and (ii) this Agreement is amended to incorporate any terms more restrictive than this Agreement; provided that a certificate of an Authorized Officer of the Borrower delivered to the Administrative Agent at least three (3) Business Days prior to the incurrence or issuance of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement, (c) if such Indebtedness is subordinated in right of payment to the Obligations, the terms of such Indebtedness provide for customary subordination of such Indebtedness to the Obligations and (d) no Subsidiary of the Borrower (other than a Guarantor) is an obligor under such Indebtedness.

"Permitted Holders" shall mean the Sanchez Permitted Holders and GSO.

"Permitted Investments" shall mean:

(a) United States dollars;

(b) securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

(c) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with (i) any Lender or (ii) any domestic or foreign commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks and $100,000,000 (or the United States dollar equivalent as of the date of determination) in the case of non-U.S. banks (any such bank in the forgoing an "Approved Bank");

(d) repurchase obligations for underlying securities of the types described in clauses (b) and (c) above or clauses (f) and (g) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (c) above;

(e) commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) rated A-2 (or the equivalent thereof) or better rated at least P-2 by Moody's or at least A-2 by S&P or P-2 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) and in each case maturing within 12 months after the date of acquisition thereof;

(f) marketable short-term money market and similar liquid funds having a rating of at least P-2 (or the equivalent thereof) or A-2 (or the equivalent thereof) from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(g) readily marketable direct obligations issued or fully guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof; provided, that each such readily marketable direct obligation shall have an Investment Grade Rating from either Moody's or S&P or Moody's (or the equivalent thereof) (or, if at any time neither Moody's nor S&P or Moody's (or the equivalent thereof) shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(h) Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower); and

(i) investment funds investing substantially all of their assets in securities of the types de-scribed in clauses (a) through (g) above.

"Permitted Liens" shall mean:

(a) Liens for taxes, assessments or governmental charges or claims not yet overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP, or for property taxes on property that the Borrower or one of its Subsidiaries has determined to abandon if the sole recourse for such tax, assessment, charge or claim is to such property;

(b) Liens in respect of property or assets of the Borrower or any of the Restricted Subsidiaries imposed by law, such as landlords', sublandlords', vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' and mechanics' Liens and other similar Liens arising in the ordinary course of business or incident to the exploration, development, operation or maintenance of Oil and Gas Properties, in each case so long as such Liens (i) are not overdue for a period of more than sixty (60) days or (ii) are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(c) Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 11.9;

(d) Liens incurred or pledges or deposits made in connection with workers' compensation, unemployment insurance and other types of social security, old age pension, public liability obligations or similar legislation, and deposits securing liabilities to insurance carriers under insurance arrangements in respect of such obligations, or to secure (or secure the Liens securing) liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(e) deposits and other Liens securing (or securing the bonds or similar instruments securing) the performance of tenders, statutory obligations, plugging and abandonment or decommissioning obligations, surety, stay, customs and appeal

bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof) incurred in the ordinary course of business or in a manner consistent with past practice or industry practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, or otherwise constituting Investments permitted by Section 10.5;

(f) ground leases, subleases, licenses or sublicenses in respect of real property (other than any Oil and Gas Properties) on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(g) easements, rights-of-way, restrictive covenants, licenses, restrictions (including zoning restrictions), title defects, exceptions, deficiencies or irregularities in title, encroachments, protrusions, servitudes, permits, conditions and covenants and other similar charges or encumbrances (including in any rights-of-way or other property of the Borrower or its Restricted Subsidiaries for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil or other minerals or timber, and other like purposes, or for joint or common use of surface estates, rights of way, facilities and equipment) not (i) interfering in any material respect with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, (ii) securing monetary obligations or (iii) materially impairing the value of the affected Borrowing Base Properties, taken as a whole.

(h) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(i) Liens arising from precautionary Uniform Commercial Code financing statement or similar filings pursuant to Section 10.1(f);

(j) statutory or common law Liens created in the ordinary course of business in favor of banks and other financial institutions and customary deposit, securities or commodity account terms relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit, securities or commodity accounts or other funds maintained with a creditor depository institution, provided that no such deposit, securities or commodity account is a dedicated cash collateral account (other than a cash withheld account in favor of the Administrative Agent);

(k) contractual or statutory Liens which arise in the ordinary course of business under or in connection with operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, Farm-Out Agreements, Farm-In Agreements, division orders, contracts for the sale, gathering, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements that are usual or customary in the Oil and Gas Business and are for claims which are not delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP; provided that any such Lien referred to in this clause (m) does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by the Borrower or any Restricted Subsidiary or materially impair the value of the affected Borrowing Base Properties, taken as a whole;

(l) Liens on pipelines, pipeline facilities, and other midstream assets or facilities that arise by operation of law or other like Liens arising by operation of law in the ordinary course of business and incident to the exploration, development, operation and maintenance of Oil and Gas Properties;

(m) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(n) Liens on equipment of the Borrower or any Restricted Subsidiary granted in the ordinary course of business to the Borrower or such Restricted Subsidiary's client at which such equipment is located;

(o) security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business; and

(p) any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof and Liens on Permitted Investments to be used to satisfy or discharge Indebtedness; provided that (i) such Permitted Investments are deposited into an account from which payment is to be made, directly or indirectly, to the Person or Persons holding the Indebtedness that is to be satisfied or discharged, (ii) such Liens extend solely to the account in which such Permitted Investments are deposited and are solely in favor of the Person or Persons holding the Indebtedness (or any agent or trustee for such Person or Persons) that is to be satisfied or discharged and (iii) the satisfaction or discharge of such Indebtedness is expressly permitted hereunder.

"Permitted Refinancing Indebtedness" shall mean, with respect to any Indebtedness (the "Refinanced Indebtedness"), any Indebtedness issued or incurred in exchange for, or the net proceeds of which are used to modify, extend, refinance, renew, replace or refund (collectively to "Refinance" or a "Refinancing" or "Refinanced"), such Refinanced Indebtedness (or previous refinancing thereof constituting Permitted Refinancing Indebtedness); provided that (a) the principal amount (or accreted value, if applicable) of any such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Refinanced Indebtedness outstanding immediately prior to such Refinancing except by an amount equal to the unpaid accrued interest and premium thereon and other amounts paid in connection with the defeasance or discharge of such Indebtedness plus other amounts paid and fees and expenses incurred in connection with such Refinancing plus an amount equal to any existing commitment unutilized and letters of credit undrawn thereunder, (b) the direct and contingent obligors with respect to such Permitted Refinancing Indebtedness immediately prior to such Refinancing are not changed as a result of such Refinancing (except that a Credit Party may be added as an additional obligor), (c) other than with respect to a Refinancing in respect of Indebtedness permitted pursuant to Section 10.1(f), such Permitted Refinancing Indebtedness shall have a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Refinanced Indebtedness, (d) the terms and conditions of any such Permitted Refinancing Indebtedness, taken as a whole, (i) are not materially more restrictive on or less favorable to the Borrower and its Restricted Subsidiaries than the terms and conditions of the Refinanced Indebtedness (including, if applicable, as to collateral priority and subordination, but excluding as to interest rates, fees, floors, funding discounts and redemption or prepayment premiums) or (ii) are (A) customary for similar indebtedness in light of current market conditions and (B) this Agreement is amended to incorporate any terms more restrictive than this Agreement; provided that a certificate of an Authorized Officer of the Borrower delivered to the Administrative Agent at least three (3) Business Days prior to the incurrence or issuance of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement and (e) if the Refinanced Indebtedness is subordinated in right of payment or security such Permitted Refinancing Indebtedness shall be subordinated on terms no less favorable to the Secured Parties. Notwithstanding the foregoing, Permitted Refinancing Indebtedness in respect of Permitted Additional Debt must constitute Permitted Additional Debt.

"Permitted Tax Distribution" shall have the meaning provided in Section 10.6(c)(i).

"Person" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"Petroleum Industry Standards" shall mean the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"Plan" shall mean any multiemployer or single-employer plan, as defined in Section 4001 of ERISA and subject to Title IV of ERISA, that is or was within any of the preceding six plan years sponsored, maintained for or contributed to by (or to which there is or was an obligation to contribute or to make payments to) the Borrower or an ERISA Affiliate, or with respect to which the Borrower or an ERISA Affiliate has any actual or contingent liability.

"Preferred Stock" shall mean any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up (including, without limitation, the GSO Preferred Equity Interests).

"Prime Rate" shall mean the rate of interest *per annum* publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to debtors).

"Pro Forma Basis" shall mean, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.11.

"Proceeding" shall have the meaning provided in Section 12.7.

"Production Payments and Reserve Sales" shall mean the grant or transfer by the Borrower or any of its Restricted Subsidiaries to any Person of (a) a contractual royalty, overriding royalty or net profits interest, production payment, partnership or other interest in Oil and Gas Properties or reserves or (b) the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the Oil and Gas Business, including any such grants or transfers.

"Prohibited Material Contract Amendments" shall mean (a) any amendment, change, supplement or modification, including through a consent or waiver, to the following provisions and definitions or that would permit the following to occur:

(i) with respect to the Joint Development Agreement, (A) Section 7.8 of the Joint Development Agreement (No Third Party Beneficiaries) as it relates to the Lenders, the Administrative Agent or the Qualified Foreclosure Transferee (as defined therein), (B) any change that would affect the Qualified Foreclosure Transferee's right to succeed to Borrower's rights under the Joint Development Agreement, (C) Section 3.2(g) and Section 3.2(h) of the Joint Development Agreement (Function of the Operating Committee), (D) the definition of "Unanimous Consent" and (E) any change or amendment the effect of which would be to remove the Borrower or the Qualified Foreclosure Transferee, as applicable, from the operating committee thereunder,

(ii) with respect to the Management Services Agreement, (A) Section 16 of the Management Services Agreement (No Third-Party Beneficiaries; Subsidiary Obligations) as they relate to the Lenders, the Administrative Agent or the Qualified Foreclosure Transferee (as defined therein), (B) Section 5(d) of the Management Services Agreement (Separateness Covenants) (provided that changes to correct typographical or other manifest errors shall be permitted subject to the Borrower providing the Administrative Agent three (3) Business Days' prior written notice of such change (or such lesser time as may be agreed by the Administrative Agent in its sole discretion)) and (C) any change that would affect the Qualified Foreclosure Transferee's right to succeed to Borrower's rights under the Management Services Agreement,

(iii) with respect to the Borrower's LPA, (A) Section 15.17 of the Borrower's LPA (Third Party Beneficiaries) as it relates to the Lenders or the Administrative Agent, (B) Section 15.1 of the Borrower's LPA (Amendments), (C) Section 15.22 of the Borrower's LPA (Partnership Covenants, Representations and Warranties) (provided that changes to correct typographical or other manifest errors shall be permitted subject to the Borrower providing the Administrative Agent three (3) Business Days' prior written notice of such change (or such lesser time as may be agreed by the Administrative Agent in its sole discretion)), (D) Section 5.9(b) of the Borrower's LPA (Independent Director; Separateness Covenants) and (E) any change which would permit Parent to withdraw as the Borrower's general partner to withdraw, and

(iv) with respect to the Parent LLCA, (A) Section 12.6 of the Parent LLCA (Third Party Beneficiaries) as it relates to the Lenders or the Administrative Agent, (B) Section 5.13 of the Parent LLCA (Company Covenants,

Representations and Warranties) (provided that changes to correct typographical or other manifest errors shall be permitted subject to the Borrower providing the Administrative Agent three (3) Business Days' prior written notice of such change (or such lesser time as may be agreed by the Administrative Agent in its sole discretion)) and (C) Section 12.5 of the Parent LLCA (Amendments); and

(b) any amendment, change, supplement or modification, including through a consent or waiver, to the following provisions and definitions or that would permit the following to occur in a manner adverse to the Lenders or the Borrower:

(i) with respect to the Joint Development Agreement, (A) any change which would change the standard that no consent is necessary from any party to the Joint Development Agreement in order for the Qualified Foreclosure Transferee (as defined therein) to join the Joint Development Agreement, (B) any change that affects the Administrative Agent's right to appoint the Qualified Foreclosure Transferee, (C) any change to the definition of "Qualified Foreclosure Transfer" or any provision providing for such transfer, (D) any amendment to the definition of "Foreclosure Transfer", (E) any change to Section 3.7(e) of the Joint Development Agreement, which limits the rights of the Borrower or the Qualified Foreclosure Transferee to propose wells or the taking of other actions to satisfy drilling commitments under the Development Agreement, (F) any change to Section 3.5 of the Joint Development Agreement (Quorum and Voting) and (G) any change to the definition or implementation of an Alternative Equitable Partition as set forth in Section 4.5 of the Joint Development Agreement (Sale Transaction),

(ii) with respect to the Development Agreement, at such time that GSO no longer holds Equity Interests in the Borrower, any changes to Section 2.1 of the Development Agreement (Commitment Wells) and Section 3.3 of the Development Agreement (Default),

(iii) with respect to the Marketing Agreement, at such time that GSO no longer holds Equity Interests in the Borrower, any change to Section 3.1 of the Marketing Agreement (Price) and the definitions of "Purchaser's Allocable Share of Midstream Charges", "Producer's Allocable Share of the Springfield Agreements" and "Producer's Allocable Share of the Other Contracts" only as they affect such provision, and

(iv) with respect to the Borrower's LPA and the Parent LLCA, any change to the independent director provisions, the definition of "Independent Director", "Cause", any other component definitions thereof only as they affect such provisions and voting rights for such independent director.

"Prohibited Preferred Amendments" shall mean any amendment, change, supplement or modification, including through a consent or waiver, to (a) the second sentence of Section 4.1(b) of the Borrower's LPA (Distributions) or any change that would eliminate the effect of such provision, (b) the first sentence of Section 14.2 of the Borrower's LPA (Optional Redemption) or any change that would eliminate the effect of such sentence or make the GSO Preferred Equity Interests due and payable in full upon an event of default and (c) include a maturity date or mandatory redemption provision to the GSO Preferred Equity Interests.

"Projections" shall mean financial estimates, forecasts and other forward-looking information prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby and the negotiation of the Credit Documents.

"Proposed Acquisition" shall have the meaning provided in Section 10.10(a).

"Proposed Borrowing Base" shall have the meaning provided in Section 2.14(c)(i).

"Proposed Borrowing Base Notice" shall have the meaning provided in Section 2.14(c)(ii).

"Proved Developed Producing Reserves" shall mean oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

“Proved Reserves” shall mean oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both “Proved Reserves” and one of the following: (a) “Developed Producing Reserves”, (b) “Developed Non-Producing Reserves” or (c) “Undeveloped Reserves”.

“Purchase and Sale Agreement” shall have the meaning provided to such term in the recitals of this Agreement.

“Purchase and Sale Agreement Representations” shall mean those certain representations and warranties made by the Seller and its Affiliates in the Purchase and Sale Agreement as are material to the interests of the Lenders, to the extent that the Borrower (or its Affiliates) has the right to terminate, collectively or individually, their obligations under the Purchase and Sale Agreement, or to decline to consummate the Acquisition, in whole or in part, as a result of a breach of such representations and warranties.

“PV-9” shall mean, with respect to any Proved Reserves expected to be produced from any Borrowing Base Properties, the net present value, discounted at 9% *per annum*, of the future net revenues expected to accrue to the Borrower’s and the Credit Parties’ collective interests in such reserves during the remaining expected economic lives of such reserves calculated in accordance with the most recent Bank Price Deck.

“Qualified Equity Interests” shall mean any Equity Interests of the Borrower or any Parent Entity other than Disqualified Stock.

“Qualified Preferred Equity” shall mean Preferred Stock of the Borrower that is on the same terms as or on terms no less favorable to the Lenders or Borrower than the terms of the GSO Preferred Equity Interests that are issued on the Closing Date.

“Qualifying IPO” shall mean the issuance by Holdings or Parent of its Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

“Redeem” shall mean, with respect to any Equity Interests, the redemption, repurchase, retirement or other acquisition or retirement for value of such Equity Interests. “Redemption” shall have a correlative meaning.

“Redetermination Date” shall mean, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.14(d).

“Refinance” shall have the meaning provided in the definition of Permitted Refinancing Indebtedness contained in this Section 1.1.

“Register” shall have the meaning provided in Section 13.6(b)(iv).

“Regulation T” shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

“Regulation U” shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

“Regulation X” shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

“Reimbursement Date” shall have the meaning provided in Section 3.4(a).

“Related Indemnified Person” shall mean, with respect to an Indemnitee, (a) any controlling Person or controlled Affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling

Persons or controlled Affiliates and (c) the respective agents and representatives of such Indemnitee or any of its controlling Persons or controlled Affiliates, in the case of this clause (c), acting at the instructions of such Indemnitee, controlling Person or such controlled Affiliate.

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

"Requested Interim Redetermination" shall have the meaning provided in Section 2.14(b).

"Required Cash Collateral Amount" shall have the meaning provided in Section 3.7(c).

"Required Lenders" shall mean, at any date, (a) Non-Defaulting Lenders having or holding at least 66.67% of the Adjusted Total Commitment at such date or (b) if the Total Commitment has been terminated,

Non-Defaulting Lenders having or holding at least 66.67% of the outstanding principal amount of the Loans and Letter of Credit Exposure (excluding the Loans and Letter of Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Requirement of Law" shall mean, as to any Person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Reserve Report" shall mean (a) the Initial Reserve Report and (b) (i) any other subsequent report, in form reasonably satisfactory to the Administrative Agent and/or (ii) any other engineering data reasonably acceptable to the Administrative Agent, setting forth, as of each January 1st or July 1st (or such other date in the event of certain Interim Redeterminations) the Proved Reserves attributable to the Borrowing Base Properties, together with a projection of the rate of production and future net revenues, operating expenses (including production taxes and ad valorem expenses) and capital expenditures with respect thereto as of such date, based upon the most recent Bank Price Deck; provided that in connection with any Interim Redeterminations of the Borrowing Base pursuant to the last sentence of Section 2.14(b), the Borrower shall only be required, for purposes of updating the Reserve Report, to set forth such additional Proved Reserves and related information as are the subject of such acquisition.

"Reserve Report Certificate" shall mean a certificate of an Authorized Officer in substantially the form of Exhibit A certifying as to the matters set forth in Section 9.12(c).

"Restricted Payments" shall have the meaning provided in Section 10.6.

"Restricted Subsidiary" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"S&P" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"Sanchez" shall mean Sanchez Energy Corporation, a Delaware corporation.

"Sanchez Cash Contribution" shall mean the contribution by Sanchez and its subsidiaries, directly or indirectly, to the Borrower in an aggregate amount not less than $100,000,000 for common limited partner interests issued by the Borrower to Holdings.

"Sanchez Indenture Change of Control" shall mean "Change of Control" as defined in the Sanchez Specified Indenture on the date hereof.

"Sanchez O&G" shall mean Sanchez Oil & Gas Corporation, a Delaware corporation.

“Sanchez Parent Credit Agreement” shall mean that certain Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez, Royal Bank of Canada, as Administrative Agent, the other agents party thereto and the lenders party thereto, as the same may be amended, restated, supplemented, replaced, refinanced or otherwise modified from time to time.

“Sanchez Permitted Holders” shall mean (a) Sanchez and its Controlled Investment Affiliates which Sanchez controls, (b) the officers, directors, employees and other members of management of the Persons described in clause (a) and (c) Antonio R. Sanchez, III and A.R. Sanchez, Jr. and their Immediate

Family Members; provided that for purposes of the definition of “Change of Control” the Persons described in clause (c) above shall not constitute Permitted Holders at any time they hold voting power equal to or more than 50% of all Equity Interests collectively and beneficially held by the Persons described in clauses (a) and (b) above.

“Sanchez Specified Indebtedness” shall mean (a) the Sanchez Parent Credit Agreement, (b) that certain 6.125% Senior Secured Notes Due 2023 Indenture dated June 27, 2014 among Sanchez, the guarantors party thereto, and U.S. Bank National Association, as trustee (the “Sanchez Specified Indenture”), (c) that certain 7.75% Senior Notes Due 2021 Indenture dated June 13, 2013 among Sanchez, the guarantors party thereto, and U.S. Bank National Association, as trustee, as supplemented by that certain First Supplemental Indenture, dated as of September 11, 2013 and as further supplemented by that certain Second Supplemental Indenture, dated as of June 2, 2014 and (d) other indebtedness of the type described in clause (a) and (b) of the definition of Indebtedness (including refinancings and replacements of the foregoing) of Sanchez and its subsidiaries that are not “unrestricted subsidiaries” under and pursuant to the terms of the Sanchez Specified Indebtedness.

“Sanchez Specified Indenture” shall have the meaning provided in the definition of Sanchez Specified Indebtedness contained in this Section 1.1.

“Sanctioned Country” shall mean, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

“Sanctioned Person” shall mean at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union, any EU member state, the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

“Sanctions” shall mean all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state, the United Kingdom or other relevant sanctions authority.

“Satisfactorily Cash Collateralized or Backstopped” shall mean, with respect to any Letter of Credit, to (a) pledge and deposit with the Issuing Bank in respect of such Letter of Credit as collateral for the L/C Obligations in respect of such Letter of Credit, cash or deposit account balances in an amount equal to 103% of the amount of the Letters of Credit Outstanding in respect of such Letter of Credit or (b) if the Administrative Agent and relevant Issuing Bank benefiting from such collateral shall agree in their reasonable discretion, other forms of credit support (including any backstop letter of credit) in an amount equal to 103% of the amount of the Letters of Credit Outstanding in respect of such Letter of Credit from an issuer reasonably satisfactory to the Administrative Agent and such Issuing Bank, in each case under clause (a) and (b) above pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank.

“Scheduled Redetermination” shall have the meaning provided in Section 2.14(b).

“Scheduled Redetermination Date” shall mean the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.14.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Cash Management Agreement" shall mean any agreement related to Cash Management Services by and between the Borrower or any of its Restricted Subsidiaries and any Cash Management Bank.

"Secured Hedge Agreement" shall mean any Hedge Agreement by and between the Borrower or any of its Restricted Subsidiaries and any Hedge Bank.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, Issuing Bank, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement and each Subagent pursuant to Section 12.2 appointed by the Administrative Agent with respect to matters relating to the Credit Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"Securities Account" shall have the meaning assigned to such term in the UCC.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Documents" shall mean, collectively, (a) the Collateral Agreement, (b) the Mortgages and (c) each other security agreement or other instrument or document executed and delivered pursuant to Section 9.9 or Section 9.11 or pursuant to any other such Security Documents or otherwise to secure or perfect the security interest in any or all of the Obligations.

"Seller" and "Sellers" shall have the meaning provided to such term in the recitals of this Agreement.

"Side Letter Agreement" shall mean the side letter agreement between Sanchez, the Borrower and SN EF Maverick, LLC dated as of January 12, 2017 as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Solvent" shall mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets of such Person and its Restricted Subsidiaries, on a consolidated basis, exceeds their debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person and its Restricted Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person and its Restricted Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (d) such Person and its Restricted Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital. The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"Specified Additional Debt" shall mean any unsecured senior, senior subordinated, subordinated loans or notes or other unsecured funded debt or any Junior Debt issued or incurred by the Borrower or a Restricted Subsidiary (including any Indebtedness incurred pursuant to Section 10.1(b), Section 10.1(j) and Section 10.1(k)).

"Specified Contractual Requirements" shall mean, with respect to any Person, the terms of any applicable Organizational Documents, joint venture agreement, shareholders' agreement or similar agreement.

"Specified Representations" shall mean, collectively, the representations and warranties of the Borrower provided in the following sections of this Agreement: Section 8.1(a)(ii), Section 8.2, Sections 8.3(c), Section 8.5, Section 8.7, Section 8.14, Section 8.15, Section 8.19 and Section 8.20 (with respect to the last sentence).

"Specified Subsidiary" shall mean, at any date of determination any Restricted Subsidiary (a) whose Total Assets at the last day of the applicable Test Period were equal to or greater than 10.0% of the Consolidated Total Assets of the Borrower and

the Restricted Subsidiaries at such date, or (b) whose revenues during such Test Period were equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP.

"Specified Transaction" shall mean (a) solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an equity issuance, to the Borrower, in each case, in connection with an acquisition or Investment, (b) any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP) (excluding held-for-sale discontinued operations until actually disposed of), (c) any Investment that results in a Person becoming a Restricted Subsidiary, (d) any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement, (e) any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person or the purchase or acquisition of any material Oil and Gas Properties (as determined by the Borrower in good faith), (f) any Disposition (i) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (ii) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary or material Oil and Gas Properties (as determined by the Borrower in good faith) or (g) any Investment, issuance or incurrence of Indebtedness, Restricted Payment or transaction under Section 10.7 that by the terms of this Agreement requires a financial ratio to be calculated on a Pro Forma Basis.

"SPV" shall have the meaning provided in Section 13.6(g).

"Stated Amount" of any Letter of Credit shall mean the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met.

"Subagent" shall have the meaning provided in Section 12.2.

"Subsidiary" shall mean, with respect to any Person: (a) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and (b) any partnership, joint venture, limited liability company or similar entity of which: (i) more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and (ii) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity. Unless otherwise specified, "Subsidiary" shall mean a Subsidiary of the Borrower.

"Subsidiary Guarantor" shall mean each Subsidiary that is a Guarantor.

"Subsidiary Redesignation" shall have the meaning provided in the definition of "Unrestricted Subsidiary" contained in this Section 1.1.

"Swap" shall mean any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap PV" shall mean, as of any date of determination, with respect to any commodity Hedge Agreement, the present value, discounted at 9% *per annum*, of the future receipts expected to be paid to the Borrower or its Restricted Subsidiaries under such Hedge Agreement as of such date based on the Administrative Agent's then current Bank Price Deck; provided, that the "Swap PV" shall never be less than $0.00.

"Swap Termination Value" shall mean, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, the sum of any unpaid amount in respect of such Hedge Agreement and such termination value(s), and (b) for any date prior to the date referenced in

clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender).

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Termination Date" shall mean the earlier to occur of (a) the Maturity Date and (b) the date on which the Total Commitment shall have terminated.

"Test Period" shall mean (subject to Section 1.11(a)), as of any date of determination, the four consecutive fiscal quarters of the Borrower then last ended and for which financial statements have been delivered to the Administrative Agent in accordance with clause (a) or (b) of Section 9.1; provided that with respect to dates of determination prior to the date when financials statements have been delivered to the Administrative Agent in accordance with Section 9.1(a) for the fiscal year of the Borrower ending December 31, 2017, the Test Period shall not be such four consecutive four fiscal quarters of the Borrower then last ended, but instead shall be one, two or three fiscal consecutive quarters of the Borrower then last ended based on customary annualization mechanics that are further described in Section 1.11(e).

"Total Assets" shall mean the total assets of any Person determined in accordance with GAAP as shown on the most recent balance sheet of such Person.

"Total Commitment" shall mean the sum of the Commitments of the Lenders.

"Total Exposure" shall mean, with respect to any Lender at any time, the sum of (a) the aggregate principal amount of the Loans of such Lender then outstanding and (b) such Lender's Letter of Credit Exposure at such time.

"Trademark" shall have the meaning assigned to such term in the Collateral Agreement.

"Transaction Expenses" shall mean any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries (or by Sanchez or any direct or indirect Parent Entity of the Borrower and reimbursed by the Borrower) in connection with the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby.

"Transactions" shall mean, collectively, the Acquisition and the consummation of the other transactions contemplated by the Purchase and Sale Agreement or related thereto, this Agreement, the payment of Transaction Expenses and the other transactions contemplated by this Agreement and the Credit Documents.

"Transferee" shall have the meaning provided in Section 13.6(e).

"Type" shall mean, as to any Loan, its nature as an ABR Loan or a LIBOR Loan.

"UCC" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection or priority of security interests in any Collateral.

"Unfunded Current Liability" of any Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("SFAS 87")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the date hereof, exceeds the Fair Market Value of the assets allocable thereto.

"Uniform Customs" shall mean, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits as approved by the International Chamber of Commerce, commencing on July 1, 2007 (or such later version thereof as may be in effect at the time of issuance).

"Unpaid Drawing" shall have the meaning provided in Section 3.4(a).

"Unrestricted Cash" shall mean cash or cash equivalents (including Permitted Investments) of the Borrower or any of its Restricted Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any of its Restricted Subsidiaries; provided that, such Unrestricted Cash shall exclude any cash and cash equivalents of the Borrower and the Restricted Subsidiaries that are (a) set aside in a segregated cash collateral or escrow account for the benefit of a party other than the Borrower, a Guarantor or the Administrative Agent or (b) subject to an account control or securities account control agreement in favor of a third party other than the Administrative Agent.

"Unrestricted Subsidiary" shall mean (a) any Restricted Subsidiary designated as an Unrestricted Subsidiary by the Borrower in a written notice to the Administrative Agent; provided that, (i) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the Fair Market Value of the Borrower's investment therein on such date of designation and such designation shall be permitted only to the extent such Investment is permitted under Section 10.5 on the date of such designation, (ii) such designation shall be deemed to be a Disposition pursuant to which the provisions of Section 2.14(f) will apply to the extent contemplated thereby and (iii) no Default, Event of Default or Borrowing Base Deficiency exists or would result from such designation immediately after giving effect thereto and (b) each Subsidiary of an Unrestricted Subsidiary. No Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would be a "Restricted Subsidiary" for the purpose of any Specified Additional Debt or any Permitted Refinancing Indebtedness thereof, in each case, to the extent applicable. The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary (each, a "Subsidiary Redesignation"), and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if (A) to the extent such Subsidiary has outstanding Indebtedness on the date of such designation, immediately after giving effect to such designation, no Borrowing Base Deficiency exists and (B) no Default or Event of Default would result from such Subsidiary Redesignation.

"U.S. Lender" shall mean any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Volumetric Production Payment" shall mean, production payment obligations recorded as deferred revenue in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness; provided that the effects of any prepayments made on such Indebtedness shall be disregarded in making such calculation.

"Wholly owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly owned Subsidiary of such person.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2 Other Interpretive Provisions. With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b) The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c) Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d) The terms "include," "includes," and "including" are by way of example and not limitation.

(e) The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(g) Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(h) Any reference to any Person shall be constructed to include such Person's successors or assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(i) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(j) The word "will" shall be construed to have the same meaning as the word "shall".

(k) The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, whether real, personal or mixed, including cash, securities, accounts and contract rights.

(l) The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

1.3 Accounting Terms. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof. In the event that any "Accounting Change" shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Majority Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "Accounting Changes" refers to changes

in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

1.4 Rounding. Any financial ratios required to be maintained or complied with by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5 References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to Organizational Documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document and (b) references to any Requirement of Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law.

1.6 Times of Day. Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight saving or standard, as applicable).

1.7 Timing of Payment or Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in Section 2.9) or performance shall extend to the immediately succeeding Business Day.

1.8 Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "LIBOR Loan").

1.9 Hedging Requirements Generally. For purposes of any determination with respect to compliance with Section 8.18 or Section 10.10 or any other calculation under or requirement of this Agreement in respect of hedging shall be calculated separately for crude, gas and natural gas liquid.

1.10 Certain Determinations. For purposes of determining compliance with a covenant set forth in Section 10.1, 10.2, 10.4, 10.5, 10.6, 10.7 and 10.14, but subject to any limitation expressly set forth therein, as applicable, at any time (whether at the time of incurrence or thereafter), any Lien, Investment, Indebtedness, Disposition, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction meets the criteria of one, or more than one, of the exclusions to such covenant permitted pursuant to Section 10.1, 10.2, 10.4, 10.5, 10.6, 10.7 and 10.14, the Borrower shall, in its sole discretion, determine under which such exclusion to such covenant such Lien, Investment, Indebtedness, Disposition, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction (or, in each case, any portion thereof) is permitted.

1.11 Pro Forma and Other Calculations.

(a) Notwithstanding anything to the contrary herein, financial ratios and tests, including the Consolidated Total Net Leverage Ratio and the Current Ratio, and compliance with covenants determined by reference to Consolidated EBITDAX (or Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities) shall be calculated in the manner prescribed by this Section 1.11; provided, that notwithstanding anything to the contrary in Section 1.11(b), Section 1.11(c) or Section 1.11(d), when calculating the Consolidated Total Net Leverage Ratio and Current Ratio for purposes of Section 10.11 (other than for the purpose of determining *pro forma* compliance with Section 10.11), the events described in this Section 1.11 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect. In addition, if the Borrower provides to the Administrative Agent the same certifications that it would provide under Section 9.01(b) with respect to internal financial statements of the Borrower, whenever a financial ratio or test is to be calculated on a Pro Forma Basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which such internal financial



012972

statements of the Borrower are available (as determined in good faith by the Borrower). For the avoidance of doubt, the provisions of the foregoing sentence shall not apply for purposes of calculating the Consolidated Total Net Leverage Ratio or Current Ratio for purposes of Section 10.11 (other than for the purpose of determining *pro forma* compliance with Section 10.11), which shall be based on the financial statements delivered pursuant to Section 9.1(a) or Section 9.1(b), as applicable, for the relevant Test Period.

(b) For purposes of calculating any financial ratio or test or compliance with any covenant determined by reference to Consolidated EBITDAX (or Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities), Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.11(d)) that have been made (i) during the applicable Test Period or (ii) if applicable as described in Section 1.11(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a Pro Forma Basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDAX and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.11, then such financial ratio or test or compliance with any covenant determined by reference to Consolidated EBITDAX (or Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.11.

(c) Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run rate" cost savings, operating expense reductions and synergies resulting from or relating to any Specified Transactions (including the Transaction) which shall be determined in accordance with clause (a)(vi) of the definition of "Consolidated EBITDAX"; provided, for the avoidance of doubt, no amounts shall be added pursuant to this Section 1.11(c) to the extent duplicative of any amounts that are otherwise added back in computing Consolidated EBITDAX (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period.

(d) In the event that (i) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement, discharge, defeasance or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility unless such Indebtedness has been permanently repaid and not replaced), (ii) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock or (iii) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock, (A) during the applicable Test Period or (B) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness or such issuance, refinancing or redemption of Disqualified Stock or Preferred Stock to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(e) For the purposes of calculating the Financial Performance Covenant set forth in Section 10.11(a), Consolidated EBITDAX for the fiscal quarter of the Borrower ending (i) June 30, 2017, shall be equal to Consolidated EBITDAX for the fiscal quarter of the Borrower ending on such date multiplied by 4, (ii) September 30, 2017, shall be equal to Consolidated EBITDAX for the two consecutive fiscal quarters of the Borrower ending on such date multiplied by two and (iii) December 31, 2017, shall be equal to Consolidated EBITDAX for the three consecutive fiscal quarters of the Borrower ending on such date multiplied by 4/3; provided that (A) if a calculation of Consolidated EBITDAX is required prior to the delivery of quarterly financial statements for the fiscal quarter of the Borrower ended March 31, 2017 pursuant to Section 9.1(b), then Consolidated EBITDAX shall be equal to (x) the Consolidated EBITDAX for the fiscal quarter ending September 30, 2016 multiplied by two plus (y) the Consolidated EBITDAX for the fiscal quarter ending December 31, 2016 multiplied by two and (B) if Consolidated EBITDAX is required for any Test Period prior to the delivery of quarterly financial statements for the fiscal quarter of the Borrower ended June 30, 2017 pursuant to Section 9.1(b), then Consolidated EBITDAX shall be equal to (x) the

Consolidated EBITDAX for the fiscal quarter ending December 31, 2016 multiplied by two plus (y) the Consolidated EBITDAX for the fiscal quarter ending March 31, 2017 multiplied by two.

SECTION 2. AMOUNT AND TERMS OF CREDIT

2.1 Commitments.

(a) Subject to and upon the terms and conditions herein set forth, each Lender severally, but not jointly, agrees to make a loan or loans denominated in Dollars (each a "Loan" and, collectively, the "Loans") to the Borrower, which Loans (i) shall be made at any time and from time to time on and after the Closing Date and prior to the Termination Date, (ii) may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or LIBOR Loans; provided that all Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Loans of the same Type, (iii) may be repaid and reborrowed in accordance with the provisions hereof, (iv) shall not, for any Lender at any time, after giving effect thereto and to the application of the proceeds thereof, result in such Lender's Total Exposure at such time exceeding such Lender's Commitment Percentage at such time of the Loan Limit and (v) shall not, after giving effect thereto and to the application of the proceeds thereof, result in the aggregate amount of all Lenders' Total Exposures at such time exceeding the Loan Limit.

(b) Each Lender may at its option make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan, provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.10 shall apply).

2.2 Minimum Amount of Each Borrowing; Maximum Number of Borrowings. The aggregate principal amount of each Borrowing shall be in a minimum amount of at least the Minimum Borrowing Amount for such Type of Loans and in a multiple of $100,000 in excess thereof and Loans to reimburse the applicable Issuing Bank with respect to any Unpaid Drawing shall be made in the amounts required by Section 3.3 or Section 3.4, as applicable. More than one Borrowing may be incurred on any date; provided, that at no time shall there be outstanding more than ten Borrowings of LIBOR Loans under this Agreement.

2.3 Notice of Borrowing.

(a) Whenever the Borrower desires to incur Loans (other than borrowings to repay Unpaid Drawings), the Borrower shall give the Administrative Agent at the Administrative Agent's Office, (i) prior to 1:00 p.m. (New York City time) at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing of Loans if such Loans are to be initially LIBOR Loans and (ii) written notice (or telephonic notice promptly confirmed in writing) prior to 11:00 a.m. (New York City time) on the date of each Borrowing of Loans that are to be ABR Loans. Such Notice of Borrowing shall specify (A) the aggregate principal amount of the Loans to be made pursuant to such Borrowing, (B) the date of the Borrowing (which shall be a Business Day) and (C) whether the respective Borrowing shall consist of ABR Loans and/or LIBOR Loans and, if LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall promptly give each Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of Loans, of such Lender's Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.

(b) Borrowings to reimburse Unpaid Drawings shall be made upon the notice specified in Section 3.4(a).

(c) Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower.

2.4 Disbursement of Funds.

(a) No later than 1:00 p.m. (New York City time) on the date specified in each Notice of Borrowing, each Lender will make available its *pro rata* portion of each Borrowing requested to be made on such date in the manner provided below.

(b) Each Lender shall make available all amounts it is to fund to the Borrower under any Borrowing in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will (except in the case of Borrowings to repay Unpaid Drawings) make available to the Borrower, by depositing or wiring to a Controlled Account as designated by the Borrower in the Notice of Borrowing to the Administrative Agent the aggregate of the amounts so made available in Dollars. Unless the Administrative Agent shall have been notified by any Lender prior to the date of any such Borrowing (or, with respect to an ABR Loan, the date of such Borrowing prior to 1:00 p.m. (New York City time)) that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.8, for the respective Loans.

(c) Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5 Repayment of Loans; Evidence of Debt.

(a) The Borrower agrees to repay to the Administrative Agent, for the benefit of the applicable Lenders, on the earlier of (i) the Termination Date and (ii) on the Maturity Date, the then outstanding Loans.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office from time to time, including the amounts of principal and interest payable and paid to such lending office from time to time under this Agreement.

(c) The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 13.6(b)(iv), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, the Type of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d) The entries made in the Register and accounts and subaccounts maintained pursuant to Sections 2.5(b) and (c) shall, to the extent permitted by applicable Requirements of Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner

affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.6 Conversions and Continuations.

(a) Subject to the penultimate sentence of this Section 2.6(a), (i) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least the Minimum Borrowing Amount (and in multiples of $100,000 in excess thereof) of the outstanding principal amount of Loans of one Type into a Borrowing or Borrowings of another Type and (ii) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any LIBOR Loans as LIBOR Loans for an additional Interest Period; provided that (A) no partial conversion of LIBOR Loans shall reduce the outstanding principal amount of LIBOR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (B) ABR Loans may not be converted into LIBOR Loans if an Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such conversion, (C) LIBOR Loans may not be continued as LIBOR Loans for an additional Interest Period if an Event of Default is in existence on the date of the proposed continuation and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, and (D) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2. Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. (New York City time) at least (1) three Business Days', in the case of a continuation of or conversion to LIBOR Loans or (2) the date of conversion, in the case of a conversion into ABR Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a "Notice of Conversion or Continuation") specifying the Loans to be so converted or continued, the Type of Loans to be converted into or continued and, if such Loans are to be converted into or continued as LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b) If any Event of Default is in existence at the time of any proposed continuation of any LIBOR Loans and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, such LIBOR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans. If upon the expiration of any Interest Period in respect of LIBOR Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in Section 2.6(a) above, the Borrower shall be deemed to have elected to continue such Borrowing of LIBOR Loans into a Borrowing of LIBOR Loans having an interest period of one month, effective as of the expiration date of such current Interest Period.

2.7 Pro Rata Borrowings. Each Borrowing of Loans under this Agreement shall be made by the Lenders *pro rata* on the basis of their then applicable Commitment Percentages. It is understood that (a) no Lender shall be responsible for any default by any other Lender in its obligation to make Loans hereunder and that each Lender severally but not jointly shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder and (b) failure by a Lender to perform any of its obligations under any of the Credit Documents shall not release any Person from performance of its obligation under any Credit Document.

2.8 Interest.

(a) The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable Margin plus the ABR, in each case, in effect from time to time.

(b) The unpaid principal amount of each LIBOR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable Margin plus the relevant LIBOR Rate, in each case, in effect from time to time.

(c) If all or a portion of (i) the principal amount of any Loan or (ii) any other amount payable under the Credit Documents (including, without limitation, interest payable thereon and premium, if any) shall not be paid when due (whether at stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate *per annum* that is (the "Default Rate") (A) in the case of overdue principal, the rate that would otherwise be applicable thereto plus 2.00%, (B) in the case of any overdue interest, to the extent permitted by applicable Requirements of Law, the rate described in Section 2.8(a) plus 2.00% from and including the date of such non-payment to the date on which such amount is paid in full (after as well as before judgment) and (C) in the case of any overdue amount not specified in Sections 2.8(c)(A) or 2.8(c)(B) above, a rate *per annum* equal to the rate *per annum* otherwise payable at such time on ABR Loans plus 2.00% (or if after maturity, at the interest rate payable on ABR Loans as of the maturity date plus 2.00%).

(d) Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; provided that any Loan that is repaid on the same date on which it is made shall bear interest for one day. Except as provided below, interest shall be payable (i) in respect of each ABR Loan, quarterly in arrears on the last Business Day of each March, June, September and December, (ii) in respect of each LIBOR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three-month intervals after the first day of such Interest Period and (iii) in respect of each Loan, (A) on any prepayment (on the amount prepaid), (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

(e) All computations of interest hereunder shall be made in accordance with Section 5.5.

(f) The Administrative Agent, upon determining the interest rate for any Borrowing of LIBOR Loans, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

2.9 Interest Periods. At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of LIBOR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower be (i) a one-, two-, three- or six- or (if agreed by all the Lenders making such LIBOR Loans) a twelve-month period or (ii) any period shorter than one month (if agreed by all the Lenders making such LIBOR Loans) as requested by the Borrower.

Notwithstanding anything to the contrary contained above:

(a) the initial Interest Period for any Borrowing of LIBOR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b) if any Interest Period relating to a Borrowing of LIBOR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c) if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period in respect of a LIBOR Loan would otherwise expire on a day that is not a Business Day, but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d) the Borrower shall not be entitled to elect any Interest Period in respect of any LIBOR Loan if such Interest Period would extend beyond the Maturity Date.

2.10 Increased Costs, Illegality, Etc.

(a) In the event that (x) in the case of Section 2.10(a)(i) below, the Majority Lenders or (y) in the case of Sections 2.10(a)(ii) and 2.10(a)(iii) below, any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i) on any date for determining the LIBOR Rate for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such LIBOR Borrowing are not generally available in the relevant market or (B) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR Rate; or

(ii) any Lender shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto), that a Change in Law occurring at any time after the Closing Date shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender to any Tax (other than (1) Indemnified Taxes or Other Taxes, or (2) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (C) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBOR Loans made by such Lender, which results in the cost to such Lender of making, converting into, continuing or maintaining LIBOR Loans or participating in Letters of Credit (in each case hereunder) increasing by an amount which such Lender reasonably deems material or the amounts received or receivable by such Lender hereunder with respect to the foregoing shall be reduced; or

(iii) at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Administrative Agent, in the case of Section 2.10(a)(i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of Section 2.10(a)(i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to LIBOR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of Section 2.10(a)(ii) above, the Borrower shall pay to such Lender, promptly (but no later than fifteen days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto and (z) in the case of Section 2.10(a)(iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

(b) At any time that any LIBOR Loan is affected by the circumstances described in Sections 2.10(a)(ii) or 2.10(a)(iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.10(a)(iii) shall) either (i) if the affected LIBOR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Sections 2.10(a)(ii) or 2.10(a)(iii) or (ii) if the affected LIBOR Loan is then outstanding, upon at least three Business Days' notice to the Administrative Agent, require the affected Lender to convert each such LIBOR Loan into an ABR Loan; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c) If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity requirements of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity

requirements occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy or liquidity requirements), then from time to time, promptly (but in any event no later than fifteen days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

2.11 Compensation. If (a) any payment of principal of any LIBOR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such LIBOR Loan as a result of a payment or conversion pursuant to Section 2.5, Section 2.6, Section 2.10, Section 5.1, Section 5.2 or Section 13.7, as a result of acceleration of the maturity of the Loans pursuant to Section 11 or for any other reason, (b) any Borrowing of LIBOR Loans is not made on the date specified in a Notice of Borrowing, (c) any ABR Loan is not converted into a LIBOR Loan on the date specified in a Notice of Conversion or Continuation, (d) any LIBOR Loan is not continued as a LIBOR Loan on the date specified in a Notice of Conversion or Continuation or (e) any prepayment of principal of any LIBOR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or Section 5.2, the Borrower shall after the Borrower's receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent (within fifteen days after such request) for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such LIBOR Loan.

2.12 Change of Lending Office. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), Section 2.10(a)(iii), Section 2.10(c), Section 3.11 or Section 5.4 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation does not cause such Lender or its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10, Section 3.11 or Section 5.4.

2.13 Notice of Certain Costs. Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, Section 2.11 or Section 5.4 is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, Tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, Section 2.11 or Section 5.4, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower; provided that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.14 Borrowing Base.

(a) Initial Borrowing Base. For the period from and including the Closing Date to but excluding the first Redetermination Date, the Borrowing Base shall be $330,000,000; provided that, if less than 95% of the PV-9 of the Acquired Assets identified in the Initial Reserve Report are acquired, such amount may be reduced by the amount the Administrative Agent deems appropriate in good faith in accordance with its usual and customary oil and gas lending criteria as they exist at the particular time (and approved by the Required Lenders) but in no case shall such reduction exceed the PV-9 of the Proved

Reserves in respect of the Acquired Assets that were not acquired. Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments from time to time pursuant to the Borrowing Base Adjustment Provisions.

(b) Scheduled and Interim Redeterminations. The Borrowing Base shall be redetermined semi-annually in accordance with this Section 2.14 (a "Scheduled Redetermination"), and, subject to Section 2.14(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Administrative Agent, the Issuing Banks and the Lenders on (x) the date that is sixty (60) days after the Closing Date, (y) October 1, 2017 and (z) thereafter, April 1st and October 1st of each year (or, in each case, as promptly as possible thereafter). In addition, (i) the Borrower may at any time, by notifying the Administrative Agent thereof, (A) once prior to the date of the first Scheduled Redetermination and (B) once during the period between any two Scheduled Redeterminations, and (ii) the Administrative Agent, following the date of the first Scheduled Redetermination, may, including at the direction of the Majority Lenders, by notifying the Borrower thereof, once during the period between two Scheduled Redeterminations, in each case elect to cause the Borrowing Base to be redetermined between Scheduled Redeterminations (a "Requested Interim Redetermination") in accordance with this Section 2.14. In addition to, and not including and/or limited by the Requested Interim Redeterminations allowed above, the Borrower may, by notifying the Administrative Agent thereof, at any time between Scheduled Redeterminations, request additional Requested Interim Redeterminations of the Borrowing Base in the event it acquires Oil and Gas Properties with Proved Reserves which are to be Borrowing Base Properties having a PV-9 (calculated at the time of acquisition) in excess of 5.0% of the Borrowing Base in effect immediately prior to such acquisition (as determined by the Administrative Agent); provided that for purposes of the foregoing, the designation of an Unrestricted Subsidiary owning Oil and Gas Properties with Proved Reserves as a Restricted Subsidiary shall be deemed to constitute an acquisition by the Borrower of Oil and Gas Properties with Proved Reserves. Substantially contemporaneously with the consummation of the Alternative Equitable Partition in accordance with Section 10.4(p), there shall be an additional Borrowing Base redetermination (an "Alternative Equitable Partition Redetermination" and together with Requested Interim Redeterminations, "Interim Redeterminations").

(c) Scheduled and Interim Redetermination Procedure.

(i) Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows: upon receipt by the Administrative Agent of (A) the Reserve Report and the Reserve Report Certificate, and (B) such other reports, data and supplemental information, including the information provided pursuant to Section 9.12(c) or Section 10.4(p)(ii), as may, from time to time, be reasonably requested by the Required Lenders (the Reserve Report, such Reserve Report Certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall in good faith propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including the status of title information with respect to the Borrowing Base Properties as described in the Engineering Reports and the existence of any Hedge Agreements or any other Indebtedness) as the Administrative Agent deems appropriate in good faith in accordance with its usual and customary oil and gas lending criteria as they exist at the particular time.

(ii) The Administrative Agent shall notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice"):

(A) in the case of a Scheduled Redetermination, (1) if the Administrative Agent shall have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely manner, then on or before thirty (30) days prior to the date of the first Scheduled Redetermination, September 1, 2017 and thereafter, March 1 and September 1 of such year following the date of delivery or (2) if the Administrative Agent shall not have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely manner, then promptly after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.14(c)(i); and

(B) in the case of an Interim Redetermination, promptly, and in any event, within 15 days after the Administrative Agent has received the required Engineering Reports and/or other information as may be required pursuant to Section 10.4(p)(ii).

(iii) Any Proposed Borrowing Base that would increase the Borrowing Base then in effect must be approved by each Lender in each such Lender's sole discretion and consistent with each such Lender's normal and customary oil and gas lending criteria as they exist at the particular time as provided in this Section 2.14(c)(iii) and any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect must be approved or be deemed to have been approved by Lenders constituting at least the Required Lenders in each such Lender's sole discretion and consistent with each such Lender's normal and customary oil and gas lending criteria as they exist at the particular time as provided in this Section 2.14(c)(iii). Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have 15 days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base. If, however, at the end of such 15-day period, each Lender or the Required Lenders, as applicable, have not approved, as aforesaid, then the Administrative Agent shall promptly thereafter poll the Lenders to ascertain the highest Borrowing Base then acceptable to the each Lender (in the case of any increase to the Borrowing Base) or a number of Lenders sufficient to constitute the Required Lenders (in any other case) and such amount shall become the new Borrowing Base, effective on the date specified in Section 2.14(d).

(d) Effectiveness of a Redetermined Borrowing Base. Subject to Section 2.14(h), after a redetermined Borrowing Base is approved by each Lender or the Required Lenders, as applicable, pursuant to Section 2.14(c)(iii), the Administrative Agent shall promptly thereafter notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Administrative Agent, the Issuing Banks and the Lenders:

(i) in the case of a Scheduled Redetermination, (A) if the Administrative Agent shall have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely and complete manner, on the date that is sixty (60) days after the Closing Date, October 1, 2017 and thereafter, the April 1st and October 1st, (or, in each case, as promptly as possible thereafter), following such notice, or (B) if the Administrative Agent shall not have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely and complete manner, then on the Business Day next succeeding delivery of such New Borrowing Base Notice; and

(ii) in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such New Borrowing Base Notice.

Subject to Section 2.14(h), such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date or the next adjustment to the Borrowing Base pursuant to the Borrowing Base Adjustment Provisions, whichever occurs first. Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

(e) Reduction of Borrowing Base Upon Incurrence of Borrowing Base Reduction Debt. Upon the issuance or incurrence of any Specified Additional Debt (other than (i) any Specified Additional Debt constituting Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness, but only to the extent that the aggregate principal amount of Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness does not exceed the principal amount of the Refinanced Indebtedness and (ii) without duplication of the Specified Additional Debt referenced in Section 2.14(e)(i), the first $200,000,000 of Specified Additional Debt incurred after the Closing Date), the Borrowing Base then in effect shall be reduced by an amount equal to the product of 0.25 multiplied by the stated principal amount of such Specified Additional Debt (without regard to any original issue discount), and the Borrowing Base as so reduced shall become the new Borrowing Base immediately upon the date of such issuance or incurrence, effective and applicable to the Borrower, the Administrative Agent, the Issuing Banks and the Lenders on such date until the next redetermination or modification thereof hereunder.

(f) Reduction of Borrowing Base Upon Termination of Hedge Positions and Asset Dispositions.

(i) If the Borrower or any Restricted Subsidiary changes the material economic terms, terminates, unwinds or cancels or creates any off-setting positions in respect of any commodity hedge positions (whether evidenced by a



012981

floor, put or other Hedge Agreement) upon which the Lenders relied in determining the Borrowing Base (each, an "Affected Commodity Hedge"), and/or

(ii) If the Borrower or one of the other Credit Parties Disposes of Oil and Gas Properties or Disposes of any Equity Interests in any Restricted Subsidiary or Minority Investment owning Oil and Gas Properties and such Disposition involves Borrowing Base Properties included in the most recently delivered Reserve Report, and

(iii) the sum of (x) the Swap PV of any such Affected Commodity Hedge (after taking into account the economic effect (including with respect to tenor) of any other Hedge Agreement executed contemporaneously with the taking of such actions) plus (y) the aggregate Borrowing Base Value of all such Borrowing Base Properties Disposed of (after giving effect to any concurrent acquisitions of and other Investments in Oil and Gas Properties by the Borrower and the Restricted Subsidiaries with respect to which the Borrower has delivered a Reserve Report in accordance with Section 9.12(b)), in each case, since the later of (I) the last Scheduled Redetermination Date and (II) the last adjustment of the Borrowing Base made pursuant to this Section 2.14(f) exceeds 5.0% of the then-effective Borrowing Base then, the Required Lenders shall have the right (upon the affirmative vote of the Required Lenders) to adjust the Borrowing Base in an amount equal to the sum of (1) the Borrowing Base Value, if any, attributable to such Affected Commodity Hedges in the calculation of the then-effective Borrowing Base (after taking into account the economic effect (including with respect to tenor) of any other Hedge Agreement executed contemporaneously with the taking of such actions) and (2) an amount equal to the Borrowing Base Value, if any, attributable to such Disposed of Borrowing Base Properties in the calculation of the then-effective Borrowing Base (after giving effect to any concurrent acquisitions of and other Investments in Oil and Gas Properties by the Borrower and the Restricted Subsidiaries with respect to which the Borrower has delivered a Reserve Report in accordance with Section 9.12(b)), where in each case the Borrowing Base Value shall be determined by the Required Lenders in accordance with the usual and customary oil and gas lending criteria as it exists at the particular time. If the Required Lenders in fact make any such adjustment, the Administrative Agent shall promptly notify the Borrower in writing of the Borrowing Base Value, if any, attributable to such Affected Commodity Hedges and Disposed of Borrowing Base Properties in the calculation of the then effective Borrowing Base and upon receipt of such notice, the Borrowing Base shall be simultaneously reduced by such amount.

(iv) For the purposes of this Section 2.14(f) a "Disposition" of Oil and Gas Properties shall be deemed to include the designation of a Restricted Subsidiary owning Oil and Gas Properties as an Unrestricted Subsidiary and the Disposition or other transfer of Oil and Gas Properties or the Equity Interests in any Restricted Subsidiary or Minority Investment owning Oil and Gas Properties to an Unrestricted Subsidiary.

(g) Reduction of Borrowing Base Related to Title. If (i) the Borrower fails to provide the information required by Section 9.13(a) within the time period specified therein or (ii) any title defect or exception requested by the Administrative Agent to be cured pursuant to Section 9.13(b) is not cured within the time period specified therein, the Required Lenders shall have the right to adjust the Borrowing Base upon at least three (3) Business Days' prior written notice (which such notice shall include the effective date of reduction) such that, after giving effect to such reduction, the Borrower shall have provided reasonably satisfactory title information in respect of the required percentage of the value of the Borrowing Base Properties, and upon the effective date of the reduction specified in the notice described above, the new Borrowing Base will become effective.

(h) Borrower's Right to Elect Reduced Borrowing Base. Within three (3) Business Days of its receipt of a New Borrowing Base Notice, the Borrower may provide written notice to the Administrative Agent and the Lenders that specifies for the period from the effective date of the New Borrowing Base Notice until the next succeeding Scheduled Redetermination Date, the Borrowing Base will be a lesser amount than the amount set forth in such New Borrowing Base Notice, whereupon such specified lesser amount will become the new Borrowing Base. The Borrower's notice under this Section 2.14(h) shall be irrevocable, but without prejudice to any party's right to initiate an Interim Redetermination or to the Borrowing Base Adjustment Provisions.

(i) Administrative Agent Data. The Administrative Agent hereby agrees to provide, promptly, and in any event within three (3) Business Days, following its receipt of a written request by the Borrower, an updated Bank Price Deck. In addition, the Administrative Agent agrees, upon reasonable request, to meet with the Borrower to discuss its evaluation of

the reservoir engineering of the Oil and Gas Properties included in the Reserve Report, its methodologies for valuing such properties and the other factors considered in calculating the Borrowing Base.

2.15 Defaulting Lenders. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a) Commitment Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 4.1(a);

(b) The Commitment and Total Exposure of such Defaulting Lender shall not be included in determining whether all Lenders, the Majority Lenders or the Required Lenders or each Lender have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 13.1); provided that (i) any waiver, amendment or modification requiring the consent of all Lenders pursuant to Section 13.1 or requiring the consent of each affected Lender pursuant to Section 13.1(a)(A) or (a)(I) shall require the consent of such Defaulting Lender (which for the avoidance of doubt would include any change to the Maturity Date applicable to such Defaulting Lender, decreasing or forgiving any principal or interest due to such Defaulting Lender, any decrease of any interest rate applicable to Loans made by such Defaulting Lender (other than the waiving of post-default interest rates) and any increase in or extension of such Defaulting Lender's Commitment) and (ii) any redetermination, whether an increase, decrease or affirmation, of the Borrowing Base shall occur without the participation of a Defaulting Lender, but the Commitment (*i.e.*, the Commitment Percentage of the Borrowing Base) of a Defaulting Lender may not be increased without the consent of such Defaulting Lender;

(c) If any Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender, then (i) all or any part of such Letter of Credit Exposure of such Defaulting Lender will, subject to the limitation in the first proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders *pro rata* in accordance with their respective Commitment Percentages; provided that (A) each Non-Defaulting Lender's Total Exposure may not in any event exceed the Commitment Percentage of the Loan Limit of such Non-Defaulting Lender as in effect at the time of such reallocation and (B) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Banks or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender, (ii) to the extent that all or any portion of the Defaulting Lender's Letter of Credit Exposure cannot, or can only partially, be so reallocated to Non-Defaulting Lenders, whether by reason of the first proviso in Section 2.15(c)(i) or otherwise, the Borrower shall within two Business Days following notice by the Administrative Agent Cash Collateralize for the benefit of the applicable Issuing Bank only the Borrower's obligations corresponding to such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to Section 2.15(c)(i) above), in accordance with the procedures set forth in Section 3.7 for so long as such Letter of Credit Exposure is outstanding, (iii) if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.15(c), the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period such Defaulting Lender's Letter of Credit Exposure is Cash Collateralized (and such fees shall be payable to the Issuing Banks), (iv) if the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.15(c), then the Letter of Credit Fees payable for the account of the Lenders pursuant to Section 4.1(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Commitment Percentages and the Borrower shall not be required to pay any Letter of Credit Fees to the Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period that such Defaulting Lender's Letter of Credit Exposure is reallocated, or (v) if any Defaulting Lender's Letter of Credit Exposure is neither Cash Collateralized nor reallocated pursuant to this Section 2.15(c), then, without prejudice to any rights or remedies of any Issuing Bank or any Lender hereunder, all Letter of Credit Fees payable under Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure shall be payable to such Issuing Bank until such Letter of Credit Exposure is Cash Collateralized and/or reallocated;

(d) So long as any Lender is a Defaulting Lender, no Issuing Bank will be required to issue any new Letter of Credit or amend any outstanding Letter of Credit to increase the Stated Amount thereof, alter the drawing terms thereunder or extend the expiry date thereof, unless such Issuing Bank is reasonably satisfied that any exposure that would result from the exposure to such Defaulting Lender is eliminated or fully covered by the Commitments of the Non-Defaulting Lenders or by

Cash Collateralization or a combination thereof in accordance with Section 2.15(c) above or otherwise in a manner reasonably satisfactory to such Issuing Bank, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.15(c)(i) (and Defaulting Lenders shall not participate therein);

(e) If the Borrower, the Administrative Agent and each Issuing Bank agree in writing in their discretion that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender and any applicable Cash Collateral shall be promptly returned to the Borrower and any Letter of Credit Exposure of such Lender reallocated pursuant to Section 2.15(c) shall be reallocated back to such Lender; provided that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender; and

(f) Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 11 or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 13.8), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a *pro rata* basis of any amounts owing by that Defaulting Lender to each Issuing Bank hereunder; third, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fourth, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fifth, to the payment of any amounts owing to the Lenders, each Issuing Bank as a result of any final judgment of a court of competent jurisdiction obtained by any Lender or such Issuing Bank against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; sixth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any final judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and seventh, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans or Unpaid Drawings, such payment shall be applied solely to pay the relevant Loans of, and Unpaid Drawings owed to, the relevant non-Defaulting Lenders on a *pro rata* basis prior to being applied in the manner set forth in this Section 2.15(f). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to Section 3.7 shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

SECTION 3. LETTERS OF CREDIT

3.1 Letters of Credit.

(a) Subject to and upon the terms and conditions herein set forth, at any time and from time to time on and after the Closing Date and prior to the L/C Maturity Date, each Issuing Bank, severally, and not jointly, agrees, in reliance upon the agreements of the Lenders set forth in this Section 3, to issue upon the request of the Borrower and for the direct or indirect benefit of the Borrower and the Restricted Subsidiaries, a letter of credit or letters of credit (the "Letters of Credit" and each, a "Letter of Credit") in such form and with such Issuer Documents as may be approved by the applicable Issuing Bank in its reasonable discretion; provided that the Borrower shall be a co-applicant of, and jointly and severally liable with respect to, each Letter of Credit issued for the account of a Restricted Subsidiary.

(b) Notwithstanding the foregoing, (i) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letters of Credit Outstanding at such time, would exceed the Letter of Credit Commitment then in effect, (ii) no Letter of Credit shall be issued the Stated Amount of which would cause the aggregate amount of all Lenders' Total Exposures at such time to exceed the Loan Limit then in effect, (iii) each Letter of Credit shall have an expiration date occurring no later

than twelve (12) months after the date of issuance or such longer period of time as may be agreed by the applicable Issuing Bank, unless otherwise agreed upon by the Administrative Agent and the applicable Issuing Bank or as provided under Section 3.2(b); provided that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to twelve (12) months or such longer period of time as may be agreed upon by the applicable Issuing Bank, subject to the provisions of Section 3.2(b); provided, further, that in no event shall such expiration date occur later than the L/C Maturity Date unless such Letter of Credit is Satisfactorily Cash Collateralized or Backstopped (iv) no Letter of Credit shall be issued if it would be illegal under any applicable Requirement of Law for the beneficiary of the Letter of Credit to have a Letter of Credit issued in its favor, (v) no Letter of Credit shall be issued by an Issuing Bank after it has received a written notice from any Credit Party or the Administrative Agent or the Majority Lenders stating that a Default or Event of Default has occurred and is continuing until such time as such Issuing Bank shall have received a written notice (A) of rescission of such notice from the party or parties originally delivering such notice, (B) of the waiver of such Default or Event of Default in accordance with the provisions of Section 13.1 or (C) that such Default or Event of Default is no longer continuing, (vi) no Issuing Bank shall have an obligation to issue a Letter of Credit in a Stated Amount which, when added to the outstanding Letters of Credit issued by such Issuing Bank, would exceed such Issuing Bank's Maximum Letter of Credit Commitment, and (vii) without the consent of the applicable Issuing Bank, no Letter of Credit shall be issued in any currency other than Dollars.

(c) Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the applicable Issuing Bank (which notice the Administrative Agent shall promptly transmit to each of the applicable Lenders), the Borrower shall have the right, on any day, permanently to terminate or reduce the Letter of Credit Commitment in whole or in part; provided that, after giving effect to such termination or reduction, the Letters of Credit Outstanding shall not exceed the Letter of Credit Commitment.

3.2 Letter of Credit Applications.

(a) Whenever the Borrower desires that a Letter of Credit be issued, amended or renewed for its account on its own behalf, or on behalf of its Restricted Subsidiaries, the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the applicable Issuing Bank and the Administrative Agent a Letter of Credit application, amendment request or any such document as may be approved by the applicable Issuing Bank (each, a "Letter of Credit Application"). Upon receipt of any Letter of Credit Application or amendment request, the applicable Issuing Bank will (A) use its best efforts to process such Letter of Credit Application on the Business Day on which such Letter of Credit Application is received, provided that such Letter of Credit Application is received no later than 12:00 p.m. (New York City time) on such Business Day, or (B) otherwise issue such Letter of Credit or amendment on the first Business Day next succeeding receipt of such Letter of Credit Application or amendment. No Issuing Bank shall issue any Letters of Credit unless such Issuing Bank shall have received notice from the Administrative Agent that the conditions to such issuance have been met.

(b) If the Borrower so requests in any applicable Letter of Credit Application, the applicable Issuing Bank may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit such Issuing Bank to prevent any such extension at least once in each 12-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such 12-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the applicable Issuing Bank, the Borrower shall not be required to make a specific request to such Issuing Bank for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable Issuing Bank to permit the extension of such Letter of Credit at any time to an expiry date not later than the L/C Maturity Date; provided, however, that such Issuing Bank shall not permit any such extension if (i) such Issuing Bank has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 3.1(b) or otherwise), or (ii) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date from the Administrative Agent that one or more of the applicable conditions specified in Section 7 are not then satisfied, and in each such case directing such Issuing Bank not to permit such extension.

(c) Each Issuing Bank (other than the Administrative Agent or any of its Affiliates) shall, at least once each week, provide the Administrative Agent with a list of all Letters of Credit issued by it that are outstanding at such time; provided that, upon written request from the Administrative Agent, such Issuing Bank shall thereafter notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Issuing Bank.

3.3 Letter of Credit Participations.

(a) Immediately upon the issuance by an Issuing Bank of any Letter of Credit, such Issuing Bank shall be deemed to have sold and transferred to each Lender (each such Lender, in its capacity under this Section 3.3, an "L/C Participant"), and each such L/C Participant shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Bank, without recourse or warranty, an undivided interest and participation (each an "L/C Participation"), to the extent of such L/C Participant's Commitment Percentage, in each Letter of Credit, each substitute therefor, each drawing made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.

(b) In determining whether to pay under any Letter of Credit, the relevant Issuing Bank shall have no obligation relative to the L/C Participants other than to confirm that (i) any documents required to be delivered under such Letter of Credit have been delivered, (ii) such Issuing Bank has examined the documents with reasonable care and (iii) the documents appear to comply on their face with the requirements of such Letter of Credit. Any action taken or omitted to be taken by the relevant Issuing Bank under or in connection with any Letter of Credit issued by it, if taken or omitted in the absence of gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction), shall not create for such Issuing Bank any resulting liability.

(c) In the event that an Issuing Bank makes any payment under any Letter of Credit issued by it and the Borrower shall not have repaid such amount in full to such Issuing Bank pursuant to Section 3.4(a), such Issuing Bank shall promptly notify the Administrative Agent (which shall promptly notify each L/C Participant) of such failure, and each such L/C Participant shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuing Bank, the amount of such L/C Participant's Commitment Percentage of such unreimbursed payment in Dollars and in immediately available funds. Each L/C Participant shall make available to the Administrative Agent for the account of the relevant Issuing Bank such L/C Participant's Commitment Percentage of the amount of such payment no later than 1:00 p.m. (New York City time) on the first Business Day after the date notified by such Issuing Bank in immediately available funds. If and to the extent such L/C Participant shall not have so made its Commitment Percentage of the amount of such payment available to the Administrative Agent for the account of the relevant Issuing Bank, such L/C Participant agrees to pay to the Administrative Agent for the account of such Issuing Bank, forthwith on demand, such amount, together with interest thereon for each day from such date until the date such amount is paid to the Administrative Agent for the account of such Issuing Bank at a rate *per annum* equal to the Overnight Rate from time to time then in effect, plus any administrative, processing or similar fees customarily charged by such Issuing Bank in connection with the foregoing. The failure of any L/C Participant to make available to the Administrative Agent for the account of any Issuing Bank its Commitment Percentage of any payment under any Letter of Credit shall not relieve any other L/C Participant of its obligation hereunder to make available to the Administrative Agent for the account of such Issuing Bank its Commitment Percentage of any payment under such Letter of Credit on the date required, as specified above, but no L/C Participant shall be responsible for the failure of any other L/C Participant to make available to the Administrative Agent such other L/C Participant's Commitment Percentage of any such payment.

(d) Whenever an Issuing Bank receives a payment in respect of an unpaid reimbursement obligation as to which the Administrative Agent has received for the account of such Issuing Bank any payments from the L/C Participants pursuant to Section 3.3(c) above, such Issuing Bank shall pay to the Administrative Agent and the Administrative Agent shall promptly pay to each L/C Participant that has paid its Commitment Percentage of such reimbursement obligation, in Dollars and in immediately available funds, an amount equal to such L/C Participant's share (based upon the proportionate aggregate amount originally funded by such L/C Participant to the aggregate amount funded by all L/C Participants) of the principal amount so paid in respect of such reimbursement obligation and interest thereon accruing after the purchase of the respective L/C Participations at the Overnight Rate.

(e) The obligations of the L/C Participants to make payments to the Administrative Agent for the account of an Issuing Bank with respect to Letters of Credit shall be irrevocable and not subject to counterclaim, set-off or other defense or any other qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including under any of the following circumstances:

(i) any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii) the existence of any claim, set-off, defense or other right that the Borrower or any other Person (including an L/C Participant) may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Issuing Bank, any Lender or other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower and the beneficiary named in any such Letter of Credit);

(iii) any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv) the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents;

(v) the occurrence of any Default or Event of Default; or

(vi) any other event, condition of circumstance, whether or not similar to the foregoing.

3.4 Agreement to Repay Letter of Credit Drawings.

(a) The Borrower hereby agrees to reimburse the relevant Issuing Bank by making payment in Dollars or to the Administrative Agent for the account of such Issuing Bank (whether with its own funds or with proceeds of the Loans) in immediately available funds, for any payment or disbursement made by such Issuing Bank under any Letter of Credit issued by it (each such amount so paid until reimbursed, an "Unpaid Drawing") (i) within one Business Day of the date of such payment or disbursement if such Issuing Bank provides notice to the Borrower of such payment or disbursement prior to 11:00 a.m. (New York City time) on such next succeeding Business Day (from the date of such payment or disbursement) or (ii) if such notice is received after such time, on the next Business Day following the date of receipt of such notice (such required date for reimbursement under Section 3.4(a)(i) or 3.4(a)(ii), as applicable, on such Business Day (the "Reimbursement Date")), with interest on the amount so paid or disbursed by such Issuing Bank, from and including the date of such payment or disbursement to but excluding the Reimbursement Date, at the *per annum* rate for each day equal to the rate described in Section 2.8(a); provided that, notwithstanding anything contained in this Agreement to the contrary, with respect to any Letter of Credit, (i) unless the Borrower shall have notified the Administrative Agent and such Issuing Bank prior to 11:00 a.m. (New York City time) on the Reimbursement Date that the Borrower intends to reimburse such Issuing Bank for the amount of such drawing with funds other than the proceeds of Loans, the Borrower shall be deemed to have given a Notice of Borrowing requesting that the Lenders make Loans (which shall be ABR Loans) on the Reimbursement Date in an amount equal to the amount at such drawing, and (ii) the Administrative Agent shall promptly notify each L/C Participant of such drawing and the amount of its Loan to be made in respect thereof, and each L/C Participant shall be irrevocably obligated to make a Loan to the Borrower in the manner deemed to have been requested in the amount of its Commitment Percentage of the applicable Unpaid Drawing by 12:00 noon (New York City time) on such Reimbursement Date by making the amount of such Loan available to the Administrative Agent. Such Loans made in respect of such Unpaid Drawing on such Reimbursement Date shall be made without regard to the Minimum Borrowing Amount and without regard to the satisfaction of the conditions set forth in Section 7. The Administrative Agent shall use the proceeds of such Loans solely for purpose of reimbursing the relevant Issuing Bank for the related Unpaid Drawing. In the event that the Borrower fails to Cash Collateralize any Letter of Credit that is outstanding on the L/C Maturity Date, the full amount of the Letters of Credit Outstanding in respect of such Letter of Credit shall be deemed to be an Unpaid Drawing subject to the provisions of this Section 3.4 except that such Issuing Bank shall hold the proceeds received from the Lenders as contemplated above as cash collateral for such Letter of Credit to reimburse any Drawing under

such Letter of Credit and shall use such proceeds first, to reimburse itself for any Drawings made in respect of such Letter of Credit following the L/C Maturity Date, second, to the extent such Letter of Credit expires or is returned undrawn while any such cash collateral remains, to the repayment of obligations in respect of any Loans that have not paid at such time and third, to the Borrower or as otherwise directed by a court of competent jurisdiction. Nothing in this Section 3.4(a) shall affect the Borrower's obligation to repay all outstanding Loans when due in accordance with the terms of this Agreement.

(b) The obligations of the Borrower under this Section 3 shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against such Issuing Bank, any beneficiary of a Letter of Credit, the Administrative Agent or any Lender (including in its capacity as an L/C Participant) or any other Person, including any defense based upon (i) the failure of any drawing under a Letter of Credit (each a "Drawing") to conform to the terms of the Letter of Credit, (ii) any non-application or misapplication by the beneficiary of the proceeds of such Drawing, (iii) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (iv) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (v) any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee, (vi) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or message or advice, however transmitted, in connection with any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank or (vii) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 3.4, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder; provided that the foregoing shall not be construed to excuse the relevant Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The Borrower expressly agrees that any action taken or omitted to be taken by an Issuing Bank under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction), shall be binding on the Borrower and shall not result in any liability of such Issuing Bank to the Borrower; provided that the foregoing shall not be construed to excuse such Issuing Bank from liability to the Borrower to the extent of any direct damages suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care, when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof as determined by a final and non-appealable judgment of a court of competent jurisdiction. In furtherance of the foregoing and without limiting the generality thereof, the parties hereto agree that, with respect to documents presented which appear on their face to be in compliance with the terms of a Letter of Credit, the Issuing Bank that issued such Letter of Credit may in its sole discretion either accept or make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit (unless the Borrower shall consent to payment thereon not withstanding such lack of strict compliance).

3.5 New or Successor Issuing Bank.

(a) Any Issuing Bank may resign as an Issuing Bank upon 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower. The Borrower may replace any Issuing Bank for any reason upon written notice to such Issuing Bank and the Administrative Agent and may add Issuing Banks at any time upon notice to the Administrative Agent. If an Issuing Bank shall resign or be replaced, or if the Borrower shall decide to add a new Issuing Bank under this Agreement, then the Borrower may appoint from among the Lenders (who have agreed to act as successor issuer of Letters of Credit or a new Issuing Bank) a successor issuer of Letters of Credit or a new Issuing Bank, as the case may be, or, with the consent of the Administrative Agent (such consent not to be unreasonably withheld) and such new Issuing Bank, another successor or new issuer of Letters of Credit, whereupon such successor issuer shall succeed to the rights, powers and duties of the replaced or

resigning Issuing Bank under this Agreement and the other Credit Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of an Issuing Bank hereunder, and the term "Issuing Bank" shall mean such successor or such new issuer of Letters of Credit effective upon such appointment. The acceptance of any appointment as an Issuing Bank hereunder whether as a successor issuer or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form reasonably satisfactory to the Borrower and the Administrative Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become an "Issuing Bank" hereunder. After the resignation or replacement of an Issuing Bank hereunder, the resigning or replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Credit Documents with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit. In connection with any resignation or replacement pursuant to this Section 3.5(a) (but, in case of any such resignation, only to the extent that a successor issuer of Letters of Credit shall have been appointed), either (i) the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning or replaced Issuing Bank replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) the Borrower shall cause the outstanding Letters of Credit to be Satisfactorily Cash Collateralized or Backstopped. After any resigning or replaced Issuing Bank's resignation or replacement as Issuing Bank, the provisions of this Agreement relating to an Issuing Bank shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was an Issuing Bank under this Agreement or (B) at any time with respect to Letters of Credit issued by such Issuing Bank.

(b) To the extent that there are, at the time of any resignation or replacement as set forth in Section 3.5(a) above, any outstanding Letters of Credit, nothing herein shall be deemed to impact or impair any rights and obligations of any of the parties hereto with respect to such outstanding Letters of Credit (including any obligations related to the payment of fees or the reimbursement or funding of amounts drawn), except that the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall have the obligations regarding outstanding Letters of Credit described in Section 3.5(a) above.

3.6 Role of Issuing Bank. Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, no Issuing Bank shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable to any Lender for (a) any action taken or omitted in connection herewith at the request or with the approval of the Majority Lenders, (b) any action taken or omitted in the absence of gross negligence or willful misconduct or (c) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable or responsible for any of the matters described in Section 3.3(e); provided that anything in such Section to the contrary notwithstanding, the Borrower may have a claim against an Issuing Bank, and such Issuing Bank may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by such Issuing Bank's willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction) or such Issuing Bank's unlawful failure (as finally determined by a court of competent jurisdiction) to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, any Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Issuing Bank shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

3.7 Cash Collateral.

(a) Upon the request of the Majority Lenders if, as of or following the L/C Maturity Date, there are any Letters of Credit Outstanding, the Borrower shall immediately Cash Collateralize the Letters of Credit Outstanding.

(b) If any Event of Default shall occur and be continuing, the Majority Lenders may require that the L/C Obligations be Cash Collateralized; provided that, upon the occurrence of an Event of Default referred to in Section 11.5 with respect to the Borrower, the Borrower shall immediately Cash Collateralize the Letters of Credit then outstanding and no notice or request by or consent from the Majority Lenders shall be required.

(c) For purposes of this Agreement, "Cash Collateralize" shall mean to (i) pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Banks and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to the amount of the Letters of Credit Outstanding required to be Cash Collateralized (the "Required Cash Collateral Amount") or (ii) if the relevant Issuing Bank benefiting from such collateral shall agree in its reasonable discretion, other forms of credit support (including any backstop letter of credit) in a face amount equal to 103% of the Required Cash Collateral Amount from an issuer reasonably satisfactory to such Issuing Bank, in each case under Section 3.5(c)(i) and 3.5(c)(ii) above pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Banks and the L/C Participants, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Such cash Collateral shall be maintained in blocked, interest bearing deposit accounts established by and in the name of the Borrower, but under the "control" (as defined in Section 9-104 of the UCC) of the Administrative Agent.

3.8 Applicability of ISP and UCP. Unless otherwise expressly agreed to by the relevant Issuing Bank and the Borrower when a Letter of Credit is issued (a) the rules of the ISP or the Uniform Customs and Practice for Documentary Credits shall apply to each standby Letter of Credit and (b) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each commercial Letter of Credit.

3.9 Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

3.10 Letters of Credit Issued for Restricted Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrower shall be obligated to reimburse the relevant Issuing Bank hereunder for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Restricted Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

3.11 Increased Costs. If, after the Closing Date, the adoption of any Change in Law shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy or similar requirement against Letters of Credit issued by any Issuing Bank, or any L/C Participant's L/C Participation therein, or (b) impose on any Issuing Bank or any L/C Participant any other conditions, costs or expenses affecting its obligations under this Agreement in respect of Letters of Credit or L/C Participations therein or any Letter of Credit or such L/C Participant's L/C Participation therein, and the result of any of the foregoing is to increase the cost to such Issuing Bank or such L/C Participant of issuing, maintaining or participating in any Letter of Credit, or to reduce the amount of any sum received or receivable by such Issuing Bank or such L/C Participant hereunder (other than (i) Indemnified Taxes or Other Taxes or (ii) Excluded Taxes) in respect of Letters of Credit or L/C Participations therein, then, promptly (and in any event no later than 15 days) after receipt of written demand to the Borrower by such Issuing Bank or such L/C Participant, as the case may be (a copy of which notice shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), the Borrower shall pay to such Issuing Bank or such L/C Participant such additional amount or amounts as will compensate such Issuing Bank or such L/C Participant for such increased cost or reduction, it being understood and agreed, however, that no Issuing Bank or L/C Participant shall be entitled to such compensation as a result of such Person's

compliance with, or pursuant to any request or directive to comply with, any such Requirement of Law as in effect on the Closing Date. A certificate submitted to the Borrower by the relevant Issuing Bank or an L/C Participant, as the case may be (a copy of which certificate shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), setting forth in reasonable detail the basis for the determination of such additional amount or amounts necessary to compensate such Issuing Bank or such L/C Participant as aforesaid shall be conclusive and binding on the Borrower absent clearly demonstrable error.

SECTION 4. FEES; COMMITMENTS.

4.1 Fees.

(a) The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Lender (in each case *pro rata* according to the respective Commitment Percentages of the Lenders), a commitment fee (the "Commitment Fee") for each day from the Closing Date until but excluding the Termination Date. Each Commitment Fee shall be payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and (ii) on the Termination Date (for the period ended on such date for which no payment has been received pursuant to Section 4.1(a)(i) above), and shall be computed for each day during such period at a rate *per annum* equal to the Commitment Fee Rate in effect on such day on the Available Commitment in effect on such day.

(b) The Borrower agrees to pay to the Administrative Agent in Dollars for the account of the Lenders *pro rata* on the basis of their respective Letter of Credit Exposure, a fee in respect of each Letter of Credit (the "Letter of Credit Fee"), for the period from the date of issuance of such Letter of Credit until the termination or expiration date of such Letter of Credit computed at the *per annum* rate for each day equal to the Applicable Margin for LIBOR Loans on the average daily Stated Amount of such Letter of Credit. Such Letter of Credit Fees shall be due and payable (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to Section 4.1(a)(i) above).

(c) The Borrower agrees to pay to each Issuing Bank a fee in respect of each Letter of Credit issued by it (the "Fronting Fee"), for the period from the date of issuance of such Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% *per annum* (or such other amount as may be agreed in a separate writing between the Borrower and the relevant Issuing Bank) on the average daily Stated Amount of such Letter of Credit (or at such other rate *per annum* as agreed in writing between the Borrower and the relevant Issuing Bank). Such Fronting Fees shall be due and payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to Section 4.1(a)(i) above).

(d) The Borrower agrees to pay directly to each Issuing Bank upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it such amount as the relevant Issuing Bank and the Borrower shall have agreed upon for issuances of, drawings under or amendments of, letters of credit issued by it.

(e) The Borrower agrees to pay to the Administrative Agent the administrative agent fees in the amounts and on the dates as set forth in writing from time to time between the Administrative Agent and the Borrower.

4.2 Voluntary Reduction of Commitments.

(a) Upon at least three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Commitments, in whole or in part; provided that (i) with respect to the Commitments, any such termination or reduction shall apply proportionately and permanently to reduce the Commitments of each of the Lenders (provided that (x) after giving effect to any such reduction and to the repayment of any Loans made on such date, the Total Exposure of any such Lender does not exceed the Commitment of such Lender and (y) for the avoidance of doubt, any

such repayment of Loans contemplated by the preceding Section 4.2(a)(i)(x) shall be made in compliance with the requirements of Section 5.3(a) with respect to the ratable allocation of payments hereunder and prior to any reduction being made to the Commitment of any other Lender), (ii) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least $1,000,000 and (iii) after giving effect to such termination or reduction and to any prepayments of Loans or cancellation or Cash Collateralization of Letters of Credit made on the date thereof in accordance with this Agreement, the aggregate amount of the Lenders' Total Exposures shall not exceed the Loan Limit.

(b) The Borrower may terminate the unused amount of the Commitment of a Defaulting Lender upon not less than three (3) Business Days' prior notice to the Administrative Agent (which will promptly notify the Lenders thereof), and in such event the provisions of Section 2.15(f) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts), provided that such termination will not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, any Issuing Bank or any Lender may have against such Defaulting Lender.

Notwithstanding anything to the contrary contained in this Agreement, any such notice of commitment termination pursuant to Section 4.2 may state that it is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

4.3 Mandatory Termination of Commitments. The Total Commitment shall terminate at 5:00 p.m. (New York City time) on the Termination Date.

SECTION 5. PAYMENTS.

5.1 Voluntary Prepayments. The Borrower shall have the right to prepay Loans without premium or penalty, in whole or in part from time to time on the following terms and conditions:

(a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and (in the case of LIBOR Loans) the specific Borrowing(s) being prepaid, which notice shall be given by the Borrower no later than 1:00 p.m. (New York City time) (i) in the case of LIBOR Loans, three (3) Business Days prior to and (ii) in the case of ABR Loans on the date of such prepayment and shall promptly be transmitted by the Administrative Agent to each of the Lenders;

(b) each partial prepayment of (i) LIBOR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof or a lesser amount to the extent such lesser amount represents the entire aggregate outstanding LIBOR Loans at such time, and (ii) any ABR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof or a lesser amount to the extent such lesser amount represents the entire aggregate outstanding ABR Loans at such time; provided that no partial prepayment of LIBOR Loans made pursuant to a single Borrowing shall reduce the outstanding LIBOR Loans made pursuant to such Borrowing to an amount less than the applicable Minimum Borrowing Amount for such LIBOR Loans; and

(c) any prepayment of LIBOR Loans pursuant to this Section 5.1 on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.11.

Each such notice shall specify the date and amount of such prepayment and the Type of Loans to be prepaid. At the Borrower's election in connection with any prepayment pursuant to this Section 5.1, such prepayment shall not be applied to any Loans of a Defaulting Lender except in accordance with Section 2.15(f).

Notwithstanding anything to the contrary contained in this Agreement, any such notice of prepayment pursuant to Section 5.1 may state that it is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

5.2 Mandatory Prepayments.

(a) Repayment following Optional Reduction of Commitments. If, after giving effect to any termination or reduction of the Commitments pursuant to Section 4.2(a), the aggregate Total Exposures of all Lenders exceeds the Loan Limit (as reduced), then the Borrower shall on the same Business Day (i) prepay the Loans on the date of such termination or reduction in an aggregate principal amount equal to such excess and (ii) if any excess remains after prepaying all of the Loans as a result of any Letter of Credit Exposure, pay to the Administrative Agent on behalf of the Issuing Banks and the L/C Participants an amount in cash or otherwise Cash Collateralize an amount equal to such excess as provided in Section 3.7.

(b) Repayment of Loans Following Redetermination or Adjustment of Borrowing Base.

(i) If, at any time, a Borrowing Base Deficiency exists (including as a result of a redetermination of the Borrowing Base in accordance with Section 2.14(b), but excluding any adjustment to the Borrowing Base pursuant to Sections 2.14(e), 2.14(f) or 2.14(h)), then the Borrower shall, within ten (10) Business Days after (x) its receipt of a New Borrowing Base Notice indicating such Borrowing Base Deficiency or (y) in the case of Section 2.14(g) the effectiveness of a new Borrowing Base, inform the Administrative Agent that it intends to take one or more of the following actions (with the option in Section 5.2(b)(i)(B) being deemed to be selected by the Borrower, if the Borrower fails to so inform the Administrative Agent): (A) within 30 days following such election prepay the Loans in an aggregate principal amount equal to such Borrowing Base Deficiency, (B) prepay the Loans in six equal monthly installments, commencing on the 30th day following such election with each payment being equal to l/6th of the aggregate principal amount of such Borrowing Base Deficiency, (C) within 15 days following such election, designate additional Oil and Gas Properties (accompanied by engineering reports reasonably acceptable to the Administrative Agent) not evaluated in the most recently delivered Reserve Report or other Collateral acceptable to the Administrative Agent having a Borrowing Base Value (as proposed by the Administrative Agent and approved by the Required Lenders in good faith in accordance with their respective usual and customary oil and gas lending criteria as they exist at the particular time) sufficient, after giving effect to any other actions taken pursuant to this Section 5.2(b)(i) to eliminate any such Borrowing Base Deficiency and within 30 days of such designation take actions as may be required for such designated Oil and Gas Properties to become Mortgaged Properties, or (D) undertake a combination of Sections 5.2(b)(i)(A), 5.2(b)(i)(B) and 5.2(b)(i)(C); provided that if, because of Letter of Credit Exposure, a Borrowing Base Deficiency remains after prepaying all of the Loans, the Borrower shall Cash Collateralize such remaining Borrowing Base Deficiency as provided in Section 3.7; provided further, that any Borrowing Base Deficiency must be cured on or prior to the Termination Date.

(ii) Upon any adjustment to the Borrowing Base pursuant to Section 2.14(e), 2.14(f) or 2.14(h), if the aggregate Total Exposures of all Lenders exceeds the Borrowing Base, as adjusted, then the Borrower shall (A) prepay the Loans in an aggregate principal amount equal to such Borrowing Base Deficiency and (B) if any excess remains after prepaying all of the Loans as a result of any Letter of Credit Exposure, Cash Collateralize such Borrowing Base Deficiency as provided in Section 3.7. The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral no later than three (3) Business Days following the date it receives written notice from the Administrative Agent of the adjustment of the Borrowing Base and the resulting Borrowing Base Deficiency; provided that all payments required to be made pursuant to this Section 5.2(b)(ii) must be made on or prior to the Termination Date.

(c) Application to Loans. With respect to each prepayment of Loans elected under Section 5.1 or required by Section 5.2, the Borrower may designate (i) the Types of Loans that are to be prepaid and the specific Borrowing(s) being repaid and (ii) the Loans to be prepaid; provided that (A) each prepayment of any Loans made pursuant to a Borrowing shall be applied *pro rata* among such Loans and (B) notwithstanding the provisions of the preceding clause (A), no prepayment of Loans shall be applied to the Loans of a Defaulting Lender except in accordance with Section 2.15(f). In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(d) LIBOR Interest Periods. In lieu of making any payment pursuant to this Section 5.2 in respect of any LIBOR Loan, other than on the last day of the Interest Period thereof so long as no Event of Default shall have occurred and be continuing, the Borrower at its option may deposit, on behalf of the Borrower, with the Administrative Agent an amount equal to the amount of the LIBOR Loan to be prepaid and such LIBOR Loan shall be repaid on the last day of the Interest Period

Case 23-90055 Document 1852-15 Filed in TXSB on 03/24/23 Page 145 of 300

therefor in the required amount. Such deposit shall be held by the Administrative Agent in a corporate time deposit account established on terms reasonably satisfactory to the Administrative Agent, earning interest at the then customary rate for accounts of such type. The Borrower hereby grants to the Administrative Agent, for the benefit of the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Such deposit shall constitute cash collateral for the LIBOR Loans to be so prepaid; provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 5.2.

(e) Application of Proceeds. The application of proceeds pursuant to this Section 5.2 shall not reduce the aggregate amount of Commitments under the Facility and amounts prepaid may be reborrowed subject to the Available Commitment.

5.3 Method and Place of Payment.

(a) Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto or the Issuing Banks entitled thereto, as the case may be, not later than 2:00 p.m. (New York City time), in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account. All repayments or prepayments of any Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. (New York City time) or, otherwise, on the next Business Day in the sole discretion of the Administrative Agent) like funds relating to the payment of principal or interest or fees ratably to the Lenders or the Issuing Banks, as applicable, entitled thereto.

(b) For purposes of computing interest or fees, any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day in the sole discretion of the Administrative Agent. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day as set forth in Section 1.7 and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

5.4 Net Payments.

(a) Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided that if the Borrower, any Guarantor or the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes or Other Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings of Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section 5.4) the Administrative Agent, the Collateral Agent, or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made. After any payment of Taxes by any Credit Party to a Governmental Authority as provided in this Section 5.4, the Borrower or other applicable withholding agent shall deliver to the Administrative Agent, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by law to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(b) The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for, any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c) The Credit Parties shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within 15 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error and shall constitute a required notice for purposes of Section 2.13.

(d) Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (i) whether or not any payments made hereunder or under any other Credit Document are subject to Taxes, (ii) if applicable, the required rate of withholding or deduction, and (iii) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Credit Party pursuant to any Credit Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction. In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e) Without limiting the generality of Section 5.4(d), each Lender with respect to any Loan made to the Borrower shall, to the extent it is legally eligible to do so:

(i) in the case of a Non-U.S. Lender, deliver to the Borrower and the Administrative Agent two copies of (A) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service ("IRS") Form W-8BEN or form W-8BEN-E, as applicable (or any applicable successor form) (together with a certificate (substantially in the form of Exhibit J hereto) representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, is not a "10-percent shareholder" (within the meaning of Section 881(c)(3)(B) of the Code) of the Borrower, is not a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code) and the interest payments in question are not effectively connected with the conduct by such Lender of a trade or business within the United States), (B) IRS Form W-8BEN or Form W-8BEN-E, as applicable, or Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in Section 5.4(e)(i)(A) and 5.4(e)(i)(B) above, provided that if the Non-U.S. Lender is a partnership and not a participating Lender, and one or more of the partners is claiming portfolio interest treatment, a certificate substantially in the form of Exhibit J hereto may be provided by such Non-U.S. Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made; provided, however, that such other form and supplementary documentation described in this Section 5.4(e)(i)(D) (other than forms and documentation also described in Sections 5.4(e)(i)(A), 5.4(e)(i)(B), or 5.4(e)(i)(C)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender; and

(ii) in the case of a U.S. Lender, deliver to the Borrower and the Administrative Agent two IRS Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such U.S. Lender is exempt from United States federal backup withholding.

Any documentation and information required to be delivered by a Lender pursuant to this Section 5.4(e) shall be delivered by such Lender (i) on or prior to the date it becomes a party to this Agreement, (ii) on or before any date on which such documentation expires or becomes obsolete or invalid, (iii) after the occurrence of any change in the Lender's circumstances requiring a change in the most recent documentation previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and each such Lender shall promptly notify in writing the Borrower and the Administrative Agent if such Lender is no longer legally eligible to provide any documentation previously provided.

Each Person that shall become a Participant pursuant to Section 13.6 or a Lender pursuant to Section 13.6 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 5.4(e); provided that in the case of a Participant such Participant shall furnish all such required forms and statements to the Person from which the related participation shall have been purchased.

(f) If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it has received a refund of an Indemnified Tax or Other Tax for which it has been indemnified pursuant to this Section 5.4 (including by the payment of additional amounts pursuant to this Section 5.4), then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (net of all reasonable out-of-pocket expenses of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse net after-Tax position (taking into account expenses or any taxes imposed on the refund) than it would have been in if the payment had not been required; provided that the Borrower or such Guarantor, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower or such Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority. No Lender nor the Administrative Agent nor the Collateral Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party in connection with this Section 5.4(f) or any other provision of this Section 5.4.

(g) On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement, the Administrative Agent shall deliver to the Borrower whichever of the following is applicable: (i) two executed copies of IRS Form W-9 or (ii) two executed copies of IRS Form W-8IMY certifying that it is a U.S. branch and has agreed to be treated as U.S. person for U.S. federal withholding tax purposes with respect to payments received by it from the Borrower.

(h) If a payment made to any Lender under this Agreement or any other Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this Section 5.4(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i) For the avoidance of doubt, for purposes of this Section 5.4, the term "Lender" includes any Issuing Bank and the term "applicable law" or "Requirement of Law" includes FATCA.

(j) The agreements in this Section 5.4 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

5.5 Computations of Interest and Fees.

(a) Except as provided in the next succeeding sentence, interest on LIBOR Loans and ABR Loans shall be calculated on the basis of a 360-day year for the actual days elapsed. Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the Administrative Agent's prime rate and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

(b) Fees and the average daily Stated Amount of Letters of Credit shall be calculated on the basis of a 360-day year for the actual days elapsed.

5.6 Limit on Rate of Interest.

(a) No Payment Shall Exceed Lawful Rate. Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect to any of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b) Payment at Highest Lawful Rate. If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c) Adjustment if Any Payment Exceeds Lawful Rate. If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower or any other Credit Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any applicable Requirement of Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable Requirements of Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.8.

(d) Rebate of Excess Interest. Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable Requirement of Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

SECTION 6. CONDITIONS PRECEDENT TO CLOSING DATE

6.1 Conditions Precedent to Closing Date. The obligations of the Lenders to make Loans and of the Issuing Banks to issue Letters of Credit under this Agreement on the Closing Date are subject to the satisfaction of the following conditions precedent, except as otherwise agreed or waived pursuant to Section 13.1.

(a) Credit Agreement. The Administrative Agent (or its counsel) shall have received from each party hereto counterparts (in such number as may be reasonably requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(b) Consummation of Acquisition. The Acquisition shall have been consummated, or shall be consummated substantially concurrently with the Closing Date, in accordance with the terms of the Purchase and Sale Agreement without giving effect to any amendments, consents or waivers thereto that is materially adverse to the interest of the Lenders without the consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed) and without there being any right of the Borrower or its Affiliates to terminate or not consummate the Acquisition that was available to the Borrower and its

Affiliates which was unexercised without the consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed).

(c) Purchase and Sale Agreement Representations and Specified Representations. The Administrative Agent shall have received a certificate from an Authorized Officer of the Borrower, certifying that as of the Closing Date, the Purchase and Sale Agreement Representations and the Specified Representations shall be true and correct in all material respects.

(d) Legal Opinions. The Administrative Agent shall have received, on behalf of itself, the Collateral Agent and the Lenders, (i) an opinion of Kirkland & Ellis LLP, counsel to the Credit Parties, substantially in the form of Exhibit M-1, (ii) an opinion of Kirkland & Ellis LLP, as special counsel to Sanchez, Parent, Holdings and Borrower, substantially in the form of Exhibit M-2 and (iii) an opinion of Akin Gump Strauss Hauer & Feld LLP, as special counsel to Sanchez, Parent, Holdings and the Borrower, substantially in the form of Exhibit M-3.

(e) Organizational Documentation. The Administrative Agent shall have received a certificate of an Authorized Officer of the Credit Parties, Parent and Holdings setting forth (i) resolutions of the Board of Directors with respect to the authorization of each of the Credit Parties to execute and deliver the Credit Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of each Credit Party, of Holdings or of Parent (A) who are authorized to sign the Credit Documents (on behalf of such Credit Party) to which such Credit Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such Authorized Officers, and (iv) the articles or certificate of incorporation and by-laws or other applicable Organizational Documents of the Credit Parties, Holdings and Parent, certified as being true and complete. The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(f) Closing Certificate. The Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying (i) after giving effect to the Acquisition, to the percentage of the aggregate PV-9 of the Proved Reserves in respect of the Acquired Assets included in the Initial Reserve Report that the Borrower will acquire as a result of the Acquisition, (ii) (A) to the transactions for which the Borrower and/or its Subsidiaries have material joint and several liability with any party as of the Closing Date and (B) that all transactions to which the Borrower and/or its Subsidiaries have joint and several liability are arms-length transactions, (iii) the conditions set forth in Sections 6.1(b), 6.1(c), 6.1(s) and 6.1(w) have been satisfied or waived, (iv) that attached to the certificate as Schedule 1 is a true and complete copy of the Purchase and Sale Agreement and (v) that Exhibits L and N-1 through N-6 represent true and complete copies of the GSO Preferred Equity Documentation referenced in Section 6.1(t) and the Material Contracts referenced in Section 6.1(x).

(g) Good Standing. The Administrative Agent shall have received a certificate of good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Credit Party as of a recent date prior to the Closing Date from such Secretary of State (or other similar official).

(h) Notice of Borrowing. The Administrative Agent shall have received a Notice of Borrowing as required by Section 2.3(a).

(i) Solvency Certificate. The Administrative Agent shall have received a solvency certificate substantially in the form of Exhibit I hereto and signed by a Financial Officer of the Borrower.

(j) Initial Reserve Report. The Administrative Agent shall have received the Initial Reserve Report.

(k) Security Documents. The Administrative Agent shall have received (i) from each party thereto executed counterparts (in such number as may be reasonably requested by the Administrative Agent) of the Collateral Agreement, (ii) UCC financing statements in proper form for filing sufficient to perfect the Collateral Agent's security interest in the Collateral perfected by such UCC financing statements and authorization to file such UCC financing statements and (iii) stock certificates,

if any, representing the Equity Interests in (A) each Domestic Subsidiary that is a Material Subsidiary owned by a Credit Party and (B) the Borrower, accompanied, in each case, by undated stock powers executed in blank.

(l) Lien Searches. The Administrative Agent (or its counsel) shall have received customary UCC, tax and judgment lien search results with respect to the Borrower and its Restricted Subsidiaries in their applicable jurisdictions of organization.

(m) Insurance Certificates. The Administrative Agent shall have received copies of insurance certificates evidencing the insurance required to be maintained by the Borrower and the Restricted Subsidiaries pursuant to Section 9.3.

(n) Financial Information. The Administrative Agent shall have received audited statements of revenues and direct expenses with respect to the Acquired Assets for fiscal years ended December 31, 2014 and December 31, 2015 and for the nine-month period ended September 30, 2016 (the "Closing Date Financials").

(o) Pro Forma Financials. The Administrative Agent shall have received (a) a *pro forma* consolidated balance sheet and related *pro forma* consolidated statement of income of the Borrower and its Subsidiaries as of and for the nine-month period ending September 30, 2016 and (b) a *pro forma* consolidated statement of income of the Borrower and its Subsidiaries as of and for the twelve-month period ending December 31, 2015, in each case, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statement of income).

(p) Minimum Availability. On the Closing Date, after giving effect to the Transactions, the Borrower shall have Available Commitments of not less than $65,000,000.

(q) PATRIOT Act. The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information about the Credit Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the PATRIOT Act that has been requested by the Administrative Agent in writing not less than ten (10) Business Days prior to the Closing Date.

(r) Fees and Expenses. The Administrative Agent, Lead Arrangers and the Lenders shall have received all fees due on the Closing Date and, to the extent invoiced at least three (3) Business Days before the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(s) Equity Contribution. The Equity Contribution shall have been consummated, or on the Closing Date shall be consummated substantially concurrently with the funding of the initial Borrowings hereunder and shall not be less than the amount equal to the greater of (i) the aggregate amount sufficient, when combined with the amount of any Borrowings on the Closing Date, to consummate the Acquisition and (ii) 60.0% of the purchase price paid by the Borrower under the Purchase and Sale Agreement for the Acquired Assets.

(t) GSO Preferred Equity Documentation. The GSO Preferred Equity Documentation shall be consistent with the forms attached hereto as Exhibit L.

(u) Minimum Hedging. The Administrative Agent shall have received reasonably satisfactory evidence from the Borrower that the Borrower has entered into Hedge Agreements with Approved Counterparties having notional volumes (excluding any volumes hedged pursuant to basis differential Hedge Agreements) equal to not less than 80.0% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Proved Developed Producing Reserves in respect of the Acquired Assets based upon the Initial Reserve Reports for the period of eighteen (18) months commencing immediately after the Closing Date (beginning with the calendar month no later than April 2017). With respect to such hedging requirements at least 75.0% of the notional volumes in respect of such Hedging Agreements provided for thereunder shall be in the form of (x) swaps, (y) puts or (z) collars (which, in the case of puts and collars, such puts and the put component of such collars shall be at then market prices as determined in

good faith and certified to by an Authorized Officer of the Borrower; provided that such puts and the put component of such collars may be entered into at prices that are within 5.0% of then market prices for the relevant commodity being hedged).

(v) Releases. The Administrative Agent shall have received, or concurrently with the Closing Date shall receive, evidence reasonably satisfactory to the Administrative Agent that duly executed recordable releases and terminations in forms reasonably acceptable to the Administrative Agent with respect to any and all liens or security interests encumbering the Acquired Assets relating to any Indebtedness for borrowed money of the Sellers or their Affiliates (as such term is defined in the Purchase and Sale Agreement) have been obtained.

(w) No Material Indebtedness. On the Closing Date, after giving effect to the Transactions, neither the Borrower nor any of its Subsidiaries shall have any Material Indebtedness for borrowed money other than the Facility, with any existing Indebtedness for borrowed money having been paid in full, any commitments associated with such indebtedness terminated and all liens and security interests released.

(x) Material Documents. The Material Contracts shall be consistent with the forms attached hereto as (a) in the case of the Joint Development Agreement, Exhibit N-1, (b) in the case of the Management Services Agreement, Exhibit N-2, (c) in the case of the Borrower's LPA, Exhibit N-3, (d) in the case of the Parent LLCA, Exhibit N-4, (e) in the case of the Development Agreement, Exhibit N-5, (f) in the case of the Marketing Agreement, Exhibit N-6 and (g) in the case of the Side Letter Agreement, Exhibit N-7.

(y) Expiration Date. The Closing Date shall occur prior to the Expiration Date.

The Administrative Agent shall notify the Credit Parties and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

SECTION 7. CONDITIONS PRECEDENT TO SUBSEQUENT CREDIT EVENTS.

The agreement of each Lender to make any Loan requested to be made by it on any date after the Closing Date, and the obligation of any Issuing Bank to issue Letters of Credit or amend any Letter of Credit to increase the amount thereof on any date after the Closing Date, is subject to the satisfaction of the following conditions precedent:

(a) No Default or Event of Default. At the time of each such Credit Event and also after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

(b) Representations and Warranties. All representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date and except that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates).

(c) Notice of Borrowing; Letter of Credit Application. Prior to the making of each Loan (other than any Loan made pursuant to Section 3.4(a)), the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of Section 2.3(a) or, in the case of a Letter of Credit, prior to the issuance of each Letter of Credit or any amendment to increase the amount of any Letter of Credit, the applicable Issuing Bank and the Administrative Agent shall have received a Letter of Credit Application as required by Section 3.2(a).

The acceptance of the benefits of each Credit Event after the Closing Date shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in Section 7 above have been satisfied as of that time.

SECTION 8. REPRESENTATIONS, WARRANTIES AND AGREEMENTS

In order to induce the Lenders to enter into this Agreement, to make the Loans and issue or participate in, or increase the amount of, Letters of Credit as provided for herein, the Borrower makes, on the date of each Credit Event, the following representations and warranties to, and agreements with, the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans and the issuance, or increase in the amount, of the Letters of Credit:

8.1 Corporate Status. Each of the Parent, Holdings, Borrower and each Material Subsidiary of the Borrower (a)(i) is duly organized and validly existing under the laws of the jurisdiction of its organization and (ii) has the corporate or other organizational power and authority to own its property and assets and to transact its business as now conducted and (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.2 Corporate Power and Authority; Enforceability. The Parent, Holdings and each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party. The Parent, Holdings and each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

8.3 No Violation. None of the execution, delivery or performance by the Parent, Holdings or any Credit Party of the Credit Documents to which it is a party will (a) contravene any Requirement of Law, except to the extent such contravention would not reasonably be expected to result in a Material Adverse Effect, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Credit Party or any of the Restricted Subsidiaries (other than Liens created under the Credit Documents and Permitted Liens) pursuant to the terms of Sanchez Specified Indebtedness with an aggregate principal amount in excess of $25,000,000, any indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other instrument to which such Credit Party or any of the Restricted Subsidiaries is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "Contractual Requirement") except to the extent such breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect or in the case of such Sanchez Specified Indebtedness in any material respect or (c) violate any provision of the Organizational Documents of the Parent, Holdings, any Credit Party or any of the Restricted Subsidiaries.

8.4 Litigation. Except as set forth on Schedule 8.4, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Borrower, threatened in writing with respect to the Borrower or any of its Restricted Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

8.5 Margin Regulations. Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, Regulation U or Regulation X of the Board.

8.6 Governmental Approvals; Other Consents. The execution, delivery and performance of each Credit Document do not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority or any other Person in connection with (a) the execution, delivery or performance by, or enforcement against, the Parent, Holdings or any Credit Party of this Agreement or any other Credit Document, (b) the grant by Parent, Holdings or any Credit Party of the Liens granted by it pursuant to the Security Documents, (c) the perfection or maintenance of the Liens created under the Security Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Security Documents, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the

Security Documents and (iii) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

8.7 Investment Company Act. Neither any Credit Party nor the Parent or Holdings is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

8.8 True and Complete Disclosure.

(a) All written factual information delivered to the Administrative Agent and the Lenders (other than the Projections, estimates and information of a general economic nature or general industry nature) (the "Information") concerning the Parent, Holdings, the Borrower, the Restricted Subsidiaries, the Transactions and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby and the negotiation of the Credit Documents (as modified or supplemented by other information so furnished), when taken as a whole, was true and correct in all material respects, as of the date when made and did not, taken as a whole, contain any untrue statement of a material fact as of the date when made or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made.

(b) The Projections (i) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof (it being understood that actual results may vary materially from the Projections), as of the date such Projections were furnished to the Lenders and (ii) as of the Closing Date, have not been modified in any material respect by the Borrower.

(c) As of the Closing Date, neither the Borrower nor any Restricted Subsidiary has any material Indebtedness, any material guarantee obligations, contingent liabilities, off balance sheet liabilities, partnership liabilities for taxes or unusual forward or long-term commitments that, in each case, have not been disclosed to the Administrative Agent.

8.9 Tax Matters. Except where the failure of which would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect, (a) each of the Borrower and its Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it (including in its capacity as withholding agent) and (b) has paid all Taxes payable by it that have become due, other than those (i) not yet delinquent or (ii) being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP.

8.10 Compliance with ERISA.

(a) (i) Each Plan (excluding Multiemployer Plans and Foreign Plans) is in compliance with ERISA, the Code and any applicable Requirement of Law; (ii) no Reportable Event has occurred with respect to any Plan (excluding Multiemployer Plans and Foreign Plans); (iii) no Plan (excluding Multiemployer Plans and Foreign Plans) is "insolvent" (within the meaning of Section 4245 of ERISA) or is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), and no written notice of any such insolvency or endangered or critical status has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; (iv) none of the Borrower or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate, been notified in writing that it will incur any liability under any of the foregoing Sections with respect to any Plan; (v) no proceedings have been instituted (or are reasonably likely to be instituted) to terminate any Plan (excluding Multiemployer Plans and Foreign Plans) or to appoint a trustee to administer any Plan (excluding Multiemployer Plans and Foreign Plans), and no written notice of any such proceedings has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; (vi) no lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate been notified in writing that such a lien will be imposed on the assets of the Borrower or any ERISA Affiliate on account of any Plan (excluding Multiemployer Plans and Foreign Plans); and (vii) no ERISA Event has or is reasonably likely

to occur with respect to any Plan, except to the extent that a breach of any of the representations or warranties in this Section 8.10(a) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect. No Plan (other than a Multiemployer Plan) has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.10(a), be reasonably likely to have a Material Adverse Effect. With respect to Plans that are Multiemployer Plans, the representations and warranties in this Section 8.10(a), other than any made with respect to (i) liability under Section 4201 or 4204 of ERISA or (ii) liability for "termination" (within the meaning of Title IV of ERISA) of such Plans under ERISA, are made to the knowledge of the Borrower.

(b) All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect. All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.11 Subsidiaries; Equity Interests. Schedule 8.11 lists each Subsidiary of the Borrower (and the direct and indirect ownership interest of the Borrower therein), in each case existing on the Closing Date (after giving effect to the Transactions). Each Guarantor, Material Subsidiary and Unrestricted Subsidiary as of the Closing Date (after giving effect to the Transactions) has been so designated on Schedule 8.11. All of the outstanding Equity Interests in the Borrower and the Restricted Subsidiaries have been validly issued, are fully paid and nonassessable and all such Equity Interests owned by any Credit Party are owned free and clear of all Liens except (i) those created under the Security Documents and (ii) any nonconsensual Lien that is permitted under Section 10.2.

8.12 Environmental Laws.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Borrower and each of the Subsidiaries are in compliance with all applicable Environmental Laws; (ii) neither the Borrower nor any Subsidiary has received written notice of any Environmental Claim; (iii) neither the Borrower nor any Subsidiary is conducting or has been ordered by a governmental agency to conduct any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; and (iv) neither the Borrower nor any of the Subsidiaries has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or formerly owned or leased facility in a manner that would reasonably be expected to give rise to liability of the Borrower or any Subsidiary under Environmental Law.

8.13 Properties.

(a) Assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary in connection with the Transactions and any assignments made in connection therewith, except as set forth on Schedule 8.13 hereto, each Credit Party has good and defensible title to the Borrowing Base Properties evaluated in the most recently delivered Reserve Report (other than those (i) disposed of in compliance with Section 10.4 since delivery of such Reserve Report, (ii) leases that have expired in accordance with their terms and (iii) with title defects disclosed in writing to the Administrative Agent), and valid title to all its material personal properties, in each case, free and clear of all Liens other than Liens permitted by Section 10.2, except in each case where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. After giving full effect to the Liens permitted by Section 10.2, the Borrower or the Restricted Subsidiary specified as the owner owns the working interests and net revenue interests attributable to the Hydrocarbon Interests as such working interests and net revenue interests are reflected in the most recently delivered Reserve Report, and the ownership of such properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such property in an amount in excess of the working interest of each property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such property.

(b) All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, except to the extent that any such failure to be valid or subsisting would not reasonably be expected to have a Material Adverse Effect.

(c) The rights and properties presently owned, leased or licensed by the Credit Parties including all easements and rights of way, include all rights and properties necessary to permit the Credit Parties to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to have a Material Adverse Effect.

(d) All of the properties of the Borrower and the Restricted Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except to the extent any failure to satisfy the foregoing would not reasonably be expected to have a Material Adverse Effect.

8.14 Solvency. After giving effect to the consummation of the Transactions (including the execution and delivery of this Agreement), the Borrower on a consolidated basis with its Restricted Subsidiaries will be Solvent.

8.15 Security Documents. The Security Documents create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien or security interest in the respective Collateral described therein as security for the Obligations to the extent that a legal, valid, binding and enforceable Lien or security interest in such Collateral may be created under any applicable Requirement of Law (subjected to Permitted Liens), which Lien or security interest, upon the filing of financing statements, recordation of the Mortgages or the obtaining of possession or "control," in each case, as applicable, with respect to the relevant Collateral as required under the applicable UCC or applicable local law, will constitute a fully perfected first Lien on, and security interest in, all right, title and interest of the Borrower and each other Credit Party thereunder in such Collateral, in each case prior and superior in right to any other Person (other than Permitted Liens which are permitted to be prior and superior), in each case to the extent that a security interest may be perfected by the filing of a financing statement under the applicable UCC, recordation of the Mortgages under applicable local law or by obtaining possession or "control."

8.16 Gas Imbalances, Prepayments. On the Closing Date, except as set forth on Schedule 8.16, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding 2.0% of the aggregate Hydrocarbon volumes (stated on an Mcf equivalent basis) listed on the most recent Reserve Report, that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

8.17 Marketing of Production. Except as set forth on Schedule 8.17 or otherwise disclosed to the Administrative Agent in writing, no material agreements exist (which are not cancelable on 60 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's and its Restricted Subsidiaries' average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months.

8.18 Hedge Agreements. Schedule 8.18 sets forth, as of the Closing Date, a true and complete list of all material commodity Hedge Agreements of each Credit Party, the terms thereof relating to the type, term, effective date, termination date and notional amounts or volumes, the net mark to market value thereof (as of February 24, 2017), all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

8.19 PATRIOT Act. On the Closing Date, each Credit Party is in compliance in all material respects with the material provisions of the PATRIOT Act.

8.20 Anti-Corruption Laws and Sanctions. The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and directors, and to the knowledge of the Borrower, its employees and agents, are in compliance with Anti-Corruption Laws

and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Borrower being designated as a Sanctioned Person. None of (a) the Borrower, any Subsidiary or, to the knowledge of the Borrower or such Subsidiary, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

8.21 No Material Adverse Effect. Since the Closing Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

8.22 Financial Statements.

(a) The annual financial statements in respect of the Closing Date Financials and, on and after the first date of delivery of financial statements pursuant to Section 9.1(a), the most recent financial statements delivered pursuant to Section 9.1(a) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except for customary year-end adjustments and the absence of complete footnotes and as otherwise expressly noted therein.

(b) The interim financial statements in respect of the Closing Date Financials and, on and after the first date of delivery of financial statements pursuant to Section 9.1(b), the most recent financial statements delivered pursuant to Section 9.1(b) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

8.23 Insurance. The properties of each Credit Party and each of its Restricted Subsidiaries are insured in accordance with the requirement of Section 9.3.

8.24 Use of Proceeds. The proceeds of the Loans shall be used for the acquisition, development and exploration of Oil and Gas Properties, and for working capital and other general corporate and partnership purposes of the Borrower and its Subsidiaries (including any transaction permitted hereunder).

8.25 Foreign Operations. The Borrower and the other Credit Parties do not own any Oil and Gas Properties not located within and will not conduct any operations outside the geographical boundaries of the United States.

8.26 Senior Debt Status. The Obligations constitute "Senior Indebtedness", "Designated Senior Indebtedness" or any similar designation under and as defined in any agreement governing any senior subordinated or subordinated Indebtedness and the subordination provisions set forth in each such agreement are legally valid and enforceable against the parties thereto.

8.27 EEA Financial Institutions. No Credit Party is an EEA Financial Institution.

SECTION 9. AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until Payment in Full.

9.1 Information Covenants. The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a) Annual Financial Statements. Within 90 days after the end of each fiscal year (120 days in the case of the fiscal year ending December 31, 2017) (and, in the case of the fiscal year ended December 31, 2016, such financial statements shall be limited to revenues and direct expenses with respect to the Acquired Assets), the audited consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such fiscal year, and the related consolidated statements of operations, shareholders' equity and cash flows and

a reasonably detailed description of the business activities that took place during the period covered by the financial statements, and, beginning with the financial statements for the fiscal year ending December 31, 2018, setting forth comparative consolidated figures for the preceding fiscal years (or, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements) prepared in accordance with GAAP, and, except with respect to such reconciliation, certified by KPMG LLP or another independent certified public accountants of recognized national standing whose opinion shall not be materially qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, (x) the occurrence of an upcoming maturity date of the Facility, (y) any potential or actual inability to satisfy a financial maintenance covenant, including the Financial Performance Covenants, on a future date or in a future period or (z) any cross-default or prospective cross default under another debt facility on the basis of a potential or actual inability to satisfy a financial maintenance covenant, including the Financial Performance Covenants, on a future date or in a future period), together in any event with a certificate of such accounting firm stating that in the course of either (i) its regular audit of the business of the Borrower and its consolidated Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards or (ii) performing certain other procedures permitted by professional standards, such accounting firm has obtained no knowledge of any Event of Default relating to the Financial Performance Covenants that has occurred and is continuing or, if in the opinion of such accounting firm such an Event of Default has occurred and is continuing, a statement as to the nature thereof.

(b) Quarterly Financial Statements. With respect to each of the first three quarterly accounting periods in each fiscal year of the Borrower, on or before the date that is 45 days after the end of each such quarterly accounting period (or, in the case of any fiscal quarter ending after the Closing Date and on or prior to September 30, 2017, 60 days), the consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows and a reasonably detailed description of the business activities that took place during the period covered by the financial statements and, beginning with the financial statements for the quarterly period ending March 31, 2018, setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of such periods in the prior fiscal year (or, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements), all of which shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows, of the Borrower and its consolidated Subsidiaries in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.

(c) Officer's Certificates. At the time of the delivery of the financial statements provided for in Section 9.1(a) and Section 9.1(b), a certificate of a Financial Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (i) beginning with the fiscal quarter ending June 30, 2017, the calculations required to establish whether the Borrower and its Restricted Subsidiaries were in compliance with the Financial Performance Covenants as at the end of such fiscal year or period, as the case may be, (ii) a specification of any change in the identity of the Restricted Subsidiaries, Material Subsidiaries, Guarantors and Unrestricted Subsidiaries as at the end of such fiscal year or period, as the case may be, from the Restricted Subsidiaries, Guarantors and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date or the most recent fiscal year or period, as the case may be, (iii) the amount of any *pro forma* adjustment not previously set forth in a certificate of a Financial Officer or any change in the amount of a *pro forma* adjustment set forth in any certificate of a Financial Officer previously provided and, in either case, in reasonable detail, the calculations and basis therefor, (iv) in the case of the delivery of financial statements provided for in Section 9.1(a), in reasonable detail the Applicable Equity Amount as at the end of the fiscal year to which such financial statements are applicable, (v) any new Subsidiaries that have been formed since the delivery of the last such certificate, whether such Subsidiaries need to become Credit Parties and copies of their Organizational Documents, (vi) in the case of the delivery of financial statements provided for in Section 9.1(a), a specification of each application by or on behalf of any Credit Party for any Patent with the United States Patent and Trademark Office and each registration of any Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright

Office, as applicable, filed during the preceding twelve-month period and (vii) a reasonably detailed description of any Preferred Stock (including the aggregate value of such Preferred Stock and information as to whether such Preferred Stock constitutes GSO Controlled Preferred Equity Interests or Qualified Preferred Equity) issued by the Borrower since the later of (A) the Closing Date and (B) the fiscal quarter most recently ended.

(d) Notice of Default; Litigation; ERISA Events. Promptly after an Authorized Officer of the Borrower or any of the Restricted Subsidiaries obtains actual knowledge thereof, notice of (i) the occurrence of any Default or Event of Default, which notice shall specify the nature thereof and what action the Borrower proposes to take with respect thereto, (ii) any litigation or governmental proceeding pending or threatened in writing against the Borrower or any of the Subsidiaries that would reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect and (iii) the occurrence of any ERISA Event or similar event with respect to a Plan or Foreign Plan, in each case, that would reasonably be expected to have a Material Adverse Effect.

(e) Environmental Matters. Promptly after obtaining actual knowledge of any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i) any Environmental Claim brought, filed or threatened in writing against any Credit Party; and

(ii) the actual release or threatened release of any Hazardous Material on, at, under or from any facility owned or leased by a Credit Party in violation of Environmental Laws or as would reasonably be expected to result in liability under Environmental Laws or the conduct of any investigation, or any removal, remedial or other corrective action under Environmental Laws in response to the actual or alleged presence, release or threatened release of any Hazardous Material on, at, under or from any facility owned or leased by a Credit Party.

All such notices shall describe in reasonable detail the nature of the claim, investigation, removal or remedial action.

(f) Other Information. With reasonable promptness, but subject to the limitations set forth in the last sentence of Section 9.2(a), such other information regarding the operations, business affairs and the financial condition of the Borrower or the Restricted Subsidiaries as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.

(g) Certificate of Authorized Officer – Hedge Agreements. Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all commodity Hedge Agreements of the Borrower and each Credit Party, the material terms thereof (in respect of the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof (as of the last Business Day of such fiscal year or period, as applicable and for which a mark-to-market value is reasonably available), any new credit support agreements relating thereto not listed on Schedule 8.17 or on any previously delivered certificate delivered pursuant to this Section 9.1(g), any margin required or supplied under any credit support document and the counterparty to each such agreement; provided that such certificate shall be required solely to the extent the foregoing certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(h) Certificate of Authorized Officer – Gas Imbalances. Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, certifying that as of the last Business Day of the most recently ended fiscal year or period, as applicable, except as specified in such certificate, on a net basis, there are no gas imbalances, ship or pay obligations or other prepayment obligations exceeding 2.0% of the aggregate Hydrocarbon volumes (stated on an Mcf equivalent basis) listed on the most recent Reserve Report, that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor; provided that such certificate shall be required solely to the extent the foregoing information and its certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(i) Certificate of Authorized Officer – Production Report and Lease Operating Statement. Concurrently with any delivery of each Reserve Report in connection with a Scheduled Redetermination, a certificate of an Authorized Officer of the Borrower, setting forth, for each calendar month during the then current fiscal year to date, the volume of production of Hydrocarbons and sales attributable to production of Hydrocarbons (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Borrowing Base Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto for each such calendar month; provided that such certificate shall be required solely to the extent the foregoing information and its certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(j) List of Purchasers. At the time of the delivery of the financial statements provided for in Section 9.1(a), a certificate of an Authorized Officer of the Borrower setting forth a list of Persons purchasing Hydrocarbons from the Borrower or any other Credit Party which account for greater than 25% of the revenues resulting from the sale of all Hydrocarbons from the Borrower and such other Credit Parties during the fiscal year for which such financial statements relate.

(k) Cash Flow and Capex Projections and Financial Projections; Approved Budget. (i) Concurrently with the delivery of the March 1st and September 1st Reserve Reports pursuant to Section 9.12(a), a reasonably detailed consolidated projection of cash flows and capital expenditures for the following four fiscal quarter period (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of each fiscal quarter, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto), which financial projections shall in each case be accompanied by a certificate of an Authorized Officer stating that such financial projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such financial projections, it being understood that actual results may vary from such financial projections and that such variations may be material. (ii) Each Approved Budget (as defined under the Joint Development Committee) when approved by the Operating Committee (as defined under the Joint Development Committee).

(l) Certificate of Authorized Officer – Marketing Agreements. Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all material marketing agreements for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months from the last day of such fiscal year or period, as applicable and are not cancellable on 60 days' notice or less without penalty or detriment; provided that such certificate shall be required solely to the extent the foregoing information and its certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(m) Sales and Dispositions and Hedge Unwinds.

(i) In the event the Borrower or any Restricted Subsidiary intends to Dispose of any Borrowing Base Properties, or Equity Interests in any Person owning Borrowing Base Properties, in each case, with a Borrowing Base Value in excess of 3.0% of the then-effective Borrowing Base in a single transaction or in multiple transactions since the later of (A) the last Scheduled Redetermination Date and (B) the last adjustment of the Borrowing Base made pursuant to Section 2.14(f) when combined with the Swap PV of any Hedge Agreements terminated, unwound or otherwise Disposed of by the Borrower or any Restricted Subsidiary during such time period, three (3) Business Days (or such shorter time period agreed by the Administrative Agent) prior written notice (which, for the avoidance of doubt, may be delivered by email) of such Disposition, the Borrowing Base Properties that are the subject of such Disposition, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent.

(ii) In the event that the Borrower or any Restricted Subsidiary intends to terminate, unwind or otherwise Dispose of Hedge Agreements with respect to which the Borrower reasonably believes the Swap PV of which (after taking into account the economic effect (including with respect to tenor) of any other Hedge Agreement executed contemporaneously with the taking of such actions and including any anticipated decline in the mark-to market value thereof)



013008

is in excess of 3.0% of the then-effective Borrowing Base in a single transaction or in multiple transactions since the later of (A) the last Scheduled Redetermination Date and (B) the last adjustment of the Borrowing Base made pursuant to Section 2.14(f) when combined with the Borrowing Base Value of any Disposition of any Borrowing Base Properties, or Equity Interests in any Person owning Borrowing Base Properties made during such time period, prior or concurrent written notice (which, for the avoidance of doubt, may be delivered by email) of the foregoing, the anticipated decline in the mark-to-market value thereof or net cash proceeds therefrom and any other details thereof reasonably requested by the Administrative Agent.

(n) Notices of Material Events related to Material Contracts.

(i) Written notice of any default or similar event under, or termination of, any Material Contract as promptly as practicable upon the Borrower or an Authorized Officer of the Borrower obtaining knowledge of such event (but, in any event, within three (3) Business Days upon receiving or providing written thereto from a third party (or such longer time agreed to by the Administrative Agent)).

(ii) Three (3) Business Days (or such shorter time agreed to by the Administrative Agent) prior written notice of any amendments, supplements, modifications, including through a waiver or consent, under any Material Contract.

(iii) As promptly as practicable after receipt, or provision, of any "Tag-Along Notice", notice of a "Tag-Along Offer", "ROFO Notice" or "IPO Notice" (each such quoted term having the meaning ascribed to it under the Joint Development Agreement) (but, in any event, within three (3) Business Days upon receiving or providing written thereto from a third party (or such longer time agreed to by the Administrative Agent)).

(iv) Prior written notice of entry into any transaction by the Borrower or its Restricted Subsidiaries with an Affiliate (other than the Borrower and the Restricted Subsidiaries) in which the Borrower or its Restricted Subsidiaries are jointly and severally liable with any other party for any obligation together with a certification from an Authorized Officer of the Borrower that such transaction is an arms-length transaction and will not result in a Default under any Credit Document or a breach of the Borrower's LPA or the Parent LLCA.

(v) After the appointment of an Independent Director (as defined in the Parent LLCA) to the board of directors of Parent or any Subsidiary, (A) five (5) Business Days (or such shorter time agreed to by the Administrative Agent in its sole discretion) prior written notice of any proposed change of such Independent Director and (B) notice of any resignation of such Independent Director no later than three (3) Business Days (or such longer time agreed to by the Administrative Agent in its sole discretion) following such resignation.

(o) Information Regarding the Parent, Holdings, Borrower and Subsidiaries.

(i) Patriot Act. Promptly upon request, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(ii) Changes. Prompt written notice of (and in any event at least five (5) Business Days prior thereto or such later time as the Administrative Agent may agree in its sole discretion) any change (A) in the Parent's, Holdings' or a Credit Party's corporate name, (B) in the location of the Parent's, Holdings' or Credit Party's chief executive office or principal place of business, (C) in the Parent's, Holdings' or Credit Party's form of organization, (D) in the Parent's, Holdings' or Credit Party's jurisdiction of organization and (E) in the Parent's, Holdings' or Credit Party's federal taxpayer identification number.

(iii) New Subsidiaries. Within five (5) Business Days of the formation of any Subsidiary of the Borrower (or such other time as the Administrative Agent may agree in its sole discretion), notice thereof and copies of the Organizational Documents of such Subsidiary.

(iv) Organizational Documents. Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the Organizational Documents of the Borrower or any Subsidiary.

It is understood that documents required to be delivered pursuant to Sections 9.1(a) through (o) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 13.2 or (ii) on which such documents are transmitted by electronic mail to the Administrative Agent; provided that: (A) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents delivered pursuant to Sections 9.1(a), 9.1(b), 9.1(c) and 9.1(f) to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (B) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of (or the provision of a link on the Borrower's website to) any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

9.2 Books, Records and Inspections.

(a) The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or officers and designated representatives of the Majority Lenders (as accompanied by the Administrative Agent), to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's and its Affiliates control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's and its Affiliates control to permit such inspection), and to examine the financial records of the Parent, Holdings, the Borrower and any such Restricted Subsidiary and discuss the affairs, finances, accounts and condition of the Parent, Holdings, the Borrower or any such Restricted Subsidiary with its and their officers and independent accountants therefor, in each case of the foregoing upon reasonable advance notice to the Borrower, all at such reasonable times and intervals during normal business hours and to such reasonable extent as the Administrative Agent or the Majority Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); provided that, excluding any such visits and inspections during the continuation of an Event of Default (i) only the Administrative Agent on behalf of the Majority Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 9.2 and the Administrative Agent shall not exercise such rights more than two (2) times during any calendar year absent a continuing Event of Default, and (ii) only one such visit per fiscal year shall be at the Borrower's expense; provided, further, that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) or any representative of the Majority Lenders may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Majority Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in Section 9.1(f) or this Section 9.2, neither the Parent, Holdings, the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (A) that constitutes non-financial trade secrets or non-financial proprietary information, (B) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding agreement or (C) that is subject to attorney-client or similar privilege or constitutes attorney work product.

(b) The Borrower will, and will cause each of the Restricted Subsidiaries to, maintain financial reports as may be required in accordance with GAAP.

9.3 Maintenance of Insurance. The Borrower will, and will cause each Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its

business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. The Secured Parties shall be the additional insureds on any such liability insurance as their interests may appear and, if property insurance is obtained, the Collateral Agent shall be the loss payee under any such property insurance; provided that, so long as no Event of Default has occurred and is then continuing, the Secured Parties will provide any proceeds of such property insurance to the Borrower.

9.4 Payment of Taxes and Obligations under Management Services Agreement, Side Letter Agreement and Marketing Agreement. The Borrower shall, and shall cause each Restricted Subsidiary to, pay, discharge or otherwise satisfy its payment obligations in respect of (a) all Tax liabilities, assessments and governmental charges, before the same shall become delinquent or in default, except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect and (b) each of (i) the Management Services Agreement, (ii) the Side Letter Agreement and (iii) the Marketing Agreement.

9.5 Maintenance of Existence; Compliance. The Borrower will, and will cause its Restricted Subsidiaries to, (a) (i) preserve, renew and keep in full force and effect its organizational existence in the State of Delaware and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Requirements and Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect; and (c) maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, the PATRIOT Act and applicable Sanctions.

9.6 Compliance with Statutes, Regulations, Etc. The Borrower will, and will cause each Restricted Subsidiary to, comply with all Requirements of Law applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.7 ERISA.

(a) Promptly after the Borrower knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to have a Material Adverse Effect, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Borrower, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto: (i) that an ERISA Event has occurred or is likely to occur; (ii) that a Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); (iii) that a proceeding has been instituted against the Borrower or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; (iv) or that the Borrower or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

(b) Promptly following any request therefor, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that the Borrower and any of its Subsidiaries may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the Borrower and any of its

Subsidiaries may request with respect to any Multiemployer Plan; provided that if the Borrower or any of its Subsidiaries has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable Subsidiaries shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

9.8 Maintenance of Properties. The Borrower will, and will cause each of the Restricted Subsidiaries to, except in each case, where the failure to so comply or cause would not reasonably be expected to result in a Material Adverse Effect (it being understood that this Section 9.8 shall not restrict any transaction otherwise permitted by Section 10.3 or Section 10.4):

(a) operate its Oil and Gas Properties and other material properties or cause such Oil and Gas Properties and other material properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable Contractual Requirements and all applicable Requirements of Law, including applicable proration requirements and Environmental Laws, and all applicable Requirements of Law of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom;

(b) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other material properties, including all equipment, machinery and facilities; and

(c) to the extent a Credit Party is not the operator of any property, the Borrower shall use commercially reasonable efforts to cause the operator to operate such property in accordance with customary industry practices.

9.9 Additional Guarantors, Grantors and Collateral.

(a) Subject to any applicable limitations set forth in the Guarantee or the Security Documents, the Borrower will cause (i) any direct or indirect Domestic Subsidiary (other than any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and (ii) any Domestic Subsidiary of the Borrower that ceases to be an Excluded Subsidiary, in each case within 45 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its reasonable discretion) to execute (A) a Guarantee or a supplement to the Guarantee, substantially in the form of Exhibit H thereto, in order to become a Guarantor, (B) a supplement to the Collateral Agreement, substantially in the form of Exhibit H thereto, in order to become a grantor and a pledgor thereunder, and (C) a joinder to the Intercompany Note. In connection with the execution and delivery of the Guarantee, the Borrower shall provide a customary opinion of counsel with respect to the Guarantee in form and substance reasonably satisfactory to the Administrative Agent.

(b) Subject to any applicable limitations set forth in the Collateral Agreement, (i) the Borrower will pledge, and, if applicable, will cause each other Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.9(a)) to pledge, to the Collateral Agent, for the benefit of the Secured Parties, (A) all of the Equity Interests (other than any Excluded Equity Interests) directly owned by the Borrower or any Credit Party (or Person required to become a Guarantor pursuant to Section 9.9(a)), in each case, formed or otherwise purchased or acquired after the Closing Date, pursuant to supplements to the Collateral Agreement substantially in the form of Exhibit H, thereto and (B) except with respect to intercompany Indebtedness, all evidences of Indebtedness of the type set forth in clauses (a) and (b) of the definition of Indebtedness in a principal amount in excess of $500,000 (individually) that is owing to the Borrower or any Guarantor (or Person required to become a Guarantor pursuant to Section 9.9(a)) (which shall be evidenced by a promissory note), in each case pursuant to supplements to the Collateral Agreement substantially in the form of Exhibit H thereto and (ii) Parent and Holdings will pledge, to the Collateral Agent, for the benefit of the Secured Parties, all of the Equity Interests of the Borrower owned by Parent or Holdings, as applicable, pursuant to the Collateral Agreement substantially in the form of Exhibit H, thereto.

(c) The Borrower agrees that all Indebtedness of the Borrower and each of its Restricted Subsidiaries that is owing to any Credit Party (or a Person required to become a Subsidiary Guarantor pursuant to Section 9.9(a)) shall be evidenced

by the Intercompany Note, which promissory note shall be required to be pledged to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Collateral Agreement.

(d) In connection with each redetermination (but not any adjustment) of the Borrowing Base, the Borrower shall review the applicable Reserve Report, if any, and the list of current Mortgaged Properties (as described in Section 9.12(c)), to ascertain whether the PV-9 of the Mortgaged Properties (calculated at the time of redetermination) is sufficient to meet the Collateral Coverage Minimum after giving effect to exploration and production activities, acquisitions, Dispositions and production. In the event that the PV-9 of the Mortgaged Properties (calculated at the time of redetermination) is not sufficient to meet the Collateral Coverage Minimum, then the Borrower shall, and shall cause the Credit Parties to, grant, within 60 days of delivery of the certificate required under Section 9.12(c) (or such longer period as the Administrative Agent may agree in its reasonable discretion), to the Collateral Agent as security for the Obligations a Lien (subject to Liens permitted by Section 10.2) on additional Oil and Gas Properties not already subject to a Lien of the Security Documents such that, after giving effect thereto, the PV-9 of the Mortgaged Properties (calculated at the time of redetermination) is sufficient to meet the Collateral Coverage Minimum. All such Liens will be created and perfected by and in accordance with the provisions of the Security Documents, including, if applicable, any additional Mortgages. In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its property and such Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with the provisions of Sections 9.9(a), (b) and (c).

9.10 Use of Proceeds.

(a) The Borrower will use the proceeds of Loans for the acquisition, development and exploration of Oil and Gas Properties, and for working capital and other general corporate and partnership purposes of the Borrower and its Subsidiaries (including any transaction expressly permitted hereunder).

(b) The Borrower will use Letters of Credit (i) for general corporate and partnership purposes and (ii) to support deposits required under purchase and sale agreements pursuant to which the Borrower or one or more Restricted Subsidiaries may acquire Oil and Gas Properties and (iii) to backstop obligations under contracts entered into from time to time incident to the Borrower's or any of its Subsidiaries' business.

9.11 Further Assurances.

(a) Subject to the applicable limitations set forth in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture, filings, assignments of as-extracted collateral to the extent constituting Collateral, mortgages, deeds of trust and other documents) that the Collateral Agent or the Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries.

(b) Notwithstanding anything to the contrary in this Agreement, the Collateral Agreement, or any other Credit Document, the Administrative Agent may grant extensions of time for or waivers of the requirements of the creation or perfection of security interests in or the obtaining of title opinions or other title information, legal opinions, appraisals, flood insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Credit Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items is not required by law or cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Credit Documents.

(c) Notwithstanding the foregoing provisions of this Section 9.11 or anything in this Agreement or any other Credit Document to the contrary: (i) the Collateral shall not include any property constituting an Excluded Asset while such property constitutes an Excluded Asset and (ii) no actions in any jurisdiction outside of the United States or that are necessary to comply with any Requirement of Law of any jurisdiction outside of the United States shall be required in order to create any security interest in assets located, titled, registered or filed outside of the United States or to prefect such security interests (it

being understood that there shall be no collateral agreements, security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the laws of any jurisdiction outside of the United States); provided that nothing in this Section 9.11 or any other provision of the Credit Documents shall affect or impair the Borrower's obligation to meet the Collateral Coverage Minimum.

9.12 Reserve Reports.

(a) On or before (x) the date that is thirty (30) days after the Closing Date, (y) September 1, 2017 and (z) thereafter, March 1st and September 1st of each year, the Borrower shall furnish to the Administrative Agent a Reserve Report evaluating, as of the immediately preceding January 1st and July 1st, the Proved Reserves of the Borrower and the Credit Parties located within the geographic boundaries of the United States of America and other applicable Oil and Gas Properties of the Credit Parties that the Borrower desires to have included in any calculation of the Borrowing Base. Each Reserve Report as of (i) January 1st shall be prepared by one or more Approved Petroleum Engineers and (ii) July 1st shall be prepared, at the sole election of the Borrower, (A) by one or more Approved Petroleum Engineers or (B) by or under the supervision of the chief engineer of Sanchez O&G or Sanchez.

(b) In the event of an Requested Interim Redetermination, the Borrower shall furnish to the Administrative Agent a Reserve Report prepared by one or more Approved Petroleum Engineers or prepared under the supervision of the chief engineer of Sanchez O&G or Sanchez. For any Requested Interim Redetermination pursuant to Section 2.14(b), the Borrower shall provide such Reserve Report with an "as of" date as required by the Administrative Agent, as soon as possible, but in any event no later than 30 days, in the case of any Requested Interim Redetermination requested by the Borrower or 45 days, in the case of any Requested Interim Redetermination requested by the Administrative Agent or the Lenders, following the receipt of such request.

(c) With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent a Reserve Report Certificate from an Authorized Officer of the Borrower certifying that in all material respects:

(i) in the case of Reserve Reports prepared by or under the supervision of the chief engineer of Sanchez O&G or Sanchez (other than January 1 Reserve Reports), such Reserve Report has been prepared, except as otherwise specified therein, in accordance with the procedures used in the immediately preceding January 1 Reserve Report or the Initial Reserve Report, if no January 1 Reserve Report has been delivered;

(ii) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects;

(iii) assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary in connection with the Transactions and any assignments made in connection therewith, except as set forth in an exhibit to such certificate, the Borrower or another Credit Party has good and defensible title to the Borrowing Base Properties evaluated in such Reserve Report (other than those (A) Disposed of in compliance with Section 10.4 since delivery of such Reserve Report, (B) leases that have expired in accordance with their terms and (C) with title defects disclosed in writing to the Administrative Agent) and such Borrowing Base Properties are free of all Liens except for Liens permitted by Section 10.2;

(iv) except as set forth on an exhibit to such certificate, as of the date of such Reserve Report, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 8.16 with respect to the Credit Parties' Oil and Gas Property evaluated in such Reserve Report that would require the Borrower or any other Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor;

(v) none of the Borrowing Base Properties have been Disposed of since the date of the last Borrowing Base determination except those Borrowing Base Properties listed on such certificate as having been Disposed of; and

(vi) the certificate shall also attach, as schedules thereto, a list of (A) all material marketing agreements (which are not cancellable on 60 days' notice or less without penalty or detriment) entered into subsequent to the later of the Closing Date and the most recently delivered Reserve Report for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and that have a maturity date or expiry date of longer than six months from the last day of such fiscal year or period, as applicable and (B) all Borrowing Base Properties constituting Proved Reserves evaluated by such Reserve Report that are Mortgaged Property and demonstrating that the PV-9 of such Mortgaged Property (calculated at the time of delivery of such Reserve Report) is sufficient to meet the Collateral Coverage Minimum.

9.13 Title Information.

(a) In connection with the delivery to the Administrative Agent of each Reserve Report required by Section 9.12(a) following the Closing Date, the Borrower will use commercially reasonably efforts to deliver or make available, if reasonably requested by the Administrative Agent in writing (which such request (i) if, in connection with acquisitions of Oil and Gas Properties resulting in an adjustment to the Borrowing Base, may be made at the time of any such Borrowing Base adjustment and (ii) otherwise, may not be made more than twice per year), within sixty (60) days of the date of such written request (or such longer period as the Administrative Agent may agree in its reasonable discretion), title information in form and substance reasonably acceptable to the Administrative Agent covering enough of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report, so that the Administrative Agent shall have had the opportunity to review (including title information previously made available to the Administrative Agent) title information reasonably satisfactory to the Administrative Agent on Borrowing Base Properties constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report.

(b) If title information has been provided under Section 9.13(a) and the Administrative Agent provides written notice to the Borrower that title defects or exceptions exist with respect to such properties, then the Borrower shall, within sixty (60) days of its receipt of such notice (or such longer period as the Administrative Agent may agree in its reasonable discretion) (i) cure any such title defects or exceptions (including defects or exceptions as to priority of the Collateral Agent's Liens that are not permitted by Section 10.2) raised by such information, (ii) substitute acceptable Mortgaged Properties having an equivalent value with no title defects or exceptions except for Liens permitted by Section 10.2 and/or (iii) deliver title information in form and substance reasonably acceptable to the Administrative Agent so that the Administrative Agent shall have received, (including title information previously made available to the Administrative Agent) reasonably satisfactory title information on Hydrocarbon Interests constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report.

(c) If any title defect or exception requested by the Administrative Agent to be cured cannot be cured or if the Borrower is unable to provide reasonably acceptable title information on Hydrocarbon Interests constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report, in each case, within such 60-day period (or longer period as the Administrative Agent may agree in its reasonable discretion), such default shall not be a Default or Event of Default, but instead the Administrative Agent and Required Lenders shall have the right to adjust the Borrowing Base as contemplated by Section 2.14(g).

9.14 Compliance with Environmental Laws. The Borrower will, and will cause each of the Restricted Subsidiaries to, except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain, maintain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent the Credit Parties or Subsidiaries are required by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

9.15 Deposit Account, Securities Account and Commodity Account Control Agreements. The Borrower will, and will cause each Guarantor to, in connection with any Deposit Account, Securities Account or Commodity Account (in each case, other than any Excluded Account for so long as it is an Excluded Account) (a) held or maintained on the Closing Date by the Borrower or any such Guarantor, promptly but in any event within sixty (60) days of the Closing Date (or such later date as the Collateral Agent may agree in its sole discretion), enter into and deliver to the Collateral Agent deposit account control agreements, securities account control agreements and commodity account control agreements, as applicable, in form and substance reasonably satisfactory to the Collateral Agent and the account bank or securities intermediary, as applicable, for any such Deposit Account, Securities Account or Commodity Account and (b) established on or after the Closing Date by the Borrower or any such Guarantor, (i) provide written notice to the Administrative Agent of the establishment of such Deposit Account, Securities Account or Commodity Account within ten (10) Business Days of such establishment (or such later time as the Administrative Agent may agree in its sole discretion) and (ii) promptly but in any event within thirty (30) days of the establishment of such Deposit Account, Securities Account or Commodity Account (or such later date as the Collateral Agent may agree in its sole discretion), enter into and deliver to the Collateral Agent a deposit account control agreement, securities account control agreement or commodity account control agreement, as applicable, in form and substance reasonably satisfactory to the Collateral Agent and the account bank, securities intermediary, or commodity intermediary as applicable, for any such Deposit Account, Securities Account or Commodity Account. After the occurrence and during the continuance of an Event of Default, the Collateral Agent may give instructions directing the disposition of funds credited to any Deposit Account, Securities Account or Commodity Account and/or withhold any withdrawal rights from the Borrower or any Guarantor with respect to funds credited to any Deposit Account, Securities Account or Commodity Account.

9.16 Minimum Hedged Volumes. The Borrower will on or before the last day of each fiscal quarter of the Borrower, enter into Hedge Agreements with Approved Counterparties so that, as of the last day of each such fiscal quarter, the Borrower will have entered into Hedge Agreements having notional volumes (excluding any volumes hedged pursuant to (x) basis differential Hedge Agreements or (y) Hedge Agreements which when entered into where not at then current market prices) equal to at least 50% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Borrower's and its Restricted Subsidiaries' Proved Developed Producing Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable, subject to update pursuant to Section 10.10(d)) for the period commencing with the last day of such fiscal quarter and ending twenty-four (24) months later; provided that the minimum hedging volume requirement set forth in this Section 9.16 shall be suspended during any time that the (a) Consolidated Total Net Leverage Ratio as of such time is equal to or less than 2.00:1.00 and (b) the aggregate outstanding principal amount of Loans at such time does not exceed $100,000,000.

9.17 Separateness. The Borrower will not, and will not permit any Restricted Subsidiary to:

(a) fail to comply with the covenants set forth in (i) Section 15.22 of the Borrower's LPA and any similar covenants related to separateness and (ii) any similar covenants set forth in the Organizational Documents of any Restricted Subsidiary;

(b) fail to observe all corporate, limited liability company or partnership formalities and other formalities required by their respective Organizational Documents or the laws of the jurisdiction where such entity is organized, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the law in the jurisdiction where such entity is organized;

(c) commingle its funds or assets with the funds or assets of any other Person; provided, however, that distributions made by the Borrower or the Restricted Subsidiary, as applicable, not in violation of its Organizational Documents or the Credit Documents shall not be considered assets of the Borrower or the Restricted Subsidiary, as applicable for purposes of this Section 9.17(c);

(d) fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates);

(e) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(f) hold itself out to be responsible for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person (other than pursuant to the arrangements provided for in (i) the Purchase and Sale Agreement, (ii) the Management Services Agreement, (iii) the Marketing Agreement, (iv) the Side Letter Agreement, (v) the Development Agreement and (vi) pursuant to Guarantees in accordance with the Credit Documents);

(g) fail to (i) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (ii) conduct its business solely in its own name, (iii) hold its assets in its own name or (iv) correct any known misunderstanding regarding its separate identity (provided the Borrower may authorize agents pursuant to the Management Services Agreement, in their own name as agents for the Borrower, to perform management services on behalf of the Borrower);

(h) fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(i) fail to pay its own liabilities from its own funds (other than pursuant to the arrangements provided for in (i) the Purchase and Sale Agreement, (ii) the Management Services Agreement, (iii) the Marketing Agreement, (iv) the Side Letter Agreement, (v) the Development Agreement and (vi) pursuant to Guarantees in accordance with the Credit Documents);

(j) identify its partners or other Affiliates, as applicable, as a division or part of it;

(k) guarantee, or otherwise become a restricted subsidiary pursuant to any agreement governing, the Indebtedness (as defined in the Borrower's LPA as in effect on the date hereof) of Holdings or any of its Affiliates (other than the Borrower and its Subsidiaries);

(l) fail to be adequately capitalized to engage in its business separate and apart from Sanchez and its Affiliates and to remain solvent;

(m) fail to ensure that all material transactions between the Borrower, its Subsidiaries, on the one hand, and Sanchez or its Affiliates (other than the Borrower and its Restricted Subsidiaries), on the other hand, whether currently existing or hereafter entered into, will be on an arm's length basis;

(n) have the same slate of Persons serving as officers of Sanchez or any of its Affiliates (excluding the Borrower and any of its Restricted Subsidiaries) also serve in the same capacities with the Borrower or any of its Subsidiaries;

(o) permit the assets of the Borrower and its Subsidiaries to be listed as assets on the financial statement of any other Person; provided, however, that the assets of the Borrower and its Subsidiaries may be included in a consolidated financial statement of Sanchez and its Affiliates, provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of the Borrower and its Subsidiaries and Parent, Holdings and their Affiliates and to indicate that the Borrower's and its Subsidiaries' assets and credit are not available to satisfy the debts and other obligations of Parent, Holdings, their respective Affiliates or any other Person and (ii) such assets shall be listed on the Borrower's and its Subsidiaries' own separate balance sheet(s);

(p) the representations made pursuant to Section 15.22(c) of the Borrower's LPA shall prove to be untrue.

It is understood that, for the avoidance of doubt, compliance with the covenants set forth in other Sections shall not be deemed to constitute compliance with the covenants contained in this Section 9.17.

9.18 Proceeds of Loans. The Borrower will, and will cause each of the Guarantors, to maintain the proceeds of the Loans in a Controlled Account until such proceeds are transferred to a third party in a transaction not prohibited by the Credit

Documents or a deposit account which is not required to be a Controlled Account for a purpose that is permitted by the Credit Documents.

9.19 Post-Closing Obligations.

(a) The Borrower will, within thirty (30) days following the Closing Date (subject to extension by the Administrative Agent in its sole discretion), provide title information in form and substance reasonably satisfactory to the Administrative Agent covering enough of the Credit Parties' Borrowing Base Properties evaluated by the Initial Reserve Report, so that the Administrative Agent shall have had the opportunity to review title information reasonably satisfactory to the Administrative Agent on Borrowing Base Properties constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report.

(b) The Borrower will use commercially reasonable efforts to enter into Hedge Agreements with Approved Counterparties as soon as practicable after the Closing Date, taking into account the Borrower's good faith determination of market factors and volume limitations (but in no event later than the twentieth (20th) Business Day following the Closing Date), having notional volumes (excluding any volumes hedged pursuant to basis differential Hedge Agreements) equal to not less than 80.0% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Borrower's and its Restricted Subsidiaries' Proved Developed Producing Reserves in respect of the Acquired Assets based upon the Initial Reserve Reports for the period of 19 through 36 months after the Closing Date (beginning with the calendar month no later than April 2017) . With respect to such hedging requirements (1) at least 75.0% of the notional volumes in respect of such Hedge Agreement provided for thereunder shall be in the form of (x) swaps, (y) puts or (z) collars (which, in the case of puts and collars, such puts and the put component of such collars shall be at then market prices as determined in good faith and certified to by an Authorized Officer of the Borrower; provided that such puts and the put component of such collars may be entered into at prices that are within 5.0% of then market prices for the relevant commodity being hedged) and (2) on a time of the week during business hours identified by the Borrower in writing (which may include email) to the Administrative Agent beginning no later than five (5) Business Days of the Closing Date, the Borrower shall provide a weekly update on the status of hedges put in place and hold a call with the Administrative Agent to discuss the hedging process on a weekly basis until the aforementioned requirement in this Section 9.19 has been met (it being agreed and understood that if the Borrower fails to provide such update and hold such call at such specified times (other than as a result of the failure of the Administrative Agent to participate in such call), the Borrower shall have three (3) Business Days (or such longer time acceptable to the Administrative Agent in its sole discretion) after receipt of written notice from the Administrative Agent of the failure to so provide such update and hold such call and if such update is provided and call occurs within such three (3) Business Day period (or such longer time acceptable to the Administrative Agent in its sole discretion), then no failure of this Section 9.19 shall be deemed to have occurred hereunder).

(c) Within 60 days of the Closing Date, the Borrower shall, and shall cause the Credit Parties to, grant to the Collateral Agent as security for the Obligations a Lien (subject to Liens permitted by Section 10.2) on Oil and Gas Properties such that, after giving effect thereto, the PV-9 of the Borrowing Base Properties constituting Mortgaged Property is sufficient to meet the Collateral Coverage Minimum. All such Liens will be created and perfected by and in accordance with the provisions of the Security Documents. In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its property and such Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with the provisions of Sections 9.9(a), (b) and (c). In connection with the delivery of Mortgages pursuant to this Section 9.19(c), the Borrower shall deliver to the Administrative Agent (i) customary opinions of counsel in form and substance reasonably acceptable to the Administrative Agent and (ii) any other documents reasonably requested by the Administrative Agent for the prompt completion of the recording or filing of such Mortgages as may be necessary to create a valid first-priority mortgage Lien (subject to Liens permitted by Section 10.02) on such Oil and Gas Properties.

SECTION 10. NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until Payment in Full:

10.1 Limitation on Indebtedness. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness other than the following:

(a) Indebtedness arising (i) under the Credit Documents and (ii) any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness; provided that, if such Indebtedness is secured by any of the Collateral, it shall be secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement;

(b) Indebtedness of a Borrower or any Restricted Subsidiary in an amount not to exceed the Applicable Equity Amount so long as such Indebtedness (i) is (A) unsecured or (B) if secured, secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement and (ii) does not mature or become subject to mandatory redemption prior to 91 days after the Maturity Date if such Indebtedness is of the type referred to in clauses (a) and (b) of the definition of Indebtedness;

(c) Indebtedness of (i) the Borrower or any Guarantor owing to the Borrower or any Subsidiary; provided that any such Indebtedness owing by a Credit Party to a Subsidiary that is not a Guarantor shall (x) be evidenced by the Intercompany Note or (y) otherwise be outstanding on the Closing Date so long as such Indebtedness is evidenced by an intercompany note substantially in the form of Exhibit H or otherwise subject to subordination terms substantially identical to the subordination terms set forth in Exhibit H, in each case, to the extent permitted by Requirements of Law, (ii) any Subsidiary that is not a Guarantor owing to any other Subsidiary that is not a Guarantor and (iii) to the extent permitted by Section 10.5, any Subsidiary that is not a Guarantor owing to the Borrower or any Guarantor;

(d) subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness or other obligations of the Borrower or other Restricted Subsidiaries that is permitted to be incurred under this Agreement (except that a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section 10.1(d), guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1) and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; provided that (A) if the Indebtedness being guaranteed under this Section 10.1(d) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (B) no guarantee by any Restricted Subsidiary of any Permitted Additional Debt shall be permitted unless such Restricted Subsidiary shall have also provided a guarantee of the Obligations substantially on the terms set forth in the Guarantee;

(e) Guarantee Obligations (i) incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors, licensees or sublicensees or (ii) otherwise constituting Investments permitted by Sections 10.5(c), 10.5(f), 10.5(g), 10.5(h), 10.5(i), 10.5(n), 10.5(o) and 10.5(p);

(f) (i) Indebtedness (including Indebtedness arising under Capital Leases) incurred prior to or within 270 days following the acquisition, construction, lease, repair, replacement, expansion or improvement of assets (real or personal, and whether through the direct purchase of property or the Equity Interests of a Person owning such property) to finance the acquisition, construction, lease, repair, replacement expansion, or improvement of such assets, (ii) Indebtedness arising under Capital Leases, other than (A) Capital Leases in effect on the Closing Date and (B) Capital Leases entered into pursuant to Section 10.1(f)(i) above and (iii) any Permitted Refinancing Indebtedness issued or incurred to Refinance any such Indebtedness; provided, that the aggregate principal amount of Indebtedness permitted by Sections 10.1(f)(i), 10.1(f)(ii) and 10.1(f)(iii) shall not exceed at any time outstanding the greater of $20,000,000, 2.5% of Consolidated Total Assets and 2.5% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date of incurrence of such Indebtedness based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date);

(g) Indebtedness outstanding on the date hereof to the extent such Indebtedness is set forth on Schedule 10.1 and any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness;

(h) Indebtedness in respect of Hedge Agreements, subject to the limitations set forth in Section 10.10;

(i) Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, and obligations in respect of letters of credit, bank guaranties or instruments related thereto, in each case provided in the ordinary course of business or consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice;

(j) (i) other additional Indebtedness and (ii) any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness, provided that, in each case, (A) the aggregate principal amount of Indebtedness outstanding at any time pursuant to this Section 10.1(j) shall not at the time of incurrence thereof and immediately after giving effect thereto and the use of proceeds thereof on a Pro Forma Basis, exceed the greater of $50,000,000, 5% of Consolidated Total Assets and 5% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date of incurrence of such Indebtedness based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date) and (B) if such Indebtedness is secured by any of the Collateral, secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement;

(k) Indebtedness in respect of Permitted Additional Debt and any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness; provided that (i) Liquidity shall be greater than or equal to 15.0% of the Borrowing Base immediately prior to such incurrence, (ii) immediately after giving effect to the incurrence or issuance thereof and the use of proceeds therefrom, the Borrower shall be in compliance with the Financial Performance Covenants on a Pro Forma Basis (with the maximum ratio for the Consolidated Total Net Leverage Ratio Financial Covenant being deemed to be 3.50:1.00 for this purpose) and (iii) if secured, secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement;

(l) Cash Management Obligations, Cash Management Services and other Indebtedness in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business;

(m) Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(n) Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case assumed or entered into in connection with the Transactions, Investments permitted by Section 10.5 and the Disposition of any business, assets or Equity Interests not prohibited hereunder;

(o) Indebtedness of the Borrower or any Restricted Subsidiary consisting of obligations to pay insurance premiums;

(p) Indebtedness representing deferred compensation to employees, consultants or independent contractors of (i) the Borrower or (ii) to the extent attributable to the ownership or operation of Parent, Holdings, the Borrower and its Restricted Subsidiaries incurred in the ordinary course of business or consistent with past practice;

(q) Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions or any other Investment permitted hereunder; and

(r) Indebtedness associated with bonds or surety obligations required by Requirements of Law or by Governmental Authorities in connection with the operation of Oil and Gas Properties in the ordinary course of business.

For purposes of determining compliance with Section 10.1, in the event that an item of Indebtedness (or any portion thereof) at any time, whether at the time of incurrence or issuance or upon the application of all or a portion of the proceeds thereof or subsequently, meets the criteria of more than one of the categories of permitted Indebtedness described in Sections

10.1(a) through 10.1(r) above, the Borrower, in its sole discretion, will classify and may subsequently reclassify such item of Indebtedness (or any portion thereof) in any one or more of the types of Indebtedness described in Sections 10.1(a) through 10.1(r) and will only be required to include the amount and type of such Indebtedness in such of the above Sections as determined by the Borrower at such time. The Borrower will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Sections 10.1(a) through 10.1(r) above.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount, and the payment of interest or dividends in the form of additional Indebtedness of the same class, accretion or amortization of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, will, in each case, not be deemed to be an incurrence of Indebtedness for purposes of this Section 10.1. The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness or Disqualified Stock, as applicable, being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal (or equivalent) amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

In no event shall any definition of 'Change of Control' or an equivalent concept in any Material Indebtedness of the type contemplated in clauses (a) and (b) of the definition of Indebtedness be less favorable to the Borrower than the definition of Change of Control herein unless this Agreement is amended to incorporate any such less favorable terms.

10.2 Limitation on Liens. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or any Restricted Subsidiary, whether now owned or hereafter acquired, except:

(a) Liens arising under the Credit Documents to secure the Obligations (including Liens in respect of any Letter of Credit or Letter of Credit Application or Liens contemplated by Section 3.7) or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage);

(b) Permitted Liens (which shall not secure Indebtedness set forth in clauses (a) and (b) of the definition thereof);

(c) Liens (including liens arising under Capital Leases to secure obligations under any Capital Lease) securing Indebtedness permitted pursuant to Section 10.1(f); provided that (i) such Liens attach concurrently with or within 270 days after the acquisition, lease, repair, replacement, construction, expansion or improvement (as applicable) financed thereby, (ii) other than the property financed by such Indebtedness, such Liens do not at any time encumber any property, except for replacements thereof and accessions and additions to such property and the proceeds and the products thereof and customary security deposits and (iii) with respect to Capital Leases, such Liens do not at any time extend to or cover any assets (except for accessions and additions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of, such Indebtedness; provided that in each case individual financings permitted pursuant to Section 10.1(f) provided by one lender may be cross collateralized to other financings permitted pursuant to Section 10.1(f) provided by such lender (and its Affiliates);

(d) Liens existing on the date hereof listed on Schedule 10.2(d) and any such replacement thereof that does not increase the principal amount of the Indebtedness secured by such Lien or expand the Collateral subject to such Lien;

(e) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien permitted by this Section 10.2; provided, however, that (x) such new Lien shall be limited to all or part of the same type of property that secured the original Indebtedness (plus improvements on and accessions to such property) (or upon or in after-acquired property (i) that is affixed or incorporated into the property covered by such Lien or (ii) if the terms of such Indebtedness require or include a pledge of after acquired property (it being understood that such requirement shall not be

permitted to apply to any property to which such requirement would not have applied but for such acquisition)), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the applicable Indebtedness at the time the original Lien became a Lien permitted hereunder, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement and (z) on the date of the incurrence of the Indebtedness secured by such Liens, the grantors of any such Liens shall comprise only the same Persons or a subset of such Persons that were the grantors of the Liens securing the debt being refinanced, refunded, extended, renewed or replaced; provided further that in no event shall any such Liens secure Indebtedness set forth in clauses (a) and (b) of the definition thereof with the Collateral unless secured by Junior Liens and the representative of such Indebtedness becomes party to a Customary Intercreditor Agreement;

(f) Liens securing Indebtedness or other obligations (i) of the Borrower or a Restricted Subsidiary in favor of a Credit Party that are Junior Liens and (ii) of any Restricted Subsidiary that is not a Credit Party in favor of any Restricted Subsidiary that is not a Credit Party;

(g) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 10.5 to be applied against the purchase price for such Investment and (ii) consisting of an agreement to Dispose of any property in a transaction permitted under Section 10.4, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(h) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business permitted by this Agreement;

(i) Liens that are contractual rights of set-off (i) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (ii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(j) Liens solely on any cash earnest money deposits made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement in connection with an Investment permitted under Section 10.5;

(k) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(l) Liens in respect of Production Payments and Reserve Sales, subject to adjustment of the Borrowing Base as set forth in Section 2.14(f) as required under Section 10.4(b);

(m) agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business;

(n) Liens securing any Indebtedness permitted by (i) Section 10.1(d) (solely and to the same extent that the Indebtedness guaranteed by such Guarantee Obligations is permitted to be subject to a Lien hereunder), (ii) Sections 10.1(i), 10.1(n) and 10.1(r), so long as the aggregate amount of Indebtedness, secured pursuant to this Section 10.2(n)(ii) does not exceed the greater of $20,000,000, 2% of Consolidated Total Assets and 2% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date of incurrence of such Indebtedness based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date), and (iii) Section 10.1(k) (provided that such Liens are Junior Liens on the Collateral and subject to a Customary Intercreditor Agreement);

(o) Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(l), or other Environmental Law, unless such Lien (i) by action of the lienholder, or by operation of law, takes priority over any Liens arising under the Credit Documents on the property upon which it is a Lien, or

(ii) materially impairs the use of the property covered by such Lien for the purposes for which such property is held; provided that such Liens described in prongs (i) and (ii) shall not be deemed to include institutional controls or activity and use limitations that are utilized in connection with remedial actions pursuant to Environmental Laws;

(p) any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions to the extent any amount would be permitted to be applied to such Indebtedness in accordance with Section 10.7 on the date when such amount was provided to such trustee; and

(q) additional Liens on property not constituting Borrowing Base Properties and/or Junior Liens on Collateral so long as the outstanding principal amount of the obligations secured thereby, when aggregated with the outstanding principal of other obligations secured by Liens permitted under this Section 10.2(q), at the time of the incurrence thereof and immediately after giving effect thereto and the use of proceeds thereof on a Pro Forma Basis does not exceed the greater of $50,000,000, 5% of Consolidated Total Assets and 5% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date on which such Lien or the Indebtedness secured is incurred based upon the financial statements or Reserve Report, as applicable, most recently available prior to the such date).

No intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of the Liens permitted under this Section 10.2 or the use of the phrase "subject to" when used in connection with Permitted Liens, Liens permitted by this Section 10.2 or otherwise. It is understood that there shall be no Liens on non-Borrowing Base Properties securing Consolidated Total Indebtedness (excluding Indebtedness of the type set forth in clause (e) of the definition of Indebtedness) other than Lien securing the Obligations and Junior Liens securing Specified Additional Debt.

10.3 Limitation on Fundamental Changes. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of, all or substantially all its business units, assets or other properties, taken as a whole, except that:

(a) any Restricted Subsidiary that is not a Guarantor may (i) merge, amalgamate or consolidate with or into any other Restricted Subsidiary and (ii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower, a Guarantor or any other Restricted Subsidiary of the Borrower;

(b) any Subsidiary Guarantor may (i) merge, amalgamate or consolidate with or into any other Subsidiary Guarantor and (ii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Guarantor; and

(c) any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise Disposed of or transferred in accordance with Section 10.4, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution.

10.4 Limitation on Sale of Assets. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, (x) convey, sell, lease, sell and leaseback, assign, transfer (including any Production Payments and Reserve Sales) or otherwise dispose (each of the foregoing a "Disposition") of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired or (y) sell to any Person (other than the Borrower or a Guarantor) any shares owned by it of any Restricted Subsidiary's Equity Interests, except that:

(a) the Borrower and the Restricted Subsidiaries may Dispose of (i) inventory and other goods held for sale, including Hydrocarbons, obsolete, worn out, used or surplus equipment, vehicles and other assets (other than accounts receivable) in the ordinary course of business, (ii) Permitted Investments, and (iii) assets, other than Proved Reserves of the Borrower and its Restricted Subsidiaries, for the purposes of charitable contributions or similar gifts to the extent such assets

are not material to the ability of the Borrower and its Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b) the Borrower and the Restricted Subsidiaries may Dispose of any Borrowing Base Properties or of all the Equity Interests in a Subsidiary owning Borrowing Base Properties so long as (i) such Disposition is for Fair Market Value, (ii) at least 75% of the consideration for such Disposition is cash received by the Borrower or Restricted Subsidiary making such Disposition, (iii) if the aggregate Borrowing Base Value of all such Borrowing Base Properties Disposed of since the later of (A) the last Scheduled Redetermination Date and (B) the last adjustment of the Borrowing Base made pursuant to Section 2.14(f) exceeds 5.0% of the then-effective Borrowing Base (calculated together with the other items required under Section 2.14(f) including the termination or off-set of Hedge Agreements), then the Borrowing Base shall be adjusted in accordance with the provisions of Section 2.14(f) and (iv) (A) no Event of Default exists or would result such Disposition and (B) no Borrowing Base Deficiency exists or would result therefrom (unless, in each case, the net proceeds of such Disposition are applied to reduce such Borrowing Base Deficiency);

(c) the Borrower and the Restricted Subsidiaries may Dispose of property or assets to the Borrower or to a Restricted Subsidiary; provided that if the transferor of such property is a Credit Party (i) the transferee thereof is a Credit Party or (ii) such transaction is permitted under Section 10.5(f)(iii);

(d) to the extent such transaction constitutes a Disposition, the Borrower and any Restricted Subsidiary may effect any transaction permitted by Section 10.2 (other than Section 10.2(l)), Section 10.3, Section 10.5(d), Section 10.5(h) (as contemplated by the proviso of Section 10.5(h)(i)) or Section 10.5(l), or Section 10.6 (other than in the case of Section 10.6, to the extent any such Restricted Payment by the Borrower consists of Oil and Gas Properties);

(e) the Borrower and the Restricted Subsidiaries may lease, sublease, license or sublicense (on a non-exclusive basis with respect to any intellectual property) real (other than Oil and Gas Properties), personal or intellectual property in the ordinary course of business;

(f) Like-kind exchanges of property (other than Borrowing Base Properties) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property and (iii) any such Disposition is for Fair Market Value;

(g) Farm-Out Agreements with respect to undeveloped acreage to which no Proved Reserves are attributable and assignments in connection with such Farm-Out Agreements;

(h) Dispositions at Fair Market Value of Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding agreements to the extent the same would be permitted under Section 10.5(i); provided that, immediately after giving effect thereto and on a Pro Forma Basis, (i) no Event of Default shall have occurred and be continuing and (ii) no Borrowing Base Deficiency exists (unless the net proceeds of such Disposition are applied to reduce such Borrowing Base Deficiency);

(i) transfers of property subject to a Casualty Event or in connection with any condemnation proceeding with respect to Collateral;

(j) Dispositions or discounts without recourse of accounts receivable in true sale transactions (i) in connection with the collection or compromise thereof in the ordinary course of business or (ii) to the extent the proceeds thereof are used to prepay any Loans then outstanding;

(k) the unwinding or termination of any Hedge Agreement (subject to the terms of Section 2.14(f));

(l) Dispositions of Oil and Gas Properties that are not Borrowing Base Properties or all the Equity Interests of any Restricted Subsidiary or of any Minority Investment owning Oil and Gas Properties that are not Borrowing Base Properties; provided that, immediately after giving effect thereto and on a Pro Forma Basis, (i) no Event of Default shall have

occurred and be continuing and (ii) no Borrowing Base Deficiency exists (unless the net proceeds of such Disposition are applied to reduce such Borrowing Base Deficiency); provided further that, if such Restricted Subsidiary or Minority Investment also own assets other than Oil and Gas Properties that are not Borrowing Base Properties, such Disposition shall not permitted pursuant to this Section 10.4(l) unless another clause of Section 10.4 permits such Disposition with respect to such assets;

(m) any issuance or sale of Equity Interests in, or sale of Indebtedness or other securities of, an Unrestricted Subsidiary (or a Restricted Subsidiary which owns an Unrestricted Subsidiary at Fair Market Value so long as such Restricted Subsidiary owns no assets other than the Equity Interests of such Unrestricted Subsidiary);

(n) subject to adjustment of the Borrowing Base as set forth in Section 2.14(f) to the extent applicable, any swap of assets (other than cash equivalents) in exchange for other assets in the ordinary course of business of comparable or greater value to the business of the Borrower and its Restricted Subsidiaries, taken as a whole, as determined in good faith by the management of the Borrower; it is understood, for avoidance of doubt, that the Alternative Equitable Partition is not permitted under this Section 10.4(n); provided, that, any Disposition of Borrowing Base Properties pursuant to this Section 10.4(n) in any transaction or series of related transactions shall be limited to properties having a value not to exceed 10% of the Borrowing Base then in effect unless otherwise agreed to by the Administrative Agent in its sole discretion;

(o) (i) any Restricted Subsidiary that is not a Guarantor may Dispose of its assets to the Borrower, a Guarantor or any other Restricted Subsidiary of the Borrower and (ii) any Guarantor may Dispose of its assets to the Borrower or any of its Subsidiary Guarantors; and

(p) the Alternative Equitable Partition (as defined in the Joint Development Agreement), subject to (i) prior receipt of the ROFO Notice (as defined in the Joint Development Agreement) as set forth in Section 9.1(n)(iii) and (ii) prior provision of information (A) reasonably necessary to consummate an Alternative Equitable Partition Redetermination upon the consummation of such Alternative Equitable Participation and (B) reasonably requested by the Administrative Agent related to the Alternative Equitable Partition, in each case for this Section 10.4(p)(ii) as soon as practicable in light of the terms of the Joint Development Agreement.

To the extent any Collateral is Disposed of as expressly permitted by this Section 10.4 to any Person other than a Credit Party, such Collateral shall be sold free and clear of the Liens created by the Credit Documents, and, if requested by the Administrative Agent, upon certification by an Authorized Officer of the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing (provided that the Borrower shall provide such certification prior to the Administrative Agent taking any such actions in respect of a Disposition of Borrowing Base Properties).

10.5 Limitation on Investments. The Borrower will not, and will not permit any of the Restricted Subsidiaries, to (i) purchase or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned Restricted Subsidiary immediately prior to such merger, consolidation or amalgamation) any Equity Interests, evidences of Indebtedness or other securities of any other Person or make capital contributions to any other Person, (ii) assume, or make any loans, advances or other extensions of credit to (including in respect of the issuance of a Letter of Credit on behalf of) or guarantees of, the Indebtedness of any other Person or (iii) purchase or otherwise acquire (in one transaction or a series of related transactions) (x) all or substantially all of the property and assets or business of another Person or (y) assets constituting a business unit, line of business or division of such Person (each, an "Investment"), except:

(a) extensions of trade credit and purchases of assets and services (including purchases of inventory, supplies and materials) in the ordinary course of business;

(b) Investments in assets that constituted Permitted Investments at the time such Investments were made;

(c) (i) Investments existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date as set forth on Schedule 10.5(c), (ii) Investments existing on the Closing Date of the Borrower or any Restricted Subsidiary in any other Subsidiary and (iii) any extensions, modifications, replacements, renewals or reinvestments thereof, so long as the amount of any Investment made pursuant to this Section 10.5(c) is not increased at any time above the amount of

such Investment as of the Closing Date (other than (a) pursuant to an increase as required by the terms of any such Investment as in existence on the Closing Date or (b) as otherwise permitted under this Section 10.5);

(d) any Investment acquired by the Borrower or any of its Restricted Subsidiaries: (i) in exchange for any other Investment, accounts receivable or endorsements for collection or deposit held by the Borrower or any such Restricted Subsidiary in each case in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer), (ii) in satisfaction of judgments against other Persons, (iii) as a result of a foreclosure by the Borrower or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default or (iv) as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates;

(e) Investments to the extent that payment for such Investments is made with Qualified Equity Interests of the Borrower or a Parent Entity;

(f) Investments (i) by the Borrower in any Guarantor or by any Guarantor in the Borrower, (ii) by any Restricted Subsidiary that is not a Guarantor in the Borrower or any other Restricted Subsidiary, and (iii) by the Borrower or any Guarantor in any Restricted Subsidiary that is not a Guarantor, valued at the Fair Market Value (determined by the Borrower in good faith) of such Investment at the time each such Investment is made, in an aggregate amount outstanding pursuant to this Section 10.5(f)(iii) that, at the time such Investment is made, would not exceed $10,000,000;

(g) Investments constituting direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint bidding, joint venture or area of mutual interest agreements, gathering, transportation, processing or related systems, development agreements, unitization agreements, pooling arrangements, service contracts, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America;

(h) Investments including Investments in joint ventures (regardless of the form of legal entity) or similar Persons that do not constitute Restricted Subsidiaries, in each case valued at the Fair Market Value (determined by the Borrower acting in good faith) of such Investment at the time each such Investment is made, in an aggregate amount outstanding pursuant to this Section 10.5(h) not to exceed the sum of (i) the greater of $30,000,000 and 3% of Consolidated Total Assets and 3% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date such Investment is made based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date); provided, however, Investments under this clause (h)(i) made in Persons other than the Borrower and the Guarantors, valued at the Fair Market Value (determined by the Borrower in good faith) of such Investment at the time each Investment is made, together with Investments made under Section 10.5(f)(iii), shall not exceed $10,000,000 at any time outstanding, plus (ii) the Applicable Equity Amount at such time plus (iii) an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash from cash generated by any such bona fide Investment made under this Section 10.5(h) and which amount shall not exceed the amount of such Investment valued at the Fair Market Value of such Investment at the time such Investment was made;

(i) Investments made at any such time during which, immediately after giving effect to the making of any Investment (i) on a Pro Forma Basis no Borrowing Base Deficiency exists and no Default or Event of Default shall have occurred and be continuing, (ii) Liquidity is not less than 20% of the then effective Borrowing Base and (iii) on a Pro Forma Basis the Borrower shall be in compliance with the Financial Performance Covenant set forth in Section 10.11(a), with the required maximum Consolidated Total Net Leverage Ratio being deemed to be 2.75:1.00 for the purpose of such test;

(j) Investments constituting non-cash proceeds of Dispositions of assets to the extent permitted by Section 10.4 (other than Sections 10.4(c) and 10.4(d)) or any other disposition of assets not constituting a Disposition;

(k) loans and advances to Holdings in lieu of, and not in excess of the amount of, Restricted Payments to the extent permitted (and without duplication of the amounts of Restricted Payments permitted) to be made to such parent in accordance with Section 10.6;

(l) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(m) Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices or industry practice;

(n) advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case, of the Borrower or any Restricted Subsidiary, in each case in the ordinary course of business;

(o) guarantee obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(p) Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this Section 10.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(q) to the extent constituting Investments, the Transactions;

(r) Investments in Hedge Agreements permitted by Section 10.1 and Section 10.10;

(s) to the extent constituting Investments, fundamental changes and Restricted Payments permitted under Section 10.3 and Section 10.6;

(t) Investments resulting from pledges and deposits under clauses (d) and (e) of the definition of "Permitted Liens" and Sections 10.2(g) and 10.2(j);

(u) advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Borrower or the relevant Restricted Subsidiary;

(v) Investments consisting of licensing of intellectual property pursuant to joint marketing arrangements with other Persons in the ordinary course of business; and

(w) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors in the ordinary course of business.

10.6 Limitation on Restricted Payments. The Borrower will not directly or indirectly pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than the accrual of any such dividend or distribution or dividends and distributions on Equity Interests payable solely by the issuance of additional Qualified Equity Interests) or Redeem any of its Equity Interests or the Equity Interests of any Parent Entity (other than through the issuance of additional Qualified Equity Interests), or permit any Restricted Subsidiary to Redeem any Equity Interests of the Borrower or any Parent Entity, now or hereafter outstanding or pay any fees to Affiliates (other than the Borrower and its Restricted Subsidiaries) (all of the foregoing, "Restricted Payments"); except that:

(a) the Borrower may (or may make Restricted Payments to permit Parent or Holdings to) redeem, acquire, retire or repurchase shares of its (or such Parent Entity's) Equity Interests held by any present or former officer, manager,

consultant, director or employee (or their respective Affiliates, estates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees or immediate family members) of the Borrower and its Restricted Subsidiaries or of Parent or Holdings, in connection with the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any equity option or equity appreciation rights plan, any management, director and/or employee equity ownership, benefit or incentive plan or agreement, equity subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement; provided that the aggregate amount of Restricted Payments made under this Section 10.6(a) does not exceed in any calendar year the sum of (i) $5,000,000 (which shall increase to $7,500,000 subsequent to the consummation of a Qualifying IPO by the Borrower or Holdings or Parent) (with unused amounts in any calendar year being carried over to the next two succeeding calendar years) plus (ii) all net cash proceeds obtained by or contributed to the Borrower during such calendar year from the sales of Equity Interests to other future, present or former officers, consultants, employees, directors and managers in connection with any permitted compensation and incentive arrangements and not used for any other purpose or included for the purpose of calculating any other basket hereunder or Section 11.13 plus (iii) all net cash proceeds obtained from any key-man life insurance policies received during such calendar year plus (iv) the amount of any cash bonuses otherwise payable to members of management, directors or consultants of any such Parent Entity, the Borrower or its Subsidiaries in connection with the Transactions that are foregone in return for the receipt of Equity Interests; notwithstanding the foregoing, the Borrower may elect to apply all or any portion of the aggregate increase contemplated by Sections 10.6(a)(ii), 10.6(a)(iii) and 10.6(a)(iv) above in any calendar year and provided, further, that cancellation of Indebtedness owing to the Borrower or any of its Restricted Subsidiaries from any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members), of the Borrower, any Restricted Subsidiary, any direct or indirect parent company of the Borrower or any of the Borrower's Restricted Subsidiaries in connection with a repurchase of Equity Interests of the Borrower or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of this Agreement;

(b) to the extent constituting Restricted Payments, the Borrower may consummate transactions expressly permitted by Section 10.3;

(c) the Borrower may make and pay Restricted Payments:

(i) with respect to any taxable period ending after the Closing Date for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes, distributions to any owner of Borrower in an amount necessary to permit such owner to pay its U.S. federal, state and/or local income taxes and franchise taxes (imposed in lieu of income taxes) (as applicable) attributable to its ownership of the Borrower (and, in the case of franchise taxes, payable by such owner as a result of being treated as a member of a combined or unitary group of which the Borrower is a member) with respect to such taxable period (assuming that each owner is subject to tax at the highest combined marginal federal, state, and/or local income or franchise tax rate applicable to any owner for such taxable period and taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes (and any limitations thereon), the alternative minimum tax, any loss of the Borrower allocable to an owner for prior taxable periods to the extent such loss is of a character that would allow such loss to be available to such owner to reduce attributable taxes of such owner in the current taxable period and has not already been taken into account in determining permitted distributions under this Section 10.6(c)(i) for prior periods, and the character (*e.g.*, long-term or short-term capital gain or ordinary or exempt) of the applicable income) (such distributions, "Permitted Tax Distributions"); provided that distributions pursuant to this Section 10.6(c)(i) in respect of an Unrestricted Subsidiary shall be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any of its Restricted Subsidiaries for such purpose;

(ii) the proceeds of which shall be used to allow Parent and Holdings to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and other professional costs and expenses) to the extent attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries;

(iii) the proceeds of which shall be used to make Restricted Payments to allow any Parent or Holdings to pay fees and expenses related to any equity issuance or offering or debt issuance, incurrence or offering, Disposition

or acquisition or investment transaction not relating to any other portfolio company of any Holdings and Parent permitted by this Agreement, whether or not consummated;

(iv) the proceeds of which shall be used to pay fees and expenses required to maintain its corporate existence or good standing under applicable law, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, current or former, directors, officers, employees and consultants of Holdings and Parent, and any payroll, social security or similar taxes thereof, to the extent such salaries, bonuses, other benefits and indemnities are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries; and

(v) in the form of Equity Interests of the Borrower (other than Disqualified Stock (excluding Qualified Preferred Equity) not otherwise permitted by Section 10.1);

(d) if no Default, Event of Default or Borrowing Base Deficiency is continuing or would result therefrom, the Borrower may pay any dividends or distributions within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(e) so long as, immediately after giving effect thereto, (i) on a Pro Forma Basis no Borrowing Base Deficiency exists and no Default or Event of Default shall have occurred and be continuing, (ii) Liquidity is not less than 20% of the then effective Borrowing Base and (iii) on a Pro Forma Basis the Borrower shall be in compliance with the Financial Performance Covenant set forth in Section 10.11(a), with the required maximum Consolidated Total Net Leverage Ratio being deemed to be 2.75:1.00 for the purpose of such test, from and after the date that is one year after the Closing Date, the Borrower may declare and pay additional Restricted Payments without limit in cash or otherwise to the holders of its Equity Interests (including, for the avoidance of doubt, Preferred Stock) provided, that, in the case of any Restricted Payment in the form of assets other than cash, no such Restricted Payment shall be made if a Borrowing Base Deficiency would result from an adjustment to the Borrowing Base resulting from such Restricted Payment (unless the Borrower shall have cash on hand sufficient to eliminate any such potential Borrowing Base Deficiency);

(f) the Borrower may consummate the Transactions and make payments of fees pursuant to and in accordance with (i) the Management Services Agreement, (ii) the Side Letter Agreement (in the case of fees payable to Sanchez and its affiliates, limited to an aggregate amount not to exceed $500,000 *per annum*) and (iii) the Marketing Agreement, in each case, as in effect on the Closing Date and as permitted by Section 10.13; provided that the aggregate amounts payable under the foregoing items (i), (ii) and (iii) may be increased by an aggregate amount of up to $2,000,000 during the term of this Agreement; and

(g) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may declare and pay Restricted Payments in an aggregate amount not to exceed the Applicable Equity Amount at the time such Restricted Payment is paid.

10.7 Limitations on Debt Payments and Amendments.

(a) The Borrower will not, and will not permit any Restricted Subsidiary to prepay, repurchase or redeem or otherwise defease prior to its scheduled maturity any Indebtedness described in clauses (a) and (b) of the definition thereof that is expressly subordinated in right of payment or is unsecured or secured on a junior basis to the Indebtedness incurred hereunder (or any Permitted Refinancing Indebtedness in respect thereof to the extent constituting Junior Debt) (such other Indebtedness or any Permitted Refinancing Indebtedness in respect thereof, "Junior Debt") (for the avoidance of doubt, it being understood that payments of regularly-scheduled cash interest in respect of Junior Debt and any AHYDO payments shall be permitted); provided, however, that the Borrower or any Restricted Subsidiary may prepay, repurchase, redeem or defease prior to its scheduled maturity any Junior Debt (i) in exchange for or with the proceeds of any Permitted Refinancing Indebtedness, (ii) by converting or exchanging any Junior Debt to Qualified Equity Interests or Qualified Preferred Equity of the Borrower or any Parent Entity, (iii) so long as, immediately after giving effect thereto, (A) on a Pro Forma Basis, no Borrowing Base Deficiency exists and no Default or Event of Default shall have occurred and be continuing, (B) Liquidity is not less than 20% of the then effective Borrowing Base and (C) on a Pro Forma Basis the Borrower shall be in compliance with the Financial Performance



013029

Covenant set forth in Section 10.11(a), with the required maximum Consolidated Total Net Leverage Ratio being deemed to be 2.75:1.00 for the purpose of such test; or (iv) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, in an aggregate amount not to exceed the Applicable Equity Amount; provided, further, that, after giving effect to any adjustment of the Borrowing Base made pursuant to Section 2.14(g) and any repayment of the Loans required in connection therewith, so long as no Event of Default then exists, the Borrower or any Restricted Subsidiary may make mandatory prepayments or redemptions in respect of any Junior Debt with the proceeds of the disposition of any assets that have been pledged to secure such Junior Debt;

(b) The Borrower will not amend or modify the terms of any Junior Debt, other than amendments or modifications that (i) otherwise comply with the definition of "Permitted Refinancing Indebtedness" that may be incurred to Refinance any such Indebtedness, (ii) would have the effect of converting any Junior Debt to Qualified Equity Interests of a Parent Entity or Qualified Preferred Equity of the Borrower or (iii) to the extent such amendment or modification would not have been prohibited under this Agreement at the time such Permitted Refinancing Indebtedness or Junior Debt was first issued, incurred or entered into, as applicable (it being understood that in no event shall such amendment or modification make earlier the final maturity date of such Indebtedness or reduce the Weighted Average Life to Maturity of such Indebtedness and, with respect to any Permitted Additional Debt or Permitted Refinancing Indebtedness thereof, such analysis shall assume that the Agreement in effect at the time of such amendment or modification constituted the Agreement at the time when such Permitted Refinancing Indebtedness or Junior Debt was first issued, incurred or entered into, as applicable); and

(c) Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Section 10.7 shall prohibit (i) the repayment or prepayment of intercompany subordinated Indebtedness owed by the Borrower or any Restricted Subsidiary to the Borrower or any Restricted Subsidiary, in either case, unless an Event of Default has occurred and is continuing and the Borrower has received a notice from the Collateral Agent instructing it not to make or permit the Borrower and/or the Restricted Subsidiaries to make any such repayment or prepayment or (ii) substantially concurrent transfers of credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 10.1 after giving effect to such transfer.

10.8 Negative Pledge Agreements. The Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into or permit to exist any Contractual Requirement (other than this Agreement or any other Credit Document) that limits the ability of the Borrower or any Restricted Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Credit Documents; provided that the foregoing shall not apply to each of the following Contractual Requirements that:

(a) (i) exist on the Closing Date and (to the extent not otherwise permitted by this Section 10.8) are listed on Schedule 10.8 and (ii) to the extent Contractual Requirements permitted by Section 10.8(a)(i) are set forth in an agreement evidencing Indebtedness or other obligations, are set forth in any agreement evidencing any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness or obligation so long as such Permitted Refinancing Indebtedness does not expand the scope of such Contractual Requirement;

(b) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of the Borrower, so long as such Contractual Requirements were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of the Borrower and only relate to the assets of such Restricted Subsidiary or any of its Restricted Subsidiaries;

(c) are customary provisions applicable to the assets or equity interests of joint ventures or otherwise arise in agreements restricting the Disposition or distribution of such assets of property subject to oil and gas leases, joint operating agreements, joint exploration and/or development agreements, participation agreements and other similar agreements entered into in the ordinary course of the oil and gas exploration and development business;

(d) are customary restrictions on commercial real estate leases, commercial real estate subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

(e) are customary provisions restricting subletting or assignment of any lease governing a commercial real estate leasehold interest of the Borrower or any Restricted Subsidiary;

(f) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(g) restrict the use of cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(h) are imposed by Requirements of Law;

(i) are included in any agreement relating to any Lien, so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 10.8;

(j) are restrictions regarding licenses or sublicenses by the Borrower and the Restricted Subsidiaries of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such intellectual property);

(k) are encumbrances or restrictions contained in an agreement or other instrument of a Person that is assumed in connection with the acquisition of assets from such Person that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to the properties or assets of any Person, other than the property or assets of the Person and its Subsidiaries, so acquired and such agreement or other instrument is not in respect of Indebtedness described in clauses (a) and (b) of the definition thereof; and

(l) are encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in Sections 10.8(a) through 10.8(k) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

10.9 Limitation on Subsidiary Distributions. The Borrower will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary on its Equity Interests or with respect to any other interest or participation in, or measured by, its profits or transfer any property to the Borrower or any Restricted Subsidiary except (in each case) for such encumbrances or restrictions existing under or by reason of:

(a) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the Credit Documents;

(b) purchase money obligations for property acquired in the ordinary course of business and obligations under any Capital Lease that impose restrictions on transferring the property so acquired;

(c) any applicable Requirement of Law;

(d) any agreement or other instrument of an Unrestricted Subsidiary that is designated a Restricted Subsidiary, or that is assumed in connection with the acquisition of assets from a Person, in each case that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or designated;

(e) contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Equity Interests or assets of such Subsidiary;

(f) secured Indebtedness otherwise permitted to be incurred pursuant to Section 10.1 and Section 10.2 as it relates to the right of the debtor to dispose of the assets securing such Indebtedness;

(g) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(h) other Indebtedness of Restricted Subsidiaries permitted to be incurred subsequent to the Closing Date pursuant to Section 10.1 so long as the provisions relating to such encumbrance or restriction contained in such Indebtedness are no less favorable to the Borrower, taken as a whole, as determined by the Board of Directors of the Borrower in good faith, than the provisions contained in this Agreement as in effect on the Closing Date;

(i) customary provisions in joint venture agreements or agreements governing property held with a common owner and other similar agreements or arrangements relating solely to such joint venture or property or are otherwise customary encumbrances or restrictions imposed pursuant to any agreement of the type described in the definition of "Industry Investments" entered into in the ordinary course of business so long as such provisions do not concern the ability of any Restricted Subsidiary to make cash dividends;

(j) customary provisions contained in commercial real estate leases, commercial real estate sub-leases, licenses, sub-licenses or similar agreements, in each case, entered into in the ordinary course of business;

(k) any agreements entered into with respect to any sale, transfer, lease or other Disposition permitted by Section 10.4 and applicable solely to assets under such sale, transfer, lease or other Disposition; and

(l) any encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in Sections 10.9(a) through 10.9(j) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower's Board of Directors, no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

10.10 Hedge Agreements. The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Hedge Agreements with any Person other than:

(a) Hedge Agreements with Approved Counterparties in respect of commodities entered into not for speculative purposes the notional volumes for which (when aggregated with other commodity Hedge Agreements then in effect), other than (i) puts, (ii) floors and (iii) basis differential swaps on volumes already hedged pursuant to other Hedge Agreements permitted under this Section 10.10(a), do not exceed, as of the date the latest hedging transaction is entered into under a Hedge Agreement (and for each month during the period during which such hedge transaction is in effect), (x) 85% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Credit Parties' total Proved Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable, subject to update pursuant to Section 10.10(d)) for the forty-eight (48) month period from the date of creation of such hedging transaction and (y) 75% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Credit Parties' total Proved Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable, subject to update pursuant to Section 10.10(d)) for the eighteen (18) month period beginning with the forty-ninth (49th) month after the date of creation of such hedging transaction (the "Ongoing Hedges"). Ongoing Hedges shall not, in any case, have a tenor greater than sixty-six (66) months. In addition to the Ongoing Hedges, in connection with a proposed or pending acquisition of Oil and Gas Properties (a "Proposed Acquisition"), the Credit Parties may also enter into incremental hedging transactions with respect to the Credit Parties' reasonably anticipated projected Hydrocarbon

production from the total Proved Reserves of the Credit Parties to be acquired pursuant to the Proposed Acquisition with notional amounts (when aggregated with other commodity Hedge Agreements then in effect), other than (i) puts, (ii) floors and (iii) basis differential swaps on volumes hedged pursuant to other Hedge Agreements permitted under this Section 10.10(a), that do not exceed, as of the date the latest any such hedging transaction is entered into under a Hedge Agreement (and for each month during the period during which such hedge transaction is in effect) 15% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Credit Parties' total Proved Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable) prior to such Proposed Acquisition (such that the aggregate shall not be more than 100% of such reasonably anticipated Hydrocarbon production prior to the consummation of such Proposed Acquisition) for a period not exceeding 36 months from the date of creation of such hedging transaction during the period between (i) the date on which such Credit Party signs a definitive acquisition agreement in connection with a Proposed Acquisition and (ii) the earliest of (A) the date of consummation of such Proposed Acquisition, (B) the date of termination of such Proposed Acquisition and (C) 90 days after the date of execution of such definitive acquisition agreement. However, all such incremental hedging contracts entered into with respect to a Proposed Acquisition must be terminated or unwound within 90 days following the date of termination of such Proposed Acquisition;

(b) other Hedge Agreements (other than any Hedge Agreements in respect of commodities or equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions) entered into not for speculative purposes (it is understood that commodity Hedge Agreements in respect of (i) puts, (ii) floors and (iii) basis differential swaps on volumes hedged pursuant to other Hedge Agreements are permitted under Section 10.10(a));

(c) It is understood that for purposes of Section 10.10(a) and 10.10(b), the following Hedge Agreements shall be deemed not to be speculative or entered into for speculative purposes: (i) any commodity Hedge Agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and or forecasted Hydrocarbon production of the Borrower or its Restricted Subsidiaries (whether or not contracted) and (ii) any Hedge Agreement intended, at inception of execution, (A) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or its Restricted Subsidiaries or (B) to manage commodity portfolio exposure associated with changes in interest rates or (C) to hedge any exposure that the Borrower or its Restricted Subsidiaries may have to counterparties under other Hedge Agreements such that the combination of such Hedge Agreements is not speculative taken as a whole.

(d) For purposes of entering into or maintaining Ongoing Hedges under Section 10.10(a) or Hedge Agreement pursuant to Section 9.16, forecasts of reasonably anticipated Hydrocarbon production from the Credit Parties' total Proved Reserves shall be based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable (for purposes of this clause (d), the "Applicable Reserve Report"); provided that such forecasts may be revised by the Borrower based on information that is reasonably acceptable to the Administrative Agent to account for any increase or decrease therein anticipated because of information obtained by Borrower or any other Credit Party subsequent to the publication of such Applicable Reserve Report (including the Borrower's or any other Credit Party's internal forecasts of production decline rates for existing wells and additions to or deletions from anticipated future production from new wells and acquisitions coming on stream or failing to come on stream).

10.11 Financial Covenants.

(a) Consolidated Total Net Leverage Ratio. The Borrower will not permit the Consolidated Total Net Leverage Ratio, as of the last day of any Test Period, commencing with the fiscal quarter of the Borrower ending June 30, 2017, to be greater than 4.00 to 1.00.

(b) Current Ratio. The Borrower will not permit the Current Ratio as of the last day of any fiscal quarter commencing with the quarter ending June 30, 2017 to be less than 1.00 to 1.00.

10.12 Use of Proceeds. The Borrower will not request any Loan or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the

proceeds of any Loan or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States, the United Kingdom or a European Union member state, or in any Sanctioned Country, (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto or (d) in violation of the PATRIOT Act.

10.13 Restrictions on Amendments to Material Documents and GSO Preferred Equity Documentation.

(a) Restrictions on Amendments to Material Documents and GSO Preferred Equity Documentation. The Borrower shall not, and shall not permit Parent, Holdings or its Subsidiaries (or any of their successors and assigns) to, amend, change, supplement or otherwise modify (or permit to be amended, changed, supplement or otherwise modified), including through a consent or wavier, the Material Contracts and the GSO Preferred Equity Documentation in any manner that (i) is materially adverse to the Borrower or Lenders or (ii) would constitute a Prohibited Material Contract Amendment or Prohibited Preferred Amendment (it being understood, for avoidance of doubt, that any Prohibited Material Contract Amendments or Prohibited Preferred Amendment may be made if approved by the Majority Lenders).

(b) Further Assurances. No agreement shall be entered into which effectively replaces (or has the equivalent effect of replacing) any Material Contract or the terms thereof except if such agreement provides for the same terms as such Material Contract (subject only to amendments, changes, supplements or other modification, including through a consent or wavier, of the type that if they were made directly to the applicable Material Contract they would be permitted pursuant to Section 10.13(a)) (any such agreement, an "Additional Material Contract"). The organizational documents of any Restricted Subsidiary shall be in form and substance reasonably satisfactory to the Administrative Agent and shall contain "separateness covenants" and independent directorship obligations consistent with the Parent LLCA.

10.14 Transactions with Affiliates. The Borrower shall not conduct, and cause each of the Restricted Subsidiaries not to conduct, any transactions with any of its Affiliates (other than the Borrower and the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction) unless such transactions are on terms that are as favorable to the Borrower or such Restricted Subsidiary as it would obtain at the time in a comparable arm's-length transaction with a Person that is not an Affiliate, provided that the foregoing restrictions shall not apply to:

(a) the consummation of the Transactions;

(b) equity issuances, repurchases, retirements, redemptions or other acquisitions or retirements of Equity Interests by the Borrower or any dividends and distributions, in each case, permitted under Section 10.6;

(c) loans, advances and other transactions between or among the Borrower, any Subsidiary or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower or such Subsidiary, but for the Borrower's or such Subsidiary's ownership of Equity Interests in such joint venture or such Subsidiary) to the extent permitted under Section 10.5;

(d) payments pursuant to Sections 10.6(f)(i), 10.6(f)(ii) and 10.6(f)(iii);

(e) any issuance of Equity Interests or other payments, awards or grants in securities, Equity Interests or otherwise pursuant to, or the funding of, employment arrangements, equity options and equity ownership plans approved by the Board of Directors of the Borrower; and

(f) any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the Board of Directors of the Borrower from an accounting, appraisal or investment banking firm, in each case of nationally-recognized standing that is in the good faith determination of the Borrower qualified to render such letter, which letter states that such transaction is (i) fair, from a financial point of view, to the Borrower or such Restricted Subsidiary and (ii) on terms, taken as a whole, that are no less favorable to the Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's length transaction with a person that is not an Affiliate.

10.15 End of Fiscal Years; Fiscal Quarters. The Borrower shall not and shall not permit any of its Restricted Subsidiaries to have its fiscal year end on a date other than December 31 or have its fiscal quarters end on dates other than March 31, June 30 or September 30.

10.16 Change in Business; Foreign Operations. The Borrower shall not, and shall not permit its Restricted Subsidiaries, (a) to fundamentally or substantively alter the character of their business, taken as a whole, from the business conducted by them on the Closing Date and other business activities incidental, reasonably related or ancillary to any of the foregoing and reasonable extensions thereof, (b) to own any Oil and Gas Properties not located within the geographical boundaries of the United States or (c) be organized under any law other than the laws of the United States or any state thereof or the District of Columbia.

10.17 Gas Imbalances, Prepayments. The Borrower shall not, and shall not permit its Restricted Subsidiaries to have, gas imbalances, take or pay or other prepayments exceeding 2.0% of the aggregate Hydrocarbon volumes (stated on an Mcf equivalent basis) listed on the most recent Reserve Report, that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor; provided, that, so long as such gas imbalance is corrected within five (5) Business Days of the Borrower or such Restricted Subsidiary becoming aware of such imbalance, no violation of this Section 10.17 shall be deemed to occur.

SECTION 11. EVENTS OF DEFAULT

Upon the occurrence of any of the following specified events (each an "Event of Default"):

11.1 Payments. The Borrower shall (a) default in the payment when due of any principal of the Loans or (b) default, and such default shall continue for five or more Business Days, in the payment when due of any interest on the Loans or any Unpaid Drawings, fees or of any other amounts owing hereunder or under any other Credit Document (other than any amount referred to in Section 11.1(a) above).

11.2 Representations, Etc. Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate, report or notice delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made.

11.3 Covenants. Any Credit Party shall:

(a) default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.1(d)(i), Section 9.5 (solely with respect to the Borrower), Section 9.17, Section 9.18 or Section 10; or

(b) default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 11.1 or Section 11.2 or Section 11.3(a)) contained in this Agreement or any Credit Document and such default shall continue unremedied for a period of at least 30 days after the earlier of (i) receipt of written notice thereof by the Borrower from the Administrative Agent or (ii) the date the Borrower or an Authorized Officer of the Borrower knew or should have known of such default.

11.4 Default Under Other Agreements.

(a) The Borrower or any of the Restricted Subsidiaries shall (i) default in any payment with respect to any Material Indebtedness (other than the Indebtedness described in Section 11.1) beyond the period of grace, if any, provided in the instrument of agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than (1) with respect to indebtedness in respect of any Hedge Agreements, termination events or equivalent events pursuant to the terms of such Hedge Agreements, (2) any event requiring prepayment pursuant to customary asset sale provisions and (3) secured Indebtedness that becomes due as a result of a Disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement), the effect of which default or other event or condition is to cause, or to permit the holder or holders of such

Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, unless, in the case of each of the foregoing, such holder or holders shall have (or through its or their trustee or agent on its or their behalf) waived such default in a writing to the Borrower, or

(b) Without limiting the provisions of Section 11.4(a) above, any such default under any such Material Indebtedness shall cause such Material Indebtedness to be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment or as a mandatory prepayment (and (i) with respect to Indebtedness consisting of any Hedge Agreements, other than due to a termination event or equivalent event pursuant to the terms of such Hedge Agreements, (ii) other than pursuant to customary asset sale provisions and (iii) other than secured Indebtedness that becomes due as a result of a Disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement) prior to the stated maturity thereof.

11.5 Bankruptcy, Etc. The Parent, Holdings, Borrower or any Specified Subsidiary shall commence a voluntary case, proceeding or action concerning itself under Title 11 of the United States Code entitled “Bankruptcy” or any other applicable insolvency, debtor relief, or debt adjustment law as now or hereafter in effect, or any successor thereto (the “Bankruptcy Code”); or an involuntary case, proceeding or action is commenced against the Parent, Holdings, the Borrower or any Specified Subsidiary and the petition is not dismissed or stayed within 60 days after commencement of the case, proceeding or action, the Parent, Holdings, the Borrower or the applicable Specified Subsidiary consents to the institution of such case, proceeding or action prior to such 60-day period, or any order of relief or other order approving any such case, proceeding or action is entered; or a custodian (as defined in the Bankruptcy Code), receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or similar person is appointed for, or takes charge of, the Parent, Holdings, the Borrower or any Specified Subsidiary or all or any substantial portion of the property or business thereof; or the Parent, Holdings, the Borrower or any Specified Subsidiary suffers any appointment of any custodian, receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or the like for it or any substantial part of its property or business to continue undischarged or unstayed for a period of 60 days; the Parent, Holdings, the Borrower or any Specified Subsidiary makes a general assignment for the benefit of creditors.

11.6 ERISA.

(a) (i) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; (ii) any Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof); (iii) an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Plan or to appoint a trustee to administer any Plan (including the giving of written notice thereof); (iv) the Borrower or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof); or (v) an ERISA Event has or is reasonably like to occur; and

(b) there would result from any event or events set forth in Section 11.6(a) the imposition of a lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a lien, security interest or liability; and

(c) such lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect.

11.7 Guarantee and Credit Agreement. The Guarantee, this Agreement or any material provision of the foregoing shall cease to be in full force or effect (other than pursuant to the terms hereof and thereof) or any Guarantor or any other Credit Party shall assert in writing that any such Credit Party’s obligations thereunder are not to be in effect or are not to be legal, valid and binding obligations (other than pursuant to the terms hereof or thereof).

11.8 Security Documents. The Collateral Agreement, Mortgage or any other Security Document pursuant to which assets of the Borrower and the Credit Parties with an aggregate fair market value in excess of $10,000,000 are pledged as

Collateral or any material provision thereof or a Customary Intercreditor Agreement or any material potion thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Credit Party shall assert in writing that any grantor's obligations under the Collateral Agreement, the Mortgage or any other Security Document are not in effect or not legal, valid and binding obligations (other than pursuant to the terms hereof or thereof).

11.9 Judgments. (a) One or more monetary judgments or decrees shall be entered against the Borrower or any of the Restricted Subsidiaries involving a liability of $25,000,000 or more in the aggregate for all such judgments and decrees for the Borrower and/or the Restricted Subsidiaries (to the extent not paid or covered by insurance provided by a carrier not disputing coverage), or (b) any one or more non-monetary judgments that have, or would reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, shall be rendered against the Borrower and/or the Restricted Subsidiaries, in each case which judgments are not satisfied, discharged or effectively waived or stayed for a period of 60 consecutive days.

11.10 Change of Control. A Change of Control shall have occurred.

11.11 Status as Unrestricted Subsidiary. While the Borrower remains a direct or indirect subsidiary of Sanchez, Holdings or the Borrower ceases to be an "unrestricted subsidiary" (as opposed to a "restricted subsidiary") under and as defined in Sanchez Specified Indebtedness.

Then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent may with the consent of and, upon the written request of the Majority Lenders, shall, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party, except as otherwise specifically provided for in this Agreement (provided that, if an Event of Default specified in Section 11.5 shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified in clauses (a), (b) and (c) below shall occur automatically without the giving of any such notice): (a) declare the Total Commitment terminated, whereupon the Commitment of each shall forthwith terminate immediately, the Borrowing Base shall automatically and concurrently be reduced to $0 and any fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (b) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or (c) demand cash collateral in respect of any outstanding Letter of Credit pursuant to Section 3.7(b) in an amount equal to the aggregate Stated Amount of all Letters of Credit issued and then outstanding. In addition, after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

11.12 Application of Proceeds. Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to the Borrower under Section 11.5 shall, subject to the terms of any applicable Customary Intercreditor Agreement, be applied:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under Section 12.7 and amounts payable under Section 2) payable to the Administrative Agent and/or Collateral Agent in such Person's capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders and the Issuing Banks (including fees, disbursements and other charges of counsel payable under Section 12.7) arising under the Credit Documents and amounts payable under Section 2, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees, interest on the Loans and Unpaid Drawings and regularly scheduled payments in respect of Secured Hedge Agreements (but not any close-

out or termination amounts), ratably among the Lenders, the Issuing Banks and the Hedge Banks in proportion to the respective amounts described in this clause Third payable to them;

Fourth, (i) to payment of that portion of the Obligations constituting unpaid principal of the Loans, the Unpaid Drawings and Obligations then owing under Secured Hedge Agreements (to the extent not paid pursuant to clause Third) and the Secured Cash Management Agreements and (ii) to Cash Collateralize that portion of Letters of Credit Outstanding comprising the aggregate undrawn amount of Letters of Credit to the extent not otherwise Cash Collateralized by the Borrower pursuant to Section 3.7, ratably among the Lenders, the Issuing Banks, the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this clause Fourth held by them; provided that (x) any such amounts applied pursuant to the foregoing clause (ii) shall be paid to the Administrative Agent for the ratable account of the applicable Issuing Bank to Cash Collateralize such Letters of Credit Outstanding, (y) subject to Section 3.7, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to this clause Fourth shall be applied to satisfy drawings under such Letters of Credit as they occur and (z) upon the expiration of any Letter of Credit, the *pro rata* share of Cash Collateral attributable to such expired Letter of Credit shall be distributed in accordance with this clause Fourth;

Fifth, to the payment of all other Obligations of the Credit Parties owing under or in respect of the Credit Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Requirements of Law.

Subject to Section 3.7, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above. Notwithstanding the foregoing, no amounts received from any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

11.13 Equity Cure.

(a) Notwithstanding anything to the contrary contained in this Section 11 or in any Credit Document, in the event that the Borrower fails to comply with any Financial Performance Covenant, then:

(i) until the expiration of the tenth Business Day subsequent to the date the compliance certificate for calculating such Financial Performance Covenants is required to be delivered pursuant to Section 9.1(c) (the "Cure Deadline"), the Borrower shall have the right to cure such failure (the "Cure Right") by receiving cash proceeds (which cash proceeds shall be received no earlier than the first day of the applicable fiscal quarter for which there is a failure to comply with the applicable Financial Performance Covenant) from an issuance of Qualified Equity Interests (other than Disqualified Stock) or Qualified Preferred Equity or a cash capital contribution, and upon receipt by the Borrower of such cash proceeds (such cash amount being referred to as the "Cure Amount") pursuant to the exercise of such Cure Right, the applicable Financial Performance Covenant shall be recalculated giving effect to the following *pro forma* adjustments:

(A) Consolidated EBITDAX and/or Consolidated Current Assets, as specified by the Borrower, shall be increased, solely for the purpose of determining the existence of an Event of Default resulting from a breach of the applicable Financial Performance Covenant with respect to any Test Period that includes the fiscal quarter for which the Cure Right was exercised and not for any other purpose under this Agreement, by an amount equal to the Cure Amount; provided that, any increase of Consolidated EBITDAX as a result of the application of this Section 11.13(a) shall be added to Consolidated EBITDAX after giving effect to any annualization of Consolidated EBITDAX pursuant to Section 1.11;

(B) Consolidated Total Indebtedness for the applicable fiscal quarter for which there is a failure to comply with the applicable Financial Performance Covenant shall not be decreased by any prepayments of

Indebtedness with the proceeds of the Cure Amount and any cash proceeds shall not be "netted" for purposes of ratio calculations with respect to any four fiscal quarter period in which the fiscal quarter period in which such equity cure has been made is included; and

(C) if, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the applicable Financial Performance Covenant, the Borrower shall be deemed to have satisfied the requirements of the applicable Financial Performance Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of the applicable Financial Performance Covenant that had occurred shall be deemed cured for the purposes of this Agreement; provided that (1) in each period of four consecutive fiscal quarters there shall be at least two fiscal quarters in which no Cure Right is exercised, (2) Cure Rights shall not be exercised more than five times during the term of this Agreement, (3) each Cure Amount shall be no greater than the amount required to cause the Borrower to be in compliance with the applicable Financial Performance Covenant above (such amount, the "Necessary Cure Amount"); provided that if the Cure Right is exercised prior to the date financial statements are required to be delivered for such fiscal quarter, then the Cure Amount shall be equal to the amount reasonably determined by the Borrower in good faith that is required for purposes of complying with the Financial Performance Covenant for such fiscal quarter (such amount, the "Expected Cure Amount"), (4) in respect of the fiscal quarter in which such Cure Right was exercised and for each Test Period that includes such fiscal quarter, all Cure Amounts shall be disregarded for the purposes of any financial ratio determination under the Credit Documents other than for determining compliance with the applicable Financial Performance Covenant and (5) no Lender or Issuing Bank shall be required to make any extension of credit hereunder during the 10 Business Day period referred to above, unless the Borrower shall have received the Cure Amount and provided a certificate from a Financial Officer of the Borrower certifying such fact; and

(ii) upon receipt by the Administrative Agent of written notice, on or prior to the Cure Deadline, that the Borrower intends to exercise the Cure Right in respect of a fiscal quarter, the Lenders shall not be permitted to accelerate Loans held by them or to exercise remedies against the Collateral on the basis of a failure to comply with the requirements of the applicable Financial Performance Covenant, unless such failure is not cured pursuant to the exercise of the Cure Right on or prior to the Cure Deadline.

(b) Expected Cure Amount. Notwithstanding anything herein to the contrary, to the extent that the Expected Cure Amount is (i) greater than the Necessary Cure Amount, then such difference may be used for the purposes of determining the Applicable Equity Amount and (ii) less than the Necessary Cure Amount, then not later than the applicable Cure Deadline, the Borrower must receive cash proceeds from an issuance of Qualified Equity Interests (other than Disqualified Stock) or Qualified Preferred Equity or a cash capital contribution, the cash proceeds of which received by Borrower shall be equal to the shortfall between such Expected Cure Amount and such Necessary Cure Amount.

## SECTION 12. THE AGENTS

### 12.1 Appointment.

(a) Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto. The provisions of this Section 12 (other than Section 12.1(c) with respect to the Lead Arranger, and Section 12.9, Section 12.11, Section 12.12 and the last sentence of Section 12.4 with respect to the Borrower) are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as third party beneficiary of any such provision. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Administrative Agent.

(b) The Administrative Agent, each Lender and each Issuing Bank hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent, each Lender and each Issuing Bank irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein, or any fiduciary relationship with any of the Administrative Agent, the Lenders or the Issuing Banks, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Collateral Agent.

(c) Each of the Lead Arrangers, each in its capacity as such, shall not have any obligations, duties or responsibilities under this Agreement but shall be entitled to all benefits of this Section 12.

12.2 Delegation of Duties. The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "Subagent") and shall be entitled to advice of counsel concerning all matters pertaining to such duties; provided, however, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent. If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent. Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any Subagents selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

12.3 Exculpatory Provisions. No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof. The Collateral Agent shall not be under any obligation to the Administrative Agent, any Lender or any Issuing Bank to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.

12.4 Reliance by Agents. The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, email, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent. The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes. The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Majority Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent and the Collateral

Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Majority Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; provided that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or applicable Requirements of Law. For purposes of determining compliance with the conditions specified in Section 6 on the Closing Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

12.5 Notice of Default. Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Majority Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval or consent of the Majority Lenders, the Required Lenders, each individual lender or adversely affect Lender, as applicable.

12.6 Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereinafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender or any Issuing Bank. Each Lender and each Issuing Bank represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

12.7 Indemnification. The Lenders severally agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Commitments or Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of any actual or threatened claim, action, suit,

litigation, investigation or proceeding (each, a "Proceeding") relating to the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any Proceeding; provided that no Lender shall be liable to the Administrative Agent or the Collateral Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Administrative Agent's or the Collateral Agent's, as applicable, gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction; provided, further, that no action taken in accordance with the directions of the Majority Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence, bad faith or willful misconduct for purposes of this Section 12.7. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this Section 12.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and provided, further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction. The agreements in this Section 12.7 shall survive the payment of the Loans and all other amounts payable hereunder.

12.8 Agents in Its Individual Capacities. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents. With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

12.9 Successor Agents. Each of the Administrative Agent and Collateral Agent may at any time give notice of its resignation to the Lenders, the Issuing Banks and the Borrower. If the Administrative Agent and/or Collateral Agent becomes a Defaulting Lender, then such Administrative Agent or Collateral Agent, may be removed as Administrative Agent or Collateral Agent, as the case may be, at the reasonable request of the Borrower or the Majority Lenders. Upon receipt of any such notice of resignation or removal, as the case may be, the Majority Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Default under Section 11.1 or 11.5 is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If, in the case of a resignation of a retiring Agent, no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Issuing Banks, appoint a successor Agent meeting the qualifications set forth above (provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders or Issuing Banks under and Credit Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and Issuing Bank directly, until such time as the Majority Lenders appoint a successor

Agent as provided for above in this Section 12.9). Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Majority Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section 12.9). After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including Section 12.7) and Section 13.5 shall continue in effect for the benefit of such retiring Agent, its Subagents and their respective Agent-Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

Any resignation of any Person as Administrative Agent pursuant to this Section 12.9 shall also constitute its resignation as Issuing Bank. Upon the acceptance of a successor's appointment as Administrative Agent hereunder (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (b) the retiring Issuing Bank shall be discharged from all of its duties and obligations hereunder and under the other Credit Documents, and (c) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

12.10 Withholding Tax. To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses. In addition, each Lender shall severally indemnify the Administrative Agent for (i) any Indemnified Taxes attributable to such Lender (to the extent the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.6(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with a Credit Document, and any reasonable expenses arising therefrom or with respect thereto. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due to the Administrative Agent under this Section 12.10. For the avoidance of doubt, for purposes of this Section 12.10, the term "Lender" includes any Issuing Bank.

12.11 Security Documents and Collateral Agent under Security Documents and Guarantee. Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents. Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may (a) execute any documents or instruments necessary in connection with a Disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is required to be released pursuant to Section 13.17 or (c) release any applicable Guarantor from the Guarantee in accordance with Section 13.17. The Lenders and the Issuing Banks (including in their capacities as potential Cash Management Banks and potential Hedge Banks) irrevocably agree that (x) the Collateral Agent is authorized and the Collateral Agent agrees it shall (for the benefit of Borrower), without any further consent of any Lender, enter into or amend any Customary Intercreditor Agreement with the collateral agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral that is permitted under this Agreement, in each case for the purpose of adding the holders of such Indebtedness (or their representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto (it being understood that any such amendment, amendment

and restatement or supplement may make such other changes to the applicable Customary Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and with any material modifications to be reasonably satisfactory to the Administrative Agent), (y) the Collateral Agent may rely exclusively on a certificate of an Authorized Officer of the Borrower as to whether any such other Liens are permitted and (z) any Customary Intercreditor Agreement referred to in Section 12.11(x) above, entered into by the Collateral Agent, shall be binding on the Secured Parties. Furthermore, the Lenders and the Issuing Banks (including in their capacities as potential Cash Management Bank and potential Hedge Banks) hereby authorize the Administrative Agent and the Collateral Agent to subordinate any Lien on any property granted to or held by the Administrative Agent or Collateral Agent under any Credit Document to the holder of any Lien on such property that is permitted by Section 10.2(c); provided that prior to any such request, the Borrower shall have in each case delivered to the Administrative Agent a certificate of an Authorized Officer of the Borrower certifying that such subordination is permitted under this Agreement.

12.12 Right to Realize on Collateral and Enforce Guarantee. Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Agents and each Secured Party hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent.

12.13 Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding, constituting an Event of Default under Section 11.5, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid hereunder or under any other Credit Document in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel, to the extent due under Section 13.5) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, to the extent due under Section 13.5.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

12.14 Credit Bidding. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Majority Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Credit Party is subject, or (b) at any other sale, foreclosure or acceptance

of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be credit bid by the Administrative Agent at the direction of the Majority Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the Acquired Assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any Disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Majority Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in Section 13.1 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason, such Obligations shall automatically be reassigned to the Secured Parties *pro rata* and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in Section 12.14(ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 13. MISCELLANEOUS

13.1 Amendments, Waivers and Releases.

(a) Except as expressly set forth in this Agreement, neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 13.1. The Majority Lenders may, or, with the written consent of the Majority Lenders, the Administrative Agent and/or the Collateral Agent shall, from time to time, (i) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (ii) waive in writing, on such terms and conditions as the Majority Lenders or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; provided, however, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; provided, further, that no such waiver and no such amendment, supplement or modification shall:

(A) forgive or reduce any portion of any Loan or reduce the stated rate (it being understood that only the consent of the Majority Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend Section 2.8(c)), or forgive or reduce any portion, or extend the date for the payment (including the Maturity Date), of any principal, interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates and any change due to a change in the Borrowing Base or

Available Commitment), or extend the final expiration date of any Lender's Commitment (provided that (1) any Lender, upon the request of the Borrower, may extend the final expiration date of its Commitment in a manner that has no adverse effect on any other Lender without the consent of any other Lender, including the Majority Lenders, and (2) it is understood and agreed that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default shall not constitute an increase of the Commitments of any Lender) or extend the final expiration date of any Letter of Credit beyond the L/C Maturity Date, or increase the amount of the Commitment of any Lender, or make any Loan, interest, fee or other amount payable in any currency other than Dollars, in each case without the written consent of each Lender directly and adversely affected thereby, or

(B) amend, modify or waive any provision of this Section 13.1 in a manner that would reduce the voting rights of any Lender, or reduce the percentages specified in the definitions of the terms "Majority Lenders" or "Required Lenders", consent to the assignment or transfer by the Borrower of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3), in each case without the written consent of each Lender, or

(C) amend the provisions of Section 11.12 or any analogous provision of any Security Document, in a manner that would by its terms alter the order of payment specified therein or the *pro rata* sharing of payments required thereby, without the prior written consent of each Lender directly and adversely affected thereby, or

(D) amend, modify or waive any provision of Section 12 without the written consent of the then-current Administrative Agent and Collateral Agent, as applicable, or former or current Agent to whom Section 12 then applies in a manner that directly and adversely affects such Person, or

(E) amend, modify or waive any provision of Section 3 or the rights or duties of any Issuing Bank without the written consent of each Issuing Bank, or

(F) release all or substantially all of the aggregate value of the Guarantees without the prior written consent of each Lender, or

(G) release all or substantially all of the Collateral under the Security Documents without the prior written consent of each Lender, or

(H) amend Section 2.9 so as to permit Interest Period intervals greater than six months without regard to availability to Lenders, without the written consent of each Lender directly and adversely affected thereby, or

(I) increase the Borrowing Base without the written consent of each Lender (subject to Section 13.1(b) in the case of a Defaulting Lender) or decrease or maintain the Borrowing Base without the written consent of the Required Lenders; provided that a Scheduled Redetermination may be postponed by the Required Lenders; provided, further, with respect to one Scheduled Redetermination, such Scheduled Redetermination may be postponed for not more than 90 days with the consent of the Majority Lenders, or

(J) affect the rights or duties of, or any fees or other amounts payable to, any Agent under this Agreement or any other Credit Document without the prior written consent of such Agent.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon the Borrower, such Lenders, the Administrative Agent and all future holders of the affected Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender whose consent is required hereunder.

(b) Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that the Commitment or Loan Limit of such Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender (provided that the Administrative Agent may with the consent of the Borrower amend, modify or supplement the Credit Documents to effectuate an increase in the Borrowing Base where such Defaulting Lender does not consent to an increase to the Borrowing Base, including not increasing the Borrowing Base by the portion thereof applicable to the Defaulting Lender) and no such amendment, waiver or consent shall disproportionately adversely affect such Defaulting Lender without its consent as compared to other Lenders (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders).

(c) Without the consent of any Lender or Issuing Bank, the Credit Parties and the Administrative Agent or Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment, modification or waiver of any Credit Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Credit Document.

(d) Notwithstanding anything to the contrary herein, no Lender consent is required to effect any amendment, modification or supplement to any Customary Intercreditor Agreement, any subordination agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral (i) that is for the purpose of adding the holders of such secured or subordinated Indebtedness permitted to be incurred under this Agreement (or, in each case, a representative with respect thereto), as parties thereto, as expressly contemplated by the terms of such Customary Intercreditor Agreement, such subordination agreement or such other intercreditor agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders), (ii) that is expressly contemplated by any Customary Intercreditor Agreement, any subordination agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral or (iii) otherwise, with respect to any other amendments, modifications or supplements, to the extent such amendment, modification or supplement is satisfactory to the Administrative Agent in its sole discretion; provided that, in each case, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or Collateral Agent hereunder or under any other Credit Document without the prior written consent of the Administrative Agent or Collateral Agent, as applicable.

(e) Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents (including any exhibit, schedule or other attachment) may be made with the consent of the Borrower and the Administrative Agent (i) if such modifications are not adverse in any material respect to the Lenders or the Issuing Banks (in which case, the consent of the Issuing Banks shall be required) or (ii) to the extent necessary to cure any ambiguity, omission, mistake, defect or inconsistency so long as, if requested by the Administrative Agent, the Lenders and the Issuing Banks shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Majority Lenders stating that the Majority Lenders object to such amendment.

13.2 Notices. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a) if to the Borrower, the Administrative Agent, the Collateral Agent, or any Issuing Bank, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b) if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Administrative Agent, the Collateral Agent and the Issuing Banks.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii)(A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail, when delivered; provided that notices and other communications to the Administrative Agent or the Lenders pursuant to Section 2.3, Section 2.6, Section 2.9, Section 4.2 and Section 5.1 shall not be effective until received.

13.3 No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Requirements of Law.

13.4 Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder. Such representations and warranties shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than Obligations under Secured Hedge Agreements, Secured Cash Management Agreements or contingent indemnification obligations, in any such case, not then due and payable).

13.5 Payment of Expenses; Indemnification.

(a) The Borrower agrees (i) to pay or reimburse the Administrative Agent and the other Agents and the Lead Arranger for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, delivery, execution and administration of this Agreement and the other Credit Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration (including out-of-pocket costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent or Collateral Agent in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Documents) of the transactions contemplated hereby and thereby, including all Attorney Costs, which shall be limited to Simpson Thacher & Bartlett LLP and one local counsel as reasonably necessary in any jurisdiction relevant to the interests of the Lenders taken as a whole (and in the case of an actual or perceived conflict of interest, one additional counsel and (if reasonably necessary) one local counsel in each relevant jurisdiction to the affected Indemnitees similarly situated) and (ii) to pay or reimburse the Administrative Agent, the Collateral Agent, the Issuing Banks and each Lender for out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Credit Documents (including all such costs and expenses incurred during any legal proceeding, including any bankruptcy or insolvency proceeding, and including all respective Attorney Costs). The agreements in this Section 13.5 shall survive the repayment of all other Obligations. All amounts due under this Section 13.5 shall be paid within thirty (30) days after written demand therefor (together with backup documentation supporting such reimbursement request). If any Credit Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Credit Document, such amount may be paid on behalf of such Credit Party by the Administrative Agent in its discretion.

(b) The Borrower shall indemnify and hold harmless each Agent, Lender, Lead Arranger, Agent-Related Party and their Affiliates, and their respective officers, directors, employees, partners, agents, advisors and other representatives of the foregoing (collectively the "Indemnitees") from and against any and all liabilities, losses, damages, claims, or out-of-pocket expenses (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction, and in the case of an actual or perceived conflict of interest, one additional counsel and (if reasonably necessary) one local counsel in each relevant jurisdiction to the affected Indemnitees similarly situated) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Credit Document or any other agreement, letter or instrument delivered in connection with the Transactions or the transactions contemplated by, or the consummation of the transactions contemplated by, any Credit Document, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged Environmental Claim regarding, or liability or obligation under Environmental Law of, the Credit Parties or any Subsidiary or (iv) any Proceeding and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other Person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "Indemnified Liabilities"); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, losses, damages, claims or out-of-pocket expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its Related Indemnified Persons, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Credit Document by such Indemnitee or of any of its Related Indemnified Persons, as determined by a final non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as a Lender, an administrative agent or collateral agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates (as determined in a final and non-appealable judgment of a court of competent jurisdiction). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except for direct (as opposed to indirect, special, punitive or consequential) damages resulting from the gross negligence, bad faith or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable judgment, of such Indemnitee), nor shall any Indemnitee, Agent-Related Parties, Credit Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Credit Party, in respect of any such damages incurred or paid by an Indemnitee to a third party, or which are included in a third-party claim, and for any out-of-pocket expenses related thereto). In the case of a Proceeding to which the indemnity in this Section 13.5 applies, such indemnity shall be effective whether or not such Proceeding is brought by any Credit Party, any Subsidiary of any Credit Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Credit Documents are consummated. All amounts due under this Section 13.5 shall be paid within thirty (30) days after written demand therefor (together with backup documentation supporting such reimbursement request); provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 13.5. The agreements in this Section 13.5 shall survive the resignation of the Administrative Agent, Collateral Agent or Issuing Banks, the replacement of any of the foregoing or any Lender and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 13.5(b) shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses and disbursements arising from any non-Tax claims.

13.6 Successors and Assigns; Participations and Assignments.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), except that (i) except as expressly permitted by Section 10.3, the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any

attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except in accordance with this Section 13.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in Section 13.6(c) and, to the extent expressly contemplated hereby, the Agent-Related Parties and each other Person entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in Section 13.6(b)(ii) below, any Lender may at any time assign to one or more assignees (other than any Defaulting Lender, any Disqualified Institution, GSO, except in accordance with Section 13.6(b)(vii), and its Affiliates, Sanchez and its Affiliates (including, for avoidance of doubt, the Borrower or any Subsidiary of the Borrower) or natural persons) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including participations in L/C Obligations) at the time owing to it) with the prior written consent of:

(A) the Borrower (not to be unreasonably withheld or delayed); provided that no consent of the Borrower shall be required for an assignment if (1) the assignee is a Lender, an affiliate of a Lender or an Approved Fund or (ii) an Event of Default under Section 11.1 or Section 11.5 with respect to the Borrower or any Material Subsidiary has occurred and is continuing; provided further that, for any assignments for which the Borrower's consent is required, such consent shall be deemed to have been given if the Borrower has not responded within five (5) Business Days of a written request for such consent pursuant to Section 13.6(h), and

(B) the Administrative Agent and each Issuing Bank (in each case, not to be unreasonably withheld or delayed).

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans or an assignment to another Lender, any Affiliate of a Lender or an Approved Fund, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 and increments of $5,000,000 in excess thereof, unless each of the Borrower, each Issuing Bank and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); provided that no such consent of the Borrower shall be required if an Event of Default under Section 11.1 or Section 11.5 with respect to the Borrower or any Material Subsidiary has occurred and is continuing;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and the Administrative Agent shall enter the relevant information in the Register pursuant to paragraph (b)(iv) of this Section 13.6; and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and applicable Tax forms (including those described in Sections 5.4(d), 5.4(e), 5.4(g) and 5.4(h), as applicable).

(iii) Subject to acceptance and recording thereof pursuant to this Section 13.6(b)(iv), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and

Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.10, Section 2.11, Section 3.11, Section 5.4 and Section 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall not be treated as an assignment and shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.6(c).

(iv) The Administrative Agent, acting solely for this purpose as a nonfiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders (including any SPVs that provide all or any part of a Loan pursuant to Section 13.6(g) hereof), and the Commitments of, and principal amount (and stated interest amounts) of the Loans and L/C Obligations and any payment made by each Issuing Bank under any applicable Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Further, the Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent, each Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent, each Issuing Bank and, solely with respect to itself, each other Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this Section 13.6(b) (unless waived) and any written consent to such assignment required by this Section 13.6(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.

(vi) The Administrative Agent shall have no duty to ascertain, monitor or enforce compliance with the restrictions on assignments and participations related to Disqualified Institutions. The Administrative Agent shall be authorized to provide the list of Disqualified Institutions to any Lender that requests the same, subject to the confidentiality obligations in Section 13.16.

(vii) At any time within twenty (20) Business Days following either (x) the acceleration of the Loans pursuant to Section 11 or (y) the occurrence of an Event of Default, if GSO delivers a Notice of Purchase Election substantially in the form of Exhibit K hereto (a "Notice of Purchase Election") to the Administrative Agent, which notice shall be irrevocable, then each Lender shall assign all of its rights, obligations, claims and liabilities under this Agreement (including all of its Commitment and the Loans at such time owing to it) to GSO on the following terms and conditions:

(A) such assignments being at par (including any accrued and unpaid interest, fees, breakage cost and all other amounts payable to the Administrative Agent, Collateral Agent, any other Agent hereunder, the Issuing Banks and the Lenders);

(B) the execution by GSO and each Lender of an Assignment and Assumption;

(C) that GSO shall be assigned the rights and obligations of all (and not less than all) Lenders under this Agreement;

(D) such assignments being consummated within ten (10) Business Days following the delivery of the Notice of Purchase Election;

(E) such assignments being without recourse to or representation by the Administrative Agent or Lenders;

(F) that all Letters of Credit shall have (1) expired or been terminated or (2) Satisfactorily Cash Collateralized or Backstopped;

(G) that any payment made by an Issuing Bank pursuant to a drawing on a Letter of Credit issued by it shall be fully reimbursed;

(H) that all Obligations under Secured Hedge Agreements and Secured Cash Management Agreements shall be (1) paid in full in cash or (2) cash collateralized or otherwise secured, in each case, to the reasonable satisfaction of the applicable Hedge Bank or Cash Management Bank; and

(I) that the documentation to effectuate such assignment is in form and substance reasonably satisfactory to the Administrative Agent to reflect the foregoing terms and conditions.

Notwithstanding anything to the contrary in this Agreement, upon the delivery of a Notice of Purchase Election, the Administrative Agent, the Collateral Agent and any Issuing Bank shall be entitled to resign effective upon the consummation of any such assignment and GSO shall be entitled to appoint a replacement Administrative Agent and Collateral Agent; provided, that, (a) the resigning Administrative Agent shall be entitled to the rights afforded to a resigning Administrative Agent pursuant to Section 12.9 (excluding its right to appoint a successor Administrative Agent pursuant to the third sentence of such Section), (b) the resigning Collateral Agent shall be entitled to the rights afforded to a resigning Collateral Agent pursuant to Section 12.9 (excluding its right to appoint a successor Administrative Agent pursuant to the third sentence of such Section) and (c) any resigning Issuing Bank shall be entitled to the rights afforded to a replaced Issuing Bank pursuant to Section 3.9(a). The Lenders hereby authorize and direct the Administrative Agent to enter into a letter agreement with GSO that is consistent with the terms of this Section 13.6(b)(vii).

(c) (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or any Issuing Bank, sell participations to one or more banks or other entities (each, a "Participant") other than any Defaulting Lender, any Disqualified Institution, GSO and its Affiliates, Sanchez and its Affiliates (including, for avoidance of doubt, the Borrower or any Subsidiary of the Borrower) or natural persons in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, each Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 13.1(a)(A) and 13.1(a)(I) that affects such Participant, provided that the Participant shall have no right to consent to any modification to the percentages specified in the definitions of the terms "Majority Lenders" or "Required Lenders". Subject to Section 13.6(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.10, Section 2.11, Section 3.11 and Section 5.4 to the same extent as if it were a Lender (subject to the limitations and requirements of those Sections and Section 2.12 and Section 13.7) as though it were a Lender and had acquired its interest by assignment pursuant to Section 13.6(b). To the extent permitted by Requirements of Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; provided such Participant agrees to be subject to Section 13.8(a) as though it were a Lender.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.10, Section 2.11, Section 3.11 or Section 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (such consent not to be unreasonably withheld); provided that the Participant shall be subject to the provisions in Section 2.12 as if it were an assignee under Section 13.6(a) and Section 13.6 (b). Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest amounts) of each Participant's interest in the Loans or other obligations

under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and each party hereto shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(d) Any Lender may, without the consent of the Borrower, any Issuing Bank or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note, substantially in the form of Exhibit G, as the case may be, evidencing the Loans owing to such Lender.

(e) Subject to Section 13.16, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "Transferee") and any prospective Transferee any and all Confidential Information (including financial information) in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(f) The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(g) Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (a "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (A) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV. This Section 13.6(g) may not be amended without the written consent of the SPV. Notwithstanding anything to the contrary in this

Agreement, subject to the following sentence, each SPV shall be entitled to the benefits of Section 2.10, Section 2.11, Section 3.11 and Section 5.4 to the same extent as if it were a Lender (subject to the limitations and requirements of Section 2.10, Section 2.11, Section 3.11 and Section 5.4 as though it were a Lender, and Sections 2.12 and 13.7, and has acquired its interest by assignment pursuant to Section 13.6(b). Notwithstanding the prior sentence, an SPV shall not be entitled to receive any greater payment under Section 2.10, Section 2.11, Section 3.11 or Section 5.4 than its Granting Lender would have been entitled to receive absent the grant to such SPV, unless such grant to such SPV is made with the Borrower's prior written consent (which consent shall not be unreasonably withheld).

(h) In the event that the Borrower's consent (or deemed consent) shall be required with respect to any assignment by a Lender described in this Section 13.6, a written request for such consent shall be delivered to an Authorized Officer of the Borrower and any other officer or employee designated by the Borrower in writing to the Administrative Agent.

13.7 Replacements of Lenders under Certain Circumstances.

(a) In the event that any Lender (i) requests reimbursement for amounts owing pursuant to Section 2.10, Section 3.11 or Section 5.4 (other than Section 5.4(b)), (ii) is affected in the manner described in Section 2.10(a)(iii) and as a result thereof any of the actions described in such Section is required to be taken or (iii) becomes a Defaulting Lender, the Borrower shall be entitled to replace such Lender by requiring such Lender to assign its Loans and its Commitments hereunder to one or more assignees, subject to (x) the consent rights that the Administrative Agent and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) have and (y) the restrictions on the Persons who may be assignees under Section 13.6(b); provided that (A) such replacement does not conflict with any Requirement of Law, (B) the replacement bank or institution shall purchase, at par, all Loans and the Borrower shall pay all other amounts (other than any disputed amounts, until such amounts are no longer in dispute, pursuant to Section 2.10, Section 3.11 or Section 5.4, as the case may be) owing to such replaced Lender prior to the date of replacement (subject to any exceptions agreed to between the assignee(s) and the replaced Lender to facilitate such assignment), (C) the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) and (D) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 and the Borrower and the Administrative Agent shall otherwise comply with Section 13.6 (provided that the Borrower shall not be obligated to pay the registration and processing fee referred to therein as long as the replacement Lender pays such fee).

(b) If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination that pursuant to the terms of Section 13.1 requires the consent of all of the Lenders affected, the Required Lenders pursuant to Section 13.1(a)(I) or each Lender and, in each case with respect to which the Majority Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and its Commitments hereunder to one or more assignees, subject to (x) the consent rights that the Administrative Agent and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) have and (y) the restrictions on the Persons who may be assignees, in each case, under Section 13.6(b); provided that (i) the assignee(s) shall purchase, at par, all Loans and the Borrower shall pay all other amounts owing to such Non-Consenting Lender prior to the date of replacement (subject to any exceptions agreed to between the assignee(s) and the Non-Consenting Lender to facilitate such assignment) and (ii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 and the Borrower and the Administrative Agent shall otherwise comply with Section 13.6 (provided that the Borrower shall not be obligated to pay the registration and processing fee referred to therein as long as the replacement Lender pays such fee).

(c) Notwithstanding anything herein to the contrary each party hereto agrees that any assignment pursuant to the terms of this Section 13.7 may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent, each Issuing Bank and the assignee and that the Lender making such assignment need not be a party thereto.

(d) Any such Lender replacement pursuant to this Section 13.7 shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

13.8 Adjustments; Set-off.

(a) If any Lender (a "Benefited Lender") shall at any time receive any payment in respect of any principal of or interest on all or part of the Loans made by it, or the participations in Letter of Credit Obligations held by it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 11.5, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender entitled thereto, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall (i) notify the Administrative Agent of such fact, and (ii) purchase for cash at face value from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably in accordance with the aggregate principal of and accrued interest on their respective Loans and other amounts owing them; provided, however, that (A) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (B) the provisions of this paragraph shall not be construed to apply to (1) any payment made by the Borrower or any other Credit Party pursuant to and in accordance with the terms of this Agreement and the other Credit Documents, (2) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, Commitments or participations in Drawings to any assignee or participant or (3) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Margin in respect of Loans or Commitments of Lenders that have consented to any such extension. Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation; provided, further, that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

(b) After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders and Issuing Banks provided by Requirements of Law, each Lender, each Issuing Bank and their respective Affiliates, at any time, shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Requirements of Law, against any amount due and payable by the Borrower or any Restricted Subsidiary hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, such Issuing Bank or any of their respective Affiliates, branches or agencies thereof to or for the credit or the account of the Borrower or any Credit Party. Each Lender or Issuing Bank agrees promptly to notify the Borrower (and the Restricted Subsidiaries, if applicable) and the Administrative Agent after any such set-off and application made by such Lender, such Issuing Bank or their respective Affiliates; provided that the failure to give such notice shall not affect the validity of such set-off and application.

13.9 Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission, *i.e.* a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

13.10 Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11 Integration. This Agreement and the other Credit Documents represent the agreement of the Borrower, the Guarantors, the Collateral Agent, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Borrower, the Guarantors, any Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents.

13.12 GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13.13 Submission to Jurisdiction; Waivers. Each party hereto hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York and the courts of the United States of America for the Southern District of New York, in each case located in New York County, and appellate courts from any thereof; provided that nothing contained herein or in any other Credit Document will prevent any Lender, the Collateral Agent or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Credit Documents or against any Collateral or any other property of any Credit Party in any other forum in which jurisdiction can be established;

(b) consents that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 at such other address of which the Administrative Agent shall have been notified pursuant to Section 13.2;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Requirements of Law or shall limit the right to sue in any other jurisdiction;

(e) acknowledges the waiver of special, exemplary, punitive or consequential damages contained in Section 13.5; and

(f) agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13.14 Acknowledgments. The Borrower hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b) (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between the Borrower and the other Credit Parties, on the one hand, and the Administrative Agent, the Lenders and the other Agents on the other hand, and the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent, other Agents and the Lenders, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of the Borrower, any other Credit Parties or any of their respective Affiliates, equity holders, creditors or employees or any other Person; (iii) neither the Administrative Agent, any other Agent, any Lead Arranger, nor any Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification

hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent, any Lead Arranger, or any Lender has advised or is currently advising any of the Borrower, the other Credit Parties or their respective Affiliates on other matters) and none of the Administrative Agent, any Agent, any Lead Arranger or any Lender has any obligation to any of the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent and its Affiliates, each other Agent and each of its Affiliates and each Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its respective Affiliates, and none of the Administrative Agent, any other Agent or any Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) none of the Administrative Agent, any Agent or any Lender has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and each Agent with respect to any breach or alleged breach of agency or fiduciary duty; and

(c) no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower, on the one hand, and any Lender, on the other hand.

13.15 WAIVERS OF JURY TRIAL. THE BORROWER, EACH AGENT, EACH ISSUING BANK AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16 Confidentiality. The Administrative Agent, each other Agent, any Issuing Bank and each other Lender shall hold all Confidential Information (as defined below) confidential in accordance with its customary procedure for handling confidential information of this nature and in any event may make disclosure (a) as required or requested by any Governmental Authority, self-regulatory agency or representative thereof or pursuant to legal process or applicable Requirements of Law, (b) to such Lender's or the Administrative Agent's, any Issuing Bank's or such other Agent's attorneys, professional advisors, independent auditors, trustees, agents or Affiliates (and any Affiliate's attorneys, professional advisors, independent auditors, trustees or agents) (each, an "Advisor") in each case who need to know such Confidential Information in connection with the administration of the Credit Documents and are informed of the confidential nature of such Confidential Information (provided that the Administrative Agent, each Agent, each Issuing Bank and each other Lender shall be responsible for its respective Advisors' compliance with this paragraph), (c) to an investor or prospective investor in a securitization that agrees its access to Confidential Information regarding the Credit Parties, the Loans and the Credit Documents is solely for purposes of evaluating an investment in a securitization and who agrees to treat such Confidential Information as confidential, (d) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a securitization and who agrees to treat such Confidential Information as confidential, (e) to a nationally recognized ratings agency that requires access to Confidential Information regarding the Credit Parties, the Loans and Credit Documents, (f) to prospective Transferees or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties in Hedge Agreements to be entered into in connection with Loans made hereunder as long as such Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.16 and (g) to the extent such Confidential Information becomes public other than by reason of disclosure by such Person in breach of this Agreement; provided that unless prohibited by applicable Requirements of Law, each Lender, the Administrative Agent, any Issuing Bank and each other Agent shall endeavor to notify the Borrower (without any liability for a failure to so notify the Borrower) of any request made to such Lender, the Administrative Agent, any Issuing Bank or such other Agent, as applicable, by any governmental agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information; provided further that in no event shall any Lender, the Administrative Agent, any Issuing Bank or any other Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary. "Confidential Information" shall mean all information received from the Borrower or any Restricted Subsidiary not marked as "public" relating to the Borrower, such Restricted

Subsidiary or their respective businesses, other than any such information that is available to the Administrative Agent, any other Agent, any Issuing Bank or any Lender on a non-confidential basis prior to disclosure by the Borrower and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry. Any Person required to maintain the confidentiality of Confidential Information as provided in this Section 13.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Person would accord to its own confidential information.

13.17 Release of Collateral and Guarantee Obligations.

(a) The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) in full, as set forth in Section 13.7(b) below, (ii) upon the Disposition of such Collateral (including as part of or in connection with any other Disposition permitted hereunder) to any Person other than another Credit Party, to the extent such Disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) upon any Collateral becoming an Excluded Asset, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Majority Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee in accordance with this Section 13.17 and (vi) as required by the Collateral Agent to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents. Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guarantees (A) upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary or otherwise becoming an Excluded Subsidiary (other than by virtue of such Subsidiary becoming an Immaterial Subsidiary) and (B) in the case of a Guarantor becoming an Excluded Subsidiary by virtue of such Subsidiary becoming an Immaterial Subsidiary upon written request of the Borrower to the Administrative Agent (which request shall include a certification of an Authorized Officer that such Guarantor to be released is an Immaterial Subsidiary). The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. In connection with any release hereunder, the Administrative Agent and Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower and at the Borrower's expense in connection with the release of any Liens created by any Credit Document in respect of such Subsidiary, property or asset. Upon the request of the Administrative Agent, in connection with any documentation to effectuate the release of Collateral pursuant to a partial release of Liens in respect of Collateral, a UCC-3 filing in respect of personal property or similar recording or filing, the Borrower shall certify that only the Collateral intended to be released pursuant to the terms of Section 13.17(a) was released pursuant to such documentation.

(b) Notwithstanding anything to the contrary contained herein or any other Credit Document, upon Payment in Full, the Administrative Agent and/or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Credit Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent or indemnification obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

13.18 USA PATRIOT Act. The Agents and each Lender hereby notify the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Agent and such Lender to identify each Credit Party in accordance with the PATRIOT Act.

13.19 Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate *per annum* equal to the applicable Overnight Rate from time to time in effect.

13.20 Reinstatement. This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any substantial part of its property, or otherwise, all as though such payments had not been made.

13.21 Disposition of Proceeds. The Security Documents contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Collateral Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to their as-extracted collateral in the form of production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property. The Security Documents further provide in general for the application of such proceeds to the satisfaction of the Obligations described therein and secured thereby. Notwithstanding the assignment contained in such Security Documents, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Credit Parties and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Credit Parties.

13.22 Collateral Matters; Hedge Agreements. The benefit of the Security Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available on a *pro rata* basis pursuant to terms agreed upon in the Credit Documents to any Person (a) under any Secured Hedge Agreement, in each case, after giving effect to all netting arrangements relating to such Hedge Agreements or (b) under any Secured Cash Management Agreement. No Person shall have any voting rights under any Credit Document solely as a result of the existence of obligations owed to it under any such Secured Hedge Agreement or Secured Cash Management Agreement.

13.23 Agency of the Borrower for the Other Credit Parties. Each of the other Credit Parties hereby appoints the Borrower as its agent for all purposes relevant to this Agreement and the other Credit Documents, including the giving and receipt of notices and the execution and delivery of all documents, instruments and certificates contemplated herein and therein and all modifications hereto and thereto.

13.24 Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature Pages Follow.]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

**SN EF UNSUB, LP**, as the Borrower

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

ADMINISTRATIVE AGENT::

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent

By: /s/ Darren Vanek
Name: Darren Vanek
Title: Authorized Officer

LENDER: **JPMORGAN CHASE BANK, N.A.,**
as Lender

By: /s/ Darren Vanek
Name: Darren Vanek
Title: Authorized Officer

Case 4:23-cv-00587 Document 68-21-23 Filed on 04/19/23 in TXSD Page 215 of 300

LENDER:

**CITIBANK, N.A.,**
as Lender

By: /s/ Jeff Ard
Name: Jeff Ard
Title: Vice President

LENDER:

**CAPITAL ONE, NATIONAL ASSOCIATION,**
as Lender

By: /s/ Michael Higgins
Name: Michael Higgins
Title: Senior Director

LENDER:

**ROYAL BANK OF CANADA,**
as Lender

By: /s/ Mark Lumpkin, Jr.
Name: Mark Lumpkin, Jr.
Title: Authorized Signatory

LENDER:

**BMO HARRIS BANK, NA,**
as Lender

By: /s/ Matthew L. Davis
Name: Matthew L. Davis
Title: Vice President

LENDER:

**ING CAPITAL LLC,**
as Lender

By: /s/ Josh Strong
Name: Josh Strong
Title: Director

By: /s/ Charles Hall
Name: Charles Hall
Title: Managing Director

LENDER:

**SUNTRUST BANK,**
as Lender

By: /s/ John Kovarik
Name: John Kovarik
Title: Vice President

LENDER:

**ABN AMRO CAPITAL USA LLC,**
as Lender

By: /s/ David Montgomery
Name: David Montgomery
Title: Executive Director

By: /s/ Uravashi Zutshi
Name: Uravashi Zutshi
Title: Managing Director

LENDER:

**CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK BRANCH,** as Lender

By: /s/ Richard Antl
Name: Richard Antl
Title: Authorized Signatory

By: /s/ William M. Reid
Name: William M. Reid
Title: Authorized Signatory

LENDER:

**FIFTH THIRD BANK,**
as Lender

By: /s/ Justin Bellamy
Name: Justin Bellamy
Title: Director

LENDER:

**NATIXIS, NEW YORK BRANCH,**
as Lender

By: /s/ Timothy Polvado
Name: Timothy Polvado
Title: Senior Managing Director

By: /s/ Carlos Quinteros
Name: Carlos Quinteros
Title: Managing Director

LENDER:

**PNC BANK, NATIONAL ASSOCIATION,**
as Lender

By: /s/ Sandra Aultman
Name: Sandra Aultman
Title: Managing Director

LENDER:

**BOKF, NA dba Bank of Texas,**
as Lender

By: /s/ Mari Salazar
Name: Mari Salazar
Title: Senior Vice President, Energy Lending

LENDER:

**CITIZENS BANK, N.A.,**
as Lender

By: /s/ Scott Donaldson
Name: Scott Donaldson
Title: Senior Vice President

LENDER:

**COMERICA BANK,**
as Lender

By: /s/ William B. Robinson
Name: William B. Robinson
Title: Senior Vice President

| | |
|---|---|
| LENDER: | **The Huntington National Bank,**<br>as Lender<br><br>By: /s/ Margaret Niekrash<br>Name: Margaret Niekrash<br>Title: Senior Vice President |

**EXHIBIT A TO**
**CREDIT AGREEMENT**

**[FORM OF] RESERVE REPORT CERTIFICATE**

This Reserve Report Certificate (this "Certificate"), dated as of [_______], 201[ ], relates to the Reserve Report dated as of [January 1] [July 1] [other date in case of Interim Redetermination], 201[ ] delivered pursuant to Section 9.12(c) of that certain Credit Agreement dated as of March [●], 2017 (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent and an Issuing Bank and each other Issuing Bank from time to time party thereto. Each capitalized term used herein having the same meaning given to it in the Credit Agreement unless otherwise specified. The undersigned certifies he/she is an Authorized Officer and, on behalf of the Borrower, in his/her capacity as an Authorized Officer of the Borrower and not in his/her individual capacity, certifies that in all material respects:

(a) in the case of Reserve Reports prepared by or under the supervision of the chief engineer of the Borrower or Sanchez (other than January 1 Reserve Reports) such Reserve Report has been prepared, except as set forth in an exhibit to such Reserve Report, in accordance with the procedures used in the immediately preceding January 1 Reserve Report or the Initial Reserve Report, if no January 1 Reserve Report has been delivered;

(b) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects;

(c) assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary in connection with the Transactions and any assignments made in connection therewith, except as set forth on Annex I hereto, the Borrower or another Credit Party has good and defensible title to the Borrowing Base Properties evaluated in such Reserve Report (other than those (i) Disposed of in compliance with Section 10.4 of the Credit Agreement since delivery of such Reserve Report, (ii) leases that have expired in accordance with their terms and (iii) with title defects disclosed in writing to the Administrative Agent) and such Borrowing Base Properties are free of all Liens except for Liens permitted pursuant to Section 10.2 of the Credit Agreement;

(d) except as set forth on Annex II hereto, as of the date of such Reserve Report, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 8.16 of the Credit Agreement with respect to the Credit Parties' Oil and Gas Property evaluated in such Reserve Report that would require the Borrower or any other Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor;

(e) no Borrowing Base Properties have been Disposed of since the date of the last Borrowing Base determination except those Borrowing Base Properties listed on Annex III hereto; and

(f) Annex IV sets forth a list of (A) all material marketing agreements (which are not cancellable on 60 days' notice or less without penalty or detriment) entered into subsequent to the later of the Closing Date and the most recently delivered Reserve Report for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties' rights to purchase, production, whether or not the same are currently being exercised) that represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and that have a maturity date or expiry date of longer than six months from the last day of such fiscal year or period, as applicable and (B) all Borrowing Base Properties evaluated by such Reserve Report that are Collateral and demonstrating that the PV-9 of the Collateral (calculated at the time of delivery of such Reserve Report) meets the Collateral Coverage Minimum.

*[Remainder of page intentionally left blank; signature page follows]*

EXECUTED AND DELIVERED as of the date first set forth above.

**SN EF UNSUB, LP**

By: ______________________________
Name:
Title:

**EXHIBIT B TO
CREDIT AGREEMENT**

**FORM OF
NOTICE OF BORROWING**

JPMORGAN CHASE BANK, N.A.
712 MAIN STREET, 5TH FLOOR
HOUSTON, TX 77002
Attention: Darren Vanek

[Date]

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of March [●], 2017, among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), the Lenders from time to time party thereto, JPMORGAN CHASE BANK, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and each other Issuing Bank from time to time party thereto (as amended, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower hereby gives you notice pursuant to Section 2.3 of the Credit Agreement that it requests a Borrowing under the Credit Agreement, and in that connection sets forth below the terms on which such Borrowing is requested to be made:

(A) The aggregate principal amount of Borrowing: ____________
(B) The date of Borrowing[1] (which is a Business Day): ____________
(C) The type of Borrowing[2]: ____________
(D) Interest Period (if LIBOR Borrowing)[3]: ____________
(E) The location and number of the Borrower's Account to which funds are to be disbursed: ____________

**SN EF UNSUB, LP**

By: ______________________________
Name:
Title:

1 Date of Notice of Borrowing: To be submitted (A) prior to 1:00 p.m. (New York City time) at least three Business Days prior to each Borrowing of Loans if such Loans are to be initially LIBOR Loans; or (B) prior to 11:00 a.m. (New York City time) on the date of each Borrowing of Loans that are to be ABR Loans.
2 Specify a LIBOR Borrowing or an ABR Borrowing.
3 The Interest Period applicable to a LIBOR Borrowing shall be subject to the definition of "Interest Period" in the Credit Agreement. If no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration.

Case 22-90000 Document 323-23 Filed in TXSB on 06/12/22 Page 234 of 300

**EXHIBIT C TO
CREDIT AGREEMENT**

**FORM OF
GUARANTEE**

[Attached]

**[FORM OF] GUARANTEE AGREEMENT**

This **GUARANTEE AGREEMENT** (this "Guaranty"), dated as of **[__________]**, 2017, by and among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), the Subsidiaries of the Borrower listed on the signature page hereof (each such Subsidiary and the Borrower, a "Guarantor" and, collectively, the "Guarantors"), and JPMORGAN CHASE BANK, N.A., as collateral agent and administrative agent for the Secured Parties referred to below (in its capacity as collateral agent, together with any successor thereto in such capacity, the "Collateral Agent").

**WITNESSETH:**

WHEREAS, the Borrower, the Lenders party thereto from time to time, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent and an Issuing Bank, and each other Issuing Bank from time to time party thereto, have entered into a Credit Agreement, dated as of March 1, 2017 (as amended, restated, modified, waived and/or supplemented from time to time, the "Credit Agreement"), providing for the making of Loans to the Borrower and the issuance of Letters of Credit for the account of the Borrower;

WHEREAS, one or more Cash Management Banks or Hedge Banks have entered or may from time to time enter into Secured Cash Management Agreements or Secured Hedge Agreements, as applicable, with the Borrower and/or its Restricted Subsidiaries and one or more Cash Management Banks have provided or may from time to time provide Cash Management Services pursuant to Secured Cash Management Agreements to the Borrower and/or any of its Restricted Subsidiaries (the foregoing, together with the making of Loans and the issuance of Letters of Credit, collectively, the "Extensions of Credit");

WHEREAS, the proceeds of the Extensions of Credit will be used in part to enable the Borrower to make valuable transfers to the Guarantors in connection with the operation of their respective businesses;

WHEREAS, it is a condition to the obligations of the Secured Parties to make their respective Extensions of Credit to the Borrower that the Borrower and each Guarantor shall have executed and delivered this Guaranty; and

WHEREAS, each Guarantor will obtain benefits from the Extensions of Credit, and accordingly desires to execute this Guaranty in order to satisfy the conditions described in the preceding paragraph and to induce the Secured Parties to make their respective Extensions of Credit.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and to induce the Administrative Agent, the Collateral Agent, the Issuing Banks and the Lenders to enter into the Credit Agreement and the Lenders and the Issuing Banks to make the Extensions of Credit to the Borrower under the Credit Agreement, to induce one or more Hedge Banks to enter into Secured Hedge Agreements with the Borrower and/or its Restricted Subsidiaries and to induce one or more Cash Management Banks to provide Cash Management Services pursuant to Secured Cash Management Agreements with the Borrower and/or its Restricted Subsidiaries, the Borrower and Guarantors hereby agree with the Collateral Agent, for the benefit of the Secured Parties, as follows:

SECTION 1. DEFINITIONS.

(a) Capitalized terms used herein shall have the meanings assigned to them in the Credit Agreement, unless otherwise defined herein. References to this "Guaranty" shall mean this Guaranty, including all amendments, modifications and supplements and any annexes, exhibits and schedules to any of the foregoing, and shall refer to this Guaranty as the same may be in effect at the time such reference becomes operative.

(b) The following term shall have the following meaning:

"Qualified Keepwell Provider": in respect of any Hedging Obligation, each Credit Party that, at the time the relevant guarantee (or grant of the relevant security interest, as applicable) becomes effective with respect to such Hedging Obligation, constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder

and can cause another person to qualify as an "eligible contract participant" with respect to such Hedging Obligation at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 2. THE GUARANTY.

(a) Guaranty of Guaranteed Obligations. Each Guarantor unconditionally guarantees to the Collateral Agent, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, other than, with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor (the "Guaranteed Obligations") for the benefit of the Secured Parties. Each Guarantor further agrees that the Guaranteed Obligations may be extended, modified, amended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension, modification, amendment or renewal of any Guaranteed Obligation. To the extent permitted by applicable law, each Guarantor waives presentment to, demand of payment from and protest to the Borrower, any other Credit Party or any Restricted Subsidiary of any of the Guaranteed Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.

(b) Guaranty of Payment and Performance. Each Guarantor further agrees that its guarantee hereunder constitutes a guarantee of payment and performance when due and not of collection, and waives any right to require that any resort be had by the Collateral Agent or any other Secured Party to any security held for the payment or performance of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Collateral Agent or any other Secured Party in favor of the Borrower or any other person.

(c) Special Guaranty to Confer ECP Status. The Borrower, unconditionally and irrevocably, with respect to each other Guarantor, guarantees such Guarantor's guarantee under Section 2(a) hereof of any Secured Hedge Agreement. The obligations of the Borrower under this Section 2(c) shall remain in full force and effect until Payment in Full. The Borrower intends that this Section 2(c) constitute, and this Section 2(c) shall be deemed to constitute, a guarantee or other agreement for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(d) No Limitations. Except for termination or release of a Guarantor's obligations hereunder as expressly provided for in Section 5(g) hereof and except as otherwise provided under applicable law, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise (other than defense of payment or performance). Without limiting the generality of the foregoing, to the extent permitted by applicable law and except for and subject to any limitations in connection with any applicable termination or release of a Guarantor's obligations hereunder in accordance with the terms of Section 5(g) hereof, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by: (i) the failure of the Collateral Agent or any other Secured Party to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Credit Document or otherwise; (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Credit Document or any other agreement, including with respect to any other Guarantor under this Guaranty; (iii) the release of, or the failure to perfect any security interest in, or the exchange, substitution, release or any impairment of, any security held by the Collateral Agent or any other Secured Party for the Guaranteed Obligations; (iv) any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations; (v) any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than Payment in Full); (vi) any illegality, lack of validity or enforceability of any Guaranteed Obligation; (vii) any change in the corporate existence, structure or ownership of the Borrower or any other Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or any other Guarantor or its assets or any resulting release or discharge of any Guaranteed Obligation (other than Payment in Full); (viii) the existence of any claim, set-off or other rights that the Guarantor may have at any time against the Borrower or any other Guarantor, the Collateral Agent, or any other corporation or Person, whether in connection herewith or any unrelated transactions, provided that nothing herein will prevent the assertion of any such claim by separate suit or compulsory counterclaim; and (ix) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Collateral Agent or any Secured Party that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower or

any other Credit Party or any other guarantor or surety. Each Guarantor expressly authorizes the applicable Secured Parties to take and hold security for the payment and performance of the Guaranteed Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Guaranteed Obligations, all without affecting the obligations of any Guarantor hereunder. To the fullest extent permitted by applicable law, each Guarantor waives any defense based on or arising out of any defense of any other Guarantor or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Guarantor, other than Payment in Full. The Collateral Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with the Borrower or any other Credit Party or exercise any other right or remedy available to them against the Borrower or any other Credit Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent of Payment in Full. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any other Guarantor, as the case may be, or any security.

(e) Reinstatement. Notwithstanding the provisions of Section 5(g)(i) hereof, each Guarantor agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored or returned by the Collateral Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any other Credit Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any other Credit Party or any substantial part of its property, or otherwise, all as though such payment had not been made.

(f) Agreement To Pay; Subrogation. In furtherance of the foregoing and not in limitation of any other right that the Collateral Agent or any other Secured Party has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Borrower or any other Credit Party to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Collateral Agent such unpaid Guaranteed

Obligation. Upon payment by any Guarantor of any sums to the Collateral Agent as provided above, all rights of such Guarantor against the Borrower or Credit Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be fully subordinated to the indefeasible Payment in Full.

(g) Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's and each other Credit Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that neither the Collateral Agent nor any other Secured Party will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

(h) Keepwell. Each Qualified Keepwell Provider hereby jointly and severally absolutely, unconditionally, and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this guarantee in respect of any Hedging Obligation (provided, however, that each Qualified Keepwell Provider shall only be liable under this Section 2(h) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section, or otherwise under this guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified Keepwell Provider under this Section 2(h) shall remain in full force and effect until this Agreement is terminated in accordance with Section 5(g) hereof. Each Qualified Keepwell Provider intends that this Section 2(h) constitute, and this Section 2(h) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 3. FURTHER ASSURANCES.

Each Guarantor agrees, upon the written request of the Collateral Agent, to execute and deliver to the Collateral Agent, from time to time, any additional instruments or documents reasonably considered necessary by the Collateral Agent to cause this Guaranty to be, become or remain valid and effective in accordance with its terms.

SECTION 4. PAYMENTS FREE AND CLEAR OF TAXES.

Each Guarantor agrees that such Guarantor will perform or observe all of the terms, covenants and agreements that Section 5.4 of the Credit Agreement requires such Guarantor to perform or observe, subject to the qualifications set forth therein.

SECTION 5. OTHER TERMS.

(a) Entire Agreement. This Guaranty, together with the other Credit Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to a guaranty of the loans and advances under the Credit Documents.

(b) Headings. The headings in this Guaranty are for convenience of reference only and are not part of the substance of this Guaranty.

(c) Severability. Whenever possible, each provision of this Guaranty shall be interpreted in such a manner to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

(d) Notices. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be given as provided in Section 13.2 of the Credit Agreement.

(e) Successors and Assigns. Whenever in this Guaranty any Guarantor is referred to, such reference shall be deemed to include the permitted successors and assigns of such party (in accordance with the terms of the Credit Agreement); and all covenants, promises and agreements by any Guarantor that are contained in this Guaranty shall bind and inure to the benefit of its respective permitted successors and assigns.

(f) No Waiver; Cumulative Remedies; Amendments. No failure or delay by the Administrative Agent or Collateral Agent in exercising any right, power or remedy hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights, powers and remedies of the Administrative Agent or Collateral Agent hereunder are cumulative and are not exclusive of any rights, powers or remedies that it would otherwise have. No waiver of any provision of this Guaranty or consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be permitted by this Section 5(f), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of any Loan or the issuance of any Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or Collateral Agent may have had notice or knowledge of such Default or Event of Default at the time. No notice or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in similar or other circumstances. When making any demand hereunder against any of the Guarantors, the Administrative Agent, Collateral Agent or any other Secured Party may, but shall be under no obligation to, make a similar demand on the Borrower or any other Guarantor or guarantor, and any failure by the Administrative Agent or Collateral Agent or any other Secured Party to make any such demand or to collect any payments from the Borrower or any such other Guarantor or guarantor or any release of the Borrower or such other Guarantor or guarantor shall not relieve any of the Guarantors in respect of which a demand or collection is not made or any of the Guarantors not so released of their several obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the Collateral Agent or any other Secured Party against any of the Guarantors. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

Neither this Guaranty nor any provision hereof may be waived, amended, supplemented or modified (other than a termination of this Guaranty pursuant to Section 5(g) hereof) except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Guarantor or Guarantors with respect to which such waiver, amendment, supplement or modification is to apply, subject to any consent required in accordance with Section 13.1 of the Credit Agreement.

(g) Termination and Release.

(i) This Guaranty shall terminate upon Payment in Full.

(ii) A Guarantor shall be released from its obligations hereunder in accordance with Section 13.17 of the Credit Agreement.

(iii) In connection with any release pursuant to this Section 5(g), the Collateral Agent shall execute and deliver to the Borrower, at the Borrower's expense, all documents that the Borrower shall reasonably request to evidence such release; provided that, upon request by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer of the Borrower certifying that such transaction has been or was consummated in compliance with the Credit Documents. Any execution and delivery of documents pursuant to this Section 5(g) shall be without recourse to or warranty by the Collateral Agent.

(h) Counterparts. This Guaranty may be executed in any number of counterparts, each of which shall collectively and separately constitute one and the same agreement.

(i) Limitation of Liability. Each Guarantor, and by its acceptance of this Guaranty, the Collateral Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Guaranteed Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Guaranteed Obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Collateral Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Guaranteed Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Guaranteed Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

SECTION 6. INDEMNITY; SUBROGATION AND SUBORDINATION.

(a) Indemnity and Subrogation. In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 6(c) hereof), the Borrower agrees that (i) in the event a payment shall be made by any Guarantor under this Guaranty in respect of any Obligation of the Borrower, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the Person to whom such payment shall have been made to the extent of such payment and (ii) in the event any assets of any Guarantor shall be sold pursuant to this Guaranty or any other Security Document to satisfy in whole or in part an Obligation of the Borrower, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

(b) Contribution and Subrogation. Each Guarantor (a "Contributing Guarantor") agrees (subject to Section 6(c) hereof) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Obligation or assets of any other Guarantor shall be sold pursuant to any Security Document to satisfy any Obligation owed to any Secured Party and such other Guarantor (the "Claiming Guarantor") shall not have been fully indemnified by the Borrower as provided in Section 6(a) hereof, the Contributing Guarantor shall indemnify the Claiming Guarantor in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as applicable, in each case multiplied by a fraction of which the numerator shall be the net worth of such Contributing Guarantor on the date hereof and the denominator shall be the aggregate net worth of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 9.9 of the Credit Agreement, the date of the supplement hereto executed and delivered by such Guarantor). Any Contributing Guarantor making any payment to a Claiming Guarantor pursuant to this Section 6(b) shall be subrogated to the rights of such Claiming Guarantor under Section 6(a) hereof to the extent of such payment. The provisions of this Section 6(b) shall in no respect limit the obligations and liabilities of any Guarantor to the Collateral Agent and the other

Secured Parties, and each Guarantor shall remain liable to the Collateral Agent and the other Secured Parties for the full amount guaranteed by such Guarantor hereunder.

(c) Subordination. Notwithstanding any provision of this Guaranty to the contrary, all rights of the Guarantors under Sections 6(a) and 6(b) hereof and all other rights of indemnity, contribution or subrogation of any Guarantor under applicable law or otherwise shall be fully subordinated to the indefeasible Payment in Full. Notwithstanding any payment or payments made by any of the Guarantors hereunder or any set-off or appropriation or application of funds of any of the Guarantors by any Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of the Collateral Agent or any other Secured Party against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by any Secured Party for the payment of the Obligations until the indefeasible Payment in Full, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder until the indefeasible Payment in Full. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time prior to the indefeasible Payment in Full, such amount shall be held by such Guarantor in trust for the Collateral Agent and the other Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be paid to the Collateral Agent to be credited and applied against the Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement. No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 6(a) and 6(b) hereof (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

SECTION 7. GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS; INDEMNITY.

(a) The terms of Sections 13.12, 13.13 and 13.15 of the Credit Agreement with respect to governing law, submission of jurisdiction, venue and waiver of trial by jury are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

(b) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5(d) hereof. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(c) to the extent that the Borrower would be required to do so under Section 13.5(b) of the Credit Agreement, each Guarantor agrees to indemnify the Administrative Agent and the other Indemnitees in accordance with the provisions of Section 13.5(b) of the Credit Agreement.

SECTION 8. RIGHT OF SET OFF.

After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders and Issuing Banks provided by Requirements of Law, each Lender, each Issuing Bank and their respective Affiliates, at any time, shall have the right, without prior notice to any Guarantor, any such notice being expressly waived by each Guarantor to the extent permitted by applicable Requirements of Law, against any amount owed by or any Obligation of the Borrower or any Restricted Subsidiary hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, such Issuing Bank or any of their respective Affiliates, branches or agencies thereof to or for the credit or the account of any Guarantor. Each Lender or Issuing Bank agrees promptly to notify the Borrower (and the Restricted Subsidiaries, if applicable) and the Administrative Agent after any such set-off and application made by such Lender, such Issuing Bank or their respective Affiliates; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this Section 8 are in addition to other rights and remedies (including other rights of set off) that such Lender may have.

SECTION 9. ADDITIONAL SUBSIDIARIES.

Upon execution and delivery by the Collateral Agent and any Subsidiary of the Borrower that is required to become a party hereto by Section 9.11 of the Credit Agreement of an instrument in the form of Exhibit I hereto, such Subsidiary shall become a Guarantor hereunder with the same force and effect as if originally named as a Guarantor herein. The execution and delivery of any such instrument shall not require the consent of any other party to this Guaranty. The rights and obligations of each party to this Guaranty shall remain in full force and effect notwithstanding the addition of any new party to this Guaranty. Each reference to "Guarantor" in this Guaranty shall be deemed to include such Subsidiary.

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed and delivered as of the date first above written.

**SN EF UnSub, LP**

By: ____________________
Name: ____________________
Title: ____________________

**[Subsidiary Guarantors]**

Accepted and Agreed to:

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent

By: ______________________
Name: ______________________
Title: ______________________

Exhibit I
to Guaranty

SUPPLEMENT NO. _______ dated as of _______ (this "Supplement"), to the Guarantee Agreement dated as of **[___________]**, 2017 (the "Guaranty"), among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each Subsidiary of the Borrower party thereto (the "Existing Guarantors") and JPMORGAN CHASE BANK, N.A., as collateral agent and administrative agent (in its capacity as collateral agent, the "Collateral Agent") for the Lenders (as defined therein).

A. Reference is made to the Credit Agreement dated as of **[___________]**, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders and agents party thereto from time to time, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent and an Issuing Bank, and each other Issuing Bank from time to time party thereto.

B. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Guaranty, as applicable.

C. The Borrower and the Existing Guarantors have entered into the Guaranty in order to induce the Secured Parties to make their respective Extensions of Credit. Section 9 of the Guaranty provides that additional Subsidiaries may become Guarantors under the Guaranty by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary of the Borrower (the "New Subsidiary") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Guarantor under the Guaranty in order to induce the Secured Parties to make their respective additional Extensions of Credit, and as consideration for Extensions of Credit previously made.

Accordingly, the Collateral Agent and the New Subsidiary agree as follows:

SECTION 1. In accordance with Section 9 of the Guaranty, the New Subsidiary by its signature below becomes a Guarantor under the Guaranty with the same force and effect as if originally named therein as a Guarantor and the New Subsidiary hereby agrees to all the terms and provisions of the Guaranty applicable to it as a Guarantor thereunder. In furtherance of the foregoing, the New Subsidiary (a) does hereby guarantee to the Collateral Agent the payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations as set forth in the Guaranty and (b) if New Subsidiary is a Qualified Keepwell Provider, does hereby agree to perform all obligations of the Guaranty applicable to it in such capacity. Each reference to a "Guarantor" in the Guaranty and in this Supplement shall be deemed to include the New Subsidiary. The Guaranty is hereby incorporated herein by reference.

SECTION 2. The New Subsidiary represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 3. This Supplement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract. This Supplement shall become effective when the Collateral Agent shall have received a counterpart of this Supplement that bears the signature of the New Subsidiary. Delivery of an executed signature page to this Supplement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4. Except as expressly supplemented hereby, the Guaranty shall remain in full force and effect.

SECTION 5. **THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6. In the event any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Guaranty shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in <u>Section 5(d)</u> of the Guaranty.

SECTION 8. The New Subsidiary agrees to reimburse the Collateral Agent in accordance with <u>Section 13.5</u> of the Credit Agreement for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable and documented fees, disbursements and other charges of counsel to the Collateral Agent.

[Remainder of page left intentionally blank.]

IN WITNESS WHEREOF, the New Subsidiary has duly executed this Supplement to the Guaranty as of the day and year first above written.

**[NAME OF NEW SUBSIDIARY]**

By: ____________________
Name: ____________________
Title: ____________________

**EXHIBIT D TO
CREDIT AGREEMENT**

**FORM OF
MORTGAGE/DEED OF TRUST**

[Attached]

WHEN RECORDED OR FILED,
PLEASE RETURN TO:
Simpson Thacher & Bartlett LLP
600 Travis Street, Suite 5400
Houston, TX 77002-3009
Attention: Austin Browne

*Space above for County Recorder's Use*

**DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT**

**FROM**

**SN EF UnSub, LP**

**as Grantor**

**TO**

**DARREN VANEK, AS TRUSTEE**
**FOR THE BENEFIT OF**

**JPMORGAN CHASE BANK, N.A.**
**as Collateral Agent and as Beneficiary,**
**for the benefit of itself**
**and the Secured Parties**

A CARBON, PHOTOGRAPHIC, OR OTHER REPRODUCTION OF THIS INSTRUMENT IS SUFFICIENT AS A FINANCING STATEMENT.

TO THE EXTENT PERMITTED BY LAW, A POWER OF SALE HAS BEEN GRANTED IN THIS INSTRUMENT. A POWER OF SALE MAY ALLOW THE TRUSTEE OR THE BENEFICIARY TO TAKE SOME OR ALL OF THE DEED OF TRUST PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE GRANTOR UNDER THIS INSTRUMENT.

THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.

THIS INSTRUMENT SECURES PAYMENT OF FUTURE ADVANCES.

THIS INSTRUMENT COVERS PROCEEDS OF DEED OF TRUST PROPERTY.

THIS INSTRUMENT COVERS, AMONG OTHER THINGS, MINERALS, AS-EXTRACTED COLLATERAL AND OTHER SUBSTANCES OF VALUE WHICH MAY BE EXTRACTED FROM THE EARTH (INCLUDING WITHOUT LIMITATION OIL AND GAS) AND THE ACCOUNTS RELATED THERETO WHICH WILL BE FINANCED AT THE WELLHEADS OF THE WELL OR WELLS LOCATED ON THE PROPERTIES DESCRIBED IN EXHIBIT A HERETO. THIS FINANCING STATEMENT IS TO BE FILED OR FILED FOR RECORD, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF THE RECORDERS OF THE COUNTIES LISTED ON THE EXHIBIT HERETO. THE GRANTOR HAS AN INTEREST OF RECORD IN THE REAL ESTATE CONCERNED, WHICH INTEREST IS DESCRIBED IN THE EXHIBIT ATTACHED HERETO.

PORTIONS OF THE DEED OF TRUST PROPERTY ARE GOODS WHICH ARE OR ARE TO BECOME AFFIXED TO OR FIXTURES ON THE LAND DESCRIBED IN OR REFERRED TO IN THE EXHIBIT HERETO. THIS FINANCING STATEMENT IS TO BE FILED FOR RECORD OR RECORDED, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED. THE GRANTOR IS THE OWNER OF A RECORD INTEREST IN THE REAL ESTATE CONCERNED. THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS.

**TABLE OF CONTENTS**

Page


ARTICLE I
DEFINITIONS

| | | |
|---|---|---|
| Section 1.01. | Terms Defined Above | 1 |
| Section 1.02. | UCC and Other Defined Terms. | 1 |
| Section 1.03. | Definitions | 2 |

ARTICLE II
GRANT OF LIEN AND SECURED OBLIGATIONS

| | | |
|---|---|---|
| Section 2.01. | Grant of Liens | 3 |
| Section 2.02. | Grant of Security Interest | 4 |
| Section 2.03. | Secured Obligations | 5 |
| Section 2.04. | Fixture Filing, As-Extracted Collateral, Etc. | 5 |
| Section 2.05. | Pro Rata Benefit | 5 |
| Section 2.06. | Excluded Properties | 5 |

ARTICLE III
ASSIGNMENT OF AS-EXTRACTED COLLATERAL

| | | |
|---|---|---|
| Section 3.01. | Assignment | 5 |
| Section 3.02. | No Modification of Payment Obligations | 6 |
| Section 3.03. | Rights and Title of Consignee | 6 |

ARTICLE IV
REPRESENTATIONS, WARRANTIES AND COVENANTS

| | | |
|---|---|---|
| Section 4.01. | Title | 6 |
| Section 4.02. | First Priority Liens | 7 |
| Section 4.03. | Defend Title | 7 |
| Section 4.04. | Not a Foreign Person | 7 |
| Section 4.05. | Revenue and Cost Bearing Interest | 7 |

ARTICLE V
RIGHTS AND REMEDIES

| | | |
|---|---|---|
| Section 5.01. | Event of Default | 7 |
| Section 5.02. | Foreclosure and Sale | 7 |
| Section 5.03. | Substitute Trustees and Agents | 8 |
| Section 5.04. | Judicial Foreclosure; Receivership | 9 |
| Section 5.05. | Foreclosure for Installments | 9 |
| Section 5.06. | Separate Sales | 9 |

| | | |
|---|---|---|
| Section 5.07. | Possession of Deed of Trust Property | 9 |
| Section 5.08. | Occupancy After Foreclosure | 9 |
| Section 5.09. | Remedies Cumulative, Concurrent and Nonexclusive | 10 |
| Section 5.10. | Discontinuance of Proceedings | 10 |
| Section 5.11. | No Release of Obligations | 10 |
| Section 5.12. | Release of and Resort to Collateral | 10 |
| Section 5.13. | Waiver of Redemption, Notice and Marshalling of Assets, Etc. | 10 |
| Section 5.14. | Application of Proceeds | 10 |
| Section 5.15. | Resignation of Operator | 11 |
| Section 5.16. | Exculpation | 11 |
| Section 5.17. | Payment of Expenses; Indemnity | 11 |

ARTICLE VI
THE TRUSTEE

| | | |
|---|---|---|
| Section 6.01. | Duties, Rights, and Powers of Trustee | 12 |
| Section 6.02. | Successor Trustee | 12 |
| Section 6.03. | Retention of Moneys | 12 |

ARTICLE VII
MISCELLANEOUS

| | | |
|---|---|---|
| Section 7.01. | Instrument Construction. | 13 |
| Section 7.02. | Releases | 13 |
| Section 7.03. | Invalidity | 13 |
| Section 7.04. | Successors and Assigns | 13 |
| Section 7.05. | Satisfaction of Prior Encumbrance | 13 |
| Section 7.06. | Application of Payments to Certain Obligations | 13 |
| Section 7.07. | Nature of Covenants | 13 |
| Section 7.08. | Notices | 14 |
| Section 7.09. | Counterparts | 14 |
| Section 7.10. | GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL | 14 |
| Section 7.11. | Financing Statement; Fixture Filing | 15 |
| Section 7.12. | Execution of Financing Statements | 15 |
| Section 7.13. | Debtor's Interests | 15 |
| Section 7.14. | Exculpation Provisions | 15 |
| Section 7.15. | Hedge Banks | 15 |
| Section 7.16. | Headings | 16 |
| Section 7.17. | Survival | 16 |
| Section 7.18. | Non-Judicial Foreclosure in Texas | 16 |
| Section 7.19. | ENTIRE AGREEMENT | 16 |

<u>Exhibit A</u> Oil and Gas Properties

**THIS DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT** (this "Deed of Trust") is entered into as of **March 1, 2017** (the "Effective Date") by **SN EF UnSub, LP** (the "Grantor"), a Delaware limited partnership, in favor of (a) **DARREN VANEK**, as Trustee for the benefit of **JPMORGAN CHASE BANK, N.A.**, as Collateral Agent under the Credit Agreement and Collateral Agreement referred to below (in such capacity and together with its successors and assigns, the "Beneficiary") and the Secured Parties, with respect to all Deed of Trust Properties located in the State of Texas and (b) the Beneficiary for its benefit and the benefit of the other Secured Parties with respect to all UCC Collateral.

## RECITALS

1. The Grantor, as Borrower (in such capacity, the "Borrower"), the Lenders party thereto from time to time, JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent and an Issuing Bank, and each other Issuing Bank from time to time party thereto, have entered into a Credit Agreement, dated as of March 1, 2017 (as amended, restated, amended and restated, modified, waived and/or supplemented from time to time, the "Credit Agreement"), providing for the making of Loans to and the issuance of Letters of Credit for the account of the Borrower.

2. One or more Cash Management Banks or Hedge Banks have entered or may from time to time enter into Secured Cash Management Agreements or Secured Hedge Agreements, as applicable, with the Borrower and/or its Restricted Subsidiaries and one or more Cash Management Banks have provided or may from time to time provide Cash Management Services pursuant to Secured Cash Management Agreements to the Borrower and/or any of its Restricted Subsidiaries (the foregoing, together with the making of Loans and the issuance of Letters of Credit, collectively, the "Extensions of Credit").

3. In accordance with the terms of the Credit Agreement, the Borrower, certain present and future Subsidiaries of the Borrower constituting Guarantors, and the Collateral Agent may enter into a Guarantee Agreement (such Guarantee Agreement, as it may be amended, restated, modified, and/or supplemented from time to time, the "Guarantee Agreement") pursuant to which, under the terms and conditions stated therein, the Guarantors guarantee the Obligations and the Borrower undertakes certain other obligations including a guarantee of certain obligations.

4. The Beneficiary and the Secured Parties have conditioned their obligations to make Extensions of Credit under the Secured Transaction Documents upon the execution and delivery by the Grantor of this Deed of Trust, and the Grantor has agreed to enter into this Deed of Trust to secure the Obligations.

5. Therefore, in order to comply with the terms and conditions of the Secured Transaction Documents and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby agrees as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01. Terms Defined Above. As used in this Deed of Trust, each term defined above has the meaning indicated above.

Section 1.02. UCC and Other Defined Terms. Each capitalized term used in this Deed of Trust and not defined in this Deed of Trust shall have the meaning ascribed to such term in the Credit Agreement. Any capitalized term not defined in either this Deed of Trust or the Credit Agreement shall have the meaning ascribed to such term in the Applicable UCC (for avoidance of doubt, those terms include Accounts, As-Extracted Collateral, Deposit Account, Fixtures, General Intangibles, Goods, Instruments, Inventory, Proceeds and Supporting Obligations). The rules of construction and other interpretive provisions specified in Sections 1.2 of the Credit Agreement shall apply to this Deed of Trust, including terms defined in the preamble and recitals to this Deed of Trust. The use of the phrase "subject to" as used in connection with Permitted Encumbrances or otherwise and the permitted existence of any Permitted Encumbrances or any other Liens shall not be interpreted to expressly or impliedly subordinate any Liens granted in favor of the Trustee, the Beneficiary or any other Secured Party as there is no intention to subordinate the Liens granted

in favor of the Beneficiary and the other Secured Parties. No provision of this Deed of Trust or any other Credit Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.03. Definitions.

"Accounts and Contract Rights" means all Accounts (including accounts in the form of joint interest billings under applicable operating agreements), contract rights and general intangibles derived from or pertaining to (a) the ownership, operation and development of the Collateral or (b) the production, processing, treating, sale, purchase, exchange or transportation of Hydrocarbons, including all accounts and proceeds accruing to Grantor attributable to the sale of Hydrocarbons or produced from the Collateral or any units or pooled interest units in which all or a portion of the Collateral forms a part.

"Applicable UCC" means the provisions of the Uniform Commercial Code presently in effect in the jurisdiction in which the relevant UCC Collateral is situated or which otherwise is applicable to the creation, perfection or priority of the Liens described herein or the rights and remedies of Beneficiary under this Deed of Trust.

"Collateral" means, collectively, all the Deed of Trust Property and all the UCC Collateral.

"Deed of Trust Property" means the Oil and Gas Properties and other properties, rights, titles, interests, estates and assets described in Section 2.01(a) through Section 2.01(e).

"Event of Default" has the meaning assigned to such term in Section 5.01.

"Future Advances" means future obligations and future advances that the Beneficiary or any other Secured Party may make pursuant to any Secured Transaction Document.

"Hydrocarbon Interests" means all rights, titles, interests and estates and the lands and premises covered or affected thereby now or hereafter acquired by the Grantor in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, fee interests, surface interests, mineral fee interests, mineral servitudes, executive rights, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means (a) all oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other minerals, including those which may be produced and saved from or attributable to the Oil and Gas Properties and (b) all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests or other properties constituting Oil and Gas Properties.

"Obligations" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit or under any Secured Cash Management Agreement or Secured Hedge Agreement, in each case, entered into with the Borrower or any of its Restricted Subsidiaries, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the maturity of Loans and L/C Obligations and the commencement by or against any Credit Party or any Affiliate thereof in any proceeding under any bankruptcy or insolvency law naming such Person, the Borrower or its Restricted Subsidiaries as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) any amounts advanced or expended by the Administrative Agent in connection with the "Cure Right" under and as defined in each of the Management Services Agreement and/or Joint Development Agreement. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) include the obligation (including Guarantee Obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document. Notwithstanding the foregoing, Excluded Swap Obligations shall not constitute Obligations.

“Oil and Gas Properties” means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization agreements, pooling agreements and declarations of pooled or unitized units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of any Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

“Payment in Full” means all the Obligations (other than (a) Hedging Obligations in respect of any Secured Hedge Agreements, (b) Cash Management Obligations in respect of any Secured Cash Management Agreements and (c) any contingent or indemnification obligations not then due and owing) have been paid in full in cash or immediately available funds and the Lenders and any other Secured Parties have no further commitment to lend under the Credit Agreement, the aggregate Total Exposure has been reduced to zero ($0.00), the aggregate Commitments have been terminated in full, and each Issuing Bank has no further obligations to issue Letters of Credit under the Credit Agreement.

“Permitted Encumbrances” means all Liens permitted under Section 10.2 of the Credit Agreement.

“Post-Default Rate” means the post-default rate per annum set forth in Section 2.8(c) of the Credit Agreement, but in no event to exceed the Highest Lawful Rate.

“Property” means any and all tangible and intangible assets and properties, whether real, personal or mixed, including cash, securities, accounts and contract rights.

“Secured Transaction Documents” means the Credit Agreement, this Deed of Trust, any other Security Document, any Secured Hedging Agreement, any Secured Cash Management Agreement, the Guarantee Agreement, the Collateral Agreement, and any other Credit Document, including any such document entered into after the date hereof.

“Specified Parties” means the Trustee (and its Related Parties), the Beneficiary and each other Indemnitee.

“Trustee” means Darren Vanek of Harris County, Texas, whose address for notice hereunder is 712 Main St, 5th Floor, Houston, TX 77002 and any successors and substitutes in trust hereunder.

“UCC Collateral” means the property and other assets described in Section 2.02.

## ARTICLE II
## GRANT OF LIEN AND SECURED OBLIGATIONS

Section 2.01. Grant of Liens. To secure payment and performance of the Obligations, the Grantor for, and in consideration of, the promises and debts and trusts hereinafter mentioned does by these presents hereby GRANT, BARGAIN, SELL, ASSIGN, MORTGAGE WITH POWER OF SALE, TRANSFER and CONVEY to the Trustee, for the use and benefit of the Beneficiary and the Secured Parties, all the Properties, rights, titles and interests and estates listed in clauses (a) through

(e) below in this Section 2.01, which are located in, under or which cover, concern or relate to Properties located in the State of Texas, TO HAVE AND TO HOLD unto the Trustee forever to secure the Obligations:

(a) all rights, titles, interests and estates now owned or hereafter acquired by the Grantor in and to any Oil and Gas Properties, including those described on Exhibit A;

(b) all rights, titles, interests and estates now owned or hereafter acquired by the Grantor in and to all geological, geophysical, engineering, accounting, title, legal and other technical or business data concerning any Oil and Gas Properties, the Hydrocarbons or any other item of property which are in the possession of the Grantor, and all books, files, records, magnetic media, computer records and other forms of recording or obtaining access to such data;

(c) all rights, titles, interests and estates now owned or hereafter acquired by the Grantor in and to all Hydrocarbons;

(d) any Property, including any Oil and Gas Properties, that may from time to time hereafter, by delivery or by writing of any kind, be subject to the Liens hereof by the Grantor or by anyone on the Grantor's behalf; and the Trustee and/or the Beneficiary are hereby authorized to receive the same at any time as additional security hereunder; and

(e) all of the Properties, including any Oil and Gas Properties, rights, titles, interests and estates of every nature whatsoever now owned or hereafter acquired by the Grantor, including (i) any Properties, rights, titles, interests and estates as the same may be enlarged by the discharge of any payments out of production or by the removal of any charges or Permitted Encumbrances to which any Oil and Gas Properties or other Properties, rights, titles, interests or estates are subject, (ii) all rights of the Grantor to Liens securing payment of proceeds from the sale of production from any Oil and Gas Properties, together with any and all renewals and extensions of any of such related Properties, rights, titles, interests or estates and (iii) all contracts and agreements supplemental to, amending or in substitution for the contracts and agreements described or mentioned above.

For the avoidance of doubt, it is the intent of the Grantor that all Properties, rights, titles, interests and estates of the nature set forth and described in clauses (a) through (e) in this Section 2.01 which are located in, under or which cover, concern or relate to any Property, right, title, interest and estate in the State of Texas shall be subject to the Lien of this Deed of Trust and thus be "Deed of Trust Property" as such term is used in this Deed of Trust even if (i) the Properties, rights, titles, interests and estates on Exhibit A shall be incorrectly described or (ii) a description of all or a portion of such Properties, rights, titles, interests and estates are omitted or limited in any manner whatsoever.

Notwithstanding any provision in this Deed of Trust to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) included in the definition of "Deed of Trust Property" and no Building or Manufactured (Mobile) Home is hereby encumbered by this Deed of Trust.

Any fractions or percentages specified on Exhibit A in referring to the Grantor's interest are solely for purposes of the warranties made by the Grantor pursuant to Section 4.01 and 4.05 and shall in no manner limit the quantum of interest affected by this Section 2.01 with respect to any Oil and Gas property now owned or hereafter acquired by the Grantor.

Section 2.02. Grant of Security Interest. To further secure the Obligations, the Grantor hereby pledges, assigns, transfers and grants to the Beneficiary, for the benefit of the Secured Parties, a security interest in and to all of the Grantor's rights, titles and interests in and to the following Property of the Grantor (whether now owned or hereafter acquired by operation of law or otherwise):

(a) all Accounts and Contract Rights;

(b) all As-Extracted Collateral, including from or attributable or relating to the Deed of Trust Property;

(c) all books and records pertaining to the Oil and Gas Properties;

(d) all Fixtures;

(e) all Hydrocarbons; and

(f) to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security, guarantees and other Supporting Obligations given with respect to any of the foregoing.

Section 2.03. Secured Obligations. This Deed of Trust is executed and delivered by the Grantor to secure and enforce the Obligations.

Section 2.04. Fixture Filing, As-Extracted Collateral, Etc. Without in any manner limiting the generality of any of the other provisions of this Deed of Trust: (a) some portions of the goods described or to which reference is made herein are or are to become Fixtures on, under or related to the land described or to which reference is made herein or on Exhibit A; (b) the security interests created hereby under applicable provisions of the Applicable UCC will attach to all As-Extracted Collateral and all other Hydrocarbons; (c) this Deed of Trust is to be filed of record in the real estate records or other appropriate records as a financing statement; and (d) the Grantor is the record owner of the real estate or interests in the real estate comprised of the Deed of Trust Property.

Section 2.05. Pro Rata Benefit. This Deed of Trust is executed and granted for the pro rata benefit of the Beneficiary and the Secured Parties, as set forth in Section 5.14, to secure the Obligations until Payment in Full has occurred.

Section 2.06. Excluded Properties. Notwithstanding anything herein to the contrary, in no event shall the Collateral include, and the Grantor shall not be deemed to have granted a lien on or security interest in any of the Grantor's right, title or interest in any Property constituting "Excluded Assets" (as such term is defined in the Credit Agreement) but only to the extent and for so long as such Property constitutes "Excluded Assets". For the avoidance of doubt, nothing in this Section 2.6 shall be deemed to negate the requirement in the Credit Agreement that the Collateral Coverage Minimum be satisfied.

**ARTICLE III**
**ASSIGNMENT OF AS-EXTRACTED COLLATERAL**

Section 3.01. Assignment.

(a) In order to further secure the Obligations, the Grantor has absolutely and unconditionally assigned, transferred, conveyed and granted a security interest, and does hereby absolutely and unconditionally assign, transfer, convey and grant a security interest unto the Beneficiary for the benefit of the Secured Parties in and to:

(i) all of its As-Extracted Collateral located in, from or attributable or relating to the Deed of Trust Properties located in each county where this Deed of Trust is filed, including without limitation, all As-Extracted Collateral relating to the Hydrocarbon Interests, the Hydrocarbons and all products obtained or processed therefrom;

(ii) the revenues and proceeds now and hereafter attributable to such Deed of Trust Properties, including the Hydrocarbons, and said products and all payments in lieu thereof, such as "take or pay" payments or settlements; and

(iii) all amounts and proceeds hereafter payable to or to become payable to the Grantor or now or hereafter relating to any part of such Deed of Trust Properties and all amounts, sums, monies, revenues and income which become payable to the Grantor from, or with respect to, any of the Deed of Trust Properties, present or future, now or hereafter constituting a part of the Hydrocarbon Interests.

(b) Subject to Section 13.21 of the Credit Agreement and Section 3.01(f) the Hydrocarbons and products are to be delivered into pipe lines connected with the Deed of Trust Property, or to the purchaser thereof, to the credit of the Beneficiary, for its benefit and the benefit of the Secured Parties, free and clear of all taxes, charges, costs and expenses; and all such revenues and proceeds shall be paid directly to the Beneficiary, at its offices in Houston, Texas, with no duty or obligation of any party paying the same to inquire into the rights of the Beneficiary to receive the same, what application is made thereof, or as to any other matter.

(c) Subject to Section 13.21 of the Credit Agreement the Grantor agrees to perform all such acts, and to execute all such further assignments, transfers and division orders and other instruments as may be reasonably required or desired by the Beneficiary, after receipt of a written request from the Beneficiary, in order to have said proceeds and revenues so paid to the Beneficiary. In addition to any and all rights of a secured party under Sections 9.607 and 9.609 of the Applicable UCC, the Beneficiary is fully authorized to receive and receipt for said revenues and proceeds; to endorse and cash any and all checks and drafts payable to the order of the Grantor or the Beneficiary for the account of the Grantor received from or in connection with said revenues or proceeds and to hold the proceeds thereof in a Deposit Account with the Beneficiary, a Lender or other acceptable commercial bank as additional collateral securing the Obligations; and to execute transfer and division orders in the name of the Grantor, or otherwise, with warranties binding the Grantor. All proceeds received by the Beneficiary pursuant to this grant and assignment shall be applied as provided in Section 5.14.

(d) The Beneficiary shall not be liable for any delay, neglect or failure to effect collection of any proceeds or to take any other action in connection therewith or hereunder; but the Beneficiary shall have the right, at its election, if an Event of Default shall have occurred and be continuing, after written notice is provided to the Grantor from the Beneficiary, in the name of the Grantor or otherwise, to prosecute and defend any and all actions or legal proceedings deemed advisable by the Beneficiary in order to collect such funds and to protect the interests of the Beneficiary and/or the Grantor, with all out-of-pocket costs, expenses and attorneys' fees incurred in connection therewith being paid by the Grantor.

(e) The Grantor hereby appoints the Beneficiary as its attorney-in-fact to pursue any and all rights of the Grantor to Liens in the Hydrocarbons securing payment of proceeds of runs attributable to the Hydrocarbons which power of attorney shall be coupled with an interest and shall be irrevocable until Payment in Full (it being understood that no rights shall be exercised under such power of attorney unless an Event of Default has occurred and is continuing).

(f) Notwithstanding the foregoing, until such time as an Event of Default has occurred and is continuing, Beneficiary hereby grants to Grantor a license to sell, receive and receipt for proceeds from the sale of Hydrocarbons. This license will terminate automatically upon an Event of Default (and upon prior written notice from the Beneficiary) and for so long as the same continues and if such Event of Default shall cease to exist or cease to continue, such license shall be automatically reinstated upon such Event of Default's ceasing to exist or cease to continue.

(g) Each Mortgagor does hereby specifically agree that third-parties shall be entitled to rely, and shall be fully protected in relying, upon any written notice by the Mortgagee that an Event of Default has occurred and is continuing for the purposes of clause (f) above.

Section 3.02. No Modification of Payment Obligations. Nothing herein contained shall modify or otherwise alter the obligation of the Grantor to make prompt payment of all amounts constituting Obligations when and as the same become due regardless of whether the proceeds of the As-Extracted Collateral and Hydrocarbons are sufficient to pay the same and the rights provided in accordance with the foregoing assignment provision shall be cumulative of all other security of any and every character now or hereafter existing to secure payment of the Obligations. Nothing in this Article III is intended to be an acceptance of collateral in satisfaction of the Obligations.

Section 3.03. Rights and Title of Consignee. In addition to the rights, titles and interests hereby conveyed pursuant to Section 2.01, the Grantor hereby grants to the Beneficiary the Grantor's Liens given to interest owners as secured parties to secure the obligations of the first purchasers of Hydrocarbons to pay the purchase price, including those rights provided in Section 9.343 of the Applicable UCC.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS

The Grantor hereby represents, warrants and covenants as follows:

Section 4.01. Title. To the extent of the undivided interests specified on Exhibit A, the Grantor has good and defensible title to the Hydrocarbon Interests and has valid title to all of its UCC Collateral except to the extent it would not

result in a Material Adverse Effect. The Collateral is free and clear of all Liens except Permitted Encumbrances.

Section 4.02. First Priority Liens. (a) With respect to the Deed of Trust Property, upon the filing of a fully executed and duly acknowledged counterpart of this Deed of Trust in the appropriate real estate records of the offices of the County Clerks of each county in the State of Texas where any of the Deed of Trust Property is located, such filing will provide constructive notice to third parties of the contents of this Deed of Trust with respect to the Deed of Trust Property as of the date of that recording and will perfect the deed of trust Lien on the Deed of Trust Property, (b) with respect to the UCC Collateral, upon the filing of a fully executed and duly acknowledged counterpart of this Deed of Trust in the appropriate real estate records of the offices of the County Clerks of each county in the State of Texas where any of the UCC Collateral is located, such filing will result in the perfection of security interests with respect to the UCC Collateral constituting Fixtures and As-Extracted Collateral relating to the Deed of Trust Property (and effective as set forth in Section 7.11) and (c) the security interests and Liens granted pursuant to this Deed of Trust are prior to all other Liens on the Collateral other than Permitted Encumbrances to the extent permitted by the Credit Agreement (it being understood that there is no intent to subordinate any Liens created hereunder to any other Liens).

Section 4.03. Defend Title. This Deed of Trust is, and always will be kept, a legal, valid and, subject to any bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law), enforceable first priority Lien upon the Collateral; provided that Permitted Encumbrances may exist, but no intent to subordinate the priority of the Liens created hereby is intended or inferred by such existence. Other than any Permitted Encumbrances, the Grantor will warrant and defend the title to the Collateral against the claims and demands of all other Persons whomsoever and will maintain and preserve the Lien created hereby (and its priority) until Payment in Full (provided that Permitted Encumbrances may exist as (and with the priority) permitted by the Credit Agreement). If (a) an adverse claim be made against or a cloud develop upon the title to any part of the Collateral other than a Permitted Encumbrance or (b) any Person, including the holder of a Permitted Encumbrance, shall challenge the priority or validity of the Liens created by this Deed of Trust, then the Grantor agrees to promptly defend against such adverse claim, take appropriate action to remove such cloud or subordinate such Permitted Encumbrance, in each case, at the Grantor's sole cost and expense. The Grantor further agrees that the Beneficiary may take such other action as it deems advisable to protect and preserve its interests in the Collateral, and in such event the Grantor will indemnify the Beneficiary against any and all costs, attorneys' fees and other expenses which it may incur in defending against any such adverse claim or taking action to remove any such cloud.

Section 4.04. Not a Foreign Person. The Grantor is not a "foreign person" within the meaning of the Code, Sections 1445 and 7701 (i.e. the Grantor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Code and any regulations promulgated thereunder).

Section 4.05. Revenue and Cost Bearing Interest. The Grantor's ownership of the Hydrocarbon Interests and the undivided interests therein as specified on Exhibit A will, prior to giving full effect to all Permitted Encumbrances and any Dispositions not prohibited by the Credit Agreement, afford the Grantor not less than those net interests (expressed as a fraction, percentage or decimal) in the production from or which is allocated to such Hydrocarbon Interest specified as Net Revenue Interest (as defined and specified on Exhibit A) on attached Exhibit A and will cause the Grantor to bear not more than that portion (expressed as a fraction, percentage or decimal), specified as Working Interest on Exhibit A, of the costs of drilling, developing and operating the wells identified on Exhibit A except to the extent of any proportionate corresponding increase in the Net Revenue Interest.

**ARTICLE V**
**RIGHTS AND REMEDIES**

Section 5.01. Event of Default. An Event of Default under the Credit Agreement shall be an "Event of Default" under this Deed of Trust.

Section 5.02. Foreclosure and Sale.

(a) If an Event of Default shall occur and be continuing, to the extent provided by applicable law, the Beneficiary

shall have the right and option to proceed with foreclosure by proceeding, or directing the Trustee to proceed with foreclosure and to sell all or any portion of such Deed of Trust Property at one or more sales, as an entirety or in parcels, at such place or places in otherwise such manner and upon such notice as may be required by law, or, in the absence of any such requirement, as the Beneficiary may deem appropriate, and to make conveyance to the purchaser or purchasers. Where the Deed of Trust Property is situated in more than one jurisdiction, notice as above provided shall be posted and filed in all such jurisdictions (if such notices are required by law), and all such Deed of Trust Property may be sold in any such jurisdiction and any such notice shall designate the jurisdiction where such Deed of Trust Property is to be sold. Nothing contained in this Section 5.02 shall be construed so as to limit in any way any rights to sell the Deed of Trust Property or any portion thereof by private sale if and to the extent that such private sale is permitted under the laws of the applicable jurisdiction or by public or private sale after entry of a judgment by any court of competent jurisdiction so ordering. The Grantor hereby irrevocably appoints the Beneficiary, with full power of substitution, to be the attorney-in-fact of the Grantor and in the name and on behalf of the Grantor to execute and deliver any deeds, transfers, conveyances, assignments, assurances and notices which the Grantor ought to execute and deliver and do and perform any and all such acts and things which the Grantor ought to do and perform under the covenants herein contained and generally, to use the name of the Grantor in the exercise of all or any of the powers hereby conferred on the Beneficiary. At any such sale: (i) whether made under the power herein contained or any other legal enactment, or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for the Trustee or the Beneficiary, as appropriate, to have physically present, or to have constructive possession of, the Deed of Trust Property (the Grantor hereby covenanting and agreeing to deliver any portion of the Deed of Trust Property not actually or constructively possessed by the Trustee or the Beneficiary immediately upon his, her or its demand) and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually present and delivered to purchaser at such sale, (ii) each instrument of conveyance executed by the Trustee or the Beneficiary shall contain a general warranty of title, binding upon the Grantor and its successors and assigns, (iii) each and every recital contained in any instrument of conveyance made by the Trustee or the Beneficiary shall conclusively establish (except as between the Grantor and the Beneficiary) the truth and accuracy of the matters recited therein, including, without limitation, nonpayment of the Obligations, advertisement and conduct of such sale in the manner provided herein and otherwise by law and appointment of any successor trustee hereunder, (iv) any and all prerequisites to the validity thereof shall be conclusively presumed to have been performed, (v) the receipt of the Trustee, the Beneficiary or of such other party or officer making the sale shall be a sufficient discharge to the purchaser or purchasers for its purchase money and no such purchaser or purchasers, or its assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money, or be in any way answerable for any loss, misapplication or nonapplication thereof, (vi) to the fullest extent permitted by law, the Grantor shall be completely and irrevocably divested of all of its right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against the Grantor, and against any and all other Persons claiming or to claim the property sold or any part thereof, by, through or under the Grantor, and (vii) to the extent and under such circumstances as are permitted by law, the Beneficiary may be a purchaser at any such sale, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the Obligations (in the order of priority set forth in Section 5.14) in lieu of cash payment. Anything in this Section 5.02(a) to the contrary notwithstanding, the Beneficiary agrees that it will not exercise any rights under the power of attorney provided for in this Section 5.02(a) unless an Event of Default has occurred and is continuing.

(b) If an Event of Default shall occur and be continuing, then (i) the Beneficiary shall be entitled to all of the rights, powers and remedies afforded a secured party by the Applicable UCC with reference to the UCC Collateral or (ii) the Trustee or the Beneficiary may proceed as to any Collateral in accordance with the rights and remedies granted under this Deed of Trust or applicable law in respect of the Collateral. Such rights, powers and remedies shall be cumulative and in addition to those granted to the Trustee or the Beneficiary under any other provision of this Deed of Trust or under any other Credit Document or any Secured Transaction Document. Written notice mailed to the Grantor as provided herein at least ten (10) days prior to the date of public sale of any part of the Collateral which is personal property subject to the provisions of the Applicable UCC, or prior to the date after which private sale of any such part of the Collateral will be made, shall constitute reasonable notice.

Section 5.03. Substitute Trustees and Agents. The Trustee or the Beneficiary may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale held by the Trustee or the Beneficiary, including the posting of notices (but, in the case of a non-judicial foreclosure proceeding, expressly excluding the conduct of the sale) but in the name and on behalf of the Trustee, the Beneficiary or their successor or substitute, as applicable. If the

Trustee or the Beneficiary or their successor or substitute shall have given notice of sale hereunder, any successor or substitute trustee or deed of trust/mortgagee agent thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute trustee or deed of trust/mortgagee agent conducting the sale.

Section 5.04. Judicial Foreclosure; Receivership; Failure to Perform. If an Event of Default has occurred and is continuing, the Beneficiary shall have the right and power to proceed by a suit or suits in equity or at law, whether for the specific performance of any covenant or agreement herein contained or in aid of the execution of any power herein granted, or for any foreclosure hereunder or for the sale of the Collateral under the judgment or decree of any court or courts of competent jurisdiction, or for the appointment of a receiver pending any foreclosure hereunder or the sale of the Collateral under the order of a court or courts of competent jurisdiction or under executory or other legal process, or for the enforcement of any other appropriate legal or equitable remedy. The Grantor agrees that if it fails to perform any act or to take any action which it is required to perform or take hereunder or pay any money which the Grantor is required to pay hereunder, the Beneficiary, in the Grantor's name or its own name, may, but shall not be obligated to, perform or cause to perform such act or take such action or pay such money, and any expenses so incurred by it and any money so paid by it shall be an obligation constituting an expense under Section 13.5(a) of the Credit Agreement owing by the Grantor to the Beneficiary and the Beneficiary, upon making such payment, shall be subrogated to all of the rights of the Person receiving such payment.

Section 5.05. Foreclosure for Installments. If an Event of Default has occurred and is continuing, the Beneficiary shall also have the option to proceed with foreclosure in satisfaction of any installments of the Obligations which have not been paid when due either through the courts or by directing the Trustee to proceed with foreclosure in satisfaction of the matured but unpaid portion of the Obligations as if under a full foreclosure, conducting the sale as herein provided and without declaring the entire principal balance and accrued interest and other Obligations then due; such sale may be made subject to the unmatured portion of the Obligations, and any such sale shall not in any manner affect the unmatured portion of the Obligations, but as to such unmatured portion of the Obligations this Deed of Trust shall remain in full force and effect just as though no sale had been made hereunder. It is further agreed that if an Event of Default has occurred and is continuing, several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Obligations, it being the purpose hereof to provide for a foreclosure and sale of the security for any matured portion of the Obligations without exhausting the power to foreclose and sell the Deed of Trust Property for any subsequently maturing portion of the Obligations.

Section 5.06. Separate Sales. If an Event of Default has occurred and is continuing, the Collateral may be sold in one or more parcels and to the extent permitted by applicable law in such manner and order as the Beneficiary, in its sole discretion, may elect, it being expressly understood and agreed that the right of sale arising out of any Event of Default shall not be exhausted by any one or more sales.

Section 5.07. Possession of Deed of Trust Property. If an Event of Default shall have occurred and be continuing, then, to the extent permitted by applicable law, the Beneficiary shall have the right and power to enter into and upon and take possession of all or any part of the Collateral in the possession of the Grantor, its successors or assigns, or its or their agents or servants, and may exclude the Grantor, its successors or assigns, and all Persons claiming under the Grantor, and its or their agents or servants wholly or partly therefrom; and, to the extent permitted by applicable law, holding the same, the Beneficiary may use, administer, manage, operate and control the Collateral and conduct the business thereof to the same extent as the Grantor, its successors or assigns, might at the time do and may exercise all rights and powers of the Grantor, in the name, place and stead of the Grantor, or otherwise as the Beneficiary shall deem best.

Section 5.08. Occupancy After Foreclosure. In the event there is a foreclosure sale hereunder and at the time of such sale the Grantor or the Grantor's representatives, successors or assigns or any other Person claiming any interest in the Collateral by, through or under the Grantor, are occupying or using the Deed of Trust Property or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either the landlord or tenant, or at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser; to the extent permitted by applicable law, the purchaser at such sale shall, notwithstanding any language herein apparently to the contrary, have the sole option to demand immediate possession following the sale or to permit the occupants to remain as tenants at will. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain a summary action for possession of the Deed of

Trust Property (such as an action for forcible entry and detainer) in any court having jurisdiction.

Section 5.09. Remedies Cumulative, Concurrent and Nonexclusive. Every right, power, privilege and remedy herein given to the Trustee or the Beneficiary shall be cumulative and in addition to every other right, power and remedy herein specifically given or now or hereafter existing in equity, at law or by statute (including specifically those granted by the Applicable UCC in effect and applicable to the Collateral or any portion thereof). Each and every right, power, privilege and remedy whether specifically herein given or otherwise existing may be exercised from time to time and so often and in such order as may be deemed expedient by the Trustee or the Beneficiary, and the exercise, or the beginning of the exercise, or the abandonment, of any such right, power, privilege or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter any other right, power, privilege or remedy. No delay or omission by the Trustee or the Beneficiary or any Secured Party in the exercise of any right, power or remedy shall impair any such right, power, privilege or remedy or operate as a waiver thereof or of any other right, power, privilege or remedy then or thereafter existing.

Section 5.10. Discontinuance of Proceedings. If the Trustee or the Beneficiary shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under any Secured Transaction Document or available at law and shall thereafter elect to discontinue or abandon same for any reason, then it shall have the unqualified right so to do and, in such an event, the parties shall be restored to their former positions with respect to the Obligations, this Deed of Trust, the Credit Agreement, the Collateral and otherwise, and the rights, remedies, recourses and powers of the Trustee and the Beneficiary, as applicable, shall continue as if same had never been invoked.

Section 5.11. No Release of Obligations. Neither the Grantor, any Guarantor nor any other Person hereafter obligated for payment of all or any part of the Obligations shall be relieved of such obligation by reason of: (a) the failure of the Trustee to comply with any request of the Grantor, or any Guarantor or any other Person so obligated to foreclose the Lien of this Deed of Trust or to enforce any provision hereunder or under the Credit Agreement; (b) the release, regardless of consideration, of the Deed of Trust Property or any portion thereof or interest therein or the addition of any other property to the Deed of Trust Property; (c) any agreement or stipulation between any subsequent owner of the Deed of Trust Property and the Beneficiary extending, renewing, rearranging or in any other way modifying the terms of this Deed of Trust without first having obtained the consent of, given notice to or paid any consideration to the Grantor, any Guarantor or such other Person, and in such event the Grantor, Guarantor and all such other Person shall continue to be liable to make payment according to the terms of any such extension or modification agreement unless expressly released and discharged in writing by the Beneficiary; or (d) by any other act or occurrence save and except if Payment in Full has occurred.

Section 5.12. Release of and Resort to Collateral. The Beneficiary may release, regardless of consideration, any part of the Collateral without, as to the remainder, in any way impairing, affecting, subordinating or releasing the Lien created in or evidenced by this Deed of Trust or its stature as a first and prior Lien in and to the Collateral, provided that Permitted Encumbrances to the extent permitted by the Credit Agreement may exist, and without in any way releasing or diminishing the liability of any Person liable for the repayment of the Obligations. For payment of the Obligations, the Beneficiary may resort to any other security therefor held by the Beneficiary or the Trustee in such order and manner as the Beneficiary may elect.

Section 5.13. Waiver of Redemption, Notice and Marshalling of Assets, Etc. To the fullest extent permitted by law, the Grantor hereby irrevocably and unconditionally waives and releases (a) all benefits that might accrue to the Grantor by virtue of any present or future moratorium law or other law exempting the Collateral from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment and (b) any right to a marshalling of assets or a sale in inverse order of alienation. If any law referred to in this Deed of Trust and now in force, of which the Grantor or its successor or successors might take advantage despite the provisions hereof, shall hereafter be repealed or cease to be in force, such law shall thereafter be deemed not to constitute any part of the contract herein contained or to preclude the operation or application of the provisions hereof. If the laws of any state which provides for a redemption period do not permit the redemption period to be waived, the redemption period shall be specifically reduced to the minimum amount of time allowable by statute.

Section 5.14. Application of Proceeds. The proceeds of any sale of the Collateral or any part thereof and all other monies received in any proceedings for the enforcement hereof or otherwise, whose application has not elsewhere herein been

specifically provided for, shall be applied:

(a) first, to the payment of all reasonable expenses incurred by the Trustee or the Beneficiary incident to the enforcement of this Deed of Trust, the Credit Agreement or any other Secured Transaction Document to collect any portion of the Obligations (including, without limiting the generality of the foregoing, expenses of any entry or taking of possession, of any sale, of advertisement thereof, and of conveyances, and court costs, compensation of agents and employees, reasonable legal fees of the Trustee acting, if applicable), and to the payment of all other reasonable charges, expenses, liabilities and advances incurred or made by the Trustee or the Beneficiary under this Deed of Trust or in executing any trust or power hereunder, in each case, with respect to the Beneficiary, to the extent the Borrower would be required to make such payments pursuant to Section 13.5 of the Credit Agreement; and

(b) second, as set forth in Section 11.2 of the Credit Agreement.

Section 5.15. Resignation of Operator. In addition to all rights and remedies under this Deed of Trust, at law and in equity, if any Event of Default shall occur and the Trustee or the Beneficiary shall exercise any remedies under this Deed of Trust with respect to any portion of the Deed of Trust Property (or the Grantor shall transfer any Deed of Trust Property "in lieu of" foreclosure) whereupon the Grantor is divested of its title to any of the Collateral, the Beneficiary shall have the right to request that any operator of any Deed of Trust Property which is the Grantor to resign as operator under the joint operating agreement applicable thereto, and no later than 60 days after receipt by the Grantor of any such request, the Grantor shall resign (or, to the extent able to do so, cause such other Person acting as operator to resign), subject to the terms of such joint operating agreements, as operator of such Deed of Trust Property.

Section 5.16. Exculpation; Indemnity. THE SPECIFIED PARTIES SHALL NOT BE LIABLE, IN CONNECTION WITH ANY ACTION TAKEN, FOR ANY LOSS SUSTAINED BY THE GRANTOR RESULTING FROM AN ASSERTION THAT THE BENEFICIARY HAS RECEIVED FUNDS FROM THE PRODUCTION OF HYDROCARBONS CLAIMED BY THIRD PERSONS OR ANY ACT OR OMISSION OF ANY SPECIFIED PARTY IN ADMINISTERING, MANAGING, OPERATING OR CONTROLLING THE DEED OF TRUST PROPERTY **INCLUDING SUCH LOSS WHICH MAY RESULT FROM THE ORDINARY NEGLIGENCE OF A SPECIFIED PARTY UNLESS SUCH LOSS IS DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE DIRECTLY RESULTED FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF SUCH SPECIFIED PARTY**. NO SPECIFIED PARTY WILL BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION, DUTY OR LIABILITY OF THE GRANTOR. THE GRANTOR AGREES TO PAY, AND TO SAVE THE INDEMNITEES HARMLESS FROM, ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES OR DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE AND ADMINISTRATION OF THIS DEED OF TRUST TO THE EXTENT THE BORROWER WOULD BE REQUIRED TO DO SO PURSUANT TO SECTION 13.5 OF THE CREDIT AGREEMENT. THE LIABILITIES OF THE GRANTOR AS SET FORTH IN THIS SECTION 5.16 SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST.

Section 5.17. Payment of Expenses; Indemnity.

(a) The Grantor agrees to pay or promptly reimburse the (i) Trustee for all advances, charges, out-of-pocket costs and expenses including, without limitation, all out-of-pocket costs and expenses of holding, preparing for sale and selling, collecting or otherwise realizing upon the Collateral and all out-of-pocket attorneys' fees, legal expenses and court costs incurred by the Trustee in connection with the exercise of its respective rights and remedies hereunder, including, without limitation, any advances, charges, costs and expenses that may be incurred in any effort to enforce any of the provisions of this Deed of Trust or any obligation of the Grantor in respect of the Collateral or in connection with (A) the preservation of the Lien of, or the rights of the Trustee under this Deed of Trust, (B) any actual or attempted sale, lease, disposition, exchange, collection, compromise, settlement or other realization in respect of, or care of, the Collateral, including all such costs and expenses incurred in any bankruptcy, reorganization, workout or other similar proceeding, or (C) otherwise enforcing or preserving any rights under this Deed of Trust and (ii) the Beneficiary and the Secured Parties to the extent the Borrower would be required to do so pursuant to Section 13.5(a) of the Credit Agreement.

(b) THE GRANTOR AGREES TO PAY, AND TO SAVE THE SPECIFIED PARTIES HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES WITH RESPECT TO THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE AND ADMINISTRATION OF THIS DEED OF TRUST TO THE EXTENT THE BORROWER WOULD BE REQUIRED TO DO SO PURSUANT TO SECTION 13.5(b) OF THE CREDIT AGREEMENT. FOR THE AVOIDANCE OF DOUBT, THE TRUSTEE AND ITS RELATED PARTIES SHALL BE DEEMED TO BE INDEMNITEES UNDER THE CREDIT AGREEMENT FOR PURPOSES OF THE FOREGOING INDEMNITY. THE GRANTOR HEREBY ASSENTS TO, RATIFIES AND CONFIRMS ANY AND ALL ACTIONS OF EACH SPECIFIED PARTY WITH RESPECT TO THE COLLATERAL TAKEN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS DEED OF TRUST. **NOTWITHSTANDING THE FOREGOING, THE FOREGOING INDEMNITY (INCLUDING THE GRANTOR'S AGREEMENTS TO MAKE PAYMENTS AND HOLD THE TRUSTEE HARMLESS) APPLIES TO MATTERS THAT, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF ANY TRUSTEE BUT NOT TO THE EXTENT CAUSED BY OR ARISING OUT OF THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF ANY TRUSTEE.**

## ARTICLE VI
## THE TRUSTEE

Section 6.01. Duties, Rights, and Powers of Trustee. The Trustee shall have no duty to see to any recording, filing or registration of this Deed of Trust or any other instrument in addition or supplemental thereto, or to give any notice thereof, or to see to the payment of or be under any duty in respect of any tax or assessment or other governmental charge which may be levied or assessed on the Deed of Trust Property, or any part thereof, or against the Grantor, or to see to the performance or observance by the Grantor of any of the covenants and agreements contained herein. The Trustee shall not be responsible for the execution, acknowledgment or validity of this Deed of Trust or of any instrument in addition or supplemental hereto or for the sufficiency of the security purported to be created hereby, and makes no representation in respect thereof or in respect of the rights of the Beneficiary. The Trustee shall have the right to advice of counsel upon any matters arising hereunder and shall be fully protected in relying as to legal matters on the advice of counsel. The Trustee shall not incur any personal liability hereunder except for the Trustee's own gross negligence or willful misconduct; and the Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder, believed by him in good faith to be genuine.

Section 6.02. Successor Trustee. The Trustee may resign by written notice addressed to the Beneficiary or be removed at any time with or without cause by an instrument in writing duly executed on behalf of the Beneficiary. In case of the death, resignation or removal of the Trustee, a successor may be appointed by the Beneficiary by instrument of substitution complying with any applicable Governmental Requirements, or, in the absence of any such requirement, without formality other than appointment and designation in writing. Written notice of such appointment and designation shall be given by the Beneficiary to the Grantor, but the validity of any such appointment shall not be impaired or affected by failure to give such notice or by any defect therein. Such appointment and designation shall be full evidence of the right and authority to make the same and of all the facts therein recited. Upon the making of any such appointment and designation, this Deed of Trust shall vest in the successor all the estate and title in and to all of the Deed of Trust Property, and the successor shall thereupon succeed to all of the rights, powers, privileges, immunities and duties hereby conferred upon the Trustee named herein, and one such appointment and designation shall not exhaust the right to appoint and designate an additional successor but such right may be exercised repeatedly until Payment in Full has occurred. To facilitate the administration of the duties hereunder, the Beneficiary may appoint multiple trustees to serve in such capacity or in such jurisdictions as the Beneficiary may designate.

Section 6.03. Retention of Moneys. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law) and the Trustee shall be under no liability for interest on any moneys received by him hereunder.

**ARTICLE VII**
**MISCELLANEOUS**

Section 7.01. Instrument Construction. This Deed of Trust may be construed as a mortgage, deed of trust, conveyance, assignment, security agreement, fixture filing, pledge, financing statement, hypothecation or contract, or any one or more of them, in order fully to effectuate the Lien hereof and the purposes and agreements herein set forth.

Section 7.02. Releases.

(a) Full Release. If Payment in Full has occurred, the Beneficiary shall forthwith cause release, satisfaction and discharge of this Deed of Trust to be entered upon the record at the expense of the Grantor and shall execute and deliver or cause to be executed and delivered such instruments of satisfaction and release as may be appropriate. Otherwise, this Deed of Trust shall remain and continue in full force and effect.

(b) Partial Release. If any of the Collateral shall be sold, transferred or otherwise Disposed of to a Person other than a Credit Party by the Grantor in a transaction permitted by the Credit Agreement (a fact as to which the Beneficiary may rely on upon a certificate of an Authorized Officer of the Grantor to establish), then the Beneficiary, at the request and sole expense of the Grantor, shall promptly execute and deliver to the Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on the Collateral; provided that, upon the request of the Beneficiary, the Grantor shall deliver to the Beneficiary a certification by the Grantor stating that (i) such transaction is in compliance with the Credit Documents and (ii) no Collateral other than the Collateral required to be released is being released.

(c) Possession of Notes. The Grantor acknowledges and agrees that possession of any Note (or any replacements of any said Note or other instrument evidencing any part of the Obligations) at any time by any Credit Party or other guarantor shall not in any manner extinguish the Obligations or this Deed of Trust, and the Grantor shall have the right to issue and reissue any of the Notes from time to time as its interest or as convenience may require, without in any manner extinguishing or affecting the Obligations or the Lien of this Deed of Trust.

Section 7.03. Invalidity. Any provision of this Deed of Trust held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 7.04. Successors and Assigns. The provisions of this Deed of Trust shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that the Grantor may not assign, transfer or delegate any of its rights or obligations under this Deed of Trust without the prior written consent of the Beneficiary.

Section 7.05. Satisfaction of Prior Encumbrance. To the extent that proceeds of the Credit Agreement are used to pay Indebtedness secured by any outstanding Lien against the Deed of Trust Property then the parties agree that: (a) such proceeds have been advanced at the Grantor's request, and (b) the Beneficiary and the Lenders shall be subrogated to any and all rights and Liens owned by any owner or holder of such outstanding Liens, irrespective of whether said Liens are or have been released. It is expressly understood that, in consideration of the payment of such other Indebtedness, the Grantor hereby waives and releases all demands and causes of action for offsets and payments to, upon and in connection with such Indebtedness. This Deed of Trust is made with full substitution and subrogation of the Trustee and the Beneficiary and his or her successors in this trust and his and/or her and their assigns in and to all covenants and warranties by others heretofore given or made in respect of the Deed of Trust Property or any part thereof.

Section 7.06. Application of Payments to Certain Obligations. If any part of the Obligations cannot be lawfully secured by this Deed of Trust or if any part of the Deed of Trust Property cannot be lawfully subject to the Lien hereof to the full extent of the Obligations, then all payments made shall be applied on said Obligations first in discharge of that portion thereof which is not secured by this Deed of Trust.

Section 7.07. Nature of Covenants. The covenants and agreements herein contained shall constitute covenants

running with the land and interests covered or affected hereby and shall be binding upon the heirs, legal representatives, successors and assigns of the parties hereto.

Section 7.08. Notices. All notices, requests, consents, demands and other communications required or permitted hereunder shall be in writing and shall be deemed sufficiently given or furnished if delivered by registered or certified United States mail, postage prepaid, or by personal service (including express or courier service) at the addresses specified in Section 7.12 (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any such notice or communication shall be deemed to have been given either at the time of personal delivery or, in the case of delivery at the address and in the manner provided herein, upon receipt; provided that, service of notice as required by the laws of any state in which portions of the Deed of Trust Property may be situated shall for all purposes be deemed appropriate and sufficient with the giving of such notice.

Section 7.09. Counterparts. This Deed of Trust may be executed in several counterparts, all of which are identical, except that to facilitate recordation, if the Deed of Trust Property is situated in more than one county, descriptions of only those portions of the Deed of Trust Property located in the county in which a particular counterpart is recorded shall be attached as Exhibit A to such counterpart. Each of such counterparts shall for all purposes be deemed to be an original and all such counterparts shall together constitute but one and the same instrument. Complete copies of this Deed of Trust containing the entire Exhibit A have been retained by the Beneficiary.

Section 7.10. GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a) THIS DEED OF TRUST SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(b) EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS DEED OF TRUST AND THE OTHER CREDIT DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE LOCATED IN NEW YORK COUNTY, AND APPELLATE COURTS FROM ANY THEREOF; PROVIDED THAT NOTHING CONTAINED HEREIN OR IN ANY OTHER CREDIT DOCUMENT WILL PREVENT ANY LENDER, THE COLLATERAL AGENT OR THE ADMINISTRATIVE AGENT FROM BRINGING ANY ACTION TO ENFORCE ANY AWARD OR JUDGMENT OR EXERCISE ANY RIGHT UNDER THE CREDIT DOCUMENTS OR AGAINST ANY COLLATERAL OR ANY OTHER PROPERTY OF ANY CREDIT PARTY IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED.

(c) EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS DEED OF TRUST OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) AGREES THAT NO OTHER PARTY HERETO SHALL HAVE ANY LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES, OR DAMAGES RELATING TO THIS DEED OF TRUST OR ANY OTHER CREDIT DOCUMENT; AND (iii) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS DEED OF TRUST, THE CREDIT DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 7.10.

(d) EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT (I) SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO BORROWER AT ITS ADDRESS SET FORTH IN SECTION 7.12 OR AT SUCH OTHER ADDRESS OF WHICH THE BENEFICIARY SHALL HAVE BEEN NOTIFIED PURSUANT THERETO AND (II) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 7.11. Financing Statement; Fixture Filing. This Deed of Trust shall be effective as a financing statement filed as a fixture filing with respect to all Fixtures included within the Collateral and is to be filed or filed for record in the real estate records, mortgage records or other appropriate records of each jurisdiction where any part of the Deed of Trust Property (including fixtures) is located. This Deed of Trust shall also be effective as a financing statement covering As-Extracted Collateral included within the Collateral (including oil and gas and all other substances of value which may be extracted from the ground) and accounts financed at the wellhead or minehead of wells or mines located on the properties subject to the Applicable UCC and is to be filed for record in the real estate records, UCC records or other appropriate records of each jurisdiction where any part of the Deed of Trust Property is situated.

Section 7.12. Execution of Financing Statements. Pursuant to the Applicable UCC, the Grantor authorizes the Beneficiary, its counsel or its representative, at any time and from time to time, to file or record financing statements, continuation statements, amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of the Grantor in such form and in such offices as the Beneficiary reasonably determines appropriate to perfect the security interests of the Beneficiary under this Deed of Trust.

In that regard, the following information is provided:

| | |
|---|---|
| Name of Debtor/Grantor: | SN EF UnSub, LP |
| Address of Grantor: | **1000 Main Street, Suite 3000** |
| **Houston, Texas 77002** | |
| Attention: | **Tony Sanchez, III** |
| State of Formation/Location: | Delaware |
| Principal Place of Business of Debtor: | **Houston, Texas** |
| Name of Secured Party: | JPMorgan Chase Bank, N.A., as Beneficiary for the benefit of the Secured Parties |
| Address of Secured Party: | 712 Main St, 5th Floor, Houston, TX 77002 |
| Owner of Record of Real Property: | Grantor/Debtor |

Section 7.13. Debtor's Interests. The Grantor has an interest of record in each item of real property constituting Deed of Trust Property hereunder.

Section 7.14. Exculpation Provisions. EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS DEED OF TRUST; AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS DEED OF TRUST; THAT IT HAS IN FACT READ THIS DEED OF TRUST AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS DEED OF TRUST; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS DEED OF TRUST; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS DEED OF TRUST; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS DEED OF TRUST RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS DEED OF TRUST ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 7.15. Hedge Banks. For the avoidance of doubt, the benefit of this Deed of Trust relating to any Collateral securing the Hedging Obligations shall also extend to and be available to the Hedge Banks in respect of the Secured Hedge Agreements as set forth herein and in the Credit Agreement; provided, however, as set forth above, the Obligations do not include any Excluded Swap Obligations of the Grantor.

Section 7.16. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Deed of Trust and shall not affect the construction of, or be taken into consideration in interpreting, this Deed of Trust.

Section 7.17. Survival. THE AGREEMENTS AND LIABILITIES OF THE GRANTOR SET FORTH IN SECTION 5.16 SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST. TO THE EXTENT THAT ANY PAYMENTS ON THE OBLIGATIONS OR PROCEEDS OF ANY COLLATERAL ARE SUBSEQUENTLY INVALIDATED, DECLARED TO BE FRAUDULENT OR PREFERENTIAL, SET ASIDE OR REQUIRED TO BE REPAID TO A TRUSTEE, DEBTOR IN POSSESSION, RECEIVER OR OTHER PERSON UNDER ANY BANKRUPTCY LAW, COMMON LAW OR EQUITABLE CAUSE, THEN TO SUCH EXTENT, THE OBLIGATIONS SO SATISFIED SHALL BE REVIVED AND CONTINUE AS IF SUCH PAYMENT OR PROCEEDS HAD NOT BEEN RECEIVED AND THE BENEFICIARY'S AND THE OTHER SECURED PARTIES' LIENS, SECURITY INTERESTS, RIGHTS, POWERS AND REMEDIES UNDER THIS DEED OF TRUST AND EACH SECURITY INSTRUMENT SHALL CONTINUE IN FULL FORCE AND EFFECT. IN SUCH EVENT, EACH SECURITY INSTRUMENT SHALL BE AUTOMATICALLY REINSTATED AND EACH GRANTOR SHALL TAKE SUCH ACTION AS MAY BE REASONABLY REQUESTED BY THE BENEFICIARY AND THE OTHER SECURED PARTIES TO EFFECT SUCH REINSTATEMENT.

Section 7.18. Non-Judicial Foreclosure in Texas. In furtherance of the foregoing set forth in Section 5.02, upon the occurrence of an Event of Default and during the continuation thereof, the Trustee, or his successor or substitute, is authorized and empowered and it shall be his special duty at the request of Beneficiary to sell the Deed of Trust Property or any part thereof situated in the State of Texas, at the courthouse of any county (whether or not the counties in which the Deed of Trust Property is located are contiguous, if the Deed of Trust Property is located in more than one county) in the State of Texas in which any part of the Deed of Trust Property is situated, at public auction to the highest bidder for cash between the hours of ten o'clock a.m. and four o'clock p.m. on the first Tuesday in any month (such sale must begin at the time stated in the notice of sale or not later than three hours after such time) or at such other place, time and date as provided by the statutes of the State of Texas then in force governing sales of real estate under powers of sale conferred by deed of trust (including Section 51.002 of the Texas Property Code, or if and to the extent that such statute is not in force and effect, as provided by any successor statute or statutes of the State of Texas), after having given notice of such sale in accordance with such statutes. Any sale made by Trustee hereunder may be as an entirety or in such parcels as Beneficiary may request. To the extent permitted by applicable law, any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. The sale by Trustee of less than the whole of the Deed of Trust Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Deed of Trust Property shall be sold; and, if the proceeds of such sale of less than the whole of the Deed of Trust Property shall be less than the aggregate of the Obligations and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Deed of Trust Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Deed of Trust Property but Beneficiary shall have the right, at its sole election, to request Trustee to sell less than the whole of the Deed of Trust Property. Trustee may, after any request or direction by Beneficiary, sell not only the real property but also the UCC Collateral and other interests which are a part of the Deed of Trust Property, or any part thereof, as a unit and as a part of a single sale, or may sell any part of the Deed of Trust Property separately from the remainder of the Deed of Trust Property. It shall not be necessary for Trustee to have taken possession of any part of the Deed of Trust Property or to have present or to exhibit at any sale any of the Collateral. After each sale, Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Grantor, conveying the property so sold to the purchaser or purchasers with general warranty of title of Grantor, subject to the Permitted Encumbrances, and shall receive the proceeds of said sale or sales and apply the same as herein provided. Trustee or his successor or substitute may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices (but excluding the conduct of sale), but in the name and on behalf of Trustee, his successor or substitute. If Trustee or his successor or substitute shall have given notice of sale hereunder, any successor or substitute Trustee thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute Trustee conducting the sale.

Section 7.19. ENTIRE AGREEMENT. THIS DEED OF TRUST AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS

DEED OF TRUST, INCLUDING GRANTING OF LIENS AND SECURITY INTERESTS PURSUANT TO THIS DEED OF TRUST, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

[SIGNATURES BEGIN NEXT PAGE]

EXECUTED this ____ day of March, 2017, to be effective as of the Effective Date.

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

STATE OF TEXAS §
§
COUNTY OF HARRIS §

This instrument was acknowledged before me on this ___ day of March, 2017, by Cameron W. George, in his capacity as Chief Financial Officer and Treasurer of SN EF UnSub GP, LLC, the general partner of **SN EF UnSub, LP**, a Delaware limited partnership company, on behalf of said limited partnership.

Notary Public

Seal:

EXHIBIT A

to

DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT

Introduction

The capitalized terms used but not defined in this Exhibit A are used as defined in the Deed of Trust. For purposes of this Exhibit A the capitalized terms not defined in the Deed of Trust are as follows:

1. "Working Interest" or "Gross Working Interest" and "W.I." or "G.W.I." means an interest owned in an oil, gas and mineral lease that determines the cost bearing percentage of the owner of such interest.

2. "Net Revenue Interest" or "N.R.I." means an interest (expressed as a percentage or decimal fraction), determined net of all royalties, overriding royalties, production payments or other burdens payable out of production, in and to all Hydrocarbons produced and saved from or attributable to a Well. In the case of any Well listed in Exhibit A, the Net Revenue Interest specified for such Well shall mean the sum of the percentage or decimal fraction set forth after the words "Net Revenue Interest" in the portion applicable to such Well plus, in the case of any Well with respect to which a royalty interest and/or overriding royalty is stated in this Exhibit A and applicable to such Well, the percentage or decimal fraction set forth after the words "Royalty Interest" or "Overriding Royalty Interest" in each such portion of Exhibit A.

3. "Before Payout" or "BPO" means the Working Interest and/or Net Revenue Interest of a party before the point in time when the Well has recovered from production all costs as specified in underlying farmout, assignments or other documents in the chain of title, usually including costs of drilling, completing and equipping a well or wells plus costs of operating the well or wells during the recoupment period.

4. "After Payout" or "APO" means the Working Interest and/or Net Revenue Interest of a party after the point in time when the Well has recovered from production all costs as specified in the underlying farmout, assignments or other documents in the chain of title, usually including costs of drilling, completing and equipping a well or wells plus costs of operating the well or wells during the recoupment period.

5. "Well" means (a) any existing well identified in Exhibit A, including replacement well drilled in lieu thereof from which gas is now or hereafter produced and (b) any well at any time producing or capable of producing gas attributable to the Hydrocarbons as defined above, including any well which has been shut-in, has temporarily ceased production or on which workover, reworking, plugging and abandonment or other operations are being conducted or planned.

All references contained in this Exhibit A to the Oil and Gas Properties are intended to include references to (a) the volume or book and page, file, entry or instrument number of the appropriate records of the particular county in the State where each such lease or other instrument is recorded and (b) all valid and existing amendments, supplements and other modifications to such lease or other instrument of record in such county records regardless of whether such amendments, supplements and modifications are expressly described herein. A special reference is here made to each such lease or other instrument and the record thereof for a more particular description of the property and interests sought to be affected by the Deed of Trust and for all other purposes.

For recording purposes, in regards to each county portion to this Exhibit A, this Introduction may be attached to an original executed copy of the Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement to be separately filed of record in each county.

SCHEDULE I

to

DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT

[to be attached]

**EXHIBIT E TO**
**CREDIT AGREEMENT**

**FORM OF**
**COLLATERAL AGREEMENT**

[Attached]

**COLLATERAL AGREEMENT**

dated and effective as of
March 1, 2017,
among
SN EF UnSub, LP,
each Subsidiary of SN EF UnSub, LP, identified herein,

SN EF UnSub Holdings, LLC,
SN EF UnSub GP, LLC
and
JPMORGAN CHASE BANK, N.A.,
as Collateral Agent and Administrative Agent

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I. | | |
| DEFINITIONS | | 1 |
| Section 1.01. | Credit Agreement | 1 |
| Section 1.02. | Other Defined Terms | 1 |
| ARTICLE II. | | |
| PLEDGE OF SECURITIES | | 4 |
| Section 2.01. | Pledge of Credit Party Collateral | 4 |
| Section 2.02. | Pledge of Parent Collateral | 5 |
| Section 2.03. | Delivery of the Pledged Collateral | 5 |
| Section 2.04. | Representations, Warranties and Covenants | 6 |
| Section 2.05. | Limited Liability Company and Limited Partnership Interests | 7 |
| Section 2.06. | Registration in Nominee Name; Denominations | 8 |
| Section 2.07. | Voting Rights; Dividends and Interest, etc | 8 |
| ARTICLE III. | | |
| SECURITY INTERESTS IN PERSONAL PROPERTY | | 9 |
| Section 3.01. | Security Interest | 9 |
| Section 3.02. | Representations and Warranties | 11 |
| Section 3.03. | Covenants | 12 |
| Section 3.04. | Other Actions | 14 |
| Section 3.05. | Covenants Regarding Patent, Trademark and Copyright Collateral | 14 |
| Section 3.06. | Commercial Tort Claims | 14 |
| ARTICLE IV. | | |
| REMEDIES | | 14 |
| Section 4.01. | Remedies upon Default | 14 |
| Section 4.02. | Application of Proceeds | 15 |
| Section 4.03. | Grant of License to Use Intellectual Property | 15 |
| Section 4.04. | Securities Act, etc | 16 |
| ARTICLE V. | | |
| MISCELLANEOUS | | 16 |
| Section 5.01. | Notices | 16 |
| Section 5.02. | Security Interest Absolute | 16 |
| Section 5.03. | Limitation by Law | 17 |
| Section 5.04. | Binding Effect; Several Agreement | 17 |
| Section 5.05. | Successors and Assigns | 17 |
| Section 5.06. | Agent’s Fees and Expenses; Indemnification | 17 |
| Section 5.07. | Agent Appointed Attorney-in-Fact | 17 |
| Section 5.08. | GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS | 18 |
| Section 5.09. | Waivers; Amendment | 19 |
| Section 5.10. | Severability | 19 |
| Section 5.11. | Counterparts | 19 |
| Section 5.12. | Headings | 19 |
| Section 5.13. | Termination or Release | 19 |
| Section 5.14. | Right of Set-off | 20 |
| Section 5.15. | Subordination | 20 |
| Section 5.16. | Limitation of Liability | 20 |
| Section 5.17. | Survival of Agreement | 20 |

EXHIBITS

| | |
|---|---|
| Exhibit I | Form of Supplement to the Collateral Agreement |
| Exhibit II | Form of Perfection Certificate |

SCHEDULES

| | |
|---|---|
| Schedule I | Subsidiary Parties |
| Schedule II | Pledged Stock; Debt Securities |
| Schedule III | Intellectual Property |
| Schedule IV | Securities Accounts |
| Schedule V | Deposit Accounts |
| Schedule VI | Commodity Accounts |
| Schedule VII | Commercial Tort Claims |

This **COLLATERAL AGREEMENT** dated and effective as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each Subsidiary of the Borrower listed on Schedule I hereto and each Subsidiary of the Borrower that becomes a party hereto after the date hereof pursuant to Section 5.14 (each, a "Subsidiary Party"), SN EF Unsub Holdings, LLC, a Delaware limited liability company ("Holdings"), SN EF Unsub GP, LLC, a Delaware limited liability company ("Parent") and JPMORGAN CHASE BANK, N.A., as Collateral Agent (in such capacity, the "Agent" or the "Collateral Agent") and Administrative Agent for the Secured Parties.

WHEREAS, pursuant to the Credit Agreement, dated as of March 1, 2017 (as amended, restated, modified, waived and/or supplemented from time to time, the "Credit Agreement"), among the Borrower, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, and the Lenders and agents from time to time parties thereto, the Borrower will from time to time incur Loans and obligations under Letters of Credit;

WHEREAS, one or more Cash Management Banks or Hedge Banks have entered or may from time to time enter into Secured Cash Management Agreements or Secured Hedge Agreements, as applicable, with the Borrower and/or its Restricted Subsidiaries and one or more Cash Management Banks have provided or may from time to time provide Cash Management Services pursuant to Secured Cash Management Agreements to the Borrower and/or any of its Restricted Subsidiaries (the foregoing, together with the making of Loans and the issuance of Letters of Credit, collectively, the "Extensions of Credit");

WHEREAS, each Pledgor and Grantor is executing and delivering this Agreement pursuant to the terms of the Credit Agreement to induce the Administrative Agent, the Collateral Agent, the Issuing Banks, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement and each sub-agent appointed pursuant to Section 12.2 of the Credit Agreement by the Administrative Agent with respect to matters relating to the Credit Documents or by the Collateral Agent with respect to matters relating to any Security Document (collectively, the "Secured Parties") to make their respective Extensions of Credit to the Borrower;

WHEREAS, the Subsidiary Parties are Subsidiaries of the Borrower, will derive substantial benefits from each Extension of Credit to the Borrower and are willing to execute and deliver this Agreement in order to induce the Secured Parties to make their respective Extensions of Credit; and

WHEREAS, Parent is the general partner of the Borrower and Holdings is a limited partner of the Borrower and each of Parent and Holdings will derive substantial benefits from each Extension of Credit to the Borrower and are willing to execute and deliver this Agreement in order to induce the Secured Parties to make their respective Extensions of Credit.

Accordingly, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.01. Credit Agreement.

(a) Capitalized terms used in this Agreement and not otherwise defined herein have the respective meanings assigned thereto in the Credit Agreement. Terms used herein that are defined in Article 8 or Article 9 of the UCC (even where capitalized herein and not capitalized in the UCC) shall, unless otherwise defined herein, have the meanings ascribed to such terms in Article 8 or Article 9, as applicable of the UCC.

(b) The rules of construction specified in Sections 1.2 and 1.5 of the Credit Agreement also apply to this Agreement.

Section 1.02. Other Defined Terms.

As used in this Agreement, the following terms have the meanings specified below:
"Agent" means the party named as such in the preamble of this Agreement until a successor (including successors under

the Credit Agreement) replaces it and, thereafter, means such successor.

"Agreement" has the meaning assigned to such term in the preamble of this Agreement.

"Article 9 Collateral" has the meaning assigned to such term in Section 3.01.

"Borrower" has the meaning assigned to such term in the preamble of this Agreement.

"Collateral" means Article 9 Collateral and Pledged Collateral; provided that, for the avoidance of doubt, Collateral shall exclude any Property constituting an Excluded Asset while such Property constitutes an Excluded Asset.

"Collateral Agent" means the party named as such in the preamble of this Agreement until a successor (including successors under the Credit Agreement) replaces it and, thereafter, means such successor.

"Commercial Tort Claims" means all commercial tort claims (as defined in Section 9-102(a)(13) of the UCC), now or hereafter held by any Grantor, including those listed in Schedule VII hereto.

"Commodity Accounts" means all commodity accounts (as defined in Section 9-102(a)(14) of the UCC) now or hereafter held by any Grantor, including those listed on Schedule VI hereto.

"Copyright License" means any written agreement, now or hereafter in effect, granting any right to any Grantor under any Copyright now or hereafter owned by any third party, and all rights of any Grantor under any such agreement (including any such rights that such Grantor has the right to license).

"Copyrights" means all of the following now owned or hereafter acquired by any Grantor (or, as required in the context of the definition of "Copyright License," any third party licensor): (a) all copyright rights in any work subject to the copyright laws of the United States, whether as author, assignee, transferee or otherwise, and (b) all registrations and applications for registration of any such copyright in the United States, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on Schedule III.

"Credit Agreement" has the meaning assigned to such term in the preamble of this Agreement.

"Credit Party Pledgor" means the Borrower and each Subsidiary Party.

"Credit Party Pledged Collateral" has the meaning assigned to such term in Section 2.01(a).

"Credit Party Pledged Stock" has the meaning assigned to such term in Section 2.01(a).

"Deposit Accounts" means all deposit accounts (as defined in Section 9-102(a)(29) of the UCC) now or hereafter held by any Grantor, including those listed on Schedule V hereto.

"Federal Securities Laws" has the meaning assigned to such term in Section 4.04.

"General Intangibles" means all "general intangibles" as defined in the UCC, including all causes of action and all other intangible personal property of any Grantor of every kind and nature (other than Accounts) now owned or hereafter acquired by any Grantor, including corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, swap agreements and other agreements), Intellectual Property, goodwill, registrations, franchises and tax refund claims.

"Grantor" means the Borrower and each Subsidiary Party.

"Intellectual Property" means all intellectual and similar property of every kind and nature now owned or hereafter acquired by any Grantor, including inventions, designs, Patents, Copyrights, Trademarks, Patent Licenses, Copyright Licenses,

Trademark Licenses, trade secrets, domain names, confidential or proprietary technical and business information, know-how, show-how or other data or information and all related documentation.

"Parent Pledged Collateral" has the meaning assigned to such term in Section 2.02(a).

"Parent Pledged Stock" has the meaning assigned to such terms in Section 2.02(a).

"Parent Pledgor" means each of SN EF UnSub GP, LLC and SN EF UnSub Holdings, LLC.

"Patent License" means any written agreement, now or hereafter in effect, granting to any Grantor any right to make, use or sell any invention covered by a Patent, now or hereafter owned by any third party (including any such rights that such Grantor has the right to license).

"Patents" means all of the following now owned or hereafter acquired by any Grantor (or, as required in the context of the definition of "Patent License," any third party licensor): (a) all patents of the United States, and all applications for patents of the United States, including those listed on Schedule III, and (b) all reissues, continuations, divisions, continuations-in-part or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Perfection Certificate" means a certificate substantially in the form of Exhibit II or another form reasonably acceptable to the Agent, completed and supplemented with the schedules and attachments contemplated thereby and duly executed by an Authorized Officer of the Borrower.

"Permitted Liens" means Liens expressly permitted by Section 10.2 of the Credit Agreement.

"Pledged Collateral" means the Credit Party Pledged Collateral and the Parent Pledged Collateral.

"Pledged Debt Securities" has the meaning assigned to such term in Section 2.01(a).

"Pledged Securities" means Pledged Debt Securities and Pledged Stock.

"Pledged Stock" means the Credit Party Pledged Stock and the Parent Pledged Stock.

"Pledgor" means each Credit Party Pledgor and each Parent Pledgor.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Property" means any and all tangible and intangible assets and properties, whether real, personal or mixed, including cash, securities, accounts and contract rights.

"Securities Accounts" means all securities accounts (as defined in Section 8-501 of the UCC or other applicable law) now or hereafter held by any Grantor, including those listed in Schedule IV hereto.

"Security Interest" has the meaning assigned to such term in Section 3.01.

"Subsidiary Party" has the meaning assigned to such term in the preamble of this Agreement.

"Trademark License" means any written agreement, now or hereafter in effect, granting to any Grantor any right to use any Trademark now or hereafter owned by any third party (including any such rights that such Grantor has the right to license).

"Trademarks" means all of the following now owned or hereafter acquired by any Grantor (or, as required in the context

of the definition of "Trademark License," any third party licensor): (a) all trademarks, service marks, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations thereof (if any), and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any political subdivision thereof, and all renewals thereof, including those listed on Schedule III, and (b) all goodwill associated therewith or symbolized thereby.

"UCC" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection or priority of security interests in any Collateral.

ARTICLE II.
PLEDGE OF SECURITIES

Section 2.01. Pledge of Credit Party Collateral. (a) As security for the payment and performance in full of the Obligations, each Credit Party Pledgor hereby assigns and pledges to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, and hereby grants to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, a security interest in all of such Credit Party Pledgor's right, title and interest in, to and under (i) the Equity Interests directly owned by it (which such Equity Interests owned by each Credit Party Pledgor as of the date hereof are listed on Schedule II) and all other Equity Interests obtained in the future by such Credit Party Pledgor and any certificates, instruments or other documents representing all such Equity Interests (the properties and items described above in this clause (i) being, collectively, the "Credit Party Pledged Stock"); provided that the Credit Party Pledged Stock shall not include any Excluded Assets; (ii)(A) all evidences of Indebtedness for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or similar instruments, in each case currently issued or owed to such Credit Party Pledgor (which such evidences of Indebtedness and obligations owned by each Credit Party Pledgor as of the date hereof are listed on Schedule II), (B) all evidences of Indebtedness and obligations of the type referred to in clause (ii)(a) above in the future issued or owed to such Credit Party Pledgor and (C) the promissory notes and any other instruments, if any, evidencing such evidences of Indebtedness and obligations (such evidences of Indebtedness and obligations and other items described in clauses (ii)(A) through (C) above being, collectively, the "Pledged Debt Securities"); provided that Pledged Debt Securities shall not include any Excluded Asset; (iii) subject to Section 2.07, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the properties and items referred to in clauses (i) and (ii) above; (iv) subject to Section 2.07, all rights and privileges (including voting rights) of such Credit Party Pledgor with respect to the properties and items referred to in clauses (i), (ii) and (iii) above; and (v) all Proceeds of any of the foregoing (the properties and items referred to in clauses (i) through (v) above being collectively referred to as the "Credit Party Pledged Collateral").

TO HAVE AND TO HOLD the Credit Party Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

(a) The security interests granted in Section 2.01(a) are granted as security only and shall not subject the Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Credit Party Pledgor with respect to or arising out of the Credit Party Pledged Collateral.

Section 2.02. Pledge of Parent Collateral. (a) As security for the payment and performance in full of the Obligations, each Parent Pledgor hereby assigns and pledges to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, and hereby grants to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, a security interest in all of such Parent Pledgor's right, title and interest in, to and under (i) the Equity Interests in the Borrower directly owned by it (which such Equity Interests owned by each Parent Pledgor as of the date hereof are listed on Schedule II) and all other Equity Interests in the Borrower obtained in the future by such Parent Pledgor and any certificates, instruments or other documents representing all such Equity Interests (the properties and items described above in this clause (i) being, collectively, the "Parent Pledged Stock"); provided that the Parent Pledged Stock shall not include any Excluded Assets; (ii) subject to

Section 2.07, all dividends, cash, distributions and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the properties and items referred to in clause (i) above; (iii) subject to Section 2.07, all rights and privileges (including voting rights) of such Parent Pledgor with respect to the properties and items referred to in clauses (i) and (ii) above; and (iv) all Proceeds of any of the foregoing (the properties and items referred to in clauses (i) through (iv) above being collectively referred to as the "Parent Pledged Collateral").

TO HAVE AND TO HOLD the Parent Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

(a) The security interests granted in Section 2.02(a) are as security only and shall not subject the Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Parent Pledgor with respect to or arising out of the Parent Pledged Collateral.

Section 2.03. Delivery of the Pledged Collateral.

(a) On the Closing Date, each Credit Party Pledgor agrees to deliver to the Agent for the benefit of the Secured Parties any and all Credit Party Pledged Stock constituting certificated securities indicated on Schedule II as being owned by such Credit Party Pledgor as of the date hereof. Within 60 days after the Closing Date (or such longer time as the Agent shall permit in its sole discretion), each Credit Party Pledgor agrees to deliver to the Agent for the benefit of the Secured Parties any and all Pledged Debt Securities indicated on Schedule II as being owned by such Credit Party Pledgor as of the date hereof to the extent such Pledged Debt Securities are required to be delivered pursuant to Section 2.03(c). Without prejudice to the foregoing sentence, each Credit Party Pledgor that after the Closing Date acquires any Credit Party Pledged Stock constituting certified securities or any Pledged Debt Securities shall promptly (and in any event within 45 days after its acquisition thereof (or such longer time as the Agent may permit in its sole discretion)) deliver or cause to be delivered to the Agent for the benefit of the Secured Parties, all such Credit Party Pledged Stock constituting certificated securities and all such Pledged Debt Securities that such Credit Party Pledgor has so acquired; provided, that, any such Pledged Debt Securities shall be required to be delivered to the extent set forth in Section 2.03(c).

(b) On the Closing Date, each Parent Pledgor agrees to deliver to the Agent for the benefit of the Secured Parties any and all Parent Pledged Stock constituting certificated securities and indicated on Schedule II as being owned by such Parent Pledgor as of the date hereof. Each Parent Pledgor that after the Closing Date acquires any Parent Pledged Stock constituting certificated securities shall promptly (and in any event within 45 days after its acquisition thereof (or such longer time as the Agent may permit in its sole discretion)) deliver or cause to be delivered to the Agent for the benefit of the Secured Parties, all such Parent Pledged Stock constituting certificated securities that such Parent Pledgor has so acquired.

(c) Each Credit Party Pledgor will cause any Pledged Debt Securities that are owed to such Credit Party Pledgor and that are evidenced by a promissory note or instrument to be pledged and delivered to the Agent, for the benefit of the Secured Parties, pursuant to the terms hereof; provided, that, except with respect to Intercompany Indebtedness, such request shall not apply to Pledged Debt Securities with a principal amount that does not exceed $500,000, individually or $1,000,000 in the aggregate.

(d) Upon delivery to the Agent, any Pledged Stock constituting certificated securities and any Pledged Debt Securities required to be delivered pursuant to the foregoing paragraphs (a) through (c) of this Section 2.03 shall be accompanied by stock or securities powers or note powers, as applicable, duly indorsed or executed in blank or other instruments of transfer reasonably satisfactory to the Agent and by such other instruments and documents as the Agent may reasonably request (other than instruments or documents governed by or requiring actions in any non-US jurisdiction related to Equity Interests of Foreign Subsidiaries). Each delivery of Pledged Stock constituting certificated securities and each delivery of Pledged Debt Securities shall be accompanied by a schedule describing the securities substantially in the form of Schedule II, which schedule shall be attached hereto as Schedule II (or a supplement to Schedule II, as applicable) and made a part hereof; provided that failure to attach any such schedule hereto shall not affect the validity of such pledge

of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

(e) If any Pledged Stock listed in Schedule II as of the date hereof constitutes an uncertificated security (within the meaning of Article 8 of the UCC), the Pledgor or Pledgors thereof shall, within 60 days following the Closing Date (or such later date as the Agent may agree in its sole discretion), cause the issuer thereof to enter into a control agreement with such Pledgor or Pledgors and the Agent wherein such issuer agrees to comply with instructions with respect to such Pledged Stock originated by the Agent without further consent of such Pledgor or Pledgors or any other Person, such agreement to be in form and substance reasonably satisfactory to the Agent and sufficient to cause the Agent's security interest in such Pledged Stock to be perfected by control within the meaning of Article 8 of the UCC. If, after the Closing Date, any Pledgor acquires Pledged Stock constituting an uncertificated security, such Pledgor shall cause the issuer thereof, within 45 days after request by the Agent (or such later date as the Agent may agree in its sole discretion) to enter into a control agreement as described in the preceding sentence with respect to such uncertificated Pledged Stock (and making the agreements described in the preceding sentence), such agreement to be in form and substance reasonably satisfactory to the Agent and sufficient to cause the Agent's security interest in such Pledged Stock to be perfected by control within the meaning of Article 8 of the UCC.

Section 2.04. Representations, Warranties and Covenants. Each Pledgor represents and warrants to, and covenants with, the Agent, for the benefit of the Secured Parties, that:

(a) As of the date hereof or the date of the last supplement to Schedule II, Schedule II correctly sets forth (i) the issued and outstanding Equity Interests owned by each Pledgor and (ii) all evidences of Indebtedness for borrowed money and obligations evidenced by bonds, debentures, notes, loan agreements or similar instruments issued to or owned by such Pledgor. As of the date hereof or the date of the last supplement to Schedule II, the Pledged Stock and the Pledged Debt Securities described in Schedule II include all of the Equity Interests and all evidences of Indebtedness and obligations that are required to be pledged in order to satisfy the provisions of the Credit Agreement and that are required to be delivered to the Agent pursuant to the provisions of the Credit Agreement and pursuant to Section 2.03(a), Section 2.03(b) or Section 2.03(c), as applicable.

(b) The Pledged Stock, to the best of each Pledgor's knowledge, has been duly and validly authorized and issued by the issuers thereof and are fully paid and nonassessable.

(c) Except for the Liens granted hereunder and the Liens permitted under Section 10.2 of the Credit Agreement, each Pledgor (i) is and, subject to any transfers made in compliance with the Credit Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule II as owned by such Pledgor, (ii) holds the same free and clear of all Liens, other than Permitted Liens, will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral other than pursuant to a transaction permitted by the Credit Agreement and other than Permitted Liens, and (iii) subject to the rights of such Pledgor under the Credit Documents to dispose of Pledged Collateral, will use commercially reasonable efforts to defend its title or interest thereto or therein and the priority thereof against any Lien that is not otherwise permitted by Section 10.2 of the Credit Agreement (including with respect to its priority relative to the Liens created hereunder), however arising, of all Persons.

(d) Other than (i) as set forth in Schedule II, (ii) restrictions and limitations imposed or permitted by the Credit Documents or securities laws generally and (iii) transfer restrictions that exist at the time of the acquisition of Equity Interests in such Person, the Pledged Collateral is and will continue to be freely transferable and assignable, and none of the Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter, by-law, memorandum of association or articles of association provisions or contractual restriction of any nature that could prohibit, impair, delay or otherwise affect in any manner material and adverse to the Secured Parties, the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Agent of rights and remedies hereunder other than under applicable Requirements of Law.

(e) Each Pledgor has the power and authority to pledge the Pledged Collateral pledged by it hereunder

in the manner hereby done or contemplated.

(f) Other than as set forth in the Credit Agreement or the schedules thereto, no consent or approval of any Governmental Authority, any securities exchange or any other person was or is necessary to the validity of the pledge effected hereby, other than (i) filings and registrations necessary to perfect the Liens on the Collateral granted by the Credit Parties and by the Parent Pledgors in favor of the Agent for the benefit of the Secured Parties and (ii) such as have been obtained and are in full force and effect.

(g) By virtue of the execution and delivery by the Pledgors of this Agreement, when (i) any Pledged Stock constituting certificated securities and any Pledged Debt Securities constituting promissory notes or other instruments are delivered to the Agent, for the benefit of the Secured Parties, in accordance with this Agreement (including the applicable indorsements and documents described in Section 2.03(d)), the Agent will obtain, for the benefit of the Secured Parties, a legal, valid and perfected first lien upon and security interest in such Pledged Stock and Pledged Debt Securities (perfected by control with respect to such certificated Pledged Stock and by possession with respect to such Pledged Debt Securities), as security for the payment and performance of the Obligations, (ii) any Pledged Stock constituting uncertificated securities becomes subject to a control agreement in accordance with Section 2.03 hereof, the Agent will obtain, for the benefit of the Secured Parties, a legal, valid and perfected first lien upon and security interest in such Pledged Stock and Pledged Debt Securities (perfected by control with respect to such certificated Pledged Stock and by possession with respect to such Pledged Debt Securities), as security for the payment and performance of the Obligations and (iii) a financing statement in proper form has been filed in the appropriate filing offices in respect of any Pledged Collateral constituting Investment Property, Instruments or General Intangibles, then the Agent (without limitation to any perfection accomplished pursuant to Section 2.04(g)(i)) will obtain, for the benefit of the Secured Parties, a legal, valid and perfected lien upon and security interest in such Pledged Collateral, subject only to Permitted Liens, as security for the payment and performance of the Obligations.

(h) The pledge effected hereby is effective to vest in the Agent, for the benefit of the Secured Parties, the rights of the Pledgors in the Pledged Collateral to the extent intended hereby.

(i) No Pledged Securities are being held in or credited to a securities account as of the Closing Date. No Pledgor shall deposit any Pledged Securities in, or cause or allow any Pledged Securities to be credited to or held as a financial asset in, any securities account without the prior written consent of the Agent, which consent may be predicated, without limitation, upon the Agent's having control under the UCC or other applicable law of such securities account and the security entitlements carried therein, for the benefit of the Secured Parties, pursuant to a control agreement in form and substance reasonably satisfactory to the Agent between the Agent, the relevant Pledgor and the relevant securities intermediary.

Notwithstanding anything to the contrary in this Agreement, the representations, warranties and covenants made by any relevant Pledgor in this Agreement with respect to the creation, perfection or priority (as applicable) of the security interest granted in favor of the Agent (pursuant to this Agreement) shall be deemed not to apply to Excluded Assets.

Section 2.05. Limited Liability Company and Limited Partnership Interests.

(a) Each Pledgor shall cause each interest in any limited liability company or limited partnership controlled by any Pledgor, pledged hereunder and represented by a certificate, to be a "security" within the meaning of Article 8 of the UCC, and shall cause each such interest to be, at all times hereafter, represented by a certificate unless and until such interest is no longer such a "security" and the Pledgor complies with Section 2.05(b).

(b) Each Pledgor shall not permit any interest in any limited liability company or limited partnership controlled by a Pledgor, pledged hereunder and not represented by a certificate to be a "security" within the meaning of Article 8 of the UCC, and the Pledgors shall at no time elect to treat any such interest as a "security" within the meaning of Article 8 of the UCC or issue any certificate representing such interest, unless prior to such election, the applicable Pledgor provides notification to the Agent of such election and delivers, as applicable, any such certificate to the Agent

pursuant to the terms hereof (it being understood, for avoidance of doubt, that there shall be no uncertificated Article 8 "securities").

Section 2.06. Registration in Nominee Name; Denominations. If an Event of Default shall have occurred and be continuing, (a) the Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to have the Pledged Securities registered in its own name as pledgee or in the name of its nominee (as pledgee or as sub-agent), or hold the Pledged Securities in the name of the applicable Pledgor, indorsed or assigned in blank in favor of the Agent, and (b) each Pledgor will promptly give to the Agent copies of any written notices or other written communications received by it with respect to Pledged Securities registered in the name of such Pledgor. If an Event of Default shall have occurred and be continuing, the Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement, to the extent permitted by the documentation governing such Pledged Securities. Each Pledgor shall use its commercially reasonable efforts to cause any Subsidiary that is not a party to this Agreement to comply with a request by the Agent, pursuant to this Section 2.06, to exchange certificates or instruments representing Pledged Securities of such Subsidiary for certificates or instruments of smaller or larger denominations.

Section 2.07. Voting Rights; Dividends and Interest, etc.

(a) Unless and until an Event of Default shall have occurred and be continuing and the Agent shall have given notice to the relevant Pledgors of the Agent's intention to exercise its rights hereunder:

(i) Each Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Credit Documents.

(ii) The Agent shall promptly execute and deliver to each Pledgor, or cause to be executed and delivered to such Pledgor, all such proxies, powers of attorney and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above.

(iii) Each Pledgor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral pledged by such Pledgor to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Credit Documents, and applicable laws; provided that any noncash dividends, interest, principal or other distributions that would constitute Pledged Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by any Pledgor in certificated form, shall be promptly (and in any event within 45 days of their receipt (or such longer time as the Agent shall permit in its sole discretion)) delivered to the Agent, for the benefit of the Secured Parties, in the same form as so received (and, if reasonably requested by the Agent, indorsed in blank or in a manner reasonably satisfactory to the Agent). So long as no Default or Event of Default has occurred and is continuing, the Agent shall promptly deliver to each relevant Pledgor any Pledged Securities in its possession if requested to be delivered to the issuer thereof in connection with any exchange or redemption of such Pledged Securities permitted by the Credit Agreement in accordance with this Section 2.07(a)(iii).

(b) After the occurrence and during the continuance of an Event of Default and upon notice by the Agent to the relevant Pledgors of the Agent's intention to exercise its rights hereunder, all rights of any Pledgor to dividends, interest, principal or other distributions that such Pledgor is authorized to receive pursuant to paragraph (a)(iii) of this Section 2.07 shall cease, and all such rights shall thereupon become vested, for the benefit of the Secured Parties, in the Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions; provided that, the Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Pledgors to receive and retain such amounts. All dividends, interest, principal or other distributions received by any Pledgor contrary to the provisions of this Section 2.07 shall not be

commingled by such Pledgor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Agent, for the benefit of the Secured Parties, and shall be forthwith delivered to the Agent, for the benefit of the Secured Parties, in the same form as so received (indorsed in a manner reasonably satisfactory to the Agent). Any and all money and other property paid over to or received by the Agent pursuant to the provisions of this paragraph (b) shall be retained by the Agent in an account to be established by the Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 4.02. After all Events of Default have been cured or waived and the Borrower has delivered to the Agent a certificate to that effect, the Agent shall promptly repay to each Pledgor (without interest) all dividends, interest, principal or other distributions that such Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section 2.07 and that remain in such account.

(c) Upon the occurrence and during the continuance of an Event of Default and after notice by the Agent to the relevant Pledgors of the Agent's intention to exercise its rights hereunder, subject to applicable Requirements of Law, all rights of any Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.07, and the obligations of the Agent under paragraph (a)(ii) of this Section 2.07, shall cease, and all such rights shall thereupon become vested in the Agent, for the benefit of the Secured Parties, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that the Agent shall have the right from time to time, following and during the continuance of an Event of Default to permit the Pledgors to exercise such rights. After all Events of Default have been cured or waived and the Borrower has delivered to the Agent a certificate to that effect, all rights of any Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.07, and the obligations of the Agent under paragraph (a)(ii) of this Section 2.07, shall in each case be reinstated.

(d) Any notice given by the Agent to the Pledgors suspending their rights under paragraph (a) of this Section 2.07 (i) shall be in writing, (ii) may be given to one or more of the Pledgors at the same or different times and (iii) may suspend the rights of the Pledgors under paragraph (a)(i) or paragraph (a)(iii) in part without suspending all such rights (as specified by the Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing.

## ARTICLE III.
## SECURITY INTERESTS IN PERSONAL PROPERTY

Section 3.01. Security Interest.

(a) As security for the payment and performance in full of the Obligations, each Grantor hereby assigns and pledges to the Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all right, title and interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

(i) all Accounts;

(ii) all Chattel Paper;

(iii) all cash and Deposit Accounts;

(iv) all Documents;

(v) all Equipment;

(vi) all Fixtures;

(vii) all General Intangibles;

(viii) all Goods;

(ix) all Instruments;

(x) all Intellectual Property;

(xi) all Inventory;

(xii) all Investment Property, Securities Accounts and Commodity Accounts;

(xiii) all Letters of Credit and Letter of Credit Rights;

(xiv) all minerals, oil, gas and As-Extracted Collateral;

(xv) all motor vehicles;

(xvi) all books and records pertaining to the Article 9 Collateral;

(xvii) all Commercial Tort Claims; and

(xviii)substitutions, replacements, accessions, products and proceeds (including insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) and to the extent not otherwise included, all proceeds, Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

Notwithstanding anything to the contrary in this Agreement, Article 9 Collateral does not include any Property that constitutes an Excluded Asset while such Property constitutes on Excluded Asset, and the representations, warranties and covenants made by any relevant Grantor in this Agreement with respect to Article 9 Collateral shall not be construed to mean or imply that Article 9 Collateral includes any Excluded Asset or that the Security Interest exists in any Excluded Assets, while any such Property is an Excluded Asset.

(b) Each Grantor and Pledgor hereby irrevocably authorizes the Agent at any time and from time to time to file in any relevant jurisdiction any initial financing statements (including fixture filings) with respect to the Collateral or any part thereof and amendments thereto that contain the information required by Article 9 of the UCC for the filing of any financing statement or amendment, including (i) whether such Grantor or Pledgor is an organization, the type of organization and any organizational identification number issued to such Grantor or Pledgor, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates and (iii) a description of collateral that describes such property in any other manner as the Agent may reasonably determine is necessary or advisable to ensure the perfection of the security interest in the Collateral granted under this Agreement, including describing such property as “all assets” or “all property” or words of similar effect. Each Grantor and each Pledgor agrees to provide such information to the Agent promptly upon any reasonable request, including any updates to the Schedules hereto to reflect any additional applicable property not listed thereon.

The Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office or any similar office in any other country) such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by each Grantor in Article 9 Collateral consisting of United States Patents, United States registered Trademarks and United States registered Copyrights, without the signature of any Grantor, and naming any Grantor or the Grantors as debtors and the Agent as secured party.

(c) The Security Interest is granted as security only and shall not subject the Agent or any other Secured

Case 22-90168 Document 1-23 Filed in TXSB on 06/12/23 Page 288 of 300

Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Article 9 Collateral.

Section 3.02. Representations and Warranties. The Grantors jointly and severally represent and warrant to the Agent and the Secured Parties that:

(a) Each Grantor and Pledgor has good and valid rights in and title (except as otherwise permitted under any Credit Document) to the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder and has full power and authority to grant to the Agent the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval that has been obtained and is in full force and effect or has otherwise been disclosed herein or in the Credit Agreement and the Schedules thereto.

(b) The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein, including the exact legal name of each Grantor and Pledgor, is correct and complete, in all material respects, as of the Closing Date. Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations containing a description of the Article 9 Collateral and the Parent Pledged Collateral have been prepared by the Agent based upon the information provided to the Agent in the Perfection Certificate for filing in each governmental, municipal or other office specified in the Perfection Certificate (or specified by notice from the Borrower to the Agent after the Closing Date in the case of filings, recordings or registrations required by Section 9.13 of the Credit Agreement), and constitute all the filings, recordings and registrations (other than filings required to be made in the United States Patent and Trademark Office and the United States Copyright Office in order to perfect the Security Interest in Article 9 Collateral consisting of United States Patents, United States registered Trademarks and United States registered Copyrights) that are necessary to publish notice of and protect the validity of and to establish a legal, valid and perfected security interest in favor of the Agent (for the benefit of the Secured Parties) in respect of all Article 9 Collateral and Parent Pledged Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in any such jurisdiction, except as provided under applicable law with respect to the filing of continuation statements or amendments. Each Grantor represents and warrants that a fully executed agreement in the form hereof (or a short form hereof which form shall be reasonably acceptable to the Agent) containing a description of all Article 9 Collateral consisting of Intellectual Property with respect to registered United States Patents (and Patents for which registration applications are pending), registered United States Trademarks (and Trademarks for which registration applications are pending) and registered United States Copyrights (and Copyrights for which registration applications are pending) has been delivered to the Agent for recording with the United States Patent and Trademark Office and the United States Copyright Office pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as applicable, to protect the validity of and to establish a legal, valid and perfected security interest in favor of the Agent, for the benefit of the Secured Parties, in respect of all Article 9 Collateral consisting of such Intellectual Property in which a security interest may be perfected by recording with the United States Patent and Trademark Office and the United States Copyright Office, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary (other than such actions as are necessary to perfect the Security Interest with respect to any Article 9 Collateral consisting of Patents, Trademarks and Copyrights (or registration or application for registration thereof) acquired or developed after the Closing Date).

(c) The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Obligations, (ii) subject to the filings described in Section 3.02(b), a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the Uniform Commercial Code or other applicable law in such jurisdictions and (iii) subject to Section 3.02(b), a security interest that shall be perfected in all Article 9 Collateral in which a security interest may be perfected upon the recording of this Agreement (or a short form hereof) with the United States Patent and Trademark Office and the United States Copyright Office, as applicable. The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral other than Liens permitted under Section 10.2 of the Credit Agreement.

(d) The Article 9 Collateral is owned by the Grantors and Pledgors free and clear of any Lien, other than Liens permitted under Section 10.2 of the Credit Agreement. None of the Grantors or Pledgors has filed or consented to the filing of (i) any financing statement or analogous document under the Uniform Commercial Code or any other applicable laws covering any Article 9 Collateral, (ii) any assignment in the nature of a security interest in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the United States Patent and Trademark Office or the United States Copyright Office or (iii) any assignment in the nature of a security interest in which any Grantor and Pledgor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for Liens permitted under Section 10.2 of the Credit Agreement. None of the Grantors has entered into any control agreement with respect to any Deposit Account, Securities Account or Commodity Account (in each case other than Excluded Accounts) that would grant control (pursuant to Section 9-104 of the UCC with respect to a Deposit Account, Section 8-106 of the UCC or other applicable law with respect to a Securities Account and Section 9-106(b) of the UCC with respect to a Commodity Account) of such Deposit Account, such Securities Account (or any security entitlement carved therein) or Commodity Account (or any commodity contract carried therein) to any Person other than the Agent for the benefit of the Secured Parties.

(e) As of the date hereof, the Deposit Accounts, Commodity Accounts and Securities Accounts listed in Schedule IV, Schedule V and Schedule VI, respectively, are all of the those types of accounts maintained by the Grantors.

(f) As of the date hereof the Commercial Tort Claims listed in Schedule VII hereof are all of the Commercial Tort claims with an individual value in excess of $250,000 held by the Grantors.

Section 3.03. Covenants.

(a) Each Grantor and each Pledgor agrees that if it effects or permits any change referred to in Section 9.1(o)(ii) of the Credit Agreement it will ensure that all filings have been made, or will have been made within any applicable statutory period, under the Uniform Commercial Code or otherwise that are required in order for the Agent at all times following such change to have a valid, legal and perfected first priority security interest (subject to Liens permitted under Section 10.2 of the Credit Agreement) in all the Article 9 Collateral, for the benefit of the Secured Parties.

(b) Subject to the rights of such Grantor under the Credit Documents to dispose of Collateral, each Grantor shall, at its own expense, upon the reasonable request of the Agent, use commercially reasonable efforts to defend title to the Article 9 Collateral against all persons and to defend the Security Interest of the Agent, for the benefit of the Secured Parties, in the Article 9 Collateral and the priority thereof against any Lien that is not otherwise permitted under Section 10.2 of the Credit Agreement to exist or have such priority; provided that, nothing in this Agreement shall prevent any Grantor from discontinuing the operation or maintenance of any of its assets or properties if such discontinuance is (i) determined by such Grantor to be desirable in the conduct of its business and (ii) permitted by the Credit Documents.

(c) Each Grantor and each Pledgor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Agent may from time to time reasonably request to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement and the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith.

Without limiting the generality of the foregoing, each Grantor authorizes the Agent, with prompt notice thereof to the Grantors, to supplement this Agreement by supplementing Schedule III or adding additional schedules hereto to specifically identify any asset or item that may constitute Copyrights, Patents, Trademarks, Copyright Licenses, Patent Licenses or Trademark Licenses; provided that any Grantor shall have the right, exercisable within 90 days after it has been notified by the Agent of the specific identification of any such Collateral, to advise the Agent in writing of any inaccuracy of the representations

and warranties made by such Grantor hereunder with respect to such Article 9 Collateral. Each Grantor agrees that it will use its commercially reasonable efforts to take such action as shall be necessary in order that the representations and warranties set forth in Section 3.02(b) will be true and correct with respect to such Copyrights, Patents, Trademarks, Copyright Licenses, Patent Licenses or Trademark Licenses within 90 days after the date it has been notified by the Agent of the specific identification of such Copyrights, Patents, Trademarks, Copyright Licenses, Patent Licenses or Trademark Licenses.

(d) (i) After the occurrence of an Event of Default and during the continuance thereof, the Agent shall have the right to verify under reasonable procedures the validity, amount, quality, quantity, value, condition and status of, or any other matter relating to, the Article 9 Collateral, including, in the case of Accounts or Article 9 Collateral in the possession of any third person, by contacting Account Debtors or the third person possessing such Article 9 Collateral for the purpose of making such a verification and each Grantor shall furnish all such assistance and information as Agent may reasonably request in connection with any such verification. The Agent shall have the right to share any information it gains from such inspection or verification with any Secured Party.

(i) The Agent hereby authorizes each Grantor to collect such Grantor's Accounts and the Agent may curtail or terminate said authority at any time after written notice is provided by the Agent to such Grantor after the occurrence and during the continuance of an Event of Default.

(ii) At the Agent's written request at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall deliver to the Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Accounts, including all original orders, invoices and shipping receipts.

(e) At its option, the Agent may discharge any past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral or Pledged Collateral and that is not a Permitted Lien, and may pay for the maintenance and preservation of the Article 9 Collateral or Pledged Collateral to the extent any Grantor or Pledgor, as applicable fails to do so as required by the Credit Agreement or this Agreement, and each Grantor and each Pledgor jointly and severally agrees to reimburse the Agent on demand for any reasonable payment made or any reasonable expense incurred by the Agent pursuant to the foregoing authorization; provided, however, that nothing in this Section 3.03(e) shall be interpreted as excusing any Grantor or Pledgor from the performance of, or imposing any obligation on the Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor or Pledgor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Credit Documents.

(f) Each Grantor and each Pledgor (rather than the Agent or any Secured Party) and each shall remain liable for the observance and performance of all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Article 9 Collateral or to the Pledged Collateral (including under the organizational or governing documents or agreements of any issuer of Pledged Securities) and each Grantor and each Pledgor jointly and severally agrees to indemnify and hold harmless the Agent and the Secured Parties from and against any and all liability for such performance.

(g) During the continuance of an Event of Default, none of the Grantors will, without the Agent's prior written consent (which consent shall not be unreasonably withheld), grant any extension of the time of payment of any Accounts included in the Article 9 Collateral, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any person liable for the payment thereof or allow any credit or discount whatsoever thereon, other than extensions, credits, discounts, compromises or settlements granted or made in the ordinary course of business and consistent with prudent business practices, except as permitted by the Credit Agreement.

(h) Each Grantor irrevocably makes, constitutes and appoints the Agent (and all officers, employees or agents designated by the Agent) as such Grantor's true and lawful agent (and attorney-in-fact) for the purpose, during the continuance of an Event of Default, of making, settling and adjusting claims in respect of Article 9 Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto. In the event that any

Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required by the Credit Documents or to pay any premium in whole or part relating thereto, the Agent may, without waiving or releasing any obligation or liability of the Grantors hereunder or any Event of Default, in its sole discretion, obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Agent reasonably deems advisable. All sums disbursed by the Agent in connection with this Section 3.03(h), including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, upon demand, by the Grantors to the Agent and shall be additional Obligations secured hereby.

Section 3.04. Other Actions. In order to further ensure the attachment, perfection and priority of, and the ability of the Agent to enforce, for the benefit of the Secured Parties, the Agent's security interest in the Article 9 Collateral, each Grantor agrees, in each case at such Grantor's own expense, to take the following actions with respect to the following Article 9 Collateral:

(a) Instruments and Tangible Chattel Paper. If any Grantor shall at any time own or acquire any Instruments or Tangible Chattel Paper evidencing individually an amount in excess of $500,000 (or in the aggregate in excess of $1,000,000), such Grantor shall promptly (and in any event within 30 days of its acquisition (or such longer period as the Agent may agree to)) notify the Agent and promptly endorse, assign and deliver the same to the Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Agent may from time to time reasonably request.

Section 3.05. Covenants Regarding Patent, Trademark and Copyright Collateral. Except as permitted by the Credit Agreement:

(a) Each Grantor, either itself or through any agent, employee, licensee or designee, shall upon the reasonable request of the Agent, execute and deliver any and all agreements, instruments, documents and papers as the Agent may reasonably request to evidence the Agent's security interest in such Patent, Trademark or Copyright.

(b) Upon and during the continuance of an Event of Default, at the request of the Agent, each Grantor shall use commercially reasonable efforts to obtain all requisite consents or approvals from the licensor under each Copyright License, Patent License or Trademark License to effect the assignment of all such Grantor's right, title and interest thereunder to (in the Agent's sole discretion) the designee of the Agent or the Agent.

Section 3.06. Commercial Tort Claims. If after the Closing Date any Grantor acquires any Commercial Tort Claim with an individual value in excess of $250,000, such Grantor shall promptly provide to the Agent notice of the acquisition of such Commercial Tort Claim, such notice to (i) describe such Commercial Tort Claim in sufficient detail such that, in the judgment of the Agent, such description will constitute an adequate description under Section 9-108 of the UCC, and (ii) identify any such Commercial Tort Claim that constitutes an Excluded Asset. The foregoing notice shall supplement, and shall be deemed to constitute a part of, Schedule VII.

## ARTICLE IV.
## REMEDIES

Section 4.01. Remedies upon Default. Upon the occurrence and during the continuance of an Event of Default, subject to applicable Requirements of Law, each Pledgor and Grantor agrees to deliver each item of Collateral to the Agent on demand, and it is agreed that the Agent shall have the right to take any of or all the following actions at the same or different times: (a) with respect to any Article 9 Collateral consisting of Intellectual Property, on demand, to cause the Security Interest to become an assignment, transfer and conveyance of any of or all such Article 9 Collateral by the applicable Pledgors to the Agent or to license or sublicense, whether general, special or otherwise, and whether on an exclusive or a nonexclusive basis, any such Article 9 Collateral throughout the world on such terms and conditions and in such manner as the Agent shall determine (other than in violation of any then-existing licensing arrangements to the extent that waivers thereunder cannot be obtained), (b) with or without legal process and with or without prior notice or demand for performance, to take possession of the Article 9 Collateral and without liability for trespass to the applicable Pledgor or Grantor to enter any premises where the Article 9

Collateral may be located for the purpose of taking possession of or removing the Article 9 Collateral and (c) generally, to exercise any and all rights afforded to a secured party under the applicable Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, each Pledgor and Grantor agrees that the Agent shall have the right, subject to the requirements of applicable law, to sell or otherwise dispose of all or any part of the Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Agent shall deem appropriate. The Agent shall be authorized in connection with any sale of a security (if it deems it advisable to do so) pursuant to the foregoing to restrict the prospective bidders or purchasers to persons who represent and agree that they are purchasing such security for their own account, for investment, and not with a view to the distribution or sale thereof. Upon consummation of any such sale of Collateral pursuant to this Section 4.01, the Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Pledgor or Grantor, and each Pledgor and Grantor hereby waives and releases (to the extent permitted by law) all rights of redemption, stay, valuation and appraisal that such Pledgor or Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Agent shall give the applicable Pledgors and Grantors 10 days' written notice (which each Pledgor and Grantor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Agent's intention to make any sale of Collateral. At any such sale, the Collateral, or the portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Agent may (in its sole and absolute discretion) determine. The Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In the case of any sale of all or any part of the Collateral made on credit or for future delivery, the Collateral so sold may be retained by the Agent until the sale price is paid by the purchaser or purchasers thereof, but the Agent shall not incur any liability in the event that any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in the case of any such failure, such Collateral may be sold again upon notice given in accordance with provisions above. At any public (or, to the extent permitted by law, private) sale made pursuant to this Section 4.01, any Secured Party may bid for or purchase for cash (or, in accordance with Section 12.14 of the Credit Agreement, credit bid), free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Pledgor or Grantor (all such rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Pledgor or Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Agent shall be free to carry out such sale pursuant to such agreement and no Pledgor or Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. To the extent provided in this Section 4.01, any sale that complies with such provisions shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions.

Section 4.02. Application of Proceeds. Upon the occurrence and during the continuance of an Event of Default, the Agent shall promptly apply the proceeds, moneys or balances of any collection or sale of Collateral, as well as any Collateral consisting of cash, in accordance with Section 11.12 of the Credit Agreement.

The Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Agent or such officer or be answerable in any way for the misapplication thereof.

Section 4.03. Grant of License to Use Intellectual Property. For the purpose of enabling the Agent to exercise rights and remedies under this Agreement at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor and Pledgor grants (such grant effective solely after the occurrence and during the continuance of an Event of Default) to (in the Agent's sole discretion) a designee of the Agent or the Agent, for the benefit of the Secured Parties, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Pledgor or Grantor) to use, license or sublicense any of the Article 9 Collateral consisting of Intellectual Property now owned or hereafter acquired by such Pledgor or Grantor, wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, the right to prosecute and maintain all Intellectual Property and the right to sue for past infringement of the Intellectual Property; provided, however, that nothing in this Section 4.03 shall require Grantors or Pledgors to grant any license that is prohibited by any rule of law, statute or regulation, or is prohibited by, or constitutes a breach or default under or results in the termination of, any contract, license, instrument or other agreement with an unaffiliated third party, to the extent permitted by the Credit Agreement, with respect to such Intellectual Property Collateral; and provided, further, that such licenses to be granted hereunder with respect to Trademarks shall be subject to the maintenance of quality standards with respect to the goods and services on which such Trademarks are used sufficient to preserve the validity of such Trademarks. For the avoidance of doubt, the use of such license by the Agent may be exercised, at the option of the Agent, only during the continuation of an Event of Default. Furthermore, each Grantor and Pledgor hereby grants to the Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the United States Copyright Office or the United States Patent and Trademark Office or any state office in order to effect an absolute assignment of all right, title and interest in each Patent, Trademark or Copyright, and to record the same.

Section 4.04. Securities Act, etc. In view of the position of the Pledgors in relation to the Pledged Collateral, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar federal statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Collateral permitted hereunder. Each Pledgor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Agent if the Agent were to attempt to dispose of all or any part of the Pledged Collateral, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Collateral could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Agent in any attempt to dispose of all or part of the Pledged Collateral under applicable Blue Sky or other state securities laws or similar laws analogous in purpose or effect. Each Pledgor acknowledges and agrees that in light of such restrictions and limitations, the Agent, in its sole and absolute discretion, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Collateral or part thereof shall have been filed under the Federal Securities Laws or, to the extent applicable, Blue Sky or other state securities laws and (b) may approach and negotiate with a single potential purchaser to effect such sale. Each Pledgor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Agent shall incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price that the Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached. The provisions of this Section 4.04 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Agent sells.

ARTICLE V.
MISCELLANEOUS

Section 5.01. Notices. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 13.2 of the Credit Agreement (whether or not then in effect), as such address may be changed by written notice to the Agent and the Borrower. All communications and notices hereunder to any Pledgor or Grantor shall be given to it in care of the Borrower, with such notice to be given as provided in Section 13.2 of the Credit Agreement (whether or not then in effect).

Section 5.02. Security Interest Absolute. All rights of the Agent hereunder, the Security Interest, the security interest

in the Pledged Collateral and all obligations of each Pledgor and Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Credit Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Credit Document, or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Pledgor or Grantor in respect of the Obligations or this Agreement (other than a defense of Payment in Full).

Section 5.03. Limitation by Law. All rights, remedies and powers provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable Requirements of Law, and all the provisions of this Agreement are intended to be subject to all applicable Requirements of Law that may be controlling and to be limited to the extent necessary so that they shall not render this Agreement invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law or regulation.

Section 5.04. Binding Effect; Several Agreement. This Agreement shall become effective as to any party to this Agreement when a counterpart hereof executed on behalf of such party shall have been delivered to the Agent and a counterpart hereof shall have been executed on behalf of the Agent, and thereafter shall be binding upon such party and the Agent and their respective permitted successors and assigns, and shall inure to the benefit of such party, the Agent and the other Secured Parties and their respective permitted successors and assigns, except that no Grantor or Pledgor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except with the prior written consent of the Administrative Agent. This Agreement shall be construed as a separate agreement with respect to each party and may be amended, modified, supplemented, waived or released in accordance with Section 5.09.

Section 5.05. Successors and Assigns. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Pledgor or Grantor or the Agent that are contained in this Agreement shall bind and inure to the benefit of their respective permitted successors and assigns. The Agent hereunder shall at all times be the same person that is the "Collateral Agent" under the Credit Agreement. Written notice of resignation by the "Collateral Agent" pursuant to the Credit Agreement shall also constitute notice of resignation as the Agent under this Agreement. Upon the acceptance of any appointment as the "Collateral Agent" under the Credit Agreement by a successor "Collateral Agent", that successor "Collateral Agent" shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent pursuant hereto.

Section 5.06. Agent's Fees and Expenses; Indemnification.

(a) The parties hereto agree that the Agent shall be entitled to reimbursement of its expenses incurred hereunder and indemnification as provided in Section 13.5 of the Credit Agreement.

(b) Any such amounts payable as provided hereunder shall be additional Obligations secured hereby and by the other Security Documents. The provisions of this Section 5.06 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Credit Document, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Credit Document, or any investigation made by or on behalf of the Agent or any other Secured Party.

Section 5.07. Agent Appointed Attorney-in-Fact. Each Pledgor and Grantor hereby appoints the Agent the attorney-in-fact of such Pledgor or Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest (it being understood that no rights shall be exercised under such power of attorney unless an Event of Default has occurred and is continuing). Without limiting the generality of the foregoing, subject to applicable Requirements of Law, the Agent shall have the right, upon the occurrence and during the continuance of an Event of Default, with full power of substitution either in the Agent's

Case 22-90000 Document 635-21 Filed in TXSB on 06/21/22 Page 147 of 380

name or in the name of such Pledgor or Grantor, (a) to receive, indorse, assign or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof, (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to ask for, demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due under and by virtue of any Collateral; (d) to sign the name of any Pledgor or Grantor on any invoice or bill of lading relating to any of the Collateral; (e) to send verifications of Accounts to any Account Debtor; (f) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (g) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (h) to notify, or to require any Pledgor or Grantor to notify, Account Debtors to make payment directly to the Agent; and (i) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Agent were the absolute owner of the Collateral for all purposes; provided that nothing herein contained shall be construed as requiring or obligating the Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Pledgor or Grantor for any act or failure to act hereunder, except for their own or their Related Parties' gross negligence, bad faith, or willful misconduct.

Section 5.08. GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS.

(a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b) THE TERMS OF SECTIONS 13.13 AND 13.15 OF THE CREDIT AGREEMENT ARE INCORPORATED HEREIN BY REFERENCE, *MUTATIS MUTANDIS*, AND THE PARTIES HERETO AGREE TO SUCH TERMS.

(c) EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED IN SECTION 5.01. NOTHING IN THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVICE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 5.09. Waivers; Amendment.

(a) No failure or delay by the Agent, any Issuing Bank, any Lender or any other Secured Party in exercising any right, power or remedy hereunder or under any other Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy, or any abandonment or discontinuance of steps to enforce such a right, power or remedy, preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights, powers and remedies of the Agent, any Issuing Bank, the Lenders or any other Secured Party hereunder and under the other Credit Documents are cumulative and are not exclusive of any rights, powers or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Credit Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 5.09, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or the issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Agent, any Lender, any Issuing Bank or any other Secured Party may have had notice or knowledge of such Default or Event of Default at the time. No notice or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof or of any other Security Document may be waived, amended, supplemented or modified except pursuant to an agreement or agreements in writing entered into by the Agent and the Credit Party or Credit Parties with respect to which such waiver, amendment, supplement or modification is to apply, subject to any consent required in accordance with Section 13.1 of the Credit Agreement. The Agent may conclusively rely on a certificate of an Authorized Officer of the Borrower as to whether any amendment contemplated by this Section 5.09(b) is permitted.

Section 5.10. Severability. In the event any one or more of the provisions contained in this Agreement or in any other Credit Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 5.11. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract, and shall become effective as provided in Section 5.04. Delivery of an executed counterpart to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually signed original.

Section 5.12. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 5.13. Termination or Release.

(a) This Agreement, the pledges made herein, the Security Interest and all other security interests granted hereby shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Pledgors and/or Grantors upon Payment in Full.

(b) A Subsidiary Party shall automatically be released from its obligations hereunder and/or the security interests in any Collateral shall in each case be automatically released upon the occurrence of any of the circumstances set forth in Section 13.17 of the Credit Agreement, in each case, to the extent Section 13.17 provides for such automatic release, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to any applicable Subsidiary Party.

(c) In connection with any termination or release pursuant to paragraph (a), or (b) of this Section 5.13,

the Agent shall execute and deliver to any Pledgor or Grantor, at such Pledgor's or Grantor's expense, all documents that such Pledgor or Grantor shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Pledgor, such of the Pledged Collateral that may be in the possession of the Agent and has not theretofore been sold or otherwise applied or released pursuant to this Agreement (it being understood that the Agent may rely conclusively on a certificate delivered to it by a Responsible Officer of the Grantor upon its reasonable request that any Disposition was done in compliance with the terms of the Credit Documents). Any execution and delivery of documents pursuant to this Section 5.13 shall be without recourse to or warranty by the Agent. In connection with any release pursuant to paragraph (a) or (b) above, the Pledgors or Grantors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements. Upon the receipt of any necessary or proper instruments of termination, satisfaction or release prepared by the Borrower, the Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Agreement or the Security Documents. Upon the request of the Agent, the Grantor shall have delivered to the Agent a certification by an Authorized Officer of the Grantor stating that (i) any Disposition giving rise to any such termination or release was in compliance with the Credit Documents and (ii) no Collateral other than the Collateral required to be released is being released from Liens hereunder.

(d) Additional Subsidiaries. Upon execution and delivery by the Agent and any Subsidiary that is required to become a party hereto by Section 9.9 of the Credit Agreement of an instrument in the form of Exhibit I hereto, such Subsidiary shall become a Subsidiary Party hereunder with the same force and effect as if originally named as a Subsidiary Party herein. The execution and delivery of any such instrument shall not require the consent of any other party to this Agreement. The rights and obligations of each party to this Agreement shall remain in full force and effect notwithstanding the addition of any new party to this Agreement.

Section 5.14. Right of Set-off. After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders and Issuing Banks provided by Requirements of Law, each Lender, each Issuing Bank and their respective Affiliates, at any time, shall have the right, without prior notice to any Grantor, any such notice being expressly waived by the Grantors to the extent permitted by applicable Requirements of Law, against any amount due and payable by the Borrower or any Restricted Subsidiary hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, such Issuing Bank or any of their respective Affiliates, branches or agencies thereof to or for the credit or the account of the any Grantor. Each Lender or Issuing Bank agrees promptly to notify the Borrower (and the Restricted Subsidiaries, if applicable) and the Administrative Agent after any such set-off and application made by such Lender, such Issuing Bank or their respective Affiliates; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this Section 5.15 are in addition to other rights and remedies (including other rights of set off) that such Lender may have.

Section 5.15. Subordination. Notwithstanding any provision of this Agreement to the contrary, all rights of the Grantors and Pledgors (other than the Borrower) to indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the Payment in Full of the Obligations. No failure on the part of the Borrower or any other Grantor or Pledgor to make the payments required under applicable law or otherwise shall in any respect limit the obligations and liabilities of any Grantor or Pledgor with respect to its obligations hereunder, and each Grantor or Pledgor shall remain liable for the full amount of the obligations of such Grantor or Pledgor hereunder. Each Grantor and Pledgor (other than the Borrower) hereby agrees all Indebtedness owed to it by any other Grantor or Pledgor shall be subordinated in accordance with the terms of the Intercompany Note.

Section 5.16. Limitation of Liability. The parties agree that, notwithstanding any provision hereof to the contrary, the maximum liability of each Grantor and each Pledgor hereunder shall in no event exceed the amount which can be secured by such Grantor or Pledgor under applicable federal and state law relating to the insolvency of debtors.

Section 5.17. Survival of Agreement. All covenants, agreements, representations and warranties made by the

Grantors and the Pledgors hereunder and in the other Credit Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Secured Parties and shall survive the execution and delivery of the Credit Documents, the making of any Loans and issuance of any Letters of Credit and the provision of services under Secured Cash Management Agreements or Secured Hedge Agreements, regardless of any investigation made by any Secured Party or on its behalf and notwithstanding that any Secured Party may have had notice or knowledge of any Default at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect as long as this Agreement has not been terminated or released pursuant to Section 5.13 above.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**SN EF UNSUB, LP**

By: SN EF UNSUB GP, LLC, its general partner

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**SN EF UNSUB HOLDINGS, LLC**

By: /s/ Eduardo A. Sanchez
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB GP, LLC**

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent and Administrative Agent

By: /s/ Darren Vanek
Name: Darren Vanek
Title: Authorized Officer