*Earnings (Loss) Per Share*—The following table shows the computation of basic and diluted net loss per share for the three and nine months ended September 30, 2019 and 2018 (in thousands, except per share amounts):

| | Three Months Ended September 30, 2019 | Three Months Ended September 30, 2018 | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|---|---|
| **Net income (loss)** | $ (112,448) | $ 5,598 | $ (232,755) | $ (34,204) |
| Less: | | | | |
| Preferred stock dividends | (2,312) | (3,987) | (7,153) | (11,961) |
| Preferred unit dividends and distributions | (12,500) | (12,500) | (37,500) | (34,908) |
| Preferred unit amortization | (7,638) | (6,458) | (22,029) | (18,577) |
| **Net loss attributable to common stockholders** | $ (134,898) | $ (17,347) | $ (299,437) | $ (99,650) |
| Weighted average number of unrestricted outstanding common shares used to calculate basic and dilutive net loss per share(1)(2) | 97,395 | 82,073 | 95,272 | 81,597 |
| **Net loss per common share - basic and diluted** | $ (1.39) | $ (0.21) | $ (3.14) | $ (1.22) |

(1) The three and nine months ended September 30, 2018 exclude 1,840,007 and 2,591,553 shares, respectively, of weighted average restricted stock and 12,520,179 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

(2) The three and nine months ended September 30, 2019 exclude 433,369 and 942,551 shares, respectively, of weighted average restricted stock and 7,306,402 and 8,757,574 shares, respectively, of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

**Note 15. Stock-Based Compensation**

The Company’s Third Amended and Restated Long Term Incentive Plan (the “LTIP”) allows for grants of stock options, stock appreciation rights, restricted shares, phantom stock, other stock based awards or stock awards, or any combination thereof.

Effective January 1, 2019, the Company records stock-based compensation expense for awards granted in accordance with the provisions of ASU 2018-07 “Compensation - Stock Compensation (ASC 718) - Improvements to Nonemployee Share-Based Payment Accounting,” which expands the scope of ASC 718, “Compensation – Stock Compensation,” to include share-based payment transactions for acquiring goods and services from nonemployees. Pursuant to this standard, stock-based compensation expense is based on the grant-date fair value of our stock awards and is recognized over the vesting period using the straight-line method. As a result of our adoption of ASU 2018-07, the Company remeasured the value of our outstanding unvested awards as of January 1, 2019. This did not have a material impact on our financial statements.

During the three and nine months ended September 30, 2019, the Company did not issue any shares of restricted common stock pursuant to the LTIP.

During the three months ended September 30, 2019, the Company did not issue any shares of phantom stock pursuant to the LTIP. During the nine months ended September 30, 2019, the Company issued an immaterial number of shares of phantom stock pursuant to the LTIP to certain employees of SOG, with whom the Company has a services agreement. These shares of phantom stock vest in equal annual amounts over a three year period.

For the 2018 performance period applicable to our performance phantom stock awards granted in 2017 (the “Performance Awards”), 0% of the target shares were awarded.

For the 2018 performance period applicable to our cash-settled performance-based phantom stock awards and stock-settled performance-based phantom stock awards granted in 2018 (together, the “PBPS Awards”), 71% of the target shares were awarded, equating to 419,430 cash-settled awards and 419,430 stock-settled awards. Stock-based compensation expense for these awards was calculated in accordance with ASC 718 and is being amortized over the vesting period.

The Company recognized the following stock-based compensation expense (in thousands) which is included in general and administrative expense in the condensed consolidated statements of operations:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Restricted stock awards, directors | $ — | $ 305 | $ 42 | $ 932 |
| Restricted stock awards, non-employees | 45 | (862) | 270 | 1,957 |
| Performance awards | 51 | (842) | 83 | (12) |
| Phantom stock awards | (101) | (2,652) | (40) | 1,467 |
| Total stock-based compensation expense | $ (5) | $ (4,051) | $ 355 | $ 4,344 |

Based on the $0.03 per share closing price of the Company’s common stock on September 30, 2019, there was approximately $0.3 million of unrecognized compensation cost related to the non-vested restricted shares outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the $0.03 per share closing price of the Company’s common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated restricted stock outstanding. The cost is expected to be recognized over an average period of approximately 1.5 years.

Based on the $0.03 per share closing price of the Company’s common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated phantom stock (“PAPS”) and phantom stock outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the estimated per share price of the common stock underlying the Performance Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the Performance Awards. The cost is estimated to be recognized over a weighted average period of approximately 2.3 years.

Based on the estimated per share price of the common stock underlying the PBPS Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the PBPS Awards. The cost is estimated to be recognized over a weighted average period of approximately 1.1 years.

A summary of the status of the non-vested restricted shares for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested common stock, beginning of period | 2,714 | 5,767 | 5,024 | 4,897 |
| Granted | — | 146 | — | 3,303 |
| Vested | (51) | (59) | (2,164) | (2,218) |
| Forfeited | (24) | (414) | (221) | (542) |
| Non-vested common stock, end of period | 2,639 | 5,440 | 2,639 | 5,440 |

As of September 30, 2019, approximately 8.4 million shares remained available for future issuance to participants under the LTIP.

A summary of the status of the non-vested phantom stock and PAPS for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested phantom stock and PAPS, beginning of period | 2,857 | 5,888 | 5,125 | 3,589 |
| Granted | — | 253 | 7 | 3,905 |
| Vested | (60) | (46) | (1,874) | (1,197) |
| Forfeited | (58) | (465) | (519) | (667) |
| Non-vested phantom stock and PAPS, end of period | 2,739 | 5,630 | 2,739 | 5,630 |

**Note 16. Income Taxes**

The Company used a year-to-date effective tax rate method for recording income taxes for the nine month periods ended September 30, 2019 and 2018. This method is based on our determination at September 30, 2019 and 2018 that due to our valuation allowance position, the income tax provision does not materially change by using a year-to-date effective tax rate method as compared to an estimated full year annual effective tax rate method. Further, for the period ended September 30, 2018, a small change in our estimated ordinary income could have resulted in a large change in the estimated annual effective tax rate. We will use this year-to-date effective tax rate method each quarter until such time a return to the annualized effective tax rate method is deemed material or appropriate.

The Company's effective tax rate for the nine months ended September 30, 2019 and 2018 was approximately 0% and  0%, respectively. The difference between the statutory federal income taxes calculated using a U.S. Federal statutory corporate income tax rate of 21% and the Company's effective tax rates is related to the valuation allowance on deferred tax assets.

The Company provides for deferred income taxes on the difference between the tax basis of an asset or liability and its carrying amount in the financial statements in accordance with authoritative guidance for accounting for income taxes. This difference will result in taxable income or deductions in future years when the reported amount of the asset or liability is recovered or settled, respectively. In recording deferred income tax assets, the Company considers whether it is more likely than not that some portion or all of the deferred income tax assets will be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those deferred income tax assets would be deductible. The Company believes that after considering all the available objective evidence, both positive and negative, historical and prospective, with greater weight given to historical evidence, management is not able to determine that it is more likely than not that the deferred tax assets will be realized and, therefore, has established a valuation allowance to reduce the deferred tax assets as of September 30, 2019. The Company will continue to assess the valuation allowance against deferred tax assets considering all available information obtained in future reporting periods.

At September 30, 2019, the Company had no material uncertain tax positions.

**Note 17. Commitments and Contingencies**

*Stockholder Derivative Litigation*

On August 29, 2018, a derivative action was filed in the Court of Chancery of the State of Delaware against certain of the Company's directors (Armato et al. v. A.R. Sanchez, Jr. et al., No. 2018-0642, the "Derivative Action"). The complaint alleges breach of fiduciary duty, unjust enrichment and waste of corporate assets against directors of the Company based on purportedly excessive compensation of the Company's non-employee directors. On October 22, 2018, the Company and defendant directors filed an answer to the Derivative Action. In their answer, the defendant directors denied any wrongdoing or liability in response to the allegations in the complaint. On August 16, 2019 a suggestion of bankruptcy was filed in the Derivative Action by the Company, and there has been no activity in the case since that time. Given the status and the preliminary state of the Derivative Action, the Company is unable to reasonably predict an outcome of the Derivative Action or a timeframe for its resolution. The complaint does not specify damages sought.

From time to time, the Company may be involved in lawsuits or other legal proceedings that arise in the normal course of its business. Management cannot predict the ultimate outcome of such lawsuits or claims. Management does not currently expect the outcome of any of the known claims or proceedings to individually or in the aggregate have a material adverse effect on our results of operations or financial condition. We are not aware of any material governmental proceedings against us or contemplated to be brought against us.

*Catarina Drilling Commitment*

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. The lease also creates a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. During the commitment period ending June 30, 2019, the Company drilled 13 wells that may be counted toward the next annual drilling commitment period, which began on July 1, 2019. Furthermore, our 2019 capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

*Comanche Drilling Commitment*

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. If we fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years), we and Gavilan are jointly and severally liable for a default fee of $0.2 million for each well we do not timely complete and equip. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position.

*Palmetto Drilling Commitment*

Marathon Oil EF LLC (“Marathon”) is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

*Volume Commitments*

As is common in our industry, the Company is party to certain oil and natural gas gathering and transportation and natural gas processing agreements that obligate us to deliver a specified volume of production over a defined time horizon. If not fulfilled, the Company is subject to deficiency payments to our midstream counterparties. As of September 30, 2019, the Company had approximately $406.3 million in future commitments related to oil and natural gas gathering and transportation agreements ($140.6 million for 2019 through 2021, $128.8 million from 2022 through 2024, and $136.9 million under commitments expiring after December 31, 2024, in the aggregate) and approximately $40.5 million in future commitments related to natural gas processing agreements ($39.8 million for 2019 through 2021,

and $0.7 million from 2022 through 2024, in the aggregate) that are not recorded in the accompanying condensed consolidated balance sheets.

For the three and nine months ended September 30, 2019, the Company incurred expenses related to deficiency fees of approximately $3.6 million and $7.5 million, respectively, and for the three and nine months ended September 30, 2018, the Company incurred expenses related to deficiency fees of approximately $1.6 million and $3.8 million, respectively. These expenses are reported on the condensed consolidated statements of operations in the “Oil and natural gas production expenses” line item. We expect to incur additional expenses related to our volume commitments in connection with our reduced capital activity.

*Loss Contingencies*

To the extent we are able to assess the likelihood of a negative outcome for a contingency, whether it be the loss or impairment of an asset or the incurrence of a liability, our assessments of such likelihood range from remote to probable. If we determine that a negative outcome is probable and the amount of loss is reasonably estimable, we accrue an undiscounted liability equal to the estimated amount. If a range of probable loss amounts can be reasonably estimated and no amount within the range is a better estimate than any other amount, then we accrue an undiscounted liability equal to the minimum amount in the range. In addition, we estimate legal fees that we expect to incur associated with loss contingencies and accrue those costs when they are material and probable of being incurred.

We do not record a contingent liability when the likelihood of loss is probable but the amount cannot be reasonably estimated or when the likelihood of loss is believed to be only reasonably possible or remote. For contingencies where an unfavorable outcome is reasonably possible and the impact would be material to our consolidated financial statements, we disclose the nature of the contingency and, where feasible, an estimate of the possible loss or range of loss.

For the three and nine months ended September 30, 2019, we recorded a loss on impairment of a prepaid asset of $11.8 million.

*Other Commitments and Contingencies*

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company’s bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business, notwithstanding the filing of the Bankruptcy Petitions. In addition, the filing of the Bankruptcy Petitions may allow the Company to assume, assign or reject certain commitments as executory contracts. See “—Note 3. Chapter 11 Cases” for additional information.

**Note 18. Condensed Consolidating Financial Information**

The Company’s 7.75% Notes and 6.125% Notes have been registered with the SEC and are guaranteed by all of the Company’s subsidiaries, except for SN UR Holdings, SN Services, LLC, SN Terminal, LLC, SN Midstream, LLC, SN Comanche Manager, LLC, SN UnSub GP, SN UnSub Holdings, SN UnSub, SN Capital, LLC, Sanchez Resources, LLC, SR Acquisition I, LLC, SR Acquisition III, LLC and SR TMS, LLC which are unrestricted subsidiaries of the Company. As of September 30, 2019 such guarantor subsidiaries were 100% owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several.

Rule 3-10 of Regulation S-X requires that, in lieu of providing separate financial statements for subsidiary guarantors, condensed consolidating financial information be provided where the subsidiaries have guaranteed the debt of a registered security, where the guarantees are full, unconditional and joint and several and where the voting interest of the subsidiaries are 100% owned by the registrant.

The Company has no assets or operations independent of its subsidiaries and there are no significant restrictions upon the ability of its subsidiary guarantors to distribute funds to the Company by dividends or loans.

The following is a presentation of condensed consolidating financial information on a parent company, combined guarantor subsidiaries, combined non-guarantor subsidiaries and consolidated basis (in thousands) in

accordance with Rule 3-10 of Regulation S-X and should be read in conjunction with the condensed consolidated financial statements. The financial information may not necessarily be indicative of results of operations, cash flows or financial position had such guarantor subsidiaries operated as independent entities.

Investments in subsidiaries are accounted for by the respective parent company using the equity method for purposes of this presentation. Results of operations of subsidiaries are, therefore, reflected in the parent company’s investment accounts and earnings. The principal elimination entries set forth below eliminate investments in subsidiaries and intercompany balances and transactions. Typically in a condensed consolidating financial statement, the net income and equity of the parent company equals the net income and equity of the consolidated entity.

The guarantor subsidiaries, along with non-guarantor subsidiary SN UR Holdings, LLC in addition to Sanchez Energy Corporation, constitute Debtors in the Chapter 11 Cases. Although the filing of the Bankruptcy Petitions triggered defaults on the Debtors’ debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors’ prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code. See “—Note 3. Chapter 11 Cases” and “—Note 7. Debt” for additional information.

A summary of the condensed consolidated guarantor balance sheets as of September 30, 2019 and December 31, 2018 is presented below (in thousands):

| | September 30, 2019 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 243,889 | $ 122,817 | $ 106,561 | $ (172,357) | $ 300,910 |
| Total oil and natural gas properties, net | 60 | 1,498,844 | 717,321 | — | 2,216,225 |
| Investment in subsidiaries | 1,609,093 | — | (7,278) | (1,601,815) | — |
| Other assets | 52,146 | 259,623 | 33,906 | — | 345,675 |
| **Total Assets** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 77,254 | $ 202,889 | $ 189,010 | $ (172,357) | $ 296,796 |
| Long term liabilities | 2,370,695 | 235,861 | 181,680 | — | 2,788,236 |
| Mezzanine equity | — | — | 474,857 | — | 474,857 |
| Total stockholders' equity (deficit) | (542,761) | 1,442,534 | 4,963 | (1,601,815) | (697,079) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |

| Assets | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | December 31, 2018 | | | | |
| Total current assets | $ 473,062 | $ 69,934 | $ 146,765 | $ (316,780) | $ 372,981 |
| Total oil and natural gas properties, net | 36 | 1,600,378 | 758,711 | — | 2,359,125 |
| Investment in subsidiaries | 1,577,054 | — | (7,280) | (1,569,774) | — |
| Other assets | 22,917 | 10,307 | 54,630 | — | 87,854 |
| **Total Assets** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 155,396 | $ 282,719 | $ 226,964 | $ (316,780) | $ 348,299 |
| Long term liabilities | 2,203,546 | 51,211 | 208,599 | — | 2,463,356 |
| Mezzanine equity | — | — | 452,828 | — | 452,828 |
| Total stockholders' equity (deficit) | (285,873) | 1,346,689 | 64,435 | (1,569,774) | (444,523) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |

A summary of the condensed consolidated guarantor statements of operations for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | Three Months Ended September 30, 2019 | | | | |
| Total revenues | $ — | $ 110,327 | $ 52,219 | $ — | $ 162,546 |
| Total operating costs and expenses | (35,928) | (116,966) | (45,410) | 90 | (198,214) |
| Other income (expense) | (27,494) | 1,533 | 3,759 | (90) | (22,292) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (118,743) | (5,106) | 10,568 | — | (113,281) |
| Income tax benefit | (833) | — | — | — | (833) |
| Equity in income (loss) of subsidiaries | 5,462 | — | — | (5,462) | — |
| **Net income (loss)** | $ (112,448) | $ (5,106) | $ 10,568 | $ (5,462) | $ (112,448) |

| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | Three Months Ended September 30, 2018 | | | | |
| Total revenues | $ — | $ 197,203 | $ 80,507 | $ — | $ 277,710 |
| Total operating costs and expenses | (16,717) | (126,573) | (49,969) | 134 | (193,125) |
| Other income (expense) | (52,165) | 794 | (27,482) | (134) | (78,987) |
| **Income (loss) before income taxes** | (68,882) | 71,424 | 3,056 | — | 5,598 |
| Equity in income (loss) of subsidiaries | 74,480 | — | — | (74,480) | — |
| **Net income (loss)** | $ 5,598 | $ 71,424 | $ 3,056 | $ (74,480) | $ 5,598 |

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total revenues | $ — | $ 395,050 | $ 179,300 | $ — | $ 574,350 |
| Total operating costs and expenses | (90,587) | (358,005) | (158,412) | 360 | (606,644) |
| Other income (expense) | (123,907) | 2,188 | (23,084) | (360) | (145,163) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (269,815) | 39,233 | (2,196) | — | (232,778) |
| Income tax benefit | (23) | — | — | — | (23) |
| Equity in income (loss) of subsidiaries | 37,037 | — | — | (37,037) | — |
| **Net income (loss)** | $ (232,755) | $ 39,233 | $ (2,196) | $ (37,037) | $ (232,755) |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total revenues | $ — | $ 543,529 | $ 244,722 | $ — | $ 788,251 |
| Total operating costs and expenses | (56,967) | (334,408) | (163,833) | 406 | (554,802) |
| Other income (expense) | (200,124) | (4,469) | (62,654) | (406) | (267,653) |
| **Income (loss) before income taxes** | (257,091) | 204,652 | 18,235 | — | (34,204) |
| Equity in income (loss) of subsidiaries | 222,887 | — | — | (222,887) | — |
| **Net income (loss)** | $ (34,204) | $ 204,652 | $ 18,235 | $ (222,887) | $ (34,204) |

A summary of the condensed consolidated guarantor statements of cash flows for the nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Net cash provided by (used in) operating activities | $ (166,502) | $ 233,600 | $ 32,652 | $ — | $ 99,750 |
| Net cash provided by (used in) investing activities | 109,510 | (81,169) | (34,665) | (103,893) | (110,217) |
| Net cash provided by (used in) financing activities | 48,315 | (159,599) | (217) | 103,893 | (7,608) |
| **Net increase (decrease) in cash and cash equivalents** | (8,677) | (7,168) | (2,230) | — | (18,075) |
| **Cash and cash equivalents, beginning of period** | 68,762 | 58,429 | 70,422 | — | 197,613 |
| **Cash and cash equivalents, end of period** | $ 60,085 | $ 51,261 | $ 68,192 | $ — | $ 179,538 |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (175,586) | $ 326,068 | $ 99,044 | $ — | $ 249,526 |
| Net cash provided by (used in) investing activities | (136,290) | (396,492) | (58,365) | 137,325 | (453,822) |
| Net cash provided by (used in) financing activities | 419,714 | 128,026 | (21,881) | (137,325) | 388,534 |
| **Net increase (decrease) in cash and cash equivalents** | 107,838 | 57,602 | 18,798 | — | 184,238 |
| **Cash and cash equivalents, beginning of period** | 86,937 | 29,046 | 68,451 | — | 184,434 |
| **Cash and cash equivalents, end of period** | $ 194,775 | $ 86,648 | $ 87,249 | $ — | $ 368,672 |

**Note 19. Variable Interest Entities ("VIE")**

The Company's investment in GRHL represents a VIE that could expose the Company to losses limited to the estimated fair value of the investment. The carrying amounts of the investment in GRHL, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was in each case approximately $7.3 million. The Company did not record any earnings from its ownership of the Class A Units for the period from January 1, 2018 through September 30, 2019. The Company determined that Blackstone is the primary beneficiary of the VIE as the Company has no significant voting rights in GRHL under the LLC Agreement and no power over decisions related to the business activities of GRHL, other than operation of the properties.

The Company's investment in SNMP represents a VIE that could expose the Company to losses limited to the equity in the investment at any point in time. The carrying amounts of the investment in SNMP, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was approximately $0.8 million and $3.9 million, respectively.

Below is a comparison of the carrying amounts of the assets and liabilities of the VIE and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Beginning balance | $ 11,189 | $ 32,507 |
| Gain (loss) from change in fair value of investment in SNMP | (3,068) | (21,318) |
| Maximum exposure to loss | $ 8,121 | $ 11,189 |

**Note 20. Leases**

We determine if an arrangement is a lease at inception. To the extent that we determine an arrangement represents a lease, we classify that lease as an operating lease or a finance lease. We currently do not have any finance leases. We capitalize our operating leases on our consolidated balance sheet through a ROU asset and a corresponding lease liability. ROU assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. Short term leases that have an initial term of one year or less are not capitalized but are disclosed below. Short term lease costs exclude expenses related to leases with a lease term of one month or less.

Our operating leases are reflected as operating lease ROU assets, short term operating lease liabilities and long term operating lease liabilities on our consolidated balance sheet. Operating lease ROU assets and liabilities are recognized at the commencement date of an arrangement based on the present value of lease payments over the lease term. In addition to the present value of lease payments, the operating lease ROU asset also includes any lease payments

made to the lessor prior to lease commencement less any lease incentives and initial direct costs incurred. Lease expense for operating lease payments is recognized on a straight-line basis over the lease term.

***Nature of Leases***

We lease property including corporate and field offices and facilities, vehicles, field equipment, and midstream gathering and processing facilities to support our operations. A more detailed description of our significant lease types is included below.

*Midstream Gathering and Processing Facilities*

We engage in various types of transactions with midstream entities to gather and/or process our products, leveraging integrated systems and facilities wholly owned by the midstream counterparty. Under certain of these arrangements, we utilize substantially all of the underlying gathering system or processing facility capacity and we have, therefore, concluded that those underlying assets meet the definition of an identified asset. These contracts have non-cancellable lease terms of approximately four to 17 years and continue thereafter on a renewable basis subject to termination by either party with notice. Consequently, certain of our gathering and/or processing contracts represent an operating lease of the underlying midstream system or facilities with a lease term that equals the primary non-cancellable contract term.

*Real Estate*

We rent space from third parties for our corporate and field office locations and lease acreage for general corporate purposes. Our office and acreage lease agreements are structured with non-cancellable lease terms of three to 10 years. We have concluded that these agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

*Field Equipment and Vehicles*

We enter into daywork contracts for drilling rigs with third parties to support our drilling activities. Our drilling rig arrangements are typically structured with a term that is in effect until drilling operations are completed on a specified well or well pad in accordance with the development plan. Upon mutual agreement with the contractor, we typically have the option to extend the contract term for additional wells or well pads by providing thirty days' notice prior to the end of the original contract term. We have concluded that our drilling rig arrangements represent operating leases with lease terms of six to 18 months. For those arrangements with terms of less than one year, we have determined those arrangements to be short term operating leases. Due to the continuously evolving nature of our drilling schedules and the potential volatility in commodity prices in an annual period, our strategy to enter into shorter term drilling rig arrangements allows us the flexibility to respond to changes in our operating and economic environment. We exercise our discretion in choosing to extend or not extend contracts on a rig-by-rig basis depending on the conditions present at the time the contract expires. At the time of contract commencement, we have determined we cannot conclude with reasonable certainty if we will choose to extend the contract beyond its original term. Pursuant to the successful efforts method of accounting, our net share of these costs is capitalized as part of oil and natural gas properties on the balance sheet as incurred.

We rent compressors from third parties to facilitate the downstream movement of our production from our drilling operations to market. Our compressor arrangements typically have non-cancellable lease terms of 12 to 24 months and continue thereafter on a month-to-month basis subject to termination by either party with thirty days' notice. We have concluded that our compressor arrangements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

We rent our vehicle fleet for our drilling and operations personnel. Our vehicle agreements have non-cancellable lease terms of 18 months. We have concluded that our vehicle agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

***Significant Judgments***

*Discount Rate*

Our leases typically do not provide an implicit rate. Accordingly, we are required to use our estimated incremental borrowing rate in determining the present value of lease payments based on the information available at commencement date. Our estimated incremental borrowing rate reflects a reasonable projection of the interest that we would expect to pay to borrow, on a collateralized basis, over a similar term, an amount equal to the lease payments in a similar economic environment. The Company gives consideration to various factors, including the terms of the Company's outstanding debt instruments, publicly available data for instruments with similar characteristics and other information, together with internally generated estimates, assumptions and judgment to determine the Company's incremental borrowing rate for purposes of making these calculations.

*Practical Expedients and Accounting Policy Elections*

Certain of our lease arrangements include lease and non-lease components. For all existing asset classes with multiple component types, we have utilized the practical expedient to not separate lease and non-lease components. Accordingly, we account for the lease and non-lease components in an arrangement as a single lease component.

In addition, for all existing asset classes, we have elected an accounting policy to not apply the recognition requirements of Topic 842 to our short term leases. Accordingly, we recognize lease payments related to our short term leases in our statement of operations, which has not changed from our prior recognition.

The following are components of our lease expense for the three and nine months ended September 30, 2019, the majority of which are included in oil and natural gas production expenses on the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, 2019 | Nine Months Ended September 30, 2019 |
|---|---|---|
| Operating lease expense | $ 25,069 | $ 74,997 |
| Short term and variable lease expense | 4,688 | 20,657 |
| Total lease expense | $ 29,757 | $ 95,654 |
| | | |
| Operating lease cost[(1)] | $ 3,118 | $ 6,175 |
| Short term lease cost[(1)] | 191 | 1,187 |
| Variable lease cost[(1)] | — | 65 |
| Total lease cost | $ 3,309 | $ 7,427 |

(1) Represents capital expenditures related to the use of drilling rigs for the three and nine months ended September 30, 2019 which are capitalized as part of oil and natural gas properties on our condensed consolidated balance sheets.

Other information related to our operating leases are as follows (in thousands, except lease term and discount rate):

| | Nine Months Ended September 30, 2019 |
|---|---|
| Operating cash flows from operating leases | $ 95,654 |
| Investing cash flows from operating leases | 7,427 |
| ROU assets obtained in exchange for operating lease obligations | 361,648 |
| Amortization of ROU assets | (81,509) |
| | |
| Weighted average remaining lease term (years) | 3.1 |
| Weighted average discount rate | 10% |

As of September 30, 2019, minimum future payments, including imputed interest, for our long term operating leases under ASC 842 are as follows (in thousands):

| | | |
|---|---|---|
| October 1, 2019 through December 31, 2019 | $ | 34,228 |
| 2020 | | 119,293 |
| 2021 | | 80,513 |
| 2022 | | 60,269 |
| 2023 | | 26,847 |
| Thereafter | | 9,797 |
| Total lease payments | | 330,947 |
| Less: Imputed interest | | 47,463 |
| Total lease liabilities | $ | 283,484 |

As of December 31, 2018, undiscounted minimum future payments for our long term operating leases under ASC 840 were as follows (in thousands):

| | | |
|---|---|---|
| 2019 | $ | 100,640 |
| 2020 | | 84,472 |
| 2021 | | 52,499 |
| 2022 | | 31,682 |
| 2023 | | 11,631 |
| Thereafter | | 8,467 |
| Total lease payments | $ | 289,391 |

**Note 21. Subsequent Events**

On October 22, 2019, the Debtors filed a motion for entry of an order authorizing rejection of an office sublease. The Bankruptcy Court has not yet ruled on the motion.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing in Part I, Item 1 of this Quarterly Report on Form 10-Q and information contained in our 2018 Annual Report. The following discussion contains "forward-looking statements" that reflect our future plans, estimates, beliefs and expected performance. Please see "Cautionary Note Regarding Forward-Looking Statements."*

**Business Overview**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of oil and natural gas resources in the onshore United States. We are currently focused on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas, and we also have other producing properties and undeveloped acreage, including in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, as well as other locations in Louisiana and Texas, which may offer potential future development opportunities. As of September 30, 2019, we held approximately 435,000 gross (233,000 net) leasehold acres in the Eagle Ford Shale, where we plan to invest the majority of our 2019 capital budget. We continually evaluate opportunities to manage our overall portfolio, which may include the acquisition of additional properties in the Eagle Ford Shale or other producing areas and, from time to time, the divestiture of non-core assets. Our successful acquisition or divestiture of such properties will generally depend on the circumstances and market conditions at the time we consider such opportunities. As discussed below, we are currently operating our business as debtors-in-possession in accordance with the applicable provisions of the Bankruptcy Code (as defined below).

At this time, we are primarily focused on lowering cash costs across our business and reducing our financial leverage, with an objective of maximizing our liquidity position and improving our balance sheet.

As previously disclosed, the Company substantially reduced its capital expenditures from approximately $593 million in 2018 to a budgeted amount of $100 to $150 million for 2019 in order to preserve capital in the current low and uncertain commodity price environment. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In addition, commodity prices remain depressed, and the Company's oil, natural gas and NGL production has declined in connection with reduced development activity. Lower commodity prices and declining production have adversely impacted the Company's revenues and cash flow. This has led to a reduction in forecasted liquidity, which has affected the Company's ability to service the significant obligations associated with its high level of indebtedness.

To improve its liquidity and position the Company for future success, Sanchez Energy undertook a review of various strategic alternatives with its advisors and Board of Directors (the "Board") beginning in 2018. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes (as defined below) for a 30-day grace period, which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. The Debtors filed their Bankruptcy Petitions (as defined below) on August 11, 2019, prior to the expiration of the grace period. Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility (as defined below) on an interim basis, as discussed below.

***Voluntary Reorganization Under Chapter 11***

On August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC ("SN Maverick") and SN UR Holdings, LLC ("SN UR Holdings") (collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors filed a motion with the Bankruptcy Court seeking to jointly administer all of the Debtors' chapter 11 cases (the "Chapter 11 Cases") under the caption *In re Sanchez Energy Corporation*, Case No. 19-34508. The Debtors also filed various motions with the Bankruptcy Court, which were approved, seeking authorization to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Additionally, the Bankruptcy Court has granted certain other relief requested by the Debtors, including interim relief allowing the Company to use its cash to fund the Chapter 11 Cases and to borrow an initial $50 million pursuant to the DIP Facility (as defined below), and giving the Company the authority to, among other things, continue to pay certain vendors and other third parties. During the pendency of the Chapter 11 Cases, all transactions outside the ordinary course of the Company's business require prior approval of the Bankruptcy Court. The Company expects ordinary course operations to continue substantially uninterrupted during the Chapter 11 Cases. SN UnSub, its general partner, and certain other unrestricted subsidiaries of the Company are not included in the Chapter 11 cases and are classified as "non-Debtors."

Subject to certain exceptions, under the Bankruptcy Code, the filing of the Bankruptcy Petitions automatically enjoined, or stayed, the continuation of most judicial or administrative proceedings or filing of other actions against the Debtors or their property to recover, collect or secure a claim arising prior to the date of the Bankruptcy Petitions. Accordingly, although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code.

Under the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full before the holders of the Company's existing stockholders are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of settlements, if any, they will receive. A plan of reorganization could result in holders of the Debtors' liabilities and/or stockholders receiving no settlement on account of their interests and cancellation of their holdings.

For the duration of the Company's Chapter 11 Cases, the Company's operations and ability to develop and execute its business plan are subject to the risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2019. As a result of these risks and uncertainties, the number, amount or composition, as applicable, of the Company's stock and stockholders, assets, liabilities, officers and/or directors could be significantly different following the outcome of the Chapter 11 Cases, and the description of the Company's operations, properties and capital plans included in this quarterly report may not accurately reflect its operations, properties and capital plans following the Chapter 11 Cases.

***Executory Contracts***

Subject to certain exceptions, under the Bankruptcy Code, the Debtors may assume, assign or reject certain executory contracts and unexpired leases subject to the approval of the Bankruptcy Court and certain other conditions. Generally, the rejection of an executory contract or unexpired lease is treated as a prepetition breach of such executory contract or unexpired lease and, subject to certain exceptions, relieves the Debtors of performing their future obligations under such executory contract or unexpired lease but entitles the contract counterparty or lessor to a prepetition general unsecured claim for damages caused by such deemed breach. Counterparties to such rejected contracts or leases may assert unsecured claims in the Bankruptcy Court against the applicable Debtors' estate for such damages. Generally, the assumption of an executory contract or unexpired lease requires the Debtors to cure existing monetary defaults under such executory contract or unexpired lease and provide adequate assurance of future performance. Accordingly, any description of an executory contract or unexpired lease with the Debtor in this quarterly report, including where

applicable a quantification of a Debtor's obligations under any such executory contract or unexpired lease with the Debtor, is qualified by any overriding rejection rights such Debtor has under the Bankruptcy Code. Further, nothing herein is or shall be deemed an admission with respect to any claim amounts or calculations arising from the rejection of any executory contract or unexpired lease and the Debtors expressly preserve all of their rights with respect thereto. With limited exceptions, the Debtors have not yet made formal determinations with respect to the assumption or rejection of executory contracts or unexpired leases.

***Process for Plan of Reorganization***

Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company, the other Debtors, their creditors or other stakeholders, or at all.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization (the "Exclusive Filing Period"), and if the Debtors' plan of reorganization is filed within the Exclusive Filing Period, the Debtors also have the exclusive right for 180 days after the Petition Date to solicit acceptances and rejections regarding such plan of reorganization, in each case, subject to extension for cause by the Bankruptcy Court. If the Exclusive Filing Period lapses, any party in interest may file a plan of reorganization for any of the Debtors.

In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be confirmed by the Bankruptcy Court in order to become effective. A plan of reorganization would be accepted by holders of claims against and equity interests in the Company if (i) more than one-half in number and at least two-thirds in dollar amount of allowed claims actually voting in each class of claims impaired by the plan have voted to accept the plan and (ii) at least two-thirds in amount of allowed equity interests actually voting in each class of equity interests impaired by the plan has voted to accept the plan. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan.

Under certain circumstances set forth in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class (i.e., secured or unsecured claims, subordinated or senior claims, preferred or common stock). Generally, with respect to common stock or preferred stock interests, a plan may be "crammed down" even if the stockholders receive no recovery if the proponent of the plan demonstrates that (1) no class junior to the common stock or class or series of preferred stock, as applicable, is receiving or retaining property under the plan and (2) no class of claims or interests senior to the common stock or class or series of preferred stock, as applicable is being paid more than in full.

The timeline for the Debtors to file a plan of reorganization will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions, that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan will be implemented successfully.

***Magnitude of Potential Claims***

On September 24, 2019, the Debtors filed with the Bankruptcy Court schedules and statements setting forth, among other things, our assets and liabilities, subject to the assumptions filed in connection therewith (the "Schedules and Statements"). The Debtors may subsequently decide to amend or modify the Schedules and Statements.

On October 24, 2019, the Debtors filed a motion to set a bar date to assist with the claims reconciliation process, proposing a bar date of December 13, 2019 and a governmental bar date of February 7, 2020. Through the claims resolution process, differences in amounts scheduled by the Debtors and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court where appropriate. In light of the potential number and amount of claims filed, the claims resolution process may take considerable time to complete, and we expect that it will continue after our emergence from bankruptcy. Accordingly, the ultimate number and amount of allowed claims is not presently known, nor can the ultimate recovery with respect to allowed claims presently be ascertained.

***Effect of Filing on Creditors and Stockholders***

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full or consensual agreement reached between parties before the holders of our existing common stock or preferred stock are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock and preferred stock, receiving no distribution on account of their interests and cancellation of their holdings. As discussed above, if certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by the holders of our common stock or preferred stock and notwithstanding the fact that such holders do not receive or retain any property on account of their equity interests under the plan. Because of such possibilities, the value of the Debtors' securities is highly speculative.

***Appointment of Creditors' Committee***

On August 26, 2019, the Bankruptcy Court appointed the official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors.

***Ability to Continue as a Going Concern***

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility should provide sufficient liquidity for the Company during the pendency of the Chapter 11 Cases. However, the significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described above raise substantial doubt about the Company's ability to continue as a going concern. The condensed consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities and commitments in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of the going concern uncertainty. If the Company cannot continue as a going concern, adjustments to the carrying values and classification of its assets and liabilities and the reported amounts of income and expenses could be required and could be material.

***Covenant Violations***

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under its Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt.

Additionally, the filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties

terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***DIP Facility***

In connection with the Bankruptcy Petitions, the Debtors filed a motion seeking, among other things, interim and final approval of debtor-in-possession financing on terms and conditions set forth in a proposed Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as amended, supplemented or otherwise modified, the "DIP Facility") among Sanchez Energy Corporation, as borrower, the financial institutions or other entities from time to time parties thereto, as lenders (the "DIP Lenders"), and Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent (the "DIP Agent"). The initial lenders under the DIP Facility are members of an ad hoc group of certain holders of the 7.25% Senior Secured Notes (the "Secured Noteholders") or affiliates of such Secured Noteholders. The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders (as defined in the DIP Facility) entered into an amendment to the DIP Facility (the "Amendment"). By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the DIP Facility (the "Final DIP Order") and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders. The DIP Facility, as it was approved on an interim basis, contains the terms as set forth below (although certain of the below terms are subject to modification prior to final approval of the DIP Facility):

- a senior secured priming superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $350 million, consisting of (i) a new money, multiple draw term loan facility in the amount of $175 million (the "New Money DIP Loans"), backstopped by certain Secured Noteholders (the "Backstop Lenders"), $50 million of which was available on an interim basis upon entry of the Bankruptcy Court's interim order (the "Interim DIP Order"); and (ii) a refinancing term loan effectuated by way of a conversion of $175 million of 7.25% Senior Secured Notes into obligations under the DIP Facility (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans");

- borrowings under the (i) New Money DIP Loans will bear interest at a rate per annum equal to adjusted LIBOR (subject to a 2% floor) plus 8.00% and (ii) Roll-Up Loans will bear interest at the non-default rate of the 7.25% Senior Secured Notes of 7.25% per annum;

- the Company has paid the Backstop Lenders a 5.00% fee in cash in exchange for their commitment to backstop the New Money DIP Loans, and the Company is also required to pay (i) the DIP Lenders a 1.00% fee on the New Money DIP Loans payable upon the Debtors' emergence from the Chapter 11 Cases and (ii) the DIP Lenders a 0.5% per annum commitment fee on undrawn New Money DIP Loans payable monthly;

- the maturity of the DIP Facility is nine months after the Petition Date, subject to earlier termination upon occurrence of customary defaults;

- the proceeds of the New Money DIP Loans may be used for: (i) transaction costs, fees and expenses; (ii) working capital and general corporate purposes; (iii) bankruptcy-related costs and expenses (including restructuring fees and adequate protection payments); and (iv) subject to final approval of the Bankruptcy Court, refinancing all amounts existing under the Company's existing Credit Agreement;

- the obligations under the New Money DIP Loans will be secured (subject to the Carve-Out (as defined below) and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim; (ii) a perfected first priority senior security interest and lien on all unencumbered property (subject to certain exceptions set forth in the DIP Facility and/or the Interim DIP Order); (iii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and/or the Interim DIP Order); and (iv) a perfected junior lien on certain other property subject to valid, perfected and unavoidable prepetition liens;

- the obligations under the Roll-Up Loans will be secured (subject to the Carve-Out and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim and (ii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and the Interim DIP Order);

- the Debtors' Chapter 11 Cases are subject to certain milestones, including with respect to the filing and approvals of a disclosure statement and a Chapter 11 plan of reorganization;

- the DIP Facility will provide for certain customary covenants applicable to the Company, including covenants requiring (i) minimum liquidity in an amount of $15 million, subject to certain exclusions; (ii) beginning the first four-week period ending after the Petition Date, compliance with an approved operating debtor-in-possession budget (the "DIP Budget"), subject to permitted variance of 15% (with variance of 25% for midstream-related disbursements for the first four-week test period), tested on a rolling four-week basis on disbursements excluding certain professional fees, DIP Facility interest and fees and adequate protection payments; and (iii) delivery of a rolling 13-week operating cash flow forecast updated every four weeks and a weekly DIP Budget variance report; and

- the Debtors' obligations to the DIP Lenders and the liens and superpriority claims are subject in each case to a carve-out (the "Carve-Out") that accounts for certain administrative, court and legal fees payable in connection with the Chapter 11 Cases.

In addition, the Interim DIP Order contemplates that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the Senior Secured 7.25% Notes, and are required to continue to make the semi-annual interest payments as they come due under the indenture for the Senior Secured 7.25% Notes during the Chapter 11 Cases.

There can be no assurance that the DIP Facility will be approved on a final basis, on the terms described above, or at all. We are in ongoing conversations with the DIP Lenders and other stakeholders regarding the terms of the Final DIP Order and the DIP Facility.

***Derivative Contracts***

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Bankruptcy Petitions, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***Basis of Presentation***

The condensed consolidated financial statements have been prepared in accordance with U.S. GAAP.

***Core Properties***

***Eagle Ford Shale***

We and our predecessor entities have a long history in the Eagle Ford Shale, where, as of September 30, 2019, we had assembled approximately 435,000 gross (233,000 net) leasehold acres.

In 2017, we acquired approximately 252,000 gross (61,000 net) acres in Dimmit, Webb, La Salle, Zavala and Maverick counties, Texas (the "Comanche Acquisition"), representing a 24% working interest in the asset, which we refer to as the Comanche area.

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing on September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. As of August 31, 2018, the Company had achieved a 30-well bank at Comanche that was applied toward the annual development commitment for the period that extended from September 1, 2018 to August 31, 2019. The Company completed and equipped an additional 63 wells at Comanche between September 1, 2018 and August 31, 2019, resulting in a total of 93 wells that were applied toward the annual development commitment of 60 wells. Accordingly, the Company has met its annual development commitment for the period September 1, 2018 to August 31, 2019, and has completed and equipped 30 wells that can be applied toward the development commitment for the period September 1, 2019 to August 31, 2020. The Company completed and equipped an additional six wells at Comanche between September 1, 2019 and September 30, 2019. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position. SN Maverick is currently engaged in a disagreement with Gavilan Resources, LLC ("Gavilan"), an entity controlled by Blackstone, regarding operations of the Comanche Assets under the joint development agreement with Gavilan (the "JDA"). Among other things, Gavilan has asserted that SN Maverick is in default of the JDA and Gavilan has the right to take over operations of the Comanche Assets. Although SN Maverick disputes Gavilan's assertions and has asserted defenses to the allegations and its own counterclaims against Gavilan, if Gavilan prevails in the disagreement, SN Maverick would lose its rights to operate the Comanche Assets and certain rights of SN Maverick under the JDA, including the ability to vote or appoint representatives to the operating committee or to transfer the Comanche Assets, among others. Furthermore, Gavilan has attempted to initiate a division of operatorship under the JDA pursuant to which operatorship of the Comanche Assets would be divided between Gavilan (or a third-party operator) and SN Maverick in accordance with certain procedures specified in the JDA. Arbitration regarding this dispute was initiated by Gavilan with the American Arbitration Association on February 18, 2019, seeking, among other things, a declaration that SN Maverick is in default under the JDA, and the Company submitted its answer and counterclaims on February 26, 2019 seeking, among other things, a declaration that Gavilan is in default under the JDA. Loss of operatorship of some portion or all of the Comanche Assets, or a finding that SN Maverick is in default under the JDA, would have a material adverse effect on our business, financial condition or results of operations. On the Petition Date, the arbitrator was notified by letter of the filing of the Bankruptcy Petitions and of the automatic stay under the Bankruptcy Code.

We have approximately 106,000 net acres in Dimmit, La Salle and Webb counties, Texas representing a 100% working interest, which we refer to as the Catarina area.

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. For the commitment period ending June 30, 2019, the Company drilled a total of 63 wells toward the annual drilling commitment of 50 wells. Accordingly, the Company met all of its 50-well annual drilling commitment for the period July 1, 2018 to June 30, 2019 and initiated a bank of 13 wells that will be counted toward the next annual drilling commitment period. We drilled four additional wells in the Catarina area during the third quarter 2019, bringing our total to 17 wells toward the commitment period July 1, 2019 to June 30, 2020. Furthermore, our 2019 drilling activities from July 1, 2019 to the present date and our capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

We have approximately 58,000 net acres in Dimmit, Frio, La Salle, and Zavala counties, Texas, which we refer to as the Maverick area, which we believe lies in the black oil window.

We have approximately 7,600 net acres in Gonzales County, Texas, which we refer to as the Palmetto area, which we believe lies in the volatile oil window.

Marathon Oil EF LLC ("Marathon") is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

***Tuscaloosa Marine Shale***

As of September 30, 2019, we owned approximately 12,400 net acres in the TMS. Although TMS development is currently challenged due to well costs and commodity prices, we believe that the TMS play may offer significant future development potential as changes in technology, commodity prices and service costs occur.

***Recent Developments***

Please see the first paragraph under "*Business Overview*," "*—Voluntary Reorganization Under Chapter 11*" and "*—DIP Facility*" above, in addition to the other matters discussed above regarding our Bankruptcy Petitions and related matters.

***UnSub Tolling Agreement***

On August 10, 2019, the Company entered into a tolling agreement (the "Tolling Agreement") among Sanchez Energy Corporation, SN UR Holdings, SN EF UnSub Holdings, LLC ("SN UnSub Holdings"), SN Maverick (together with Sanchez Energy Corporation, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP (together with GSO LLC, the "GSO Parties").

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated March 1, 2017 (the "LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any Investor Redemption Event (as such term is defined in the LLC Agreement) will be tolled during the Tolling Period.

The Tolling Agreement expires on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; (2) the failure of Sanchez Energy Corporation, SN Maverick or SN UR Holdings, to the extent such party has commenced a Proceeding (the earliest commencement date of a Proceeding by Sanchez Energy Corporation, SN Maverick or SN UR Holdings, as applicable, the "Initial Petition Date"), to obtain a bankruptcy court order approving the Tolling Agreement by the 20th day after the Initial Petition Date (the "Order Deadline"), unless the parties agree to extend such date by written agreement (the Order Deadline was subsequently extended to September 24, 2019); or (3) the effectiveness of delivery by any party of a written notice of

termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

On September 19, 2019, the Bankruptcy Court authorized the Debtors' performance of their obligations under the Tolling Agreement.

***Outlook***

We and other companies in our industry face significant risks related to business operations, the prices we receive for our production, competition for employees and capital, and other factors which could materially impact our results of operations and financial condition. Although commodity and capital markets showed signs of improvement, oil prices experienced a significant decline in the fourth quarter 2018 and have remained volatile in 2019 through the present date. As a result, we continue to manage our business for the potential of ongoing commodity price volatility. This volatility has significantly influenced our industry and operating environment in the past, and we believe it may again in the future. We face continuing uncertainty with respect to the demand for our products, commodity prices, service availability and costs, and our ability to fund capital projects, along with significant challenges associated with our financial position. The Company set its 2019 capital budget at a range of $100 million to $150 million for development and optimization activities in our core areas, which represents a substantial reduction from capital expenditures of approximately $593 million in 2018. We generally seek to remain flexible in our business strategy to make changes to this estimated capital budget as the commodity markets and our overall financial and business position evolve over time. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In November 2018, we engaged Moelis & Company LLC as financial advisor to explore strategic alternatives to strengthen our balance sheet and maximize the value of the Company. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes for a 30-day grace period which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. On the Petition Date, prior to the expiration of the grace period, the Company and other Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility on an interim basis. Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company and the other Debtors, their creditors or other stakeholders, or at all.

**Results of Operations**

***Three Months Ended September 30, 2019 Compared to Three Months Ended September 30, 2018***

**Net Production and Revenues from Production**

The following table summarizes production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Three Months Ended September 30, | | Decrease 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| **Net Production:** | | | | |
| Oil (MBbls) | 1,926 | 2,300 | (374) | (16)% |
| Natural gas liquids (MBbls) | 2,029 | 2,473 | (444) | (18)% |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | (13)% |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | (16)% |
| **Average Sales Price Excluding Derivatives[1]:** | | | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 | $ (15.07) | (21)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.33 | 3.00 | (0.67) | (22)% |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 | $ (12.33) | (32)% |
| **Average Sales Price Including Derivatives[2]:** | | | | |
| Oil ($ per Bbl) | $ 53.64 | $ 55.19 | $ (1.55) | (3)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.55 | 3.19 | (0.64) | (20)% |
| Oil equivalent ($ per Boe) | $ 26.49 | $ 34.29 | $ (7.80) | (23)% |
| **Revenues from Production[1][3]:** | | | | |
| Oil sales | $ 106,016 | $ 161,243 | $ (55,227) | (34)% |
| Natural gas liquids sales | 22,675 | 69,995 | (47,320) | (68)% |
| Natural gas sales | 26,572 | 39,460 | (12,888) | (33)% |
| Total revenues from production | $ 155,263 | $ 270,698 | $ (115,435) | (43)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Three Months Ended September 30, 2019 | Three Months Ended September 30, 2018 |
|---|---|---|
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 917 | 1,011 |
| Catarina | 672 | 891 |
| Maverick | 220 | 347 |
| Palmetto | 95 | 25 |
| TMS / Other | 22 | 26 |
| Total | 1,926 | 2,300 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 807 | 932 |
| Catarina | 1,191 | 1,531 |
| Maverick | 4 | 3 |
| Palmetto | 27 | 7 |
| Total | 2,029 | 2,473 |
| **Natural gas (MMcf)** | | |
| Comanche | 4,644 | 4,895 |
| Catarina | 6,589 | 8,235 |
| Maverick | 20 | 10 |
| Palmetto | 151 | 34 |
| Total | 11,404 | 13,174 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 5,856 | 6,969 |
| Average daily production (Boe/d) | 63,652 | 75,750 |
| **Average sales price [1]:** | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 |
| Natural gas liquids ($ per Bbl) | $ 11.17 | $ 28.30 |
| Natural gas ($ per Mcf) | $ 2.33 | $ 3.00 |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.76 | $ 10.85 |
| Production and ad valorem taxes | $ 1.68 | $ 2.18 |
| General and administrative expenses | $ 3.57 | $ 3.06 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 9.75 |
| Impairment of oil and natural gas properties | $ 1.67 | $ 0.45 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 6,969 MBoe for the three months ended September 30, 2018 to 5,856 MBoe for the three months ended September 30, 2019, primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 2,498 | 1,701 | 2,758 |
| Catarina | 460 | 2,961 | 441 | 3,795 |
| Palmetto | 81 | 147 | 86 | 38 |
| Maverick | 66 | 227 | 66 | 352 |
| TMS / Other | 46 | 23 | 47 | 26 |
| Total | 2,435 | 5,856 | 2,341 | 6,969 |

For the three months ended September 30, 2019 and 2018, 33% of our production was oil, 35% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $155.3 million and $270.7 million for the three months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas for the three months ended September 30, 2019 decreased $55.2 million, $47.3 million and $12.9 million, respectively, as compared to the three months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues***. The Company recorded sales and marketing revenues of $7.3 million and $7.0 million during the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the three months ended September 30, 2018 to the three months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Three Months Ended September 30, 2019 | Production Volume Three Months Ended September 30, 2018 | Difference | Three Months Ended September 30, 2018 Average Sales Price | Revenue Decrease from Production |
|---|---|---|---|---|---|
| Oil (MBbls) | 1,926 | 2,300 | (374) | $ 70.11 | $ (26,220) |
| NGLs (MBbls) | 2,029 | 2,473 | (444) | $ 28.30 | $ (12,567) |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | $ 3.00 | $ (5,302) |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | $ 38.84 | $ (44,089) |

| | Average Sales Price per Unit Three Months Ended September 30, 2019 | Average Sales Price per Unit Three Months Ended September 30, 2018 | Difference | Three Months Ended September 30, 2019 Production Volume | Revenue Decrease from Price |
|---|---|---|---|---|---|
| Oil (MBbls) | $ 55.04 | $ 70.11 | $ (15.07) | 1,926 | $ (29,007) |
| NGLs (MBbls) | $ 11.17 | $ 28.30 | $ (17.13) | 2,029 | $ (34,753) |
| Natural gas (MMcf) | $ 2.33 | $ 3.00 | $ (0.67) | 11,404 | $ (7,586) |
| Total oil equivalent (MBoe) | $ 26.51 | $ 38.84 | $ (12.33) | 5,856 | $ (71,346) |

Additionally, a 10% increase or decrease in our average realized sales prices for the three months ended September 30, 2019, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $15.5 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Three Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| Oil and natural gas production expenses | $ 74,740 | $ 75,594 | $ (854) | (1)% |
| Exploration expenses | 164 | 2,698 | (2,534) | (94)% |
| Sales and marketing expenses | 6,672 | 7,239 | (567) | (8)% |
| Production and ad valorem taxes | 9,867 | 15,221 | (5,354) | (35)% |
| Depreciation, depletion, amortization and accretion | 57,864 | 67,944 | (10,080) | (15)% |
| Impairment of oil and natural gas properties | 9,761 | 3,117 | 6,644 | * |
| General and administrative expenses[(1)] | 20,915 | 21,312 | (397) | (2)% |
| Prepetition restructuring charges | 18,231 | — | 18,231 | * |
| Total operating costs and expenses | 198,214 | 193,125 | 5,089 | 3 % |
| | | | | |
| Interest income | 221 | 1,130 | (909) | (80)% |
| Other expense | (12,829) | (7,677) | (5,152) | 67 % |
| Interest expense | (22,884) | (44,154) | 21,270 | (48)% |
| Net gains (losses) on commodity derivatives | 13,200 | (28,286) | 41,486 | * |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (833) | — | (833) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.1 million and non-cash stock-based compensation benefit $1.4 million for the three months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses decreased to $74.7 million ($12.76 per Boe) for the three months ended September 30, 2019, as compared to $75.6 million ($10.85 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the three months ended September 30, 2018, the Company recognized a benefit of approximately $5.9 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $81.5 million ($11.70 per Boe). The decrease in oil and natural gas production expenses from the three months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the three months ended September 30, 2019 is primarily attributable to a decrease in production. The increase in oil and natural gas production expenses per Boe for the three months ended September 30, 2019 compared to the three months ended September 30, 2018 is primarily related to a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $0.2 million and $2.7 million during the three months ended September 30, 2019 and 2018, respectively. The decrease in our exploration expenses for the three months ended September 30, 2019 as compared to the same period in 2018 was primarily due to a decrease in activity leading to reduced exploratory geological and geophysical seismic costs.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $6.7 million and $7.2 million for the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in

support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $9.9 million ($1.68 per Boe) and $15.2 million ($2.18 per Boe) for the three months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the third quarter 2019 compared to the same period in 2018 was primarily due to the decrease in production taxes based on the corresponding decrease in revenue during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $10.0 million from $67.9 million ($9.75 per Boe) for the three months ended September 30, 2018 to $57.9 million ($9.88 per Boe) for the three months ended September 30, 2019. The decrease in expense represented an approximate $10.8 million decrease from lower production which was partially offset by a $0.8 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We did not record proved property impairments for the three months ended September 30, 2019 or 2018. We recorded impairment of $9.8 million and $3.1 million to our unproved oil and natural gas properties for the three months and ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $20.9 million ($3.57 per Boe) for the three months ended September 30, 2019 compared to $21.3 million ($3.06 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $18.2 million for the three months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the three months ended September 30, 2018.

***Other Expense.*** For the three months ended September 30, 2019 and 2018, respectively, other expense totaled $12.8 million compared to other expense of $7.7 million for the three months ended September 30, 2018. The other expense during the three months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset. Additionally, we experienced a loss of $4.3 million associated with the decrease in fair value of the investment in SNMP, which was partially offset by a gain of $0.6 million associated with the increase in fair value of the investment in Lonestar. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets, and we experienced losses of $10.7 million and $1.0 million associated with the decreases in fair value of the investments in Lonestar and SNMP, respectively. Additionally, for the three month period ended September 30, 2019, we recorded $2.4 million of income from equipment rentals, we did not record any dividend income from the SNMP common units and we did not experience any gains or losses on embedded derivatives. For the three months ended September 30, 2018, we recorded income from equipment rentals of $3.0 million, dividend income of $1.1 million from the SNMP common units, and a loss on embedded derivatives of $1.1 million.

***Interest Expense.*** For the three months ended September 30, 2019, interest expense totaled $22.9 million and included $2.0 million in amortization of debt issuance costs. For the three months ended September 30, 2018, interest expense totaled $44.2 million and included $2.9 million in amortization of debt issuance costs. As of the Petition Date we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-

annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the three months ended September 30, 2019, we recognized a net gain of $13.2 million on our commodity derivative contracts, which included mark-to-market gains on unsettled oil derivatives of $15.8 million and mark-to-market losses on unsettled natural gas derivatives of $2.5 million. In addition, during the three months ended September 30, 2019, we experienced net settlement losses of $0.1 million, which included settlement losses of $2.7 million on our oil derivative contracts and settlement gains of $2.6 million on our natural gas derivative contracts. The mark-to-market gains and losses were a result of the decreases and increases, respectively, in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses and gains during the period were primarily a result of increases and decreases, respectively, in commodity prices from the time the positions were entered into until the time of settlement. During the three months ended September 30, 2018, we recognized a net loss of $28.3 million on our commodity derivative contracts, which included mark-to-market gains on our oil derivative contracts of $6.0 million and mark-to-market losses on our natural gas derivative contracts of $2.5 million. In addition, during the three months ended September 30, 2018, we experienced settlement losses on our oil derivative contracts of $34.3 million partially offset by settlement gains of $2.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | | Three Months Ended September 30, 2019 |
|---|---|---|
| DIP lender fee on initial borrowing | $ | 8,814 |
| DIP Facility costs | | 4,512 |
| Legal and other professional advisory fees | | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | | 30,424 |
| Reorganization items | $ | 55,321 |

***Income Tax Benefit.*** For the three months ended September 30, 2019, the Company recorded an income tax benefit of $0.8 million, and our effective tax rate was approximately 0.7%. The Company did not record an income tax expense or benefit for the three months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

*Nine Months Ended September 30, 2019 Compared to Nine Months Ended September 30, 2018*

**Net Production and Revenues from Production**

The following table summarizes net production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Nine Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| **Net Production:** | | | | |
| Oil (MBbls) | 6,375 | 7,198 | (823) | (11)% |
| Natural gas liquids (MBbls) | 6,539 | 7,363 | (824) | (11)% |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | (11)% |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | (11)% |
| **Average Sales Price Excluding Derivatives[(1)]:** | | | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 | $ (8.89) | (14)% |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.75 | 2.96 | (0.21) | (7)% |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 | $ (6.71) | (19)% |
| **Average Sales Price Including Derivatives[(2)]:** | | | | |
| Oil ($ per Bbl) | $ 55.08 | $ 53.75 | $ 1.33 | 2 % |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.82 | 3.16 | (0.34) | (11)% |
| Oil equivalent ($ per Boe) | $ 28.78 | $ 32.32 | $ (3.54) | (11)% |
| **Revenues from Production[(1)(3)]:** | | | | |
| Oil sales | $ 362,424 | $ 473,178 | $ (110,754) | (23)% |
| Natural gas liquids sales | 92,891 | 175,833 | (82,942) | (47)% |
| Natural gas sales | 100,932 | 122,330 | (21,398) | (17)% |
| Total revenues from production | $ 556,247 | $ 771,341 | $ (215,094) | (28)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 2,962 | 3,350 |
| Catarina | 2,435 | 2,491 |
| Maverick | 713 | 1,201 |
| Palmetto | 203 | 82 |
| TMS / Other | 62 | 74 |
| Total | 6,375 | 7,198 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 2,543 | 2,993 |
| Catarina | 3,931 | 4,325 |
| Maverick | 13 | 20 |
| Palmetto | 52 | 25 |
| Total | 6,539 | 7,363 |
| **Natural gas (MMcf)** | | |
| Comanche | 14,176 | 16,429 |
| Catarina | 22,123 | 24,716 |
| Maverick | 73 | 94 |
| Palmetto | 285 | 134 |
| Total | 36,657 | 41,373 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 19,024 | 21,457 |
| Average daily production (Boe/d) | 69,685 | 78,597 |
| **Average sales price [(1)]:** | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 |
| Natural gas liquids ($ per Bbl) | $ 14.21 | $ 23.88 |
| Natural gas ($ per Mcf) | $ 2.75 | $ 2.96 |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.17 | $ 10.49 |
| Production and ad valorem taxes | $ 1.82 | $ 2.00 |
| General and administrative expenses | $ 3.48 | $ 3.41 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 8.83 |
| Impairment of oil and natural gas properties | $ 1.20 | $ 0.20 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 21,457 MBoe for the nine months ended September 30, 2018 to 19,024 MBoe for the nine months ended September 30, 2019 primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 7,868 | 1,701 | 9,082 |
| Catarina | 460 | 10,053 | 441 | 10,935 |
| Palmetto | 81 | 738 | 86 | 129 |
| Maverick | 66 | 303 | 66 | 1,237 |
| TMS / Other | 46 | 63 | 47 | 74 |
| Total | 2,435 | 19,025 | 2,341 | 21,457 |

For the nine months ended September 30, 2019 and 2018, 34% of our production was oil, 34% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $556.2 million and $771.3 million for the nine months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas decreased $110.8 million, $82.9 million and $21.4 million, respectively, as compared to the nine months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues.*** The Company recorded sales and marketing revenues of $18.1 million and $16.9 million during the nine months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the nine months ended September 30, 2018 to the nine months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Nine Months Ended September 30, | | | Nine Months Ended September 30, 2018 | Revenue Decrease |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Average Sales Price | from Production |
| Oil (MBbls) | 6,375 | 7,198 | (823) | $ 65.74 | $ (54,102) |
| NGLs (MBbls) | 6,539 | 7,363 | (824) | $ 23.88 | $ (19,678) |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | $ 2.96 | $ (13,944) |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | $ 35.95 | $ (87,724) |

| | Average Sales Price per Unit Nine Months Ended September 30, | | | Nine Months Ended September 30, 2019 | Revenue Increase/(Decrease) |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Production Volume | from Price |
| Oil (MBbls) | $ 56.85 | $ 65.74 | $ (8.89) | 6,375 | $ (56,652) |
| NGLs (MBbls) | $ 14.21 | $ 23.88 | $ (9.67) | 6,539 | $ (63,264) |
| Natural gas (MMcf) | $ 2.75 | $ 2.96 | $ (0.21) | 36,657 | $ (7,454) |
| Total oil equivalent (MBoe) | $ 29.24 | $ 35.95 | $ (6.71) | 19,024 | $ (127,370) |

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $55.6 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 | Increase (Decrease) 2019 vs. 2018 $ | Increase (Decrease) 2019 vs. 2018 % |
|---|---|---|---|---|
| Oil and natural gas production expenses | $ 231,441 | $ 225,186 | $ 6,255 | 3 % |
| Exploration expenses | 4,983 | 3,247 | 1,736 | 53 % |
| Sales and marketing expenses | 16,591 | 16,498 | 93 | 1 % |
| Production and ad valorem taxes | 34,682 | 42,898 | (8,216) | (19)% |
| Depreciation, depletion, amortization and accretion | 187,920 | 189,515 | (1,595) | (1)% |
| Impairment of oil and natural gas properties | 22,906 | 4,259 | 18,647 | * |
| General and administrative expenses[(1)] | 66,266 | 73,199 | (6,933) | (9)% |
| Prepetition restructuring charges | 41,855 | — | 41,855 | * |
| Total operating costs and expenses | 606,644 | 554,802 | 51,842 | 9 % |
| | | | | |
| Interest income | 1,447 | 3,400 | (1,953) | (57)% |
| Other income (expense) | (13,785) | 2,467 | (16,252) | * |
| Gain on sale of oil and natural gas properties | — | 1,528 | (1,528) | * |
| Interest expense | (111,998) | (132,664) | 20,666 | (16)% |
| Net losses on commodity derivatives | (20,827) | (142,384) | 121,557 | (85)% |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (23) | — | (23) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.4 million and $2.9 million for the nine months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses increased to approximately $231.4 million ($12.17 per Boe) for the nine months ended September 30, 2019 as compared to $225.2 million ($10.49 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the nine months ended September 30, 2018, the Company recognized a benefit of approximately $17.8 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $243.0 million ($11.32 per Boe). The decrease in oil and natural gas production expenses from the nine months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the nine months ended September 30, 2019 is primarily attributable to a decrease in production. The decrease in oil and natural gas production expenses was slightly offset by an increase in transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina. The increase in oil and natural gas production expenses per Boe for the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018 is primarily related to an increase in marketing and transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina during January and April 2019 and a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $5.0 million and $3.2 million during the nine months ended September 30, 2019 and 2018, respectively. The increase in our exploration expenses for the nine months ended September 30, 2019 as compared to the same period in 2018 was due to an increase in our exploratory geological and geophysical seismic costs and an increase in our delay rentals for the first half of 2019.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $16.6 million and $16.5 million for the nine months ended September 30, 2019 and 2018, respectively. We believe an

opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $34.7 million ($1.82 per Boe) and $42.9 million ($2.00 per Boe) for the nine months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the first nine months of 2019 compared to the same period in 2018 was primarily due to the corresponding decrease in revenues during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $1.6 million from $189.5 million ($8.83 per Boe) for the nine months ended September 30, 2018 to $187.9 million ($9.88 per Boe) for the nine months ended September 30, 2019. The decrease in expense represented an approximate $21.5 million decrease from lower production which was partially offset by a $19.9 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We recorded a proved property impairment of $4.3 million for the nine months ended September 30, 2019. We did not record a proved property impairment for the nine months ended September 30, 2018. We recorded impairment of $18.6 million and $4.3 million to our unproved oil and natural gas properties for the nine months ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $66.3 million ($3.48 per Boe) for the nine months ended September 30, 2019 compared to $73.2 million ($3.41 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount. Additionally, we experienced a decrease in our stock-based compensation expense for the three months ended September 30, 2019 as compared to the same period in 2018 resulting from a decrease in the Company's stock price. Offsetting these decreases, we experienced increases in salaries and wages resulting from employee retention and executive compensation programs.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $41.9 million for the nine months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the nine months ended September 30, 2018.

***Other Income (Expense).*** For the nine months ended September 30, 2019, other expense totaled $13.8 million compared to other income of $2.5 million for the nine months ended September 30, 2018. The other expense during the nine months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset and $1.2 million in shortfall and idle rig costs. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets or idle rig costs. Additionally, for the nine months ended September 30, 2019 we experienced losses of $3.1 million and $1.4 million associated with the decreases in fair value of the investments in SNMP and Lonestar, respectively. For the nine months ended September 30, 2018, we experienced a loss of $9.1 million and a gain of $5.7 million associated with the decreases and increases in fair value of the investments in SNMP and Lonestar, respectively. Further, we received $2.6 million in income from equipment rentals during the nine months ended September 30, 2019 as compared to $7.3 million for the comparable period of 2018, we experienced a gain on our embedded derivative contracts of $0.3 million for the nine months ended September 30, 2019 as compared to a loss of $7.1 million for the comparable period of 2018, and we recorded dividend income of approximately $0.7 million from quarterly distributions on the SNMP common units as compared to $3.2 million for the comparable period of 2018.

***Interest Expense.*** For the nine months ended September 30, 2019, interest expense totaled $112.0 million and included $8.3 million in amortization of debt issuance costs. For the nine months ended September 30, 2018, interest

expense totaled $132.7 million and included $12.7 million in amortization of debt issuance costs. As of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the nine months ended September 30, 2019, we recognized a net loss of $20.8 million on our commodity derivative contracts, which included net losses of $8.7 million associated with the settlements of commodity derivative contracts and mark-to-market losses of $12.1 million on unsettled commodity derivative contracts. The mark-to-market losses were a result of the increase in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses during the period were primarily a result of increases in commodity prices from the time the positions were entered into until the time of settlement. During the nine months ended September 30, 2018, we recognized a net loss of $142.4 million on our commodity derivative contracts, which included mark-to-market losses on oil and natural gas derivative contracts of $50.0 million and $14.5 million, respectively. In addition, during the nine months ended September 30, 2018 we experienced settlement losses on our oil commodity derivative contracts of $86.3 million, which were partially offset by settlement gains of $8.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | Nine Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items | $ 55,321 |

***Income Tax Benefit.*** For the nine months ended September 30, 2019, the Company recorded an income tax benefit of less than $0.1 million and our effective tax rate was approximately 0%. The Company did not record an income tax expense or benefit for the nine months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

**Critical Accounting Policies and Estimates**

The preparation of financial statements in accordance with U.S. GAAP requires our management to select and apply accounting policies that provide the framework to report our results of operations and financial position. The selection and application of those policies requires our management to make difficult subjective or complex judgments concerning reported amounts of revenue and expenses during the reporting period and the reported amounts of assets and liabilities at the date of the financial statements. As a result, there exists the likelihood that materially different amounts would be reported under different conditions or using different assumptions.

As of September 30, 2019, our critical accounting policies were consistent with those discussed in our 2018 Annual Report.

**Use of Estimates**

The condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of proved oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts, embedded derivatives and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of G&A expenses. Actual results could differ materially from those estimates.

**Liquidity and Capital Resources**

The primary source of liquidity and capital resources to fund our development program and other obligations has been cash flow from operations, available cash on hand and proceeds from borrowings and securities issuances. Operating cash flows, however, are largely dependent on oil and natural gas prices and differentials, sales volumes and costs. Oil and natural gas prices declined significantly during the fourth quarter 2018 and have remained low in 2019 through the present date. These lower commodity prices, in addition to reduced production levels from our decreased capital expenditures budget, have negatively impacted revenues, earnings and cash flows, and sustained low oil and natural gas prices have had and will continue to have a material and adverse effect on our liquidity position and our ability to raise additional funds through financing transactions. On the Petition Date, the Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases—Voluntary Reorganization Under Chapter 11" and above in "—Business Overview—Voluntary Reorganization Under Chapter 11" for additional information.

As of September 30, 2019, we had approximately $179.5 million in cash and cash equivalents and $90.0 million in available borrowing capacity under the SN UnSub Credit Agreement, resulting in aggregate liquidity of approximately $269.5 million. Borrowings under the DIP Facility are not available to SN UnSub or our other non-Debtor subsidiaries, and borrowings under the SN UnSub Credit Agreement are not available to the Debtors or any other non-Debtor subsidiary other than SN UnSub.

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under the Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes (approximately $2.3 billion in aggregate principal). We do not have sufficient liquidity to pay such accelerated amounts. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt. The significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described under "Business Overview" raise substantial doubt about the Company's ability to continue as a going concern. See above under "Business Overview" for a description of these and other developments. In addition, during the existence of an event of default under the Credit Agreement and the Chapter 11 Cases, we have no borrowing capacity under the Credit Agreement, even if any available borrowing capacity remained under the Credit Agreement (although, as noted below, we anticipate paying off the Credit Agreement in full subject to final approval of the Bankruptcy Court).

Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. On May 23, 2019, as part of the most recent semi-annual redetermination, the borrowing base under the SN UnSub Credit Agreement was decreased from $315 million to $240 million. As of September 30, 2019, there were approximately $150.0 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. The next regularly scheduled borrowing base redetermination is expected in the fourth quarter 2019. Based upon current commodity prices and other factors, we believe that the borrowing base under the SN UnSub Credit Agreement will likely be decreased at the next redetermination and may be decreased at future redeterminations, and any or all such decreases may be material. Were the lenders under the SN UnSub Credit Agreement to reduce the borrowing base to an amount below the current outstanding borrowings of SN UnSub, and provided no waiver is granted by those lenders, we would be required at our election to repay the deficiency

within 30 days (in a single installment) to 180 days (in six equal monthly installments), pledge additional oil and natural gas assets as security for the amount of debt outstanding, or seek such other remedies available under the SN UnSub Credit Agreement, in which case we may not be able to satisfy the liquidity requirements of SN UnSub.

The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders entered into the Amendment. By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the Final DIP Order and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders.

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility will be sufficient to fund our anticipated 2019 operating needs. However, there can be no assurance that the Company's cash flows, cash on hand and any financing we are able to obtain through the DIP Facility will be sufficient to continue to fund its operations or to allow the Company to continue as a going concern until a Chapter 11 plan of reorganization is confirmed by the Bankruptcy Court or an alternative restructuring transaction is approved by the Bankruptcy Court and consummated. In addition, if we are required under the Final DIP Order to pay the past due interest, and to continue making the semi-annual interest payments due, under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases, or we fail to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity required to maintain undeveloped leasehold positions as discussed above, then that requirement or failure to negotiate could further limit our flexibility in planning for, or reacting to, changes in our business and the oil and natural gas exploration and production industry and could have a material adverse effect on our business, financial condition or results of operations. We have incurred significant professional fees and other costs in connection with our evaluation of strategic alternatives and preparation for the Chapter 11 Cases and expect that we will continue to incur significant professional fees and costs throughout our Chapter 11 Cases. The Company's long-term liquidity requirements, the adequacy of its capital resources and its ability to continue as a going concern are difficult to predict at this time and ultimately cannot be determined until a Chapter 11 plan of reorganization has been confirmed, if at all, by the Bankruptcy Court. The Debtors are subject to such liquidity risks as well as the other risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019.

We continuously evaluate our current and projected capital spending, operating activities and funding requirements, with consideration of realized commodity prices and the results of our operations and may make further adjustments to our capital expenditures and related financing plans as warranted.

**Cash Flows**

Our cash flows for the nine months ended September 30, 2019 and 2018 (in thousands) are as follows:

| | Nine Months Ended September 30, 2019 | 2018 |
|---|---|---|
| **Cash Flow Data:** | | |
| Net cash provided by operating activities | $ 99,750 | $ 249,526 |
| Net cash used in investing activities | $ (110,217) | $ (453,822) |
| Net cash (used in) provided by financing activities | $ (7,608) | $ 388,534 |

***Net Cash Provided by Operating Activities.*** Net cash provided by operating activities was $99.8 million for the nine months ended September 30, 2019 compared to cash provided by operating activities of $249.5 million for the same period in 2018. This decrease was primarily related to lower revenues from lower production and lower realized prices.

One of the primary sources of variability in the Company's cash flows from operating activities is fluctuations in commodity prices, the impact of which the Company has historically partially mitigated by entering into commodity derivative contracts. Production volume changes also impact cash flow, costs related to operations and debt service.

***Net Cash Used in Investing Activities.*** Net cash flows used in investing activities totaled $110.2 million for the nine months ended September 30, 2019 compared to $453.8 million for the same period in 2018. Capital expenditures incurred for drilling and leasehold activities for the nine months ended September 30, 2019 totaled $61.2 million, and cash paid for capital expenditures was $114.7 million. The capital expenditures incurred are primarily associated with bringing 48 gross wells on-line during the first three quarters of 2019. The difference between expenditures incurred and paid during the period is due to timing of payments associated with higher activity levels during the fourth quarter 2018. We also received $5.2 million from the sale of certain other assets. During the nine months ended September 30, 2018, capital expenditures incurred for drilling and leasehold activities totaled $479.0 million and cash paid for capital expenditures was $452.3 million. The capital expenditures incurred are primarily associated with bringing 172 gross wells on-line. In addition, we received $2.8 million related to the post-closing adjustments for the Comanche Acquisition during the nine months ended September 30, 2018.

***Net Cash Used in or Provided by Financing Activities.*** Net cash flows used in financing activities totaled $7.6 million for the nine months ended September 30, 2019 compared net cash flows provided by financing activities of $388.5 million for the same period in 2018. During the nine months ended September 30, 2019, we had borrowings of $50.0 million under our DIP Facility and $7.9 million under our Credit Facility. Additionally, we made payments of $18.3 million on the SN UnSub Credit Agreement and our other debt agreements and made payments of $37.5 million for distributions to holders of the SN UnSub Preferred Units. During the nine months ended September 30, 2018, we issued $500 million in 7.25% Senior Secured Notes (before discounts of $5.1 million) and had incremental borrowings of $45 million. Additionally, we made repayments on our prior credit facility of $95 million and payments on the SN UnSub Credit Agreement of $8.0 million. We also made payments of $22.4 million for distributions to holders of the SN UnSub Preferred Units and paid dividends on our Series A and B Preferred Stock of $12.0 million.

**Off-Balance Sheet Arrangements**

As of September 30, 2019, we did not have any off-balance sheet arrangements.

**Commitments and Contractual Obligations**

Refer to "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

There have been no material changes in our contractual obligations during the nine months ended September 30, 2019, other than those disclosed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to a variety of market risks, including the effects of adverse changes in commodity prices and, potentially, interest rates as described below.

The primary objective of the following information is to provide quantitative and qualitative information about our potential exposure to market risks. The disclosures are not meant to be precise indicators of expected future losses, but rather indicators of reasonably possible losses. All of our market risk sensitive instruments were entered into for purposes other than speculative trading.

**Commodity Price Risk**

Our primary market risk exposure relates to the prices we receive for our oil, natural gas and NGL production. The prices we ultimately realize for our oil, natural gas and NGLs are based on a number of variables, including prevailing index prices attributable to our production and certain differentials to those index prices. Pricing for oil, natural gas and NGLs is volatile and unpredictable, and this volatility is expected to continue in the future. In addition, the prices we receive for our oil, natural gas and NGLs depend on many factors outside of our control, such as the supply and demand for oil, natural gas and NGLs, the relative strength of the global economy, the actions of OPEC and international sanctions against countries such as Iran and Venezuela.

To reduce the impact on the Company’s business and results of operations from fluctuations in the prices we receive for oil, natural gas and NGLs, and to protect the economics of property acquisitions at the time of execution, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. These transactions may include fixed price swaps (whereby, on the settlement date, the Company will receive or pay an amount based on the difference between a pre-determined fixed price and a variable market price for a notional quantity of production), put options (whereby the Company pays a cash premium in order to establish a fixed floor price for a notional quantity of production and, on the settlement date, receives the excess, if any, of the fixed price floor over a variable market price), and costless collars (whereby, on the settlement date, the Company receives the excess, if any, of a variable market price over a fixed floor price, up to a fixed ceiling price for a notional quantity of production). In addition, the Company periodically enters into call swaptions as a way to achieve greater downside price protection than offered under prevailing fixed price swaps by agreeing to increase the notional quantity hedged or extend the notional quantity settlement period under a fixed price swap at the counterparty’s election on a designated date. The market for NGL hedging has historically been constrained in terms of price, tenor, liquidity and availability of counterparties. The Company does not currently have any NGL hedges in place. We continue to assess our exposure to NGL price volatility and the NGL hedging market in general and may seek to enter into derivatives in the future on a portion of our projected NGL production. In addition, from time to time, the Company may evaluate strategies to unwind, terminate, cancel, restructure or otherwise modify its existing commodity derivatives, as applicable, in connection with the ongoing assessment of its general risk profile, including projected future production levels, covenant and other compliance requirements, its overall financial position and other considerations.

These hedging activities, which, as of September 30, 2019 are regulated by, as applicable, the terms of the DIP Facility, the Credit Agreement, the SN UnSub Credit Agreement and SN UnSub’s organizational documents, are intended to manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market participants. As of September 30, 2019, any derivatives that are, as applicable, with (a) lenders, or affiliates of lenders, to the SN UnSub Credit Agreement or (b) counterparties designated as secured under the DIP Facility or Credit Agreement are, in each case, collateralized by the assets securing the applicable facility, and, therefore, did not as of September 30, 2019 require the posting of cash collateral. As of September 30, 2019, any derivatives that are, as applicable, with (x) non-lenders (or non-lender affiliates) under the SN UnSub Credit Agreement or (y) counterparties that are not designated as secured under the DIP Facility and Credit Agreement are, in each case, unsecured and do not require the posting of cash or other collateral. It is never the Company’s intention to enter into derivative contracts for speculative trading purposes. Please refer to Note 8, “Derivative Instruments” for a description of all of our derivatives covering anticipated future production as of September 30, 2019.

The prices at which we enter into commodity derivative contracts covering our production in the future will be dependent upon conditions in the commodity and financial markets at the time we enter into these transactions, which may result in higher or lower hedge prices for oil, natural gas and NGLs under these contracts, if any, as compared to the hedge prices under our current contracts. Accordingly, our hedging strategy may not protect us from significant or sustained declines in the prices of oil, natural gas and NGLs for future production. Conversely, our hedging strategy may limit our ability to realize incremental cash flows from commodity price increases during periods for which we have hedged our production. As such, our hedging strategy may not prove effective in adequately protecting us from changes in the prices of oil, natural gas and NGLs that could have a significant adverse effect on our liquidity, business, financial condition and results of operations.

At September 30, 2019, the fair value of our commodity derivative contracts was a net asset of approximately $9.1 million. A 10% increase or decrease in the oil and natural gas index prices above the September 30, 2019 prices

would result in a decrease or increase, respectively, in the fair value of our commodity derivative contracts of $15.1 million. On a consolidated basis as of September 30, 2019, the Company has hedged approximately 580,000 Bbls of its remaining 2019 oil production and 3,362,000 MMBtu of its remaining 2019 natural gas production. As of September 30, 2019, SN UnSub's production represents approximately 68% of the hedged oil volumes and approximately 73% of the hedged natural gas volumes.

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

Following the filing of the Bankruptcy Petitions, our ability to enter into derivatives is limited. For further information, see "Part II, Item 1A. Risk Factors—We have significant exposure to fluctuations in commodity prices since only a portion of our estimated future production is covered by commodity derivatives and we may not be able to enter into commodity derivatives covering our estimated future production on favorable terms or at all" included in our Form 10-Q for the quarter ended June 30, 2019.

**Credit Risk**

Our credit risk relates primarily to trade receivables and financial derivative instruments. Credit exposure for each customer is monitored for outstanding balances and current activity. For derivatives entered into as part of our hedging program, we are subject to counterparty credit risk to the extent the counterparty is unable to meet its settlement commitments. We may also be exposed to credit risk due to the concentration of our customers in the energy industry, as our customers may be similarly affected by prolonged changes in economic and industry conditions, or by the sale of our oil and natural gas production to a limited number of purchasers.

We actively manage this credit risk by selecting counterparties that we believe to be highly creditworthy and continuing to monitor their financial position. Concentration of credit risk is regularly reviewed to ensure that counterparty credit risk is adequately diversified.

As of September 30, 2019, the substantial majority of our credit exposure was with investment grade counterparties. We believe exposure to losses related to credit risk at September 30, 2019 was not material, which is consistent with all periods presented.

**Interest Rate Risk**

As of September 30, 2019, we had $50.0 million outstanding under the DIP Facility, $7.9 million outstanding under the Credit Agreement, $150.0 million outstanding under the SN UnSub Credit Agreement and $22.9 million outstanding under the SR Credit Agreement, all of which carry variable interest rates. The DIP Facility, with respect to the New Money DIP Loans, bears interest at a variable rate, and the Roll-Up Loans, if and when approved, will bear interest at a fixed rate. Our Senior Notes bear interest at fixed interest rates. As of September 30, 2019, a one percent change in the interest rates on the SN UnSub Credit Agreement would result in an approximately $1.5 million change in annual interest expense, and a one percent change in the interest rates on the SR Credit Agreement or DIP Facility would be insignificant. Further, as of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise. We believe our exposure to interest-related losses at September 30, 2019 was not material.

We currently do not have any interest rate derivative contracts in place. We continue to assess our exposure to fluctuating interest rates and may seek to enter into interest rate derivatives in the future on a portion of our variable rate indebtedness.

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a-15 promulgated pursuant to the Securities Exchange Act of 1934, as amended (the “Exchange Act”). Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in reports that we file or submit under the Exchange Act is appropriately recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that information required to be disclosed by us in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Controls**

There was no change in our internal control over financial reporting during the three months ended September 30, 2019 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. The adoption of ASC 842, Leases, required the implementation of new controls and the modification of certain accounting processes. The impact of these changes was not material to the Company’s internal control over financial reporting.

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings**

For a description of our material pending legal proceedings as of September 30, 2019, please refer to (i) “Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies.” and (ii) the “Business Overview” of “Part I, Item 2. Management’s Discussion and Analysis of Financial Condition and Results of Operations.”

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company’s bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business notwithstanding the filing of the Bankruptcy Petitions. If a Chapter 11 plan of reorganization is confirmed, it will provide for the treatment of claims against the Company’s bankruptcy estates, including prepetition liabilities that have not otherwise been satisfied or addressed during the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions

that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan or transactions will be implemented successfully.

**Item 1A. Risk Factors**

Carefully consider the risk factors under the caption "Risk Factors" under Part I, Item 1A in our 2018 Annual Report and under Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019, together with all of the other information included in this Quarterly Report on Form 10-Q and in our other public filings, press releases, and public discussions with our management. Additional risks and uncertainties not currently known to us or that we currently deem immaterial may materially adversely affect our business, financial condition or results of operations.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

*Unregistered Sales of Equity Securities*

None.

*Repurchase of Equity Securities*

| Period | Total number of shares withheld[(1)] | Average Price per share | Total number of shares repurchased as part of publicly announced plans | Maximum number of shares that may yet be repurchased under the plan |
|---|---|---|---|---|
| July 1, 2019 - July 31, 2019 | 1,362 | $ 0.11 | — | — |
| August 1, 2019 - August 31, 2019 | 10,480 | $ 0.08 | — | — |
| September 1, 2019 - September 30, 2019 | 1,227 | $ 0.02 | — | — |
| Total | 13,069 | $ 0.08 | — | — |

(1) Represents shares that were purchased by the Company to satisfy employee tax withholding obligations that arose upon the vesting of restricted stock awards

**Item 3. Defaults Upon Senior Securities**

See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases— Covenant Violations" which is incorporated in this item by reference.

The annual dividend on each share of our Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series A Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series A Preferred Stock as of the date of filing of this report is approximately $1.4 million.

The annual dividend on each share of our Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series B Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series B Preferred Stock as of the date of filing of this report is approximately $7.4 million.

Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series A Preferred Stock, Series B Preferred Stock or common stock.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

**EXHIBIT INDEX**

| | | |
|---|---|---|
| 3.1 | | Restated Certificate of Incorporation of Sanchez Energy Corporation, effective as of May 28, 2013 (filed as Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013 (File No. 001-35372) and incorporated herein by reference). |
| 3.2 | | Certificate of Designations of Series C Junior Participating Preferred Stock of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on July 29, 2015 (File No. 001-35372) and incorporated herein by reference). |
| 3.3 | | Amended and Restated Bylaws, dated as of December 13, 2011 (filed as Exhibit 3.2 to the Company's Current Report on Form 8-K on December 19, 2011 (File No. 001-35372) and incorporated herein by reference). |
| 10.1(a) | | Senior Secured Debtor-in-Possession Term Loan Credit Agreement dated as of August 16, 2019, among Sanchez Energy Corporation, a debtor and debtor-in-possession under Chapter 11 of Bankruptcy Code, as borrower, the several lenders from time to time parities thereto, and Wilmington Savings Fund Society, FSB as administrative Agent and collateral agent. |
| 10.2(a) | | Tolling Agreement dated August 10. 2019, by and among SN UR Holdings, LLC, SN EF UnSub Holdings, LLC, SN EF Maverick, LLC, Sanchez Energy Corporation, GSO ST Holdings Associates LLC, and GSO ST Holdings LP. |
| 10.3(a) | | First Amendment to Senor Secured Debtor-in-Possession Term Loan Credit Agreement dated September 24, 2019, by and among Sanchez Energy Corporation, the required lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent. |
| 31.1(a) | | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.2(a) | | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |
| 32.1(b) | | Sarbanes-Oxley Section 906 certification of Principal Executive Officer. |
| 32.2(b) | | Sarbanes-Oxley Section 906 certification of Principal Financial Officer. |
| 101.INS(a) | — | XBRL Instance Document. |
| 101.SCH(a) | — | XBRL Taxonomy Extension Schema Document. |
| 101.CAL(a) | — | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF(a) | — | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB(a) | — | XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE(a) | — | XBRL Taxonomy Extension Presentation Linkbase Document |

(a) Filed herewith.

(b) Furnished herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on November 8, 2019.

SANCHEZ ENERGY CORPORATION

By: /s/ Kirsten A. Hink
Kirsten A. Hink
*Senior Vice President and Chief Accounting Officer*
(Duly Authorized Officer)

By: /s/ Cameron W. George
Cameron W. George
*Executive Vice President and Chief Financial Officer*
(Principal Financial Officer)

# EXHIBIT 33

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered)<br>Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC AND SN EF UNSUB, LP TO DEBTORS' ASSUMPTION OF THE RATIFICATION AGREEMENT**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC, the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], of the Ratification and Assumption Agreement (the "Ratification Agreement") made as of April 1, 2018, by UnSub, SN EF Maverick, LLC ("Maverick"), and Carnero G&P LLC ("Carnero").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] To the extent executory, GSO and UnSub object to the assumption of the Memorandum of Agreement, dated as of April 1, 2018, by UnSub, Maverick and Carnero. Moreover, GSO and UnSub reserve the right to argue that the Ratification Agreement is not executory.

1. GSO and UnSub are filing this objection simultaneously with the *Objection of GSO ST Holdings LP, GSO ST Holdings Associates LLC and SN EF UnSub, LP To Debtors' Rejection of the Comanche Agreements* (the "Comanche Rejection Opposition") (Docket No. 1352) and, to avoid duplicative pleadings, incorporate by reference the objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* (Docket No. 1309), which they intend to file prior to the hearing on June 25, 2020 (the "Settlement Agreement Opposition").

2. The Debtors seek to assume the Ratification Agreement as part of their overall scheme to implement the Settlement Agreement. But the Ratification Agreement cannot be assumed because it will serve no purpose in the future. The Debtors appear to believe that the Ratification Agreement stands for the proposition that UnSub's hydrocarbons are committed to Carnero for processing. This is incorrect.

3. As we will set forth more fully in the Settlement Agreement Opposition, the Debtors' presumption that the Ratification Agreement dedicates UnSub's hydrocarbons to Carnero is flawed for two reasons. First, without the Marketing Agreement, the Debtors have no contractual rights to deliver UnSub's hydrocarbons. Assumption of the Ratification Agreement does nothing to change that; indeed, the Ratification Agreement is meaningless once the Marketing Agreement is rejected because UnSub's obligations under the Ratification Agreement are entirely derivative of its obligations under the Marketing Agreement. Second, even if the Marketing Agreement remains in place, UnSub's volumes are not dedicated to Carnero until the term of the Brasada contract ends (*i.e.*, 2034) unless there is an earlier termination in accordance with the Firm Gas Gathering, Processing and Purchase Agreement between Maverick and Carnero (the

"GGPA"). Rejection of the Brasada contract (or any agreement for that matter) does not amount to a termination and thus does not trigger this "springing dedication" in the GGPA. Accordingly, the Debtors' assumption of the Ratification Agreement is of no practical effect.

4. The Debtors have made it clear throughout this process that the restructuring of the existing Comanche midstream arrangement sits at the bottom of their to-do list. That is not surprising, given that they own just 6-8% of the Comanche working interests. Their priorities lie elsewhere—namely, the Catarina working interests, which they own in their entirety. Consequently, it is imperative that UnSub is able to control the flow of its hydrocarbons, and to contract freely with midstream counterparties, especially if the Court approves the rejection of the Marketing Agreement (and the suite of other contracts that are integrated with the Marketing Agreement). The Court should therefore not permit assumption of the Ratification Agreement.

5. It is in all parties' interest to adjudicate this dispute in the near term. GSO and UnSub intend work with the Debtors and Carnero to establish a timely and efficient process to resolve disputes over UnSub's ability to control its hydrocarbons. We believe that process will conclusively show that UnSub maintains full control of its hydrocarbons upon the rejection of the Marketing Agreement and that, even if the Marketing Agreement is assumed, UnSub's hydrocarbons are not committed to Carnero without its consent—which the Debtors have never sought much less obtained.

WHEREFORE, GSO and UnSub respectfully request for all of the reasons stated above that this Court deny assumption of the Ratification Agreement.

[*Remainder of page intentionally blank*]

Dated: June 22, 2020
Houston, Texas

*/s/ Thomas A. Woolley*

**MCCLOSKEY ROBERSON, PLLC**
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (pending *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

**Certificate of Service**

I hereby certify that the foregoing pleading was served on all parties registered to receive notice through the Court's CM/ECF system on June 22, 2020.

/s/ *Thomas A. Woolley*
Thomas A. Woolley, III

# EXHIBIT 34

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC, AND SN EF UNSUB, LP TO DEBTORS' REJECTION OF THE AGENCY AGREEMENTS**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC ("Unsub GP"), the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* (Docket No. 1326), of the Retained Marketing Contracts Services Agreement, by and between SN EF Maverick, LLC ("Maverick") and SN Catarina, LLC, collectively, as Provider, and Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, and Anadarko Energy Services Company, collectively, as Recipient, as amended (the "Marketing Agency Agreement") and the Retained Midstream

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

Contracts Services Agreement, by and between Maverick, as Provider, and Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP, together, as Recipient, as amended (the "Midstream Agency Agreement," and together with the Marketing Agency Agreement, the "Agency Agreements").

## PRELIMINARY STATEMENT

In the Debtors' settlement motion (the "Settlement Motion") (Docket No. 1309), the Debtors sought approval of a settlement agreement (the "Settlement Agreement") in which Maverick promised to reject the Agency Agreements. The Settlement Agreement contemplated that, by rejecting the Agency Agreements, the Debtors would move the gas generated by the Comanche Assets—which are owned by various working interest owners including Maverick and UnSub—to Carnero G&P LLC ("Carnero") for processing. This rejection promise was a key part of the deal the Debtors struck with the other parties to the Settlement Agreement: in exchange for moving the Comanche gas volumes to Carnero, the Debtors would receive lower gas-processing rates from Carnero on gas produced by the Catarina Assets—which are wholly owned by Debtor entities other than Maverick.

In discovery leading up to the hearing on the Settlement Motion, it became apparent there was no process in place to ensure that Maverick's interests were protected. No fiduciary had Maverick's best interests at heart. Rather, the same fiduciary was making decisions for all the Debtors collectively, including Maverick. This fatally infected the Settlement Agreement and the rejection of the Agency Agreements, which benefitted the other Debtors at Maverick's expense. Under the Settlement Agreement, Maverick has to do all the heavy lifting—rejecting the Agency Agreements—while the Debtors reap the rewards. This cannot be a proper exercise of Maverick's business judgment. The Court should not permit rejection of the Agency Agreements.

<u>**REQUEST FOR LEAVE TO FILE OUT OF TIME**</u>

1. GSO and UnSub acknowledge that objections to assumption and rejection were due on June 22, and respectfully request leave to file this Objection out of time.

2. The standard for leave to file out of time, which requires "excusable neglect" under Federal Rule of Civil Procedure 6(b) and Bankruptcy Rule 9006(b), "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Blake* v. *Peake*, No. CIV.A. H-04-1068, 2008 WL 5114655, at *1 (S.D. Tex. Dec. 3, 2008). "Relevant factors include: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *Blake*, 2008 WL 5114655, at *1.

3. GSO and UnSub's request plainly satisfies this standard. First, there will be no prejudice to the Debtors from accepting this Objection out of time. Other parties have already objected to the Agency Agreements. (*See* Docket No. 1355.) Moreover, the Debtors are familiar with, and no doubt already preparing to address, the substantive issues raised in this Objection, which concern whether Maverick's interests were taken into account when the decision was made to have Maverick reject the Agency Agreements. This issue was briefed in connection with the Settlement Motion and discussed at the motion hearing. The Court's order granting the motion requires the Debtors to further address this issue at a future hearing. (Docket No. 1415 ¶ 10.)

4. Second, the delay of less than three weeks will have no meaningful impact on the judicial proceedings concerning assumption and rejection. The Debtor has not yet filed responses to the assumption/rejection objections. And again, the issues raised in this Objection are ones the Debtors must address anyway pursuant to the Court's order of June 30.

5. Third, the reason for the delay was not in control of GSO and UnSub. Neither is a party to the Agency Agreements, and in the ordinary course, they would take no position on assumption or rejection of those agreements. But discovery on the Settlement Motion, which was ongoing when the assumption/rejection objection deadline passed, revealed the factual predicate of this Objection. The Debtors completed their document production early in the morning on Sunday, June 21, 2020—the day before the rejection/assumption objection deadline. Over the next three days, three depositions were conducted leading up to the hearing—including a deposition of the Debtors' representative, Mr. Meghji, on June 22, the day of the deadline. These documents and depositions showed there was no process to consider how rejecting the Agency Agreements would affect Maverick's interests, as distinct from the other Debtors'.

6. Finally, GSO and UnSub have acted in good faith in bringing these issues to the attention of the other parties and the Court. All the parties are well aware of GSO and UnSub's position that the Debtors failed to advance Maverick's interests in entering into the Settlement Agreement. GSO and UnSub are filing this Objection to make clear that they object to Maverick's rejection of the Agency Agreements insofar as it is contrary to the interests of Maverick and the other Comanche working interest owners, including UnSub.

## BACKGROUND

7. The Agency Agreements obligate Maverick to perform obligations of Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (collectively, "Anadarko") under certain midstream contracts. (*See* Docket No. 1309 at 8 n.7.) Among these obligations is delivery of gas produced by the Comanche Assets to the Brasada gas processing plant. The Comanche Assets are owned by multiple working interest owners including Maverick, UnSub, and others.

8. The Debtors' position is that, by virtue of rejection of the Agency Agreement, the Comanche gas volumes will no longer be committed to Brasada and will instead flow to Carnero

under a preexisting agreement between Maverick and Carnero. As Mr. Meghji explained at his deposition: "In simple terms, the rejection of those contracts triggers the ratification agreements whereby the volumes go from Brasada to Carnero as per the ratifications that had been signed by all -- effectively, by all the working interest partners for Comanche to direct the volumes to go to Carnero." (Meghji Dep. Tr. at 47:7–12.) GSO and UnSub disagree with the Debtors' position, for reasons we have explained elsewhere and do not repeat in this Objection.

9. Whether the Debtors are right or wrong about the effect of rejecting the Agency Agreements, one thing is clear: delivering the Comanche gas is the key benefit of the Settlement Agreement to the Debtors' counterparties to the agreement, including Carnero. Mr. Meghji agreed at his deposition that this is the "principal benefit" the Debtors are providing. (Meghji Dep. Tr. at 132:5–6.)

10. If they can deliver this benefit, the Debtors will receive rate reductions—effectively, a volume discount—from Carnero and other midstream service providers. Mr. Meghji stated in his deposition that "there is significant additional financial benefit [of the Settlement Agreement] from the reduction in rates to the debtors, which amounts to significant dollars going forward." (Meghji Dep. Tr. at 51:18–21.)

11. Critically, these rate reductions represent tremendous benefits for the Catarina Assets, but minimal benefits for Comanche. As explained in the Debtors' March 2020 business plan, the Debtors have a 100% working interest in Catarina, but Maverick has only a 6% economic interest in the Comanche. (*See* Sanchez Energy Business Plan (Mar. 2020) at 22, 23, *available at* https://www.sec.gov/Archives/edgar/data/1528837/000110465920043897/tm2011997d2_ex99-1.pdf.) Unsurprisingly, the Debtors sought to maximize their Catarina assets by using their leverage over the Comanche, in which they have a very small stake.

12. At his deposition, Mr. Meghji asserted that the Comanche working interest owners will receive a benefit of $7 million from lower rates at Carnero. (Meghji Dep. Tr. at 123:19–23.) Even if this assertion is true—and to be clear, it has not yet been meaningfully tested—Maverick's 6% share of this benefit would be $420,000, virtually nothing compared to the benefits the other Debtors will get from lower Catarina rates.

13. In fact, the Settlement Agreement affirmatively harms Maverick by making it more difficult to obtain a better deal for the Comanche. Before entering into the Settlement Agreement, the Debtors never even tried to negotiate an optimal result for Comanche. As Mr. Meghji has admitted, GSO urged him multiple times to renegotiate rates with the Comanche's current midstream provider, but the Debtors never did so. (Meghji Dep. Tr. at 59:24–60:17, 136:23–25.) This was extremely harmful because the Comanche needs a comprehensive midstream solution for gathering, processing, and transportation. The Settlement Agreement offers only somewhat lower processing rates, which make up only a minority of the Comanche midstream costs.

14. A true fiduciary to Maverick would have tried to maximize its value by achieving the best possible midstream deal for the Comanche. Instead, Mr. Meghji applied the maxim "do no harm." When asked what process he used to ensure the settlement was fair to Maverick (as distinct from the other Debtors), Mr. Meghji responded: "We looked at the impact of entering into this Settlement Agreement and essentially wanted ***to make sure that they were no worse off*** and better off, if possible. And given what I've just explained to you, that they are actually better off as a result of this agreement, I felt like that was -- ***did not cause any harm to Maverick*** and its working interest holders." (Meghji Dep. Tr. at 124:7–14.)

**<u>OBJECTION</u>**

15. The Court should deny Maverick's request to reject the Agency Agreements because it is contrary to Maverick's interests. The other Debtors are reaping the rewards from

Maverick's rejection of the Brasada agreement, leaving Maverick with just a small tip for its efforts. Meanwhile, the Debtors' myopic focus on the Settlement Agreement has caused them to overlook other opportunities, including promising negotiations with the Debtors' current midstream providers (Occidental Petroleum Corporation and Western Midstream Partners LP) and other potential midstream providers that could provide a much better deal for Comanche. This failure to pursue other options has affirmatively harmed Maverick.

16. A debtor's decision to assume or reject an executory contract is subject to the Court's review under the "business judgment" standard. *See* 11 U.S.C. § 365(a); *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985). A "bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to assume or reject it. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Court should not "blindly accept" a debtor's decision to reject a contract, but rather "must ensure the decision-making process used by a debtor in possession in exercising its powers under the [Bankruptcy] Code is a sensible one." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 427 (Bankr. N.D. Tex. 2009) (citing *In re Orion Pictures Corp.*, 4 F.3d at 1099; *Richmond Leasing Co.*, 762 F.2d at 1309).

17. While the rejection of the Agency Agreements may well be a sound exercise of the other Debtors' business judgment, it is a disastrous exercise of Maverick's. That is hardly surprising, because no one had Maverick's best interests at heart when the Debtors inked the Settlement Agreement committing them to reject the Agency Agreements. As Mr. Meghji admitted, he simply tried to ensure that Maverick was not harmed by rejecting the Agency Agreements to enrich the other Debtors. "Do no harm" is not the correct standard for a fiduciary;

in any event, the Debtors' failure to pursue other options did harm Maverick. The Court should not permit the other Debtors to use rejection to advance their interests in a way that does not meaningfully benefit, and in fact harms, Maverick.

[*Remainder of page intentionally blank*]

## CONCLUSION

WHEREFORE, GSO and UnSub respectfully request for all of the reasons stated above that this Court deny rejection of the Agency Agreements, and grant such other and further relief as the Court may deem just and proper.

Dated: July 14, 2020
Houston, Texas

/s/ *Thomas A. Woolley*

**MCCLOSKEY ROBERSON, PLLC**
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

**Certificate of Service**

I hereby certify that the foregoing pleading was served on all parties registered to receive notice through the Court's CM/ECF system on July 14, 2020.

/s/ *Thomas A. Woolley*
Thomas A. Woolley, III

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC, AND SN EF UNSUB, LP TO DEBTORS' REJECTION OF THE AGENCY AGREEMENTS**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC ("Unsub GP"), the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* (Docket No. 1326), of the Retained Marketing Contracts Services Agreement, by and between SN EF Maverick, LLC ("Maverick") and SN Catarina, LLC, collectively, as Provider, and Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, and Anadarko Energy Services Company, collectively, as Recipient, as amended (the "Marketing Agency Agreement") and the Retained Midstream

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

Contracts Services Agreement, by and between Maverick, as Provider, and Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP, together, as Recipient, as amended (the "Midstream Agency Agreement," and together with the Marketing Agency Agreement, the "Agency Agreements").

**PRELIMINARY STATEMENT**

In the Debtors' settlement motion (the "Settlement Motion") (Docket No. 1309), the Debtors sought approval of a settlement agreement (the "Settlement Agreement") in which Maverick promised to reject the Agency Agreements. The Settlement Agreement contemplated that, by rejecting the Agency Agreements, the Debtors would move the gas generated by the Comanche Assets—which are owned by various working interest owners including Maverick and UnSub—to Carnero G&P LLC ("Carnero") for processing. This rejection promise was a key part of the deal the Debtors struck with the other parties to the Settlement Agreement: in exchange for moving the Comanche gas volumes to Carnero, the Debtors would receive lower gas-processing rates from Carnero on gas produced by the Catarina Assets—which are wholly owned by Debtor entities other than Maverick.

In discovery leading up to the hearing on the Settlement Motion, it became apparent there was no process in place to ensure that Maverick's interests were protected. No fiduciary had Maverick's best interests at heart. Rather, the same fiduciary was making decisions for all the Debtors collectively, including Maverick. This fatally infected the Settlement Agreement and the rejection of the Agency Agreements, which benefitted the other Debtors at Maverick's expense. Under the Settlement Agreement, Maverick has to do all the heavy lifting—rejecting the Agency Agreements—while the Debtors reap the rewards. This cannot be a proper exercise of Maverick's business judgment. The Court should not permit rejection of the Agency Agreements.

**REQUEST FOR LEAVE TO FILE OUT OF TIME**

1. GSO and UnSub acknowledge that objections to assumption and rejection were due on June 22, and respectfully request leave to file this Objection out of time.

2. The standard for leave to file out of time, which requires "excusable neglect" under Federal Rule of Civil Procedure 6(b) and Bankruptcy Rule 9006(b), "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Blake* v. *Peake*, No. CIV.A. H-04-1068, 2008 WL 5114655, at *1 (S.D. Tex. Dec. 3, 2008). "Relevant factors include: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *Blake*, 2008 WL 5114655, at *1.

3. GSO and UnSub's request plainly satisfies this standard. First, there will be no prejudice to the Debtors from accepting this Objection out of time. Other parties have already objected to the Agency Agreements. (*See* Docket No. 1355.) Moreover, the Debtors are familiar with, and no doubt already preparing to address, the substantive issues raised in this Objection, which concern whether Maverick's interests were taken into account when the decision was made to have Maverick reject the Agency Agreements. This issue was briefed in connection with the Settlement Motion and discussed at the motion hearing. The Court's order granting the motion requires the Debtors to further address this issue at a future hearing. (Docket No. 1415 ¶ 10.)

4. Second, the delay of less than three weeks will have no meaningful impact on the judicial proceedings concerning assumption and rejection. The Debtor has not yet filed responses to the assumption/rejection objections. And again, the issues raised in this Objection are ones the Debtors must address anyway pursuant to the Court's order of June 30.

5. Third, the reason for the delay was not in control of GSO and UnSub. Neither is a party to the Agency Agreements, and in the ordinary course, they would take no position on assumption or rejection of those agreements. But discovery on the Settlement Motion, which was ongoing when the assumption/rejection objection deadline passed, revealed the factual predicate of this Objection. The Debtors completed their document production early in the morning on Sunday, June 21, 2020—the day before the rejection/assumption objection deadline. Over the next three days, three depositions were conducted leading up to the hearing—including a deposition of the Debtors' representative, Mr. Meghji, on June 22, the day of the deadline. These documents and depositions showed there was no process to consider how rejecting the Agency Agreements would affect Maverick's interests, as distinct from the other Debtors'.

6. Finally, GSO and UnSub have acted in good faith in bringing these issues to the attention of the other parties and the Court. All the parties are well aware of GSO and UnSub's position that the Debtors failed to advance Maverick's interests in entering into the Settlement Agreement. GSO and UnSub are filing this Objection to make clear that they object to Maverick's rejection of the Agency Agreements insofar as it is contrary to the interests of Maverick and the other Comanche working interest owners, including UnSub.

## BACKGROUND

7. The Agency Agreements obligate Maverick to perform obligations of Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (collectively, "Anadarko") under certain midstream contracts. (*See* Docket No. 1309 at 8 n.7.) Among these obligations is delivery of gas produced by the Comanche Assets to the Brasada gas processing plant. The Comanche Assets are owned by multiple working interest owners including Maverick, UnSub, and others.

8. The Debtors' position is that, by virtue of rejection of the Agency Agreement, the Comanche gas volumes will no longer be committed to Brasada and will instead flow to Carnero

under a preexisting agreement between Maverick and Carnero. As Mr. Meghji explained at his deposition: "In simple terms, the rejection of those contracts triggers the ratification agreements whereby the volumes go from Brasada to Carnero as per the ratifications that had been signed by all -- effectively, by all the working interest partners for Comanche to direct the volumes to go to Carnero." (Meghji Dep. Tr. at 47:7–12.) GSO and UnSub disagree with the Debtors' position, for reasons we have explained elsewhere and do not repeat in this Objection.

9. Whether the Debtors are right or wrong about the effect of rejecting the Agency Agreements, one thing is clear: delivering the Comanche gas is the key benefit of the Settlement Agreement to the Debtors' counterparties to the agreement, including Carnero. Mr. Meghji agreed at his deposition that this is the "principal benefit" the Debtors are providing. (Meghji Dep. Tr. at 132:5–6.)

10. If they can deliver this benefit, the Debtors will receive rate reductions—effectively, a volume discount—from Carnero and other midstream service providers. Mr. Meghji stated in his deposition that "there is significant additional financial benefit [of the Settlement Agreement] from the reduction in rates to the debtors, which amounts to significant dollars going forward." (Meghji Dep. Tr. at 51:18–21.)

11. Critically, these rate reductions represent tremendous benefits for the Catarina Assets, but minimal benefits for Comanche. As explained in the Debtors' March 2020 business plan, the Debtors have a 100% working interest in Catarina, but Maverick has only a 6% economic interest in the Comanche. (*See* Sanchez Energy Business Plan (Mar. 2020) at 22, 23, *available at* https://www.sec.gov/Archives/edgar/data/1528837/000110465920043897/tm2011997d2_ex99-1.pdf.) Unsurprisingly, the Debtors sought to maximize their Catarina assets by using their leverage over the Comanche, in which they have a very small stake.

Case 4:21-cv-00587 Document 43-4 Filed on 03/17/21 in TXSD Page 6 of 12

12. At his deposition, Mr. Meghji asserted that the Comanche working interest owners will receive a benefit of $7 million from lower rates at Carnero. (Meghji Dep. Tr. at 123:19–23.) Even if this assertion is true—and to be clear, it has not yet been meaningfully tested—Maverick's 6% share of this benefit would be $420,000, virtually nothing compared to the benefits the other Debtors will get from lower Catarina rates.

13. In fact, the Settlement Agreement affirmatively harms Maverick by making it more difficult to obtain a better deal for the Comanche. Before entering into the Settlement Agreement, the Debtors never even tried to negotiate an optimal result for Comanche. As Mr. Meghji has admitted, GSO urged him multiple times to renegotiate rates with the Comanche's current midstream provider, but the Debtors never did so. (Meghji Dep. Tr. at 59:24–60:17, 136:23–25.) This was extremely harmful because the Comanche needs a comprehensive midstream solution for gathering, processing, and transportation. The Settlement Agreement offers only somewhat lower processing rates, which make up only a minority of the Comanche midstream costs.

14. A true fiduciary to Maverick would have tried to maximize its value by achieving the best possible midstream deal for the Comanche. Instead, Mr. Meghji applied the maxim "do no harm." When asked what process he used to ensure the settlement was fair to Maverick (as distinct from the other Debtors), Mr. Meghji responded: "We looked at the impact of entering into this Settlement Agreement and essentially wanted ***to make sure that they were no worse off*** and better off, if possible. And given what I've just explained to you, that they are actually better off as a result of this agreement, I felt like that was -- ***did not cause any harm to Maverick*** and its working interest holders." (Meghji Dep. Tr. at 124:7–14.)

## OBJECTION

15. The Court should deny Maverick's request to reject the Agency Agreements because it is contrary to Maverick's interests. The other Debtors are reaping the rewards from

Maverick's rejection of the Brasada agreement, leaving Maverick with just a small tip for its efforts. Meanwhile, the Debtors' myopic focus on the Settlement Agreement has caused them to overlook other opportunities, including promising negotiations with the Debtors' current midstream providers (Occidental Petroleum Corporation and Western Midstream Partners LP) and other potential midstream providers that could provide a much better deal for Comanche. This failure to pursue other options has affirmatively harmed Maverick.

16. A debtor's decision to assume or reject an executory contract is subject to the Court's review under the "business judgment" standard. *See* 11 U.S.C. § 365(a); *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985). A "bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to assume or reject it. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Court should not "blindly accept" a debtor's decision to reject a contract, but rather "must ensure the decision-making process used by a debtor in possession in exercising its powers under the [Bankruptcy] Code is a sensible one." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 427 (Bankr. N.D. Tex. 2009) (citing *In re Orion Pictures Corp.*, 4 F.3d at 1099; *Richmond Leasing Co.*, 762 F.2d at 1309).

17. While the rejection of the Agency Agreements may well be a sound exercise of the other Debtors' business judgment, it is a disastrous exercise of Maverick's. That is hardly surprising, because no one had Maverick's best interests at heart when the Debtors inked the Settlement Agreement committing them to reject the Agency Agreements. As Mr. Meghji admitted, he simply tried to ensure that Maverick was not harmed by rejecting the Agency Agreements to enrich the other Debtors. "Do no harm" is not the correct standard for a fiduciary;

in any event, the Debtors' failure to pursue other options did harm Maverick. The Court should not permit the other Debtors to use rejection to advance their interests in a way that does not meaningfully benefit, and in fact harms, Maverick.

[*Remainder of page intentionally blank*]

Case 4:23-cv-00587 Document 34-25 Filed on 04/19/23 in TXSD Page 69 of 202

## CONCLUSION

WHEREFORE, GSO and UnSub respectfully request for all of the reasons stated above that this Court deny rejection of the Agency Agreements, and grant such other and further relief as the Court may deem just and proper.

Dated: July 14, 2020
Houston, Texas

/s/ *Thomas A. Woolley*

**MCCLOSKEY ROBERSON, PLLC**
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

**Certificate of Service**

I hereby certify that the foregoing pleading was served on all parties registered to receive notice through the Court's CM/ECF system on July 14, 2020.

/s/ *Thomas A. Woolley*
Thomas A. Woolley, III

Case 2:22-cv-00357 Document 63-25 Filed 04/19/23 in 08/24/22 Page 1 of 8

# EXHIBIT 35

ENTERED
06/30/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | § | Case No. 19-34508 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

Upon consideration of the *Emergency Motion of the Debtors Pursuant to Section 365(A) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [DKT. # 1309] (the "Motion")[2], seeking among other things:

(1) Authorization to enter into and perform under a Settlement Agreement with certain of the Debtors' existing midstream and marketing service providers;

(2) Approval of the Debtors' assumption, in accordance with the Settlement Agreement, of (a) the Carnero Agreements, as amended by the Carnero Agreement Amendment, and (b) the Catarina Gathering Agreement, as amended by the Catarina Gathering Amendment (collectively, the "***Assumed Agreements***");

(3) Authorization to enter into the New Seco Pipeline Agreements;

and upon consideration of the evidence admitted and representations made on the record at the hearing on the Motion held on June 29, 2020 (the "Hearing"); and all objections to the Motion

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis, LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 700 Milam, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

having been withdrawn, resolved, or overruled on the merits; and this Court having considered the legal and factual bases for the relief requested in the Motion; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Hearing.

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The matters raised in the Motion are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

C. Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D. Proper, sufficient, and adequate notice of the Motion and the Hearing have been given in accordance with the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is necessary.

E. The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, and the transactions proposed in the Settlement Agreement are reasonable and appropriate under the circumstances, and the Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justification for the transactions proposed by the Settlement Agreement and (ii)

compelling circumstances for approval of the transactions contemplated as part of the Settlement Agreement pursuant to sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 9019. The terms of the Settlement Agreement are fair and reasonable, falling above the lowest point in the range of reasonableness, and are in the best interests of the Debtors' estates and their stakeholders as a whole.

F. Based upon the evidence and arguments made at the Hearing, this Court has weighed the probability of success in litigation, the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it. This Court has also taken into account the paramount interest of creditors and, based on all of the foregoing, has determined that the relief requested in the Motion is fair and equitable, in the best interests of the Debtors and their estates as a whole, and should be approved in all respects.

G. In the absence of the Settlement Agreement, the Debtors and their estates face considerable litigation expense, risk, and delay. The disputes between the Settlement Parties involve numerous legal and factual issues, and judicial resolution of these disputes will require extensive and costly briefing and discovery. Even if the Debtors were successful in litigating their alleged claims against the other Settlement Parties, any judgment obtained may be subject to appeal with no guarantee as to the ultimate outcome. Moreover, there is no doubt that the Settlement Parties' combined legal spend during a protracted litigation process would be substantial and further forestall any return of value to the Debtors and their stakeholders. The Settlement Agreement, however, resolves the Settlement Parties' disputes now without the need for costly, uncertain litigation.

H. The Settlement Agreement and the transactions contemplated thereby were negotiated, proposed, and entered into by the Settlement Parties, each of whom were represented by competent counsel, in good faith, without collusion, and as a result of arm's-length bargaining.

**IT IS HEREBY FOUND AND DETERMINED THAT:**

1. The Settlement Agreement is approved in its entirety, and the Debtors are authorized to enter into and perform under the Settlement Agreement and take all actions necessary to effectuate the terms of the Settlement Agreement.

2. In accordance with the Settlement Agreement, the Debtors hereby assume, pursuant to section 365 of the Bankruptcy Code, the Assumed Agreements. Effective as of the Closing Date, each of the Assumption Agreements will be deemed amended by the applicable Amendment Agreement and ratified for all purposes under the Plan. The Debtors are authorized to perform thereunder, in each case subject to and in accordance with the terms of the Settlement Agreement.

3. To the extent applicable, the Debtors are authorized, pursuant to section 363 of the Bankruptcy Code, to enter into and perform under the New Seco Pipeline Agreements.

4. The Settlement Parties are authorized to take such steps and actions as may be necessary or appropriate to implement the terms of the Settlement Agreement and this Order.

5. Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)), the terms and conditions of this Order shall be effective and enforceable upon its entry.

6. As part of the implementation and execution of the Plan, this Court shall retain jurisdiction with respect to all matters arising from or related to the Settlement Agreement or this Order.

7. Nothing in the Settlement Agreement or this Order requires any Other Comanche Working Interest Holder to deliver to and transport its hydrocarbons through the SECO Pipeline to the extent such Other Comanche Working Interest Holder's consent is necessary and such consent has not been obtained. This same principle applies to other matters related to the Settlement Agreement on which an Other Comanche Working Interest Holder's consent is necessary and consent has not been obtained.

8. Nothing in this Order impairs, modifies, prejudices, or otherwise affects rights of Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries), Eagle Ford TX LP, Mitsui E&P Texas LP, Gavilan Resources LLC, and GSO ST Holdings LP and each of its affiliates, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, SN EF UnSub LP, SN EF UnSub Holdings, LLC and each of their respective affiliates (collectively, the "Comanche Non-Ops"), with respect to each of the Comanche Non-Ops' contracts, including, but not limited to, each of the Comanche Non-Ops' production marketing agreements with SN Maverick (as assignee of Anadarko E&P Onshore LLC) (the "PMAs"). For the avoidance of doubt and notwithstanding anything to the contrary in this Order, nothing in this Order shall constitute a finding that SN Maverick has or has not acted in a manner consistent with its obligations to act in good faith and in a commercially reasonable manner under the circumstances (as set forth in such PMAs) in its performance under the PMAs.

9. Notwithstanding anything to the contrary in this Order, this Order shall not waive, limit, impair, operate to preclude, or otherwise impact in any manner any claims or causes of action arising out of, in connection with, or related to (in any manner) the Settlement Agreement.

10. Any determination by SN Maverick as to whether to assume or reject a contract must be:

a. made by a fiduciary for SN Maverick;

b. made by the fiduciary after the fiduciary has exercised sufficient due diligence to determine whether the assumption or rejection is in the best interest of SN Maverick;

c. in the best interest of SN Maverick; and

d. considered after notice and hearing.

11. If all or any portion of the $8,000,000 must be refunded, SN Maverick will be liable for the return only of that portion of the $8,000,000 actually received by SN Maverick.

12. Any party-in-interest that has standing to object to the relief sough in ECF No. 1309 will continue to have standing to object to any motion by SN Maverick to assume or reject a contract that is filed in accordance with this order.

13. Any rejection or termination of any material agreement affecting the Comanche Assets or any adoption of a material agreement affecting the Comanche Assets must be approved by either (i) the Operating Committee under the Comanche Joint Development Agreement, in accordance with its terms, if required under the terms of the Comanche Joint Development Agreement; or (ii) otherwise by Order of this Court.

14. Notwithstanding anything to the contrary in this Order, the Motion, the Assumed Agreements, the New Seco Pipeline Agreements or the Settlement Agreement (including the Amendment to the Settlement Agreement), (i) the Debtors and Reorganized Debtors shall continue to comply with all executory contracts and unexpired leases until they are assumed or rejected as set forth in paragraphs 23 and 24 of the Confirmation Order and (ii) the Settlement Agreement (including the Amendment to the Settlement Agreement) and this Order does not modify or impact any rights or defenses of any Counterparty (as defined in the Confirmation Order) in connection with any objection to the assumption or rejection of any executory contracts or unexpired leases (and to prosecute any timely filed objection) under the Plan or Confirmation Order.

15. Nothing in this Order shall alter in any way the rights of the Lien-Related Litigation Creditor Representative (as defined in the Plan) under the terms of the Plan.

Signed: June 30, 2020

Marvin Isgur
United States Bankruptcy Judge

# EXHIBIT 36

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC. | § | CASE NO. 21-03908-ADV |
| | § | HOUSTON, TEXAS |
| VS | § | TUESDAY, |
| | § | DECEMBER 7, 2021 |
| SN EF UNSUB, LP, ET AL | § | 2:30 P.M. TO 2:58 P.M. |

MOTION HEARING (HYBRID HEARING)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

FOR THE DEBTOR:

(VIA TELEPHONE)
PAUL, WEISS, RIFKIND, WHARTON AND GARRISON
Justin Ward, Esq.
1285 Avenue of the Americas
New York, NY 10019
212-373-3000

MCLOSKEY ROBERSON, PLLC
Thomas Woolley, Esq.
945 Heights Blvd
Houston, TX 77008
713-337-3910

FOR CARNERO G&P, LLC:

PORTER HEDGES LLP
Joshua Wolfshohl, Esq.
Amy Falcon, Esq.
1000 Main St, 36th Floor
Houston, TX 77002
713-226-6000

FOR MESQUITE ENERGY, INC.

FOLEY GARDERE
James G. Munisteri, Esq.
Sara Brown, Esq.
1000 Louisiana Street
Suite 2000
Houston, TX 77002
713-276-5500

(VIA TELEPHONE)
WILLKIE FARR AND GALLAGHER LLP
Mark Stancil, Esq.
Dennis Jenkins, Esq.
1875 K Street, NW
Washington, DC 20006
202-303-1133

FOR MITSUI E&P TEXAS LP:

SIDLEY AUSTIN LLP
Duston McFaul, Esq.
Maegan Quejada
1000 Louisiana St
Suite 6000
Houston, TX 77002
713-495-4500

APPEARANCES (CONT'D):

FOR EAGLE FORD TX LP: (VIA TELEPHONE)
MORGAN, LEWIS AND BOCKIUS LLP
Julia Frost Davies, Esq.
One Federal Street
Boston, MA 02215
617-341-7700

FOR VENADO EF L.P. (VIA TELEPHONE)
KIRKLAND AND ELLIS LLP
Sydney Corry, Esq.
609 Main Street
Houston, TX 77002
253-455-6202

(Please also see Electronic Appearances.)

# INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (None called.) | | | | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Plaintiff's: Exhibits 25-1 to 25-13 | 9 | 9 |
| Defendant's: Exhibits 26-1 to 26-7 | 9 | 9 |

HOUSTON, TEXAS; TUESDAY, DECEMBER 7, 2021; 2:30 P.M.

THE BALIFF: All rise.

THE COURT: Please be seated.

All right. We are here in the Canero G&P, LLC versus SN EF UnSub LP, et al, Adversary Proceeding 21-3908. We'll start with appearances in court, we'll then take any appearances on the phone. If you wish to appear on the phone, please press five star.

Mr. Wolfshohl.

MR. WOLFSHOHL: Good afternoon, Your Honor. Joshua Wolfshohl and Amy Falcon, my colleague, for Carnero, the Plaintiff.

Good to see, Your Honor. Good to be back in the courtroom. This is my first hearing back, and I don't think I've been in this courthouse for two years and I'm actually glad to be here.

THE COURT: Glad to have you back.

MR. MUNISTERI: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. MUNISTERI: James Munisteri for Mesquite. Ditto, it's nice to be back.

THE COURT: It's very nice to have people back.

MR. MUNISTERI: And I'm on joined on the phone by Mr. Stancil and by Ms. Brown. And Ms. Brown just wanted me to make sure she's going to be designated as the presenter.

THE COURT: All right. Thank you.

MR. MCFAUL: Good afternoon, Your Honor. Duston McFaul, Sidley Austin for Mitsui E&P Texas, LP, which is one of the non-ops, and Ms. Maegan Quejada is on the phone, as well.

THE COURT: All right.

MR. MCFAUL: Thank you.

THE COURT: Thank you.

MR. MCFAUL: Nice to see you.

THE COURT: Ms. Frost-Davies, good afternoon.

MS. FROST-DAVIES: Good afternoon, Your Honor. Julia Frost-Davies, Morgan Lewis, on behalf of Eagle Ford Texas, LP also one of the non-op Defendants.

THE COURT: All right. Thank you.

From the 253 area code, is 253-456-6202. Let me see what I have.

MS. CORRY: Sydney Corry. This is Sydney Corry with Kirkland and Ellis on behalf of Venado EF LP.

THE COURT: Ms. Corry, good afternoon.

MS. CORRY: Good afternoon.

THE COURT: Mr. Ward.

MR. WARD: Good afternoon, Your Honor. Justin Ward from Paul Wiess on behalf of Defendant UnSub and possibly also attending today on behalf of Unsub are Thomas Woolley from McCloskey Roberson and also from Paul Weiss,

Alice (indiscernible).

THE COURT: Mr. Ward, thank you.

Mr. Stancil.

(No audible response.)

THE COURT: Mr. Stancil.

MR. STANCIL: Good afternoon, Your Honor. Mark Stancil from Willkie Farr & Gallagher on behalf of Mesquite Energy, Inc. I'M also joined by my colleague, Dennis Jenkins, also representing Mesquite.

THE COURT: Mr. Stancil, Mr. Jenkins, good afternoon.

From 212-728-8276.

MR. JENKINS: Your Honor, Dennis Jenkins of Willkie Farr. It's good to be back in front of Your Honor, thank you.

THE COURT: Good to have you here, Mr. Jenkins.

All right. I show that's all of the folks that wish to speak at today's hearing. If you change your mind and want to speak during the course of the hearing, just press five star.

I've now held a few, maybe you know half a dozen of these hybrid hearings, and they've worked pretty well. But if anyone has trouble hearing or seeing, just find a way to let me know, and we'll be sure that those of you that are remote can see what's happening in the court, and those of

you in court can see what's happening remotely.

So I think we'll go, I guess, to you Mr. Wolfshohl.

MR. WOLFSHOHL: I think that's right, Your Honor. And just as a housekeeping matter, we conferred -- well, we conferred with Mr. Munisteri, I think he was speaking for the entirety of the Defendants -- but I don't think that there's any objection to our exhibits and we had no objection to their exhibits being admitted.

THE COURT: All right. Can you give me those exhibit identifiers?

MR. WOLFSHOHL: Sure, Your Honor. For Carnero, our Exhibit List was at Docket No. 25. And so it would be all of the exhibits that were attached to that Docket entry which I think would be 25-1 through, I believe --

THE COURT: Thirteen?

MR. WOLFSHOHL: -- 13.

THE COURT: All right.

MR. WOLFSHOHL: And we also reference a number of documents that are on the Docket that were voluminous that we didn't want to have to refile. But in our Exhibit List, there's a number of documents we are going to refer to at least one of those. But I don't think there's any issue with those being admitted.

And then Mr. Munisteri, or whoever is in charge of

the Defendants, I just know we didn't have any objection to theirs. I don't think that they filed the actual exhibits, but they did file a list and they sent us their exhibits and we didn't have any issue with them, Your Honor.

MR. MUNISTERI: Your Honor, both parties agreed no objections to the other parties' exhibits.

THE COURT: But what are your exhibits? What are the exhibits, what -- how do I find them?

MR. STANCIL: Your Honor, this is Mark Stancil, we filed our Exhibit List, I believe it's -- I want to say Docket 26, but Ms. Brown may correct me. Our exhibits are listed there.

And essentially they are the same documents that Movants are relying on, and we just typically reference though a transcript from prior hearings in the bankruptcy and an Order. So I think all of our items are directly out of the Docket for the bankruptcy case.

THE COURT: All right. So without objection Exhibits 25-1 through -13 are admitted.

(Plaintiff's Exhibits 25-1 through 25-13 are offered and admitted in evidence.)

THE COURT: And the documents that are referenced in Exhibit 26 are admitted as to 1 through 7. I think that's what you-all are asking me to do.

(Defendant's Exhibits 26-1 through 26-7 are offered and

admitted in evidence.)

MR. WOLFSHOHL: That's my understanding Your Honor.

THE COURT: All right.

MR. WOLFSHOHL: If you will, Your Honor, could you please make Ms. Falcon the presenter?

THE COURT: Of course.

MR. WOLFSHOHL: And I think both parties are really just -- now that we've got the exhibits admitted, I think we're just going to really just argue our points and we both got presentations that we exchanged prior to the hearing.

But before I jump into my presentation I want to go through something -- to clear something up, because I think it's based on some of the arguments in the surreply that the Defendants filed, as well as the presentation that they provided to us right before the hearing. Ms. Falcon is pulling up -- this is one of the documents that we identified -- is it on the screen?

THE COURT: Oh, yeah. I'm going to split the screen here to where people in court can --

MR. WOLFSHOHL: Okay.

THE COURT: -- see both faces and --

All right. Go ahead, please.

MR. WOLFSHOHL: Thank you, Your Honor.

There seems to be confusion about -- as Your Honor, knows -- I know you've read the pleadings and you've probably digested quite a bit in the last several days -- but there seems to be some confusion about whether the GGBA was assumed pursuant to the Settlement Agreement that was entered into around confirmation on June the 30th of 2020. And I want to clarify because the GGBA that I'm seeking to enforce, in this State Court lawsuit, was in fact not assumed pursuant to that agreement, Your Honor.

And if you go to the Settlement Agreement -- this is the Settlement Agreement that was attached to the motion that was filed seeking to approve the Midstream Settlement Agreement. You look at the definition of assumption agreements and it says -- starts with the Carnero Agreements and then it says the Catarina Gathering Agreement and then it identifies a number of other documents that are not the GGBA that I'm seeking to enforce.

In fact, it references that agreement, but it does not say that, that's an assumption agreement. If you look at the -- read all the way through Your Honor. It talks about ratification agreements that ratified the FGGBA, the Comanche FGGBA, that's the agreement that I'm seeking to enforce. It's a defined term in the Settlement Agreement, but it is not an assumption agreement so we will go to --

Ms. Falcon, if you can go to the Carnero

Agreements first?

You see the Carnero Agreement references the Carnero Gathering Agreement and the Carnero Processing Agreement, and we'll start with the Gathering Agreement. This is an agreement with SN Caterina.

Your Honor, if you remember, and I'm sure that -- I'm sure that the Reorganized Debtor is going to tell you a little bit about the history of these contracts -- but the Debtor had essentially two large pieces of acreage. One was the -- they referred to as the "Catarina Acreage" and the other one they referred to as the "Comanche Acreage." Most of the benefit that the Debtor was getting under the Settlement Agreement -- the Midstream Settlement Agreement -- related to the Catarina Acreage. My client was making significant concessions on rates as to the Catarina Acreage.

The Carnero Gathering Agreement that's reference as a "Carnero Agreement" under this agreement is with SN Caterina, which is the entity that owned the Caterina assets.

If you look -- the same thing goes for the Carnero Processing Agreement. Also in agreement with SN Caterina.

These are not agreements with SN Maverick. And if you look -- the specific Comanche FGGBA is a defined agreement under the Settlement Agreement, but it is not an

agreement that was an assumption agreement. The way that my GGBA that I'm seeking to enforce was assumed was pursuant to the Plan. It was listed as a contract that was being assumed, and the time passed and nobody objected to it. But it was not assumed pursuant to that Order, it just wasn't.

And there seems to be some reliance on the idea that somehow it was assumed in a qualified fashion and that as a result -- I don't think this is relevant -- but as a result of the termination of the Settlement Agreement that somehow that combined with the way the Settlement Agreement was approved that there was some kind of qualified assumption of my agreement.

But as to the GGBA, the fundamental agreement that I'm seeking to enforce in my State Court action, it was assumed with no qualifications.

But I just wanted to clear that up, Your Honor, and I'll move to the presentation.

So Your Honor, we think that this -- this is a very straightforward analysis. The issue before the Court, we have a State Court lawsuit that was filed in July of 2021, more than a year after the Plan got confirmed and more than a year after the Plan went effective. We're seeking declarations under the Texas Civil Practice and Revenues Code. And there are declarations that we are asking a State Court to interpret related to the assumed contracts. The

fundamental contract being the GGBA that was assumed under the Plan.

Most of the Defendants are non-Debtors, but there are Reorganized Debtors that are Defendants, as well. But it has to do with -- the fundamental disputes have to do with actions that were taken post-confirmation, actions that were taken more than a year after confirmation, more than a year after the effective date. The Defendant’s bear the burden to establish jurisdiction and we don’t think that they can, Your Honor.

Most of Carnero’s claims in the dec action don’t reference the Code, the Plan, or any order of this Court. The thing that they have really focused on are the claims where we are asking the State Court to declare what our rights are once these contracts are rejected.

THE COURT: Actually, I think that’s not quite right. This may be a bit of the inverse of that, but what I read the Complaint from them as being, is that you're asking that people be compelled to take action in the Bankruptcy Court to implement what you think your rights are, and you're asking the State Court to determine that before they ever act in the Bankruptcy Court.

And as I read their Complaint -- and you’ve got the right sections up here, K and L -- K seems to say that the State Court can order action to be taken here and L

seems to interpret what that action might be. And I think that's the heart of the Complaint. Not what your rights are necessarily, but that your attempt to control what occurs at 515 Rusk Street, for lack of a better description, is the way I would describe what I read their concerns to be.

MR. WOLFSHOHL: I don't disagree with the way that they've cast their Complaints, Your Honor. And I will tell you -- and I'm just going to say -- if confusion about the language is something that is causing the problem, this can be amended to make it clear, but my client's intent was not to dictate what it was that they were going to do with respect to 365. The purpose of these provisions is specifically to deal with what happens in the event of rejection.

THE COURT: Well, I know, but take a look at L. If you think you can amend out K and L, it may be worth thinking about doing that before we continue with the hearing.

By the way there may be nothing wrong with doing it this way and I'm not necessarily saying that you lose --

MR. WOLFSHOHL: No.

THE COURT: -- because of this.

MR. WOLFSHOHL: I understand.

THE COURT: But I think what the Complaint is, is you're having the State Court declare the effect of

rejection of a contract before it's ever rejected under L. That's a big step that may or may not be a fatal step. But if you can take away K and L, it's going to change the discussion, I think, that we're going to have today. I'm just -- I'll let the other side speak up about this, but that's what I'm reading the graver unhappiness to be about.

MR. WOLFSHOHL: Well, I can tell you, Your Honor, that when this Complaint, or this Petition, was prepared, the concern that we had was that they were continuing to pursue the OXY litigation and continuing to pursue rejection.

THE COURT: Right.

MR. WOLFSHOHL: But we were concerned that once they rejected, that they weren't going to honor our agreement. And that was the -- that was the gist of the concern.

Now they have since announced to Your Honor, that they're going to do some sort of hybrid type of assumption and that they're going to --

THE COURT: Well, I think we're coming back on the 21st, understandably.

MR. WOLFSHOHL: Well, I mean, they say that, Your Honor, but you know, we've been here several times, we don't know exactly what's going to happen. I'm just saying that the concern that my client has is that whatever global

settlement that they're entering into in some way impairs my client's rights under the GGBA, which is an assumed contract. I don't think I have to adjudicate those rights in Your Honor's court. And if you think that -- I mean --

THE COURT: I'm doing my best to not cross that bridge right now, because I don't know where the day is going to end up. But if what you're telling me is you don't need K and L, it's going to change what's happening a lot. But if you need K and L, it's going to change things a lot, too. So I think if you're really telling me this was stylistic, but not substantive to do K and L and the way you did them, then you can amend it away, it certainly will make a different argument.

And you know that I'm going to react to sort of with this initial negative reaction that any other court can tell me what needs to happen in my court, just as I wouldn't do that to them. I don't know that necessarily means it's wrong, but it may suggest to you the -- good idea.

MR. WOLFSHOHL: I believed that the issue was more nuanced than that, Your Honor.

THE COURT: Okay.

MR. WOLFSHOHL: I believed that the issue -- and they've raised this -- is this notion -- and this is -- I'm going to tell you what we didn't intend to do.

They raised this issue that this somehow, that K

was meant to require them or have a State Court say that they were required to exercise their rejection rights under 365. The intent -- and I mean it may not be artfully worded -- but the intent, in saying "among other actions," was to qualify that there were a number of ways to basically effect the termination of the obligations under the existing commitments. And the Debtors know that that was a way for them to do it, because that was the purpose of the Midstream Settlement Agreement. The Midstream Settlement --

THE COURT: I read K, the plain language of K, to ask the State Court to make Mesquite pursue Section 365.

MR. WOLFSHOHL: That's not the intent --

THE COURT: That is the way --

MR. WOLFSHOHL: That is not the intent and that could be amended. But here is where I'm getting to on how I think it's more nuanced.

The -- I knew you were going to -- I mean, I knew that because they raised that and I thought, you know, what -- you know, if that needs to be amended to be clarified, I think it changes, you know -- if Your Honor, believes that, that's what that means, that is not the intent. But the other question is if -- and you know, and it sounds like maybe you're going even further than that -- is if I'm asking the State Court to say "upon rejection," which is just a breach of contract under applicable law, that it has

an effect on my contract. And it has the effect of the Debtor's no longer obligated under those existing commitments and I just don't see how that could be -- fall under Your Honor's jurisdiction. Because once you reject, you know, you proceed, you know, as a Reorganized Debtor with the consequences of rejection.

THE COURT: So look -- and I said to you, I'm not necessarily saying there's anything wrong with this, but I'm not sure that every rejection order or rejection agreement has unmodified rights of a breach, right? The Court can certainly have a more nuanced order than that.

And I don't know -- first of all, I don't know if they're going to seek rejection. I don't know if I'm going to approve rejection. I don't know if I'm going to approve rejection if I say it's conditioned on certain events. There are all sorts of things that can happen, and to ask for declaration of what I'm going to do before I do it, before I know what I'm going to do, and to say anytime I act under 365, here's the consequence, that may be perfectly correct to go to State Court to do it. Not sure why we're doing it before we've decided.

MR. WOLFSHOHL: Can I have an opportunity to confer with my client? I actually think I -- I mean, I'm not sure I'm going to be able to get the right people on the phone immediately, I'm wondering if perhaps --

THE COURT: Well, let me ask the Defendants whether -- you're already telling me that I'm misreading K and I don't mean that you're doing that by saying it's my fault.

MR. WOLFSHOHL: I'm telling you that it's different than our intent, that's what --

THE COURT: Right.

MR. WOLFSHOHL: -- I'm saying. Yeah.

THE COURT: I know people are prepared for this hearing, but I see little point in going through it if I'm going to go through a hearing and then give you a chance to amend and then come back, as opposed to saying I would rather be arguing about what we're arguing about.

MR. WOLFSHOHL: Yeah.

THE COURT: And it may make sense to give you an amendment opportunity. Everyone here is going to be back on the 21st anyway, and then we just continue the hearing on the 21st and take everything up at the same time. Also adds more clarity to what the disputes about, I think.

Let me see what people think of that. I'll start in court with -- see if it makes any sense.

Mr. McFaul and Mr. Munisteri?

MR. MCFAUL: Yeah. Duston McFaul for Mitsui and well, I'll go ahead. I was going to say Mr. Stancil is taking the lead. But our position is that, of course, we're

fine with giving them an ability to amend, but we view this whole lawsuit as an attempt to get a court to say, "You are required to reject contracts and move the dedication of those minerals to us." We think K clearly says you are obligated to reject. That right only arises with Your Honor, so.

THE COURT: I think it does, too, but he's telling me that's not what he means to be asking for, so are you really going to spend an hour --

MR. MCFAUL: Understood. Understood.

THE COURT: I'm just asking --

MR. MCFAUL: We don't --

THE COURT: Does it make some sense to go a different direction?

MR. MCFAUL: We don't think they can amend and rectify it, but we're supportive of the opportunity.

THE COURT: It may be that --

MR. STANCIL: Your Honor --

THE COURT: -- they could is the problem and at which point, maybe you would be happy.

MR. MCFAUL: And I'll turn it over to Mr. Stancil.

THE COURT: I think at some point -- I'm going to now sort of -- at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of

that are a State Court issue. And so I don't know that this necessarily means this isn't going to go back to State Court, just because I'm concerned about that, because they can clearly fix at least some of the issues. I think.

Let me hear from folks on the phone.

MR. STANCIL: Your Honor.

THE COURT: Go ahead, Mr. Stancil.

MR. STANCIL: This is Mark Stancil, thank you -- for Mesquite.

Of course, understanding Your Honor will qualify that, I think we can cover a lot of ground today and I think would actually be very useful.

I think even if K were gone entirely, I think this would still be before, Your Honor, and I'm happy to get into that in a minute or now. But I think there are multiple independent bases for jurisdiction and I think it would actually significantly -- even if they're going to attempt to amend, which is not what they're supposed to be doing on removal, but even if they're going to attempt to amend, I think we could clarify the landscape significantly today to see if they're going to do it successfully.

But I think no matter what they amend, I think they're going to be back in front of Your Honor either way.

THE COURT: I think we're coming back either way, if that's what you mean. It's just a question whether I do

the amendment before the argument or after. Let me --

MR. STANCIL: Your Honor, I'll go one further and say we believe that Your Honor will have jurisdiction, and we think this lawsuit is going to be resolved on a motion to dismiss definitively by Your Honor with respect to the agreement that are in front of you. We don't agree that it's going to need to end up in State Court at all.

THE COURT: I don't know if it needs to end up in State Court or not. And that's the argument I'm going to eventually need to hear, whether it's today or another day.

Let me hear if anybody else wants to pitch in on that?

(No audible response.)

THE COURT: Okay. Well, look, I'm going to go ahead --

MR. WARD: Your Honor --

THE COURT: Yes. Go ahead.

MR. WARD: Your Honor, this is Justin Ward from Paul Weiss.

I do just want to raise the issue and to be candid, we haven't even looked into this of whether, you know, there are certain procedural issue with sort of defeating federal jurisdiction, bankruptcy jurisdiction by filing a Complaint that's within the Court's jurisdiction then amending after removal to sort of remove -- you know,

eliminate jurisdiction. I just want to make sure that, you know, it's not something we've thought about, but I'm not as I sit here today, if that's even possible.

MR. WOLFSHOHL: Your Honor, that's not --

MR. STANCIL: Your Honor, we have looked at that. It is removal jurisdiction is determined at the moment of filing a Complaint. But you know, I grant there might be some inefficiency to go going back to State Court with a new Complaint.

But we agree with the point I think Mr. Ward was making that I think it has to live or die at the moment of a filing with the Complaint when it comes to subject matter jurisdiction. They would be amending in front of you having put in front of you and then I guess they would be moving to dismiss for lack of subject matter jurisdiction.

THE COURT: I don't think it would be -- look, subject matter jurisdiction is plainly determined at the point of removal, but I'm not sure that abstention is the same as subject matter jurisdiction, so.

MR. WOLFSHOHL: Your Honor, also, you can always, you know, remove or, I mean, remand or dismiss a Complaint based on a lack of subject matter jurisdiction. The subject matter jurisdiction is a continuum, and if I modify the Complaint to make it clearer, I don't see how that could possibly in anyway interfere with --

THE COURT: Well, I do think that there may be a question of if the removal was proper, because there was subject matter jurisdiction, and you amend, I don't think that the remand motion gets to say that I don't have subject matter jurisdiction. I think it gets to say we should now abstain.

MR. WOLFSHOHL: For lack of subject matter jurisdiction?

THE COURT: No. Abstain on other principles.

MR. WOLFSHOHL: Right.

THE COURT: Maybe that had it been filed today there wouldn't be subject matter jurisdiction, but we would still have subject matter jurisdiction over something that was filed that way, I think. That part can be briefed as well. I'm not looking -- the Defendants aren't going to wave this argument by me allowing the amendment, but it may focus you more on the abstention argument.

MR. WOLFSHOHL: Yeah.

THE COURT: If you want the right to amend, I don't know that. I think so. I'm going to do this. I know it's frustrating for everybody, but probably more frustrating for me because I've got to read all this stuff and I'll have to read it again. I want you to amend.

MR. WOLFSHOHL: Okay.

THE COURT: If I'm misreading it, they're

misreading it, I don't want to hear the whole argument over the wrong issues. I'm going to require the amendment to be done -- can you get it done by Friday?

MR. WOLFSHOHL: I think I can. Yes, sir.

THE COURT: Not later than the 10th at 5:00 o'clock.

I want any supplement to the motions by the -- to the responses, I should say, by the Defendants to be filed by the 17th.

And then we'll come back on the 21st, along with the settlement implementation hearing at 1:30 on the 21st, and I'm going to tell Ms. Do to just block off the rest of the day for those two matters so that you won't get interrupted.

I'm sorry to bring everybody down for this, but I think it is the better course of action, so that we're all focused on what we need to be focused on. Their settlement may affect what you need, and what you amend may cause some relaxation by the Defendants, I don't know. But I want to see what that is.

So I think it's the most efficient thing to do and that's what we'll do today. I'll see you-all on the 21st.

THE COURT: Thank you.

MR. WOLFSHOHL: Thank you, Your Honor.

MR. STANCIL: Thank you, Your Honor.

THE COURT: We're in adjournment until 4:00 o'clock.

(Proceeding adjourned at 2:58 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #64921*

*DATE FILED: DECEMBER 13, 2021*

# EXHIBIT 37

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Debtors.[1] | ) | (Jointly Administered) |

**LIMITED OBJECTION AND RESERVATION**
**OF RIGHTS OF GAVILAN RESOURCES, LLC TO**
**ASSUMPTION AND REJECTION OF CONTRACTS UNDER**
**THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

Gavilan Resources, LLC ("**Gavilan**") by and through undersigned counsel submits this limited objection and reservation of rights (the "**Objection**") to the proposed assumption and rejection of contracts under the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1205] (the "**Plan**") filed by Sanchez Energy Corporation and its debtor affiliates in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and pursuant to the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1212] (as amended by the *Order Granting Emergency Motion Modifying Paragraph 17 of the Order Approving Disclosure Statement and Confirming Second*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

*Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1267], the "**Confirmation Order**"), and the *Notice of Filing of Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1326] (the "**Executory Contract Notice**"), and respectfully states as follows:

## BACKGROUND

*A. Gavilan And The Comanche Assets*

1. Gavilan is a private company in the business of acquiring, developing, and producing oil and natural gas assets in the Eagle Ford shale play in south Texas. In March 2017, Gavilan, along with non-Debtor SN EF UnSub LP ("**UnSub**") and Debtor SN EF Maverick, LLC ("**SN Maverick**") (together with Debtor Sanchez Energy Corporation, "**Sanchez**" or the "**Debtors**"), purchased certain assets in the Eagle Ford shale, known as the Comanche assets (the "**Comanche Assets**"), for approximately $2.3 billion from Anadarko Petroleum ("**Anadarko**"). Gavilan paid Anadarko 50% of the purchase price, roughly $1.13 billion, and acquired 50% of all of Anadarko's interest in the Comanche Assets. UnSub paid Anadarko $744 million for the other 50% of Anadarko's proved developed producing ("**PDP**") assets, and 20% of Anadarko's proved developed non-producing ("**PDNP**") assets and proved undeveloped ("**PUD**") assets. SN Maverick paid Anadarko $394 million for the remaining 30% of Anadarko's PDNP and PUD assets.

2. Gavilan, Sanchez, and UnSub, either as part of the transaction with Anadarko or immediately thereafter, became party to a number of agreements and obtained rights with respect to others related to the operations and management of the Comanche Assets. These agreements range from joint operating agreements ("**JOAs**"), pooling agreements, marketing agreements, to

the Joint Development Agreement ("**JDA**") – the subject of the Operatorship Dispute (defined below) currently pending before this Court. In addition to the contracts to which Gavilan is a direct party, certain Debtor contracts inure to the benefit of Gavilan and cannot be modified without the consent of Gavilan. For example, each of the marketing agreements between Gavilan and Sanchez requires Gavilan's approval for certain new, or changes to existing, processing, treating, transportation or similar or related agreements.

*B. The Operatorship Dispute, The Plan And The Debtors' Executory Contracts*

3. As referenced above, Gavilan, Sanchez, and UnSub are parties to the JDA. Sanchez was in Default (as defined in the JDA), for two independent reasons, under the JDA for months – before Sanchez filed its own chapter 11 cases. Sanchez disputed the Defaults, forcing Gavilan to confirm the Defaults through a contractually mandated arbitration process. Gavilan started arbitration proceedings in February 2019.

4. In August 2019, before the conclusion of the arbitration, the Debtors and certain affiliates filed the above-captioned Chapter 11 Cases. Following the commencement of the Debtors' Chapter 11 Cases, Gavilan sought relief from the automatic stay to continue the arbitration. In December 2019 and January 2020, Gavilan and the Debtors agreed to move the arbitration proceedings to these Chapter 11 Cases so that the dispute among the parties, the "Operatorship Dispute," could finally be resolved. The Operatorship Dispute is styled as *Gavilan Resources, LLC v. SN EF Maverick, LLC, et al.*, Adv. Proc. No. 20-03021. Trial on the Operatorship Dispute concluded on June 5, 2020 and, as of the date hereof, the matter remains under consideration by the Court.

5. On April 30, 2020, the Court confirmed the Plan proposed by the Debtors, but the Debtors left unresolved issues related to assumption and rejection of numerous contracts, including

those with, and otherwise affecting, Gavilan. The Debtors' lists of proposed contracts to be assumed or rejected have been filed, and amended, on a number of occasions. The Executory Contract Notice is the last filed list. Exhibit B to the Executory Contract Notice is the list of executory contracts that the Debtors intend to reject, while Exhibit C to the same is the list of the executory contracts that the Debtors intend to assume. On June 7, 2020, Gavilan requested additional information regarding certain of the contracts listed in the Executory Contract Notice and, on June 20, 2020, reiterated that request and made additional requests for information relevant to this Objection and the Debtors' proposed assumption or rejection (the "**Informal Requests**"). As of the time of this filing, Gavilan has not received a response to the Informal Requests.

*C. Gavilan's Chapter 11 Cases*

6. On May 15, 2020, Gavilan and its affiliated debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Gavilan's and its debtor affiliate's cases (the "**Gavilan Cases**") are being jointly administered under *In re Gavilan Resources, LLC*, Case No. 20-32656 (Bankr. S.D. Tex. 2020). At the request of Gavilan, the automatic stay was lifted in the Gavilan Cases for the limited purpose of allowing Gavilan and Sanchez to prosecute their asserted claims to a final judgment in the Operatorship Dispute, and for no other reason.

## OBJECTION

7. Pursuant to sections 365 and 362[2] of the Bankruptcy Code, Gavilan files this limited Objection and reservation of rights with respect to the Debtors' proposed rejection and assumption of any contracts to which Gavilan is a party or in which Gavilan has an interest (the "**Contracts**").

---

[2] The automatic stay imposed in the Gavilan Cases has not been modified or otherwise lifted and the Debtors in these Chapter 11 Cases have made no attempt to do so. Gavilan is reserving all rights to seek enforcement of the automatic

*A. Whether Assumption Or Rejection Is Supported By The Debtors' Business Judgment Cannot Be Determined Until Resolution Of The Operatorship Dispute*

8. The Debtors' proposed assumption or rejection of the Contracts is not appropriate at this stage of these Chapter 11 Cases because the resolution of the Operatorship Dispute remains under consideration by the Court. Operatorship of the Comanche Assets is a central issue in both these Chapter 11 Cases as well as the Gavilan Cases. Each of the parties agrees that the right to operate the Comanche Assets is an important right, and the decision by the Court on the Operatorship Dispute, no matter the outcome, will most assuredly cause each of the parties to review its options, including with respect to the assumption or rejection of the Contracts, and adjust its strategies to maximize the value of all involved bankruptcy estates.

9. Pursuant to section 365(a) of the Bankruptcy Code, a trustee or debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard by which a debtor's decision to reject or assume an executory contract is reviewed is the business judgment rule. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019); *see also Richmond Leasing Co. v. Capital Bank, N.A. (In re Richmond Leasing Co.)*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying the business judgement rule). The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Bartlinski v. Sanchez*, 39 F. Supp. 3d 862, 866 (S.D. Tex. 2014) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). "In applying the business judgment rule in deciding whether to grant a debtor's motion to reject a contract a court is not adjured to blindly accept, but rather only to show proper

---

stay in the Gavilan Cases to the extent the proposed treatment of any Contract impermissibly affects Gavilan's rights thereunder.

deference to the business judgment of the debtor's management." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) (citing *In re Richmond Leasing*, 762 F.2d at 1309). Furthermore, "[i]n reviewing a trustee's or debtor-in-possession's decision to assume [or reject] an executory contract …, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession." *Id.* at 427 (quoting *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (alteration in original)).

10. Indeed, the Debtors have yet to make a showing that the assumption or rejection of the Contracts, much less the assumption or rejection of each of the contracts listed in the Executory Contract Notice, is an appropriate application of the Debtors' business judgment, especially as it relates to the Comanche Assets. Moreover, however deferential the business judgment rule may be to the Debtors, it would be difficult to contend that the Debtors' management has made an informed decision regarding whether to assume or reject the Contracts, without considering the impact of this Court's ruling in the Operatorship Dispute. Operatorship of the Comanche Assets is a key component of the value of the Comanche Assets. Without the Operatorship Dispute being decided, the Debtors will not be able to make a convincing case that the decisions under section 365 are adequately "informed" and in "good faith." Accordingly, the Debtors' proposed rejection and assumption of the Contracts should not be considered until the Operatorship Dispute is resolved.

*B. The Debtors Have Not Satisfied The Requirements Of Section 365(b)*

11. As referenced above, the Debtors propose to assume several of the Contracts with Gavilan. Pursuant to section 365(b) of the Bankruptcy Code,

> [i]f there has been a default in an executory contract or unexpired lease of the debtor, the [debtor-in-possession] may not assume such contract or lease unless, … the [debtor-in-possession]—
>
> (A) cures, or provides adequate assurance that the [debtor-in-possession] will promptly cure, such default [subject to certain exceptions] …;
>
> (B) compensates, or provides adequate assurance that the [debtor-in-possession] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

12. While there is no set definition of "adequate assurance of future performance," courts have assessed numerous factors in the analysis. "[T]o determine if the debtor in possession has provided adequate assurance of future performance, we have held that courts must look to factual conditions, including consideration of whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 438-39 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also In re Richmond Leasing*, 762 F.2d at 1310 (discussing the same factors) (citations omitted).

13. As an initial matter, the Debtors have not responded to Gavilan's Informal Requests for additional information regarding the Contracts, and Gavilan is in the process of reviewing ongoing discovery in connection with the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a*

*Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended* [Docket No. 1309] (the "**Settlement Motion**"). Accordingly, Gavilan reserves the right to supplement this Objection based on additional information provided by the Debtors.

14. In addition, as described in the Settlement Motion, the Debtors have proposed to reject certain of the processing and transportation agreements currently handling Gavilan's production even though the Debtors are also proposing to assume the Gavilan marketing agreements which require Gavilan's consent to modify such processing and transportation arrangements. This proposed result appears untenable under the Bankruptcy Code. If the Debtors are allowed to reject, and thus breach, such processing and transportation agreements, among others, the Debtors cannot purport to be in compliance with, and thus assume, Gavilan's marketing agreements.

15. Based on this and other facts currently available to Gavilan, including the Debtors' apparent lack of liquidity[3] and ongoing uncertainty regarding the proposed go-forward management of the Debtors, Gavilan objects to the proposed assumption of the Contracts until such time as the Debtors can cure any existing defaults and provide adequate assurance of future performance under the Contracts the Debtors propose to assume.

## RESERVATION OF RIGHTS

16. Based on the foregoing, Gavilan reserves the right to amend or supplement this Objection, raise additional objections to the Debtors' proposed treatment of the Contracts, seek

[3] As part of Sanchez's proposed Settlement Agreement (as defined in the Settlement Motion), Sanchez will immediately receive $8 million upon Court approval of the Settlement Agreement. This, they say, is "crucial to providing the needed liquidity." Settlement Motion, ¶ 3. They further state that the relief requested in the Settlement Motion and Settlement Agreement is "critical to the occurrence of the Effective Date." *Id.* at ¶ 4.

formal discovery, and to seek any other or further relief. In addition, because Gavilan is a debtor in the Gavilan Cases, Gavilan reserves all rights to assume or reject its own executory contracts pursuant to section 365 of the Bankruptcy Code, including certain of those contracts which the Debtors purport to assume or reject pursuant to the Plan and Confirmation Order, and to seek enforcement of the automatic stay in the Gavilan Cases.

**CONCLUSION**

Based on the foregoing, Gavilan respectfully requests that the Court defer the Debtors' requests to reject or assume the Contracts until a more appropriate time, and grant such other and further relief as the Court may deem just and proper.

Dated: June 22, 2020
Houston, Texas

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (TX 15776275)
Brenda Funk (TX 24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Emails: Alfredo.Perez@weil.com;
Brenda.Funk@weil.com

- and -

Garrett Fail (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Garrett.Fail@weil.com

*Proposed Attorneys for Gavilan Resources, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2020, a true and correct copy of the foregoing objection was served by e-mail on the parties who receive electronic notice in these cases pursuant to the Court's ECF filing system.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

# EXHIBIT 38

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC | ) | CASE NO: 22-03035 |
| | ) | ADVERSARY |
| Plaintiffs, | ) | |
| | ) | Houston, Texas |
| Vs. | ) | |
| | ) | Monday, May 23, 2022 |
| SN EF UNSUB, LP, ET AL., | ) | |
| | ) | 8:58 A.M. to 10:47 A.M. |
| Defendants. | ) | |
| ------------------------------- | ) | |

MOTION HEARING

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Carnero G&P, LLC: | JOSHUA W. WOLFSHOHL<br>AMY COATES FALCON<br>Porter Hedges, LLP<br>1000 Main Street, Suite 3600<br>Houston, TX 77002 |
| For Eagle Ford TX LP: | JULIA FROST-DAVIES<br>Morgan Lewis & Bockius, LLP<br>One Federal Street<br>Boston, MA 02115 |
| For Mesquite Energy: | JAMES G. MUNISTERI<br>Foley Gardere<br>1000 Louisiana Street, Suite 2000<br>Houston, TX 77002 |
| | MARK T. STANCIL<br>Willkie Farr & Gallagher, LLP<br>1875 K Street NW<br>Washington, D.C. 20006 |
| For Mitsui E&P Texas LP: | DUSTON K. MCFAUL<br>Sidley Austin, LLP<br>1000 Louisiana Street, Suite 5900<br>Houston, TX 77002 |

For SN EF UnSub, LP: PAUL M. BASTA
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

For Venado EF LP: CONOR P. MCNAMARA
Kirkland and Ellis, LLP
300 N. LaSalle
Chicago, IL 60654

Court Reporter: UNKNOWN

Courtroom Deputy: UNKNOWN

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| PLAINTIFFS' EXHIBITS | RECEIVED |
|---|---|
| Exhibits 25-1 through 25-11 | 7 |
| Exhibits 26-1 through 6 | 8 |
| Exhibits 26-16 through 21 | 8 |
| Exhibits 26-23 through 44 | 8 |
| Exhibit 26-46 through 53 | 8 |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|

HOUSTON, TEXAS; MONDAY, MAY 23, 2022; 8:58 A.M.

(Call to Order)

THE COURT: All right. We are here in the Carnero adversary proceeding. It is 22-03035. If you wish to appear today in court, please approach the podium and appear. If you wish to appear on the phone, please press 5 star one time on your phone.

MR. STANCIL: Good morning, Your Honor. Mark Stancil from Willkie Farr & Gallagher for the Debtors.

THE COURT: Good morning, Mr. Stancil.

MR. MUNISTERI: Good morning, Your Honor. Jim Munisteri with Foley & Lardner for the Debtors.

THE COURT: Good morning, Mr. Munisteri.

MR. WOLFSHOHL: Good morning, Your Honor. Joshua Wolfshohl and Aaron Power for the plaintiffs, Carnero.

THE COURT: Good morning, Mr. Wolfshohl.

MR. McFAUL: And good morning, Your Honor. Dustin McFaul, Sidley Austin, for Mitsui E&P Texas.

THE COURT: Good morning, Mr. McFaul. Mr. Basta.

MR. BASTA: Good morning, Your Honor. Sorry I'm not there in person. Paul Basta and Andy Ehrlich from Paul, Weiss on behalf of EF UnSub.

THE COURT: Good morning. Ms. Frost-Davies.

MS. FROST-DAVIES: Good morning, Your Honor. Julia Frost-Davies of Morgan Lewis on behalf of Eagle Ford

Texas.

THE COURT: Good morning. Do you know that we can't see you on the camera, which is okay, but I wanted you to know that.

MS. FROST-DAVIES: Your Honor, I have COVID and I'm not camera ready. No one wants to see this, so I apologize.

THE COURT: Do you need to postpone the hearing or are you good enough to participate, Ms. Frost-Davies?

MS. FROST-DAVIES: I do not. I am fine. Thank you for asking, Your Honor.

THE COURT: All right. I hope you get better. Thank you.

MS. FROST-DAVIES: Thank you, Your Honor.

THE COURT: Mr. McNamara.

MR. McNAMARA: Good morning, Your Honor. Conor McNamara, Kirkland & Ellis, on behalf (indiscernible) LP.

THE COURT: Ms. Falcon, I see you, but I don't have 5 star for you. Can you just shake your head, do you intend to speak today because, if so, I'll find you.

MR. WOLFSHOHL: I don't think that she does plan to, Your Honor. She's with my firm. She actually also tested positive to COVID last week, and so that's why she's not here.

THE COURT: Oh, here she is. Ms. Falcon, good

morning.

MS. FALCON: Good morning, Your Honor. Yes, I do have COVID as well, but I'm prepared to move forward. I don't expect to have to say anything, but I am here, just I'm muted.

THE COURT: Thank you. All right. Mr. Wolfshohl, are you going to take the lead?

MR. WOLFSHOHL: I am, Your Honor. And, Your Honor, for purposes of my presentation -- first of all, I think we can probably -- you want to talk about exhibits first?

THE COURT: Sure.

MR. WOLFSHOHL: I think most of this is just going to be argument, in addition to the exhibits that we're going to seek to be admitted, Your Honor.

THE COURT: All right.

MR. WOLFSHOHL: Well, first of all, on my exhibits, I don't think -- is there any objection? I don't think that there is. I think we had agreed that --

MR. STANCIL: Right, no objection.

THE COURT: So those are going to be Exhibits 25-1 through 25-11; is that right?

MR. WOLFSHOHL: That's correct, Your Honor.

THE COURT: All right. Does any party have any objection? All right, 25-1 through 25-11 are admitted.

(Exhibits 25-1 - 25-11 Entered into Evidence)

THE COURT: And what about for other exhibits? Mr. Munisteri.

MR. MUNISTERI: Good morning, Your Honor. We offer Exhibits 1 through 24 -- I'm sorry -- 1 through 54 and it's Document 28 is the full list.

THE COURT: That only go through 53.

MR. MUNISTERI: Well, 54 is the amended list, but it's just a certificate of authenticity. And we've reached -- 54 is -- and we've reached an agreement on authenticity, so, frankly, 1 through 53 is all that's necessary.

MR. WOLFSHOHL: Agreed as to authenticity, Your Honor. A number of the exhibits that are identified are documents on the court docket, which we're fine with the Court taking judicial notice of. However, I'm going to identify the ones that we would object based on relevance, Your Honor, and that is Exhibit 7 through 15 and Exhibit 22 and Exhibit 45.

Your Honor, and same caveat with all of the documents that were filed of record. Exhibit 52, we think that's the motion for judgment on the pleadings. We're not here today on that. I have a relevance objection to it. I do understand that the Court can take judicial notice of it, but the relevance objection to that is really the same as the objection that I have to all the exhibits I just

identified. It attaches a number of documents, and it really goes into the merits of the claims, and I don't believe that that's what before the Court today.

THE COURT: All right. I'm admitting 26-1 through 6, 26-16 through 21, 26-23 through 44, and 26-46 to 53.

(Exhibits 26-1 - 6, 26-16 - 21, 26-23 - 44, 26-46 - 53 Entered into Evidence)

If 7 to 15, 22, or 45 are utilized today, then you can object that they are not yet admitted and argue relevance once I can understand it because I'm not going to guess as to relevance. Does that work for everybody?

MR. MUNISTERI: Yes, Your Honor.

MR. WOLFSHOHL: Works for me, Your Honor.

THE COURT: Thank you.

MR. WOLFSHOHL: And, Your Honor, we have a short slide deck that if you give Mr. Power the sharing screen.

THE COURT: I will. Let me get my screen split so people in court can see faces and documents. All right, it's all yours.

MR. WOLFSHOHL: Thank you, Your Honor. So my slide deck is going to be a lot shorter than theirs. I think one of the reasons is that a large focus today by the defendants is going to be on the merits of my claims. I don't believe that that's relevant to Your Honor's determination of jurisdiction.

I believe that this case really hinges on timing. As Your Honor had previously acknowledged in this case and I think in others, in Chapter 11 cases after confirmation, there comes a time when a Bankruptcy Court loses jurisdiction and contract disputes have to be decided by state courts.

Carnero believes that that point in time occurred at the latest when Your Honor entered the December 21, 2021 order in the OXY West adversary. It was at that point in time when all issues under Section 365 regarding assumption and rejection were resolved and adjudicated, and it was after that point in time that Carnero's contract claims arose.

As Your Honor knows, the GGPA was assumed back when the plan got confirmed in June of 2020. At that time, and this is going to be a significant source of contention between the parties, I just don't think it's really an issue. At that point in time, Carnero had no basis to object to assumption. It had no breach of contract claim. They hadn't done what they ultimately did in December of 2021.

And, frankly, there was no contemplation by any party that that is what was going to happen. It wasn't the contemplation of the Debtors, it wasn't the contemplation of Carnero. Nothing about anything related to the OXY West's

settlement was disclosed parties in connection with confirmation. And, in fact, as Your Honor knows, an entirely different agreement was actually approved by the Court, so what actually ultimately happened was entirely contrary to what happened at confirmation.

Your Honor, my client believes that the GGPA was not breached until December 23, 2021.

THE COURT: December 23rd --

MR. WOLFSHOHL: 23rd.

THE COURT: -- or -1st?

MR. WOLFSHOHL: That was the date that they filed the notice saying that the settlement had gone -- became effective. The 21st was Your Honor's hearing. They had not executed the settlement, as I appreciated, and you asked for them to file a notice upon execution of the settlement, and I believe it was the 23rd that they actually filed that notice and said that the settlement had become effective.

A lot of what the defendant's rely on is this, I'm going to call it time travel logic. They're saying, you know, somehow my claims that didn't really come into existence until the 23rd of December somehow should have been raised back at confirmation. And, Your Honor, I think that that argument completely defies logic.

In a way, Mesquite and the defendants fault Carnero for filing its state court lawsuit both too late and

too early. They say that we should have asserted something at confirmation in the context of an objection, but then on the other hand say when you did file it, you didn't have all the documents and you didn't know if you had a good claim yet. We believed we had a claim then and we believe we have a claim now, but you can't really reconcile those positions, Your Honor.

It also faults Carnero for not objecting to the OXY West settlement. And Your Honor can look at your docket, read your hearing transcript, and see that that is just not a valid argument. First of all, they didn't file a motion with the Court asking for permission to approve it. Mr. Jenkins stood up before you and gave you a long explanation about how they were allowed to do it without Court approval, and they can. The plan provided that they could.

Your Honor even pushed back on some of the language and required that said, look, I don't even know what this settlement is. I don't know what's going on behind the scenes. I don't know what the amendments are. And you pushed back and said this order needs to read that this is at and between the parties and not something that binds other parties.

I didn't know the terms of the settlement at that time. You didn't know the terms of the settlement at that

time. You didn't approve the settlement. All you did was enter a 365 order, Your Honor.

I think that for Your Honor to look at this and crystallize what it is that's really at issue, you got to look at our petition for what it does and what it doesn't do.

THE COURT: So when I look at your petition, it pretty carefully avoids bankruptcy. There's a footnote that says something occurred in the bankruptcy case. And part of the argument you're briefing is that we can't look at their defenses, for example, their position that what you're seeking to do is contrary to the plan or whatever.

I want you to -- I'm trying to figure out there's got to be some limiting principle here. Let's assume that what you're trying to do were to run directly contrary to one of her orders, in other words, it's unambiguous that you're violating an order.

MR. WOLFSHOHL: Yup.

THE COURT: I know that's not what we have here from your point of view. But if it were directly contrary to a court order, is that a defense that they couldn't remove based on or would they have to put (indiscernible).

MR. WOLFSHOHL: I actually think it is. I think it matters what the defense is, Your Honor. And I think if you look at the case law, including case law interpreting

the Fifth Circuit, I think what you will see is courts say that you can't assert a defense for purposes of creating federal jurisdiction or bankruptcy jurisdiction. I think that that is the decision that you have to make.

THE COURT: You certainly can't assert a defense for the purpose of creating federal jurisdiction. But their position is that if it is not for that, for the purpose of federal jurisdiction, but it is, in fact, an integral and obvious defense that might create federal jurisdiction, so long as it's not done artificially.

MR. WOLFSHOHL: Well, and I don't think it's just a motive, Your Honor. I think it's whether it's a valid defense. I'm actually thinking -- I actually believe that you have to make that determination for purposes of determining jurisdiction today. And I think in your hypothetical, if it was something that ran contrary, I do believe that I would be -- I mean, that falls into Craig's Stores; it's the enforcement or the interpretation of a bankruptcy court order or the plan specifically.

And so, I think that -- I do believe that those are very different facts from what we have today.

THE COURT: Okay. But do you --

MR. WOLFSHOHL: Yes.

THE COURT: I'm trying to figure out from a limiting principle point of view, I think your briefing says

defenses can't create jurisdiction, but I think what you're telling me is artificial defenses can't create it.

MR. WOLFSHOHL: That's correct.

THE COURT: But if there is, in fact, a real defense that it runs contrary to the bankruptcy order, that is sufficient for removal.

MR. WOLFSHOHL: I think that that would be sufficient for creating the jurisdiction, but I firmly believe that that's the decision you have to make. I think that that's for purposes of determining whether there is a valid defense. I mean, almost any contract action that they remove, they could somehow, you know, make an allegation that, you know, because the plan has very broad language that talks about the Debtor operating its business or doing certain things, I think that you could go down a path where that's limitless. And every time that they want to bring something back into bankruptcy court, they simply assert that it's somehow related to something that was stated in the plan.

And I think that the decision that Your Honor has to make is do they, you know, I mean, you've seen their arguments. I don't think that they have any merit. I don't think that anything that I'm doing is contrary to the plan or the confirmation order, nor do I think that you have to look back to the confirmation order and the plan injunction.

I just don't think -- I think that completely defies logic, the idea that the plan injunction prevents me from asserting a breach of contract claim that didn't exist until the date that they entered into the new agreement.

THE COURT: I don't know where this argument's going to go, but I don't think your characterization of what they're saying is exactly right either. They're telling me that in the plan, it says that you can have amendments -- I forget the exact language, but they quote a sentence --

MR. WOLFSHOHL: Yeah. No, no, no, and I --

THE COURT: -- that you can have amendments. And they're saying if they're authorized to amend, your time to object was to say no, as part of 365, you can't amend, and you didn't.

MR. WOLFSHOHL: But that's not the argument that I'm actually making either, Your Honor. I do not -- first of all, we're not objecting to the fact that they amended. We're objecting to the fact that we believe their amendments violated our contract, that's it. I'm not trying to make a broad sweeping allegation that --

THE COURT: Well, but you'd have that same objection if they'd done this pre-effective date.

MR. WOLFSHOHL: Except that I wasn't put on notice of what an amendment might look like. And, in fact, they were going in front of the Court saying that they were

rejecting the agreement.

THE COURT: Well, no, that's not the issue today.

MR. WOLFSHOHL: I'm sorry.

THE COURT: Let's assume we're pre-effective date and pre-effective date, they assume with amendments to be announced later. You wouldn't have known them then either. The issue is whether you have to object early on to an announced right to amend unknown later. I don't know the answer, but...

MR. WOLFSHOHL: Yeah, well, I mean, I don't think that -- I think because the plan also preserves my rights under the contract, I don't think that there's any way that my claim would just go away. I mean, it's not a cure claim. I mean, there was no default as of the date that the confirmation order got entered.

All my rights as a contract counterparty were preserved post-confirmation. I don't think, even in your scenario, Your Honor, I don't think that that's something that is subject to the plan injunction. But that is, as you know, not exactly on all fours with what our situation is.

THE COURT: Right. Unfortunately, I don't know if we have anything that's going to be on all fours, but that's what I'm trying to figure out someone that's charging rough, why don't you go ahead.

MR. WOLFSHOHL: No problem, Your Honor. And so,

just to reiterate, and I think Your Honor was speaking to this whenever I was starting to talk about it. You know, our contract or our claims that are set out in the petition, the state court petition, our breach of contract claims, breach of the GGPA, and declaratory judgment claims based on the GGPA and related contracts.

What it does not do, what our petition does not do, Your Honor, is it doesn't challenge the validity of the OXY West settlement. It simply says that, you know, the settlement, as we appreciate it, which we're still digesting has amendments in contracts that violate our contract, violate our agreement.

We don't dispute that they had the ability to assume and amend the midstream agency agreements. We're not disputing that they had the ability to do that. We're not attacking their midstream renegotiation or amendment. We're not asserting claims that existed, as I said, as of the plan effective date. We're not asserting any claims under Section 365. We're not arguing that they couldn't assume the midstream agency agreements.

We're not arguing or asserting that they -- we're not making any allegation that the midstream agency agreements were not capable of assumption, and there's no allegation that Mesquite owes any amounts to Carnero as a cure. This is not a cure claim, it just isn't, Your Honor.

And we're also not seeking to terminate the existing commitments; that's not what we're doing.

For purposes of remand, Your Honor, we think the arguments are straightforward. I don't think that this case arises under the Bankruptcy Code for the reasons that I've stated: 365, we're not asking you to interpret 365. We're not asking you to deal with assumption or rejection. We're not asking you to determine a cure or rejection damages.

This is solely a post-assumption breach of contract case. Your Honor, I don't think that this case arises in the bankruptcy because Carnero state court petition does not require the Court to consider the plan or the confirmation order. I just don't think it does. We've talked about what their allegations are, Your Honor, and I think that you can determine for purposes of jurisdiction that those counterclaims and defenses are not applicable to the actual state court petition that's on file.

THE COURT: Well, except you're saying they're not applicable because they don't have merit.

MR. WOLFSHOHL: That's correct, Your Honor, but I think --

THE COURT: But if they did merit, could they create jurisdiction?

MR. WOLFSHOHL: Potentially, Your Honor. And I think that that's what -- I mean, look, I read a lot of

jurisdiction cases and I think the well pleaded complaint rule applies to certain levels of jurisdiction and not others. And I think that, you know, defenses -- I think Your Honor says in other cases that you got to look at the totality of -- you got to look at the claims in the context of the bankruptcy.

And I think that when you look at these claims in the context of this bankruptcy and what the plan actually does and what the confirmation order actually does, I think you have to conclude that there's no jurisdiction, Your Honor.

We think that basically, this is a Craig's Stores case. We think that related-to jurisdiction is the proper analysis. And if you look at the criteria that Craig's Stores and if you look at the criteria that Craig's Stores analyzes, this is a breach of contract claim. It arose in December 2021. We don't believe it arose any sooner than that. We don't think that it could have been raised as of confirmation, and there was no antagonism that existed as of confirmation as between the parties to this case.

THE COURT: So their argument on this issue is that because we have the unique nature of a plan that postpones assumptions 'til post-effective date, that you are bound by that unique provision of the plan, and because you're bound by that unique provision, there is post-

confirmation jurisdiction based on the fact that the plan contemplated, and its implementation required consideration of these assumptions and rejections.

Now your argument is the amendment isn't an assumption objection. I got that. But the argument that you have up on the screen right now seems to deal more with whether you can have related-to jurisdiction after an effective date.

What is your more generic response to their argument that the plan itself can structure events that are post-confirmation not ordinarily contemplated in a plan, but there they are and, therefore, you can have core jurisdiction to enforce the plan because of those contemplated delays. Does that question make sense?

MR. WOLFSHOHL: I think it does. So, Your Honor, I think that that is possible. But as you acknowledged before you asked the question, my position is that this falls outside of that. My position is that because of the nature of our claims, what we're asserting is not something that relates to the core jurisdiction that extended beyond confirmation and dealt with assumption and rejection.

I don't believe that -- or the plan injunction for that matter. I think that the claims that we're asserting relate -- so I think you have to look at it on a case-by-case basis, and I think that that jurisdiction has to be

limited to what it is that the plan actually contemplates. And, frankly, because there is no disclosure of anything that would have violated my client's contract rights under an assumed contract, I don't know how I could have --

THE COURT: Well, I mean, the fact is you wouldn't have known.

MR. WOLFSHOHL: I wouldn't have known.

THE COURT: But it does contemplate the possibility of amendments may have been consistent, may have been inconsistent with your client's rights and that objection didn't get made, right?

MR. WOLFSHOHL: It didn't. But, I mean, I think, Your Honor, for me to be on notice of a claim, I think I have to be provided with some indication of some kind of breach of my contract.

Just putting in there that there could be some amendments, I just don't see how that's something that puts me on notice, especially given the context of the plan where we were entering into a settlement agreement where they were going to proceed in a completely different way, Your Honor.

And, Your Honor, I'm not going to spend a lot of time on mandatory abstention or permissive abstention. I think this really hinges on jurisdiction. We've made arguments in our briefing on both. You know, we also have exhibits that talk about, you know, state court dockets

versus federal and bankruptcy court dockets.

We believe that mandatory abstention is applicable. We also believe that numerous factors under permissive abstention support remanding the case back to -- or abstaining and letting the case go back to state court, Your Honor.

In summary, we just -- you know, there has to be a point when this Court's jurisdiction ends. And I think that when you're talking about an amendment that did -- where they did not come before you and didn't ask for permission, didn't put parties on notice of exactly what their amendments were going to be.

And if those amendments breach my client's contract -- I mean, to me, it's really a question of whether you're going to continue to bring counterparties the contracts into the Bankruptcy Court to adjudicate the rights when the Debtor is off doing things without providing notice to anybody or telling anybody about what it is that they're doing.

THE COURT: I mean, I really do understand the argument, but it's almost like who makes the decision, the state court or the bankruptcy court, as to whether the scope of what we authorized included what they did.

MR. WOLFSHOHL: I think Your Honor makes that decision at this point.

THE COURT: And they're arguing that I have to decide that scope question.

MR. WOLFSHOHL: At this point, you do, I believe. And I think that if you determine that, in fact, what I am asking for is something that is just a breach of contract claim under amended agreements, I think that that is something for the state court. I think once you decide -- and I believe you can decide it based on what's in front of you.

THE COURT: Well, I'm not asking this right. If we authorize them to do unknown amendments and you're arguing we should -- in effect, we should have authorized them to do unknown amendments.

MR. WOLFSHOHL: That's not what I'm arguing.

THE COURT: Okay.

MR. WOLFSHOHL: I'm arguing that there is a consequence to an amendment that breaches my contract. I don't think that under the bankruptcy plan or confirmation order that you said you can go and amend contracts in a way that breaches other contracts without any kind of consequence.

I mean, I don't know why -- other than you making a determination that this was something that was authorized, why do you need to be the one that analyzes whether it was a violation of my contract rights? That's just a state court

contract interpretation.

Once you get past the -- I mean, the fact that you authorized them to do it, Your Honor, is not critical to the actual merits of my claim. All that does is say they were allowed to do it. It doesn't mean that they were, you know -- I mean, it doesn't take away my right to asset that that was a breach, especially something where it doesn't actually happen until, you know, two years after.

I think that's the fundamental problem is that this is not subject -- I just do not, fundamentally do not believe that this is subject to the plan injunction. And as long as it's not, all you're doing is determining, yes, they were allowed to do it, but you don't need -- that's not something the state court -- I mean, if you say they were allowed to do it and then it goes back to state court, the state court doesn't need to do any further analysis of the plan, confirmation order, or any other order that you've entered, Your Honor.

THE COURT: Well, somebody has to figure out what it means to say you don't have to do it, and is that me or is that the state court?

MR. WOLFSHOHL: I think that's you, and I think that's in this proceeding right now, the remand proceeding, and I think that, frankly, I don't think it bears on my claims. I think that my claims are still allowed

regardless, but it doesn't affect the merits of my claim; it doesn't affect what my claim is based on. My claim is not based on anything that's in the confirmation order or the assumption order. My claim is just based on what they did in the contract.

Thank you, Your Honor.

THE COURT: I understand. Thank you. Mr. Stancil.

MR. STANCIL: I'm out of practice for in-person court, so I've got stuff everywhere, Your Honor.

THE COURT: Take your time. I'm out of practice too.

MR. STANCIL: I think the last time, one of the last times I was in an in-person court was our Alta Mesa experience. I'm going to keep it under two hours this time if I can.

THE COURT: Do you have a PowerPoint you can --

MR. STANCIL: We do, Your Honor. May I ask if you would give permission to Mr. Shindy to do the screensharing?

THE COURT: Hopefully, that worked.

MR. STANCIL: Okay. So Mr. Wolfshohl was correct, I have more slides, but I'm going to jump around a little bit because I don't think we want to go through or need to go through all 50 of them.

Andrew, can you go into presentation mode, please.

Let's go to Slide 3 and we'll just start from there.

Your Honor, I'd like to just give a quick overview of why we're here and what the question is. So we have arising under, arising in, and related-to jurisdiction. They are all three independent bases for jurisdiction. They don't all mix together as my colleague would suggest.

So we're here because Section 365 and 1123(b)(3) of the Code allow the plan to specify the process in terms of assumption and rejection decisions, including with amendments. And the GGPA and the assumed Comanche agreements, those are the ones that he says breached the GGPA, were all, pursuant to the terms of the plan, assumed as of the effective date.

So, yes, this is an unusual procedure in the plan and it's not a simple sort of -- it's not like a Craig's Stores or other cases where an event is independent and happens much later after. These actually, as a matter of law, these assumptions have to happen simultaneously.

And, of course, just to start, Your Honor would need to decide what that means in Article 5(a) and how the upshot of assuming as of the effective date both sets of contracts could leave the Debtor crippled with competing obligations.

Article 5(f) specifically contemplates amendments, and I want to particularly focus on the second part of 5(f)

here at the bottom: "The plan provides that modifications, amendments, et cetera, during the Chapter 11 cases shall not be deemed to alter the prepetition nature of the executory contract." The essence of their Complaint is that these amended contracts are post-petition contracts. Well, we think that directly contravenes Article 5(f) of the plan. We're not here to discuss the merits, but Your Honor, we do need to make that determination.

Next slide, please.

So to talk a little bit about the -- are we on a lag, Andrew? I was afraid of this.

All right, well, I'll tell you what it says.

THE COURT: Let's just take a minute.

MR. STANCIL: Okay.

THE COURT: There it is.

MR. STANCIL: All right. So just focusing on the core sort of practical question. As Your Honor I think put it, does this Court have jurisdiction to decide whether the exercise of the Debtor's rights under the code and/or the plan subjected the Debtors to contradictory obligations.

So we have two sets of assumed contracts, both assumed pursuant to the plan as of the effective date. If Carnero's lawsuit were meritorious, we would have dedications to two different people, primary dedications, the same hydrocarbons have to flow in two different

directions. That is --

THE COURT: Well, their argument is on that issue, as I understand it, that the dedications are stacked, not simultaneous, and that you might change the priority of who gets the dedication, but you wouldn't change it altogether. Are they wrong about that?

MR. STANCIL: That is not their argument, Your Honor. They asked for a declaration that they have the primary midstream dedication, and the terms of the assumed Comanche agreements keep in place the primary dedication to the OXY West parties.

THE COURT: Right. But they don't say that there isn't a dedication to both, right, just who gets first, or is that wrong?

MR. STANCIL: No, they both -- their view is that they have them first because the other dedications expired, and the assumed agreements say that their dedication is first. It is directly contrary.

THE COURT: No. I agree there's a contradiction of priority, but there is no contradiction of existence.

MR. STANCIL: Oh, that's correct, Your Honor. I apologize.

THE COURT: No, I just --

MR. STANCIL: Right. For purposes of today, what matters -- and I believe that with respect, I think Mr.

Wolfshohl has conceded why we have jurisdiction. The fact that he says that you have to decide whether your orders authorize or conflict with their lawsuit, that is jurisdiction. We are not here to determine whether ultimately, the question of interpretation of the contract is a question of state law. Of course, it is at the very bottom level.

The question is whether that question arises under, arises in, or is related to. And there is no procedure by which Your Honor looks at the merits of our defenses and positions to evaluate them and decide whether on the merits, they're substantial. That is jurisdiction; that's the question.

The fact that Your Honor has to tell us what all of these provisions mean, and I'm going to walk through a few of them, that is jurisdiction; that's arising in and arising jurisdiction.

THE COURT: So, Mr. Stancil, if you're right about that and if we determine that there isn't a conflict that we need to resolve on that issue between our various orders, do we then abstain because the rest of it we would just be a purely state law matter, or do we keep then the state law matters even though he's correct on the subject matter jurisdiction question?

MR. STANCIL: No, Your Honor, you would not. I'd

like to point you to Senior Care Centers in particular. Let me see if I can --

THE COURT: That's out of the Northern District; is that right?

MR. STANCIL: Yes, which we're not too far south for that to at least be persuasive, I hope.

Andrew, Slide 41, please. I'm jumping way out of order, Your Honor.

THE COURT: No, that's -- you can tell I'm pretty interested in this. That's why I asked him a lot of questions. I'm going to ask you a lot of questions.

MR. STANCIL: No, I understand. I only seem to find the thorny issues to appear in front of you with.

4-1, Andrew.

So while that's coming up, I'll give you the background in the case. So it was a bankruptcy where a lease was assumed in the bankruptcy. So the reorganized debtor had assumed a lease pursuant to the plan, but there was a liquidating trust, and the liquidating trust held the bulk of the equity in the reorganized debtor and was going to monetize that for the benefit of unsecured creditors.

After the effective date, the trustee, liquidating trustee proposed to sell the equity securing cash for the unsecureds. The landlord sued in state court and argued that this is a post-effective date trigger of the change of

control under the assumed lease. So it's actually much, much simpler and cleaner case than this one because there's no -- this isn't a situation like we have here with the assumption of contracts as of the effective date after confirmation.

But even in this case, a pure post-effective date action, the Bankruptcy Court rejected the jurisdictional argument and held that subject matter jurisdiction exists even under the narrowest test.

And so, I think that the point here, Your Honor, is -- and it goes through these considerations from U.S. Brass on substantial but not full consummation; it's what we have here. The landlord had a fair chance to challenge the portion of the plan that authorized the trustee to do this.

And to Your Honor's last question, the Court rejected the request for abstention. The Court did not say, well, if I've determined that this is consistent with the plan, you know, there's no sort of abstention get out -- you either have jurisdiction or you don't, and the jurisdiction for removal purposes is determined at the time of removal. But moreover, Your Honor, I'm not too worried about that partly because we're confident that your orders do directly conflict with what they're trying to do.

And so, if we could jump back, I'd like to -- let's go back to Slide 6, Andrew. I think it'd be helpful

to illustrate, and I'll take credit and blame for drawing this chart, how assumption and rejection worked under this sort of unusual mechanism.

So we started with a list, an assumed/reject list. This is pre-confirmation. If your contract was on the assumption list and it was assumed as of the effective date, absent any further action. If it was, it was on the naughty list, on the reject list, then the question is, did you have a timely objection to rejection; if you didn't it was rejected as of the effective date.

But where we are is in the category of if there was an objection to rejection, what happened.

THE COURT: Look, you're going to need to slow down. This is the most confusing chart, Mr. Stancil -- I know you took credit -- that I've ever seen.

MR. STANCIL: I said blame as well, Your Honor, but I understand.

THE COURT: You did, but just give me a minute to be sure I follow what it's doing. So if there's something on the rejection list, someone has to timely object to it before it's rejected?

MR. STANCIL: If it's on the rejection list and you do not object to that, it's rejected.

THE COURT: Okay.

MR. STANCIL: If you do object to the rejection of

your contract, then you go into -- you could preserve that. Even after confirmation, if the fate of your objection survives that, it'll be resolved after confirmation.

And so, the land that we're in is this blue box here in the bottom because Your Honor will remember that prior to confirmation in this case, we didn't really know how we were going to get the -- we didn't know how we were going to be able to go effective and we didn't have a midstream restructuring.

So what the parties did was there was a settlement agreement between the Debtors and Carnero, which provided a limited period of time during which the Debtors would try to reject what we call the OXY West midstream, their primary midstream contracts. That expired. If you couldn't get it rejected by I think it was October 20th of 2020, you had the option; either party could terminate the settlement agreement, and no one had the continuing duty to try to reject.

And we had a hearing, a rather lengthy hearing on this where the folks whose agreements -- many folks objected to that, right, because they didn't think that the settlement agreement that Carnero had reached with the Debtors was fair to their interests. To summarize, the argument was that the settlement agreement was more favorable to the Catarina interests than to the Comanche

interests.

And we had a lengthy hearing, and that settlement agreement was approved by Your Honor in an order, which would be required to be interpreted in this dispute, where it was clear that what the Debtors --

Andrew, why don't you go ahead to, while we're doing this, Slide 13, please.

The deal was that we would try for a period of time to get rid of the primary midstream agreements through rejection, and if we couldn't, we would have to figure something else out.

But Your Honor made a series of findings on the record in connection with approval of that order, but this was not a definitive anything for the restructuring. And, in particular -- when we get to 13, I think I want to walk through a couple of the understandings that were expressed in court while that was approved.

And, you know, while I'm at it, I think it's important to remember this is exactly the kinds of things that we would be having to argue and litigate in state court were we there.

Why don't you go back -- never mind, Andrew, just stay here.

So in the end, we didn't get it done because we couldn't get it done. We couldn't get the primary

midstream, the OXY West midstream agreements rejected. And so, what did we do? We terminated the agreement, the settlement agreement, we gave back the $8 million we promised to give them if we couldn't get the rejection done, and we were back to where we were.

But now critically -- and this is an important point that I think there's some confusion around -- the GGPA, the reason we're here today, was actually assumed as part of that settlement agreement because that settlement agreement provides that the assumption/rejection list has to remain unchanged. Well, the assumption list had the GGPA on it and that's how the GGPA got assumed, pursuant to that settlement agreement.

But it's always been understood and was explicit when we were pursuing that settlement agreement that the GGPA was just an attempt to restructure with Carnero, and if we couldn't get it, we'd go back and start over, but it was not a binding sort of predetermination of how the midstream restructuring would go.

But as Carnero would have it -- and I'd like to go, let's start with Slide 26, Andrew. As Carnero would have it, the moment the GGPA was assumed, we were bound -- if we were going to do any other assumption, we couldn't amend those agreements.

And respectfully, Your Honor, I want to start -- I

heard Mr. Wolfshohl say that we're not objecting to the fact that they amended their midstream agreements. Respectfully, that's not what their petition says. Paragraph 36(b) of their petition reads that Carnero seeks the following declarations: Mesquite, Maverick, UnSub, and the WIPS have breached the GGPA by amending or participating in amending the midstream agency agreement or other agreements that flow gas from the dedicated acreage to the midstream providers under the existing commitments. So full stop.

They're saying that under their contract, we were forbidden from amending in bankruptcy or in any other way.

So suppose that they have a contract, suppose --

THE COURT: I think he's saying a few degrees different than that. I don't think he's saying that you're forbidden from doing it by a court order, but just the consequences that you have a breach. There's a difference in those two.

MR. STANCIL: Well, not when it comes to jurisdiction, Your Honor, and it's a little difficult to argue the merits because that isn't what the contract says. But for jurisdictional purposes, suppose that the contract said that if -- and I'm making this up because it doesn't say this.

But suppose it said that you may obtain a court order under 365 amending your other agreements, but if you

do, you owe us millions of dollars. That would be preempted by the Bankruptcy Code, in the same way that courts have struck down provisions that say you can't assume my contract without paying me a fee or things like that. That would be absolutely directly contrary to the Bankruptcy Code.

You cannot prewire protections in your contract that short circuit the Bankruptcy Code, and that would be arising under a jurisdiction because it would directly contradict 1123(b)(3), which allows us to provide in a plan for how contracts are amended, and it would absolutely also contravene 365.

So whether we're right or wrong about those arguments is not to today's question, but it is absolutely the jurisdictional question. So, I mean, this is black letter law, Your Honor, that you can't have a rejection fee, or an assumption fee and you can't have a contract that prevents somebody else from assuming another contract with amendments or imposes a punishment on them for assuming with amendments.

THE COURT: Why can't you?

MR. STANCIL: It's flat out preempted by the Bankruptcy Code, Your Honor.

THE COURT: Well, it would be preempted by the Bankruptcy Code if your own contract had a provision that said on assumption in bankruptcy, you have to do this or on

rejection in bankruptcy, you have to do that. But if the contract says if you ever grant rights to anyone else in this stream of oil, it is a breach of this contract, it's not running directly contrary to the Bankruptcy Code. It might limit some of your range of motion of the bankruptcy case, but no different than it would outside of bankruptcy, right?

MR. STANCIL: I disagree, Your Honor. To the extent they are saying they are trying to restrict your range of motion in a bankruptcy, it would absolutely contravene the Bankruptcy Code.

So their contract does say if you have -- this is their first lawsuit that they withdrew, you'll remember. Their first lawsuit, which again -- and I'd have to challenge the theory that this claim didn't arise until December 23rd because they sued us in July.

But their first lawsuit said that the GGPA requires you to reject. That's their reading of their contract. So there's no difference between saying we require you to reject these other contracts, or you owe us $20 million if you don't reject these other contracts, and they have not cited a single case.

But if I can, Your Honor, I'll come back to this question, but I want to sort of walk through what arising under is, what arising in is because I think these are

important and there are specific nuances here that are, frankly, just sort of glossed over. Let me start with what it is. Arising under court jurisdiction is the cause of action created or determined by a provision of Title 11. And as we discussed at length, 1123(b)(3) and 365 will determine this, and I've just noted here at the bottom, Craig's Stores is not an arising under case. We'll get to Craig's Stores in a minute.

Next slide, please, Andrew. Actually, let's go ahead and jump ahead to 28, so a couple of slides ahead. I think I've covered the other stuff.

Carnero says that consensual modification of assumed contracts falls outside of Section 365's concern; that's wrong and we've cited the cases here. MPF Holding is just one example that it doesn't mean -- consensual modification doesn't mean the contract isn't being assumed pursuant to Section 365.

The cases that they cite for the contrary to proposition are absolutely off point, both concerned whether it violated Section 365 to make amendments to contracts and both said it didn't. So this is Richmond case. Nothing in the code suggests that the debtor may not modify its contracts when all parties to the contract consent. City of Covington is the same.

Let's go to arising under jurisdiction. The next

slide, please, Andrew.

We talked a lot, or Your Honor asked a lot of questions about what I believe is the well pleaded complaint rule, whether a defense to a lawsuit can be considered. It's relevant only under arising under jurisdiction.

It is, as Your Honor's explained -- we'll get to this in just a moment -- it doesn't apply in arising in or related-to jurisdiction. But nonetheless, even with respect to arising under jurisdiction, the courts are clear that when you have a declaratory judgment defendant who could bring a course of action to enforce its rights, that would present a federal question. That is still arising under jurisdiction.

And not only is that the case here, we actually have brought that suit. As Your Honor is aware, we filed -- after they withdrew their first action, we immediately filed -- well, I guess if they hadn't withdrawn it yet -- I apologize -- no, they had. They withdrew the suit without prejudice. We filed our adversary proceeding saying, hey, they told us we can't do X, Y and Z and they breached their Bankruptcy Court approved agreements. That action is pending in front of this Court with affirmative rights that we're asserting, so that is core arising under jurisdiction.

Let's jump ahead a couple of slides to 31, Andrew, for arising in jurisdiction.

So this applies where the Court is being asked to interpret its prior orders and provisions of the plan. I'm going to go through some of them but not all of the provisions of the plan that this lawsuit will require interpretation of, as well as some but not all of the orders that will be at issue in this lawsuit.

So this is I think just frankly Hornbook law that the requirement to interpret these orders and plan provisions is what gives jurisdiction to this Court. And as I said earlier, the fact that Mr. Wolfshohl acknowledges that Your Honor would need to look at those orders and the plan to determine whether we're serious about it. Well, I suppose if they weren't Rule 11 compliant, maybe you could do that and then throw us out.

But not only do we think they're more than arguable, we think they are meritorious. And once Your Honor says, well, I'm going to have to look and see if this lawsuit that sort of tries to impose a liability for assuming contracts simultaneously in a bankruptcy, if that's consistent with the way the plan was structured, that's the end of the jurisdictional argument.

So you concede that if what you're doing is frivolous, whether it's Rule 11 or not, it can't be sufficient to invoke jurisdiction. He concedes if you're right, it is sufficient to invoke jurisdiction, and now

we're in this great middle. Is it colorable? What is the standard that I should apply to that?

MR. STANCIL: I think literally sanctionable. As an officer of the court I can't invoke provisions of the plan or your orders as defenses, then I would have -- and the same way that I couldn't, you know, assert or make up some federal statute that doesn't exist.

I think literally that's the only barrier. You can't just say, well, I think this will somehow affect the plan if you don't have a good faith basis for it, but that's it, because once I can make any sort of reasonable or colorable, ethically compliant defense --

THE COURT: Well, you can -- let's assume that it fits right within Craig's Stores, you can always allege, well, it's going to affect the distributions. It will eventually affect the estate; therefore, it ought to be there. And Craig's Stores would say, well, no, because it arose post-confirmation, it's only related to, and we don't have post-confirmation related-to jurisdiction. It's not frivolous, it's just inconsistent with existing law, and it can't be a frivolous --

MR. STANCIL: Well, that's why it's related-to jurisdiction.

THE COURT: I understand.

MR. STANCIL: That's not arising in jurisdiction.

THE COURT: No. What we're talking about is the standard one of frivolity, is it one of you're going to win, or is it somewhere in between, and you're pushing pretty hard for frivolity.

MR. STANCIL: Well, Your Honor, because that's what the law says.

THE COURT: Show me that.

MR. STANCIL: So let's go to, it's Your Honor's decision in ABC Dentistry, so I think it's slide --

THE COURT: The one that got reversed or the other one?

MR. STANCIL: I think this is the good one -- 42. Because I think what Your Honor is asking is about so what is the well pleaded complaint rule mean, you know, how far into the defenses can we look, and it simply does not apply to arising in jurisdiction.

So this comes from the fact that the Bankruptcy Statute 1334 has both arising under, but then also arising in and related to. So it seemingly prohibits bankruptcy courts from analyzing the effect, the Court must look both to the amended complaint and its relation to the Debtor's bankruptcy to determine whether it has subject matter jurisdiction. So that is the test, so we would apply it the same way that we would apply the well pleaded -- the same way we would apply it in any other context. Is it fairly an

issue in the case? Yes.

And, Your Honor, I mean, I appreciate for intellectual puzzle around how we have to go, but I'd like to show you why this standard doesn't matter in this case how well or how firm the allegations of conflict with the plan and prior orders need to be because this is -- respectfully, Your Honor, this is directly contrary to what your Court's order said and the plan.

So let's go back to 32, Andrew.

So I want to walk through a few of the plan provisions that directly contradict what they're asking for. So just as a recap, they're asking for an order and a declaration that any amendment to the primary midstream agreements violates their contract, any amendment.

So we have Article 4(g) that the property of the reorganized debtor vests free and clear of all claims and encumbrances. Well, they say it's heavily encumbered by their dedication and that we didn't have the power to convey it to or to assume the agreements with primary dedications to OXY West.

Article 5(a) describes this post-confirmation process for assumption and rejection of executory contracts as of the effective date. And this gets to a question that Your Honor put to Mr. Wolfshohl, which is, of course, they knew that this was -- that these contracts could be amended

as of the effective date because it says so on the plan. And we submit that it is directly contrary to the plan to lie in wait and say, oh, well, since the amendment turned out I didn't like it, I would like to take you to court and object.

It's no different than if we were all here on the same day on the effective date and we were saying we want to assume these contracts over here with these amendments and we want to assume the GGPA. Certainly, Mr. Wolfshohl would not contend that this Court would lack jurisdiction.

THE COURT: Well, just -- and I don't know that this runs contrary to your argument. But effectively, what you're saying is you want to be able to show up on the effective date and say we want to assume this contract and we're going to amend it and we're not going to tell you how.

MR. STANCIL: Well, that is --

THE COURT: And the issue is whether he should then have had to have objected on the grounds that you're not going to tell him how; that's the issue in my mind. And if he doesn't object, perhaps you can amend any way you want without violating the plan. But his position is you have to tell him what it is to trigger a controversy.

MR. STANCIL: To be more specific, his position is that you can't even decide that question because if he wants that joint issue about whether he knew what the amendments

were, those are merits defenses, whether he waived the right to object to this amendment or that amendment. But it's a merits defense or argument for him precisely because of this plan provision.

So for arising under jurisdiction -- this is why we had suggested trying to do it all together because it would be clearer, but for purposes of today --

THE COURT: Just to be clear, the reason I wasn't going to do that is he's arguing it on its subject matter jurisdiction period, and I thought it was inappropriate for me to combine a merits hearing with an altogether subject matter jurisdiction issue. It would have been more efficient, but I didn't think that was the issue.

MR. STANCIL: Understood, Your Honor. I understand. But I think the point holds for jurisdictional purposes whether he, in fact, waived the right to object is determined by what Article 5 of the plan means. And he'll be free to argue on the merits that he didn't -- that wasn't a waiver, a knowing waiver of those rights, and we're going to argue that it was, but we're going to be arguing about what happened in the Bankruptcy Court and what the plan means; that's arising under jurisdiction.

Same with Article 5(f). It tells you what the plan's -- it tells you that these amended executory contracts will have modifications. I want to focus in

particular on Article -- well, I talked about 5(f) already. I'm not sure how we are authorized under 5(f) to assume amended contracts as if they were prepetition contracts.

So even -- I'm going to grant for purposes of this argument, let's assume that they were right on the merits, that the GGPA prohibits the amendments that we've done. It doesn't, but let's assume that it does. That is a -- it still must be treated under 5(f) as a prepetition contract. And so, if he believes that breached his contract --

THE COURT: Well, I don't know that you did the execution during the Chapter 11 cases, did you?

MR. STANCIL: Yes, Your Honor, absolutely.

THE COURT: Because it was open?

MR. STANCIL: It was in front of you, yes.

THE COURT: No, you're saying during the Chapter 11 cases means pre-confirmation, post-confirmation, whichever?

MR. STANCIL: Yes, Your Honor. And that's why it doesn't say prior to confirmation or prior to the effective date. The plan would make no sense. And, again, this is a merits argument. If Carnero doesn't think that that works because that's not what the plan said or mean or can't say that for whatever reason; that's a merits argument, not a jurisdictional argument. It means that we're arguing about what it means for something to happen during the Chapter 11

case under the terms of Article 5(f).

But again, this is really what this case would come down to. We think that the amendment, as of the effective date, it's a prepetition contract that he says breached his contract. If that's correct, then he had a prepetition damages claim assuming he were right; that's a bankruptcy question.

And then Article 8 says that we have exculpation for any claim related to act or omission in connection with, relating to, or arising out of the formulation, preparation, dissemination, blah, blah, blah, relating to the plan or any restructuring transaction. This is liability they are trying to impose on the Debtors, millions of dollars of liability for a restructuring transaction.

As Your Honor said when approving the order -- approving the assumption -- let's see if we can go to Slide -- well, we'll just go in order, and I'll come back to it. We have Article 11, the express retention of jurisdiction. We have -- let's skip ahead to 34.

What is the basic question in the case is whether this Court has jurisdiction to decide whether these contracts assumed here left us with competing and directly conflicting dedications.

And, Your Honor, I'm a little puzzled to know what we would do in state court when they stand up and say, well,

we think we have primary dedications, and we say, well, if you look at Judge Isgur's rulings on, for example, the Springfield dedication, it's not clear that that is correct and maybe we'd have arguments and maybe we wouldn't. But we're going to be arguing almost entirely about what happened, we would be arguing only about what happened here.

And this third bullet I think is not to be lost. Mr. Wolfshohl suggested that, you know, they had no idea what would happen in the way of potential future amendments. That may be true, but we were very clear when we made the temporary deal with Carnero and the settlement that this was just a roadmap for one potential path to restructuring and it was expressly time limited.

Let's look through a few of these statements that we had in the hearing in support of that settlement order. So on 35, this was Debtor's counsel explaining the effect of the settlement with Carnero. Nothing in the settlement agreement, if approved, preordains a party's right with respect to any JOA-ADA midstream contract or any other contract.

Their lawsuit says that because the GGPA was assumed, which the settlement agreement required, while in fact you can't amend any of those other contracts, so that's another matter.

Next slide, Andrew.

Mr. Jenkins, counsel for the DIP lenders, now the post reorg owners, made clear this is just a roadmap. Nothing in the agreement prevents the Debtors from considering all their options in such negotiations and the settlement agreement allows the Debtors to cease pursuing the rejection or assumption framework in this agreement at any time. It gives the Debtors a chance to work through this complicated midstream structure. They, at any time, can switch gears.

Now he may not have known -- Carnero may not have known if we did switch gears what those would look like, but that's crystal clear on the on the terms of the settlement order that that was not contemplated that we were being locked into the GGPA, locked into the ability or precluded from ever amending the other agreements.

And that's the upshot of their position. It's once you assume the GGPA, which we did pursuant to this colloquy and this order, no more amendments of any kind to your primary midstream agreements. That's their position. That's why they have insisted that the terms of the disputed or of the amended contracts are "irrelevant" to jurisdiction. That's why their Complaint says that they've breached the GGPA by amending.

They don't even know how they were amended because they didn't even ask for the agreements, didn't even ask to

see them until -- in fact, they never asked to see them. They sued because they said you can't do anything to them. That would be tying our hands in direct, we believe, direct violation of what this Court approved when approving the settlement order.

Slide 38, just because it's I think important to know where it is, is the section of the Carnero settlement agreement 2.2.1(d) that said, "Debtors will not remove any executory contracts from the schedule of assumed contracts." So this is what made the GGPA assumed pursuant to the settlement agreement and so, directly implicates the condition.

Now let me quickly go through a couple of the prior orders, Your Honor. In addition to the midstream settlement approval order we were just talking about, there is the -- let's just talk about the orders. In addition to the confirmation order, which I think it sort of speaks for itself and that it implements this plan and restructuring rejection and assumption framework, this Court entered a series of orders in December of 2021 resolving those other -- the OXY West litigation and authorizing amendment of the assumed Comanche agreements.

And with respect, it's not correct to say that those agreements were without supervision, review, or approval by the Court. The Court was not asked to opine on

the terms because the parties in the plan had agreed that would not be necessary. So it doesn't require -- it doesn't mean that this Court wasn't exercising authority under 365 and 1123(b)(3) to make that finding. And, in fact -- I'll have to find where I put it -- but this Court's order directly states that the Court finds that 1123(b)(3) and 365 authorize entry of the order.

So I'll try to jump ahead. Let's go to Slide 40, Andrew, and briefly talk about an allegation that you didn't hear anything about in their presentation, which is sort of the other prong of their Complaint. It says that -- Carnero says that Maverick/Mesquite didn't get the dedication for the Gavilan hydrocarbons.

And this is an easy one, Your Honor. This is arising in as arising in gets. Those interests were taken via a 363 sale in the Gavilan bankruptcy case. This Court approved that, and we will definitely have to look at the terms of that order to see whether their assertion is correct. We've noted here it's not correct for a bunch of reasons that we don't need to get into, but all of those reasons happened right here in the Bankruptcy Court.

I think I've covered senior care centers and I've covered the rest of arising in jurisdiction.

Let's talk briefly, if we had to get related-to jurisdiction. This is the sort of most permissive of the

Case 4:22-cv-00085 Document 3-25 Filed in TXSD on 03/23/22 Page 171 of 202

tests, but I think not hard to satisfy as a result. So would it affect their rights, the defendant's rights and the administration of the estate, and the answer is absolutely. We still don't even have final distribution of the estate. What they're talking about is potentially hundreds of millions of dollars of liability, I assume -- they only say millions -- but it absolutely is related to what happens to administration of the estate.

Let's talk about Craig's Stores briefly on 45, please, Andrew.

So Craig's Stores, as we noted, is not an arising in or an arising under case and it doesn't purport to set some hard and fast rule for arising in and arising under jurisdiction at all. It is not relevant.

But I think there's a particular facet of Craig's Stores that's very harmful to their case. So Craig's Stores was as plain vanilla post-confirmation as it gets, a post-effective date action. All it did was it violated an assumed agreement. It had none of this, you know, as of the effective date issue, none of the ongoing administration of the estate.

And the Court there specifically distinguished it from this unhelpfully named case, In re Case, that said -- in which a creditor had accepted a promissory note from the debtor as part of the bankruptcy plan, and a full year

later, the debtor defaulted, the creditor sued. The debtor counterclaimed in part saying that he had been induced to give the note on the belief that he could pay it off with legal services instead of cash, and then the creditor said, well, then we're taking this to bankruptcy court.

The bankruptcy case was reopened and the Fifth Circuit affirmed jurisdiction because that note, which was in satisfaction of the prepetition liability, was confected in the general negotiations seeking to settle all claims against the estate and was necessary to the formulation of an acceptable reorganization plan.

This is no different here, which is the assumed Comanche agreements were absolutely essential to resolving the prepetition dispute between the debtors and OXY West and those parties and the WIPS and everybody else.

So how do we say to them, well, even though you've got -- you know, we resolved that in these assumed agreements, now we have to go to state court. And the state court, not the bankruptcy court, is going to determine whether what you got was illusory because they say they get to jump ahead of you in line for these hydrocarbons or we have to pay them hundreds of millions of dollars potentially because of this. That is, we think, you know, leaving the merits aside, that is absolutely a question that is related to the bankruptcy case.

I'm happy, Your Honor, to spend some time on mandatory permissive abstention. I think I'll just say only for present purposes, mandatory abstention doesn't even apply to court jurisdictions or arising in and arising under. And even under related to, we don't think this meets any of the factors.

We are here, we are teed up, ready to go. I think it's going to be a challenge given the enormous complexity of this case for a state court to get up to speed. And I say that from -- I think I'm only a year in here or less than a year in trying to figure out everything that has happened and there are plenty of people on the phone who will attest to how many phone calls I have to make to say, what's this, who's that, what happened.

This would be incredibly inefficient and, frankly, really prejudicial to our clients to have this litigation overhang. They're trying to run a reorganized business. They need to get this resolved so they can decide how do we decide what to drill, how do we decide how to run our business. We don't even know what's going to happen with this potential existential threat.

So that is, we think -- I mean, that covers a lot of the factors here that would be relevant under either mandatory or permissive abstention.

I'm happy to answer any questions you may have,

Your Honor.

THE COURT: I think I'm good. Thank you, Mr. Stancil.

MR. STANCIL: Okay, thank you.

THE COURT: Does anyone else wish to argue against remand? Mr. Basta, go ahead, please.

MR. BASTA: Can you hear me, Your Honor?

THE COURT: I can. You're a little faint, but I can hear you.

MR. BASTA: Okay. I'll try to speak up. I don't usually have this problem (sound drops). Paul Basta from Paul, Weiss on behalf of GSO UnSub. We're with Mr. Stancil on this one. I don't have any slides and if the slides could be taken down.

I just want to make a few points for Your Honor and maybe give a little bit of a different lens in which if I were the Court, I would be looking at this, and I would start by asking the Court to consider two questions.

The first question is, if this met and it was a pre-confirmation effective date as per the normal Chapter 11 process, would there be any question that the Court has jurisdiction. The answer is no.

And then the second question is, does the process that was done here, which had assumption and rejections play out both effective date change jurisdiction, and our answer

to that is no. We don't think that EP Energy or Ultra or iHeart adopted a reorganization process where someone's collaterally attacking assumption would have to come to the Bankruptcy Court, but in this case, there's a different outcome.

And so I want to start by going back and just pretending for a minute that this arose pre-confirmation and effective date, and I want the Court to focus on a few provisions of the Bankruptcy Code that would have obviated this view.

One is 365(d)(2) says that assumption rejection decisions need to be made before confirmation. So if the debtor proposed the midstream settlement and the Carnero assumption and the Carnero thought that the midstream settlement could have breached its agreement, then the debtor would have been required to cure, or it would have been waived.

And so, if Carnero had thought that the midstream deal violated their agreement, that would come before the Court. If it did, the Debtor may have rejected it, in which case, Carnero would have gotten bankruptcy dollars, or maybe the Debtor would have done a different deal, but the cure process and the timing process would have funneled this dispute into this court so there was finality, and the Debtor would have gotten the reorg benefit of dealing with

this completely at the time of the effective date.

THE COURT: So, Mr. Wolfshohl describes a cousin to what you've described. He doesn't say that it would have resulted in any cure. He says it would have had a consequence.

MR. BASTA: Okay, so let's talk about that.

THE COURT: Yup, go ahead.

MR. BASTA: So let's say either it wasn't raised in the cure process, which I think it would have been raised in the cure process, or let's actually go a different direction and pretend that -- and this wouldn't have happened -- but pretend that six months into the bankruptcy case, the Debtor assumes Carnero. And then has part of confirmation, the Debtor proposes midstream settlement and Carnero thinks that that midstream settlement breached their previously assumed agreement.

Well, there's an administrative bar date. And so, Carnero would have had to assert an administrative claim, part of the administrative bar date, and there wouldn't have been any question that we would be before the Court on the benefit to the estate on that administrative claim and the Court would have had jurisdiction on the administrative claim. These are not --

THE COURT: So let me just be sure I'm following because I think I'm following, but I want to put it in other

words so that Mr. Wolfshohl can actually respond in a way that's more meaningful.

I think what you're telling me is that if it would have had a consequence that the Bankruptcy Court would have been required to liquidate the consequence, as opposed to allowing them to take all of the oil because taking all of the oil would have been inconsistent with the agreement that we would have approved.

And, therefore, I think your argument is he's wrong about whether it would have been a cure claim or an admin claim; everything would have had to have gotten liquidated if we'd approved it. Is that what you're telling me?

MR. BASTA: Well, yes, exactly right. I'm saying that the consequence of the Debtor's decision would have been a pre-effective date consequence and that a prepetition claim or administrative claim that arose out of it, which funneled to this Court as part of the claims administration process.

THE COURT: Could you lay behind the log? If you're another party that says, you know what, we don't want a claim, we don't want an admin claim, we don't want a prepetition claim; we'll just wait and the consequence of what the others are doing here is we get the oil.

MR. BASTA: I think that if the Debtor has not

proposed an administrative bar date, the whole purpose of an administrative bar date is to smoke out contingent liabilities that could have a negative impact on the reorganized company. I think if the Debtor had not proposed an administrative bar date, then maybe it would have gone to the other side, but there's definitely authority for the administrative bar date.

And from a jurisdictional perspective, Your Honor would have had jurisdiction to consider a dispute to an administrative claim, which is a claim that arises prior to the effective date.

And so, I believe, Your Honor, that we're in this world where if this had happened in the normal course or ending on the Debtor in the normal case, there would be no question that this Court has jurisdiction.

And now the question becomes as a result of this process, would -- is Carnero in the position where previously, they could not have collaterally attacked the midstream settlement in the state court and now they can, and I don't think that's what anyone here signed up for or what the Court put through. That's why the confirmation order says it's as of the effective date.

And I think that what Mr. Wolfshohl is entitled to the same rights now as he would have had had it been in the normal process. I don't think that every other debtor gets

Coca-Cola with caffeine and sugar, and we're left with decaf Diet Coke. I think this reorganization process is just as robust as the reorganization process in those other cases.

And I would like to make a couple of other points, Your Honor. I don't think that Craig's Stores, it actually proves the point. I know Mr. Stancil said it; I'm going to say it in a different way. In Craig's Stores, what was the alleged violation by the bank under the assumed contract? The allegations that they mishandled credit card accounts. So the conduct that gave rise to the breach in Craig's Stores was conduct that occurred post-effective date.

Here, the alleged breach is the entry of the order approving the midstream settlement agreement. They're saying that the midstream settlement agreement as amended and as approved violated. So it is the actual court order, because nobody here was going to do this deal without using the reorganization power and the assumption power.

Well, we came to use the Court's tools to facilitate a settlement; that's what assumption and rejection process does. It corrals everybody and uses the collective power of the Court to drive an outcome and they're saying that the entry of that order is what breaches their agreement. And while they may argue they didn't have notice and they have a claim, it doesn't change the jurisdictional question, which is it all stems from an act

of this Court, which is the approval of the midstream settlement.

One more point. I'm not sure I understand, like, the relevance of defenses or frivolous or (indiscernible), how that really gets into the analysis from my perspective. The question here is does this stem from the assumption and rejection process. This settlement agreement, the midstream settlement agreement, is just like any other settlement agreement in bankruptcy. It's a mishmash. It's a mishmash. It's got some state law things in there. It's got bankruptcy resolutions, you know, running with the land. How does that, you know, reflect into the bankruptcy power. So it's a mishmash.

The amendment to the midstream agreements is simply an implementation mechanism for a settlement. If this was a settlement, couldn't Carnero go to state court and attack the settlement? I don't think so. It's like a cocktail.

Carnero's sitting there telling you, you know, they're fine with the gin and they're fine with the Campari, just don't like the vermouth and they want to go to state court to complain about the vermouth. But I'm not going to get my Negroni unless you have vermouth, Campari, and what's the last one, gin.

THE COURT: You know, you're just confusing the

hell out of me because I'm still thinking about caffeine-free Diet Coke.

MR. BASTA: Okay, then. (Indiscernible) who would drink Diet Coke if it didn't have caffeine. I understand that point, Your Honor, and I know I'm mixing my metaphors.

But my point is this is like a package deal. It's a package deal that got done because of the oversight of this Court and the pendency of the ruler inside this Court. Without the assumption/rejection process, which is critical to the reorganization process. This settlement agreement never would have gotten done and it was a package deal.

And the idea that they can go to state court and challenge one component of this package deal is, I think, contrary to the funneling effect that bankruptcy is supposed to have.

And I would like to end where Mr. Stancil ended. You know, no one is denying Carnero, their ability to allege that the amendment violated their agreement. The question is, where is that going to be heard.

And I would argue that they want to go to state court for the precise reason that the state court is going to be less familiar with the unique assumption/rejection process that was implemented in this Court, and that kind of proves jurisdiction to me. It proves jurisdiction to me that to send it to the state court, you have to unpack how

the assumption/rejection process works in this case.

So for those reasons, Your Honor, we think there's jurisdiction, we think it's clear, we don't think it's a close call, and we think Carnero will have its day in court before this court.

THE COURT:  Mr. Basta, thank you.

MR. McFAUL:  Very briefly, Your Honor.  Dustin McFaul for Mitsui E&P.

I actually agree with Mr. Basta's last point.  I think that's going to become apparent on the judgment on the pleadings very soon.

We oppose remand as well.  We think that this Court is the place for this dispute.  Your Honor has almost 20 years of showing the efficiency of this Court, in addition to the fact that you know the case and you know what happened and nobody knows your own court orders better than you.

I don't want to gloss over the fact that the plan has an exclusive jurisdiction provision.  That was in Slide 33 of Mr. Stancil's deck.  And if you look at Part 3(c) and (d), this dispute falls squarely under the exclusive jurisdiction provision.

THE COURT:  Just to be sure you know how I'm thinking of that provision, there first has to be jurisdiction arising under 1334 before we can retain it, so

the retention issue is dependent on the 1334 question, I think. Do you have any dispute about that?

MR. McFAUL: I don't. I don't, but the timing point is an important one and the fact that it was acknowledged in the plan and in the confirmation order that subject matter jurisdiction after the effective day would be the same as it is pre-effective day because this was a different case where assumption decisions were made after the effective date, and that's all I have.

Thank you for Your Honor's time.

THE COURT: Mr. McFaul, thank you. Is there anyone else that wants to argue against remand? All right. Do you want to a 10-minute break or something, Mr. Wolfshohl?

MR. WOLFSHOHL: I was, frankly, just going to take a few minutes.

THE COURT: Go ahead.

MR. WOLFSHOHL: Your Honor, first off, a lot of what's being talked about is this idea that, you know, that these claims can be brought at some point, at least near the end they were saying that, and that I'll have my day in court.

But really, most of the bases for them saying that there is Bankruptcy Court jurisdiction is the allegation that my claims are barred, and those allegations relate to

this concept that I had to bring the claims at confirmation.

Your Honor, I just -- I mean, this to me is the crux of this argument. The fact that the plan gives them authority to do something doesn't mean that if they do that thing and somehow it violates my rights, especially when the plan also provided that contract counterparties to executory contracts that were assumed, the obligations going forward we're going to continue in effect.

That doesn't mean that that's somehow barred by the plan. The fact that the plan says they can amend as part of the assumption process is, to me, no different than saying the plan provided that the Debtor could operate in the ordinary course of business post-confirmation. That doesn't mean that the Debtor can breach contracts with impunity and without any kind of consequence.

And it doesn't mean that when they do breach contracts or commit, you know, torts and things like that when they're doing it in the context of operating in the ordinary course of business, which the plan gave them authority to do, that every single time somebody has an issue with that they have to come back to the Bankruptcy Court indefinitely.

The reality is, you know, I think one of the ways that we're sort of two ships passing in the night is that I'm not saying that the plan didn't give them the ability to

do it. It's just that the plan also, whenever they assumed my contract, gave me rights under the contract. And the moment in time when they breached my contract was the 23rd of December; it was when they inked a settlement agreement and amended contracts in a way that violated my rights under the GGPA.

And I don't think you can go back in time and somehow say that I needed to raise that at confirmation simply because they said that they could amend in the future. They didn't come back to you and ask for permission to do it.

And Mr. Basta was talking about the idea of corralling everyone. Nobody was corralled. There was a hearing and Mr. Jenkins got up and said -- he gave you the explanation, I don't need to put people on notice of this and I don't think there's really anybody out there that has standing to oppose it. This wasn't corralling everybody under 365.

This was entering into a commercial agreement that they believed -- and they clearly knew that I was out there because the day that they did it, they filed a preemptive lawsuit against me. So it's not like -- I mean, they'd say I was lying in wait. That wasn't the case. They knew I was there. They knew I had a position that the amendments, certain portions of them, not every part of the amendments.

We believed that their amendments potentially violate our rights under the GGPA.

And the other thing I want to clarify, Your Honor, because I think this was maybe lost in the discussion earlier. It's not that I think my rights somehow, you know, trump or stepped in front of their rights under the existing commitments.

What we believe is that the GGPA or the reason it was violated is that they did things to tinker with and alter rights that we had that were going to eventually come to fruition because we're talking about complicated sets of dedications related to different types of hydrocarbons. It's not that, you know, that we suddenly think because they amended, we just somehow jump in front of everybody.

What we're saying is the modifications you made altered when we were going to eventually get some type of hydrocarbons at certain times. And that is all that needs to be interpreted to decide whether we're right about that are the contracts, Your Honor. It's not the plan, it's not the confirmation order.

The reality is -- and you were asking the question earlier. This is a quote from the case that they rely on heavily, I think, the Senior Care Centers case. First off, I want to say that that's a clearly factually distinguishable case because they presented, in connection

with the plan of confirmation, exactly what it is that they were going to do.

And to some extent, Judge Jernigan said that this was essentially like res judicata and that there were collateral estoppel principles that were triggered because the landlord knew what they were going to do and didn't object to it. The Court entered the order and the entire plan revolved around the idea that this stock was going to get sold and the Court said, look, you were put on notice of this, and you should have come and said something.

The reality is -- and they're trying to sort of make our case into something like that. This case, what gets decided in the lawsuit between Carnero and the defendants is not going to affect the implementation of the plan. It may have some impact on the Debtor's, you know, value perhaps, like in a really indirect way because they have a lawsuit against them, but that's not going to change anything that happens under the plan.

The plan has a specific process, really it's an equitization plan so, you know, perhaps parties that are receiving equity in the Debtor, there's a value reduction as a result of a lawsuit, but that's the case with any lawsuit against the Debtors post-confirmation, and that's not something that in and of itself creates jurisdiction, Your Honor.

The quote that I wanted to cite to from In re Senior Care from Judge Jernigan, and she's citing to the KSRP case, but she says, "Where a well pleaded complaint rule is inapplicable, the Court may consider unfiled claims of a defendant provided that they are not immaterial, made solely for the purpose of obtaining jurisdiction, or wholly insubstantial and frivolous to determine whether a Bankruptcy Court has jurisdiction over the removed action."

So it's not exclusively frivolous, as Mr. Stancil said. I believe that Your Honor has to decide this. I mean, even if you decide it a month from now or two months from now, the fundamental question of whether my claims are barred by the plan is the only issue that could possibly confer Bankruptcy Court jurisdiction over this case.

And I don't think it's even a close call, but if the claims are not barred by the plan or the prior orders, then this is just a contract case and there's no further need to look at any of the prior orders, Your Honor, or any plan provision or anything like that. This is a question of whether amendments that they made impair my rights under the GGPA related to the existing commitments.

And the only thing that anybody'll ever look at whenever this case is ultimately decided is what do those documents say. And there's no need to look at the plan, there's no need to look at the confirmation order, there's

no need to look at the assumption order. It is going to be within the four corners of multiple different documents. But it's a complicated web, but they are all agreements that were ultimately assumed.

And I don't think that, you know, Mr. Basta was talking about this concept of, you know, changing the reality of the case and treating it as though it was something that was brought to everyone's attention at confirmation. He used that term corral everyone. Well, confirmation is a point in time whenever you do get corralled and everybody gets to see what's going to happen and things are disclosed, and people have an opportunity to object.

My position and what I'm telling Your Honor is simply saying that we may do this, and we're authorized to do this does not put anybody on -- I couldn't have filed an administrative claim. What would my administrative claim have been? I mean, nobody put me on notice of any kind of violation of the GGPA at that point.

Your Honor, I think this case hinges on specifically the terms of a contract and then those are state law claims, and I think for that reason the state court should be deciding it.

THE COURT: Thank you. All right. We have jurisdiction over this matter under 28 U.S.C. Section 1334.

The determination of our subject matter jurisdiction is obviously core in and of itself when we're trying to decide whether something is core.

First, I want to take a moment to thank all of the counsel for such informed and intelligent arguments, very much appreciated. Every question I asked got direct answers by both sides and the arguments were really outstanding.

I find that I have subject matter jurisdiction that is non-waivable. I'm going to deny the motion to remand, and these are the reasons why.

Largely, Mr. Stancil says this in his, like, second minute of talking, which is that if the Bankruptcy Court's orders control the outcome of this case, then we have subject matter jurisdiction over the entire case. And as Carnero acknowledges, the real question is whether that, in fact, exists. But if that is the real question in order to decide it, then we have to exercise subject matter jurisdiction.

There has been a discussion as to, well, what is the level of burden that needs to be demonstrated to find whether these are legitimate claims. Is it colorable; is it frivolous? Something about frivolous. I don't need to cross that bridge today.

I find from the arguments before me that it is more likely than not that the defenses that it is governed

by Bankruptcy Court orders will prevail, and there couldn't really be a higher standard than that. So whether it's colorable or frivolous, those are easily met, but I actually think it is more likely than not that Carnero will not prevail with respect to these orders.

This was a really, really, really unusual plan, and we have to apply the Fifth Circuit's rulings in accordance with the plan as the Fifth Circuit has demanded to see what we have.

It is noteworthy that the rejections of contracts, the assumptions of contracts, the amendments of contracts under the terms of the plan, even if done later, are nevertheless effective as of the effective date of the plan. That then takes them out of the question as to whether we have something that is occurring in the ordinary course of business later. They were integral to the plan itself and had an effect, albeit retroactive, as of the effective date of the plan.

That means we're going to have to go through every order that we did that pertains to this and ultimately determine whether these claims that are asserted by Carnero are barred under the terms of our prior orders, and that makes this core in all sorts of ways. It is core because it arises under, it's core because it arises in, and it's core because it's related to. Everything about this is core

because of the fact that things took effect as of the effective date of the plan.

There's something else that the parties didn't really discuss that makes this core, but it concerns me, and that is the argument that Carnero makes that it was, in effect, precluded from bringing a claim by the non-disclosure of the amendments.

If that entitles Carnero to equitable relief from some portion of the confirmation order in order to be able to bring a prepetition claim or to bring an admin claim because there was non-disclosure, we're the only court that can give that remedy. That can't be granted by any other court.

So I'm concerned about the argument that Carnero is raising that they were precluded from the opportunity to bring claims. I don't have any proof of that. I've got statements by Mr. Stancil that they were told an awful lot more than what is apparent from the record, and that may be a matter for trial.

But I do want it clear that those arguments matter to me, but those arguments don't make the orders ineffective. It may mean that they would grant relief in order to allow claims to be filed arising out of the later amendments, and no other court would have the ability to make that determination. So because both sides need to

invoke our core jurisdiction, I find that we have subject matter jurisdiction.

With respect to whether we ought to engage in mandatory abstention, one of the requirements of mandatory abstention is that matters not be core because you have to meet all in order to get mandatory abstention. I find that it does not apply.

With respect to permissive jurisdiction, I find that there are all sorts of reasons why -- excuse me -- permissive abstention, why we should not permissively abstain. I can go through the factors, but I think we all sort of understand them already. The effect on which state law issues predominate over bankruptcy issues actually don't.

As I think Mr. Wolfshohl properly explains, state law issues are pretty straightforward. It's the bankruptcy issues that are complicated and the complex bankruptcy issues predominate over the simpler state law issues. The difficult or unsettled nature of applicable law, we certainly have a difficult bankruptcy question. I don't know, according to the argument, whether we have a difficult state law question.

The presence of relating proceeding commenced in state court or other non-bankruptcy proceeding doesn't exist. The jurisdictional basis, if any under 1334, would

favor abstention. The degree of relatedness or remoteness of the proceeding to the main bankruptcy case, it is fundamental to the main bankruptcy case that is against abstention.

The substance, rather than the form of an asserted core proceeding. Again, that goes really to the defense question where everyone is agreeing that the defense can be raised if it is above some standard, and I found it's above all of those standards.

The feasibility of severing the state law claims. We can't sever them until we decide this question. I will say that I am not determining that once we decide the question of what these orders do, I am not pre-terminating the ability of Carnero to file a renewed abstention motion if all that's then left are state core matters. I'm just not deciding that today.

The burden on the Bankruptcy Court's docket is not much of a burden over here. I've got time right now, cases are slow. I am leaving the complex panel come January 1 and then I'll have all sorts of time.

The likelihood that the commencement of the proceeding involves forum shopping by one of the parties. If there's forum shopping here, I don't see it. But if there is forum shopping, it's sort of equal.

The existence of a right to a jury trial. We

haven't crossed that bridge yet, but we don't have a right to a jury trial as to what the Bankruptcy Court orders mean.

The presence and the proceeding of non-debtor parties. There are plenty of non-debtor parties. Comity doesn't really apply. The state court hasn't done anything yet. And the possibility of prejudice to other parties in the action, that favors retention of the case because of the number of parties that can be affected.

I am finding subject matter jurisdiction and I am denying abstention. Those are my conclusions and fact findings.

That now moves us to the scheduling conference. Do you all want time to confer? Are we ready to move to the scheduling conference before you confer?

MR. STANCIL: Your Honor, my preference would be to speak to my client. Is there any way we can just move the scheduling conference to a different date after we -- I can talk to my client, you can talk to your client, and then we can --

THE COURT: I think I put it here largely as a placeholder because I knew I was going to rule, and I think that's fine with me. How long do you all want?

MR. STANCIL: A week to 10 days?

MAN: I have a high school graduation I can't screw up.

THE COURT: Oh, you can screw it up, but I'll do my best to (indiscernible).

MR. WOLFSHOHL: Well, Your Honor, would you want us in person or remote for that?

THE COURT: Your choice. Every hearing is your choice.

MR. WOLFSHOHL: That makes me nervous.

THE COURT: I'm looking at the 13th.

MR. STANCIL: The 13th of June, Your Honor?

THE COURT: 13th of June.

MR. WOLFSHOHL: That would be fine, Your Honor. Thank you. Anybody on the phone want to speak up?

THE COURT: Does anyone have a conflict on June 13th at 1:30 in the afternoon?

MR. STANCIL: That works for me, Your Honor.

THE COURT: Okay. We'll reschedule the scheduling conference to June 13th at 1:30. Let me set a deadline of June 6th for you all to file your preconference papers so that I have a week to review if that's okay. Could you all meet that deadline?

MR. WOLFSHOHL: Yes.

MR. STANCIL: Yes, Your Honor.

THE COURT: Okay.

MAN: Do you want to talk about -- do you need time for the 12(c) or are you --

MR. STANCIL: Oh, yeah. I mean, Your Honor, I was kind of hoping to have a full opportunity to respond to the 12(c). Is there any way we could just abate that until we have the pretrial conference. In the context of that, we can discuss a hearing date.

MR. WOLFSHOHL: In concept, that's fine, Your Honor. I think -- is there any chance of that conference happening a week -- it's already the 23rd, never mind.

THE COURT: We will not rule on ECF 19 prior to the scheduling conference and at the schedule conference, we will set briefing deadlines if the parties haven't agreed to them. With respect to Rule 19, if the parties can agree on briefing deadlines that start to run before the conference, you can agree on those and I'm going to enforce them. So any written agreement by the parties as to ECF 19 is fine. But if you don't have one, we'll set them at that hearing.

MR. WOLFSHOHL: Okay, thank you.

THE COURT: Thank you all. We'll go ahead and recess.

(Proceedings adjourned at 10:47 A.M.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: June 1, 2022

# EXHIBIT 39

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI)<br><br>**Hearing Date**: October 5, 2022<br>**Hearing Time**: 1:30 PM<br>**Location**: Courtroom 404<br>515 Rusk<br>Houston, Texas 77002<br>**Judge Presiding**: Marvin Isgur |

**CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS PURUSANT TO RULE OF EVIDENCE 902(11)**

**[Relates to Docket Nos. 67, 78, & 99]**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

Declarant, Scott Wike, pursuant to Federal Rule of Evidence 902(11) and Federal Rule of Bankruptcy Procedure 9017, states as follows:

1. I am over 18 years of age and a United States citizen. All of the information contained within this declaration is true and correct based on my personal knowledge.

2. I am an employee of Mesquite Energy, Inc. ("Mesquite"), located at 700 Milam Street, Suite 600, Houston, Texas 77002. My title is Vice President, Marketing. I am also a custodian of records for Mesquite. I am familiar with the manner in which Mesquite's business records are kept, and I am qualified and authorized to make this declaration.

3. I have reviewed the documents listed in the attached addendum. I certify that these records are the original or duplicate copies of the original records in the custody of Mesquite.

4. I further state that:

   A. such records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

   B. such records were kept in the course of regularly conducted business activity;

   C. such records were made by the regularly conducted business activity as a regular practice; and

   D. if such record is not the original, such record is a duplicate of the original.

I certify, under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Harris County, Texas on October 1, 2022

____________________________

Scott Wike

**ADDENDUM TO THE CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS PURUSANT TO RULE OF EVIDENCE 902(11)**

- Exhibit 6: Master Settlement Agreement and Exhibits
- Exhibit 7: The Brasada Gas Processing Agreement, dated as of February 27, 2012 & Amendments No. 1–4
- Exhibit 8: Individual Transaction Confirmation to ETC Processing Agreement, dated as of April 1, 2011 & Amendments
- Exhibit 9: Firm NGPA Section 311 Gas Transportation Agreement & Firm Intrastate Transportation Agreement
- Exhibit 10: Enterprise Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko, dated as of March 1, 2012
- Exhibit 11: Enterprise Purchase Agreement between Anadarko and Enterprise Products Operating LLC, effective as of March 1, 2012
- Exhibit 12: Comanche PSA & Amendments Nos. 1-3
- Exhibit 20: Gavilan Purchase and Marketing Agreements
- Exhibit 26: Mesquite – UnSub Hydrocarbons Purchase and Marketing Agreement, dated as of December 17, 2021