**APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Adversary Proceeding #: 22-03035

*Assigned to:* Bankruptcy Judge Marvin Isgur
*Lead BK Case:* 19-34508
*Lead BK Title:* Sanchez Energy Corporation, et al
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:* 01 Determination of removed claim or cause

*Date Filed:* 02/28/22
*Date Removed From State:* 02/28/22

***Plaintiff***
-----------------------
**Carnero G&P, LLC**

represented by **Amy Coates Falcon**
Porter Hedges LLP
1000 Main St
Ste 3600
Houston, TX 77002
713-226-6681
Email: afalcon@porterhedges.com
*LEAD ATTORNEY*

**Eugene Montgomery Nettles**
Porter & Hedges
1000 Main St
36th Floor
Houston, TX 77002-2764
713-226-6609
Fax : 713-226-6209
Email: enettles@porterhedges.com
*LEAD ATTORNEY*

**Joshua W. Wolfshohl**
Porter Hedges LLP
1000 Main, 36th Floor
Houston, TX 77002
713-226-6000
Fax : 713-228-1331
Email: jwolfshohl@porterhedges.com
*LEAD ATTORNEY*

V.

***Defendant***
-----------------------
**SN EF UnSub, LP**
1111 Bagby Street

represented by **Paul M Basta**
Paul, Weiss, Rifkind, Wharton & Garrison

Suite 2050
Houston, TX 77002

1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
Email: pbasta@paulweiss.com
*LEAD ATTORNEY*

**Alice Belisle Eaton**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Fax : 212-492-0125
Email: aeaton@paulweiss.com
*LEAD ATTORNEY*

**Andrew Ehrlich**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3166
Email: aehrlich@paulweiss.com
*LEAD ATTORNEY*

**Sean Anthony Mitchell**
Paul Weiss et al
1285 Ave of the Americas
New York, NY 10019
212-373-3740
Email: mtattnall@paulweiss.com
*LEAD ATTORNEY*

**Thomas Andrew Woolley, III**
McCloskey Roberson Woolley, PLLC
190 T.C. Jester, Suite 400
Houston, TX 77007
713-337-3900
Fax : 713-337-3915
Email: rwoolley@mrwpllc.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**

**Eagle Ford TX LP**
5599 San Felipe Road
Suite 725
Houston, TX 77056

represented by **Julia Frost-Davies**
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02115
617-341-7700
Email: julia.frost-davies@morganlewis.com
*LEAD ATTORNEY*

**Amy L Kyle**
Morgan Lewis & Bockius LLP
One Federal St

Boston, MA 02115
617-951-8288
Email: amy.kyle@morganlewis.com
*LEAD ATTORNEY*

**Michelle Dawn Pector**
Morgan Lewis Bockius LLP
1000 Louisiana St
Ste 4000
Houston, TX 77002
713-890-5455
Email: michelle.pector@morganlewis.com
*LEAD ATTORNEY*

**Jared Wilkerson**
Morgan Lewis & Bockius LLP
100 Louisiana Street
Houston, TX 770002
713-890-5460
Email: jared.wilkerson@morganlewis.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**
**Venado EF L.P.**
13215 Bee Cave Pkwy.
Suite B-350
Austin, TX 78738
***aka* Javelin EF L.P.**

represented by **Sydney Corry**
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
253-455-6202
Email: sydney.corry@kirkland.com
*LEAD ATTORNEY*

**Conor P. McNamara**
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 N. LaSalle
Chicago, IL 60654
312-86202000
Email: conor.mcnamara@kirkland.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**
**Mitsui E&P Texas LP**
1300 Post Oak Blvd.
Suite 1800
Houston, TX 77056

represented by **Duston K McFaul**
SIdley Austin LLP
1000 Louisiana St.
Suite 5900
Houston, TX 77002
713-495-4500
Fax : 713-495-7799
Email: dmcfaul@sidley.com
*LEAD ATTORNEY*

**Maegan Quejada**
Sidley Austin LLP
1000 Louisiana St
Ste 5900
Houston, TX 77002
713-495-4618
Email: mquejada@sidley.com
*LEAD ATTORNEY*

***Defendant***
------------------------

**SN EF Maverick, LLC**
700 Milam Street
Suite 600
Houston, TX 77002

represented by

**Sharon Marie Beausoleil**
Foley & Lardner LLP
1000 Louisiana Street
Suite 2000
Houston, Tx 77002
713-276-5086
Email: sbeausoleil@foley.com

**Joseph Bretschneider**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Email: jbretschneider@willkie.com
*LEAD ATTORNEY*

**Sara Ann Brown**
Thompson Coburn LLP
2100 Ross Avenue
Ste 3200
Dallas, TX 75201
972-629-7100
Fax : 972-629-7171
Email: sbrown@thompsoncoburn.com

**Dennis Jenkins**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Fax : 212-728-8111
Email: djenkins@willkie.com
*LEAD ATTORNEY*

**James G Munisteri**
Foley Gardere
1000 Louisiana Street
Ste 2000
Houston, TX 77002
713-276-5500
Fax : 713-276-5555

Email: jmunisteri@foley.com

**Mark T. Stancil**
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
202-303-1133
Email: mstancil@willkie.com
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
(See above for address)

**Joseph Bretschneider**
(See above for address)
*LEAD ATTORNEY*

**Sara Ann Brown**
(See above for address)

**Dennis Jenkins**
(See above for address)
*LEAD ATTORNEY*

**James G Munisteri**
(See above for address)

**Mark T. Stancil**
(See above for address)
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Mesquite Comanche Holdings, LLC**
c/o Registered Agent -
C T Corporation System
1999 Bryan St., Suite 900
Dallas, TX 75201

represented by **Sharon Marie Beausoleil**
(See above for address)

**James G Munisteri**
(See above for address)

***Intervenor***
-----------------------

**ETC Texas Pipeline Ltd.**
1300 Main Street
Suite 2000
Houston, TX 77002

represented by **Yelena Archiyan**
Katten Muchin Rosenman LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
214.765.3657
Email: yelena.archiyan@katten.com

**John E. Mitchell**
Katten Muchin Rosenman
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
469-627-7017
Email: john.mitchell@katten.com

| Filing Date | # | Docket Text |
|---|---|---|
| 10/05/2022 | 104 | Courtroom Minutes. Time Hearing Held: 1:30 pm - 3:46 pm, 4:00 pm - 7:25 pm. Cases 21-04419, 22-03035 heard concurrently. Appearances: Joshua Wolfshohl and Amy Falcon for Carnero G&P, LLC. Duston McFaul and Megan Quejada for Mitsui E&P Texas LP. Andrew Ehrlich, Rusty Woolley and Sean Mitchell for SN EF UnSub, LP. Mark Stancil and Dennis Jenkins for SN EF Maverick, LLC/Mesquite Entities. Julia Frost-Davies for Eagle Ford TX, LP. Conor McNamara for Venado EF L.P. aka Javelin EF L.P. Jason Brookner and Lydia Webb for Western Midstream Partners, LP. Paul Mitchell for Enterprise Products Operating, LLC. Additional appearances: Harry Quarls, Cameron George and Greg Kopel with Mesquite Energy. Jerry Schroeder, Dustin Perry, Matt Hawthorn and Kaylan Dunn with Carnero. Brett Miller present. Exhibits admitted: ECF No. 103 1-39. Additional simultaneous briefing limited to 10 pgs. per topic to be filed not later than 10/26/22. The Court will take the matters under advisement on 10/27/22. (Related document(s):51 Generic Motion) (TylerLaws) Modified on 10/5/2022 (TylerLaws). (Entered: 10/05/2022) |

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
October 06, 2022
Nathan Ochsner, Clerk

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

**Order Authorizing the Filing of Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Objection to Defendants' Motion for Judgment on the Pleadings Under Seal and (II) Granting Related Relief**

[Relates to Dkt. No. 78]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Objection to Defendants' Motion for Judgment on the Pleadings* (the "Objection") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Objection, and having heard the statements of counsel regarding the relief requested

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.



13597191

013558

in the Motion at a hearing before the Court, if any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Objection under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Objection is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: October 06, 2022

Marvin Isgur
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 25, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| Carnero G&P, LLC<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | **Adv. Pro. No. 22-03035 (MI)** |

# Agreed Stipulation and Order Regarding Additional Briefing Requested by the Court at the October 5, 2022 Hearing

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

On October 5, 2022, the Court held a sealed hearing (the "October 5 Hearing") on Defendants SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Javelin EF L.P. (f/k/a Venado EF L.P.), Mitsui E&P Texas LP, and SN EF UnSub, LP's (n/k/a/ Crown Eagle Energy LP) (collectively, "Defendants") Motion for Judgment on the Pleadings [Dkt. 67] against Plaintiff Carnero G&P LLC's ("Plaintiff") Second Amended Complaint [Dkt. 53-1]. During the October 5 Hearing, the Court ordered additional briefing on four issues ("Additional Briefing") and gave the parties until October 26, 2022, to simultaneously file their briefs [Dkt. 104].

The parties requested copies of the transcript for the October 5 Hearing to clarify the issues the Court identified. Because the transcript was sealed and had a technical issue, it took longer to transfer the audio of the October 5 Hearing to the transcription service. The transcription service was only able to provide a copy of the transcript on October 18, 2022.

Plaintiff and Defendants, through their undersigned counsel, stipulate and agree to move the deadline for the Additional Briefing from October 26, 2022, to November 4, 2022, at 7:00 pm Central Time. As the Court directed at the October 5 Hearing, Plaintiff and Defendants will endeavor to agree in writing on the four questions presented and will seek clarification from the Court if such agreement is not achieved by October 26, 2022. The parties agree to be bound by this stipulation pending its entry as an order by the Court.

**It is ordered that:**

The deadline for the parties to simultaneously submit the Additional Briefing is moved from October 26, 2022, to November 4, 2022, at 7:00 pm Central Time.

The parties will endeavor to agree in writing on the four questions presented and will seek clarification from the Court if such agreement is not achieved by October 26, 2022.

Signed: October 25, 2022

Marvin Isgur
United States Bankruptcy Judge

AGREED AS TO FORM:

*<u>/s/ James G. Munisteri</u>*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Mesquite Energy, Inc., SN EF Maverick, LLC & Mesquite Comanche Holdings, LLC**

*<u>/s/ Thomas A. Woolley, III</u>*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New York, New York 10019 Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Crown Eagle Energy LP (f/k/a SN EF UnSub, LP)**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Conor P. McNamara*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Maegan Quejada*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl
Aaron J. Power
Eugene M. Nettles
Amy C. Falcon
**Porter Hedges LLP**
100 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshol@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Carnero G&P, LLC**

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

**Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Post-Hearing Brief Under Seal and (II) Granting Related Relief**

[Related Dkt. No. 117]

**Emergency relief has been requested.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch , LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.[2] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

**To the Honorable Marvin Isgur,**
**United States Bankruptcy Judge:**

Carnero G&P LLC ("Carnero") states as follows in support of this motion (this "Motion"):

## Emergency Relief Requested

1. Carnero seeks entry of an order, substantially in the form attached hereto (the "Proposed Order") (a) authorizing Carnero to file its ("Brief") under seal; and (b) granting related relief.

2. Carnero requests emergency consideration of this Motion to preserve the confidentiality of the information contained in the Brief.

## Jurisdiction and Venue

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1408.

4. The bases for the relief requested herein are sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Local Rule 9037-1, and the Court's *Protective Order* (Doc. No. 42).

## Background

5. On August 24, 2022 Defendants filed a Motion for Judgment on the Pleadings [Dkt. 67] attaching numerous exhibits [Dkt. 67-2 through 67-13] that Defendants both stamped Highly Confidential under the April 29, 2022 Protective Order [Dkt. 16] and redacted (the "Redacted Exhibits"). In accordance with the Protective Order, Defendants filed the Redacted Exhibits under seal.

6. In its Brief, Carnero cites and quotes certain portions of those Redacted Exhibits to support its arguments. To maintain confidentiality of the Redacted Exhibits, Carnero seeks authority to file the Brief Removal of Redactions under seal.

**Basis for Relief**

7. The Bankruptcy Code provides strong support for sealing the Brief. Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect parties from potential harm that may result from the disclosure of certain confidential information. *See* 11 U.S.C. § 107(b) ("On request of a party in interest, the bankruptcy court shall, . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information" or "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title"); *see In re Gen. Homes Corp.*, 181 B.R. 898, 903 (Bankr. S.D. Tex. 1995) ("The court has authority to seal court records, in order to protect trade secrets or confidential research, development, or confidential information, or to protect a person with regard to a scandalous or defamatory matter."). Although section 107(b) of the Bankruptcy Code is an exception to the general rule, its application in a bankruptcy proceeding is appropriate. *See In re 50-Off Stores, Inc.*, 213 B.R. 646, 654 (Bankr. W.D. Tex. 1997) ("[T]he very existence of the exception demonstrates Congress' anticipation that the administration of bankruptcy cases might, by their very nature, require special intervention to protect some kinds of information from dissemination to the world.").

8. Further, Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code. Specifically, Bankruptcy Rule 9018 provides, in relevant part, that on motion "the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information," or "to protect an entity against scandalous or defamatory matter contained in any paper filed in a case under the Code." FED. R. BANKR. P. 9018. Additionally, the Sealing Order, which governs the filing of sealed documents, provides, in relevant part, that "[c]oncurrently with the filing of a sealed document, a motion to seal must be filed electronically," and "[a]fter reviewing the motion to seal, the Court may order appropriate relief." Sealing Order, ¶ 2(d).

9. Carnero also submits that the Brief may involve commercial information that may be protected by the Court pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018. Commercial information is information which would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Wyndham Vacation Resorts, Inc. v. Faucett* (*In re Faucett),* 438 B.R. 564, 567 (Bankr. W.D. Tex. 2010) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.),* 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information need not rise to the level of a "trade secret" to be protected under section 107(b) of the Bankruptcy Code. *See In re Northstar Energy, Inc.*, 315 B.R. 425, 429 (Bankr. E.D. Tex. 2004) ("A bankruptcy court is required to seal 'documentary information filed in court that does not rise to the level of a trade secret but that is so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit that entity's competitors.'" (quoting *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996)). Rather, section 107(b) of the Bankruptcy Code is "designed to protect business entities

from disclosure of information that could reasonably be expected to cause the entity commercial injury." *Id.* (quoting *In re Glob. Crossing, Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003)).

10. Here, the Brief references and quotes information that may be commercially sensitive information regarding the terms the Redacted Exhibits. Thus, under section 107(b) of the Bankruptcy Code, sealing the Brief is appropriate. Specifically, the Brief contains detailed contractual information stamped Highly Confidential under the Protective Order and that is not typically disclosed to the public or to competitors. Accordingly, the Brief has been filed under seal.

11. In light of the foregoing, Carnero respectfully requests that the Court enter an order authorizing the Brief to be filed under seal.

**Notice**

12. Notice of this Motion shall be given to any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and any party required to be served under Bankruptcy Local Rule 9013-1(d). Due to the nature of the relief requested herein, Carnero submits that no other or further notice need be provided.

WHEREFORE, Carnero respectfully requests that the Court (i) enter the Proposed Order substantially in the form attached hereto and (ii) grant Carnero such other and further relief as is just, proper, and equitable.

Dated: November 4, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *<u>/s/ Joshua W. Wolfshohl</u>*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Defendant Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on November 4, 2022, a true and complete copy of the foregoing was duly served to all registered ECF users appearing in the case.

*<u>/s/ Joshua W. Wolfshohl</u>*
Joshua W. Wolfshohl

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[2] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

## Order Authorizing the Filing of Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Post-Hearing Brief Under Seal and (II) Granting Related Relief

[Relates to Docket No. 117]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Post-Hearing Brief* (the "Brief") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Brief, and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court, if any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter

[2] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Brief under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Brief is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: ___________________, 2022.
Houston, Texas

______________________________________
HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| **Sanchez Energy Corporation, *et al.*,** | § | **Chapter 11** |
| **Reorganized Debtors.**[1] | § | **Case No. 19-34508 (MI)** |
| | § | **(Jointly Administered)** |
| **Carnero G&P, LLC,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Adv. Pro. No. 22- 03035(MI)** |
| **SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,** | § | |
| **Defendants.** | | |

**DEFENDANTS' EMERGENCY MOTION FOR LEAVE**
**TO FILE RESPONSES TO SUPPLEMENTAL BRIEFS**
**Related to Docket Nos. 67, 78, 99, 104, 116, & 117**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN NOVEMBER 22, 2022.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors").

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Mesquite Comanche Holdings, LLC ("MCom"), Eagle Ford TX, LP ("Eagle Ford"), Javelin EF L.P. ("Javelin") (f/k/a Venado EF L.P. ("Venado")), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), and Crown Eagle Energy LP (f/k/a SN EF UnSub, LP) ("UnSub" and, together with Maverick, Mesquite, MCom, and the WIPs, the "Defendants"), by and through counsel, file this Emergency Motion for Leave to File Responses to Supplemental Briefs ("Emergency Motion") and in support thereof state as follows:

## I.
## EMERGENCY RELIEF REQUESTED

1. By this Emergency Motion, Defendants request that the Court enter an order (i) granting the parties leave to file responses of no more than eight pages (the "Supplemental Responses") to the supplemental briefs filed by the parties on November 4, 2022 (the "Supplemental Briefs"), and (ii) directing that such Supplemental Responses be filed not later than November 30, 2022 at 7:00 pm prevailing Central Time.

2. Because the proposed November 30, 2022 deadline for filing the Supplemental Responses falls within the 21-day notice period that would apply to the Emergency Motion in the absence of expedited treatment, Defendants submit that expedited treatment of the Emergency Motion is warranted.

3. In addition, and as explained in further detail below, counsel for Defendants have conferred with counsel for Plaintiff Carnero G&P, LLC ("Carnero"), who has confirmed that Carnero does not oppose the relief requested herein. In light of Carnero's non-opposition, Defendants submit that no hearing on the Emergency Motion is necessary and that expedited treatment of the Emergency Motion is appropriate.

## II.
## BACKGROUND

4. On October 5, 2022, the Court held a hearing (the "October 5 Hearing") on Defendants' Motion for Judgment on the Pleadings ("Defendants' 12(c) Motion") [Dkt No. 67].

5. During the October 5 Hearing, the Court ordered the parties to submit Supplemental Briefs addressing four question that the Court identified on the record at the October 5 Hearing. The Court ordered that the parties file their Supplemental Briefs simultaneously.

6. On November 4, 2022, the parties simultaneously filed their Supplemental Briefs.

## III.
## REQUESTED RELIEF

7. Defendants request that the Court enter an order granting leave for Defendants to file a single, consolidated Supplemental Response of not more than eight pages and for Carnero to file a Supplemental Response of not more than eight pages, both of which shall be limited to responding to the arguments set forth in the opposing side's Supplemental Brief. Defendants further request that the Court set November 30, 2022 as the deadline for filing the Supplemental Responses.

8. Good cause exists for this Court to authorize the filing of Supplemental Responses. Because the Supplemental Briefs were filed simultaneously, pursuant to this Court's direction, Defendants have not yet had an opportunity to respond to the arguments set forth in Carnero's Supplemental Brief. After reviewing Carnero's Supplemental Brief, Defendants have concluded that the filing of a short Supplemental Response would be of substantial benefit to the Court in resolving the issues presented by Defendants' 12(c) Motion. In particular, filing a Supplemental Response would allow Defendants to clarify the issues presented by Defendants' 12(c) Motion and to address the defects in the arguments set forth in Carnero's Supplemental Brief.

9. Because Defendants propose that the Supplemental Responses be limited to no more than eight pages, accepting the Supplemental Responses would not significantly burden this Court. Moreover, because Defendants propose that the Supplemental Reponses be filed promptly, by November 30, 2022, accepting the Supplemental Responses should not significantly delay this Court in resolving Defendants' 12(c) Motion.

10. Prior to filing this Emergency Motion, counsel for Defendants conferred with counsel for Carnero to ascertain Carnero's position with respect to the relief requested herein. We are authorized to state that Carnero does not oppose this request for leave to file Supplemental Responses so long as leave is granted to both sides. Accordingly, Defendants request that leave be granted for the parties to file simultaneous Supplemental Responses (with Defendants filing a single, consolidated Supplemental Response).

11. In light of Carnero's non-opposition, granting the relief requested herein would not result in prejudice to any party.

WHEREFORE, Defendants respectfully request that this Court enter an order granting the parties leave to file Supplemental Responses of no more than eight pages, on or before November 30, 2022 at 7:00 pm prevailing Central Time.

Respectfully submitted this 18th day of November, 2022.

*/s/ Sharon M. Beausoleil*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Reorganized Debtors and Defendants Mesquite Energy, Inc., SN EF Maverick, LLC, and Mesquite Comanche Holdings, LLC**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Boulevard
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant Crown Eagle Energy LP (f/k/a SN EF UnSub, LP)**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Conor P. McNamara*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana Street, Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on November 18, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties requesting such service in this case.

*/s/ Sharon M. Beausoleil*
Sharon M. Beausoleil

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:**<br>**Sanchez Energy Corporation, *et al.*,**<br>**Reorganized Debtors.**[1] | §<br>§<br>§<br>§<br>§<br>§<br>§ | **Chapter 11**<br>**Case No. 19-34508 (MI)**<br>**(Jointly Administered)** |
| **Carnero G&P, LLC,**<br>**Plaintiff,**<br>**v.**<br>**SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,**<br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Pro. No. 22- 03035(MI)** |

**ORDER GRANTING DEFENDANTS' EMERGENCY MOTION FOR LEAVE TO FILE RESPONSES TO SUPPLEMENTAL BRIEFS**

Upon consideration of Defendants' Emergency Motion for Leave to File Responses to Supplemental Briefs (the "Emergency Motion"), seeking entry of an order granting the parties leave to file supplemental responses (the "Supplemental Responses") to the arguments set forth in the supplemental briefs filed by the parties on November 4, 2022 (the "Supplemental Briefs"), and the court having jurisdiction to consider the Emergency Motion and relief requested herein, and

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors").

due and adequate notice of the Emergency Motion having been given under the circumstances; and sufficient cause appearing therefor, it is hereby ORDERED that:

1. The parties are granted leave to file Supplemental Responses, limited to responding to the arguments in the parties' Supplemental Briefs, on the terms set forth herein.

2. Defendants are granted leave to file a single, consolidated Supplemental Response, and Carnero is granted leave to file a Supplemental Response.

3. Each Supplemental Response shall not exceed eight substantive pages.

4. The Supplemental Responses, if any, shall be filed on or before November 30, 2022 at 7:00 pm prevailing Central Time; and

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

SIGNED: ________________, 2022

____________________________________
MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
November 21, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:**<br><br>**Sanchez Energy Corporation, *et al.*,**<br><br>**Reorganized Debtors.**[1] | §<br>§<br>§<br>§<br>§<br>§<br>§ | **Chapter 11**<br><br>**Case No. 19-34508 (MI)**<br><br>**(Jointly Administered)** |
| **Carnero G&P, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Pro. No. 22- 03035(MI)** |

**ORDER GRANTING DEFENDANTS' EMERGENCY MOTION FOR LEAVE TO FILE RESPONSES TO SUPPLEMENTAL BRIEFS**

Upon consideration of Defendants' Emergency Motion for Leave to File Responses to Supplemental Briefs (the "Emergency Motion"), seeking entry of an order granting the parties leave to file supplemental responses (the "Supplemental Responses") to the arguments set forth in the supplemental briefs filed by the parties on November 4, 2022 (the "Supplemental Briefs"), and the court having jurisdiction to consider the Emergency Motion and relief requested herein, and

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors").

due and adequate notice of the Emergency Motion having been given under the circumstances; and sufficient cause appearing therefor, it is hereby ORDERED that:

1. The parties are granted leave to file Supplemental Responses, limited to responding to the arguments in the parties' Supplemental Briefs, on the terms set forth herein.

2. Defendants are granted leave to file a single, consolidated Supplemental Response, and Carnero is granted leave to file a Supplemental Response.

3. Each Supplemental Response shall not exceed eight substantive pages.

4. The Supplemental Responses, if any, shall be filed on or before November 30, 2022 at 7:00 pm prevailing Central Time; and

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: November 21, 2022

Marvin Isgur
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
November 28, 2022
Nathan Ochsner, Clerk

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[2] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | §<br>§ | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | §<br>§<br>§<br>§<br>§ | |
| | § | |

**Order Authorizing the Filing of Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Post-Hearing Brief Under Seal and (II) Granting Related Relief**
[Relates to Docket No. 117]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Post-Hearing Brief* (the "Brief") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Brief, and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court, if any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter

[2] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Brief under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Brief is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: November 28, 2022

Marvin Isgur
United States Bankruptcy Judge

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

# Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing Under Seal and (II) Granting Related Relief

[Relates Dkt. No. 123]

**Emergency relief has been requested. Relief is requested not later than 5:00 p.m. on Friday, December 2, 2022.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch , LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

**To the Honorable Marvin Isgur,**
**United States Bankruptcy Judge:**

Carnero G&P LLC ("Carnero") states as follows in support of this motion (this "Motion"):

**Emergency Relief Requested**

1. Carnero seeks entry of an order, substantially in the form attached hereto (the "Proposed Order") (a) authorizing Carnero to file its *Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing* ("Brief") under seal; and (b) granting related relief.

2. Carnero requests emergency consideration of this Motion to preserve the confidentiality of the information contained in the Brief.

**Jurisdiction and Venue**

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1408.

4. The bases for the relief requested herein are sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Local Rule 9037-1, and the Court's *Protective Order* (Doc. No. 42).

**Background**

5. On August 24, 2022 Defendants filed a Motion for Judgment on the Pleadings [Dkt. 67] attaching numerous exhibits [Dkt. 67-2 through 67-13] that Defendants both stamped Highly Confidential under the April 29, 2022 Protective Order [Dkt. 16] and redacted (the "Redacted Exhibits"). In accordance with the Protective Order, Defendants filed the Redacted Exhibits under seal.

6. In its Brief, Carnero cites and quotes certain portions of those Redacted Exhibits to support its arguments. To maintain confidentiality of the Redacted Exhibits, Carnero seeks authority to file the Brief Removal of Redactions under seal.

**Basis for Relief**

7. The Bankruptcy Code provides strong support for sealing the Brief. Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect parties from potential harm that may result from the disclosure of certain confidential information. *See* 11 U.S.C. § 107(b) ("On request of a party in interest, the bankruptcy court shall, . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information" or "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title"); *see In re Gen. Homes Corp.*, 181 B.R. 898, 903 (Bankr. S.D. Tex. 1995) ("The court has authority to seal court records, in order to protect trade secrets or confidential research, development, or confidential information, or to protect a person with regard to a scandalous or defamatory matter."). Although section 107(b) of the Bankruptcy Code is an exception to the general rule, its application in a bankruptcy proceeding is appropriate. *See In re 50-Off Stores, Inc.*, 213 B.R. 646, 654 (Bankr. W.D. Tex. 1997) ("[T]he very existence of the exception demonstrates Congress' anticipation that the administration of bankruptcy cases might, by their very nature, require special intervention to protect some kinds of information from dissemination to the world.").

8. Further, Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code. Specifically, Bankruptcy Rule 9018 provides, in relevant part, that on motion "the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information," or "to protect an entity against scandalous or defamatory matter contained in any paper filed in a case under the Code." FED. R. BANKR. P. 9018. Additionally, the Sealing Order, which governs the filing of sealed documents, provides, in relevant part, that "[c]oncurrently with the filing of a sealed document, a motion to seal must be filed electronically," and "[a]fter reviewing the motion to seal, the Court may order appropriate relief." Sealing Order, ¶ 2(d).

9. Carnero also submits that the Brief may involve commercial information that may be protected by the Court pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018. Commercial information is information which would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Wyndham Vacation Resorts, Inc. v. Faucett* (*In re Faucett),* 438 B.R. 564, 567 (Bankr. W.D. Tex. 2010) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.),* 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information need not rise to the level of a "trade secret" to be protected under section 107(b) of the Bankruptcy Code. *See In re Northstar Energy, Inc.*, 315 B.R. 425, 429 (Bankr. E.D. Tex. 2004) ("A bankruptcy court is required to seal 'documentary information filed in court that does not rise to the level of a trade secret but that is so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit that entity's competitors.'" (quoting *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996)). Rather, section 107(b) of the Bankruptcy Code is "designed to protect business entities

from disclosure of information that could reasonably be expected to cause the entity commercial injury." *Id.* (quoting *In re Glob. Crossing, Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003)).

10. Here, the Brief references and quotes information that may be commercially sensitive information regarding the terms the Redacted Exhibits. Thus, under section 107(b) of the Bankruptcy Code, sealing the Brief is appropriate. Specifically, the Brief contains detailed contractual information stamped Highly Confidential under the Protective Order and that is not typically disclosed to the public or to competitors. Accordingly, the Brief has been filed under seal.

11. In light of the foregoing, Carnero respectfully requests that the Court enter an order authorizing the Brief to be filed under seal.

**Notice**

12. Notice of this Motion shall be given to any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and any party required to be served under Bankruptcy Local Rule 9013-1(d). Due to the nature of the relief requested herein, Carnero submits that no other or further notice need be provided.

WHEREFORE, Carnero respectfully requests that the Court (i) enter the Proposed Order substantially in the form attached hereto and (ii) grant Carnero such other and further relief as is just, proper, and equitable.

Dated: November 30, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Defendant Carnero G&P, LLC**

**Certificate of Service**

I hereby certify that on November 30, 2022, a true and complete copy of the foregoing was duly served to all registered ECF users appearing in the case.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P., Mitsui E&P Texas LP, | § | |
| SN EF Maverick, LLC, and Mesquite | § | |
| Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

**Order Authorizing the Filing of Carnero G&P, LLC's Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing Under Seal and (II) Granting Related Relief**
[Relates to Dkt. No. 123]

Upon Carnero G&P, LLC's emergency motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing* (the "Brief") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Brief, and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court, if

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Brief under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Brief is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: ___________________, 2022.
Houston, Texas

______________________________________
HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 22, 2022
Nathan Ochsner, Clerk

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |

**Order Authorizing the Filing of Carnero G&P, LLC's Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing Under Seal and (II) Granting Related Relief**

[Relates to Dkt. No. 123]

Upon Carnero G&P, LLC's emergency motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing* (the "Brief") under seal; and (ii) granting related relief; and the Court having reviewed the Motion

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Brief under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Brief is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: December 22, 2022

Marvin Isgur
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
January 13, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 19-34508** |
| **SANCHEZ ENERGY CORPORATION, *et al.*,** | § | |
| | § | **CHAPTER 11** |
| | § | |
| **Debtors.** | § | |
| | § | |
| **CARNERO G&P, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 22-3035** |
| | § | |
| **SN EF UNSUB, LP, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

**CASE MANAGEMENT ORDER**

Not later than January 19, 2023, Mesquite must amend its emergency motion (filed at ECF No. 127). The motion should be amended to seek the specific substantive relief that was originally intended to be announced at the status conference by proposing specific dates, events and deadlines.

The Amended Motion should be self-calendared for a hearing on January 26, 2023 at 10:00 a.m.

SIGNED 01/13/2023

Marvin Isgur
United States Bankruptcy Judge

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P. n/k/a Javelin EF L.P., | § | |
| Mitsui E&P Texas LP, SN EF Maverick, | § | |
| LLC, Mesquite Comanche Holdings, | § | |
| LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |

**Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Objection to the Amended Emergency Motion of Mesquite Defendants for Status Conference Under Seal and (II) Granting Related Relief**

[Relates Dkt. No. 131]

**Emergency relief has been requested. Relief is requested not later than 5:00 p.m. on Friday, January 27, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

**To the Honorable Marvin Isgur,**
**United States Bankruptcy Judge:**

Carnero G&P LLC ("Carnero") states as follows in support of this motion (this "Motion"):

**Emergency Relief Requested**

1. Carnero seeks entry of an order, substantially in the form attached hereto (the "Proposed Order") (a) authorizing Carnero to file its *Objection to the Amended Emergency Motion of Mesquite Defendants for Status Conference* ("Objection") under seal; and (b) granting related relief.

2. Carnero requests emergency consideration of this Motion to preserve the confidentiality of the information contained in the Objection.

**Jurisdiction and Venue**

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1408.

4. The bases for the relief requested herein are sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Local Rule 9037-1, and the Court's *Protective Order* (Doc. No. 42).

**Background**

5. On January 19, 2023, Defendants SN EF Maverick, LLC, Mesquite Comanche Holdings, LLC, and Mesquite Energy, Inc. ("Mesquite Defendants") filed their Amended Emergency Motion of Mesquite Defendants for Status Conference [Dkt. 130] ("Motion") under seal. Carnero is unable to identify any material in the Motion that describes or references material stamped Highly Confidential under the April 29, 2022 Protective Order [Dkt. 16] in a way that would allow identification of any protected document.

6. In its Objection, Carnero similarly does not describe or reference material stamped Highly Confidential at any level of detail that would allow identification of a protected document. Out of an abundance of caution, Carnero seeks authority to file the Objection under seal.

**Basis for Relief**

7. The Bankruptcy Code provides strong support for sealing the Objection. Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect parties from potential harm that may result from the disclosure of certain confidential information. *See* 11 U.S.C. § 107(b) ("On request of a party in interest, the bankruptcy court shall, . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information" or "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title"); *see In re Gen. Homes Corp.*, 181 B.R. 898, 903 (Bankr. S.D. Tex. 1995) ("The court has authority to seal court records, in order to protect trade secrets or confidential research, development, or confidential information, or to protect a person with regard to a scandalous or defamatory matter."). Although section 107(b) of the Bankruptcy Code is an exception to the general rule, its application in a bankruptcy proceeding is appropriate. *See In re 50-Off Stores, Inc.*, 213 B.R. 646, 654 (Bankr. W.D. Tex. 1997) ("[T]he very existence of the exception demonstrates Congress' anticipation that the administration of bankruptcy cases might, by their very nature, require special intervention to protect some kinds of information from dissemination to the world.").

8. Further, Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code. Specifically, Bankruptcy Rule 9018 provides, in relevant part, that on motion "the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information," or "to protect an entity against scandalous or defamatory matter contained in any paper filed in a case under the Code." FED. R. BANKR. P. 9018. Additionally, the Sealing Order, which governs the filing of sealed documents, provides, in relevant part, that "[c]oncurrently with the filing of a sealed document, a motion to seal must be filed electronically," and "[a]fter reviewing the motion to seal, the Court may order appropriate relief." Sealing Order, ¶ 2(d).

9. Carnero also submits that the Objection possibly may involve commercial information that may be protected by the Court pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018. Commercial information is information which would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Wyndham Vacation Resorts, Inc. v. Faucett* (*In re Faucett)*, 438 B.R. 564, 567 (Bankr. W.D. Tex. 2010) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information need not rise to the level of a "trade secret" to be protected under section 107(b) of the Bankruptcy Code. *See In re Northstar Energy, Inc.*, 315 B.R. 425, 429 (Bankr. E.D. Tex. 2004) ("A bankruptcy court is required to seal 'documentary information filed in court that does not rise to the level of a trade secret but that is so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit that entity's competitors.'" (quoting *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996)). Rather, section 107(b) of the Bankruptcy Code is "designed

to protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury." *Id.* (quoting *In re Glob. Crossing, Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003)).

10. In responding to the Mesquite Defendants' Motion that has been filed under seal, Carnero references in the Objection at a very high level information that may be subject to the Protective Order. Thus, under section 107(b) of the Bankruptcy Code, sealing the Objection is appropriate.

11. In light of the foregoing, Carnero respectfully requests that the Court enter an order authorizing the Objection to be filed under seal.

**Notice**

12. Notice of this Motion shall be given to any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and any party required to be served under Bankruptcy Local Rule 9013-1(d). Due to the nature of the relief requested herein, Carnero submits that no other or further notice need be provided.

WHEREFORE, Carnero respectfully requests that the Court (i) enter the Proposed Order substantially in the form attached hereto and (ii) grant Carnero such other and further relief as is just, proper, and equitable.

Dated: January 25, 2023.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Defendant Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on January 25, 2023, a true and complete copy of the foregoing was duly served to all registered ECF users appearing in the case.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P. n/k/a Javelin EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, Mesquite Comanche Holdings, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |

# Order Authorizing the Filing of Carnero G&P, LLC's (I) Objection to the Amended Emergency Motion of Mesquite Defendants for Status Conference Under Seal and (II) Granting Related Relief

[Relates to Docket No. 131]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Objection to the Amended Emergency Motion of Mesquite Defendants for Status Conference* (the "Objection") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Objection, and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court, if any (the "Hearing");

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Objection under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Objection is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: ___________________, 2023.
Houston, Texas

______________________________________
HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**APPEAL, APPEAL_NAT**

**U.S. Bankruptcy Court**
**Southern District of Texas (Houston)**
**Adversary Proceeding #: 22-03035**

*Assigned to:* Bankruptcy Judge Marvin Isgur
*Lead BK Case:* 19-34508
*Lead BK Title:* Sanchez Energy Corporation, et al
*Lead BK Chapter:* 11
*Demand:*

*Date Filed:* 02/28/22
*Date Removed From State:* 02/28/22

*Nature[s] of Suit:* 01 Determination of removed claim or cause

***Plaintiff***
**-----------------------**
**Carnero G&P, LLC**

represented by **Amy Coates Falcon**
Porter Hedges LLP
1000 Main St
Ste 3600
Houston, TX 77002
713-226-6681
Email: afalcon@porterhedges.com
*LEAD ATTORNEY*

**Eugene Montgomery Nettles**
Porter & Hedges
1000 Main St
36th Floor
Houston, TX 77002-2764
713-226-6609
Fax : 713-226-6209
Email: enettles@porterhedges.com
*LEAD ATTORNEY*

**Joshua W. Wolfshohl**
Porter Hedges LLP
1000 Main, 36th Floor
Houston, TX 77002
713-226-6000
Fax : 713-228-1331
Email: jwolfshohl@porterhedges.com
*LEAD ATTORNEY*

V.

***Defendant***
**-----------------------**
**SN EF UnSub, LP**
1111 Bagby Street

represented by **Paul M Basta**
Paul, Weiss, Rifkind, Wharton & Garrison

Suite 2050
Houston, TX 77002

1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
Email: pbasta@paulweiss.com
*LEAD ATTORNEY*

**Alice Belisle Eaton**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Fax : 212-492-0125
Email: aeaton@paulweiss.com
*LEAD ATTORNEY*

**Andrew Ehrlich**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3166
Email: aehrlich@paulweiss.com
*LEAD ATTORNEY*

**Sean Anthony Mitchell**
Paul Weiss et al
1285 Ave of the Americas
New York, NY 10019
212-373-3740
Email: mtattnall@paulweiss.com
*LEAD ATTORNEY*

**Thomas Andrew Woolley, III**
McCloskey Roberson Woolley, PLLC
190 T.C. Jester, Suite 400
Houston, TX 77007
713-337-3900
Fax : 713-337-3915
Email: rwoolley@mrwpllc.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**

**Eagle Ford TX LP**
5599 San Felipe Road
Suite 725
Houston, TX 77056

represented by **Julia Frost-Davies**
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02115
617-341-7700
Email: julia.frost-davies@morganlewis.com
*LEAD ATTORNEY*

**Amy L Kyle**
Morgan Lewis & Bockius LLP
One Federal St

Boston, MA 02115
617-951-8288
Email: amy.kyle@morganlewis.com
*LEAD ATTORNEY*

**Michelle Dawn Pector**
Morgan Lewis Bockius LLP
1000 Louisiana St
Ste 4000
Houston, TX 77002
713-890-5455
Email: michelle.pector@morganlewis.com
*LEAD ATTORNEY*

**Jared Wilkerson**
Morgan Lewis & Bockius LLP
100 Louisiana Street
Houston, TX 770002
713-890-5460
Email: jared.wilkerson@morganlewis.com
*LEAD ATTORNEY*

***Defendant***
-----------------------
**Venado EF L.P.**
13215 Bee Cave Pkwy.
Suite B-350
Austin, TX 78738
***aka* Javelin EF L.P.**

represented by **Sydney Corry**
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
253-455-6202
Email: sydney.corry@kirkland.com
*LEAD ATTORNEY*

**Conor P. McNamara**
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 N. LaSalle
Chicago, IL 60654
312-86202000
Email: conor.mcnamara@kirkland.com
*LEAD ATTORNEY*

***Defendant***
-----------------------
**Mitsui E&P Texas LP**
1300 Post Oak Blvd.
Suite 1800
Houston, TX 77056

represented by **Duston K McFaul**
SIdley Austin LLP
1000 Louisiana St.
Suite 5900
Houston, TX 77002
713-495-4500
Fax : 713-495-7799
Email: dmcfaul@sidley.com
*LEAD ATTORNEY*

**Maegan Quejada**
Sidley Austin LLP
1000 Louisiana St
Ste 5900
Houston, TX 77002
713-495-4618
Email: mquejada@sidley.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**

| | | |
|---|---|---|
| **SN EF Maverick, LLC**<br>700 Milam Street<br>Suite 600<br>Houston, TX 77002 | represented by | **Sharon Marie Beausoleil**<br>Foley & Lardner LLP<br>1000 Louisiana Street<br>Suite 2000<br>Houston, Tx 77002<br>713-276-5086<br>Email: sbeausoleil@foley.com<br><br>**Joseph Bretschneider**<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019-6099<br>212-728-8276<br>Email: jbretschneider@willkie.com<br>*LEAD ATTORNEY*<br><br>**Sara Ann Brown**<br>Thompson Coburn LLP<br>2100 Ross Avenue<br>Ste 3200<br>Dallas, TX 75201<br>972-629-7100<br>Fax : 972-629-7171<br>Email: sbrown@thompsoncoburn.com<br><br>**Dennis Jenkins**<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019-6099<br>212-728-8276<br>Fax : 212-728-8111<br>Email: djenkins@willkie.com<br>*LEAD ATTORNEY*<br><br>**James G Munisteri**<br>Foley Gardere<br>1000 Louisiana Street<br>Ste 2000<br>Houston, TX 77002<br>713-276-5500<br>Fax : 713-276-5555 |

Email: jmunisteri@foley.com

**Mark T. Stancil**
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
202-303-1133
Email: mstancil@willkie.com
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
(See above for address)

**Joseph Bretschneider**
(See above for address)
*LEAD ATTORNEY*

**Sara Ann Brown**
(See above for address)

**Dennis Jenkins**
(See above for address)
*LEAD ATTORNEY*

**James G Munisteri**
(See above for address)

**Mark T. Stancil**
(See above for address)
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Mesquite Comanche Holdings, LLC**
c/o Registered Agent -
C T Corporation System
1999 Bryan St., Suite 900
Dallas, TX 75201

represented by **Sharon Marie Beausoleil**
(See above for address)

**James G Munisteri**
(See above for address)

***Intervenor***
-----------------------

**ETC Texas Pipeline Ltd.**
1300 Main Street
Suite 2000
Houston, TX 77002

represented by **Yelena Archiyan**
Katten Muchin Rosenman LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
214.765.3657
Email: yelena.archiyan@katten.com

**John E. Mitchell**
Katten Muchin Rosenman
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
469-627-7017
Email: john.mitchell@katten.com

| Filing Date | # | Docket Text |
|---|---|---|
| 01/26/2023 | 133 | Courtroom Minutes. Time Hearing Held: 10:00 am - 10:06 am. Appearances: Mark Stancil for the Mesquite Defendants. Maegan Quejada for Mitsui E&P Texas LP. Joshua Wolfshohl and Amy Falcon for Carnero G&P, LLC. Andrew Ehrlich and Sean Mitchell for Crown Eagle Energy LP. Conor McNamara for Javelin EF L.P. Hearing continued to 2/17/23 at 10:30 am as a status/scheduling conference. (Related document(s):130 Emergency Motion (Adversary), Sealed Motion, Motion to Set Hearing) **Hearing scheduled for 2/17/2023 at 10:30 AM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 01/26/2023) |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**If you object to the relief requested, you must respond in writing.**

**Unless otherwise directed by this Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ by September 14, 2022.**

**If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk by September 14, 2022. Otherwise, this Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

GLOSSARY OF KEY TERMS ........ v

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 7

- I. The Anadarko Era (Prior to January 12, 2017) ........ 9
- II. Maverick Takes Ownership Of The Comanche Assets And Steps Into Anadarko's Shoes ........ 14
- III. April 2018: Carnero Agrees In The GGPA To Serve As Back-Up Midstream Processor ........ 16
- IV. MCom's Purchase Of Gavilan's Interest In The Comanche Assets ........ 21
- V. The Midstream Restructuring ........ 22

STANDARD OF REVIEW ........ 25

ARGUMENT ........ 26

- I. Carnero's Claims Under The GGPA Fail As A Matter Of Law ........ 26
  - A. The Enterprise Delivery Point Blocking Scheme Does Not Violate The GGPA (Counts 1–3) ........ 26
  - B. The Defendants Did Not Have A Right To Sell The Comanche Assets "Free and Clear" Of The Agency Agreements As Carnero Alleges (Counts 4–6) ........ 29
  - C. The Springfield Delivery Point And Volume Blocking Scheme Actually Protects Carnero's Rights (Count 7) ........ 32
  - D. Defendants Could Not Sell The Comanche Assets Free And Clear Of The Obligations Under The Brasada Agreement (Counts 8–10) ........ 34
  - E. The MCom Gas Blocking Scheme Disregards MCom's Other Contractual Obligations (Count 11) ........ 37
  - F. The Backdoor Extension Scheme Does Not Breach Any Obligation To Carnero (Counts 12–14) ........ 39
  - G. Carnero Failed To State Any Claim Against Mitsui ........ 42
  - H. Defendants Did Not Breach The Implied Duty to Cooperate (Count 15) ........ 43
  - I. The Plan And This Court's Orders Bar Carnero's Litigation, And Carnero Is Not Entitled To Equitable Relief From The Plan (Count 16) ........ 46
  - J. Carnero's Claim For Attorneys' Fees Is Premature And Does Not Constitute An Independent Cause of Action (Count 17) ........ 56

CONCLUSION ........ 57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anton v. U.S. Bank Nat'l Ass'n*,
No. 4:19-cv-00862-O, 2020 WL 6882653 (N.D. Tex. July 10, 2020), *aff'd sub nom. Anton v. U.S. Bank Tr. Nat'l Ass'n*, No. 20-11159, 2021 WL 4609821 (5th Cir. Oct. 6, 2021)....43

*Automation Support, Inc. v. Humble Design, L.L.C.*,
No. 17-10433, 2018 WL 1474937 (5th Cir. Mar. 26, 2018)....54

*B.J. Aviation Inc. v. City of Galveston*,
No. 14-96-01480-CV, 1999 WL 93197 (Tex. App. Feb. 25, 1999)....29

*In re Boston Blackies Mgmt., Inc.*,
Nos. 09-B-44643, 09-B-44734, 2010 WL 3310351 (Bankr. N.D. Ill. May 17, 2010)....53

*Brand Coupon Net., LLC. v. Catalina Mktg. Corp.*,
748 F.3d 631 (5th Cir. 2014)....25

*In re Burner*,
109 B.R. 216 (Bankr. W.D. Tex. 1989)....53–54

*Carlton Energy Grp. LLC v. Clivedon Petroleum Co. Ltd.*,
No. CV H-22-170, 2022 WL 2240081, at *5 (S.D. Tex. June 22, 2022)....56

*Carter v. Fenner*,
136 F.3d 1000 (5th Cir. 1998)....54

*Case Corp. v. Hi-Class Bus. Sys. of Amer., Inc.*,
184 S.W.3d 760 (Tex. App. 2015)....44–45

*Chapman Children's Tr. v. Porter & Hedges L.L.P.*,
32 S.W.3d 429 (Tex. App. 2000)....43

*Citizens Nat'l Bank of Orlando v. Vitt*,
367 F.2d 541 (5th Cir. 1966)....43

*ConocoPhillips Co. v. Noble Energy, Inc.*,
462 S.W.3d 225 (Tex. App. 2015)....38

*Dallas/Ft. Worth Int'l Airport Bd. v. Vizant Techs. LLC*,
57 S.W.3d 362 (Tex. 2019)....43

*In re: Gavilan Resources, LLC,*
Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020) ....................21, 22

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.,*
313 F.3d 305 (5th Cir. 2002) ....................25

*In re Forest Park Realty Partners*,
No. 15-34814-sgj-11, 2016 WL 6783307 (Bankr. N.D. Tex. Nov. 15, 2016) ....................4

*Hamner v. Moreno,*
No. CV H-21-2380, 2022 WL 1508982 (S.D. Tex. Apr. 21, 2022) ....................55–56

*Herbert Abstract Co., Inc. v. Touchstone Props., Ltd.,*
914 F.2d 74 (5th Cir. 1990) ....................25

*James v. Wells Fargo Bank, N.A.,*
CA No. H-14-0449, 2014 WL 2123060 (S.D. Tex. May 21, 2014) ....................25

*Peacock v. AARP, Inc.,*
181 F. Supp. 3d 430 (S.D. Tex. 2016) ....................25

*Peddy v. Aaron's Inc.,*
CA No. 18-1625, 2019 WL 763510 (E.D. La. Feb. 21, 2019) ....................25

*In re Platinum Oil Props., LLC,*
465 B.R. 621 (Bankr. D.N.M. 2011) ....................53

*Rosbottom v. Schiff,*
589 B.R. 63 (Bankr. W.D. La. 2018) ....................54

*In re Sanchez Energy Corp.,*
631 B.R. 847 (Bankr. S.D. Tex. 2021) ....................9, 10, 14

*Sinesterra v. Roy,*
347 F. App'x 9 (5th Cir. 2009) ....................56

*Sparks v. Tex. Dep't. of Transp.,*
144 F. Supp. 3d 902 (S.D. Tex. 2015) ....................25

*In re Sportsman's Warehouse, Inc.,*
No. 09-10990 (CSS), 2013 WL 492554 (Bankr. D. Del. Feb. 7, 2013) ....................54

*Turner v. Pleasant,*
663 F.3d 770 (5th Cir. 2011) ....................56

*United Student Aid Funds v. Espinosa,*
559 U.S. 260 (2010) ....................54, 55

**Other Authorities**

Fed. R. Civ. P. 60(b)(4) ..... 54, 55

Fed. R. Civ. P. 60(d)(1) ..... 54, 55

## GLOSSARY OF KEY TERMS[2]

1. Agency Agreements: Agreements by which Maverick assumed the role of Anadarko's agent and performed Anadarko's obligations under the Retained Agreements, consisting of (1) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017, by and among Maverick, SN Catarina, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company, and Sanchez Energy Corporation, as amended or modified from time to time; and (2) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017, by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, and Sanchez Energy Corporation, as amended and modified from time to time.

2. Anadarko: Comanche Assets operator and working interest owner (itself and/or through its affiliates) prior to the 2017 sale to Maverick *et al.*; as operator, Anadarko was responsible for overseeing the gas midstream process (*i.e.*, gathering, processing, transportation, and marketing/sale) for all working interest owners.

3. Anadarko/Enterprise PA: The Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, which became effective in March 2012 [redacted] The obligation to sell NGLs under the Anadarko/Enterprise PA is one of the Existing Commitments listed on Exhibit F to the GGPA.

4. Brasada Processing Agreement: Agreement between WGR Operating, LP (owner of the Brasada processing plant) and Anadarko (then operator of the Comanche Assets), dated February 27, 2012, as amended. Agreement dedicates [redacted] from the Comanche Assets to be processed at the Brasada plant. The dedication of [redacted] under the Brasada Processing Agreement is an Existing Commitment listed on Exhibit F of the GGPA.

5. Comanche Assets: Working interests in approximately 318,000 acres in south Texas subject to the various gathering, processing, transportation, and other agreements at issue in this dispute.

6. Comanche Midstream Commitments: Short and long-term obligations—including minimum volume commitments—regarding, among other things, gathering, processing, transportation, and marketing of hydrocarbons, entered into by Anadarko and other working interest owners to induce counterparties (such as Springfield Pipeline LLC and Enterprise Products Operating LLC) to invest in and build the infrastructure required to monetize production from the Comanche Assets. These commitments became obligations

---

[2] This glossary contains a summary of certain key terms and, it is hoped, will serve as a useful reference for the Court's consideration of the briefing on this motion. To the extent there is any ambiguity or inconsistency between the glossary terms and the defined terms used in the body of the motion, the latter should govern.

(directly or indirectly) of Maverick under the Comanche PSA, Agency Agreements, and related agreements pursuant to the sale of the Comanche Assets to Maverick *et al.* in 2017.

7. Comanche Purchase and Sale Agreement ("Comanche PSA"): Primary agreement by which Defendant Maverick, Defendant UnSub, and Gavilan (n/k/a Defendant MCom) acquired the Comanche Assets from Anadarko and its affiliates.

8. Existing Commitments: Defined term under the GGPA, meaning certain "binding contractual commitments" that prevent the delivery of certain hydrocarbons to Carnero under the GGPA and existed as of the signing of the GGPA in April 2018. The Existing Commitments are listed at Exhibit F to the GGPA.

9. GGPA: Firm Gas Gathering, Processing and Purchase Agreement between SN EF Maverick LLC and Carnero G&P LLC, effective as of April 1, 2018. The GGPA is a backup midstream processing agreement under which Carnero contracted to process Comanche hydrocarbons not already committed to other parties (*e.g.*, if primary processor could not accept gas or gas produced in excess of volumes committed to primary midstream parties); the GGPA also gave Carnero the option to purchase certain NGLs from Maverick starting in March 2023.

10. Master Settlement Agreement: December 2021 agreement evidencing and further consummating the Midstream Restructuring. The Master Settlement Agreement was entered into by and among: (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP; (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP; and (c) Defendants Mesquite, Maverick, and MCom. Defendant UnSub signed the Master Settlement Agreement with respect to limited provisions as well. Various agreements that were modified as part of the Midstream Restructuring were attached to the Master Settlement Agreement as exhibits.

11. Maverick/Enterprise PA: The Y-Grade Purchase and Sales Agreement entered into between Enterprise Products Operating LLC and Maverick [redacted]

12. Midstream Restructuring: Process by which the Debtors, pursuant to the confirmed Chapter 11 Plan and in consultation with the other Defendants, negotiated, assumed, rejected, and amended certain agreements concerning gas midstream marketing process for the Comanche Assets; approved by this Court's order dated December 21, 2021.

13. Purchase and Marketing Agreements ("PMAs"): Various agreements between parties with fractional ownership interests (e.g., WIPs) and the operator of the Comanche Assets governing the purchase and marketing of hydrocarbons extracted from those assets. Each of the WIPs, UnSub, and Gavilan (n/k/a MCom) entered into a PMA. There is usually one

PMA for each type of hydrocarbon extracted from the Comanche Assets—oil, residue gas, and NGLs—ensuring that the operator holds title to and/or controls the hydrocarbons prior to processing and thereby allowing and requiring those hydrocarbons to proceed under the operator's midstream agreements. Under the PMAs, Maverick purchases virtually all of the hydrocarbons produced from the Comanche Assets either before or immediately after initial gathering.

14. Ratification Agreements: Agreements whereby [redacted]

15. Retained Agreements: Certain key agreements that could not be assigned from Anadarko directly to Maverick as part of the latter's purchase of the Comanche Assets in 2017, because certain counterparties did not consent to their transfer. The Retained Agreements are listed in the schedules to the Agency Agreements and at Schedule 1.1(b) of the Comanche PSA.

16. Springfield Gas Gathering Agreements ("Springfield GGAs"): The Second Amended and Restated Lease Dedication and Gas Gathering Agreement between Springfield Pipeline LLC and Sanchez Energy Corporation. [redacted]

17. Working Interest Parties ("WIPs"): Entities, such as Defendants Eagle Ford, Venado (n/k/a Javelin), and Mitsui that owned non-operating working interests in the Comanche Assets. In practical terms, WIPs own a fractional share of each hydrocarbon molecule within and produced by the Comanche Assets.

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Mesquite Comanche Holdings, LLC ("MCom"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. ("Javelin") (f/k/a Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), and SN EF UnSub, LP (n/k/a/ Crown Eagle Energy LP) ("UnSub" and, together with Maverick, Mesquite, MCom, and the WIPs, the "Defendants"), by and through counsel, bring this Motion for Judgment on the Pleadings (the "Motion") as to the claims asserted against them in Plaintiff Carnero G&P LLC's ("Carnero") Second Amended Complaint (the "SAC"), and in support thereof state as follows:

## PRELIMINARY STATEMENT[3]

1. For more than a year, Carnero has been casting about for a way to collaterally attack the midstream restructuring effectuated pursuant to the Reorganized Debtors' reorganization Plan (the "Midstream Restructuring"). Having exhausted its procedural maneuvering, Carnero must now reckon with (i) what the parties' contracts actually say; and (ii) the consequences of Carnero's strategic decision to endorse the Plan's assumption/rejection procedures. This lawsuit is nothing more than an attempt to collaterally attack the Midstream Restructuring because Carnero's commercial interests did not prevail in the bankruptcy. That effort is both meritless as a matter of law and, in any event, barred by the Plan and orders of this Court governing the assumption of contracts under section 365 of the Bankruptcy Code.

2. The centerpiece of Carnero's contractual argument is that certain aspects of the Midstream Restructuring breach or repudiate the April 2018 Firm Gas Gathering, Processing and

---

[3] Unless otherwise specified, capitalized terms used but not defined in this Motion have the meanings given them in the *Amended and Supplemental Complaint* filed on the docket of the Declaratory Action, which is captioned as *SN EF Maverick, LLC, et al. v. Carnero G&P, LLC*, No. 21-04419 (MI) (Bankr. S.D. Tex. 2021). For clarity, this Motion cites entries on the docket of the main bankruptcy case as "Dkt. No. ___."

Purchase Agreement (the "GGPA"),[4] or violate alleged duties of good faith and "cooperation" owed to Carnero. But Carnero occupies the same contractual position under the GGPA now as it did before the Midstream Restructuring. Indeed, in certain respects, ***Defendants took steps in the Midstream Restructuring to protect or improve Carnero's position.***

3. ***First***, Carnero fundamentally misconstrues the GGPA. By its terms, the GGPA does not create the rights or obligations upon which Carnero's claims rest. Carnero's most fundamental error—which runs throughout its complaint—is its assertion that the Defendants' obligations under the Existing Commitments (defined below) somehow terminated or changed as a result of the Midstream Restructuring, such that the hydrocarbons must now flow to Carnero. The plain terms of the GGPA establish otherwise. The GGPA is a backup midstream agreement. Mesquite already had primary midstream agreements in place with certain minimum volume requirements. Carnero contracted to process those hydrocarbons that were not already committed under the primary agreements. To that end, Section 3.1(b) of the GGPA expressly ***excludes*** from its requirements those hydrocarbons subject to "Existing Commitments"—i.e., "binding contractual commitments" that prevent delivery of hydrocarbons to Carnero—and existed when the GGPA was signed.[5]

4. Therein lies the critical defect in Carnero's lawsuit: In the Midstream Restructuring, the Reorganized Debtors assumed the Existing Commitments without changes—i.e., the same amount of hydrocarbons flow to the same primary midstream parties for the same period of time as they did prior to the bankruptcy. ***That is, none of the amendments altered the Existing Commitments***. Rather, the amendments improved certain midstream economics for the

4 Exhibit 1.

5 Exhibit 1 at § 3.1(b).

Reorganized Debtors and made conforming and clarifying changes to agreements, which is precisely what section 365 of the Bankruptcy Code contemplates when a debtor assumes an agreement with amendments. Carnero did not have rights with respect to those previously committed hydrocarbons before the bankruptcy, and it does not have rights with respect to those previously committed hydrocarbons after the bankruptcy. Far from ***breaching*** the GGPA, the amendments respect the agreement's bargained-for terms.

5. In addition to that fundamental error, Carnero's purported "schemes" rest on rights that simply do not exist under the GGPA. For example:

- Counts 1–3 assert that [redacted] To the contrary, the GGPA authorizes Carnero to purchase NGLs only "at the points at which they were being sold under the Existing Commitment,"[6] and explicitly grants ***Maverick*** "sole discretion as to the location of each Additional CGP [central gathering point]."[7]

- Counts 4–6 claim that [redacted] The GGPA requires only that Maverick exercise its earliest "right or option to *terminate*" an Existing Commitment, and only if it can do so "without out-of-pocket cost."[8] Nothing in the GGPA requires Maverick to ***breach*** its contracts for Carnero's benefit.

- Count 7 complains that [redacted]

6 Exhibit 1 at § 3.1(b).

7 Exhibit 1 at § 2.1(a).

8 Exhibit 1 at § 3.1(b).

[redacted]

- Counts 8–10 (similarly to Counts 4–6) assert that [redacted]

As this Motion explains in detail, the remainder of the Carnero's complaint fares no better. At bottom, Carnero seeks to use the happenstance of the Debtors' bankruptcy to transform the GGPA from a backup agreement to a primary agreement—all in manifest disregard of the plain terms of the GGPA and numerous other agreements.[9]

6. ***Second***, even if Carnero's contract-based theories were not legally defective, Carnero failed to timely object or preserve its rights to dispute the Midstream Restructuring. The Plan provides that contracts assumed pursuant to its terms: (i) include all "modifications, amendments, supplements, restatements, or other agreements";[10] (ii) are assumed as of the effective date of the Plan (the "Effective Date"); (iii) retain their character as "pre-petition" contracts notwithstanding assumption;[11] and (iv) re-vested in the Reorganized Debtors free and clear of all liens, claims, charges or encumbrances.[12] Critically, these provisions apply to all of the

---

9 Because these purported breach of contract "schemes" fail, and Defendants are acting in full compliance with the GGPA, Carnero's claims for anticipatory repudiation (Claims 2, 5, 9, and 13) must similarly be dismissed. Nowhere has Carnero sufficiently alleged a "fixed intention" from the Defendants to abandon or renounce the GGPA. *In re Forest Park Realty Partners, III, L.P.*, No. 15-34814-sgj-11, 2016 WL 6783307, at *10 (Bankr. N.D. Tex. Nov. 15, 2016). Likewise, Carnero's claims for declaratory relief also fail, and judgment should be granted as a matter of law in favor of the Defendants with respect to Claims 3,6, 10, and 14.

10 Dkt. No. 1205 at Art. V.F. ("Exhibit 2").

11 Exhibit 2 at Art. V.F.

12 Exhibit 2 at Arts. IV.G., V.A.,V.F.

agreements assumed pursuant to the Midstream Restructuring, ***and*** to the GGPA. Carnero does not—and cannot—reconcile its position in this litigation with those provisions.

7. What is more, the Plan set June 22, 2020 as the "Contract Objection Deadline,"[13]and the "Confirmation Order" [Dkt. No. 1212] provided that any counterparty to an executory contract or unexpired lease that failed to make a timely objection to a proposed assumption "shall be deemed to have assented to such assumption."[14] Carnero made no such objection—presumably because, at the time, it hoped that Mesquite would succeed in rejecting the primary midstream agreements and allow Carnero to assume that position. Nor did Carnero even attempt to reserve its right to object to any future assumption of the primary midstream agreements, in stark contrast to other contract counterparties, including Defendants UnSub and the WIPs, that filed timely objections and preserved claims when it was still unclear how the Midstream Restructuring would shake out. Carnero did nothing—other than ***agreeing*** to the Plan and Confirmation Order effectuating these terms—apparently believing that such a course of action was to its strategic advantage.

8. Indeed, even when it was clear that Carnero's attempt to displace the primary midstream agreements had failed by June 2021, Carnero did not file any objection or other reservation of rights. Rather, on July 31, 2021, it filed baseless litigation (namely, its first lawsuit claiming that the GGPA contractually obligated the Debtors to ***reject*** those agreements under section 365). In December 2021, when the parties announced that they had amended the primary agreements and would be seeking an order approving their assumption pursuant to the Plan, Carnero maintained its silence even as the parties appeared before this Court on that request.

---

13 *See* Dkt. Nos. 1118, 1212, and 1263. Exhibits 3, 4, and 5, respectively.

14 Exhibit 4 Dkt. No. 1212 at ¶ 18.

Carnero appeared at that hearing but did not ask to see the amended agreements, reserve its rights, or even to delay entry of the assumption order pending further opportunity to object or to review the amendments. Carnero did not ask to see the amended agreements even after the order was entered; instead, Carnero filed another state-court lawsuit claiming that the amendments (which it had not seen) somehow must have violated its rights (which it did not enumerate) under the GGPA. Only after its jurisdictional gambit to go to state court had failed—and following ***Mesquite's*** efforts to obtain necessary counterparties' consents to allow Carnero's counsel to review the agreements—did Carnero attempt to articulate some theory by which the amended agreements ran afoul of the GGPA.

9. Under even the most generous standard imaginable, Carnero's belated attack on the Midstream Restructuring comes far too late. It cannot overcome the express terms of the Plan and the Confirmation Order, or escape the consequences of its repeated decisions to lie in wait rather than present plausible claims or objections to this Court. Granting Carnero the rare remedy of equitable relief from its many choices would upend the clear terms of the Plan, the Confirmation Order, and virtually every other action by the parties in interest as part of—and in reliance on—the Midstream Restructuring.

10. ***Third***, Carnero incorrectly characterizes the WIPs' and UnSub's obligations. Carnero asserts that Defendant UnSub and the Defendant WIPs—Eagle Ford, Javelin, and Mitsui—have independent obligations to supply gas to Carnero under the GGPA. But certain of the WIPs and UnSub, at best, guaranteed ***only Maverick's obligations*** under the GGPA, so any obligations they may owe to Carnero are entirely derivative of Maverick's obligations. Because Maverick is in compliance with its GGPA obligations, there is no breach for UnSub or the guarantor WIPs to step into. Mitsui's letter agreement (the "Letter Agreement") with Carnero is

even narrower. In the Letter Agreement, Mitsui did not ratify the GGPA; it merely agreed to take certain actions (or refrain from taking actions) with respect to certain marketing agreements it has with Maverick, and it has complied with that agreement. That is where the inquiry ends. And even if the WIPs' and UnSub's obligations were independent of Maverick's obligations—which they are not—their volumes would still be contractually bound by the Existing Commitments, including the dedications under the Brasada Processing Agreement and the ETC Processing Agreement. That is because, among other things, each committed to sell its production to Maverick under its respective marketing agreements (the "PMAs") before or immediately after initial gathering. Once sold to Maverick, such hydrocarbons become subject to the Existing Commitments that bind Maverick and preempt Carnero's claim to the hydrocarbons under the GGPA.

11. ***Fourth***, Carnero's allegations that Defendants violated an implied duty to "cooperate" with Carnero (to Defendants' own detriment and/or to advantage Carnero's pre-bankruptcy position) fail. Defendants have no such duty under the GGPA, and, in any event, the Midstream Restructuring agreements on their face do not hinder Carnero's rights.

12. Carnero is in the same position now as it was prior to the Midstream Restructuring. The fact that Carnero is dissatisfied with its role as back-up provider does not warrant its repeated efforts to dismantle years of negotiations and restructuring in the Bankruptcy Court. With this final quixotic effort from Carnero, it is time to bring an end to this dispute and remove the sword of Damocles that has been dangling over the Defendants for more than a year since the Plan went into effect.

## BACKGROUND

13. This dispute concerns commitments governing the midstream gathering, processing, transportation, and marketing of gas produced from working interests in approximately

318,000 acres in south Texas (the "Comanche Assets"). The following diagram illustrates generally how gas flows from wellheads to markets.




14. Relevant to this motion, the gas midstream marketing process consists of four main steps:

(1) Gathering – "Gathering" refers to the system of pipelines and equipment used to collect gas and gas condensate from the wellheads at "receipt points" and move the mixture to "delivery points" at the front end of a processing plant.[15]

(2) Processing – "Processing" refers to the method by which the gas mixture is refined into two main components—gas (also known as natural gas or

[15] In addition to gas and gas condensate, most wells also produce oil, which is separated at or near the wellhead and handled through a different processing and transportation system. The contracts at issue in this case do not concern oil.

residue gas) and natural gas liquids ("NGLs"). Residue gas and NGLs that have been processed are delivered to designated "delivery points" at the back end of the processing plant.

(3) Transportation – After processing, the residue gas and NGLs are separately transported from processing facilities via pipelines to market.

(4) Marketing – The residue gas and NGLs are sold in the market.

15. The midstream process for the Comanche Assets is governed by a web of ownership interests and service contracts. The hydrocarbons in the ground are owned by a number of working interest owners, one of whom also functions as the "operator" and is responsible for overseeing the midstream marketing process.

**I. The Anadarko Era (Prior to January 12, 2017)**

16. Through January 11, 2017, Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko") along with Eagle Ford, Javelin, and Mitsui owned working interests in the Comanche Assets.[16] *In re Sanchez Energy Corp.* ("*Sanchez*"), 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). Anadarko was the operator of the Comanche Assets and developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production downstream to customers. *Id.* at 851–52. To that end, Anadarko and certain of its affiliates contracted with several midstream parties that made substantial investments in the infrastructure required to monetize production from the Comanche Assets. As a condition of making those investments, the midstream counterparties required and received certain

16 [redacted] Throughout its purchase and marketing agreements with Anadarko, Eagle Ford is also referred to as Korea National Oil Company (or KNOC).

contractual promises regarding, among other things, duration of agreements, delivery of hydrocarbons, and minimum volume commitments (collectively the "Comanche Midstream Commitments"). *Id.*

17. Pursuant to these contracts, the gas and NGLs produced from the Comanche Assets were committed to be gathered, processed, transported, and marketed as follows.

(1) Gathering – The Comanche gas was primarily gathered through two separate systems:

- **Springfield Gas Gathering Agreements**: [redacted] *Sanchez*, 631 B.R. at 852. [redacted]
- **Howard Gathering Agreement**: [redacted]

---

[redacted]

[redacted]

(2) Processing – The Comanche Assets were subject to two processing agreements:

- **Brasada Processing Agreement**: [redacted]

- **ETC Processing Agreement**: [redacted]

(3) Transportation – Anadarko entered into separate transportation agreements for moving processed residue gas and NGLs to market:

- **Eagle Ford Midstream Transportation Agreements (Residue Gas)**: [redacted]

---

[redacted]

[redacted].

[redacted]

- **Enterprise Transportation Agreement (NGLs)**: [redacted]

(4) Marketing – Residue gas and NGLs processed by ETC and Brasada were subject to different marketing agreements.

- **Enterprise Purchase Agreement**: [redacted]

- **Eagle Ford Midstream**: [redacted]

18. As operator for the Comanche Assets, Anadarko was the party to the above agreements. The WIPs' share of the hydrocarbons was subjected to the same midstream process via Purchasing and Marketing Agreements ("WIP PMAs") between each WIP and Anadarko. [redacted]

---

[redacted]

[redacted]

19. Thus, by the start of 2017, as illustrated below, Anadarko had in place a series of interconnected agreements governing the gathering, processing, transportation, and marketing of hydrocarbons from the Comanche Assets:

[redacted]

[redacted]

## II. Maverick Takes Ownership Of The Comanche Assets And Steps Into Anadarko's Shoes

20. Maverick and various co-investors, including Defendant UnSub and Gavilan Resources, LLC ("Gavilan"), purchased Anadarko's interests in the Comanche Assets in 2017. The parties executed a Purchase and Sale Agreement (the "Comanche PSA") dated January 12, 2017,[24] and Maverick stepped into Anadarko's role as operator, *Sanchez*, 631 B.R. at 85. [redacted]

21. A group of key agreements (collectively, the "Retained Agreements"), however, could not be assigned because certain counterparties did not consent to their transfer. *Sanchez*, 631 B.R. at 852.[26] Maverick and Anadarko therefore entered into two agency agreements (the "Agency Agreements") whereby Maverick would act as Anadarko's agent to perform Anadarko's

---

[24] Exhibit 12 Comanche PSA. ("Exhibit 12").

[redacted]

[26] The Retained Agreements included the Brasada Processing Agreement and the ETC Processing Agreement as well as the following marketing contracts: (a) the Enterprise Products Transportation Agreement; (b) the Enterprise Products Purchase Agreement; (c) the Eagle Ford Midstream Firm NGPA Section 311 Gas Transportation Agreement; (d) the Eagle Ford Midstream Firm Intrastate Gas Transportation Agreement; (e) the Springfield Lease Dedication and Gas Gathering Agreement; and (f) the WIPs PMAs, among others. [redacted]

obligations under the Retained Agreements.[27] Maverick would thus receive the benefits of the Retained Agreements and undertake Anadarko's duties thereunder without modifying or expanding Anadarko's liabilities. The Agency Agreements obligated Maverick to serve as Anadarko's exclusive agent until expiration of the last Retained Agreement.[28]

22. Maverick also agreed to assume the WIP PMAs and enter into new purchase and marketing agreements with its co-investors UnSub and Gavilan, thereby agreeing to purchase the hydrocarbon production from all the other working interest owners. [redacted]

[27] [redacted] The Agency Agreements are: (1) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017, by and among Maverick, SN Catarina, LLC ("Catarina"), Anadarko E&P Onshore LLC ("AEP"), Kerr-McGee Oil & Gas Onshore LP ("KMOG"), Anadarko Energy Services Company ("AESC"), and Sanchez Energy Corporation, as amended or modified from time to time, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017, and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017 (collectively, the "Marketing Agency Agreement") ("Exhibit 13"); and (2) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017, by and among Maverick, AEP, KMOG, and Sanchez Energy Corporation, as amended and modified from time to time (the "Midstream Agency Agreement") ("Exhibit 14").

[28] Exhibit 13 at Art. VI; Exhibit 14 at Art. VI.

[redacted]

23. As a result of the transactions and agreements undertaken in connection with Maverick, UnSub, and Gavilan's purchase of Anadarko's interests in the Comanche Assets, the Comanche hydrocarbons remained subject to the same Comanche Midstream Commitments as Maverick stepped into the role as operator:

[redacted]

## III. April 2018: Carnero Agrees In The GGPA To Serve As Back-Up Midstream Processor

24. On April 1, 2018, after the closing of the Comanche PSA, Maverick and Carnero entered into the GGPA as a back-up midstream gathering and processing agreement for the Comanche Assets. Given the existence of the primary midstream commitments described above, the GGPA expressly covered only ***uncommitted*** gas production from the Comanche Assets (i.e., the gas not subject to the Comanche Midstream Commitments).[31] The GGPA obligated Maverick

[31] Exhibit 1 at § 3.1(a).

to deliver uncommitted gas at two "Primary Receipt Points," which were the two interconnection points between the Springfield gathering system and the Carnero pipelines; Carnero was then obligated to transport that gas to its Carnero's processing facilities and process it.[32]

25. As the GGPA expressly recognized, at the time, there were two other gas processors, Brasada and ETC,[33] to which [redacted] from the Comanche Assets were already committed. Consequently, Section 3.1(b) of the GGPA defined "Dedicated Gas"[34] under the GGPA (which was to be delivered to Carnero) as only such gas that was *not already dedicated elsewhere pursuant to these prior commitments* (i.e., to Brasada and ETC):[35]

> to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) **is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero**, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), **such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment . . . and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost . . . .**[36]

26. Accordingly, the gas and/or NGLs that are subject to the Existing Commitments are entirely "excluded" from the dedication to Carnero under the GGPA until the Existing

---

32 Exhibit 1 at Exhibit A; *id.* at § 3.2.

33 Exhibit 1 at Exhibit F.

34 "Dedicated Gas" is defined as "Producer's Gas" generated from certain specified land, and "Producer's Gas" is defined as "all Gas that is owned or controlled by Producer [*i.e.*, Maverick] or which Producer has the right to market." Exhibit 1 at § 1.1.

35 Exhibit 1 at §§ 3.1(a), 3.1(b).

36 Exhibit 1 at § 3.1(b) (emphasis added).

Commitments terminate. The agreements containing the Existing Commitments include, without limitation, the agreements enumerated in Exhibit F to the GGPA as well as "associated amendments if any."[37]

27. The following chart summarizes the Existing Commitments for the processing of gas as of the effective date of the GGPA:[38]

Existing Commitments (Processing)
As of April 1, 2018

| Party | Primary Plants/Facilities | Dedicated Comanche Gas per day | MVCs | Execution Date | Termination Date |
|---|---|---|---|---|---|
| WGR Operating, LP | "Brasada" | [redacted] | [redacted] | February 27, 2012 | [redacted] |
| ETC Texas Pipeline, Ltd. | "Jackson" | [redacted] | [redacted] | April 1, 2011 | [redacted] |

28. In sum, the GGPA served as a mere backup agreement, providing additional processing capacity in the event other existing processors could not accept volumes (for example. during a force majeure event) or if, through future drilling, volumes exceeded the committed amounts.

29. On the same day the GGPA was executed, Carnero and Defendants UnSub and Maverick entered into a ratification agreement, pursuant to which UnSub ratified Maverick's obligations under the GGPA.[39] Defendant Eagle Ford, Defendant Javelin, and Gavilan also executed ratification agreements in substantially the same form as the UnSub ratification

37 Exhibit 1 at Exhibit F.

[redacted]

39 Exhibit 15 UnSub Ratification and Assumption Agreement at § 2.

agreement.[40] The UnSub, Eagle Ford, and Javelin ratification agreements are collectively referred to as the "Ratification Agreements." [redacted]

30. Instead of entering into a ratification agreement, Mitsui, Maverick, and Carnero entered into a Letter Agreement, dated April 1, 2018, wherein Mitsui, pursuant to the procedures under the relevant WIP PMAs, consented to Maverick processing Mitsui's gas from the Comanche Assets under the GGPA.[43] While Mitsui consented to Maverick entering into the GGPA, the parties agreed that Mitsui would retain its right to take certain production in kind.[44] However, it agreed not to exercise its right to take such production in kind during the initial term of the GGPA "to the extent such [production] would be dedicated to the [GGPA] under the terms thereof."[45] In other words, the only obligations that Mitsui undertook were to consent to Maverick's entry into the GGPA and not to exercise its right to take production in kind. Carnero has not, and cannot, allege that Mitsui did not fulfill those obligations. Importantly, contrary to Carnero's allegations, Mitsui

---

40 *See* Exhibit 16, Exhibit 17, and Exhibit 18, respectively. [redacted] Exhibit 15 at § 2; Exhibit 16 at § 2; Exhibit 17 at § 2. "Producer" is defined in the GGPA as Maverick. Exhibit 1 at Preamble.

41 Exhibits 15–17 at §§ 2, 4.

42 Exhibit 1 at Preamble.

43 Exhibit 19 Mitsui Letter Agreement.

44 Exhibit 19 at § 1.

45 Exhibit 19 at § 2.

did not ratify the GGPA. Therefore, it is not a party thereto and cannot have breached (anticipatorily or actually) the GGPA.

31. Lastly, although Maverick entered the GGPA in April 2018, the GGPA itself is set to expire in April 2033—[redacted] Thus, the Existing Commitments not only pre-date the GGPA but also remain in effect after Carnero's role as backup provider ends.

32. Accordingly, as of April 2018, the interconnected midstream network contracts consisted of the following:

[redacted]

---

46 Exhibit 1 at Art. IX.

## IV. MCom's Purchase Of Gavilan's Interest In The Comanche Assets

33. As noted above, both Gavilan and Maverick agreed [redacted] To that end, as also noted above, Gavilan entered into three purchase and marketing agreements with Maverick (the "Gavilan PMAs" (a/k/a the "Gavilan/MCom PMAs")), [redacted] In the Gavilan PMAs, Gavilan acknowledged that [redacted] Maverick, in turn, promised Anadarko that it would take "all actions necessary to ensure that all co-working interest owner production," including Gavilan's, remains subject to the Retained Midstream Contracts governing the Comanche Midstream Commitments and that [redacted]

34. Gavilan filed a chapter 11 petition on May 15, 2020. MCom, a wholly owned subsidiary of Mesquite, acquired certain of Gavilan's interests in the Comanche Assets in a section 363 sale pursuant to an Asset Purchase Agreement, dated October 16, 2020 (the "Gavilan PSA"), which was approved by this Court.[50] Among the assets acquired by MCom were the Gavilan PMAs, which were assumed and assigned by Gavilan to MCom without material amendment.[51]

---

[redacted]

49 *See* Exhibit 13 Marketing Agency Agreement at § 3.1(j) (agreeing to take "all actions necessary to ensure that all co-working interest owner production" remains subject to the Retained Midstream Contracts governing the Comanche Midstream Commitments); *see also id.* at §§ 3.1(h), (i), (o), (q), (r).

50 Exhibit 21. The Gavilan PSA is available at docket number 366 in the case captioned *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020).

51 The Gavilan PMAs were listed on Exhibit B to the Debtors' Plan Supplement for assumption. Pursuant to a stipulation dated November 12, 2020, Gavilan consented to the assumption of the PMAs pursuant to the Plan, *see*

As a result, MCom remains bound to sell its production to Maverick; Maverick, in turn, must gather, process, transport, and market such hydrocarbons in accordance with the Comanche Midstream Commitments, including the Existing Commitments.

35. This Court's order approving the sale (the "Gavilan Sale Order") provided that the assets vested in MCom "free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, ***other than the Assumed Liabilities and Permitted Liens***[.]"[52] The Gavilan PSA defined "Permitted Liens" to include, among other things, "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the contracts disclosed on Disclosure Schedule 3.05(a).[53] Disclosure Schedule 3.05(a) lists the Comanche PSA.[54] Accordingly, pursuant to the Gavilan PSA and as so ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments.

## V. The Midstream Restructuring

36. On April 30, 2020, following the onset of the global pandemic, historic declines in oil and gas prices, and severe declines in the Debtors' liquidity, this Court confirmed the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Plan"). [Dkt. No. 1205]. On the Effective Date of the Plan, the Reorganized Debtors had not yet finalized the Midstream Restructuring, and they had not yet finally determined all the

Dkt. No. 1758 (Exhibit 22), and they were deemed assumed by Reorganized Debtor Maverick as of the Effective Date of the Plan.

52 Exhibit 23. *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI), Dkt. No. 361 ¶ V (Bankr. S. D. Tex. 2020) (emphasis added).

53 Exhibit 21 at Exhibit I at I-2.

54 Disclosure Schedule 3.05(a) also lists the GGPA and the Ratification and Assumption Agreement, dated May 22, 2018, among Gavilan, Maverick, and Carnero, whereby Gavilan ratified the GGPA. Exhibit 21 Gavilan PSA, Disclosure Schedule 3.05(a) at 24.

executory contracts and unexpired leases to be assumed or rejected pursuant to the Plan. Following months of litigation and negotiations, in December 2021, the Reorganized Debtors determined that the Midstream Restructuring was in their best interests and that all of the Comanche working interest owners would, pursuant to the Plan and the order confirming it (the "Confirmation Order"), assume and maintain the Existing Commitments, as they existed prepetition but with improved economics for the Reorganized Debtors, UnSub, MCom, and the WIPs.

37. To effectuate such assumption, in part, the Reorganized Debtor Maverick and the WIPs entered into the *Stipulation and Agreed Order Authorizing Assumption of Comanche Non-Ops' Production Marketing Agreements* (the "WIP PMA Assumption Order"), which was approved by this Court on December 6, 2021.[55] The WIP PMA Assumption Order includes findings that the WIPs' Comanche production is sold by Maverick pursuant to the Agency Agreements (as defined in the WIP PMA Assumption Order) and provides for Reorganized Debtor Maverick's assumption of the PMAs with each of the WIPs as of the Effective Date of the Plan.[56] The WIP PMA Assumption Order also provides:

> The PMAs shall remain in full force and effect and shall be binding upon each of the parties thereto in accordance with their terms, and the PMAs shall be enforceable in accordance with their terms pursuant to otherwise applicable law. For purposes of clarification, in connection with the entry of this Order, the Reorganized Debtors and the Comanche Non-Ops have not agreed to any amendments or modifications to the terms of the PMAs.[57]

38. In addition, in December 2021, to further evidence and consummate the Midstream Restructuring, Mesquite and Maverick entered into a Master Settlement Agreement by and among (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy

---

55 Exhibit 24.

56 Exhibit 24 at ¶¶ F & 3.

57 Exhibit 24 at ¶ 5.

Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP, and (c) Mesquite, Maverick, and MCom (the "Master Settlement Agreement"). UnSub signed the Master Settlement Agreement for limited provisions as well.[58]

39. Pursuant to the Master Settlement Agreement, the parties submitted the *Stipulation and Agreed Order*, Dkt. No. 2253 (the "Settlement Order"), which this Court entered on December 21, 2021, agreeing, in accordance with the Plan and the Confirmation Order, to (a) the dismissal of certain litigation, (b) the rejection of the "Rejected Comanche Agreements" (as defined in the Settlement Order), and (c) the assumption of the "Assumed Comanche Agreements" (as defined in the Settlement Order).[59] The Settlement Order identified which of the Assumed Comanche Agreements were being assumed with amendments.[60]

40. As described more fully in the relevant portions of the Argument section below, the Assumed Comanche Agreements left the Existing Commitments intact. The amendments improved certain midstream economics and made conforming and clarifying changes to agreements, but did not alter the scope or duration of the Existing Commitments. In short, the same hydrocarbons subject to the Existing Commitments prior to the Midstream Restructuring will physically flow through the gathering, processing, transportation, and marketing system exactly as anticipated when the GGPA was executed in April 2018.

---

[redacted]

[59] Exhibit 25 at ¶¶ 2, 8, 9.

[60] Exhibit 25 at Exhibit 1. [redacted]

## STANDARD OF REVIEW

41. A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Herbert Abstract Co., Inc. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990). Like a motion for summary judgment, a Rule 12(c) motion "should be granted if there is no issue of material fact and if the pleadings show that the moving party is entitled to judgment as a matter of law." *James v. Wells Fargo Bank, N.A.*, CA No. H-14-0449, 2014 WL 2123060, at *2 (S.D. Tex. May 21, 2014) (citing *Greenberg v. General Mills Fun Grp., Inc.*, 478 F.2d 254, 256 (5th Cir. 1973)). Disputes of contract interpretation are questions of law properly resolved by motions for judgment on the pleadings. *Peddy v. Aaron's Inc.*, CA No. 18-1625, 2019 WL 763510, at *2 (E.D. La. Feb. 21, 2019).

42. When considering a motion for judgment on the pleadings, courts may consider (a) the contents of the pleadings, (b) any documents attached to the pleadings, (c) any documents attached to the motion for judgment on the pleadings that are central to the claim and referenced by the complaint, and (d) any judicially noticed matters of public record. *See Brand Coupon Net., LLC. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002) (holding that the district court properly considered a letter agreement not attached to the complaint in ruling on a Rule 12(c) motion); *Sparks v. Tex. Dep't. of Transp.*, 144 F. Supp. 3d 902, 903 (S.D. Tex. 2015); *James*, 2014 WL 2123060, at *3. "[D]ocuments are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claims." *Peacock v. AARP, Inc.*, 181 F. Supp. 3d 430, 434 (S.D. Tex. 2016) (internal quotation marks omitted).

## ARGUMENT

### I. Carnero's Claims Under The GGPA Fail As A Matter Of Law

#### A. The Enterprise Delivery Point Blocking Scheme Does Not Violate The GGPA (Counts 1–3)

43. Carnero first claims that Maverick and Enterprise wrongfully extended the March 2012 NGL purchase agreement originally between Anadarko and Enterprise (the "Anadarko/Enterprise PA"), [redacted] Carnero is wrong.

44. The Anadarko/Enterprise PA is one of the Retained Agreements under the GGPA; [redacted]. Accordingly, those NGLs are excluded from the GGPA by its express terms.[61] [redacted]

45. [redacted]

[61] Exhibit 1 at § 3.1(b) and Exhibit F.

[redacted]

[redacted]

[redacted]

46. [redacted]

47. [redacted] ***To the contrary, Section 2.1(a) of the GGPA expressly affords Defendants the unfettered discretion whether to create and establish new receipt points,*** [redacted]: "Producer will have sole discretion as to the location of each Additional CGP [central gathering point] or additional well."[64]

---

[64] Exhibit 1 at § 2.1(a).

48. Moreover, the GGPA expressly affords Carnero the option to purchase NGLs processed at Brasada only "at the points at which they were being sold under the Existing Commitment."[65] The GGPA refers to these points as "Additional Plant Product Receipt Points." Thus, the GGPA allowed Carnero, if it exercises its option, to purchase and take title to the NGLs [redacted] Furthermore, the GGPA provides that Carnero assumes all risk associated with its ability or inability to do so, agreeing that "any costs associated with . . . connecting to the Additional Plant Product Receipt Points [will be] borne by Carnero."[66] The "right" that Carnero posits to purchase at other receipt points simply does not exist under the GGPA.

49. [redacted], Carnero will have the option to purchase the NGLs at this precise point, which is termed an "Additional Plant Product Receipt Point" under the GGPA.[68]

50. [redacted]

---

65 Exhibit 1 at § 3.1(b).

66 Exhibit 1 at § 3.1(b).

[redacted]

68 Exhibit 1 at § 3.1(b).

[redacted] Moreover, the GGPA's terms permit amendments only with the express consent of each party, in their respective sole discretion.[70] The GGPA has never given Carnero any right or option to purchase NGLs at any other point.

51. [redacted]

B. **The Defendants Did Not Have A Right To Sell The Comanche Assets "Free and Clear" Of The Agency Agreements As Carnero Alleges (Counts 4–6)**

52. [redacted] Carnero's chain of reasoning fails in multiple respects.

---

[redacted]

70 Exhibit 1 at § 17.2 ("[GGPA] will be amended only by an instrument in writing signed by both Parties."); *see generally B.J. Aviation Inc. v. City of Galveston*, No. 14-96-01480-CV, 1999 WL 93197, at *5 (Tex. App. Feb. 25, 1999) ("Obviously, parties are always free to amend their agreements.").

[redacted]

53. ***First***, there is no covenant or promise in the GGPA that prevents Maverick from assigning any of the Existing Commitments in any context. An obligation to ***terminate*** the Existing Commitments at the earliest opportunity to do so without cost is not a tacit prohibition on ***assignment*** of those agreements. Tellingly, Carnero points to nothing in the Agency Agreements stating that, if Maverick were to sell the Comanche Assets, Maverick's obligations under the Agency Agreements would end (or that Maverick would have an option to terminate those obligations without out-of-pocket cost to Maverick or claims of damages).

54. ***Second***, and contrary to Carnero's assumption, the Agency Agreements already ***require*** Defendants to ensure that the Comanche hydrocarbons will continue to flow according to the current midstream arrangements, even if the assets were sold. Section 3.1(j) of the Agency Agreements expressly obligates Maverick to "take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Marketing Contracts, including all Hydrocarbons attributable to [Anadarko], UnSub, and [Gavilan]."[72]

55. Still other provisions of the Agency Agreements prohibit Maverick from selling the Comanche Assets free and clear of any obligations:

- Maverick is required to ensure that any "buy/sell transaction[s]" concerning the Comanche hydrocarbons complied with the Retained Agreements.[73]
- Maverick must "[t]ake any and all actions needed to ensure" that there were "no modifications, alterations, revisions, or amendments" to the Retained

---

72 Exhibit 13 at 6; Exhibit 14 at 6. [redacted]

73 Exhibit 13 at §§ 3.1(a)–(c).

Agreements that would "in any manner expand, increase, or alter" Anadarko's obligations or "otherwise be detrimental in any matter . . . with respect to [Anadarko]'s obligations."[74]

- Maverick must take any and all actions "necessary to ensure that no modifications . . . to any joint operating agreement, Production Marketing Agreement, or any related agreement are made . . . which would in any manner expand, increase, or alter [Anadarko's] obligations in any detrimental manner under any [Retained Agreement]."[75]
- Similarly, Maverick is not permitted to enter into any "new commitment agreement . . . that would, in any manner, restrict, minimize, reduce, or limit the Hydrocarbons being transported and/or sold under any of the [Retained Agreements]."[76]
- Maverick is also obligated to "meet and serve [Anadarko's] performance obligations under each of the [Retained Agreements] for the full term" of the Agency Agreements.[77]

56. Accordingly, far from having the opportunity to terminate the Agency Agreements upon sale of the Comanche Assets, Maverick is expressly required to ensure continued performance of those essential obligations. Put differently, selling the assets free and clear of the Agency Agreements, as Carnero alleges was previously permitted, would have required breaching the Agency Agreements and risking significant potential damages. The GGPA does not require

[74] Exhibit 13 at § 3.1(h).

[75] Exhibit 13 at § 3.1(i).

[76] Exhibit 13 at § 3.1(i).

[77] Exhibit 13 at §§ 3.1(o), 3.1(p).

***breach*** of any agreement, so it follows that an amendment to the Agency Agreements requiring assignment (which avoids such a breach) cannot violate the GGPA.

57. ***Third***, Maverick is bound by still further contractual requirements to ensure that the Comanche hydrocarbons would continue to flow according to current midstream agreements. As discussed above, before Defendants acquired the Comanche Assets from Anadarko, Anadarko had developed a comprehensive (and costly) system to gather, process, transport, and market Comanche hydrocarbon production (including that of the WIPs).[78] Thus, if Maverick were to sell the Comanche Assets free of any obligations or commitments, then the entire hydrocarbon production, processing, and transportation system would collapse, and Maverick would be in breach of its contractual obligations to Anadarko.[79] Anadarko would also face liability to the other midstream parties for failing to perform.

58. [redacted]

### C. The Springfield Delivery Point And Volume Blocking Scheme Actually *Protects* Carnero's Rights (Count 7)

59. [redacted]

---

[redacted]

79 Exhibit 13 at § 3.1(h) (requiring Maverick not to engage in any action that would "expand, increase, or alter" Anadarko's obligations or "otherwise be detrimental" to Anadarko's obligations).

[redacted]

[redacted].

60. [redacted]

61. [redacted]

---

[redacted]

[redacted]

62. [redacted]

63. [redacted]

D. **Defendants Could Not Sell The Comanche Assets Free And Clear Of The Obligations Under The Brasada Agreement (Counts 8–10)**

64. [redacted]

---

[84] *See* Exhibit 1 at § 3.2(a)–(c).

[redacted]

[redacted]

65. ***First***, the GGPA expressly lists the Brasada Processing Agreement among the agreements that contain Existing Commitments.[87] [redacted]

66. ***Second***, [redacted] the Agency Agreements [redacted] already required that hydrocarbons flow to Brasada for processing. As explained previously, the Comanche Assets could not be sold free and clear due to the interconnected system of hydrocarbon processing, transportation, and marketing put in place by Anadarko. For example, Exhibit A of the Agency Agreement lists the purchase agreement between Anadarko and Enterprise, [redacted]

[87] Exhibit 1.

[88] Maverick executed the amendment only "in its capacity as Agent" for Anadarko. *See* Exhibit 13 at Art. II, § 2.1.

[redacted] Moreover, the Agency Agreements state that Maverick must "take all actions necessary to ensure that all co-working interest owner production is transported/and or sold pursuant to the Retained Marketing Contracts," which would encompass the Brasada Processing Agreement.[90]

67. [redacted]

68. [redacted]

89 Exhibit 13 at Exhibit A.

90 Exhibit 13 at § 3.1(j).

[redacted]

[redacted]

E. **The MCom Gas Blocking Scheme Disregards MCom's Other Contractual Obligations (Count 11)**

69. According to Carnero, [redacted] [redacted]. Carnero also alleges [redacted]

70. ***First***, [redacted]

---

[92] *See* Exhibit 1 at 3.2.

[redacted]

71. ***Second***, MCom did not acquire Gavilan's working interests free and clear of the Existing Commitments. MCom acquired Gavilan's interests through a section "363" sale approved by this Court.[95] The Gavilan assets were transferred to MCom subject to the Existing Commitments. Among other things, Gavilan assumed and assigned to MCom all of its right, title, and interest in and to the Gavilan Purchase and Marketing Agreements (Gavilan PMAs). [redacted] Maverick assumed the PMAs as of the Effective Date of the Plan.[97] As a consequence, MCom remains bound to sell its production to Maverick which, in turn, must gather, process, transport, and market such hydrocarbons in accordance with the Existing Commitments. [redacted].

72. [redacted]

---

[redacted]

95 Exhibit 23.

[redacted]

97 Exhibit 2 at Art. V.A.

[redacted] The Gavilan PSA, the Gavilan Sale Order, [redacted] independently require Maverick and MCom to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments and thereby are excluded from Carnero's dedication. This so-called "scheme" does not constitute a breach of the GGPA.

**F. The Backdoor Extension Scheme Does Not Breach Any Obligation To Carnero (Counts 12–14)**

73. [redacted]

74. However, Carnero's argument ignores the undisputed fact that [redacted]

75. [redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

76. [redacted]

77. [redacted]

This has been the arrangement since Carnero first contracted with Maverick in 2018, and it is explicitly acknowledged under the GGPA, which defines "Producer's Gas" as gas that is owned or controlled by Maverick or which Maverick has the right to market.[103] Nothing has changed following the Midstream Restructuring.

[redacted]

[redacted]

103 Exhibit 1 at § 1.1. [redacted] Ratification Agreements Exhibits 15–17 at § 4. Under the Letter Agreement, Mitsui agreed not to exercise its right to take in kind during the initial term of the GGPA "to the extent such [production] would be dedicated to the [GGPA] under the terms thereof." Mitsui Letter Agreement Exhibit 19 at § 2.

78. [redacted] Thus, UnSub explicitly agreed to deliver its hydrocarbons in accordance with the Midstream Agency Agreements, which bind Maverick to the Existing Commitments.

79. [redacted]

80. As with the Agency Agreements and the Brasada Processing Agreement "extension schemes," Carnero has failed to sufficiently allege that the WIPs and UnSub breached the GGPA. Nor have their actions indicated a fixed intention to anticipatorily breach the GGPA. Accordingly, Carnero's requests for declaratory judgment should be denied, and judgment should be entered in favor of the Defendants.

---

[redacted]

G. **Carnero Failed To State Any Claim Against Mitsui**

81. Carnero's allegations against Mitsui hinges on Carnero's incorrect assertion that Mitsui ratified the GGPA in the Letter Agreement. However, nowhere in the Letter Agreement did Mitsui ever agree to ratify the GGPA or undertake ***any*** obligations under the GGPA. Instead, the focus of the Letter Agreement was actions that Mitsui agreed to take (or refrain from taking) under the PMAs it had with Maverick. Specifically, Mitsui agreed to consent, pursuant to the election procedures in the PMAs, to Maverick's entry into the GGPA in exchange for the retention of its right to take Mitsui Excess Production (as defined in the Letter Agreement) in kind.[105] Mitsui also agreed in section 2 of the Letter Agreement that it would not exercise such retained right to take the Mitsui Excess Production in kind "to the extent such Mitsui Excess Production would be dedicated to the [GGPA] under the terms thereof as if Mitsui had ratified the [GGPA] as a Comanche Producer."[106] The only reference to ratification is in section 2 of the Letter Agreement, and such reference merely describes the extent to which Mitsui may not take Mitsui Excess Production in kind. Therefore, contrary to Carnero's allegations, nowhere in the Letter Agreement did Mitsui ratify the GGPA, nor did it agree to undertake any obligations under the GGPA. Accordingly, all of Carnero's allegations of Mitsui's breach of the GGPA, whether actual or anticipatory, must fail because Mitsui is not a party to the GGPA. Further, Carnero has not alleged that Mitsui has breached any of its obligations under the Letter Agreement, and it cannot do so as no such breach exists.

[105] Exhibit 19 at § 1.

[106] Exhibit 19 at § 2.

H. **Defendants Did Not Breach The Implied Duty to Cooperate (Count 15)**

82. Carnero alleges that the Defendants have violated an implied duty to "cooperate" purportedly inherent in the GGPA. [redacted]

83. Where it exists, the implied duty to cooperate prohibits a party from hindering, preventing, or interfering with the other party's ability to perform its duties under an agreement. *Citizens Nat'l Bank of Orlando v. Vitt*, 367 F.2d 541, 544 (5th Cir. 1966). "Under Texas law, however, contracting parties owe a good-faith duty only if they expressly agree to act in good faith, a statute imposes the duty, or the parties have a 'special relationship' like that between an insurer and insured." *Dallas/Ft. Worth Int'l Airport Bd. v. Vizant Techs. LLC*, 57 S.W.3d 362, 369, fn.13 (Tex. 2019). Accordingly, courts must remain "mindful of the fact that 'Texas law does not favor implied covenants.'" *Chapman Children's Tr. v. Porter & Hedges L.L.P.*, 32 S.W.3d 429, 437 (Tex. App. 2000) (quoting *Bank One Texas, N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App. 1998)). "As a general rule, [courts] look only to the written contract to discern obligations of the contracting parties"; courts "will not imply a covenant simply because it is needed to make the contract fair, wise, or just." 32 S.W.3d at 437; *see also Anton v. U.S. Bank Nat'l Ass'n*, No. 4:19-cv-00862-O, 2020 WL 6882653, at *10 (N.D. Tex. July 10, 2020), *aff'd sub nom. Anton v. U.S. Bank Tr. Nat'l Ass'n*, No. 20-11159, 2021 WL 4609821 (5th Cir. Oct. 6, 2021) ("An implied covenant must rest on the intention of the parties as found in the agreement, and it must be found

within the contemplation of the parties that they deemed it unnecessary to express it.") (internal quotations omitted).

84. The GGPA evinces no such obligation to "cooperate" in the manner Carnero suggests. As discussed *supra* (p.26–42), Carnero's ability to perform under the terms of the GGPA has not changed nor has its status as a backup processor. It remains in the same position now as it did prior to the Midstream Restructuring.

85. [redacted]

86. [redacted] Under Section 3.1(b) of the GGPA, Carnero is entitled to NGLs only at the exact point at which they were being sold under the Existing Commitment.[109]

87. [redacted]

---

[redacted]

108 Exhibit 1 at § 2.1 ("Producer will have sole discretion as to the location of each Additional CGP [central gathering point] or additional well.").

109 Exhibit 1 at § 3.1(b) ("Carnero will have the option . . . to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment").

[redacted] *Case Corp. v. Hi-Class Bus. Sys. of Amer., Inc.*, 184 S.W.3d 760, 773–75 (Tex. App. 2015). There, the plaintiff-software company, Case Corp., and the defendant-manufacturer, Hi-Class, had entered into an agreement whereby Case Corp. agreed to license its software for use in Hi-Class's systems. Although Hi-Class disparaged Case Corp.'s products to its independent dealers and forced its independent dealers to use other, newly preferred software vendors, the court determined that such actions did not impede Case Corp.'s performance under the licensing agreement. Case Corp. was still required to provide its software to Hi-Class. The fact that the manufacturer's actions may have impeded Case Corp.'s ability to sell its software to the manufacturer's independent dealers, however, only interfered with Case Corp.'s chances to benefit from the agreement, not its performance. *Id.*

88. [redacted]

89. Thus, even if this Court upheld an implied duty to cooperate, Carnero's allegations fail to establish that Defendants have acted in such a fashion as to obstruct Carnero from performing under the GGPA. [redacted]

### I. The Plan And This Court's Orders Bar Carnero's Litigation, And Carnero Is Not Entitled To Equitable Relief From The Plan (Count 16)

1. The Plan And This Court's Orders Bar Carnero's Collateral Attack on the Midstream Restructuring.

90. Even if the purported schemes Carnero has alleged somehow violated the GGPA (they do not), Carnero's challenge comes far too late. The Plan and this Court's orders estop Carnero from raising these belated objections to the Midstream Restructuring, whether couched as purported breaches of the GGPA or otherwise. Indeed, by the express terms of the Plan and Confirmation Order, Carnero is deemed to have ***assented*** to the assumption of and amendments to executory contracts and unexpired leases.

91. Given the complex and unusual circumstances of this case, the Plan provided for the assumption or rejection of many executory contracts ***after*** the Plan's confirmation and the Effective Date. As described more fully below, the assumption/rejection process spelled out clear requirements for any party-in-interest wishing to object to the terms of decision to assume a contract, including any amendments thereto. Carnero fully supported those Plan terms, presumably because, at the time, Carnero thought those requirements would better serve its commercial interests.[110] The relief sought by Carnero's lawsuit would contradict numerous express provisions of the Plan and the Confirmation Order, on which the Defendants and their counterparties have

[110] Exhibit 4 at ¶ 23 (including Carnero in the protections afforded to Executory Contract Counterparties).

justifiably relied in charting the Midstream Restructuring under which the Reorganized Debtors will operate.

92. ***First***, the very premise of Carnero's lawsuit—namely, that [redacted]—directly conflicts with the Plan's terms. Article V.A of the Plan provides:

> Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are ***effective as of the Effective Date***, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.[111]

Thus, the Midstream Restructuring agreements and the GGPA were, as a matter of law by operation of the Plan, assumed ***simultaneously*** on the Effective Date. Carnero's lawsuit defies this provision, treating the GGPA as assumed first in time even though the Plan provides that assumptions and rejections are all part of a single restructuring contemplated and effectuated by the Plan.

93. ***Second***, and relatedly, Carnero's lawsuit seeks to impose massive monetary and other liability on the Reorganized Debtors as if the disputed amendments transformed the Midstream Restructuring into post-bankruptcy agreements. Here again, Carnero's position directly contradicts the Plan, which states:

> Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases ***shall not be deemed to alter the prepetition nature of the Executory Contract*** or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.[112]

[111] Exhibit 2 at Art. V.A (emphasis added).

[112] Exhibit 2 at Art. V.F (emphasis added).

By seeking relief against the Reorganized Debtors, Carnero is ignoring an important Plan provision that operates to ensure that, even if an agreement were amended after the Plan's confirmation, the Reorganized Debtors would not bear post-confirmation liability.

94. ***Third***, the Plan reinforces these basic requirements by declaring that on the Effective Date "all property in each Estate," which includes the Midstream Restructuring agreements assumed as of the Effective Date, "shall vest in each applicable Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances."[113] The relief sought in Carnero's lawsuit would upend that clear directive by making the amended agreements vested in the Debtors subject to enormous "charges" or "encumbrances" asserted by Carnero. By the same token, the Reorganized Debtors' interests in the Comanche hydrocarbons vested free and clear, such that the Reorganized Debtors had the right to direct them as provided in the Midstream Restructuring agreements, without another party-in-interest seeking to challenge that action. Carnero's lawsuit, however, would seek to make the same molecules of gas subject to ***conflicting*** demands on the Effective Date. The Plan precludes such a paradoxical emergence from chapter 11.

95. ***Fourth***, stakeholders, including Carnero, had the opportunity to object to confirmation of the Plan, including the unique provisions providing for the post-Effective Date assumption and rejection of contracts. Notably, a number of parties negotiated for specific and special reservations of rights tailored to their specific issues or needs, including parties to the Dimension State Court Action, the United States, and other governmental entities, including those parties to Federal Leases, Texas taxing authorities, and the Catarina Lessors.[114] Carnero never

---

[113] Exhibit 2 at Art. IV.G.

[114] Exhibit 4 at ¶¶ 29–38.

sought nor obtained any special reservations of rights, notwithstanding the ample opportunity to do so.

96. In addition, the Court established a process for identifying contracts as to which a party-in-interest might object to assumption, and resolving any objections. The Plan, the Solicitation Procedures Order, and the Confirmation Order, required all objections to the assumption or rejection of executory contracts and unexpired leases to be filed on or before the Contract Objection Deadline (June 22, 2020), except for limited unrelated exceptions.[115]

97. Indeed, a number of counterparties specifically negotiated the terms of the Confirmation Order regarding those objection rights,[116] and the resulting order is crystal clear: "[a]ny counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim by the Contract Objection Deadline ***shall be deemed to have assented to such assumption*** or Cure Claim."[117] Carnero did not seek even to reserve its rights to object to possible assumption of the primary midstream agreements before that deadline, even though Carnero's then-operative Settlement Agreement with Mesquite provided only a limited window of time during which Mesquite would seek to reject the primary midstream agreements, and even though the parties and the Court repeatedly acknowledged at the hearing to approve the Settlement Agreement that "nothing in the settlement agreement, if approved, preordains a party's right with respect to any . . . midstream contract, or any other contract." [Dkt. No. 1418, June 29, 2020 Transcript at 27:13–15].

---

[115] *See generally* Exhibit 2, Exhibit 3, and Exhibit 4.

[116] Carnero was expressly included in the list of defined "Counterparties" under the Confirmation Order. *See* Exhibit 4 at ¶ 23.

[117] Exhibit 4 at ¶ 18 (emphasis added).

98. Nor did Carnero seek to object or reserve its rights when the Reorganized Debtors moved to assume certain amended agreements containing the Existing Commitments, moving them from the list of contracts to be rejected to the list of contracts to be assumed. Carnero cannot excuse its failure to object on the ground that it simply could not foresee that the agreements might contain amendments.

99. To the contrary, Carnero's ***first*** state-court lawsuit (filed on July 31, 2021) alleged that "UnSub and Mesquite may be in active negotiations to enter into a new marketing agreement or a modified version of the rejected Marketing Agreement."[118] That lawsuit also alleged that "UnSub and Mesquite may be attempting to negotiate a new dedication agreement or amend other agreements (***including the Existing Commitments***) to prevent delivery of UnSub's gas to Carnero," and that "[t]hese actions are in derogation of Carnero's rights under the GGPA."[119] Carnero has thus acknowledged it was fully aware that Defendants may be negotiating amendments to the Existing Commitments but deliberately refrained from seeking to object or reserve rights before this Court. The reason for that refusal is obvious: Carnero recognized that lodging an objection in this Court would doom its effort to evade this Court's jurisdiction over its collateral attacks on the Midstream Restructuring. Even assuming Carnero might have had grounds to seek relief from the Plan objection deadline ***last*** July, it did nothing because it wanted to improve its chances of escaping to state court.

100. What is more, Carnero did nothing when the parties to the Midstream Restructuring came before this Court in December 2021 for the express purpose of seeking approval of the Midstream Restructuring agreements. Carnero appeared at that hearing but lodged neither an

[118] Carnero Original Petition, Exhibit 27 at ¶ 26.

[119] Exhibit 27 at ¶ 26 (emphasis added).

objection nor a reservation of rights. Nor did Carnero seek to delay entry of the order pending review of the amendments or consideration of a possible objection or reservation of rights. Rather, having withdrawn its first lawsuit rather than amend it, Carnero elected to stand silently by while parties presented the matter for the Court's consideration and the order was entered. Those parties—including Defendants and their numerous contractual counterparties—acted in good-faith reliance on the absence of any objection, reservation, or even hesitation from Carnero's counsel at the hearing.

101. Indeed, had Carnero raised any concern at that hearing, the parties might have been able to address it ***before*** the agreements had been approved by the Court. But Carnero was still bent on dodging this Court's jurisdiction (it would file its second state-court lawsuit a few weeks later). Moreover, Carnero did not ***want*** the parties to be able to address any concerns it might have had with the Midstream Restructuring before those agreements were approved by this Court, because—in addition to confirming this Court's jurisdiction—Carnero would diminish its leverage to bring harassing litigation after the fact.

102. In that regard, it is telling that Carnero did not ask to review the amended agreements before, during, or after the December 21, 2021 hearing. Nor did Carnero ask to review the amended agreements before filing its second state-court lawsuit on January 21, 2022, which claimed nonetheless that the amendments must have violated the GGPA. It was only through the extensive affirmative efforts of ***Mesquite's*** counsel over the ensuing weeks and months that the necessary counterparties' consents were obtained to cause Carnero's counsel to review the amended agreements. Mesquite did so because, as explained above, the amendments did not expand or alter the Existing Commitments, leaving Carnero with the same rights it had before the

Midstream Restructuring. Carnero and its counsel took no serious interest in the contents of the amended agreements until its jurisdictional gambit had ended.

103. Carnero complains that it [redacted] Yet Carnero ignores the specific Plan provisions allowing for assumption on amended terms and the slew of objections and reservations of rights timely raised by other parties, such as Oxy, UnSub, the WIPs, and other parties specifically referenced in the Confirmation Order.[120]

104. For example, on June 8, 2020, several days before the Contraction Objection Deadline, Oxy and Wes filed a preliminary objection to the Settlement Agreement between Maverick and Carnero, objecting to the Debtors' request for expedited approval. The objections expressed concern that approval of the Settlement Agreement would require the Debtors to breach their obligations under the Agency Agreements, rejection of which was disputed.[121] Similarly, on June 22, 2020, the day of the Contract Objection Deadline, the WIPs filed their own objection and reservation of rights with respect to the Settlement Agreement. The WIPs requested that approval of the agreement be denied "unless and until (i) the Debtors provide sufficient information for the Court and parties in interest to evaluate the propriety of the Settlement . . . and (ii) the Debtors demonstrate that the transactions contemplated by the Settlement . . . are consistent with the

[120] *See, e.g.*, Oxy/Wes's Preliminary Objection to Settlement Motion, Dkt. No. 1314 (June 8, 2020) (Exhibit 28); Venado, Eagle Ford, and Mitsui's Objection to the Settlement Motion, Dkt. No. 1351 (June 22, 2020) (Exhibit 29); UnSub's Objection to Settlement Motion, Dkt. No. 1373 (June 24, 2020) (Exhibit 30); Oxy/Wes's Supplemental Objection to Settlement Motion, Dkt. No. 1381 (June 25, 2020) (Exhibit 31). In addition to objecting to the Settlement Agreement, UnSub also filed objections to the Assumption of Contracts (Dkt. No. 1354, Exhibit 32), the Assumption of the Ratification Agreements (Dkt. No. 1356, Exhibit 33), and the Rejection of the Agency Agreements (Dkt. No. 1465, Exhibit 34).

[121] Exhibit 28 at 5.

Debtors' duties to the Comanche Non-Ops under their respective PMAs."[122] Carnero was deeply involved in the bankruptcy proceedings at this time and received notice of such objections and reservations of rights being filed. Yet, Carnero did not act to preserve its own rights in the event that rejection of the primary midstream agreements did not occur. Indeed, Carnero was involved in responding to objections by the WIPs, UnSub, and others to the assumption of the GGPA and other assumptions and amendments to contracts involving Carnero.[123]

105. Carnero knowingly passed up opportunity after opportunity to assert an objection or reservation of rights regarding assumption of the Midstream Restructuring agreements. It is clear that Carnero did so for strategic reasons associated with its failed jurisdictional strategy to evade this Court's review. Accordingly, pursuant to the Plan and the Confirmation Order, Carnero is now deemed to assent to the assumption of those contracts, with amendments. Carnero's self-inflicted lack of knowledge as to certain particulars of those amendments cannot excuse those refusals to act. *In re Platinum Oil Props., LLC*, 465 B.R. 621, 638–41 (Bankr. D.N.M. 2011) (creditor is bound by the terms of confirmed chapter 11 plan even if creditor had a different understanding of terms' meaning or did not realize their effect). Such consequences are common features of chapter 11 plans and are regularly enforced. *See, e.g.*, *In re Boston Blackies Mgmt., Inc.*, Nos. 09-B-44643, 09-B-44734, 2010 WL 3310351, at *4 (Bankr. N.D. Ill. May 17, 2010) ("Those non-debtor parties to Designated Contracts and Added Contracts who did not object to the assumption, cure, and assignment of their Designated Contract . . . are deemed to have consented to the assumption, cure, and assignment"); *In re Burner*, 109 B.R. 216, 222 (Bankr. W.D. Tex. 1989) (finding creditor had waived right to object to provisions of plan by failing to file

[122] Exhibit 29 at ¶ 3.

[123] Exhibit 35 Dkt. No. 1415, Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended.

objection to plan prior to confirmation, casting ballot accepting plan, and not attacking confirmation order by appeal); *In re Sportsman's Warehouse, Inc.*, No. 09-10990 (CSS), 2013 WL 492554, at *7 (Bankr. D. Del. Feb. 7, 2013) ("But since Landlord did not object to assumption of Lease . . . the default is deemed cured and Landlord's claims are barred").

2. The Extreme Remedy of Equitable Relief under FRCP 60(b)(4) or FRCP 60(d)(1) Should Not Be Granted Given Carnero's Failure to Preserve Its Rights.

106. Carnero cannot seek equitable relief from these failures by arguing that the Plan's deadline can be set aside under FRCP 60(b)(4). As the Supreme Court recently confirmed, Rule 60(b)(4) applies to void a judgment in only limited circumstances: A void judgment "is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final. The list of infirmities is exceedingly short; otherwise Rule 60(b)(4)'s exception to finality would swallow the rule." *United Student Aid Funds v. Espinosa*, 559 U.S. 260, 270 (2010). The Fifth Circuit has likewise recognized that Rule 60(b) relief is "an extraordinary remedy," *Carter v. Fenner*, 136 F.3d 1000, 1007 (5th Cir. 1998), and cautioned against utilizing Rule 60(b)(4) as a back-door substitute to an appeal or as an effort to collaterally attack the substance of a confirmed Plan. *See Carter*, 136 F.3d at 1006 (citing *Hoult v. Hoult*, 57 F.3d 1, 3 (1st Cir. 1995)); *see also Rosbottom v. Schiff*, 589 B.R. 63, 69 (Bankr. W.D. La. 2018).

107. Given Rule 60(b)(4)'s limited application, the Fifth Circuit has recognized only two circumstances when a judgment may be set as void: (1) if there is a lack of subject matter or personal jurisdiction over the case or (2) if the lower court acted in a manner contrary to due process. *See Automation Support, Inc. v. Humble Design, L.L.C.*, No. 17-10433, 2018 WL 1474937, at *2 (5th Cir. Mar. 26, 2018); *Carter*, 136 F.3d at 1005. [redacted]

108. Carnero complains that the [redacted] As explained above, however, Carnero had the ability to object to the process contemplated by the Plan in April 2020 and reserve its rights prior to the objection deadline for contracts in June 2020, a right that many other parties-in-interest exercised. And Carnero's first state-court lawsuit averred in July 2021—***months*** before this Court entered an order approving assumption of the Midstream Restructuring agreements—that Carnero believed the parties were negotiating amendments "in derogation of Carnero's rights under the GGPA."[124] Consequently, *United Student Aid Funds, Inc.*—the principal case on which Carnero relies—is fatal to Carnero's position. There, the Supreme Court held that "Rule 60(b)(4) does not provide a license for litigants to sleep on their rights . . . [and] the party's failure to avail itself of that opportunity [to object] will not justify Rule 60(b)(4) relief." *United Student Aid Funds, Inc.*, 559 U.S. at 275–76 (denying relief under Rule 60(b)(4) and affirming bankruptcy court's judgment). Carnero ***chose*** not to assert an objection or reservation before this Court in June 2020, in July 2021, or in December 2021. Indeed, Carnero did not seek any relief from this Court until its bid to escape the Bankruptcy Court's jurisdiction altogether had failed. Rule 60(b)(4) does not reward such gamesmanship.

109. Carnero's reliance on FRCP 60(d)(1) is similarly unavailing. Carnero briefly recites elements—[redacted])—that must be alleged to invoke the Court's power to entertain an independent action. But Carnero does not present any support for any of those essential elements. Carnero's request for equitable relief under Rule 60(d)(1) should fail on that basis alone. *See Hamner v. Moreno*, No. CV H-21-2380, 2022 WL 1508982, at

[124] Exhibit 27, Carnero's Original Petition at ¶ 26.

*2 (S.D. Tex. Apr. 21, 2022), *report and recommendation adopted*, 2022 WL 1507203 (S.D. Tex. May 12, 2022).

110. In any event, as detailed above, Carnero had ample opportunity to reserve its rights or object, but it did not do so. *See Sinesterra v. Roy*, 347 F. App'x 9, 10 (5th Cir. 2009) ("A party cannot relitigate 'in the independent equitable action issues that were open to litigation in the former action where he had a fair opportunity to make his claim or defense in that action.'") (quoting *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 79 (5th Cir. 1970)). The circumstances here thus bear no resemblance to the outrageous facts in the *Turner* case upon which Carnero relies. There, a federal judge refused to recuse himself from a personal injury action despite being close friends with the defense attorney (the judge was eventually impeached). *See Turner v. Pleasant*, 663 F.3d 770, 773–75 (5th Cir. 2011). The only obstacle to Carnero taking action to preserve its rights was its litigation strategy to avoid having this Court review its collateral attack on the Midstream Restructuring. That is not a basis for equitable relief from the express terms of the Plan and this Court's orders.

### J. Carnero's Claim For Attorneys' Fees Is Premature And Does Not Constitute An Independent Cause of Action (Count 17)

111. Finally, Carnero seeks an award of attorneys' fees pursuant to Sections 37 and 38 of the Texas Civil Practice & Remedies Code. SAC at ¶ 111. This claim fails for two fundamental reasons: (1) there is no independent cause of action for attorneys' fees and (2) any request is premature, as Carnero has not succeed on the merits of its claims. As the district court recently recognized in *Carlton Energy Grp. LLC v. Clivedon Petroleum Co. Ltd.*, "Section 38 permits recovery of reasonable attorneys' fees in addition to the amount of a valid claim or cost. ***It does not create its own cause of action***." No. CV H-22-170, 2022 WL 2240081, at *5 (S.D. Tex. June 22, 2022) (emphasis added). Count 17 therefore fails.

## CONCLUSION

112. For all of the foregoing reasons, the Defendants respectfully request that this Court enter judgment on the pleadings in their favor on all causes of action set forth in Carnero's Second Amended Complaint and dismiss Carnero's claims with prejudice.

Respectfully submitted this 24th day of August, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Reorganized Debtors and Defendants Mesquite Energy, Inc., SN EF Maverick, LLC, and Mesquite Comanche Holdings, LLC**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Boulevard
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant Crown Eagle Energy LP (f/k/a SN EF UnSub, LP)**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Conor P. McNamara*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Maegan Quejada*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana Street, Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 24, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

/s/ *James G. Munisteri*
James G. Munisteri

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**DEFENDANTS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS TO REMAIN UNDER SEAL, AND (II) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 5:00 PM (CT) ON FEBRUARY 3, 2023.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

Defendants SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Javelin EF L.P. (f/k/a Venado EF L.P.), Mitsui E&P Texas LP, and Crown Eagle Energy LP (f/k/a SN EF UnSub, LP) (collectively, the "Defendants"), by and through undersigned counsel, hereby file this Motion for Entry of an Order (I) Authorizing Defendants' Motion for Judgment on the Pleadings to Remain Under Seal and (II) Granting Related Relief (the "Motion"). In support of this Motion, the Defendants respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Defendants file this Motion to (a) redact certain information in their August 24, 2022 Motion for Judgment on the Pleadings pursuant to the Stipulated Protective Order (Dkt. No. 16) and (b) direct that the un-redacted Motion for Judgment on the Pleadings remain under seal and confidential and not be made publicly available.

2. The Defendants are filing this Motion out of an abundance of caution, and reserve all rights regarding the confidential information at issue in this Motion.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C §§ 157 and 1334.

4. Venue is proper pursuant to 28 U.S.C. §§ 157(b)(2).

5. The bases for the relief requested herein are sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule 9037-1.

## BACKGROUND

6. On April 29, 2022, the Court entered the Stipulated Protective Order, setting out the procedures for the treatment of confidential material. *See* Dkt. No. 16.

7. On July 14, 2022, the Court granted Plaintiff Carnero G&P LLC ("Carnero")'s Motion for Leave to File Second Amended Complaint. *See* Dkt. No. 57. Carnero had filed its Second Amended Complaint under seal pursuant to the Stipulated Protective Order.

8. On August 24, 2022, in response to Carnero's Second Amended Complaint, the Defendants filed their Motion for Judgment on the Pleadings and accompanying exhibits under seal in accordance with the Stipulated Protective Order. *See* Dkt. No. 67.

9. At the Court's direction, on February 1, 2023, the Defendants filed a redacted version of the Motion for Judgment on the Pleadings.

## GROUNDS FOR RELIEF

10. Pursuant to section 107(b) of the Bankruptcy Code, the Court is authorized to issue orders to protect entities with respect to certain confidential information. *See* 11 U.S.C. § 107(b). Additionally, section 105(a) of the Bankruptcy Code, which codifies the bankruptcy court's inherent equitable powers, empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

11. Bankruptcy Rule 9018 implements section 107(b) of the Bankruptcy Code and provides in pertinent part:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

12. Although there is a strong presumption in favor of public access to court records, such access is not without limit. *See Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 598 (1978). Sections 105(a) and 107(b) and Bankruptcy Rule 9018 authorize this Court to limit public access under the circumstances present in this case. Certain information in the Motion for Judgment on

the Pleadings contains "confidential" information or has been designated as "Highly Confidential," as such terms are defined in the Stipulated Protective Order, and are required to be filed under seal as per such Stipulated Protective Order. Moreover, the Defendants' Motion for Judgment on the Pleadings references and cites language from Carnero's Second Amended Complaint, which was also filed under seal.

13. The Defendants further submit that the Motion for Judgment on the Pleadings involves commercial information that warrants continued protection by the Court pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018. Commerical information is information that would result in an "unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Wyndham Vacation Resorts, Inc. v. Faucett (In re Faucett)*, 438 B.R. 564, 567 (Bankr. W.D. Tex. 2010) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994)). Commerical information need not rise to the level of a "trade secret" to be protected under section 107(b) of the Bankruptcy Code. *See In re Northstar Energy, Inc.*, 315 B.R. 425, 429 (Bankr. E.D. Tex. 2004) ("A bankruptcy court is required to seal 'documentary information filed in court that does not rise to the level of a trade secret but that is so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit the entity's competitors.'") (quoting *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996). Here, the Motion for Judgment on the Pleadings references and quotes commercially sensitive information regarding the terms of the accompanying exhibits that Defendants stamped Highly Confidential under the Protective Order. Accordingly, keeping the Motion for Judgment on the Pleadings under seal is appropriate.

14. In light of the foregoing, the Defendants respectfully request that the Court enter an order authorizing the un-redacted version of the Motion for Judgment on the Pleadings to remain sealed.

WHEREFORE, the Defendants respectfully request that this Court enter an order that: (a) grants this Motion, and (b) grants all such other relief as the Court deems appropriate and just under the circumstances.

*[Signature page to follow]*

Respectfully submitted this 1st day of February, 2023.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendants SN EF Maverick LLC, Mesquite Energy, Inc. and Mesquite Comanche Holdings, LLC**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant Crown Eagle Energy LP (f/k/a SN EF UnSub, LP)**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, Texas 7002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, Massachusetts 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Conor P. McNamara*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P.**
**(f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on February 1, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties requesting such service in this case.

*/s/ James G. Munisteri*
James G. Munisteri

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**ORDER GRANTING DEFENDANTS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS TO REMAIN UNDER SEAL, AND (II) GRANTING RELATED RELIEF**

Upon consideration of Defendants' Emergency Motion (the "Motion to Seal") for entry of an order (i) authorizing *Defendants' Motion for Judgment on the Pleadings* (the "Motion for Judgment on the Pleadings") to remain under seal; and (ii) granting related relief; and the Court having reviewed the Motion to Seal, the Motion for Judgment on the Pleadings, and the court

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

having jurisdiction to consider the Motion to Seal and the relief requested herein and due and adequate notice of the Motion to Seal having been given under the circumstances; and sufficient cause appearing therefor, it is hereby ORDERED that:

1. The Motion for Judgment on the Pleadings is authorized to remain under seal;

2. The Defendants are authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion to Seal.

3. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

SIGNED: ________________, 2023

______________________________________
MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
February 02, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 19-34508** |
| **SANCHEZ ENERGY CORPORATION, *et al.*,** | § | |
| | § | **CHAPTER 11** |
| | § | |
| **Debtors.** | § | |
| | § | |
| **CARNERO G&P, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 22-3035** |
| | § | |
| **SN EF UNSUB, LP, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION

Carnero is a Counterparty to the Carnero Gas Gathering Processing and Purchasing Agreement with the defendants. The defendants are parties to both the Carnero Agreement and to other agreements which affect the timing and manner of Carnero's right to receive residue gas and natural gas liquids under the Carnero Agreement. Carnero alleges that the debtors assumed amended versions of agreements which effectively allow the defendants to breach their obligations under the Carnero Agreement. The defendants filed a Rule 12(c) motion for judgment on the pleadings. Judgment is granted for the defendants.

## BACKGROUND

This adversary proceeding involves a series of interlocking contractual agreements that affect rights in assets that the parties refer to as the Comanche Assets. The effect of amendments to certain of those agreements, the effect of sales of working interests in the Comanche Assets on Carnero's rights, and the effect of certain Plan provisions on Carnero's right to bring this suit are

the core issues underlying this dispute. All the parties involved in this proceeding operate in the area of the Comanche Assets and are subject to or have rights under the disputed agreements. (ECF No. 78 at 6). Carnero, the plaintiff, is a midstream provider. Maverick and Mesquite Energy, Inc. (formerly Sanchez Energy Corporation) are debtor-defendants in this proceeding. (ECF No. 78 at 6). Defendants Eagle Ford, Javelin (formerly Venado), and Mitsui are "Working Interest Parties. Defendant Mesquite Comanche Holdings, LLC (MCom) inherited its position from Gavilan, which was originally one of the parties operating in the area. (ECF No. 78 at 6). Defendant SN EF UnSub LP (UnSub) is affiliated with the debtors but was not itself a debtor in this chapter 11 reorganization. (ECF No. 78 at 6).

## I. The Anadarko Regime

Prior to the debtors' chapter 11 filing, gas from wellheads located in the area of the Comanche Assets would flow through gathering pipelines from the wellheads to a processing facility. (ECF No. 67 at 16). At the processing facility, the mixture would be processed into residue gas and natural gas liquids. (ECF No. 67 at 16). From the processing facility, the residue gas and natural gas liquids would again be transported via pipeline to market. (ECF No. 67 at 16). The agreements which form the background for this proceeding can be sorted into four categories: gathering, processing, transportation, and marketing agreements. Anadarko originally established and operated the working interests which produced substantially all hydrocarbons from the Comanche Assets. Maverick inherited the Anadarko regime.

Under the Anadarko regime, the Springfield Gathering Agreements committed most of the gas produced from the Comanche Assets to the gathering system owned and operated by Springfield Pipeline. (ECF No. 67 at 18). The Springfield Gathering Agreements set specific

delivery points for gas from the Comanche Assets at the Brasada processing plant. (ECF No. 67 at 19).

The gas from the Comanche Assets was subject to two processing agreements involving two separate processing plants once the gas had been gathered. (ECF No. 67 at 19). Under the Brasada Processing Agreement, Anadarko committed a specific volume of gas/day to be processed at the Brasada Plant. (ECF No. 67 at 19). Under the ETC Processing Agreement, Anadarko committed a specific volume of gas/day to be processed at the ETC plant. (ECF No. 67 at 19).

Once the gas had been processed into residue gas and natural gas liquids, it became subject to transportation agreements, under which the processed products would be transported to market. (ECF No. 67 at 19). Residue gas was transported from the Brasada Plant under the Eagle Ford Transportation agreement. (ECF No. 67 at 19). Natural gas liquids were transported from the Brasada Plant under the Enterprise Transportation Agreement. (ECF No. 67 at 20).

Once the residue gas and natural gas liquids were transported, they became subject to marketing agreements between Anadarko and its counterparties. (ECF No. 67 at 20). Enterprise had the right to purchase natural gas liquids processed at the Brasada Plant under the Anadarko/Enterprise Purchase Agreement. (ECF No. 67 at 20). The residue gas processed at the Brasada Plant and transported by Eagle Ford would be sold further downstream. (ECF No. 67 at 20).

The Working Interest Parties were parties to certain Purchase and Marketing Agreements (the WIP Agreements) with Anadarko, subjecting them to the Anadarko regime laid out above. (ECF No. 67 at 20-21). Through the WIP Agreements, Anadarko became the owner of all the hydrocarbons in the Comanche assets once they had been gathered. (ECF No. 67 at 21).

Hydrocarbons pulled from wellheads operated by the Working Interest Parties were gathered, processed, transported, and marketed under the same agreements as Anadarko.

## II. MAVERICK TAKES CONTROL AND CARNERO STEPS IN AS BACK-UP PROVIDER

Under the Comanche Purchase Agreement, Maverick, Gavilan, and UnSub stepped into Anadarko's role as operator of the Comanche Assets, effective January 2017. (ECF No. 78 at 9). As part of this transaction, Maverick assumed the WIP Agreements and entered into additional marketing agreements with UnSub and Gavilan. (ECF No. 67 at 23).

Some counterparties to gathering and processing agreements under the Anadarko regime did not consent to the assignment of those contracts to Maverick, Gavilan, and UnSub (these are referred to as the "Retained Agreements" under the Comanche Purchase Agreement and throughout). (ECF No. 78 at. 10). As a result, through Agency Agreements, Maverick agreed to act as Anadarko's agent in fulfilling Anadarko's obligations under the Retained Agreements, effectively keeping in place the Anadarko regime with Maverick simply stepping in as operator. (ECF No. 78 at 10). The Comanche Purchase Agreement and Agency Agreements contain language providing that the defendants will "take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the" Retained Agreements. (ECF No. 68-13 at 7, ECF No. 68-14 at 7, ECF No. 67-11 at 369).

Carnero and the defendants, through various agreements laid out below, are parties to the Carnero Agreement, effective April 1, 2018. (ECF No. 78 at 11). The Carnero Agreement dedicates gas from the Comanche Assets to Carnero, but only as a back-up provider of gathering and processing services. (ECF No. 51-16 at 2). The agreements which formed the Anadarko regime and survived the switch from Anadarko to Maverick as operator are referred to in the

Carnero Agreement as "Existing Commitments."[1] (ECF No. 78 at 12). Under the Carnero Agreement, hydrocarbons are dedicated to Carnero, but the dedication is subject to the Existing Commitments. Carnero cannot receive any hydrocarbons already accounted for by the Anadarko regime until the expiration or termination of those agreements. (ECF No. 78 at 12). Critical to resolution of the present dispute is the fact that substantially all the hydrocarbons produced from the Comanche Assets are accounted for by Existing Commitments. The Existing Commitments include the Retained Agreements (e.g., the Anadarko/Enterprise Purchase Agreement as well as the Brasada and ETC Agreements). (ECF No. 78 at 14-16).

Effective as of the same date as the Carnero Agreement (April 1, 2018), Maverick, Gavilan (and later MCom), UnSub, Eagle Ford, and Javelin agreed to be bound by the terms of the Carnero Agreement. (ECF No. 78 at 11). Through a Letter Agreement, Mitsui did not ratify the Carnero Agreement but rather agreed to authorize Mitsui's gas from the Comanche Assets under the Carnero Agreement "as if" Mitsui had ratified the Carnero Agreement. (ECF No. 78 at 12).

Section 2.1 of the Carnero Agreement provides that "[Maverick] will have sole discretion as to the location of each Additional CGP or additional well." (ECF No. 51-16 at 11). A CGP is a central gathering point. (ECF No. 51-16 at 4).

Section 3.1 of the Carnero Agreement governs the delivery obligations of Carnero's counterparties (and de facto counterparties) to the Carnero Agreement. (ECF No. 51-16 at 13). Section 3.1(b), reads

> "Notwithstanding Section 3.1(a, *to the extent any Gas* that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i *is subject to binding contractual commitments set forth on Exhibit F* that exist as of the Effective Date and prevent the delivery of such Gas

[1] The Existing Commitments reference those agreements specifically listed in an exhibit to the Carnero Agreement (the agreements at issue in this case) and any agreements already committing gas from assets that Maverick and the defendants might acquire and to which Maverick would be bound. (ECF No. 51-16 at 13, 58-59).

> hereunder or the sale of such natural gas liquids to Carnero, or (ii with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of Producer's acquisition (*collectively, the "Existing Commitments", such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A the end of the then-current term of such Existing Commitment* (excluding any subsequent "evergreen" or "renewal" terms, it being understood that Producer shall give timely notice to terminate any such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) *and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost* (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer*), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1* (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), *Carnero will have the option*, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, *to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment* (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero)."

(ECF No. 51-16 at 13, 14) (emphasis added).

## III. THE PLAN OF REORGANIZATION

The Plan of Reorganization contained a unique provision which allowed the debtors to assume and amend executory contracts *after* confirmation, but subject to objections and Court approval. (Case No. 19-34508, ECF No. 1212). Though the decision would be made post-confirmation, any amendments and assumptions would be effective as of the Effective Date of the Plan. (Case No. 19-34508, ECF No. 1212 at 12). The Confirmation Order provided that

> "assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease is May 20, 2020 . . . Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim by the Contract Objection Deadline shall be deemed to have assented to such assumption or Cure Claim."

(Case No. 19-34508, ECF No. 1212 at 11). The Contract Objection Deadline was later extended out to June 22, 2020. (ECF No. 51-5 at 2). Further,

> "Assumption (or assumption and assignment) of any Executory Contract . . . shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment."

(Case No. 19-34508, ECF No. 1212 at 12).

With respect to raising objections and arguments regarding the assumption of executory contracts, the Confirmation order mandated that

> "nothing in this Confirmation Order or the Plan (and neither the confirmation nor consummation of the Plan) shall eliminate, alter or impair (or otherwise prevent any Counterparty (as defined below) from asserting), any or all of the Counterparties' respective defenses, arguments or appellate rights to the extent relating to (a) any proposed assumption or rejection of any Executory Contract or Unexpired Lease with such Counterparty or real property interests of such Counterparty . . . *provided* that each Counterparty shall be required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to the Contract Objection Deadline."

(Case No. 19-34508, ECF No. 1212 at 14). The Confirmation Order and Plan define Carnero as a "Counterparty." (Case No. 19-34508, ECF No. 1212 at 14).

The Confirmation Order and Plan provided that all property of the estate (including the contracts at issue here) would vest in the reorganized debtors "free and clear of all Liens, Claims, charges, or other encumbrances" on the Effective Date. (Case No. 19-34508, ECF No. 1212 at 51).

Finally, the Plan stated that

> "Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract . . .Modifications, amendments, supplements, and restatements to prepetition Executory Contracts . . . shall not be deemed to alter the prepetition nature of the Executory Contract."
>
> (Case No. 19-34508, ECF No. 1212 at 57).

## IV. THE MIDSTREAM RESTRUCTURING

Post-Confirmation, various settlements and associated amendments affected the structure of the above series of agreements.

The defendants entered into the Midstream Settlement with Carnero's support on June 6, 2020, but it ultimately fell apart and terminated in June 2021. (ECF No. 67 at 30). Through the Midstream Settlement, Carnero would have been promoted from its back-up position and become first in line. (ECF No. 78 at 17). It failed after the debtors' unsuccessful attempt to reject the agreements now at the center of this dispute. (ECF No. 78 at 17).

In October of 2020, Gavilan sold its interest in the Comanche Assets to MCom but did not assign the Comanche Purchase Agreement to MCom. (ECF No. 67 at 29).

By an order of this Court, Maverick assumed the WIP Agreements as an essential component of the reorganized debtors' decision to assume the Existing Commitments on December 6, 2021. (Case No. 19-34508, ECF No. 2201 at 3).

On December 21, 2021, the defendants effectuated the Midstream Restructuring,[2] commemorated by a Master Settlement Agreement. (ECF No. 67 at 9). Through the Midstream Restructuring, the debtors assumed the Existing Commitments with clarifying amendments designed to ensure the stability of the reorganized debtors. (Case No. 19-34508, ECF No. 2253 at 10). For example, the Master Settlement Agreement includes provisions requiring a Comanche Asset purchaser to assume the MCom and Maverick obligations under the Agency Agreements.

The Maverick/Enterprise Purchase Agreement is a purchase and sales agreement between Maverick and Enterprise set to commence in April of 2023, immediately after the primary term of

[2] For the sake of clarity, the Midstream Restructuring is an agreement separate and apart from the Midstream Settlement. The Midstream Restructuring was designed after the failure of the Midstream Settlement. Although Carnero was involved in the Midstream Settlement, it was not involved in the Midstream Restructuring.

the Anadarko/Enterprise Purchase Agreement ends. (ECF No. 67-2). The Maverick/Enterprise Purchase Agreement provides that "Subject to . . . Seller's obligations under the Carnero Purchase Agreement . . . Seller . . . dedicates and commits to sell" the product that had originally been subject to the Anadarko/Enterprise Purchase Agreement. (ECF No. 67-2 at 41). It further clarifies that "other than with respect to Seller's obligations pursuant to the Carnero Purchase Agreement, any agreements now or hereinafter entered into . . . do not and will not conflict with or infringe upon the dedication under this agreement." (ECF No. 67-2 at 43). The Maverick/Enterprise Purchase Agreement states that Maverick will not take any action to alter delivery points that would modify Carnero's rights under the Carnero Agreement. (ECF No. 67-2 at 42).

Amendments to the Springfield Gathering Agreement set up two "interruptible connection points" which were intended to allow excess residue gas and natural gas liquids to flow to Carnero under the Carnero Agreement. (ECF No. 67 at 41-42). Specifically, the Springfield Amendments added language to the Springfield Gathering Agreements clarifying how and when anything could be delivered to an interruptible connection point (i.e., Carnero):

> "Gatherer shall have no obligation to deliver Gas to Shipper's Transporter(s) at a location other than the Delivery Points and subject to the following, the Interruptible Connection Point(s); provided, however, if the Brasada Processing Plant and, until July 1, 2023, the ETC Processing Plant, are unable to process any portion or portions of Shipper's entire Delivery Nomination, at any time, then Shipper may submit nominations to Gatherer indicating the quantity of Gas to be delivered to Shipper's Transporter or downstream customer at an Interruptible Connection Point(s) in MMBtu per Day; provided, further, that the volume of Gas nominated to an Interruptible Connection Point(s) shall not exceed the volume of Gas in MMBtu per Day that the Brasada Processing Plant and, until July 1, 2023, the ETC Processing Plant are unable in the aggregate to process; and provided, further, Shipper's right to nominate Gas to an Interruptible Connection Point(s) shall be temporarily suspended at such time as the Brasada Processing Plant or, if applicable, the ETC Processing Plant, are physically capable in the aggregate of processing Shipper's entire Delivery Nomination. For the sake of clarity, Shipper may nominate Gas volumes in excess of Shipper's obligations in the Brasada Processing Agreement and the ETC Processing Agreement to an Interruptible Connection Point."

(ECF No. 67-2 at 422-423). "Delivery Nomination" means "the quantity of Gas to be delivered to Shipper's Transporter or downstream customer at each Delivery Point." (ECF No. 67-2 at 270).

Through the MCom Assumption Agreement (which was entered in connection with the Master Settlement Agreement) MCom committed its residue gas according to the Agency Agreements until those agreements terminated. (ECF No. 67-2 at 95). Through this agreement, MCom agreed to require any purchaser of the Comanche Assets to take assignment of the MCom Assumption Agreement. (ECF No. 67-2 at 96). The Springfield Amendments contain a provision clarifying that "for the avoidance of doubt," the sale to MCom was subject to the Gavilan Dedication and MCom and Mesquite were not released from that dedication on account of the sale. (ECF No. 67-2 at 422).

Finally, in conjunction with the Master Settlement Agreement, the Working Side Interest letter required the Working Interest Parties (and UnSub, as a party to the Master Settlement Agreement) to require a purchaser of their working interest in the Comanche Assets to take assignment of the relevant agreements to which they were party. (ECF No. 67-2 at 531).

## V. PROCEDURAL HISTORY

Carnero supported the Plan and did not object to its confirmation. At no time (until this proceeding) did Carnero raise an objection or attempt to preserve its right to object to the assumption of the Carnero Agreement or any other contract affecting its property rights.[3] The Effective Date of the Plan was June 30, 2020. (Case No. 19-34508, ECF No. 1417 at 1). Carnero attended the December 21, 2021 hearing at which the Court approved the Midstream Restructuring

[3] Carnero points out in its complaint that the Carnero Agreement's dedication created a property interest. (ECF No. 53-1 at 10). Therefore, under the terms of the Plan, Carnero would have had the right to object to the assumption of contracts affecting its property rights even if it was not a party to that particular contract. (Case No. 19-34508, ECF No. 1212 at 14). (preserving a Counterparty's rights "relating to (a) any proposed assumption or rejection of any Executory Contract or Unexpired Lease with such Counterparty *or real property interests of such Counterparty*") (emphasis added).

but, again, did not say anything. (Case No. 19-34508, ECF No. 2254). Carnero filed this claim in state court on January 21, 2022. (ECF No. 1 at 8). The defendants removed the action to this Court on February 28, 2022. (ECF No. 1). The defendants filed a motion for judgment on the pleadings. (ECF No. 67). The Court held a hearing on the defendants' motion on October 5, 2022 at 1:30 P.M. (ECF No. 112).

**JURISDICTION**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. A proceeding is "related to" a case under title 11 if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984)). A bankruptcy court's "related to" jurisdiction narrows post-confirmation. *Natixis Funding Corp. v. GenOn Mid-Atl., L.L.C. (In re GenOn Mid-Atl. Dev., L.L.C.)*, 42 F.4th 523, 534 (5th Cir. 2022). The relevant question for "related to" jurisdiction post-confirmation is whether "the dispute 'pertain[s] to the implementation or execution' of the debtor's reorganization plan[.]" *Id.* (citing *U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002)).

In *GenOn*, the Fifth Circuit concluded that it is not enough that litigation may deplete estate resources to find that a matter is "related to" the execution of a plan of reorganization—such a rule would be far too broad and encompass too many claims. *Id.* at 538. However, the Fifth Circuit clarified that this does not mean a dispute must threaten to "torpedo" a reorganization to find that it relates to the bankruptcy. *Id.* at 537. Instead, the dispute merely "must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities." *Id.* at 538.

In *Craig's Stores*, the Fifth Circuit held that a state-law dispute fell outside the bankruptcy court's jurisdiction where the suit was brought more than a year after confirmation, well after the

debtor had reorganized. *Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 391 (5th Cir. 2001)). Here, while brought after confirmation, the dispute implicates a complicated and essential settlement among parties that was effectuated in accordance with Plan provisions under this Court's supervision. As in *GenOn*, the plaintiff's claims "threaten to destabilize the fragile consensus around a settlement crucial to the success of" the debtors' reorganization. *In re GenOn*, 42 F.4th at 536.

There are two primary issues in this adversary proceeding: (i) whether Carnero's claims are barred by the Plan and (ii) if not, whether defendants breached the Carnero Agreement by entering into the Midstream Restructuring. This Court clearly has jurisdiction to resolve the first issue. It is a core matter because it implicates the Plan and this Court's ability to enforce its own confirmation order. 28 U.S.C § 157(b)(2). The plan explicitly granted the debtors the authority to assume contracts post-confirmation and set deadlines for parties in interest, such as Carnero, to object to contract assumption. The Plan is premised upon the understanding that the debtors' ability to assume contracts post-confirmation would be essential to their ability to successfully reorganize. Adjudicating this dispute necessarily requires the interpretation and application of specific Plan provisions and orders from this Court issued in conjunction with the Midstream Restructuring which Carnero alleges violated its contractual rights under the Carnero Agreement.

This Court also has jurisdiction over the contract interpretation issue as a matter "related to" the bankruptcy proceeding, despite Carnero's assertion that all the facts giving rise to its claim occurred post-confirmation. The dispute involves contract claims that arose as a result of the debtors' attempts to assume and amend executory contracts under the terms of the Plan. This dispute essentially amounts to an argument over whether the debtors properly exercised their rights to assume amended executory contracts under § 365 of the Bankruptcy Code or whether that

exercise amounted to the debtors' violation of the contractual and due process rights of Carnero. By threatening to unravel a key component of the debtors' reorganization, the contract claims against the defendants implicate the feasibility of the Plan and the vitality of this Court's pre- and post-confirmation orders. The Court has "related to" jurisdiction.

## LEGAL STANDARD

Before the Court is the defendants' Rule 12(c) motion for a judgment on the pleadings. Federal Rule of Bankruptcy Procedure 7012(b) applies Rule 12(c) to adversary proceedings. FED. R. BANKR. P. 7012(b). Federal Rule of Civil procedure 12(c) states that "a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).

In the Fifth Circuit, "the standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To defeat a 12(b)(6) motion, the plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A complaint plausibly states a claim for relief when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Plausibility," at the Rule 12(b)(6) stage, does not mean "possibility." *Id*. at 679. A complaint that offers bare legal conclusions, unsupported by well-pleaded factual allegations tending to establish a plausible basis for relief, must be dismissed. *See id*. at 679–80 (citing *Twombly*, 550 U.S. at 551, 555, 565–67, 570) (explaining that legal conclusions cannot be taken as true without factual support). The Court reviews motions under Rule 12(b)(6) "accepting all

well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).

## DISCUSSION

Carnero is barred from bringing this claim by the terms of the Plan. Even if Carnero's claims were not barred by the Plan, they fail as a matter of law. Carnero's complaint fails to allege sufficient, well-plead factual allegations that support its claim for relief.

### I. CARNERO'S CLAIMS ARE BARRED

Because Carnero failed to timely exercise its rights under the Plan and under the relevant Rules, its actions in this case are barred. Even accepting Carnero's contractual interpretation as true (which it is not), relief under Rule 60 is not appropriate where Carnero's own inaction stripped it of its rights under the Carnero Agreement.[4] The issue here centers around two decisions made by Carnero: (i) the failure to object to the assumption of the Carnero Agreement or otherwise preserve its right to object by the Contract Objection Deadline (knowing that there were still some contracts which had been neither assumed nor assigned and for which negotiations were ongoing); and (ii) the failure to raise an objection to or demand to see the terms of the Midstream Restructuring at the December 21 hearing.

#### A. The Plan Bars Carnero's Action

This is not the first time the Court has had to consider the application of the provision of this Plan which allowed the debtors to assume and reject contracts after confirmation. In an earlier adversary proceeding, which forms part of the backdrop for the one at hand, this Court held that Occidental had "waived its argument that Mesquite cannot exercise its rejection rights under § 365

[4] As laid out in detail in the second section of the discussion, Carnero's interpretation of its rights under the Carnero Agreement conflict with its unambiguous terms.

after the effective Date of the Plan because Occidental expressly assented to the rejection procedure in this case." *In re Sanchez Energy Corp.*, 631 B.R. 847, 856 (Bankr. S.D. Tex. 2021).

This case presents a unique timing issue in light of the Plan's language: whether the Plan's language precludes a claim for breach of a contract that was assumed *simultaneously* with the amended agreements Carnero alleges form the basis of the breach (i.e., both were assumed as of the Effective Date, per the language of the Plan). Carnero argues that it would have to have a crystal ball to know that it should have objected to the assumption of the at-issue contracts by the Contract Objection Deadline since the Court did not approve the assumption of those contracts until December 2021. The defendants counter that Carnero was not required to predict the nature of the contracts and amendments, but rather failed to object and now brings this breach of contract claim in an attempt to circumvent the deadlines set by the Plan.[5]

Carnero, like every other party in interest in this bankruptcy, had the ability to object to Plan confirmation or otherwise seek to preserve its rights concerning the unique provision setting a deadline for contract objections but allowing post-confirmation assumptions and amendments to be effective as of the Effective Date. Carnero did nothing to preserve those rights.[6] Carnero's argument that the Plan somehow stripped Carnero of its rights falls flat. The Plan did not deprive Carnero of rights. The Plan and bankruptcy procedures gave Carnero avenues to exercise its rights in a manner that would not upend the debtors' reorganization efforts, and Carnero failed to avail itself of those avenues. If Carnero believed that those avenues were inadequate, it needed to timely

---

[5] The defendants do not allege that Carnero's claim for breach is a belated Cure Claim, so the Court's discussion is limited to its characterization as a deadline-barred objection to assumption.

[6] Other parties, for example, did file such reservations of rights specifically addressing the uncertainty regarding which Comanche-asset-related contracts the defendants would assume and reject. (Case No. 19-34508, ECF No. 1184).

voice that objection. It cannot remain silent, allow the Court to issue an order establishing the procedures, not follow the procedures, and then complain.

Carnero argues that these provisions of the Plan merely mean that Carnero would be deemed to have no objection to a post-confirmation assumption of a contract absent Carnero's assertion of an objection prior to the Contract Objection deadline. According to Carnero, that does not mean the Plan should be read as allowing the debtors to breach some contracts by assuming amended versions of others. But Carnero's interpretation of the circumstances here presume a timeline where the Carnero Agreement was effectively assumed *before* the Master Settlement Agreement and associated amendments. The Plan specifically provides that these assumptions were made *simultaneously* on the Effective Date.

In an earlier proceeding in this bankruptcy, this Court found that Occidental could not bring a belated rejection claim and collaterally attack the Plan's rejection procedure where it had consented to the rejection procedure laid out in the Plan. *In re Sanchez Energy Corp.*, 631 B.R. at 857. There, the Court noted that "even if the Court made a legal error, that error did not deprive Occidental of due process or exceed the Court's subject matter jurisdiction." *Id*. at 857 (citing *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (holding that a confirmed plan will not be overturned for legal error when a party has notice of the error and does not object or timely appeal)). The Court further held that

> "Res judicata bars Occidental from attacking the Plan's rejection procedure post-confirmation. The preservation provision of the Confirmation Order preserved Occidental's defenses to rejection of its contracts with Sanchez. The Plan and Confirmation Order established the rejection procedure. Occidental may challenge whether rejection of its contracts with Sanchez is appropriate, but it is estopped from attacking the rejection procedure."

*Id*. at 859.

Taking that logic a step further, Carnero had the opportunity to challenge the assumption of its own contract (just as Occidental had the right to challenge rejection). It did not do so. It had the right to object to the approval of the Midstream Restructuring. It did not do so. With respect to Carnero's contention that the timing in this case did not allow such intervention, Carnero could have objected to the relevant Plan procedures that lead to such timing. It did not do so. Because it did none of those things, Carnero is now barred from arguing that the debtors' Plan or exercise of its § 365 rights violated the Carnero Agreement.

The balance debtors strike in bankruptcy in exercising their business judgment to decide which contracts to reject and which to assume in order to effectively (and feasibly) reorganize are subject to court supervision. This ensures that all parties are treated fairly and that their rights will be protected, should they choose to timely exercise them. Carnero cannot sit on its bankruptcy rights then argue that they hold a run-of-the-mill state law breach of contract claim based purely on actions that occurred in conjunction with the debtors' reorganization process. Put another way, Carnero cannot strategically choose to not exercise its bankruptcy rights during the bankruptcy case and later reframe an objection to the assumption of a contract as a post-petition claim for breach. To allow them to do so would be to allow contract counterparties to escape the bankruptcy Court's oversight and jurisdiction and threaten the stability of the reorganization process by leaving the assumption of executory contracts—and, by extension, the feasibility of the Plan—open to later collateral attack.

**B. The Plan does not Violate Due Process Notice Requirements**

Carnero next argues that if its claim is barred, the Fourteenth Amendment's due process notice requirement demands relief under Rule 60. Federal Rule of Civil Procedure Rule 60(b)(4) grants a court leave to "relieve a party or its legal representative from a final judgment, order, or

proceeding" if "the judgment is void." FED. R. CIV. P. 60(b)(4). A judgment is void, for example, where it violates a party's due process rights, but the Rule is not read to "provide a license for litigants to sleep on their rights." *Espinosa*, 559 U.S. at 275. "Rule 60(b)(4) strikes a balance between the need for finality of judgments and the importance of ensuring that litigants have a full and fair opportunity to litigate a dispute." *Id*. Where a "party has been afforded a full and fair opportunity to litigate, the party's failure to avail itself of that opportunity will not justify Rule 60(b)(4) relief." *Id*.

The case at hand, involving a debtors' Plan of Reorganization, serves as a prime example of an instance where the "need for finality of judgments" is paramount. The terms of the Plan in this case did not strip Carnero of its rights to object or otherwise be heard on matters relating to its contractual and property rights. Instead, the Plan stated that whatever rights Carnero *did* have to object to the assumption of contracts would be waived if Carnero failed to exercise them by a certain date. Those clear terms of the Plan put Carnero on notice as to the need for Carnero to exercise its rights by the Contract Objection Deadline, even though the process of assumption and rejection was ongoing. The Plan did not need to give specific details as to which contracts would be assumed and with what amendments in order to satisfy the due process notice requirements. That Carnero either (a) chose not to exercise its rights or (b) mistakenly believed it did not have standing to do so does not amount to a deprivation of due process meriting relief under Rule 60.

A Supreme Court case cited by Carnero comments broadly, but informatively, on the due process notice requirement. *Mullane* dealt with whether constructive notice by publication of the settling of a trust satisfied due process. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950). There, the court noted that "'[t]he fundamental requisite of due process of law is the opportunity to be heard.' This right to be heard has little reality or worth unless one is informed

that the matter is pending and can choose for himself whether to appear or default, acquiesce, or contest." *Id*. at 656. (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). Due process requires an "opportunity for hearing appropriate to the nature of the case," meaning that there is no one-size-fits-all standard by which courts may glean whether parties have been properly noticed. *Id*.

Carnero's comparison of the issue here to that in *Mullane* falls short in a few ways. First, that case dealt with the tenuous nature of relying on constructive notice. *Id*. Here, Carnero had *actual* notice of the Plan provisions with which it did not comply and therefore waived its right to prosecute the issues it now brings. Moreover, *Mullane* holds that it is not appropriate to require "published notice insofar as they are urged on behalf of any beneficiaries whose interest or addresses are unknown." *Id*. at 318. In other words, notions of due process do not somehow impose a duty on a party to provide notice beyond the realm of what is known (or can reasonably become known) at the time. Carnero could not be noticed of facts that no one knew when Plan was confirmed. The Plan included the mechanism Carnero now takes issue with *precisely because* of those unknowns. As the court in *Mullane* noted, all that can be reasonably required of due process is "under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id*. at 314. (citing *Milliken v. Meyer*, 311 U.S. 457 (1940)). Carnero was apprised of its rights, apprised of the fact that there were ongoing processes and conversations as the debtors weighed which contracts should be assumed or rejected (even if there were hopes, predictions, and tentative plans at the time of confirmation),[7]

[7] Even though there were schedules in which the debtors indicated some contracts which they, at the time, intended to either assume or reject, the Plan gave the debtors the right to stray from that schedule. (ECF No. 1212 at 11). If there had been certainty as to assumption, amendment, and rejection at Confirmation, it would not have been necessary to allow the debtors to do so after Confirmation. Therefore, it was not reasonable for Carnero to rely on those schedules as they now claim they did in failing to raise any objections by the Objection Deadline.

and given an opportunity to present or preserve its objections which it chose not to take. That is not a denial of due process.

In December of 2021, Carnero knew that certain midstream agreements and amendments to those agreements would be assumed, pending this Court's approval, and had the right and opportunity to demand to see and object to the terms of the Midstream Restructuring as potentially in conflict with the Carnero Agreement.[8] Like in *Espinosa*, the debtors had the right to rely on the lack of objection to the terms of the Plan and the lack of objection to the Midstream Restructuring. *Espinosa*, 559 U.S. 260. It is for that reason—the defendants' and other parties' reliance on the finality of the Plan and this Court's judgments—that the Court declines to exercise its discretionary power to grant equitable relief from the terms of the Plan under Rule 60(d)(1). FED. R. CIV. P. 60(d)(1).

## II. THE MIDSTREAM RESTRUCTURING DID NOT BREACH THE CARNERO AGREEMENT

Carnero's breach of contract claims fail even if they are not barred by the Plan. The mechanics of the Plan and the Bankruptcy Code mandate that the Carnero Agreement was assumed without any default. In any case, basic principles of contract interpretation provide that the Midstream Restructuring did not breach the Carnero Agreement.

The Plan provisions and bankruptcy process lead the Court to conclude that the Midstream Restructuring did not breach the Carnero Agreement. The terms of the Carnero Agreement were unchanged by the Midstream Restructuring. Instead, the parties made amendments to the Existing Commitments which may or may not affect the timing of when or how gas will be delivered to

[8] 11 U.S.C. § 1109(b) provides that "a party in interest . . . may raise and my appear and be heard on *any issue* in a case under this chapter." (emphasis added). In a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure, the general discovery rules under Rule 7026 apply, which Carnero could have used to request to see the details of the Midstream Restructuring. Fed. R. Bankr. P. 7026, 9014(c).

Carnero. Carnero alleges that, in the various ways detailed below, those amendments either themselves amount to breach or will eventually require the defendants to breach the Carnero Agreement. This interpretation is unfounded—particularly where an interpretation that would read the various contracts in harmony with one another is not only available but is also supported by the plain, unambiguous language of the agreements.

**A. The Debtors Assumed a Default-Free Carnero Agreement**

Because of the Plan provision which states that assumed contracts, even if amended, retain their prepetition nature, Carnero's claim that amendments to the Existing Commitments breached the Carnero Agreement fail. (Case No. 19-34508, ECF No. 1212 at 57). The Carnero Agreement was always subject to the carve-out of the Existing Commitments. Even though the Existing Commitments were amended in the bankruptcy process, they retained their prepetition nature by the express terms of the Plan.[9] Therefore, Carnero's timeline where the Carnero Agreement exists and then the defendants breached the Carnero Agreement by entering into the Midstream Restructuring belies this Court's order confirming the Plan.[10]

Further, the Court may only approve the assumption of a contract if any default existing *"at the time of assumption"* is cured. 11 U.S.C. § 365(b)(1) (emphasis added). Court approval of assumption inherently includes a finding of no current default. Based on the timing mechanism laid out in the Plan, if there was a default of the Carnero Agreement, it occurred *at the time of assumption*—the Effective Date—because that is also the time at which the Midstream Restructuring was effectively assumed. But the Court approved the assumption of the Carnero

[9] Again, if Carnero took issue with this provision of the Plan, it had the opportunity to object to Confirmation but failed to do so. It does not get a second chance to object to a Plan provision by framing the objection as one for breach of contract.

[10] Carnero's misperception of the timeline of this case further undercuts its characterization of the issues here as post-petition matters that defeat this Court's jurisdiction.

Agreement not subject to any cure claim and without any finding of default. Therefore, the simultaneous assumption of the Carnero Agreement and Midstream Restructuring under the Plan incorporates a finding that the Midstream Restructuring did not cause a default of the Carnero Agreement.[11] Carnero argues that this leads to an absurd scenario where, ten years down the road, Maverick could have amended the assumed agreements and used the Plan provision to argue that it does not amount to a breach of the Carnero Agreement. That is not what occurred here. The debtors did not assume contracts and then later try to amend them. They assumed contracts *as amended*, which the Plan allowed the debtors to do.

Even absent the effect of these unique Plan provisions, Carnero's claims fail as a matter of contract law. The parties disagree as to the proper interpretation of the contractual terms of the Carnero Agreement, among other relevant agreements. Interpretation of unambiguous contractual terms is a determination of law and therefore an appropriate determination for the Court to make on the pleadings. *See In re Tri-Union Dev. Corp.*, 479 B.R. 425, 441 (Bankr. S.D. Tex. 2012) (citing *Travis Cnty., Tex. v. Flint Hills Res., L.P.*, 456 Fed. Appx. 410, 413 (5th Cir. 2011)). "A contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (citing *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699 (2nd Cir. 2010)). "If the contract terms are susceptible to only one reasonable construction, the contract is unambiguous and will be enforced as written." *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (citing *In re El Paso Refinery, LP*, 302 F.3d at 353 (5th Cir. 2002)). "Ambiguity does not arise because of a 'simple lack of clarity' or because the parties proffer

[11] At the very least it means, contrary to Carnero's argument at hearing, that the default is not a prepetition default that "rides through" the bankruptcy. (ECF No. 112 at 105, 106).

different interpretations of the contract." *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375 (5th Cir. 2013) (quoting *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)). It is only where a contract is ambiguous that the Court considers parole evidence or considers canons of construction beyond looking to the plain meaning of the language to inform its interpretation of the contract. *Id.*

The defendants' assumption of the Existing Commitments, even as amended, does not amount to a breach of the unambiguous terms of the Carnero Agreement. This is predominantly because Carnero's baseline assumptions concerning what its rights are under the Carnero Agreement are flawed.

**B. The "Extension Schemes"**

Several of Carnero's claims center around the idea that the Midstream Restructuring "ties the hands" of the defendants, causing the defendants to fail to fulfill their requirement under the Carnero Agreement to terminate the Existing Commitments as early as possible. These claims allege that before the Midstream Restructuring, the defendants could have sold the Comanche Assets (or, rather, their working interest in those assets) free and clear of the parties' obligations under various agreements. As a result, gas would have flowed to Carnero because the sale of the Comanche Assets would have effectively terminated the Existing Commitments. However, this argument is based on a flawed interpretation of the plain language of the Carnero Agreement in the context of the debtors' reorganization efforts.[12]

[12] Notably, some of Carnero's "extension scheme" allegations involve amendments to Existing Commitments entered into as part of the Midstream Restructuring which are Retained Agreements. (ECF No. 67 at 43). Anadarko (not named as a defendant and not party to the Carnero Agreement) entered into both those agreements and the amendments; Maverick is bound to them as Anadarko's agent under the Agency Agreements. (ECF No. 68-13 at 2, 5).

The relevant language of the Carnero Agreement requires the defendants to terminate the Existing Commitments at the "earlier of (A) the end of the then-current term of such Existing Commitment . . . and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost" which Carnero does not agree to cover. (ECF No. 51-16 at 13.)

The Carnero Agreement is unambiguous in its requirement that its counterparties terminate the Existing Commitments at the earliest time possible without incurring out-of-pocket costs. For example, Maverick would likely have to incur "out of pocket costs" if it were to terminate an Existing Commitment by simply repudiating it, therefore breaching the commitment. On the Court's interpretation of the provision and these facts, it is irrelevant whether the various amendments might have caused the Existing Commitments to remain in force. The Master Settlement Agreement and related amendments were necessary to effectuate the debtor's reorganization effort. This is partially demonstrated by the Occidental adversary proceeding, in which this Court held that covenants running with the land would survive rejection under § 365. Such a ruling changed the economics of the debtors' position, making it more costly to reject the contracts they initially sought to shed in the bankruptcy. As this Court pointed out in that case, the Plan provision which allowed the debtors to assume contracts on an unconventional timeline was necessary "to forestall liquidation." *In re Sanchez Energy Corp.*, 631 B.R. at 851.

Under the plain language of the Carnero Agreement, the debtors could not have terminated those agreements at the earliest time possible (i.e., in the bankruptcy proceeding or by leaving the Agency Agreements unamended) without incurring "out-of-pocket costs," which the Carnero Agreement explicitly does not require the debtors to incur. Negotiating deals with the counterparties to the Existing Commitments (and other agreements Carnero takes issue with) were

necessary to the debtor's reorganization. Allowing them to terminate by leaving the pre-bankruptcy regime in place or by rejecting them outright would have imposed a cost on the debtors, the estate, and the creditors that the language of the Carnero Agreement did not demand under any reasonable interpretation. In any case, the amendments did not "extend" the Existing Commitments because language in several commitments predating the Carnero Agreement already prevented the Comanche Assets from being sold free and clear of those commitments.[13]

In a slightly different vein, Carnero alleges that the Maverick/Enterprise Purchase Agreement (part of the Midstream Restructuring) impermissibly extended the Anadarko/Enterprise Purchase Agreement (an Existing Commitment). The Anadarko/Enterprise Purchase Agreement expires in April 2023. Through the Maverick/Enterprise Purchase Agreement, Maverick will essentially step into Anadarko's role in an agreement set to begin in April 2023. (ECF No. 67-2 at 41). The mechanics of this allegation differ from the other "extension" allegations because it involves a new agreement, not an amendment to an existing one. However, a provision of the Maverick/Enterprise Purchase Agreement only commits Enterprise to continue purchasing natural gas liquids at the end term of the Anadarko/Enterprise Purchase Agreement *if* Carnero chooses not to exercise its right to purchase those liquids. (ECF No. 67-2 at 43). The Maverick/Enterprise Purchase Agreement does not impermissibly extend the Anadarko/Enterprise Purchase Agreement in a manner that blocks Carnero from exercising its rights under the Carnero Agreement.

[13] For example, take the Comanche Purchase Agreement language cited in the Background of this Opinion: Maverick must "take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Marketing Contracts." (ECF No. 68-13 at 7).

**C. The "Blocking Schemes"**

Another set of the claims alleges that defendants breached the Carnero Agreement by "blocking" Carnero's right to receive gas at certain receipt points or otherwise frustrate Carnero's right to choose or create new receipt points. Again, the plain language of the Carnero Agreement does not support Carnero's theory of its rights as a threshold matter. The components of the Midstream Restructuring with which Carnero takes issue in this regard cannot be said to "block" any of Carnero's rights.

Each of Carnero's "blocking scheme" allegations presume that it had the right to choose receipt points under the Carnero Agreement. Section 2.1(a) of the Carnero Agreement states that "Producer will have sole discretion as to the location of each Additional CGP or additional well." (ECF No. 51-16 at 11). "Producer" is defined to mean Maverick (and, through the various ratifications, other defendants in this case). (ECF No. 51-16 at 2). An "Additional CGP" means an additional delivery or receipt point. (ECF No. 51-16 at 4, 5, 8). This unambiguously establishes that the defendants—not Carnero—had the right to create new connection points. Therefore, it does not affect Carnero's rights at all, even under its interpretation of the Springfield Amendments as requiring the defendants to get Springfield's consent to make a new receipt point or of the Maverick/Enterprise Purchase Agreement as requiring the consent of Enterprise. Nothing in the Carnero Agreement precludes such an arrangement. In any event, the defendants do not read the Springfield Amendments as granting Springfield a veto right, so Carnero's concern on this front is not supported by any evidence that the agreement will cause the defendants to breach the Carnero Agreement.

Carnero attempts to read ambiguity into the Carnero Agreement by arguing that its option to purchase Additional Plant Products in section 3.1 of the Carnero Agreement endows it with a

right to choose a receipt point for those products. But the provision Carnero points to explicitly states that "Carnero will have the option . . . to purchase those Additional Plant Products *at the points at which they were being sold under the Existing Commitment*." (ECF No. 51-16 at 14) (emphasis added). Again, the plain language is unambiguous. Carnero's only option under the Carnero Agreement is to purchase the Additional Plant Products, not to choose new receipt points for those products. Carnero reads this provision as allowing Carnero the right to purchase Additional Plant Products at any receipt point of its choice and it merely has the option to receiving them at the point at which they were being sold under the prior commitments.[14] This construction of the emphasized language above as granting it two options (whether *and* where to purchase products) is strained and not reasonable given the context of the provision and other language in the agreement which explicitly grants only the Producer the right to choose receipt points. Because Carnero does not have the right to create new receipt points or otherwise choose receipt points under the Carnero Agreement, Carnero's claims fail to the extent they argue that certain amendments made as part of the Midstream Restructuring interfered with that right.

Other nuances of Carnero's allegations with respect to what it deems "blocking schemes" fail as a matter of contract interpretation.

Carnero alleges that, as part of the Maverick/Enterprise Purchase Agreement, Enterprise was granted a "veto right" over changes to receipt points in the Carnero Agreement and delivery points under the Anadarko/Enterprise Purchase Agreement. This would, allegedly, negatively impact Carnero, which interprets the Carnero Agreement as granting it a right to receipt at *any*

[14] Carnero seems to triangulate this dual structure through its understanding of what duties the dedication in the Carnero Agreement imposed on Maverick. (ECF No. 112 at 153-155). While the dedication did impose a duty on Carnero's counterparties to deliver a product, there is nothing that says the Carnero Agreement could not designate specific sites or methods to determine how and where the product would be delivered, which it did. Even taking Carnero's understanding of the law on this front as true, finding an implied duty to deliver does not necessarily imply that Carnero has the right to choose receipt and delivery points.

point as soon as the primary term of the Anadarko/Enterprise Purchase Agreement ended. Aside from the flaws laid out above, Carnero's argument here ignores explicit provisions of the Maverick/Enterprise Purchase Agreement which prevent Maverick from altering Carnero's right to receipt under the Carnero Agreement. The Maverick/Enterprise Purchase Agreement includes language that prevents Maverick from modifying delivery points in "any way which would change or alter the option right set forth in Section 3.1(b) of the Carnero Purchase Agreement." (ECF No. 67-2 at 42, 43). Perhaps more detrimental to Carnero's argument on this front is that, by way of the language in the Maverick/Enterprise Purchase Agreement which provides it is subject to Carnero's exercise of its option to purchase at the end of the primary term of the Anadarko/Enterprise Purchase Agreement, if the Maverick/Enterprise Purchase Agreement dedication takes effect, it will be because *Carnero chose not to exercise its purchase option under the Carnero Agreement*. In that case, it should not matter to Carnero whether Enterprise has control over the location of receipt points because it will have waived its right to those products. At that stage, whether a receipt point conducive to Carnero's rights under the Carnero Agreement exists would be moot.

Carnero alleges that the Springfield Amendments expanded the defendants' delivery obligations by converting volume commitments to each of the ETC and Brasada plants into aggregate volume commitments. In simpler terms, Carnero's reading of the Springfield Amendments would prevent gas from flowing to Carnero until a specified volume encompassing the sum of the commitments to each of the Brasada and ETC plants had been delivered in aggregate. This is because Carnero alleges the Springfield Amendments relegated Carnero's only delivery point to an interruptible connection point to which the defendants agreed to not deliver anything until the volume exceeded the aggregate of both the Brasada and ETC agreements.

Carnero contends that, before the Springfield Amendments, Carnero could receive gas in excess of either agreement from two separate sites. Further, the defendants allegedly agreed that Springfield must consent to any additional delivery points, blocking Carnero's right to receipt.

While read in isolation, the language of the Springfield Amendments might be interpreted as turning the Brasada and ETC commitments into aggregate volume commitments, the definition of "Delivery Nomination" clarifies that the nomination applies individually to each customer at each delivery point. (ECF no. 67-2 at 270). Therefore, where the amendment reads "if the Brasada Processing Plant and . . . the ETC Processing Plant, are unable to process any portion or portions of Shipper's entire Delivery Nomination, at any time, then Shipper may submit nominations to . . . an Interruptible Connection Point(s)," it preserves the volume (not aggregate) nature of the ETC and Brasada Commitments as subject to two separate "Delivery Nominations." (ECF No. 67-2 at 422-423). This reading is supported by clarifying language in the amendment which specifies that "[f]or the sake of clarity, Shipper may nominate Gas volumes in excess of Shipper's obligations in the Brasada Processing Agreement and the ETC Processing Agreement to an Interruptible Connection Point."[15] (ECF No. 67-2 at 422-423).

**D. The Implied Duty to Cooperate**

Carnero alleges that the Midstream Restructuring constitutes the defendants' breach of an alleged implied duty to cooperate inherent in the Carnero Agreement absent breach of any express term of the agreement.

Texas law generally disfavors implied covenants, instead tending to construe contracts as they are written. *See In re Baerg Real Prop. Tr.*, 585 B.R. 373 (Bankr. N.D. Tex. 2018). Whether

[15] The defendants' motion for judgment on the pleadings relies on this interpretation of the Springfield Amendments and states that the defendants never intended to convert the Brasada and ETC commitments into aggregate volume commitments. (ECF No. 67 at 34, fn. 86).

an implied duty to cooperate is read into a contract is dependent upon the terms of the contract and the nature of the parties' performance as demanded by the contract. *See Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452 (5th Cir. 2003). "'Whenever cooperation is necessary for performance of a contract, there is an implied condition of contract that cooperation will be given.'" *Id.* (citing *Citizens Nat'l Bank of Orlando v. Vitt*, 367 F.2d 541, 544–45 (5th Cir.1966)). "A duty to cooperate implies that one party will not prevent the other party from performing the contract." *In re Baerg Real Prop. Tr.*, 585 B.R. at 590. (citing *Tex. Nat. Bank v. Sandia Mortg. Corp.*, 872 F.2d 692, 699 (5th Cir. 1989)).

The typical scenario where an implied duty to cooperate applies involves a party who is owed performance under a contract interfering with the other party's ability to render that performance (e.g., if a contractor owes work to a counterparty, the counterparty cannot interfere with the contractor's ability to render that performance). *See, e.g., Int'l Ship Repair & Marine Services, Inc. v. Great Lakes Drudge & Dock Co., LLC*, 2022 WL 398418 (S.D. Tex. Jan. 13, 2022), *report and recommendation adopted sub nom. Int'l Ship Repair & Marine Services, Inc. v. Great Lakes Dredge & Dock Co., LLC*, 2022 WL 393574 (S.D. Tex. Feb. 9, 2022). In *Int'l Ship Repair*, for example, the court found an implied duty to cooperate because the contract "reflect[ed] both sides' interest in the complete and timely performance of the work. Such complete and timely performance of the work was, necessarily, contingent upon both sides cooperating and efficiently agreeing upon change order items." *Id.*

The parties' performance under the Carnero Agreement cannot be comfortably analogized to these standard structures where courts tend to find an implied duty to cooperate. Carnero does not "owe" a *current* duty to the defendants such that the defendants' other agreements can be said to interfere with Carnero's performance of that duty in the manner contemplated by the implied

covenant. Instead, this is a situation where Carnero's rights to receive performance are predicated on matters outside Carnero's control, so no implied covenant to cooperate should be read into the plain, express terms of the agreement.

## III. THE MIDSTREAM RESTRUCTURING IS NOT ANTICIPATORY BREACH OF THE CARNERO AGREEMENT

Carnero argues in the alternative that, even if the assumption of the Master Settlement Agreement and associated amendments does not constitute breach of the Carnero Agreement, it constitutes *anticipatory* breach of the Carnero Agreement. This argument fails because, for the reasons stated above, the Master Settlement Agreement and associated amendments do not impermissibly extend the Existing Commitments or otherwise block any of Carnero's rights under the Carnero Agreement.

Anticipatory breach involves a party to a contract, whose performance is not yet due, indicating an intent to not perform under the terms of an agreement. *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004). To successfully argue anticipatory breach, the moving party must show "(1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party." *Id*. (citing *Taylor Pub. Co. v. Sys. Mktg. Co.*, 686 S.W.2d 213, 217 (Tex.App.-Dallas 1984, writ ref'd n.r.e.).

The Court agrees with the defendants' interpretation of the parties' obligations under the various agreements at issue. The defendants cannot be said to have anticipatorily breached the Carnero Agreement because they have not indicated an intent to do so by entering into the amendments associated with the Midstream Restructuring. To the contrary, the defendants have indicated only an intent to adhere to the letter of the Carnero Agreement and even argue that some of the amendments they adopted in conjunction with the Midstream Restructuring served to protect Carnero's rights under the Carnero Agreement. (ECF No. 67 at 11). Similarly, because the Court

holds that Carnero's rights are not impaired, Carnero cannot prove the third element of anticipatory repudiation: damages.

## IV. Declaratory Judgment

Based on its interpretation of the Carnero Agreement and Midstream Restructuring agreements, Carnero next asks the Court to declare provisions of the Midstream Restructuring agreements which conflict with the Carnero Agreement null and void. A court has discretion to issue declaratory judgment in a "case of 'actual controversy' within its jurisdiction." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting 28 U.S.C § 2201(a)). A Court's decision to issue a declaratory judgment is a three-step inquiry: "(1) whether an 'actual controversy' exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether "to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). The "actual case or controversy" requirement refers to an Article III case or controversy. *MedImmune, Inc.*, 549 U.S. at 127. Therefore, if there is no actual case or controversy, the Court lacks subject matter jurisdiction. The Court has broad discretion as to whether an exercise of its power to grant declaratory relief is necessary and appropriate.

Compare the situation here, for example to the case in *Hosp. Internists*, where the court found declaratory judgment necessary to prevent injury in the future based on a conflict between how a party was performing and the terms of an agreement. *Hosp. Internists of Austin, P.A. v. Quantum Plus, LLC*, 2019 WL 1922051 (W.D. Tex. Jan. 23, 2019). Here, no actual controversy exists between the parties regarding the proper interpretation of the at-issue agreements because the contractual terms are unambiguous and do not conflict with any provision of the Midstream Restructuring and Master Settlement Agreement. *See, e.g., Kelly Inv., Inc. v. Cont'l Common*

*Corp.*, 2001 WL 630467 (E.D. La. June 5, 2001) (finding, by contrast, that because the context of the contract rendered its meaning unclear, an actual controversy existed, and declaratory judgment was appropriate). There is no future, legal injury for the Court to prevent. Even if there is subject matter jurisdiction, the Court declines to issue the declaratory judgment proposed by Carnero where no conflict between or among the agreements exists which would render it necessary to declare any part of the Midstream Restructuring null as Carnero requests—particularly when that process was central to the debtors' ability to successfully reorganize.

### V. ATTORNEY'S FEES

Carnero's claims are barred by the Plan and Confirmation Order. Regardless, the underlying claims for breach and anticipatory breach of contract fail as a matter of law. Based on these findings, an award of attorney's fees is not appropriate.

## CONCLUSION

A separate judgment for the defendants will be issued.

SIGNED 02/02/2023

Marvin Isgur
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
February 02, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 19-34508** |
| **SANCHEZ ENERGY CORPORATION, *et al.*,** | § | |
| | § | **CHAPTER 11** |
| | § | |
| **Debtors.** | § | |
| | § | |
| **CARNERO G&P, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 22-3035** |
| | § | |
| **SN EF UNSUB, LP, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

**JUDGMENT**

All relief in Plaintiff's complaint (ECF No. 53-1) is denied. Costs are awarded against the Plaintiff.

SIGNED 02/02/2023

Marvin Isgur
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
February 16, 2023
Nathan Ochsner, Clerk

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P. n/k/a Javelin EF L.P., | § | |
| Mitsui E&P Texas LP, SN EF Maverick, | § | |
| LLC, Mesquite Comanche Holdings, | § | |
| LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |

**Order Authorizing the Filing of Carnero G&P, LLC's (I) Objection to the Amended Emergency Motion of Mesquite Defendants for Status Conference Under Seal and (II) Granting Related Relief**
[Relates to Docket No. 131]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Objection to the Amended Emergency Motion of Mesquite Defendants for Status Conference* (the "Objection") under seal; and (ii) granting related relief;

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.



13783095

013728

and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Objection under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Objection is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: February 16, 2023

Marvin Isgur
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
February 23, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**ORDER GRANTING DEFENDANTS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS TO REMAIN UNDER SEAL, AND (II) GRANTING RELATED RELIEF**

Upon consideration of Defendants' Emergency Motion (the "Motion to Seal") for entry of an order (i) authorizing *Defendants' Motion for Judgment on the Pleadings* (the "Motion for Judgment on the Pleadings") to remain under seal; and (ii) granting related relief; and the Court having reviewed the Motion to Seal, the Motion for Judgment on the Pleadings, and the court

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

having jurisdiction to consider the Motion to Seal and the relief requested herein and due and adequate notice of the Motion to Seal having been given under the circumstances; and sufficient cause appearing therefor, it is hereby ORDERED that:

1. The Motion for Judgment on the Pleadings is authorized to remain under seal;

2. The Defendants are authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion to Seal.

3. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: February 23, 2023

Marvin Isgur
United States Bankruptcy Judge