**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | § | Case No. 19-34508 (MI) |
| Debtors. | § | (Jointly Administered) |
| OCCIDENTAL PETROLEUM CORP., ANADARKO PETROLEUM CORPORATION, ANADARKO E&P ONSHORE LLC, ANADARKO ENERGY SERVICES COMPANY, KERR-MCGEE OIL & GAS ONSHORE LP, WESTERN MIDSTREAM PARTNERS LP, WGR OPERATING, LP, and SPRINGFIELD PIPELINE, LLC, | § | Adversary Proceeding<br>Case No. __________ |
| Plaintiffs, | § | |
| v. | § | |
| SANCHEZ ENERGY CORPORATION, SN CATARINA, LLC, and SN EF MAVERICK, LLC, | § | |
| Defendants. | § | |

1 The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

## COMPLAINT

Plaintiffs Occidental Petroleum Corporation ("**Occidental**"), Anadarko Petroleum Corporation ("**APC**"), Anadarko Energy Services Company ("**AESC**"), Anadarko E&P Onshore LLC ("**AEP**"), and Kerr-McGee Oil & Gas Onshore LP ("**KMOG**," and together with AEP, "**Anadarko**") (Anadarko, Occidental, APC, and AESC are referred to herein collectively as the "**Oxy Parties**"), and Western Midstream Partners LP ("**WES**"), WGR Operating, LP ("**WGR**") and Springfield Pipeline, LLC ("**Springfield**," and together with WES and WGR, the "**WES Parties**") (and the WES Parties together with the Oxy Parties, the "**Plaintiffs**"), by and through undersigned counsel, each bring this adversary proceeding against Sanchez Energy Corporation ("**SN Parent**"), SN Catarina, LLC ("**SN Catarina**"), and SN EF Maverick, LLC ("**SN Maverick**," and, together with SN Parent and SN Catarina, "**Sanchez**," or the "**Defendants**"), which are debtors and debtors in possession in these chapter 11 cases, and in support thereof state as follows:

## INTRODUCTION

This dispute arises from a 2017 sale to Sanchez and certain other purchasers of Anadarko's interest and operatorship in certain oil and gas leases and associated assets located in South Texas referred to as the "Comanche assets" (the "**Comanche Transaction**").

The complexity of the Comanche Transaction cannot be overstated. Through an intricate web of interdependent agreements—each of which was critical to the overall viability and purpose of the Comanche Transaction—Anadarko transferred not only its working interest in the oil and gas leases, but also the benefits and burdens of a turnkey operation comprised of midstream and downstream infrastructure contracts by which those interests could be monetized. From Sanchez's perspective, this interwoven package of agreements was not only critical to the transfer of the assets, but also to its ability to monetize its newly acquired oil and gas assets. From Anadarko's perspective, the package of agreements was designed to relieve it of the significant ongoing



AMERICAS 102749514

4824-9032-2625.1

015182

midstream and downstream obligations associated with such assets and formed the basis upon which Anadarko was willing to sell the Comanche assets. Each of these agreements was thus a necessary part of the Comanche Transaction and, collectively, was like a house of cards: the removal of any agreement would cause the transaction to collapse.

For many years before the Comanche Transaction, Anadarko acquired, developed, and carefully designed a comprehensive system to gather, process, and transport Comanche production downstream to customers. To that end, Anadarko contracted with several key midstream parties, each of whom made substantial investments in building out the necessary infrastructure to enhance and monetize the Comanche assets—infrastructure that would never have been built without specific and clear acreage dedications and/or long term commitments.

While the purpose of the Comanche Transaction was to transfer this comprehensive package of assets and contracts, a group of key assets could not be assigned because certain counterparties did not consent to their transfer. Included within this group were certain midstream and downstream contracts for the gathering, processing, transporting, and/or marketing of oil and gas produced from the Comanche area (the "**Retained Agreements**"). The Retained Agreements were, and are, critical parts of the tracks that allow the train that is the Comanche assets to run. Because that system requires substantial capital to build and maintain, most of the Retained Agreements required Anadarko to deliver certain minimum volumes of hydrocarbons or pay significant fees (the "**Minimum Volume Commitments**") to sufficiently compensate the counterparties for their investments.[2]

[2] Minimum Volume Commitments refer to the minimum volume of hydrocarbons that must be delivered to the applicable midstream or downstream counterparty in accordance with the applicable agreement transported in a certain specified time period and with respect to which payment of fees (whether in the form of reservation fees, deficiency fees or any other fees) is required for such volume of hydrocarbons, whether or not such hydrocarbons are actually gathered, processed, transported or otherwise delivered in accordance with the applicable agreement.

To facilitate the Debtors' acquisition of the Comanche assets in light of the counterparties' refusal to substitute Sanchez for Anadarko, Sanchez and Anadarko entered into two agency agreements (the "**Agency Agreements**"), whereby Sanchez would act as Anadarko's agent under the Retained Agreements. Sanchez would therefore receive the benefits of such agreements, but also take on Anadarko's obligations thereunder. The Agency Agreements were crucial to the consummation of the Comanche Transaction, as the Minimum Volume Commitments under the Retained Agreements were substantial. As a result, Anadarko would not have sold the Comanche leases and wells to Sanchez and the other purchasers (and lost its ability to deliver volumes in satisfaction of the Minimum Volume Commitments) without the assurance that Sanchez would perform all of Anadarko's obligations under the Retained Agreements pursuant to the Agency Agreements.

Moreover, at the time of contracting for the construction of the Comanche midstream and downstream infrastructure, Anadarko knew that all production from the Comanche field would be necessary to satisfy the Minimum Volume Commitment obligations under the Retained Agreements and the EFM Agreements (as defined below). As a result, Anadarko entered into certain marketing production agreements with the other working interest holders (the "**WI Production Marketing Agreements**"). These agreements gave Anadarko the right to market the other working interest holders' production pursuant to specific midstream and marketing agreements that existed at the time the WI Production Marketing Agreements were executed or that were entered into in accordance with the WI Production Marketing Agreements ("**Commitment Agreements**"), including, at the time that the WI Production Marketing Agreements were transferred to SN Maverick pursuant to the Downstream Marketing Agreements Assumption Agreement, each of the Retained Agreements and the EFM Agreements, and required

the other working interest holders to pay their proportionate share of the costs thereunder, including the Minimum Volume Commitments and related fees. While Anadarko agreed to assign these WI Production Marketing Agreements to Sanchez as part of the Comanche Transaction, it did so on the strict condition, imposed via the Agency Agreements, that Sanchez would not materially modify the WI Production Marketing Agreements without Anadarko's consent, including in a manner that would impair satisfaction of the Minimum Volume Commitments in the Retained Agreements.

Similarly, the purchase and sale agreement required that each other buyer enter into its own production marketing agreement with SN Maverick (in a form acceptable to Anadarko and as a condition to closing of the Comanche Transaction) that ensured such buyer's production would be committed to satisfy the Minimum Volume Commitments under the Retained Agreements and the EFM Agreements. Both the production marketing agreements with the buyers and the assignment and restrictions on the WI Production Marketing Agreements were key parts of the parties' bargain, as they that (i) ensured all working interest owners' hydrocarbons continued to be processed, transported, and marketed pursuant to the Retained Agreements and the EFM Agreements, (ii) required the other working interest holders to bear their proportionate share of the Minimum Volume Commitments thereunder and (iii) allowed Sanchez to meet its obligations under the Agency Agreements.

Another key part of the parties' bargain was the continued use by Sanchez and the other buyers of an oil and gas gathering system constructed and maintained by Springfield, a wholly-owned subsidiary of WES and an indirect, majority-owned subsidiary of Anadarko's parent, APC (the "**Springfield Gathering System**"). The Springfield Gathering System is comprised of interconnected pipelines that transport oil and gas from the Comanche wells to various processing

plants, including the gas processing plants maintained by the Retained Agreement counterparties. As part of the Comanche Transaction, Anadarko assigned, with Springfield's consent, its oil and gas gathering agreements with Springfield (the "**Original Springfield Agreements**") to SN Parent and one of the other buyers, Gavilan. To compensate Springfield (and its majority-owner, APC) for its upfront and continued investments in the Springfield Gathering System, Springfield required the gathering agreements be immediately amended to ensure the dedications and commitments under such agreements would constitute covenants running with the land that would bind Sanchez (and any other subsequent owners of its Comanche assets). The Springfield Gathering System was a critical component of the Comanche Transaction. As a subsidiary of WES and an affiliate of Anadarko, Springfield would not have agreed to an assignment of the Original Springfield Agreements to SN Parent and Gavilan unless Anadarko was willing to close on the transaction and Sanchez had agreed, via the Agency Agreements, to comply with the Retained Agreements—specifically, the Brasada Processing Agreement (defined below) to which WES's subsidiary, WGR, was a counterparty. Nor would Anadarko have been willing to sell the Comanche assets to Sanchez and the other buyers if not for the assignment of the Original Springfield Agreements and the dedications thereunder, as satisfaction of the Minimum Volume Commitments under the Retained Agreements and the EFM Agreements was dependent on production continuing to flow through the Springfield Gathering System before it could be delivered to the Retained Agreement and the EFM Agreements counterparties. Nor would the buyers have purchased the Comanche assets without guaranteed access to the Springfield Gathering System—the sole means by which the underlying hydrocarbons could be effectively monetized.

Another of the many ways the parties structured the Comanche Transaction to mitigate against the Minimum Volume Commitment obligations under the Retained Agreements, the

Springfield Agreements (defined below), and the EFM Agreements was through entry into the Development Agreement (defined below). Because the projected future production from the wells producing at the time of the Comanche Transaction was insufficient to satisfy the Minimum Volume Commitment obligations under the Retained Agreements, Springfield Agreements, and the EFM Agreements, the Development Agreement required the buyers to drill 60 wells annually for a five year term (which generally coincided with the term of the Minimum Volume Commitments in the Retained Agreements and the EFM Agreements) or pay Anadarko a $200,000 default fee for each undrilled well. Here too, the parties structured these commitments to constitute covenants running with the land that would be binding on Sanchez and subsequent owners of the Comanche leases.

The parties entered into many other agreements that formed integral parts of the Comanche Transaction, including (i) a joint operating agreement that transferred to the buyers the burdens and benefits of certain oil and gas leases that were retained by Anadarko due to the inability to obtain lessor consent (*i.e.*, the Joint Operating Agreement, as defined below), (ii) a license for seismic data owned by Anadarko (*i.e.*, the Seismic License, as defined below), and (iii) an agreement for the sharing of well cores (*i.e.*, the Core Sharing Agreement, as defined below).

Based on the allegations set forth below, this adversary proceeding seeks the following declarations from this Court: (i) the Springfield Agreements contain real covenants running with the land; (ii) alternatively, the Springfield Agreements contain equitable servitudes; (iii) the Development Agreement contains real covenants running with the land; (iv) alternatively, the Development Agreement contains equitable servitudes; (v) all or a portion of the Comanche Documents listed on Schedules I and II attached hereto form an integrated, non-severable

agreement; and (vi) granting Plaintiffs such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

2. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, the Plaintiffs consent to entry of final orders or judgment by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4. This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001(2), which allows for an adversary proceeding "to determine the validity, priority, or extent of a lien or other interest in property," Bankruptcy Rule 7001(7), which allows for an adversary proceeding "to obtain . . . equitable relief," and section 105(a) of the title 11 of the United States Code (the "**Bankruptcy Code**"). Declaratory relief is appropriate pursuant to Bankruptcy Rule 7001(9) and 28 U.S.C. § 2201. As set forth below, an actual legal controversy exists between Plaintiffs and Defendants.

## PROCEDURAL HISTORY

5. On August 11, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

6. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On August 12, 2019, the Court entered an order authorizing the joint administration and procedural consolidation of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

8. On April 30, 2020, the Court entered an order (the "**Confirmation Order**") confirming the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporations and Its Debtor Affiliates* (the "**Plan**").[3] To date, the Plan has not gone Effective (as defined therein).

9. In the typical bankruptcy proceeding, debtors resolve assumption and rejection issues under section 365 of the Bankruptcy Code before confirmation of a plan of reorganization. The Debtors in these Chapter 11 Cases waited until the literal eve of confirmation to identify the contracts that they sought to assume or reject. To allow them to quickly exit chapter 11, the Debtors proposed an atypical structure by which they could delay disputes regarding assumption and rejection issues until after confirmation—and even the effectiveness—of the Plan. Specifically, the Confirmation Order (as amended) and Plan established a post-confirmation deadline for counterparties to file objections to rejection or assumption and required the Court to adjudicate such objections prior to such contracts being assumed or rejected.[4] The Debtors were to list their executory contracts and unexpired leases on one of two schedules: an Assumption Schedule or a Rejection Schedule (each as defined below). Furthermore, the Confirmation Order reserved the Debtors and Reorganized Debtors'[5] ability to move executory contracts or unexpired leases from the Assumption Schedule to the Rejection Schedule (and vice versa) subject to a deadline.[6] Any executory contract or unexpired lease that is listed on the Assumption Schedule or

3 Docket No. 1212.

4 *E.g.*, Docket No. 1212 ¶¶ 17-25; Docket No. 1267.

5 As defined therein.

6 Docket No. 1212 ¶ 18.

the Rejection Schedule would be deemed assumed or rejected, as appropriate on the Effective Date (as defined in the Confirmation Order), if no party in interest objected to assumption or rejection before the objection deadline. Additionally, the Plan provides that any executory contract or unexpired lease that is not included on the Rejection Schedule or the Assumption Schedule is deemed assumed upon the Effective Date if no objections to assumption are received by the applicable objection deadline.[7]

10. The Plaintiffs objected to the confirmation of the Plan and the Debtors' proposed approach to rejection and assumption disputes,[8] but agreed to withdraw that objection subject certain negotiated language being added to the Confirmation Order that, among other things, fully preserved all of the Plaintiffs' defenses to any proposed rejection or assumption of contracts.[9]

11. On the eve of the confirmation hearing, April 29, 2020, the Debtors filed their *Notice of Filing of Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (as subsequently amended, the Exhibit B is the "**Rejection Schedule**" and Exhibit C is the "**Assumption Schedule**") containing over ninety (90) entries that identify one or more of the Oxy Parties or WES Parties as the applicable counterparties to the contracts on the Rejection Schedule or Assumption Schedule.[10]

12. Included on the Rejection Schedule, as amended, were the agreements listed on **Schedule I** attached hereto (such agreements, collectively, the "**Rejection Comanche Documents**"), which include the PSA, the Agency Agreements, the EFM Agreements, the EFM

7 Plan Art. V.A.

8 Docket No. 1164.

9 Docket No. 1187 Ex. A, at 2-4.

10 Docket No. 1197; *see also* Docket Nos. 1274, 1293, 1326.

Assignment Agreement, the Development Agreement, the Springfield Agreements, the Springfield Transport Agreement, and the UnSub Production Marketing Agreements (each defined below).[11]

13. Meanwhile, the Assumption Schedule included the agreements listed on **Schedule II** attached hereto (the "**Assumption Comanche Documents**," and, together with the Rejection Comanche Documents, the "**Comanche Documents**"), including the Specified Gathering Assumption Agreement, the Gavilan Production Marketing Agreements, the WI Production Marketing Agreements, the Core Sharing Agreement, and the Seismic License.

14. Further, the Joint Operating Agreement (as defined below) is a Comanche Document that was not on the Rejection Schedule or the Assumption Schedule and is thus slated for assumption upon the Effective Date as provided for in the Plan,[12] and is included on Schedule II hereto.

15. Contemporaneously with the filing of this Complaint, the Plaintiffs have filed their *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* (the "**Objection**"). In the Objection, the Plaintiffs object to the ability of the Debtors or Reorganized Debtors, as applicable, to seek to reject contracts after confirmation (and consummation) of a chapter 11 plan. This Complaint is filed, in an abundance of caution, to resolve issues related to other rejection objections raised in the Objection and in no way constitutes a waiver or admission of the ability of the Debtors or Reorganized Debtors to reject contracts after confirmation and/or consummation of its Plan.

[11] The Retained Agreements were also included on the Rejection Schedule. However, as discussed in the Objection (defined below) filed contemporaneously with this Complaint, the Plaintiffs object to the Debtors' proposed rejection of the Retained Agreements, because the Debtors are not a party to the Retained Agreements and therefore such agreements are not subject to section 365 of the Bankruptcy Code.

[12] Plan Art. V.A.

## PARTIES

16. Plaintiff Occidental is a corporation having its principal place of business at 5 Greenway Plaza Suite 110, Houston, TX 77046.

17. Plaintiff APC is a corporation having its principal place of business at 1201 Lake Robbins Drive, The Woodlands, Texas 77380.

18. Plaintiff AEP is a limited liability company having its principal place of business at 1201 Lake Robbins Drive, The Woodlands, Texas 77380.

19. Plaintiff AESC is a corporation having its principal place of business at 1201 Lake Robbins Drive, The Woodlands, Texas 77380.

20. Plaintiff KMOG is a limited partnership having its principal place of business at 1201 Lake Robbins Drive, The Woodlands, Texas 77380.

21. Plaintiff WES is a master limited partnership having its principal place of business at 9950 Woodloch Forest Drive, Suite 2800, The Woodlands, TX, 77380.

22. Plaintiff WGR is a limited partnership having its principal place of business at 9950 Woodloch Forest Drive, Suite 2800, The Woodlands, TX, 77380.

23. Plaintiff Springfield is a limited liability company having its principal place of business at 9950 Woodloch Forest Drive, Suite 2800, The Woodlands, TX, 77380.

24. Defendants are debtors and debtors-in-possession in the Chapter 11 Cases.[13]

[13] Plaintiffs do not concede that the Reorganized Debtors have any authority to reject executory contracts or unexpired leases post-Effective Date.

## FACTUAL ALLEGATIONS

### I. OVERVIEW OF THE COMANCHE TRANSACTION

#### A. The Comanche Transaction Was Complex and Consisted of an Interrelated Set of Agreements.

25. On January 12, 2017, pursuant to a Purchase and Sale Agreement (the "**PSA**") with AEP and KMOG, SN Parent (through two of its subsidiaries, SN EF UnSub, LP ("**UnSub**") and SN Maverick (together with UnSub, the "**SN Buyers**")) and Gavilan Resources LLC ("**Gavilan**" and together with the SN Buyers, the "**Buyers**")[14] acquired Anadarko's 49% average working interest in certain oil and gas leases granting the right to explore for and produce hydrocarbons on approximately 320,000 gross acres located in Dimmit, La Salle, Maverick, Webb, and Zavala Counties, Texas in the Eagle Ford shale and certain related assets (collectively, the "**Comanche Assets**") in exchange for cash, the assumption of certain obligations, and other forms of consideration set forth in the PSA and related transaction documents. The Comanche Transaction closed on March 1, 2017.

26. The principal aim of the PSA was that all of Anadarko's interests in the Comanche Assets, including the Comanche leases and the many related agreements, would be transferred to the Buyers who would assume all of the related liabilities for such assets. Most of the Comanche leases were assigned by various Assignments and Bills of Sale by which the Buyers acquired a fee determinable interest in the oil and gas in place beneath the lands associated with the assigned leases. The assignment of certain midstream and downstream contracts was accomplished by various assumption agreements (the "**Assumption Agreements**").[15] Certain leases and contracts

---

[14] At the time of the Comanche Transaction, Gavilan was known as Aguila Production, LLC and was listed as such in the transaction documents.

[15] *See* PSA § 11.15. The Assumption Agreements include the following agreements listed on the Rejection Schedule: a Springfield Gathering Assumption Agreement; Specified Midstream Assumption Agreement; and a

were not immediately transferrable, however, because the consent of certain counterparties was required. As contemplated by the PSA, Anadarko retained those leases and contracts while the parties sought the required consents, but provided the Buyers with access to the benefits of such assets by entering into a marketing transition services agreement (the "**Marketing Transition Services Agreement**").

27. Like in any complex transaction, the parties hit a roadblock along the way when several counterparties ultimately did not consent to the assignment of their leases or contracts. As discussed in greater detail below, through the PSA and a series of interlocking agreements, the parties had planned for this possibility and transacted around this issue.[16] The main workaround was the parties' entry into the Agency Agreements, which provided the Buyers with the benefit of certain unassignable contracts in exchange for SN Maverick and SN Catarina agreeing to act as Anadarko's agent and perform its obligations under such agreements.

28. The following visual depicts the transaction documents and the means by which certain assets were either assigned or retained:

Downstream Marketing Agreements Assumption Agreement. The Debtors, however, seek to assume only one of the Assumption Agreements: the Specified Gathering Assumption Agreement.

16 PSA § 13.4(b) & sched. 13.4.




### B. The Joint Operating Agreement Provides Buyers with the Benefit of Certain Retained Leases.

29. Among the assets that could not be transferred were certain oil and gas leases and wells. The parties solved for this in the PSA by having Anadarko retain such leases and entering into a joint operating agreement (the "**Joint Operating Agreement**") whereby SN Maverick was appointed as operator for such leases.[17] Pursuant to the Joint Operating Agreement, Anadarko retained ownership of such retained leases and wells, but held them for the benefit of Buyers. As the beneficial owners, Buyers are responsible for all of the costs and liabilities associated with the operations of the retained leases. Pursuant to the Joint Operating Agreement, SN Maverick is charged with the duty to operate the assets as a "reasonable prudent operator."[18]

17 *Id.* § 13.4(b)(i).

18 *See* Joint Operating Agreement Art. V.A.

**C. The Transition Services Agreements Provide Buyers with Access to Critical Services, While Anadarko Solicits Consents from Contract Counterparties.**

30. Due to the integrated and cohesive nature of the upstream, midstream, and downstream agreements, the PSA provided that the parties would work to gather consents to assignment from various contract counterparties after the closing of the transaction. To provide Buyers with access to the yet-to-be-assigned marketing contracts in the interim period, Anadarko, AESC, and SN Maverick executed the Marketing Transition Services Agreement. The Marketing Transition Services Agreement provided that Anadarko and AESC would serve as SN Maverick's agent to manage and administer its production under various marketing contracts, including the Original Springfield Agreements, the Retained Agreements, and the EFM Agreements during the interim transition period.

31. On or around June 1, 2017, the Marketing Transition Services Agreement terminated and, pursuant to the PSA, the parties contemporaneously entered into the Assumption Agreements in respect of the Original Springfield Agreements and the other marketing contracts for which consent was received, including the WI Production Marketing Agreements with the other Comanche working interest holders (discussed in detail below).[19] Under the Assumption Agreements, Anadarko assigned its interests in the subject contracts and SN Maverick, UnSub, Gavilan, and/or SN Parent, as applicable, assumed all of Anadarko's obligations and liabilities under such contracts.

---

[19] PSA § 11.15.

### D. The Agency Agreements Provide the Buyers with Access to Critical Processing and Marketing Services under the Retained Agreements.

32. During the transition period, it became clear that certain critical midstream and downstream contracts (*i.e.*, the Retained Agreements) would not be transferred because the counterparties would not consent to Anadarko's assignment to the Buyers. Among these Retained Agreements were the following midstream gathering and processing contracts: (i) that certain Gas Processing Agreement, by and between AEP and WGR, dated February 27, 2012 (as amended, the "**Brasada Processing Agreement**"), and (ii) that certain Gathering and Processing Agreement by and between AEP and ETC Texas Pipeline, Ltd., dated April 1, 2011 (the "**ETC Processing Agreement**" and together with the Brasada Processing Agreement, the "**Retained Midstream Agreements**").

33. Pursuant to the Brasada Processing Agreement, WGR—a wholly-owned subsidiary of WES—agreed to build a gas processing plant (the "**Brasada Plant**") in La Salle County, Texas for the Comanche gas production shipped via the Springfield Gathering System. As memorialized in the Brasada Processing Agreement and related amendments, WGR agreed to build the Brasada Plant at a substantial cost and provide gas processing services through June 2023 in consideration for certain dedications, fixed rates and Minimum Volume Commitments and related fees.

34. Pursuant to the ETC Processing Agreement, certain production from Comanche is transported and processed at ETC's La Grange, Chisolm, and Jackson Plants. In exchange for ETC providing gas processing services through June 2023, AEP agreed to certain fixed rates, Minimum Volume Commitments and related fees.

35. Certain marketing contracts also could not be assigned for lack of counterparty consent. These included: (i) the Enterprise Products Transportation Agreement; (ii) the Double Eagle/Kinder Morgan Throughput Agreement; (iii) the BP Crude Oil Sales Agreement; and (iv)

the Enterprise Products Purchase Agreement (collectively, the "**Retained Downstream Agreements**").[20] Each of the Downstream Agreements contains certain Minimum Volume Commitments and related fees.

36. As noted above, the parties had already solved for the lack-of-consent scenario in the PSA. Upon termination of the Marketing Transition Services Agreement, the Buyers and Anadarko would enter into the two Agency Agreements: (i) an agency agreement between Anadarko, SN Maverick, and SN Parent by which Anadarko appointed SN Maverick to act as its agent for the Retained Midstream Agreements (the "**Midstream Agency Agreement**"), and (ii) an agency agreement between Anadarko, AESC, SN Maverick, SN Catarina, and SN Parent by which Anadarko appointed SN Maverick and SN Catarina to act as its agents for the Retained Downstream Agreements (the "**Marketing Agency Agreement**").

37. The Agency Agreements served two primary purposes. *First*, they provided the Buyers with the benefits of Anadarko's contractual rights under the Retained Agreements, which were critical to monetizing production from the Comanche leases. *Second*, they were additional and significant consideration to Anadarko, who, despite divesting its working interests in Comanche, would remain a party to the Retained Agreements that each contained Minimum Volume Commitments and related deficiency fees. Under the Agency Agreements, SN Maverick and SN Catarina agreed to perform all of Anadarko's obligations under the Retained Agreements (including satisfying the Minimum Volume Commitments thereunder). Sanchez also agreed to indemnify Anadarko against any claims or other losses arising out of SN Maverick's or SN

[20] At the time of execution of the Marketing Agency Agreement, the EFM Agreements (described below) were also Retained Downstream Agreements and subject to the Marketing Agency Agreement.

Catarina's failure to comply with the Agency Agreements, including any claims or losses arising under or related to the Retained Agreements.

38. At the time of the transaction, Anadarko's exposure on account of Minimum Volume Commitments or deficiency fees under the Retained Agreements was substantial. Thus, it is no surprise that the Agency Agreements were fundamental to the deal, and without them, the transaction would have fallen apart. But the Agency Agreements do not operate in isolation. Various other agreements assigned or executed in connection with the Comanche Transaction work hand in hand with the Agency Agreements and are critical to the construct on which the Agency Agreements are premised.

### E. Various Marketing Agreements Ensure Production Is Committed to Performance of the Agency Agreements, Retained Agreements, and EFM Agreements.

39. Anadarko and Sanchez knew that all working interest holders' production from the Comanche field would be necessary to satisfy the Minimum Volume Commitment obligations under the Retained Agreements and the EFM Agreements. Accordingly, Anadarko took several steps to ensure that the Buyers and other working interest owners' production would be committed to Sanchez's performance of the Agency Agreements and the EFM Agreements.

40. As to the Buyers, each of them agreed in the PSA that all of its respective production and hydrocarbons attributable to the Comanche Assets would be transported and/or sold as provided in the Agency Agreements and that it would not elect to take its production in kind.[21] In support of that obligation, and as a condition to Closing under the PSA, Gavilan and UnSub entered into one or more production marketing agreements with SN Maverick (in a form acceptable to Anadarko) under which Gavilan and UnSub each agreed to commit its respective

21 *Id.* § 11.15(f).

production to SN Maverick and permit SN Maverick to market its production in accordance with the applicable Commitment Agreements, including the Retained Agreements and the EFM Agreements (the "**Gavilan Production Marketing Agreements**" and such agreement with UnSub the "**UnSub Production Marketing Agreement**").[22]

41. As to the other working interest owners, the WI Production Marketing Agreements were assigned to SN Maverick. These agreements consist of various Crude Oil, Residue Gas, and NGL marketing agreements with SM Energy Company ("**SM**") (which subsequently sold its interests to Venado Oil and Gas, LLC ("**Venado**")), Eagle Ford TX LP, a subsidiary of Korean National Oil Corporation ("**KNOC**") and Mitsui & Co. Ltd. ("**Mitsui**"). The assignment of the WI Production Marketing Agreements gave SN Maverick the right to market their production and use such production to satisfy its obligations under the Agency Agreements (including the Minimum Volume Commitments under the Retained Agreements and EFM Agreements).

42. Each of the Gavilan Production Marketing Agreements, UnSub Production Marketing Agreements and the WI Production Marketing Agreements requires the respective working interest holder to pay Sanchez for its proportionate share of the obligations under the Retained Agreements and EFM Agreements (discussed below), including the Minimum Volume Commitments and related fees thereunder.

43. While Anadarko agreed to assign the WI Production Marketing Agreements to SN Maverick as part of the Comanche Transaction, it did so only on the strict condition, imposed via the Agency Agreements, that such assigned WI Production Marketing Agreements not be materially modified without Anadarko's consent. Moreover, the Agency Agreements require SN Maverick to: (1) ensure the other working interest owners' production is processed, transported

---

22 *Id.* §§ 4.7, 5.8, 6.3(p).

and/or sold pursuant to the Retained Agreements; (2) take any and all actions necessary to ensure fulfillment of its obligations under the Retained Agreements before meeting any future commitments SN Maverick may enter into under the WI Production Marketing Agreements; and (3) take all actions necessary to ensure there are no modifications or alterations to the WI Production Marketing Agreements that would inhibit performance under the Retained Agreements. Further, pursuant to the Agency Agreements, SN Maverick is prohibited from consenting to the assignment of any WI Production Marketing Agreement without Anadarko's prior written consent.[23] In sum, Sanchez's rights under the WI Production Marketing Agreements were significantly limited by—and not intended to exist without—the restrictions set forth in the Agency Agreements and the Retained Agreements.

44. The assignment of the WI Production Marketing Agreements pursuant to the terms and restrictions set forth in the PSA, as well as entry into the Gavilan Production Marketing Agreement and UnSub Production Marketing Agreements, were key parts of Anadarko's and the Buyers' bargain, as it ensured that the other working interest owners' hydrocarbons continued to be processed, transported, and marketed pursuant to the Retained Agreements, that the other working interest holders continued to bear their proportionate share of the Minimum Volume Commitments thereunder and that Sanchez would be able to meet its obligations under the Agency Agreements.

[23] Midstream Agency Agreement § 3.1(r), Marketing Agency Agreement § 3.1(s).

### F. The EFM Agreements Are Temporarily Assigned, and Provide Buyers with Access to Transportation Services.

45. The PSA also contemplated Anadarko would assign two transportation agreements (collectively, the "**EFM Agreements**")[24] with Eagle Ford Midstream, LP, a subsidiary of NextEra Energy, to SN Maverick. But as with the Retained Agreements, the parties encountered a similar roadblock in obtaining counterparty consent. Initially, the EFM Agreements were made subject to the Marketing Agency Agreement. EFM, however, eventually consented to the assignment of the EFM Agreements, conditioned on Anadarko remaining liable for a SN Maverick default until such time EFM deemed SN Maverick creditworthy. To document the consent and assignment, AESC, SN Maverick and EFM entered into an Assignment and Consent to Assignment Agreement (the "**EFM Assignment Agreement**") whereby AESC agreed to "temporarily" assign, and SN Maverick agreed to accept and assume, all of AESC's rights and obligations under the EFM Agreements.

46. Given Anadarko's potential exposure, the EFM Assignment Agreement provides several layers of protection to Anadarko in case of a default by SN Maverick. First, the EFM Assignment Agreement provides that AESC has the right to immediately recall the temporary assignment of the EFM Agreements if SN Maverick fails to timely fulfill any obligations assumed under the EFM Assignment Agreement.

47. In addition, AESC also has the right to immediately recall the temporary assignment of the EFM Agreements if SN Maverick defaults under the Marketing Agency Agreement, even if it has not otherwise breached any of the EFM Agreements.

---

[24] A certain Firm Intrastate Transportation Agreement, dated January 17, 2012, and a certain Firm NGPA 311 Gas Transportation Agreement, dated January 17, 2012.

48. Finally, SN Maverick also indemnifies AESC and each of the Seller Indemnified Parties (as defined in the PSA) from any claims arising out of or resulting from SN Maverick's performance or lack of performance of the EFM Agreements or the EFM Assignment Agreement.

49. As additional insurance (and further demonstrating the interrelated nature of the Comanche Documents), both the PSA and the Marketing Agency Agreements were amended to provide that any breach by SN Maverick under the EFM Assignment Agreement (i) that is not cured prior to the time that Anadarko recalls the temporary assignment of the EFM Agreements would constitute a default under the PSA and (ii) will also be deemed to be an "Event of Default" under the Marketing Agency Agreement if Anadarko elects to recall the temporary assignment.[25]

### G. The Buyers Required an Assignment of the Original Springfield Agreements, Which Ensured Production for the Retained Agreements and EFM Agreements.

50. Just as the parties would not close without the Agency Agreements, they also would not close without an assignment of the Original Springfield Agreements. The Springfield Gathering System was specifically developed and constructed to facilitate the collection of produced reserves from the Comanche leases. Continued access and connection to Springfield Gathering System improves the value of the reserves (produced or unproduced) in the Comanche leases. The Springfield Gathering System was (and continues to be) the only available gathering system by which the Buyers would be able to monetize the Comanche Assets.

51. For this reason, the Buyers required that Anadarko assign to them the Original Springfield Agreements in order to close on the Comanche Transaction.[26] The assignment was also important to Anadarko in connection with the Agency Agreement because the ability of the

[25] Third Amendment to Purchase and Sale Agreement art. II; First Amendment to the Retained Marketing Contracts Services Agreement § 4.

[26] PSA § 11.15(a).

SN Buyers to satisfy the Minimum Volume Commitments under the Retained Agreements, Agency Agreements, and EFM Agreements was premised on production being gathered through the Springfield Gathering System.

52. In reliance on the overall deal that had been struck between Anadarko and the Buyers, Springfield consented to the assignment of its agreements to the Buyers.[27] Thus, following termination of the Marketing Transition Services Agreement, the parties executed a certain Springfield Gathering Assumption Agreement, whereby Anadarko assigned the Original Springfield Agreements to SN Parent (as to the assets acquired by SN Buyers under the PSA) and Gavilan (as to assets acquired by it under the PSA). As a subsidiary of WES and an affiliate of Anadarko, Springfield would not have agreed to an assignment of the Original Springfield Agreements to the SN Buyers and Gavilan but for the fact that Anadarko was willing to close on the transaction and SN Maverick, SN Catarina, and SN Parent had agreed, via the Agency Agreements, to comply with the Retained Agreements to which WES's subsidiary, WGR, was a counterparty.

53. Nor was Springfield willing to consent to an assignment of the Original Springfield Agreements in their then-current form. Springfield required additional comfort that SN Parent and Gavilan would meet their assigned obligations under the Original Springfield Agreements. Therefore, as part of the Comanche Transaction and immediately following such assignment, on June 1, 2017, Springfield entered into amended and restated agreements with each of SN Parent

27 A portion of the Springfield Gathering System consists of field compressors that are necessary to move gas from the receipt points to the Brasada Plant. These compressors need dry gas to operate, which can only come from the tailgate of the Brasada Plant. To facilitate this exchange, Springfield and AEP entered into a Firm Intrastate Gas Transportation Service Agreement (the "**Springfield Transport Agreement**"), which provides Springfield access to dry gas from the Brasada Plant tailgate that Springfield then pipes to the field to power the Springfield Gathering System's compressors. The Springfield Transport Agreement, which is integral to the continued functioning of the Springfield Gathering System, was also assigned to Sanchez in connection with the PSA.

and Gavilan: (i) a Second Amended and Restated Lease Dedication and Oil Gathering Agreement (such agreement with SN Parent, the "**Springfield OGA**"), and (ii) a Second Amended and Restated Lease Dedication and Gas Gathering Agreement (such agreement with SN Parent, the "**Springfield GGA**" and together with Springfield OGA, the "**Springfield Agreements**"). Texas law governs the Springfield Agreements.[28]

54. The Springfield Agreements amend and restate the Original Springfield Agreements to (i) make SN Parent a direct party, and (ii) state the parties' intent that the dedication, covenants, and commitments that existed in the Original Springfield Agreements run with the land.

55. Indeed, the Dedications in the Springfield Agreements provide that:

> [SN Parent] dedicates, covenants and commits to the System and performance of this Agreement (a) the Leases[29] (including all unproduced Gas that is attributable to the Leases), (b) all Wells other than the Excluded Wells and (c) the Dedicated Production. [SN Parent] acknowledges and agrees that the dedication, covenants and commitments set forth . . . under this Agreement are continuations of the dedication, covenants and commitments made by AEP in the [Original Springfield Agreements] (the "**Prior Dedication**"), to the extent (and only to the extent) that AEP assigned the Original Agreement to [SN Parent], and that the Prior Dedication has not been terminated or interrupted in any way by the entry into this Agreement.[30]

56. As set forth in the Springfield Agreements, the intent was clear that the dedication was to constitute a covenant running with the land or an equitable servitude:

> Each Party agrees that the dedication, covenants and commitments set forth in this Section 2 or in any other section under this Agreement are equitable servitudes and covenants running with the land with respect to (a) the Leases (including all unproduced Gas [or Oil] that is attributable to the Leases), (b) all Wells other than the

28 *E.g.*, Springfield GGA § 11.2, at 44.

29 The term "Lease," as used in the Springfield Agreements, is "[SN Parent's] or its Affiliates right title and interest in and to any lease, mineral interest (including specifically minerals in or under the ground) . . . within the Dedicated Area." *E.g.*, Springfield GGA, at 19.

30 *E.g.*, Springfield GGA § 2.

> Excluded Wells and (c) the Dedicated Production, and shall be binding on [SN Parent], [SN Parent's] Affiliates, and the successors and permitted assigns of [SN Parent] and [SN Parent's] Affiliates.[31]

57. SN Parent also conveyed to Springfield a surface easement and right of way carved out of its interest in the Comanche leases to "lay and maintain pipelines, and to install any other necessary equipment on and across" the Dedicated Area.[32]

58. The Springfield Agreements further burden the Comanche leases by providing that any transfer of SN Parent's rights under the leases must be made subject to the Springfield Agreements.[33]

59. SN Parent, as a party to the Springfield Agreements, has actual notice of their existence and the covenants, dedications, and commitments therein. Any successors to SN Parent's interest in the Comanche leases would also be charged with constructive notice of the Springfield Agreements because the PSA identified and assigned the Original Springfield Agreements, and the PSA is part of record title.

### H. The Development Agreement Ensures Production Is Sufficient to Meet the Minimum Volume Commitments Under the Retained Agreements, EFM Agreements, Agency Agreements, and Springfield Agreements.

60. Given the steeply-declining nature of hydrocarbon production from the Comanche Assets (*i.e.*, shale formation), the parties understood that the drilling of new wells would be required in order for the Buyers to meet the Minimum Volume Commitments under the Retained Agreements (for which they were obligated to perform pursuant to the Agency Agreement and PSA, as described above), the EFM Agreements, and Springfield Agreements. Thus, as additional insurance, Buyers and Anadarko entered into a Development Agreement (the "**Development**

---

[31] *E.g.*, *id.*

[32] *E.g.*, *id.* § 14.6, at 54.

[33] *E.g.*, *id.* § 2.

**Agreement**"), which was a condition to closing under the PSA[34] and part of the consideration for the Comanche Transaction.[35]

61. The Development Agreement, which is governed by Texas law,[36] obligates SN Maverick, UnSub, and Gavilan to complete and equip 60 gross wells for each 12-month period commencing on September 1, 2017 and continuing for a five-year term (for a total of 300 wells).[37] Within 10 days after the end of each 12-month period, Buyers are joint and severally liable to pay Anadarko a default fee of $200,000 for each well that they fail to complete within such period.[38]

62. In the Development Agreement, SN Parent guarantees the obligations of the SN Buyers.[39]

63. The Development Agreement also makes clear that the parties intended the agreement and the obligations of the drilling parties to be covenants running with the land:

> ***Covenants Running with Lands.*** The obligations of the Drilling Parties under this Agreement are partial consideration for Anadarko's conveyance of the Assets to the Drilling Parties under the Assignments, and such obligations touch and concern the Leases and lands and obligations related thereto, being things in existence, and shall be covenants running with the land. Such obligations shall burden each Drilling Party's interest, and the interest of any permitted successor or assign of such Drilling Party, in and to the Leases and the lands related thereto, for the benefit of Anadarko.[40]

64. As to notice of the dedication, the Development Agreement requires the parties to execute and record a memorandum of the Development Agreement in the real property records of

---

34 PSA §§ 4.7, 5.8, 6.3(l).

35 Development Agreement, at recital C.

36 *Id.* § 4.10.

37 *Id.* § 2.1.

38 *Id.* § 3.3.

39 *Id.* § 4.15.

40 *Id.* § 4.1 (formatting in original).

the counties where the Comanche leases are located.[41] On February 28, 2017, Anadarko and Buyers executed a Memorandum of Development Agreement dated effective July 1, 2016. This Memorandum of Development Agreement was filed with the county clerks of Dimmit, La Salle, Maverick, Webb, and Zavala Counties, and put the parties and their successors in interest on notice of the contents of the Development Agreement—including the covenants contained therein.

### I. Other Transaction Agreements Provide Valuable Licenses that Are Necessary for SN Buyers to Operate the Comanche Assets.

65. In connection with the transfer of the Comanche Assets, and as a condition precedent to closing,[42] several licenses that are critical to the operation of the Comanche Assets were transferred to the Buyers. Specifically, APC and the Buyers entered into a Non-Exclusive Seismic Data Use License, dated March 1, 2017 (the "**Seismic License**") and AEP and the Buyers entered into a Non-Exclusive Data Use License and Access Agreement, dated March 1, 2017 (the "**Core Sharing Agreement**"), the forms of which were attached as Exhibits to the PSA.

66. The Seismic License provides Buyers with a 25-year license to certain proprietary geological and geophysical information held by APC permitting the Buyers to access and use such seismic data in connection with their ownership and operation of the Comanche Assets.

67. The Core Sharing Agreement expressly states that it is entered into in connection with the PSA and provides the Buyers with access to certain well cores owned by AEP for a period of 25 years for the Buyers' use in connection with their ownership and operation of the Comanche Assets.

68. The Seismic License and Core Sharing Agreement provided the Buyers with critical information regarding the specific assets they were purchasing from Anadarko, and the parties

---

[41] *Id.* § 4.13.

[42] PSA §§ 4.7, 5.8, 6.3(m), 6.3(n).

would not have entered into the Seismic License and the Core Sharing Agreement if not for their entry into the other Comanche Documents.

## II. THE COMANCHE DOCUMENTS WORK TOGETHER TO ENSURE THAT THE PARTIES RECEIVE THE FULL BENEFIT OF THE COMANCHE TRANSACTION.

69. In sum, all of the Comanche Documents—including, without limitation, the PSA, Agency Agreements, Springfield Agreements, Development Agreement, WI Production Marketing Agreements, Gavilan Production Marketing Agreements, UnSub Production Marketing Agreement, Joint Operating Agreement, EFM Assignment Agreement, EFM Agreements, Seismic License, Core Sharing Agreement, the Marketing Transition Services Agreement and the Assumption Agreements—were either executed with, transferred pursuant to, or incorporated into the Comanche Transaction. Together, they provide the Debtors with ownership of the Comanche Assets and the means by which to monetize such assets, and ensure continued performance under the Retained Agreements and EFM Agreements thereby minimizing any future liabilities to Anadarko under such agreements.

70. The following diagram depicts how the agreements allow production from the Comanche area to flow from the leases and wells downstream to market:




71. Notably, these agreements work in tandem to minimize the disruption caused by the inability to transfer the Retained Agreements and the EFM Agreements in the following ways:

- *First*, the Agency Agreements require SN Maverick and SN Catarina, as Anadarko's agent, to perform all of Anadarko's obligations under the Retained Agreements and indemnify Anadarko for any losses incurred under such Retained Agreements.

- *Second*, to ensure production from the other working interest owners would be available to satisfy the Minimum Volume Commitments under the Retained Agreements and EFM Agreements, (i) the PSA requires each of SN Maverick, Gavilan, and UnSub to dedicate all of its production from the Comanche Assets to the performance of the Agency Agreements and not take its production in kind, and (ii) the PSA required that, as a condition to Closing, each of Gavilan and UnSub entered into certain production marketing agreements with SN Maverick in a form acceptable to Anadarko, pursuant to which Gavilan and UnSub agreed to commit its respective production to SN Maverick and to be marketed in accordance with the Retained Agreements and EFM Agreements.

- *Third*, the Agency Agreements require SN Maverick to perform its obligations under the WI Production Marketing Agreements, and not alter those agreements in any way that would inhibit SN Maverick's performance under the Retained Agreements.

- *Fourth*, the EFM Assignment Agreement provides that the Buyers receive access to the transportation services provided under the EFM Agreements, but also ensures Anadarko

has the ability to recall the assignment upon a SN Maverick default under the EFM Assignment Agreement or the Marketing Agency Agreement.

- *Fifth*, amendments to the PSA and Marketing Agency Agreement ensure a breach of the EFM Assignment Agreement or the EFM Agreements would give rise to events of default under such agreements.

- *Sixth*, the Springfield Agreements, which provide the Buyers with access to the Springfield Gathering System,[43] contain dedications, covenants and commitments that are covenants running with the land not susceptible to rejection, and the assignment and amendment of the Original Springfield Agreements ensured that volumes would continue to flow in satisfaction of the Minimum Volume Commitments and other obligations under the Retained Agreements, EFM Agreements, and Agency Agreements.

- *Seventh*, the Development Agreement, which was expressly intended to run with the land, is designed to ensure (i) sufficient development on the Comanche Assets, resulting in production volumes that satisfy the Minimum Volume Commitments in the Retained Agreements, EFM Agreements and Springfield Agreements, and (ii) the development of Anadarko's retained leases.

72. Together these agreements constitute the necessary terms and conditions pursuant to which the parties agreed to transact.

## III. THE DOCUMENTS RELATED TO, AND EXECUTED IN CONNECTION WITH, THE COMANCHE TRANSACTION FORM ONE INTEGRATED, NON-SEVERABLE AGREEMENT.

### A. The PSA Is Integrated and Non-Severable with the Comanche Documents.

73. As discussed above, the parties designed the PSA to maintain the comprehensive nature of the Comanche Transaction, which necessarily included executing and incorporating multiple ancillary documents, exhibits, and schedules, all of which form one integrated, non-severable agreement. The PSA is explicit on this point:

> THIS AGREEMENT, THE EXHIBITS AND SCHEDULES HERETO, THE TRANSACTION DOCUMENTS AND THE CONFIDENTIALITY AGREEMENT COLLECTIVELY CONSTITUTE THE ENTIRE AGREEMENT AMONG SELLER AND BUYER PERTAINING TO THE SUBJECT MATTER

[43] The continued functioning of the Springfield Gathering System is dependent upon the Springfield Transport Agreement.

> HEREOF AND SUPERSEDE ALL PRIOR AGREEMENTS, UNDERSTANDINGS, NEGOTIATIONS, AND DISCUSSIONS, WHETHER ORAL OR WRITTEN, OF SELLER AND BUYER PERTAINING TO THE SUBJECT MATTER HEREOF.[44]

In turn, the PSA defines "Transaction Documents" as "those documents executed and delivered pursuant to or in connection with this Agreement, including the Infrastructure Side Letter."[45] Further, the PSA expressly provides that "[a]ll of the Exhibits and Schedules referred to in this Agreement constitute part of this Agreement."

74. The documents that were executed and delivered in connection with the PSA (the forms of which were also attached as exhibits to the PSA) and thus constitute Transaction Documents (within the definition of the PSA) include, without limitation, the following Comanche Documents: the Assignments and Bills of Sale (PSA Ex. C-1); the Springfield Gathering Assumption Agreement (PSA Ex. H-1); Specified Midstream Assumption Agreement is Exhibit H-2; the Downstream Marketing Assumption Agreement (PSA Ex. H-3); the Specified Gathering Assumption Agreement (PSA Ex. H-4); the Core Sharing Agreement (PSA Ex. I); the Seismic License (PSA Ex. M); the Development Agreement (PSA Ex. N); the Joint Operating Agreement (PSA Ex. O); the Midstream Agency Agreement (PSA Ex. S-2); and the Marketing Agency Agreement (PSA Ex. S-1).

75. The PSA also contains numerous other references that further evidence the parties' intent to form one integrated agreement. For example, the PSA includes many of the Comanche Documents—including, without limitation, the Development Agreement, the Joint Operating

[44] PSA § 15.9(a) (capitalization in original).

[45] *Id.* at 24. Each of the Comanche Documents is a "Transaction Document" under the PSA.

Agreement, the Gavilan Production Marketing Agreements and the UnSub Production Marketing Agreements—as closing deliverables or conditions precedent to close under the PSA.[46]

76. The PSA also provides for the assignment of marketing and midstream agreements pursuant to the Assumption Agreements, and provides the mechanics for obtaining any required consents for such assignments and a workaround for when consent is not granted.[47] In that scenario, those agreements will be subject to the applicable Agency Agreement and the applicable Sanchez entity will perform such agreement as Anadarko's agent.

### B. The Comanche Documents Are Integrated, Non-Severable with the PSA.

77. The Comanche Documents themselves further demonstrate the intent that the PSA and Comanche Documents form one integrated, non-severable agreement.

78. As to the Agency Agreements, the recitals specifically reference that they are entered into "pursuant to schedule 13.4" of the PSA and that their "Effective Date" is the date of termination of the Marketing Transition Services Agreement under the PSA.[48] The Agency Agreements further provide that the "Parties agree and understand that the Parties have agreed to enter into this Agreement as a result of credit/assignment issues related to the PSA."[49] The Agency Agreements also explicitly incorporate by reference several provisions of the PSA.[50] Both Agency

[46] *See, e.g.*, PSA §§ 4.7, 5.8, 6.3(a), 6.3(l), 6.3(m), 6.3(n), 6.3(o), 6.3(p).

[47] *Id.* § 11.15 & sched. 13.4.

[48] Agency Agreements 1; *see also id.* Art. VI (providing that services under the agreement "shall commence on the date of termination of the Marketing Transition Services Agreement").

[49] *Id.* § 3.5 (all caps omitted).

[50] *See, e.g.*, *id.* § 3.6(B) ("claims for indemnification" to "be asserted and resolved according to . . . Section 8.9 of the PSA"); *id.* § 9.5 (to "be governed by the terms and conditions set forth in Section 15.13 of the PSA"); *id.* § 9.12 (confidentiality of "Section 12.2 of the PSA").

Agreements also provide that "[t]o the extent that any defined terms used in this Agreement are not otherwise defined here, they shall have the definition set forth in the PSA."[51]

79. As to the Development Agreement, several provisions refer to or incorporate sections of the PSA. Indeed, the recitals make clear their interrelatedness. Recital A explicitly mentions the PSA, where "Anadarko sold and assigned, and the Drilling Parties purchased and paid for, the Assets."[52] Recital B then notes the assignment of those assets "[a]s part of the transactions contemplated by the [PSA]." And Recital C provides as "[a]s part of the consideration for the sale of the Assets to the Drilling Parties, Anadarko desires the near-term development of the Assets," *i.e.*, the subject matter of the Development Agreement.[53] The Development Agreement goes on to state that it is "is subject to the Purchase Agreement, and nothing in this Agreement shall operate to limit, release, or impair any of Anadarko's or the Drilling Parties' respective rights, obligations, remedies, or indemnities in the Purchase Agreement," and that "[t]o the extent the terms and provisions of this Agreement are in conflict, or inconsistent, with the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control."[54] The Development Agreement also refers to the Springfield Gathering System in connection with equipping the wells completed under the Development Agreement by connecting them to Springfield's Receipt Points.[55]

---

51 *Id.* § 9.11.

52 Recital A also notes that terms that are used but not defined in the Development Agreement will have their meaning as specified in the PSA.

53 Section 4.1 of the Development Agreement further acknowledges the link between the Development Agreement and the PSA by noting the obligations of the parties under the Development Agreement are partial consideration for the assets being assigned under the PSA.

54 Development Agreement § 4.5.

55 *Id.* Art. 1, at p. 2-3 (defining "Equipping" as such activities and actions necessary "in order to flow Hydrocarbons . . . through the Rec[ei]pt Points to the Springfield Gathering System"); *id.* Art. 1, at p. 4 (defining "Receipt Points" as "the inlet of Gatherer's oil, gas and condensate measurement facilities existing now, or in the future,

80. As to the Springfield Agreements, the Springfield Gathering Assumption Agreement clearly refers to the integrated nature of the transaction.[56] The Springfield Gathering Assumption Agreement refers to the PSA and acknowledges the obligations of the parties to assign and accept assignment of the Original Springfield Agreements under the PSA.[57] The Springfield Gathering Assumption Agreement assigned the rights and obligations in the Original Springfield Agreements, but subject to the terms of the PSA.[58] Further, the Springfield Gathering Assumption Agreement limits any representations and warranties to those expressed in the Assumption Agreement, the PSA, and any other document delivered pursuant to the Agreement or the PSA.[59] It also provides that "THIS AGREEMENT AND THE PSA (INCLUDING THE OTHER TRANSACTION DOCUMENTS ENTERED INTO IN CONNECTION THEREWITH) COLLECTIVELY CONSTITUTE THE ENTIRE AGREEMENT AMONG ASSIGNOR AND ASSIGNEE PERTAINING TO THE SUBJECT MATTER HEREOF . . . ."[60] The Springfield Gathering Assumption Agreement also notes that it was "executed and delivered pursuant to the terms of the PSA," "is specifically made subject to" the PSA, "is intended to be supplemental to and not duplicative or in conflict with" the PSA, and that, in the event of a conflict, the PSA would control.[61] The Original Springfield Agreements were assigned as part of the Comanche Transaction. As explained above, the parties would not have consummated the Comanche Transaction without the assignment of the Original Springfield Agreements. And the parties

where Gatherer receives production from the Drilling Parties"); *id.* Art. 1, at p. 3 (defining "Gatherer" as "Springfield Pipeline LLC").

56 The form of the Springfield Gathering Assumption Agreement is attached to the PSA.

57 Springfield Gathering Assumption Agreement, at recitals.

58 *Id.* §§ 1.1, 1.2.

59 *Id.* § 2.2.

60 *Id.* § 6.5.

61 *Id.* § 6.1.

would not have assigned the Original Springfield Agreements without the undertakings and protections to Anadarko in the Springfield Gathering Assumption Agreement and the Agency Agreements.

81. As to the EFM Assignment Agreement, it expressly notes that it "is executed and delivered pursuant to the terms of the PSA and is specifically made subject to the terms, conditions, and covenants contained therein," and in the event of any conflict with the terms of the PSA, the PSA controls.[62] Both the PSA and the Marketing Agency Agreements were amended to provide that any breach by SN Maverick under the EFM Assignment Agreement will also be a default under the PSA and Marketing Agency Agreement if Anadarko recalls the temporary assignment of the EFM Agreements.[63] The EFM Assignment Agreement and PSA together impose strict restrictions on SN Maverick's and EFM's ability to amend the EFM Agreements and were intended to function as an integrated supplement thereto. The EFM Agreements were assigned as part of the Comanche Transaction pursuant to the EFM Assignment Agreements. The parties would not have consummated the Comanche Transaction without the assignment of the EFM Agreements. And the parties would not have assigned the EFM Agreements without the undertakings and protections for Anadarko contained within the EFM Assignment Agreements.

### C. The Agency Agreements Are Integrated and Non-Severable with the WI Production Marketing Agreements.

82. By their very nature, the Agency Agreements are dependent on the WI Production Marketing Agreements, as Sanchez would be unable to perform its duties under the Agency Agreements without continued access to the WI Production Marketing Agreements. The Agency

---

62 EFM Assignment Agreement § 26.

63 Third Amendment to Purchase and Sale Agreement art. II; First Amendment to the Retained Marketing Contracts Services Agreement § 4.

Agreements make this clear. The Marketing Agency Agreement defines the (WI) "Production Marketing Agreements" as "those certain agreements set forth on Exhibit B, which is attached hereto and incorporated herein for all purposes."[64] While the WI Production Marketing Agreements were assigned as part of the Comanche Transaction, Anadarko would not have agreed to such assignment or entered into the other Comanche Documents if not for the protections set forth in the Agency Agreements that limit Sanchez and the counterparties' rights to amend such agreements. Specifically, the Agency Agreements limit the Sanchez counterparties' rights under the WI Production Marketing Agreements through covenants that bar them from modifying, altering, revising, extending, or amending, among other agreements, the WI Production Marketing Agreements in any manner that would adversely impact the Sanchez counterparties' ability to satisfy their obligations to Anadarko, including under the Retained Agreements.[65] The Agency Agreements further require the Sanchez counterparties to "take any and all actions necessary to ensure [the] fulfillment of [their] obligations under the [Retained Agreements] before meeting any future commitments [they] may enter into under the [WI] Production Marketing Agreements."[66] Moreover, the Marketing Agency Agreement prohibits the Sanchez counterparties from assigning any WI Production Marketing Agreement without Anadarko's prior written consent.[67] In sum, without continued access to the WI Production Marketing Agreements, the Agency Agreements become a dead letter, plainly showing such agreements were intended to be integrated and non-severable.

[64] Marketing Agency Agreement, at 3. The Midstream Agency Agreement includes a similar definition of Production Marketing Agreement, but a typo misidentifies the exhibit reference, which is not a list of the Production Marketing Agreements but rather the "Transportation Agreements," as defined in the Midstream Agency Agreement. *See* Midstream Agency Agreement, at 3 & Ex. A.

[65] *E.g.*, Marketing Agency Agreement § 3.1(i).

[66] *E.g.*, *id.* § 3.1(r).

[67] *See id.* § 9.4.

## COUNT I

**(Declaratory Judgment that the Springfield Agreements Contain Covenants Running with the Land)**

83. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

84. An actual controversy exists as to whether the Springfield Agreements contain covenants running with the land such that they are real property interests.

85. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to the Debtors, Plaintiffs, and all parties-in-interest as to whether the Debtors may reject the Springfield Agreements, which they have sought to do.

86. Texas law governs whether the Springfield Agreements contain covenants running with the land.

87. Under Texas law, a covenant runs with the land when: (i) it touches and concerns the land; (ii) it relates to a thing in existence or specifically binds the parties and their assigns; (iii) the parties to the covenant intend it to run with the land; (iv) the successor to the burden has notice; and (v) there is privity of estate between the parties to the agreement.

88. The covenants contained in the Springfield Agreements touch and concern the land because they both benefit and burden SN Parent's interest in the Comanche leases, thereby impacting SN Parent's use, value and enjoyment of the Comanche leases:

a) The covenants contained in the Springfield Agreements benefit SN Parent's interest in the Comanche leases by allowing SN Parent to use and enjoy the leases for their intended purpose—the production of hydrocarbons—while increasing the value of SN Parent's unproduced reserves;

b) The covenants contained in the Springfield Agreements burden SN Parent's interest in the Comanche leases because (1) SN Parent's grant of a surface easement, carved out of its interest in the Comanche leases, to Springfield reduces SN's real property interest under the Comanche leases; (2) SN Parent's ability to utilize its reserves are limited by the Dedications, thereby

> diminishing the value of its reserves; (3) the Springfield Agreements include fixed gathering fees; and (4) any transfer of SN Parent's rights under the Comanche leases must be made subject to the Springfield Agreements.

89. The covenants contained in the Springfield Agreements relate to a thing in existence: SN Parent's interest in the Comanche leases.

90. The covenants contained in the Springfield Agreements specifically bind SN Parent, Springfield and their assigns.

91. The covenants contained in the Springfield Agreements were intended by the parties to run with the land. For example, the Springfield Agreements specifically provide that the parties agree that such covenants are covenants running with the land:

> Each Party agrees that the dedication, covenants and commitments set forth in this Section 2 or in any other section under this Agreement ***are equitable servitudes and covenants running with the land with respect to*** (a) the Leases (including all unproduced Gas [Oil] that is attributable to the Leases), (b) all Wells other than the Excluded Wells and (c) the Dedicated Production, ***and shall be binding on [SN Parent], [SN Parent's] Affiliates, and the successors and permitted assigns of [SN Parent] and [SN Parent's] Affiliates***.[68]

92. The Springfield Agreements provide that any sale or transfer of SN Parent's interest in the Comanche leases is to be made subject to the Springfield Agreements, including the "dedication, covenants, and commitments" contained therein.[69]

93. The Defendants were on notice as to the burden imposed by the covenants contained in the Springfield Agreements because they or their affiliates are the original parties to the Springfield Agreements. Any assignee would have constructive notice because the assignment

---

[68] *E.g.*, Springfield OGA § 2 (emphasis added).

[69] *E.g.*, *id.* § 2.

of the oil and gas leases refers to the PSA which, in turn, refers to the Original Springfield Agreements.

94. Vertical privity is satisfied for several reasons including: (i) Springfield is an original party to the Original Springfield Agreement; (ii) SN Parent was assigned via the Springfield Gathering Assumption Agreement all of Anadarko's rights, title and interest to the Original Springfield Agreements, which were then amended and restated via the Springfield Agreements; and (iii) the Springfield Agreements expressly bind successors and assigns.

95. To the extent horizontal privity is required, there is horizontal privity between the parties to the Springfield Agreements for several reasons including: (1) the parties entered into the Springfield Agreements in connection with the Comanche Transaction and (2) the Springfield Agreements each grant and convey to Springfield a surface easement and right of way carved out of SN Parent's leasehold estate.

96. Accordingly, the Springfield Agreements contain covenants running with the land.

## COUNT II

### (Declaratory Judgment, in the Alternative, that the Springfield Agreements Contain Equitable Servitudes)

97. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

98. An actual controversy exists as to whether the Springfield Agreements contain equitable servitudes such that they are real property interests.

99. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to the Debtors, Plaintiffs, and all parties-in-interest as to whether the Debtors may reject the Springfield Agreements, which they have sought to do.

100. Texas law governs whether the Springfield Agreements contain equitable servitudes.

101. Under Texas law, even if some of the requirements for a covenant running with the land are missing, a covenant may still run with the land in equity as an equitable servitude if: (1) the successor to the burdened land took its interest with notice of the restriction; (2) the covenant limits the use of the burdened land; and (3) the covenant benefits the land of the party seeking to enforce it.

102. SN Parent had actual notice of the covenants contained in the Original Springfield Agreements, as amended and restated in the Springfield Agreements, when it took assignment of the Comanche leases. Any assignee would have constructive notice because the assignment of the oil and gas leases refers to the PSA which, in turn, refers to the Original Springfield Agreements.

103. The covenants contained in the Springfield Agreements burden SN Parent's interest in the Comanche leases for several reasons including: (1) SN Parent's grant and conveyance of a surface easement, carved out of its interest in the Comanche leases, to Springfield reduces SN Parent's real property interest under the Comanche leases, thereby impacting SN Parent's use, value and enjoyment of the leases; (2) SN Parent's ability to utilize its reserves are limited by the Dedications, thereby diminishing the value of its reserves; (3) the Springfield Agreements include fixed gathering fees; and (4) any transfer of SN Parent's rights under the Comanche leases must be made subject to the Springfield Agreements.

104. The covenants contained in the Springfield Agreements benefit the Springfield Gathering System and Springfield's underlying real property easements because they ensure there is sufficient production available for transportation in the system and to satisfy associated Minimum Volume Commitments.

105. Accordingly, the Springfield Agreements contain equitable servitudes.

## COUNT III

**(Declaratory Judgment that the Development Agreement Contains Covenants Running with the Land)**

106. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

107. An actual controversy exists as to whether the Development Agreement contains covenants running with the land such that they are real property interests.

108. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to the Debtors, Plaintiffs, and all parties-in-interest as to whether the Debtors may reject the Development Agreement, which they have sought to do.

109. Texas law governs whether the Development Agreement contains covenants running with the land.

110. Under Texas law, a covenant runs with the land when (i) it touches and concerns the land; (ii) it relates to a thing in existence or specifically binds the parties and their assigns; (iii) the parties to the covenant intend it to run with the land; (iv) the successor to the burden has notice; and (v) there is privity of estate between the parties to the agreement.

111. The covenants contained in the Development Agreement touch and concern the land because they both benefit and burden SN Buyers' interest in the Comanche leases, thereby impacting SN Buyers' use, value and enjoyment of the Comanche leases:

a) The covenants contained in the Development Agreement benefit SN Buyers' interest in the Comanche leases by (1) obligating SN Maverick and Gavilan to drill and complete a total of 300 wells over a five-year term commencing on September 1, 2017 (60 wells per year); (2) enabling SN Buyers to use and enjoy the Comanche leases for their intended purpose: the production of hydrocarbons; (3) enhancing the value of SN Buyers' interest in the Comanche leases by the production of hydrocarbons and allowing SN Buyers to perpetuate their valuable leasehold interests; and (4)

backstopping the Minimum Volume Commitments under the Retained Agreements and the EFM Agreements (which SN Parent was obligated to satisfy) and the Springfield Agreements via continued production.

b) The covenants contained in the Development Agreement burden SN Buyers' interest in the Comanche leases by (1) dictating exactly how the SN Buyers must use and develop their oil and gas leases; (2) restricting SN Buyers' ability to drill and develop the Comanche Asset at their own pace or otherwise adjust their drilling plan to account for economic and other environmental factors; (3) binding SN Buyers' successors and assigns to drilling requirements for the benefit of Anadarko; and (4) rendering the Comanche leases less attractive to potential buyers that may desire to develop the Comanche leases at a different pace than is required by the Development Agreement.

112. The covenants contained in the Development Agreement relate to a thing in existence: SN Buyers' interest in the Comanche leases.

113. The covenants contained in the Development Agreement specifically bind Anadarko, SN Buyers and their assigns.

114. The covenants contained in the Development Agreement were intended by the parties to run with the land. For example, the Development Agreement specifically provides that the parties agree that such covenants are covenants running with the land:

> ***Covenants Running with Lands***. The obligations of the Drilling Parties under this Agreement are partial consideration for Anadarko's conveyance of the Assets to the Drilling Parties under the Assignments, and such obligations touch and concern the Leases and lands and obligations related thereto, being things in existence, and shall be covenants running with the land. Such obligations shall burden each Drilling Party's interest, and the interest of any permitted successor or assign of such Drilling Party, in and to the Leases and the lands related thereto, for the benefit of Anadarko.[70]

115. The Debtors were on notice as to the burden imposed by the covenants contained in the Development Agreement because they or their affiliates are parties to the Development Agreement. Any successor is on notice of the Development Agreement because the Memorandum

[70] Development Agreement § 4.1.

of Development Agreement dated effective July 1, 2016 was filed with the county clerks of Dimmit, La Salle, Maverick, Webb, and Zavala Counties.

116. Vertical privity is satisfied for several reasons including (i) SN Buyers and Anadarko are the original parties to the Development Agreement, and (ii) the Development Agreement expressly bind successors and assigns.

117. To the extent horizontal privity is required, there is horizontal privity between the parties to the Development Agreement. For example, the Development Agreement was executed in connection with the conveyance of the Comanche leases from Anadarko to SN Buyers. The Development Agreement provides that "[t]he obligations of the Drilling Parties under this Agreement are partial consideration for Anadarko's conveyance of the Assets to the Drilling Parties under the Assignments."[71] Additionally, Anadarko retained ownership of leases and wells located in the same Comanche area in those circumstances where it could not obtain lessor consent.

118. Accordingly, the Development Agreement contains covenants running with the land.

**COUNT IV**

**(Declaratory Judgment, in the Alternative, that the Development Agreement Contains Equitable Servitudes)**

119. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

120. An actual controversy exists as to whether the Development Agreement contains equitable servitudes such that they are real property interests.

---

71 *Id.* § 2.1.

121. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to the Debtors, Plaintiffs, and all parties-in-interest as to whether the Debtors may reject the Development Agreement, which they have sought to do.

122. Texas law governs whether the Development Agreement contains equitable servitudes.

123. Under Texas law, even if some of the requirements for a covenant running with the land are missing, a covenant may still run with the land in equity as an equitable servitude if: (1) the successor to the burdened land took its interest with notice of the restriction; (2) the covenant limits the use of the burdened land; and (3) the covenant benefits the land of the party seeking to enforce it.

124. SN Buyers had actual notice of the covenants contained in the Development Agreement because they are the original parties to the Development Agreement. Any successor is on notice of the Development Agreement because the Memorandum of Development Agreement dated effective July 1, 2016 was filed with the county clerks of Dimmit, La Salle, Maverick, Webb, and Zavala Counties.

125. The covenants contained in the Development Agreement burden SN Buyers' interest in the Comanche leases by: (1) dictating exactly how the SN Buyers must use and develop their oil and gas leases; (2) restricting SN Buyers' ability to drill and develop the Comanche Asset at their own pace or otherwise adjust their drilling plan to account for economic and other environmental factors; (3) binding SN Buyers' successors and assigns to drilling requirements for the benefit of Anadarko; and (4) rendering the Comanche leases less attractive to potential buyers that may desire to develop the Comanche leases at a different pace than is required by the Development Agreement.

126. The covenants contained in the Development Agreement benefit Anadarko's retained leases that will continue to be developed pursuant to the Development Agreement.

127. Accordingly, the Development Agreement contains equitable servitudes.

## COUNT V

### (Declaratory Judgment that the Comanche Documents Form a Single, Integrated and Non-Severable Contract)

128. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

129. An actual controversy exists as to whether all or a portion of the Comanche Documents form a single, integrated, non-severable contract.

130. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to the Debtors, Plaintiffs, and all parties-in-interest as to whether the Debtors may reject the Rejection Comanche Documents, which they have sought to do.

131. Texas law governs all of the Comanche Documents.

132. Under Texas law, whether agreements are integrated and non-severable may depend on: (1) the intent of the parties; (2) the subject matter of the agreement; and (3) the conduct of the parties. The primary determinant is the intent of the parties as expressed by the instruments.

133. The parties intended that the Comanche Documents would constitute a single, integrated, non-severable agreement. The language and provisions of the Comanche Documents evidence this intent.

134. Although contained in several instruments, some of which were executed at different times, all of the Comanche Documents were either executed with, transferred pursuant to, or incorporated into a single, integrated, non-severable transaction (i.e., the Comanche Transaction) and, as such, must be interpreted together.

135. The EFM Agreements were temporarily assigned to SN Maverick as part of the Comanche Transaction.

136. The EFM Agreements would not have been temporarily assigned to SN Maverick without the protections provided to Anadarko in (and the other terms and conditions of) the other Comanche Documents, including, without limitation, the EFM Assignment Agreement, the PSA, and the Agency Agreements.

137. The parties did not intend SN Maverick to have rights under the EFM Agreements without the restrictions and burdens contained in the other Comanche Documents, including, without limitation, the EFM Agreements, PSA, and the Agency Agreements.

138. The WI Production Marketing Agreements were assigned to SN Maverick as part of the Comanche Transaction.

139. The other Comanche Documents would not have been entered into without the assignment to SN Maverick of the WI Production Marketing Agreements.

140. The WI Production Marketing Agreements would not have been assigned to SN Maverick without the entry into the other Comanche Documents, including, without limitation, the protections provided to Anadarko in the Agency Agreements.

141. The parties never intended SN Maverick to have rights under the WI Production Marketing Agreements without, and independent from, the restrictions placed on such rights in the Agency Agreements and PSA, including, without limitation, with respect to Sanchez's ability to modify or amend such agreements.

142. As part of the Comanche Transaction, the Original Springfield Agreements were assigned to SN Parent and Gavilan and, immediately following such assignment, were amended and restated as the Springfield Agreements.

143. The other Comanche Documents would not have been entered into without the assignment to SN Parent and Gavilan of the Original Springfield Agreements and the subsequent amendment and restatement thereto.

144. The Original Springfield Agreements would not have been assigned to SN Parent and Gavilan, and amended and restated as the Springfield Agreements, without the entry into the other Comanche Documents, including, without limitation, the protections provided in the Agency Agreements and the Development Agreement.

145. Each of the Comanche Documents form an integral part of the Comanche Transaction and the parties would not have entered into any Comanche Document without each of the other Comanche Documents.

146. The plain language of the Comanche Documents, as well as the facts and circumstances surrounding their negotiation, execution, and implementation, demonstrates that the various Comanche Documents were necessary and integral to the Comanche Transaction and to effectuate a seamless and wholesale transfer of ownership, operation and liabilities of the Comanche Assets to the Buyers.

147. The shared subject matter of the agreements further demonstrates that they are integrated and non-severable.

148. The conduct of the parties, including their performance under the agreements, also demonstrates that the agreements are integrated and non-severable.

149. Accordingly, all or a portion of the Comanche Documents form a single, integrated, non-severable agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment as follows:

I. On Count I, declaring that the Springfield Agreements contain real covenants running with the land;

II. On Count II, declaring that the Springfield Agreements contain equitable servitudes;

III. On Count III, declaring that the Development Agreement contains real covenants running with the land;

IV. On Count IV, declaring that the Development Agreement contains equitable servitudes;

V. On Count V, declaring that all or a portion of the Comanche Documents constitute a single, integrated, non-severable agreement; and

VI. Granting Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted this 22nd day of June, 2020.

*/s/ Jason S. Brookner*
Jason S. Brookner (Texas Bar No. 24033684)
James J. Ormiston (Texas Bar No.15307500)
Jonathan M. Hyman (Texas Bar No. 24032455)
**GRAY REED & McGRAW LLP**
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
jormiston@grayreed.com
jhyman@grayreed.com

-and-

Philip B. Jordan (Texas Bar No. 24067695)
Lydia R. Webb (Texas Bar No. 24083758)
**GRAY REED & McGRAW LLP**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: pjordan@grayreed.com
lwebb@grayreed.com

*Attorneys for the WES Parties*

*/s/ Thomas E Lauria*
Thomas E Lauria (Texas Bar No. 11998025)
Amanda Parra Criste (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: tlauria@whitecase.com
aparracriste@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

-and-

Jason Zakia (admitted *pro hac vice*)
Erin Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 6060-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
jzakia@whitecase.com
erin.rosenberg@whitecase.com

*Attorneys for the Oxy Parties*

## SCHEDULE I[1]

### Rejection Comanche Documents

1) Purchase and Sale Agreement, dated January 12, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation, as amended, including by that Amendment to Purchase and Sale Agreement, dated as of March 1, 2017, that Second Amendment to Purchase and Sale Agreement, dated effective as of March 1, 2017 and that Third Amendment to Purchase and Sale Agreement, dated June 28, 2017 ("**PSA**")

2) Development Agreement, dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation ("**Development Agreement**")

3) Memorandum of Development Agreement (Dimmit County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

4) Memorandum of Development Agreement (La Salle County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

5) Memorandum of Development Agreement (Maverick County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

6) Memorandum of Development Agreement (Webb County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

7) Memorandum of Development Agreement (Zavala County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

[1] The agreements set forth on Schedule I shall include all amendments thereto.

8) Retained Midstream Contracts Services Agreement, dated as of the Effective Date (June 1, 2017) by and among SN EF Maverick, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and Sanchez Energy Corporation ("**Midstream Agency Agreement**")

9) Retained Marketing Contracts Services Agreement, dated as of the Effective Date (June 1, 2017) by and among SN EF Maverick, LLC, SN Catarina, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017 ("**Marketing Agency Agreement**")

10) Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017 ("**Springfield GGA**")

11) Agreement to Amend Gas Gathering Agreements, dated June 1, 2017 between Springfield Pipeline LLC, Sanchez Energy Corporation and Gavilan Resources, LLC

12) Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation ("**Springfield OGA**")

13) Firm Intrastate Gas Transportation Services Agreement, dated March 1, 2013, by and between Springfield Pipeline LLC and SN EF Maverick (as assignor of Anadarko E&P Onshore LLC), including any Attachment to Firm Intrastate Gas Transportation Service Agreement (the "**Springfield Transport Agreement**")

14) Springfield Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sanchez Energy Corporation, and Gavilan Resources, LLC

15) Downstream Marketing Agreements Assumption Agreement, dated as of June 1, 2017 by and between Anadarko Energy Services Company and SN EF Maverick, LLC

16) Specified Midstream Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and SN EF Maverick, LLC

17) Assignment and Consent to Assignment Agreement, dated effective as of June 28, 2017 by and among Anadarko Energy Services Company, SN EF Maverick, LLC and Eagle Ford Midstream, LP ("**EFM Assignment Agreement**")

18) Amended and Restated Marketing Transition Services Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC, SN Catarina, LLC, Anadarko Energy Services Company, Kerr-McGee Oil & Gas Onshore LP, Anadarko E&P Onshore LLC and Sanchez Energy Corporation ("**Marketing Transition Services Agreement**")

19) Hydrocarbons Purchase and Marketing Agreement, dated as of January 12, 2017 between SN EF Maverick, LLC, SN EF UnSub, LP and Sanchez Energy Corporation ("**UnSub Production Marketing Agreement**")

20) Firm Intrastate Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company), as amended, including by that First Amendment to Firm Intrastate Gas Transportation Agreement, dated as of June 27, 2016

21) Firm NGPA Section 311 Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company), as amended, including by that First Amendment to Firm NGPA Section 311 Gas Transportation Agreement, dated as of June 27, 2016

# SCHEDULE II[2]

## Assumption Comanche Documents

1) Joint Operating Agreement, dated effective as of March 1, 2017 by and between SN EF Maverick, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF UnSub, LP and Gavilan Resources, LLC ("**Joint Operating Agreement**")

2) Crude Oil Production Marketing Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC and Gavilan Resources, LLC

3) Residue Gas Marketing Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC and Gavilan Resources, LLC

4) Natural Gas Liquids Marketing Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC and Gavilan Resources, LLC

5) Maverick Crude Oil Production Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

6) Maverick Residue Gas Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP, as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated February 1, 2014

7) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

8) Maverick Oil Production Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and SM Energy Company (as predecessor to Venado EF L.P.)

9) Maverick Residue Gas Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and SM Energy Company (as predecessor to Venado EF L.P.)

10) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and SM Energy Company (as predecessor to Venado EF L.P.), as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated February 1, 2014

---

[2] The agreements set forth on Schedule II shall include all amendments thereto.

11) Maverick Oil Production Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

12) Maverick Residue Gas Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

13) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

14) Non-Exclusive Data Use License and Access Agreement, dated March 1, 2017 between Anadarko E&P Onshore LLC, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC ("**Core Sharing Agreement**")

15) Non-Exclusive Seismic Data Use License, dated March 1, 2017 by and between Anadarko Petroleum Corporation, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC ("**Seismic License**")

16) Specified Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
December 21, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| OCCIDENTAL PETROLEUM CORP., ANADARKO PETROLEUM CORPORATION, ANADARKO E&P ONSHORE LLC, ANADARKO ENERGY SERVICES COMPANY, KERR-MCGEE OIL & GAS ONSHORE LP, WESTERN MIDSTREAM PARTNERS LP, WGR OPERATING, LP, and SPRINGFIELD PIPELINE, LLC,<br><br>Plaintiffs,<br>v.<br><br>SANCHEZ ENERGY CORPORATION, SN CATARINA, LLC, and SN EF MAVERICK, LLC,<br><br>Defendants. | Adv. Proc. No. 20-03198 |

**STIPULATION OF DISMISSAL AND AGREED ORDER**

This Stipulation of Dismissal and Agreed Order (the "Order")[2] is made, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure(applicable herein pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure), between (i) Plaintiffs Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Plaintiffs Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Defendants Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.

**RECITALS**

**WHEREAS**, certain of the Parties are party to a number of agreements related certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in their Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1326] seeking to reject or assume certain Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Case No. 19-34508, Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing this adversary proceeding (this "Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Docket No. 46] and took matters under advisement;

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89, 90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Docket No. 97] (the "Reconsideration Motion") in this Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order, to find that the

Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Court's Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, such Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to the *Stipulation and Agreed Order* (the "Contested Matter Order")[3] filed in the Debtors' Chapter 11 cases (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to the Contested Matter Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of this Adversary Proceeding; and (v) dismissal of the Appeal;

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

[3] The form of Contested Matter Order is attached hereto as Exhibit 1.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon the occurrence of all of the following events (a) its approval and entry by this Court on the docket for this Adversary Proceeding; (b) entry of the Contested Matter Order by this Court in the Debtors' Chapter 11 cases; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "Order Effective Date"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. As of the Order Effective Date, except to the extent expressly set forth in this Order otherwise, this Adversary Proceeding, including Counts I, II, III, IV, and V, is dismissed, with prejudice.

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

5. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order and to effectuate the relief granted pursuant to this Order.

6. Each Party is to bear its own costs, expenses, and attorneys' fees.

7. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

**IT IS SO ORDERED.**

Signed: December 21, 2021

Marvin Isgur
United States Bankruptcy Judge

This Order is issued subject to entry of an order in Appeal No. 4:21-CV-1734 authorizing the undersigned judge to enter the order signed on this date in adversary proceeding 20-3198.

**ACCCEPTED AND AGREED:**

*/s/ Lydia R. Webb*
**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

/s/ *Thomas MacWright*
**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*
**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

**EXHIBIT 1**

**FORM OF CONTESTED MATTER ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| | ) | |
| Reorganized Debtors.[1] | ) | (Jointly Administered) |

**STIPULATION AND AGREED ORDER**

This Stipulation and Agreed Order (the "Order") is made pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure (applicable herein pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure), between (i) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline, LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.[2]

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

## RECITALS

**WHEREAS**, certain of the Parties are party to multiple agreements related to certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in the above-captioned Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], seeking to reject or assume the Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing the adversary proceeding captioned *Occidental Petroleum Corp. v. Sanchez Energy Corp.*, Adv. Pro. No. 20-03198 (S.D. Tex.) (the "OXY/WES Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Adv. Pro. No. 20-03198, Docket No. 46] and took matters under advisement;

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89-90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Adv. Pro. Docket No. 97] (the "Reconsideration Motion") in the OXY/WES Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order to find that the Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, the Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to this Order (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to this Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan;[3] (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of the OXY/WES Adversary Proceeding; and (v) dismissal of the Appeal; and

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

**NOW, THEREFORE, IT IS STIPULATED, ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

---

[3] Certain of the agreements identified in Schedules 1 and 2 to the Complaint were previously assumed by the applicable Debtor(s) in connection with the *Stipulation of Dismissal and Agreed Order* [Docket No. 1973] and the *Stipulation and Agreed Order Authorizing Assumption of Comanche Non-Ops' Production Marketing Agreements* [Docket No. 2201].

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon the occurrence of all of the following events: (a) entry by this Court on the docket of these Chapter 11 Cases; (b) the entry by this Court of the Stipulation of Dismissal in the form attached hereto as Exhibit 3 (the "AP Dismissal Stipulation") in the OXY/WES Adversary Proceeding; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "Order Effective Date"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. The Parties are deemed to agree, and it is hereby found, that, as of the Order Effective Date, each of the Assumed Comanche Agreements is an Executory Contract that is capable of assumption pursuant to the Plan and each of the Rejected Comanche Agreements is an Executory Contact that is capable of rejection pursuant to the Plan; *provided, however*, consistent with the Partial Rejection Order, characterization of the Springfield Agreements as Executory Contracts does not alter or otherwise impact the real property interests granted to Springfield in the Springfield Agreements.

5. It is hereby found, and each of the Parties hereby agrees, that each applicable Mesquite Entity, as a Reorganized Debtor, is and shall be entitled, pursuant to the Plan and 11

Case 20-31887 Document 1573 Filed 12/11/20 in TXSB Page 14 of 21

U.S.C. §§365 and 1123, to assume each of the Assumed Comanche Agreements and to reject each of the Rejected Comanche Agreements, and all requirements for assumption or rejection, as applicable, pursuant to the Plan, the Confirmation Order, any other Orders of this Court in these proceedings or relating proceedings, and 11 U.S.C. §§365 and 1123 are hereby deemed satisfied.

6. All objections to the assumption and rejection of the Assumed Comanche Agreements and Rejected Comanche Agreements as contemplated by this Order, including but not limited to the Rejection Objection, are hereby deemed withdrawn or overruled, with prejudice, and all related contested matters are dismissed.

7. On the Order Effective Date, each of the applicable Mesquite Entities is hereby authorized and directed to assume each of the Assumed Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the assumption of the Assumed Comanche Agreements, in each case to the extent required by the Settlement effective as of the Effective Date of the Plan.

8. On the Order Effective Date, each of the applicable Debtors is hereby authorized to reject each of the Rejected Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the rejection of the Rejected Comanche Agreements, with such rejections being effective as of the Effective Date of the Plan.

9. Upon assumption pursuant to the Settlement and this Order, each of the Assumed Comanche Agreements, including the Springfield Agreements, as each may be amended, shall remain in full force and effect, and be binding upon each of the parties thereto in accordance with their respective terms and otherwise applicable law.

10. As a condition to assumption of the Springfield Agreements, Mesquite shall pay to Springfield Pipeline LLC (i) $51,832,780.72 in the aggregate and (ii) an amount equal to all unpaid

amounts, if any, (x) invoiced and (y) due and payable in the ordinary course of business between December 17, 2021 and the effective date of the Settlement pursuant to the Springfield Agreements and/or any applicable gas or oil gathering agreements with Gavilan Resources, LLC, in each case only as required by the Settlement (the "Springfield Cure Amount"). As a condition to assumption of the Assumed Comanche Agreements to which the Occidental Entities or Eagle Ford Midstream, LP are a party, Mesquite shall pay to the Occidental Entities and Eagle Ford Midstream, LP $0 on account of defaults occurring prior to December 1, 2021 and shall pay all amounts due and owing under the such agreements from and after December 1, 2021 in the ordinary course of business (the "OXY Cure Amount"). Other than the Springfield Cure Amount and the OXY Cure Amount, no Cure Claims with respect to the Assumed Comanche Agreements exist or shall otherwise be due or payable in connection with the assumption of the Assumed Comanche Agreements, and no adequate assurances for assumption of the Assumed Comanche Agreements shall be required by this Order or the Plan as a condition to the assumptions contemplated hereby. Subject to payment of the Springfield Cure Amount and the OXY Cure Amount, the Debtors and Reorganized Debtors shall also be deemed to be in compliance with each of the Assumed Comanche Agreements through the date of this Order for all purposes of the Confirmation Order.

11. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

12. Each Party is to bear its own costs, expenses and attorneys' fees.

13. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

**IT IS SO ORDERED.**

Signed: ___________________, 2021

________________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**STIPULATED AND AGREED AS TO FORM AND CONTENT:**

*/s/ Lydia R. Webb*
**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

*/s/ Thomas MacWright*
**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*
**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

Case 19-34508 Document 1513-2 Filed 12/04/2020 in TXSB Page 73 of 76

# EXHIBIT 1
# ASSUMED COMANCHE AGREEMENTS

1) Second Amended and Restated Lease Dedication and Gas Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017 as amended and supplemented, from time to time*

2) Second Amended and Restated Lease Dedication and Oil Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017, as amended and supplemented, from time to time, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated as of August 14, 2017*

3) Agreement to Amend Gas Gathering Agreements, dated June 1, 2017 between Springfield Pipeline LLC, Sanchez Energy Corporation and Gavilan Resources, LLC

4) The Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017*

5) The Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil& Gas Onshore LP and Sanchez Energy Corporation*

6) Purchase and Sale Agreement, dated January 12, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation, as amended, including by that Amendment to Purchase and Sale Agreement, dated as of March 1, 2017, that Second Amendment to Purchase and Sale Agreement, dated effective as of March 1, 2017 and that Third Amendment to Purchase and Sale Agreement, dated June 28, 2017*

7) Assignment and Consent to Assignment Agreement, dated effective as of June 28, 2017 by and among Anadarko Energy Services Company, SN EF Maverick, LLC and Eagle Ford Midstream, LP

8) Firm Intrastate Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company), as amended, including by that First Amendment to Firm Intrastate Gas Transportation Agreement, dated as of June 27, 2016

9) Firm NGPA Section 311 Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of

---

* Assumed as amended pursuant to terms of the Settlement Agreement.

Case 20-33233 Document 1573-28 Filed in TXSB on 12/11/20 Page 19 of 21

Anadarko Energy Services Company), as amended, including by that First Amendment to Firm NGPA Section 311 Gas Transportation Agreement, dated as of June 27, 2016.

10) Joint Operating Agreement, dated effective as of March 1, 2017 by and between SN EF Maverick, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF UnSub, LP and Gavilan Resources, LLC

11) Non-Exclusive Data Use License and Access Agreement, dated March 1, 2017 between Anadarko E&P Onshore LLC, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

12) Non-Exclusive Seismic Data Use License, dated March 1, 2017 by and between Anadarko Petroleum Corporation, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

13) Springfield Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sanchez Energy Corporation, and Gavilan Resources, LLC

14) Downstream Marketing Agreements Assumption Agreement, dated as of June 1, 2017 by and between Anadarko Energy Services Company and SN EF Maverick, LLC

15) Specified Midstream Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and SN EF Maverick, LLC

16) Amended and Restated Marketing Transition Services Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC, SN Catarina, LLC, Anadarko Energy Services Company, Kerr-McGee Oil & Gas Onshore LP, Anadarko E&P Onshore LLC and Sanchez Energy Corporation

17) Specified Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC

18) Firm Intrastate Gas Transportation Services Agreement, dated March 1, 2013, by and between Springfield Pipeline LLC and SN EF Maverick (as assignor of Anadarko E&P Onshore LLC), including any Attachment to Firm Intrastate Gas Transportation Service Agreement

**EXHIBIT 2**
**REJECTED COMANCHE AGREEMENTS**

1) Development Agreement, dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

2) Memorandum of Development Agreement (Dimmit County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

3) Memorandum of Development Agreement (La Salle County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

4) Memorandum of Development Agreement (Maverick County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

5) Memorandum of Development Agreement (Webb County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

6) Memorandum of Development Agreement (Zavala County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

**EXHIBIT 3**
**FORM OF AP DISMISSAL STIPULATION**