IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| | § | |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. ______________ |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | § § § | |
| | § | |
| *Defendants.* | § | |

**NOTICE OF REMOVAL**

Defendants SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. remove the state court action styled *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.,* Cause No. 2021-46431, in the 269th District Court of Harris County, Texas (the "**State Court Action**"), to the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), through referral by the

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

United States District Court for the Southern District of Texas, Houston Division (the "**District Court**"), pursuant to the District Court's General Order 2012-6. This Notice of Removal is filed pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, and Rules 9027-1 and 9027-2 of the Southern District of Texas Bankruptcy Local Rules. Jurisdiction of this case arises under 28 U.S.C. § 1334 and 11 U.S.C. §§1142, 105.

**PROCEDURAL BACKGROUND**

**A. The Parties**

1. Plaintiff Carnero G&P LLC ("**Carnero**") is a Delaware limited liability company, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("**Targa**") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("**SNMP**") with its principal place of business in Houston, Texas. Plaintiff's counsel is:

Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

2. Defendant SN EF UnSub, LP ("**UnSub**") is a limited partnership organized under the laws of Delaware with its principal place of business at 1111 Bagby Street, Suite 2050, Houston, Texas 77002. UnSub's counsel is:

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

and

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

3. Defendant Eagle Ford TX LP ("**Eagle Ford**") is a limited partnership organized under the laws of Texas with its principal place of business at 5599 San Felipe Road, Suite 725, Houston, Texas 77056. Eagle Ford's counsel is:

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701

julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

4. Defendant Venado EF L.P. ("**Venado**") is a limited partnership organized under the laws of Delaware with its principal place of business at 13215 Bee Cave Pkwy, Suite B-350, Austin, Texas 78738. Venado's counsel is:

Rex Manning
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
rex.manning@kirkland.com

5. Defendant Mitsui E&P Texas LP ("**Mitsui**") is a limited partnership organized under the laws of Texas with its principal place of business at 1300 Post Oak Blvd., Suite 1800, Houston, Texas 77056. Mitsui's counsel is:

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

6. Defendant Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**") is a corporation organized under the laws of

Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. Mesquite's counsel is:

James G. Munisteri
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com

and

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

In paragraphs 13 and 23 of *Plaintiff's Original Petition,* Carnero alleges that SN EF Maverick, LLC ("**Maverick**") is "now known as Mesquite Energy, Inc." and that, "[u]pon the effective date of the Plan, Mesquite became the successor to Maverick." This statement is incorrect; Mesquite and Maverick are separate entities. Mesquite and Maverick are affiliates.

**B. The Bankruptcy Case**

7. On August 11, 2019, Sanchez Energy Corporation and certain of its affiliates ("**Debtors**") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of Texas, Houston Division ("Bankruptcy Court"). On August 12, 2019, the Court entered an order directing joint administration of the bankruptcy cases of the Debtors, with the lead bankruptcy case as Case No. 19-3408, *In re Sanchez Energy Corporation, et al.* (the "**Bankruptcy Case**").

8. On April 30, 2020, the Bankruptcy Court entered the Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates ("**Confirmation Order**").[2] The Confirmation Order approved the Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates (the "**Plan**").[3]

9. On June 30, 2020 (the "**Plan Effective Date**"), the Debtors filed the Notice of Effective Date. *See* Dkt. No. 1417.

10. Pursuant to the Plan, the debtors were required to identify certain executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "**Rejection Schedule**") or to be assumed as listed on Exhibit C (as amended, the "**Assumption Schedule**") to the Plan.[4] If no party in interest filed a timely objection to a contract's inclusion on either the Rejection Schedule or Assumption Schedule, the executory contract or unexpired lease was deemed assumed or rejected as indicated, effective as of the Plan Effective Date.[5] For those contracts to which an objection was timely filed, the Plan provides that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" of such executory contract or unexpired lease.[6]

---

[2] 19-34508 Dkt. 1212.

[3] 19-34508 Dkt. 1212.

[4] 19-34508 Dkt. 1212 at 10 ¶¶17, 18; 55; see also Plan, Art. V.

[5] 19-34508 Dkt. 1212 at 10 ¶¶17, 18; 55.

[6] 19-34508 Dkt. 1212 at 10 ¶¶17, 18; 55.

11. Section XI of the Plan further provides that the Bankruptcy Court would "retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" including to "**resolve any matters related to Executory Contracts or Unexpired Leases**, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under any Executory Contract[.]"[7]

12. Paragraph 17 of the Confirmation Order provides that any "Executory contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory contract or Unexpired Lease . . . shall not be demed to be assumed or rejected, as applicable, until entry of an order resolving the dispute approving the assumption or rejection."[8] Paragraph 24 provides that, until the bankruptcy court resolves the dispute regarding assumption or rejection, the "agreement shall continue as in effect immediately prior to the effective date."[9]

**C. The State Court Action**

13. Carnero filed *Plaintiff's Original Petition* and initiated the State Court Action on July 30, 2021.

14. UnSub was served on August 13, 2021.

15. Eagle Ford was served on August 13, 2021.

16. Venado was served on August 16, 2021.

17. Mitsui was served on August 13, 2021.

18. Mesquite was served on August 13, 2021.

19. None of the Defendants has filed an answer or other responsive pleading in state court. The Defendants and Plaintiff have executed a stipulation regarding the deadline for Defendants' responsive pleadings that is being filed along with this notice.

[7] 19-34508 Dkt. 1212 at 69 (emphasis added).

[8] 19-34508 Dkt. 1212 at 10 ¶17.

[9] 19-34508 Dkt. 1212 at 15 ¶24.

20. In the State Court Action, Carnero seeks a declaratory judgment regarding the effect of assumption and rejection on the rights and obligations of the Defendants under certain contracts that were included in the Assumption Schedule or Rejection Schedule in the Bankruptcy Case, including contracts that remain in dispute awaiting the Bankruptcy Court's resolution of matters relating to assumption or rejection of certain executory contracts. Specifically, the State Court action seeks declarations regarding the following agreements.

a. **The Marketing Agreement** – The Hydrocarbons Purchase and Marketing Agreement between Maverick and UnSub, dated January 12, 2017.[10]

The Marketing Agreement was included on the Rejection Schedule,[11] but in June and July 2020, UnSub objected[12] and initiated an adversary proceeding captioned *GSO ST Holdings LP, et. al. v. Sanchez Energy Corporation, et. al.*, Adv. Proc. No. 20-03197 (the "**GSO-Sanchez Adversary Proceeding**"). On June 28, 2021, pursuant to a settlement agreement, the Bankruptcy Court entered an order, which among other things, deemed the Marketing Agreement to be rejected, as of June 1, 2021 (the "**UnSub Stipulation and Agreed Order**").[13] Paragraph 10 of the UnSub Stipulation and Agreed Order provides that the Bankruptcy Court "shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Stipulation and Agreed Order.[14]

b. **The Midstream Agency Agreement** – The Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC, and Kerr-McGee Oil & Gas Onshore LP, on the other, and solely for the purposes of a guaranty, Mesquite, entered on or around June 1, 2017.[15]

---

[10] 19-34508 Dkt. 1373-4.

[11] 19-34508 Dkt. 1326 at 114.

[12] 19-34508 Dkt. 1354, 1356, 1456.

[13] 19-34508 Dkt. 1983 at 9.

[14] 19-34508 Dkt. 1983 at 6.

[15] 19-34508 Dkt. 1544-3.

The Midstream Agency Agreement was also listed on the Rejection Schedule,[16] and the parties in interest to that agreement also filed an objection and initiated an adversary proceeding captioned *Occidental Petroleum Corp., et. al. v. Sanchez Energy Corporation et. al., Adv. Proc. No.* 20 -03198 ("**Sanchez-Oxy Adversary Proceeding**"). The Sanchez-Oxy Adversary Proceeding remains pending.

c. **The GGPA** – The Firm Gas Gathering Processing and Purchasing Agreement between Maverick and Carnero, effective April 1, 2018.[17]

While the GGPA was initially listed on the Rejection Schedule,[18] it was ultimately assumed. The Bankruptcy Court's *Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended*, (the "Midstream Settlement Approval Order"), by which the GGPA was assumed, determined that ordered, among other things, that "[a]ny determination by SN Maverick as to whether to assume or reject a contract must be . . . made by [a fiduciary for SN Maverick];in the best interest of SN Maverick; . . . and considered after notice and hearing" and "[a]ny rejection or termination of any material agreement affecting the Comanche Assets or any adoption of a material agreement affecting the Comanche Assets must be approved by either (i) the Operating Committee" (which no longer exists) or "(ii) otherwise by Order of this Court.[19]

d. **The UnSub Ratification Agreement** – The Ratification and Assumption Agreement between UnSub, Maverick, and Carnero, effective April 1, 2018.[20]

The UnSub Ratification Agreement was listed on the Assumption Schedule, but parties in interest to that agreement filed objections.[21] Pursuant to the Stipulation and

[16] 19-34508 Dkt. 1326 at 86.

[17] 19-34508 Dkt. 1373-8. The GGPA was amended, through the Amendment to Firm Gas Gatherings, Processing and Purchase Agreement by and among SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018.

[18] *Compare* 19-34508 Dkt. 1326 at 193, with 19-34508 Dkt. 1188 at 93.

[19] 19-34508 Dkt. 1415 at 5-6 ¶¶10, 13.

[20] 19-34508 Dkt. 1373-7.

[21] 19-34508 Dkt. 1373.

Agreed Order discussed above, the UnSub Ratification Agreement was deemed assumed as of June 1, 2021.[22]

e. **The Letter Agreement** – The Letter Agreement between Mitsui, Carnero, and Maverick, effective April 1, 2018.[23] The Bankruptcy Court has not issued an order assuming or rejecting the Letter Agreement.[24]

21. Carnero's petition alleges that, ***if*** the Bankruptcy Court ultimately rejects the Midstream Agency Agreement (which, as noted above, was listed on the Rejection Schedule and is currently subject to an objection), the GGPA and certain ratification agreements would require delivery of the gas to Carnero that is currently subject to the Midstream Agency Agreement.[25]

22. The petition further alleges that Mesquite is obligated (under the GGPA) to continue pursuing rejection of the Midstream Agency Agreement in Bankruptcy Case. The petition claims that Mesquite "might withdraw its rejection" motion and "may be in active negotiations to enter into a new marketing agreement or modified version of the rejected Marketing Agreement."[26]

23. The petition asks the state court to issue an order declaring the Defendants' rights and obligations under various contracts as a matter of

---

[22] 19-34508 Dkt. 1983 at 8.

[23] 19-34508 Dkt. 1326 at 197.

[24] While only identified as the "Ratification Agreements" in the Original Petition, Carnero's claims relate to other agreements at issue in the Bankruptcy Case, including but not limited to the following:

- Memorandum of Agreement by and among Venado EF L.P., SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018;
- Ratification and Assumption Agreement by and among Venado EF L.P., SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018;
- Memorandum of Agreement by and among Eagle Ford TX LP, SN Ef Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018; and
- Ratification and Assumption Agreement by and among Eagle Ford TX, LP, SN EF Maverick, LLC, and Carnero G&P, LLC, dated as of April 1, 2018.

[25] Original Pet. at 7 ¶24.

[26] Original Pet. at 9 ¶¶25 – 26.

bankruptcy law. For example, Carnero asks the state court to issue an order declaring the legal effect of the rejection of the Marketing Agreement under 11 U.S.C. § 365, and declaring that, following such rejection, "UnSub must deliver UnSub's gas . . . to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement."[27]

24. Carnero also requests the state court declare that Mesquite is obligated to "pursu[e] rejection of the Midstream Agency Agreement under 11 U.S.C. § 365" and that, after "rejection of the Midstream Agency Agreement under 11 U.S.C. § 365," the Defendants' gas in the "Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement" and the Defendants must deliver their gas to Carnero.[28]

## Basis for Removal

25. Section 1452 provides that a "party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under Chapter 11 or arises in or is related to the Bankruptcy Case.

26. "Subject matter jurisdiction remains in the bankruptcy court, even after a bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (cleaned up); *TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 688 (Bankr. N.D. Tex. 2020). This authority includes "jurisdiction

[27] Original Pet. at 10 ¶36(j).

[28] Original Pet. at 10 ¶36(k) – (l).

to interpret and enforce its own prior orders." *Burch v. Freedom Mortgage Corporation (Matter of Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021).

27. Specifically, bankruptcy courts maintain "'arising in or under' jurisdiction" (or "core" jurisdiction) over disputes centering on the interpretation of one of their orders. *Rohifard v. Brewer & Prichard, P.C. (In re ABC Dentistry, P.A.)*, 16-34221, 2019 WL 913356, at *3 (Bankr. S.D. Tex. Feb. 21, 2019), *aff'd*, BR H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019), *rev'd on other grounds*, 978 F.3d 323 (5th Cir. 2020); *see also Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)).

28. Bankruptcy courts have "related to" (or "non-core" jurisdiction) over matters that "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.*), 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015); *see also Crown Vantage*, 421 F.3d 963 (9th Cir. 2005) (discussing factors for retention of "related to" jurisdiction).

29. Here, the State Court Action expressly requests declarations regarding the rejection or assumption of certain executory contracts under Section 365 of the Bankruptcy Code, including those agreements that have not yet been assumed or rejected in the Bankruptcy Case (and thus seeks a declaration as to the scope or effect of such assumption or rejection decision that the Bankruptcy Court may enter in the future). Carnero further seeks to preclude Mesquite[29] from withdrawing its rejection of the Midstream Agency

---

[29] Carnero named only Mesquite as a party to the State Court Action, but Maverick is the real party in interest because (i) Maverick is the counterparty to the various agreements and (ii) Maverick is the party that listed the Midstream Agency Agreement on the Rejection Schedule. The Defendants refer in this Notice of Removal to "Mesquite," as that is the entity that Carnero sued, but do not waive their objection that Mesquite is not the real party in interest.

To the extent that naming Mesquite—not Maverick—in the State Court Action was intentional and Carnero in fact seeks a judgment declaring that *Mesquite* is obligated under various agreements that it was not a party to, Carnero's claim against Mesquite requires the interpretation and enforcement of the Confirmation Order and Plan, and therefore arises in the Bankruptcy Case.

Agreement in the Bankruptcy Case and to preempt an order from this Court on the impact of any rejection of the Midstream Agency Agreement.

30. When the Bankruptcy Court entered the Midstream Settlement Approval Order, it recognized the complexities of the various agreements related to the Comanche Assets and required the rejection or termination of material agreements affecting the Comanche Assets to be approved by an order of the Bankruptcy Court (or Operating Committee).[30] Moreover, it imposed further conditions precedent to Maverick's assumption or rejection of executory contracts, including that any assumption or rejection has to be made by a fiduciary for Maverick, in the best interest of Maverick, and after notice and hearing.[31]

31. Through the State Court Action, Carnero attempts to interfere with the Bankruptcy Court's determinations regarding the rejection or assumption of certain executory contracts, pursuant to the process laid out in the Confirmation Order and Plan (and further supplemented by the Bankruptcy Court's orders, including the Midstream Settlement Approval Order). Moreover, the petition's invocation of the Bankruptcy Code and its attempt to affect (or preclude) future prospective orders from the Bankruptcy Court—and positions that Mesquite (or Maverick) may take in the Bankruptcy Case in the future, including in compliance with the Midstream Settlement Order—confer jurisdiction on this Court because Carnero's claims "arise in," or at the very least relate to, the Bankruptcy Case.

---

[30] 19-34508 Dkt. 1415 at 6 ¶13.

[31] 19-34508 Dkt. 1415 at 5-6 ¶11

## ADDITIONAL PROCEDURAL MATTERS

**A. Timely Removal under § 1446 and Bankruptcy Rule 9027(a)(3)**

32. This notice of removal is timely filed because it is filed within 30 days of service and within the period provided by Federal Rule of Bankruptcy Procedure 9027(a)(3) and 28 U.S.C. §1446(b).

**B. Proper Federal Court**

33. The 269th District Court of Harris County, Texas is located within the Southern District of Texas, Houston Division. Therefore, under 28 U.S.C. §§ 1334 and 1452, and Fed. R. Bankr. P. 9027, this action is properly removed to this Court. *See, e.g., In re SBMC Healthcare, LLC,* 519 B.R. 172 (Bankr. S.D. Tex. 2014).

34. Pursuant to Local Rule 9027-1, Defendants state that they do consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**C. State Court Documents Attached**

35. Pursuant to Fed. R. Bankr. P. 9027(a) and Bankruptcy Local Rule 9027-1, an appendix is attached to this notice, which includes a copy of the state-court docket sheet and all documents filed with the state court.

**D. Notice**

36. Upon the filing of this notice of removal, the Defendants will duly notify the Clerk for the 269th District Court for Harris County, Texas, attaching a copy of this notice of removal.

DocuSigned by:
James G. Munisteri
_______________________ Date: 9/10/2021
E0263... 
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax
713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax
214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant**
**Mesquite Energy, Inc.**

DocuSigned by:
Thomas A. Woolley, III
0FC1[illegible]CB27AB[illegible]457...

______________________ Date: 9/9/2021

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

DocuSigned by:
Jared Wilkerson
3547CBB788AE472...

Date: 9/9/2021

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

DocuSigned by:
Rex Manning
5F49358EDFCC492...

Date: 9/9/2021

Rex Manning
**Kirkland & Ellis LLP**
Kirkland & Ellis International LLP
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
rex.manning@kirkland.com

**Attorney for Defendant Venado EF L.P.**

DocuSigned by:
Maegan Quejada
Date: 9/9/2021

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on September 9, 2021, on all persons entitled to receive service through the Court's Pacer ECF filing system.

*/s/ Sharon M. Beausoleil*
Sharon M. Beausoleil

**NOTICE OF REMOVAL**
INDEX OF ATTACHMENTS

| NO. | DESCRIPTION |
|---|---|
| 1 | Index of Attachments to Notice of Removal |
| 2 | List of Counsel |
| 3 | State Court Action Docket Sheet |
| 4 | Pleadings, Executed Process, Signed Orders, and Other Filings from State Court Action |

**NOTICE OF REMOVAL**
LIST OF COUNSEL OF RECORD

| PARTY | COUNSEL |
|---|---|
| PLAINTIFF CARNERO G&P LLC | Eugene M. Nettles<br>Joshua W. Wolfshohl<br>Amy C. Falcon<br>**Porter Hedges LLP**<br>1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>Telephone: (713) 226-6000<br>Facsimile: (713) 226-6295<br>enettles@porterhedges.com<br>jwolfshohl@porterhedges.com<br>afalcon@porterhedges.com |
| DEFENDANT SN EF UNSUB, LP | Paul M. Basta<br>Alice Belisle Eaton<br>Andrew J. Ehrlich<br>Sean A. Mitchell<br>Justin D. Ward<br>**Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3900<br>pbasta@paulweiss.com<br>aeaton@paulweiss.com<br>aehrlich@paulweiss.com<br>smitchell@paulweiss.com<br>jward@paulweiss.com<br><br>Thomas A. Woolley, III<br>**McCloskey Roberson, PLLC**<br>945 Heights Blvd.<br>Houston, Texas 77008<br>Telephone: (713) 337-3910<br>Facsimile: (713) 868-1275<br>rwoolley@mrwpllc.com |

| PARTY | COUNSEL |
|---|---|
| DEFENDANT EAGLE FORD TX LP | Michelle Pector, Esq.<br>Jared Wilkerson, Esq.<br>**Morgan, Lewis & Bockius LLP**<br>1000 Louisiana St., Suite 4000<br>Houston, TX 77002<br>Telephone: (713) 890-5000<br>Facsimile: (713) 890-5001<br>michelle.pector@morganlewis.com<br>jared.wilkerson@morganlewis.com<br><br>Julia Frost-Davies, Esq.<br>Amy L. Kyle, Esq.<br>**Morgan, Lewis & Bockius LLP**<br>One Federal Street<br>Boston, MA 02215<br>Telephone: (617) 341-7700<br>Facsimile: (617) 341-7701<br>julia.frost-davies@morganlewis.com<br>amy.kyle@morganlewis.com |
| DEFENDANT VENADO EF L.P. | Rex Manning<br>**Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>609 Main Street<br>Houston, Texas 77002<br>Telephone: (713) 836-3600<br>Facsimile: (713) 836-3601<br>rex.manning@kirkland.com |

| PARTY | COUNSEL |
|---|---|
| DEFENDANT MITSUI E&P TEXAS LP | Duston K. McFaul<br>Maegan Quejada<br>**Sidley Austin LLP**<br>1000 Louisiana St., Suite 5900<br>Houston, Texas 77002<br>Telephone: (713) 495-4500<br>dmcfaul@sidley.com<br>mquejada@sidley.com<br><br>Angela C. Zambrano<br>**Sidley Austin LLP**<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas 75201<br>Telephone: (214) 981-3300<br>angela.zambrano@sidley.com |
| DEFENDANT MESQUITE ENERGY, INC. F/K/A SANCHEZ ENERGY CORPORATION | James G. Munisteri<br>**Foley & Lardner LLP**<br>1000 Louisiana, Suite 2000<br>Houston, Texas 77002<br>Tel. 713.276.5500 / Fax 713.276.5555<br>jmunisteri@foley.com<br><br>Dennis Jenkins<br>Joseph Bretschneider<br>**Willkie Farr & Gallagher LLP**<br>787 Seventh Avenue<br>New York, NY 10019-6099<br>Telephone: (212) 728-8276<br>Facsimile: (212) 728-8111<br>djenkins@willkie.com<br>jbretschneider@willkie.com<br><br>Mark T. Stancil<br>**Willkie Farr & Gallagher LLP**<br>1875 K Street, N.W.<br>Washington, DC 20006-1238<br>Telephone: (202) 303-1133<br>Facsimile: (202) 303-2133<br>mstancil@willkie.com |

## APPEALS
No Appeals found.

## COST STATMENTS
No Cost Statments found.

## TRANSFERS
No Transfers found.

## POST TRIAL WRITS
No Post Trial Writs found.

## ABSTRACTS
No Abstracts found.

## SETTINGS
No Settings found.

## NOTICES
No Notices found.

## SUMMARY

### CASE DETAILS

| | |
|---|---|
| **File Date** | 7/30/2021 |
| **Case (Cause) Location** | |
| **Case (Cause) Status** | Active - Civil |
| **Case (Cause) Type** | HOMEOWNERS ASSOCIATION |
| **Next/Last Setting Date** | N/A |
| **Jury Fee Paid Date** | N/A |

### CURRENT PRESIDING JUDGE

| | |
|---|---|
| **Court** | 269th |
| **Address** | 201 CAROLINE (Floor: 13)<br>HOUSTON, TX 77002<br>Phone:7133686370 |
| **JudgeName** | CORY SEPOLIO |
| **Court Type** | Civil |

## ACTIVE PARTIES

| Name | Type | Post Jdgm | Attorney |
|---|---|---|---|
| CARNERO G&P LLC | PLAINTIFF - CIVIL | | NETTLES, EUGENE M. |
| SN EF UNSUB LP | DEFENDANT - CIVIL | | |
| EAGLE FORD TX LP | DEFENDANT - CIVIL | | |
| VENADO EF L P | DEFENDANT - CIVIL | | |
| MITSUI E&P TEXAS LP | DEFENDANT - CIVIL | | |
| MESQUITE ENERGY INC | DEFENDANT - CIVIL | | |
| SN EF UNSUB LP MAY BE SERVED THROUGH ITS REGISTERED AGENT | REGISTERED AGENT | | |
| EAGLE FORD TX LP MAY BE SERVED THROUGH | REGISTERED AGENT | | |

| | |
|---|---|
| ITS REGISTERED AGENT | |
| VENADO EF L P MAY BE SERVED THROUGH ITS REGISTERED AGENT | REGISTERED AGENT |
| MITSUI E&P TEXAS LP MAY BE SERVED BY SERVING THROUGH ITS REGISTERED | REGISTERED AGENT |
| MESQUITE ENERGY INC (IS A CORPORATION) MAY BE SERVED THROUGH ITS | REGISTERED AGENT |

## INACTIVE PARTIES

No inactive parties found.

## JUDGMENT/EVENTS

| Date | Description | Order Signed | Post Jdgm | Pgs | Volume /Page | Filing Attorney | Person Filing |
|---|---|---|---|---|---|---|---|
| 7/30/2021 | ORIGINAL PETITION | | | 0 | | NETTLES, EUGENE M. | CARNERO G&P LLC |

## SERVICES

| Type | Status | Instrument | Person | Requested | Issued | Served | Returned | Received | Tracking | Deliver To |
|---|---|---|---|---|---|---|---|---|---|---|
| CITATION | SERVICE RETURN/EXECUTED | ORIGINAL PETITION | SN EF UNSUB LP MAY BE SERVED THROUGH ITS REGISTERED AGENT | 7/30/2021 | | 8/11/2021 | 8/13/2021 | | 73900908 | E-MAIL |
| 1999 BRYAN STREET ST SUITE 900 DALLAS TX 75201 | | | | | | | | | | |
| CITATION | SERVICE RETURN/EXECUTED | ORIGINAL PETITION | EAGLE FORD TX LP MAY BE SERVED THROUGH ITS REGISTERED AGENT | 7/30/2021 | | 8/11/2021 | 8/13/2021 | | 73900910 | E-MAIL |
| 206 E 9TH STREET SUITE 1300 AUSTIN TX 78701 | | | | | | | | | | |
| CITATION | SERVICE RETURN/EXECUTED | ORIGINAL PETITION | VENADO EF L P MAY BE SERVED THROUGH ITS REGISTERED AGENT | 7/30/2021 | | 8/11/2021 | 8/16/2021 | | 73900911 | E-MAIL |
| 5444 WESTHEIMER #1000 HOUSTON TX 77056 | | | | | | | | | | |
| CITATION | SERVICE RETURN/EXECUTED | ORIGINAL PETITION | MITSUI E&P TEXAS LP MAY BE SERVED BY SERVING THROUGH ITS REGISTERED | 7/30/2021 | | 8/11/2021 | 8/13/2021 | | 73900912 | E-MAIL |
| 1999 BRYAN STREET SUITE 900 DALLAS TX 75201 | | | | | | | | | | |
| CITATION CORPORATE | SERVICE RETURN/EXECUTED | ORIGINAL PETITION | MESQUITE ENERGY INC (IS A CORPORATION) MAY BE SERVED THROUGH ITS | 7/30/2021 | | 8/11/2021 | 8/13/2021 | | 73900913 | E-MAIL |
| 1999 BRYAN ST SUITE 900 DALLAS TX 75201 | | | | | | | | | | |

## DOCUMENTS

| Number | Document | Post Jdgm | Date | Pgs |
|---|---|---|---|---|
| 97736304 | Stipulation Regarding Defendants' Deadline to File Responsive Pleadings | | 09/07/2021 | 7 |
| 97459521 | Return of Service - MITSUI E&P Texas LP | | 08/20/2021 | 4 |
| 97459532 | Return of Service - Mesquite Energy Inc | | 08/20/2021 | 4 |
| 97459646 | Return of Service - SN EF Unsub, LP | | 08/20/2021 | 4 |
| 97460203 | Return of Service - Eagle Ford TX LP | | 08/20/2021 | 4 |
| 97460281 | Affidavit of Service | | 08/20/2021 | 4 |
| 97254947 | Requests for Issuance of Service | | 08/09/2021 | 5 |
| 97113645 | Plaintiffs Original Petition | | 07/30/2021 | 12 |

**NOTICE OF REMOVAL**
INDEX OF PLEADINGS, PROCESS, AND
ORDERS FROM STATE COURT ACTION

| **DATE** | **DESCRIPTION** |
|---|---|
| 7/30/2021 | Plaintiff's Original Petition |
| 8/9/2021 | Request for Issuance of Service |
| 8/20/2021 | Affidavit of Service – Eagle Ford TX, LP |
| 8/20/2021 | Affidavit of Service – Mesquite Energy, Inc. |
| 8/20/2021 | Affidavit of Service – Mitsui E&P Texas LP |
| 8/20/2021 | Affidavit of Service – SN EF UnSub LP |
| 8/20/2021 | Affidavit of Service – Venado EF L.P. |
| 9/4/2021 | Stipulation |

7/30/2021 9:07 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 55852780
By: Cecilia Thayer
Filed: 7/30/2021 9:07 AM

CAUSE NO. ________

| | | |
|---|---|---|
| CARNERO G&P LLC,<br>Plaintiff,<br>v.<br><br>SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, and MESQUITE ENERGY, INC.,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br><br>___ JUDICIAL DISTRICT |

# Plaintiff's Original Petition

Plaintiff CARNERO G&P LLC ("Carnero" or "Plaintiff") files this original petition against Defendants SN EF UNSUB, LP ("UnSub"), EAGLE FORD TX LP ("Eagle Ford"), VENADO EF L.P. ("Venado"), MITSUI E&P TEXAS LP ("Mitsui"), and MESQUITE ENERGY, INC. ("Mesquite") and alleges as follows:

## I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

## II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

6. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

7. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

8. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

9. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute

provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

10. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief and attorney's fees and costs.

## VI. Factual Background

11. This is a dispute over the meaning of three contracts arising from oil and gas operations on the "Comanche Assets" in the Western Eagle Ford Shale.

**The Comanche Assets**

12. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**The Comanche Assets Acquisition**

13. In January, 2017, SN EF Maverick, LLC ("Maverick") (a subsidiary of Sanchez Energy Corporation ("Sanchez")) and various co-investors, including Gavilan Resources, LLC ("Gavilan")[1] and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets. The transaction closed on March 1, 2017.

[1] Gavilan Resources, LLC filed for bankruptcy on May 15, 2020, and later sold its interests in the Comanche Assets to Maverick (now known as Mesquite Energy, Inc., as explained below) in or about October 2020. As a result, the Plaintiff has not named Gavilan as a defendant.

**Comanche Assets Existing Commitments Dedications**

14. At the time of the Comanche Assets acquisition, the acreage conveyed to Maverick, Gavilan, and UnSub was dedicated by Anadarko for gathering and processing to other midstream providers pursuant to agreements that prevent, in part, the delivery of gas to other service providers (the "Existing Commitments").[2] Anadarko retained these Existing Commitments under the terms of the March 1, 2017 Comanche Assets acquisition agreements, specifically the Retained Midstream Contracts Services Agreement among Maverick, as "Provider," and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP, collectively as the "Recipient" (the "Midstream Agency Agreement"). The Midstream Agency Agreement required Provider to act as Recipient's agent for delivering gas on behalf of Recipient under the retained Existing Commitments.

15. Maverick, UnSub, and the WIPS never became parties to the underlying Existing Commitments. The Midstream Agency Agreement is the only agreement that required Maverick to deliver gas from the Comanche Assets to the Recipient for delivery under the Anadarko-retained Existing Commitments. UnSub and the WIPs never became parties to the Midstream Agency Agreement.

**Comanche Assets Marketing Agreement**

16. UnSub and Maverick agreed that Maverick would buy UnSub's share of the oil and gas produced by the Comanche Assets under the terms of a Hydrocarbons Purchase and Marketing Agreement (the "Marketing Agreement") dated as of January 12, 2017. The Marketing Agreement

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time that Carnero, Mesquite and UnSub entered into the Ratification Agreement referenced herein.

is the only agreement that linked UnSub's gas from the Comanche Assets to the Existing Commitments.

**Comanche Assets Dedication to Carnero**

17. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA"). The GGPA obligates Maverick to deliver certain "Dedicated Gas" produced by the Comanche Assets (i.e., the "Dedicated Acreage") to Carnero. Section 3.1(b) of the GGPA excludes certain gas that is committed to other service providers under the Existing Commitments until the obligation to deliver gas thereunder terminates or expires. In addition, Section 3.1(b) of the GGPA requires Mesquite, as successor to Maverick, to terminate the obligation to deliver gas under any Existing Commitment at the earliest possible time.

18. UnSub, Maverick, and Carnero entered into a Ratification Agreement (the "UnSub Ratification Agreement") on the same day that Maverick and Carnero entered into the GGPA. Gavilan, Eagle Ford and Venado also executed ratification agreements in substantially the same form as UnSub's Ratification Agreement. These agreements together with the UnSub Ratification Agreement are collectively referred to as the "Ratification Agreements". As a consequence of the various Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have the same obligations as Maverick to terminate their delivery obligations under any Existing Commitments at the earliest possible time. Mitsui signed a Letter Agreement dated effective April 1, 2018 ("Letter Agreement"), that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA.

19. At the same time they signed the GGPA and the various Ratification Agreements and the Letter Agreement, Unsub, Eagle Ford, Venado, Maverick, Gavilan, and Carnero entered

into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment") dated effective April 1, 2018.

20. Through the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado ratified and confirmed the GGPA in all respects and each agreed to assume all obligations of *a Producer* (as defined in the GGPA) under the GGPA in all respects. Specifically, the various Ratification Agreements each provide:

a. **Section 2 –** "Producer [UnSub, Eagle Ford, and Venado each] hereby *ratifies and confirms the GGPA in all respects, and agrees that Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] will assume all the obligations of a* ***'Producer' (as defined in the GGPA)*** *under the GGPA in all respects and make all the representations and warranties of a 'Producer' under the GGPA."* [Emphasis Added.]

b. **Section 4** - "*Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA…*[3] *and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA….*" [Emphasis added.]

c. **Section 6 –** UnSub, Gavilan, Eagle Ford, and Venado each appointed Maverick as its "Producer's Representative"—"its agent and attorney-in-fact with respect to all matters under the GGPA," including receipt of notices and delivery of nominations as set forth in Article VI of the GGPA.

21. The GGPA provides that a "Producer" (as defined in the GGPA)—(which includes UnSub, Gavilan, Eagle Ford, and Venado per the various Ratification Agreements)—has the following obligations:

a. **Section 3.1(b) –** Producer's Gas that is subject to "Existing Commitments" is excluded from the dedication under Section 3.1(b) of the GGPA, *but only until "the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System … or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right*

[3] Venado's Ratification Agreement omits the language that is omitted in this quote ("(including with respect to after acquired interests)").

> *at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1*." [Emphasis added].

22. Based on these provisions in the GGPA and the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have *all* the obligations of Producers under the GGPA, including the obligation to comply with the terms of Section 3.1(b) of the GGPA. These obligations specifically include the obligation, upon termination of any Existing Commitment preventing delivery of their gas to Carnero, to deliver all gas previously subject to such Existing Commitment to Carnero for Carnero to gather, process, and purchase. Further, UnSub, Gavilan, Eagle Ford, and Venado appointed Maverick as their representative for purposes of delivering nominations with respect to all of their gas from the Comanche Assets under the GGPA. Under the Letter Agreement, Mitsui authorized Mesquite to market the gas from Mitsui's interest in the Comanche Assets under the GGPA.

**Maverick's Bankruptcy**

23. Maverick and certain of its affiliates (collectively, the "Sanchez Debtors") filed chapter 11 bankruptcy petitions on August 11, 2019 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") [Case No. 19-34508, jointly administered]. On April 30, 2020, the Bankruptcy Court entered an order confirming the Sanchez Debtors' Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 1205, Case No. 19-34508] (the "Plan"). As part of the Plan confirmation process, Maverick assumed the GGPA. Upon the effective date of the Plan, Mesquite became the successor to Maverick.

24. On June 28, 2021, the Bankruptcy Court entered a Stipulation of Dismissal and Agreed Order confirming the agreed rejection of the Marketing Agreement and the assumption of the UnSub Ratification Agreement by Mesquite (the "Rejection-Assumption Order"). The rejection of the Marketing Agreement terminated Mesquite's right to UnSub's gas and triggered

the obligation under Section 3.1 of the GGPA and the UnSub Ratification Agreement for UnSub to deliver its gas to Carnero for gathering, processing, and purchase.

25. Mesquite commenced proceedings to reject the Midstream Agency Agreement, which would terminate any delivery obligation thereunder, as well as under each Existing Commitment. Termination of Mesquite's delivery obligation under the Existing Commitments (which Mesquite and UnSub, Eagle Ford, and Venado must undertake at the earliest possible time) requires the delivery of Mesquite's, UnSub's, and the WIPs' gas to Carnero under the GGPA and the Ratification Agreements. On information and belief, the WIPs are causing Mesquite to withdraw its rejection of the Midstream Agency Agreement and/or to enter into new midstream agreement(s) in violation of the GGPA and the Ratification Agreements, which would prevent delivery of the WIPs' gas to Carnero.

26. Additionally, the Rejection-Assumption Order indicates that UnSub and Mesquite may be in active negotiations to enter into a new marketing agreement or a modified version of the rejected Marketing Agreement. On information and belief, UnSub and Mesquite may be attempting to negotiate a new dedication agreement or amend other agreements (including the Existing Commitments) to prevent delivery of UnSub's gas to Carnero. On information and belief, the WIPs are taking a similar position that would prevent delivery of their gas to Carnero. These actions are in derogation of Carnero's rights under the GGPA, the various Ratification Agreements, and the Letter Agreement. If such agreement(s) are consummated, it will be a material breach of the UnSub Ratification Agreement and the GGPA. Additionally, UnSub's statements and actions in the Bankruptcy Court confirm that it does not intend to comply with the terms of the UnSub Ratification Agreement and the GGPA.

## VII. Causes of Action

### A. Declaratory Judgment

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are affected by those contracts. Carnero may have determined any question of construction or validity arising under those contracts and obtain a declaration of rights, status, or other legal relations under the GGPA, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to its Ratification Agreement and the GGPA, all of UnSub's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(b) Pursuant to their respective Ratification Agreements and the GGPA, all of Eagle Ford's and Venado's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(c) Pursuant to the Letter Agreement and the GGPA, all of Mitsui's gas from the Comanche Assets is dedicated to Carnero;

(d) Their respective Ratification Agreements and the GGPA require UnSub, Eagle Ford, Venado, and Mesquite to exercise any and all options or rights at the earliest possible time to terminate any Existing Commitments (as defined in Section 3.1(b) of the GGPA);

(e) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), UnSub and Mesquite must tender for delivery all of their gas from the Comanche Assets to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(f) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Eagle Ford and Venado must tender for delivery all of their gas from the Comanche Assets

to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(g) The GGPA and the Letter Agreement require that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Mitsui must tender for delivery all of its gas from the Comanche Assets to Mesquite for delivery to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(h) In their respective Ratification Agreements UnSub, Eagle Ford, and Venado designate Mesquite their Producer's Representative with respect to all matters arising under the GGPA;

(i) In the Letter Agreement, Mitsui designates Mesquite as its marketer with respect to Mitsui's gas from the Comanche Assets to be processed through the GGPA;

(j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,

i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and

ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

(k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.

(l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,

i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;

ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and

iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the Ratification Agreements, the Letter Agreement, and the GGPA.

**B. Attorney's Fees**

38. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code § 37.009 and as allowed by the GGPA and Ratification Agreements or other applicable agreement or statutory provision.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: July 30, 2021.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Eugene M. Nettles*
Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

8/9/2021 9:02 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56104985
By: Rhonda Momon
Filed: 8/9/2021 9:02 AM

Marilyn Burgess
HARRIS COUNTY DISTRICT CLERK

201 Caroline | P.O. Box 4651 | Houston, Texas 77210-4651 | 832-927-5800 | www.hcdistrictclerk.com

# Request for Issuance of Service

**CASE NUMBER: 2021-46431** **CURRENT COURT: 269th Jidicial District**
**Name(s) of Documents to be served: Plaintiff's Original Petition**

**FILE DATE:** 07/30/2021 Month/Day/Year
**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: SN EF UNSUB, LP

Address of Service: 1999 Bryan St., Suite 900

City, State & Zip: Dallas, Texas 75201

Agent (if applicable): CT Corporation System

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**
☐ **Citation Scire Facias** **Newspaper______________**
☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**
☐ **Protective Order**
☐ **Secretary of State Citation ($12.00)** ☐ **Capias (not by E-Issuance)** ☐ **Attachment (not by E-Issuance)**
☐ **Certiorari** ☐ **Highway Commission ($12.00)**
☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**
☐ **Habeas Corpus (not by E-Issuance)** ☐ **Injunction** ☐ **Sequestration**
☐ **Subpoena**
☐ **Other (Please Describe) ____________________________________**
**(See additional Forms for Post Judgment Service)**

**SERVICE BY *(check one)*:**
☐ **ATTORNEY PICK-UP (phone) __________________**
☐ **MAIL to attorney at: ____________________**
☐ **CONSTABLE**
☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**
***Note:*** The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ________________ Phone: __________

☐ **OTHER**, *explain* ________________________________________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Amy C. Falcon Bar # or ID 24053576

Mailing Address: Porter Hedges LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002

Phone Number: 713.226.6681

Marilyn Burgess
HARRIS COUNTY DISTRICT CLERK

Request for Issuance of Service

**CASE NUMBER: 2021-46431** **CURRENT COURT: 269th Jidicial District**
**Name(s) of Documents to be served: Plaintiff's Original Petition**

**FILE DATE:** 07/30/2021 Month/Day/Year
**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: EAGLE FORD TX LP

Address of Service: 206 E. 9th Street, Suite 1300

City, State & Zip: Austin, Texas 78701

Agent (if applicable): Capitol Corporate Services, Inc.

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**
☐ **Citation Scire Facias** **Newspaper______________**
☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**
☐ **Protective Order**
☐ **Secretary of State Citation ($12.00)** ☐ **Capias (not by E-Issuance)** ☐ **Attachment (not by E-Issuance)**
☐ **Certiorari** ☐ **Highway Commission ($12.00)**
☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**
☐ **Habeas Corpus (not by E-Issuance)** ☐ **Injunction** ☐ **Sequestration**
☐ **Subpoena**
☐ **Other (Please Describe)** ____________________________________
**(See additional Forms for Post Judgment Service)**

**SERVICE BY *(check one)*:**
☐ **ATTORNEY PICK-UP (phone)** __________________
☐ **MAIL to attorney at:** __________________
☐ **CONSTABLE**
☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**
***Note*: The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.**

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ________________ Phone: __________

☐ **OTHER**, *explain* ______________________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Amy C. Falcon Bar # or ID 24053576

Mailing Address: Porter Hedges LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002

Phone Number: 713.226.6681

015297

Marilyn Burgess
HARRIS COUNTY DISTRICT CLERK
201 Caroline | P.O. Box 4651 | Houston, Texas 77210-4651 | 832-927-5800 | www.hcdistrictclerk.com

# Request for Issuance of Service

**CASE NUMBER: 2021-46431** **CURRENT COURT: 269th Jidicial District**
**Name(s) of Documents to be served: Plaintiff's Original Petition**

**FILE DATE:** 07/30/2021 Month/Day/Year
**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: VENADO EF L.P.

Address of Service: 5444 Westheimer #1000

City, State & Zip: Houston, Texas 77056

Agent (if applicable): Corporate Creations Network, Inc.

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**
☐ **Citation Scire Facias** **Newspaper______________**
☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**
☐ **Protective Order**
☐ **Secretary of State Citation ($12.00)** ☐ **Capias (not by E-Issuance)** ☐ **Attachment (not by E-Issuance)**
☐ **Certiorari** ☐ **Highway Commission ($12.00)**
☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**
☐ **Habeas Corpus (not by E-Issuance)** ☐ **Injunction** ☐ **Sequestration**
☐ **Subpoena**
☐ **Other (Please Describe) ____________________________________**
**(See additional Forms for Post Judgment Service)**

**SERVICE BY (*check one*):**
☐ **ATTORNEY PICK-UP (phone) __________________**
☐ **MAIL to attorney at: ____________________**
☐ **CONSTABLE**
☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**
***Note*: The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.**

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ________________ Phone: __________

☐ **OTHER**, *explain* ______________________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Amy C. Falcon Bar # or ID 24053576

Mailing Address: Porter Hedges LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002

Phone Number: 713.226.6681

015298

Marilyn Burgess
HARRIS COUNTY DISTRICT CLERK

# Request for Issuance of Service

**CASE NUMBER: 2021-46431** **CURRENT COURT: 269th Jidicial District**
**Name(s) of Documents to be served: Plaintiff's Original Petition**

**FILE DATE:** 07/30/2021 Month/Day/Year
**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: MITSUI E&P TEXAS LP

Address of Service: 1999 Bryan Street, Suite 900

City, State & Zip: Dallas Texas 75201

Agent (if applicable): CT Corporation System

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**

☐ **Citation Scire Facias** **Newspaper______________**

☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**

☐ **Protective Order**

☐ **Secretary of State Citation ($12.00)** ☐ **Capias (not by E-Issuance)** ☐ **Attachment (not by E-Issuance)**

☐ **Certiorari** ☐ **Highway Commission ($12.00)**

☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**

☐ **Habeas Corpus (not by E-Issuance)** ☐ **Injunction** ☐ **Sequestration**

☐ **Subpoena**

☐ **Other (Please Describe) ___________________________________**

**(See additional Forms for Post Judgment Service)**

**SERVICE BY *(check one)*:**

☐ **ATTORNEY PICK-UP (phone) __________________**
☐ **MAIL to attorney at: __________________**
☐ **CONSTABLE**
☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**
***Note*: The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.**

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ________________ Phone: __________

☐ **OTHER**, *explain* ______________________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Amy C. Falcon Bar # or ID 24053576

Mailing Address: Porter Hedges LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002

Phone Number: 713.226.6681

015299

Marilyn Burgess
HARRIS COUNTY DISTRICT CLERK
201 Caroline | P.O. Box 4651 | Houston, Texas 77210-4651 | 832-927-5800 | www.hcdistrictclerk.com

Request for Issuance of Service

**CASE NUMBER: 2021-46431** **CURRENT COURT: 269th Jidicial District**
**Name(s) of Documents to be served: Plaintiff's Original Petition**

**FILE DATE:** 07/30/2021 Month/Day/Year
**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to**: MESQUITE ENERGY, INC.

Address of Service: 1999 Bryan Street, Suite 900

City, State & Zip: Dallas Texas 75201

Agent (if applicable): CT Corporation System

**TYPE OF SERVICE/PROCESS TO BE ISSUED**: (Check the proper Box)

☒ **Citation** ☐ **Citation by Posting** ☐ **Citation by Publication** ☐ **Citations Rule 106 Service**
☐ **Citation Scire Facias** **Newspaper**______________
☐ **Temporary Restraining Order** ☐ **Precept** ☐ **Notice**
☐ **Protective Order**
☐ **Secretary of State Citation ($12.00)** ☐ **Capias** (not by E-Issuance) ☐ **Attachment** (not by E-Issuance)
☐ **Certiorari** ☐ **Highway Commission ($12.00)**
☐ **Commissioner of Insurance ($12.00)** ☐ **Hague Convention ($16.00)** ☐ **Garnishment**
☐ **Habeas Corpus** (not by E-Issuance) ☐ **Injunction** ☐ **Sequestration**
☐ **Subpoena**
☐ **Other (Please Describe)** ________________________________
**(See additional Forms for Post Judgment Service)**

**SERVICE BY *(check one)*:**
☐ **ATTORNEY PICK-UP (phone)** __________________
☐ **MAIL to attorney at:** ___________________
☐ **CONSTABLE**
☐ **CERTIFIED MAIL by District Clerk**

☒ **E-Issuance by District Clerk**
**(No Service Copy Fees Charged)**
***Note*: The email registered with EfileTexas.gov must be used to retrieve the E-Issuance Service Documents. Visit www.hcdistrictclerk.com for more instructions.**

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: ________________ Phone: __________

☐ **OTHER**, *explain* ______________________________________

**Issuance of Service Requested By:** Attorney/Party Name: Amy C. Falcon Bar # or ID 24053576

Mailing Address: Porter Hedges LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002

Phone Number: 713.226.6681

8/20/2021 10:53 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56500564
By: A Davis
Filed: 8/20/2021 10:53 AM

# AFFIDAVIT OF SERVICE

**State of Texas** **County of Harris** **269th Judicial District Court**

Case Number: 2021-46431

Plaintiff:
**CARNERO G&P LLC**

vs.

Defendant:
**SN EF UNSUB, LP, EAGLE FORD TX LP, et al**

Received these papers on the 12th day of August, 2021 at 5:30 pm to be served on **EAGLE FORD TX LP care of its Registered Agent, CAPITOL CORPORATE SERVICES, INC., 206 E. 9th Street, Suite 1300, Austin, Travis County, TX 78701.**

I, Vivian Smith, being duly sworn, depose and say that on the **13th day of August, 2021 at 10:05 am, I:**

hand-delivered a true copy of this **Citation together with Plaintiff's Original Petition,** to **EAGLE FORD TX LP care of its Registered Agent, CAPITOL CORPORATE SERVICES, INC.** by and through its designated agent, **MARY ANN QUICK,** at the address of: **206 E. 9th Street, Suite 1300, Austin, Travis County, TX 78701,** having first endorsed upon such copy of such process the date of delivery.

I certify that I am approved by the Judicial Branch Certification Commission, Misc. Docket No. 05-9122 under rule 103, 501, and 501.2 of the TRCP to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas. I am competent to make this oath; I am not less than 18 years of age, I am not a party to the above-referenced cause, I have not been convicted of a felony or a crime of moral turpitude, and I am not interested in the outcome of the above-referenced cause.

Subscribed and Sworn to before me on the 13th day of August, 2021 by the affiant who is personally known to me.

NOTARY PUBLIC

SCOTT L. THOMAS
NOTARY PUBLIC
STATE OF TEXAS
ID# 10407286
EXPIRES 1-9-2024

**Vivian Smith**
PSC-12617, Exp. 5/31/2022

Our Job Serial Number: THP-2021004015
Ref: 224-0199

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2c

Receipt Number: 942370
Tracking Number: 73900910

**COPY OF PLEADING PROVIDED BY PLT**

CAUSE NUMBER: 202146431

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 269th Judicial |
| vs. | District Court of |
| DEFENDANT: SN EF UNSUB LP | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: EAGLE FORD TX LP MAY BE SERVED THROUGH ITS REGISTERED AGENT CAPITOL
CORPORATE SERVICES INC
206 E 9TH STREET SUITE 1300
AUSTIN TX 78701

Attached is a copy of PLAINTIFF'S ORIGINAL PETITION.

This instrument was filed on July 30, 2021, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this August 11, 2021.

DISTRICT COURT OF HARRIS COUNTY TEXAS

Marilyn Burgess

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: RHONDA MOMON

Issued at request of:
FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681

Bar Number: 24053576

Tracking Number: 73900910

CAUSE NUMBER: 202146431

PLAINTIFF: CARNERO G&P LLC

vs.

DEFENDANT: SN EF UNSUB LP

In the 269th

Judicial District Court

of Harris County, Texas

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at ________o'clock _____. M., on the ________ day of ________________________________________, 20_______.

Executed at (address) ______________________________________________________________
in _______________ County
at _______ o'clock _____. M., on the ________ day of ________________________________________________, 20 ______,

by delivering to __________________________________________________________ defendant,
in person, a true copy of this
Citation together with the accompanying ______ copy(ies) of the ______________________________________________ Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _________ day of _____________________________________________, 20 _______.

FEE: $ ______________

______________________________________________

________________ of ___________________

County, Texas

______________________________________ By: ________________________________________

Affiant Deputy

On this day, ____________________________________________________________, known to me to be the person whose signature
appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this __________ of ________________________________________, 20 _____

________________________________________

Notary Public

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 56500564
Status as of 8/20/2021 11:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 8/20/2021 10:53:35 AM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 8/20/2021 10:53:35 AM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 8/20/2021 10:53:35 AM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 8/20/2021 10:53:35 AM | SENT |

8/20/2021 10:42 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56499614
By: F Abdul-Bari
Filed: 8/20/2021 10:42 AM

**CAUSE NO. 202146431**

| | | |
|---|---|---|
| **CARNERO G&P LLC** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **Plaintiff(s),** | § | |
| **VS.** | § | **269TH JUDICIAL DISTRICT** |
| | § | |
| **SN EF UNSUB, LP, ET AL** | § | |
| | § | |
| **Defendant(s).** | § | **HARRIS COUNTY, TEXAS** |

# RETURN OF SERVICE

Came to my hand on **Thursday, August 12, 2021 at 5:54 PM,**
Executed at: **1999 BRYAN STREET, STE 900, DALLAS, TX 75201**
within the county of **DALLAS** at **10:44 AM,** on **Friday, August 13, 2021,**
by delivering to the within named:

**MESQUITE ENERGY INC**

By delivering to its **Registered Agent, CT CORPORATION SYSTEM**
By delivering to its **Authorized Agent, TERRI THONGSAVAT**
a true copy of this

**CITATION CORPORATE AND PLAINTIFF'S ORIGINAL PETITION**

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **Adil Tadli** who after being duly sworn on oath states: "My name is **Adil Tadli**. I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Civil Practice and Remedies Codes as they apply to service of process. I am certified by the Judicial Branch Certification Commission to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas in compliance with rule 103 and 501.2 of the TRCP."

By:______________________________
**Adil Tadli - PSC 1206 - Exp 05/31/22**
**served@specialdelivery.com**

**Subscribed and Sworn to by Adil Tadli, Before Me, the undersigned authority, on this** 17th **day of August, 2021.**

Charity N. Coleman
**Notary Public in and for the State of Texas**

CHARITY N COLEMAN
Notary Public
STATE OF TEXAS
ID# 12523831-2
My Comm. Exp. March 21, 2025

015305

CAUSE NO. 202146431

COPY OF PLEADING PROVIDED BY PLT

RECEIPT NO: 942370 TRACKING NO: 73900913

| | |
|---|---|
| Plaintiff:<br>CARNERO G&P LLC<br>vs.<br>Defendant:<br>SN EF UNSUB LP | In The 269th<br>Judicial District Court of<br>Harris County, Texas<br>201 CAROLINE<br>Houston, Texas |

**CITATION CORPORATE**

**THE STATE OF TEXAS**
**County of Harris**

**To: MESQUITE ENERGY INC (IS A CORPORATION) MAY BE SERVED THROUGH ITS REGISTERED AGENT CT CORPORATION SYSTEM**
**1999 BRYAN ST SUITE 900, DALLAS TX 75201**

Attached is a copy of: PLAINTIFF'S ORIGINAL PETITION

This instrument was filed on July 30, 2021 in the above cited cause number and court. The instrument attached describes the claim against you.

**YOU HAVE BEEN SUED.** You may employ an attorney. If you or your Attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration date of 20 days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

This citation was issued on August 11, 2021, under my hand and seal of said court.

<u>Issued at the request of:</u>

FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681
Bar Number: 24053576

Marilyn Burgess, District Clerk

Harris County, Texas
201 CAROLINE Houston Texas 77002
(PO Box 4651, Houston, Texas 77210)

Generated By:RHONDA MOMON

Tracking Number: 73900913

**CAUSE NUMBER: 202146431**

**PLAINTIFF: CARNERO G&P LLC**

**vs.**

**DEFENDANT: SN EF UNSUB LP**

**In the 269th**

**Judicial District Court of**

**Harris County, Texas**

OFFICER - AUTHORIZED PERSON RETURN

Came to hand at _______ o'clock ___. M. on the _________ day of ________________________, 20_____. Executed at

(Address)_____________________________________________________________________________________________
in

____________________ County at o'clock ___. M. On the _________ day of ________________________, 20_____, by

Delivering to _______________________________________________defendant, in person, a true copy of this Citation together with the accompanying ______ copy (ies) of the «Attachment». Petition attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _______________day of _________________________________, 20.

Fees $_________________________

_____________________________________________
Affiant

By________________________________________
Deputy

On this day, ______________________________________________________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, On this ______ day of _________________________________, 20__.

__________________________________________
Notary Public

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 56499614
Status as of 8/20/2021 10:46 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 8/20/2021 10:42:11 AM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 8/20/2021 10:42:11 AM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 8/20/2021 10:42:11 AM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 8/20/2021 10:42:11 AM | SENT |

8/20/2021 10:38 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56499287
By: F Abdul-Bari
Filed: 8/20/2021 10:38 AM

**CAUSE NO. 202146431**

| | | |
|---|---|---|
| **CARNERO G&P LLC** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **Plaintiff(s),** | § | |
| **VS.** | § | **269TH JUDICIAL DISTRICT** |
| | § | |
| **SN EF UNSUB, LP, ET AL** | § | |
| | § | |
| **Defendant(s).** | § | **HARRIS COUNTY, TEXAS** |

# RETURN OF SERVICE

Came to my hand on **Thursday, August 12, 2021 at 5:54 PM,**
Executed at: **1999 BRYAN STREET, STE 900, DALLAS, TX 75201**
within the county of **DALLAS** at **10:44 AM,** on **Friday, August 13, 2021,**
by delivering to the within named:

**MITSUI E&P TEXAS LP**

By delivering to its **Registered Agent, CT CORPORATION SYSTEM**
By delivering to its **Authorized Agent, TERRI THONGSAVAT**
a true copy of this

**CITATION AND PLAINTIFF'S ORIGINAL PETITION**

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **Adil Tadli** who after being duly sworn on oath states: "My name is **Adil Tadli.** I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Civil Practice and Remedies Codes as they apply to service of process. I am certified by the Judicial Branch Certification Commission to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas in compliance with rule 103 and 501.2 of the TRCP."

By:______________________________
**Adil Tadli - PSC 1206 - Exp 05/31/22**
**served@specialdelivery.com**

**Subscribed and Sworn to by Adil Tadli, Before Me, the undersigned authority, on this** 17th **day of August, 2021.**

Charity N. Coleman
**Notary Public in and for the State of Texas**

CHARITY N COLEMAN
Notary Public
STATE OF TEXAS
ID# 12523831-2
My Comm. Exp. March 21, 2025

015309

Receipt Number: 942370
Tracking Number: 73900912

**COPY OF PLEADING PROVIDED BY PLT**

CAUSE NUMBER: 202146431

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 269th Judicial |
| vs. | District Court of |
| DEFENDANT: SN EF UNSUB LP | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: MITSUI E&P TEXAS LP MAY BE SERVED BY SERVING THROUGH ITS REGISTERED AGENT

CT CORPORATION SYSTEM

1999 BRYAN STREET SUITE 900

DALLAS TX 75201

Attached is a copy of PLAINTIFF'S ORIGINAL PETITION.

This instrument was filed on July 30, 2021, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this August 11, 2021.

DISTRICT COURT OF HARRIS COUNTY, TEXAS

Marilyn Burgess

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: RHONDA MOMON

Issued at request of:
FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681

Bar Number: 24053576

Tracking Number: 73900912

CAUSE NUMBER: 202146431

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 269th |
| vs. | Judicial District Court |
| DEFENDANT: SN EF UNSUB LP | of Harris County, Texas |

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at _______ o'clock ____. M., on the _______ day of _______________, 20_____.

Executed at (address) _______________ in _______________ County at _______ o'clock ____. M., on the _______ day of _______________, 20 _____,

by delivering to _______________ defendant, in person, a true copy of this Citation together with the accompanying _____ copy(ies) of the _______________ Petition attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _______ day of _______________, 20 _____.

FEE: $ __________

_______________

__________ of __________

County, Texas

_______________ By: _______________

Affiant Deputy

On this day, _______________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this _______ of _______________, 20 _____

_______________

Notary Public

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 56499287
Status as of 8/20/2021 10:45 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 8/20/2021 10:38:19 AM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 8/20/2021 10:38:19 AM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 8/20/2021 10:38:19 AM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 8/20/2021 10:38:19 AM | SENT |

8/20/2021 10:45 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56499925
By: F Abdul-Bari
Filed: 8/20/2021 10:45 AM

**CAUSE NO. 202146431**

| | | |
|---|---|---|
| **CARNERO G&P LLC** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **Plaintiff(s),** | § | |
| **VS.** | § | **269TH JUDICIAL DISTRICT** |
| | § | |
| **SN EF UNSUB, LP, ET AL** | § | |
| | § | |
| **Defendant(s).** | § | **HARRIS COUNTY, TEXAS** |

# RETURN OF SERVICE

Came to my hand on **Thursday, August 12, 2021 at 5:54 PM,**
Executed at: **1999 BRYAN STREET, STE 900, DALLAS, TX 75201**
within the county of **DALLAS** at **10:44 AM,** on **Friday, August 13, 2021,**
by delivering to the within named:

**SN EF UNSUB, LP**

By delivering to its **Registered Agent, CT CORPORATION SYSTEM**
By delivering to its **Authorized Agent, TERRI THONGSAVAT**
a true copy of this

**CITATION AND PLAINTIFF'S ORIGINAL PETITION**

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **Adil Tadli** who after being duly sworn on oath states: "My name is **Adil Tadli.** I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Civil Practice and Remedies Codes as they apply to service of process. I am certified by the Judicial Branch Certification Commission to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas in compliance with rule 103 and 501.2 of the TRCP."

By: [signature]
**Adil Tadli - PSC 1206 - Exp 05/31/22**
**served@specialdelivery.com**

**Subscribed and Sworn to by Adil Tadli, Before Me, the undersigned authority, on this** 17th **day of August, 2021.**

[signature] Charity N Coleman
**Notary Public in and for the State of Texas**

CHARITY N COLEMAN
Notary Public
STATE OF TEXAS
ID# 12523831-2
My Comm. Exp. March 21, 2025

015313

Receipt Number: 942370
Tracking Number: 73900908

**COPY OF PLEADING PROVIDED BY PLT**

CAUSE NUMBER: 202146431

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 269th Judicial |
| vs. | District Court of |
| DEFENDANT: SN EF UNSUB LP | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: SN EF UNSUB LP MAY BE SERVED THROUGH ITS REGISTERED AGENT CT CORPORATION SYSTEM

1999 BRYAN STREET ST SUITE 900

DALLAS TX 75201

Attached is a copy of PLAINTIFF'S ORIGINAL PETITION.

This instrument was filed on July 30, 2021, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this August 11, 2021.

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: RHONDA MOMON

Issued at request of:
FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681

Bar Number: 24053576

Tracking Number: 73900908

CAUSE NUMBER: 202146431

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 269th |
| vs. | Judicial District Court |
| DEFENDANT: SN EF UNSUB LP | of Harris County, Texas |

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at ________o'clock _____. M., on the ________ day of ______________________________, 20______.

Executed at (address) ______________________________
in ______________ County
at _______ o'clock _____. M., on the ________ day of ______________________________, 20 ______,

by delivering to ______________________________ defendant, in person, a true copy of this Citation together with the accompanying ______ copy(ies) of the ______________________________ Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this ________ day of ______________________________, 20 _______.

FEE: $ _____________

______________________________

______________ of ______________

County, Texas

______________________________ By: ______________________________

Affiant Deputy

On this day, ______________________________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this __________ of ______________________________, 20 ______

______________________________

Notary Public

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 56499925
Status as of 8/20/2021 10:49 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 8/20/2021 10:45:59 AM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 8/20/2021 10:45:59 AM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 8/20/2021 10:45:59 AM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 8/20/2021 10:45:59 AM | SENT |

8/20/2021 10:57 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56500817
By: A Davis
Filed: 8/20/2021 10:57 AM

# AFFIDAVIT OF SERVICE

**State of HARRIS** **County of TEXAS** **269th Judicial District Court**

Case Number: 202146431

Plaintiff:
**CARNERO G&P LLC**

vs.

Defendant:
**SN EF UNSUB LP, ET AL**

Received these papers on the 12th day of August, 2021 at 1:00 pm to be served on **VENADO EF L P By Delivering To Registered Agent, Corporate Creations Network Inc., 5444 WESTHEIMER # 1000, HOUSTON, TX 77056.**

I, NIKKI WILLIAMS, being duly sworn, depose and say that on the **16th day of August, 2021 at 3:28 pm, I:**

served an **AUTHORIZED** entity by delivering a true copy of the **CITATION AND PLAINTIFFS ORIGINAL PETITION** with the date and hour of service endorsed thereon by me, to: **MARIA NEWMAN** as **AUTHORIZED AGENT FOR SERVICE** at the address of: **5444 WESTHEIMER # 1000, HOUSTON, TX 77056**, who stated they are authorized to accept service for **VENADO EF L P By Delivering To Registered Agent, Corporate Creations Network Inc.**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 44, Sex: F, Race/Skin Color: Hispanic, Height: 5'6", Weight: 160, Hair: Dark Brown, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served.

Nikki Williams
**NIKKI WILLIAMS**
PSC-18760 EXP 10/31/2022

Subscribed and Sworn to before me on the 16th day of August, 2021 by the affiant who is personally known to me.

Alexandra Tedder
NOTARY PUBLIC

Our Job Serial Number: DNE-2021000736
Ref: 2240203

ALEXANDRA TEDDER
Notary Public, State of Texas
Comm. Expires 03-19-2025
Notary ID 132985705

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1p

Receipt Number: 942370
Tracking Number: 73900911

COPY OF PLEADING PROVIDED BY PLT

CAUSE NUMBER: 202146431

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 269th Judicial |
| vs. | District Court of |
| DEFENDANT: SN EF UNSUB LP | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: VENADO EF L P MAY BE SERVED THROUGH ITS REGISTERED AGENT

CORPORATE CREATIONS NETWORK INC

5444 WESTHEIMER #1000

HOUSTON TX 77056

Attached is a copy of PLAINTIFF'S ORIGINAL PETITION.

This instrument was filed on July 30, 2021, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this August 11, 2021.

DISTRICT COURT OF HARRIS COUNTY TEXAS

Marilyn Burgess

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: RHONDA MOMON

Issued at request of:
FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681

Bar Number: 24053576

Tracking Number: 73900911

CAUSE NUMBER: 202146431

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 269th |
| vs. | Judicial District Court |
| DEFENDANT: SN EF UNSUB LP | of Harris County, Texas |

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at ________o'clock _____. M., on the ________ day of ______________________________, 20_______.

Executed at (address) ______________________________________________
in _______________ County
at _______ o'clock _____. M., on the ________ day of ______________________________, 20 ______,

by delivering to ______________________________ defendant, in person, a true copy of this Citation together with the accompanying _______ copy(ies) of the ______________________________ Petition

attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this ________ day of ______________________________, 20 _______.

FEE: $ ______________

______________________________________

_______________ of _______________

County, Texas

______________________________ By: ______________________________

Affiant Deputy

On this day, ______________________________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this ________ of ______________________________, 20 _____

______________________________
Notary Public

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 56500817
Status as of 8/20/2021 11:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 8/20/2021 10:57:02 AM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 8/20/2021 10:57:02 AM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 8/20/2021 10:57:02 AM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 8/20/2021 10:57:02 AM | SENT |

9/4/2021 3:43 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56978934
By: F Abdul-Bari
Filed: 9/7/2021 12:00 AM

Cause No. 2021-46431

| | | |
|---|---|---|
| Carnero G&P, LLC | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| SN EF Unsub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | § | |
| *Defendants*. | § | 269TH DISTRICT COURT |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |

| | | |
|---|---|---|
| Carnero G&P, LLC | § | |
| | § | Adversary No. ______________ |
| *Plaintiff*, | § | |
| v. | § | |
| SN EF Unsub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | § | |
| *Defendants*. | § | |

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

# STIPULATION

By the signatures of the counsel below, Plaintiff Carnero G&P, LLC and Defendants SN EF Unsub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. (collectively "**Defendants**") have agreed to abate the Defendants' deadline to file responsive pleadings in connection with the lawsuit *Carnero G&P, LLC v. SN EF Unsub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.,* Cause No. 2021-46431, in the 269th District Court of Harris County, Texas (the "**State Court Action**"), which the Defendants intend to remove to the United States Bankruptcy Court for the Southern District of Texas, Houston Division, and which Plaintiff then intends to move to remand, as follows:

1. The parties agree to abate the deadline for filing responsive pleadings (including answers or motions to dismiss) until after a resolution of the motion to remand.
2. The deadline for filing a responsive pleading will be 20 days after a ruling on the motion to remand.

DocuSigned by:
Joshua W. Wolfshohl
9689C6A6E7454EC...

Date: 9/4/2021

Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Plaintiff Carnero G&P, LLC**

DocuSigned by:
ED2633 D79D34D5

______________________________ Date: 9/3/2021

James G. Munisteri
**Foley & Lardner LLP**
Texas Bar No. 14667380
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax
713.276.5555
jmunisteri@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax
214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant**
**Mesquite Energy, Inc.**

DocuSigned by:
Rusty Woolley
________________________________ Date: 9/3/2021

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Defendant SN EF Unsub, LP**

DocuSigned by:
Jared Wilkerson
____________________ Date: 9/3/2021

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

DocuSigned by:
Rex Manning
FF49358EDFCC492...
____________________ Date: 9/3/2021

Rex Manning
**Kirkland & Ellis LLP**
Kirkland & Ellis International LLP
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
rex.manning@kirkland.com

**Attorney for Defendant Venado EF L.P.**

DocuSigned by:
Maegan Quejada
________________________ Date: 9/3/2021

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Defendant Mitsui E&P Texas LP**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sara Brown on behalf of Sara Brown
Bar No. 24075773
sabrown@foley.com
Envelope ID: 56978934
Status as of 9/7/2021 8:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 9/4/2021 3:43:23 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 9/4/2021 3:43:23 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 9/4/2021 3:43:23 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 9/4/2021 3:43:23 PM | SENT |
| James G. Munisteri | 14667380 | jmunisteri@gardere.com | 9/4/2021 3:43:23 PM | SENT |
| Sara Brown | 24075773 | sabrown@foley.com | 9/4/2021 3:43:23 PM | SENT |
| Thomas Andrew Woolley | 24042193 | twoolley@mrwpllc.com | 9/4/2021 3:43:23 PM | SENT |
| Jared Wilkerson | 24084096 | jared.wilkerson@morganlewis.com | 9/4/2021 3:43:23 PM | SENT |
| Rex Manning | | rex.manning@kirkland.com | 9/4/2021 3:43:23 PM | SENT |
| Angela C.Zambrano | | angela.zambrano@sidley.com | 9/4/2021 3:43:23 PM | SENT |
| Duston K.McFaul | | dmcfaul@sidley.com | 9/4/2021 3:43:23 PM | SENT |
| Maegan Quejada | | mquejada@sidley.com | 9/4/2021 3:43:23 PM | SENT |

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 21-03908 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P., Mitsui E&P Texas LP, | § | |
| and Mesquite Energy, Inc., | § | |
| | § | |
| Defendants. | § | |

**Adversary Plaintiff's Motion to Remand to State Court or for Abstention**

(Related to Doc. No. 1)

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

.

1 The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

# Table of Contents


Summary of the Relief Requested ........ 1

Background ........ 2

Argument ........ 4

I. The Court lacks jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit. ........ 4

A. The Court's post-confirmation jurisdiction is limited to matters pertaining to the implementation or execution of the Plan, which is assessed under the Craig's Stores' three-factor test. ........ 6

B. The Craig's Stores factors do not support jurisdiction over Carnero's claims. ........ 8

1. The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts. ........ 8

2. The claims in the State Court Lawsuit were not pending as of the Plan confirmation date. ........ 9

3. No facts or law deriving from the reorganization or Plan are necessary to decide Carnero's claims. ........ 9

II. The factors applicable to 28 U.S.C. 1334(c)(2) support mandatory abstention. ........ 11

A. Carnero has timely filed this motion for abstention and its claim is based on state law. ........ 12

B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b). ........ 12

C. Carnero's claims are non-core. ........ 12

D. Carnero filed its claims in the State Court Lawsuit. ........ 13

E. The state court can timely adjudicate Carnero's claims. ........ 13

III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention. ........ 14

A. The permissive abstention factors. ........ 14

B. The balance of the factors favors permissive abstention. ........ 16

1. The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention. ........ 16

2. The extent to which state law issues predominate over bankruptcy issues. ........ 16

3. The difficult or unsettled nature of applicable law. ........ 16

4. The presence of related proceeding commenced in state court or other nonbankruptcy proceeding. ........ 17

5. The jurisdictional basis, if any, other than § 1334. ........ 17

6. The degree of relatedness or remoteness of proceeding to the main bankruptcy case. ........ 17

7. The substance rather than the form of an asserted core proceeding. .................. 18

8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court. ........................................................................ 18

9. The burden on the bankruptcy court's docket. .................................................. 18

10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties.................................................. 18

11. The existence of a right to a jury trial. ........................................................... 19

12. The presence in the proceeding of nondebtor parties. ....................................... 19

13. Comity. ......................................................................................................... 19

14. The possibility of prejudice to other parties in the action. ................................. 20

Conclusion ............................................................................................................... 20

## Table of Authorities

**Cases**

*In re Austin Development Co.*, 19 F. 3d 1077 (5th Cir. 1994).................................................7, 11

*In re Craig's Stores of Tex., Inc.*, 266 F.3d 388 (5th Cir. 2001)...............................7, 8, 11, 12, 16

*In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813 (Bankr. S.D. Tex. 2006).....................................16

*In re Encompass Services Corp.*, 337 B.R. 864 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006)...............................................................9

*Matter of Galaz,* 841 F.3d 316 (5th Cir. 2016).........................................................................7, 10

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 589 (5th Cir. 2008) ........................................................................................10

*In re Hous. Reg'l Sports Network, L.P.*, 547 B.R. 717 (S.D. Tex. 2016) .......................................7

*In re Mugica*, 362 B.R. 782 (Bankr. S.D. Tex. 2007)...................................................................12

*In re Petroleum Products & Services, Inc.*, 561 B.R. 662 (Bankr. S.D. Tex. 2016) ...............12, 13

*Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.),* 336 B.R. 286, 290 (Bankr. S.D. Tex. 2005)....................................................................................................5

*In re SBMC Healthcare, LLC*, 519 B.R. 172 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017).............................................15, 16, 17, 18, 19, 20

*In re Seven Seas Petroleum, Inc.*, 522 F.3d 575 (5th Cir. 2008) .................................................11

*Smith v. Bank of Am. Corp.*, 605 Fed. Appx. 311 (5th Cir. 2015) ....................................4, 12

*Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 930 (5th Cir. 1999) ..............................13

*In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016)...12

*In re Ultra Petroleum Corp.*, No. 16-32202, 2019 WL 2524936 (Bankr. S.D. Tex. Jan. 9, 2019), *report and recommendation adopted*, No. 4:19-CV-00090, 2019 WL 2524704 (S.D. Tex. Feb. 25, 2019) ..........................................................................................................................9

*In re Wood*, 825 F.2d 90 (5th Cir.1987) ...........................................................................................15

*Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) ........................................................................4, 5

**Statutes**

28 U.S.C. §§ 157(b)(1) .......................................................................................................12

28 U.S.C. § 1334(b) ........................................................................................2, 4, 7, 12, 19,20

28 U.S.C. § 1334(c) ........................................................................................1, 2, 4, 11, 14, 21

28 U.S.C. § 1452(b) ..................................................................................................................1, 2

Tex. Civ. Prac. & Rem. Code Ch. 37.......................................................................................2, 3, 16

**Rules**

Fed. R. Bankr. P. 5011(b) ..............................................................................................................1

Fed. R. Bankr. P. 9014....................................................................................................................1

Bankr. Local Rule 9013-1...............................................................................................................1

Under 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, Adversary Plaintiff Carnero G&P LLC ("Carnero") files this Motion to Remand to State Court or for Abstention to return this case to the 269th Judicial District Court, Harris County, Texas:

## Summary of the Relief Requested

1. This suit arises out of contracts between Carnero and non-debtors SN EF UnSub LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui") (collectively, "WIPs"), and reorganized debtor Mesquite Energy, Inc. ("Mesquite")[2] (formerly known as Sanchez Energy Corporation) (collectively, the WIPs and Mesquite are the "Defendants"). Those contracts are as follows:

- April 1, 2018 Firm Gas Gathering, Processing and Purchasing Agreement ("GGPA") between Carnero and SN EF Maverick, LLC ("Maverick"), as amended by Carnero, the WIPs and Maverick, **Exhibit 1**;
- April 1, 2018 Ratification Agreements among Carnero, Maverick, UnSub, Eagle Ford, and Venado ratifying the GGPA ("Ratification Agreements"), **Exhibits 2-4**;
- April 1, 2018 Letter Agreement among Carnero, Maverick, and Mitsui regarding the GGPA ("Letter Agreement"), **Exhibit 5**.

2. The Reorganized Debtors assumed all of these contracts (collectively, the "Assumed Contracts"). Post-confirmation, Carnero filed a lawsuit in state court against the Defendants as Cause No. 2021-46431 in the 269th Judicial District Court, Harris County, Texas ("State Court Lawsuit"). In the lawsuit, the sole relief that Carnero seeks is a declaratory judgment

---

[2] Carnero recognizes that it may have misidentified Mesquite as the correct contract counterparty on the contracts that are the subject of this dispute. Carnero intends to correct this issue by amending its petition. For purposes of this Motion, it does not change the analysis that remand or abstention is warranted. Both Mesquite and Maverick are Reorganized Debtors.

under Texas Civil Practice and Remedies Code Chapter 37 regarding the parties' rights and obligations under the Assumed Contracts. The Defendants removed the case to this Court based on purported bankruptcy jurisdiction under 28 U.S.C. § 1334(b). But the State Court Lawsuit raises only matters of post-confirmation contract interpretation under state law that do not relate to implementation or execution of the Reorganized Debtors' plan of reorganization. This Court should remand this case to the state court or abstain for three reasons: (i) the Court lacks post-confirmation subject matter jurisdiction over Carnero's state court claim under 28 U.S.C. § 1334(b); (ii) the factors applicable to 28 U.S.C. § 1334(c)(2) require mandatory abstention; and (iii) the factors applicable to 28 U.S.C. § 1334(c)(1) favor permissive abstention and equitable remand pursuant to 28 U.S.C. § 1452(b).

## Background

3. The Reorganized Debtors filed their Chapter 11 petitions on August 11, 2019. [Case No. 19-34508, Dkt. 1].

4. The Court entered its Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan or Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates (the "Plan") on April 30, 2020. [Case No. 19-34508, Dkt. 1212].

5. On June 17, 2020, the Reorganized Debtors filed their Notice of Filing of Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates listing the contracts they rejected and assumed. [Case No. 19-34508, Dkt. 1326]. The assumed contracts include the GGPA, the Ratification Agreements, other than UnSub's Ratification Agreement, and the Letter Agreement. [*Id*. at PDF p. 194].

6. On June 30, 2020, the Plan became effective.[Case No. 19-34508, Dkt. 1417].

7. On June 28, 2021, the Court entered the Stipulation of Dismissal and Agreed Order resolving the adversary proceeding Case No. 20-03197 filed by GSO ST Holdings LP, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, and SN EF UnSub, LP against Sanchez Energy Corporation, SN EF Maverick, LLC, SN UR Holdings, LLC and Carnero G&P LLC. [Case No. 19-34508, 1983]. Through this order, the Reorganized Debtors assumed the UnSub Ratification Agreement and rejected the Marketing Agreement (defined below).

8. On July 30, 2021, Carnero filed the State Court Lawsuit against the Defendants seeking declarations under Texas Civil Practice and Remedies Code Chapter 37 regarding the parties' rights and obligations under the Assumed Contracts. [Dkt. 1-4]. The Assumed Contracts relate to oil and gas assets referred to as the "Comanche Assets." The GGPA contains terms requiring the Defendants to deliver gas from the Comanche Assets to Carnero in certain circumstances. The declarations Carnero seeks include the parties' rights and obligations under the Assumed Contracts and how those rights and obligations may be affected by certain other contracts that currently cause the gas from the Comanche Assets to be delivered to gas gatherers, processors, and purchasers other than Carnero. Those other contracts include:

(i) a rejected Hydrocarbons Purchase and Marketing Agreement ("Marketing Agreement") between UnSub and Maverick dated January 12, 2017 [Case No. 19-34508, Dkt. 1373]; and

(ii) an executory Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC, and Kerr-McGee Oil & Gas Onshore LP, on the other, and Mesquite as guarantor dated on or about June 1, 2017 ("Midstream Agency Agreement") [Case No. 19-34508, Dkt. 1544-2], which the Reorganized Debtors have not yet rejected or assumed.

9. Carnero does not seek any declarations ***under*** the Marketing Agreement or the Midstream Agency Agreement, and it cannot seek such declarations because it is not a party to either. Carnero also does not seek any declarations ***under*** the Bankruptcy Code, the Plan, any order

of this Court, or any other contract to which the Reorganized Debtors are parties other than the Assumed Contracts. Carnero does not seek to require the Reorganized Debtors to assume or reject any executory contract, including the Midstream Agency Agreement, or to interfere with this Court's determination of the assumption/rejection question for any executory contract under its prior orders.

10. On September 10, 2021, the Defendants filed the Notice of Removal of the State Court Lawsuit to this adversary proceeding. [Dkt. 1]. The only stated basis for jurisdiction is 28 U.S.C. § 1334(b).

## Argument

11. The Court should remand this adversary proceeding to the state court for three reasons. First, under 28 U.S.C. § 1334(b) this Court lacks jurisdiction to hear Carnero's state law contract interpretation claim under the Assumed Contracts. Second, the factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention. Third, the factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention and remand.

### I. The Court lacks jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit.

12. To sustain removal of the State Court Action to the Bankruptcy Court, the Defendants bear the burden to show this Court has subject matter jurisdiction over Carnero's state law claim for declaratory relief under the Assumed Contracts. *See Smith v. Bank of Am. Corp.*, 605 Fed. Appx. 311, 313 (5th Cir. 2015) ("The removing party bears the burden of establishing both the existence of federal subject-matter jurisdiction and the propriety of removal."). This burden cannot be satisfied by pointing to allegations that merely share something in common with the Reorganized Debtors' bankruptcy. *See Matter of Zale Corp.*, 62 F.3d 746, 753 (5th Cir. 1995) ("Shared facts between the third-party action and a debtor-creditor conflict do not in and of

themselves suffice to make the third-party action 'related to' the bankruptcy."). "Merely because an action may share common facts with a bankruptcy does not confer 'related to' jurisdiction on the Court." *Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.)*, 336 B.R. 286, 290 (Bankr. S.D. Tex. 2005); *see also Zale Corp.*, 62 F.3d at 753.

13. The Defendants ground their argument for this Court's jurisdiction on declarations sought in the State Court Lawsuit petition (Dkt. 1-4) at ¶¶ 36(j)-36(l). They allege (paraphrased) that Carnero:

- seeks declarations that if the Midstream Agency Agreement is rejected, that rejection may require delivery of gas to Carnero under the Assumed Contracts (Removal ¶ 21);
- seeks declarations that the Assumed Contracts may require Mesquite to continue to pursue rejection of the Midstream Agency Agreement (*Id.* ¶ 22);
- seeks declarations of the parties' rights and obligations under the Assumed Contracts as a matter of bankruptcy law (*Id.* ¶ 23);
- seeks declarations that Mesquite is obligated to pursue rejection of the Midstream Agency Agreement under 11 U.S.C. § 365 (*Id.* ¶ 24) and to preclude Mesquite from withdrawing its rejection of the Midstream Agency Agreement (*Id.* ¶ 31);
- seeks declarations regarding the rejection or assumption of certain executory contracts under the Bankruptcy Code (*Id.* ¶ 29); and
- seeks to preempt an order from this Court on the impact of any rejection of the Midstream Agency Agreement (*Id.*) by attempting to interfere with the Bankruptcy Court's determinations regarding the rejection or assumption of certain executory contracts. *Id.* ¶ 31.

14. The Defendants misstate Carnero's allegations. Carnero's actual allegations, excerpted below and taken as pled, demonstrate that, in this post-confirmation dispute, Carnero seeks only state court relief under the Assumed Contracts:

(j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,

i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and

ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

(k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.

(l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,

i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;

ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and

iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

In these three paragraphs, Carnero seeks declarations to resolve a post-confirmation dispute with Mesquite/Maverick and the four non-debtor WIPs only under the various Assumed Contracts—not under the Bankruptcy Code, not under the Plan, not under any order entered by the Bankruptcy Court, and not under any executory contract yet to be assumed or rejected. The Defendants must fit these claims into the Court's post-confirmation jurisdiction. They cannot carry that burden.

### *A. The Court's post-confirmation jurisdiction is limited to matters pertaining to the implementation or execution of the Plan, which is assessed under the Craig's Stores' three-factor test.*

15. The Bankruptcy Court is a court of limited jurisdiction. Its jurisdiction extends to "'all civil proceedings arising under title 11, or arising in or related to cases under title 11,'" *In*

*Matter of Galaz,* 841 F.3d 316, 322 (5th Cir. 2016) (quoting 28 U.S.C. § 1334(b)). Once the court confirms a debtor's chapter 11 plan of reorganization, however, that jurisdiction ceases to exist, other than for "matters pertaining to the *implementation or execution* of the plan." *In re Craig's Stores of Tex., Inc.,* 266 F.3d 388, 390 (5th Cir. 2001). The Court confirmed the Reorganized Debtors' Plan on April 30, 2020, and the Plan went effective on June 30, 2020 [Case 19-34508, Dkt. 1417], so the Court's jurisdiction is the more narrow post-confirmation jurisdiction standard described in *Craig's Stores*.

16. While the Plan contains retention of jurisdiction language (*see* Plan at Art. XI; Confirmation Order, ¶ 43), the source of subject matter jurisdiction for the Bankruptcy Court post-confirmation is solely 28 U.S.C. § 1334. *See In re Hous. Reg'l Sports Network, L.P.,* 547 B.R. 717, 735 (S.D. Tex. 2016). Neither the Plan nor the Court can create jurisdiction where it does not exist. Similarly, the Midstream Settlement Approval Order (Dkt. 1415) (as defined in the Notice of Removal) cannot create subject matter jurisdiction where it does not exist. That order provides that "[a]s part of the implementation and execution of the Plan, this Court shall retain jurisdiction with respect to all matters arising from or related to…this Order." (*Id.* at 4.) That is the same scope of jurisdiction stated in *Craig's Stores*.

17. Important here, the parties' rights and obligations under Assumed Contracts post-confirmation—after contracts have been assumed or rejected—are matters of contract interpretation under state law and do not relate to the implementation or execution of the Plan or any order. *See Craig's Stores*, 266 F.3d at 390; *see also In re Austin Development Co.*, 19 F. 3d 1077, 1084 (5th Cir. 1994) (holding that after lease was rejected, cause of action for breach of lease "should be decided in state court" because "the debtor's estate had no remaining interest in

the outcome of that controversy, which is not 'related to' the bankruptcy as is required for federal jurisdiction").

18. The Fifth Circuit addressed a post-confirmation dispute concerning performance under an assumed contract in *Craig's Stores*. There, 18 months after the court confirmed debtor Craig's Stores' plan of reorganization, Craig's Stores sued a bank in bankruptcy court asserting state law claims based on a contract it had assumed. *Craig's Stores*, 266 F.3d at 390. The court determined the bankruptcy court lacked jurisdiction over the claim based on three factors: (1) it "dealt with post-confirmation relations between the parties," (*even though* "the contract existed throughout the reorganization and was, by implication, assumed") with (2) "no antagonism or claim pending between the parties as of the date of reorganization" and (3) "no facts or law deriving from the reorganization or plan was necessary" to Craig's Stores' claims. *Id*. at 391. Instead, reorganized Craig's Stores was "capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court" and could not "come running to the bankruptcy judge every time something unpleasant happens." *Id*. at 390-91 (internal quotations omitted). Considering the three *Craig's Stores* factors, the Court lacks jurisdiction over Carnero's claim.

### *B. The* **Craig's Stores** *factors do not support jurisdiction over Carnero's claims.*

1. <u>The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts.</u>

19. Mesquite/Maverick has suffered something unpleasant post-confirmation: Carnero has sued it and the four non-debtor WIPs seeking declaratory relief regarding a dispute that has arisen post-confirmation out of the Assumed Contracts. Specifically, the dispute relates to the Defendants' obligations under the Assumed Contracts *since their assumption* to deliver gas from the Comanche Assets to Carnero and to terminate, at the earliest possible time, any prior delivery

obligation that sends that gas to others. The dispute does not arise out of obligations imposed on Mesquite/Maverick by the Plan, but by the Assumed Contracts, and those contracts were not created by the Plan. *See In re Encompass Services Corp.*, 337 B.R. 864, 875 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006). The dispute, thus, relates to the post-confirmation relations of the parties under the terms of the Assumed Contracts.

2. <u>The claims in the State Court Lawsuit were not pending as of the Plan confirmation date.</u>

20. The Court confirmed the Plan on April 30, 2020. This dispute arose 15 months later when Carnero filed the State Court Lawsuit on July 30, 2021. Carnero's claims may share some common facts with the bankruptcy proceeding because Carnero seeks declarations under contracts the Reorganized Debtors assumed, but that is not enough to establish that the claims could affect the implementation or execution of the Plan. *See In re Ultra Petroleum Corp.*, No. 16-32202, 2019 WL 2524936, at *7 (Bankr. S.D. Tex. Jan. 9, 2019), *report and recommendation adopted*, No. 4:19-CV-00090, 2019 WL 2524704 (S.D. Tex. Feb. 25, 2019) (holding that common facts and circumstances between pre-confirmation complaint against debtor and debtor's post-confirmation counterclaim against different party were insufficient to establish "related to" jurisdiction under narrow post-confirmation jurisdictional standard). As in *Craig's Stores*, the dispute in the State Court Lawsuit arose only *after* the Assumed Contracts were assumed.

3. <u>No facts or law deriving from the reorganization or Plan are necessary to decide Carnero's claims.</u>

21. The state court can decide Carnero's claims without facts or law deriving from Mesquite/Maverick's reorganization, the Plan, or any order of this Court, and without reference to the Bankruptcy Code. Indeed, the Plan does not address resolving disputes concerning the Reorganized Debtors' rights and obligations under assumed contracts. Instead, the Plan creates

procedures for the assumption, assignment, and rejection of Executory Contracts (*see* Plan at Art. V.A.), a claims process for rejected contracts (*see id.* at Art. V.B.), and a cure process for assumed contracts (*see id.* at Art. V.C.). The Plan further addresses the scope of assumption and allows the Reorganized Debtors to alter their treatment of a contract following the resolution of certain disputes not at issue. *See* Plan at Art.V.F., Art. V.H. Resolving a dispute as to the Reorganized Debtors' rights and obligations under the Assumed Contracts does not impact compliance with the Plan or its completion. *See, e.g., Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where litigation at issue did not attempt to subvert confirmed plan).

22. While a bankruptcy court retains jurisdiction to interpret and enforce its own prior orders (*Galaz*, 665 Fed. Appx. at 376), Carnero's claim for declarations of the parties' rights and obligations under the Assumed Contracts *after* rejection of the Midstream Agency Agreement [Case No. 19-34508, Dkt. 1544-2] does not invoke that jurisdiction. The claim does not interfere with this Court's authority under the Midstream Settlement Approval Order [Case No. 19-34508, Dkt. 1415 ¶ 13] to approve any rejection, termination, or adoption of the Midstream Agency Agreement, or involve interpretation or enforcement of that order. Rather, the Reorganized Debtors are free to reject or assume the Midstream Agency Agreement, get an order from this Court approving their choice, and then face the legal and commercial consequences of that choice under the terms of the Assumed Contracts.

23. Nor does Carnero's claim for declarations under the Assumed Contracts following the June 28, 2021 rejection of the Marketing Agreement [Case No. 19-34508, Dkt. 1983] invoke such retained jurisdiction. The post-confirmation implications of the rejected Marketing

Agreement on the parties' rights and obligations under Assumed Contracts are just the sort of matter that involves contract interpretation under state law, and not implementation or execution of the Plan or any order of this Court. *See Craig's Stores*, 266 F.3d at 390 (holding that court lacked jurisdiction to hear post-confirmation cause of action for breach of assumed contract); *Austin Development*, 19 F. 3d at 1084 (holding that court lacked jurisdiction to hear post-confirmation cause of action regarding third party beneficiary's rights in rejected contract). For purposes of a post-confirmation jurisdictional analysis, there is no meaningful distinction between a post-confirmation breach of contract dispute regarding an assumed contract (as in *Craig's Stores*) or the State Court Lawsuit seeking declaratory relief of the parties' rights and obligations under the Assumed Contracts.

24. Considering the above, any dispute regarding the parties' relations under the Assumed Contracts on a post-assumption, go-forward basis simply does not impact compliance with the Plan or any Bankruptcy Court order, does not impact implementation of the Plan or enforcement of any Bankruptcy Court order, and, in fact, has no impact on the Plan or any Bankruptcy Court order whatsoever. *See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where the litigation at issue did not attempt to subvert the confirmed plan) (citation omitted). Therefore, this Court lacks jurisdiction to hear the State Court Lawsuit and should remand it to the state court.

## II. The factors applicable to 28 U.S.C. 1334(c)(2) support mandatory abstention.

25. The Court must abstain from hearing claims when: (1) a motion requesting abstention has been timely filed; (2) the claim is essentially premised on state law; (3) the claims have no independent basis for federal jurisdiction other than § 1334(b); (4) the claims are non-core; (5) an action has been commenced in state court; and (6) the action can be timely adjudicated

in state court. *See In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347, at *21 (Bankr. S.D. Tex. Apr. 19, 2016) (Rodriguez, J.); *In re Petroleum Products & Services, Inc.*, 561 B.R. 662, 665 (Bankr. S.D. Tex. 2016) (Isgur, J.) (quoting *In re Mugica*, 362 B.R. 782, 792 (Bankr. S.D. Tex. 2007) (Isgur, J.)). The factors applied to the State Court Lawsuit support mandatory abstention.

***A. Carnero has timely filed this motion for abstention and its claim is based on state law.***

26. The first two factors are met. This motion was timely filed on or before 30 days after the Defendants filed the Notice of Removal on September 10, 2021, and satisfies factor (1). Carnero's claim for declaratory relief to interpret the Assumed Contracts is a state law claim. *See Craig's Stores*, 266 F.3d. at 390. This satisfies factor (2). These two factors support mandatory abstention.

***B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b).***

27. The Defendants bear the burden to show the Court has jurisdiction. *See Smith*, 605 Fed. Appx. at 313. In their Notice of Removal [Dkt. 1], the Defendants allege only 28 U.S.C. § 1334(b) as the basis for this Court's jurisdiction. The Defendants misstate Carnero's purely state law contract interpretation claim in an attempt to fit Carnero's claims within the post-confirmation "related to" jurisdiction of this Court. But as explained in Section I, in these circumstances, the Court lacks such jurisdiction. No other basis for federal jurisdiction exists. This factor supports mandatory abstention.

***C. Carnero's claims are non-core.***

28. Non-core proceedings relate to a case under title 11, but do not arise under title 11, or arise in a case under title 11. 28 U.S.C. §§ 157(b)(1); *Petroleum Products*, 561 B.R. at 665. In contrast, core proceedings invoke a substantive right provided by title 11 or by their nature, can arise only in the context of a bankruptcy case. *Petroleum Products*, 561 B.R. at 665 (citing

*Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 930 (5th Cir. 1999)). Carnero's state law contract interpretation claims relate to the Reorganized Debtors' chapter 11 case only in the sense that the Reorganized Debtors were Debtors before June 30, 2020 (the Effective Date of the Plan). They do not invoke Section 365 or any other substantive rights under the Bankruptcy Code. The State Court Lawsuit did not arise under title 11 or in a case under title 11, as Carnero filed it post-confirmation when no estate to administer exists. Further, the State Court Lawsuit does not invoke any right provided by title 11. As a garden-variety contract interpretation declaratory relief action, it could—and does—arise outside the context of a bankruptcy case. Thus, the State Court Lawsuit is a non-core proceeding. *Id*. ("A claim based on state created rights, which could have proceeded in state court had there been no bankruptcy, is likely not core…Petroleum Products' claims do not invoke a substantive right provided by Title 11 nor are they of a nature that could only arise in a bankruptcy case—they are simply state contract claims."). This factor supports mandatory abstention.

***D. Carnero filed its claims in the State Court Lawsuit.***

29. Carnero filed the State Court Lawsuit in state court on July 30, 2021. The Defendants do not dispute this. This factor supports mandatory abstention.

***E. The state court can timely adjudicate Carnero's claims.***

30. Carnero bears the burden to show that the State Court Lawsuit can be timely adjudicated in the state court. *Petroleum Products*, 561 B.R. at 666. It can carry that burden. Official court and caseload statistics for the period September 2020 through September 2021 from The Texas Office of Court Administration Court Activity Reporting and Directory System for Harris County, Texas,[3] and for the period June 2020 through June 2021 from the United States

---

[3] The Texas Office of Court Administration data and records are available here: https://card.txcourts.gov/.

Courts Caseload Statistics Data Tables[4] show that both the Harris County District Courts and the United States Bankruptcy Court for the Southern District of Texas continue to manage significant caseloads during this pandemic affected period. *See* **Exhibit 6**, Harris County statistics, **Exhibit 7**, US Bankruptcy Court SD TX statistics. Those same statistics show that both courts are also clearing thousands of cases each year. Statistics show the judge of the 269th Harris County Judicial District Court where the State Court Lawsuit is pending resolves cases faster than the average case resolution for all Harris County District Courts. *See* **Exhibit 8**, Gavelytics Report for J. Sepolio. Considering these data, the state court can timely adjudicate the State Court Lawsuit.[5] This factor supports mandatory abstention.

31. In sum, Carnero can establish all six factors applicable to mandatory abstention under 28 U.S.C. § 1334(c)(2). The Court should mandatorily abstain from adjudicating this adversary proceeding and remand the case to the state court.

## III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention.

32. If the Court disagrees that mandatory abstention applies, it should permissively abstain from hearing the adversary proceeding and remand the case to state court because the factors applicable to 28 U.S.C. § 1334(c)(1) heavily favor permissive abstention or remand.

### *A. The permissive abstention factors.*

33. A bankruptcy court may permissively abstain "from hearing a proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). The

[4] The United States Courts Caseload Statistics Data Tables are available here: https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables.

[5] *See* **Exhibit 9**, the Affidavit of Amy C. Falcon, proving up the process by which Carnero obtained the court statistics reflected in Exhibits 6-8.

bankruptcy court has "broad power to abstain whenever appropriate." *In re Wood,* 825 F.2d 90, 93 (5th Cir.1987). The factors courts consider include:

(a) the effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention;

(b) the extent to which state law issues predominate over bankruptcy issues;

(c) the difficult or unsettled nature of applicable law;

(d) the presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(e) the jurisdictional basis, if any, other than § 1334;

(f) the degree of relatedness or remoteness of proceeding to main bankruptcy case;

(g) the substance rather than the form of an asserted core proceeding;

(h) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(i) the burden on the bankruptcy court's docket;

(j) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(k) the existence of a right to a jury trial;

(l) the presence in the proceeding of nondebtor parties;

(m) comity; and

(n) the possibility of prejudice to other parties in the action.

*In re SBMC Healthcare, LLC*, 519 B.R. 172, 190 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017). Application of these factors to this adversary proceeding favor permissive abstention.

***B. The balance of the factors favors permissive abstention.***

1. The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention.

34. The State Court Lawsuit largely involves non-debtor parties. Only Mesquite/Maverick is a Reorganized Debtor, the other five parties are non-debtors. The outcome of the suit will not deplete or increase the estate. First, post-confirmation, no estate exists. Second, the Reorganized Debtors assumed the Assumed Contracts. The effect of the assumption on the estate was established when the contracts were assumed. Remand to the state court to declare the parties' rights and obligations under the Assumed Contracts will not change that effect. This factor favors abstention. *See In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 848 (Bankr. S.D. Tex. 2006) (Bohm, J.) (recognizing that this factor does not apply post-confirmation when no estate exists).

2. The extent to which state law issues predominate over bankruptcy issues.

35. The State Court Proceeding only involves state law issues—the parties' rights and obligations under the Assumed Contracts. *See Craig's Stores*, 266 F.3d at 390 (recognizing contract claims as state law claims). Carnero has not alleged claims seeking enforcement of the Plan or an order issued by this Court or requesting this Court take action on any executory contract. No bankruptcy issues arise from Carnero's declaratory relief claim. State law issues predominate over bankruptcy issues in this circumstance. This factor favors abstention. *See Doctors Hosp.*, 351 B.R. at 849 (recognizing that when proceeding includes only state law claims and no bankruptcy issues, state law claims predominate)

3. The difficult or unsettled nature of applicable law.

36. Carnero's declaratory relief claim is a garden-variety state law claim. The claim is premised on the Assumed Contracts and Carnero's statutory right under Tex. Civ. Prac. & Rem. Code Ch. 37 to have the state court declare the parties' rights and obligations under those contracts.

These are state law principles to which the state court is better able to respond. *See SBMC Healthcare*, 519 B.R. at 191. This factor favors abstention.

4. <u>The presence of related proceeding commenced in state court or other nonbankruptcy proceeding.</u>

37. Carnero filed the State Court Lawsuit in the state district court in Harris County, Texas. There are no other related state court proceedings. While there are continuing proceedings in the bankruptcy case, for the reasons set forth above, they do not implicate the claims asserted in the State Court Proceeding. This factor is likely neutral, at best, when viewed most favorably to the Defendants. *See SBMC Healthcare*, 519 B.R. at 191.

5. <u>The jurisdictional basis, if any, other than § 1334.</u>

38. The Defendants pleaded only Section 1334(b) as the basis for jurisdiction. As shown above, the Court lacks jurisdiction under that section. Even if the Court had jurisdiction under Section 1334(b), this is the only basis on which jurisdiction rests. The State Court Proceeding raises no federal question or complete diversity grounds for jurisdiction. This factor heavily favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

6. <u>The degree of relatedness or remoteness of proceeding to the main bankruptcy case.</u>

39. As discussed above, Carnero's claims are not "related to" the post-confirmation Reorganized Debtors' Chapter 11 case. Even if related, that relationship is remote. This dispute involves (1) mostly non-debtors (Mesquite/Maverick is the only Reorganized Debtor defendant); (2) events occurring after confirmation when no estate remains to be administered; and (3) exclusively non-bankruptcy issues—the parties' rights and obligations under the Assumed Contracts. At most, this dispute is remotely related to the Reorganized Debtors' Chapter 11 proceeding. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

7. The substance rather than the form of an asserted core proceeding.

40. Carnero's direct cause of action is non-core, as discussed above. Even if the claim was core, the substance of the dispute consists of a state law claim based on the rights and relationship of the parties post-confirmation under the Assumed Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court.

41. Carnero's direct cause of action is non-core, as discussed above. Thus, this factor does not apply. Even if Carnero's claim was core, the dispute consists of a state law claim with no bankruptcy matters that exist post-confirmation from which to sever the claims. The state court can enter and enforce an order that declares the parties' rights and obligations under the Assumed Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191-92.

9. The burden on the bankruptcy court's docket.

42. This Court is among the busiest bankruptcy courts in the country for complex bankruptcies such as that involving the Reorganized Debtors. While Carnero does not doubt the Court will prioritize this case, there is no question it will add strain to the Court's already taxed time and resources. *See* Ex. 7. As such, this factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties

43. Defendants are forum shopping. They removed the State Court Lawsuit involving only a state law claim for declarations under assumed contracts that arose post-confirmation against multiple non-debtor defendants and a single Reorganized Debtor defendant. As in *Craig's Stores*, the Defendants want to run to the bankruptcy court to protect themselves from

unpleasantness that arose after the Reorganized Debtors emerged from bankruptcy. To seek shelter from the state court in the bankruptcy court, in the Notice of Removal the Defendants misstate the nature of the declaratory relief pleaded as seeking declarations "under various contracts as a matter of bankruptcy law," "declaring the legal effect of rejection of the Marketing Agreement under 11 U.S.C. § 365," and "that Mesquite is obligated to 'pursu[e] rejection of the Midstream Agency Agreement under 11 U.S.C. § 365." This is not what Carnero seeks. It seeks declarations solely under the Assumed Contracts as to the parties' rights and obligations under those contracts. Misstating Carnero's claim is the only way the Defendants can try to squeeze the claim into Section 1334(b) jurisdiction. As discussed above, Section 1334(b) does not authorize "related to" jurisdiction over Carnero's post-confirmation claims under the Assumed Contracts. This factor favors abstention.

11. The existence of a right to a jury trial.

44. The parties waived their right to trial by jury in the Assumed Contracts. This factor weighs against abstention. *See SBMC Healthcare*, 519 B.R. at 192.

12. The presence in the proceeding of nondebtor parties.

45. Of the six parties involved the State Court Lawsuit, only one is a Reorganized Debtor, Mesquite/Maverick, who was more than 15 months passed confirmation of the Plan when Carnero filed the lawsuit. This factor favors abstention. *See SBMC Healthcare,* 519 B.R. at 192.

13. Comity.

46. Carnero had already instituted its lawsuit in Texas state court when the Defendants removed the State Court Lawsuit to this Court. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

14. <u>The possibility of prejudice to other parties in the action.</u>

47. The issue is which court, this Court or the state court, should hear Carnero's state court claim. Both forums are capable of adjudicating the claim. But the State Court Lawsuit involves no active debtors; no debtor rights require this Court's protection. At best, this factor is neutral. *See SBMC Healthcare*, 519 B.R. at 192.

48. Eleven of the 14 permissive abstention factors favor abstention. Only factor (11) the existence of a right to a jury trial favors retention. Factor (4) the presence of related proceeding commenced in state court or other nonbankruptcy proceeding and factor (14) the possibility of prejudice to other parties in the action are neutral. Because many more factors favor abstention than favor retention, permissive abstention is appropriate.

49. The Court may give greater weight to some factors. The Court should give more weight to the fact that: (a) the resolution of the Carnero's direct claim does not implicate the estate, because no estate exists post-confirmation, or the implementation or execution of the Plan (factor 1); (b) the law governing the dispute is entirely Texas state law (factor 2); (c) this Court has no subject matter jurisdiction over Carnero's direct claim, or even if it does, the only jurisdictional basis is 28 U.S.C. § 1334 (factor 5); and (d) five of the six parties in this dispute are non-debtors (factor 12). With greater weight to these factors, the Court should permissively abstain from hearing the adversary proceeding and remand the case to the Harris County District Court. *See SBMC Healthcare*, 519 B.R. at 193.

## Conclusion

Carnero's State Court Lawsuit, which alleges claims that arose post-confirmation against one Reorganized Debtor and three non-debtors, seeks only state court relief. As a result, this Court lacks post-confirmation jurisdiction under 28 U.S.C. § 1334(b) to hear this adversary proceeding and Carnero asks that it remand the case to the state court. Carnero also requests that this Court

mandatorily abstain from hearing this adversary proceeding under 28 U.S.C. § 1334(c)(2), and the factors support its request. Finally, the factors relating to permissive abstention under 28 U.S.C. § 1334(c)(1) favor this Court's permissively abstaining from hearing this adversary proceeding. Accordingly, Carnero asks the Court to remand the State Court Lawsuit to state court.

**Dated: October 8, 2021.**

Respectfully submitted,

**PORTER HEDGES LLP**

By: *__/s/ Joshua W. Wolfshohl__*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on October 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

# EXHIBIT 1

*Execution Version*

# FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT

This Firm Gas Gathering, Processing and Purchase Agreement (this "Agreement") is entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by and among SN EF Maverick, LLC ("Producer"), a Delaware limited liability company, and Carnero G&P LLC, a Delaware limited liability company ("Carnero"). Producer and Carnero may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Background:

Producer currently owns undivided working interests and/or controls Gas produced, or to be produced, from certain lands or oil and gas leases located in South Texas;

Carnero owns, or has interests in or rights to gathering, treating and processing facilities capable of receiving deliveries of Gas from Producer at the Receipt Point(s) and delivering Residue Gas to Producer at the Delivery Point(s); and

Producer desires that Carnero provide certain gathering, treating and processing services described in this Agreement, and Carnero desires to provide Producer those gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement.

Agreement:

In consideration of the mutual covenants set forth in this Agreement, Carnero and Producer hereby agree and covenant as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** Definitions. Except in those certain instances where the context states another meaning, the following terms when used in this Agreement have the following meanings:

"Additional CGP" has the meaning set forth in Section 2.1.

"Additional Plant Products" has the meaning set forth in Section 3.1(b).

"Additional Plant Product Receipt Points" has the meaning set forth in Section 3.1(b).

"Adequate Assurance of Performance" shall mean sufficient security in the amount and for the term reasonably acceptable to Carnero in the form of (i) an irrevocable standby letter of credit issued by a Qualified Financial Institution in a format reasonably acceptable to Carnero or (ii) cash (either as a deposit, or prepayment), in either case (i) or (ii), not to exceed such Comanche Producer's anticipated obligations over any ninety (90) day period. If the credit of such Comanche Producer's guarantor is deemed to be acceptable to Carnero, in Carnero's sole reasonable opinion, the demand for Adequate Assurance of Performance can be satisfied with a parental guaranty issued on behalf of such Comanche Producer in a format, amount and tenor

EXHIBIT
1
exhibitsticker.com

acceptable to Carnero, but only for as long as the credit of such Comanche Producer's guarantor continues to be acceptable to Carnero, after which time only Adequate Assurance of Performance in the form of (i) or (ii) will be acceptable to Carnero.

"Affiliate" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by or is under common control with such Party, and "control" means the power to direct or cause the direction of the management and policies of such Person or Party, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by virtue of the ownership of shares or other equity interests, the holding of voting rights or contractual rights, partnership interests or otherwise. Notwithstanding the foregoing, for purposes of this Agreement and any Ratification Agreement, (a) Producer and its Affiliates, on the one hand, shall not be considered Affiliates of Carnero and its Affiliates, on the other hand and (b) Producer and any other Comanche Producer shall not be considered Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means, with respect to any person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives and requirements, of any Governmental Authority, including all official interpretations thereof by any such Governmental Authority, as in effect at any time or from time to time and, in each case, applicable to or binding upon such person and, in the case of Carnero, the Carnero System.

"Business Day" means any Day on which the Federal Reserve member banks in Houston, Texas are open for business.

"Btu" means a British thermal unit, which is the amount of heat required to raise the temperature of one pound of pure water from 59 degrees Fahrenheit to 60 degrees Fahrenheit.

"Carnero" has the meaning set forth in the preamble.

"Carnero System" means the facilities Carnero will own, solely or jointly with others, or in which Carnero holds capacity, which will include the Gathering System, the Receipt Point(s), the Treating Facility, the Delivery Point(s) and the Plant(s), Condensate stabilization facilities and stabilized Condensate truck racks or pipeline loading facilities, including all related appurtenances and facilities and any expansions and modifications of any of the foregoing.

"Cashout Percentage" means the applicable percentage set forth in the applicable table contained in Section 6.6(c) or Section 6.6(e).

"Cashout Price" for any Month means (i) if the downstream pipeline balances in kind, the price per MMBtu as published in Platt's Gas Daily Price Guide for such Month under the headings "Daily Midpoint Averages", "East Texas-Houston Ship Channel" or, if mutually agreed by the Parties, another widely accepted, alternative Gas Daily Price for such Month and (ii) if the downstream pipeline does not balance in kind, the cashout prices for such Month of the downstream pipeline receiving Gas at the Residue Gas Delivery Points. With respect to clause (i) of the preceding sentence, if *Platt's* Gas Daily does not report the Cashout Price for a given Month or the Cashout Price or *Platt's* Gas Daily Price Guide is no longer published, the Parties,

will determine a mutually agreeable price in lieu of the Cashout Price that is representative of the value of Gas in LaSalle or Refugio County, Texas, depending on the location of the Redelivery Pipeline to which the imbalance relates.

"CGP" or "CDP" means a central gathering point and/or a central delivery point directly connected to the Carnero System at which Producer's Gas is received hereunder, as such points are specified on Exhibit A hereto.

"Change in Law" means (i) the adoption, promulgation, repeal or modification after the Effective Date of any Applicable Law, (ii) the imposition after the Effective Date of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any approval of any Governmental Authority that establishes new, additional or modified requirements for the operation of the Carnero System, (iii) the non-approval or non-renewal of any approval of any Governmental Authority, or the renewal of the same on terms more onerous for Carnero than originally issued, other than as a result of Carnero's action or inaction in violation of Applicable Law, or (iv) any other restrictions or restraints imposed by Applicable Law after the Effective Date that were not in effect on or prior to the Effective Date.

"Change in Taxes" means any increase in Taxes directly attributable to Carnero imposed by the United States, the State of Texas or any other Governmental Authority exercising jurisdiction and arising from a Change in Law and imposed on or measured by: (i) Emissions or (ii) the provision of gathering or other services hereunder, including receipt of Gas or redelivery of Gas under this Agreement, but, for the avoidance of doubt, excluding any ad valorem taxes or Taxes imposed on Carnero with respect to its net income.

"Comanche Producers" means (i) Producer and (ii) each of SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, Mitsui E&P Texas LP and their respective Affiliates, successors and assigns that delivers Gas to Carnero from the Dedicated Acreage under one or more Ratification Agreements.

"Compression Fee" has the meaning set forth on Exhibit B.

"Compression Fuel" means the quantity of MMBtus utilized or incurred in the operation of the field compression facilities for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee) and other use requirements.

"Condensate" means natural gas liquids in Gas that condense in the Carnero System or as a result of Carnero's operations prior to processing that Gas at the Plant(s).

"Contract Year" means that twelve-Month period commencing on the Effective Date and each subsequent twelve-Month period during the term of this Agreement commencing on each anniversary of the Effective Date.

"Cubic feet" or "cubic foot" means the volume of Gas, corrected for water vapor, which occupies one cubic foot of space at a temperature of 60° Fahrenheit and an absolute pressure of 14.73 pounds psia.

"Day" means the period of time beginning at 9:00 a.m. Central Time on any calendar day and ending at 9:00 a.m. Central Time on the calendar day immediately following.

"Dedicated Acreage" means the acreage designated on Exhibit D.

"Dedicated Gas" means Producer's Gas that is produced from any well or wellbore located within the Dedicated Acreage.

"Delivery Point(s)" means the inlet flange of the custody transfer meter(s) owned by the Redelivery Pipeline(s) at the Residue Gas Delivery Point(s), as such points are specified on Exhibit A attached hereto.

"Delivery Quantity" means that quantity of Residue Gas, expressed in MMBtus, delivered by Carnero at the Residue Gas Delivery Point(s) to, or for the account of, Producer.

"EBB" has the meaning set forth in Section 6.1.

"Effective Date" has the meaning set forth in the preamble.

"Excess Gas" shall mean all volumes of Gas tendered by Producer under this Agreement in excess of the MDQ.

"Exhibit" and "Exhibits" have the meanings set forth in Section 1.3.

"Firm" means, with respect to those obligations of a Party that are designated as such, that such Party may interrupt its performance without liability only to the extent its performance is prevented by an event of Force Majeure or as otherwise specifically allowed for in this Agreement.

"FL&U" means the aggregate of (i) Producer's share of Plant Fuel as determined in accordance with Exhibit C; plus (ii) Gathering L&U, plus (iii) Producer's share of Compression Fuel as determined in accordance with the allocation procedure set forth in Exhibit C.

"Force Majeure" has the meaning set forth in Section 11.1.

"Full Recovery Allocation" has the meaning set forth in Section 3.7.

"Gas" means natural gas produced from gas wells and gas produced in association with oil (casinghead gas) and includes all hydrocarbons and non-hydrocarbons produced with the gas.

"Gathering Fee" has the meaning set forth in Section 5.1.

"Gathering L&U" means the quantity of MMBtus calculated in accordance with the procedure set forth in Exhibit C.

"Gathering System" means the Gas gathering pipeline system(s) connecting the Receipt Point(s) to the Plant(s).

Case 23-20-03587 Document 25-29 Filed 04/19/23 08/05/20 Page 102 of 533

"Governmental Authority" means: (i) the United States of America; (ii) any state, county, parish, municipality, or other governmental subdivision within the United States of America; and (iii) any court or any governmental department, commission, board, bureau, agency, or other instrumentality of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"Gross Heating Value" means the number of Btu's produced by the combustion, on an as delivered basis and at a constant pressure, of the amount of the Gas which would occupy a volume of one (1) Cubic Foot at a temperature of 60°F and at a pressure of fourteen and seventy-three hundredths (14.73) psia, with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

"Imbalance" has the meaning set forth in Section 6.6.

"Initial Term" has the meaning set forth in Article 9.

"Insolvency Event" has the meaning set forth in Section 14.1.

"Interruptible" means all obligations of Carnero that are not designated as Priority Interruptible or Firm, as to which Carnero may interrupt its performance for any or no reason.

"Maximum Daily Quantity" and "MDQ" means 260 MMcf/day or such lesser volume determined under Section 3.3(a). The Maximum Daily Quantity or MDQ is the maximum quantity of Gas that Carnero is obligated to receive from all Comanche Producers on each Day, in the aggregate, on a Firm basis at the Primary Receipt Point(s) and thereafter, gather, treat, process and redeliver.

"Maximum Receipt Capacity" means the maximum volume that Carnero is obligated to receive at any Receipt Point from all Comanche Producers on any Day, as specified on Exhibit A.

"Maximum System Pressure" means the maximum pressure at which the Gathering System may be operated as specified by Carnero from time to time, which may be different for different segments of the Gathering System and which, until otherwise communicated in writing by Carnero to Producer, will be: (i) for Gas delivered at the Highway 83 – T2 CDP, identified on Exhibit A, 1440 psig; and (ii) for Gas delivered at either the Maverick CDP or Highway 83 – Carnero CDP, identified on Exhibit A, 1250 psig.

"Mcf" and "MMcf" mean 1,000 cubic feet of Gas and 1,000,000 cubic feet of Gas, respectively.

"MMBtu" means 1,000,000 Btu's.

"Month" means a period beginning at 9:00 a.m. Central Time on the first day of a calendar month and ending at 9:00 a.m. Central Time on the first day of the calendar month immediately thereafter.

"Other Fuel" means electricity or other energy sources (other than Gas) used as fuel in the operation of the Carnero System.

"Other Fuel Fee" means a fee for Other Fuel, which fee will be Producer's pro rata share of the actual cost of the Other Fuel incurred by Carnero.

"Overdelivered" has the meaning set forth in Section 6.6(c).

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" includes any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, or Governmental Authority.

"Plant(s)" means the processing plant(s) at which Producer's Gas is actually delivered for processing and associated facilities, including facilities for treating and compression, and such other gas processing facilities that Carnero may make available from time to time in its sole discretion.

"Plant Fuel" will be determined as set forth on Exhibit C.

"Plant Products" means liquefiable hydrocarbon components, which Carnero removes and recovers from Gas in the cryogenic liquid extraction process at the Plant(s), including ethane, propane, normal butane, iso-butane and natural gasoline, and mixtures thereof.

"Primary Component" means ethane, propane, isobutene, normal butane and natural gasoline.

"Primary Receipt Points" means the Maverick CDP and Highway 83 – Carnero CDP, as described on Exhibit A.

"Priority Interruptible" means all obligations of Carnero that are not designated as Firm or Interruptible, as to which Carnero may interrupt its performance for any reason or no reason, or as otherwise specifically allowed for in this Agreement. Priority Interruptible obligations will be secondary to any Firm obligations and will have priority to any Interruptible obligations on the Carnero System.

"Processing Fee" has the meaning set forth in Section 5.3.

"Producer" has the meaning set forth in preamble.

"Producer's Gas" means all Gas that is owned or controlled by Producer or which Producer has the right to market.

"Producer's Products" means those Plant Products that are allocated to Producer's Gas in accordance with the allocation procedure set forth in Exhibit C.

"Producers' Representative" has the meaning set forth in Section 17.11.

"Product Price" means, for each gallon of Plant Product or Additional Plant Product calculated on a component by component basis and expressed in cents per gallon, the average Daily high and low prices per gallon, for the applicable Month, as quoted by Oil Price Information Service in the OPIS-LP-Gas Report for "Any Current Month" under "Mont Belvieu Spot Gas Liquids Prices" for each Primary Component contained in the Plant Products or Additional Plant Products for the applicable Month of delivery of Plant Products or Additional Plant Products by Carnero to the downstream purchaser, less (i) Taxes (excluding ad valorem taxes and taxes imposed on Carnero with respect to its net income); (ii) the T&F Fee; and (iii) any quality adjustment or similar fees charged or deducted by any purchaser of Plant Products or Additional Plant Products; provided that in the event a Force Majeure or other circumstance prevents Carnero's NGL purchaser from delivery of Plant Products or Additional Plant Products to Mont Belvieu, the Product Price will mean the weighted average sales price per gallon for each Plant Product or Additional Plant Product received by Carnero for the total volume of that Plant Product or Additional Plant Product sold by Carnero during the Month in which the Plant Product or Additional Plant Product is produced, expressed in cents per gallon (less the deductions set forth in clauses (i) and (iii) above, and less the actual transportation, fractionation, exchange or other fees incurred by Carnero in connection with any such disposition (other than take or pay fees or demand charges)).

"Product Shrinkage" is defined in Exhibit C.

"psia" means pounds per square inch absolute.

"psig" means pounds per square inch gauge.

"Qualified Financial Institution" means a U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least ten billion U.S. dollars ($10,000,000,000) and with a credit rating of at least A- by Standard & Poor's Financial Services, LLC, a subsidiary of The McGraw-Hill Companies, Inc. or its successor or at least A3 by Moody's Investors Service, Inc. or its successor.

"Raptor Plant" shall mean the Raptor gas processing facility owned by Carnero located in LaSalle County, Texas.

"Ratification Agreement" means an agreement executed by a Comanche Producer ratifying or otherwise committing such Comanche Producer to the performance of this Agreement, and on terms mutually agreeable to Carnero and the applicable Comanche Producer.

"Receipt Point(s)" means the inlet flange of the custody transfer meter(s) on the Carnero System at the CGPs, as such points are specified on Exhibit A and any Additional CGPs connected to the Carnero System pursuant to Section 2.1.

"Receipt Quantity" means the aggregate quantity of Producer's Gas, stated in MMBtu, received by Carnero at the Receipt Point(s) less FL&U, shrinkage attributable to Producer's Condensate and Producer's contractually allocated share of Product Shrinkage, as such allocations are determined in accordance with Exhibit C.

"Redelivery Pipelines" means the SECO, Western, Eagle Ford Midstream, TPL SouthTex Transmission Company LP natural gas pipelines or any other residue gas pipelines which Carnero may make available in its sole and absolute discretion at the tailgate of the Plant(s).

"Representatives" has the meaning set forth in Section 17.4.

"Residue Gas" means that portion of Producer's Gas remaining and available after the extraction of FL&U, shrinkage attributable to Producer's Condensate and Producer's allocated share of Product Shrinkage, which are each allocated in accordance with the procedures set forth on Exhibit C.

"Residue Gas Delivery Point(s)" has the meaning set forth in Exhibit A.

"Scheduled Quantity" means the quantity of Producer's Gas or Residue Gas (each in MMBtu) confirmed by Carnero to be received or delivered under this Agreement at a Receipt Point or a Residue Gas Delivery Point, as the case may be, subject to Producer's compliance with the nomination procedures set forth in this Agreement.

"Silver Oak II Plant" shall mean the Silver Oak II gas processing plant owned by Carnero and located in Bee County, Texas.

"Subject Gas" shall have the meaning set forth in Section 3.1(c).

"T2 Pipeline" means the Gas gathering pipeline system running from the inlet flange of meter #64-8038 (at the interconnection between the Carnero facilities and the T2 facilities) to the inlet flange of meter #69-3629 (at the interconnection between the T2 facilities and the Silver Oak II Plant).

"Taxes" means taxes, fees, or charges (including penalties and interest thereon) now or hereafter enacted, levied or assessed by any Governmental Authority.

"Term" has the meaning set forth in Article 9.

"Theoretical Gallons" means the number of gallons of each NGL component that are present in Gas as determined at the applicable Receipt Point(s). Theoretical Gallons will be determined by multiplying: (i) the gallons per Mcf of ethane, propane, butanes and pentanes plus derived from the chromatographic analysis at that point, by (ii) the volume in Mcf measured at that point.

"Third Party Gas" means all Gas that is owned and controlled by Persons other than Producer or its Affiliates.

"T&F Fee" has the meaning set forth on Exhibit G.

"Treating Facility" means an amine treating facility (including downstream dehydration facilities).

"Treating Fee" has the meaning set forth in Section 5.2.

"Underdelivered" has the meaning set forth in Section 6.6(c).

"Unit of Volume" means one cubic foot of Gas.

**Section 1.2** Rules of Interpretation. All references in this Agreement to articles, sections, subsections, Exhibits and other subdivisions refer to corresponding articles, sections, subsections, Exhibits and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any articles, sections, subsections, Exhibits and subdivisions are for convenience only and will not constitute part of such articles, sections, subsections, Exhibits and subdivisions and will be disregarded in construing the language contained in such articles, sections, subsections, Exhibits and subdivisions. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. The word "or" is not intended to be exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions. No consideration will be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement.

**Section 1.3** Exhibits. The following exhibits (collectively "Exhibits", and each an "Exhibit") are attached to, form part of, and are incorporated herein by reference as though contained in the body of this Agreement:

| | | |
|---|---|---|
| Exhibit A | - | Receipt Point(s); Delivery Point(s) |
| Exhibit B | - | Fees |
| Exhibit C | - | Allocations |
| Exhibit D | - | Dedicated Acreage |
| Exhibit E | - | Memorandum of Agreement |
| Exhibit F | - | Existing Commitments |
| Exhibit G | - | Transportation and Fractionation Fee |

Whenever any term or condition, whether express or implied, of any Exhibit conflicts with or is at variance with any term or condition of the body of this Agreement, the latter will prevail to the extent of such conflict or variance.

## ARTICLE 2
## CARNERO AND PRODUCER FACILITIES

**Section 2.1** Additional Wells and CGPs.

(a) If Producer proposes to establish additional CGPs other than the CGPs set forth on Exhibit A (each, an "Additional CGP"), or complete additional wells within the Dedicated Acreage, then it shall notify Carnero of each such Additional CGP or additional well. Producer will have sole discretion as to the location of each Additional CGP or additional well. When notifying Carnero of an Additional CGP or a new well, Producer shall provide Carnero with the

CGP or a well location, projected production, drilling schedule, expected flow rate and gas analysis information reasonably acceptable to Carnero (as to such Additional CGP or new well, collectively, "CGP Information").

(b) For each Additional CGP requested by Producer, Carnero will develop and deliver a good faith estimated cost and estimated construction timeline to establish and connect any such Additional CGP to the Gathering System and will connect such Additional CGP and Producer will reimburse Carnero 112.5% of the cost of connecting such Additional CGP, including any costs for pipeline, connections, pipeline taps, measurement equipment, telemetry and dehydration. Notwithstanding the foregoing sentence, if the Additional CGP is more than 5 miles from (i) the then-existing Gathering System and (ii) any wellhead gathering system that either delivers Gas to the Gathering System or that has an interconnect to a gathering system that delivers Gas to the Gathering System, then (A) Carnero may, within 45 Days following Carnero's receipt of the CGP Information, decline to connect the Additional CGP, in which case such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect and (B) the Producer will be entitled to engage another party to gather and/or process the Gas. With respect to the Dedicated Gas released pursuant to this Section 2.1(b) and gathered from the Additional CGP or its associated wells and delivered to a Plant (but not through the Gathering System), Producer will not incur the Gathering Fee, but will incur the Processing Fee to the extent processed by or on behalf of Carnero and all other applicable fees due hereunder. For the avoidance of doubt, Producer has the right to construct, own and operate facilities upstream of the CGPs in accordance with this Agreement.

(c) With respect to wellhead connections only, Carnero may, in its sole discretion, decline to connect any well(s) that will produce Dedicated Gas, and any well(s) that Carnero declines to connect (and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect (each a "Released Well"). Producer may contract with other Persons to gather Gas produced from Released Wells. If Carnero does not agree, within 45 Days following Carnero's receipt of the relevant well information, to connect any well to the Gathering System, then Carnero will be deemed to have declined to connect such well to the Gathering System. With respect to any Released Well, Producer may elect, within 30 days after such well becomes a Released Well, to require Carnero to connect such Released Well to the Gathering System and reimburse Carnero 112.5% of the cost of connecting such Released Well. If Producer elects to require Carnero to connect a Released Well to the Gathering System, then such well shall, as of such date of election, cease to be a Released Well and shall be subject to dedication hereunder.

(d) No later than 90 Days prior to the end of the one (1) year period described in the foregoing subsection (b) or (c), or any applicable successive one (1) year period thereafter, Carnero may elect, pursuant to written notice delivered to Producer, to connect such Additional CGP or Released Well to the Gathering System. If Carnero does not deliver such election, declines to connect or delivers its election to connect but does not actually connect the Additional CGP or Released Well to the Gathering System such that the Additional CGP or

connection for the Released Well is ready and able to accept volumes of Gas prior to the end of such one (1) year period, then such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be temporarily released from the dedication hereunder for an additional one (1) year period. If Carnero timely elects to connect, and actually connects, the Additional CGP or Released Well to the Gathering System, such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be subject to the dedication hereunder as of the end of such one (1) year period. Notwithstanding the foregoing, if any such Additional CGP or Released Well has not been connected to the Gathering System by the date that is three (3) years after the delivery of Carnero's election to not connect, such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) or Released Well (and associated Dedicated Acreage included in the proration unit for such well), as applicable, shall be permanently released from any dedication hereunder.

**Section 2.2** Grant of Producer's Land Rights. Producer agrees to grant to Carnero or its designee, without any warranty of title, insofar as Producer has the legal right to do so, the non-exclusive right of ingress and egress over, across and under all lands and leaseholds or premises of Producer, for the construction, maintenance and operation of pipelines and other facilities necessary or convenient for the gathering, treating, processing and redelivery of Producer's Gas under this Agreement. Carnero's use of such rights will not unreasonably interfere with Producer's operations or those of the surface owners. Producer will not be obligated to maintain in effect any underlying agreements granting Carnero such rights. Any use of such rights by Carnero or its designees shall be at the sole cost, risk and expense of Carnero and Carnero will indemnify Producer from claims related to Carnero's use of such rights.

**Section 2.3** Producer's Reservations. Producer reserves for itself the following rights:

(a) to operate (or cause to be operated) wells producing Producer's Gas in its sole discretion, including the right (but not the obligation) to drill new wells, repair and rework old wells, temporarily shut in wells or renew or extend, in whole or in part, any oil and gas lease or term mineral interest, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part, when no longer deemed by Producer to be capable of producing in paying quantities under normal methods of operation;

(b) to use Producer's Gas for lease operations (including reservoir pressure maintenance and enhanced recovery techniques, except, in each case, any such operations that are reasonably expected to decrease expected aggregate volumes of Gas to be delivered to Carnero hereunder over the Initial Term of this Agreement) and water treatment facility operations relating to the lands within the Dedicated Acreage;

(c) to deliver Producer's Gas or furnish Producer's Gas to Producer's lessors and holders of other burdens on production with respect to such Producer's Gas as is required to satisfy the terms of the applicable oil and gas leases or other applicable instruments;

(d) to pool, communitize or unitize Producer's interests with respect to Producer's Gas; *provided* that Producer's share of Producer's Gas produced from such pooled, communitized, or unitized interests shall be committed and dedicated pursuant to this Agreement; and

(e) to retain all liquids (and title to such liquids) separated from Producer’s Gas by the use of conventional lease separators prior to delivery of Producer’s Gas to Carnero at the Receipt Point(s), provided that Producer will not be permitted to remove or recover hydrocarbons from Producer’s Gas other than through the use of conventional mechanical gas/oil field separators.

**Section 2.4** Downstream Arrangements. Producer agrees that it will, throughout the term of this Agreement, secure adequate transportation capacity and make necessary arrangements to market the Residue Gas re-delivered to Producer at the Residue Gas Delivery Point(s) in accordance with this Agreement.

**Section 2.5** Memorandum. Contemporaneously with the execution of this Agreement and from time to time during the Term, the Parties (including each Person included within the definition of Producer) will execute, acknowledge, deliver and record a Memorandum of this Agreement, substantially in the form of Exhibit E, identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

## ARTICLE 3
## QUANTITY AND SERVICES

**Section 3.1** Producer’s Delivery Obligations. Subject to the terms and conditions of this Agreement, Producer’s obligations are as follows:

(a) Subject to Sections 3.1(c), 3.1(d), 3.1(e) and Exhibit B, Producer shall tender for delivery to Carnero at the Primary Receipt Points 100% of the Dedicated Gas (which may exceed, at each Receipt Point, the Maximum Receipt Capacity specified for that Receipt Point and may exceed the Maximum Daily Quantity in the aggregate at all Receipt Points to the extent Carnero accepts such additional quantities of Gas pursuant to Section 3.5);

(b) Notwithstanding Section 3.1(a), to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer’s acquisition (collectively, the “Existing Commitments”), such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent “evergreen” or “renewal” terms, it being understood that Producer shall give timely notice to terminate any

such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

(c) If Carnero is unable to accept any volumes of Dedicated Gas at the Primary Receipt Points for transport on the Gathering System or other pipeline systems owned by Carnero or on which Carnero has capacity or any Plant(s) are unable to accept any volumes of Dedicated Gas for processing, in either case, for more than 30 Days in any period of 60 Days other than as a result of Force Majeure (such volumes, the "Subject Gas"), then Carnero and Producer shall proceed as follows:

(i) Carnero shall have the obligation to gather and transport all of the Subject Gas to another processing plant owned or operated by Carnero, or in which Carnero has processing rights and process such Subject Gas at that plant, to the extent of available capacity;

(ii) To the extent Carnero does not accept the Subject Gas in Section 3.1(c)(i), the Subject Gas shall be immediately temporarily released from the dedication hereunder and Producer may enter into short term interruptible arrangements with third parties for the transportation and processing of such Subject Gas ("Temporary Arrangements"); provided that Producer must again deliver such Subject Gas to Carnero at the Receipt Points on the first (1st) Day of the Month immediately following 30 days after Producer receives notice from Carnero that Carnero is able to accept the Subject Gas;

(iii) At the request of either Party, Carnero shall cause the Board of Carnero to promptly meet to discuss and negotiate in good faith in respect of the possible expansion of either the Raptor Plant or the Silver Oak II Plant or the construction of new facilities to be owned by Carnero to process additional Gas;

(iv) Subject to Section 3.1(c)(i), if after 30 Days following the delivery by either Party of a request for a meeting of the Board of Carnero under Section 3.1(c)(iii), (A) Carnero has not adopted a plan by which Carnero will process such Subject Gas at a processing plant owned by Carnero (including the election of any Member to undertake construction of an Additional Plant as a sole risk project) and (B) Carnero and Producer

have not agreed on a plan by which Carnero by no later than 60 Days after the delivery of any such request will be able to process such Subject Gas at the Raptor Plant, the Silver Oak II Plant or another processing facility owned by Carnero, or in which Carnero has processing rights, or at another mutually agreeable processing plant, then upon Producer's request such Subject Gas will be temporarily released from the dedication hereunder and Producer may enter into Temporary Arrangements for the gathering and processing of such Subject Gas for a term that does not exceed the greater of (x) one year and (y) the expected period determined by Carnero in its reasonable discretion (based on then-existing contractual commitments in respect of firm capacity for processing at the Raptor Plant, Silver Oak II Plant and other processing plants owned by Carnero, or at which Carnero has processing rights) during which the Raptor Plant, Silver Oak II Plant and any such other processing plants will not have Firm capacity to process such Subject Gas (the "Capacity Limitation Period");

(v) Producer shall promptly give Carnero notice of execution of any Temporary Arrangement. To the extent as of 180 Days after the inception of any Temporary Arrangement, Producer and Carnero have not agreed on a plan to gather and process such Subject Gas at either the Raptor Plant, the Silver Oak II Plant, or another processing facility that Carnero owns or in which it has processing rights, then such Subject Gas shall again be temporarily released from the dedication hereunder and Producer may renew such (or enter into a new) Temporary Arrangement for a period not to exceed one year (or the Capacity Limitation Period, if longer);

(vi) Any of Producer's Gas temporarily released from this Agreement in accordance with this Section 3.1(c) shall not be Dedicated Gas hereunder; *provided, however*, that such Gas shall become Dedicated Gas again at the conclusion of any temporary release.

(d) If, as a result of Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, are unable to accept any of Producer's Gas for more than 30 Days in any period of 90 Days, the volumes of Producer's Gas that cannot be accepted by Carnero shall be temporarily released from the dedication hereunder for the remainder of the then-current Month and the next three full Months, and Producer may enter into Temporary Arrangements for the gathering and processing of such released Gas for a term that does not exceed such Force Majeure period and succeeding periods of three Months if such processing facilities continue to be unable to accept Producer's Gas for reasons of Force Majeure upon the expiration of each three Month period;

(e) If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer may deliver the volume of Gas that is not accepted by Carnero to third parties for gathering and/or processing and such Gas will be temporarily released from dedication under this Agreement; provided, however, that if Carnero provides Producer notice that Carnero can accept any or all of such released Gas, as soon as commercially and operationally practicable (and in no event later than two (2) Days following receipt of such

notice), Producer will again deliver the volumes of released Gas specified in such notice to Carnero and such volumes of Gas will again be subject to the dedication hereunder; and

(f) If (i) for any reason, including Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, do not accept any of Producer's Gas up to the MDQ for more than 180 Days out of any 365 Day period, (ii) Carnero is not constructing a Plant to accommodate such Gas and (iii) Producer and Carnero have not otherwise agreed on a processing solution pursuant to Section 3.1(c), such volumes of Producer's Gas that are not accepted by Carnero shall be permanently released from the dedication hereunder, and Producer may enter into any alternative arrangements for the transportation and/or processing of such Gas.

(g) The provisions of this Section 3.1 shall be covenants running with the land, and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto. Producer and its Affiliates shall require any purchaser, assignee or other transferee of any portion of such interests to ratify this Agreement and to expressly assume and agree to the terms hereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

**Section 3.2** Carnero's Obligations. Subject to the terms and conditions of this Agreement, Carnero will provide the following Firm services:

(a) receive and gather at the Receipt Point(s) the quantity of Gas tendered by Producer from the Dedicated Acreage (not to exceed, when taken together with Gas tendered by all Comanche Producers from the Dedicated Acreage), the Maximum Receipt Capacity specified for that Receipt Point and not to exceed the Maximum Daily Quantity in the aggregate at all Receipt Point(s));

(b) subject to Section 5.2, treat at the Treating Facility, Producer's Gas that Carnero is obligated to receive at the Receipt Point(s) (as determined under subparagraph 3.2(a)) that requires treatment;

(c) process for the removal of Plant Products, Producer's Gas that Carnero receives at the Receipt Point(s) (as determined under subparagraph 3.2(a)), with the understanding that Producer's Gas shall be delivered to the Raptor Plant (including any expansion thereof or addition thereto) unless it is not available, in which case such Producer's Gas shall be processed at the Silver Oak II Plant (or another processing facility with available capacity that Carnero owns or in which it has processing rights);

(d) purchase Producer's Products; and

(e) deliver the quantity of Residue Gas in-kind attributable to Producer's Gas received at the Receipt Point(s).

**Section 3.3** Reduction of MDQ and Volume Limitations.

(a) Beginning on the fifth (5th) anniversary of the Effective Date, if, during any one (1) year rolling period (each, a "Determination Period"), the Comanche Producers fail to

deliver a daily average of least 90% of the then-effective MDQ (except for any such failure caused by Carnero not receiving properly tendered volumes up to the then-effective MDQ for any reason, including Force Majeure), Carnero may, within sixty (60) Days following the end of such Determination Period, elect to reduce the MDQ for all future periods to a quantity equal to the average volume delivered by all Comanche Producers during such Determination Period; provided, however, Carnero may not reduce the MDQ in any calendar quarter by an amount greater than ten percent (10%) of the MDQ then in effect, and the MDQ shall only be reduced to the extent that the volumes are unavailable and reasonably expected to not soon return. Any such notice shall be effective with respect to all Comanche Producers upon delivery to Producer hereunder.

(b) Subject to Section 3.4, Carnero's obligation to receive, gather, treat, dehydrate, process and deliver Producer's Gas will be on a Firm basis and will not, when taken with all Gas delivered by the Comanche Producers from the Dedicated Acreage, exceed either: (a) the Maximum Daily Quantity, or (b) the Maximum Receipt Capacity for the Receipt Point(s), as specified in Exhibit A. To the extent the Carnero System includes third party facilities in which Carnero holds capacity, such capacity shall be at least Firm or Priority Interruptible capacity, as applicable, to the extent Carnero provides Firm or Priority Interruptible capacity to Producer hereunder.

**Section 3.4** Priority Interruptible Volumes. Carnero will, on a Priority Interruptible basis, accept Excess Gas at all Receipt Point(s) to the extent of available capacity on the Carnero System and, if accepted by Carnero, Carnero will gather, treat and process those quantities as Priority Interruptible volumes in accordance with the terms of this Agreement, subject to Section 3.5(c).

**Section 3.5** Curtailment; Bypassing.

(a) If it becomes necessary to curtail the gathering, treating and processing of Producer's Gas for any reason (including Force Majeure or because the design capacity limit of any of the Carnero System has been reached); provided that (i) Carnero shall not enter into agreements for Firm gathering services that in the aggregate exceed the design capacity limit of the Carnero System or of any particular Plant at such time as such agreements are entered into; or (ii) offer any class(es) of service other than Firm, Priority Interruptible or Interruptible (each as defined herein) on the Carnero System; then, subject to the last sentence of this Section 3.5(a): (i) Carnero will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Priority Interruptible, and will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Priority Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Firm; and (ii) Producer's Firm volumes will be accepted on a prorated basis with other Gas for which Carnero's obligations are designated as Firm, such prorating to be based on nominations submitted prior to the time that Carnero gives notice of curtailment to its customers. Notwithstanding anything in this Agreement to the contrary, all Gas received under the Firm Gas Gathering Agreement and the Firm Gas Processing Agreement between Carnero, SN Catarina, LLC and Sanchez Energy

Corporation that is gathered to and processed at the Silver Oak II Plant will have priority over Gas delivered under this Agreement for gathering to and processing at the Silver Oak II Plant.

(b) Any portion of the Gas bypassed around the Plant(s) shall be bypassed in the following order of priority: (i) any bypass gas for the Day will be first attributed to any Gas delivered by any Person that does not have processing rights; (ii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Interruptible processing obligations; (iii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Priority Interruptible processing obligations; and (iv) finally, subject to subparagraph 3.5(a), the remaining quantity of Gas, if any, bypassed around the Plant(s) will be ratably attributed to Gas delivered under Firm processing obligations. The share of Producer's Gas that will be ratably bypassed will be based on the ratio of all Producer's Gas received at the Receipt Point(s) having that priority of service (*i.e.*, Interruptible, Priority Interruptible or Firm) divided by all Gas (including Producer's Gas) received by Carnero having the same priority of service (i.e. Interruptible, Priority Interruptible or Firm). Carnero shall have no obligation to ratably bypass Gas for any Person that does not have processing rights and, with respect to such volumes, Carnero may, acting in its sole discretion, select the source and volume of Gas which is so bypassed.

(c) To the extent of Carnero's Firm processing obligations to the Comanche Producers with respect to Gas produced from the interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement, such volumes will be processed at the Raptor Plant (including any expansion thereof or additions thereto) in preference to other Gas delivered under this Agreement and Gas delivered under other agreements containing Firm processing obligations. To the extent Carnero accepts additional volumes of Producer's Gas under Section 3.4 hereof, Carnero will process such Gas: (i) at the Raptor Plant on a Priority Interruptible basis; and (ii) subject to the last sentence of Section 3.5(a), at the Silver Oak II Plant on a Priority Interruptible basis.

**Section 3.6** Commingling. Producer agrees that Producer's Gas received by Carnero under this Agreement will constitute part of the supply of Gas from all sources in Carnero System, and Carnero has the right to commingle Producer's Gas with other Gas, to deliver molecules different from those received from Producer and to handle the molecules received from Producer and others in any manner.

**Section 3.7** Ethane Rejection Settlement Option. Producer may elect, on its behalf and on behalf of all Comanche Producers as a single election, allocation of its and their Products and settlement of amounts due hereunder based on a methodology assuming either (a) minimized recovery of ethane as a Plant Product ("Ethane Rejection Allocation") or (b) maximized recovery of ethane as a Plant Product ("Full Recovery Allocation") for each Month during the Term, by submitting written notice of such election to Carnero not less than 15 Days prior to the first Day of the applicable Month. In the event Carnero does not timely receive the same election for all Comanche Producers delivering Gas from the Dedicated Acreage, the previous election for which all Comanche Producers delivered timely notice shall remain in effect. The corresponding Product recovery factors for each allocation are set forth in Exhibit C. In the event Producer fails to timely notify Carnero of a change to its election with respect to a given Month, Producer will be deemed to have elected the same allocation as elected for

the prior Month. Producer will not be entitled to cause the Plant to be operated in any particular manner, including to actually minimize or maximize ethane recovery. Carnero will accommodate Producer's request for Ethane Rejection Allocation or Full Recovery Allocation, provided Carnero has available Gas sufficient to operate the Plant to minimize or maximize ethane recovery, as applicable, in accordance with standard industry practice.

## ARTICLE 4
## POINTS OF RECEIPT AND DELIVERY; PRESSURE

**Section 4.1** Receipt Point(s). Subject to the terms of this Agreement, Carnero will receive Producer's Gas at the Receipt Point(s).

**Section 4.2** Delivery Point(s). Subject to the terms of this Agreement, Carnero will deliver Residue Gas to Producer at the Delivery Point(s).

**Section 4.3** Delivery Pressure. Producer will deliver Producer's Gas to Carnero at the Receipt Point(s) at a pressure sufficient to enter the Gathering System against the actual operating pressure, as the same may vary from time to time, but not to exceed Carnero's Maximum System Pressure. Carnero will use commercially reasonable efforts to maintain the pressure in the Gathering System as follows: (i) 1250 psig at the Highway 83 – T2 CDP identified on Exhibit A; and (ii) 1250 psig at the Maverick CDP identified on Exhibit A and the Highway 83 – Carnero CDP identified on Exhibit A. Producer will not be obligated to compress Producer's Gas in order to effectuate delivery of Producer's Gas to Carnero if the pressure in the Gathering System at the Receipt Points exceeds the Maximum System Pressure for such Receipt Point (notwithstanding any higher pressures at which the Gathering System is operated by Carnero hereunder), and any such volumes of Producer's Gas that would require compression in order to enter the Receipt Point at the time of delivery shall be released from the dedication hereunder.

**Section 4.4** Redelivery Pressure. Carnero will deliver Residue Gas at the Delivery Point(s) at the pressures existing in the Redelivery Pipeline(s), from time to time, but not to exceed the maximum allowable delivery pressure of the applicable Redelivery Pipeline.

**Section 4.5** Rate of Flow. Producer will use commercially reasonable efforts to balance the quantities of Producer's Gas delivered to and received from the Carnero System and, if necessary, make adjustments to the rate of Gas production or nominations to balance such receipts and deliveries. Carnero will endeavor to permit up to a 10% variance per Day in receipts and deliveries of Producers' Gas from the Scheduled Quantity for that Day, to the extent such variance does not impede Carnero's compliance with this Agreement, any other agreement, Applicable Law or any permit. In no event will Carnero be obligated to deliver or receive a quantity of Producers' Gas during any given Day that differs by more than 10% from the Scheduled Quantity for such Day. If the actual quantity of Producer's Gas received at the Receipt Point(s) for the account of Producer on any Day differs from the Scheduled Quantity(ies) for such Receipt Point(s), then Carnero shall only be obligated to deliver at the Delivery Point(s) on that Day the lesser of the actual quantity of Residue Gas attributable to Producer's Gas received on that Day or the Scheduled Quantity. The Parties will use commercially reasonable efforts to receive and deliver the Scheduled Quantity at a uniform

hourly rate of flow determined by dividing the Scheduled Quantity by 24. Carnero has (i) no obligation to accept variations from a uniform hourly rate of flow, and (ii) the ability, to be exercised in Carnero's sole discretion, to accept variations based on Carnero's operating conditions, without waiver of the uniform flow requirement set out in this Section.

## ARTICLE 5
## FEES, BILLING, AND PAYMENT

**Section 5.1** Gathering Fee. As consideration for the gathering services performed by Carnero under this Agreement, Producer will pay to Carnero the gathering fee set forth on Exhibit B (the "Gathering Fee").

**Section 5.2** Treating Fee. As consideration for the treating services performed by Carnero under this Agreement, Producer will pay to Carnero the treating fee set forth on Exhibit B (the "Treating Fee").

**Section 5.3** Processing Fee. Carnero will process Producer's Gas in accordance with this Agreement, and Producer will pay Carnero the processing fee set forth on Exhibit B (the "Processing Fee").

**Section 5.4** Compression Fee. Producer will pay Carnero the Compression Fee.

**Section 5.5** Other Fuel Fee. Producer will pay to Carnero the Other Fuel Fee.

**Section 5.6** FL&U, Plant Products and Condensate. In addition to the other charges set forth in this Agreement, Producer hereby conveys to Carnero, and title transfers at the Receipt Point(s) or Additional Plant Product Receipt Point(s), as applicable (free of charge and free of liens or encumbrances of any nature): (a) a quantity of Gas each Month equal to the FL&U attributable to Producer's Gas, (b) all Plant Products allocated to Producer (including, in each case, all components thereof, contained in Producer's Gas at the Receipt Point(s)) (c) all Additional Plant Products; and (d) all Condensate allocated to Producer contained in Producer's Gas at the Receipt Point(s).

**Section 5.7** Payment for Plant Products and Condensate. Carnero will pay Producer each Month for (i) Plant Products allocated to Producer and all Additional Plant Products, an amount equal to: (A) the Plant Products as determined in accordance with the allocation procedure set forth in Exhibit C plus all Additional Plant Products, multiplied by (B) the Product Price, for such Plant Products and Additional Plant Products, multiplied by (C) 100%, plus (ii) Condensate, an amount equal to: (A) the Condensate allocated to Producer as determined in accordance with the allocation procedure set forth in Exhibit C, to the extent recovered from the gathering facilities owned by Carnero, multiplied by (B) the weighted average sales price per gallon for the total volume of Condensate sold by Carnero at the Plant(s) to unaffiliated third parties during the applicable Month in which the Condensate is sold, multiplied by (C) 50%. If no Condensate is sold at the Plant(s) to unaffiliated third parties during the applicable Month, then for that Month, the price will be based on arms-length, third party condensate sale transaction data provided by Carnero in good faith.

**Section 5.8** Statements and Payments.

(a) If required by the Redelivery Pipelines, Carnero will provide the Redelivery Pipelines an allocation each Month for the Residue Gas delivered during the preceding Month on behalf of Producer. Such allocations will be based upon the Redelivery Pipelines' custody transfer measurement volume and allocated by Carnero on a pro-rata basis in accordance with all volumes received on the Carnero System for delivery to the Pipelines.

(b) On or before the 25th of each Month, Carnero will tender to Producer a monthly statement showing for the preceding Month the following:

(i) the actual metered volumes of Producer's Gas received by Carnero at each Receipt Point in Mcf and MMBtu;

(ii) Producer's allocated share of the Residue Gas delivered to the Residue Gas Delivery Point(s) (in MMBtu);

(iii) the Plant Fuel, Gathering L&U, Compression Fuel, shrinkage attributable to Producer's Condensate and Product Shrinkage allocated to Producer at each Receipt Point;

(iv) the volumes of Producer's Products;

(v) the applicable Product Price(s);

(vi) the volumes of Condensate;

(vii) the Gathering Fees;

(viii) the T&F Fees;

(ix) the Compression Fees, if any;

(x) the Treating Fees, if any;

(xi) the Processing Fees;

(xii) the Other Fuel Fees;

(xiii) any Imbalance cashout charges or credits;

(xiv) any amounts due Carnero pursuant to the terms of Section 17.7 hereof; and

(xv) the total net amount due to Producer or Carnero, as the case may be, under this Agreement.

(c) The Parties agree that all amounts owed under this Agreement (other than for indemnity obligations) will be netted between the Parties on a Monthly basis. If the monthly

statement reflects Carnero owes Producer, Carnero will remit the balance due on or before the last Day of the Month, or if the monthly statement reflects Producer owes Carnero, Producer will remit the balance due Carnero within ten calendar Days after their receipt of the Carnero monthly statement, provided that if the payment date is not a Business Day, payment is due on the next Business Day following that date. Carnero will have the right to pay and invoice each Comanche Producer independently and, upon Carnero's request, Producer shall promptly provide all information necessary for Carnero to calculate payments and invoices for each Comanche Producer and to make such payments to the Comanche Producers. If Carnero elects to pay the Comanche Producers directly, the payments will be made on the same terms and Carnero will have the same rights with respect to each Comanche Producer (including netting) as with the payments to Producer. If Producer is in default, Carnero will use commercially reasonable efforts to pay and invoice each Comanche Producer independently. Payment will be by ACH or wire transfer to the following accounts (which may be changed by such Party with advance written notice), as applicable:

Payments to Carnero:
For the account of: Carnero G&P LLC
Bank: JP Morgan Chase
ABA: 021000021
Account Number: 263735760

Payments to Producer:
For the account of: SN EF Maverick, LLC
Bank: SunTrust Bank
ABA: 061000104
Account Number: 1000205698318

(d) If a Party fails to pay the entire undisputed amount of any invoice when the amount is due, the other Party may bill such nonpaying Party a charge for late payment which will be included by the other Party on the next regular invoice rendered, or by separate invoice. The charge for any late payment for amounts that are not disputed in good faith will be equal to the product of (i) the unpaid, undisputed portion of the invoice, times (ii) the ratio of the number of Days from the due date to the date of actual payment to 365, times (iii) the prime interest rate, as in effect from time to time, as published in the *Wall Street Journal*, plus 2% per annum; provided, however, that in no event will such interest rate exceed the maximum rate permitted by law.

(e) As to each individual Comanche Producer, in the event such Comanche Producer owes Carnero a net payment as set forth in the monthly statement provided pursuant to this Section 5.8, Carnero has the right to demand from such Comanche Producer Adequate Assurance of Performance for any of its obligations under this Agreement or its Ratification Agreement. In any event where Adequate Assurance of Performance is required by Carnero, it shall be posted by the relevant Comanche Producer within five (5) Business Days of written notice.

**Section 5.9** Annual Rate Adjustment. On June 1st of each year beginning in 2019, all fees for services by Carnero in accordance with this Agreement (including the Gathering

Fee, the Treating Fee, the Processing Fee, and the Compression Fee, but excluding the Other Fuel Fee (the "Fees")) shall be adjusted by the product of the Fees then in effect multiplied by the percentage increase (if any) between the Consumer Price Index (All Urban Consumers (CPI-U); U.S. City Average; All items, 1982-1984 reference base, issued by the United States Department of Labor, Bureau of Labor Statistics ("BLS") (the "CPI")) for January of the current year and the CPI for January of the immediately preceding year. For avoidance of doubt, in no event shall the Fees be reduced below those in effect for the immediately preceding year. If the 1982-1984 reference base is no longer used as the standard reference base by BLS, then the standard reference base shall be that chosen from time to time by BLS.

**Section 5.10** Disputed Statement. If Producer, in good faith, disputes any billing or statement, Producer will pay to Carnero any undisputed amount and will notify Carnero in writing within ten (10) calendar days following receipt of Carnero's invoice that Producer disputes other amounts, which notice will include adequate documentation demonstrating the amount of and basis for the dispute. The Parties will endeavor in good faith to resolve such dispute within thirty (30) Days following Carnero's receipt of such notice. Producer waives the right to dispute or challenge any invoice or statement if Producer does not dispute or challenge that invoice or statement in a written notice in accordance with the preceding sentence delivered to Carnero within twenty-four (24) Months after the invoice or statement was issued.

**Section 5.11** Examination of Books. Carnero and Producer, upon notice in writing to the other Party and upon execution of a mutually acceptable confidentiality agreement which is typical of this type of audit, with neither Party's consent to agree to such mutually acceptable confidentiality agreement to be unreasonably withheld, will have the right to examine and audit, at all reasonable times, books, records and charts of the other Party to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation within the 24-Month period following the Month in which the same was rendered or made under or pursuant to this Agreement. This examination right will not be available with respect to any proprietary information or any information not directly relevant to transactions under this Agreement.

**Section 5.12** Information. Carnero and Producer will each preserve all books, records and charts applicable to this Agreement, including all test and measurement data and charts, for a period of at least 24 Months following the end of each calendar year, or such longer periods as will be required under law or regulation.

## ARTICLE 6
## NOMINATIONS, SCHEDULING AND IMBALANCES

**Section 6.1** Submission. Producer will submit nominations for Producer's Gas to the attention of the Gas Scheduling Department of Carnero, or its designee, in writing via Electronic Bulletin Board ("EBB"), or when such EBB is unavailable, by fax, email or other electronic means designated by Carnero.

**Section 6.2** Nominations. The deadline for submitting nominations each Month is 9:00 a.m. (Central Time), two Business Days prior to the beginning of each Month. Producer may nominate quantities of Producer's Gas up to the MDQ each Day on a Firm basis and in

excess of the MDQ each Day on a Priority Interruptible basis (subject in all cases to Section 3.5) and the nomination must include the following:

(a) Producer's name, contact name, email address and phone number;

(b) contract number assigned by Carnero;

(c) daily quantity of Producer's Gas to be received by Carnero at each Receipt Point;

(d) daily quantity of Residue Gas to be delivered by Carnero to the Residue Gas Delivery Point(s);

(e) daily quantity of Producer's Gas that is produced from interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement;

(f) begin date for the nomination and end date for the nomination (not to extend past the last Day of the Month in which Gas would first flow under the nomination); and

(g) Producer's contract numbers with upstream and downstream Persons from whom Producer's Gas will be received and to whom Residue Gas will be delivered.

**Section 6.3** Daily Changes. By 9:00 a.m. Central Time on the Day before Producer's Gas is desired to flow, Producer may submit to Carnero a change to the Monthly nomination made in accordance with Section 6.2; provided, however, Producer may submit any number of subsequent nomination changes subject to the then-current scheduling practices used by intrastate and interstate pipelines to schedule natural gas transportation services and the following sentence. Producer shall make each nomination and Carnero shall confirm such nomination and schedule the nominated Producer's Gas or Residue Gas for delivery in conformance with the North American Energy Standards Board ("NAESB") timeline, as may be revised by NAESB from time to time.

**Section 6.4** Waiver of Nomination Requirements. Carnero, in its reasonable discretion, may accept nominations at such later time as operating conditions permit, and may waive any nomination requirement. Notwithstanding anything to the contrary, however, Carnero will not be obligated to provide service under this Agreement on any Day on which Producer does not nominate volumes pursuant to the procedures in this Agreement. It is understood by Producer that Producer is the sole responsible Party for Monthly nominations of Comanche Producer volumes into the Redelivery Pipelines. It is further understood by Producer that Producer is the sole responsible Party for daily, Monthly and cumulative Imbalances of Comanche Producer volumes with the Redelivery Pipelines.

**Section 6.5** Discrepancies in Nomination. If a discrepancy exists between Producer's nominated volumes and volumes confirmed by the Redelivery Pipeline for Producer at the Delivery Point(s), Carnero will notify Producer and Producer will be responsible for correcting the discrepancy and will timely re-nominate the corrected volumes. If the discrepancy is not resolved on a timely basis, the "corrected volumes" will be the lesser of the

volumes nominated by Producer at the Delivery Point(s) and the volumes confirmed by the Redelivery Pipeline.

**Section 6.6** Imbalances. "Imbalance" means the cumulative difference in a Month between (1) the Receipt Quantity, and (2) the Delivery Quantity.

(a) Producer's Gas to be gathered under this Agreement will be received, gathered and delivered by Carnero as set forth in Section 4.5, to the extent it is consistent with the operating conditions on the Carnero System as described in this Agreement. The quantities of Producer's Gas received from Producer and Residue Gas delivered to, or for the account of, Producer will be kept in balance on a daily as well as Monthly basis. It is the intent of Carnero and Producer that any variance, or Imbalance be minimal and incidental. Carnero may establish operational balancing agreements with Redelivery Pipelines.

(b) Each Party will notify the other Party as soon as practicable when it becomes aware of an Imbalance in receipts or deliveries. Carnero will provide written, oral or electronic notification to Producer of any Imbalance in receipts and deliveries, and Carnero and Producer will promptly make adjustments in receipts and deliveries as are consistent with Carnero's operating conditions in order to balance any Imbalance so shown. Carnero will settle any Imbalances each Month by using the methods set forth in this Section 6.6. In addition, there will be a final cashout immediately upon or following the termination of this Agreement, and in this regard, the provisions of this Section 6.6 will survive the termination of this Agreement. Carnero, at any time and with notice to Producer, may initiate an operational flow order to protect its pipeline operations that limits receipts and deliveries and requires hourly and daily rates of flow to be uniform and in balance. In such event, Carnero may adjust Producer's Scheduled Quantity to comply with the operational flow order.

(c) If for any Month the Receipt Quantity is less than the Delivery Quantity, then Producer will be deemed to be "Underdelivered" for such Month. If for any Month the Receipt Quantity is greater than the Delivery Quantity, then Producer will be deemed to be "Overdelivered" for such Month.

(d) Each Month, Overdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Carnero to Producer (by direct payment or offset) at a price equal to the applicable Cashout Percentage multiplied by the Cashout Price for each such tier set forth in Table A below and adding together the results of each calculation for such Month:

Table A

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤ 5% | 100% |
| >5% but ≤10% | 90% |
| >10% but ≤15% | 85% |
| >15% but ≤20% | 80% |
| > 20% | 75% |

(e) Each Month, Underdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Producer to Carnero at a price equal to the applicable Cashout

Percentage multiplied by the Cashout Price for tier set forth in Table B below and adding together the results of each calculation for such Month:

Table B

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤5% | 100% |
| >5% but ≤ 10% | 110% |
| >10% but ≤ 15% | 115% |
| >15% but ≤ 20% | 120% |
| >20% | 125% |

(f) Imbalance Indemnity. PRODUCER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD CARNERO HARMLESS FROM AND AGAINST ANY PENALTIES, FINES, FEES, LOSSES, CLAIMS, CAUSES OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE), OR JUDGMENTS OBTAINED (INCLUDING THE PAYMENT OF REASONABLE ATTORNEYS' FEES AND COURT COSTS) AGAINST CARNERO BY (I) ANY UPSTREAM OR DOWNSTREAM PIPELINES, (II) ANY PARTY WITH CURTAILED CAPACITY, AND (III) ANY OTHER THIRD PARTY, TO THE EXTENT ARISING OUT OF OR CAUSED BY IMBALANCES BETWEEN THE RECEIPT POINT(S) AND THE DELIVERY POINT(S) FROM PRODUCER'S FAILURE TO TIMELY BALANCE RECEIPTS AND DELIVERIES ON THE CARNERO SYSTEM.

(g) Safety. Carnero has no obligation to receive Imbalances from Producer; provided, however, if Producer continues to deliver a quantity of Producer's Gas at the Receipt Point(s) that results in delivery in excess of or less than the Scheduled Quantity to be received by Producer at the Delivery Point(s) and such Imbalance, as determined by Carnero acting in its sole discretion, jeopardizes the safety of Carnero's operations or its ability to meet its contractual commitments to others, Carnero has the right to (i) vent, without being held liable to Producer, all or such part of that excess quantity as Carnero, in its reasonable discretion, deems necessary; (ii) cease receipt of all or any portion of Producer's Gas at the Receipt Point(s) if Carnero, in its reasonable discretion, deems that action necessary; or (iii) cease delivery of all or any portion of Residue Gas at the Delivery Point(s) if Carnero, in its reasonable discretion, deems that action necessary.

## ARTICLE 7
## POSSESSION AND RESPONSIBILITY

**Section 7.1** Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination: (i) while such Gas is within Producer's control and possession; or (ii) to the extent arising from or relating to Producer's operation of its facilities, the failure of

Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO).

**Section 7.2** Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, (i) while such Gas is within Carnero's control and possession; or (ii) to the extent arising from or relating to Carnero's operation of the Carnero System (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof), the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER).

## ARTICLE 8
## TITLE, WARRANTY, TAXES AND INDEMNIFICATION

**Section 8.1** Title, Warranty, Taxes and Indemnity.

(a) Producer warrants that it (i) has good and merchantable title and right to Producer's Gas (other than Third Party Gas) delivered to Carnero (including all components thereof), and that Producer's Gas will be free and clear of any and all liens, encumbrances and adverse claims of every kind (other than the lien described in Section 9.343 of the Texas Business and Commerce Code) and (ii) has the right to deliver all Third Party Gas delivered by Producer to Carnero hereunder. If the title to Gas delivered by Producer hereunder is disputed or is involved in any legal action, or if Carnero becomes aware of a claim that Producer is not disbursing funds received hereunder to a party entitled thereto, Carnero shall have the right to withhold payment (without interest), or cease receiving the Gas, to the extent of the interest or amount disputed or involved in legal action, during the pendency of the action or until the funds or title, as applicable, are freed from the dispute, or until Producer furnishes, or causes to be furnished, indemnification to save Carnero harmless from all claims arising out of the dispute or action, including penalties and interest, with surety acceptable to Carnero. Producer will pay all taxes levied on Gas that Producer delivers to Carnero at the Receipt Point(s), except

for income taxes, ad valorem, and property or similar taxes based upon the assessed value of the Carnero System. PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND SAVE CARNERO HARMLESS FROM AND AGAINST ANY AND ALL ROYALTIES, TAXES ALLOCABLE TO PRODUCER UNDER THIS AGREEMENT, PAYMENTS, LIENS, ENCUMBRANCES, SUITS, ACTIONS, CAUSES OF ACTION (WHETHER IN TORT OR IN CONTRACT), CLAIMS AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS BY TAXING AUTHORITIES OR THIRD PARTIES CLAIMING OWNERSHIP OF OR AN INTEREST IN GAS TENDERED UNDER THIS AGREEMENT OR FUNDS DERIVED THEREFROM (INCLUDING THE FL&U, PLANT PRODUCTS, CONDENSATE, COMPRESSION FUEL AND PLANT FUEL CONTAINED THEREIN, AND THE ADDITIONAL PLANT PRODUCTS, EACH OF WHICH ARE HEREBY CONVEYED TO CARNERO). CARNERO WARRANTS THAT RESIDUE GAS TENDERED FOR DELIVERY TO PRODUCER AT THE DELIVERY POINT(S) WILL BE FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. CARNERO AGREES TO INDEMNIFY, DEFEND, AND SAVE PRODUCER HARMLESS FROM AND AGAINST ALL CLAIMS AND DEMANDS TO THE EXTENT INCURRED BY PRODUCER ON ACCOUNT OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(b) Producer agrees to receive all payments for Gas sold hereunder, including payments for working interests, royalties, and other burdens, and to disburse such payments to the parties legally entitled thereto in strict accordance with the provision of the leases or agreements creating the respective interests of such parties, or as otherwise required by Applicable Law. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all losses, including interest, arising out of or in any way related to Carnero's disbursement of proceeds in accordance with the terms of this Agreement, and Producer agrees to indemnify and reimburse Carnero for any amount attributable to an interest erroneously claimed by Producer and/or paid by Carnero. Producer shall notify Carnero in writing of any future change in ownership or payment address and shall furnish Carnero with recorded documentation with respect thereto.

**Section 8.2** Substances Recovered in Pipeline. All substances, whether or not of commercial value, of whatever nature (excluding Residue Gas, Plant Products, and Condensate), which Carnero recovers in the course of rendering the gathering and processing services, will be Carnero's sole property, and Producer hereby conveys those substances to Carnero free and clear of any liens, claims, or other encumbrances. Except for payments expressly due Producer hereunder, Carnero will not be obligated to account to Producer for any value, whether or not realized by Carnero that may attach or be said to attach to such substances.

## ARTICLE 9
## TERM

This Agreement will commence on the Effective Date and remain in full force and effect until the fifteenth anniversary of the Effective Date (the "Initial Term") and will continue on a year to year basis thereafter unless and until terminated by either Carnero or Producer upon at least 90 Days' written notice to the other Party prior to the fifteenth anniversary of the Effective Date or any subsequent anniversary thereof (the "Term").

## ARTICLE 10
## QUALITY AND MEASUREMENT

**Section 10.1** Quality Specifications.

(a) Producer's Gas received and delivered at each Receipt Point will meet the following quality specifications:

(i) Oxygen – not to exceed 5 parts per million by volume;

(ii) Hydrogen Sulfide - not to exceed 4 parts per million by volume;

(iii) Total Sulfur - including mercaptans and hydrogen sulfide, not to exceed one grain per one hundred cubic feet of Gas;

(iv) Carbon Dioxide - not to exceed 2% by volume;

(v) Liquids - the Gas will be free of water and other objectionable liquids at the temperature and pressure at which the Gas is delivered;

(vi) Dust, Gums and Solid Matter - the Gas will be commercially free of dust, gums, gum forming constituents, inerts, and other media or solid matter;

(vii) Gross Heating Value - have a Gross Heating Value of not less than 1200 Btu per cubic foot;

(viii) Minimum GPM - have not less than 4.0 gallons of ethane plus natural gas liquids per Mcf of Producer's Gas;

(ix) Temperature - have a temperature of not less than 40° Fahrenheit and not more than 120° Fahrenheit;

(x) Nitrogen - not to exceed 1% by volume and total inert Gases not to exceed 3% by volume;

(xi) Water Vapor - not more than seven pounds per MMcf;

(xii) Other - not to contain any carbon monoxide, halogens or unsaturated hydrocarbons; and

(xiii) Hazardous Waste - not to contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976.

(b) If Producer delivers Gas not meeting the specifications set forth in Section 10.1(a) (as those specifications may be modified as provided in Section 10.1(c)), Carnero, upon written notice to Producer, has the right to (i) cease accepting deliveries of such non-specification Gas at the Receipt Point(s), or (ii) accept Gas not meeting the above specifications and charge a mutually agreeable out of specification fee; provided, however, that if the Parties cannot agree on such fee, Producer will cease deliveries of such non-specification Gas unless or until such Gas once again meets, or is brought into compliance with the specifications required in this Agreement.

(c) Notwithstanding the specifications in Section 10.1(a), should the operator of any Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline notify Carnero of different or additional quality specifications required for the receipt of Gas from the Carnero System, then Carnero will notify Producer of any such different or additional specifications as soon as practicable after being notified by the operator of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline, and such specifications will, upon Producer's receipt of such notice, modify the above quality specifications in Section 10.1(a) (other than Section 10.1(a)(vii) and Section 10.1(a)(viii)) to meet the most stringent quality specifications of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline for as long as required by the operator thereof.

(d) To the extent that Producer tenders Gas at the Receipt Points meeting the specifications set forth in Section 10.1(a), Carnero shall deliver to Producer at the Delivery Point Gas meeting the specifications of the applicable Redelivery Pipeline.

**Section 10.2** Indemnification for Non-Specification Gas. Each Party hereby indemnifies and holds the other Party, and its Affiliates, subsidiaries and parent, and its and their employees, officers, directors, partners, members, managers, agents and insurers harmless from and against any and all losses, costs, damages, liabilities, claims, actions or expense (including court costs and attorneys' fees) of whatsoever nature whether arising out of contract, tort or strict liability arising from the indemnifying Party's delivery of Gas which (a) in the case of Producer, fails to comply with Section 10.1(a) and (b) in the case of Carnero, fails to comply with Section 10.1(d).

**Section 10.3** Additional Fees, Costs or Penalties. If a Redelivery Pipeline (or any pipeline downstream thereof) imposes additional fees, costs or penalties upon Carnero for the receipt of non-specification Gas, Carnero may, in its sole discretion, assess such additional fees, costs or penalties upon all producers, including Producer, which contributed to such additional fees, costs or penalties, on a pro-rata basis.

**Section 10.4** Measurement.

(a) For billing and payment purposes, Producer's Gas received and Residue Gas delivered under this Agreement will be measured by metering facilities installed, operated and maintained by Carnero or its designee. Such measurement stations shall be equipped with orifice meters or ultrasonic flow measurement devices. Carnero shall install composite

sampling devices and/or on line chromatographs at each Receipt Point. Producer shall not be permitted to install samplers or chromatographs or any other metering facilities at any Receipt Point.

(b) The measurement of Producer's Gas at Receipt Point(s) and Residue Gas at Delivery Point(s) will be conducted in accordance with the following:

(i) Measurement under this Agreement will be based on the Unit of Volume. The Unit of Volume shall be corrected for actual water vapor, at a pressure and temperature existing at the point of measurement, by applying industry accepted practices and procedures. All quantities given herein, unless expressly stated, are in terms of such unit. The average atmospheric pressure will be assumed to be fourteen and seven-tenths (14.7) pounds per square inch, irrespective of the actual natural atmospheric pressure from time to time. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8 *Compressibility Factors of Natural Gas and Other Hydrocarbon Gases*, as last amended.

(ii) Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association in AGA Report # 3, Orifice Metering of Natural Gas, ANSI/API 2530, latest revision or AGA Report #9, Measurement of Gas by Multi-path Ultrasonic Meters.

(iii) The specific gravity of the Gas will be determined at the points of measurement by one of the following methods, selected in Carnero's reasonable discretion: (1) an online chromatograph, (2) continuous sampling, or (3) spot sampling.

(iv) The temperature when Gas is flowing, the factor for specific gravity according to the latest test therefor and the corrections for deviation from Boyle's Law applicable during each metering period will be used to make proper computations of Gas volumes measured under this Agreement.

(v) At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will obtain a representative sample of the Gas at each point of measurement under this Agreement. The Gross Heating Value of Gas will, at Carnero's option, be determined at each point of measurement: (1) by an online chromatograph, (2) by a continuous sampler, or (3) by spot samples, taken by Carnero or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. The Gross Heating Value shall be computed per GPA standard 2172, *Calculation of Gross Heating Value, Relative Density, Compressibility and Theoretical Hydrocarbon Liquid Content for Natural Gas Mixtures for Custody Transfer*, and converted to the condition specified in the definition of Unit of Volume. The physical constants used in Btu computation for a perfect Gas

will be derived from the *"Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds"* as published in the GPA Standard 2145 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $CH_6$. The $CH_6$+ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Carnero's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample. The method to be used for chromatographic analysis will be that contained in GPA standard 2261, *Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography* and any superseding revisions thereof.

(vi) At Carnero's discretion, other types of Btu per cubic foot measuring devices may be installed and operated, and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(vii) If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, both Parties agree that this Agreement will be amended accordingly.

(viii) Carnero, or its designee, will install, own, operate and maintain industry standard type measuring and testing equipment necessary to measure and test Gas transported under this Agreement and will keep the same accurate and in good repair. At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will verify the accuracy of Carnero's measuring and testing equipment. Data editing, calibrations, repairs and adjustments of Carnero's measuring and testing equipment will be done only by employees of Carnero or its designated representatives. Producer or its designated representative may, in the presence of an employee of Carnero or Carnero's designated representative, have access to Carnero's measuring and analyzing equipment at any reasonable time, and has the right to witness tests, calibrations and adjustments thereof. All tests scheduled under this Agreement will be preceded by reasonable notice to Producer. Upon the request of Producer for a special test of any meter or auxiliary equipment, Carnero will permit an independent third party selected by Producer to witness a test of the accuracy of same; provided, however, that the cost of such special test will be borne by Producer, unless the percentage of inaccuracy found is more than 2% of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries. If the resultant aggregate inaccuracy in the computed receipts is not more than 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate. All equipment will, in any case, be adjusted at the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the

last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction will be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test, or (ii) 45 Days.

(ix) If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other methods mutually acceptable to both Parties.

(x) Upon request of Producer and if an EFM is installed, Carnero will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within 30 Days; provided, however, that Carnero will provide only such EFM data that relates to Producer's Receipt Point(s) or wells, as the case may be, and not to the Carnero System. Carnero's measurement audit package for a given Month will be deemed correct if no written objection thereto is served on either Party by the other within the year following any Month, but the same will be retained for a two-year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Carnero's premises during normal business hours.

(xi) Producer, at its sole cost and expense, may install, operate and maintain, but in the same manner as is required for Carnero's equipment under this Agreement, check measuring and testing equipment of standard type; provided that the same does not interfere with the operation of Carnero's equipment. Sharing of the meter tube, meter taps, sensing lines, or data signals of Carnero's meter shall not be permitted as part of the check meter installation. The measurement and testing of Gas under this Agreement or for purposes of this Agreement will, nevertheless, be effected only by Carnero's equipment, except as provided in Section 10.4(b)(ix) above. Carnero has the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer hereunder with respect to Carnero's metering and testing equipment.

(xii) If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Carnero that pulsations exist that affect the measurement accuracy, the operator of the facility or facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(xiii) If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, in Carnero's reasonable discretion,

employing such new method or technique is advisable. Carnero will notify Producer in writing of any such election prior to actually implementing such substitution.

## ARTICLE 11
## FORCE MAJEURE AND CURTAILMENT

**Section 11.1** Force Majeure. Except with regard to indemnity obligations and payment obligations under this Agreement, neither Carnero nor Producer will be liable in damages to the other for any act, omission, or circumstances occasioned by or in consequence of any blockades, insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, storms, hurricanes and tropical storms or threat of such, extreme cold or freezing weather, lightning, restraint of rulers and peoples, civil disturbances, terrorist activities, explosions, maintenance (whether routine or non-routine, or scheduled or unscheduled) or breakage of or accidents to machinery, lines of pipe or any portion of the Carnero System, the failure of any upstream or downstream pipeline to take Gas, Plant Products or Additional Plant Products or to install, repair or operate facilities to receive Gas, Plant Products or Additional Plant Products, the order of any court or governmental authority having jurisdiction, or any other cause, whether of the kind in this Agreement enumerated or otherwise, in each case, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome (any such event, "Force Majeure"). Neither the inability to obtain rights-of-way, easements, equipment, materials or labor on terms reasonably acceptable to Carnero, in its sole discretion, nor the failure to prevent or settle any strike or strikes, will be considered a matter reasonably within the control of the Party claiming suspension and each is excluded from any diligence or remedial requirements under this Agreement. For avoidance of doubt, any delay or inability of Carnero to obtain on terms acceptable to Carnero, acting in its sole discretion, any necessary permits or rights-of-way and any delay in receiving or inability to obtain equipment, material or labor, will be deemed to be a Force Majeure event.

**Section 11.2** Performance Excused; Mitigation Duty. The Party experiencing the condition of Force Majeure shall be excused from performance under this Agreement (except with regard to amounts due or becoming due hereunder, credit matters, or with regard to any indemnity obligations), and shall not be liable for any failure to perform (excepting the above-mentioned exceptions) during a Force Majeure Event. Except as provided herein, the Party experiencing a Force Majeure event shall use commercially reasonable efforts to mitigate the effects of any Force Majeure Event and to remedy any inability to perform its obligations hereunder due to such events (except as provided in Section 11.1) as promptly as reasonably practicable.

**Section 11.3** Notices. If any Force Majeure Event should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall: (a) state the date that the Force Majeure Event began, (b) describe the Force Majeure Event, and (c) provide an estimate of the date the condition of Force Majeure shall cease.

**Section 11.4** Force Majeure Release. If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or due to insufficient capacity or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer

may deliver such Gas to third parties for transportation or gathering or processing, provided, that, except to the extent otherwise provided in Article 3, Producer shall not enter into any agreements with third parties for transportation or gathering or processing services with respect to temporarily released Gas for a term greater than 30 Days, except as provided otherwise in Section 3.1.

**Section 11.5** Curtailment by Redelivery Pipeline. If any of the Redelivery Pipelines to which Carnero is delivering Residue Gas curtails physical receipts or deliveries of Residue Gas or experiences operating constraints, then subject to Section 3.5, Carnero will make commercially reasonable efforts to deliver Residue Gas under this Agreement to other Redelivery Pipelines.

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 12.1** Carnero's General Representations and Warranties. Carnero represents and warrants to Producer as follows:

(a) Carnero is a limited partnership formed and validly existing under the laws of the State of Texas;

(b) Carnero has all requisite power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or instrument to which Carnero is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Carnero or of the constituent documents of Carnero; and

(d) this Agreement has been duly executed and delivered by Carnero and all documents required hereunder to be executed and delivered by Carnero have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Carnero enforceable in accordance with their respective terms.

**Section 12.2** Producer's Representations and Warranties. Producer represents and warrants to Carnero as follows:

(a) Producer is a limited liability company formed, validly existing and in good standing under the laws of the State of Delaware;

(b) Producer has the requisite corporate, limited liability company or limited partnership power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or

instrument to which Producer is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to such Producer or of the constituent documents of Producer; and

(d) this Agreement has been duly executed and delivered by Producer and all documents required hereunder to be executed and delivered by Producer have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Producer enforceable in accordance with their respective terms.

## ARTICLE 13
## ASSIGNMENT

**Section 13.1** Assignment.

(a) Neither Party may assign or otherwise convey all or any portion of its right, title, or interest under this Agreement without obtaining the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed, and any purported assignment without such consent will be void; provided, that (i) either Party may assign this Agreement to a third party acquiring all or substantially all of the assets of such Party that are directly or indirectly subject to this Agreement, without the consent of the other Party, (ii) Carnero may assign this Agreement to an Affiliate without the consent of Producer, (iii) either Party may grant a security interest in its right, title and interest in, to and under this Agreement to secure any credit facility or indebtedness (including obligations under any swap agreement) of such Party or its Affiliates without the consent of the other Party, (iv) Carnero may assign this Agreement without Producer's consent in connection with a sale or transfer of the Carnero System, and (v) Producer may assign or partially assign this Agreement without Carnero's consent in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage; provided, in the case of clause (v), that the credit assurance requirements hereunder are continuously complied with by Producer and its assignee prior to and after any assignment by Producer.

(b) Any transfer in accordance with this Section 13.1, shall require, as a condition to its effectiveness, the transferee (other than any grantee under any lien, pledge, encumbrance or security interest) to assume in writing the obligations and liabilities of the transferor under this Agreement to the extent arising from and after the effective date of the assignment (including in the case of Producer, the dedication set forth in Section 3.1). No transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Carnero until the first of the month following the date Carnero has received a copy of the recorded transfer document or other proof satisfactory to Carnero that the claimant is legally entitled to such interest. Notwithstanding anything to the contrary herein, no assigning Party will be released from any of its obligations or liabilities under this Agreement.

**ARTICLE 14**
**FAILURE TO PAY; REMEDIES**

**Section 14.1** Producer Default. The following shall constitute events of "Default" by Producer under this Agreement:

(a) if Producer fails to pay any amount to Carnero when the same is due, and Producer's account remains delinquent beyond a 10-Business Day period following receipt by Producer of written notice of such delinquency, exclusive of any amounts subject to a good faith dispute;

(b) if Producer fails to post credit assurance as required pursuant to Section 5.8(e), and such failure continues for a period of five Business Days after the date such credit assurance is required under Section 5.8(e);

(c) if Producer experiences an Insolvency Event; and

(d) if Producer is in material breach of this Agreement (other than for failure to pay amounts due, which is addressed in Section 14.1(a) or failure to post credit assurance in accordance with Section 5.8(e), which is addressed in Section 14.1(b)), and that breach or default is not cured within 45 Days after receipt by Producer of written notice from Carnero asserting a breach or default.

For purposes of this Article 14, "Insolvency Event" means, with respect to any Person, such Person (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or a regulator, supervisor or similar official, in each case which is not dismissed, discharged, stayed or restrained in each case within 60 Days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, dissolution or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 Days thereafter; or (viii) takes any action in furtherance of, or consents to or approves of any of the foregoing acts.

**Section 14.2** Remedies. Carnero shall have the following remedies:

(a) if Producer is in Default, Carnero may, in addition and without prejudice to any other remedies Carnero may have under this Agreement or at law or in equity, suspend receipts,

deliveries and/or payments under this Agreement and/or terminate this Agreement, in each case upon written notice;

(b) if Producer fails to pay any amount due Carnero when the same is due, except for amounts disputed in good faith, Carnero may, in addition to any other remedy it may have under this Agreement, upon two Days prior written notice: (i) suspend further receipts and deliveries of Producer's Gas until such amount is paid, (ii) require advance payment in cash or payment on a more frequent billing cycle and/or (iii) require Producer to post credit support in accordance with Section 5.8(e). If Producer does not timely provide the security required pursuant to this Section 14.2(b) Carnero shall be entitled to terminate this Agreement upon written notice to Producer; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

**Section 14.3** Carnero Default. The following shall constitute events of "Default" by Carnero under this Agreement:

(a) if Carnero fails to pay any amount due Producer when the same is due, and Carnero's account remains delinquent beyond a 10-Day period, exclusive of any amounts subject to a good faith dispute;

(b) if Carnero experiences an Insolvency Event; and

(c) if Carnero is in material breach of this Agreement (other than as described in Section 14.3(a) and such material breach is not cured within 45 Days after receipt by Carnero of written notice from Producer asserting such material breach.

**Section 14.4** Producer Remedies. If Carnero is in Default, Producer may:

(a) suspend deliveries of Dedicated Gas to Carnero and transport or process such Dedicated Gas on another gathering system or at another gas processing plant and/or terminate this Agreement, in each case upon written notice;

(b) suspend payment under this Agreement upon written notice; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

## ARTICLE 15
## CHOICE OF LAW; DISPUTE RESOLUTION; JURISDICTION; VENUE

**Section 15.1** Choice of Law. This Agreement will be interpreted, construed, and governed by the laws of the state of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

**Section 15.2** Dispute Resolution. Before submitting any dispute for resolution by a court, a Party will provide written notice to the other of the occurrence of such dispute. If the

Parties fail to resolve the dispute within 15 Business Days after such notice is given, then the Parties will seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel will endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within 30 Days after the original notice of dispute is given, then either Party may pursue any remedies available at law or in equity, but this Section 15.2 does not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 15.2 if application of such limitations would prevent a Party from filing a lawsuit or Claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

**Section 15.3** Jurisdiction; Venue. Each Party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement exclusively in any federal or state court in Houston, Harris County, Texas. IN CONNECTION WITH CLAIMS ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF, EACH PARTY (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SPECIFIED COURTS; (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THOSE COURTS; AND (III) WAIVES ANY OBJECTION THAT THOSE COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY. EACH PARTY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM RELATING TO THIS AGREEMENT.

## ARTICLE 16
## NOTICES

**Section 16.1** Notices. Any notice, request, demand, statement, bill, payment or other communication provided for in this Agreement or any notice which any Party may desire to give to the other, will be in writing and will be considered as duly delivered if delivered by mail, commercial courier, facsimile, e-mail or personally, to the addresses, e-mail addresses or facsimile numbers of the applicable Parties, and to the attention of their respective contact persons, as follows:

Carnero: Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: South Texas Contract Administration
Phone: 918-925-3500
Fax: 918-925-3533
E-mail: TPLcontractadmin@targaresources.com

Producer: SN EF Maverick, LLC
1000 Main, Suite 3000
Houston, Texas 77002
Attn: Contracts Admin
Phone: 713-783-8000
Fax: 713-783-9993

E-mail: contractsadmin@sanchezog.com

Statements and invoices may also be delivered via email to the designated addresses set forth above. Either Party may at any time and from time to time by written notice to the other Party designate different persons or addresses for notice.

Notices will be deemed received: (a) if sent by first class mail, upon the postmark date when properly addressed and deposited in the United States mail, first class postage prepaid; (b) if sent by facsimile, upon the sending Party's receipt of its facsimile machine's confirmation of successful transmission, provided that if the Day on which such facsimile is sent is not a Business Day or is after 5:00 p.m. on a Business Day in the receiving Party's jurisdiction, then such facsimile will be deemed to have been delivered on the next Business Day; (c) if sent by commercial courier, upon the date of actual delivery as evidenced by the recipient's written acknowledgment of receipt; (d) if delivered personally, upon the date of actual delivery; and (e) if by e-mail, upon the date of an express confirmation of receipt of such e-mail by the intended recipient (which confirmation such recipient shall be obligated to deliver reasonably promptly).

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 17.1** Counterparts. This Agreement may be executed in two counterparts, including those delivered by facsimile or other electronic means, each of which when so executed and delivered will be an original, and such counterparts together will constitute one instrument.

**Section 17.2** Entire Agreement. This Agreement, including the Exhibits referenced in and attached to this Agreement, contain the entire agreement of Carnero and Producer with respect to the matters addressed in this Agreement and will be amended only by an instrument in writing signed by both Parties. The Parties acknowledge that this Agreement will be deemed and considered for all purposes as prepared through the joint efforts of the Parties and will not be construed against a Party as a result of the preparation, submittal, negotiation or drafting of this Agreement.

**Section 17.3** Mutual Waiver of Certain Remedies. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OTHER THAN REASONABLE ATTORNEYS' FEES AND COURT COSTS AND DAMAGES INDEMNIFIED AGAINST IN SECTION 10.2, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE FOR: (A) ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES; OR (B) FOR LOST OR DELAYED PRODUCTION OR LOST BUSINESS OPPORTUNITY, IN EACH CASE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY BREACH HEREOF, INCLUDING CLAIMS ARISING IN CONTRACT, TORT OR OTHERWISE (OTHER THAN SUCH DAMAGES OR LOSSES PAID OR OWED TO A PERSON NOT A PARTY TO THIS AGREEMENT OR A RATIFICATION AGREEMENT (OTHER THAN AN AFFILIATE OF A PARTY)). THIS SECTION 17.3 WILL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR OTHER FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS

PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.

**Section 17.4** Confidentiality. Carnero, Producer and any other Comanche Producer (upon execution of a Ratification Agreement), and their respective employees, agents, officers, directors, Affiliates and attorneys, will keep the terms of this Agreement confidential. It is understood and agreed upon that disclosure of the terms of this Agreement to any Person who is not a Party to this Agreement could result in damage to non-disclosing Party for which the disclosing Party may be held liable. However, any of the foregoing Persons disclosed in the first sentence of this Section 17.4 may disclose the terms of this Agreement, without prior permission of any Party, to the following Persons ("Representatives") in the following circumstances:

(a) to any potential contractors or professional consultants or advisers engaged by or on behalf of such Person and acting in that capacity where such disclosure is essential to such Representative's work;

(b) to financial institutions and other financing sources requiring such disclosure as a condition precedent to making, continuing or renewing a loan or making an investment in such Person or its Affiliates;

(c) as required by regulatory bodies, including the U.S. Securities and Exchange Commission and any stock exchange to which such Person or its Affiliates are subject, taxing authorities with jurisdiction over part or all of the subject matter of this Agreement and to other Persons to whom disclosure is required by such regulatory bodies;

(d) to courts or other tribunals having jurisdiction and requiring such disclosure, and to other Persons to whom disclosure is required by such courts or other tribunals;

(e) to current or prospective partners or joint venturers or purchasers of the assets or equity of such Person and their Affiliates;

(f) to independent certified public accountants for purposes of obtaining a financial audit; and

(g) as required by subpoena or other legal discovery processes;

provided, however, each Person shall be liable for breach of this Section 17.4 by its Representatives.

**Section 17.5** Consent to Disconnection. If this Agreement terminates for any reason whatsoever, Producer hereby consents and agrees that Carnero may disconnect any wells, leases, pipeline connections or other facilities utilized by Producer that deliver Producer's Gas at the Receipt Point(s) under this Agreement. "Disconnect" for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which Producer's Gas was delivered under this Agreement that are either owned by Carnero, or owned by the pipeline with which Carnero contracted for the gathering or transportation

services at the Delivery Point(s). This consent and agreement by Producer in this paragraph applies to both Carnero and Carnero's Affiliates, without distinction, and is intended in all respects to satisfy the laws, rules or regulations of any applicable jurisdiction.

**Section 17.6** Governmental Regulations; Change in Regulations. This Agreement will be subject to all valid applicable state, local and federal laws, orders, directives, rules and regulations of any Governmental Authority having jurisdiction over this Agreement and the gathering, treating and processing of Producer's Gas and delivery of Residue Gas under this Agreement.

**Section 17.7** Change in Law Costs. If in Carnero's reasonable determination there is a Change in Law resulting in a Governmental Authority requiring Carnero to incur any cost in connection with the sale, purchase, gathering, treating and processing of Producer's Gas or ownership or operation of the Carnero System, Carnero may charge Producer a fee to compensate Carnero for Producer's proportionate share of such cost (based on Producer's aggregate volumes utilizing the Carnero System for the applicable period as compared to the aggregate volumes of other parties utilizing the Carnero System for such period) from the earlier of (i) the date such Change in Law becomes effective or (ii) the date such costs are first incurred.

**Section 17.8** No Waiver. No waiver by either Party of any default of the other Party under this Agreement will operate as a waiver of any future default, whether of a like or different character or nature.

**Section 17.9** Survival. The provisions of Section 17.4 will survive any expiration or termination of this Agreement for a period of one year. The respective indemnification obligations of the Parties set forth in this Agreement will survive any expiration or termination of this Agreement. Any expiration or termination of this Agreement will not relieve Carnero or Producer of any accrued obligations to pay monies due, if any, to the other Party or any obligations to settle any Imbalances due, if any, to the other Party or a Redelivery Pipeline, or any other obligations incurred or accrued before any expiration or termination of this Agreement.

**Section 17.10** Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable because it is contrary to Applicable Law, all other provisions of this Agreement shall nevertheless remain in full force and effect, and the Parties hereby agree to amend the Agreement (and/or enter into other mutually acceptable agreements or arrangements) to the extent necessary to effect the original intent of the Parties and maintain the Parties' relative economic burdens and benefits, as closely as possible.

**Section 17.11** Producers' Representative.

(a) Producer is hereby appointed by each Person executing a Ratification Agreement as their representative ("Producers' Representative") with respect to all matters arising under this Agreement, including but not limited to the following:

(i) To give and receive all notices, and to make all payments due to Carnero;

(ii) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(iii) To receive all payments and disburse such payments to each Person executing a Ratification Agreement, to the extent legally entitled thereto; and

(iv) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the Agreement.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producers' Representative on behalf of each Person included within the definition of Producer or Comanche Producer as fully and with the same effect as though each such Person had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producers' Representative designated above, or designate a new Producers' Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of Producer and each Person executing and delivering a Ratification Agreement. Producers' Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producers' Representative. Each Person executing and delivering a Ratification Agreement shall be liable to Carnero in accordance with the terms set forth therein.

(b) Notwithstanding the terms of Section 17.11(a) above, the obligations of each Comanche Producer shall be several and not joint to the extent of the Producer's Share, as set forth in the Ratification Agreement.

(c) Carnero agrees that, without prejudice to any other rights it may have in respect of any Default by Producer, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, this Agreement due to any default by Producer that is capable of being cured by the Comanche Producers without first notifying each Comanche Producer in writing of the nature and details of such default with reasonable specificity and providing each Comanche Producer 30 days (or in the case of a payment default, 10 Business Days) following such Comanche Producer's receipt of such notice to cure such default, including the right to step into the position of Producer and assume the obligations and responsibilities of Producer hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share (as defined in the applicable Ratification Agreement) of such responsibilities and obligations. If a Comanche Producer cures the default within such 30 day (or in the case of a payment default, 10 Business Day) period in accordance with the terms of this Agreement, then as to such Comanche Producer, the default will be deemed cured in accordance with this Agreement and Producer and Carnero will not have any further right against such Comanche Producer (to the extent arising due to the cured default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise

terminate, this Agreement with respect to such Comanche Producer. For clarity, Carnero may provide the notice required by this paragraph to the Comanche Producers concurrently with or after notices provided to Producer under Section 14.1.

*(Signatures Follow on Next Page)*

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________

Name: ______________________

Title: ______________________

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________________

Name: Antonio R. Sanchez III

Title: Chief Executive Officer

**EXHIBIT A**

**Attached to and made a part of the Firm Gas Gathering, Processing
and Purchase Agreement
between
Carnero G&P LLC and SN EF Maverick LLC
dated April 1, 2018**

**Receipt Point(s); Delivery Point(s)**

**Receipt Point(s)**

| ***Meter Number*** | ***Receipt Point*** | ***Maximum Receipt Capacity (MMcf/d)*** |
|---|---|---|
| 4043654 | Maverick CDP | 235 MMcfd |
| 4043653 | Highway 83 – Carnero CDP | 75 MMcfd |
| 2048026 | Highway 83 – T2 CDP* | 75 MMcfd |

**Delivery Point(s)**

| ***Meter Number(s)*** | ***Residue Gas Delivery Point(s)*** | |
|---|---|---|
| 4034034 | Western | 115 MMcfd |
| TBD*** | Eagle Ford Midstream Pipeline (NET)** | 150 MMcfd |
| 4034036 | SECO | 250 MMcfd |
| 02-T2-09-8090 | TPL SouthTex Transmission Company LP* | 35 MMcfd |
| 02-T2-09-3630 | TPL SouthTex Transmission Company LP* | 35 MMcfd |

*Deliveries to Silver Oak II Plant only

**Potential future Delivery Point – there is no current interconnect

***Meter number not currently available

# EXHIBIT B

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## FEES

Gathering Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement at the same fees, the Gathering Fee shall be $0.15 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Treating Fee (based on $CO_2$ content and Mcf as determined at the Receipt Point(s)):

| | |
|---|---|
| If $CO_2$ content is 2.00% or less | no fee |
| If $CO_2$ content is greater than 2.0% | **To be determined when service is required.** |

Compression Fee: **To be determined when compression is required**

Processing Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement, the Processing Fee shall be $0.253 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Gathering and Processing Fees for Excess Gas: The Gathering Fee, Treating Fee, Compression Fee, and Processing Fee set forth above shall apply with respect to the Firm Volumes (as determined with respect to the then-effective MDQ) and the Priority Interruptible volumes that Carnero accepts under the terms of Section 3.4 of the Agreement. Carnero may refuse to accept any Excess Gas for gathering and processing under this Agreement due to lack of available capacity on the Carnero System. All Excess Gas that Carnero does not accept from Producer shall be, at Producer's sole discretion, temporarily released from the dedication hereunder, subject to the following paragraph.

Producer will give Carnero not less than one hundred twenty (120) days prior written notice and the applicable production projections and forecast, identifying the scope, source and nature of the applicable volumes in reasonable detail (the "Excess Gas Notice") in the event Producer anticipates delivering volumes of Excess Gas on a continuing basis for which Carnero has insufficient capacity on the Carnero System and which Carnero does not accept. Within forty-five (45) days following delivery of Producer's Excess Gas Notice, Carnero may, acting in its sole discretion, propose to accept Excess Gas at adjusted gathering and processing fees (the "Adjusted Gathering, Treating, Compression and Processing Fees"), mutually agreed between the parties that are reflective of: (i) Carnero's capital expenditures (including a reasonable return

on investment with respect to such expenditures); and (ii) any incremental expenses, fees or other costs, in each case, with respect to the receipt, gathering, processing and redelivery (including delivery of contractually allocated Residue Gas and Plant Products) of Producer's Gas. Within ninety (90) days following receipt of Producer's Excess Gas Notice, Producer and Carnero shall negotiate in good faith to arrive at mutually agreeable Adjusted Gathering, Treating, Compression and Processing Fees and an incremental maximum daily quantity, including the period during which such fees will be effective. If Producer and Carnero are unable to agree on the Adjusted Gathering, Treating, Compression and Processing Fees during the Negotiation Period, then Producer may enter into negotiations with a third party for the gathering, processing or redelivery of the Excess Gas. Once Producer has substantially negotiated definitive agreements with a third party, such that all commercial terms (and terms allocating risk) have been finally determined (the "Third Party Offer"), Producer will provide such agreements to Carnero and offer to Carnero, by irrevocable written notice, the option to enter into such agreements, with such changes as are necessary to reflect usage of Carnero's facilities and Carnero shall have 30 days after receipt of the Third Party Offer to elect to accept the Third Party Offer, except that the Receipt Point(s) and Redelivery Point(s) shall be the same as the Receipt and Redelivery Point(s) set forth under this Agreement. In the event that Carnero declines to accept the Third Party Offer, Producer may thereafter elect to cause such Excess Gas to be permanently released from dedication under this Agreement; provided that in no event will Excess Gas be released under this provision if such release would cause (or be reasonably expected to cause) Producer to not be able to deliver the then existing MDQ hereunder.

# EXHIBIT C

## Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018

## Allocations

1. Allocation of Producer's Condensate. A share of Condensate recovered by Carnero upstream of the Plant(s) will be allocated to Producer each Month in accordance with the following formula:

$$\text{Producer's Share of Condensate} = AC \times \frac{PHV}{THV}$$

Where:

AC = the aggregate volume of Condensate delivered from the Carnero System for such Month;

PHV = the total MMBtus attributable to the C5+ component of Producer's Gas gathered and received at all Receipt Point(s) during such Month; and

THV = the total MMBtus attributable to the C5+ component of all Gas gathered and received in the Carnero System upstream of the Plant(s) during such Month.

2. Allocation of Producer's Products.

(a) In the event Producer has elected Full Recovery Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated in paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 90% |
| Propane | 96% |
| Butanes plus | 99% |

(b) In the event Producer has elected Ethane Rejection Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated under paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 35% |
| Propane | 94% |
| Butanes plus | 99% |

(c) At Carnero's election, Carnero may implement a different allocation methodology that it determines, in good faith, provides for a reasonable allocation of Plant Products.

3. Residue Gas. Producer's allocated share of Residue Gas for all Receipt Point(s) under this Agreement will be the quantity of Producer's Gas, in MMBtus, as measured at all Receipt Point(s), minus each of the following: (i) FL&U, (ii) shrinkage attributable to Producer's Condensate and (iii) Product Shrinkage. Plant Fuel, Gathering L&U and Compression Fuel (each as comprising a part of FL&U), Product Shrinkage and shrinkage attributable to Producer's Condensate will be determined as follows.

(a) Producer's share of Plant Fuel, stated in MMBtus, will be determined each Month by multiplying the actual quantity of MMBtus utilized or incurred in the operation of the Plant(s) for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee), use requirements and Gas lost as a result of, but not limited to, leakage, venting or flaring, discrepancies due to meter inaccuracies or variations of temperature and/or pressure at the Plant(s), as well as any Gas that is otherwise unaccounted for in the Plant(s) by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas delivered to the inlet of the Plant(s) during that Month, and (ii) the denominator of which is the total MMBtus attributable to all Gas delivered to the inlet of the Plant(s) during such Month.

(b) Producer's share of Gathering L&U, stated in MMBtus, will be determined each Month by multiplying the actual Gas that is lost and Gas that is unaccounted for in the Gathering System (which is the total MMBtus attributable to all Gas received into the Gathering System, less the total MMBtus attributable to all Gas delivered to facilities downstream of the Gathering System, less Compression Fuel and less shrinkage attributable to Condensate), by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) and transported on the Gathering System during that Month, and (ii) the denominator of

which is the total MMBtus attributable to all Gas received into and transported on the Gathering System during such Month.

(c) Producer's share of Compression Fuel, stated in MMBtus, will be determined each Month by multiplying the actual fuel in MMBtus used by Carnero in the operation of the compression facilities by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) during that Month that require compression at the compression facilities, and (ii) the denominator of which is the total MMBtus attributable to all Gas received into the Carnero System during such Month that require compression at the compression facilities.

(d) Producer's allocated share of product shrinkage (the "Product Shrinkage") for each Month will be the aggregate Btus determined by multiplying the gallons of each Plant Product, by component, of Producer's Products at all Receipt Point(s) by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145*, and superseding revisions thereof, and as adjusted to 60º Fahrenheit and a 14.73 psia pressure base.

(e) Producer's allocated share of shrinkage attributable to Producer's Condensate will be calculated by Carnero each Month by multiplying the number of gallons of each component of Condensate attributable to Producer's Gas by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145,* and superseding revisions thereof, and as adjusted to 60° Fahrenheit and a 14.73 psia pressure base. The aggregate Btu of all such components will constitute the shrinkage attributable to Producer's Condensate hereunder.

**EXHIBIT D**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**DEDICATED ACREAGE**

**For SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is all of Maverick, Webb, Dimmit and LaSalle Counties, Texas.**

**For each Comanche Producer other than SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is such Comanche Producer's existing right, title and interest as of the Effective Date (excluding any after acquired interest) in and to lands, leaseholds, property rights, and/or wells (and the right to produce Gas therefrom) located in the area circled in red in the below diagram, excluding Mexico.**



**EXHIBIT E**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**MEMORANDUM OF AGREEMENT**

THIS MEMORANDUM OF Agreement (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), among SN EF Maverick, LLC, a Delaware limited liability company ("Producer"), and Carnero G&P LLC, a Delaware limited liability company ("Carnero").

**RECITALS**

WHEREAS, on the Effective Date, Producer and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "Agreement") under which Carnero agreed to provide gas gathering and gas processing services to Producer for its benefit and for the benefit of certain other producers;

WHEREAS, Producer and Carnero desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreement and certain provisions contained therein.

1. **Term**. The term of the Agreement commenced on the Effective Date and continues in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the Agreement is terminated by Carnero or Producer upon at least 90 days' written notice to the other Party prior to the expiration of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreement, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreement and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreement or otherwise excluded as provided in the Agreement) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage, excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released or excluded from the Dedication in accordance with the Agreement (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, treat, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreement.

4. **Covenant Running with the Land**. So long as the Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns.

5. **Incorporation of Terms**. The terms and conditions of the Agreement are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreement in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreement.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

Producer and Carnero have signed this Memorandum as of the date first above written, but effective as of the Effective Date.

**CARNERO:**
**CARNERO G&P LLC**

By: ____________________________
Name: __________________________
Title: ___________________________

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ____________________________
Name: __________________________
Title: ___________________________

**THIS INSTRUMENT PREPARED BY:**

_________________
_________________
_________________
Attention: _________

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED INSTRUMENTS**

See attached.

**EXHIBIT F**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**EXISTING COMMITMENTS**

Residue Gas Commitment Agreements

1. Firm Gas Transportation Agreement dated October 1, 2012 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC and associated amendments if any

2. Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP and associated amendments if any

3. Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any

4. Firm Intrastate Gas Transportation Agreement dated March 01, 2013 between Anadarko E&P Onshore, LLC and Springfield Pipeline, LLC and associated amendments if any

5. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

6. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

7. Firm Transportation Agreement dated October 05, 2010 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

11. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

<u>Natural Gas Liquids Commitment Agreements</u>

1. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

2. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

3. Firm Transportation Agreement dated October 01, 2009 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

4. Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko Energy Services Company dated March 1, 2012, and associated amendments if any

5. Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, dated March 1, 2012, and associated amendments if any

6. Raw Make (Y-Grade) Purchase and Sale Agreement between Anadarko E&P Onshore LLC and Plains Gas Solutions LLC, dated August 1, 2015, and associated amendments if any
7. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

# EXHIBIT G

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## TRANSPORTATION AND FRACTIONATION FEE

A. For the first four (4) Contract Years during the Term, T&F Fee (expressed in cents per gallon) shall mean the following:

T&F Fee (expressed in cents per gallon) = (Combined T&F Fee) + (.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

B. Beginning on the fourth (4th) anniversary of the Effective Date and continuing for the remainder of the Term, the T&F Fee shall be comprised of each of the following components:

(i) Transportation Fee: means the actual out-of-pocket cost for transportation of Producer's Products, including any (i) pipeline transportation or exchange fees; (ii) truck and tank car rental fees incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product; and (iii) any other out-of-pocket costs incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product (other than take or pay fees or demand charges), plus (ii) Fractionation Fee (expressed in cents per gallon) = (Base Fractionation Fee) + [(.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

where:

*Combined T&F Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product

*Base Fractionation Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product, adjusted annually beginning on the 5th anniversary of the Effective Date by multiplying the then effective Base Fractionation Fee by the FERC Index

*FERC Index* means the FERC Oil Pipeline Index "Multiplier to Use", as published by the Federal Energy Regulatory Commission pursuant to 18 CFR 342.3, or its successor index then in effect.

*Gas Price* means the sum of (i) the Houston Ship Channel-Index (HSC) as published in the first issue of such Month of INSIDE FERC's GAS MARKET REPORT (or any replacement thereof mutually agreeable to the Parties if it is no longer published), expressed in $/MMBtu, plus (ii) a market differential expressed in $/MMBtu, which is currently $0.15/MMBtu. Producer acknowledges that the market differential represents Carnero's best approximation of the costs reasonably to be incurred by a fractionator of all natural gas fuel being delivered to the fractionator in relation to the HSC Index, and

that Carnero may change the market differential as utilized in determining the T&F Fee as warranted by market conditions.

*Electricity Price means* the average cost of purchased electricity (expressed in dollars/kWh) at the fractionator for the Month prior to the Month in which Producer's Plant Products or Additional Plant Products were delivered to the fractionator.

*Execution Version*

**AMENDMENT TO**

**FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT**

This Amendment to Firm Gas Gathering, Processing and Purchase Agreement, (this "Amendment"), is effective as of the 1st day of April, 2018 (the "Effective Date") and is entered into by and among SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC (collectively the "Producers") and Carnero G&P LLC ("Carnero"). Carnero and each Producer are each referred to herein individually as a "Party" and collectively as the "Parties".

**Recitals**

A. Effective as of the Effective Date, SN EF Maverick, LLC and Carnero entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (the "FGGPPA").

B. Also effective as of the Effective Date, each of the other Producers ratified the FGGPPA pursuant to a Ratification Agreement, by and among such Producer, Carnero and SN EF Maverick, LLC (each, a "Ratification Agreement").

C. The Parties desire to amend the FGGPPA as set forth herein.

**Agreement**

For and in consideration of the foregoing and the mutual covenants and agreements contained herein and in the FGGPPA and the Ratification Agreements, and intending to be legally bound hereby, the Parties hereby agree as follows:

1. Amendment of FGGPPA. The FGGPPA is hereby amended as follows:

(a) The following definitions are inserted in Section 1.1 of the FGGPPA in appropriate alphabetic order:

""Carnero Group" has the meaning set forth in Section 7.1."

""Producer Group" has the meaning set forth in Section 7.2."

(b) Section 7.1 of the FGGPPA is deleted and replaced with the following:

"Section 7.1 Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully

responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination arising from: (i) such Gas while such Gas is within Producer's control and possession; (ii) the failure of Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof; or (iii) the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "CARNERO GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO GROUP)."

(c) Section 7.2 of the FGGPPA is deleted and replaced with the following:

"Section 7.2 Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, arising from: (i) such Gas while such Gas is within Carnero's control and possession (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof); or (ii) the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "PRODUCER GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING

TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER GROUP)."

2. Effectiveness. All matters contemplated in this Amendment will become effective, for all purposes, as of the Effective Date.

3. Effect on FGGPPA and Ratification Agreements. Except as expressly amended by this Amendment, the FGGPPA remains in full force and effect. The Parties acknowledge and agree that this Amendment shall in no manner impair or affect the validity or enforceability of the FGGPPA or any Ratification Agreement.

4. Counterparts. This Amendment may be executed in any number of counterparts (including by .pdf or other electronic means), each of which shall be an original but all of which together shall constitute one instrument.

**[Signature Pages Follow]**

The Parties have executed this Amendment as of the day and year first above written.

**CARNERO G&P LLC**

By: ______________________ GPS

Name: Patrick J. McDonie

Title: President

**SN EF MAVERICK, LLC**

By: ______________________

Name: Antonio R. Sanchez, III

Title: Chief Executive Officer

**EAGLE FORD TX LP**

By: ______________________

Name: Joo hyo Lee

Title: Treasury and Commercial Manager

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**GAVILAN RESOURCES, LLC**

By: ____________________

Name: David E. Roberts Jr.

Title: Chief Executive Officer

**VENADO EF L.P.**

By: ______________________

Name: Stacy Shivers

Title: VP of Operations

# EXHIBIT 2

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**SN EF UnSub LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ________________________________
Name:
Title:

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ________________________________
Name:
Title:

**Carnero G&P LLC**

By: ________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF UnSub GP, LLC, the general partner of SN EF UnSub LP, a Delaware limited partnership, on behalf of said partnership.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

**All of Producer's right, title and interest in and to lands, leaseholds, property rights, and/or wells (and the right to produce gas therefrom) located in Maverick, Webb, Dimmit and LaSalle Counties, Texas, including the instruments listed on the attached Exhibit A.**

# EXHIBIT 3

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case solely with respect to Producer's Share of such representations and warranties and obligations and subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, or otherwise satisfy Producer's Share of such payment or obligation; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Termination. This Agreement shall terminate in its entirety upon the earlier to occur of (i) termination of GGPA, or (ii) the mutual written agreement between Parties. Upon termination Producer shall not have any further obligations or liability under this Agreement beyond that prescribed in the GGPA.

10. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name:
Title:

**Eagle Ford TX LP**

By:________________________________
Name: Joohyo Lee
Title: Treasury and Commercial Manager

**Carnero G&P LLC**

By:________________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**Eagle Ford TX LP**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Eagle Ford TX LP, a Texas limited partnership, on behalf of said partnership.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

# EXHIBIT 4

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as such term is defined in the GGPA). In addition, if Carnero seeks payment directly from Producer as

permitted in Section 5.8(c) of the GGPA, Producer will have the rights provided in Sections 5.10 and 5.11 of the GGPA to dispute such invoices and audit the records applicable to such invoices.

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Venado EF L.P.**

By:________________________________
Name:
Title:

**Carnero G&P LLC**

By:________________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Venado EF L.P.**

By: Venado EF GP LLC, its general partner

By:______________________________
Name: Stacy L. Shivers
Title: Vice President – Operations

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Venado EF L.P.**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By: [signature]
Name: Patrick J. McDonie
Title: President

GPS

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ________________________________
Name:
Title:

**Venado EF L.P.**

By: ________________________________
Name:
Title:

**Carnero G&P LLC**

By: ________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Venado EF L.P., a Delaware limited partnership, on behalf of said partnership.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

**EXHIBIT A**

**DEDICATED INSTRUMENTS**

# EXHIBIT 5

MEPTX
Mitsui E&P Texas LP

SN EF Maverick, LLC
1000 Main St. Suite 3000
Houston, TX 77002
Attn: John Happ

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: Patrick McDonie

Attn: Mr. John Happ and Mr. Patrick McDonie

RE: Retained Take-In-Kind Rights of Mitsui E&P Texas LP in Volumes Committed to the Raptor Gas Processing Facility in La Salle County, Texas

This Letter Agreement ("Agreement") is hereby entered into by and among Mitsui E&P Texas LP, a Texas Limited Partnership ("Mitsui") and SN EF Maverick, LLC, a Delaware Limited Liability Company ("Sanchez") and Carnero G&P LLC, a Delaware Limited Liability Company ("Carnero"), dated this ___ day of April, 2018 and effective as of April 1, 2018 ("Effective Date"). Mitsui, Sanchez and Carnero may be referred to herein individually as "Party", or collectively as "Parties.

Whereas, Mitsui and Sanchez are now parties to that certain Maverick Natural Gas Liquids Marketing Agreement dated effective January 1st, 2012, and that certain Maverick Residue Gas Marketing Agreement dated effective January 1st, 2012 (the "PMAs"), and said PMAs give broad powers to Sanchez as a marketer of Mitsui's share of gas and natural gas liquids (collectively, "Products") produced from the contract areas of seventeen joint operating agreements to which both Mitsui and Sanchez are parties ("Comanche Area"), and said marketing powers include the ability to enter into certain contracts with third parties covering the gathering, treating, processing, transportation, etc., of Mitsui's Products ("Commitment Agreements").

Whereas, if Mitsui rejects a Commitment Agreement per the PMAs, then said Commitment Agreement is deemed a "Rejected Commitment Agreement" under the PMAs, and Mitsui retains the right to take-in-kind its Products as to any excess volumes over and above the volumes committed pursuant to that particular Rejected Commitment Agreement.

Whereas, Sanchez is now considering entering into a Firm Gas Gathering Processing and Purchase Agreement with Carnero for gas produced from the Comanche Area ("the FGGPPA"), and the FGGPPA would be considered a new Commitment Agreement under the PMAs requiring a written election by Mitsui to either approve or reject the FGGPPA.

Whereas, prior to the inception of the FGGPPA, Mitsui rejected a Commitment Agreement dated September 1st, 2016 committing an aggregate of 299,000 MMBtus/day in volumes in the Comanche Area to the Brasada gas processing plant currently owned by WGR Operating, LP in La Salle County, Texas, resulting in Mitsui's ability to take its Products in-kind as to any volumes in excess of the 299,000 MMBtus/day committed to the Brasada plant ("Mitsui Excess Production").

Now, therefore, in consideration of the premises and covenants contained herein, the Parties hereby agree as follows:

1. In accordance with the election procedures provided for in the PMAs, Mitsui shall hereby agree to grant in writing via a ballot its consent to, and acceptance of, Sanchez entering into the FGGPPA with Carnero, resulting in the FGGPPA becoming a Commitment Agreement under the PMAs. However, irrespective of the FGGPPA's status as an accepted Commitment Agreement under the PMAs and of any terms of the PMAs to the contrary, subject to Paragraph 2. below, Mitsui shall retain its right to take the Mitsui Excess Production in-kind throughout the "Initial Term" of the FGGPPA (as said term is defined in the FGGPPA).

2. Notwithstanding Mitsui's retained right to take the Mitsui Excess Production in-kind pursuant to Paragraph 1. above, and subject to Paragraph 3. below, Mitsui hereby agrees and promises to not exercise its right to take the Mitsui Excess Production in-kind during the entire Initial Term of the FGGPPA, to the extent such Mitsui Excess Production would be dedicated to the FGGPPA under the terms thereof as if Mitsui had ratified the FGGPPA as a Comanche Producer (as defined in the FGGPPA).

3. It is hereby understood by the Parties that if, during the Initial Term, the FGGPPA is subsequently amended or the terms thereof waived by Sanchez and Carnero without Mitsui's prior written consent (but excluding elections or actions expressly contemplated by Section 2.1 (to the extent providing for connection of Additional CGPs, new wells or Released Wells within the Dedicated Acreage), Section 3.1 (to the extent providing for releases of volumes of Gas), Section 3.3(a) (to the extent authorizing reductions in MDQ), Section 3.7 (relating to ethane rejection/recovery elections), Section 5.9 (to the extent providing for annual adjustments in fees), Section 10.1(c) (to the extent providing for modification of specifications based upon specifications of Redelivery Pipelines or T2 Pipeline) and Section 10.4(b)(vii) (to the extent adopting revised GPA standards) of the FGGPPA), and said amendment or waiver is:

a. Adverse or disadvantageous to Mitsui's interests or the marketing of Mitsui's Products as determined by Mitsui in its reasonable discretion, when such amendment or waiver addresses:

   i. Fees (other than implementation of the existing annual adjustment in Section 5.9);
   ii. Purchase price for Plant Products, Additional Plant Products and Condensate;
   iii. Imbalance cash out arrangements and the Cashout Price;
   iv. Treatment of disputed billing statements and audit rights;
   v. Plant Products, Additional Plant Products and Condensate allocation procedures in Exhibit C;
   vi. Change to the Dedicated Acreage (other than as a result of lease termination);
   vii. Elimination of any Receipt Point or Delivery Point;
   viii. Change to the Maximum Daily Quantity, or Maximum Receipt Capacity for any Receipt Point, other than pursuant to Section 3.3;
   ix. Alteration of Carnero's obligations described in Section 3.2 or 11.5;
   x. Procedures, costs and standards for connection of new wells and Additional CGPs as set out in Section 2.1;
   xi. Producer's reservations in Section 2.3;
   xii. Treatment of Subject Volumes not accepted, as described in Section 3.1(c) or Producer's Gas volumes not accepted as a result of Force Majeure or other reasons under Sections 3.1(d), (e) and (f) and Section 11.4, or otherwise;
   xiii. Priorities, whether under Section 3.3(b), Section 3.5, or otherwise; or
   xiv. Term of the Agreement; or

b. materially adverse or materially disadvantageous to Mitsui's interests or the marketing of Mitsui's Products in cases other than those set forth in Paragraph 3(a),

(each such amendment or waiver, an "Amendment"), then Sanchez and Carnero may proceed with the Amendment; however Paragraph 2. above shall no longer have any force or effect, and Mitsui shall again have the right to take the Mitsui Excess Production in-kind. This right to take-in-kind by Mitsui shall take effect sixty (60) days from the effective date of any Amendment which Mitsui did not consent to in writing. Notwithstanding the preceding, before exercising its right to take in kind under this Agreement, Mitsui shall send notice to Sanchez and Carnero, and Sanchez and Carnero shall have thirty (30) days following receipt of notice (which may fall within the sixty (60) day period noted above) in which to retract the Amendment, revise the Amendment so it does not apply in any manner to Mitsui and Mitsui's Products, or reach an alternate solution accepted by Mitsui in writing, in which case the right to take in kind shall no longer apply with respect to that specific Amendment (without prejudice to Mitsui's rights with respect to any subsequent proposed amendment or waiver). If sixty (60) days have passed since the effective date of the relevant Amendment, and the thirty (30) day cure period for Sanchez and Carnero under the preceding sentence has passed

without resolution, then Mitsui is free to commence taking the Mitsui Excess Production in kind, notwithstanding any provisions of the PMAs to the contrary..

4. Provided that the consent requirement of Paragraph 3. above is complied with at all times, in the event the PMAs expire, in whole or in part, prior to the expiration of the Initial Term of the FGGPPA, then Mitsui agrees that Sanchez can continue to market Mitsui's Products to the extent necessary and required by the FGGPPA throughout the entire Initial Term of the FGGPPA and Mitsui will execute a mutually-acceptable form of agreement with Sanchez providing for such rights.

5. Provided that the consent requirement of Paragraph 3. above is complied with at all times, Mitsui agrees that, without prejudice to any other rights it may have against Sanchez for any default or failure to perform its duties and obligations under the PMAs with respect to the FGGPPA ("Default"), Mitsui will not suspend deliveries of gas under, or otherwise suspend performance under, or terminate, any PMA in a manner that would impact Sanchez's performance of or ability to perform its then-existing commitments under the FGGPPA due to any default by Sanchez that is capable of being cured by Carnero without first notifying Carnero in writing of the details of any such Default with reasonable specificity, providing Carnero a copy of the applicable PMA, and providing Carnero 30 days (or in the case of a payment default, 10 business days) following Carnero's receipt of such notice to cure such Default on behalf of Sanchez. If Carnero, in its sole discretion, cures the Default within such 30-day (or in the case of a payment default, 10 business day) period in accordance with the terms of the applicable PMA, the Default will be deemed cured in accordance with the applicable PMA and Mitsui will not have any further right (to the extent arising due to that cured Default) to suspend performance under, or otherwise terminate, the applicable PMA.

6. So long as Mitsui is not exercising its right to take Mitsui Excess Production in-kind and the FGGPPA is still in effect, Carnero agrees that, without prejudice to any other rights it may have in respect of any default by Sanchez under the FGGPPA, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA in a manner that would impact Mitsui's production, marketing and sale of Products, or ability to produce, market and sell Products, due to any default by Sanchez that is capable of being cured by Mitsui without first notifying Mitsui in writing of the nature and details of such default with reasonable specificity and providing Mitsui 30 days (or in the case of a payment default, 10 business days) following Mitsui's receipt of such notice to cure such default, including the right to step into the position of Sanchez and assume the obligations and responsibilities of Sanchez hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share of such responsibilities and obligations. If Mitsui, in its sole discretion, cures the default within such 30 day (or in the case of a payment default, 10 business day) period in accordance with the terms of the FGGPPA, then as to Mitsui, the default will be deemed cured in accordance with the FGGPPA and Sanchez and Carnero will not (to the extent arising due to the cured default) suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA with respect to Mitsui's Producer's Share. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Comanche

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:_[signature]_

Its:_SVP & COO_

Dated:_May 9th, 2018_

SN EF Maverick, LLC

By:________________

Its:________________

[initials]

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:________________________

Its:________________________

Dated:________________________

SN EF Maverick, LLC

By: [signature]
Antonio R. Sanchez, III

Its: Chief Executive Officer

Dated:______________________________

Carnero G&P LLC

By:__________________________________

Its:__________________________________

Dated:______________________________

Dated:________________________

Carnero G&P LLC

By:________________________ GPS

Its: President

Dated:________________________

# EXHIBIT 6

# District Courts

## Activity Detail from September 1, 2020 to September 30, 2021

### County: Harris

### 92.3 Percent Reporting Rate

### 12 Reports Received Out of a Possible 13

**CIVIL CASES**

| | Injury or Damage | | | | | | Real Property | |
|---|---|---|---|---|---|---|---|---|
| Cases on Docket: | **Motor Vehicle** | **Medical Malpractice** | **Other Professional Malpractice** | **Product Liability - Asbestos/ Silica** | **Other Product Liability** | **Other Injury or Damage** | **Eminent Domain** | **Other Real Property** |
| **Cases Pending 9/1/2020:** | | | | | | | | |
| *Active Cases* | 21,297 | 494 | 85 | 243 | 236 | 4,446 | 67 | 7,657 |
| *Inactive Cases* | 902 | 28 | 12 | 3 | 15 | 348 | 4 | 340 |
| Docket Adjustments | 156 | (3) | (1) | (3) | 22 | 14 | 1 | 64 |
| **Cases Added:** | | | | | | | | |
| New Cases Filed | 14,255 | 274 | 31 | 36 | 58 | 2,807 | 21 | 7,951 |
| Other Cases Reaching Docket: | | | | | | | | |
| *Cases Reactivated* | 2,634 | 39 | 10 | 1 | 20 | 544 | 8 | 2,090 |
| *All Other Cases Added* | 279 | 2 | 3 | 4 | 4 | 215 | 1 | 74 |
| **Total Cases On Docket** | 38,621 | 806 | 128 | 281 | 340 | 8,026 | 98 | 17,836 |
| **Dispositions:** | | | | | | | | |
| Change of Venue Transfers | 3 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| Default Judgments | 236 | 0 | 1 | 0 | 1 | 46 | 0 | 77 |
| Agreed Judgments | 3,186 | 34 | 8 | 1 | 11 | 679 | 11 | 5,967 |
| Summary Judgments | 120 | 2 | 6 | 1 | 2 | 80 | 0 | 74 |
| Final Judgments: | | | | | | | | |
| *After Non-Jury Trial* | 18 | 0 | 0 | 0 | 0 | 10 | 15 | 31 |
| *By Jury Verdict* | 30 | 1 | 0 | 0 | 1 | 5 | 0 | 2 |
| *By Directed Verdict* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Dismissed for Want of Prosecution* | 1,423 | 12 | 4 | 0 | 5 | 238 | 2 | 146 |
| *Non-Suited or Dismissed by Plaintiff* | 1,729 | 28 | 5 | 31 | 13 | 362 | 1 | 150 |
| All Other Dispositions | 4,747 | 88 | 12 | 4 | 39 | 972 | 10 | 883 |
| **Total Cases Disposed** | 11,492 | 165 | 36 | 37 | 72 | 2,397 | 39 | 7,330 |
| **Placed on Inactive Status** | 3,027 | 50 | 10 | 3 | 19 | 658 | 7 | 2,054 |
| **Cases Pending 9/30/2021:** | | | | | | | | |
| *Active Cases* | | | | | | | | |
| *Inactive Cases* | | | | | | | | |

# CIVIL CASES

| Cases on Docket: | Contract: Consumer/ Commercial/ Debt | Contract: Other Contract | Civil Cases Relating to Criminal Matters | All Other Civil Cases | Tax | Total Cases |
|---|---|---|---|---|---|---|
| **Cases Pending 9/1/2020:** | | | | | | |
| *Active Cases* | 7,312 | 2,525 | 9,568 | 4,080 | 11,705 | 69,715 |
| *Inactive Cases* | 805 | 414 | 368 | 278 | 261 | 3,778 |
| Docket Adjustments | 59 | 60 | (13,954) | (38) | (81) | (13,704) |
| **Cases Added:** | | | | | | |
| New Cases Filed | 5,961 | 1,953 | 13,400 | 3,815 | 8,008 | 58,570 |
| Other Cases Reaching Docket: | | | | | | |
| *Cases Reactivated* | 699 | 259 | 1,424 | 332 | 1,576 | 9,636 |
| *All Other Cases Added* | 174 | 74 | 51 | 487 | 26 | 1,394 |
| **Total Cases On Docket** | 14,205 | 4,871 | 10,489 | 8,676 | 21,234 | 125,611 |
| **Dispositions:** | | | | | | |
| Change of Venue Transfers | 1 | 3 | 0 | 0 | 0 | 12 |
| Default Judgments | 1,302 | 458 | 323 | 353 | 1,299 | 4,096 |
| Agreed Judgments | 900 | 454 | 2,435 | 885 | 58 | 14,629 |
| Summary Judgments | 308 | 70 | 1 | 130 | 2 | 796 |
| Final Judgments: | | | | | | |
| *After Non-Jury Trial* | 90 | 25 | 56 | 103 | 307 | 655 |
| *By Jury Verdict* | 3 | 6 | 0 | 4 | 0 | 52 |
| *By Directed Verdict* | 0 | 0 | 0 | 0 | 0 | 0 |
| *Dismissed for Want of Prosecution* | 683 | 138 | 114 | 415 | 879 | 4,059 |
| *Non-Suited or Dismissed by Plaintiff* | 581 | 247 | 17 | 421 | 3,069 | 6,654 |
| All Other Dispositions | 1,782 | 917 | 4,149 | 1,349 | 450 | 15,402 |
| **Total Cases Disposed** | 5,650 | 2,318 | 7,095 | 3,660 | 6,064 | 46,355 |
| **Placed on Inactive Status** | 775 | 345 | 1,423 | 379 | 1,471 | 10,221 |
| **Cases Pending 9/30/2021:** | | | | | | |
| *Active Cases* | | | | | | |
| *Inactive Cases* | | | | | | |

**Age of Cases Disposed:**

| | 3 Months or Less | Over 3 to 6 Months | Over 6 to 12 Months | Over 12 to 18 Months | Over 18 Months | **Total Cases** |
|---|---|---|---|---|---|---|
| Number of Cases | 5,322 | 6,178 | 10,542 | 7,952 | 16,361 | 46,355 |

| **Additional Court Activity:** | **Total** |
|---|---|
| Cases in Which Jury Selected | 120 |
| Cases in Which Mistrial Declared | 3 |
| Injunction or Show Cause Order Issued | 2,386 |
| Cases in Which Plaintiff /Petitioner Represented Self | 2,797 |

# EXHIBIT 7

**Table F.**
**U.S. Bankruptcy Courts—Bankruptcy Cases Commenced, Terminated and Pending**
**During the 12-Month Periods Ending June 30, 2020 and 2021**

| Circuit and District | Filed | | | Terminated | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | Percent Change [1] | 2020 | 2021 | Percent Change [1] | 2020 [2] | 2021 | Percent Change [1] |
| **Total** | **682,363** | **462,309** | **-32.2** | **760,297** | **609,855** | **-19.8** | **954,786** | **807,243** | **-15.5** |
| **5th** | **54,446** | **35,175** | **-35.4** | **60,827** | **51,663** | **-15.1** | **99,949** | **83,461** | **-16.5** |
| TX,S | 9,015 | 6,330 | -29.8 | 9,860 | 8,512 | -13.7 | 16,398 | 14,216 | -13.3 |

NOTE: Due to differences among districts in reporting intra-district transfers, the total provided above for cases pending at the end of the last Reporting Period may not equal the number obtained by adding totals for cases pending at the end of the prior period plus cases filed during the current period, then subtracting cases terminated during the current period. The United States territorial courts assume the jurisdiction of United States bankruptcy courts within their respective territories, which do not have separate bankruptcy courts.

[1] Percent change not computed when fewer than 10 cases reported for the previous period.

[2] Revised.

[3] The United States Bankruptcy Court for Arkansas (AR) includes both the Eastern and Western Districts of Arkansas.

# EXHIBIT 8

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

## Case Volume by Date




## Motion Practice

summary

**Motion for Partial Summary Judgment/Summary Adjudication**



Granted: 42%, Granted in Part: 2%, Denied: 56%, Unspecified: 0% 170 Total Cases

**Motion for Summary Judgment**



Granted: 69%, Granted in Part: 0%, Denied: 31%, Unspecified: 0% 353 Total Cases

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

## Case Categories




## Industries




## Company Size (# of employees)



# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

Appointment

**Cory Sepolio**

Appointed: N\\A

Appointed by: N\\A

Total Cases: 3,580

Motion Filing Party Type




Average Case Length

484 Days

Average Case Length - County

539 Days

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

## Top 20 Law Firms/Lawyers




## Top 20 Litigants






015480

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

Open All Underlying Cases

# EXHIBIT 9

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 21-03908 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § § § | |
| | § | |
| Defendants. | § | |

**Affidavit of Amy C. Falcon**

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

BEFORE ME, the undersigned authority, on this day personally appeared Amy C. Falcon having been by me first duly sworn according to law, upon his oath did depose and say the following:

1. "My name is Amy C. Falcon, and I am over the age of twenty-one. I am fully qualified to make this affidavit. I verify that the factual statements contained in this affidavit are based upon my personal knowledge and are true and correct.

2. I am an attorney duly licensed in the State of Texas since May 2009. I am also admitted to practice before the United States District Courts for the Northern, Southern, and Western Districts of Texas. I am a Partner at the law firm of Porter Hedges, LLP ("Porter Hedges"),

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

where I have practiced for approximately 11 years. I am one of the attorneys representing Plaintiff Carnero G&P, LLC in the above styled action. I have been involved in drafting Carnero's Motion to Remand to State Court or for Abstention ("Motion") filed concurrently with this affidavit.

3. In support of that motion, I personally accessed the Texas Office of Court Administration data and records located at https://card.txcourts.gov/ (note that you must use Internet Explorer to run the reports). From that website, I downloaded the official case statistics for the State district courts of Harris County, Texas. That is the county where the lawsuit styled *Carnero G&P LLC v. SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.*, Cause No 2021-46431, in the 269th Judicial District Court, Harris County, Texas ("State Court Lawsuit") is pending. **Exhibit 6** to the Motion is a true and accurate copy of the Report: District Court Activity Detail for the period September 2020 through September 2021 for Harris County, Texas,[2] exported to Excel and formatted to print the data for the civil district courts.

4. I personally accessed the United States Courts Caseload Statistics Data Tables located at https://card.txcourts.gov/ReportCriteria.aspx?ddlReportName=119&ddlReportType=5018&ddlReportPeriod=. From that website, I downloaded the spreadsheet Table F – Bankruptcy Filings (June 30, 2021) showing U.S. Bankruptcy Courts-Bankruptcy Cases Filed, Terminated, and Pending—During the 12-Month Periods Ending June 30, 2020 and 2021.[3] **Exhibit 7** to the Motion is a true and accurate copy of that report, exported to Excel and formatted to print the data for the Southern District of Texas only.

5. I personally accessed the case statistics for Judge Cory Sepolio, judge of the 269th Civil District Court, Harris County, Texas, from Gavelytics located at https://www.gavelytics.com/. Gavelytics has a paywall; the steps I used to access the statistics are shown below.




[2] *See* https://card.txcourts.gov/ReportCriteria.aspx?ddlReportName=119&ddlReportType=5018&ddlReportPeriod= using search criteria From Year: 2020, From Month: September. To Year: 2021, To Month September, County Harris, Court All, Format Export to MS Excel (do not check separate monthly report box).

[3] *See* https://www.uscourts.gov/statistics/table/f/bankruptcy-filings/2021/06/30

I received training in how to use Gavelyitics through the Baylor Law School LLM in Litigation Management program in which I am currently enrolled as a student. Gavelytics provides analytics about judges, law firms, lawyers, and litigants by analyzing the court documents for each group. I access the Judges View in the Analytics application to search for Judge Sepolio.












13033488

015485

From here I reviewed the analytics for Judge Sepolio:




Because the State Court Lawsuit relates to contract interpretation, I then limited the Motion Practice view to summary judgment:




I downloaded the report to PDF. A true and correct copy of that PDF is attached as **Exhibit 8** to the Motion."

**Amy C. Falcon**
**Attorney for Plaintiff Carnero G&P LLC**

STATE OF TEXAS §
§
COUNTY OF HARRIS §

**SUBSCRIBED AND SWORN BEFORE ME** on this 6th day of October 2021, to certify which witness my hand and official seal. This notarial act was an online notarization.

LAURA FOLK
4429611
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
MARCH 6, 2025

Notary Public in and for the State of Texas

My Commission expires: 3/6/25



13033488

015487

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 21-03908 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**Order Granting Adversary Plaintiff Carnero G&P, LLC's**
**Motion to Remand to State Court or for Abstention**
[Relates to Docket No.__]

Pending before this Court is Adversary Plaintiff Carnero G&P, LLC's Motion to Remand to State Court or for Abstention pursuant to 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas to return this Adversary Proceeding to the 269th Judicial District Court, Harris County, Texas. After considering the motion, the response, and any reply, the pertinent pleadings, the evidence, and the argument of counsel, the Court finds that the motion should be granted. It is therefore **ORDERED** that:

1. Pursuant to 28 U.S.C. § 1334(b), this Court lacks jurisdiction to hear this Adversary Proceeding, which is hereby remanded to the 269th Judicial District Court of Harris County, Texas;

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2. In the alternative, pursuant to 28 U.S.C §§ 1334(c) and 1452 (b), the Court abstains from hearing the Adversary Proceeding, which is hereby remanded to the 269th Judicial District Court of Harris County, Texas; and

3. Upon entry of this Order, the Adversary Proceeding is hereby closed.

DATED: _____________, 2021

______________________________

**Honorable Marvin Isgur**
**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| | § | |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. 21-03908 |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | § § § | |
| | § | |
| *Defendants.* | § | |

**RESPONSE TO MOTION TO REMAND TO STATE COURT OR FOR ABSTENTION**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

# TABLE OF CONTENTS


Table of Contents .......... 2

Table of Authorities .......... 3

Summary .......... 6

Background .......... 9

I. The Chapter 11 Cases. .......... 9

II. The Carnero Action. .......... 11

Legal Standards .......... 14

I. "Arising Under" or "Arising In" Jurisdiction – Core Proceedings. .......... 15

II. "Related To" Jurisdiction. .......... 17

III. *Craig's Stores* and Post-Confirmation Jurisdiction. .......... 18

Arguments and Authorities .......... 20

I. The Carnero Action is a core proceeding .......... 20

A. Because the Carnero Action goes to both Mesquite's rights and the Court's authority, under Section 365, it "arises under" Title 11. .......... 20

B. Because the Carnero Action involves rights created by bankruptcy law and requires interpretation and enforcement of this Court's orders, it "arises in" the bankruptcy proceedings. .......... 22

II. At a minimum, the Court has "related to" jurisdiction over the Carnero Action. .......... 26

III. Mandatory Abstention Does Not Apply. .......... 27

IV. Permissive Abstention Does Not Apply. .......... 28

Conclusion .......... 31

**CERTIFICATE OF SERVICE** .......... 36

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Atencio v. Atencio (In re Petroleum Products & Services, Inc.)*,
556 B.R. 296 (Bankr. S.D. Tex. 2016)....................27, 29

*Bank of Louisiana v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388 (5th Cir. 2001) ... 18, 19, 20, 26

*Beital v. OCA, Inc. (In re OCA, Inc.)*,
551 F.3d 359 (5th Cir. 2008)....................18

*Beta Operating Co., LLC v. Aera Energy, LLC, (In re Mem'l Prod. Partners LP)*, 581 B.R. 206 (Bankr. S.D. Tex. 2018)....................17, 19

*Bissonnet Investments LLC v. Quinlan (In re Bissonnet Investments LLC)*,
320 F.3d 520 (5th Cir. 2003)....................15

*Burch v. Freedom Mortgage Corporation (Matter of Burch)*,
835 Fed. Appx. 741 (5th Cir. 2021)....................15

*Colvin v. Amegy Mortg. Co., L.L.C. (In re Colvin)*,
507 B.R. 169 (W.D. Tex. 2014)....................19

*Faulkner v. Lane Gorman Trubitt, LLC (In re: Reagor-Dykes Motors, LP)*,
18-50214-RLJ-11, 2021 WL 4823525 (Bankr. N.D. Tex. Oct. 14, 2021)..........18

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
17 BK 3283-LTS, 2021 WL 2676983 (D.P.R. June 29, 2021)....................21

*Fire Eagle, LLC v. Spillman Dev. Group, Ltd. (In re Spillman Dev. Group, Ltd.)*, 710 F.3d 299 (5th Cir. 2013)....................16, 18, 25, 26

*Galaz v. Katona (In re Galaz)*,
841 F.3d 316 (5th Cir. 2016)....................15, 16

*Glasstex, Inc. v. Arch Aluminum & Glass Co., Inc. (In re Polvado)*,
06-70151, 2006 WL 2993333 (Bankr. S.D. Tex. Oct. 17, 2006) (Isgur, J.) ......17

*Hassell Construction Company Inc. v. Hassel (In re Hassell)*,
19-30694, 2020 WL 728890 (Bankr. S.D. Tex. Jan. 7, 2020)....................31

*Lehman Bros. Holdings, Inc. v. Credit Agricole Corp. and Invest. Bank (In re Lehman Bros. Holdings Inc.)*,
08-13555 (JMP), 2013 WL 12334707 (S.D.N.Y. Aug. 8, 2013)....................25

*Maddox v. O'Cheskey (In re Am. Hous. Found.*),
09-ap-20232-RLJ, 2015 WL 5781396 (Bankr. N.D. Tex. Sept. 30, 2015)........17

*Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*,
378 F.3d 511 (5th Cir. 2004) ....................................................................20

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) ................................................20, 22

*Nelson v. Welch (In re Repository Technologies, Inc.)*,
601 F.3d 710 (7th Cir. 2010) ....................................................................16

*Newby v. Enron (In re Enron Corp. Sec).*,
535 F.3d 325 (5th Cir. 2008) ................................................................18, 19, 26

*Nine Point Energy Holdings, Inc. v. Caliber Measurement Services, LLC (In re Nine Point Energy Holdings, Inc.)*,
21-10570 (MFW), 2021 WL 2212007 (Bankr. D. Del. June 1, 2021) ...............25

*Occidental Petroleum Corp., v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*,
No. 20-ap-3198, 2021 WL 1822708 (Bankr. S.D. Tex. May 6, 2021) ....9, 10, 11, 20

*Quarternorth Energy, LLC v. Atlantic Maritime Services, LLC (In re Fieldwood Energy LLC)*,
20-33948, 2021 WL 4839321 (Bankr. S.D. Tex. Oct. 15, 2021) (Isgur, J.) ......17

*Ramirez v. Rodriguez (In re Ramirez)*,
413 B.R. 621 (Bankr. S.D. Tex. 2009)............................................................28

*Rohifard v. Brewer & Prichard, P.C. (In re ABC Dentistry, P.A.)*,
16-34221, 2019 WL 913356 (Bankr. S.D. Tex. Feb. 21, 2019) .........................16

*Schermerhorn v. Centurytel, Inc. (In re SkyPort Glob. Communications, Inc.)*,
08-36737-H4-11, 2013 WL 4046397 (Bankr. S.D. Tex. Aug. 7, 2013) .............15

*Schmidt v. Nordlicht*,
CV H-16-3614, 2017 WL 526017 (S.D. Tex. Feb. 9, 2017) (Rosenthal, J.) ......19

*Sportsman's Warehouse, Inc. v. McGillis/Eckman Investments-Billings, Inc. (In re Sportsman's Warehouse, Inc.)*,
457 B.R. 372 (Bankr. D. Del. 2011) ................................................................26

*In re Trans World Airlines, Inc.*,
261 B.R. 103 (Bankr. D. Del. 2001) ..........................................................22, 25

*TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680 (Bankr. N.D. Tex. 2020) .......... 15, 31

*U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296 (5th Cir. 2002) .......... 16, 19, 20, 24

*In re Ultra Petroleum Corp.*, 621 B.R. 188 (Bankr. S.D. Tex. 2020) .......... 24

*Wood v. Wood (In re Wood)*, 825 F.2d 90 (5th Cir.1987) .......... 16

**Statutes**

11 U.S.C. § 365 .......... 7, 9, 20, 21, 22, 24, 25, 31

28 U.S.C. §1334 .......... 11, 14, 28, 30

**Other Authorities**

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U. Colo. L. Rev. 845, 888 (1988) .......... 21

Defendants Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**" or "**Sanchez**"); SN EF UnSub, LP ("**Unsub**"); Defendant Eagle Ford TX LP ("**Eagle Ford**"); Venado EF L.P. ("**Venado**"); and Mitsui E&P Texas LP ("**Mitsui**") (collectively, "**Defendants**") respectfully submit this opposition to the motion to remand or for abstention filed by Plaintiff Carnero G&P LLC ("**Carnero**") (the "**Motion**") (AP Docket No. 6).[2] The lawsuit filed by Carnero in Harris County District Court (the "**Carnero Action**") is a core proceeding or, at the very least, is related to the Sanchez bankruptcy proceedings. Accordingly, the Motion should be denied.

## Summary

1. Carnero frames the Carnero Action as a post-confirmation dispute about assumed contracts, with no supposed relation to or impact on the bankruptcy proceeding. That is wrong. The Carnero Action seeks declarations over matters that (i) fall squarely within this Court's jurisdiction; (ii) would limit Mesquite's and Maverick's rights under the Bankruptcy Code—rights Mesquite and Maverick are entitled to exercise under the confirmed plan; and (iii) would effectively preempt this Court's orders in another adversary proceeding *Occidental Petroleum Corp., et. al. v. Sanchez Energy Corporation, et. al.,* Adv. No. 20-03198 (the "**Sanchez-Oxy Adversary Proceeding**").[3]

---

[2] For clarity, this brief cites entries on the docket of this adversary proceeding (No. 21-03908) as "AP Docket No. ____" and entries on the main Chapter 11 docket (No. 19-34508) as "Bankr. Docket No. ___." Capitalized terms not otherwise defined herein are defined in the Notice of Removal. (AP Docket No. 1).

[3] Except for the Carnero GGPA, to which Mesquite is a party solely for purposes of a guaranty, Mesquite is not a party to any of the agreements at issue in this case—SN EF Maverick, LLC ("**Maverick**") is the party on those agreements. (AP Docket No. 1 at 5.) Carnero alleged in the petition that "[u]pon the effective date of the Plan, Mesquite became the successor to Maverick." But this is not true—Mesquite and Maverick remain separate and distinct entities. Mesquite pointed this out in the notice of removal, and Carnero acknowledges in the Motion "that it ***may*** have misidentified Mesquite as the correct contract counterparty" and "intends

2. The timing of the Carnero Action is no accident. As noted in Paragraph 26 of the Petition, Carnero filed this lawsuit upon coming to the belief that the Comanche parties, including the parties in the Sanchez-Oxy Adversary Proceeding, were on the cusp of a global midstream settlement. The Carnero Action is a last-ditch effort to destabilize this comprehensive deal. This alone demonstrates that the Carnero Action is inextricably intertwined with this Court's jurisdiction, but the ties to the bankruptcy proceeding run even deeper.

3. For example, one issue in the Sanchez-Oxy Adversary Proceeding is whether the Court will authorize Mesquite's rejection of the Midstream Agency Agreement.[4] Carnero is not a party to the Midstream Agency Agreement but stands to benefit if Mesquite rejects that contract. Carnero seeks to cement those benefits by obtaining a declaration limiting Mesquite's business judgment to reject or assume the Midstream Agency Agreement under Section 365. Indeed, Carnero claims that the Carnero GGPA[5] and Ratification Agreements "obligate Mesquite, UnSub, Eagle Ford, and Venado to . . . pursu[e] rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365." (Petition ¶36 (k) [AP Docket No. 1-4 at 11].) In other words, if the

---

to correct this issue by amending its petition." (AP Docket No. 6 at 5.) Carnero has not, however, moved to substitute Maverick for Mesquite or stated unequivocally that the claims against Mesquite would be dismissed. To the extent Carnero seeks a judgment declaring that *Mesquite* is obligated under various agreements that it was not a party to, Carnero's claim against Mesquite requires interpretation and enforcement of the Confirmation Order and Plan, and therefore arises in the Bankruptcy Case.

[4] The Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC.

[5] The Firm Gas Gathering Processing and Purchasing Agreement between Maverick and Carnero, effective April 1, 2018 (the "**Carnero GGPA**"). The Carnero GGPA was assumed on June 30, 2020, when the Court entered the *Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended* (the "**Midstream Settlement Approval Order**"). (Bankr. Docket No. 1415.)

case were remanded, a state court would be assessing Mesquite's ability to assume or reject the Midstream Agency Agreement, usurping the authority of this Court.

4. Carnero also requests declarations as to the consequences of Mesquite's rejection of the Midstream Agency Agreement (should it occur), as well as the rejection of the Marketing Agreement[6] and assumption of the UnSub Ratification Agreement, all of which were approved in the adversary proceeding captioned *GSO ST Holdings LP, et. al. v. Sanchez Energy Corporation, et. al.,* Adv. No. 20-03197 (the "**GSO-Sanchez Adversary Proceeding**" and the "**UnSub Stipulation and Agreed Order**").[7] (Petition ¶25 [AP Docket No. 1-4 at 9].) The declarations request interpretation and enforcement of this Court's prior orders and, therefore, establish bankruptcy jurisdiction.

5. The Carnero Action is a core proceeding because the declarations Carnero seeks arise under title 11 and would not exist but for the bankruptcy proceedings. Carnero seeks declarations concerning Mesquite's ability to reject or assume executory contracts in the bankruptcy proceedings, as well as declarations that interpret and enforce the Court's prior orders, including the confirmation order and orders authorizing rejection or assumption of executory contracts. At a minimum, these declarations are "related to" the Bankruptcy Proceeding. That confirmation has already occurred does not divest this Court of jurisdiction—especially concerning the Plan's unique post-confirmation assumption and rejection procedure.

---

[6] The Hydrocarbons Purchase and Marketing Agreement between Maverick and UnSub, dated January 12, 2017.

[7] The Ratification and Assumption Agreement between UnSub, Maverick, and Carnero, effective April 1, 2018.

6. Remand would yield significant inefficiency. This Court has more than two years of experience with the parties and the complex web of contracts implicated by the Carnero Action. Forcing Defendants to litigate these issues in a forum that lacks the background and context for these proceedings would take significantly more time and risk inconsistent or conflicting outcomes. The Motion should be denied.

## BACKGROUND

### I. The Chapter 11 Cases.

7. As the Court is aware, these Chapter 11 cases have followed an unusual course. Following an August 11, 2019 bankruptcy filing (Bankr. Docket No. 1), the plan of reorganization for Sanchez and certain affiliates was confirmed on April 30, 2020. (Bankr. Docket Nos. 1198 (the "**Plan**") and 1212 (the "**Confirmation Order**").) The Plan became effective on June 30, 2020 (the "**Plan Effective Date**"). (Bankr. Docket No. 1417.)

8. The Plan provided for the assumption and rejection of contracts under 11 U.S.C. § 365 *after* confirmation and the Plan Effective Date. *See Occidental Petroleum Corp., v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)* (hereinafter "*Sanchez-Oxy*"), No. 20-ap-3198, 2021 WL 1822708, at *4 (Bankr. S.D. Tex. May 6, 2021). As the Court has explained, this unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *Id.* at *1. "To forestall liquidation, Sanchez and its creditors agreed to confirm a chapter 11 plan first and litigate Sanchez's ability to reject executory contracts later." *Id.*

9. The Plan set out a procedure to resolve rejection disputes after the Plan Effective Date. Specifically, the Debtors were to identify executory

contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "**Rejection Schedule**") or to be assumed as listed on Exhibit C (as amended, the "**Assumption Schedule**") to the Plan. (Bankr. Docket Nos. 1212 at 10 – 16 (¶¶17 – 26), and 1198 at 29 (Article V).) If no party in interest filed a timely objection to a contract's inclusion on either the Rejection Schedule or the Assumption Schedule, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date. *Id.* If an objection is timely filed, the Plan provides that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" and in the interim, the "agreement shall continue as in effect immediately prior to the effective date." *Id.*

10. Section XI of the Plan provides that the Bankruptcy Court "retain[s] exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan," specifically enumerating the Court's jurisdiction to "**resolve any matters related to Executory Contracts or Unexpired Leases**, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under any Executory Contract[.]" (Bankr. Docket No. 1212 at 69 (emphasis added).)

11. Reserving determinations of assumption and rejection until after the Confirmation Order and the Plan Effective Date necessarily affects the scope of the Court's post-confirmation jurisdiction; indeed, the Court has continued to hear core matters since the Plan Effective Date. *See, e.g., Sanchez-Oxy*, 2021 WL 1822708, at *5. In the *Sanchez-Oxy Adversary Proceeding,* this Court denied Occidental's after-the-fact challenge to the rejection procedure, concluding that the Plan and Confirmation Order are entitled to res judicata

effect. 2021 WL 1822708, at *6 – 8 ("Occidental assented to this procedure at confirmation and failed to appeal the Confirmation Order. For those reasons, Occidental's argument against post-effective date rejection amounts to a collateral attack on the procedure set out in Sanchez's Plan. Occidental waived that argument in this case.")

12. On June 28, 2021, this Court entered the UnSub Stipulation and Agreed Order which, among other things, authorized the rejection of the Marketing Agreement and assumption of the UnSub Ratification Agreement. (20-03197 Docket No. 64.)

## II. The Carnero Action.

13. In response to this Court's entry of the UnSub Stipulation and Agreed Order, on July 30, 2021, Carnero filed Plaintiff's Original Petition (the "**Petition**") in Harris County District Court and initiated the Carnero Action. (AP Docket No. 1-4 at 2.)

14. On September 10, 2021, Defendants removed the Carnero Action to this Court, asserting "arising in," "arising under," and "related to" jurisdiction, pursuant to 28 U.S.C. §1334. (AP Docket No. 1.)

15. Carnero moved to remand on October 8, 2021. (AP Docket No. 6.) Carnero and Defendants have agreed to abate Defendants' deadlines to file responsive pleadings until after a resolution of the motion for remand. (AP Docket No. 2-1.)

16. Carnero's only claim is for a declaratory judgment. (Petition ¶¶34-37 [AP Docket No. 1-4 at 10].) Carnero seeks declarations regarding the Midstream Agency Agreement, Marketing Agreement, Carnero GGPA,

Ratification Agreements,[8] and Letter Agreement between Mitsui, Carnero, and Maverick, dated April 1, 2018.[9] All of these agreements relate to oil and gas assets in Texas' Comanche Field.

17. The declarations that Carnero seeks are set out in twelve subparagraphs in Paragraph 36 of the Petition. The first nine subparagraphs (¶36(a)–(i)) merely summarize the terms of various agreements. The Petition does not identify any controversy between the parties regarding those declarations, and Carnero's Motion does not refer to them at all. Instead, the Motion focuses on the declarations sought in subparagraphs (j), (k), and (l), which implicate not just the bankruptcy proceeding but also on currently pending rejection and assumption litigation and the effect of assumption/rejection on the obligations of the non-debtor Defendants:

> (j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,
>
> i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and
>
> ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

---

[8] While only identified as the "Ratification Agreements" in the Original Petition, Carnero's claims relate to other agreements at issue in the Bankruptcy Case, including but not limited to the following:

- Memorandum of Agreement by and among Venado EF L.P., SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018;
- Ratification and Assumption Agreement by and among Venado EF L.P., SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018;
- Memorandum of Agreement by and among Eagle Ford TX LP, SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018; and
- Ratification and Assumption Agreement by and among Eagle Ford TX, LP, SN EF Maverick, LLC, and Carnero G&P, LLC, dated as of April 1, 2018.

[9] Bankr. Docket No. 1373-8. The Carnero GGPA was amended, through the Amendment to Firm Gas Gatherings, Processing and Purchase Agreement by and among SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018, to which Mitsui E&P Texas LP consented.

(k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.

(l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,

i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;

ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and

iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

18. In the UnSub Stipulation and Agreed Order, this Court authorized rejection of the Marketing Agreement (referenced in ¶36(j)) and assumption of the UnSub Ratification Agreement (among other contracts). Paragraph 10 of that order provided that this Court "shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Stipulation and Agreed Order." (Bankr. Docket No. 1983 at 6.)

19. This Court authorized assumption of the Carnero GGPA (mentioned in ¶36(j)) in its *Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended*, entered on June 30, 2020 (the "**Midstream Settlement Approval Order**"). The Midstream Settlement Approval Order provides (in relevant part):

6. As part of the implementation and execution of the Plan, this Court shall retain jurisdiction with respect to all matters arising from or related to the Settlement Agreement or this Order.

10. Any determination by SN Maverick as to whether to assume or reject a contract must be:

> a. made by a fiduciary for SN Maverick;
>
> b. made by the fiduciary after the fiduciary has exercised sufficient due diligence to determine whether the assumption or rejection is in the best interest of SN Maverick;
>
> c. in the best interest of SN Maverick; and
>
> d. considered after notice and hearing.
>
> 13. Any rejection or termination of any material agreement affecting the Comanche Assets or any adoption of a material agreement affecting the Comanche Assets must be approved by either (i) the Operating Committee under the Comanche Joint Development Agreement, in accordance with its terms, if required under the terms of the Comanche Joint Development Agreement; or (ii) otherwise by Order of this Court.

(Bankr. Docket No. 1415 at 5-6 ¶¶10, 13.)

20. Whether Mesquite can reject the Midstream Agency Agreement (also mentioned in Paragraph 36(j)), is currently being litigated in the Sanchez-Oxy Adversary Proceeding. On October 29, 2021, however, counsel for the Debtor announced that the parties had reached an agreement in principle regarding that adversary proceeding, and the matter was continued until December 8, 2021.

21. In the Carnero Action, however, Carnero alleges that Mesquite is **obligated** (under the Carnero GGPA) to continue pursuing **rejection** of the Midstream Agency Agreement. Carnero also alleges that Mesquite "might withdraw its rejection" motion and "may be in active negotiations to enter into a new marketing agreement or modified version of the rejected Marketing Agreement" in effect, seeking to interject itself into ongoing settlement discussions among other parties-in-interest to the bankruptcy proceeding (Petition ¶¶25 – 26 [AP Docket No. 1-4 at 9].)

## LEGAL STANDARDS

22. Defendants removed the Carnero Action to this Court, asserting "arising in," "arising under," and "related to" jurisdiction, pursuant to 28

U.S.C. §1334. "The existence of subject matter jurisdiction is determined at the time of removal." *Bissonnet Investments LLC v. Quinlan, (In re Bissonnet Investments LLC)*, 320 F.3d 520, 525 (5th Cir. 2003) (internal citations omitted).

23. "Subject matter jurisdiction remains in the bankruptcy court, even after a bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (cleaned up); *TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 688 (Bankr. N.D. Tex. 2020). The Bankruptcy Court retains "jurisdiction to interpret and enforce its own prior orders." *Burch v. Freedom Mortgage Corporation (Matter of Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021), cert. denied, 21-5069, 2021 WL 4508733 (U.S. Oct. 4, 2021) (affirming bankruptcy court's jurisdiction when a state-court claim rests on the debtor's "interpretation of a Chapter 11 bankruptcy order" and therefore "arises from or is related to his Title 11 bankruptcy proceedings").

24. "The Fifth Circuit has consistently held that a bankruptcy court has post-confirmation jurisdiction over matters that bear on the interpretation or execution of the debtor's plan." *Schermerhorn v. Centurytel, Inc., (In re SkyPort Glob. Communications, Inc.)*, 08-36737-H4-11, 2013 WL 4046397, at *39 (Bankr. S.D. Tex. Aug. 7, 2013), aff'd, 528 B.R. 297 (S.D. Tex. 2015), aff'd in part, 642 Fed. Appx. 301 (5th Cir. 2016) and aff'd, 661 Fed. Appx. 835 (5th Cir. 2016) (internal quotations omitted).

## I. "Arising Under" or "Arising In" Jurisdiction – Core Proceedings.

25. "Arising under" jurisdiction involves causes of action created or determined by a statutory provision of title 11, while "arising in" jurisdiction

is not based on a right expressly created by title 11, but rather based on claims that would have no existence outside of bankruptcy. *See Wood v. Wood (In re Wood)*, 825 F.2d 90 (5th Cir.1987); *see also U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002).

26. After confirmation, bankruptcy courts maintain "'arising in or under' jurisdiction" (or "core" jurisdiction) over disputes implicating the interpretation of their orders. *Rohifard v. Brewer & Prichard, P.C. (In re ABC Dentistry, P.A.)*, 16-34221, 2019 WL 913356, at *3 (Bankr. S.D. Tex. Feb. 21, 2019), *aff'd*, BR H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019), *rev'd on other grounds*, 978 F.3d 323 (5th Cir. 2020); *see also Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)). That rule recognizes the practical reality that, "[i]f the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding." *Fire Eagle, LLC v. Spillman Dev. Group, Ltd. (In re Spillman Dev. Group, Ltd.)*, 710 F.3d 299, 305 (5th Cir. 2013) (quoting *Wood*, 825 F.2d at 97). Thus, state contract-law claims are core proceedings "if they are dependent upon the rights created in bankruptcy." *Id.* (quoting *EOP–Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266–67 (5th Cir.2005)).

27. "Proceedings invoking the bankruptcy court's statutory authority to enter orders necessary for the consummation of a confirmed plan meet" the criteria for "arising in" jurisdiction "because the authority can be exercised only in the context of a bankruptcy case. In other words, such proceedings arise only in bankruptcy." *U.S. Brass*, 301 F.3d at 306. "A proceeding 'arises in' bankruptcy only if it has 'no existence outside of the bankruptcy.'" *Nelson v.*

*Welch (In re Repository Technologies, Inc.)*, 601 F.3d 710, 719 (7th Cir. 2010) (quoting *Stoe v. Flaherty,* 436 F.3d 209, 216 (3d Cir. 2006)).

28. Evaluation and enforcement of a debtor's plan fall within a bankruptcy court's jurisdiction because such actions concern the administration of the bankruptcy case and may arise only in the context of that case. *Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners LP*), 581 B.R. 206, 215 (Bankr. S.D. Tex. 2018) (Isgur, J.), aff'd, CV H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), aff'd, 799 Fed. Appx. 221 (5th Cir. 2020). "In the post-confirmation context, the Fifth Circuit has determined that bankruptcy courts have 'arising under' subject matter jurisdiction to issue declaratory judgments interpreting the plan." *Quarternorth Energy, LLC v. Atlantic Maritime Services, LLC (In re Fieldwood Energy LLC)*, 20-33948, 2021 WL 4839321, at *4 (Bankr. S.D. Tex. Oct. 15, 2021) (Isgur, J.) (citing *Mackey v. M.C. Inv. (In re Martinez)*, No. 00–40412, 2000 WL 34508398, at *1 (5th Cir. Oct. 5, 2000); and *Ins. Co. of N. Am. v. NGC Settlement Tr. & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1064 (5th Cir. 1997)).

## II. "Related To" Jurisdiction.

29. Bankruptcy courts have "related to" (or "non-core" jurisdiction) over matters that "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.*), 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015). "An action is related to bankruptcy if the outcome could alter the debtors' rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *Glasstex, Inc. v. Arch Aluminum & Glass Co., Inc. (In re Polvado),* 06-70151, 2006 WL 2993333, at *1 (Bankr. S.D. Tex. Oct. 17, 2006)

(Isgur, J.) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)). The threshold for "related to" jurisdiction is low: "attenuated, hypothetical effects of third-party litigation can give rise to related-to bankruptcy jurisdiction." *Spillman,* 710 F.3d at 305.

**III. *Craig's Stores* and Post-Confirmation Jurisdiction.**

30. Carnero wrongly argues that *Bank of Louisiana v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.*), 266 F.3d 388, 390 (5th Cir. 2001), narrows all bankruptcy court jurisdiction that could apply to this case simply because confirmation has already occurred. To the extent the analysis from *Craig's Stores* applies to this case at all, however, it would implicate only "related to" jurisdiction (which would still be satisfied).

31. In *Craig's Stores* the "Fifth Circuit adopted a more exacting theory for post-confirmation jurisdiction, recognizing that the broad 'related-to' category of bankruptcy jurisdiction diminishes after confirmation of a bankruptcy plan." *Faulkner v. Lane Gorman Trubitt, LLC, (In re: Reagor-Dykes Motors, LP),* 18-50214-RLJ-11, 2021 WL 4823525, at *3 (Bankr. N.D. Tex. Oct. 14, 2021) (discussing *Craig's Stores,* 266 F.3d at 390-91); *Beital v. OCA, Inc. (In re OCA, Inc.),* 551 F.3d 359, 367 (5th Cir. 2008) (discussing *Craig's Stores,* 266 F.3d at 390-91 and noting that "after confirmation of a reorganization plan, a stricter post-confirmation standard applies" to the "related to" standard). But in the years since *Craig's Stores* was decided, the Fifth Circuit and other courts have confirmed that case has only a narrow application.

32. In *Newby v. Enron (In re Enron Corp. Sec).,* 535 F.3d 325, 335 (5th Cir. 2008), the Court noted that the "facts in *Craig's Store* were narrow; they involved post-confirmation claims based on post-confirmation activities." *Id.*;

*see also, Colvin v. Amegy Mortg. Co., L.L.C. (In re Colvin)*, 507 B.R. 169, 178 (W.D. Tex. 2014) ("Although the holding of *Craig's Stores*—that bankruptcy jurisdiction exists after plan confirmation only 'for matters pertaining to the implementation or execution of the plan'—was somewhat broad, the facts that precipitated that holding were narrow, involving post-confirmation claims based on post-confirmation activities.").

33. *Craig's Stores* "turned on the idea that a reorganized debtor's confirmed plan marked the end of the bankruptcy." *Schmidt v. Nordlicht*, CV H-16-3614, 2017 WL 526017, at *3 (S.D. Tex. Feb. 9, 2017) (Rosenthal, J.). In *Enron* the Fifth Circuit explained that "[t]hree factors were critical to its decision" in *Craig's Stores*: "first, the claims at issue principally dealt with post-confirmation relations between the parties; second, there was no antagonism or claim pending between the parties as of the date of the reorganization; and third, no facts or law deriving from the reorganization or the plan were necessary to the claim." 535 F.3d at 335 (cleaned up).

34. While "*Craig's Stores* Court *did hold* that a bankruptcy court may lack jurisdiction over post-confirmation claims based on post-confirmation activities," it "*did not hold* that a bankruptcy court may lose jurisdiction over pre-confirmation claims based on pre-confirmation activities[.]" *Enron,* 535 F.3d at 335 (emphasis added). When a controversy or dispute arose as part of the plan confirmation process, the ordinary pre-petition framework applies, even if a proceeding is initiated only after confirmation. *Beta Operating,* 581 B.R. at 214–15.

35. Even where *Craig's Stores* "more exacting" standard applies (i.e., in cases involving post-confirmation claims about post-confirmation conduct), the bar is still low. For example, in *U.S. Brass Corp.*, the Fifth Circuit held

that *Craig's Stores* was satisfied when "bankruptcy law will ultimately determine this dispute" and the "outcome could affect the parties' post-confirmation rights and responsibilities." 301 F.3d at 305.

## ARGUMENTS AND AUTHORITIES

### I. The Carnero Action is a core proceeding.

36. This Court has jurisdiction over the Carnero Action as a core proceeding because Carnero seeks declarations about matters that directly arise under title 11 or arise in the bankruptcy proceedings.

#### *A. Because the Carnero Action goes to both Mesquite's rights and the Court's authority, under Section 365, it "arises under" Title 11.*

37. It is undisputed that the Court has jurisdiction over litigation regarding Mesquite's assumption or rejection of executory contracts, including the Midstream Agency Agreement, and that such litigation are "core" proceedings. *See Sanchez-Oxy,* 2021 WL 1822708 at *5. The Carnero Action arises under Section 365 and in the continuing assumption/rejection litigation, seeking not only to influence those proceedings but also seeking determinations of the impact of Section 365 assumptions and rejections, and Mesquite's rights and obligations under that portion of the Bankruptcy Code.

38. Section 365(a) gives debtors the choice to breach ("reject") or perform ("assume") executory contracts. *Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.),* 378 F.3d 511, 518 (5th Cir. 2004); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658, 203 L. Ed. 2d 876 (2019) ("Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward"). If the debtor elects to reject, then "the rejection of an executory contract . . . of the debtor constitutes a breach of such contract." 11

U.S.C. § 365(g).[10] That formal act of breach allows the non-debtor to make a pre-petition claim for damages that can be discharged through the ordinary claims allowance process. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U. Colo. L. Rev. 845, 888 (1988) ("Rejection does not . . . cause an executory contract to vanish or become unenforceable *against the debtor*, and is not a matter of the 'debtor reject[ing] its obligation.'")

39. "[T]he authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Century Indemnity,* 208 F.3d at 504-05 (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984)). "By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a fresh start.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 17 BK 3283-LTS, 2021 WL 2676983, at *5 (D.P.R. June 29, 2021) (quoting *Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.)*, 360 F.3d 291, 296 (1st Cir. 2004)). But the policy behind Section 365 is focused on creditors, not the debtors:

> **The interests of third party creditors is at the core of § 365**. Even more so than the protections of the automatic stay which serve to protect the debtor from piecemeal dismemberment, the ability to reject an executory contract is **rooted in the principle of maximizing the return to creditors** by permitting a debtor in possession to renounce title to and abandon burdensome property if such action is in the best interests of the estate.

[10] As set forth in § 1107, for executory contracts a debtor-in-possession in a Chapter 11 proceeding has the same powers as a trustee.

*In re Trans World Airlines, Inc.*, 261 B.R. 103, 117 (Bankr. D. Del. 2001) (internal citations omitted).

40. Whether to assume or reject an executory contract "is a fundamental right of the bankruptcy system[.]" *Id.* (citing *Nat'l Gypsum,* 208 F.3d at 504–05). And bankruptcy courts retain jurisdiction to determine the consequences of a debtor's assumption or rejection under Section 365. *See, e.g., Mission Prod.,* 139 S. Ct. at 1658 (noting that case began when creditor "returned to the Bankruptcy Court for a declaratory judgment confirming its view" of the consequence of rejection).

41. Here, Carnero seeks declarations in the Carnero Action that go to Mesquite's rights and obligations under Section 365—including whether Mesquite may pursue assumption of the Midstream Agency Agreement—and interfere with this Court's authority to approve any rejection or assumption. These declarations "arise under" title 11 and go to the heart of the restructuring of debtor-creditor relations. Section 365 exists for the benefit not just of the parties to any one contract, but also for the benefit of all creditors and the debtor's estate—it is critical for the implementation of the plan, that the bankruptcy court have control over these proceedings.

*B. Because the Carnero Action involves rights created by bankruptcy law and requires interpretation and enforcement of this Court's orders, it "arises in" the bankruptcy proceedings.*

42. The Carnero Action explicitly requests declarations regarding the impact of rejection or assumption of certain executory contracts under Section 365 of the Bankruptcy Code, including those agreements that have not yet been assumed or rejected in the Bankruptcy Case. The Carnero Action is the direct result of an administrative matter that arises only in bankruptcy cases: it is

premised on the assumption and rejection process for contracts and leases. In effect, Carnero seeks to preclude Mesquite and Maverick from withdrawing their request to reject of the Midstream Agency Agreement in the Bankruptcy Case and preempt an order from this Court on the impact of any rejection of the Midstream Agency Agreement. This Court has jurisdiction over the assumption and rejection process.

43. In the Carnero Action, Carnero attempts to interfere with this Court's determinations regarding rejection or assumption. Carnero expressly seeks a declaration that Mesquite is required to pursue rejection of the Midstream Agency Agreements. (Petition ¶36(k) [AP Docket No. 1-4 at 11].) This request could not exist independent of the Bankruptcy Case and requires interpretation and application of bankruptcy law to the facts of this case. But-for the bankruptcy-specific rejection litigation currently pending before this Court, the Carnero Action would not exist. Thus, the Carnero Action arises in an administrative matter that could exist only within a bankruptcy proceeding.

44. This Court also has "arising in" jurisdiction over the Carnero Action because it requires interpretation of the Bankruptcy Court's own orders, including but not limited to the Confirmation Order, Midstream Settlement Agreement, and UnSub Stipulation and Agreed Order. When the Bankruptcy Court approved the settlement with certain midstream counterparties and assumed the Carnero GGPA, it recognized the complexities of the various agreements related to the Comanche Assets and required the rejection or termination of material agreements affecting the Comanche Assets to be approved by an order of the Bankruptcy Court (or Operating Committee). (Bankr. Docket No. 1416 at 6 ¶13.) These orders each provide for the Court's continuing jurisdiction over matters arising from or relating to them. (Bankr.

Docket Nos. 1983 at 6; 1415 at 5-6 ¶¶10, 13.) And this Court's authority to enter orders assuming or rejecting contracts is necessary for the consummation of the Plan. *See U.S. Brass,* 301 F.3d at 306. The lawsuit's focus on the Bankruptcy Code, future prospective orders from the Bankruptcy Court, and positions that Mesquite (or Maverick) may take in the Bankruptcy Case in the future, confers jurisdiction on this Court because Carnero's claims "arise in" the Bankruptcy Case.

45. Moreover, Carnero contends that Section 3.1 of the Carnero GGPA requires Mesquite to pursue rejection of the Midstream Agency Agreement: this hinges on a question of bankruptcy, not state, law. Section 3.1(b)(ii) excludes gas from dedication to Carnero to the extent that it is subject to "Existing Commitments." (AP Docket No. 6-1 at 13.) And that exclusion continues only until the earlier of "(A) the end of the then-current term of such Existing Commitment" and "(B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost[.]" (AP Docket No. 6-1 at 13 – 14.) Whether rejection of the Midstream Agency Agreement under Section 365 is a "right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost" is a question of bankruptcy law.

46. Carnero's request for a declaration in Paragraph 36(j) requires a determination of whether a rejection is a "right or option to terminate such Existing Commitment . . .without out-of-pocket cost." This is a question of bankruptcy—not state—law and under bankruptcy law, "rejection does not abrogate, rescind, or terminate a contract." *In re Ultra Petroleum Corp.*, 621 B.R. 188, 204 (Bankr. S.D. Tex. 2020), motion to certify appeal granted, 4:20-CV-2306, 2020 WL 7323356 (S.D. Tex. Dec. 10, 2020). And there is nothing like

the concept of "rejection" in state law. So, while Carnero seeks a declaratory judgment under a Texas statute, it is dependent upon the rights that are created in bankruptcy, by the Bankruptcy Code. *See Spillman,* 710 F.3d at 305.

47. Finally, Carnero's argument that Section 3.1 of the Carnero GGPA places a limitation on Mesquite's right to assume a contract under Section 365 and would amount to a pre-petition waiver of a debtor's rights under the Bankruptcy Code. Parties cannot—through a pre-petition agreement—bargain away a debtor's rights to the assumption and rejection process. *See Trans World Airlines,* 261 B.R. at 118 (rejecting prepetition waiver of a debtor's authority to reject an executory contract); *see also Lehman Bros. Holdings, Inc. v. Credit Agricole Corp. and Invest. Bank (In re Lehman Bros. Holdings Inc.)*, 08-13555 (JMP), 2013 WL 12334707, at *3 (S.D.N.Y. Aug. 8, 2013) ("generally a debtor may not, prior to filing a petition for bankruptcy, waive or contract around the central protections of the Bankruptcy Code, because such a waiver would void important public policy in favor of debtors"); *Nine Point Energy Holdings, Inc. v. Caliber Measurement Services, LLC (In re Nine Point Energy Holdings, Inc.),* 21-10570 (MFW), 2021 WL 2212007, at *6 (Bankr. D. Del. June 1, 2021), aff'd, 21-10570 (MFW), 2021 WL 3269210 (D. Del. July 30, 2021) ("Federal courts consistently refuse to enforce waivers of federal bankruptcy rights"). Whether Section 3.1 is a prepetition waiver and whether it is effective, should be determined by this Court.

48. Carnero's claim challenges the effect of this Court's orders, and the outcome will impact numerous other parties affected by Mesquite's bankruptcy filings and should be adjudicated by the Court presiding over the bankruptcy proceedings. The Carnero Action arises in the bankruptcy proceedings because Carnero challenges the assumption/rejection proceedings

regarding the Midstream Agency Agreement and asks for determinations of bankruptcy law. It is important for all parties and the Court to know what consequences might flow from a decision to reject or assume that contract.

## II. At a minimum, the Court has "related to" jurisdiction over the Carnero Action.

49. As noted above, the more exacting standard of "related-to" jurisdiction under *Craig's Stores* does not apply to this case; even if it did, the standard would be met. Carnero seeks declarations regarding issues that arose as part of the traditional plan confirmation process—the assumption and rejection of contracts—over which this Court continues to exercise jurisdiction.

50. Unlike *Craig's Stores,* (a) the Carnero Action does not primarily address the post-confirmation relationship between the parties (Carnero is, after all, seeking a declaration regarding Mesquite's conduct in this Court), (b) the seeds of the antagonism between the parties existed at confirmation and the Plan Effective Date, and (c) the facts and law deriving from the reorganization or the plan are necessary to the claim. *Enron,* 535 F.3d at 335. *Craig's Stores* does not apply to this case; even if it did, the Carnero Action would pass the *Craig's Stores* test.

51. An action that could result in a reduction of claims against the estate gives rise to the type of "conceivable effect" on the estate required for related-to jurisdiction. *Spillman,* 710 F.3d at 304. Bankruptcy courts have determined that they "at least" had related to jurisdiction over declaratory judgment actions regarding interpretation of assumed contracts. *See, e.g., Sportsman's Warehouse, Inc. v. McGillis/Eckman Investments-Billings, Inc. (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372, 387 (Bankr. D. Del. 2011)). Carnero seeks a determination regarding the consequences of the assumption

and rejection of executory contracts. The effect on the estate is not just 'conceivable,' it is obvious. *See DSBI,* 409 B.R. at 728 (noting that the "authority to reject an executory contract is vital to the purpose of a Chapter 11 reorganization"). While couched as a request for declaratory judgment, Carnero's claims have a conceivable effect on whether certain contracts will be assumed or rejected, which will either increase or decrease the quantum of claims against the estate. The Carnero Action expressly concerns Mesquite and Maverick's pursuit of rejection of an executory contract—the Midstream Agency Agreement—which, if authorized, would give rise to prepetition claims against the estate.

52. For the reasons discussed above, with respect to "arising in" and "arising under" jurisdiction, this Court has—at the very least— "related to" jurisdiction over the Carnero Action.

**III. Mandatory Abstention Does Not Apply.**

53. "If an adversary proceeding is core, then mandatory abstention does not apply and a court would look to permissive abstention.'" *Atencio v. Atencio (In re Petroleum Products & Services, Inc.)*, 556 B.R. 296, 301 (Bankr. S.D. Tex. 2016) (citing *Gober v. Terra + Corp. (In re Gober),* 100 F.3d 1195, 1206 (5th Cir.1996)). Mandatory abstention is not warranted here because the Bankruptcy Court has "arising in" or "arising under" jurisdiction over the Carnero Action, as described above. However, even if the Court determines that it has only "related to" jurisdiction, mandatory abstention would not apply.

54. The Court must abstain from hearing a state law claim if:

> (1) a motion has been timely filed requesting abstention; (2) the cause of action is essentially one that is premised on state law; (3)

> the claim is a non-core proceeding, i.e. it is "related to" a case under title 11 but does not arise under or in a case under title 11; (4) the proceeding could not otherwise have been commenced in federal court absent federal jurisdiction under § 1334(b); (5) an action has been commenced in state court; and (6) the action could be adjudicated timely in state court.

*Ramirez v. Rodriguez (In re Ramirez),* 413 B.R. 621, 626 (Bankr. S.D. Tex. 2009) (internal citations omitted).

55. For the reasons discussed above, mandatory abstention does not apply to the Carnero Action. Carnero's requested declaratory judgment directly addresses matters pending in the Bankruptcy Case, giving rise to Bankruptcy Court jurisdiction. Indeed, while Carnero asserted its claim through the procedural mechanism of a Texas declaratory judgment action, the substance of that claim is intertwined with this bankruptcy proceeding and bankruptcy law. And to the extent Carnero's claim also calls for the interpretation of Texas contracts, it raises no novel questions of state law. Mandatory abstention does not apply.

## IV. Permissive Abstention Does Not Apply.

56. Section 1334(c)(1) governs permissive abstention. It provides that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). Relevant factors include:

> (1) effect or lack thereof on the efficient administration of the estate;
>
> (2) extent to which state law issues predominate over bankruptcy issues;
>
> (3) difficult or unsettled nature of applicable law;

(4) presence of related proceedings commenced in state court or other non-bankruptcy proceedings;

(5) jurisdictional basis, if any, other than § 1334;

(6) degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7) substance rather than the form of an asserted core proceeding;

(8) feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9) burden on the bankruptcy docket;

(10) likelihood that the commencement of the bankruptcy proceeding in bankruptcy court involves forum shopping by one of the parties;

(11) existence of the right to a jury trial;

(12) comity; and

(13) possibility of prejudice to other parties in the action.

*Atencio,* 556 B.R. at 301 (quoting *Ramirez*, 413 B.R. at 631–32).

57. Factors 1, 2, 3, 4, 6, 7, 8, 9, 11, and 13 weigh in favor of this Court exercising its jurisdiction:

- **Factor 1:** Resolving the Carnero Action in this Court will benefit the efficient administration of the estate because it will bring important issues with fundamental, core bankruptcy matters (i.e., Mesquite's and Maverick's assumption and rejection of executory contracts) into this Court.

- **Factor 2:** While the declaratory judgment claim is asserted under state procedural law, bankruptcy law issues (i.e., the effect and meaning of the Court's authorization of the debtors' assumption and rejection of executory contracts) predominate.

- **Factor 3:** To the extent that there are difficult or unsettled questions of law, they relate to bankruptcy law and not state law.

- **Factor 4:** There are no related state-court proceedings.

- **Factor 6:** The Carnero Action is closely related to the bankruptcy proceedings.

- **Factor 7:** While the Carnero Action takes the form of a state court declaratory judgment claim, the substance of the claim is a core proceeding, implicating vital aspects

- **Factor 8:** There is no way to sever Carnero's claims to permit the state court to proceed on portions of the case.

- **Factor 9:** Because the Court is already presiding over the Sanchez-Oxy Adversary Proceeding, the impact on this Court's docket will be minimal. The Bankruptcy Court is still adjudicating the assumption/rejection issues related to the Midstream Agency Agreement, is familiar with the parties, the facts, and the circumstances, and can expeditiously determine the issues.

- **Factor 11:** Carnero did not make a jury demand in state court.

- **Factor 12:** This Court has spent years with the bankruptcy proceeding. To the extent comity is relevant, it points in favor of the case remaining with the court that has far greater familiarity and history with the case and parties.

- **Factor 13:** No party will be prejudiced by this Court exercising jurisdiction over the Carnero Action.

58. Of the two remaining factors, Factor 10 does not apply because the case was not initiated in bankruptcy court and Factor 5, does not weigh heavily in favor of abstention. While Defendants rely on Section 1334 for jurisdiction, the Carnero Action is closely associated with the bankruptcy proceeding and the numerous ties between the two actions. Factor 5 should not weigh heavily on the Court's analysis.

59. To resolve Carnero's request for a declaratory judgment will require the interpretation of bankruptcy law, including the effect of assumptions and rejections under section 365, and interpretation of this Court's prior orders. These circumstances weigh against permissive abstention. *See, e.g., TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 694 (Bankr. N.D. Tex. 2020). Even though Carnero asserts a state-law declaratory judgment claim, bankruptcy-related issues predominate here, such that it would be inappropriate to permissively abstain from hearing this action.

60. The Carnero Action directly invokes the Confirmation Order, Midstream Settlement Agreement, and UnSub Stipulation and Agreed Order, and implicates issues at the center of the Sanchez-Oxy Adversary Proceeding. There would be no prejudice to any parties resulting from the adjudication of this matter by this Court. That this Court can most efficiently address Carnero's claim benefits the bankruptcy estate, the bankruptcy court, and the state court. *See, e.g., Hassell Construction Company Inc. v. Hassel (In re Hassell)*, 19-30694, 2020 WL 728890, at *6 (Bankr. S.D. Tex. Jan. 7, 2020) (declining to exercise permissive abstention when state law claims were asserted where "efficiency, as well as the direct impact these claims have on the estate, supports hearing these claims in federal court").

## CONCLUSION

The Motion should be denied in its entirety.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax
713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax
214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant**
**Mesquite Energy, Inc.**

*/s/ Andrew J. Ehrlich*

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Julia Frost-Davies*

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Rebekah Sills McEntire*

Rebekah Sills McEntire
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
34ebekah.mcentire@kirkland.com

**Attorney for Defendant Venado EF L.P.**

*/s/ Maegan Quejada*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on November 3, 2021, on all persons entitled to receive service through the Court's Pacer ECF filing system.

*/s/ James G. Munisteri*
**James G. Munisteri**

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 21-03908 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § | |
| | § | |
| Defendants. | § | |

**Carnero's Reply in Support of Its Motion to Remand**

(Related to Doc. No. 6)

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

# Table of Contents


Table of Authorities .......... ii

Summary of the Relief Requested .......... 1

Argument .......... 3

I. The State Court Lawsuit is not a "core proceeding" .......... 4

A. The State Court Lawsuit does not arise under title 11. .......... 5

1. The State Court Lawsuit does not adjudicate Maverick's and Mesquite's rights under Section 365. .......... 6

2. Declarations 36(j) and 36(l) address the parties' rights under the Assumed Contracts after Maverick and Mesquite exercise their Section 365 rights. .......... 6

3. Declaration 36(k) does not seek injunctive relief requiring Mesquite and Maverick to reject the Midstream Agency Agreement. .......... 7

4. No case supports that merely because the Oxy Adversary arises under the Code, the State Court Lawsuit also arises under the Code. .......... 9

B. The State Court Lawsuit does not arise in bankruptcy. .......... 10

1. Declaration 36(k) relates to the impact of rejection on Assumed Contracts, not Maverick's and Mesquite's rights under Section 365 to reject. .......... 10

2. The State Court Lawsuit does not require the interpretation of any order entered by this Court. .......... 11

3. Defendants cannot create jurisdiction in this Court based on prospective defensive arguments to the State Court Lawsuit. .......... 12

C. The State Court Lawsuit does not relate to the bankruptcy proceeding. .......... 13

II. Mandatory Abstention requires sending the State Court Lawsuit back to state court. .......... 18

III. The Court should permissively abstain. .......... 19

Conclusion .......... 21

# Table of Authorities

**Cases**

*In re ABC Dentistry, P.A.*, No. 16-34221, 2019 WL 913356 (Bankr. S.D. Tex. Feb. 21, 2019), *aff'd*, No. BR H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019), *rev'd and remanded sub nom. on other grounds Matter of ABC Dentistry, P.A.*, 978 F.3d 323 (5th Cir. 2020) ......7, 11

*Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004)....................3

*Bonin v. Sabine River Auth. of Louisiana*, 961 F.3d 381 (5th Cir. 2020)....................13

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987)....................4

*Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256 (5th Cir. 1995) ....................13

*In re Craig's Stores of Tex., Inc.*, 266 F.3d 388 (5th Cir. 2001)........1, 2, 10, 12, 13, 15, 16, 17, 18

*Cross v. Bankers Multiple Line Ins. Co.*, 810 F. Supp. 748 (N.D. Tex. 1992)....................13

*In re DBSI, Inc.*, 409 B.R. 720 (Bankr. D. Del. 2009)....................16

*In re e2 Communications, Inc.*, No. 02-30574-BJH-11, 2005 WL 7144839 (Bankr. N.D. Tex. Mar. 24, 2005) ....................13

*In re Enron Corp. Sec.*, 535 F.3d 325 (5th Cir. 2008)....................16

*Faulk v. Owens–Corning Fiberglass Corp.*, 48 F. Supp. 2d 653 (E.D. Tex. 1999) ....................13

*Franchise Tax Bd. of Cal v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1 (1983)........4

*In re Fieldwood Energy LLC*, No. 20-33948, 2021 WL 4839321 (Bankr. S.D. Tex. Oct. 15, 2021) ....................11

*In Matter of Galaz*, 841 F.3d 316 (5th Cir. 2016)....................7, 11

*Hanna v. Blanchette*, No. CIV.A. H-13-3119, 2014 WL 412527 (S.D. Tex. Feb. 3, 2014) .........13

*In re Hassell*, No. 19-30694, 2020 WL 728890 (Bankr. S.D. Tex. Jan. 7, 2020) ....................20

*Holloway v. Skinner*, 898 S.W.2d 793 (Tex. 1995)....................9

*Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979 (5th Cir. 1990) ....................5

*In re Legal Xtranet, Inc.*, 453 B.R. 699 (Bankr. W.D. Tex. 2011)....................9

*Lennar Corp. v. Briarwood Capital LLC*, 430 B.R. 253 (Bankr. S.D. Fla. 2010)....................9

*Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.*, 408 B.R. 90 (Bankr. S.D. Tex. 2009) ....................5

*In re Mem'l Prod. Partners LP*, 581 B.R. 206 (Bankr. S.D. Tex. 2018), *aff'd*, No. CV H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd sub nom. Matter of Mem'l Prod. Partners, L.P.*, 799 Fed. Appx. 221 (5th Cir. 2020) ....................11, 17

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019)....................6

*In re N. Parent, Inc.*, 221 B.R. 609 (Bankr. D. Mass. 1998) ....................8

*In re OCA, Inc.*, 551 F.3d 359 (5th Cir. 2008)....................5, 15

*In re Petroleum Products & Services, Inc.*, 561 B.R. 662 (Bankr. S.D. Tex. 2016) ....................18

*In re Polvado*, No. 06-70151, 2006 WL 2993333 (Bankr. S.D. Tex. Oct. 17, 2006) ....................3, 4, 13

*In re Senior Care Centers, LLC*, 622 B.R. 680 (Bankr. N.D. Tex. 2020) ....................20

*In re Spillman Dev. Group, Ltd.*, 710 F.3d 299 (5th Cir. 2013) ....................7, 11, 14

*In re Sportsman's Warehouse, Inc.*, 457 B.R. 372 (Bankr. D. Del. 2011) ....................14

*State of Tex. v. Walker*, 142 F.3d 813, 816 (5th Cir.1998) ....................4

*In re Ultra Petroleum Corp.*, No. 16-32202, 2019 WL 2524936 (Bankr. S.D. Tex. Jan. 9, 2019), *report and recommendation adopted*, No. 4:19-CV-00090, 2019 WL 2524704 (S.D. Tex. Feb. 25, 2019) ....................7, 14, 15, 16

*In re U.S. Brass Corp.*, 301 F.3d 296 (5th Cir. 2002)....................11, 17

*In re Wood*, 825 F.2d 90 (5th Cir.1987) ....................4, 5, 14

*WRT Creditors Liquidation Tr. v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 610 (S.D. Tex. 1999) ....................8

**Statutes**

28 U.S.C. § 1334....................1, 5, 13, 16, 19, 21

28 U.S.C. § 1452....................1

Texas Uniform Declaratory Judgments Act (Tex. Civ. Prac. & Rem. Code Ch. 37)....................4

**Rules**

Fed. R. Bankr. P. 5011(b) ....................1

Fed. R. Bankr. P. 9014....................1

Bankr. Local Rule 9013-1 .......... 1

Under 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, Carnero[2] files this reply in support of its Motion to Remand to State Court or for Abstention ("Motion") [Dkt. 6] to return this case to the 269th Judicial District Court, Harris County, Texas:

## Summary of the Relief Requested

1. The State Court Lawsuit, dealing with the parties' post-confirmation relations under the Assumed Contracts[3] ***and*** alleging only a state law claim originating from a dispute that arose post-confirmation and post-effective date, presents a straightforward application of the *Craig's Stores* limited post-confirmation jurisdiction of bankruptcy courts and requires remand of the case to the state court.

2. To circumvent *Craig' Stores*, the Defendants argue the merits of unpleaded defenses to Carnero's claim and misrepresent Carnero's allegations in an attempt to convert this state law contract action into a core proceeding. But this Court must determine whether it has jurisdiction over the State Court Lawsuit as *Carnero* pleaded it, not as the Defendants would like it to be pleaded. In its review, the Court looks only to the face of Carnero's Petition [Dkt. 1-4];[4] jurisdiction does not arise from the Defendants' counterclaims or defenses (let alone unpleaded ones). Carnero's state law-based declarations under the Assumed Contracts require no interpretation or enforcement of the April 30, 2020 Plan and Confirmation Order [MP Dkt.[5] 1212], the June 30, 2020 Midstream Settlement Agreement [MP Dkt. 1415], the June 28, 2021 UnSub

---

[2] Terms not defined herein have the meaning given in the Motion or the Defendants' Response.

[3] The parties agree that Maverick assumed the GGPA (governing 12.5% of the Comanche acreage), the Ratification Agreements with UnSub, Venado, Eagle Ford, and Mesquite (as successor to Gavilan by post-confirmation acquisition—*see* n.7) (governing 87.5% of the Comanche acreage), and the Letter Agreement with Mitsui.

[4] References to "Dkt." without a case number refer to this adversary proceeding.

[5] References to "MP Dkt" refer to the main bankruptcy case, 19-34508.

Stipulation and Agreed Order [MP Dkt. 1983], or any other order. Nor do the declarations relate to implementation or execution of the Plan. Allegations implicating these items appear nowhere in Carnero's Petition.

3. Even under the Defendants' erroneous "conceivable effect" standard, the Court has no jurisdiction. While the State Court Lawsuit may affect Reorganized Debtors Maverick and Mesquite,[6] it does not affect their bankruptcy estates, which ceased to exist on the effective date, and nor does it affect their choice to exercise their Section 365 rights to assume or reject contracts that remain executory. They are free to make that choice, and as former debtors, they have to face the consequences in the cold, cruel business world the same as their non-debtor contract counterparties. Every impact on a reorganized debtor arising from its post-confirmation commercial choices cannot be an issue for the bankruptcy court, else that would swallow the *Craig's Stores*' rule.

4. Mesquite and Maverick[7] know this well. They previously asserted—siding *with* Carnero—Carnero's arguments here against jurisdiction in the similarly postured post-confirmation UnSub Adversary.[8] There, non-debtor UnSub sought declarations as to the effect of

---

[6] Carnero focuses its arguments on Reorganized Debtors Maverick and Mesquite because non-debtor Carnero's contractual relationship with the non-debtor WIPs under the GGPA, Ratification Agreements, and Letter Agreement would not be a basis for this Court to exercise jurisdiction over the State Court Lawsuit. In other words, had Carnero sued the WIPs separately for declarations addressing its and the WIPs' rights and obligations under those agreements, that entirely debtor-free proceeding would not be before this Court.

[7] Carnero does not agree that Maverick should be substituted into this proceeding for Mesquite. Mesquite owns the working interest in the Comanche Assets formerly owned by Gavilan Resources, LLC and assumed its obligations under the GGPA and applicable Ratification Agreement. *See* **Exhibit A**, Gavilan Ratification Agreement; *In re Gavilan Resources*, *LLC*, Case No. 20-32656, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Gavilan Proceeding") [GP Dkt. 366 Asset Purchase Agreement at pdf p. 291 (Annex C Applicable Contracts – Contracts listing GGPA and Gavilan Ratification Agreement)]. As such *both* Maverick and Mesquite should be parties to the State Court Lawsuit. Carnero does agree that Maverick is the counterparty to the Assumed Contracts.

[8] *GSO ST Holdings LP, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, and SN EF UnSub LP v. Sanchez Energy Corporation [n/k/a Mesquite Energy, Inc.], SN EF Maverick, LLC, SN UR Holdings, LLC, and Carnero G&P, LLC,* Adversary No. 20-03197, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("UnSub Adversary") [UA Dkt. 1] filed June 23, 2020. Carnero refers to the UnSub Adversary as "UA Dkt." in docket references.

rejection of the then-executory Marketing Agreement between UnSub and Maverick on its rights under the GGPA and its Ratification Agreement. Mesquite and Maverick, in concert with Carnero, argued this Court had no jurisdiction to hear the claim.

> 30. Count Four asks this Court to determine the rights and obligations of the Mesquite Defendants and Plaintiffs under the GGPA and the Ratification Agreement in the event that the HPMA is rejected. (Am. Compl., ¶¶ 89-91.) It thus asks that this Court determine the contours of the future business relationship (if any) between Plaintiffs and the Mesquite Defendants. However, the parties' rights and obligations going forward, including under the GGPA and the Ratification Agreement, are matters of contract interpretation under state law and do not relate to the implementation or execution of the Plan.

> Count Four does not relate to the implementation or execution of the Plan, does not relate to the implementation or interpretation of the Confirmation Order, and is not related to the Midstream Settlement Agreement or the order approving it. Thus, this Court does not have subject matter jurisdiction over this post-confirmation dispute.

UA Dkt. 26 ¶ 30, 33.

5. The declarations Carnero requests in the State Court Lawsuit are no different from the declarations sought by UnSub that Mesquite and Maverick argued were outside of this Court's jurisdiction. Carnero's claims arise under state law and involve only state law issues. The Court should reject the Defendants' arguments, grant Carnero's Motion, and either remand this case to the State Court or abstain from the exercise of jurisdiction.

## Argument

6. The Bankruptcy Court's authority to hear a complaint, like any federal court's, "depends on the well-pleaded complaint rule." *In re Polvado,* No. 06-70151, 2006 WL 2993333, at *2 (Bankr. S.D. Tex. Oct. 17, 2006) (Isgur, J.) (citing *Aetna Health Inc. v. Davila,* 542 U.S. 200, 207 (2004)) (holding that based on Glass-Tex's petition and disregarding defendants' defenses,

court lacked jurisdiction to hear state law claims). Under this rule, this Court must look "only to the face of the plaintiff's petition in determining if a claim establishes federal jurisdiction." *Id.* (citing *State of Tex. v. Walker*, 142 F.3d 813, 816 (5th Cir.1998)). A claim for federal jurisdiction may not arise from a defendant's counterclaims or affirmative defenses. *Id.* (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)). This is true although the defense or counterclaim, even if anticipated, may raise a federal question. *Id.* (citing *Franchise Tax Bd. of Cal v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9–10 (1983)).

7. The Defendants ask the Court to violate this rule by twisting Carnero's allegations in the State Court Lawsuit, distorting the law of this circuit on post-confirmation jurisdiction, and arguing their anticipated defenses to Carnero's claim. They claim Carnero seeks declarations under the Code, the Plan, the Confirmation Order, the Midstream Settlement Approval Order, the UnSub Stipulation and Agreed Order,[9] and prospective orders of this Court, and thus the Court has "core" and "related to" jurisdiction. The Defendants make this claim while *never* citing a single provision in any of these that requires interpretation to grant Carnero's declaratory relief. The Court should ignore the Defendants' attempts to rewrite Carnero's claims and focus on the actual Petition [Dkt. 1-4]. Based on the Petition, the Court has no "arising under," "arising in," or "related to" jurisdiction, and it should decline to hear this case under mandatory abstention or permissive abstention.

## I. The State Court Lawsuit is not a "core proceeding"

8. Core proceedings are those that (1) arise under the Code; or (2) could arise only in a bankruptcy case such that they can have ***no*** existence outside of bankruptcy. *In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987). Carnero alleges only claims for interpretation of the Assumed

[9] June 28, 2021 Stipulation of Dismissal and Agreed Order in the UnSub Adversary [MP Dkt. 1983].

Contracts under the Texas Uniform Declaratory Judgments Act—claims that are litigated in Texas State Courts every day. The State Court Lawsuit does not arise under the Code, it arises under state law and the Assumed Contracts. The State Court Lawsuit can exist outside of bankruptcy because it only relates to the parties' state law contractual rights and obligations. The Defendants' arguments to the contrary would expand the bankruptcy court's jurisdiction beyond that allowed by 11 U.S.C. § 1334 and should be rejected.

***A. The State Court Lawsuit does not arise under title 11.***

9. A proceeding arises under title 11 if it "involves a cause of action created or determined by a statutory provision of title 11." *Wood*, 825 F.2d at 96. The Fifth Circuit has repeatedly recognized that state law contract actions do not arise under title 11. *In re OCA, Inc.*, 551 F.3d 359, 367-68 (5th Cir. 2008) ("[T]his proceeding is non-core…the instant claim is 'not based on any right created by the federal bankruptcy law,' but instead is 'simply a state contract action that, had there been no bankruptcy, could have proceeded in state court.'"); *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 984 (5th Cir. 1990) (holding that Latham's mostly state law contract claims "would not invoke substantive rights provided by title 11, nor do they arise only in the context of bankruptcy proceedings" and "are precisely the kinds of claims *Northern Pipeline* established Congress could not commit to the bankruptcy courts for adjudication."); *Wood*, 825 F.2d at 97 ("The proceeding…is a non-core proceeding. The plaintiff's suit is not based on any right created by the federal bankruptcy law…It is simply a state contract action that, had there been no bankruptcy, could have proceeded in state court."). This Court too has recognized that principle. *Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.*, 408 B.R. 90, 96 (Bankr. S.D. Tex. 2009) ("Longhorn's complaint asserts contract claims. None arise[s] under the Bankruptcy Code or could only arise in a bankruptcy case. All are state law causes of action that can arise outside of bankruptcy. The claims are non-core.").

10. The State Court Lawsuit is a state law contract action that does not require reference to, interpretation of, enforcement of, or execution of the Plan, any order of this Court, or any provision of the Code. Nevertheless, in an effort to gin up "arising under" jurisdiction, the Defendants spin Carnero's allegations as allegedly seeking declarations that "go to" Maverick's and Mesquite's rights and obligations under 11 U.S.C. § 365 to assume or reject contracts or argue their (unpleaded) defenses. Response ¶ 41. That is not what Carnero pleaded.

1. <u>The State Court Lawsuit does not adjudicate Maverick's and Mesquite's rights under Section 365.</u>

11. The State Court Lawsuit is not an action to determine whether an executory contract may or may not be assumed or rejected under Section 365. Carnero does not seek any injunctive relief requiring the Defendants to do anything. The requested declarations are limited to state law contract issues that arose post-confirmation under the Assumed Contracts.

12. The Defendants rely on *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) for the proposition that "bankruptcy courts retain jurisdiction to determine the consequences of a debtor's assumption or rejection under Section 365." The question there was based on an interpretation of Sections 365(g) and (n). Conversely, Carnero only seeks declarations regarding contractual obligations under the Assumed Contracts.

13. The Defendants incorrectly describe the State Court Lawsuit as seeking declarations that go to Maverick's and Mesquite's rights and obligations *under* 11 U.S.C. § 365 to assume or reject contracts. Response ¶ 41. That is not what Carnero seeks and the Defendants cannot prevail by rewriting the text of Carnero's petition to suit their argument.

2. <u>Declarations 36(j) and 36(l) address the parties' rights under the Assumed Contracts after Maverick and Mesquite exercise their Section 365 rights.</u>

14. Two declarations, Paragraphs 36(j) and 36(l) [Dkt. 1-4], address the impact on all of the parties' rights and obligations under the Assumed Contracts *after* Maverick and Mesquite

have exercised their Section 365 right to reject the Marketing Agreement (which they have already done) and the Midstream Agency Agreement. It requires no reference to or interpretation of Section 365 to determine what impact those breaches—which is all a rejection is—would have on Carnero's rights under the Assumed Contracts to the Comanche Gas of UnSub, Eagle Ford, Venado, Mitsui, Mesquite, and Maverick that flows under those rejected agreements. *See In re Ultra Petroleum Corp.*, 621 B.R. 188, 204 (Bankr. S.D. Tex. 2020), *motion to certify appeal granted sub nom. Rockies Express Pipeline LLC v. Ultra Res., Inc.*, No. 4:20-CV-2306, 2020 WL 7323356 (S.D. Tex. Dec. 10, 2020) ("Rejection does not 'have the effect of a breach,' nor is it 'deemed to be a breach.' Rejection is, simply, a breach."). None of the cases the Defendants cite holds that the consequences under assumed contracts after a debtor exercises its Section 365 right to reject another contract create "arising under" jurisdiction. *See In Matter of Galaz*, 841 F.3d 316, 321 (5th Cir. 2016) (holding court had jurisdiction hear claim requiring interpretation of its discharge order); *In re ABC Dentistry, P.A.*, No. 16-34221, 2019 WL 913356, at *3 (Bankr. S.D. Tex. Feb. 21, 2019), *aff'd*, No. BR H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019), *rev'd and remanded sub nom. on other grounds Matter of ABC Dentistry, P.A.*, 978 F.3d 323 (5th Cir. 2020) (holding court had jurisdiction to enforce its own order); *In re Spillman Dev. Group, Ltd.*, 710 F.3d 299, 303 (5th Cir. 2013) (holding court had jurisdiction to interpret its order under Section 363 approving credit bid to resolve declarations requested by guarantors of debts paid with 363 sale proceeds).

3. <u>Declaration 36(k) does not seek injunctive relief requiring Mesquite and Maverick to reject the Midstream Agency Agreement.</u>

15. In declaration 36(k), Carnero seeks a declaration that all of the parties to the Assumed Contracts—non-debtors UnSub, Eagle Ford, Venado, Mitsui, and non-debtor Mesquite

(successor post-confirmation to Gavilan's interest),[10] who are parties to the Ratification Agreements and Letter Agreement (and own approximately 87.5% of the Comanche working interest), and former debtor Maverick, who is a party to the GGPA—have the obligation to terminate at the earliest possible time the Existing Commitments that prevent their Comanche Gas from flowing to Carnero. Carnero does not ask for injunctive relief requiring Maverick and Mesquite to reject or terminate any contract. Consequently, this declaration does not "go to" Maverick's and Mesquite's rights under Section 365 to assume or reject the Midstream Agency Agreement. The reference to Section 365 in this declaration does not convert the contract claim to a claim "under Section 365." *See WRT Creditors Liquidation Tr. v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 610 (S.D. Tex. 1999) (recognizing that debtor's state law claims premised on defendant's impeding debtor's right to file bankruptcy under title 11 were not core claims) (citing *In re N. Parent, Inc.*, 221 B.R. 609, 626 (Bankr. D. Mass. 1998)). Maverick and Mesquite can exercise that right however they decide.

16. Indeed, Maverick's and Mesquite's actions in the main bankruptcy well demonstrate that declaration 36(k) does not go to their rights under Section 365. Maverick and Mesquite have used their business judgment to enter into a settlement agreement to reject the Midstream Agency Agreement [MP Dkt. 1415], to terminate that settlement, and to announce on October 29, 2021 they are pursuing a new settlement to assume the Midstream Agency Agreement [MP Dkt. 2144], the latter action they took after Carnero filed the State Court Lawsuit. Maverick and Mesquite can plainly exercise their business judgment to make assumption/rejection decisions unfettered by Carnero's State Court Lawsuit.

[10] Mesquite is *fully* a non-debtor as to 25% of the working interest in the Comanche Assets that is subject to the GGPA. Mesquite acquired this interest post-confirmation and post-effective date on October 16, 2020, from Gavilan Resources, LLC in Gavilan's bankruptcy proceeding. *See* Gavilan Proceeding [GP Dkt. 366]. In acquiring that interest, it assumed the obligations of Gavilan under the GGPA and the Ratification Agreement.

17. If the state court were to grant Carnero's declaration, it would not hinder Maverick and Mesquite from exercising their Section 365 rights as to the Midstream Agency Agreement because no injunction requiring Maverick and Mesquite to take a particular action would issue. But whatever choice Maverick and Mesquite make, they *will* face the consequences of that choice as to their contract obligations under the Assumed Contracts. As is fundamental in Texas state law, a party can elect to breach a contract and become responsible to his counterparty for that breach. *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) ("A party is usually able to abandon a disadvantageous but valid contract and be responsible for breach of contract only.").

4. <u>No case supports that merely because the Oxy Adversary arises under the Code, the State Court Lawsuit also arises under the Code.</u>

18. The Defendants cite no case supporting their argument that because the Oxy Adversary[11] will adjudicate the assumption or rejection of the Midstream Agency Agreement under Section 365, that causes the State Court Lawsuit to arise under Section 365 as well. Response ¶ 37. The State Court Lawsuit cannot possibly answer that question and does not purport to seek to answer it. The State Court Lawsuit also does not seek to control the outcome of the Oxy Adversary. It only addresses the state law rights of the parties under the Assumed Contracts. In fact, the Oxy Adversary can conclude and the state court would not need to interpret any order this Court *may* issue in that proceeding to enter the declarations that Carnero seeks under the Assumed Contracts. "In looking at the core versus non-core nature of the removed case, the Court must look solely to the present record, not what may or may not happen in the Bankruptcy Cases." *In re Legal Xtranet, Inc.*, 453 B.R. 699, 712 (Bankr. W.D. Tex. 2011) (quoting *Lennar Corp. v. Briarwood Capital LLC*, 430 B.R. 253, 265 (Bankr. S.D. Fla. 2010)).

---

[11] *Occidental Petroleum Corp. v. Sanchez Energy Corporation, et. al.*, Case No. 20-3198, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

19. In summary, the State Court Lawsuit cannot be a core matter based on the Defendants' "arising under" theory because it does not involve substantive bankruptcy rights granted by Section 365. The outcome of the State Court Lawsuit will not determine whether or not the Midstream Agency Agreement will be assumed or rejected. The Oxy Adversary will answer that question, and this Court will decide that issue there. The State Court Lawsuit is limited to questions of interpretation and enforcement of state law contractual rights under the Assumed Contracts. Therefore, the only possible analysis for determining this Court's jurisdiction is under *Craig's Stores* and its progeny regarding post-confirmation "related to" jurisdiction.

***B. The State Court Lawsuit does not arise in bankruptcy.***

20. The Defendants make three unpersuasive and inaccurate arguments that the State Court Lawsuit is a core matter because it "arises in" the bankruptcy case: (i) declaration 36(k) in the State Court Lawsuit will "preempt" or "interfere" with their rejection of the Midstream Agency Agreement, (ii) the State Court Lawsuit requires the interpretation of this Court's orders, and (iii) the Defendants' will assert a defensive argument in the State Court Lawsuit that will invoke a question of bankruptcy law under Section 365.

1. <u>Declaration 36(k) relates to the impact of rejection on Assumed Contracts, not Maverick's and Mesquite's rights under Section 365 to reject.</u>

21. In declaration 36(k), Carnero seeks a declaration that all of the parties to the Assumed Contracts—non-debtors UnSub, Eagle Ford, Venado, Mitsui and non-debtor Mesquite (as post-confirmation successor to Gavilan), who are parties to the Ratification Agreements & Letter Agreement, and former debtor Maverick, who is a party to the GGPA—have the obligation to terminate at the earliest possible time the Existing Commitments that prevent their Comanche Gas from flowing to Carnero. This declaration relates to the interpretation of the Assumed Contracts. If the state court enters that declaration, it will not require Maverick and Mesquite to do

anything because Carnero does not seek injunctive relief. Thus, the declaration does not interfere with Maverick's and Mesquite's rights under Section 365 to assume or reject the Midstream Agency Agreement. But its decision will create commercial consequences that the post-effective date Reorganized Debtors must face, as any other commercial actor not in bankruptcy.

2. <u>The State Court Lawsuit does not require the interpretation of any order entered by this Court.</u>

22. The Defendants make the conclusory statement that the State Court Lawsuit "requires interpretation of the Bankruptcy Court's own orders, including but not limited to the Confirmation Order, Midstream Settlement Agreement and Unsub Stipulation and Agreed Order." *Nowhere* in their Response do the Defendants cite to any portion of those orders that must be interpreted or enforced as part of the State Court Lawsuit.

23. The Defendants cite several cases for the unremarkable proposition that the Court retains jurisdiction to enforce its own orders or rights under specific Code provisions, but never explain how the State Court Lawsuit is an action to enforce or interpret any of the Court's orders or Code provision. Each of these cases is easily distinguishable. *See Galaz*, 841 F.3d at 321; *ABC Dentistry*, 2019 WL 913356 at *3 (noting that the court would not have jurisdiction over a dispute arising under a contingency fee agreement, but concluding the actual nature of the action was the enforcement of a prior court order); *Spillman.*, 710 F.3d at 303 (action regarding interpretation of a Section 363 sale order); *In re Mem'l Prod. Partners LP*, 581 B.R. 206, 215 (Bankr. S.D. Tex. 2018) (Isgur, J.), *aff'd*, No. CV H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd sub nom. Matter of Mem'l Prod. Partners, L.P.*, 799 Fed. Appx. 221 (5th Cir. 2020) (holding resolution of pre-confirmation claims required interpretation of plan so action could only arise in bankruptcy); *In re Fieldwood Energy LLC,* No. 20-33948, 2021 WL 4839321, at *5 (Bankr. S.D. Tex. Oct. 15, 2021) (plaintiff sought declarations interpreting confirmation order); *In re U.S. Brass*

*Corp.*, 301 F.3d 296, 306 (5th Cir. 2002) (holding court had "arising in" jurisdiction because appellants sought order under Section 1142(b) and both sides argued ruling under that section was necessary to implement or execute the plan such that dispute had no existence outside of bankruptcy).

24. Here, the State Court Lawsuit does not require the interpretation or enforcement of any Court order. To the contrary, Carnero seeks only to enforce contractual rights under the Assumed Contracts. To hold otherwise and follow the Defendants' suggestion that any action involving an assumed contract necessarily requires the "interpretation or enforcement" of a confirmation order or assumption order would run contrary to the Fifth Circuit's holding in *Craig's Stores* and its progeny. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390-91 (5th Cir. 2001) ("out of the proceedings will come a newly reorganized company capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court"). The Defendants fail to cite any provision in any previous order that is being interpreted or enforced in the State Court Lawsuit or any aspect of the State Court Lawsuit that only arises in bankruptcy Accordingly, there is no "arising in" jurisdiction on the basis that the State Court Lawsuit requires the interpretation and enforcement of any Court order.

3. <u>Defendants cannot create jurisdiction in this Court based on prospective defensive arguments to the State Court Lawsuit.</u>

25. Defendants' "arising under" theory is premised on the flawed argument that the State Court Lawsuit's declarations under the parties' Assumed Contracts are actually declarations regarding Mesquite's and Maverick's rights under Section 365. In paragraphs 45 through 47 of the Response, the Defendants appear to argue that their prospective defenses to the questions of the parties' contractual rights under the Assumed Contracts will invoke Section 365. For example, the Defendants appear to defend Carnero's requested declarations by arguing that "rejection" may not

be a "right or option to terminate such Existing Commitment…without out-of-pocket costs" Response ¶ 45 (quoting the GGPA). That is a defensive allegation to Carnero's requested declaration.

26. But, "on a motion to remand, the court looks exclusively to the pleading at the time of removal." *Hanna v. Blanchette*, No. CIV.A. H-13-3119, 2014 WL 412527, at *1 n.1 (S.D. Tex. Feb. 3, 2014) (citing *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 264 (5th Cir. 1995)); *see also Bonin v. Sabine River Auth. of Louisiana*, 961 F.3d 381, 385 (5th Cir. 2020); *Polvado*, 2006 WL 2993333 at 2. Moreover, "any doubts concerning removal must be resolved against removal and in favor of remanding the case back to state court and the removing party bears the burden of establishing federal jurisdiction under section 1334." *In re e2 Communications, Inc.*, No. 02-30574-BJH-11, 2005 WL 7144839, at *2 (Bankr. N.D. Tex. Mar. 24, 2005) (cleaned up) (citing *Cross v. Bankers Multiple Line Ins. Co.*, 810 F. Supp. 748, 750 (N.D. Tex. 1992), *Faulk v. Owens–Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 658 (E.D. Tex. 1999)). The Defendants ask the Court to eschew this restriction and consider their defensive arguments to Carnero's pleaded state law claim. The Court should reject this invitation and hold that it has no "arising in" jurisdiction over the State Court Lawsuit.

### *C. The State Court Lawsuit does not relate to the bankruptcy proceeding.*

27. As Carnero's State Court Lawsuit is not a core proceeding, the jurisdictional question in this case is decided by the *Craig's Stores* standard for post-confirmation, post-effective date "related to" jurisdiction. Under that standard, "[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Craig's Stores*, 266 F.3d at 390-91. The factors to be assessed are: (1) the claim "deal[s] with post-confirmation relations between the parties," (*even though* "the contract existed throughout the reorganization and [is], by

implication, assumed") with (2) "no antagonism or claim pending between the parties as of the date of reorganization" and (3) "no facts or law deriving from the reorganization or plan [is] necessary" to Carnero's claims. *See id*. at 391. The State Court Law meets all three criteria.

28. Unable to defeat this standard, the Defendants cite cases applying the more expansive "conceivable effect" standard that applies to cases pre-confirmation or that involve interpreting the court's orders. *See Spillman*, 710 F.3d at 304 (involving interpretation of Section 363 order pre-confirmation after rejecting proposed plans); *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 385 (Bankr. D. Del. 2011) (recognizing that after debtor's plan is confirmed, court's jurisdiction necessarily diminishes because estate ceases to exist, but not applying Fifth Circuit standard and holding court had "related to" jurisdiction over declaratory judgment arising from lease amended without court permission during bankruptcy proceeding and later assumed, which implicated integrity of court's assumption order).

29. Even the inapplicable "conceivable effect" standard is not met because Carnero's claims must affect the estate, not just the debtor. *See Wood*, 825 F.2d at 93 ("plaintiff's claims…must affect the estate, not just the debtor"). The Defendants assert that because Carnero allegedly "seeks a determination regarding the consequences of assumption and rejection of executory contracts," the State Court Lawsuit will "have a conceivable effect on whether certain contracts will be assumed or rejected." First, that is speculative, and second, that is an effect on *Maverick and Mesquite* (Reorganized Debtors), not their estate. The outcome of the State Court Lawsuit may affect Maverick and Mesquite, but it does not affect their estates because none exists. *See Ultra Petroleum*, 2019 WL 2524936 at 7 (holding that Ultra could not show outcome of its post-confirmation counterclaim could conceivably have any effect on its estate because no estate existed after confirmation).

30. Contrary to the Defendants' assertions, the State Court Lawsuit will not create or release a claim against the estate because it does not involve injunctive relief requiring Maverick and Mesquite to take any action. At most, the State Court Lawsuit may affect Maverick's and Mesquite's choice about what they do with the executory Midstream Agency Agreement. But that's a choice that any debtor who has emerged from bankruptcy into the cold, cruel business world must make when faced with multiple contractual obligations and contractual parties. *See Craig's Stores*, 266 F.3d at 390. Parties to a lawsuit may even choose to ignore the order of a state court, which could, of course, cause them to face more litigation. *See Ultra Petroleum*, 2019 WL 2524936 at 3 (noting that after Wyoming Supreme Court affirmed that calculation specified in SAA must use revenues, not net profits, as base for NPI Allocations, Ultra and non-operating working interest owners continued to dispute calculation method, leading non-operating working interest owners to file pre-confirmation adversary proceeding against Ultra seeking declaratory relief as to rights and obligations under SAA based on Wyoming Supreme Court ruling).

31. In the UnSub Adversary, where the parties' rights and obligations under the GGPA and UnSub Ratification Agreement were at issue and UnSub sought declarations under those agreements regarding the effect of rejection of the then-executory Marketing Agreement on those agreements, Maverick and Mesquite agreed that the Court had no "related to" jurisdiction over such claims:

> 34. Although the Plan contains procedures for the assumption, assignment, and rejection of executory contracts (*see* Plan at Art. V.A.), a claims process for rejected contracts (*id.* at Art. V.B), and a cure process for assumed contracts (*id.* at Art V.C), it does not mention or address the resolution of disputes about the Mesquite Defendants' rights under assumed contracts, like the GGPA and the Ratification Agreement. And any dispute regarding the parties' relationship pursuant to the GGPA and the Ratification Agreement on a go-forward basis does not impact compliance with the Plan, does not impact completion of the Plan, and, in fact, has no

impact on the Plan whatsoever. *See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where the litigation at issue did not attempt to subvert the confirmed plan) (citation omitted).

36. Plaintiffs and the Mesquite Defendants have been in business with one another for many years and will likely be involved in some sort of business relationship for the foreseeable future. That the Mesquite Defendants have undergone a reorganization under this Court's supervision does not mean that this Court can or should continue to determine the scope of the Mesquite Defendants' rights and obligations with respect to the future course of dealing with Plaintiffs or mediate their business relationship.

UA Dkt. 26 ¶ 34, 36.

32. To crawfish away from that argument and the applicability of *Craig's Stores* to the State Court Lawsuit, the Defendants cite a number of cases purporting to support their "related to" jurisdiction argument. All are distinguishable.

33. *In re DBSI, Inc.*, 409 B.R. 720, 728 (Bankr. D. Del. 2009) involved a *pre-confirmation* dispute over rejected and assumed leases and required the court to interpret its orders regarding those leases. *Id*. As this Court has recognized, even a pre-confirmation dispute that shares some common facts with a post-confirmation dispute does not create related-to jurisdiction over the post-confirmation dispute that is otherwise unrelated to the bankruptcy. *Ultra Petroleum*, 2019 WL 2524936 at 7 (holding that "Ultra cannot use the 'common facts and circumstances' between SCPPA and TID's pre-confirmation complaint and its [post-confirmation] counterclaim against Anadarko to bring the counterclaim under § 1334(b)'s 'related to" jurisdiction'").

34. In *In re Enron Corp. Sec.*, 535 F.3d 325, 336 (5th Cir. 2008), in analyzing *Craig's Stores*, the Fifth Circuit stated, "Fleming cannot point to a single case in which we have held that

plan confirmation divests a District Court of bankruptcy jurisdiction over *pre-confirmation* claims based on *pre-confirmation* activities that properly *had been removed pursuant* to 'related to' jurisdiction. We likewise find none." *Id.* (emphasis added). In other words, the bankruptcy court *retained* jurisdiction it already had over the plaintiff's pre-confirmation claims. Carnero alleges no pre-confirmation claims.

35. In *Mem'l Prod. Partners*, Beta asserted the court had jurisdiction only under "arising under" or "arising in" jurisdiction. The court held that claims involving the administration of the debtor's plan were core proceedings, not related to the proceedings, because the dispute arose *pre-confirmation* and was resolved in the plan itself. 518 B.R. at 215-16. Carnero's claim arises from the Defendants post-confirmation actions that have caused this post-confirmation dispute.

36. In *U.S. Brass*, the court held it had *Craig's Stores* "related to" jurisdiction because the plan obligations for resolving the Shell/CNA issues were at the heart of the dispute, which caused the proceeding to impact compliance with or completion of the plan. 301 F.3d at 305. The court also held the case was a core proceeding because each party argued "a ruling in its favor" regarding Section 1142 (empowering the bankruptcy court to enforce unperformed terms of a confirmed plan) was necessary to implement or execute the U.S. Brass plan. *Id.* at 306. Here, Carnero does not seek a ruling under any provision of the Code, only under the Assumed Contracts. Nor does it seek a ruling to enforce any unperformed terms the Plan. The Reorganized Debtors have already assumed the Assumed Contracts.

37. Finally, the Defendants assert that *Craig's Stores* is not satisfied because the "seeds of antagonism between the parties" existed at confirmation. They do not cite any case that holds that the "seeds of antagonism" meet the *Craig's Stores* standard. Indeed, no case uses this standard

to analyze the issue. The *Craig's Stores* standard is that "[t]here ***was*** no antagonism or claim pending between the parties as of the date of the reorganization." *Craig's Stores*, 266 F.3d at 391 (emphasis added). Carnero filed the State Court Lawsuit on July 30, 2021, seeking declarations under the Assumed Contract arising from the Defendants' post-confirmation actions regarding the Comanche Assets. No antagonism or claim was pending as of the June 30, 2020 effective date of the Plan. The State Court Lawsuit, thus, does not "relate to" the bankruptcy proceeding.

38. As the Court lacks "arising under," "arising in," and "related to" jurisdiction over the State Court Lawsuit, it must remand the case to the state court.

**II. Mandatory Abstention requires sending the State Court Lawsuit back to state court.**

39. The Defendants argue that mandatory abstention does not apply because the Court has "arising under" or "arising in" jurisdiction. They do not argue any of the other five factors under the mandatory abstention test. *See In re Petroleum Products & Services, Inc.*, 561 B.R. 662, 665 (Bankr. S.D. Tex. 2016) (Isgur, J.).

40. As explained, the Defendants unsuccessfully attempt to manufacture "core" jurisdiction. Their arguments are unsupported by the cases cited, rely upon misstating Carnero's allegations, and argue the Defendants' unpleaded, prospective defenses to the merits of Carnero's claim, which the Court cannot consider on a motion to remand. The State Court Lawsuit is a post-confirmation proceeding involving only state law claims. It is not a core proceeding.

41. The Defendants' final assertion against mandatory abstention is that Carnero's claim is "intertwined" with the bankruptcy proceeding and bankruptcy law, but they provide no factual or legal support for this naked assertion. The State Court Lawsuit, as explained, is not core and is not related to the bankruptcy. Carnero's claim is intertwined with state law issues, particularly in light of the fact that nearly all of the parties (Carnero, UnSub, Venado, Eagle Ford,

Mitsui, and Mesquite (as post-confirmation successor to non-debtor Gavilan's interest)) are nondebtors and would not be subject to this Court's jurisdiction.

42. The Court must abstain from hearing the State Court Lawsuit and remand it to the state court because (1) Carnero timely filed a motion requesting abstention; (2) the State Court Lawsuit is premised on state law; (3) no independent basis for federal jurisdiction other than § 1334(b) exists; (4) the State Court Lawsuit declaratory judgment claim is non-core; (5) the State Court Lawsuit was commenced in state court; and (6) the State Court Lawsuit can be timely adjudicated in state court.

**III. The Court should permissively abstain.**

43. The Defendants make similar conclusory and summary arguments regarding permissive abstention. They again rely on their baseless "core" jurisdiction argument and try to shoehorn the State Court Lawsuit into a proceeding about the rejection or assumption of executory contracts rather a claim for declarations about the rights and obligations of the parties under the Assumed Contracts.

44. The Defendants argue that this case requires interpretation of prior orders, the Confirmation Order, the Midstream Settlement Agreement (now terminated), the UnSub Stipulation and Agreed Order and relates to the Oxy Adversary. But they do not identify any provision in any of these documents that requires interpretation. Nor do the Defendants explain how jurisdiction over the Oxy Adversary affects permissive abstention here.

45. The Defendants assert that bankruptcy issues predominate and that the State Court Lawsuit is closely related to the bankruptcy. But the State Court Lawsuit is a state law contract dispute among largely non-debtors—Carnero, Venado, UnSub, Eagle Ford, Mitsui, and Mesquite, as to the interest it acquired in the Comanche Assets post-confirmation from Gavilan in the Gavilan Proceeding, which cannot be subject to the Plan or any order of this Court. The State Court Lawsuit

is, at most, peripherally related to the main bankruptcy proceeding since the Assumed Contracts have been assumed by the post-confirmation Reorganized Debtors.

46. The Defendants cite *In re Senior Care Centers, LLC*, 622 B.R. 680, 694 (Bankr. N.D. Tex. 2020), but there the court declined to permissively abstain because the issue was whether and under what circumstances the Liquidating Plan Trust formed by the debtor's plan could liquidate stock in the reorganized company. That determination required interpretation of "complex aspects of bankruptcy law," including the plan and its support document and prior orders as well as plan implementation and consummation. *Id*. The issue here involves only the interpretation of the Assumed Contracts, a straightforward issue of state contract law.

47. The Defendants also rely on *In re Hassell*, No. 19-30694, 2020 WL 728890, at *2 (Bankr. S.D. Tex. Jan. 7, 2020) to argue that this Court "can most efficiently address Carnero's claim." But *Hassell* involved state court lawsuits filed *pre-petition* that were removed *pre-confirmation* and asserted claims against the debtor stemming from his alleged wrongful ownership interest in Hassell Construction Company. Because of the *pre-confirmation* posture of the bankruptcy proceeding, where the debtor still had an estate, the claims would heavily impact the administration of his estate by increasing the assets available for distribution or establishing allowed claim amounts. Here, the outcome of the State Court Lawsuit will do neither. It will only resolve the dispute over the parties' rights and obligations under the Assumed Contracts. It will not result in an order requiring the Reorganized Debtors to take any particular action because Carnero alleges no claim for injunctive relief.

48. Carnero demonstrated that the permissive abstention factors support the Court's permissive abstention from hearing this case. The Court should grant Carnero's Motion and remand the case to the state court.

## Conclusion

Carnero's State Court Lawsuit, which alleges claims that arose post-confirmation against one Reorganized Debtor and three non-debtors, seeks only state court relief. As a result, this is not a "core proceeding" and nor does it "relate to" the bankruptcy, and the Court jurisdiction under 28 U.S.C. § 1334(b) to hear the case. Further, the factors applicable to 28 U.S.C. § 1334(c)(1)-(2), require the Court to decline jurisdiction through mandatory abstention or permissive abstention. Accordingly, Carnero asks the Court to remand the State Court Lawsuit to state court.

**Dated: November 17, 2021.**

Respectfully submitted,

**PORTER HEDGES LLP**

By: *_/s/ Joshua W. Wolfshohl_*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Plaintiff Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on November 17, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*_/s/ Joshua W. Wolfshohl_*
Joshua W. Wolfshohl

# EXHIBIT A

**RATIFICATION AND ASSUMPTION AGREEMENT**

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is dated May 22, 2018, to be effective as of April 1, 2018, by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

**RECITALS**

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ________________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Gavilan Resources, LLC**

By: ________________________________
Name:
Title:

**Carnero G&P LLC**

By: ________________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name: David E. Roberts Jr.
Title: Chief Executive Officer

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By: [signature] GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is dated May ____, 2018, to be effective as of April 1, 2018 (the "Effective Date"), by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**Gavilan Resources, LLC**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED ACREAGE**

**Maverick, Webb, Dimmit and LaSalle Counties, Texas**

**The area circled in red in the below diagram**



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| | § | |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. 21-03908 |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.[2] | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | | |

**SUR-REPLY TO MOTION TO REMAND TO STATE COURT OR FOR ABSTENTION**

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] As previously noted, except for the Carnero GGPA, to which Mesquite is a party solely for purposes of a guaranty, Mesquite is not a party to any of the agreements at issue in this case. (AP Docket Nos. 1 at 5 ¶5 and 13 at 6 n.3) SN EF Maverick, LLC ("**Maverick**") is the counterparty to the contracts, but is not a defendant. Defendants refer to "Mesquite" in this sur-reply, as that is the only Reorganized Debtor Carnero has sued. Defendants do not waive their objection that Mesquite is not the real party in interest.

Defendants[3] submit this sur-reply in opposition to Carnero's motion to remand or for abstention. (AP Docket No. 6.) For the reasons set forth below and in Defendants' response (AP Docket No. 13), the Motion lacks merit.

*A. This Court has jurisdiction over the Carnero Action because the Action is designed to interfere with the continuing assumption/rejection litigation.*

1. Carnero filed its state court petition to destabilize the proposed global midstream settlement in the Sanchez-Oxy Adversary Proceeding. Unlike a proper declaratory judgment designed "to relieve potential defendants from the Damoclean threat of impending litigation,"[4] the Carnero Action seeks a coercive, preemptory finding of liability against Defendants over the proposed assumption of the Midstream Agency Agreement. Carnero now claims that this preemptive tactic would not "hinder Maverick or Mesquite from exercising their Section 365 rights as to the Midstream Agency Agreement because no injunction . . . would issue." (AP Docket No. 23 at 14 ¶14.) This is a distinction with no substantive difference.

2. If, as Carnero argues, its suit is simply about consequences flowing from the choice to assume or reject the Midstream Agency Agreement (AP Docket No. 23 at 7 ¶3, 13 ¶15), Carnero could later pursue a breach of contract claim and dispense with an unnecessary declaratory judgment. But Carnero plainly seeks to influence Mesquite's business judgment as to whether to pursue assumption and rejection. The purpose of the Carnero Action is evident from the petition. Indeed, Carnero admits it filed suit after surmising

---

[3] Capitalized terms not otherwise defined herein are defined in the Notice of Removal and Response to Motion to Remand to State Court or for Abstention. (AP Docket Nos. 1 and 13). This brief cites entries on the docket of this adversary proceeding (No. 21-03908) as "AP Docket No. ____" and entries on the main Chapter 11 docket (No. 19-34508) as "Bankr. Docket No. ___."

[4] *Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F. Supp. 219, 237 (D.N.J. 1966) (discussing the Federal Declaratory Judgment Act).

that Defendants were in "active negotiations" in the assumption/rejection litigation to prevent delivery of gas to Carnero through, among other things, assumption of the Midstream Agency Agreement. (Petition ¶¶25-26, AP Docket No. 1-4 at 9.) Characterizing the requested relief as declaratory instead of injunctive does not escape this Court's jurisdiction.

3. The Carnero Action is not the sort of case "litigated in Texas State Courts every day" as Carnero claims. (AP Docket No. 23 at 10 ¶8.) Just the opposite. In Texas state courts, most declaratory judgments suits are filed by potential defendants seeking declarations of non-liability under contract. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 668 (Tex. 2009). Carnero turns this on its head, filing suit as a potential plaintiff seeking declarations with respect to potential breaches of contract for hypothetical future events occurring in the bankruptcy case—to disrupt resolution of the assumption/rejection litigation.

4. The authority to reject and assume executory contracts is "vital to the basic purpose of a Chapter 11 reorganization," *Century Indemnity Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2000), and this Court's authority to enter orders assuming or rejecting contracts is necessary for the consummation of the Plan. Here, everyone can see that the Carnero Action seeks to interfere with that continuing assumption/rejection litigation. This Court has "arising under" or "arising in"—or at the very least "related to"—jurisdiction over the Carnero Action and should adjudicate the Carnero Action alongside the assumption/rejection litigation.

*B. This Court has jurisdiction over the Carnero Action because the Action involves rights created by bankruptcy law and requires interpretation and enforcement of this Court's orders.*

5. Carnero alleges that the Carnero GGPA requires Mesquite to reject the Midstream Agency Agreement because *rejection* under Section 365 is synonymous with *termination*. Under Section 3.1(b) of the Carnero GGPA, gas subject to certain pre-existing binding contractual commitments is excluded from dedication to Carnero until "the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost[.]" (AP Docket No. 6-1 at 14.) Carnero seeks a declaration that Mesquite's opportunity to reject executory contracts under Section 365 ***is*** the earliest possible opportunity to terminate the Existing Commitments and that assumption of the Midstream Agency Agreement would breach the Carnero GGPA. (AP Docket No. 1-4 at 11 ¶36(k).)

6. Carnero's declaratory judgment claim requires it to establish that not pursuing rejection is a breach of the Carnero GGPA. Thus, establishing that "rejection" is equivalent to "termination" is not—as Carnero repeatedly claims in its reply—a prospective defensive argument (AP Docket No. 23 at 6 ¶2, 9 ¶6, 11 ¶10, 15 ¶20, 17 ¶25, 18 ¶26, 23 ¶40); it is an element of Carnero's claim. In declaratory judgment actions "a party who asserts an affirmative claim for relief has the burden of proving its allegations." *Castille v. Serv. Datsun, Inc.*, 01-16-00082-CV, 2017 WL 3910918, at *3 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, no pet.) (internal citations omitted); *see also TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 464 (Tex. 2018).[5] Whether Carnero is entitled to its requested Paragraph 36(k) declaration requires

[5] Carnero's attempt to invoke the "well-pleaded complaint" rule fails for additional reasons, as discussed in paragraphs 15 – 18, below.

application and interpretation of the Bankruptcy Code and depends upon rights created in bankruptcy, by the Bankruptcy Code.

7. The Carnero Action also requires the interpretation and enforcement of this Court's prior orders, hinging on a single, but faulty assumption—that there has been an unqualified assumption of the Carnero GGPA. This is simply not true. The treatment of the Carnero GGPA is governed by this Court's *Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended*, entered on June 30, 2020 (the "**Midstream Settlement Approval Order**"). (Bankr. Docket No. 1415.) The Midstream Settlement Approval Order provided for the ***qualified*** assumption of certain "Assumed Agreements" pursuant to a "Settlement Agreement" (as defined in that order). The Settlement Agreement, which was approved over the objection of other working interest parties and contract counterparties following a contentious hearing, has now been terminated in accordance with its terms, and the Midstream Settlement Approval Order itself contains a host of qualifications and limitations bearing on, among other things, the treatment of the Carnero GGPA.

8. In short, the current status of the Carnero GGPA depends on an interpretation of the Midstream Settlement Approval Order and the Settlement Agreement approved thereby. Carnero already agreed that this Court would retain jurisdiction for "all matters arising from and related to the Settlement Agreement or [the Midstream Settlement Approval Order]". (Bankr. Docket No. 1415 at 5 ¶6.) Most importantly, there can be no dispute now that the Carnero Action depends entirely on the interpretation of this

Court's Midstream Settlement Approval Order. This is no simple dispute and is certainly not the type of case "litigated in Texas State Courts every day."

9. Permitting a state court to adjudicate questions regarding one part of the "web of contracts setting forth the parties' rights and obligations with respect to the Comanche Assets[,]" *Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)* (hereinafter *"Sanchez-Oxy"*), 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021), would invade this Court's statutory authority to enter orders necessary for the consummation of a confirmed plan. *See U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002).

10. Because the Carnero Action involves rights created by bankruptcy law and requires interpretation and enforcement of this Court's orders, this Court has "arising in," "arising under," or (at the very least) "related to" jurisdiction over the Carnero Action.

*C. The Defendants' removal of the Carnero Action is consistent with Mesquite's position regarding the Court's jurisdiction in the GSO-Sanchez Adversary Proceeding.*

11. Carnero wrongly argues that in opposing this Court's jurisdiction over the Carnero Action, it is making the same arguments that Mesquite made in its motion to dismiss in the GSO-Sanchez Adversary Proceeding. According to Carnero, the declarations it seeks "are no different from the declarations sought by UnSub that Mesquite and Maverick argued were outside of this Court's jurisdiction" in the GSO-Sanchez Adversary Proceeding. (AP Docket No. 23 at 8 ¶5.)

12. But in the GSO-Sanchez Adversary Proceeding, Mesquite moved to dismiss only one of four claims asserted by UnSub.[6] It was undisputed that the Court had jurisdiction over the first three counts, which sought declarations on whether Mesquite, Maverick, and SN UR Holdings, LLC could reject certain contracts. (*See, e.g.,* AP 20-03197 Docket Nos. 24 and 26); (AP 20-03197 Docket No. 24.) Mesquite moved to dismiss only Count 4, which was not about the reorganized debtors' ability to assume or reject contracts; Count 4 sought a declaration that ***if*** the Marketing Agreement was rejected, Mesquite, Maverick, and SN UR Holdings, LLC would "have no right to market UnSub's hydrocarbons[.]" (AP 20-03197 Docket No 10 at 20 ¶89.) Mesquite argued that Count 4 should be dismissed because it (1) was not ripe and did not present a "case" or "controversy" as required by Article III of the U.S. Constitution, and (2) related only to the parties' rights and obligations going forward. (AP 20-03197 Docket No. 26 at 15 ¶¶29-30.)

13. The declarations sought in the Carnero Action are not the same as Count Four in the GSO-Sanchez Adversary Proceeding. Critically, Carnero seeks a declaration regarding Mesquite's ability to assume and/or reject executory contracts; the parties in the GSO-Sanchez Adversary Proceeding ***agreed*** that these matters fell within the Court's core jurisdiction. And even if the declarations sought in the Carnero Action were equivalent to those in Count Four, three of four defendants (Mesquite, Maverick, and SN UR Holdings, LLC) reached a global settlement with UnSub and the other

[6] UnSub, one of the Defendants here, was one of four plaintiffs in the GSO-Sanchez Adversary Proceeding (*GSO ST Holdings LP, et. al. v. Sanchez Energy Corporation, et. al.,* Adv. No. 20-03197). As such, UnSub argued at the time—and continues to believe today—that jurisdiction over Count 4 was proper.

plaintiffs before the Court decided Mesquite's motion to dismiss. (AP 20-03197 Docket No. 65 at 5.)[7] The Court never ruled on its jurisdiction over Count Four.

14. Moreover, Mesquite's primary argument in moving to dismiss Count Four was that there was no case or controversy ripe for adjudication. (AP 20-03197 Docket No. 26 at 6 ¶3.) Carnero does not mention that argument in its reply. In relying on Mesquite's secondary argument for dismissal of Count Four (that this count was not subject to the Court's jurisdiction), Carnero ignores the limited scope of Count Four and the breadth of the declarations it seeks in the Carnero Action. The declarations sought by Carnero overlap with all four counts from the GSO-Sanchez Adversary Proceeding; yet Carnero incorrectly argues that this Court has no jurisdiction over ***any*** of those declarations. Mesquite challenged only one claim in the GSO-Sanchez: Carnero is not making the same arguments here. Moreover, because the Court did not decide Mesquite's motion to dismiss, there is no preclusive effect to the arguments from the GSO-Sanchez Adversary Proceeding.

*D. The "well-pleaded complaint" rule is only relevant to "arising under" jurisdiction and confirms jurisdiction over the Carnero Action.*

15. Carnero invokes the "well-pleaded complaint" rule in its reply but to the extent this rule applies, it only supports jurisdiction. As noted in paragraph 6 above, the issues Carnero describes as "defenses" or "defensive arguments" (i.e., the issues related to the interpretation of the Bankruptcy Code and this Court's prior orders) are elements of Carnero's declaratory judgment on which Carnero bears the burden of proof—not defenses. But even

[7] Carnero did not participate in the settlement and Count Four was dismissed without prejudice as to Carnero; all other claims were dismissed with prejudice. (AP 20-03197 Docket No. 65 at 5.)

if this were not the case, the "well-pleaded complaint" rule would not alter the jurisdictional analysis.

16. As an initial matter, Carnero misstates the "well-pleaded complaint" rule; this rule "does not apply in determining whether a bankruptcy court has 'related to' jurisdiction over a removed case." *Collins v. Sidharthan (In re KSRP, Ltd.)*, 809 F.3d 263, 268 n.3 (5th Cir. 2015). This "rule" is relevant only to "arising under" jurisdiction. *See, e.g., Firefighters' Ret. Sys. v. Consulting Grp. Servs., LLC*, 541 B.R. 337, 348 (M.D. La. 2015) (citing *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 258 (1992)); *Principal Life Ins. Co. v. JP Morgan Chase Bank, N.A., (In re Brooks Mays Music Co.)*, 363 B.R. 801, 815 (Bankr. N.D. Tex. 2007) (same); *Newby v. Enron (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 511 F. Supp. 2d 742, 764 (S.D. Tex. 2005) (same). Because the Court has, at the very least, related-to jurisdiction over the Carnero Action (in addition to the other forms of jurisdiction), the "well-pleaded complaint" rule is irrelevant.

17. Even if only "arising under" jurisdiction existed, the well-pleaded complaint rule would confirm the Court's jurisdiction. Because the Carnero Action seeks a declaratory judgment, the relevant question is not whether *Carnero's* claims purport to sound in state law, but "whether 'if the *declaratory judgment defendant* brought a coercive action to enforce its rights, that suit would necessarily present a federal question.'" *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 329 (5th Cir. 2008) (emphasis added) (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 19 (1983)); *see also NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) ("Since a declaratory judgment action is inherently anticipatory, the federal issue must form part of the hypothetical

well-pleaded complaint that ***the declaratory judgment defendant*** would have filed but for the anticipatory action." (emphasis added)).

18. Here, Defendants would vindicate their rights against Carnero regarding the matters in the Carnero Action not through a state law claim, but from this Court under the Bankruptcy Code: approval of the Debtors' assumption and rejection decisions under 11 U.S.C. §365, and approval of the proposed mid-stream settlement under Bankruptcy Rule 9019. The Carnero Action is an obvious attempt to interfere with defendants' ability to seek such relief, wrapped in the guise of a state-law declaratory judgment action. Indeed, this is precisely why Carnero chose to bring a declaratory judgment action instead of claims for breach of contract or anticipatory repudiation under state law. Carnero's reply does not identify any coercive state-law action that defendants could bring against Carnero, and that omission is fatal to Carnero's invocation of the well-pleaded complaint rule.

*E. Neither mandatory nor permissive abstention apply.*

19. The Carnero Action directly invokes the Confirmation Order, Midstream Settlement Agreement, and UnSub Stipulation and Agreed Order, and implicates issues at the center of the Sanchez-Oxy Adversary Proceeding. Mandatory abstention does not apply because this is a core proceeding and, even if the Court finds that it is non-core, the substance of the Carnero Action intertwines with this bankruptcy proceeding. And nearly all permissive abstention factors weigh against permissive abstention.

## CONCLUSION

For the reasons set forth above and in Defendants' response, the Court should deny Carnero's motion to remand to state court or for abstention, and

grant Defendants any such further relief to which they have shown themselves justly entitled.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax
713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax
214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant**
**Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Rebekah Sills McEntire*
Rebekah Sills McEntire
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
rebekah.mcentire@kirkland.com

**Attorney for Defendant Venado EF L.P.**

*/s/ Maegan Quejada*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on November 25, 2021, on all persons entitled to receive service through the Court's Pacer ECF filing system.

*/s/ James G. Munisteri*
**James G. Munisteri**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. 21-03908 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § | |
| | § | |
| Defendants. | § | |

**<u>Carnero's Witness and Exhibit List for the Hearing on December 7, 2021</u>**
(Relates to Doc. Nos. 6, 23)

Carnero G&P LLC files this witness and exhibit list (the "<u>Witness and Exhibit List</u>") for the hearing scheduled for December 7, 2021, at 2:30 p.m. (CST) before the Honorable Marvin Isgur at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Avenue, Houston, Texas 77002 (the "<u>Hearing</u>").

**<u>Witnesses</u>**

Carnero may call any of the following witnesses at the Hearing:

1. John Coonce

[1] The "<u>Reorganized Debtors</u>," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2. Amy Falcon

3. Any witness called or listed by any other party;

4. Any witness necessary to lay the foundation for the admission of exhibits; and

5. Any rebuttal and/or impeachment witnesses.

**Exhibits**

Carnero may offer into evidence any one or more of the following exhibits:

| No. | Description | MARK | OFFER | OBJECT | ADMIT | W/D | Disposition After Trial |
|---|---|---|---|---|---|---|---|
| 1. | State Court Lawsuit, Original Petition Case No. 2021-46431 | | | | | | |
| 2. | April 1, 2018 Firm Gas Gathering, Processing and Purchasing Agreement ("GGPA") between Carnero and SN EF Maverick, LLC, as amended by Carnero, the SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Mesquite Energy, Inc. (as successor to Gavilan Resources, LLC), Carnero, and Maverick [Dkt. 6-1] | | | | | | |
| 3. | April 1, 2018 Ratification Agreement among UnSub, Maverick, and Carnero [Dkt. 6-2] | | | | | | |
| 4. | April 1, 2018 Ratification Agreement among Eagle Ford, Maverick, and Carnero [Dkt. 6-3] | | | | | | |
| 5. | April 1, 2018 Ratification Agreement among Venado, Maverick, and Carnero [Dkt. 6-4] | | | | | | |
| 6. | April 1, 2018 Ratification Agreement among Mesquite (as successor to Gavilan), Maverick, and Carnero [Dkt. 23-1] | | | | | | |

| No. | Description | MARK | OFFER | OBJECT | ADMIT | W/D | Disposition After Trial |
|---|---|---|---|---|---|---|---|
| 7. | April 1, 2018 Letter Agreement among Carnero, Maverick, and Mitsui E&P Texas LP regarding the GGPA [Dkt. 6-5] | | | | | | |
| 8. | Harris County District Courts, Activity Detail from September 1, 2020 to September 30, 2021 [Dkt. 6-6] | | | | | | |
| 9. | Table F., US Bankruptcy Courts – Bankruptcy Cases Commenced, Terminated and Pending During the 12-Month Periods Ending June 30, 2020 and 2021 [Dkt. 6-7] | | | | | | |
| 10. | Gavelytics Data for Judge Cory Sepolio [Dkt. 6-8] | | | | | | |
| 11. | Affidavit of Amy C. Falcon [Dkt. 6-9] | | | | | | |
| 12. | June 24, 2021 Letter Terminating the Midstream Settlement Agreement | | | | | | |
| 13. | Business Records Declaration of Carnero | | | | | | |

| Docket Numbers Referenced in Dkts. 6 and 23 Included for Judicial Notice | |
|---|---|
| Dkt. 1 | Case No. 19-34508, August 11, 2019 Reorganized Debtors Chapter 11 Petitions |
| Dkt. 1199 | Case No. 19-34508, April 30, 2020 Debtors' Amended Witness and Exhibit List for Confirmation Hearing Scheduled for April 30, 2020 at 9:00 a.m. (Exhibit 10 – listing assumed contracts) |
| Dkt. 1212 | Case No. 19-34508, April 30, 2020 Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan or Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates |
| Dkt. 1309 | Case No. 19-34508, June 6, 2020 Debtor's Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended |

| **Docket Numbers Referenced in Dkts. 6 and 23 Included for Judicial Notice** | |
|---|---|
| Dkt. 1326 | Case No. 19-34508, June 17, 2020 Notice of Filing of Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates (listing assumed contracts) |
| Dkt. 1373-4 | Case No 19-34508, Rejected Hydrocarbons Purchase and Marketing Agreement ("Marketing Agreement") between UnSub and Maverick dated January 12, 2017 |
| Dkt. 1415 | Case No. 19-34508, June 30, 2020 Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended |
| Dkt. 1417 | Case No. 19-34508, June 30, 2020 Notice of Effective Date |
| Dkt. 1544-2 | Case No, 19-34508, Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC, and Kerr-McGee Oil & Gas Onshore LP, on the other, and Mesquite as guarantor dated on or about June 1, 2017 ("Midstream Agency Agreement") |
| Dkt. 1983 | Case No. 19-34508, June 28, 2021 Stipulation of Dismissal and Agreed Order (relating to UnSub Adversary, Case No. 20-03197[2]) |
| Dkt. 2144 | Case No. 19-34508, PDF File with Audio File Attached for October 29, 2021 Hearing in the Oxy Adversary[3] |
| Dkt. 1 | Case No. 20-03197, UnSub Adversary Original Complaint |
| Dkt. 10 | Case No. 20-03197, UnSub Adversary Amended Complaint |
| Dkt. 26 | Case No. 20-03197, Mesquite Defendants' Motion to Dismiss Count 4 of Plaintiffs TSO ST Holdings LP, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, and SN EF UnSub, LP's Amended Complaint |
| Dkt. 366 | Case No. 20-32656,[4] Notice of Filing of Asset Purchase Agreement (dated October 16, 2020 by and between Gavilan Resources, LLC and Gavilan Resources Management Services, LLC, as Sellers, and Mesquite Energy, Inc., as Buyer) |

Carnero reserves the right to further amend or supplement the Witness and Exhibit List at any time prior to or during the Hearing.

Dated: December 3, 2021.

---

2 *GSO ST Holdings LP, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, and SN EF UnSub LP v. Sanchez Energy Corporation [n/k/a Mesquite Energy, Inc.], SN EF Maverick, LLC, SN UR Holdings, LLC, and Carnero G&P, LLC*, Adversary No. 20-03197, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

3 *Occidental Petroleum Corp. v. Sanchez Energy Corporation, et. al.*, Case No. 20-3198, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

4 *In re Gavilan Resources, LLC*, Case No. 20-32656, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

Respectfully submitted,
**PORTER HEDGES LLP**
By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com
**Attorneys for Plaintiff Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on December 3, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

# EXHIBIT 1

7/30/2021 9:07 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 55852780
By: Cecilia Thayer
Filed: 7/30/2021 9:07 AM

2021-46431 / Court: 269

CAUSE NO. ________

| | | |
|---|---|---|
| CARNERO G&P LLC,<br>Plaintiff,<br>v.<br><br>SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, and MESQUITE ENERGY, INC.,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br><br>___ JUDICIAL DISTRICT |

## Plaintiff's Original Petition

Plaintiff CARNERO G&P LLC ("Carnero" or "Plaintiff") files this original petition against Defendants SN EF UNSUB, LP ("UnSub"), EAGLE FORD TX LP ("Eagle Ford"), VENADO EF L.P. ("Venado"), MITSUI E&P TEXAS LP ("Mitsui"), and MESQUITE ENERGY, INC. ("Mesquite") and alleges as follows:

### I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

### II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

6. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

7. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

8. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

9. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute

provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

10. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief and attorney's fees and costs.

## VI. Factual Background

11. This is a dispute over the meaning of three contracts arising from oil and gas operations on the "Comanche Assets" in the Western Eagle Ford Shale.

**The Comanche Assets**

12. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**The Comanche Assets Acquisition**

13. In January, 2017, SN EF Maverick, LLC ("Maverick") (a subsidiary of Sanchez Energy Corporation ("Sanchez")) and various co-investors, including Gavilan Resources, LLC ("Gavilan")[1] and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets. The transaction closed on March 1, 2017.

[1] Gavilan Resources, LLC filed for bankruptcy on May 15, 2020, and later sold its interests in the Comanche Assets to Maverick (now known as Mesquite Energy, Inc., as explained below) in or about October 2020. As a result, the Plaintiff has not named Gavilan as a defendant.

**Comanche Assets Existing Commitments Dedications**

14. At the time of the Comanche Assets acquisition, the acreage conveyed to Maverick, Gavilan, and UnSub was dedicated by Anadarko for gathering and processing to other midstream providers pursuant to agreements that prevent, in part, the delivery of gas to other service providers (the "Existing Commitments").[2] Anadarko retained these Existing Commitments under the terms of the March 1, 2017 Comanche Assets acquisition agreements, specifically the Retained Midstream Contracts Services Agreement among Maverick, as "Provider," and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP, collectively as the "Recipient" (the "Midstream Agency Agreement"). The Midstream Agency Agreement required Provider to act as Recipient's agent for delivering gas on behalf of Recipient under the retained Existing Commitments.

15. Maverick, UnSub, and the WIPS never became parties to the underlying Existing Commitments. The Midstream Agency Agreement is the only agreement that required Maverick to deliver gas from the Comanche Assets to the Recipient for delivery under the Anadarko-retained Existing Commitments. UnSub and the WIPs never became parties to the Midstream Agency Agreement.

**Comanche Assets Marketing Agreement**

16. UnSub and Maverick agreed that Maverick would buy UnSub's share of the oil and gas produced by the Comanche Assets under the terms of a Hydrocarbons Purchase and Marketing Agreement (the "Marketing Agreement") dated as of January 12, 2017. The Marketing Agreement

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time that Carnero, Mesquite and UnSub entered into the Ratification Agreement referenced herein.

is the only agreement that linked UnSub's gas from the Comanche Assets to the Existing Commitments.

**Comanche Assets Dedication to Carnero**

17. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA"). The GGPA obligates Maverick to deliver certain "Dedicated Gas" produced by the Comanche Assets (i.e., the "Dedicated Acreage") to Carnero. Section 3.1(b) of the GGPA excludes certain gas that is committed to other service providers under the Existing Commitments until the obligation to deliver gas thereunder terminates or expires. In addition, Section 3.1(b) of the GGPA requires Mesquite, as successor to Maverick, to terminate the obligation to deliver gas under any Existing Commitment at the earliest possible time.

18. UnSub, Maverick, and Carnero entered into a Ratification Agreement (the "UnSub Ratification Agreement") on the same day that Maverick and Carnero entered into the GGPA. Gavilan, Eagle Ford and Venado also executed ratification agreements in substantially the same form as UnSub's Ratification Agreement. These agreements together with the UnSub Ratification Agreement are collectively referred to as the "Ratification Agreements". As a consequence of the various Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have the same obligations as Maverick to terminate their delivery obligations under any Existing Commitments at the earliest possible time. Mitsui signed a Letter Agreement dated effective April 1, 2018 ("Letter Agreement"), that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA.

19. At the same time they signed the GGPA and the various Ratification Agreements and the Letter Agreement, Unsub, Eagle Ford, Venado, Maverick, Gavilan, and Carnero entered

into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment") dated effective April 1, 2018.

20. Through the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado ratified and confirmed the GGPA in all respects and each agreed to assume all obligations of *a Producer* (as defined in the GGPA) under the GGPA in all respects. Specifically, the various Ratification Agreements each provide:

a. **Section 2** – "Producer [UnSub, Eagle Ford, and Venado each] hereby *ratifies and confirms the GGPA in all respects, and agrees that Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] will assume all the obligations of a* ***'Producer' (as defined in the GGPA)*** *under the GGPA in all respects and make all the representations and warranties of a 'Producer' under the GGPA."* [Emphasis Added.]

b. **Section 4** - "*Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA...*[3] *and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA....*" [Emphasis added.]

c. **Section 6** – UnSub, Gavilan, Eagle Ford, and Venado each appointed Maverick as its "Producer's Representative"—"its agent and attorney-in-fact with respect to all matters under the GGPA," including receipt of notices and delivery of nominations as set forth in Article VI of the GGPA.

21. The GGPA provides that a "Producer" (as defined in the GGPA)—(which includes UnSub, Gavilan, Eagle Ford, and Venado per the various Ratification Agreements)—has the following obligations:

a. **Section 3.1(b)** – Producer's Gas that is subject to "Existing Commitments" is excluded from the dedication under Section 3.1(b) of the GGPA, *but only until "the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System ... or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right*

[3] Venado's Ratification Agreement omits the language that is omitted in this quote ("(including with respect to after acquired interests)").

> *at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1.*" [Emphasis added].

22. Based on these provisions in the GGPA and the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have *all* the obligations of Producers under the GGPA, including the obligation to comply with the terms of Section 3.1(b) of the GGPA. These obligations specifically include the obligation, upon termination of any Existing Commitment preventing delivery of their gas to Carnero, to deliver all gas previously subject to such Existing Commitment to Carnero for Carnero to gather, process, and purchase. Further, UnSub, Gavilan, Eagle Ford, and Venado appointed Maverick as their representative for purposes of delivering nominations with respect to all of their gas from the Comanche Assets under the GGPA. Under the Letter Agreement, Mitsui authorized Mesquite to market the gas from Mitsui's interest in the Comanche Assets under the GGPA.

**Maverick's Bankruptcy**

23. Maverick and certain of its affiliates (collectively, the "Sanchez Debtors") filed chapter 11 bankruptcy petitions on August 11, 2019 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") [Case No. 19-34508, jointly administered]. On April 30, 2020, the Bankruptcy Court entered an order confirming the Sanchez Debtors' Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 1205, Case No. 19-34508] (the "Plan"). As part of the Plan confirmation process, Maverick assumed the GGPA. Upon the effective date of the Plan, Mesquite became the successor to Maverick.

24. On June 28, 2021, the Bankruptcy Court entered a Stipulation of Dismissal and Agreed Order confirming the agreed rejection of the Marketing Agreement and the assumption of the UnSub Ratification Agreement by Mesquite (the "Rejection-Assumption Order"). The rejection of the Marketing Agreement terminated Mesquite's right to UnSub's gas and triggered

the obligation under Section 3.1 of the GGPA and the UnSub Ratification Agreement for UnSub to deliver its gas to Carnero for gathering, processing, and purchase.

25. Mesquite commenced proceedings to reject the Midstream Agency Agreement, which would terminate any delivery obligation thereunder, as well as under each Existing Commitment. Termination of Mesquite's delivery obligation under the Existing Commitments (which Mesquite and UnSub, Eagle Ford, and Venado must undertake at the earliest possible time) requires the delivery of Mesquite's, UnSub's, and the WIPs' gas to Carnero under the GGPA and the Ratification Agreements. On information and belief, the WIPs are causing Mesquite to withdraw its rejection of the Midstream Agency Agreement and/or to enter into new midstream agreement(s) in violation of the GGPA and the Ratification Agreements, which would prevent delivery of the WIPs' gas to Carnero.

26. Additionally, the Rejection-Assumption Order indicates that UnSub and Mesquite may be in active negotiations to enter into a new marketing agreement or a modified version of the rejected Marketing Agreement. On information and belief, UnSub and Mesquite may be attempting to negotiate a new dedication agreement or amend other agreements (including the Existing Commitments) to prevent delivery of UnSub's gas to Carnero. On information and belief, the WIPs are taking a similar position that would prevent delivery of their gas to Carnero. These actions are in derogation of Carnero's rights under the GGPA, the various Ratification Agreements, and the Letter Agreement. If such agreement(s) are consummated, it will be a material breach of the UnSub Ratification Agreement and the GGPA. Additionally, UnSub's statements and actions in the Bankruptcy Court confirm that it does not intend to comply with the terms of the UnSub Ratification Agreement and the GGPA.

# VII. Causes of Action

## A. Declaratory Judgment

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are affected by those contracts. Carnero may have determined any question of construction or validity arising under those contracts and obtain a declaration of rights, status, or other legal relations under the GGPA, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to its Ratification Agreement and the GGPA, all of UnSub's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(b) Pursuant to their respective Ratification Agreements and the GGPA, all of Eagle Ford's and Venado's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(c) Pursuant to the Letter Agreement and the GGPA, all of Mitsui's gas from the Comanche Assets is dedicated to Carnero;

(d) Their respective Ratification Agreements and the GGPA require UnSub, Eagle Ford, Venado, and Mesquite to exercise any and all options or rights at the earliest possible time to terminate any Existing Commitments (as defined in Section 3.1(b) of the GGPA);

(e) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), UnSub and Mesquite must tender for delivery all of their gas from the Comanche Assets to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(f) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Eagle Ford and Venado must tender for delivery all of their gas from the Comanche Assets

to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(g) The GGPA and the Letter Agreement require that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Mitsui must tender for delivery all of its gas from the Comanche Assets to Mesquite for delivery to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(h) In their respective Ratification Agreements UnSub, Eagle Ford, and Venado designate Mesquite their Producer's Representative with respect to all matters arising under the GGPA;

(i) In the Letter Agreement, Mitsui designates Mesquite as its marketer with respect to Mitsui's gas from the Comanche Assets to be processed through the GGPA;

(j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,

i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and

ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

(k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.

(l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,

i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;

ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and

iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the Ratification Agreements, the Letter Agreement, and the GGPA.

**B. Attorney's Fees**

38. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code § 37.009 and as allowed by the GGPA and Ratification Agreements or other applicable agreement or statutory provision.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: July 30, 2021.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Eugene M. Nettles*

Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

# EXHIBIT 2

*Execution Version*

# FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT

This Firm Gas Gathering, Processing and Purchase Agreement (this "Agreement") is entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by and among SN EF Maverick, LLC ("Producer"), a Delaware limited liability company, and Carnero G&P LLC, a Delaware limited liability company ("Carnero"). Producer and Carnero may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Background:

Producer currently owns undivided working interests and/or controls Gas produced, or to be produced, from certain lands or oil and gas leases located in South Texas;

Carnero owns, or has interests in or rights to gathering, treating and processing facilities capable of receiving deliveries of Gas from Producer at the Receipt Point(s) and delivering Residue Gas to Producer at the Delivery Point(s); and

Producer desires that Carnero provide certain gathering, treating and processing services described in this Agreement, and Carnero desires to provide Producer those gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement.

Agreement:

In consideration of the mutual covenants set forth in this Agreement, Carnero and Producer hereby agree and covenant as follows:

## ARTICLE 1 DEFINITIONS

**Section 1.1** Definitions. Except in those certain instances where the context states another meaning, the following terms when used in this Agreement have the following meanings:

"Additional CGP" has the meaning set forth in Section 2.1.

"Additional Plant Products" has the meaning set forth in Section 3.1(b).

"Additional Plant Product Receipt Points" has the meaning set forth in Section 3.1(b).

"Adequate Assurance of Performance" shall mean sufficient security in the amount and for the term reasonably acceptable to Carnero in the form of (i) an irrevocable standby letter of credit issued by a Qualified Financial Institution in a format reasonably acceptable to Carnero or (ii) cash (either as a deposit, or prepayment), in either case (i) or (ii), not to exceed such Comanche Producer's anticipated obligations over any ninety (90) day period. If the credit of such Comanche Producer's guarantor is deemed to be acceptable to Carnero, in Carnero's sole reasonable opinion, the demand for Adequate Assurance of Performance can be satisfied with a parental guaranty issued on behalf of such Comanche Producer in a format, amount and tenor

EXHIBIT
1
exhibitsticker.com

acceptable to Carnero, but only for as long as the credit of such Comanche Producer's guarantor continues to be acceptable to Carnero, after which time only Adequate Assurance of Performance in the form of (i) or (ii) will be acceptable to Carnero.

"Affiliate" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by or is under common control with such Party, and "control" means the power to direct or cause the direction of the management and policies of such Person or Party, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by virtue of the ownership of shares or other equity interests, the holding of voting rights or contractual rights, partnership interests or otherwise. Notwithstanding the foregoing, for purposes of this Agreement and any Ratification Agreement, (a) Producer and its Affiliates, on the one hand, shall not be considered Affiliates of Carnero and its Affiliates, on the other hand and (b) Producer and any other Comanche Producer shall not be considered Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means, with respect to any person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives and requirements, of any Governmental Authority, including all official interpretations thereof by any such Governmental Authority, as in effect at any time or from time to time and, in each case, applicable to or binding upon such person and, in the case of Carnero, the Carnero System.

"Business Day" means any Day on which the Federal Reserve member banks in Houston, Texas are open for business.

"Btu" means a British thermal unit, which is the amount of heat required to raise the temperature of one pound of pure water from 59 degrees Fahrenheit to 60 degrees Fahrenheit.

"Carnero" has the meaning set forth in the preamble.

"Carnero System" means the facilities Carnero will own, solely or jointly with others, or in which Carnero holds capacity, which will include the Gathering System, the Receipt Point(s), the Treating Facility, the Delivery Point(s) and the Plant(s), Condensate stabilization facilities and stabilized Condensate truck racks or pipeline loading facilities, including all related appurtenances and facilities and any expansions and modifications of any of the foregoing.

"Cashout Percentage" means the applicable percentage set forth in the applicable table contained in Section 6.6(c) or Section 6.6(e).

"Cashout Price" for any Month means (i) if the downstream pipeline balances in kind, the price per MMBtu as published in Platt's Gas Daily Price Guide for such Month under the headings "Daily Midpoint Averages", "East Texas-Houston Ship Channel" or, if mutually agreed by the Parties, another widely accepted, alternative Gas Daily Price for such Month and (ii) if the downstream pipeline does not balance in kind, the cashout prices for such Month of the downstream pipeline receiving Gas at the Residue Gas Delivery Points. With respect to clause (i) of the preceding sentence, if *Platt's* Gas Daily does not report the Cashout Price for a given Month or the Cashout Price or *Platt's* Gas Daily Price Guide is no longer published, the Parties,

will determine a mutually agreeable price in lieu of the Cashout Price that is representative of the value of Gas in LaSalle or Refugio County, Texas, depending on the location of the Redelivery Pipeline to which the imbalance relates.

"CGP" or "CDP" means a central gathering point and/or a central delivery point directly connected to the Carnero System at which Producer's Gas is received hereunder, as such points are specified on Exhibit A hereto.

"Change in Law" means (i) the adoption, promulgation, repeal or modification after the Effective Date of any Applicable Law, (ii) the imposition after the Effective Date of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any approval of any Governmental Authority that establishes new, additional or modified requirements for the operation of the Carnero System, (iii) the non-approval or non-renewal of any approval of any Governmental Authority, or the renewal of the same on terms more onerous for Carnero than originally issued, other than as a result of Carnero's action or inaction in violation of Applicable Law, or (iv) any other restrictions or restraints imposed by Applicable Law after the Effective Date that were not in effect on or prior to the Effective Date.

"Change in Taxes" means any increase in Taxes directly attributable to Carnero imposed by the United States, the State of Texas or any other Governmental Authority exercising jurisdiction and arising from a Change in Law and imposed on or measured by: (i) Emissions or (ii) the provision of gathering or other services hereunder, including receipt of Gas or redelivery of Gas under this Agreement, but, for the avoidance of doubt, excluding any ad valorem taxes or Taxes imposed on Carnero with respect to its net income.

"Comanche Producers" means (i) Producer and (ii) each of SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, Mitsui E&P Texas LP and their respective Affiliates, successors and assigns that delivers Gas to Carnero from the Dedicated Acreage under one or more Ratification Agreements.

"Compression Fee" has the meaning set forth on Exhibit B.

"Compression Fuel" means the quantity of MMBtus utilized or incurred in the operation of the field compression facilities for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee) and other use requirements.

"Condensate" means natural gas liquids in Gas that condense in the Carnero System or as a result of Carnero's operations prior to processing that Gas at the Plant(s).

"Contract Year" means that twelve-Month period commencing on the Effective Date and each subsequent twelve-Month period during the term of this Agreement commencing on each anniversary of the Effective Date.

"Cubic feet" or "cubic foot" means the volume of Gas, corrected for water vapor, which occupies one cubic foot of space at a temperature of 60° Fahrenheit and an absolute pressure of 14.73 pounds psia.

"Day" means the period of time beginning at 9:00 a.m. Central Time on any calendar day and ending at 9:00 a.m. Central Time on the calendar day immediately following.

"Dedicated Acreage" means the acreage designated on Exhibit D.

"Dedicated Gas" means Producer's Gas that is produced from any well or wellbore located within the Dedicated Acreage.

"Delivery Point(s)" means the inlet flange of the custody transfer meter(s) owned by the Redelivery Pipeline(s) at the Residue Gas Delivery Point(s), as such points are specified on Exhibit A attached hereto.

"Delivery Quantity" means that quantity of Residue Gas, expressed in MMBtus, delivered by Carnero at the Residue Gas Delivery Point(s) to, or for the account of, Producer.

"EBB" has the meaning set forth in Section 6.1.

"Effective Date" has the meaning set forth in the preamble.

"Excess Gas" shall mean all volumes of Gas tendered by Producer under this Agreement in excess of the MDQ.

"Exhibit" and "Exhibits" have the meanings set forth in Section 1.3.

"Firm" means, with respect to those obligations of a Party that are designated as such, that such Party may interrupt its performance without liability only to the extent its performance is prevented by an event of Force Majeure or as otherwise specifically allowed for in this Agreement.

"FL&U" means the aggregate of (i) Producer's share of Plant Fuel as determined in accordance with Exhibit C; plus (ii) Gathering L&U, plus (iii) Producer's share of Compression Fuel as determined in accordance with the allocation procedure set forth in Exhibit C.

"Force Majeure" has the meaning set forth in Section 11.1.

"Full Recovery Allocation" has the meaning set forth in Section 3.7.

"Gas" means natural gas produced from gas wells and gas produced in association with oil (casinghead gas) and includes all hydrocarbons and non-hydrocarbons produced with the gas.

"Gathering Fee" has the meaning set forth in Section 5.1.

"Gathering L&U" means the quantity of MMBtus calculated in accordance with the procedure set forth in Exhibit C.

"Gathering System" means the Gas gathering pipeline system(s) connecting the Receipt Point(s) to the Plant(s).

"Governmental Authority" means: (i) the United States of America; (ii) any state, county, parish, municipality, or other governmental subdivision within the United States of America; and (iii) any court or any governmental department, commission, board, bureau, agency, or other instrumentality of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"Gross Heating Value" means the number of Btu's produced by the combustion, on an as delivered basis and at a constant pressure, of the amount of the Gas which would occupy a volume of one (1) Cubic Foot at a temperature of 60°F and at a pressure of fourteen and seventy-three hundredths (14.73) psia, with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

"Imbalance" has the meaning set forth in Section 6.6.

"Initial Term" has the meaning set forth in Article 9.

"Insolvency Event" has the meaning set forth in Section 14.1.

"Interruptible" means all obligations of Carnero that are not designated as Priority Interruptible or Firm, as to which Carnero may interrupt its performance for any or no reason.

"Maximum Daily Quantity" and "MDQ" means 260 MMcf/day or such lesser volume determined under Section 3.3(a). The Maximum Daily Quantity or MDQ is the maximum quantity of Gas that Carnero is obligated to receive from all Comanche Producers on each Day, in the aggregate, on a Firm basis at the Primary Receipt Point(s) and thereafter, gather, treat, process and redeliver.

"Maximum Receipt Capacity" means the maximum volume that Carnero is obligated to receive at any Receipt Point from all Comanche Producers on any Day, as specified on Exhibit A.

"Maximum System Pressure" means the maximum pressure at which the Gathering System may be operated as specified by Carnero from time to time, which may be different for different segments of the Gathering System and which, until otherwise communicated in writing by Carnero to Producer, will be: (i) for Gas delivered at the Highway 83 – T2 CDP, identified on Exhibit A, 1440 psig; and (ii) for Gas delivered at either the Maverick CDP or Highway 83 – Carnero CDP, identified on Exhibit A, 1250 psig.

"Mcf" and "MMcf" mean 1,000 cubic feet of Gas and 1,000,000 cubic feet of Gas, respectively.

"MMBtu" means 1,000,000 Btu's.

"Month" means a period beginning at 9:00 a.m. Central Time on the first day of a calendar month and ending at 9:00 a.m. Central Time on the first day of the calendar month immediately thereafter.

"Other Fuel" means electricity or other energy sources (other than Gas) used as fuel in the operation of the Carnero System.

"Other Fuel Fee" means a fee for Other Fuel, which fee will be Producer's pro rata share of the actual cost of the Other Fuel incurred by Carnero.

"Overdelivered" has the meaning set forth in Section 6.6(c).

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" includes any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, or Governmental Authority.

"Plant(s)" means the processing plant(s) at which Producer's Gas is actually delivered for processing and associated facilities, including facilities for treating and compression, and such other gas processing facilities that Carnero may make available from time to time in its sole discretion.

"Plant Fuel" will be determined as set forth on Exhibit C.

"Plant Products" means liquefiable hydrocarbon components, which Carnero removes and recovers from Gas in the cryogenic liquid extraction process at the Plant(s), including ethane, propane, normal butane, iso-butane and natural gasoline, and mixtures thereof.

"Primary Component" means ethane, propane, isobutene, normal butane and natural gasoline.

"Primary Receipt Points" means the Maverick CDP and Highway 83 – Carnero CDP, as described on Exhibit A.

"Priority Interruptible" means all obligations of Carnero that are not designated as Firm or Interruptible, as to which Carnero may interrupt its performance for any reason or no reason, or as otherwise specifically allowed for in this Agreement. Priority Interruptible obligations will be secondary to any Firm obligations and will have priority to any Interruptible obligations on the Carnero System.

"Processing Fee" has the meaning set forth in Section 5.3.

"Producer" has the meaning set forth in preamble.

"Producer's Gas" means all Gas that is owned or controlled by Producer or which Producer has the right to market.

"Producer's Products" means those Plant Products that are allocated to Producer's Gas in accordance with the allocation procedure set forth in Exhibit C.

"Producers' Representative" has the meaning set forth in Section 17.11.

"Product Price" means, for each gallon of Plant Product or Additional Plant Product calculated on a component by component basis and expressed in cents per gallon, the average Daily high and low prices per gallon, for the applicable Month, as quoted by Oil Price Information Service in the OPIS-LP-Gas Report for "Any Current Month" under "Mont Belvieu Spot Gas Liquids Prices" for each Primary Component contained in the Plant Products or Additional Plant Products for the applicable Month of delivery of Plant Products or Additional Plant Products by Carnero to the downstream purchaser, less (i) Taxes (excluding ad valorem taxes and taxes imposed on Carnero with respect to its net income); (ii) the T&F Fee; and (iii) any quality adjustment or similar fees charged or deducted by any purchaser of Plant Products or Additional Plant Products; provided that in the event a Force Majeure or other circumstance prevents Carnero's NGL purchaser from delivery of Plant Products or Additional Plant Products to Mont Belvieu, the Product Price will mean the weighted average sales price per gallon for each Plant Product or Additional Plant Product received by Carnero for the total volume of that Plant Product or Additional Plant Product sold by Carnero during the Month in which the Plant Product or Additional Plant Product is produced, expressed in cents per gallon (less the deductions set forth in clauses (i) and (iii) above, and less the actual transportation, fractionation, exchange or other fees incurred by Carnero in connection with any such disposition (other than take or pay fees or demand charges)).

"Product Shrinkage" is defined in Exhibit C.

"psia" means pounds per square inch absolute.

"psig" means pounds per square inch gauge.

"Qualified Financial Institution" means a U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least ten billion U.S. dollars ($10,000,000,000) and with a credit rating of at least A- by Standard & Poor's Financial Services, LLC, a subsidiary of The McGraw-Hill Companies, Inc. or its successor or at least A3 by Moody's Investors Service, Inc. or its successor.

"Raptor Plant" shall mean the Raptor gas processing facility owned by Carnero located in LaSalle County, Texas.

"Ratification Agreement" means an agreement executed by a Comanche Producer ratifying or otherwise committing such Comanche Producer to the performance of this Agreement, and on terms mutually agreeable to Carnero and the applicable Comanche Producer.

"Receipt Point(s)" means the inlet flange of the custody transfer meter(s) on the Carnero System at the CGPs, as such points are specified on Exhibit A and any Additional CGPs connected to the Carnero System pursuant to Section 2.1.

"Receipt Quantity" means the aggregate quantity of Producer's Gas, stated in MMBtu, received by Carnero at the Receipt Point(s) less FL&U, shrinkage attributable to Producer's Condensate and Producer's contractually allocated share of Product Shrinkage, as such allocations are determined in accordance with Exhibit C.

"Redelivery Pipelines" means the SECO, Western, Eagle Ford Midstream, TPL SouthTex Transmission Company LP natural gas pipelines or any other residue gas pipelines which Carnero may make available in its sole and absolute discretion at the tailgate of the Plant(s).

"Representatives" has the meaning set forth in Section 17.4.

"Residue Gas" means that portion of Producer's Gas remaining and available after the extraction of FL&U, shrinkage attributable to Producer's Condensate and Producer's allocated share of Product Shrinkage, which are each allocated in accordance with the procedures set forth on Exhibit C.

"Residue Gas Delivery Point(s)" has the meaning set forth in Exhibit A.

"Scheduled Quantity" means the quantity of Producer's Gas or Residue Gas (each in MMBtu) confirmed by Carnero to be received or delivered under this Agreement at a Receipt Point or a Residue Gas Delivery Point, as the case may be, subject to Producer's compliance with the nomination procedures set forth in this Agreement.

"Silver Oak II Plant" shall mean the Silver Oak II gas processing plant owned by Carnero and located in Bee County, Texas.

"Subject Gas" shall have the meaning set forth in Section 3.1(c).

"T2 Pipeline" means the Gas gathering pipeline system running from the inlet flange of meter #64-8038 (at the interconnection between the Carnero facilities and the T2 facilities) to the inlet flange of meter #69-3629 (at the interconnection between the T2 facilities and the Silver Oak II Plant).

"Taxes" means taxes, fees, or charges (including penalties and interest thereon) now or hereafter enacted, levied or assessed by any Governmental Authority.

"Term" has the meaning set forth in Article 9.

"Theoretical Gallons" means the number of gallons of each NGL component that are present in Gas as determined at the applicable Receipt Point(s). Theoretical Gallons will be determined by multiplying: (i) the gallons per Mcf of ethane, propane, butanes and pentanes plus derived from the chromatographic analysis at that point, by (ii) the volume in Mcf measured at that point.

"Third Party Gas" means all Gas that is owned and controlled by Persons other than Producer or its Affiliates.

"T&F Fee" has the meaning set forth on Exhibit G.

"Treating Facility" means an amine treating facility (including downstream dehydration facilities).

"Treating Fee" has the meaning set forth in Section 5.2.

"Underdelivered" has the meaning set forth in Section 6.6(c).

"Unit of Volume" means one cubic foot of Gas.

**Section 1.2** Rules of Interpretation. All references in this Agreement to articles, sections, subsections, Exhibits and other subdivisions refer to corresponding articles, sections, subsections, Exhibits and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any articles, sections, subsections, Exhibits and subdivisions are for convenience only and will not constitute part of such articles, sections, subsections, Exhibits and subdivisions and will be disregarded in construing the language contained in such articles, sections, subsections, Exhibits and subdivisions. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. The word "or" is not intended to be exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions. No consideration will be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement.

**Section 1.3** Exhibits. The following exhibits (collectively "Exhibits", and each an "Exhibit") are attached to, form part of, and are incorporated herein by reference as though contained in the body of this Agreement:

| | | |
|---|---|---|
| Exhibit A | - | Receipt Point(s); Delivery Point(s) |
| Exhibit B | - | Fees |
| Exhibit C | - | Allocations |
| Exhibit D | - | Dedicated Acreage |
| Exhibit E | - | Memorandum of Agreement |
| Exhibit F | - | Existing Commitments |
| Exhibit G | - | Transportation and Fractionation Fee |

Whenever any term or condition, whether express or implied, of any Exhibit conflicts with or is at variance with any term or condition of the body of this Agreement, the latter will prevail to the extent of such conflict or variance.

## ARTICLE 2
## CARNERO AND PRODUCER FACILITIES

**Section 2.1** Additional Wells and CGPs.

(a) If Producer proposes to establish additional CGPs other than the CGPs set forth on Exhibit A (each, an "Additional CGP"), or complete additional wells within the Dedicated Acreage, then it shall notify Carnero of each such Additional CGP or additional well. Producer will have sole discretion as to the location of each Additional CGP or additional well. When notifying Carnero of an Additional CGP or a new well, Producer shall provide Carnero with the

CGP or a well location, projected production, drilling schedule, expected flow rate and gas analysis information reasonably acceptable to Carnero (as to such Additional CGP or new well, collectively, "CGP Information").

(b) For each Additional CGP requested by Producer, Carnero will develop and deliver a good faith estimated cost and estimated construction timeline to establish and connect any such Additional CGP to the Gathering System and will connect such Additional CGP and Producer will reimburse Carnero 112.5% of the cost of connecting such Additional CGP, including any costs for pipeline, connections, pipeline taps, measurement equipment, telemetry and dehydration. Notwithstanding the foregoing sentence, if the Additional CGP is more than 5 miles from (i) the then-existing Gathering System and (ii) any wellhead gathering system that either delivers Gas to the Gathering System or that has an interconnect to a gathering system that delivers Gas to the Gathering System, then (A) Carnero may, within 45 Days following Carnero's receipt of the CGP Information, decline to connect the Additional CGP, in which case such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect and (B) the Producer will be entitled to engage another party to gather and/or process the Gas. With respect to the Dedicated Gas released pursuant to this Section 2.1(b) and gathered from the Additional CGP or its associated wells and delivered to a Plant (but not through the Gathering System), Producer will not incur the Gathering Fee, but will incur the Processing Fee to the extent processed by or on behalf of Carnero and all other applicable fees due hereunder. For the avoidance of doubt, Producer has the right to construct, own and operate facilities upstream of the CGPs in accordance with this Agreement.

(c) With respect to wellhead connections only, Carnero may, in its sole discretion, decline to connect any well(s) that will produce Dedicated Gas, and any well(s) that Carnero declines to connect (and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect (each a "Released Well"). Producer may contract with other Persons to gather Gas produced from Released Wells. If Carnero does not agree, within 45 Days following Carnero's receipt of the relevant well information, to connect any well to the Gathering System, then Carnero will be deemed to have declined to connect such well to the Gathering System. With respect to any Released Well, Producer may elect, within 30 days after such well becomes a Released Well, to require Carnero to connect such Released Well to the Gathering System and reimburse Carnero 112.5% of the cost of connecting such Released Well. If Producer elects to require Carnero to connect a Released Well to the Gathering System, then such well shall, as of such date of election, cease to be a Released Well and shall be subject to dedication hereunder.

(d) No later than 90 Days prior to the end of the one (1) year period described in the foregoing subsection (b) or (c), or any applicable successive one (1) year period thereafter, Carnero may elect, pursuant to written notice delivered to Producer, to connect such Additional CGP or Released Well to the Gathering System. If Carnero does not deliver such election, declines to connect or delivers its election to connect but does not actually connect the Additional CGP or Released Well to the Gathering System such that the Additional CGP or

connection for the Released Well is ready and able to accept volumes of Gas prior to the end of such one (1) year period, then such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be temporarily released from the dedication hereunder for an additional one (1) year period. If Carnero timely elects to connect, and actually connects, the Additional CGP or Released Well to the Gathering System, such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be subject to the dedication hereunder as of the end of such one (1) year period. Notwithstanding the foregoing, if any such Additional CGP or Released Well has not been connected to the Gathering System by the date that is three (3) years after the delivery of Carnero's election to not connect, such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) or Released Well (and associated Dedicated Acreage included in the proration unit for such well), as applicable, shall be permanently released from any dedication hereunder.

**Section 2.2** Grant of Producer's Land Rights. Producer agrees to grant to Carnero or its designee, without any warranty of title, insofar as Producer has the legal right to do so, the non-exclusive right of ingress and egress over, across and under all lands and leaseholds or premises of Producer, for the construction, maintenance and operation of pipelines and other facilities necessary or convenient for the gathering, treating, processing and redelivery of Producer's Gas under this Agreement. Carnero's use of such rights will not unreasonably interfere with Producer's operations or those of the surface owners. Producer will not be obligated to maintain in effect any underlying agreements granting Carnero such rights. Any use of such rights by Carnero or its designees shall be at the sole cost, risk and expense of Carnero and Carnero will indemnify Producer from claims related to Carnero's use of such rights.

**Section 2.3** Producer's Reservations. Producer reserves for itself the following rights:

(a) to operate (or cause to be operated) wells producing Producer's Gas in its sole discretion, including the right (but not the obligation) to drill new wells, repair and rework old wells, temporarily shut in wells or renew or extend, in whole or in part, any oil and gas lease or term mineral interest, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part, when no longer deemed by Producer to be capable of producing in paying quantities under normal methods of operation;

(b) to use Producer's Gas for lease operations (including reservoir pressure maintenance and enhanced recovery techniques, except, in each case, any such operations that are reasonably expected to decrease expected aggregate volumes of Gas to be delivered to Carnero hereunder over the Initial Term of this Agreement) and water treatment facility operations relating to the lands within the Dedicated Acreage;

(c) to deliver Producer's Gas or furnish Producer's Gas to Producer's lessors and holders of other burdens on production with respect to such Producer's Gas as is required to satisfy the terms of the applicable oil and gas leases or other applicable instruments;

(d) to pool, communitize or unitize Producer's interests with respect to Producer's Gas; *provided* that Producer's share of Producer's Gas produced from such pooled, communitized, or unitized interests shall be committed and dedicated pursuant to this Agreement; and

(e) to retain all liquids (and title to such liquids) separated from Producer's Gas by the use of conventional lease separators prior to delivery of Producer's Gas to Carnero at the Receipt Point(s), provided that Producer will not be permitted to remove or recover hydrocarbons from Producer's Gas other than through the use of conventional mechanical gas/oil field separators.

**Section 2.4** Downstream Arrangements. Producer agrees that it will, throughout the term of this Agreement, secure adequate transportation capacity and make necessary arrangements to market the Residue Gas re-delivered to Producer at the Residue Gas Delivery Point(s) in accordance with this Agreement.

**Section 2.5** Memorandum. Contemporaneously with the execution of this Agreement and from time to time during the Term, the Parties (including each Person included within the definition of Producer) will execute, acknowledge, deliver and record a Memorandum of this Agreement, substantially in the form of Exhibit E, identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

## ARTICLE 3
## QUANTITY AND SERVICES

**Section 3.1** Producer's Delivery Obligations. Subject to the terms and conditions of this Agreement, Producer's obligations are as follows:

(a) Subject to Sections 3.1(c), 3.1(d), 3.1(e) and Exhibit B, Producer shall tender for delivery to Carnero at the Primary Receipt Points 100% of the Dedicated Gas (which may exceed, at each Receipt Point, the Maximum Receipt Capacity specified for that Receipt Point and may exceed the Maximum Daily Quantity in the aggregate at all Receipt Points to the extent Carnero accepts such additional quantities of Gas pursuant to Section 3.5);

(b) Notwithstanding Section 3.1(a), to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent "evergreen" or "renewal" terms, it being understood that Producer shall give timely notice to terminate any

such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

(c) If Carnero is unable to accept any volumes of Dedicated Gas at the Primary Receipt Points for transport on the Gathering System or other pipeline systems owned by Carnero or on which Carnero has capacity or any Plant(s) are unable to accept any volumes of Dedicated Gas for processing, in either case, for more than 30 Days in any period of 60 Days other than as a result of Force Majeure (such volumes, the "Subject Gas"), then Carnero and Producer shall proceed as follows:

(i) Carnero shall have the obligation to gather and transport all of the Subject Gas to another processing plant owned or operated by Carnero, or in which Carnero has processing rights and process such Subject Gas at that plant, to the extent of available capacity;

(ii) To the extent Carnero does not accept the Subject Gas in Section 3.1(c)(i), the Subject Gas shall be immediately temporarily released from the dedication hereunder and Producer may enter into short term interruptible arrangements with third parties for the transportation and processing of such Subject Gas ("Temporary Arrangements"); provided that Producer must again deliver such Subject Gas to Carnero at the Receipt Points on the first (1st) Day of the Month immediately following 30 days after Producer receives notice from Carnero that Carnero is able to accept the Subject Gas;

(iii) At the request of either Party, Carnero shall cause the Board of Carnero to promptly meet to discuss and negotiate in good faith in respect of the possible expansion of either the Raptor Plant or the Silver Oak II Plant or the construction of new facilities to be owned by Carnero to process additional Gas;

(iv) Subject to Section 3.1(c)(i), if after 30 Days following the delivery by either Party of a request for a meeting of the Board of Carnero under Section 3.1(c)(iii), (A) Carnero has not adopted a plan by which Carnero will process such Subject Gas at a processing plant owned by Carnero (including the election of any Member to undertake construction of an Additional Plant as a sole risk project) and (B) Carnero and Producer

Case 4:23-cv-01587 Document 1-1 Filed on 05/01/23 in TXSD Page 14 of 61

have not agreed on a plan by which Carnero by no later than 60 Days after the delivery of any such request will be able to process such Subject Gas at the Raptor Plant, the Silver Oak II Plant or another processing facility owned by Carnero, or in which Carnero has processing rights, or at another mutually agreeable processing plant, then upon Producer's request such Subject Gas will be temporarily released from the dedication hereunder and Producer may enter into Temporary Arrangements for the gathering and processing of such Subject Gas for a term that does not exceed the greater of (x) one year and (y) the expected period determined by Carnero in its reasonable discretion (based on then-existing contractual commitments in respect of firm capacity for processing at the Raptor Plant, Silver Oak II Plant and other processing plants owned by Carnero, or at which Carnero has processing rights) during which the Raptor Plant, Silver Oak II Plant and any such other processing plants will not have Firm capacity to process such Subject Gas (the "Capacity Limitation Period");

(v) Producer shall promptly give Carnero notice of execution of any Temporary Arrangement. To the extent as of 180 Days after the inception of any Temporary Arrangement, Producer and Carnero have not agreed on a plan to gather and process such Subject Gas at either the Raptor Plant, the Silver Oak II Plant, or another processing facility that Carnero owns or in which it has processing rights, then such Subject Gas shall again be temporarily released from the dedication hereunder and Producer may renew such (or enter into a new) Temporary Arrangement for a period not to exceed one year (or the Capacity Limitation Period, if longer);

(vi) Any of Producer's Gas temporarily released from this Agreement in accordance with this Section 3.1(c) shall not be Dedicated Gas hereunder; *provided, however*, that such Gas shall become Dedicated Gas again at the conclusion of any temporary release.

(d) If, as a result of Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, are unable to accept any of Producer's Gas for more than 30 Days in any period of 90 Days, the volumes of Producer's Gas that cannot be accepted by Carnero shall be temporarily released from the dedication hereunder for the remainder of the then-current Month and the next three full Months, and Producer may enter into Temporary Arrangements for the gathering and processing of such released Gas for a term that does not exceed such Force Majeure period and succeeding periods of three Months if such processing facilities continue to be unable to accept Producer's Gas for reasons of Force Majeure upon the expiration of each three Month period;

(e) If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer may deliver the volume of Gas that is not accepted by Carnero to third parties for gathering and/or processing and such Gas will be temporarily released from dedication under this Agreement; provided, however, that if Carnero provides Producer notice that Carnero can accept any or all of such released Gas, as soon as commercially and operationally practicable (and in no event later than two (2) Days following receipt of such

notice), Producer will again deliver the volumes of released Gas specified in such notice to Carnero and such volumes of Gas will again be subject to the dedication hereunder; and

(f) If (i) for any reason, including Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, do not accept any of Producer's Gas up to the MDQ for more than 180 Days out of any 365 Day period, (ii) Carnero is not constructing a Plant to accommodate such Gas and (iii) Producer and Carnero have not otherwise agreed on a processing solution pursuant to Section 3.1(c), such volumes of Producer's Gas that are not accepted by Carnero shall be permanently released from the dedication hereunder, and Producer may enter into any alternative arrangements for the transportation and/or processing of such Gas.

(g) The provisions of this Section 3.1 shall be covenants running with the land, and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto. Producer and its Affiliates shall require any purchaser, assignee or other transferee of any portion of such interests to ratify this Agreement and to expressly assume and agree to the terms hereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

**Section 3.2** Carnero's Obligations. Subject to the terms and conditions of this Agreement, Carnero will provide the following Firm services:

(a) receive and gather at the Receipt Point(s) the quantity of Gas tendered by Producer from the Dedicated Acreage (not to exceed, when taken together with Gas tendered by all Comanche Producers from the Dedicated Acreage), the Maximum Receipt Capacity specified for that Receipt Point and not to exceed the Maximum Daily Quantity in the aggregate at all Receipt Point(s));

(b) subject to Section 5.2, treat at the Treating Facility, Producer's Gas that Carnero is obligated to receive at the Receipt Point(s) (as determined under subparagraph 3.2(a)) that requires treatment;

(c) process for the removal of Plant Products, Producer's Gas that Carnero receives at the Receipt Point(s) (as determined under subparagraph 3.2(a)), with the understanding that Producer's Gas shall be delivered to the Raptor Plant (including any expansion thereof or addition thereto) unless it is not available, in which case such Producer's Gas shall be processed at the Silver Oak II Plant (or another processing facility with available capacity that Carnero owns or in which it has processing rights);

(d) purchase Producer's Products; and

(e) deliver the quantity of Residue Gas in-kind attributable to Producer's Gas received at the Receipt Point(s).

**Section 3.3** Reduction of MDQ and Volume Limitations.

(a) Beginning on the fifth (5th) anniversary of the Effective Date, if, during any one (1) year rolling period (each, a "Determination Period"), the Comanche Producers fail to

deliver a daily average of least 90% of the then-effective MDQ (except for any such failure caused by Carnero not receiving properly tendered volumes up to the then-effective MDQ for any reason, including Force Majeure), Carnero may, within sixty (60) Days following the end of such Determination Period, elect to reduce the MDQ for all future periods to a quantity equal to the average volume delivered by all Comanche Producers during such Determination Period; provided, however, Carnero may not reduce the MDQ in any calendar quarter by an amount greater than ten percent (10%) of the MDQ then in effect, and the MDQ shall only be reduced to the extent that the volumes are unavailable and reasonably expected to not soon return. Any such notice shall be effective with respect to all Comanche Producers upon delivery to Producer hereunder.

(b) Subject to Section 3.4, Carnero's obligation to receive, gather, treat, dehydrate, process and deliver Producer's Gas will be on a Firm basis and will not, when taken with all Gas delivered by the Comanche Producers from the Dedicated Acreage, exceed either: (a) the Maximum Daily Quantity, or (b) the Maximum Receipt Capacity for the Receipt Point(s), as specified in Exhibit A. To the extent the Carnero System includes third party facilities in which Carnero holds capacity, such capacity shall be at least Firm or Priority Interruptible capacity, as applicable, to the extent Carnero provides Firm or Priority Interruptible capacity to Producer hereunder.

**Section 3.4** Priority Interruptible Volumes. Carnero will, on a Priority Interruptible basis, accept Excess Gas at all Receipt Point(s) to the extent of available capacity on the Carnero System and, if accepted by Carnero, Carnero will gather, treat and process those quantities as Priority Interruptible volumes in accordance with the terms of this Agreement, subject to Section 3.5(c).

**Section 3.5** Curtailment; Bypassing.

(a) If it becomes necessary to curtail the gathering, treating and processing of Producer's Gas for any reason (including Force Majeure or because the design capacity limit of any of the Carnero System has been reached); provided that (i) Carnero shall not enter into agreements for Firm gathering services that in the aggregate exceed the design capacity limit of the Carnero System or of any particular Plant at such time as such agreements are entered into; or (ii) offer any class(es) of service other than Firm, Priority Interruptible or Interruptible (each as defined herein) on the Carnero System; then, subject to the last sentence of this Section 3.5(a): (i) Carnero will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Priority Interruptible, and will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Priority Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Firm; and (ii) Producer's Firm volumes will be accepted on a prorated basis with other Gas for which Carnero's obligations are designated as Firm, such prorating to be based on nominations submitted prior to the time that Carnero gives notice of curtailment to its customers. Notwithstanding anything in this Agreement to the contrary, all Gas received under the Firm Gas Gathering Agreement and the Firm Gas Processing Agreement between Carnero, SN Catarina, LLC and Sanchez Energy

Corporation that is gathered to and processed at the Silver Oak II Plant will have priority over Gas delivered under this Agreement for gathering to and processing at the Silver Oak II Plant.

(b) Any portion of the Gas bypassed around the Plant(s) shall be bypassed in the following order of priority: (i) any bypass gas for the Day will be first attributed to any Gas delivered by any Person that does not have processing rights; (ii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Interruptible processing obligations; (iii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Priority Interruptible processing obligations; and (iv) finally, subject to subparagraph 3.5(a), the remaining quantity of Gas, if any, bypassed around the Plant(s) will be ratably attributed to Gas delivered under Firm processing obligations. The share of Producer's Gas that will be ratably bypassed will be based on the ratio of all Producer's Gas received at the Receipt Point(s) having that priority of service (*i.e.*, Interruptible, Priority Interruptible or Firm) divided by all Gas (including Producer's Gas) received by Carnero having the same priority of service (i.e. Interruptible, Priority Interruptible or Firm). Carnero shall have no obligation to ratably bypass Gas for any Person that does not have processing rights and, with respect to such volumes, Carnero may, acting in its sole discretion, select the source and volume of Gas which is so bypassed.

(c) To the extent of Carnero's Firm processing obligations to the Comanche Producers with respect to Gas produced from the interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement, such volumes will be processed at the Raptor Plant (including any expansion thereof or additions thereto) in preference to other Gas delivered under this Agreement and Gas delivered under other agreements containing Firm processing obligations. To the extent Carnero accepts additional volumes of Producer's Gas under Section 3.4 hereof, Carnero will process such Gas: (i) at the Raptor Plant on a Priority Interruptible basis; and (ii) subject to the last sentence of Section 3.5(a), at the Silver Oak II Plant on a Priority Interruptible basis.

**Section 3.6** Commingling. Producer agrees that Producer's Gas received by Carnero under this Agreement will constitute part of the supply of Gas from all sources in Carnero System, and Carnero has the right to commingle Producer's Gas with other Gas, to deliver molecules different from those received from Producer and to handle the molecules received from Producer and others in any manner.

**Section 3.7** Ethane Rejection Settlement Option. Producer may elect, on its behalf and on behalf of all Comanche Producers as a single election, allocation of its and their Products and settlement of amounts due hereunder based on a methodology assuming either (a) minimized recovery of ethane as a Plant Product ("Ethane Rejection Allocation") or (b) maximized recovery of ethane as a Plant Product ("Full Recovery Allocation") for each Month during the Term, by submitting written notice of such election to Carnero not less than 15 Days prior to the first Day of the applicable Month. In the event Carnero does not timely receive the same election for all Comanche Producers delivering Gas from the Dedicated Acreage, the previous election for which all Comanche Producers delivered timely notice shall remain in effect. The corresponding Product recovery factors for each allocation are set forth in Exhibit C. In the event Producer fails to timely notify Carnero of a change to its election with respect to a given Month, Producer will be deemed to have elected the same allocation as elected for

the prior Month. Producer will not be entitled to cause the Plant to be operated in any particular manner, including to actually minimize or maximize ethane recovery. Carnero will accommodate Producer's request for Ethane Rejection Allocation or Full Recovery Allocation, provided Carnero has available Gas sufficient to operate the Plant to minimize or maximize ethane recovery, as applicable, in accordance with standard industry practice.

## ARTICLE 4
## POINTS OF RECEIPT AND DELIVERY; PRESSURE

**Section 4.1** Receipt Point(s). Subject to the terms of this Agreement, Carnero will receive Producer's Gas at the Receipt Point(s).

**Section 4.2** Delivery Point(s). Subject to the terms of this Agreement, Carnero will deliver Residue Gas to Producer at the Delivery Point(s).

**Section 4.3** Delivery Pressure. Producer will deliver Producer's Gas to Carnero at the Receipt Point(s) at a pressure sufficient to enter the Gathering System against the actual operating pressure, as the same may vary from time to time, but not to exceed Carnero's Maximum System Pressure. Carnero will use commercially reasonable efforts to maintain the pressure in the Gathering System as follows: (i) 1250 psig at the Highway 83 – T2 CDP identified on Exhibit A; and (ii) 1250 psig at the Maverick CDP identified on Exhibit A and the Highway 83 – Carnero CDP identified on Exhibit A. Producer will not be obligated to compress Producer's Gas in order to effectuate delivery of Producer's Gas to Carnero if the pressure in the Gathering System at the Receipt Points exceeds the Maximum System Pressure for such Receipt Point (notwithstanding any higher pressures at which the Gathering System is operated by Carnero hereunder), and any such volumes of Producer's Gas that would require compression in order to enter the Receipt Point at the time of delivery shall be released from the dedication hereunder.

**Section 4.4** Redelivery Pressure. Carnero will deliver Residue Gas at the Delivery Point(s) at the pressures existing in the Redelivery Pipeline(s), from time to time, but not to exceed the maximum allowable delivery pressure of the applicable Redelivery Pipeline.

**Section 4.5** Rate of Flow. Producer will use commercially reasonable efforts to balance the quantities of Producer's Gas delivered to and received from the Carnero System and, if necessary, make adjustments to the rate of Gas production or nominations to balance such receipts and deliveries. Carnero will endeavor to permit up to a 10% variance per Day in receipts and deliveries of Producers' Gas from the Scheduled Quantity for that Day, to the extent such variance does not impede Carnero's compliance with this Agreement, any other agreement, Applicable Law or any permit. In no event will Carnero be obligated to deliver or receive a quantity of Producers' Gas during any given Day that differs by more than 10% from the Scheduled Quantity for such Day. If the actual quantity of Producer's Gas received at the Receipt Point(s) for the account of Producer on any Day differs from the Scheduled Quantity(ies) for such Receipt Point(s), then Carnero shall only be obligated to deliver at the Delivery Point(s) on that Day the lesser of the actual quantity of Residue Gas attributable to Producer's Gas received on that Day or the Scheduled Quantity. The Parties will use commercially reasonable efforts to receive and deliver the Scheduled Quantity at a uniform

hourly rate of flow determined by dividing the Scheduled Quantity by 24. Carnero has (i) no obligation to accept variations from a uniform hourly rate of flow, and (ii) the ability, to be exercised in Carnero's sole discretion, to accept variations based on Carnero's operating conditions, without waiver of the uniform flow requirement set out in this Section.

## ARTICLE 5
## FEES, BILLING, AND PAYMENT

**Section 5.1** Gathering Fee. As consideration for the gathering services performed by Carnero under this Agreement, Producer will pay to Carnero the gathering fee set forth on Exhibit B (the "Gathering Fee").

**Section 5.2** Treating Fee. As consideration for the treating services performed by Carnero under this Agreement, Producer will pay to Carnero the treating fee set forth on Exhibit B (the "Treating Fee").

**Section 5.3** Processing Fee. Carnero will process Producer's Gas in accordance with this Agreement, and Producer will pay Carnero the processing fee set forth on Exhibit B (the "Processing Fee").

**Section 5.4** Compression Fee. Producer will pay Carnero the Compression Fee.

**Section 5.5** Other Fuel Fee. Producer will pay to Carnero the Other Fuel Fee.

**Section 5.6** FL&U, Plant Products and Condensate. In addition to the other charges set forth in this Agreement, Producer hereby conveys to Carnero, and title transfers at the Receipt Point(s) or Additional Plant Product Receipt Point(s), as applicable (free of charge and free of liens or encumbrances of any nature): (a) a quantity of Gas each Month equal to the FL&U attributable to Producer's Gas, (b) all Plant Products allocated to Producer (including, in each case, all components thereof, contained in Producer's Gas at the Receipt Point(s)) (c) all Additional Plant Products; and (d) all Condensate allocated to Producer contained in Producer's Gas at the Receipt Point(s).

**Section 5.7** Payment for Plant Products and Condensate. Carnero will pay Producer each Month for (i) Plant Products allocated to Producer and all Additional Plant Products, an amount equal to: (A) the Plant Products as determined in accordance with the allocation procedure set forth in Exhibit C plus all Additional Plant Products, multiplied by (B) the Product Price, for such Plant Products and Additional Plant Products, multiplied by (C) 100%, plus (ii) Condensate, an amount equal to: (A) the Condensate allocated to Producer as determined in accordance with the allocation procedure set forth in Exhibit C, to the extent recovered from the gathering facilities owned by Carnero, multiplied by (B) the weighted average sales price per gallon for the total volume of Condensate sold by Carnero at the Plant(s) to unaffiliated third parties during the applicable Month in which the Condensate is sold, multiplied by (C) 50%. If no Condensate is sold at the Plant(s) to unaffiliated third parties during the applicable Month, then for that Month, the price will be based on arms-length, third party condensate sale transaction data provided by Carnero in good faith.

**Section 5.8** Statements and Payments.

(a) If required by the Redelivery Pipelines, Carnero will provide the Redelivery Pipelines an allocation each Month for the Residue Gas delivered during the preceding Month on behalf of Producer. Such allocations will be based upon the Redelivery Pipelines' custody transfer measurement volume and allocated by Carnero on a pro-rata basis in accordance with all volumes received on the Carnero System for delivery to the Pipelines.

(b) On or before the 25th of each Month, Carnero will tender to Producer a monthly statement showing for the preceding Month the following:

(i) the actual metered volumes of Producer's Gas received by Carnero at each Receipt Point in Mcf and MMBtu;

(ii) Producer's allocated share of the Residue Gas delivered to the Residue Gas Delivery Point(s) (in MMBtu);

(iii) the Plant Fuel, Gathering L&U, Compression Fuel, shrinkage attributable to Producer's Condensate and Product Shrinkage allocated to Producer at each Receipt Point;

(iv) the volumes of Producer's Products;

(v) the applicable Product Price(s);

(vi) the volumes of Condensate;

(vii) the Gathering Fees;

(viii) the T&F Fees;

(ix) the Compression Fees, if any;

(x) the Treating Fees, if any;

(xi) the Processing Fees;

(xii) the Other Fuel Fees;

(xiii) any Imbalance cashout charges or credits;

(xiv) any amounts due Carnero pursuant to the terms of Section 17.7 hereof; and

(xv) the total net amount due to Producer or Carnero, as the case may be, under this Agreement.

(c) The Parties agree that all amounts owed under this Agreement (other than for indemnity obligations) will be netted between the Parties on a Monthly basis. If the monthly

statement reflects Carnero owes Producer, Carnero will remit the balance due on or before the last Day of the Month, or if the monthly statement reflects Producer owes Carnero, Producer will remit the balance due Carnero within ten calendar Days after their receipt of the Carnero monthly statement, provided that if the payment date is not a Business Day, payment is due on the next Business Day following that date. Carnero will have the right to pay and invoice each Comanche Producer independently and, upon Carnero's request, Producer shall promptly provide all information necessary for Carnero to calculate payments and invoices for each Comanche Producer and to make such payments to the Comanche Producers. If Carnero elects to pay the Comanche Producers directly, the payments will be made on the same terms and Carnero will have the same rights with respect to each Comanche Producer (including netting) as with the payments to Producer. If Producer is in default, Carnero will use commercially reasonable efforts to pay and invoice each Comanche Producer independently. Payment will be by ACH or wire transfer to the following accounts (which may be changed by such Party with advance written notice), as applicable:

Payments to Carnero:
For the account of: Carnero G&P LLC
Bank: JP Morgan Chase
ABA: 021000021
Account Number: 263735760

Payments to Producer:
For the account of: SN EF Maverick, LLC
Bank: SunTrust Bank
ABA: 061000104
Account Number: 1000205698318

(d) If a Party fails to pay the entire undisputed amount of any invoice when the amount is due, the other Party may bill such nonpaying Party a charge for late payment which will be included by the other Party on the next regular invoice rendered, or by separate invoice. The charge for any late payment for amounts that are not disputed in good faith will be equal to the product of (i) the unpaid, undisputed portion of the invoice, times (ii) the ratio of the number of Days from the due date to the date of actual payment to 365, times (iii) the prime interest rate, as in effect from time to time, as published in the *Wall Street Journal*, plus 2% per annum; provided, however, that in no event will such interest rate exceed the maximum rate permitted by law.

(e) As to each individual Comanche Producer, in the event such Comanche Producer owes Carnero a net payment as set forth in the monthly statement provided pursuant to this Section 5.8, Carnero has the right to demand from such Comanche Producer Adequate Assurance of Performance for any of its obligations under this Agreement or its Ratification Agreement. In any event where Adequate Assurance of Performance is required by Carnero, it shall be posted by the relevant Comanche Producer within five (5) Business Days of written notice.

**Section 5.9** Annual Rate Adjustment. On June 1st of each year beginning in 2019, all fees for services by Carnero in accordance with this Agreement (including the Gathering

Fee, the Treating Fee, the Processing Fee, and the Compression Fee, but excluding the Other Fuel Fee (the "Fees")) shall be adjusted by the product of the Fees then in effect multiplied by the percentage increase (if any) between the Consumer Price Index (All Urban Consumers (CPI-U); U.S. City Average; All items, 1982-1984 reference base, issued by the United States Department of Labor, Bureau of Labor Statistics ("BLS") (the "CPI")) for January of the current year and the CPI for January of the immediately preceding year. For avoidance of doubt, in no event shall the Fees be reduced below those in effect for the immediately preceding year. If the 1982-1984 reference base is no longer used as the standard reference base by BLS, then the standard reference base shall be that chosen from time to time by BLS.

**Section 5.10** Disputed Statement. If Producer, in good faith, disputes any billing or statement, Producer will pay to Carnero any undisputed amount and will notify Carnero in writing within ten (10) calendar days following receipt of Carnero's invoice that Producer disputes other amounts, which notice will include adequate documentation demonstrating the amount of and basis for the dispute. The Parties will endeavor in good faith to resolve such dispute within thirty (30) Days following Carnero's receipt of such notice. Producer waives the right to dispute or challenge any invoice or statement if Producer does not dispute or challenge that invoice or statement in a written notice in accordance with the preceding sentence delivered to Carnero within twenty-four (24) Months after the invoice or statement was issued.

**Section 5.11** Examination of Books. Carnero and Producer, upon notice in writing to the other Party and upon execution of a mutually acceptable confidentiality agreement which is typical of this type of audit, with neither Party's consent to agree to such mutually acceptable confidentiality agreement to be unreasonably withheld, will have the right to examine and audit, at all reasonable times, books, records and charts of the other Party to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation within the 24-Month period following the Month in which the same was rendered or made under or pursuant to this Agreement. This examination right will not be available with respect to any proprietary information or any information not directly relevant to transactions under this Agreement.

**Section 5.12** Information. Carnero and Producer will each preserve all books, records and charts applicable to this Agreement, including all test and measurement data and charts, for a period of at least 24 Months following the end of each calendar year, or such longer periods as will be required under law or regulation.

## ARTICLE 6
## NOMINATIONS, SCHEDULING AND IMBALANCES

**Section 6.1** Submission. Producer will submit nominations for Producer's Gas to the attention of the Gas Scheduling Department of Carnero, or its designee, in writing via Electronic Bulletin Board ("EBB"), or when such EBB is unavailable, by fax, email or other electronic means designated by Carnero.

**Section 6.2** Nominations. The deadline for submitting nominations each Month is 9:00 a.m. (Central Time), two Business Days prior to the beginning of each Month. Producer may nominate quantities of Producer's Gas up to the MDQ each Day on a Firm basis and in

excess of the MDQ each Day on a Priority Interruptible basis (subject in all cases to Section 3.5) and the nomination must include the following:

(a) Producer's name, contact name, email address and phone number;

(b) contract number assigned by Carnero;

(c) daily quantity of Producer's Gas to be received by Carnero at each Receipt Point;

(d) daily quantity of Residue Gas to be delivered by Carnero to the Residue Gas Delivery Point(s);

(e) daily quantity of Producer's Gas that is produced from interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement;

(f) begin date for the nomination and end date for the nomination (not to extend past the last Day of the Month in which Gas would first flow under the nomination); and

(g) Producer's contract numbers with upstream and downstream Persons from whom Producer's Gas will be received and to whom Residue Gas will be delivered.

**Section 6.3** Daily Changes. By 9:00 a.m. Central Time on the Day before Producer's Gas is desired to flow, Producer may submit to Carnero a change to the Monthly nomination made in accordance with Section 6.2; provided, however, Producer may submit any number of subsequent nomination changes subject to the then-current scheduling practices used by intrastate and interstate pipelines to schedule natural gas transportation services and the following sentence. Producer shall make each nomination and Carnero shall confirm such nomination and schedule the nominated Producer's Gas or Residue Gas for delivery in conformance with the North American Energy Standards Board ("NAESB") timeline, as may be revised by NAESB from time to time.

**Section 6.4** Waiver of Nomination Requirements. Carnero, in its reasonable discretion, may accept nominations at such later time as operating conditions permit, and may waive any nomination requirement. Notwithstanding anything to the contrary, however, Carnero will not be obligated to provide service under this Agreement on any Day on which Producer does not nominate volumes pursuant to the procedures in this Agreement. It is understood by Producer that Producer is the sole responsible Party for Monthly nominations of Comanche Producer volumes into the Redelivery Pipelines. It is further understood by Producer that Producer is the sole responsible Party for daily, Monthly and cumulative Imbalances of Comanche Producer volumes with the Redelivery Pipelines.

**Section 6.5** Discrepancies in Nomination. If a discrepancy exists between Producer's nominated volumes and volumes confirmed by the Redelivery Pipeline for Producer at the Delivery Point(s), Carnero will notify Producer and Producer will be responsible for correcting the discrepancy and will timely re-nominate the corrected volumes. If the discrepancy is not resolved on a timely basis, the "corrected volumes" will be the lesser of the

volumes nominated by Producer at the Delivery Point(s) and the volumes confirmed by the Redelivery Pipeline.

**Section 6.6** Imbalances. "Imbalance" means the cumulative difference in a Month between (1) the Receipt Quantity, and (2) the Delivery Quantity.

(a) Producer's Gas to be gathered under this Agreement will be received, gathered and delivered by Carnero as set forth in Section 4.5, to the extent it is consistent with the operating conditions on the Carnero System as described in this Agreement. The quantities of Producer's Gas received from Producer and Residue Gas delivered to, or for the account of, Producer will be kept in balance on a daily as well as Monthly basis. It is the intent of Carnero and Producer that any variance, or Imbalance be minimal and incidental. Carnero may establish operational balancing agreements with Redelivery Pipelines.

(b) Each Party will notify the other Party as soon as practicable when it becomes aware of an Imbalance in receipts or deliveries. Carnero will provide written, oral or electronic notification to Producer of any Imbalance in receipts and deliveries, and Carnero and Producer will promptly make adjustments in receipts and deliveries as are consistent with Carnero's operating conditions in order to balance any Imbalance so shown. Carnero will settle any Imbalances each Month by using the methods set forth in this Section 6.6. In addition, there will be a final cashout immediately upon or following the termination of this Agreement, and in this regard, the provisions of this Section 6.6 will survive the termination of this Agreement. Carnero, at any time and with notice to Producer, may initiate an operational flow order to protect its pipeline operations that limits receipts and deliveries and requires hourly and daily rates of flow to be uniform and in balance. In such event, Carnero may adjust Producer's Scheduled Quantity to comply with the operational flow order.

(c) If for any Month the Receipt Quantity is less than the Delivery Quantity, then Producer will be deemed to be "Underdelivered" for such Month. If for any Month the Receipt Quantity is greater than the Delivery Quantity, then Producer will be deemed to be "Overdelivered" for such Month.

(d) Each Month, Overdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Carnero to Producer (by direct payment or offset) at a price equal to the applicable Cashout Percentage multiplied by the Cashout Price for each such tier set forth in Table A below and adding together the results of each calculation for such Month:

Table A

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤ 5% | 100% |
| >5% but ≤10% | 90% |
| >10% but ≤15% | 85% |
| >15% but ≤20% | 80% |
| > 20% | 75% |

(e) Each Month, Underdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Producer to Carnero at a price equal to the applicable Cashout

Percentage multiplied by the Cashout Price for tier set forth in Table B below and adding together the results of each calculation for such Month:

Table B

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤5% | 100% |
| >5% but ≤ 10% | 110% |
| >10% but ≤ 15% | 115% |
| >15% but ≤ 20% | 120% |
| >20% | 125% |

(f) Imbalance Indemnity. PRODUCER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD CARNERO HARMLESS FROM AND AGAINST ANY PENALTIES, FINES, FEES, LOSSES, CLAIMS, CAUSES OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE), OR JUDGMENTS OBTAINED (INCLUDING THE PAYMENT OF REASONABLE ATTORNEYS' FEES AND COURT COSTS) AGAINST CARNERO BY (I) ANY UPSTREAM OR DOWNSTREAM PIPELINES, (II) ANY PARTY WITH CURTAILED CAPACITY, AND (III) ANY OTHER THIRD PARTY, TO THE EXTENT ARISING OUT OF OR CAUSED BY IMBALANCES BETWEEN THE RECEIPT POINT(S) AND THE DELIVERY POINT(S) FROM PRODUCER'S FAILURE TO TIMELY BALANCE RECEIPTS AND DELIVERIES ON THE CARNERO SYSTEM.

(g) Safety. Carnero has no obligation to receive Imbalances from Producer; provided, however, if Producer continues to deliver a quantity of Producer's Gas at the Receipt Point(s) that results in delivery in excess of or less than the Scheduled Quantity to be received by Producer at the Delivery Point(s) and such Imbalance, as determined by Carnero acting in its sole discretion, jeopardizes the safety of Carnero's operations or its ability to meet its contractual commitments to others, Carnero has the right to (i) vent, without being held liable to Producer, all or such part of that excess quantity as Carnero, in its reasonable discretion, deems necessary; (ii) cease receipt of all or any portion of Producer's Gas at the Receipt Point(s) if Carnero, in its reasonable discretion, deems that action necessary; or (iii) cease delivery of all or any portion of Residue Gas at the Delivery Point(s) if Carnero, in its reasonable discretion, deems that action necessary.

## ARTICLE 7
## POSSESSION AND RESPONSIBILITY

**Section 7.1** Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination: (i) while such Gas is within Producer's control and possession; or (ii) to the extent arising from or relating to Producer's operation of its facilities, the failure of

Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO).

**Section 7.2** Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, (i) while such Gas is within Carnero's control and possession; or (ii) to the extent arising from or relating to Carnero's operation of the Carnero System (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof), the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER).

## ARTICLE 8
## TITLE, WARRANTY, TAXES AND INDEMNIFICATION

**Section 8.1** Title, Warranty, Taxes and Indemnity.

(a) Producer warrants that it (i) has good and merchantable title and right to Producer's Gas (other than Third Party Gas) delivered to Carnero (including all components thereof), and that Producer's Gas will be free and clear of any and all liens, encumbrances and adverse claims of every kind (other than the lien described in Section 9.343 of the Texas Business and Commerce Code) and (ii) has the right to deliver all Third Party Gas delivered by Producer to Carnero hereunder. If the title to Gas delivered by Producer hereunder is disputed or is involved in any legal action, or if Carnero becomes aware of a claim that Producer is not disbursing funds received hereunder to a party entitled thereto, Carnero shall have the right to withhold payment (without interest), or cease receiving the Gas, to the extent of the interest or amount disputed or involved in legal action, during the pendency of the action or until the funds or title, as applicable, are freed from the dispute, or until Producer furnishes, or causes to be furnished, indemnification to save Carnero harmless from all claims arising out of the dispute or action, including penalties and interest, with surety acceptable to Carnero. Producer will pay all taxes levied on Gas that Producer delivers to Carnero at the Receipt Point(s), except

for income taxes, ad valorem, and property or similar taxes based upon the assessed value of the Carnero System. PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND SAVE CARNERO HARMLESS FROM AND AGAINST ANY AND ALL ROYALTIES, TAXES ALLOCABLE TO PRODUCER UNDER THIS AGREEMENT, PAYMENTS, LIENS, ENCUMBRANCES, SUITS, ACTIONS, CAUSES OF ACTION (WHETHER IN TORT OR IN CONTRACT), CLAIMS AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS BY TAXING AUTHORITIES OR THIRD PARTIES CLAIMING OWNERSHIP OF OR AN INTEREST IN GAS TENDERED UNDER THIS AGREEMENT OR FUNDS DERIVED THEREFROM (INCLUDING THE FL&U, PLANT PRODUCTS, CONDENSATE, COMPRESSION FUEL AND PLANT FUEL CONTAINED THEREIN, AND THE ADDITIONAL PLANT PRODUCTS, EACH OF WHICH ARE HEREBY CONVEYED TO CARNERO). CARNERO WARRANTS THAT RESIDUE GAS TENDERED FOR DELIVERY TO PRODUCER AT THE DELIVERY POINT(S) WILL BE FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. CARNERO AGREES TO INDEMNIFY, DEFEND, AND SAVE PRODUCER HARMLESS FROM AND AGAINST ALL CLAIMS AND DEMANDS TO THE EXTENT INCURRED BY PRODUCER ON ACCOUNT OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(b) Producer agrees to receive all payments for Gas sold hereunder, including payments for working interests, royalties, and other burdens, and to disburse such payments to the parties legally entitled thereto in strict accordance with the provision of the leases or agreements creating the respective interests of such parties, or as otherwise required by Applicable Law. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all losses, including interest, arising out of or in any way related to Carnero’s disbursement of proceeds in accordance with the terms of this Agreement, and Producer agrees to indemnify and reimburse Carnero for any amount attributable to an interest erroneously claimed by Producer and/or paid by Carnero. Producer shall notify Carnero in writing of any future change in ownership or payment address and shall furnish Carnero with recorded documentation with respect thereto.

**Section 8.2** Substances Recovered in Pipeline. All substances, whether or not of commercial value, of whatever nature (excluding Residue Gas, Plant Products, and Condensate), which Carnero recovers in the course of rendering the gathering and processing services, will be Carnero’s sole property, and Producer hereby conveys those substances to Carnero free and clear of any liens, claims, or other encumbrances. Except for payments expressly due Producer hereunder, Carnero will not be obligated to account to Producer for any value, whether or not realized by Carnero that may attach or be said to attach to such substances.

## ARTICLE 9
## TERM

This Agreement will commence on the Effective Date and remain in full force and effect until the fifteenth anniversary of the Effective Date (the "Initial Term") and will continue on a year to year basis thereafter unless and until terminated by either Carnero or Producer upon at least 90 Days' written notice to the other Party prior to the fifteenth anniversary of the Effective Date or any subsequent anniversary thereof (the "Term").

## ARTICLE 10
## QUALITY AND MEASUREMENT

**Section 10.1** Quality Specifications.

(a) Producer's Gas received and delivered at each Receipt Point will meet the following quality specifications:

(i) Oxygen – not to exceed 5 parts per million by volume;

(ii) Hydrogen Sulfide - not to exceed 4 parts per million by volume;

(iii) Total Sulfur - including mercaptans and hydrogen sulfide, not to exceed one grain per one hundred cubic feet of Gas;

(iv) Carbon Dioxide - not to exceed 2% by volume;

(v) Liquids - the Gas will be free of water and other objectionable liquids at the temperature and pressure at which the Gas is delivered;

(vi) Dust, Gums and Solid Matter - the Gas will be commercially free of dust, gums, gum forming constituents, inerts, and other media or solid matter;

(vii) Gross Heating Value - have a Gross Heating Value of not less than 1200 Btu per cubic foot;

(viii) Minimum GPM - have not less than 4.0 gallons of ethane plus natural gas liquids per Mcf of Producer's Gas;

(ix) Temperature - have a temperature of not less than 40° Fahrenheit and not more than 120° Fahrenheit;

(x) Nitrogen - not to exceed 1% by volume and total inert Gases not to exceed 3% by volume;

(xi) Water Vapor - not more than seven pounds per MMcf;

(xii) Other - not to contain any carbon monoxide, halogens or unsaturated hydrocarbons; and

(xiii) Hazardous Waste - not to contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976.

(b) If Producer delivers Gas not meeting the specifications set forth in Section 10.1(a) (as those specifications may be modified as provided in Section 10.1(c)), Carnero, upon written notice to Producer, has the right to (i) cease accepting deliveries of such non-specification Gas at the Receipt Point(s), or (ii) accept Gas not meeting the above specifications and charge a mutually agreeable out of specification fee; provided, however, that if the Parties cannot agree on such fee, Producer will cease deliveries of such non-specification Gas unless or until such Gas once again meets, or is brought into compliance with the specifications required in this Agreement.

(c) Notwithstanding the specifications in Section 10.1(a), should the operator of any Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline notify Carnero of different or additional quality specifications required for the receipt of Gas from the Carnero System, then Carnero will notify Producer of any such different or additional specifications as soon as practicable after being notified by the operator of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline, and such specifications will, upon Producer's receipt of such notice, modify the above quality specifications in Section 10.1(a) (other than Section 10.1(a)(vii) and Section 10.1(a)(viii)) to meet the most stringent quality specifications of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline for as long as required by the operator thereof.

(d) To the extent that Producer tenders Gas at the Receipt Points meeting the specifications set forth in Section 10.1(a), Carnero shall deliver to Producer at the Delivery Point Gas meeting the specifications of the applicable Redelivery Pipeline.

**Section 10.2** Indemnification for Non-Specification Gas. Each Party hereby indemnifies and holds the other Party, and its Affiliates, subsidiaries and parent, and its and their employees, officers, directors, partners, members, managers, agents and insurers harmless from and against any and all losses, costs, damages, liabilities, claims, actions or expense (including court costs and attorneys' fees) of whatsoever nature whether arising out of contract, tort or strict liability arising from the indemnifying Party's delivery of Gas which (a) in the case of Producer, fails to comply with Section 10.1(a) and (b) in the case of Carnero, fails to comply with Section 10.1(d).

**Section 10.3** Additional Fees, Costs or Penalties. If a Redelivery Pipeline (or any pipeline downstream thereof) imposes additional fees, costs or penalties upon Carnero for the receipt of non-specification Gas, Carnero may, in its sole discretion, assess such additional fees, costs or penalties upon all producers, including Producer, which contributed to such additional fees, costs or penalties, on a pro-rata basis.

**Section 10.4** Measurement.

(a) For billing and payment purposes, Producer's Gas received and Residue Gas delivered under this Agreement will be measured by metering facilities installed, operated and maintained by Carnero or its designee. Such measurement stations shall be equipped with orifice meters or ultrasonic flow measurement devices. Carnero shall install composite

sampling devices and/or on line chromatographs at each Receipt Point. Producer shall not be permitted to install samplers or chromatographs or any other metering facilities at any Receipt Point.

(b) The measurement of Producer's Gas at Receipt Point(s) and Residue Gas at Delivery Point(s) will be conducted in accordance with the following:

(i) Measurement under this Agreement will be based on the Unit of Volume. The Unit of Volume shall be corrected for actual water vapor, at a pressure and temperature existing at the point of measurement, by applying industry accepted practices and procedures. All quantities given herein, unless expressly stated, are in terms of such unit. The average atmospheric pressure will be assumed to be fourteen and seven-tenths (14.7) pounds per square inch, irrespective of the actual natural atmospheric pressure from time to time. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8 *Compressibility Factors of Natural Gas and Other Hydrocarbon Gases*, as last amended.

(ii) Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association in AGA Report # 3, Orifice Metering of Natural Gas, ANSI/API 2530, latest revision or AGA Report #9, Measurement of Gas by Multi-path Ultrasonic Meters.

(iii) The specific gravity of the Gas will be determined at the points of measurement by one of the following methods, selected in Carnero's reasonable discretion: (1) an online chromatograph, (2) continuous sampling, or (3) spot sampling.

(iv) The temperature when Gas is flowing, the factor for specific gravity according to the latest test therefor and the corrections for deviation from Boyle's Law applicable during each metering period will be used to make proper computations of Gas volumes measured under this Agreement.

(v) At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will obtain a representative sample of the Gas at each point of measurement under this Agreement. The Gross Heating Value of Gas will, at Carnero's option, be determined at each point of measurement: (1) by an online chromatograph, (2) by a continuous sampler, or (3) by spot samples, taken by Carnero or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. The Gross Heating Value shall be computed per GPA standard 2172, *Calculation of Gross Heating Value, Relative Density, Compressibility and Theoretical Hydrocarbon Liquid Content for Natural Gas Mixtures for Custody Transfer*, and converted to the condition specified in the definition of Unit of Volume. The physical constants used in Btu computation for a perfect Gas

will be derived from the *"Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds"* as published in the GPA Standard 2145 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $CH_6$. The $CH_6$+ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Carnero's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample. The method to be used for chromatographic analysis will be that contained in GPA standard 2261, *Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography* and any superseding revisions thereof.

(vi) At Carnero's discretion, other types of Btu per cubic foot measuring devices may be installed and operated, and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(vii) If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, both Parties agree that this Agreement will be amended accordingly.

(viii) Carnero, or its designee, will install, own, operate and maintain industry standard type measuring and testing equipment necessary to measure and test Gas transported under this Agreement and will keep the same accurate and in good repair. At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will verify the accuracy of Carnero's measuring and testing equipment. Data editing, calibrations, repairs and adjustments of Carnero's measuring and testing equipment will be done only by employees of Carnero or its designated representatives. Producer or its designated representative may, in the presence of an employee of Carnero or Carnero's designated representative, have access to Carnero's measuring and analyzing equipment at any reasonable time, and has the right to witness tests, calibrations and adjustments thereof. All tests scheduled under this Agreement will be preceded by reasonable notice to Producer. Upon the request of Producer for a special test of any meter or auxiliary equipment, Carnero will permit an independent third party selected by Producer to witness a test of the accuracy of same; provided, however, that the cost of such special test will be borne by Producer, unless the percentage of inaccuracy found is more than 2% of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries. If the resultant aggregate inaccuracy in the computed receipts is not more than 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate. All equipment will, in any case, be adjusted at the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the

last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction will be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test, or (ii) 45 Days.

(ix) If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other methods mutually acceptable to both Parties.

(x) Upon request of Producer and if an EFM is installed, Carnero will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within 30 Days; provided, however, that Carnero will provide only such EFM data that relates to Producer's Receipt Point(s) or wells, as the case may be, and not to the Carnero System. Carnero's measurement audit package for a given Month will be deemed correct if no written objection thereto is served on either Party by the other within the year following any Month, but the same will be retained for a two-year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Carnero's premises during normal business hours.

(xi) Producer, at its sole cost and expense, may install, operate and maintain, but in the same manner as is required for Carnero's equipment under this Agreement, check measuring and testing equipment of standard type; provided that the same does not interfere with the operation of Carnero's equipment. Sharing of the meter tube, meter taps, sensing lines, or data signals of Carnero's meter shall not be permitted as part of the check meter installation. The measurement and testing of Gas under this Agreement or for purposes of this Agreement will, nevertheless, be effected only by Carnero's equipment, except as provided in Section 10.4(b)(ix) above. Carnero has the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer hereunder with respect to Carnero's metering and testing equipment.

(xii) If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Carnero that pulsations exist that affect the measurement accuracy, the operator of the facility or facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(xiii) If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, in Carnero's reasonable discretion,

employing such new method or technique is advisable. Carnero will notify Producer in writing of any such election prior to actually implementing such substitution.

## ARTICLE 11
## FORCE MAJEURE AND CURTAILMENT

**Section 11.1** Force Majeure. Except with regard to indemnity obligations and payment obligations under this Agreement, neither Carnero nor Producer will be liable in damages to the other for any act, omission, or circumstances occasioned by or in consequence of any blockades, insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, storms, hurricanes and tropical storms or threat of such, extreme cold or freezing weather, lightning, restraint of rulers and peoples, civil disturbances, terrorist activities, explosions, maintenance (whether routine or non-routine, or scheduled or unscheduled) or breakage of or accidents to machinery, lines of pipe or any portion of the Carnero System, the failure of any upstream or downstream pipeline to take Gas, Plant Products or Additional Plant Products or to install, repair or operate facilities to receive Gas, Plant Products or Additional Plant Products, the order of any court or governmental authority having jurisdiction, or any other cause, whether of the kind in this Agreement enumerated or otherwise, in each case, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome (any such event, "Force Majeure"). Neither the inability to obtain rights-of-way, easements, equipment, materials or labor on terms reasonably acceptable to Carnero, in its sole discretion, nor the failure to prevent or settle any strike or strikes, will be considered a matter reasonably within the control of the Party claiming suspension and each is excluded from any diligence or remedial requirements under this Agreement. For avoidance of doubt, any delay or inability of Carnero to obtain on terms acceptable to Carnero, acting in its sole discretion, any necessary permits or rights-of-way and any delay in receiving or inability to obtain equipment, material or labor, will be deemed to be a Force Majeure event.

**Section 11.2** Performance Excused; Mitigation Duty. The Party experiencing the condition of Force Majeure shall be excused from performance under this Agreement (except with regard to amounts due or becoming due hereunder, credit matters, or with regard to any indemnity obligations), and shall not be liable for any failure to perform (excepting the above-mentioned exceptions) during a Force Majeure Event. Except as provided herein, the Party experiencing a Force Majeure event shall use commercially reasonable efforts to mitigate the effects of any Force Majeure Event and to remedy any inability to perform its obligations hereunder due to such events (except as provided in Section 11.1) as promptly as reasonably practicable.

**Section 11.3** Notices. If any Force Majeure Event should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall: (a) state the date that the Force Majeure Event began, (b) describe the Force Majeure Event, and (c) provide an estimate of the date the condition of Force Majeure shall cease.

**Section 11.4** Force Majeure Release. If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or due to insufficient capacity or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer

may deliver such Gas to third parties for transportation or gathering or processing, provided, that, except to the extent otherwise provided in Article 3, Producer shall not enter into any agreements with third parties for transportation or gathering or processing services with respect to temporarily released Gas for a term greater than 30 Days, except as provided otherwise in Section 3.1.

**Section 11.5** Curtailment by Redelivery Pipeline. If any of the Redelivery Pipelines to which Carnero is delivering Residue Gas curtails physical receipts or deliveries of Residue Gas or experiences operating constraints, then subject to Section 3.5, Carnero will make commercially reasonable efforts to deliver Residue Gas under this Agreement to other Redelivery Pipelines.

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 12.1** Carnero's General Representations and Warranties. Carnero represents and warrants to Producer as follows:

(a) Carnero is a limited partnership formed and validly existing under the laws of the State of Texas;

(b) Carnero has all requisite power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or instrument to which Carnero is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Carnero or of the constituent documents of Carnero; and

(d) this Agreement has been duly executed and delivered by Carnero and all documents required hereunder to be executed and delivered by Carnero have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Carnero enforceable in accordance with their respective terms.

**Section 12.2** Producer's Representations and Warranties. Producer represents and warrants to Carnero as follows:

(a) Producer is a limited liability company formed, validly existing and in good standing under the laws of the State of Delaware;

(b) Producer has the requisite corporate, limited liability company or limited partnership power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or

instrument to which Producer is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to such Producer or of the constituent documents of Producer; and

(d) this Agreement has been duly executed and delivered by Producer and all documents required hereunder to be executed and delivered by Producer have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Producer enforceable in accordance with their respective terms.

## ARTICLE 13
## ASSIGNMENT

**Section 13.1** Assignment.

(a) Neither Party may assign or otherwise convey all or any portion of its right, title, or interest under this Agreement without obtaining the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed, and any purported assignment without such consent will be void; provided, that (i) either Party may assign this Agreement to a third party acquiring all or substantially all of the assets of such Party that are directly or indirectly subject to this Agreement, without the consent of the other Party, (ii) Carnero may assign this Agreement to an Affiliate without the consent of Producer, (iii) either Party may grant a security interest in its right, title and interest in, to and under this Agreement to secure any credit facility or indebtedness (including obligations under any swap agreement) of such Party or its Affiliates without the consent of the other Party, (iv) Carnero may assign this Agreement without Producer's consent in connection with a sale or transfer of the Carnero System, and (v) Producer may assign or partially assign this Agreement without Carnero's consent in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage; provided, in the case of clause (v), that the credit assurance requirements hereunder are continuously complied with by Producer and its assignee prior to and after any assignment by Producer.

(b) Any transfer in accordance with this Section 13.1, shall require, as a condition to its effectiveness, the transferee (other than any grantee under any lien, pledge, encumbrance or security interest) to assume in writing the obligations and liabilities of the transferor under this Agreement to the extent arising from and after the effective date of the assignment (including in the case of Producer, the dedication set forth in Section 3.1). No transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Carnero until the first of the month following the date Carnero has received a copy of the recorded transfer document or other proof satisfactory to Carnero that the claimant is legally entitled to such interest. Notwithstanding anything to the contrary herein, no assigning Party will be released from any of its obligations or liabilities under this Agreement.

## ARTICLE 14
## FAILURE TO PAY; REMEDIES

**Section 14.1** Producer Default. The following shall constitute events of "Default" by Producer under this Agreement:

(a) if Producer fails to pay any amount to Carnero when the same is due, and Producer's account remains delinquent beyond a 10-Business Day period following receipt by Producer of written notice of such delinquency, exclusive of any amounts subject to a good faith dispute;

(b) if Producer fails to post credit assurance as required pursuant to Section 5.8(e), and such failure continues for a period of five Business Days after the date such credit assurance is required under Section 5.8(e);

(c) if Producer experiences an Insolvency Event; and

(d) if Producer is in material breach of this Agreement (other than for failure to pay amounts due, which is addressed in Section 14.1(a) or failure to post credit assurance in accordance with Section 5.8(e), which is addressed in Section 14.1(b)), and that breach or default is not cured within 45 Days after receipt by Producer of written notice from Carnero asserting a breach or default.

For purposes of this Article 14, "Insolvency Event" means, with respect to any Person, such Person (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or a regulator, supervisor or similar official, in each case which is not dismissed, discharged, stayed or restrained in each case within 60 Days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, dissolution or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 Days thereafter; or (viii) takes any action in furtherance of, or consents to or approves of any of the foregoing acts.

**Section 14.2** Remedies. Carnero shall have the following remedies:

(a) if Producer is in Default, Carnero may, in addition and without prejudice to any other remedies Carnero may have under this Agreement or at law or in equity, suspend receipts,

deliveries and/or payments under this Agreement and/or terminate this Agreement, in each case upon written notice;

(b) if Producer fails to pay any amount due Carnero when the same is due, except for amounts disputed in good faith, Carnero may, in addition to any other remedy it may have under this Agreement, upon two Days prior written notice: (i) suspend further receipts and deliveries of Producer's Gas until such amount is paid, (ii) require advance payment in cash or payment on a more frequent billing cycle and/or (iii) require Producer to post credit support in accordance with Section 5.8(e). If Producer does not timely provide the security required pursuant to this Section 14.2(b) Carnero shall be entitled to terminate this Agreement upon written notice to Producer; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

**Section 14.3** Carnero Default. The following shall constitute events of "Default" by Carnero under this Agreement:

(a) if Carnero fails to pay any amount due Producer when the same is due, and Carnero's account remains delinquent beyond a 10-Day period, exclusive of any amounts subject to a good faith dispute;

(b) if Carnero experiences an Insolvency Event; and

(c) if Carnero is in material breach of this Agreement (other than as described in Section 14.3(a) and such material breach is not cured within 45 Days after receipt by Carnero of written notice from Producer asserting such material breach.

**Section 14.4** Producer Remedies. If Carnero is in Default, Producer may:

(a) suspend deliveries of Dedicated Gas to Carnero and transport or process such Dedicated Gas on another gathering system or at another gas processing plant and/or terminate this Agreement, in each case upon written notice;

(b) suspend payment under this Agreement upon written notice; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

## ARTICLE 15
## CHOICE OF LAW; DISPUTE RESOLUTION; JURISDICTION; VENUE

**Section 15.1** Choice of Law. This Agreement will be interpreted, construed, and governed by the laws of the state of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

**Section 15.2** Dispute Resolution. Before submitting any dispute for resolution by a court, a Party will provide written notice to the other of the occurrence of such dispute. If the

Parties fail to resolve the dispute within 15 Business Days after such notice is given, then the Parties will seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel will endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within 30 Days after the original notice of dispute is given, then either Party may pursue any remedies available at law or in equity, but this Section 15.2 does not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 15.2 if application of such limitations would prevent a Party from filing a lawsuit or Claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

**Section 15.3** Jurisdiction; Venue. Each Party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement exclusively in any federal or state court in Houston, Harris County, Texas. IN CONNECTION WITH CLAIMS ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF, EACH PARTY (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SPECIFIED COURTS; (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THOSE COURTS; AND (III) WAIVES ANY OBJECTION THAT THOSE COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY. EACH PARTY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM RELATING TO THIS AGREEMENT.

## ARTICLE 16
## NOTICES

**Section 16.1** Notices. Any notice, request, demand, statement, bill, payment or other communication provided for in this Agreement or any notice which any Party may desire to give to the other, will be in writing and will be considered as duly delivered if delivered by mail, commercial courier, facsimile, e-mail or personally, to the addresses, e-mail addresses or facsimile numbers of the applicable Parties, and to the attention of their respective contact persons, as follows:

Carnero: Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: South Texas Contract Administration
Phone: 918-925-3500
Fax: 918-925-3533
E-mail: TPLcontractadmin@targaresources.com

Producer: SN EF Maverick, LLC
1000 Main, Suite 3000
Houston, Texas 77002
Attn: Contracts Admin
Phone: 713-783-8000
Fax: 713-783-9993

E-mail: contractsadmin@sanchezog.com

Statements and invoices may also be delivered via email to the designated addresses set forth above. Either Party may at any time and from time to time by written notice to the other Party designate different persons or addresses for notice.

Notices will be deemed received: (a) if sent by first class mail, upon the postmark date when properly addressed and deposited in the United States mail, first class postage prepaid; (b) if sent by facsimile, upon the sending Party's receipt of its facsimile machine's confirmation of successful transmission, provided that if the Day on which such facsimile is sent is not a Business Day or is after 5:00 p.m. on a Business Day in the receiving Party's jurisdiction, then such facsimile will be deemed to have been delivered on the next Business Day; (c) if sent by commercial courier, upon the date of actual delivery as evidenced by the recipient's written acknowledgment of receipt; (d) if delivered personally, upon the date of actual delivery; and (e) if by e-mail, upon the date of an express confirmation of receipt of such e-mail by the intended recipient (which confirmation such recipient shall be obligated to deliver reasonably promptly).

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 17.1** Counterparts. This Agreement may be executed in two counterparts, including those delivered by facsimile or other electronic means, each of which when so executed and delivered will be an original, and such counterparts together will constitute one instrument.

**Section 17.2** Entire Agreement. This Agreement, including the Exhibits referenced in and attached to this Agreement, contain the entire agreement of Carnero and Producer with respect to the matters addressed in this Agreement and will be amended only by an instrument in writing signed by both Parties. The Parties acknowledge that this Agreement will be deemed and considered for all purposes as prepared through the joint efforts of the Parties and will not be construed against a Party as a result of the preparation, submittal, negotiation or drafting of this Agreement.

**Section 17.3** Mutual Waiver of Certain Remedies. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OTHER THAN REASONABLE ATTORNEYS' FEES AND COURT COSTS AND DAMAGES INDEMNIFIED AGAINST IN SECTION 10.2, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE FOR: (A) ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES; OR (B) FOR LOST OR DELAYED PRODUCTION OR LOST BUSINESS OPPORTUNITY, IN EACH CASE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY BREACH HEREOF, INCLUDING CLAIMS ARISING IN CONTRACT, TORT OR OTHERWISE (OTHER THAN SUCH DAMAGES OR LOSSES PAID OR OWED TO A PERSON NOT A PARTY TO THIS AGREEMENT OR A RATIFICATION AGREEMENT (OTHER THAN AN AFFILIATE OF A PARTY)). THIS SECTION 17.3 WILL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR OTHER FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS

PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.

**Section 17.4** Confidentiality. Carnero, Producer and any other Comanche Producer (upon execution of a Ratification Agreement), and their respective employees, agents, officers, directors, Affiliates and attorneys, will keep the terms of this Agreement confidential. It is understood and agreed upon that disclosure of the terms of this Agreement to any Person who is not a Party to this Agreement could result in damage to non-disclosing Party for which the disclosing Party may be held liable. However, any of the foregoing Persons disclosed in the first sentence of this Section 17.4 may disclose the terms of this Agreement, without prior permission of any Party, to the following Persons ("Representatives") in the following circumstances:

(a) to any potential contractors or professional consultants or advisers engaged by or on behalf of such Person and acting in that capacity where such disclosure is essential to such Representative's work;

(b) to financial institutions and other financing sources requiring such disclosure as a condition precedent to making, continuing or renewing a loan or making an investment in such Person or its Affiliates;

(c) as required by regulatory bodies, including the U.S. Securities and Exchange Commission and any stock exchange to which such Person or its Affiliates are subject, taxing authorities with jurisdiction over part or all of the subject matter of this Agreement and to other Persons to whom disclosure is required by such regulatory bodies;

(d) to courts or other tribunals having jurisdiction and requiring such disclosure, and to other Persons to whom disclosure is required by such courts or other tribunals;

(e) to current or prospective partners or joint venturers or purchasers of the assets or equity of such Person and their Affiliates;

(f) to independent certified public accountants for purposes of obtaining a financial audit; and

(g) as required by subpoena or other legal discovery processes;

provided, however, each Person shall be liable for breach of this Section 17.4 by its Representatives.

**Section 17.5** Consent to Disconnection. If this Agreement terminates for any reason whatsoever, Producer hereby consents and agrees that Carnero may disconnect any wells, leases, pipeline connections or other facilities utilized by Producer that deliver Producer's Gas at the Receipt Point(s) under this Agreement. "Disconnect" for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which Producer's Gas was delivered under this Agreement that are either owned by Carnero, or owned by the pipeline with which Carnero contracted for the gathering or transportation

services at the Delivery Point(s). This consent and agreement by Producer in this paragraph applies to both Carnero and Carnero's Affiliates, without distinction, and is intended in all respects to satisfy the laws, rules or regulations of any applicable jurisdiction.

**Section 17.6** Governmental Regulations; Change in Regulations. This Agreement will be subject to all valid applicable state, local and federal laws, orders, directives, rules and regulations of any Governmental Authority having jurisdiction over this Agreement and the gathering, treating and processing of Producer's Gas and delivery of Residue Gas under this Agreement.

**Section 17.7** Change in Law Costs. If in Carnero's reasonable determination there is a Change in Law resulting in a Governmental Authority requiring Carnero to incur any cost in connection with the sale, purchase, gathering, treating and processing of Producer's Gas or ownership or operation of the Carnero System, Carnero may charge Producer a fee to compensate Carnero for Producer's proportionate share of such cost (based on Producer's aggregate volumes utilizing the Carnero System for the applicable period as compared to the aggregate volumes of other parties utilizing the Carnero System for such period) from the earlier of (i) the date such Change in Law becomes effective or (ii) the date such costs are first incurred.

**Section 17.8** No Waiver. No waiver by either Party of any default of the other Party under this Agreement will operate as a waiver of any future default, whether of a like or different character or nature.

**Section 17.9** Survival. The provisions of Section 17.4 will survive any expiration or termination of this Agreement for a period of one year. The respective indemnification obligations of the Parties set forth in this Agreement will survive any expiration or termination of this Agreement. Any expiration or termination of this Agreement will not relieve Carnero or Producer of any accrued obligations to pay monies due, if any, to the other Party or any obligations to settle any Imbalances due, if any, to the other Party or a Redelivery Pipeline, or any other obligations incurred or accrued before any expiration or termination of this Agreement.

**Section 17.10** Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable because it is contrary to Applicable Law, all other provisions of this Agreement shall nevertheless remain in full force and effect, and the Parties hereby agree to amend the Agreement (and/or enter into other mutually acceptable agreements or arrangements) to the extent necessary to effect the original intent of the Parties and maintain the Parties' relative economic burdens and benefits, as closely as possible.

**Section 17.11** Producers' Representative.

(a) Producer is hereby appointed by each Person executing a Ratification Agreement as their representative ("Producers' Representative") with respect to all matters arising under this Agreement, including but not limited to the following:

(i) To give and receive all notices, and to make all payments due to Carnero;

(ii) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(iii) To receive all payments and disburse such payments to each Person executing a Ratification Agreement, to the extent legally entitled thereto; and

(iv) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the Agreement.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producers' Representative on behalf of each Person included within the definition of Producer or Comanche Producer as fully and with the same effect as though each such Person had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producers' Representative designated above, or designate a new Producers' Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of Producer and each Person executing and delivering a Ratification Agreement. Producers' Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producers' Representative. Each Person executing and delivering a Ratification Agreement shall be liable to Carnero in accordance with the terms set forth therein.

(b) Notwithstanding the terms of Section 17.11(a) above, the obligations of each Comanche Producer shall be several and not joint to the extent of the Producer's Share, as set forth in the Ratification Agreement.

(c) Carnero agrees that, without prejudice to any other rights it may have in respect of any Default by Producer, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, this Agreement due to any default by Producer that is capable of being cured by the Comanche Producers without first notifying each Comanche Producer in writing of the nature and details of such default with reasonable specificity and providing each Comanche Producer 30 days (or in the case of a payment default, 10 Business Days) following such Comanche Producer's receipt of such notice to cure such default, including the right to step into the position of Producer and assume the obligations and responsibilities of Producer hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share (as defined in the applicable Ratification Agreement) of such responsibilities and obligations. If a Comanche Producer cures the default within such 30 day (or in the case of a payment default, 10 Business Day) period in accordance with the terms of this Agreement, then as to such Comanche Producer, the default will be deemed cured in accordance with this Agreement and Producer and Carnero will not have any further right against such Comanche Producer (to the extent arising due to the cured default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise

terminate, this Agreement with respect to such Comanche Producer. For clarity, Carnero may provide the notice required by this paragraph to the Comanche Producers concurrently with or after notices provided to Producer under Section 14.1.

*(Signatures Follow on Next Page)*

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________

Name: ______________________

Title: ______________________

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________________

Name: Antonio R. Sanchez III

Title: Chief Executive Officer

**EXHIBIT A**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**Receipt Point(s); Delivery Point(s)**

**Receipt Point(s)**

| ***Meter Number*** | ***Receipt Point*** | ***Maximum Receipt Capacity (MMcf/d)*** |
|---|---|---|
| 4043654 | Maverick CDP | 235 MMcfd |
| 4043653 | Highway 83 – Carnero CDP | 75 MMcfd |
| 2048026 | Highway 83 – T2 CDP* | 75 MMcfd |

**Delivery Point(s)**

| ***Meter Number(s)*** | ***Residue Gas Delivery Point(s)*** | |
|---|---|---|
| 4034034 | Western | 115 MMcfd |
| TBD*** | Eagle Ford Midstream Pipeline (NET)** | 150 MMcfd |
| 4034036 | SECO | 250 MMcfd |
| 02-T2-09-8090 | TPL SouthTex Transmission Company LP* | 35 MMcfd |
| 02-T2-09-3630 | TPL SouthTex Transmission Company LP* | 35 MMcfd |

*Deliveries to Silver Oak II Plant only

**Potential future Delivery Point – there is no current interconnect

***Meter number not currently available

# EXHIBIT B

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## FEES

Gathering Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement at the same fees, the Gathering Fee shall be $0.15 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Treating Fee (based on $CO_2$ content and Mcf as determined at the Receipt Point(s)):

| | |
|---|---|
| If $CO_2$ content is 2.00% or less | no fee |
| If $CO_2$ content is greater than 2.0% | **To be determined when service is required.** |

Compression Fee: **To be determined when compression is required**

Processing Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement, the Processing Fee shall be $0.253 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Gathering and Processing Fees for Excess Gas: The Gathering Fee, Treating Fee, Compression Fee, and Processing Fee set forth above shall apply with respect to the Firm Volumes (as determined with respect to the then-effective MDQ) and the Priority Interruptible volumes that Carnero accepts under the terms of Section 3.4 of the Agreement. Carnero may refuse to accept any Excess Gas for gathering and processing under this Agreement due to lack of available capacity on the Carnero System. All Excess Gas that Carnero does not accept from Producer shall be, at Producer's sole discretion, temporarily released from the dedication hereunder, subject to the following paragraph.

Producer will give Carnero not less than one hundred twenty (120) days prior written notice and the applicable production projections and forecast, identifying the scope, source and nature of the applicable volumes in reasonable detail (the "Excess Gas Notice") in the event Producer anticipates delivering volumes of Excess Gas on a continuing basis for which Carnero has insufficient capacity on the Carnero System and which Carnero does not accept. Within forty-five (45) days following delivery of Producer's Excess Gas Notice, Carnero may, acting in its sole discretion, propose to accept Excess Gas at adjusted gathering and processing fees (the "Adjusted Gathering, Treating, Compression and Processing Fees"), mutually agreed between the parties that are reflective of: (i) Carnero's capital expenditures (including a reasonable return

on investment with respect to such expenditures); and (ii) any incremental expenses, fees or other costs, in each case, with respect to the receipt, gathering, processing and redelivery (including delivery of contractually allocated Residue Gas and Plant Products) of Producer's Gas. Within ninety (90) days following receipt of Producer's Excess Gas Notice, Producer and Carnero shall negotiate in good faith to arrive at mutually agreeable Adjusted Gathering, Treating, Compression and Processing Fees and an incremental maximum daily quantity, including the period during which such fees will be effective. If Producer and Carnero are unable to agree on the Adjusted Gathering, Treating, Compression and Processing Fees during the Negotiation Period, then Producer may enter into negotiations with a third party for the gathering, processing or redelivery of the Excess Gas. Once Producer has substantially negotiated definitive agreements with a third party, such that all commercial terms (and terms allocating risk) have been finally determined (the "Third Party Offer"), Producer will provide such agreements to Carnero and offer to Carnero, by irrevocable written notice, the option to enter into such agreements, with such changes as are necessary to reflect usage of Carnero's facilities and Carnero shall have 30 days after receipt of the Third Party Offer to elect to accept the Third Party Offer, except that the Receipt Point(s) and Redelivery Point(s) shall be the same as the Receipt and Redelivery Point(s) set forth under this Agreement. In the event that Carnero declines to accept the Third Party Offer, Producer may thereafter elect to cause such Excess Gas to be permanently released from dedication under this Agreement; provided that in no event will Excess Gas be released under this provision if such release would cause (or be reasonably expected to cause) Producer to not be able to deliver the then existing MDQ hereunder.

# EXHIBIT C

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## Allocations

1. Allocation of Producer's Condensate. A share of Condensate recovered by Carnero upstream of the Plant(s) will be allocated to Producer each Month in accordance with the following formula:

$$\text{Producer's Share of Condensate} = AC \times \frac{PHV}{THV}$$

Where:

AC = the aggregate volume of Condensate delivered from the Carnero System for such Month;

PHV = the total MMBtus attributable to the C5+ component of Producer's Gas gathered and received at all Receipt Point(s) during such Month; and

THV = the total MMBtus attributable to the C5+ component of all Gas gathered and received in the Carnero System upstream of the Plant(s) during such Month.

2. Allocation of Producer's Products.

(a) In the event Producer has elected Full Recovery Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated in paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 90% |
| Propane | 96% |
| Butanes plus | 99% |

(b) In the event Producer has elected Ethane Rejection Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated under paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 35% |
| Propane | 94% |
| Butanes plus | 99% |

(c) At Carnero's election, Carnero may implement a different allocation methodology that it determines, in good faith, provides for a reasonable allocation of Plant Products.

3. Residue Gas. Producer's allocated share of Residue Gas for all Receipt Point(s) under this Agreement will be the quantity of Producer's Gas, in MMBtus, as measured at all Receipt Point(s), minus each of the following: (i) FL&U, (ii) shrinkage attributable to Producer's Condensate and (iii) Product Shrinkage. Plant Fuel, Gathering L&U and Compression Fuel (each as comprising a part of FL&U), Product Shrinkage and shrinkage attributable to Producer's Condensate will be determined as follows.

(a) Producer's share of Plant Fuel, stated in MMBtus, will be determined each Month by multiplying the actual quantity of MMBtus utilized or incurred in the operation of the Plant(s) for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee), use requirements and Gas lost as a result of, but not limited to, leakage, venting or flaring, discrepancies due to meter inaccuracies or variations of temperature and/or pressure at the Plant(s), as well as any Gas that is otherwise unaccounted for in the Plant(s) by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas delivered to the inlet of the Plant(s) during that Month, and (ii) the denominator of which is the total MMBtus attributable to all Gas delivered to the inlet of the Plant(s) during such Month.

(b) Producer's share of Gathering L&U, stated in MMBtus, will be determined each Month by multiplying the actual Gas that is lost and Gas that is unaccounted for in the Gathering System (which is the total MMBtus attributable to all Gas received into the Gathering System, less the total MMBtus attributable to all Gas delivered to facilities downstream of the Gathering System, less Compression Fuel and less shrinkage attributable to Condensate), by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) and transported on the Gathering System during that Month, and (ii) the denominator of

which is the total MMBtus attributable to all Gas received into and transported on the Gathering System during such Month.

(c) Producer's share of Compression Fuel, stated in MMBtus, will be determined each Month by multiplying the actual fuel in MMBtus used by Carnero in the operation of the compression facilities by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) during that Month that require compression at the compression facilities, and (ii) the denominator of which is the total MMBtus attributable to all Gas received into the Carnero System during such Month that require compression at the compression facilities.

(d) Producer's allocated share of product shrinkage (the "Product Shrinkage") for each Month will be the aggregate Btus determined by multiplying the gallons of each Plant Product, by component, of Producer's Products at all Receipt Point(s) by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145*, and superseding revisions thereof, and as adjusted to 60º Fahrenheit and a 14.73 psia pressure base.

(e) Producer's allocated share of shrinkage attributable to Producer's Condensate will be calculated by Carnero each Month by multiplying the number of gallons of each component of Condensate attributable to Producer's Gas by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145,* and superseding revisions thereof, and as adjusted to 60° Fahrenheit and a 14.73 psia pressure base. The aggregate Btu of all such components will constitute the shrinkage attributable to Producer's Condensate hereunder.

**EXHIBIT D**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**DEDICATED ACREAGE**

**For SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is all of Maverick, Webb, Dimmit and LaSalle Counties, Texas.**

**For each Comanche Producer other than SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is such Comanche Producer's existing right, title and interest as of the Effective Date (excluding any after acquired interest) in and to lands, leaseholds, property rights, and/or wells (and the right to produce Gas therefrom) located in the area circled in red in the below diagram, excluding Mexico.**



**EXHIBIT E**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**MEMORANDUM OF AGREEMENT**

THIS MEMORANDUM OF Agreement (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), among SN EF Maverick, LLC, a Delaware limited liability company ("Producer"), and Carnero G&P LLC, a Delaware limited liability company ("Carnero").

**RECITALS**

WHEREAS, on the Effective Date, Producer and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "Agreement") under which Carnero agreed to provide gas gathering and gas processing services to Producer for its benefit and for the benefit of certain other producers;

WHEREAS, Producer and Carnero desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreement and certain provisions contained therein.

1. **Term**. The term of the Agreement commenced on the Effective Date and continues in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the Agreement is terminated by Carnero or Producer upon at least 90 days' written notice to the other Party prior to the expiration of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreement, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreement and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreement or otherwise excluded as provided in the Agreement) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage, excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released or excluded from the Dedication in accordance with the Agreement (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, treat, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreement.

Case 4:20-cv-01587 Document 53-9 Filed on 05/08/20 in TXSD Page 54 of 61

4. **Covenant Running with the Land**. So long as the Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns.

5. **Incorporation of Terms**. The terms and conditions of the Agreement are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreement in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreement.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

Producer and Carnero have signed this Memorandum as of the date first above written, but effective as of the Effective Date.

**CARNERO:**
**CARNERO G&P LLC**

By: ___________________________
Name: _________________________
Title: __________________________

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ___________________________
Name: _________________________
Title: __________________________

**THIS INSTRUMENT PREPARED BY:**

_________________
_________________
_________________
Attention: _________

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

# EXHIBIT A TO MEMORANDUM OF AGREEMENT

## DEDICATED INSTRUMENTS

See attached.

# EXHIBIT F

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## EXISTING COMMITMENTS

Residue Gas Commitment Agreements

1. Firm Gas Transportation Agreement dated October 1, 2012 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC and associated amendments if any
2. Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP and associated amendments if any
3. Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any
4. Firm Intrastate Gas Transportation Agreement dated March 01, 2013 between Anadarko E&P Onshore, LLC and Springfield Pipeline, LLC and associated amendments if any
5. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any
6. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any
7. Firm Transportation Agreement dated October 05, 2010 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any
8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any
9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

11. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

Natural Gas Liquids Commitment Agreements

1. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

2. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

3. Firm Transportation Agreement dated October 01, 2009 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

4. Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko Energy Services Company dated March 1, 2012, and associated amendments if any

5. Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, dated March 1, 2012, and associated amendments if any

6. Raw Make (Y-Grade) Purchase and Sale Agreement between Anadarko E&P Onshore LLC and Plains Gas Solutions LLC, dated August 1, 2015, and associated amendments if any

7. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

# EXHIBIT G

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## TRANSPORTATION AND FRACTIONATION FEE

A. For the first four (4) Contract Years during the Term, T&F Fee (expressed in cents per gallon) shall mean the following:

T&F Fee (expressed in cents per gallon) = (Combined T&F Fee) + (.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

B. Beginning on the fourth (4th) anniversary of the Effective Date and continuing for the remainder of the Term, the T&F Fee shall be comprised of each of the following components:

(i) Transportation Fee: means the actual out-of-pocket cost for transportation of Producer's Products, including any (i) pipeline transportation or exchange fees; (ii) truck and tank car rental fees incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product; and (iii) any other out-of-pocket costs incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product (other than take or pay fees or demand charges), plus (ii) Fractionation Fee (expressed in cents per gallon) = (Base Fractionation Fee) + [(.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

where:

*Combined T&F Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product

*Base Fractionation Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product, adjusted annually beginning on the 5th anniversary of the Effective Date by multiplying the then effective Base Fractionation Fee by the FERC Index

*FERC Index* means the FERC Oil Pipeline Index "Multiplier to Use", as published by the Federal Energy Regulatory Commission pursuant to 18 CFR 342.3, or its successor index then in effect.

*Gas Price* means the sum of (i) the Houston Ship Channel-Index (HSC) as published in the first issue of such Month of INSIDE FERC's GAS MARKET REPORT (or any replacement thereof mutually agreeable to the Parties if it is no longer published), expressed in $/MMBtu, plus (ii) a market differential expressed in $/MMBtu, which is currently $0.15/MMBtu. Producer acknowledges that the market differential represents Carnero's best approximation of the costs reasonably to be incurred by a fractionator of all natural gas fuel being delivered to the fractionator in relation to the HSC Index, and

that Carnero may change the market differential as utilized in determining the T&F Fee as warranted by market conditions.

*Electricity Price means* the average cost of purchased electricity (expressed in dollars/kWh) at the fractionator for the Month prior to the Month in which Producer's Plant Products or Additional Plant Products were delivered to the fractionator.

*Execution Version*

**AMENDMENT TO**

**FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT**

This Amendment to Firm Gas Gathering, Processing and Purchase Agreement, (this "Amendment"), is effective as of the 1st day of April, 2018 (the "Effective Date") and is entered into by and among SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC (collectively the "Producers") and Carnero G&P LLC ("Carnero"). Carnero and each Producer are each referred to herein individually as a "Party" and collectively as the "Parties".

**Recitals**

A. Effective as of the Effective Date, SN EF Maverick, LLC and Carnero entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (the "FGGPPA").

B. Also effective as of the Effective Date, each of the other Producers ratified the FGGPPA pursuant to a Ratification Agreement, by and among such Producer, Carnero and SN EF Maverick, LLC (each, a "Ratification Agreement").

C. The Parties desire to amend the FGGPPA as set forth herein.

**Agreement**

For and in consideration of the foregoing and the mutual covenants and agreements contained herein and in the FGGPPA and the Ratification Agreements, and intending to be legally bound hereby, the Parties hereby agree as follows:

1. Amendment of FGGPPA. The FGGPPA is hereby amended as follows:

(a) The following definitions are inserted in Section 1.1 of the FGGPPA in appropriate alphabetic order:

""Carnero Group" has the meaning set forth in Section 7.1."

""Producer Group" has the meaning set forth in Section 7.2."

(b) Section 7.1 of the FGGPPA is deleted and replaced with the following:

"Section 7.1 Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully

responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination arising from: (i) such Gas while such Gas is within Producer's control and possession; (ii) the failure of Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof; or (iii) the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "CARNERO GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO GROUP)."

(c) Section 7.2 of the FGGPPA is deleted and replaced with the following:

"Section 7.2 Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, arising from: (i) such Gas while such Gas is within Carnero's control and possession (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof); or (ii) the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "PRODUCER GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING

TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER GROUP)."

2. Effectiveness. All matters contemplated in this Amendment will become effective, for all purposes, as of the Effective Date.

3. Effect on FGGPPA and Ratification Agreements. Except as expressly amended by this Amendment, the FGGPPA remains in full force and effect. The Parties acknowledge and agree that this Amendment shall in no manner impair or affect the validity or enforceability of the FGGPPA or any Ratification Agreement.

4. Counterparts. This Amendment may be executed in any number of counterparts (including by .pdf or other electronic means), each of which shall be an original but all of which together shall constitute one instrument.

**[Signature Pages Follow]**

The Parties have executed this Amendment as of the day and year first above written.

**CARNERO G&P LLC**

By: ______________________ GRS

Name: Patrick J. McDonie

Title: President

**SN EF MAVERICK, LLC**

By: ________________________

Name: Antonio R. Sanchez, III

Title: Chief Executive Officer

**EAGLE FORD TX LP**

By: [signature]

Name: Joo hyo Lee

Title: Treasury and Commercial Manager

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**GAVILAN RESOURCES, LLC**

By: ______________________

Name: David E. Roberts Jr.

Title: Chief Executive Officer

**VENADO EF L.P.**

By: ______________________

Name: Stacy Shivers

Title: VP of Operations

# EXHIBIT 3

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**SN EF UnSub LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas



015673

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

______________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF UnSub GP, LLC, the general partner of SN EF UnSub LP, a Delaware limited partnership, on behalf of said partnership.

______________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

______________________________
Notary Public, State of _____________

**EXHIBIT A**

**DEDICATED INSTRUMENTS**

**All of Producer's right, title and interest in and to lands, leaseholds, property rights, and/or wells (and the right to produce gas therefrom) located in Maverick, Webb, Dimmit and LaSalle Counties, Texas, including the instruments listed on the attached Exhibit A.**

# EXHIBIT 4

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case solely with respect to Producer's Share of such representations and warranties and obligations and subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, or otherwise satisfy Producer's Share of such payment or obligation; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Termination. This Agreement shall terminate in its entirety upon the earlier to occur of (i) termination of GGPA, or (ii) the mutual written agreement between Parties. Upon termination Producer shall not have any further obligations or liability under this Agreement beyond that prescribed in the GGPA.

10. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Eagle Ford TX LP**

By:________________________________
Name:
Title:

**Carnero G&P LLC**

By:________________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name:
Title:

**Eagle Ford TX LP**

By: 이주효
Name: Joohyo Lee
Title: Treasury and Commercial Manager

**Carnero G&P LLC**

By:________________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By: [signature] GPS
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**Eagle Ford TX LP**

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Eagle Ford TX LP, a Texas limited partnership, on behalf of said partnership.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

# EXHIBIT 5

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as such term is defined in the GGPA). In addition, if Carnero seeks payment directly from Producer as

permitted in Section 5.8(c) of the GGPA, Producer will have the rights provided in Sections 5.10 and 5.11 of the GGPA to dispute such invoices and audit the records applicable to such invoices.

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Venado EF L.P.**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name:
Title:

**Venado EF L.P.**

By: Venado EF GP LLC, its general partner

By:________________________________
Name: Stacy L. Shivers
Title: Vice President – Operations

**Carnero G&P LLC**

By:________________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Venado EF L.P.**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**Venado EF L.P.**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

______________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Venado EF L.P., a Delaware limited partnership, on behalf of said partnership.

______________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

______________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

# EXHIBIT 6

**RATIFICATION AND ASSUMPTION AGREEMENT**

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is dated May 22, 2018, to be effective as of April 1, 2018, by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

**RECITALS**

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Gavilan Resources, LLC**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name: David E. Roberts Jr.
Title: Chief Executive Officer

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is dated May ____, 2018, to be effective as of April 1, 2018 (the "Effective Date"), by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**Gavilan Resources, LLC**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED ACREAGE**

**Maverick, Webb, Dimmit and LaSalle Counties, Texas**

**The area circled in red in the below diagram**



# EXHIBIT 7

MEPTX
Mitsui E&P Texas LP

SN EF Maverick, LLC
1000 Main St. Suite 3000
Houston, TX 77002
Attn: John Happ

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: Patrick McDonie

Attn: Mr. John Happ and Mr. Patrick McDonie

RE: Retained Take-In-Kind Rights of Mitsui E&P Texas LP in Volumes Committed to the Raptor Gas Processing Facility in La Salle County, Texas

This Letter Agreement ("Agreement") is hereby entered into by and among Mitsui E&P Texas LP, a Texas Limited Partnership ("Mitsui") and SN EF Maverick, LLC, a Delaware Limited Liability Company ("Sanchez") and Carnero G&P LLC, a Delaware Limited Liability Company ("Carnero"), dated this ___ day of April, 2018 and effective as of April 1, 2018 ("Effective Date"). Mitsui, Sanchez and Carnero may be referred to herein individually as "Party", or collectively as "Parties.

Whereas, Mitsui and Sanchez are now parties to that certain Maverick Natural Gas Liquids Marketing Agreement dated effective January 1st, 2012, and that certain Maverick Residue Gas Marketing Agreement dated effective January 1st, 2012 (the "PMAs"), and said PMAs give broad powers to Sanchez as a marketer of Mitsui's share of gas and natural gas liquids (collectively, "Products") produced from the contract areas of seventeen joint operating agreements to which both Mitsui and Sanchez are parties ("Comanche Area"), and said marketing powers include the ability to enter into certain contracts with third parties covering the gathering, treating, processing, transportation, etc., of Mitsui's Products ("Commitment Agreements").

Whereas, if Mitsui rejects a Commitment Agreement per the PMAs, then said Commitment Agreement is deemed a "Rejected Commitment Agreement" under the PMAs, and Mitsui retains the right to take-in-kind its Products as to any excess volumes over and above the volumes committed pursuant to that particular Rejected Commitment Agreement.

Whereas, Sanchez is now considering entering into a Firm Gas Gathering Processing and Purchase Agreement with Carnero for gas produced from the Comanche Area ("the FGGPPA"), and the FGGPPA would be considered a new Commitment Agreement under the PMAs requiring a written election by Mitsui to either approve or reject the FGGPPA.

Whereas, prior to the inception of the FGGPPA, Mitsui rejected a Commitment Agreement dated September 1st, 2016 committing an aggregate of 299,000 MMBtus/day in volumes in the Comanche Area to the Brasada gas processing plant currently owned by WGR Operating, LP in La Salle County, Texas, resulting in Mitsui's ability to take its Products in-kind as to any volumes in excess of the 299,000 MMBtus/day committed to the Brasada plant ("Mitsui Excess Production").

Now, therefore, in consideration of the premises and covenants contained herein, the Parties hereby agree as follows:

1. In accordance with the election procedures provided for in the PMAs, Mitsui shall hereby agree to grant in writing via a ballot its consent to, and acceptance of, Sanchez entering into the FGGPPA with Carnero, resulting in the FGGPPA becoming a Commitment Agreement under the PMAs. However, irrespective of the FGGPPA's status as an accepted Commitment Agreement under the PMAs and of any terms of the PMAs to the contrary, subject to Paragraph 2. below, Mitsui shall retain its right to take the Mitsui Excess Production in-kind throughout the "Initial Term" of the FGGPPA (as said term is defined in the FGGPPA).

2. Notwithstanding Mitsui's retained right to take the Mitsui Excess Production in-kind pursuant to Paragraph 1. above, and subject to Paragraph 3. below, Mitsui hereby agrees and promises to not exercise its right to take the Mitsui Excess Production in-kind during the entire Initial Term of the FGGPPA, to the extent such Mitsui Excess Production would be dedicated to the FGGPPA under the terms thereof as if Mitsui had ratified the FGGPPA as a Comanche Producer (as defined in the FGGPPA).

3. It is hereby understood by the Parties that if, during the Initial Term, the FGGPPA is subsequently amended or the terms thereof waived by Sanchez and Carnero without Mitsui's prior written consent (but excluding elections or actions expressly contemplated by Section 2.1 (to the extent providing for connection of Additional CGPs, new wells or Released Wells within the Dedicated Acreage), Section 3.1 (to the extent providing for releases of volumes of Gas), Section 3.3(a) (to the extent authorizing reductions in MDQ), Section 3.7 (relating to ethane rejection/recovery elections), Section 5.9 (to the extent providing for annual adjustments in fees), Section 10.1(c) (to the extent providing for modification of specifications based upon specifications of Redelivery Pipelines or T2 Pipeline) and Section 10.4(b)(vii) (to the extent adopting revised GPA standards) of the FGGPPA), and said amendment or waiver is:

a. Adverse or disadvantageous to Mitsui's interests or the marketing of Mitsui's Products as determined by Mitsui in its reasonable discretion, when such amendment or waiver addresses:

   i. Fees (other than implementation of the existing annual adjustment in Section 5.9);
   ii. Purchase price for Plant Products, Additional Plant Products and Condensate;
   iii. Imbalance cash out arrangements and the Cashout Price;
   iv. Treatment of disputed billing statements and audit rights;
   v. Plant Products, Additional Plant Products and Condensate allocation procedures in Exhibit C;
   vi. Change to the Dedicated Acreage (other than as a result of lease termination);
   vii. Elimination of any Receipt Point or Delivery Point;
   viii. Change to the Maximum Daily Quantity, or Maximum Receipt Capacity for any Receipt Point, other than pursuant to Section 3.3;
   ix. Alteration of Carnero's obligations described in Section 3.2 or 11.5;
   x. Procedures, costs and standards for connection of new wells and Additional CGPs as set out in Section 2.1;
   xi. Producer's reservations in Section 2.3;
   xii. Treatment of Subject Volumes not accepted, as described in Section 3.1(c) or Producer's Gas volumes not accepted as a result of Force Majeure or other reasons under Sections 3.1(d), (e) and (f) and Section 11.4, or otherwise;
   xiii. Priorities, whether under Section 3.3(b), Section 3.5, or otherwise; or
   xiv. Term of the Agreement; or

b. materially adverse or materially disadvantageous to Mitsui's interests or the marketing of Mitsui's Products in cases other than those set forth in Paragraph 3(a),

(each such amendment or waiver, an "Amendment"), then Sanchez and Carnero may proceed with the Amendment; however Paragraph 2. above shall no longer have any force or effect, and Mitsui shall again have the right to take the Mitsui Excess Production in-kind. This right to take-in-kind by Mitsui shall take effect sixty (60) days from the effective date of any Amendment which Mitsui did not consent to in writing. Notwithstanding the preceding, before exercising its right to take in kind under this Agreement, Mitsui shall send notice to Sanchez and Carnero, and Sanchez and Carnero shall have thirty (30) days following receipt of notice (which may fall within the sixty (60) day period noted above) in which to retract the Amendment, revise the Amendment so it does not apply in any manner to Mitsui and Mitsui's Products, or reach an alternate solution accepted by Mitsui in writing, in which case the right to take in kind shall no longer apply with respect to that specific Amendment (without prejudice to Mitsui's rights with respect to any subsequent proposed amendment or waiver). If sixty (60) days have passed since the effective date of the relevant Amendment, and the thirty (30) day cure period for Sanchez and Carnero under the preceding sentence has passed

without resolution, then Mitsui is free to commence taking the Mitsui Excess Production in kind, notwithstanding any provisions of the PMAs to the contrary..

4. Provided that the consent requirement of Paragraph 3. above is complied with at all times, in the event the PMAs expire, in whole or in part, prior to the expiration of the Initial Term of the FGGPPA, then Mitsui agrees that Sanchez can continue to market Mitsui's Products to the extent necessary and required by the FGGPPA throughout the entire Initial Term of the FGGPPA and Mitsui will execute a mutually-acceptable form of agreement with Sanchez providing for such rights.

5. Provided that the consent requirement of Paragraph 3. above is complied with at all times, Mitsui agrees that, without prejudice to any other rights it may have against Sanchez for any default or failure to perform its duties and obligations under the PMAs with respect to the FGGPPA ("Default"), Mitsui will not suspend deliveries of gas under, or otherwise suspend performance under, or terminate, any PMA in a manner that would impact Sanchez's performance of or ability to perform its then-existing commitments under the FGGPPA due to any default by Sanchez that is capable of being cured by Carnero without first notifying Carnero in writing of the details of any such Default with reasonable specificity, providing Carnero a copy of the applicable PMA, and providing Carnero 30 days (or in the case of a payment default, 10 business days) following Carnero's receipt of such notice to cure such Default on behalf of Sanchez. If Carnero, in its sole discretion, cures the Default within such 30-day (or in the case of a payment default, 10 business day) period in accordance with the terms of the applicable PMA, the Default will be deemed cured in accordance with the applicable PMA and Mitsui will not have any further right (to the extent arising due to that cured Default) to suspend performance under, or otherwise terminate, the applicable PMA.

6. So long as Mitsui is not exercising its right to take Mitsui Excess Production in-kind and the FGGPPA is still in effect, Carnero agrees that, without prejudice to any other rights it may have in respect of any default by Sanchez under the FGGPPA, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA in a manner that would impact Mitsui's production, marketing and sale of Products, or ability to produce, market and sell Products, due to any default by Sanchez that is capable of being cured by Mitsui without first notifying Mitsui in writing of the nature and details of such default with reasonable specificity and providing Mitsui 30 days (or in the case of a payment default, 10 business days) following Mitsui's receipt of such notice to cure such default, including the right to step into the position of Sanchez and assume the obligations and responsibilities of Sanchez hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share of such responsibilities and obligations. If Mitsui, in its sole discretion, cures the default within such 30 day (or in the case of a payment default, 10 business day) period in accordance with the terms of the FGGPPA, then as to Mitsui, the default will be deemed cured in accordance with the FGGPPA and Sanchez and Carnero will not (to the extent arising due to the cured default) suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA with respect to Mitsui's Producer's Share. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Comanche

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:____________________

Its: SVP & COO

Dated: May 9th, 2018

SN EF Maverick, LLC

By:____________________

Its:____________________

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:____________________________

Its:____________________________

Dated:__________________________

SN EF Maverick, LLC

By: [signature]
Antonio R. Sanchez, III

Its: Chief Executive Officer

Dated:______________________________

Carnero G&P LLC

By:__________________________________

Its:__________________________________

Dated:______________________________

Dated:______________________________

Carnero G&P LLC

By: ______________________________ GPS

Its: President

Dated:______________________________

# EXHIBIT 8

# District Courts

## Activity Detail from September 1, 2020 to September 30, 2021

**County: Harris**

**92.3 Percent Reporting Rate**

**12 Reports Received Out of a Possible 13**

**CIVIL CASES**

| | Injury or Damage | | | | | | Real Property | |
|---|---|---|---|---|---|---|---|---|
| Cases on Docket: | **Motor Vehicle** | **Medical Malpractice** | **Other Professional Malpractice** | **Product Liability - Asbestos/ Silica** | **Other Product Liability** | **Other Injury or Damage** | **Eminent Domain** | **Other Real Property** |
| **Cases Pending 9/1/2020:** | | | | | | | | |
| *Active Cases* | 21,297 | 494 | 85 | 243 | 236 | 4,446 | 67 | 7,657 |
| *Inactive Cases* | 902 | 28 | 12 | 3 | 15 | 348 | 4 | 340 |
| Docket Adjustments | 156 | (3) | (1) | (3) | 22 | 14 | 1 | 64 |
| **Cases Added:** | | | | | | | | |
| New Cases Filed | 14,255 | 274 | 31 | 36 | 58 | 2,807 | 21 | 7,951 |
| Other Cases Reaching Docket: | | | | | | | | |
| *Cases Reactivated* | 2,634 | 39 | 10 | 1 | 20 | 544 | 8 | 2,090 |
| *All Other Cases Added* | 279 | 2 | 3 | 4 | 4 | 215 | 1 | 74 |
| **Total Cases On Docket** | 38,621 | 806 | 128 | 281 | 340 | 8,026 | 98 | 17,836 |
| **Dispositions:** | | | | | | | | |
| Change of Venue Transfers | 3 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| Default Judgments | 236 | 0 | 1 | 0 | 1 | 46 | 0 | 77 |
| Agreed Judgments | 3,186 | 34 | 8 | 1 | 11 | 679 | 11 | 5,967 |
| Summary Judgments | 120 | 2 | 6 | 1 | 2 | 80 | 0 | 74 |
| Final Judgments: | | | | | | | | |
| *After Non-Jury Trial* | 18 | 0 | 0 | 0 | 0 | 10 | 15 | 31 |
| *By Jury Verdict* | 30 | 1 | 0 | 0 | 1 | 5 | 0 | 2 |
| *By Directed Verdict* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Dismissed for Want of Prosecution* | 1,423 | 12 | 4 | 0 | 5 | 238 | 2 | 146 |
| *Non-Suited or Dismissed by Plaintiff* | 1,729 | 28 | 5 | 31 | 13 | 362 | 1 | 150 |
| All Other Dispositions | 4,747 | 88 | 12 | 4 | 39 | 972 | 10 | 883 |
| **Total Cases Disposed** | 11,492 | 165 | 36 | 37 | 72 | 2,397 | 39 | 7,330 |
| **Placed on Inactive Status** | 3,027 | 50 | 10 | 3 | 19 | 658 | 7 | 2,054 |
| **Cases Pending 9/30/2021:** | | | | | | | | |
| *Active Cases* | | | | | | | | |
| *Inactive Cases* | | | | | | | | |

## CIVIL CASES

| Cases on Docket: | Contract: Consumer/ Commercial/ Debt | Contract: Other Contract | Civil Cases Relating to Criminal Matters | All Other Civil Cases | Tax | Total Cases |
|---|---|---|---|---|---|---|
| **Cases Pending 9/1/2020:** | | | | | | |
| *Active Cases* | 7,312 | 2,525 | 9,568 | 4,080 | 11,705 | 69,715 |
| *Inactive Cases* | 805 | 414 | 368 | 278 | 261 | 3,778 |
| Docket Adjustments | 59 | 60 | (13,954) | (38) | (81) | (13,704) |
| **Cases Added:** | | | | | | |
| New Cases Filed | 5,961 | 1,953 | 13,400 | 3,815 | 8,008 | 58,570 |
| Other Cases Reaching Docket: | | | | | | |
| *Cases Reactivated* | 699 | 259 | 1,424 | 332 | 1,576 | 9,636 |
| *All Other Cases Added* | 174 | 74 | 51 | 487 | 26 | 1,394 |
| **Total Cases On Docket** | 14,205 | 4,871 | 10,489 | 8,676 | 21,234 | 125,611 |
| **Dispositions:** | | | | | | |
| Change of Venue Transfers | 1 | 3 | 0 | 0 | 0 | 12 |
| Default Judgments | 1,302 | 458 | 323 | 353 | 1,299 | 4,096 |
| Agreed Judgments | 900 | 454 | 2,435 | 885 | 58 | 14,629 |
| Summary Judgments | 308 | 70 | 1 | 130 | 2 | 796 |
| Final Judgments: | | | | | | |
| *After Non-Jury Trial* | 90 | 25 | 56 | 103 | 307 | 655 |
| *By Jury Verdict* | 3 | 6 | 0 | 4 | 0 | 52 |
| *By Directed Verdict* | 0 | 0 | 0 | 0 | 0 | 0 |
| *Dismissed for Want of Prosecution* | 683 | 138 | 114 | 415 | 879 | 4,059 |
| *Non-Suited or Dismissed by Plaintiff* | 581 | 247 | 17 | 421 | 3,069 | 6,654 |
| All Other Dispositions | 1,782 | 917 | 4,149 | 1,349 | 450 | 15,402 |
| **Total Cases Disposed** | 5,650 | 2,318 | 7,095 | 3,660 | 6,064 | 46,355 |
| **Placed on Inactive Status** | 775 | 345 | 1,423 | 379 | 1,471 | 10,221 |
| **Cases Pending 9/30/2021:** | | | | | | |
| *Active Cases* | | | | | | |
| *Inactive Cases* | | | | | | |

**Age of Cases Disposed:**

| | 3 Months or Less | Over 3 to 6 Months | Over 6 to 12 Months | Over 12 to 18 Months | Over 18 Months | **Total Cases** |
|---|---|---|---|---|---|---|
| Number of Cases | 5,322 | 6,178 | 10,542 | 7,952 | 16,361 | 46,355 |

| **Additional Court Activity:** | **Total** |
|---|---|
| Cases in Which Jury Selected | 120 |
| Cases in Which Mistrial Declared | 3 |
| Injunction or Show Cause Order Issued | 2,386 |
| Cases in Which Plaintiff /Petitioner Represented Self | 2,797 |

# EXHIBIT 9

**Table F.**
**U.S. Bankruptcy Courts—Bankruptcy Cases Commenced, Terminated and Pending During the 12-Month Periods Ending June 30, 2020 and 2021**

| Circuit and District | Filed | | | Terminated | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | Percent Change [1] | 2020 | 2021 | Percent Change [1] | 2020 [2] | 2021 | Percent Change [1] |
| **Total** | **682,363** | **462,309** | **-32.2** | **760,297** | **609,855** | **-19.8** | **954,786** | **807,243** | **-15.5** |
| **5th** | **54,446** | **35,175** | **-35.4** | **60,827** | **51,663** | **-15.1** | **99,949** | **83,461** | **-16.5** |
| TX,S | 9,015 | 6,330 | -29.8 | 9,860 | 8,512 | -13.7 | 16,398 | 14,216 | -13.3 |

NOTE: Due to differences among districts in reporting intra-district transfers, the total provided above for cases pending at the end of the last Reporting Period may not equal the number obtained by adding totals for cases pending at the end of the prior period plus cases filed during the current period, then subtracting cases terminated during the current period. The United States territorial courts assume the jurisdiction of United States bankruptcy courts within their respective territories, which do not have separate bankruptcy courts.

[1] Percent change not computed when fewer than 10 cases reported for the previous period.

[2] Revised.

[3] The United States Bankruptcy Court for Arkansas (AR) includes both the Eastern and Western Districts of Arkansas.

# EXHIBIT 10

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

## Case Volume by Date




## Motion Practice

summary

**Motion for Partial Summary Judgment/Summary Adjudication**

Granted: 42%, Granted in Part: 2%, Denied: 56%, Unspecified: 0% — 170 Total Cases

**Motion for Summary Judgment**

Granted: 69%, Granted in Part: 0%, Denied: 31%, Unspecified: 0% — 353 Total Cases

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

## Case Categories




## Industries




## Company Size (# of employees)






015732

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

## Appointment

**Cory Sepolio**

Appointed: N\\A

Appointed by: N\\A

Total Cases: 3,580

## Motion Filing Party Type




## Average Case Length

484 Days

## Average Case Length - County

539 Days

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

## Top 20 Law Firms/Lawyers




## Top 20 Litigants



# Judges

Sep 9, 2021 10:20:03 AM Gavelytics Data - 20210908

Filters **Filing State** Texas | **Filing County** Harris | **Judge Name** Cory Sepolio

Open All Underlying Cases

# EXHIBIT 11

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 21-03908 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § | |
| | § | |
| Defendants. | § | |

# Affidavit of Amy C. Falcon

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

BEFORE ME, the undersigned authority, on this day personally appeared Amy C. Falcon having been by me first duly sworn according to law, upon his oath did depose and say the following:

1. "My name is Amy C. Falcon, and I am over the age of twenty-one. I am fully qualified to make this affidavit. I verify that the factual statements contained in this affidavit are based upon my personal knowledge and are true and correct.

2. I am an attorney duly licensed in the State of Texas since May 2009. I am also admitted to practice before the United States District Courts for the Northern, Southern, and Western Districts of Texas. I am a Partner at the law firm of Porter Hedges, LLP ("Porter Hedges"),

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

where I have practiced for approximately 11 years. I am one of the attorneys representing Plaintiff Carnero G&P, LLC in the above styled action. I have been involved in drafting Carnero's Motion to Remand to State Court or for Abstention ("Motion") filed concurrently with this affidavit.

3. In support of that motion, I personally accessed the Texas Office of Court Administration data and records located at https://card.txcourts.gov/ (note that you must use Internet Explorer to run the reports). From that website, I downloaded the official case statistics for the State district courts of Harris County, Texas. That is the county where the lawsuit styled *Carnero G&P LLC v. SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.*, Cause No 2021-46431, in the 269th Judicial District Court, Harris County, Texas ("State Court Lawsuit") is pending. **Exhibit 6** to the Motion is a true and accurate copy of the Report: District Court Activity Detail for the period September 2020 through September 2021 for Harris County, Texas,[2] exported to Excel and formatted to print the data for the civil district courts.

4. I personally accessed the United States Courts Caseload Statistics Data Tables located at https://card.txcourts.gov/ReportCriteria.aspx?ddlReportName=119&ddlReportType=5018&ddlReportPeriod=. From that website, I downloaded the spreadsheet Table F – Bankruptcy Filings (June 30, 2021) showing U.S. Bankruptcy Courts-Bankruptcy Cases Filed, Terminated, and Pending—During the 12-Month Periods Ending June 30, 2020 and 2021.[3] **Exhibit 7** to the Motion is a true and accurate copy of that report, exported to Excel and formatted to print the data for the Southern District of Texas only.

5. I personally accessed the case statistics for Judge Cory Sepolio, judge of the 269th Civil District Court, Harris County, Texas, from Gavelytics located at https://www.gavelytics.com/. Gavelytics has a paywall; the steps I used to access the statistics are shown below.




[2] *See* https://card.txcourts.gov/ReportCriteria.aspx?ddlReportName=119&ddlReportType=5018&ddlReportPeriod= using search criteria From Year: 2020, From Month: September. To Year: 2021, To Month September, County Harris, Court All, Format Export to MS Excel (do not check separate monthly report box).

[3] *See* https://www.uscourts.gov/statistics/table/f/bankruptcy-filings/2021/06/30

I received training in how to use Gavelyitics through the Baylor Law School LLM in Litigation Management program in which I am currently enrolled as a student. Gavelytics provides analytics about judges, law firms, lawyers, and litigants by analyzing the court documents for each group. I access the Judges View in the Analytics application to search for Judge Sepolio.












13033488

015740

From here I reviewed the analytics for Judge Sepolio:




Because the State Court Lawsuit relates to contract interpretation, I then limited the Motion Practice view to summary judgment:




I downloaded the report to PDF. A true and correct copy of that PDF is attached as **Exhibit 8** to the Motion."

[signature]

**Amy C. Falcon**
**Attorney for Plaintiff Carnero G&P LLC**

STATE OF TEXAS §
§
COUNTY OF HARRIS §

**SUBSCRIBED AND SWORN BEFORE ME** on this 6th day of October 2021, to certify which witness my hand and official seal. This notarial act was an online notarization.

LAURA FOLK
4429611
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
MARCH 6, 2025

[signature]

Notary Public in and for the State of Texas

My Commission expires: 3/6/25

# EXHIBIT 12

MESQUITE ENERGY

June 24, 2021

Catarina Midstream LLC, Seco Pipeline, LLC,
Sanchez Midstream Partners LP,
Sanchez Midstream Partners GP, LLC &
SP Holdings, LLC

c/o Sanchez Midstream Partners LP (n/k/a
Evolve Transition Infrastructure LP)
1360 Post Oak Blvd, Suite 2400
Houston, TX 77056
Attn: Chief Financial Officer
Email: cward@sanchezmidstream.com;
cward@evolvetransition.com

Carnero G&P LLC &
TPL SouthTex Pipeline Company LP

c/o TPL SouthTex Pipeline Company LP
110 W. 7th Street, Suite 2300
Tulsa, OK 74119
Attention: Pat McDonie
Email: pmcdonie@targaresources.com

Re: Notice of Termination of Settlement Agreement dated as of June 6, 2020, by and among Sanchez Energy Corporation (n/k/a Mesquite Energy, Inc.) and certain of its affiliates, Catarina Midstream LLC, Carnero G&P LLC, Seco Pipeline, LLC, Sanchez Midstream Partners, LP, Sanchez Midstream Partners GP, LLC, SP Holdings, LLC and TPL SouthTex Processing Company LP, as amended (the "**Settlement Agreement**")[1]

Gentlemen:

In accordance with Sections 5.1.2 and/or 5.1.3 of the Settlement Agreement, this letter shall serve as notice of the Debtors' termination of the Settlement Agreement immediately as of the date hereof.

Each of the Debtors hereby expressly reserves any and all claims, causes of actions, counterclaims, defenses, remedies and other rights of any kind that it may have, at law or in equity.

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Settlement Agreement.

Sincerely,

Cameron W. George
Chief Executive Officer

cc:

Tad Davidson and Phil Hains (taddavidson@huntonak.com and phaines@huntonak.com)
Jerry Shrader (jshrader@targaresources.com)
Joshua W. Wolfshohl (jwolfshohl@porterhedges.com)

# EXHIBIT 13

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 21-03908 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § § § | |
| | § | |
| Defendants. | § | |

## Business Records Declaration

1. My name is John Coonce. I am a Board Member of Carnero G&P, LLC and I manage the commercial aspects of Carnero's business. I am over eighteen years of age and am of sound mind. I am competent to make this declaration. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would competently testify to the matters stated herein. The facts stated herein are true and correct.

2. In my role, I am a custodian of records of Carnero's documents. I am familiar with the manner in which Carnero's business records are kept, and I am qualified and authorized to

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

make this declaration. The following records attached as Exhibits 2-7, 12 to Carnero's Witness and Exhibit List for the Hearing on December 7, 2021 (Relates to Doc. Nos. 6, 23) are records of Carnero:

| | |
|---|---|
| 2 | April 1, 2018 Firm Gas Gathering, Processing and Purchasing Agreement ("GGPA") between Carnero and SN EF Maverick, LLC, as amended by Carnero, the SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Mesquite Energy, Inc. (as successor to Gavilan Resources, LLC), Carnero, and Maverick [Dkt. 6-1] |
| 3 | April 1, 2018 Ratification Agreement among UnSub, Maverick, and Carnero [Dkt. 6-2] |
| 4 | April 1, 2018 Ratification Agreement among Eagle Ford, Maverick, and Carnero [Dkt. 6-3] |
| 5 | April 1, 2018 Ratification Agreement among Venado, Maverick, and Carnero [Dkt. 6-4] |
| 6 | April 1, 2018 Ratification Agreement among Mesquite (as successor to Gavilan), Maverick, and Carnero [Dkt. 23-1] |
| 7 | April 1, 2018 Letter Agreement among Carnero, Maverick, and Mitsui E&P Texas LP regarding the GGPA [Dkt. 6-5] |
| 12 | June 24, 2021 Letter Terminating the Midstream Settlement Agreement |

3. The records are kept in the course of Carnero's regularly conducted business; it is a regular practice of Carnero's business activity to make the records; and the records were made at or near the time of the matters set forth therein by –or from information transmitted by – Carnero personnel with knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed Tulsa, Oklahoma on this 2nd day of December, 2021.

John V. Coonce

John Coonce
Board Member, Carnero G&P, LLC

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| | § | |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. 21-03908 |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | § | |
| | § | |
| *Defendants.* | § | |

**Defendant's Witness and Exhibit List for the Hearing on December 7, 2021**

Defendants SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. ("**Defendants**") file this witness and exhibit list for the hearing scheduled for December 7, 2021, at 2:30 p.m., before the Honorable Marvin Isgur at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Avenue, Houston, Texas 77002.

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

## WITNESSES

Defendants may call any of the following witnesses at the hearing:

1. Any witness called or listed by any other party;
2. Any witness necessary to lay the foundation for the admission of exhibits; and
3. Any rebuttal and/or impeachment witnesses.

## EXHIBITS

Defendants may offer into evidence the documents filed in this adversary proceeding (No. 21-03908), the adversary proceeding captioned *GSO ST Holdings LP et al. v. Sanchez Energy Corp. et al.* (No. 20-03197), and the main Chapter 11 docket (No. 19-34508) and other related adversary proceedings, including the following documents referenced in the Notice of Removal (AP Docket No. 1), Response to Motion to Remand to State Court or for Abstention (AP Docket No. 13), and Sur-Reply to Motion to Remand to State Court or for Abstention (AP Docket No. 24):

| # | Description | Docket Ref. | Marked | Offered | Object | Admit |
|---|---|---|---|---|---|---|
| **1** | Plaintiff's Original Petition | AP Docket No. 1-4 at 2-13 | | | | |
| **2** | Plan | Bankr. Docket No. 1198 | | | | |
| **3** | Confirmation Order | Bankr. Docket No. 1212 | | | | |
| **4** | Midstream Settlement Approval Order | Bankr. Docket No. 1415 | | | | |
| **5** | Transcript of June 29, 2020 Telephonic Hearing | Bankr. Docket No. 1418 | | | | |
| **6** | Transcript of June 30, 2020 Telephonic Hearing | Bankr. Docket No. 1419 | | | | |

| # | Description | Docket Ref. | Marked | Offered | Object | Admit |
|---|---|---|---|---|---|---|
| **7** | UnSub Stipulation and Agreed Order | Bankr. Docket No. 1983 | | | | |
| | Any document filed by Carnero in this Adversary Proceeding, including the documents attached to the Motion to Remand or the reply in support of that motion | AP Docket Nos. 6, 23 | | | | |
| | Any exhibit identified or offered by any other party, including the documents attached to Carnero's Witness and Exhibit List for the Hearing on December 7, 2021 | AP Docket No. 25 | | | | |
| | Any exhibit necessary for impeachment and/or rebuttal purposes | | | | | |
| | Any document filed in the above-captioned main case | | | | | |

Defendants reserve the right to call or to introduce one or more, or none, of the witnesses or exhibits listed above, and further reserve the right to supplement or amend this list at any time prior to the hearing.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax
713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax
214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant**
**Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Julia Frost-Davies*

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Rebekah Sills McEntire*

Rebekah Sills McEntire
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
rebekah.mcentire@kirkland.com

**Attorney for Defendant Venado EF L.P.**

*/s/ Maegan Quejada*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on December 3, 2021, on all persons entitled to receive service through the Court's Pacer ECF filing system.

*/s/ James G. Munisteri*
**James G. Munisteri**

**CLOSED, DISMISSED**

**U.S. Bankruptcy Court**
**Southern District of Texas (Houston)**
**Adversary Proceeding #: 21-03908**

*Assigned to:* Bankruptcy Judge Marvin Isgur
*Lead BK Case:* 19-34508
*Lead BK Title:* Sanchez Energy Corporation, et al
*Lead BK Chapter:* 11
*Demand:*

*Date Filed:* 09/10/21
*Date Terminated:* 12/13/21
*Date Removed From State:* 09/10/21

*Nature[s] of Suit:* 01 Determination of removed claim or cause

***Plaintiff***
**-----------------------**
**Carnero G&P, LLC**

represented by **Amy Coates Falcon**
Porter Hedges LLP
1000 Main St
36th Floor
Houston, TX 77002
713-226-6000
Fax : 713-226-6295
Email: afalcon@porterhedges.com

**Eugene Montgomery Nettles**
Porter & Hedges
1000 Main St
36th Floor
Houston, TX 77002-2764
713-226-6000
Fax : 713-226-6295
Email: enettles@porterhedges.com
*LEAD ATTORNEY*

**Joshua W. Wolfshohl**
Porter Hedges LLP
1000 Main, 36th Floor
Houston, TX 77002
713-226-6000
Fax : 713-226-6295
Email: jwolfshohl@porterhedges.com

V.

***Defendant***
**-----------------------**
**SN EF UnSub, LP**

represented by **Paul M Basta**
Paul Weiss et al
1285 Avenue of the Americas

New York, NY 10019-6064
212-373-3000
Email: pbasta@paulweiss.com
*LEAD ATTORNEY*

**Alice Belisle Eaton**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Fax : 212-492-0125
Email: aeaton@paulweiss.com

**Andrew Ehrlich**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3166
Email: aehrlich@paulweiss.com

**Sean Anthony Mitchell**
Paul Weiss et al
1285 Ave of the Americas
New York, NY 10019
212-373-3000
Email: smitchell@paulweiss.com

**Justin Ward**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: jward@paulweiss.com

**Thomas Andrew Woolley, III**
McCloskey Roberson Woolley, PLLC
190 TC Jester, Suite 400
Houston, TX 77007
713-337-3900
Fax : 713-337-3915
Email: rwoolley@mrwpllc.com

***Defendant***
**-----------------------**
**Eagle Ford TX LP** represented by **Julia Frost Davies**

Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02215
617-341-7700
Email: julia.frost-davies@morganlewis.com

**Amy L Kyle**
Morgan Lewis & Bockius LLP

One Federal St
Boston, MA 02100
617-341-7700
Email: amy.kyle@morganlewis.com

**Michelle Dawn Pector**
Morgan Lewis Bockius LLP
1000 Louisiana St
Ste 4000
Houston, TX 77002
713-890-5000
Fax : 713-890-5001
Email: michelle.pector@morganlewis.com
*LEAD ATTORNEY*

**Jared Wilkerson**
Morgan Lewis & Bockius LLP
1000 Louisiana St
Suite 4000
Houston, TX 770002
713-890-5000
Email: jared.wilkerson@morganlewis.com

***Defendant***
**-----------------------**
**Venado EF L.P.** represented by **Sydney Corry**
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
253-455-6202
Email: sydney.corry@kirkland.com

**Rex Manning**
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
713-836-3600
Fax : 713-836-3601
Email: rex.manning@kirkland.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**
**Mitsui E&P Texas LP** represented by **Duston K McFaul**
SIdley Austin LLP
1000 Louisiana St.
Suite 6000
Houston, TX 77002
713-495-4500
Fax : 713-495-7799
Email: dmcfaul@sidley.com
*LEAD ATTORNEY*

**Maegan Quejada**
Sidley Austin LLP
1000 Louisiana St
Ste 5900
Houston, TX 77002
713-495-4500
Email: mquejada@sidley.com

**Angela C. Zambrano**
Sidley Austin LLP
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
214-981-3300
Email: angela.zambrano@sidley.com

***Defendant***
-----------------------
**Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation**

represented by

**Sharon Marie Beausoleil**
Foley & Lardner LLP
1000 Louisiana Street
Suite 2000
Houston, Tx 77002
713-276-5086
Email: sbeausoleil@foley.com

**Joseph Bretschneider**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Email: jbretschneider@willkie.com

**Sara Ann Brown**
Thompson Coburn LLP
2100 Ross Avenue
Ste 3200
Dallas, TX 75201
972-629-7100
Fax : 972-629-7171
Email: sbrown@thompsoncoburn.com

**Jennifer Jaye Hardy**
Willkie Farr Gallagher LLP
600 Travis St
Ste 2310
Houston, TX 77002
713-510-1766
Email: jhardy2@willkie.com

**Dennis Jenkins**
Willkie Farr & Gallagher LLP

787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Fax : 212-728-8111
Email: djenkins@willkie.com

**James G Munisteri**
Foley Gardere
1000 Louisiana Street
Ste 2000
Houston, TX 77002
713-276-5500
Fax : 713-276-5555
Email: jmunisteri@foley.com

**Mark T Stancil**
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, DC 20006
202-303-1133
Email: mstancil@willkie.com
*LEAD ATTORNEY*

| Filing Date | # | Docket Text |
|---|---|---|
| 12/07/2021 | 28 | Courtroom Minutes. Time Hearing Held: 2:30 pm - 2:58 pm. Appearances: Joshua Wolfshohl and Amy Falcon for the Plaintiff Carnero G&P, LLC. Justin Ward for Defendant SN EF UnSub, LP. James Munisteri, Dennis Jenkins, Sara Brown, and Mark Stancil for Defendant Mesquite Energy, Inc. Sydney Corry for Defendant Venado EF L.P. Dustin McFaul with Meghan Quejada for Defendant Mitsui E&P Texas LP. Julia Frost-Davies for Defendant Eagle Ford TX LP. The Court requires the amendment to the motion to be made done not later than 12/10/21 at 5:00 pm, any responses by the Defendants to be filed by 12/17/21, hearings continued to 12/21/21 at 1:30 pm. (Related document(s):3 Order for Conference, 6 Motion for Remand) **Hearings scheduled for 12/21/2021 at 01:30 PM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 12/07/2021) |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. 21-03908 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § | |
| | § | |
| Defendants. | § | |

# <u>Plaintiff's Notice of Dismissal without Prejudice</u>

(Relates to Doc. No. 1-4)

Under Fed. R. Civ. P. 41(a)(1)(A)(i), made applicable to this proceeding by Fed. R. Bankr. P. 7041, Plaintiff Carnero G&P LLC files this Notice of Dismissal without Prejudice against Defendants SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.

On July 30, 2021, Plaintiff sued Defendants in Texas state court under Cause No. 2021-46431, *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P*

[1] The "<u>Reorganized Debtors</u>," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

*Texas LP, and Mesquite Energy, Inc.*, in the 269th Judicial District Court, Harris County, Texas (the "Lawsuit").

The Defendants were served with process.

On September 10, 2021, Defendants removed the Lawsuit to this Court.

The Defendants have not served answers or a motion for summary judgment.

Plaintiff hereby dismisses the Lawsuit without prejudice to refiling its claims.

Dated: December 10, 2021.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Plaintiff Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on December 10, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC. | § | CASE NO. 21-03908-ADV |
| | § | HOUSTON, TEXAS |
| VS | § | TUESDAY, |
| | § | DECEMBER 7, 2021 |
| SN EF UNSUB, LP, ET AL | § | 2:30 P.M. TO 2:58 P.M. |

MOTION HEARING (HYBRID HEARING)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTOR: | (VIA TELEPHONE)<br>PAUL, WEISS, RIFKIND,<br>WHARTON AND GARRISON<br>Justin Ward, Esq.<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3000 |
| | MCLOSKEY ROBERSON, PLLC<br>Thomas Woolley, Esq.<br>945 Heights Blvd<br>Houston, TX 77008<br>713-337-3910 |
| FOR CARNERO G&P, LLC: | PORTER HEDGES LLP<br>Joshua Wolfshohl, Esq.<br>Amy Falcon, Esq.<br>1000 Main St, 36th Floor<br>Houston, TX 77002<br>713-226-6000 |
| FOR MESQUITE ENERGY, INC. | FOLEY GARDERE<br>James G. Munisteri, Esq.<br>Sara Brown, Esq.<br>1000 Louisiana Street<br>Suite 2000<br>Houston, TX 77002<br>713-276-5500 |
| | (VIA TELEPHONE)<br>WILLKIE FARR AND GALLAGHER LLP<br>Mark Stancil, Esq.<br>Dennis Jenkins, Esq.<br>1875 K Street, NW<br>Washington, DC 20006<br>202-303-1133 |
| FOR MITSUI E&P TEXAS LP: | SIDLEY AUSTIN LLP<br>Duston McFaul, Esq.<br>Maegan Quejada<br>1000 Louisiana St<br>Suite 6000<br>Houston, TX 77002<br>713-495-4500 |

APPEARANCES (CONT'D):

FOR EAGLE FORD TX LP: (VIA TELEPHONE)
MORGAN, LEWIS AND BOCKIUS LLP
Julia Frost Davies, Esq.
One Federal Street
Boston, MA 02215
617-341-7700

FOR VENADO EF L.P. (VIA TELEPHONE)
KIRKLAND AND ELLIS LLP
Sydney Corry, Esq.
609 Main Street
Houston, TX 77002
253-455-6202

(Please also see Electronic Appearances.)

# INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (None called.) | | | | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Plaintiff's: | | |
| Exhibits 25-1 to 25-13 | 9 | 9 |
| Defendant's: | | |
| Exhibits 26-1 to 26-7 | 9 | 9 |

HOUSTON, TEXAS; TUESDAY, DECEMBER 7, 2021; 2:30 P.M.

THE BALIFF: All rise.

THE COURT: Please be seated.

All right. We are here in the Canero G&P, LLC versus SN EF UnSub LP, et al, Adversary Proceeding 21-3908. We'll start with appearances in court, we'll then take any appearances on the phone. If you wish to appear on the phone, please press five star.

Mr. Wolfshohl.

MR. WOLFSHOHL: Good afternoon, Your Honor. Joshua Wolfshohl and Amy Falcon, my colleague, for Carnero, the Plaintiff.

Good to see, Your Honor. Good to be back in the courtroom. This is my first hearing back, and I don't think I've been in this courthouse for two years and I'm actually glad to be here.

THE COURT: Glad to have you back.

MR. MUNISTERI: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. MUNISTERI: James Munisteri for Mesquite. Ditto, it's nice to be back.

THE COURT: It's very nice to have people back.

MR. MUNISTERI: And I'm on joined on the phone by Mr. Stancil and by Ms. Brown. And Ms. Brown just wanted me to make sure she's going to be designated as the presenter.

THE COURT: All right. Thank you.

MR. MCFAUL: Good afternoon, Your Honor. Duston McFaul, Sidley Austin for Mitsui E&P Texas, LP, which is one of the non-ops, and Ms. Maegan Quejada is on the phone, as well.

THE COURT: All right.

MR. MCFAUL: Thank you.

THE COURT: Thank you.

MR. MCFAUL: Nice to see you.

THE COURT: Ms. Frost-Davies, good afternoon.

MS. FROST-DAVIES: Good afternoon, Your Honor. Julia Frost-Davies, Morgan Lewis, on behalf of Eagle Ford Texas, LP also one of the non-op Defendants.

THE COURT: All right. Thank you.

From the 253 area code, is 253-456-6202. Let me see what I have.

MS. CORRY: Sydney Corry. This is Sydney Corry with Kirkland and Ellis on behalf of Venado EF LP.

THE COURT: Ms. Corry, good afternoon.

MS. CORRY: Good afternoon.

THE COURT: Mr. Ward.

MR. WARD: Good afternoon, Your Honor. Justin Ward from Paul Wiess on behalf of Defendant UnSub and possibly also attending today on behalf of Unsub are Thomas Woolley from McCloskey Roberson and also from Paul Weiss,

Alice (indiscernible).

THE COURT: Mr. Ward, thank you.

Mr. Stancil.

(No audible response.)

THE COURT: Mr. Stancil.

MR. STANCIL: Good afternoon, Your Honor. Mark Stancil from Willkie Farr & Gallagher on behalf of Mesquite Energy, Inc. I'M also joined by my colleague, Dennis Jenkins, also representing Mesquite.

THE COURT: Mr. Stancil, Mr. Jenkins, good afternoon.

From 212-728-8276.

MR. JENKINS: Your Honor, Dennis Jenkins of Willkie Farr. It's good to be back in front of Your Honor, thank you.

THE COURT: Good to have you here, Mr. Jenkins.

All right. I show that's all of the folks that wish to speak at today's hearing. If you change your mind and want to speak during the course of the hearing, just press five star.

I've now held a few, maybe you know half a dozen of these hybrid hearings, and they've worked pretty well. But if anyone has trouble hearing or seeing, just find a way to let me know, and we'll be sure that those of you that are remote can see what's happening in the court, and those of

you in court can see what's happening remotely.

So I think we'll go, I guess, to you Mr. Wolfshohl.

MR. WOLFSHOHL: I think that's right, Your Honor. And just as a housekeeping matter, we conferred -- well, we conferred with Mr. Munisteri, I think he was speaking for the entirety of the Defendants -- but I don't think that there's any objection to our exhibits and we had no objection to their exhibits being admitted.

THE COURT: All right. Can you give me those exhibit identifiers?

MR. WOLFSHOHL: Sure, Your Honor. For Carnero, our Exhibit List was at Docket No. 25. And so it would be all of the exhibits that were attached to that Docket entry which I think would be 25-1 through, I believe --

THE COURT: Thirteen?

MR. WOLFSHOHL: -- 13.

THE COURT: All right.

MR. WOLFSHOHL: And we also reference a number of documents that are on the Docket that were voluminous that we didn't want to have to refile. But in our Exhibit List, there's a number of documents we are going to refer to at least one of those. But I don't think there's any issue with those being admitted.

And then Mr. Munisteri, or whoever is in charge of

the Defendants, I just know we didn't have any objection to theirs. I don't think that they filed the actual exhibits, but they did file a list and they sent us their exhibits and we didn't have any issue with them, Your Honor.

MR. MUNISTERI: Your Honor, both parties agreed no objections to the other parties' exhibits.

THE COURT: But what are your exhibits? What are the exhibits, what -- how do I find them?

MR. STANCIL: Your Honor, this is Mark Stancil, we filed our Exhibit List, I believe it's -- I want to say Docket 26, but Ms. Brown may correct me. Our exhibits are listed there.

And essentially they are the same documents that Movants are relying on, and we just typically reference though a transcript from prior hearings in the bankruptcy and an Order. So I think all of our items are directly out of the Docket for the bankruptcy case.

THE COURT: All right. So without objection Exhibits 25-1 through -13 are admitted.

(Plaintiff's Exhibits 25-1 through 25-13 are offered and admitted in evidence.)

THE COURT: And the documents that are referenced in Exhibit 26 are admitted as to 1 through 7. I think that's what you-all are asking me to do.

(Defendant's Exhibits 26-1 through 26-7 are offered and

admitted in evidence.)

MR. WOLFSHOHL: That's my understanding Your Honor.

THE COURT: All right.

MR. WOLFSHOHL: If you will, Your Honor, could you please make Ms. Falcon the presenter?

THE COURT: Of course.

MR. WOLFSHOHL: And I think both parties are really just -- now that we've got the exhibits admitted, I think we're just going to really just argue our points and we both got presentations that we exchanged prior to the hearing.

But before I jump into my presentation I want to go through something -- to clear something up, because I think it's based on some of the arguments in the surreply that the Defendants filed, as well as the presentation that they provided to us right before the hearing. Ms. Falcon is pulling up -- this is one of the documents that we identified -- is it on the screen?

THE COURT: Oh, yeah. I'm going to split the screen here to where people in court can --

MR. WOLFSHOHL: Okay.

THE COURT: -- see both faces and --

All right. Go ahead, please.

MR. WOLFSHOHL: Thank you, Your Honor.

There seems to be confusion about -- as Your Honor, knows -- I know you've read the pleadings and you've probably digested quite a bit in the last several days -- but there seems to be some confusion about whether the GGBA was assumed pursuant to the Settlement Agreement that was entered into around confirmation on June the 30th of 2020. And I want to clarify because the GGBA that I'm seeking to enforce, in this State Court lawsuit, was in fact not assumed pursuant to that agreement, Your Honor.

And if you go to the Settlement Agreement -- this is the Settlement Agreement that was attached to the motion that was filed seeking to approve the Midstream Settlement Agreement. You look at the definition of assumption agreements and it says -- starts with the Carnero Agreements and then it says the Catarina Gathering Agreement and then it identifies a number of other documents that are not the GGBA that I'm seeking to enforce.

In fact, it references that agreement, but it does not say that, that's an assumption agreement. If you look at the -- read all the way through Your Honor. It talks about ratification agreements that ratified the FGGBA, the Comanche FGGBA, that's the agreement that I'm seeking to enforce. It's a defined term in the Settlement Agreement, but it is not an assumption agreement so we will go to --

Ms. Falcon, if you can go to the Carnero

Agreements first?

You see the Carnero Agreement references the Carnero Gathering Agreement and the Carnero Processing Agreement, and we'll start with the Gathering Agreement. This is an agreement with SN Caterina.

Your Honor, if you remember, and I'm sure that -- I'm sure that the Reorganized Debtor is going to tell you a little bit about the history of these contracts -- but the Debtor had essentially two large pieces of acreage. One was the -- they referred to as the "Catarina Acreage" and the other one they referred to as the "Comanche Acreage." Most of the benefit that the Debtor was getting under the Settlement Agreement -- the Midstream Settlement Agreement -- related to the Catarina Acreage. My client was making significant concessions on rates as to the Catarina Acreage.

The Carnero Gathering Agreement that's reference as a "Carnero Agreement" under this agreement is with SN Caterina, which is the entity that owned the Caterina assets.

If you look -- the same thing goes for the Carnero Processing Agreement. Also in agreement with SN Caterina.

These are not agreements with SN Maverick. And if you look -- the specific Comanche FGGBA is a defined agreement under the Settlement Agreement, but it is not an

agreement that was an assumption agreement. The way that my GGBA that I'm seeking to enforce was assumed was pursuant to the Plan. It was listed as a contract that was being assumed, and the time passed and nobody objected to it. But it was not assumed pursuant to that Order, it just wasn't.

And there seems to be some reliance on the idea that somehow it was assumed in a qualified fashion and that as a result -- I don't think this is relevant -- but as a result of the termination of the Settlement Agreement that somehow that combined with the way the Settlement Agreement was approved that there was some kind of qualified assumption of my agreement.

But as to the GGBA, the fundamental agreement that I'm seeking to enforce in my State Court action, it was assumed with no qualifications.

But I just wanted to clear that up, Your Honor, and I'll move to the presentation.

So Your Honor, we think that this -- this is a very straightforward analysis. The issue before the Court, we have a State Court lawsuit that was filed in July of 2021, more than a year after the Plan got confirmed and more than a year after the Plan went effective. We're seeking declarations under the Texas Civil Practice and Revenues Code. And there are declarations that we are asking a State Court to interpret related to the assumed contracts. The

fundamental contract being the GGBA that was assumed under the Plan.

Most of the Defendants are non-Debtors, but there are Reorganized Debtors that are Defendants, as well. But it has to do with -- the fundamental disputes have to do with actions that were taken post-confirmation, actions that were taken more than a year after confirmation, more than a year after the effective date. The Defendant's bear the burden to establish jurisdiction and we don't think that they can, Your Honor.

Most of Carnero's claims in the dec action don't reference the Code, the Plan, or any order of this Court. The thing that they have really focused on are the claims where we are asking the State Court to declare what our rights are once these contracts are rejected.

THE COURT: Actually, I think that's not quite right. This may be a bit of the inverse of that, but what I read the Complaint from them as being, is that you're asking that people be compelled to take action in the Bankruptcy Court to implement what you think your rights are, and you're asking the State Court to determine that before they ever act in the Bankruptcy Court.

And as I read their Complaint -- and you've got the right sections up here, K and L -- K seems to say that the State Court can order action to be taken here and L

seems to interpret what that action might be. And I think that's the heart of the Complaint. Not what your rights are necessarily, but that your attempt to control what occurs at 515 Rusk Street, for lack of a better description, is the way I would describe what I read their concerns to be.

MR. WOLFSHOHL: I don't disagree with the way that they've cast their Complaints, Your Honor. And I will tell you -- and I'm just going to say -- if confusion about the language is something that is causing the problem, this can be amended to make it clear, but my client's intent was not to dictate what it was that they were going to do with respect to 365. The purpose of these provisions is specifically to deal with what happens in the event of rejection.

THE COURT: Well, I know, but take a look at L. If you think you can amend out K and L, it may be worth thinking about doing that before we continue with the hearing.

By the way there may be nothing wrong with doing it this way and I'm not necessarily saying that you lose --

MR. WOLFSHOHL: No.

THE COURT: -- because of this.

MR. WOLFSHOHL: I understand.

THE COURT: But I think what the Complaint is, is you're having the State Court declare the effect of

rejection of a contract before it's ever rejected under L. That's a big step that may or may not be a fatal step. But if you can take away K and L, it's going to change the discussion, I think, that we're going to have today. I'm just -- I'll let the other side speak up about this, but that's what I'm reading the graver unhappiness to be about.

MR. WOLFSHOHL: Well, I can tell you, Your Honor, that when this Complaint, or this Petition, was prepared, the concern that we had was that they were continuing to pursue the OXY litigation and continuing to pursue rejection.

THE COURT: Right.

MR. WOLFSHOHL: But we were concerned that once they rejected, that they weren't going to honor our agreement. And that was the -- that was the gist of the concern.

Now they have since announced to Your Honor, that they're going to do some sort of hybrid type of assumption and that they're going to --

THE COURT: Well, I think we're coming back on the 21st, understandably.

MR. WOLFSHOHL: Well, I mean, they say that, Your Honor, but you know, we've been here several times, we don't know exactly what's going to happen. I'm just saying that the concern that my client has is that whatever global

settlement that they're entering into in some way impairs my client's rights under the GGBA, which is an assumed contract. I don't think I have to adjudicate those rights in Your Honor's court. And if you think that -- I mean --

THE COURT: I'm doing my best to not cross that bridge right now, because I don't know where the day is going to end up. But if what you're telling me is you don't need K and L, it's going to change what's happening a lot. But if you need K and L, it's going to change things a lot, too. So I think if you're really telling me this was stylistic, but not substantive to do K and L and the way you did them, then you can amend it away, it certainly will make a different argument.

And you know that I'm going to react to sort of with this initial negative reaction that any other court can tell me what needs to happen in my court, just as I wouldn't do that to them. I don't know that necessarily means it's wrong, but it may suggest to you the -- good idea.

MR. WOLFSHOHL: I believed that the issue was more nuanced than that, Your Honor.

THE COURT: Okay.

MR. WOLFSHOHL: I believed that the issue -- and they've raised this -- is this notion -- and this is -- I'm going to tell you what we didn't intend to do.

They raised this issue that this somehow, that K

was meant to require them or have a State Court say that they were required to exercise their rejection rights under 365. The intent -- and I mean it may not be artfully worded -- but the intent, in saying "among other actions," was to qualify that there were a number of ways to basically effect the termination of the obligations under the existing commitments. And the Debtors know that that was a way for them to do it, because that was the purpose of the Midstream Settlement Agreement. The Midstream Settlement --

THE COURT: I read K, the plain language of K, to ask the State Court to make Mesquite pursue Section 365.

MR. WOLFSHOHL: That’s not the intent --

THE COURT: That is the way --

MR. WOLFSHOHL: That is not the intent and that could be amended. But here is where I’m getting to on how I think it’s more nuanced.

The -- I knew you were going to -- I mean, I knew that because they raised that and I thought, you know, what -- you know, if that needs to be amended to be clarified, I think it changes, you know -- if Your Honor, believes that, that’s what that means, that is not the intent. But the other question is if -- and you know, and it sounds like maybe you're going even further than that -- is if I’m asking the State Court to say "upon rejection," which is just a breach of contract under applicable law, that it has

an effect on my contract. And it has the effect of the Debtor's no longer obligated under those existing commitments and I just don't see how that could be -- fall under Your Honor's jurisdiction. Because once you reject, you know, you proceed, you know, as a Reorganized Debtor with the consequences of rejection.

THE COURT: So look -- and I said to you, I'm not necessarily saying there's anything wrong with this, but I'm not sure that every rejection order or rejection agreement has unmodified rights of a breach, right? The Court can certainly have a more nuanced order than that.

And I don't know -- first of all, I don't know if they're going to seek rejection. I don't know if I'm going to approve rejection. I don't know if I'm going to approve rejection if I say it's conditioned on certain events. There are all sorts of things that can happen, and to ask for declaration of what I'm going to do before I do it, before I know what I'm going to do, and to say anytime I act under 365, here's the consequence, that may be perfectly correct to go to State Court to do it. Not sure why we're doing it before we've decided.

MR. WOLFSHOHL: Can I have an opportunity to confer with my client? I actually think I -- I mean, I'm not sure I'm going to be able to get the right people on the phone immediately, I'm wondering if perhaps --

THE COURT: Well, let me ask the Defendants whether -- you're already telling me that I'm misreading K and I don't mean that you're doing that by saying it's my fault.

MR. WOLFSHOHL: I'm telling you that it's different than our intent, that's what --

THE COURT: Right.

MR. WOLFSHOHL: -- I'm saying. Yeah.

THE COURT: I know people are prepared for this hearing, but I see little point in going through it if I'm going to go through a hearing and then give you a chance to amend and then come back, as opposed to saying I would rather be arguing about what we're arguing about.

MR. WOLFSHOHL: Yeah.

THE COURT: And it may make sense to give you an amendment opportunity. Everyone here is going to be back on the 21st anyway, and then we just continue the hearing on the 21st and take everything up at the same time. Also adds more clarity to what the disputes about, I think.

Let me see what people think of that. I'll start in court with -- see if it makes any sense.

Mr. McFaul and Mr. Munisteri?

MR. MCFAUL: Yeah. Duston McFaul for Mitsui and well, I'll go ahead. I was going to say Mr. Stancil is taking the lead. But our position is that, of course, we're

fine with giving them an ability to amend, but we view this whole lawsuit as an attempt to get a court to say, "You are required to reject contracts and move the dedication of those minerals to us." We think K clearly says you are obligated to reject. That right only arises with Your Honor, so.

THE COURT: I think it does, too, but he's telling me that's not what he means to be asking for, so are you really going to spend an hour --

MR. MCFAUL: Understood. Understood.

THE COURT: I'm just asking --

MR. MCFAUL: We don't --

THE COURT: Does it make some sense to go a different direction?

MR. MCFAUL: We don't think they can amend and rectify it, but we're supportive of the opportunity.

THE COURT: It may be that --

MR. STANCIL: Your Honor --

THE COURT: -- they could is the problem and at which point, maybe you would be happy.

MR. MCFAUL: And I'll turn it over to Mr. Stancil.

THE COURT: I think at some point -- I'm going to now sort of -- at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of

that are a State Court issue. And so I don't know that this necessarily means this isn't going to go back to State Court, just because I'm concerned about that, because they can clearly fix at least some of the issues. I think.

Let me hear from folks on the phone.

MR. STANCIL: Your Honor.

THE COURT: Go ahead, Mr. Stancil.

MR. STANCIL: This is Mark Stancil, thank you -- for Mesquite.

Of course, understanding Your Honor will qualify that, I think we can cover a lot of ground today and I think would actually be very useful.

I think even if K were gone entirely, I think this would still be before, Your Honor, and I'm happy to get into that in a minute or now. But I think there are multiple independent bases for jurisdiction and I think it would actually significantly -- even if they're going to attempt to amend, which is not what they're supposed to be doing on removal, but even if they're going to attempt to amend, I think we could clarify the landscape significantly today to see if they're going to do it successfully.

But I think no matter what they amend, I think they're going to be back in front of Your Honor either way.

THE COURT: I think we're coming back either way, if that's what you mean. It's just a question whether I do

the amendment before the argument or after. Let me --

MR. STANCIL: Your Honor, I'll go one further and say we believe that Your Honor will have jurisdiction, and we think this lawsuit is going to be resolved on a motion to dismiss definitively by Your Honor with respect to the agreement that are in front of you. We don't agree that it's going to need to end up in State Court at all.

THE COURT: I don't know if it needs to end up in State Court or not. And that's the argument I'm going to eventually need to hear, whether it's today or another day.

Let me hear if anybody else wants to pitch in on that?

(No audible response.)

THE COURT: Okay. Well, look, I'm going to go ahead --

MR. WARD: Your Honor --

THE COURT: Yes. Go ahead.

MR. WARD: Your Honor, this is Justin Ward from Paul Weiss.

I do just want to raise the issue and to be candid, we haven't even looked into this of whether, you know, there are certain procedural issue with sort of defeating federal jurisdiction, bankruptcy jurisdiction by filing a Complaint that's within the Court's jurisdiction then amending after removal to sort of remove -- you know,

eliminate jurisdiction. I just want to make sure that, you know, it's not something we've thought about, but I'm not as I sit here today, if that's even possible.

MR. WOLFSHOHL: Your Honor, that's not --

MR. STANCIL: Your Honor, we have looked at that. It is removal jurisdiction is determined at the moment of filing a Complaint. But you know, I grant there might be some inefficiency to go going back to State Court with a new Complaint.

But we agree with the point I think Mr. Ward was making that I think it has to live or die at the moment of a filing with the Complaint when it comes to subject matter jurisdiction. They would be amending in front of you having put in front of you and then I guess they would be moving to dismiss for lack of subject matter jurisdiction.

THE COURT: I don't think it would be -- look, subject matter jurisdiction is plainly determined at the point of removal, but I'm not sure that abstention is the same as subject matter jurisdiction, so.

MR. WOLFSHOHL: Your Honor, also, you can always, you know, remove or, I mean, remand or dismiss a Complaint based on a lack of subject matter jurisdiction. The subject matter jurisdiction is a continuum, and if I modify the Complaint to make it clearer, I don't see how that could possibly in anyway interfere with --

THE COURT: Well, I do think that there may be a question of if the removal was proper, because there was subject matter jurisdiction, and you amend, I don't think that the remand motion gets to say that I don't have subject matter jurisdiction. I think it gets to say we should now abstain.

MR. WOLFSHOHL: For lack of subject matter jurisdiction?

THE COURT: No. Abstain on other principles.

MR. WOLFSHOHL: Right.

THE COURT: Maybe that had it been filed today there wouldn't be subject matter jurisdiction, but we would still have subject matter jurisdiction over something that was filed that way, I think. That part can be briefed as well. I'm not looking -- the Defendants aren't going to wave this argument by me allowing the amendment, but it may focus you more on the abstention argument.

MR. WOLFSHOHL: Yeah.

THE COURT: If you want the right to amend, I don't know that. I think so. I'm going to do this. I know it's frustrating for everybody, but probably more frustrating for me because I've got to read all this stuff and I'll have to read it again. I want you to amend.

MR. WOLFSHOHL: Okay.

THE COURT: If I'm misreading it, they're

misreading it, I don't want to hear the whole argument over the wrong issues. I'm going to require the amendment to be done -- can you get it done by Friday?

MR. WOLFSHOHL: I think I can. Yes, sir.

THE COURT: Not later than the 10th at 5:00 o'clock.

I want any supplement to the motions by the -- to the responses, I should say, by the Defendants to be filed by the 17th.

And then we'll come back on the 21st, along with the settlement implementation hearing at 1:30 on the 21st, and I'm going to tell Ms. Do to just block off the rest of the day for those two matters so that you won't get interrupted.

I'm sorry to bring everybody down for this, but I think it is the better course of action, so that we're all focused on what we need to be focused on. Their settlement may affect what you need, and what you amend may cause some relaxation by the Defendants, I don't know. But I want to see what that is.

So I think it's the most efficient thing to do and that's what we'll do today. I'll see you-all on the 21st.

THE COURT: Thank you.

MR. WOLFSHOHL: Thank you, Your Honor.

MR. STANCIL: Thank you, Your Honor.

THE COURT: We're in adjournment until 4:00 o'clock.

(Proceeding adjourned at 2:58 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #64921*

*DATE FILED: DECEMBER 13, 2021*