**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-________(MI)** |

**COMPLAINT**

1 The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Venado, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"), by and through counsel, each bring this adversary proceeding against Carnero G&P LLC ("Carnero" or "Defendant"), and in support thereof state as follows:

## INTRODUCTION[2]

1. This adversary proceeding concerns the Debtors' right to assume certain midstream contracts as contemplated by the confirmed Plan of reorganization. Defendant Carnero has claimed—and undoubtedly will again—that the Debtors' exercise of their assumption rights under Section 365 of the Bankruptcy Code, as part of a Court-approved settlement with Defendant, exposes the Debtors and their counterparties to significant contractual liability. This action seeks to confirm—free from doubt or further attempts by Carnero to use state courts to upend these Chapter 11 cases—Debtors' rights under the Bankruptcy Code to restructure their midstream contracts.

2. In 2018, Debtor/Plaintiff Maverick and Defendant Carnero entered into a midstream contract known as the "GGPA." The GGPA provided that Carnero would be *second* in line for Maverick's hydrocarbons, *behind* Maverick's preexisting midstream contracts with other counterparties. That is, the GGPA required Maverick to send the subject hydrocarbons to Carnero only *after* the preexisting midstream contracts had run their course, which was expected to occur in 2034, or to the extent gas production levels exceeded those existing commitments. The GGPA

[2] Unless otherwise specified, capitalized terms used but not defined in this Complaint shall have the meaning given them in the *Second Amended Joint Chapter 11 Plan of Reorganization* [Dkt. No. 1205] (as amended or supplemented from time to time, the "Plan").

provided that Maverick would exercise its first "right or option to *terminate*" the preexisting midstream contracts, so long as Maverick could do so "without out-of-pocket cost" (unless Carnero agreed to reimburse Maverick for such cost).

3. The Debtors filed for bankruptcy relief in August 2019, and the Plan of reorganization was confirmed on April 30, 2020. In June of that year—before the Plan could go effective—Maverick and Carnero (along with Seco Pipeline, LLC[3] and other parties) entered into an agreement settling a variety of disputes *and* outlining a potential path by which Maverick could restructure its midstream contracts (the "Settlement Agreement"). The Settlement Agreement required Maverick to *seek* rejection of the preexisting midstream agreements and to assume the GGPA. To that end, Maverick represented that, ***if*** rejection of the preexisting midstream agreements were successful, the GGPA would give Carnero first claim to Maverick's hydrocarbons. But the Settlement Agreement was limited in duration: if rejection had not been accomplished by October 1, 2020, Maverick could terminate the agreement and would no longer be required to pursue rejection of the preexisting midstream agreements. After a lengthy hearing, this Court approved the Settlement Agreement on the universal understanding that neither the settlement itself, nor the resulting assumption of the GGPA, "preordained" or "irrevocably" committed the Debtors to elevating Carnero to first position ahead of the preexisting midstream contracts. The Court entered an order to that effect on June 30, 2020, and the Plan went effective.

4. The Reorganized Debtors fought to reject the preexisting midstream agreements as required by the Settlement Agreement, and continued that fight (at their own expense) well past October 1, 2020. But after many months of costly litigation, the Reorganized Debtors ultimately determined that a different path was best. Accordingly, they terminated the Settlement Agreement

[3] Seco Pipeline, LLC ("Seco Pipeline"), is a subsidiary of Evolve Transition Infrastructure LP.

on June 24, 2021, and later announced a settlement by which the preexisting midstream agreements will be assumed.

5. Unhappy with that result, Carnero then attempted to *force* the Debtors to elevate the GGPA from second place to first place. On July 30, Carnero filed suit in Texas state court, claiming for the first time that the GGPA *required* the Reorganized Debtors to reject the preexisting midstream contracts, arguing that Section 365 of the Bankruptcy Code constituted a "right or option to terminate" those contracts "without out-of-pocket cost." The state court litigation was promptly removed to this Court. At the December 7 hearing on Carnero's motion to remand the case to state court, Carnero disclaimed an intent to have a state court opine that a debtor was required to reject a contract in Bankruptcy Court. While Carnero offered to amend its complaint to eliminate that particular request, Carnero continued to assert that it could seek to impose liability on the Reorganized Debtors (and other parties in interest) for deciding not to reject a contract under Section 365. And Carnero insisted that such a lawsuit could be brought only in state court. The Court invited Carnero to amend its complaint.

6. Instead of amending, however, Carnero dismissed its complaint, with the obvious goal of attempting to reassert the same claims in Texas state court at a later date. That gambit must fail. Carnero's position flies in the face of the Bankruptcy Code, the text of the parties' agreements (including the GGPA and the Settlement Agreement), and multiple orders of this Court. The Debtors and other Plaintiffs request declaratory relief from this Court to remove the cloud cast by Carnero's ongoing threat of litigation.

## THE PARTIES

7. Plaintiff Maverick is a limited liability company organized under the laws of Delaware with its principal place of business in Houston, Texas.

8. Plaintiff Mesquite is a corporation organized under the laws of Delaware with its principal place of business in Houston, Texas.

9. Plaintiff UnSub is a limited partnership organized under the laws of Delaware with its principal place of business in Houston, Texas.

10. Plaintiff Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

11. Plaintiff Venado is a limited partnership organized under the laws of Delaware with its principal place of business in Austin, Texas.

12. Plaintiff Mitsui is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

13. Defendant Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners, LP) with its principal place of business in Houston, Texas.

## JURISDICTION, VENUE, PREDICATES FOR RELIEF[4]

14. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012). Moreover, this Court's jurisdiction was expressly contemplated by Article XI of the Plan, paragraph 43 of the Confirmation Order, paragraph 6 of the Settlement Approval Order, and Section 6.2.1 of the

4 Unless otherwise specified, capitalized terms used but not defined in this "Jurisdiction, Venue, and Predicates for Relief" section shall have the meaning given them in the "Facts" section of this Complaint.

Settlement Agreement. The parties have concrete disagreements that fall squarely within this Court's jurisdiction in numerous respects and directly affect the success of the Chapter 11 Plan:

- This adversary proceeding requires interpretation of at least two of the Court's prior orders, including:
  - the Confirmation Order, which established the post-confirmation process for the Debtors' assumption and rejection of executory contracts *and* exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the Chapter 11 Cases . . . [or] the administration and implementation of the Plan"; and
  - the Settlement Approval Order, which approved the Settlement Agreement, effected the assumption of the GGPA, and required that any determination by Maverick in respect of assumption or rejection of any executory contract, (a) be made by a fiduciary of Maverick, (b) be made by a fiduciary after such fiduciary exercised sufficient due diligence to determine whether assumption or rejection is in the best interest of Maverick, (c) be determined to be in the best interest of Maverick, and (d) considered after notice and a hearing.
  - Both orders were conditioned on certain understandings Carnero has since repudiated, including that Maverick pursue a midstream structure in its best interest—a requirement imposed by the Settlement Approval Order.
- This litigation also raises at least three questions of federal bankruptcy law:
  - *First*, whether the Debtors' decision to reject or assume the Midstream Agency Agreements under Section 365 was an opportunity to "*breach* such contracts" (as Section 365(g) expressly provides) or, as Carnero has claimed, a "right or option to *terminate*" the contracts.
  - *Second*, even if rejection under Section 365 could somehow be deemed "a right or opportunity to terminate" the Existing Commitments, whether the Debtors' resulting liability for rejection damages would impose "out-of-pocket cost" on the Debtors.
  - *Third*, in any event, whether Section 3.1(b) of the GGPA—as interpreted by Carnero—would be unenforceable as a matter of federal bankruptcy law, because it would subject the Debtors to significant liability simply because the Debtors chose to assume the Midstream Agency Agreements.
- This litigation directly implicates the "implementation or execution" of the Plan, including the Plan's unusual (but necessary) post-confirmation process for assumption and rejection of executory contracts; and
- Carnero consented to the jurisdiction of this Court with regard to any proceeding "arising out of *or relating to*" the Settlement Agreement, and this litigation directly concerns Carnero's attempts to rewrite the essential terms of that agreement and this Court's approval thereof.

15. The statutory and legal predicates for the relief are 11 U.S.C. §§ 105(a) and 365(a); 28 U.S.C. §§ 2201 and 2202; Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Plan, the Confirmation Order, the Settlement Approval Order, and the Settlement Agreement.

16. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 and Bankruptcy Rule 7001, and the Court may enter final orders for matters contained herein.

17. Venue is proper in this district pursuant to 28 U.S.C. §1409, and because Carnero consented to this venue in the Settlement Agreement and resides in this District.

18. Pursuant to Bankruptcy Rule 7008 and Local Bankruptcy Rule 7008-1, Plaintiffs' consent to entry of final orders or judgment by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

### I. The Midstream Agreements

19. Through 2016, Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko"), and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties located in South Texas (the "Comanche Assets"). In January 2017, Maverick and various co-investors, including UnSub, purchased the working interests of Anadarko in the Comanche Assets. The transaction closed on March 1, 2017.

20. Prior to the sale of the Comanche Assets, Anadarko had acquired and developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production downstream to customers. To that end, Anadarko contracted with several midstream parties who made substantial investments in building out the necessary infrastructure to monetize production from the Comanche Assets in exchange for certain contractual promises regarding

delivery of hydrocarbons, rates, minimum volume commitments, and related fees (the "Existing Commitments").

21. While the purchasers of the Comanche Assets sought to buy this comprehensive package of assets and contracts, a group of key assets could not be assigned because certain counterparties did not consent to their transfer (the "Retained Agreements").[5] Maverick and Anadarko therefore entered into two agency agreements (collectively, the "Midstream Agency Agreements") whereby Maverick would act as Anadarko's agent under the Retained Agreements.[6] Maverick would thus receive the benefits of such agreements and also undertake Anadarko's obligations thereunder, including the Existing Commitments.

22. On April 1, 2018, Maverick and Carnero entered into a back-up midstream agreement for production from the Comanche Assets—the Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA"). As relevant here, Section 3.1 of the GGPA obligates Maverick to deliver to Carnero "100% of the Dedicated Gas" produced by the Comanche Assets *after* the Existing Commitments terminate, or to the extent there is gas produced in excess of the Existing Commitments. Specifically, pursuant to Section 3.1(b) of the GGPA, the Existing Commitments are excluded from the dedication to Carnero until the earliest time at which

[5] The Retained Agreements included the following midstream gathering and processing contracts (i) that certain Gas Processing Agreement, by and between Anadarko E&P Onshore LLC and WGR Operating, LP, dated February 27, 2012 (as amended, the "Brasada Processing Agreement"), and (ii) that certain Gathering and Processing Agreement by and between Anadarko E&P Onshore LLC and ETC Texas Pipeline, Ltd., dated April 1, 2011 (the "ETC Processing Agreement" and together with the Brasada Processing Agreement, the "Retained Gathering and Processing Agreements") as well as the following marketing contracts: (i) the Enterprise Products Transportation Agreement; (ii) the Double Eagle/Kinder Morgan Throughput Agreement; (iii) the BP Crude Oil Sales Agreement; and (iv) the Enterprise Products Purchase Agreement (collectively, the "Retained Marketing Agreements").

[6] The Midstream Agency Agreements include (i) an agency agreement between Anadarko, Maverick, and Sanchez Energy Corporation by which Anadarko appointed Maverick to act as its agent for the Retained Gathering and Processing Agreements (the "GPA Agency Agreement"), and (ii) an agency agreement between Anadarko, Anadarko Energy Services Company, Maverick, SN Catarina, LLC, and Sanchez Energy Corporation by which Anadarko appointed Maverick and Catarina to act as its agents for the Retained Downstream Agreements (the "Marketing Agency Agreement").

> (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time

GGPA, § 3.1(b) (emphasis added). From the inception of the GGPA in 2018 through June 2021, Carnero never once suggested that Section 3.1(b) of the GGPA (or any other provision of that agreement) required Maverick to *breach* the Existing Commitments.

23. On the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford and Venado also executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, dated April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Venado ratification agreements are collectively referred to as the "Ratification Agreements"). Maverick is thus obligated to deliver hydrocarbons to Carnero only *after* the Existing Commitments terminate, or to the extent there is gas produced in excess of the Existing Commitments. UnSub and the WIPs have ratified this commitment.

## II. The Chapter 11 Cases

24. Beginning in 2014, oil prices declined precipitously from more than $100 per barrel, to a 13-year low of approximately $26 per barrel in February 2016. *See Declaration of Cameron W. George in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 16] (the "First Day Decl.") at ¶ 51. Prices made a slight rebound in 2017, but fell again in the second half of 2018. *Id.* This extreme volatility continued through 2019. *Id.* Overall, oil prices fell approximately 50% and natural gas prices fell approximately 60% between 2014 and 2019. *Id.* As

a result of these difficult and unsustainable market conditions, on August 11, 2019, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

25. As the Court is aware, these Chapter 11 cases followed an unusual course. On April 30, 2020, under the extraordinary circumstances of a global pandemic combined with continued stress in the oil and gas industry, the Court entered the Confirmation Order. *See Order Approving Disclosure Statement and Confirming Plan of Reorganization* [Dkt. No. 1212]. The Plan provided for, among other things, the equitization of approximately $100 million of postpetition, debtor-in-possession loans and, as is particularly relevant here, delayed the assumption or rejection of certain midstream contracts. *See* Plan at 16 (Art. III.C.3); 26 – 27 (Art. V.B.). This unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *In re Sanchez Energy Corp.*, 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). "To forestall liquidation, Sanchez and its creditors agreed to confirm a chapter 11 plan first and litigate Sanchez's ability to reject executory contracts later." *Id.*

26. The Plan and Confirmation Order established a post-confirmation procedure to resolve assumption and rejection disputes. Specifically, the Debtors were to identify executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "Rejection Schedule") or to be assumed as listed on Exhibit C (as amended, the "Assumption Schedule") to the Plan Supplement. *See* Confirmation Order at ¶¶ 17 – 26; Plan at 26 - 37 (Art. V.B.). If no party in interest filed a timely objection, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date, except insofar as the objection deadline had been extended. *Id.* If an objection was timely filed, the Confirmation Order provided that the contract "**shall not be deemed assumed or rejected**, as applicable, **until entry of an order**

resolving the dispute and approving the assumption or rejection" or as may be agreed upon by the parties. Confirmation Order at ¶ 17 (emphasis added). In the interim, the "agreement shall continue as in effect immediately **prior to the effective date**." *Id.* (emphasis added).

27. Pursuant to Article XI of the Plan, the Bankruptcy Court retained "exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" including to "resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under any Executory Contract[.]" Plan at 40 (Art. XI). The Confirmation Order likewise provided that the Bankruptcy Court retained "exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of th[e] Confirmation Order." Confirmation Order at ¶ 43.

## III. Settlement Agreement With Carnero

28. Following confirmation of the Plan, the Debtors continued to work on identifying, finalizing, and implementing a strategy to restructure their midstream arrangements to reduce costs, rates, and fees. Moreover, the Plan could not be consummated until the DIP Lenders were satisfied that the Reorganized Debtors would have sufficient liquidity to operate in the ordinary course of business after the Effective Date. *See* Plan at 38 (Art. IX.B.3.).[7] Identification of a viable approach with midstream providers to improve the midstream cost structure was crucial to securing the needed liquidity. *See Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties* [Dkt. No. 1309] (the "Settlement Motion") at ¶ 3.

[7] Article IX. B.3 of the Plan provides that "it shall be a condition to the occurrence of the Effective Date" that Requisite DIP Lenders "be satisfied, in an exercise of their sole discretion, that the 13- week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date . . . reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date."

29. In early June 2020, the Debtors reached a settlement with a group of existing midstream and marketing service providers, including Carnero. *Id.* at ¶ 4. The Settlement Agreement[8] provided, among other things, as follows:

a) Carnero would return $8 million from the proceeds of a $17 million letter of credit drawn by Carnero under the existing GGPA. *See* Settlement Agreement, § 2.1;

b) Seco Pipeline would contribute to the Debtors a nearly $2 million administrative expense claim it had asserted in connection with the Debtors' postpetition termination of an agreement between the parties. *Id.* at § 2.4;

c) The Debtors agreed not to remove any executory contracts or unexpired leases from the Assumption Schedule, which at the same time included the GGPA (*id.* at § 2.2.1(d))—effectively *causing* the assumption of the GGPA;

d) The settlement parties agreed to conditionally amend certain existing agreements, *but only if* certain transactions contemplated by the Settlement Agreement successfully closed. *Id.* at § 2.5; and

e) The Debtors agreed to pursue rejection of the Midstream Agency Agreements. *Id.* at § 2.2.1(a)(iii). If the Debtors succeeded in rejecting the Midstream Agency Agreements, the amendments to certain existing agreements would take effect. *Id.* at § 2.5.2. If the Debtors did not succeed in rejecting the Midstream Agreements, the existing agreements between the settlement parties would remain as-is.

By its plain terms, the Settlement Agreement did not purport to determine a definitive path to restructure the Debtors' midstream operations. To the contrary, the parties had the option to terminate the Settlement Agreement at any time after October 1, 2020 (the "Outside Closing Date") if an order had not by then been entered rejecting the Midstream Agency Agreements. *See* Settlement Agreement, § 5.1.2. If the Debtors exercised their option to terminate instead of continuing to pursue rejection of the Midstream Agency Agreements, Carnero's sole remedy was to seek the return of all letter of credit amounts actually delivered by Carnero (*i.e.*, the $8 million). *Id.* at § 2.2.1(b). The Settlement Agreement specifically provided that return of the letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection

[8] The Settlement Agreement is attached as Exhibit A to the Settlement Motion.

and related appeals" of the Midstream Agency Agreements. *Id*. Once the Settlement Agreement terminated, the Debtors were no longer required to continue to pursue rejection of the Midstream Agency Agreements. *See id.* at § 6.4.

**IV. <u>This Court Approves The Settlement Agreement</u>**

30. Multiple parties, including UnSub and the WIPs, objected to the proposed Settlement Agreement, arguing that the settlement favored the Debtors' Catarina interests at the expense of the Comanche Assets.[9] The Court convened a hearing (at which Carnero's counsel appeared), ultimately approving the settlement without objection after substantial modifications were made to the Settlement Approval Order. *See Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts* [Dkt. No. 1415] (the "<u>Settlement Approval Order</u>").

31. At the hearing, the Court and the parties extensively discussed the limited and conditional effect that the Settlement Approval Order would have. More particularly, UnSub and the WIPs vigorously disputed any suggestion that the Settlement Approval Order would actually resolve the midstream restructuring of the Comanche Assets. The Court framed this question explicitly at the outset of the settlement hearing:

> THE COURT: Let me find out from the advocates again whether, if we approve this, there then becomes an irrevocable transaction that is set into motion where parties who could object today to it won't be able to object --

June 29, 2020 Hr'g Tr. at 18:15-18.[10]

---

[9] *See Limited Objection of Venado Oil & Gas, LLC, And Its Direct and Indirect Subsidiaries, Eagle Ford TX LP, And Mitsui E&P Texas LP to Debtors' Settlement Motion* [Dkt. No. 1351]; *Objection of GSO ST Holdings LP, GSO ST Holdings Associates LLC, and SN EF UnSub, LP to Debtors' Settlement Motion* [Dkt. No 1373]; *Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Settlement Motion* [Dkt No. 1314]; *Preliminary Objection of Gavilan Resources, LLC to Debtors' Settlement Motion* [Docket No. 13200].

[10] The June 29, 2020, hearing transcript is available at Docket Number 1418.

Furthermore, Your Honor, as you will hear from Mr. Meghji, nothing in the settlement agreement, if approved, preordains a party's right with respect to any JOA, ADA, midstream contract, or any other contract. Again, it was the debtors' intent that all of their rights are preserved. And to the extent additional language should be crafted to add to the order to confirm that point, we are open and welcome that language.

The settlement agreement itself does not effectuate a guarantee of midstream restructuring. It is only a roadmap; and frankly, a roadmap that was already signaled in the schedules filed before the plan was confirmed.

In addition, there is nothing in the agreement that prevents the debtors from considering all their options in such negotiations. The settlement agreement allows the debtors to cease pursuing the rejection or assumption framework in this agreement at any time. As mentioned, they need to return the

successful. It's no guarantee that all the contracts can or will be assumed rejected. But that's not the issue for today. It gives the debtors a chance to work through this complicated midstream structure. They, at any time, can switch gears. They give back the $8 million. And if it's not done by October 1st, they don't have to give the $8 million. They can still terminate in 95 days or so.

June 29, 2020 Hr'g Tr. at 34:22 – 25; 38:6 – 10; 41:5 – 11. Following these exchanges, the Court confirmed what the parties had acknowledged: that the Settlement Approval Order did not constrain the Debtors' ultimate restructuring of the existing Comanche midstream contracts:

> THE COURT: No, that's -- I think I'm hearing everybody tell me that when it comes time to determine whether the contracts that affect the Comanche asset should be rejected, that I'm going to be asked to determine whether there's been a proper exercise of fiduciary duty with respect to the manager of those assets.
>
> And I -- that seems to say that everyone is agreeing to that, which means approval of this has only upside and no downside. But maybe I'm missing something and we'll hear --

June 29, 2020 Hr'g Tr. at 67:6 – 14.

33. At the conclusion of the hearing, the Court approved the settlement and entered the Settlement Approval Order. The Settlement Approval Order thereby effectuated assumption of the GGPA (which could not be removed from the Assumption Schedule according to the Settlement Agreement). The Settlement Approval Order expressly and repeatedly reflected the settlement's limited and conditional nature. Specifically, the order (i) recognized that the Debtors *might not* ultimately reject the Midstream Agency Agreements (*id.* at ¶¶ 11, 13); (ii) preserved all rights and objections of UnSub and the WIPs to dispute rejection of the Midstream Agency Agreements (*id.* at ¶ 7); and (iii) preserved this Court's jurisdiction with respect to all matters "arising from or related to the Settlement Agreement or [the Settlement Approval Order]" (*id.* at ¶ 6).

34. Consistent with the terms of the Settlement Agreement and the Settlement Approval Order, the Debtors assumed the GGPA, Carnero returned the $8 million letter of credit proceeds to Mesquite, and Seco Pipeline contributed the $2 million administrative expense claim it had

asserted against the Debtors. The Plan became effective on June 30, 2020. *See Notice of Effective Date* [Dkt. No. 1417].

## V. The Debtors Reach a Stalemate Over Rejection of the Midstream Agency Agreements And Exercise Their Contractual Right To Terminate the Settlement Agreement

35. As required by the Settlement Agreement, the Debtors diligently pursued rejection of the Midstream Agency Agreements via the adversary proceeding captioned *Occidental Petroleum Corp., et al. v. Sanchez Energy Corp. et al.*, Adv. Pro. No. 20-03198 [MI] ("Sanchez/Oxy Adversary"). Various parties in interest objected to the Debtors' proposed rejection of those agreements, arguing that the agreements created covenants running with the land or equitable servitudes and were thus not subject to rejection under Section 365 of the Bankruptcy Code. *See Plaintiff's Motion for Summary Judgment* [Sanchez/Oxy Dkt. No. 50] at ¶¶ 37-133.[11] The Debtors aggressively pursued their efforts to reject the Midstream Agency Agreements, litigating cross-motions for summary judgment and exchanging voluminous discovery with plaintiffs in the Sanchez/Oxy Adversary. At no point did Carnero offer to reimburse the Debtors for either the fees and expenses they incurred attempting to reject the Midstream Agency Agreements, or for the rejection damages Mesquite (as successor to Sanchez Energy Corporation) would owe if it succeeded in rejecting the agreements. Ultimately, on June 24, 2021—nearly a full year after approval of the Settlement Agreement and nine months *after* the Settlement Agreement's Outside Closing Date—Mesquite exercised its contractual right to terminate the Settlement Agreement. Mesquite subsequently returned the $8 million in letter of credit proceeds to Carnero.

36. On July 30, 2021, Carnero filed a lawsuit (the "Carnero Action") in the District Court of Harris County, Texas against Mesquite, UnSub, and the WIPs. The Carnero Action

[11] For clarity, this Complaint cites entries on the docket of the Sanchez/Oxy Adversary proceeding as "Sanchez/Oxy Dkt. No__."

sought, among other things, declarations that (i) the GGPA and the Ratification Agreements obligate Plaintiffs to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include requiring Mesquite to pursue rejection of the Midstream Agency Agreements, and (ii) after rejection of the Midstream Agency Agreements, Plaintiffs must deliver the gas from the Comanche Assets to Carnero. *See Petition* [Carnero Dkt. No. 1-4] at ¶36(k), (l).[12] The timing of the Carnero Action was no accident. As paragraph 25 of the Petition acknowledged, Carnero filed the lawsuit upon coming to the belief that the Comanche parties, including the parties in the Sanchez/Oxy Adversary, were on the cusp of a global midstream settlement. The Carnero Action was a last-ditch effort to derail this comprehensive deal.

37. On September 10, 2021, Mesquite, UnSub, and the WIPs filed a notice of removal, removing the Carnero Action to this Court. *See Notice of Removal* [Carnero Dkt. No. 1]. On October 8, 2021, Carnero filed a motion to remand the action to state court or for abstention. *See Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero Dkt. No. 6].

38. At the December 7 hearing on the motion to remand, the Court observed that "the plain language" of paragraph 36(k) of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreements under] Section 365" (December 7, 2021 Hr'g Tr. at 18:10 – 11) and that paragraph 36 (l) asked the State Court to "declare the effect of rejection of a contract before it's ever rejected." *Id.* at 15:25 – 16:1. Carnero's counsel disclaimed that understanding, stating that Carnero's "intent was not to dictate what . . . [Mesquite] was going to do with respect to § 365." *Id.* at 15:10 – 12.[13] Rather, Carnero asserted, the purpose of paragraphs

---

12 For clarity, this complaint cites entries on the docket of the Carnero Action as "Carnero Dkt. No__." The Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.*, Adv. Pro. No. 21-03908 [MI].

13 The December 7, 2021 hearing transcript is attached hereto as Exhibit A.

36(k) & (l) was to "specifically deal with what happens in the event of rejection . . . if confusion about the language [of paragraphs 36(k) & (l)] is something that is causing the problem, this can be amended to make it clear. " *Id.* at 15:9 – 14. The Court suggested that Carnero amend the Petition to remove those paragraphs, explaining that doing so "certainly [would] make a different argument." *Id.* at 17:11 – 13. Carnero agreed to file an amended complaint by December 10. *Id.* at 26:5 – 6.

39. Rather than file an amended complaint, however, Carnero withdrew the lawsuit. *See Plaintiff's Notice of Dismissal without Prejudice* [Carnero Dkt. No. 31]. Carnero's dismissal was explicitly without prejudice so that Carnero could later continue to assert that Section 365 provided Mesquite a "right or option to terminate" the Existing Commitments "without out-of-pocket cost" and that the Settlement Approval Order was unconditional and unqualified and thus constrained the Debtors' choices by imposing liability on Mesquite if it assumed the Midstream Agency Agreements.

40. On December 21, Mesquite filed a stipulation dismissing the Sanchez/Oxy Adversary and for assumption of the Midstream Agency Agreements. *See Stipulation and Agreed Order* [Dkt. No. 2249].

## **CLAIMS FOR RELIEF**

### **COUNT I**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Section 365 Gives Mesquite the Power to Breach the Midstream Agency Agreements, Not The "Right or Option to Terminate" Those Agreements**

41. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

42. An actual controversy exists as to whether Mesquite's right under Section 365 to reject the Midstream Agency Agreements can be deemed a "right or option to **terminate**" those agreements. According to Carnero, because Section 365 provides Mesquite with a "right or option to terminate" the Midstream Agency Agreements (and the Existing Commitments contained therein), Mesquite's decision to assume (rather than reject) those agreements constitutes a breach of Section 3.1(b) of the GGPA, which requires that Mesquite exercise "any right or option to **terminate** such Existing Commitments . . . without out-of-pocket cost." GGPA, § 3.1(b) (emphasis added).

43. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code to assume the Midstream Agency Agreements.

44. The Bankruptcy Code is unequivocal that rejection of an executory contract such as the Midstream Agency Agreements does not present a "right or option to terminate" a contract; rather, rejection "constitutes a *breach* of such contract." 11 U.S.C. § 365(g) (emphasis added). Numerous courts, including the Fifth Circuit, have "held that this language does not mean that the executory contract or lease has been terminated, but only that a breach has been deemed to occur." *Matter of Austin Dev. Co.*, 19 F.3d 1077, 1082 (5th Cir. 1994) (citing *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993)); *In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir. 1990); *Leasing Serv. Corp. v. First Tenn. Bank, Nat'l Ass'n*, 826 F.2d 434, 436–37 (6th Cir.1987). The "decision to reject is thus correctly viewed only as a *power to breach the executory contract*" not as a right or option to terminate such contract. *Id.* (emphasis added). The Supreme Court recently reaffirmed this understanding, holding in *Mission Product Holdings, Inc. v. Tempnology, LLC* that "[r]ejection of a contract—any contract—in bankruptcy operates not as a rescission but

as a breach." 139 S. Ct. 1652, 1661 (2019); *see also In re United DC,* Inc., No. 12-32620, 2013 WL 310311, at *4 (Bankr. S.D. Tex. Jan. 25, 2013) (Isgur, J.) (holding that rejection "is considered a breach rather than termination").

45. As the Fifth Circuit explained, "Congress knew how to authorize the termination of executory contracts and leases in § 365. 'Termination' is used in § 365(h), (i), and (n) as one option available respectively to the purchaser of an interest in a timeshare project, the vendee of real property, or the licensee from the debtor of a right to intellectual property *if* the trustee has rejected the executory contract." *Id.* (emphasis in original). Congress was "not confused in its differing usages of the terms rejection, breach and termination." *Id.* at 1083.

46. Moreover, "breach and termination of leases or executory contracts are not synonymous terms under state law." *Id.* (citing *Resolution Trust Corp. v. Cramer*, 6 F.3d 1102, 1108 (5th Cir.1993) (describing options available to landlords under Texas law)); *In re Storage Technology, supra; In re Picnic 'N Chicken, Inc.*, 58 B.R. 523, 525 (Bankr. S. D. Cal. 1986) (California law). Congress "could have chosen to depart from the state law meanings of these terms, but taken as a whole, § 365 suggests that it did not do so." *Id.*

47. Accordingly, Section 365 gave the Debtors the statutory power to *breach* the Midstream Agency Agreements, not the "right or option to *terminate*" those contracts.

**COUNT II**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Rejection Imposes "Out-of-Pocket Cost" On the Debtor**

48. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

49. An actual controversy exists as to whether rejection imposes "out-of-pocket cost" on the Debtors.

50. A declaration from this Court would serve the important purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Debtors may assume the Midstream Agency Agreements without incurring liability for breach of the GGPA.

51. Carnero has asserted that the Debtors can reject the Midstream Agency Agreements without incurring "out-of-pocket cost." Carnero is wrong. A "rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for **damages**." *Mission Product Holdings, Inc.*, 139 S. Ct. at 1661 (emphasis added). If Mesquite succeeded in rejecting the Midstream Agency Agreements, it would have owed its counterparties rejection damages for its failure to honor the Existing Commitments. Those damages would undoubtedly be substantial.

52. Accordingly, Mesquite would incur significant out-of-pocket cost if it rejected the Midstream Agency Agreements.

**COUNT III**

**(All Plaintiffs Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That—As Carnero Reads It—Section 3.1(b) of the GGPA is Unenforceable Under Bankruptcy Law, the Plan, and the Confirmation Order)**

53. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

54. An actual controversy exists as to whether—if Carnero's reading of Section 3.1(b) of the GGPA is correct—that provision would be unenforceable under bankruptcy law, the Plan, and the Confirmation Order.

55. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether Mesquite may assume the Midstream Agency Agreements without incurring liability for breach of the GGPA.

56. Even if (as Carnero claims) Section 3.1(b) of the GGPA imposes liability on Mesquite for assuming the Midstream Agency Agreements, such a provision would be unenforceable under bankruptcy law. The authority to assume or reject an executory contract is a "vital part of the bankruptcy process." *In re Trans World Airlines, Inc*., 261 B.R. 103, 123 (Bankr. D. Del. 2001). Section 365 "expresses a clear Congressional policy favoring assumption and assignment. Such a policy . . . insure[s] that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors." *Matter of U. L. Radio Corp*., 19 B.R. 537, 544 (Bankr. S.D.N.Y. 1982). Section 365 reflects the "fundamental bankruptcy policy allowing a debtor to realize maximum value from its [contracts] for the benefit of its estate and creditors." *In re Jamesway Corp*., 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996).

57. To effectuate this policy, bankruptcy courts routinely invalidate prepetition contractual provisions that restrict or condition the debtor's right to assume (and assign) its contracts. For example, courts have invalidated provisions that (i) condition consent to assignment upon payment by the debtor of an "assumption fee;"[14] (ii) provide for additional payments (*e.g.*, profit sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such contract upon assignment;[15] (iii) provide for any rights of first

---

14 *See In re Howe*, 78 B.R. 226, 228 (Bankr. D. S. D. 1987).

15 *See In re Golfsmith Int'l Holdings, Inc*., No. 16-12033 (LSS), 2017 WL 5564291, at *9 (Bankr. D. Del. Jan. 19, 2017); *see also In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996); *Robb v. Schindler*, 142 B.R. 589 (D. Mass. 1992); *South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.)*, 129 B.R. 200 (9th Cir. BAP 1991); *In re The National Sugar Refining Co*., 21 B.R. 196 (Bankr. S. D. N. Y. 1982).

refusal on a counterparty's part;[16] and (iv) provide for any recapture or termination rights in favor of the counterparty.[17]

58. Courts routinely invalidate such punitive provisions because they contravene the central purpose of Section 365 by restricting the debtor's ability to realize the value of its assets. A creditor cannot impose a penalty on the debtor for exercising its right to assume a contract. Section 3.1(b) of the GGPA (as Carnero reads it) would do exactly that: it would impose liability on Mesquite for its decision to assume the Midstream Agency Agreements. By the same token, Carnero's reading of Section 3.1(b) would allow Carnero to improve its position vis-à-vis other creditors and jump in line ahead of the current beneficiaries of the Existing Commitments. Such a provision is unenforceable under bankruptcy law.

59. Moreover, Article VIII.B of the Plan specifically exculpates Mesquite from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the . . . administration and implementation of the Plan." Article VIII.B became immediately effective on the Effective Date (June 30, 2020) pursuant to paragraph 9 of the Confirmation Order. The Debtors' and/or Reorganized Debtors' decision whether to assume or reject a contract falls squarely within this exculpation provision. Carnero's attempt to impose liability on the Debtors and/or the Reorganized Debtors for assuming the Midstream Agency Agreements thus violates both the Plan and the Confirmation Order.

---

16 *See In re Golfsmith Int'l Holdings, Inc*., 2017 WL 5564291, at *9.

17 *See In re Fairway Group Holdings Corp., et al.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 20, 2020); *see also In re Winn-Dixie, Inc.*, Case No. 05-03817 (M. D. Fla 2005); *In re Boscov's Inc., et al.*, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008)

## COUNT IV

**(By Plaintiffs Mesquite and Maverick, against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) that Carnero Breached the Settlement Agreement)**

60. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

61. An actual controversy exists as to whether Carnero breached the Settlement Agreement.

62. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Settlement Agreement's provision for assumption of the GGPA reflected the parties' intent to impose liability on Mesquite if, after validly terminating the Settlement Agreement, Mesquite ultimately assumed the Midstream Agency Agreements.

63. Section 2.2.1(d) of the Settlement Agreement required that the Debtors not remove any executory contracts from the Assumption Schedule, which included the GGPA. The Settlement Agreement thus caused assumption of the GGPA. The assumption of the GGPA, however, was not unqualified. The Settlement Agreement gave the Debtors the option to terminate that agreement if an order rejecting the Midstream Agency Agreements had not been entered by October 1, 2020, and specifically provided that return of the $8 million letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Midstream Agency Agreements. *Id*. The obligation to pursue rejection was not among the enumerated provisions that would survive termination of the Settlement Agreement. *Id.* at § 6.4.

64. The parties repeatedly acknowledged at the June 29-30, 2020 hearing that the Settlement Approval Order (and resulting assumption of the GGPA) would not preordain the Debtors' midstream restructuring. Carnero's counsel did not dispute any of these statements. Nor did Carnero object to the language of the Settlement Approval Order, which expressly recognized that the Debtors *might not* ultimately reject the Midstream Agency Agreements. Settlement Approval Order at ¶¶ 11, 13. The parties' understanding was crystal clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Settlement Agreement and failing to continue to pursue rejection of the Midstream Agency Agreements. Carnero breached the Settlement Agreement by repudiating this clear understanding and initiating the Carnero Action.

65. Moreover, the Settlement Approval Order and the Settlement Agreement both provided that the Bankruptcy Court would retain jurisdiction with respect to all matters arising from or relating to the Settlement Agreement. Settlement Approval Order at ¶ 6; Settlement Agreement, § 6.2.1. This Court had jurisdiction over the entire Carnero Action as a core proceeding because the action (i) went to both Mesquite's rights and the Court's authority under Section 365 and (ii) involved rights created by bankruptcy law and required interpretation and enforcement of this Court's orders. Even if the Carnero Action was not a core proceeding, the Court—at a minimum—had "related to" jurisdiction which requires only that the matter "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.)*, 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015).

66. Carnero was thus obligated to bring the Carnero Action before this Court and breached this obligation by filing the Petition in state court. Section 6.3 of the Settlement Agreement awards non-breaching parties "attorneys' fees and costs" as "a remedy for any such

breach." Accordingly, Mesquite and Maverick respectfully request attorneys' fees for removing the Carnero Action, defending it in Bankruptcy Court, and enforcing this lawsuit.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs Mesquite, Maverick, UnSub, and the WIPs respectfully request that the Court enter judgment as follows:

I. On Count I, declaring that, as a matter of bankruptcy law, Section 365 of the Bankruptcy Code gives Mesquite the power to breach the Midstream Agency Agreements, not the "right or option to terminate" those contracts;

II. On Count II, declaring that, as a matter of bankruptcy law, Mesquite would incur "out-of-pocket cost" if it chose to reject the Midstream Agency Agreements;

III. On Count III, declaring that—if Carnero's reading were correct—Section 3.1(b) of the GGPA is unenforceable under bankruptcy law, the Plan, and the Confirmation Order; and

IV. Granting Plaintiffs such other and further relief as the Court deems just and proper.

**FURTHER,** Plaintiffs Maverick and Mesquite respectfully request that the Court enter judgment as follows:

I. On Count IV, declaring that Carnero breached the Settlement Agreement and awarding attorneys' fees for removing the Carnero Action, defending it in Bankruptcy Court, and enforcing this lawsuit; and

II. Granting Plaintiffs such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank.]*

Respectfully submitted this 21st of December, 2021.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff**
**Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Plaintiff**
**SN EF UnSub, LP**

*/s/ Michelle Pector*
Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorney for Plaintiff Venado EF L.P.**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Plaintiff**
**Mitsui E&P Texas LP**

# EXHIBIT A

**December 7, 2021 Hearing Transcript**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC. | § | CASE NO. 21-03908-ADV |
| | § | HOUSTON, TEXAS |
| VS | § | TUESDAY, |
| | § | DECEMBER 7, 2021 |
| SN EF UNSUB, LP, ET AL | § | 2:30 P.M. TO 2:58 P.M. |

MOTION HEARING (HYBRID HEARING)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTOR: | (VIA TELEPHONE)<br>PAUL, WEISS, RIFKIND, WHARTON AND GARRISON<br>Justin Ward, Esq.<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3000 |
| | MCLOSKEY ROBERSON, PLLC<br>Thomas Woolley, Esq.<br>945 Heights Blvd<br>Houston, TX 77008<br>713-337-3910 |
| FOR CARNERO G&P, LLC: | PORTER HEDGES LLP<br>Joshua Wolfshohl, Esq.<br>Amy Falcon, Esq.<br>1000 Main St, 36th Floor<br>Houston, TX 77002<br>713-226-6000 |
| FOR MESQUITE ENERGY, INC. | FOLEY GARDERE<br>James G. Munisteri, Esq.<br>Sara Brown, Esq.<br>1000 Louisiana Street<br>Suite 2000<br>Houston, TX 77002<br>713-276-5500 |
| | (VIA TELEPHONE)<br>WILLKIE FARR AND GALLAGHER LLP<br>Mark Stancil, Esq.<br>Dennis Jenkins, Esq.<br>1875 K Street, NW<br>Washington, DC 20006<br>202-303-1133 |
| FOR MITSUI E&P TEXAS LP: | SIDLEY AUSTIN LLP<br>Duston McFaul, Esq.<br>Maegan Quejada<br>1000 Louisiana St<br>Suite 6000<br>Houston, TX 77002<br>713-495-4500 |

APPEARANCES (CONT'D):

FOR EAGLE FORD TX LP: (VIA TELEPHONE)
MORGAN, LEWIS AND BOCKIUS LLP
Julia Frost Davies, Esq.
One Federal Street
Boston, MA 02215
617-341-7700

FOR VENADO EF L.P. (VIA TELEPHONE)
KIRKLAND AND ELLIS LLP
Sydney Corry, Esq.
609 Main Street
Houston, TX 77002
253-455-6202

(Please also see Electronic Appearances.)

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
| --- | --- | --- | --- | --- |
| (None called.) | | | | |

| EXHIBITS: | Offered | Received |
| --- | --- | --- |
| Plaintiff's: | | |
| Exhibits 25-1 to 25-13 | 9 | 9 |
| Defendant's: | | |
| Exhibits 26-1 to 26-7 | 9 | 9 |

HOUSTON, TEXAS; TUESDAY, DECEMBER 7, 2021; 2:30 P.M.

THE BALIFF: All rise.

THE COURT: Please be seated.

All right. We are here in the Canero G&P, LLC versus SN EF UnSub LP, et al, Adversary Proceeding 21-3908. We'll start with appearances in court, we'll then take any appearances on the phone. If you wish to appear on the phone, please press five star.

Mr. Wolfshohl.

MR. WOLFSHOHL: Good afternoon, Your Honor. Joshua Wolfshohl and Amy Falcon, my colleague, for Carnero, the Plaintiff.

Good to see, Your Honor. Good to be back in the courtroom. This is my first hearing back, and I don't think I've been in this courthouse for two years and I'm actually glad to be here.

THE COURT: Glad to have you back.

MR. MUNISTERI: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. MUNISTERI: James Munisteri for Mesquite. Ditto, it's nice to be back.

THE COURT: It's very nice to have people back.

MR. MUNISTERI: And I'm on joined on the phone by Mr. Stancil and by Ms. Brown. And Ms. Brown just wanted me to make sure she's going to be designated as the presenter.

THE COURT: All right. Thank you.

MR. MCFAUL: Good afternoon, Your Honor. Duston McFaul, Sidley Austin for Mitsui E&P Texas, LP, which is one of the non-ops, and Ms. Maegan Quejada is on the phone, as well.

THE COURT: All right.

MR. MCFAUL: Thank you.

THE COURT: Thank you.

MR. MCFAUL: Nice to see you.

THE COURT: Ms. Frost-Davies, good afternoon.

MS. FROST-DAVIES: Good afternoon, Your Honor. Julia Frost-Davies, Morgan Lewis, on behalf of Eagle Ford Texas, LP also one of the non-op Defendants.

THE COURT: All right. Thank you.

From the 253 area code, is 253-456-6202. Let me see what I have.

MS. CORRY: Sydney Corry. This is Sydney Corry with Kirkland and Ellis on behalf of Venado EF LP.

THE COURT: Ms. Corry, good afternoon.

MS. CORRY: Good afternoon.

THE COURT: Mr. Ward.

MR. WARD: Good afternoon, Your Honor. Justin Ward from Paul Wiess on behalf of Defendant UnSub and possibly also attending today on behalf of Unsub are Thomas Woolley from McCloskey Roberson and also from Paul Weiss,

Alice (indiscernible).

THE COURT: Mr. Ward, thank you.

Mr. Stancil.

(No audible response.)

THE COURT: Mr. Stancil.

MR. STANCIL: Good afternoon, Your Honor. Mark Stancil from Willkie Farr & Gallagher on behalf of Mesquite Energy, Inc. I'M also joined by my colleague, Dennis Jenkins, also representing Mesquite.

THE COURT: Mr. Stancil, Mr. Jenkins, good afternoon.

From 212-728-8276.

MR. JENKINS: Your Honor, Dennis Jenkins of Willkie Farr. It's good to be back in front of Your Honor, thank you.

THE COURT: Good to have you here, Mr. Jenkins.

All right. I show that's all of the folks that wish to speak at today's hearing. If you change your mind and want to speak during the course of the hearing, just press five star.

I've now held a few, maybe you know half a dozen of these hybrid hearings, and they've worked pretty well. But if anyone has trouble hearing or seeing, just find a way to let me know, and we'll be sure that those of you that are remote can see what's happening in the court, and those of

you in court can see what's happening remotely.

So I think we'll go, I guess, to you Mr. Wolfshohl.

MR. WOLFSHOHL: I think that's right, Your Honor. And just as a housekeeping matter, we conferred -- well, we conferred with Mr. Munisteri, I think he was speaking for the entirety of the Defendants -- but I don't think that there's any objection to our exhibits and we had no objection to their exhibits being admitted.

THE COURT: All right. Can you give me those exhibit identifiers?

MR. WOLFSHOHL: Sure, Your Honor. For Carnero, our Exhibit List was at Docket No. 25. And so it would be all of the exhibits that were attached to that Docket entry which I think would be 25-1 through, I believe --

THE COURT: Thirteen?

MR. WOLFSHOHL: -- 13.

THE COURT: All right.

MR. WOLFSHOHL: And we also reference a number of documents that are on the Docket that were voluminous that we didn't want to have to refile. But in our Exhibit List, there's a number of documents we are going to refer to at least one of those. But I don't think there's any issue with those being admitted.

And then Mr. Munisteri, or whoever is in charge of

the Defendants, I just know we didn't have any objection to theirs. I don't think that they filed the actual exhibits, but they did file a list and they sent us their exhibits and we didn't have any issue with them, Your Honor.

MR. MUNISTERI: Your Honor, both parties agreed no objections to the other parties' exhibits.

THE COURT: But what are your exhibits? What are the exhibits, what -- how do I find them?

MR. STANCIL: Your Honor, this is Mark Stancil, we filed our Exhibit List, I believe it's -- I want to say Docket 26, but Ms. Brown may correct me. Our exhibits are listed there.

And essentially they are the same documents that Movants are relying on, and we just typically reference though a transcript from prior hearings in the bankruptcy and an Order. So I think all of our items are directly out of the Docket for the bankruptcy case.

THE COURT: All right. So without objection Exhibits 25-1 through -13 are admitted.

(Plaintiff's Exhibits 25-1 through 25-13 are offered and admitted in evidence.)

THE COURT: And the documents that are referenced in Exhibit 26 are admitted as to 1 through 7. I think that's what you-all are asking me to do.

(Defendant's Exhibits 26-1 through 26-7 are offered and

admitted in evidence.)

MR. WOLFSHOHL: That's my understanding Your Honor.

THE COURT: All right.

MR. WOLFSHOHL: If you will, Your Honor, could you please make Ms. Falcon the presenter?

THE COURT: Of course.

MR. WOLFSHOHL: And I think both parties are really just -- now that we've got the exhibits admitted, I think we're just going to really just argue our points and we both got presentations that we exchanged prior to the hearing.

But before I jump into my presentation I want to go through something -- to clear something up, because I think it's based on some of the arguments in the surreply that the Defendants filed, as well as the presentation that they provided to us right before the hearing. Ms. Falcon is pulling up -- this is one of the documents that we identified -- is it on the screen?

THE COURT: Oh, yeah. I'm going to split the screen here to where people in court can --

MR. WOLFSHOHL: Okay.

THE COURT: -- see both faces and --

All right. Go ahead, please.

MR. WOLFSHOHL: Thank you, Your Honor.

There seems to be confusion about -- as Your Honor, knows -- I know you've read the pleadings and you've probably digested quite a bit in the last several days -- but there seems to be some confusion about whether the GGBA was assumed pursuant to the Settlement Agreement that was entered into around confirmation on June the 30th of 2020. And I want to clarify because the GGBA that I'm seeking to enforce, in this State Court lawsuit, was in fact not assumed pursuant to that agreement, Your Honor.

And if you go to the Settlement Agreement -- this is the Settlement Agreement that was attached to the motion that was filed seeking to approve the Midstream Settlement Agreement. You look at the definition of assumption agreements and it says -- starts with the Carnero Agreements and then it says the Catarina Gathering Agreement and then it identifies a number of other documents that are not the GGBA that I'm seeking to enforce.

In fact, it references that agreement, but it does not say that, that's an assumption agreement. If you look at the -- read all the way through Your Honor. It talks about ratification agreements that ratified the FGGBA, the Comanche FGGBA, that's the agreement that I'm seeking to enforce. It's a defined term in the Settlement Agreement, but it is not an assumption agreement so we will go to --

Ms. Falcon, if you can go to the Carnero

Agreements first?

You see the Carnero Agreement references the Carnero Gathering Agreement and the Carnero Processing Agreement, and we'll start with the Gathering Agreement. This is an agreement with SN Caterina.

Your Honor, if you remember, and I'm sure that -- I'm sure that the Reorganized Debtor is going to tell you a little bit about the history of these contracts -- but the Debtor had essentially two large pieces of acreage. One was the -- they referred to as the "Catarina Acreage" and the other one they referred to as the "Comanche Acreage." Most of the benefit that the Debtor was getting under the Settlement Agreement -- the Midstream Settlement Agreement -- related to the Catarina Acreage. My client was making significant concessions on rates as to the Catarina Acreage.

The Carnero Gathering Agreement that's reference as a "Carnero Agreement" under this agreement is with SN Caterina, which is the entity that owned the Caterina assets.

If you look -- the same thing goes for the Carnero Processing Agreement. Also in agreement with SN Caterina.

These are not agreements with SN Maverick. And if you look -- the specific Comanche FGGBA is a defined agreement under the Settlement Agreement, but it is not an

agreement that was an assumption agreement. The way that my GGBA that I'm seeking to enforce was assumed was pursuant to the Plan. It was listed as a contract that was being assumed, and the time passed and nobody objected to it. But it was not assumed pursuant to that Order, it just wasn't.

And there seems to be some reliance on the idea that somehow it was assumed in a qualified fashion and that as a result -- I don't think this is relevant -- but as a result of the termination of the Settlement Agreement that somehow that combined with the way the Settlement Agreement was approved that there was some kind of qualified assumption of my agreement.

But as to the GGBA, the fundamental agreement that I'm seeking to enforce in my State Court action, it was assumed with no qualifications.

But I just wanted to clear that up, Your Honor, and I'll move to the presentation.

So Your Honor, we think that this -- this is a very straightforward analysis. The issue before the Court, we have a State Court lawsuit that was filed in July of 2021, more than a year after the Plan got confirmed and more than a year after the Plan went effective. We're seeking declarations under the Texas Civil Practice and Revenues Code. And there are declarations that we are asking a State Court to interpret related to the assumed contracts. The

fundamental contract being the GGBA that was assumed under the Plan.

Most of the Defendants are non-Debtors, but there are Reorganized Debtors that are Defendants, as well. But it has to do with -- the fundamental disputes have to do with actions that were taken post-confirmation, actions that were taken more than a year after confirmation, more than a year after the effective date. The Defendant’s bear the burden to establish jurisdiction and we don’t think that they can, Your Honor.

Most of Carnero’s claims in the dec action don’t reference the Code, the Plan, or any order of this Court. The thing that they have really focused on are the claims where we are asking the State Court to declare what our rights are once these contracts are rejected.

THE COURT: Actually, I think that’s not quite right. This may be a bit of the inverse of that, but what I read the Complaint from them as being, is that you're asking that people be compelled to take action in the Bankruptcy Court to implement what you think your rights are, and you're asking the State Court to determine that before they ever act in the Bankruptcy Court.

And as I read their Complaint -- and you’ve got the right sections up here, K and L -- K seems to say that the State Court can order action to be taken here and L

seems to interpret what that action might be. And I think that's the heart of the Complaint. Not what your rights are necessarily, but that your attempt to control what occurs at 515 Rusk Street, for lack of a better description, is the way I would describe what I read their concerns to be.

MR. WOLFSHOHL: I don't disagree with the way that they've cast their Complaints, Your Honor. And I will tell you -- and I'm just going to say -- if confusion about the language is something that is causing the problem, this can be amended to make it clear, but my client's intent was not to dictate what it was that they were going to do with respect to 365. The purpose of these provisions is specifically to deal with what happens in the event of rejection.

THE COURT: Well, I know, but take a look at L. If you think you can amend out K and L, it may be worth thinking about doing that before we continue with the hearing.

By the way there may be nothing wrong with doing it this way and I'm not necessarily saying that you lose --

MR. WOLFSHOHL: No.

THE COURT: -- because of this.

MR. WOLFSHOHL: I understand.

THE COURT: But I think what the Complaint is, is you're having the State Court declare the effect of

rejection of a contract before it’s ever rejected under L. That’s a big step that may or may not be a fatal step. But if you can take away K and L, it’s going to change the discussion, I think, that we’re going to have today. I’m just -- I’ll let the other side speak up about this, but that’s what I’m reading the graver unhappiness to be about.

MR. WOLFSHOHL: Well, I can tell you, Your Honor, that when this Complaint, or this Petition, was prepared, the concern that we had was that they were continuing to pursue the OXY litigation and continuing to pursue rejection.

THE COURT: Right.

MR. WOLFSHOHL: But we were concerned that once they rejected, that they weren’t going to honor our agreement. And that was the -- that was the gist of the concern.

Now they have since announced to Your Honor, that they're going to do some sort of hybrid type of assumption and that they're going to --

THE COURT: Well, I think we’re coming back on the 21st, understandably.

MR. WOLFSHOHL: Well, I mean, they say that, Your Honor, but you know, we’ve been here several times, we don’t know exactly what’s going to happen. I’m just saying that the concern that my client has is that whatever global

settlement that they're entering into in some way impairs my client's rights under the GGBA, which is an assumed contract. I don't think I have to adjudicate those rights in Your Honor's court. And if you think that -- I mean --

THE COURT: I'm doing my best to not cross that bridge right now, because I don't know where the day is going to end up. But if what you're telling me is you don't need K and L, it's going to change what's happening a lot. But if you need K and L, it's going to change things a lot, too. So I think if you're really telling me this was stylistic, but not substantive to do K and L and the way you did them, then you can amend it away, it certainly will make a different argument.

And you know that I'm going to react to sort of with this initial negative reaction that any other court can tell me what needs to happen in my court, just as I wouldn't do that to them. I don't know that necessarily means it's wrong, but it may suggest to you the -- good idea.

MR. WOLFSHOHL: I believed that the issue was more nuanced than that, Your Honor.

THE COURT: Okay.

MR. WOLFSHOHL: I believed that the issue -- and they've raised this -- is this notion -- and this is -- I'm going to tell you what we didn't intend to do.

They raised this issue that this somehow, that K

was meant to require them or have a State Court say that they were required to exercise their rejection rights under 365. The intent -- and I mean it may not be artfully worded -- but the intent, in saying "among other actions," was to qualify that there were a number of ways to basically effect the termination of the obligations under the existing commitments. And the Debtors know that that was a way for them to do it, because that was the purpose of the Midstream Settlement Agreement. The Midstream Settlement --

THE COURT: I read K, the plain language of K, to ask the State Court to make Mesquite pursue Section 365.

MR. WOLFSHOHL: That's not the intent --

THE COURT: That is the way --

MR. WOLFSHOHL: That is not the intent and that could be amended. But here is where I'm getting to on how I think it's more nuanced.

The -- I knew you were going to -- I mean, I knew that because they raised that and I thought, you know, what -- you know, if that needs to be amended to be clarified, I think it changes, you know -- if Your Honor, believes that, that's what that means, that is not the intent. But the other question is if -- and you know, and it sounds like maybe you're going even further than that -- is if I'm asking the State Court to say "upon rejection," which is just a breach of contract under applicable law, that it has

an effect on my contract. And it has the effect of the Debtor's no longer obligated under those existing commitments and I just don't see how that could be -- fall under Your Honor's jurisdiction. Because once you reject, you know, you proceed, you know, as a Reorganized Debtor with the consequences of rejection.

THE COURT: So look -- and I said to you, I'm not necessarily saying there's anything wrong with this, but I'm not sure that every rejection order or rejection agreement has unmodified rights of a breach, right? The Court can certainly have a more nuanced order than that.

And I don't know -- first of all, I don't know if they're going to seek rejection. I don't know if I'm going to approve rejection. I don't know if I'm going to approve rejection if I say it's conditioned on certain events. There are all sorts of things that can happen, and to ask for declaration of what I'm going to do before I do it, before I know what I'm going to do, and to say anytime I act under 365, here's the consequence, that may be perfectly correct to go to State Court to do it. Not sure why we're doing it before we've decided.

MR. WOLFSHOHL: Can I have an opportunity to confer with my client? I actually think I -- I mean, I'm not sure I'm going to be able to get the right people on the phone immediately, I'm wondering if perhaps --

THE COURT: Well, let me ask the Defendants whether -- you're already telling me that I'm misreading K and I don't mean that you're doing that by saying it's my fault.

MR. WOLFSHOHL: I'm telling you that it's different than our intent, that's what --

THE COURT: Right.

MR. WOLFSHOHL: -- I'm saying. Yeah.

THE COURT: I know people are prepared for this hearing, but I see little point in going through it if I'm going to go through a hearing and then give you a chance to amend and then come back, as opposed to saying I would rather be arguing about what we're arguing about.

MR. WOLFSHOHL: Yeah.

THE COURT: And it may make sense to give you an amendment opportunity. Everyone here is going to be back on the 21st anyway, and then we just continue the hearing on the 21st and take everything up at the same time. Also adds more clarity to what the disputes about, I think.

Let me see what people think of that. I'll start in court with -- see if it makes any sense.

Mr. McFaul and Mr. Munisteri?

MR. MCFAUL: Yeah. Duston McFaul for Mitsui and well, I'll go ahead. I was going to say Mr. Stancil is taking the lead. But our position is that, of course, we're

fine with giving them an ability to amend, but we view this whole lawsuit as an attempt to get a court to say, "You are required to reject contracts and move the dedication of those minerals to us." We think K clearly says you are obligated to reject. That right only arises with Your Honor, so.

THE COURT: I think it does, too, but he's telling me that's not what he means to be asking for, so are you really going to spend an hour --

MR. MCFAUL: Understood. Understood.

THE COURT: I'm just asking --

MR. MCFAUL: We don't --

THE COURT: Does it make some sense to go a different direction?

MR. MCFAUL: We don't think they can amend and rectify it, but we're supportive of the opportunity.

THE COURT: It may be that --

MR. STANCIL: Your Honor --

THE COURT: -- they could is the problem and at which point, maybe you would be happy.

MR. MCFAUL: And I'll turn it over to Mr. Stancil.

THE COURT: I think at some point -- I'm going to now sort of -- at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of

that are a State Court issue. And so I don't know that this necessarily means this isn't going to go back to State Court, just because I'm concerned about that, because they can clearly fix at least some of the issues. I think.

Let me hear from folks on the phone.

MR. STANCIL: Your Honor.

THE COURT: Go ahead, Mr. Stancil.

MR. STANCIL: This is Mark Stancil, thank you -- for Mesquite.

Of course, understanding Your Honor will qualify that, I think we can cover a lot of ground today and I think would actually be very useful.

I think even if K were gone entirely, I think this would still be before, Your Honor, and I'm happy to get into that in a minute or now. But I think there are multiple independent bases for jurisdiction and I think it would actually significantly -- even if they're going to attempt to amend, which is not what they're supposed to be doing on removal, but even if they're going to attempt to amend, I think we could clarify the landscape significantly today to see if they're going to do it successfully.

But I think no matter what they amend, I think they're going to be back in front of Your Honor either way.

THE COURT: I think we're coming back either way, if that's what you mean. It's just a question whether I do

the amendment before the argument or after. Let me --

MR. STANCIL: Your Honor, I'll go one further and say we believe that Your Honor will have jurisdiction, and we think this lawsuit is going to be resolved on a motion to dismiss definitively by Your Honor with respect to the agreement that are in front of you. We don't agree that it's going to need to end up in State Court at all.

THE COURT: I don't know if it needs to end up in State Court or not. And that's the argument I'm going to eventually need to hear, whether it's today or another day.

Let me hear if anybody else wants to pitch in on that?

(No audible response.)

THE COURT: Okay. Well, look, I'm going to go ahead --

MR. WARD: Your Honor --

THE COURT: Yes. Go ahead.

MR. WARD: Your Honor, this is Justin Ward from Paul Weiss.

I do just want to raise the issue and to be candid, we haven't even looked into this of whether, you know, there are certain procedural issue with sort of defeating federal jurisdiction, bankruptcy jurisdiction by filing a Complaint that's within the Court's jurisdiction then amending after removal to sort of remove -- you know,

eliminate jurisdiction. I just want to make sure that, you know, it's not something we've thought about, but I'm not as I sit here today, if that's even possible.

MR. WOLFSHOHL: Your Honor, that's not --

MR. STANCIL: Your Honor, we have looked at that. It is removal jurisdiction is determined at the moment of filing a Complaint. But you know, I grant there might be some inefficiency to go going back to State Court with a new Complaint.

But we agree with the point I think Mr. Ward was making that I think it has to live or die at the moment of a filing with the Complaint when it comes to subject matter jurisdiction. They would be amending in front of you having put in front of you and then I guess they would be moving to dismiss for lack of subject matter jurisdiction.

THE COURT: I don't think it would be -- look, subject matter jurisdiction is plainly determined at the point of removal, but I'm not sure that abstention is the same as subject matter jurisdiction, so.

MR. WOLFSHOHL: Your Honor, also, you can always, you know, remove or, I mean, remand or dismiss a Complaint based on a lack of subject matter jurisdiction. The subject matter jurisdiction is a continuum, and if I modify the Complaint to make it clearer, I don't see how that could possibly in anyway interfere with --

THE COURT: Well, I do think that there may be a question of if the removal was proper, because there was subject matter jurisdiction, and you amend, I don't think that the remand motion gets to say that I don't have subject matter jurisdiction. I think it gets to say we should now abstain.

MR. WOLFSHOHL: For lack of subject matter jurisdiction?

THE COURT: No. Abstain on other principles.

MR. WOLFSHOHL: Right.

THE COURT: Maybe that had it been filed today there wouldn't be subject matter jurisdiction, but we would still have subject matter jurisdiction over something that was filed that way, I think. That part can be briefed as well. I'm not looking -- the Defendants aren't going to wave this argument by me allowing the amendment, but it may focus you more on the abstention argument.

MR. WOLFSHOHL: Yeah.

THE COURT: If you want the right to amend, I don't know that. I think so. I'm going to do this. I know it's frustrating for everybody, but probably more frustrating for me because I've got to read all this stuff and I'll have to read it again. I want you to amend.

MR. WOLFSHOHL: Okay.

THE COURT: If I'm misreading it, they're

misreading it, I don't want to hear the whole argument over the wrong issues. I'm going to require the amendment to be done -- can you get it done by Friday?

MR. WOLFSHOHL: I think I can. Yes, sir.

THE COURT: Not later than the 10th at 5:00 o'clock.

I want any supplement to the motions by the -- to the responses, I should say, by the Defendants to be filed by the 17th.

And then we'll come back on the 21st, along with the settlement implementation hearing at 1:30 on the 21st, and I'm going to tell Ms. Do to just block off the rest of the day for those two matters so that you won't get interrupted.

I'm sorry to bring everybody down for this, but I think it is the better course of action, so that we're all focused on what we need to be focused on. Their settlement may affect what you need, and what you amend may cause some relaxation by the Defendants, I don't know. But I want to see what that is.

So I think it's the most efficient thing to do and that's what we'll do today. I'll see you-all on the 21st.

THE COURT: Thank you.

MR. WOLFSHOHL: Thank you, Your Honor.

MR. STANCIL: Thank you, Your Honor.

THE COURT: We're in adjournment until 4:00 o'clock.

(Proceeding adjourned at 2:58 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #64921*

*DATE FILED: DECEMBER 13, 2021*

B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP | **DEFENDANTS**<br>Carnero G&P, LLC |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>See Attachment | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Causes of Action Seeking Declaratory Judgments, Pursuant to 28 USC 2201

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [1] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Sanchez Energy Corporation | BANKRUPTCY CASE NO.<br>19-34508 (MI) | |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Marvin Isgur |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF<br>Carnero G&P, LLC | DEFENDANT<br>SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | ADVERSARY PROCEEDING NO.<br>21-03908 (MI) |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Marvin Isgur |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>***/s/ James G. Munisteri*** | | |
| DATE<br>12/21/2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>James G. Munisteri | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# ATTACHMENT TO ADVERSARY COVER SHEET
## ATTORNEYS FOR PLAINTIFFS

**Attorneys for Plaintiffs SN EF Maverick, LLC and Mesquite Energy, Inc.:**

James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Eagle Ford TX, LP:**

Michelle Pector, Esq.
Jared Wilkerson, Esq.
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorney for Plaintiff Venado EF L.P.:**

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorneys for Plaintiff Mitsui E&P Texas LP:**

Duston K. McFaul
Maegan Quejada
Sidley Austin LLP
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
Sidley Austin LLP
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Plaintiff SN EF UnSub, LP:**

Thomas A. Woolley, III
McCloskey Roberson, PLLC
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-________(MI)** |

**COMPLAINT**

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Venado, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"), by and through counsel, each bring this adversary proceeding against Carnero G&P LLC ("Carnero" or "Defendant"), and in support thereof state as follows:

## INTRODUCTION[2]

1. This adversary proceeding concerns the Debtors' right to assume certain midstream contracts as contemplated by the confirmed Plan of reorganization. Defendant Carnero has claimed—and undoubtedly will again—that the Debtors' exercise of their assumption rights under Section 365 of the Bankruptcy Code, as part of a Court-approved settlement with Defendant, exposes the Debtors and their counterparties to significant contractual liability. This action seeks to confirm—free from doubt or further attempts by Carnero to use state courts to upend these Chapter 11 cases—Debtors' rights under the Bankruptcy Code to restructure their midstream contracts.

2. In 2018, Debtor/Plaintiff Maverick and Defendant Carnero entered into a midstream contract known as the "GGPA." The GGPA provided that Carnero would be *second* in line for Maverick's hydrocarbons, *behind* Maverick's preexisting midstream contracts with other counterparties. That is, the GGPA required Maverick to send the subject hydrocarbons to Carnero only *after* the preexisting midstream contracts had run their course, which was expected to occur in 2034, or to the extent gas production levels exceeded those existing commitments. The GGPA

[2] Unless otherwise specified, capitalized terms used but not defined in this Complaint shall have the meaning given them in the *Second Amended Joint Chapter 11 Plan of Reorganization* [Dkt. No. 1205] (as amended or supplemented from time to time, the "Plan").

provided that Maverick would exercise its first "right or option to *terminate*" the preexisting midstream contracts, so long as Maverick could do so "without out-of-pocket cost" (unless Carnero agreed to reimburse Maverick for such cost).

3. The Debtors filed for bankruptcy relief in August 2019, and the Plan of reorganization was confirmed on April 30, 2020. In June of that year—before the Plan could go effective—Maverick and Carnero (along with Seco Pipeline, LLC[3] and other parties) entered into an agreement settling a variety of disputes *and* outlining a potential path by which Maverick could restructure its midstream contracts (the "Settlement Agreement"). The Settlement Agreement required Maverick to *seek* rejection of the preexisting midstream agreements and to assume the GGPA. To that end, Maverick represented that, ***if*** rejection of the preexisting midstream agreements were successful, the GGPA would give Carnero first claim to Maverick's hydrocarbons. But the Settlement Agreement was limited in duration: if rejection had not been accomplished by October 1, 2020, Maverick could terminate the agreement and would no longer be required to pursue rejection of the preexisting midstream agreements. After a lengthy hearing, this Court approved the Settlement Agreement on the universal understanding that neither the settlement itself, nor the resulting assumption of the GGPA, "preordained" or "irrevocably" committed the Debtors to elevating Carnero to first position ahead of the preexisting midstream contracts. The Court entered an order to that effect on June 30, 2020, and the Plan went effective.

4. The Reorganized Debtors fought to reject the preexisting midstream agreements as required by the Settlement Agreement, and continued that fight (at their own expense) well past October 1, 2020. But after many months of costly litigation, the Reorganized Debtors ultimately determined that a different path was best. Accordingly, they terminated the Settlement Agreement

[3] Seco Pipeline, LLC ("Seco Pipeline"), is a subsidiary of Evolve Transition Infrastructure LP.

on June 24, 2021, and later announced a settlement by which the preexisting midstream agreements will be assumed.

5. Unhappy with that result, Carnero then attempted to *force* the Debtors to elevate the GGPA from second place to first place. On July 30, Carnero filed suit in Texas state court, claiming for the first time that the GGPA *required* the Reorganized Debtors to reject the preexisting midstream contracts, arguing that Section 365 of the Bankruptcy Code constituted a "right or option to terminate" those contracts "without out-of-pocket cost." The state court litigation was promptly removed to this Court. At the December 7 hearing on Carnero's motion to remand the case to state court, Carnero disclaimed an intent to have a state court opine that a debtor was required to reject a contract in Bankruptcy Court. While Carnero offered to amend its complaint to eliminate that particular request, Carnero continued to assert that it could seek to impose liability on the Reorganized Debtors (and other parties in interest) for deciding not to reject a contract under Section 365. And Carnero insisted that such a lawsuit could be brought only in state court. The Court invited Carnero to amend its complaint.

6. Instead of amending, however, Carnero dismissed its complaint, with the obvious goal of attempting to reassert the same claims in Texas state court at a later date. That gambit must fail. Carnero's position flies in the face of the Bankruptcy Code, the text of the parties' agreements (including the GGPA and the Settlement Agreement), and multiple orders of this Court. The Debtors and other Plaintiffs request declaratory relief from this Court to remove the cloud cast by Carnero's ongoing threat of litigation.

## THE PARTIES

7. Plaintiff Maverick is a limited liability company organized under the laws of Delaware with its principal place of business in Houston, Texas.

8. Plaintiff Mesquite is a corporation organized under the laws of Delaware with its principal place of business in Houston, Texas.

9. Plaintiff UnSub is a limited partnership organized under the laws of Delaware with its principal place of business in Houston, Texas.

10. Plaintiff Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

11. Plaintiff Venado is a limited partnership organized under the laws of Delaware with its principal place of business in Austin, Texas.

12. Plaintiff Mitsui is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

13. Defendant Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners, LP) with its principal place of business in Houston, Texas.

## JURISDICTION, VENUE, PREDICATES FOR RELIEF[4]

14. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012). Moreover, this Court's jurisdiction was expressly contemplated by Article XI of the Plan, paragraph 43 of the Confirmation Order, paragraph 6 of the Settlement Approval Order, and Section 6.2.1 of the

[4] Unless otherwise specified, capitalized terms used but not defined in this "Jurisdiction, Venue, and Predicates for Relief" section shall have the meaning given them in the "Facts" section of this Complaint.

Settlement Agreement. The parties have concrete disagreements that fall squarely within this Court's jurisdiction in numerous respects and directly affect the success of the Chapter 11 Plan:

- This adversary proceeding requires interpretation of at least two of the Court's prior orders, including:
  - the Confirmation Order, which established the post-confirmation process for the Debtors' assumption and rejection of executory contracts *and* exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the Chapter 11 Cases . . . [or] the administration and implementation of the Plan"; and
  - the Settlement Approval Order, which approved the Settlement Agreement, effected the assumption of the GGPA, and required that any determination by Maverick in respect of assumption or rejection of any executory contract, (a) be made by a fiduciary of Maverick, (b) be made by a fiduciary after such fiduciary exercised sufficient due diligence to determine whether assumption or rejection is in the best interest of Maverick, (c) be determined to be in the best interest of Maverick, and (d) considered after notice and a hearing.
  - Both orders were conditioned on certain understandings Carnero has since repudiated, including that Maverick pursue a midstream structure in its best interest—a requirement imposed by the Settlement Approval Order.
- This litigation also raises at least three questions of federal bankruptcy law:
  - *First*, whether the Debtors' decision to reject or assume the Midstream Agency Agreements under Section 365 was an opportunity to "*breach* such contracts" (as Section 365(g) expressly provides) or, as Carnero has claimed, a "right or option to *terminate*" the contracts.
  - *Second*, even if rejection under Section 365 could somehow be deemed "a right or opportunity to terminate" the Existing Commitments, whether the Debtors' resulting liability for rejection damages would impose "out-of-pocket cost" on the Debtors.
  - *Third*, in any event, whether Section 3.1(b) of the GGPA—as interpreted by Carnero—would be unenforceable as a matter of federal bankruptcy law, because it would subject the Debtors to significant liability simply because the Debtors chose to assume the Midstream Agency Agreements.
- This litigation directly implicates the "implementation or execution" of the Plan, including the Plan's unusual (but necessary) post-confirmation process for assumption and rejection of executory contracts; and
- Carnero consented to the jurisdiction of this Court with regard to any proceeding "arising out of *or relating to*" the Settlement Agreement, and this litigation directly concerns Carnero's attempts to rewrite the essential terms of that agreement and this Court's approval thereof.

15. The statutory and legal predicates for the relief are 11 U.S.C. §§ 105(a) and 365(a); 28 U.S.C. §§ 2201 and 2202; Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Plan, the Confirmation Order, the Settlement Approval Order, and the Settlement Agreement.

16. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 and Bankruptcy Rule 7001, and the Court may enter final orders for matters contained herein.

17. Venue is proper in this district pursuant to 28 U.S.C. §1409, and because Carnero consented to this venue in the Settlement Agreement and resides in this District.

18. Pursuant to Bankruptcy Rule 7008 and Local Bankruptcy Rule 7008-1, Plaintiffs' consent to entry of final orders or judgment by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

### I. The Midstream Agreements

19. Through 2016, Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko"), and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties located in South Texas (the "Comanche Assets"). In January 2017, Maverick and various co-investors, including UnSub, purchased the working interests of Anadarko in the Comanche Assets. The transaction closed on March 1, 2017.

20. Prior to the sale of the Comanche Assets, Anadarko had acquired and developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production downstream to customers. To that end, Anadarko contracted with several midstream parties who made substantial investments in building out the necessary infrastructure to monetize production from the Comanche Assets in exchange for certain contractual promises regarding

delivery of hydrocarbons, rates, minimum volume commitments, and related fees (the "Existing Commitments").

21. While the purchasers of the Comanche Assets sought to buy this comprehensive package of assets and contracts, a group of key assets could not be assigned because certain counterparties did not consent to their transfer (the "Retained Agreements").[5] Maverick and Anadarko therefore entered into two agency agreements (collectively, the "Midstream Agency Agreements") whereby Maverick would act as Anadarko's agent under the Retained Agreements.[6] Maverick would thus receive the benefits of such agreements and also undertake Anadarko's obligations thereunder, including the Existing Commitments.

22. On April 1, 2018, Maverick and Carnero entered into a back-up midstream agreement for production from the Comanche Assets—the Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA"). As relevant here, Section 3.1 of the GGPA obligates Maverick to deliver to Carnero "100% of the Dedicated Gas" produced by the Comanche Assets *after* the Existing Commitments terminate, or to the extent there is gas produced in excess of the Existing Commitments. Specifically, pursuant to Section 3.1(b) of the GGPA, the Existing Commitments are excluded from the dedication to Carnero until the earliest time at which

[5] The Retained Agreements included the following midstream gathering and processing contracts (i) that certain Gas Processing Agreement, by and between Anadarko E&P Onshore LLC and WGR Operating, LP, dated February 27, 2012 (as amended, the "Brasada Processing Agreement"), and (ii) that certain Gathering and Processing Agreement by and between Anadarko E&P Onshore LLC and ETC Texas Pipeline, Ltd., dated April 1, 2011 (the "ETC Processing Agreement" and together with the Brasada Processing Agreement, the "Retained Gathering and Processing Agreements") as well as the following marketing contracts: (i) the Enterprise Products Transportation Agreement; (ii) the Double Eagle/Kinder Morgan Throughput Agreement; (iii) the BP Crude Oil Sales Agreement; and (iv) the Enterprise Products Purchase Agreement (collectively, the "Retained Marketing Agreements").

[6] The Midstream Agency Agreements include (i) an agency agreement between Anadarko, Maverick, and Sanchez Energy Corporation by which Anadarko appointed Maverick to act as its agent for the Retained Gathering and Processing Agreements (the "GPA Agency Agreement"), and (ii) an agency agreement between Anadarko, Anadarko Energy Services Company, Maverick, SN Catarina, LLC, and Sanchez Energy Corporation by which Anadarko appointed Maverick and Catarina to act as its agents for the Retained Downstream Agreements (the "Marketing Agency Agreement").

Mesquite can exercise "**<u>any right or option to terminate</u>** such Existing Commitments…**<u>without out-of-pocket cost</u>**:"

> (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time

GGPA, § 3.1(b) (emphasis added). From the inception of the GGPA in 2018 through June 2021, Carnero never once suggested that Section 3.1(b) of the GGPA (or any other provision of that agreement) required Maverick to *breach* the Existing Commitments.

23. On the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford and Venado also executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, dated April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Venado ratification agreements are collectively referred to as the "<u>Ratification Agreements</u>"). Maverick is thus obligated to deliver hydrocarbons to Carnero only *after* the Existing Commitments terminate, or to the extent there is gas produced in excess of the Existing Commitments. UnSub and the WIPs have ratified this commitment.

## II. <u>The Chapter 11 Cases</u>

24. Beginning in 2014, oil prices declined precipitously from more than $100 per barrel, to a 13-year low of approximately $26 per barrel in February 2016. *See Declaration of Cameron W. George in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 16] (the "<u>First Day Decl.</u>") at ¶ 51. Prices made a slight rebound in 2017, but fell again in the second half of 2018. *Id.* This extreme volatility continued through 2019. *Id.* Overall, oil prices fell approximately 50% and natural gas prices fell approximately 60% between 2014 and 2019. *Id.* As

a result of these difficult and unsustainable market conditions, on August 11, 2019, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

25. As the Court is aware, these Chapter 11 cases followed an unusual course. On April 30, 2020, under the extraordinary circumstances of a global pandemic combined with continued stress in the oil and gas industry, the Court entered the Confirmation Order. *See Order Approving Disclosure Statement and Confirming Plan of Reorganization* [Dkt. No. 1212]. The Plan provided for, among other things, the equitization of approximately $100 million of postpetition, debtor-in-possession loans and, as is particularly relevant here, delayed the assumption or rejection of certain midstream contracts. *See* Plan at 16 (Art. III.C.3); 26 – 27 (Art. V.B.). This unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *In re Sanchez Energy Corp.*, 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). "To forestall liquidation, Sanchez and its creditors agreed to confirm a chapter 11 plan first and litigate Sanchez's ability to reject executory contracts later." *Id.*

26. The Plan and Confirmation Order established a post-confirmation procedure to resolve assumption and rejection disputes. Specifically, the Debtors were to identify executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "Rejection Schedule") or to be assumed as listed on Exhibit C (as amended, the "Assumption Schedule") to the Plan Supplement. *See* Confirmation Order at ¶¶ 17 – 26; Plan at 26 - 37 (Art. V.B.). If no party in interest filed a timely objection, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date, except insofar as the objection deadline had been extended. *Id.* If an objection was timely filed, the Confirmation Order provided that the contract "**shall not be deemed assumed or rejected**, as applicable, **until entry of an order**

resolving the dispute and approving the assumption or rejection" or as may be agreed upon by the parties. Confirmation Order at ¶ 17 (emphasis added). In the interim, the "agreement shall continue as in effect immediately **prior to the effective date**." *Id.* (emphasis added).

27. Pursuant to Article XI of the Plan, the Bankruptcy Court retained "exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" including to "resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under any Executory Contract[.]" Plan at 40 (Art. XI). The Confirmation Order likewise provided that the Bankruptcy Court retained "exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of th[e] Confirmation Order." Confirmation Order at ¶ 43.

## III. Settlement Agreement With Carnero

28. Following confirmation of the Plan, the Debtors continued to work on identifying, finalizing, and implementing a strategy to restructure their midstream arrangements to reduce costs, rates, and fees. Moreover, the Plan could not be consummated until the DIP Lenders were satisfied that the Reorganized Debtors would have sufficient liquidity to operate in the ordinary course of business after the Effective Date. *See* Plan at 38 (Art. IX.B.3.).[7] Identification of a viable approach with midstream providers to improve the midstream cost structure was crucial to securing the needed liquidity. *See Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties* [Dkt. No. 1309] (the "Settlement Motion") at ¶ 3.

[7] Article IX. B.3 of the Plan provides that "it shall be a condition to the occurrence of the Effective Date" that Requisite DIP Lenders "be satisfied, in an exercise of their sole discretion, that the 13- week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date . . . reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date."

29. In early June 2020, the Debtors reached a settlement with a group of existing midstream and marketing service providers, including Carnero. *Id.* at ¶ 4. The Settlement Agreement[8] provided, among other things, as follows:

a) Carnero would return $8 million from the proceeds of a $17 million letter of credit drawn by Carnero under the existing GGPA. *See* Settlement Agreement, § 2.1;

b) Seco Pipeline would contribute to the Debtors a nearly $2 million administrative expense claim it had asserted in connection with the Debtors' postpetition termination of an agreement between the parties. *Id.* at § 2.4;

c) The Debtors agreed not to remove any executory contracts or unexpired leases from the Assumption Schedule, which at the same time included the GGPA (*id.* at § 2.2.1(d))—effectively *causing* the assumption of the GGPA;

d) The settlement parties agreed to conditionally amend certain existing agreements, *but only if* certain transactions contemplated by the Settlement Agreement successfully closed. *Id.* at § 2.5; and

e) The Debtors agreed to pursue rejection of the Midstream Agency Agreements. *Id.* at § 2.2.1(a)(iii). If the Debtors succeeded in rejecting the Midstream Agency Agreements, the amendments to certain existing agreements would take effect. *Id.* at § 2.5.2. If the Debtors did not succeed in rejecting the Midstream Agreements, the existing agreements between the settlement parties would remain as-is.

By its plain terms, the Settlement Agreement did not purport to determine a definitive path to restructure the Debtors' midstream operations. To the contrary, the parties had the option to terminate the Settlement Agreement at any time after October 1, 2020 (the "Outside Closing Date") if an order had not by then been entered rejecting the Midstream Agency Agreements. *See* Settlement Agreement, § 5.1.2. If the Debtors exercised their option to terminate instead of continuing to pursue rejection of the Midstream Agency Agreements, Carnero's sole remedy was to seek the return of all letter of credit amounts actually delivered by Carnero (*i.e.*, the $8 million). *Id.* at § 2.2.1(b). The Settlement Agreement specifically provided that return of the letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection

[8] The Settlement Agreement is attached as Exhibit A to the Settlement Motion.

and related appeals" of the Midstream Agency Agreements. *Id*. Once the Settlement Agreement terminated, the Debtors were no longer required to continue to pursue rejection of the Midstream Agency Agreements. *See id.* at § 6.4.

## IV. This Court Approves The Settlement Agreement

30. Multiple parties, including UnSub and the WIPs, objected to the proposed Settlement Agreement, arguing that the settlement favored the Debtors' Catarina interests at the expense of the Comanche Assets.[9] The Court convened a hearing (at which Carnero's counsel appeared), ultimately approving the settlement without objection after substantial modifications were made to the Settlement Approval Order. *See Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts* [Dkt. No. 1415] (the "Settlement Approval Order").

31. At the hearing, the Court and the parties extensively discussed the limited and conditional effect that the Settlement Approval Order would have. More particularly, UnSub and the WIPs vigorously disputed any suggestion that the Settlement Approval Order would actually resolve the midstream restructuring of the Comanche Assets. The Court framed this question explicitly at the outset of the settlement hearing:

> THE COURT: Let me find out from the advocates again
> whether, if we approve this, there then becomes an irrevocable
> transaction that is set into motion where parties who could
> object today to it won't be able to object --

June 29, 2020 Hr'g Tr. at 18:15-18.[10]

---

9 *See Limited Objection of Venado Oil & Gas, LLC, And Its Direct and Indirect Subsidiaries, Eagle Ford TX LP, And Mitsui E&P Texas LP to Debtors' Settlement Motion* [Dkt. No. 1351]; *Objection of GSO ST Holdings LP, GSO ST Holdings Associates LLC, and SN EF UnSub, LP to Debtors' Settlement Motion* [Dkt. No 1373]; *Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Settlement Motion* [Dkt No. 1314]; *Preliminary Objection of Gavilan Resources, LLC to Debtors' Settlement Motion* [Docket No. 13200].

10 The June 29, 2020, hearing transcript is available at Docket Number 1418.

32. The parties' argument and colloquies with the Court—none of which Carnero's counsel disputed—repeatedly acknowledged that the Settlement Approval Order (and resulting assumption of the GGPA) *would not* preordain the Debtors' ultimate midstream restructuring. Debtors' counsel stated as follows:

> Furthermore, Your Honor, as you will hear from Mr. Meghji, nothing in the settlement agreement, if approved, preordains a party's right with respect to any JOA, ADA, midstream contract, or any other contract. Again, it was the debtors' intent that all of their rights are preserved. And to the extent additional language should be crafted to add to the order to confirm that point, we are open and welcome that language.

June 29, 2020 Hr'g Tr. at 27:12-19. Counsel for the DIP lenders (which acquired the equity of the Reorganized Debtors pursuant to the Plan) agreed, explaining that the Settlement Agreement and resulting assumption of the GGPA was only the beginning of the midstream restructuring process:

> The settlement agreement itself does not effectuate a guarantee of midstream restructuring. It is only a roadmap; and frankly, a roadmap that was already signaled in the schedules filed before the plan was confirmed.

> In addition, there is nothing in the agreement that prevents the debtors from considering all their options in such negotiations. The settlement agreement allows the debtors to cease pursuing the rejection or assumption framework in this agreement at any time. As mentioned, they need to return the

> successful. It's no guarantee that all the contracts can or will be assumed rejected. But that's not the issue for today. It gives the debtors a chance to work through this complicated midstream structure. They, at any time, can switch gears. They give back the $8 million. And if it's not done by October 1st, they don't have to give the $8 million. They can still terminate in 95 days or so.

June 29, 2020 Hr'g Tr. at 34:22 – 25; 38:6 – 10; 41:5 – 11. Following these exchanges, the Court confirmed what the parties had acknowledged: that the Settlement Approval Order did not constrain the Debtors' ultimate restructuring of the existing Comanche midstream contracts:

> THE COURT: No, that's -- I think I'm hearing everybody tell me that when it comes time to determine whether the contracts that affect the Comanche asset should be rejected, that I'm going to be asked to determine whether there's been a proper exercise of fiduciary duty with respect to the manager of those assets.
>
> And I -- that seems to say that everyone is agreeing to that, which means approval of this has only upside and no downside. But maybe I'm missing something and we'll hear --

June 29, 2020 Hr'g Tr. at 67:6 – 14.

33. At the conclusion of the hearing, the Court approved the settlement and entered the Settlement Approval Order. The Settlement Approval Order thereby effectuated assumption of the GGPA (which could not be removed from the Assumption Schedule according to the Settlement Agreement). The Settlement Approval Order expressly and repeatedly reflected the settlement's limited and conditional nature. Specifically, the order (i) recognized that the Debtors *might not* ultimately reject the Midstream Agency Agreements (*id.* at ¶¶ 11, 13); (ii) preserved all rights and objections of UnSub and the WIPs to dispute rejection of the Midstream Agency Agreements (*id.* at ¶ 7); and (iii) preserved this Court's jurisdiction with respect to all matters "arising from or related to the Settlement Agreement or [the Settlement Approval Order]" (*id.* at ¶ 6).

34. Consistent with the terms of the Settlement Agreement and the Settlement Approval Order, the Debtors assumed the GGPA, Carnero returned the $8 million letter of credit proceeds to Mesquite, and Seco Pipeline contributed the $2 million administrative expense claim it had

asserted against the Debtors. The Plan became effective on June 30, 2020. *See Notice of Effective Date* [Dkt. No. 1417].

## V. The Debtors Reach a Stalemate Over Rejection of the Midstream Agency Agreements And Exercise Their Contractual Right To Terminate the Settlement Agreement

35. As required by the Settlement Agreement, the Debtors diligently pursued rejection of the Midstream Agency Agreements via the adversary proceeding captioned *Occidental Petroleum Corp., et al. v. Sanchez Energy Corp. et al*., Adv. Pro. No. 20-03198 [MI] ("Sanchez/Oxy Adversary"). Various parties in interest objected to the Debtors' proposed rejection of those agreements, arguing that the agreements created covenants running with the land or equitable servitudes and were thus not subject to rejection under Section 365 of the Bankruptcy Code. *See Plaintiff's Motion for Summary Judgment* [Sanchez/Oxy Dkt. No. 50] at ¶¶ 37-133.[11] The Debtors aggressively pursued their efforts to reject the Midstream Agency Agreements, litigating cross-motions for summary judgment and exchanging voluminous discovery with plaintiffs in the Sanchez/Oxy Adversary. At no point did Carnero offer to reimburse the Debtors for either the fees and expenses they incurred attempting to reject the Midstream Agency Agreements, or for the rejection damages Mesquite (as successor to Sanchez Energy Corporation) would owe if it succeeded in rejecting the agreements. Ultimately, on June 24, 2021—nearly a full year after approval of the Settlement Agreement and nine months *after* the Settlement Agreement's Outside Closing Date—Mesquite exercised its contractual right to terminate the Settlement Agreement. Mesquite subsequently returned the $8 million in letter of credit proceeds to Carnero.

36. On July 30, 2021, Carnero filed a lawsuit (the "Carnero Action") in the District Court of Harris County, Texas against Mesquite, UnSub, and the WIPs. The Carnero Action

[11] For clarity, this Complaint cites entries on the docket of the Sanchez/Oxy Adversary proceeding as "Sanchez/Oxy Dkt. No__."

sought, among other things, declarations that (i) the GGPA and the Ratification Agreements obligate Plaintiffs to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include requiring Mesquite to pursue rejection of the Midstream Agency Agreements, and (ii) after rejection of the Midstream Agency Agreements, Plaintiffs must deliver the gas from the Comanche Assets to Carnero. *See Petition* [Carnero Dkt. No. 1-4] at ¶36(k), (l).[12] The timing of the Carnero Action was no accident. As paragraph 25 of the Petition acknowledged, Carnero filed the lawsuit upon coming to the belief that the Comanche parties, including the parties in the Sanchez/Oxy Adversary, were on the cusp of a global midstream settlement. The Carnero Action was a last-ditch effort to derail this comprehensive deal.

37. On September 10, 2021, Mesquite, UnSub, and the WIPs filed a notice of removal, removing the Carnero Action to this Court. *See Notice of Removal* [Carnero Dkt. No. 1]. On October 8, 2021, Carnero filed a motion to remand the action to state court or for abstention. *See Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero Dkt. No. 6].

38. At the December 7 hearing on the motion to remand, the Court observed that "the plain language" of paragraph 36(k) of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreements under] Section 365" (December 7, 2021 Hr'g Tr. at 18:10 – 11) and that paragraph 36 (l) asked the State Court to "declare the effect of rejection of a contract before it's ever rejected." *Id.* at 15:25 – 16:1. Carnero's counsel disclaimed that understanding, stating that Carnero's "intent was not to dictate what . . . [Mesquite] was going to do with respect to § 365." *Id.* at 15:10 – 12.[13] Rather, Carnero asserted, the purpose of paragraphs

---

12 For clarity, this complaint cites entries on the docket of the Carnero Action as "Carnero Dkt. No__." The Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

13 The December 7, 2021 hearing transcript is attached hereto as Exhibit A.

36(k) & (l) was to "specifically deal with what happens in the event of rejection . . . if confusion about the language [of paragraphs 36(k) & (l)] is something that is causing the problem, this can be amended to make it clear. " *Id.* at 15:9 – 14. The Court suggested that Carnero amend the Petition to remove those paragraphs, explaining that doing so "certainly [would] make a different argument." *Id.* at 17:11 – 13. Carnero agreed to file an amended complaint by December 10. *Id.* at 26:5 – 6.

39. Rather than file an amended complaint, however, Carnero withdrew the lawsuit. *See Plaintiff's Notice of Dismissal without Prejudice* [Carnero Dkt. No. 31]. Carnero's dismissal was explicitly without prejudice so that Carnero could later continue to assert that Section 365 provided Mesquite a "right or option to terminate" the Existing Commitments "without out-of-pocket cost" and that the Settlement Approval Order was unconditional and unqualified and thus constrained the Debtors' choices by imposing liability on Mesquite if it assumed the Midstream Agency Agreements.

40. On December 21, Mesquite filed a stipulation dismissing the Sanchez/Oxy Adversary and for assumption of the Midstream Agency Agreements. *See Stipulation and Agreed Order* [Dkt. No. 2249].

## CLAIMS FOR RELIEF

## COUNT I

### (All Plaintiffs Against Defendant Carnero)

### Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Section 365 Gives Mesquite the Power to Breach the Midstream Agency Agreements, Not The "Right or Option to Terminate" Those Agreements

41. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

42. An actual controversy exists as to whether Mesquite's right under Section 365 to reject the Midstream Agency Agreements can be deemed a "right or option to **terminate**" those agreements. According to Carnero, because Section 365 provides Mesquite with a "right or option to terminate" the Midstream Agency Agreements (and the Existing Commitments contained therein), Mesquite's decision to assume (rather than reject) those agreements constitutes a breach of Section 3.1(b) of the GGPA, which requires that Mesquite exercise "any right or option to **terminate** such Existing Commitments . . . without out-of-pocket cost." GGPA, § 3.1(b) (emphasis added).

43. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code to assume the Midstream Agency Agreements.

44. The Bankruptcy Code is unequivocal that rejection of an executory contract such as the Midstream Agency Agreements does not present a "right or option to terminate" a contract; rather, rejection "constitutes a *breach* of such contract." 11 U.S.C. § 365(g) (emphasis added). Numerous courts, including the Fifth Circuit, have "held that this language does not mean that the executory contract or lease has been terminated, but only that a breach has been deemed to occur." *Matter of Austin Dev. Co*., 19 F.3d 1077, 1082 (5th Cir. 1994) (citing *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993)); *In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir. 1990); *Leasing Serv. Corp. v. First Tenn. Bank, Nat'l Ass'n*, 826 F.2d 434, 436–37 (6th Cir.1987). The "decision to reject is thus correctly viewed only as a *power to breach the executory contract*" not as a right or option to terminate such contract. *Id.* (emphasis added). The Supreme Court recently reaffirmed this understanding, holding in *Mission Product Holdings, Inc. v. Tempnology, LLC* that "[r]ejection of a contract—any contract—in bankruptcy operates not as a rescission but

as a breach." 139 S. Ct. 1652, 1661 (2019); *see also In re United DC,* Inc., No. 12-32620, 2013 WL 310311, at *4 (Bankr. S.D. Tex. Jan. 25, 2013) (Isgur, J.) (holding that rejection "is considered a breach rather than termination").

45. As the Fifth Circuit explained, "Congress knew how to authorize the termination of executory contracts and leases in § 365. 'Termination' is used in § 365(h), (i), and (n) as one option available respectively to the purchaser of an interest in a timeshare project, the vendee of real property, or the licensee from the debtor of a right to intellectual property *if* the trustee has rejected the executory contract." *Id.* (emphasis in original). Congress was "not confused in its differing usages of the terms rejection, breach and termination." *Id.* at 1083.

46. Moreover, "breach and termination of leases or executory contracts are not synonymous terms under state law." *Id.* (citing *Resolution Trust Corp. v. Cramer*, 6 F.3d 1102, 1108 (5th Cir.1993) (describing options available to landlords under Texas law)); *In re Storage Technology, supra; In re Picnic 'N Chicken, Inc*., 58 B.R. 523, 525 (Bankr. S. D. Cal. 1986) (California law). Congress "could have chosen to depart from the state law meanings of these terms, but taken as a whole, § 365 suggests that it did not do so." *Id.*

47. Accordingly, Section 365 gave the Debtors the statutory power to *breach* the Midstream Agency Agreements, not the "right or option to *terminate*" those contracts.

## COUNT II

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Rejection Imposes "Out-of-Pocket Cost" On the Debtor**

48. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

49. An actual controversy exists as to whether rejection imposes "out-of-pocket cost" on the Debtors.

50. A declaration from this Court would serve the important purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Debtors may assume the Midstream Agency Agreements without incurring liability for breach of the GGPA.

51. Carnero has asserted that the Debtors can reject the Midstream Agency Agreements without incurring "out-of-pocket cost." Carnero is wrong. A "rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for **damages**." *Mission Product Holdings, Inc.*, 139 S. Ct. at 1661 (emphasis added). If Mesquite succeeded in rejecting the Midstream Agency Agreements, it would have owed its counterparties rejection damages for its failure to honor the Existing Commitments. Those damages would undoubtedly be substantial.

52. Accordingly, Mesquite would incur significant out-of-pocket cost if it rejected the Midstream Agency Agreements.

## COUNT III

**(All Plaintiffs Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That—As Carnero Reads It—Section 3.1(b) of the GGPA is Unenforceable Under Bankruptcy Law, the Plan, and the Confirmation Order)**

53. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

54. An actual controversy exists as to whether—if Carnero's reading of Section 3.1(b) of the GGPA is correct—that provision would be unenforceable under bankruptcy law, the Plan, and the Confirmation Order.

55. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether Mesquite may assume the Midstream Agency Agreements without incurring liability for breach of the GGPA.

56. Even if (as Carnero claims) Section 3.1(b) of the GGPA imposes liability on Mesquite for assuming the Midstream Agency Agreements, such a provision would be unenforceable under bankruptcy law. The authority to assume or reject an executory contract is a "vital part of the bankruptcy process." *In re Trans World Airlines, Inc*., 261 B.R. 103, 123 (Bankr. D. Del. 2001). Section 365 "expresses a clear Congressional policy favoring assumption and assignment. Such a policy . . . insure[s] that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors." *Matter of U. L. Radio Corp*., 19 B.R. 537, 544 (Bankr. S.D.N.Y. 1982). Section 365 reflects the "fundamental bankruptcy policy allowing a debtor to realize maximum value from its [contracts] for the benefit of its estate and creditors." *In re Jamesway Corp*., 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996).

57. To effectuate this policy, bankruptcy courts routinely invalidate prepetition contractual provisions that restrict or condition the debtor's right to assume (and assign) its contracts. For example, courts have invalidated provisions that (i) condition consent to assignment upon payment by the debtor of an "assumption fee;"[14] (ii) provide for additional payments (*e.g.*, profit sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such contract upon assignment;[15] (iii) provide for any rights of first

---

14 *See In re Howe*, 78 B.R. 226, 228 (Bankr. D. S. D. 1987).

15 *See In re Golfsmith Int'l Holdings, Inc*., No. 16-12033 (LSS), 2017 WL 5564291, at *9 (Bankr. D. Del. Jan. 19, 2017); *see also In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996); *Robb v. Schindler*, 142 B.R. 589 (D. Mass. 1992); *South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.)*, 129 B.R. 200 (9th Cir. BAP 1991); *In re The National Sugar Refining Co*., 21 B.R. 196 (Bankr. S. D. N. Y. 1982).

refusal on a counterparty's part;[16] and (iv) provide for any recapture or termination rights in favor of the counterparty.[17]

58. Courts routinely invalidate such punitive provisions because they contravene the central purpose of Section 365 by restricting the debtor's ability to realize the value of its assets. A creditor cannot impose a penalty on the debtor for exercising its right to assume a contract. Section 3.1(b) of the GGPA (as Carnero reads it) would do exactly that: it would impose liability on Mesquite for its decision to assume the Midstream Agency Agreements. By the same token, Carnero's reading of Section 3.1(b) would allow Carnero to improve its position vis-à-vis other creditors and jump in line ahead of the current beneficiaries of the Existing Commitments. Such a provision is unenforceable under bankruptcy law.

59. Moreover, Article VIII.B of the Plan specifically exculpates Mesquite from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the . . . administration and implementation of the Plan." Article VIII.B became immediately effective on the Effective Date (June 30, 2020) pursuant to paragraph 9 of the Confirmation Order. The Debtors' and/or Reorganized Debtors' decision whether to assume or reject a contract falls squarely within this exculpation provision. Carnero's attempt to impose liability on the Debtors and/or the Reorganized Debtors for assuming the Midstream Agency Agreements thus violates both the Plan and the Confirmation Order.

---

16 *See In re Golfsmith Int'l Holdings, Inc*., 2017 WL 5564291, at *9.

17 *See In re Fairway Group Holdings Corp., et al.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 20, 2020); *see also In re Winn-Dixie, Inc.*, Case No. 05-03817 (M. D. Fla 2005); *In re Boscov's Inc., et al.*, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008)

**COUNT IV**

**(By Plaintiffs Mesquite and Maverick, against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) that Carnero Breached the Settlement Agreement)**

60. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

61. An actual controversy exists as to whether Carnero breached the Settlement Agreement.

62. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Settlement Agreement's provision for assumption of the GGPA reflected the parties' intent to impose liability on Mesquite if, after validly terminating the Settlement Agreement, Mesquite ultimately assumed the Midstream Agency Agreements.

63. Section 2.2.1(d) of the Settlement Agreement required that the Debtors not remove any executory contracts from the Assumption Schedule, which included the GGPA. The Settlement Agreement thus caused assumption of the GGPA. The assumption of the GGPA, however, was not unqualified. The Settlement Agreement gave the Debtors the option to terminate that agreement if an order rejecting the Midstream Agency Agreements had not been entered by October 1, 2020, and specifically provided that return of the $8 million letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Midstream Agency Agreements. *Id*. The obligation to pursue rejection was not among the enumerated provisions that would survive termination of the Settlement Agreement. *Id.* at § 6.4.

64. The parties repeatedly acknowledged at the June 29-30, 2020 hearing that the Settlement Approval Order (and resulting assumption of the GGPA) would not preordain the Debtors' midstream restructuring. Carnero's counsel did not dispute any of these statements. Nor did Carnero object to the language of the Settlement Approval Order, which expressly recognized that the Debtors *might not* ultimately reject the Midstream Agency Agreements. Settlement Approval Order at ¶¶ 11, 13. The parties' understanding was crystal clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Settlement Agreement and failing to continue to pursue rejection of the Midstream Agency Agreements. Carnero breached the Settlement Agreement by repudiating this clear understanding and initiating the Carnero Action.

65. Moreover, the Settlement Approval Order and the Settlement Agreement both provided that the Bankruptcy Court would retain jurisdiction with respect to all matters arising from or relating to the Settlement Agreement. Settlement Approval Order at ¶ 6; Settlement Agreement, § 6.2.1. This Court had jurisdiction over the entire Carnero Action as a core proceeding because the action (i) went to both Mesquite's rights and the Court's authority under Section 365 and (ii) involved rights created by bankruptcy law and required interpretation and enforcement of this Court's orders. Even if the Carnero Action was not a core proceeding, the Court—at a minimum—had "related to" jurisdiction which requires only that the matter "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.)*, 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015).

66. Carnero was thus obligated to bring the Carnero Action before this Court and breached this obligation by filing the Petition in state court. Section 6.3 of the Settlement Agreement awards non-breaching parties "attorneys' fees and costs" as "a remedy for any such

breach." Accordingly, Mesquite and Maverick respectfully request attorneys' fees for removing the Carnero Action, defending it in Bankruptcy Court, and enforcing this lawsuit.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs Mesquite, Maverick, UnSub, and the WIPs respectfully request that the Court enter judgment as follows:

I. On Count I, declaring that, as a matter of bankruptcy law, Section 365 of the Bankruptcy Code gives Mesquite the power to breach the Midstream Agency Agreements, not the "right or option to terminate" those contracts;

II. On Count II, declaring that, as a matter of bankruptcy law, Mesquite would incur "out-of-pocket cost" if it chose to reject the Midstream Agency Agreements;

III. On Count III, declaring that—if Carnero's reading were correct—Section 3.1(b) of the GGPA is unenforceable under bankruptcy law, the Plan, and the Confirmation Order; and

IV. Granting Plaintiffs such other and further relief as the Court deems just and proper.

**FURTHER,** Plaintiffs Maverick and Mesquite respectfully request that the Court enter judgment as follows:

I. On Count IV, declaring that Carnero breached the Settlement Agreement and awarding attorneys' fees for removing the Carnero Action, defending it in Bankruptcy Court, and enforcing this lawsuit; and

II. Granting Plaintiffs such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank.]*

Respectfully submitted this 21st of December, 2021.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff**
**Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Plaintiff**
**SN EF UnSub, LP**

*/s/ Michelle Pector*
Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorney for Plaintiff Venado EF L.P.**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Plaintiff**
**Mitsui E&P Texas LP**

# EXHIBIT A

## December 7, 2021 Hearing Transcript

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC. | § | CASE NO. 21-03908-ADV |
| | § | HOUSTON, TEXAS |
| VS | § | TUESDAY, |
| | § | DECEMBER 7, 2021 |
| SN EF UNSUB, LP, ET AL | § | 2:30 P.M. TO 2:58 P.M. |

MOTION HEARING (HYBRID HEARING)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTOR: | (VIA TELEPHONE)<br>PAUL, WEISS, RIFKIND, WHARTON AND GARRISON<br>Justin Ward, Esq.<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3000 |
| | MCLOSKEY ROBERSON, PLLC<br>Thomas Woolley, Esq.<br>945 Heights Blvd<br>Houston, TX 77008<br>713-337-3910 |
| FOR CARNERO G&P, LLC: | PORTER HEDGES LLP<br>Joshua Wolfshohl, Esq.<br>Amy Falcon, Esq.<br>1000 Main St, 36th Floor<br>Houston, TX 77002<br>713-226-6000 |
| FOR MESQUITE ENERGY, INC. | FOLEY GARDERE<br>James G. Munisteri, Esq.<br>Sara Brown, Esq.<br>1000 Louisiana Street<br>Suite 2000<br>Houston, TX 77002<br>713-276-5500 |
| | (VIA TELEPHONE)<br>WILLKIE FARR AND GALLAGHER LLP<br>Mark Stancil, Esq.<br>Dennis Jenkins, Esq.<br>1875 K Street, NW<br>Washington, DC 20006<br>202-303-1133 |
| FOR MITSUI E&P TEXAS LP: | SIDLEY AUSTIN LLP<br>Duston McFaul, Esq.<br>Maegan Quejada<br>1000 Louisiana St<br>Suite 6000<br>Houston, TX 77002<br>713-495-4500 |

APPEARANCES (CONT'D):

| | |
|---|---|
| FOR EAGLE FORD TX LP: | (VIA TELEPHONE)<br>MORGAN, LEWIS AND BOCKIUS LLP<br>Julia Frost Davies, Esq.<br>One Federal Street<br>Boston, MA 02215<br>617-341-7700 |
| FOR VENADO EF L.P. | (VIA TELEPHONE)<br>KIRKLAND AND ELLIS LLP<br>Sydney Corry, Esq.<br>609 Main Street<br>Houston, TX 77002<br>253-455-6202 |

(Please also see Electronic Appearances.)

## INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (None called.) | | | | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Plaintiff's: Exhibits 25-1 to 25-13 | 9 | 9 |
| Defendant's: Exhibits 26-1 to 26-7 | 9 | 9 |

HOUSTON, TEXAS; TUESDAY, DECEMBER 7, 2021; 2:30 P.M.

THE BALIFF: All rise.

THE COURT: Please be seated.

All right. We are here in the Canero G&P, LLC versus SN EF UnSub LP, et al, Adversary Proceeding 21-3908. We'll start with appearances in court, we'll then take any appearances on the phone. If you wish to appear on the phone, please press five star.

Mr. Wolfshohl.

MR. WOLFSHOHL: Good afternoon, Your Honor. Joshua Wolfshohl and Amy Falcon, my colleague, for Carnero, the Plaintiff.

Good to see, Your Honor. Good to be back in the courtroom. This is my first hearing back, and I don't think I've been in this courthouse for two years and I'm actually glad to be here.

THE COURT: Glad to have you back.

MR. MUNISTERI: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. MUNISTERI: James Munisteri for Mesquite. Ditto, it's nice to be back.

THE COURT: It's very nice to have people back.

MR. MUNISTERI: And I'm on joined on the phone by Mr. Stancil and by Ms. Brown. And Ms. Brown just wanted me to make sure she's going to be designated as the presenter.

THE COURT: All right. Thank you.

MR. MCFAUL: Good afternoon, Your Honor. Duston McFaul, Sidley Austin for Mitsui E&P Texas, LP, which is one of the non-ops, and Ms. Maegan Quejada is on the phone, as well.

THE COURT: All right.

MR. MCFAUL: Thank you.

THE COURT: Thank you.

MR. MCFAUL: Nice to see you.

THE COURT: Ms. Frost-Davies, good afternoon.

MS. FROST-DAVIES: Good afternoon, Your Honor. Julia Frost-Davies, Morgan Lewis, on behalf of Eagle Ford Texas, LP also one of the non-op Defendants.

THE COURT: All right. Thank you.

From the 253 area code, is 253-456-6202. Let me see what I have.

MS. CORRY: Sydney Corry. This is Sydney Corry with Kirkland and Ellis on behalf of Venado EF LP.

THE COURT: Ms. Corry, good afternoon.

MS. CORRY: Good afternoon.

THE COURT: Mr. Ward.

MR. WARD: Good afternoon, Your Honor. Justin Ward from Paul Wiess on behalf of Defendant UnSub and possibly also attending today on behalf of Unsub are Thomas Woolley from McCloskey Roberson and also from Paul Weiss,

Alice (indiscernible).

THE COURT: Mr. Ward, thank you.

Mr. Stancil.

(No audible response.)

THE COURT: Mr. Stancil.

MR. STANCIL: Good afternoon, Your Honor. Mark Stancil from Willkie Farr & Gallagher on behalf of Mesquite Energy, Inc. I'M also joined by my colleague, Dennis Jenkins, also representing Mesquite.

THE COURT: Mr. Stancil, Mr. Jenkins, good afternoon.

From 212-728-8276.

MR. JENKINS: Your Honor, Dennis Jenkins of Willkie Farr. It's good to be back in front of Your Honor, thank you.

THE COURT: Good to have you here, Mr. Jenkins.

All right. I show that's all of the folks that wish to speak at today's hearing. If you change your mind and want to speak during the course of the hearing, just press five star.

I've now held a few, maybe you know half a dozen of these hybrid hearings, and they've worked pretty well. But if anyone has trouble hearing or seeing, just find a way to let me know, and we'll be sure that those of you that are remote can see what's happening in the court, and those of

you in court can see what's happening remotely.

So I think we'll go, I guess, to you Mr. Wolfshohl.

MR. WOLFSHOHL: I think that's right, Your Honor. And just as a housekeeping matter, we conferred -- well, we conferred with Mr. Munisteri, I think he was speaking for the entirety of the Defendants -- but I don't think that there's any objection to our exhibits and we had no objection to their exhibits being admitted.

THE COURT: All right. Can you give me those exhibit identifiers?

MR. WOLFSHOHL: Sure, Your Honor. For Carnero, our Exhibit List was at Docket No. 25. And so it would be all of the exhibits that were attached to that Docket entry which I think would be 25-1 through, I believe --

THE COURT: Thirteen?

MR. WOLFSHOHL: -- 13.

THE COURT: All right.

MR. WOLFSHOHL: And we also reference a number of documents that are on the Docket that were voluminous that we didn't want to have to refile. But in our Exhibit List, there's a number of documents we are going to refer to at least one of those. But I don't think there's any issue with those being admitted.

And then Mr. Munisteri, or whoever is in charge of

the Defendants, I just know we didn't have any objection to theirs. I don't think that they filed the actual exhibits, but they did file a list and they sent us their exhibits and we didn't have any issue with them, Your Honor.

MR. MUNISTERI: Your Honor, both parties agreed no objections to the other parties' exhibits.

THE COURT: But what are your exhibits? What are the exhibits, what -- how do I find them?

MR. STANCIL: Your Honor, this is Mark Stancil, we filed our Exhibit List, I believe it's -- I want to say Docket 26, but Ms. Brown may correct me. Our exhibits are listed there.

And essentially they are the same documents that Movants are relying on, and we just typically reference though a transcript from prior hearings in the bankruptcy and an Order. So I think all of our items are directly out of the Docket for the bankruptcy case.

THE COURT: All right. So without objection Exhibits 25-1 through -13 are admitted.

(Plaintiff's Exhibits 25-1 through 25-13 are offered and admitted in evidence.)

THE COURT: And the documents that are referenced in Exhibit 26 are admitted as to 1 through 7. I think that's what you-all are asking me to do.

(Defendant's Exhibits 26-1 through 26-7 are offered and

admitted in evidence.)

MR. WOLFSHOHL: That's my understanding Your Honor.

THE COURT: All right.

MR. WOLFSHOHL: If you will, Your Honor, could you please make Ms. Falcon the presenter?

THE COURT: Of course.

MR. WOLFSHOHL: And I think both parties are really just -- now that we've got the exhibits admitted, I think we're just going to really just argue our points and we both got presentations that we exchanged prior to the hearing.

But before I jump into my presentation I want to go through something -- to clear something up, because I think it's based on some of the arguments in the surreply that the Defendants filed, as well as the presentation that they provided to us right before the hearing. Ms. Falcon is pulling up -- this is one of the documents that we identified -- is it on the screen?

THE COURT: Oh, yeah. I'm going to split the screen here to where people in court can --

MR. WOLFSHOHL: Okay.

THE COURT: -- see both faces and --

All right. Go ahead, please.

MR. WOLFSHOHL: Thank you, Your Honor.

There seems to be confusion about -- as Your Honor, knows -- I know you've read the pleadings and you've probably digested quite a bit in the last several days -- but there seems to be some confusion about whether the GGBA was assumed pursuant to the Settlement Agreement that was entered into around confirmation on June the 30th of 2020. And I want to clarify because the GGBA that I'm seeking to enforce, in this State Court lawsuit, was in fact not assumed pursuant to that agreement, Your Honor.

And if you go to the Settlement Agreement -- this is the Settlement Agreement that was attached to the motion that was filed seeking to approve the Midstream Settlement Agreement. You look at the definition of assumption agreements and it says -- starts with the Carnero Agreements and then it says the Catarina Gathering Agreement and then it identifies a number of other documents that are not the GGBA that I'm seeking to enforce.

In fact, it references that agreement, but it does not say that, that's an assumption agreement. If you look at the -- read all the way through Your Honor. It talks about ratification agreements that ratified the FGGBA, the Comanche FGGBA, that's the agreement that I'm seeking to enforce. It's a defined term in the Settlement Agreement, but it is not an assumption agreement so we will go to --

Ms. Falcon, if you can go to the Carnero

Agreements first?

You see the Carnero Agreement references the Carnero Gathering Agreement and the Carnero Processing Agreement, and we'll start with the Gathering Agreement. This is an agreement with SN Caterina.

Your Honor, if you remember, and I'm sure that -- I'm sure that the Reorganized Debtor is going to tell you a little bit about the history of these contracts -- but the Debtor had essentially two large pieces of acreage. One was the -- they referred to as the "Catarina Acreage" and the other one they referred to as the "Comanche Acreage." Most of the benefit that the Debtor was getting under the Settlement Agreement -- the Midstream Settlement Agreement -- related to the Catarina Acreage. My client was making significant concessions on rates as to the Catarina Acreage.

The Carnero Gathering Agreement that's reference as a "Carnero Agreement" under this agreement is with SN Caterina, which is the entity that owned the Caterina assets.

If you look -- the same thing goes for the Carnero Processing Agreement. Also in agreement with SN Caterina.

These are not agreements with SN Maverick. And if you look -- the specific Comanche FGGBA is a defined agreement under the Settlement Agreement, but it is not an

agreement that was an assumption agreement. The way that my GGBA that I'm seeking to enforce was assumed was pursuant to the Plan. It was listed as a contract that was being assumed, and the time passed and nobody objected to it. But it was not assumed pursuant to that Order, it just wasn't.

And there seems to be some reliance on the idea that somehow it was assumed in a qualified fashion and that as a result -- I don't think this is relevant -- but as a result of the termination of the Settlement Agreement that somehow that combined with the way the Settlement Agreement was approved that there was some kind of qualified assumption of my agreement.

But as to the GGBA, the fundamental agreement that I'm seeking to enforce in my State Court action, it was assumed with no qualifications.

But I just wanted to clear that up, Your Honor, and I'll move to the presentation.

So Your Honor, we think that this -- this is a very straightforward analysis. The issue before the Court, we have a State Court lawsuit that was filed in July of 2021, more than a year after the Plan got confirmed and more than a year after the Plan went effective. We're seeking declarations under the Texas Civil Practice and Revenues Code. And there are declarations that we are asking a State Court to interpret related to the assumed contracts. The

fundamental contract being the GGBA that was assumed under the Plan.

Most of the Defendants are non-Debtors, but there are Reorganized Debtors that are Defendants, as well. But it has to do with -- the fundamental disputes have to do with actions that were taken post-confirmation, actions that were taken more than a year after confirmation, more than a year after the effective date. The Defendant's bear the burden to establish jurisdiction and we don't think that they can, Your Honor.

Most of Carnero's claims in the dec action don't reference the Code, the Plan, or any order of this Court. The thing that they have really focused on are the claims where we are asking the State Court to declare what our rights are once these contracts are rejected.

THE COURT: Actually, I think that's not quite right. This may be a bit of the inverse of that, but what I read the Complaint from them as being, is that you're asking that people be compelled to take action in the Bankruptcy Court to implement what you think your rights are, and you're asking the State Court to determine that before they ever act in the Bankruptcy Court.

And as I read their Complaint -- and you've got the right sections up here, K and L -- K seems to say that the State Court can order action to be taken here and L

seems to interpret what that action might be. And I think that's the heart of the Complaint. Not what your rights are necessarily, but that your attempt to control what occurs at 515 Rusk Street, for lack of a better description, is the way I would describe what I read their concerns to be.

MR. WOLFSHOHL: I don't disagree with the way that they've cast their Complaints, Your Honor. And I will tell you -- and I'm just going to say -- if confusion about the language is something that is causing the problem, this can be amended to make it clear, but my client's intent was not to dictate what it was that they were going to do with respect to 365. The purpose of these provisions is specifically to deal with what happens in the event of rejection.

THE COURT: Well, I know, but take a look at L. If you think you can amend out K and L, it may be worth thinking about doing that before we continue with the hearing.

By the way there may be nothing wrong with doing it this way and I'm not necessarily saying that you lose --

MR. WOLFSHOHL: No.

THE COURT: -- because of this.

MR. WOLFSHOHL: I understand.

THE COURT: But I think what the Complaint is, is you're having the State Court declare the effect of

rejection of a contract before it's ever rejected under L. That's a big step that may or may not be a fatal step. But if you can take away K and L, it's going to change the discussion, I think, that we're going to have today. I'm just -- I'll let the other side speak up about this, but that's what I'm reading the graver unhappiness to be about.

MR. WOLFSHOHL: Well, I can tell you, Your Honor, that when this Complaint, or this Petition, was prepared, the concern that we had was that they were continuing to pursue the OXY litigation and continuing to pursue rejection.

THE COURT: Right.

MR. WOLFSHOHL: But we were concerned that once they rejected, that they weren't going to honor our agreement. And that was the -- that was the gist of the concern.

Now they have since announced to Your Honor, that they're going to do some sort of hybrid type of assumption and that they're going to --

THE COURT: Well, I think we're coming back on the 21st, understandably.

MR. WOLFSHOHL: Well, I mean, they say that, Your Honor, but you know, we've been here several times, we don't know exactly what's going to happen. I'm just saying that the concern that my client has is that whatever global

settlement that they're entering into in some way impairs my client's rights under the GGBA, which is an assumed contract. I don't think I have to adjudicate those rights in Your Honor's court. And if you think that -- I mean --

THE COURT: I'm doing my best to not cross that bridge right now, because I don't know where the day is going to end up. But if what you're telling me is you don't need K and L, it's going to change what's happening a lot. But if you need K and L, it's going to change things a lot, too. So I think if you're really telling me this was stylistic, but not substantive to do K and L and the way you did them, then you can amend it away, it certainly will make a different argument.

And you know that I'm going to react to sort of with this initial negative reaction that any other court can tell me what needs to happen in my court, just as I wouldn't do that to them. I don't know that necessarily means it's wrong, but it may suggest to you the -- good idea.

MR. WOLFSHOHL: I believed that the issue was more nuanced than that, Your Honor.

THE COURT: Okay.

MR. WOLFSHOHL: I believed that the issue -- and they've raised this -- is this notion -- and this is -- I'm going to tell you what we didn't intend to do.

They raised this issue that this somehow, that K

was meant to require them or have a State Court say that they were required to exercise their rejection rights under 365. The intent -- and I mean it may not be artfully worded -- but the intent, in saying "among other actions," was to qualify that there were a number of ways to basically effect the termination of the obligations under the existing commitments. And the Debtors know that that was a way for them to do it, because that was the purpose of the Midstream Settlement Agreement. The Midstream Settlement --

THE COURT: I read K, the plain language of K, to ask the State Court to make Mesquite pursue Section 365.

MR. WOLFSHOHL: That’s not the intent --

THE COURT: That is the way --

MR. WOLFSHOHL: That is not the intent and that could be amended. But here is where I’m getting to on how I think it’s more nuanced.

The -- I knew you were going to -- I mean, I knew that because they raised that and I thought, you know, what -- you know, if that needs to be amended to be clarified, I think it changes, you know -- if Your Honor, believes that, that’s what that means, that is not the intent. But the other question is if -- and you know, and it sounds like maybe you're going even further than that -- is if I’m asking the State Court to say "upon rejection," which is just a breach of contract under applicable law, that it has

an effect on my contract. And it has the effect of the Debtor’s no longer obligated under those existing commitments and I just don’t see how that could be -- fall under Your Honor’s jurisdiction. Because once you reject, you know, you proceed, you know, as a Reorganized Debtor with the consequences of rejection.

THE COURT: So look -- and I said to you, I’m not necessarily saying there’s anything wrong with this, but I’m not sure that every rejection order or rejection agreement has unmodified rights of a breach, right? The Court can certainly have a more nuanced order than that.

And I don’t know -- first of all, I don’t know if they’re going to seek rejection. I don’t know if I’m going to approve rejection. I don’t know if I’m going to approve rejection if I say it’s conditioned on certain events. There are all sorts of things that can happen, and to ask for declaration of what I’m going to do before I do it, before I know what I’m going to do, and to say anytime I act under 365, here’s the consequence, that may be perfectly correct to go to State Court to do it. Not sure why we’re doing it before we've decided.

MR. WOLFSHOHL: Can I have an opportunity to confer with my client? I actually think I -- I mean, I’m not sure I’m going to be able to get the right people on the phone immediately, I’m wondering if perhaps --

THE COURT: Well, let me ask the Defendants whether -- you're already telling me that I'm misreading K and I don't mean that you're doing that by saying it's my fault.

MR. WOLFSHOHL: I'm telling you that it's different than our intent, that's what --

THE COURT: Right.

MR. WOLFSHOHL: -- I'm saying. Yeah.

THE COURT: I know people are prepared for this hearing, but I see little point in going through it if I'm going to go through a hearing and then give you a chance to amend and then come back, as opposed to saying I would rather be arguing about what we're arguing about.

MR. WOLFSHOHL: Yeah.

THE COURT: And it may make sense to give you an amendment opportunity. Everyone here is going to be back on the 21st anyway, and then we just continue the hearing on the 21st and take everything up at the same time. Also adds more clarity to what the disputes about, I think.

Let me see what people think of that. I'll start in court with -- see if it makes any sense.

Mr. McFaul and Mr. Munisteri?

MR. MCFAUL: Yeah. Duston McFaul for Mitsui and well, I'll go ahead. I was going to say Mr. Stancil is taking the lead. But our position is that, of course, we're

fine with giving them an ability to amend, but we view this whole lawsuit as an attempt to get a court to say, "You are required to reject contracts and move the dedication of those minerals to us." We think K clearly says you are obligated to reject. That right only arises with Your Honor, so.

THE COURT: I think it does, too, but he's telling me that's not what he means to be asking for, so are you really going to spend an hour --

MR. MCFAUL: Understood. Understood.

THE COURT: I'm just asking --

MR. MCFAUL: We don't --

THE COURT: Does it make some sense to go a different direction?

MR. MCFAUL: We don't think they can amend and rectify it, but we're supportive of the opportunity.

THE COURT: It may be that --

MR. STANCIL: Your Honor --

THE COURT: -- they could is the problem and at which point, maybe you would be happy.

MR. MCFAUL: And I'll turn it over to Mr. Stancil.

THE COURT: I think at some point -- I'm going to now sort of -- at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of

that are a State Court issue. And so I don't know that this necessarily means this isn't going to go back to State Court, just because I'm concerned about that, because they can clearly fix at least some of the issues. I think.

Let me hear from folks on the phone.

MR. STANCIL: Your Honor.

THE COURT: Go ahead, Mr. Stancil.

MR. STANCIL: This is Mark Stancil, thank you -- for Mesquite.

Of course, understanding Your Honor will qualify that, I think we can cover a lot of ground today and I think would actually be very useful.

I think even if K were gone entirely, I think this would still be before, Your Honor, and I'm happy to get into that in a minute or now. But I think there are multiple independent bases for jurisdiction and I think it would actually significantly -- even if they're going to attempt to amend, which is not what they're supposed to be doing on removal, but even if they're going to attempt to amend, I think we could clarify the landscape significantly today to see if they're going to do it successfully.

But I think no matter what they amend, I think they're going to be back in front of Your Honor either way.

THE COURT: I think we're coming back either way, if that's what you mean. It's just a question whether I do

the amendment before the argument or after. Let me --

MR. STANCIL: Your Honor, I'll go one further and say we believe that Your Honor will have jurisdiction, and we think this lawsuit is going to be resolved on a motion to dismiss definitively by Your Honor with respect to the agreement that are in front of you. We don't agree that it's going to need to end up in State Court at all.

THE COURT: I don't know if it needs to end up in State Court or not. And that's the argument I'm going to eventually need to hear, whether it's today or another day.

Let me hear if anybody else wants to pitch in on that?

(No audible response.)

THE COURT: Okay. Well, look, I'm going to go ahead --

MR. WARD: Your Honor --

THE COURT: Yes. Go ahead.

MR. WARD: Your Honor, this is Justin Ward from Paul Weiss.

I do just want to raise the issue and to be candid, we haven't even looked into this of whether, you know, there are certain procedural issue with sort of defeating federal jurisdiction, bankruptcy jurisdiction by filing a Complaint that's within the Court's jurisdiction then amending after removal to sort of remove -- you know,

eliminate jurisdiction. I just want to make sure that, you know, it's not something we've thought about, but I'm not as I sit here today, if that's even possible.

MR. WOLFSHOHL: Your Honor, that's not --

MR. STANCIL: Your Honor, we have looked at that. It is removal jurisdiction is determined at the moment of filing a Complaint. But you know, I grant there might be some inefficiency to go going back to State Court with a new Complaint.

But we agree with the point I think Mr. Ward was making that I think it has to live or die at the moment of a filing with the Complaint when it comes to subject matter jurisdiction. They would be amending in front of you having put in front of you and then I guess they would be moving to dismiss for lack of subject matter jurisdiction.

THE COURT: I don't think it would be -- look, subject matter jurisdiction is plainly determined at the point of removal, but I'm not sure that abstention is the same as subject matter jurisdiction, so.

MR. WOLFSHOHL: Your Honor, also, you can always, you know, remove or, I mean, remand or dismiss a Complaint based on a lack of subject matter jurisdiction. The subject matter jurisdiction is a continuum, and if I modify the Complaint to make it clearer, I don't see how that could possibly in anyway interfere with --

THE COURT: Well, I do think that there may be a question of if the removal was proper, because there was subject matter jurisdiction, and you amend, I don't think that the remand motion gets to say that I don't have subject matter jurisdiction. I think it gets to say we should now abstain.

MR. WOLFSHOHL: For lack of subject matter jurisdiction?

THE COURT: No. Abstain on other principles.

MR. WOLFSHOHL: Right.

THE COURT: Maybe that had it been filed today there wouldn't be subject matter jurisdiction, but we would still have subject matter jurisdiction over something that was filed that way, I think. That part can be briefed as well. I'm not looking -- the Defendants aren't going to wave this argument by me allowing the amendment, but it may focus you more on the abstention argument.

MR. WOLFSHOHL: Yeah.

THE COURT: If you want the right to amend, I don't know that. I think so. I'm going to do this. I know it's frustrating for everybody, but probably more frustrating for me because I've got to read all this stuff and I'll have to read it again. I want you to amend.

MR. WOLFSHOHL: Okay.

THE COURT: If I'm misreading it, they're

misreading it, I don't want to hear the whole argument over the wrong issues. I'm going to require the amendment to be done -- can you get it done by Friday?

MR. WOLFSHOHL: I think I can. Yes, sir.

THE COURT: Not later than the 10th at 5:00 o'clock.

I want any supplement to the motions by the -- to the responses, I should say, by the Defendants to be filed by the 17th.

And then we'll come back on the 21st, along with the settlement implementation hearing at 1:30 on the 21st, and I'm going to tell Ms. Do to just block off the rest of the day for those two matters so that you won't get interrupted.

I'm sorry to bring everybody down for this, but I think it is the better course of action, so that we're all focused on what we need to be focused on. Their settlement may affect what you need, and what you amend may cause some relaxation by the Defendants, I don't know. But I want to see what that is.

So I think it's the most efficient thing to do and that's what we'll do today. I'll see you-all on the 21st.

THE COURT: Thank you.

MR. WOLFSHOHL: Thank you, Your Honor.

MR. STANCIL: Thank you, Your Honor.

THE COURT: We're in adjournment until 4:00 o'clock.

(Proceeding adjourned at 2:58 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #64921*

*DATE FILED: DECEMBER 13, 2021*

B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP | **DEFENDANTS**<br>Carnero G&P, LLC |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>See Attachment | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Causes of Action Seeking Declaratory Judgments, Pursuant to 28 USC 2201

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [1] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Sanchez Energy Corporation | BANKRUPTCY CASE NO.<br>19-34508 (MI) | |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Marvin Isgur |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF<br>Carnero G&P, LLC | DEFENDANT<br>SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | ADVERSARY PROCEEDING NO.<br>21-03908 (MI) |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Marvin Isgur |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>***/s/ James G. Munisteri*** | | |
| DATE<br>12/21/2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>James G. Munisteri | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**ATTACHMENT TO ADVERSARY COVER SHEET**
**ATTORNEYS FOR PLAINTIFFS**

**Attorneys for Plaintiffs SN EF Maverick, LLC and Mesquite Energy, Inc.:**

James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Eagle Ford TX, LP:**

Michelle Pector, Esq.
Jared Wilkerson, Esq.
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorney for Plaintiff Venado EF L.P.:**

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorneys for Plaintiff Mitsui E&P Texas LP:**

Duston K. McFaul
Maegan Quejada
Sidley Austin LLP
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
Sidley Austin LLP
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Plaintiff SN EF UnSub, LP:**

Thomas A. Woolley, III
McCloskey Roberson, PLLC
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub LP, Plaintiffs, | § | Adversary No. 21-04419 |
| | § | |
| v. | § | |
| | § | |
| Carnero G&P, LLC, Defendant. | § | |

**Carnero's Notice of No Opposition to**
**<u>Plaintiffs' Amended and Supplemental Complaint</u>**
(Relates to Dkt. 22-1)

Carnero G&P LLC files this Notice of No Opposition to Plaintiffs SN EF Maverick, LLC ("<u>Maverick</u>"), Mesquite Energy, Inc. ("<u>Mesquite</u>"), Eagle Ford TX LP ("<u>Eagle Ford</u>"), Venado EF L.P. ("<u>Venado</u>"), Mitsui E&P Texas LP ("<u>Mitsui</u>"), and SN EF UnSub LP's ("<u>UnSub</u>") Amended and Supplemental Complaint and would show the Court as follows:

1. On December 21, 2021, Maverick and Mesquite settled the Oxy Adversary[2] by agreeing to assume and to amend certain midstream contracts, including the Midstream Agency

[1] The "<u>Reorganized Debtors</u>," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. ("<u>Main Case</u>").

[2] *Occidental Petroleum Corp., et al. v. Sanchez Energy Corp., et al.*, Adversary No. 20-03198, , in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

Agreements and other Existing Commitments (defined in the GGPA), that affect Carnero's right to process Plaintiffs' gas under the April 1, 2018 Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA"), as amended. All Plaintiffs and Carnero are parties to the GGPA directly or through ratification or amendment.

2. Plaintiffs also filed their Complaint in this Adversary Proceeding alleging four state law contract claims arising from a dispute over the parties' rights and obligations under the GGPA. Plaintiffs attempted to disguise the claims as arising under the Bankruptcy Code, arising in the Main Case, or relating to the Main Case. In reality, the Complaint's primary goals were twofold: to conduct improper forum-shopping and to prevent Carnero from asserting state law claims under the GGPA in state court. Notably, nearly all of the defendants (holding what Carnero understands to be 87.5% of the working interest that is subject to the dispute with Carnero) are not subject to this Court's jurisdiction absent the claims that Maverick/Mesquite are attempting to manufacture.

3. On January 21, 2022, Carnero moved to dismiss all four counts in the Complaint on the grounds that the Court lacks jurisdiction to hear the post-confirmation, post-effective date state law claims. Three of the counts addressed no pending controversy and were unripe, moot, or sought advisory opinions on issues relating to Maverick/Mesquite's exercise of Section 365 rights to reject Midstream Agency Agreements. Maverick/Mesquite's assumption of those agreements meant rejection of them was no longer possible. Carnero had in fact dismissed its claims relating to rejection of those agreements asserted in its first state court lawsuit ("First Carnero Action") filed on July 30, 2021,[3] removed to this Court,[4] and dismissed without prejudice by Carnero on December 10, 2021.

---

[3] Cause No. 2021-46431, *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.*, in the 269th Judicial District Court, Harris County, Texas.

[4] *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, Adversary No. 21-03908, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Prior RAP")

4. In the fourth count, manufactured from imagined Carnero allegations, Plaintiffs asserted that Carnero breached this Court's June 30, 2020 Midstream Settlement Approval Order [Main Case Dkt. 1415] by filing state law contract claims in the First Carnero Action solely to interpret the GGPA as ratified and amended. Plaintiffs failed to state any claim—Plaintiffs, not Carnero, invoked that order in their notice of removal of the First Carnero Action. [Prior RAP Dkt. 1].

5. In connection with moving to dismiss this adversary proceeding, on January 21, 2022, Carnero also filed the a new state court lawsuit ("New Carnero Action").[5] Carnero alleges claims under the GGPA arising from the amendments to the Midstream Settlement Agreement and other Existing Commitments that Maverick/Mesquite made through an operational decision as post-confirmation reorganized debtors to settle the Oxy Adversary. [New RAP Dkt. 1-4 at 15]. These claims have nothing to do with Maverick/Mesquite's Section 365 right to reject any contract or any bankruptcy issue. Yet, Plaintiffs removed the case to this Court. [New RAP Dkt. 1].

6. After missing their February 28, 2022 deadline to respond to Carnero's motion to dismiss this case, on March 1, 2022, Plaintiffs filed their motion for leave to amend their defective Complaint. [Dkt. 23]. At the status conference on March 2, 2022, the Court ordered Carnero to file a response to the motion for leave by March 18, 2022.

7. Carnero has taken that time to analyze Plaintiffs' Amended Complaint [Dkt. 22-1] in which they now allege seven counts—the same four counts plus three new counts. The amended four counts suffer the same fatal defects as the original counts and the three new counts suffer similar fatal defects. Once again, Plaintiffs' purpose is to prevent Carnero from asserting in state

---

[5] *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, Cause No. 2022-04224, in the 215th Judicial District Court, Harris County, Texas, filed on January 1, 2022, and removed on February 28, 2022, to *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, Adversary No. 22-03035, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("New RAP") [New RAP Dkt. 1].

court post-confirmation, post-effective date state law contract claims under the GGPA to hold Plaintiffs liable for their operational decision to settle the Oxy Adversary by amending the Midstream Agency Agreements and other Existing Commitments—amendments that were not subject to the supervision, review, or approval of the Court, were outside the restrictions of the Bankruptcy Code and the Bankruptcy Rules, and were not within the purview of Section 365—in a manner that violates the GGPA. All seven counts are either beyond this Court's jurisdiction or fail to state claims.

8. Carnero will not oppose the Amended Complaint. Instead, it will move to dismiss the claims on various grounds. As the Court noted at the December 7, 2021 hearing on Carnero's motion to remand the First Carnero Action, "at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of that are a State Court issue." [Dkt. 1-1, 2:22-22:1]. The same holds true now that the Plaintiffs have assumed and amended the Midstream Agency Agreements and other Existing Commitments. The State Court is the place where Plaintiffs should face the consequences those actions create under other contracts like the GGPA.

Dated: March 17, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Defendant Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on March 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-04419 (MI)** |

**AMENDED AND SUPPLEMENTAL COMPLAINT**

1 The Reorganized Debtors in these Chapter 11 Cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"), by and through counsel, each bring this Amended and Supplemental Complaint (the "Amended Complaint") against Carnero G&P LLC ("Carnero" or "Defendant"), and in support thereof state as follows:

## INTRODUCTION[2]

1. This adversary proceeding seeks to bring much-needed closure to the midstream restructuring of Debtors Sanchez Energy Corporation and its affiliates (collectively, "Debtors"). The Debtors commenced these Chapter 11 cases in August 2019. In April of 2020, the Debtors entered into an agreement with Carnero, which had a contract to serve as the Debtors' *backup* midstream provider, pursuant to which the Debtors agreed to seek rejection of the existing *primary* midstream agreements—but only for a limited period of time and subject to numerous conditions. If that rejection were successful, Carnero stood to become one of the Debtors' primary midstream service providers. The rejection did not succeed, and (only after continuing such efforts well beyond the contractually required period), the Debtors validly terminated the agreement with Carnero.

2. Still needing to restructure their midstream agreements, the Debtors began negotiating certain favorable amendments to the existing primary midstream agreements. Carnero

[2] Unless otherwise specified, capitalized terms used but not defined in this Amended Complaint shall have the meaning given them in the *Second Amended Joint Chapter 11 Plan of Reorganization* [Dkt. No. 1205] (as amended or supplemented from time to time, the "Plan").

For clarity, this Amended Complaint cites entries on the docket of the main bankruptcy case as "Dkt. No. __" and entries on the docket of this Adversary Proceeding as "Adv. Pro. Dkt. No. __."

then sought to disrupt those negotiations by filing a state-court lawsuit claiming, among other things, that its backup midstream agreement with the Debtors "obligate[d]" the Debtors to take action in Bankruptcy Court to terminate the existing primary midstream agreements, including "***pursuing rejection of [those agreements] under 11 U.S.C. Section 365***." Petition [Carnero Dkt. No. 1-4] at ¶36(k), (l).[3] Plaintiffs here (defendants in state court) promptly removed that action to this Court. When confronted with this transparent attempt to claim that the lawsuit sought to cause a state court to interfere with exercise of the Debtors' rights under 11 U.S.C. § 365, Carnero's counsel disclaimed any such intent and indicated that Carnero would amend its complaint. Instead, Carnero withdrew that action *without prejudice*. Plaintiffs therefore filed the original version of this adversary proceeding seeking to adjudicate (among other things) Carnero's theory that it could use its backup midstream agreement to constrain the Debtors' rights under Section 365.

3. The same day that adversary was filed, the Debtors presented for this Court's approval an order authorizing the assumption of, and amendment to, the existing primary midstream agreements. Carnero appeared at the hearing and lodged no objection. This Court approved the assumption and amendment—as of the Effective Date—as expressly contemplated by the Plan (to which Carnero also had not objected). At long last, the midstream restructuring for these assets was complete.

4. A few weeks later, Carnero responded to this adversary proceeding by presenting yet another theory by which it sought to punish the Debtors for validly exercising its rights under Section 365 and the Plan. While purporting to abandon its prior argument that the Debtors were contractually required to reject the existing primary midstream agreements, Carnero now claimed

---

[3] For clarity, this Amended Complaint cites entries on the docket of the First Carnero Action (as defined below) as "Carnero Dkt. No__." The First Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

that the Debtors were contractually prohibited from making *any amendment whatsoever* to those agreements when assuming them. That is, Carnero now contends that it holds a valid contractual right that imposes *post-reorganization* liability on the Debtors for negotiating favorable amendments to contracts as part of a Section 365 assumption decision. The Debtors' Plan expressly contemplates and allows assumption of contracts on amended terms as part of a midstream restructuring, and Carnero never objected to these Plan provisions. In addition, the Debtors' contract with Carnero does not prohibit or restrict the assumption and amendment of other midstream contracts. Even if it did, it would turn the Bankruptcy Code on its head to allow contracting parties to tie a debtor's hands in Chapter 11. To make matters worse, it remains far from clear whether Carnero is actually willing to definitively abandon its prior theory that the contract *requires* the Debtors to pursue rejection. Accordingly, Plaintiffs bring this amended adversary proceeding to bring to a close, once and for all, Carnero's attempt to scuttle the Debtors' midstream restructuring.

## THE PARTIES

5. Plaintiff Maverick is a limited liability company organized under the laws of Delaware with its principal place of business in Houston, Texas.

6. Plaintiff Mesquite is a corporation organized under the laws of Delaware with its principal place of business in Houston, Texas.

7. Plaintiff UnSub is a limited partnership organized under the laws of Delaware with its principal place of business in Houston, Texas.

8. Plaintiff Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

9. Plaintiff Javelin is a limited partnership organized under the laws of Delaware with its principal place of business in Austin, Texas.

10. Plaintiff Mitsui is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

11. Defendant Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners, LP) with its principal place of business in Houston, Texas.

## JURISDICTION, VENUE, PREDICATES FOR RELIEF[4]

12. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012). Moreover, this Court's jurisdiction was expressly contemplated by Article XI of the Plan, paragraph 43 of the Confirmation Order, paragraph 6 of the Carnero Settlement Approval Order, and Section 6.2.1 of the Carnero Settlement Agreement. The parties have concrete disagreements that fall squarely within this Court's jurisdiction and directly affect the success of the Plan:

- This controversy directly implicates the "implementation or execution" of the Plan's Midstream Restructuring and requires interpretation of at least four Plan provisions, including:
    - Article IV.G. (Vesting of Assets of the Reorganized Debtors), which provided that, on the Plan Effective Date, all property in each Debtor estate, all Causes of Action, and any property acquired by any of the Debtors vested in each applicable Reorganized Debtor "free and clear" of all Liens, Claims, charges, or other encumbrances;
    - Article V (Treatment of Executory Contracts and Unexpired Leases), which established the unusual (but necessary) post-confirmation process for the Debtors' assumption and rejection of executory contracts and unexpired leases, with such assumptions or rejections effective as of the Effective Date of the Plan;
    - Article V.F. (Modifications, Amendments, Supplements, Restatements, or Other Agreements), which provided that each assumed executory contract "shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall

[4] Unless otherwise specified, capitalized terms used but not defined in this "Jurisdiction, Venue, and Predicates for Relief" section shall have the meaning given them in the "Facts" section of this Complaint.

not be deemed to alter the…validity, priority, or amount of any Claims that may arise in connection therewith"; and

- Article VIII (Effect of Confirmation of the Plan), which provided for the discharge of claims against the Reorganized Debtors as of the Effective Date and exculpated the Reorganized Debtors from "any claim related to any act or omission…in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] any Restructuring Transaction", and enjoined all claims released or discharged pursuant to the Plan.

- This controversy requires interpretation of at least five of the Court's prior orders, including:
  - the Confirmation Order [Dkt. No. 1212], which implemented the Plan provisions described above and reserved Carnero's right to object to its rights vesting "free and clear" of all claims against the Reorganized Debtors, *provided* that it file a written objection with this Court on or prior to May 20, 2020 (which Carnero failed to do);
  - the Carnero Settlement Approval Order [Dkt. No. 1415], which approved the Carnero Settlement Agreement but was expressly conditioned on the Debtors' ability to pursue a different midstream restructuring transaction in the Debtors' best interest;
  - the Stipulation of Dismissal and Agreed Order [Dkt. No. 1983], which approved the assumption and rejection of certain agreements with UnSub;
  - the PMA Assumption Order [Dkt. No. 2201], which approved the assumption of certain production marketing agreements pursuant to the Plan; and
  - the Oxy/Wes Stipulation And Agreed Order [Dkt. No. 2253], which approved the assumption of certain of the Debtors' midstream contracts as amended pursuant to the settlement with the Oxy/Wes Parties and effected the Midstream Restructuring.
- This controversy raises an important question of federal bankruptcy law: whether, as interpreted by Carnero, Section 3.1(b) of the GGPA would be unenforceable as a matter of federal bankruptcy law because it would subject the Debtors to significant liability or Carnero termination rights simply because—without extending the term of the Existing Commitments or otherwise expanding their scope—the Debtors negotiated ***improvements*** to their midstream cost structure that benefited the estate and were necessary to effect the Midstream Restructuring.
- Lastly, this controversy implicates important federal policy interests underlying the Bankruptcy Code: primarily, whether awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to its prepetition status quo would violate the federal policy interests underlying Section 365 of the Bankruptcy Code.

13. The statutory and legal predicates for the relief are 11 U.S.C. §§ 105(a), 365, 524, 1123, and 1141; 28 U.S.C. §§ 157, 1334, 1367, 2201 and 2202; Rules 3020(d), 4007, and 7001 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Plan, the Confirmation Order, the Oxy/Wes Stipulation and Agreed Order, the Oxy/Wes Settlement Agreement, the Carnero Settlement Approval Order, the Carnero Settlement Agreement, the Stipulation of Dismissal and Agreed Order, and the PMA Assumption Order.

14. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157, and the Court may enter final orders for matters contained herein.

15. Venue is proper in this district pursuant to 28 U.S.C. §1409, and because Carnero consented to this venue in the Carnero Settlement Agreement and resides in this District.

16. Pursuant to Bankruptcy Rule 7008 and Local Bankruptcy Rule 7008-1, Plaintiffs consent to entry of final orders or judgment by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

### I. The Existing Commitments

17. Through 2016, Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko"), and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties located in South Texas (the "Comanche Assets"). In January 2017, pursuant to that certain Purchase and Sale Agreement dated January 12, 2017 (the "Comanche PSA"), Maverick and various co-investors, including UnSub and Gavilan Resources, LLC ("Gavilan"), purchased the working interests of Anadarko in the Comanche Assets. The transaction closed on or about March 1, 2017.

18. Prior to the sale of the Comanche Assets, Anadarko had acquired and developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production downstream to customers. To that end, Anadarko and certain of its affiliates contracted

with several midstream parties who made substantial investments in building out the necessary infrastructure to monetize production from the Comanche Assets in exchange for certain contractual promises regarding, among other things, duration of agreements, delivery of hydrocarbons, and minimum volume commitments (collectively, the "Existing Commitments"). As relevant here, the Existing Commitments include, without limitation, the commitments contained in the agreements listed below:[5]

**Table 1: Existing Commitments**

| Agreement | Service Type |
|---|---|
| Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP | Transportation |
| Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP | Transportation |
| Gathering & Processing Agreement dated April 1, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD ("**ETC Processing Agreement**") | Gathering and processing & natural gas liquid purchase |
| Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP ("**Brasada Processing Agreement**") | Gathering and processing & natural gas liquid purchase |
| Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC[6] | Infield gas gathering |
| Transportation Services Agreement dated March 1, 2012 between Enterprise Products Operating LLC and Anadarko Energy Services Company | Transportation |
| Purchase Agreement dated March 1, 2012 between Anadarko Energy Services Company and Enterprise Products Operating LLC | Purchases at tailgate of Brasada plant |

5 The summary of Existing Commitments contained herein is provided for descriptive purposes only, does not include all agreements, and is qualified in its entirety by the actual agreements, including any and all amendments and modifications thereto.

6 Each of the WIPs also had its own separate lease dedication and gas gathering agreements with Springfield Pipeline LLC, which agreements also constitute Existing Commitments.

19. While the purchasers sought to buy all of Anadarko's interests in the Comanche Assets, a group of key assets (collectively, the "Retained Agreements") could not be assigned because certain counterparties did not consent to their transfer.[7] Maverick and Anadarko therefore entered into two agency agreements (collectively, the "Midstream Agency Agreements") whereby Maverick would act as Anadarko's agent under the Retained Agreements.[8] Maverick would thus receive the benefits of such agreements and also undertake Anadarko's obligations thereunder.

## II. The GGPA and the Ratification Agreements

20. On April 1, 2018, Maverick and Carnero entered into a back-up midstream agreement—the Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA")—for production from the Comanche Assets. Pursuant to the GGPA, Carnero is second in line for Maverick's hydrocarbons, behind certain agreed-upon commitments and dedications, including the Existing Commitments. Specifically, Section 3.1(b) of the GGPA provides as follows:

> to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) **is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero**, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to

---

7 The Retained Agreements included the Brasada Processing Agreement and the ETC Processing Agreement (collectively, the "Retained Gathering and Processing Agreements") as well as the following marketing contracts: (i) the Enterprise Products Transportation Agreement; (ii) the Double Eagle/Kinder Morgan Throughput Agreement; (iii) the BP Crude Oil Sales Agreement; and (iv) the Enterprise Products Purchase Agreement (collectively, the "Retained Marketing Agreements").

8 The Midstream Agency Agreements include: (i) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, AEP, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended or modified from time to time, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017 Agreements (collectively, the "Marketing Agency Agreement"); and (ii) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, AEP, Kerr-McGee Oil & Gas Onshore LP and Sanchez Energy Corporation, as amended and modified from time to time (the "GPA Agency Agreement").

> Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), **such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment…and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost…**

GGPA, § 3.1(b) (emphasis added). Exhibit F to the GGPA lists the agreements described above in Table 1 "**and associated amendments if any**" to those agreements. GGPA, Ex. F (emphasis added).[9] The GGPA explicitly contemplates subsequent amendments to the Existing Commitments and incorporates those amendments by reference. Carnero's argument that the GGPA prohibits *all* amendments to the Existing Commitments is thus patently at odds with the plain language of the GGPA.

21. On the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford, Javelin, and Gavilan also executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, dated April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Javelin ratification agreements are collectively referred to as the "Ratification Agreements"). UnSub, the WIPs and Gavilan thus ratified Maverick's commitment to deliver hydrocarbons to Carnero subject to the Existing Commitments.

[9] While Exhibit F to the GGPA lists certain agreements not described in Table 1, those agreements either terminated pursuant to their terms before the date of this filing, were rejected pursuant to the Plan, and/or do not contain commitments that prevent delivery of the subject hydrocarbons to Carnero.

## III. Mesquite Purchases Gavilan's Interest in the Comanche Assets Subject to the Existing Commitments

22. In October 2020, pursuant to that certain "363" Asset Purchase Agreement dated October 16, 2020 (the "Gavilan PSA"), approved by this Court,[10] Mesquite Comanche Holdings, LLC ("MCom"), a wholly-owned subsidiary of Mesquite, acquired certain of Gavilan's interests in the Comanche Assets. Carnero argues "upon information and belief" that because Gavilan did not assign the Comanche PSA to Mesquite, "Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments." Plaintiff's Amended Petition at ¶ 24 [Dkt. No. 2418-4]. However, pursuant to Section 2.05(a) of the Gavilan PSA, MCom acquired Gavilan's interest in the Comanche Assets "free and clear of all claims, encumbrances, Liens or Liabilities **other than the Assumed Liabilities and Permitted Liens**[.]" Gavilan PSA, §2.05(a) (emphasis added); Def. "Free and Clear." "Permitted Liens" includes, among other things, "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the contracts disclosed on Disclosure Schedule 3.05(a). Gavilan PSA, Ex. I at I-2. Disclosure Schedule 3.05(a) lists the Comanche PSA.[11] Gavilan PSA, Disclosure Schedule 3.05(a) at 1. Accordingly, while Gavilan did not assign the Comanche PSA to Mesquite or MCom, it sold its assets to Mesquite's designee, MCom, subject to the covenants in the Comanche PSA, including the requirement that Mesquite and MCom honor the Existing Commitments.

23. Consistent with the terms of the Gavilan PSA, this Court's order approving the sale (the "Gavilan Sale Order") provided that the assets vested in MCom "free and clear of all claims,

---

10 The Gavilan PSA is available at docket number 366 in the case captioned *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S. D. Tex. 2020).

11 Disclosure Schedule 3.05(a) also lists the GGPA and the Ratification and Assumption Agreement, dated May 22, 2018, among Gavilan, Maverick and Carnero whereby Gavilan ratified the GGPA. Gavilan PSA, Disclosure Schedule 3.05(a) at 24.

encumbrances, Liens or Liabilities of any kind or nature whatsoever, **other than the Assumed Liabilities and Permitted Liens**[.]" *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S. D. Tex. 2020) [Dkt. No. 361 at ¶ V] (emphasis added). Pursuant to the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments.

24. In any event, pursuant to Section 3.1(j) of the GPA Agency Agreement, Mesquite (as successor to Maverick) is required to "take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Midstream Contracts, including all Hydrocarbons attributable to…[Maverick], Unsub and [Gavilan]." The "Retained Midstream Contracts" are listed on Schedule 1.1(b) and include each of the Existing Commitments described above in Table 1. Moreover, Gavilan was bound to sell its hydrocarbons to Maverick pursuant to certain marketing agreements (the "Gavilan Marketing Agreements"), all of which were assumed and assigned to MCom. MCom thus remains bound to sell its hydrocarbons to Maverick who, in turn, must transport and sell them subject to the Existing Commitments pursuant to the GPA Agency Agreement. Even if MCom had not acquired Gavilan's assets subject to the Existing Commitments pursuant to the Gavilan PSA and the Gavilan Sale Order (which it did), the GPA Agency Agreement and the Gavilan Marketing Agreements independently require Maverick to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments.

## IV. The Debtors' Midstream Restructuring

25. As the Court is aware, these Chapter 11 Cases followed an unusual course. On April 30, 2020, the Court confirmed the Debtors' Plan of reorganization under the extraordinary circumstances of a global pandemic combined with continued stress in the oil and gas industry. *See Order Approving Disclosure Statement and Confirming Plan of Reorganization* [Dkt. No. 1212] (the "Confirmation Order"). The Plan provided for, among other things, the equitization of



015926

approximately $100 million of postpetition, debtor-in-possession loans and, as is particularly relevant here, delayed the implementation of the Debtors' Midstream Restructuring. *See* Plan at 16 (Art. III.C.3); 26 – 27 (Art. V.B.). This unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *In re Sanchez Energy Corp*., 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). To forestall liquidation, Sanchez and its creditors agreed to confirm a Chapter 11 plan first, and restructure the Debtors' midstream operations later. *Id.*

26. The Plan, however, could not be consummated until the DIP Lenders were satisfied that the Reorganized Debtors would have sufficient liquidity to operate in the ordinary course of business after the Effective Date. *See* Plan at 38 (Art. IX.B.3.).[12] Because the Debtors' midstream operations were weighed down by above-market contracts and rates, identifying a viable approach to improve the Debtors' midstream cost structure was crucial to securing the needed liquidity. *See Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties* [Dkt. No. 1309] (the "Carnero Settlement Motion") at ¶ 3; *see also* June 29, 2020 Hr'g Tr. at 30:21-22.

27. The Plan and Confirmation Order thus gave the Debtors flexibility to renegotiate their midstream contracts and established a post-confirmation procedure to resolve assumption and rejection disputes with midstream providers. Specifically, the Debtors were to identify executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "Rejection Schedule") or to be assumed as listed on Exhibit C (as amended, the "Assumption Schedule") to the Plan Supplement. *See* Confirmation Order at ¶¶ 17 – 26; Plan at 26 - 37 (Art.

[12] Article IX.B.3 of the Plan provides that "it shall be a condition to the occurrence of the Effective Date" that Requisite DIP Lenders "be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date . . . reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date."

V.B.). If no party in interest filed a timely objection, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date, except insofar as the objection deadline had been extended. *Id.* If an objection was timely filed, the Confirmation Order provided that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" or as may be agreed upon by the parties. Confirmation Order at ¶ 17. All assumptions and rejections of executory contracts were deemed effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection was after the Effective Date. *Id.*

28. As is typical, the Plan and Confirmation Order provided that the Debtors would emerge from bankruptcy with a clean slate, free from any liability arising out of the implementation of the Midstream Restructuring. Pursuant to Article IV.D of the Plan, on the Effective Date, all property of the estate vested in the Reorganized Debtors "free and clear of all Liens, Claims, charges, or other encumbrances." Notably, Article IV.F. of the Plan provided that each assumed executory contract vested in the Reorganized Debtors with "all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter…the validity, priority, or amount of any Claims that may arise in connection therewith." Contract counterparties wishing to object to the Plan's vesting provision were "required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to [May 20, 2020]."[13] Confirmation Order at ¶ 23. Several counterparties preserved their rights by filing timely objections. Carnero did not.

---

13 The May 20th deadline was extended to June 22, 2020, by an order of this Court dated May 20, 2020 [Dkt. No. 1267].

29. The Plan also (i) discharged all claims against the Reorganized Debtors as of the Effective Date (Art. VIII.A); (ii) exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] **any Restructuring Transaction**" (Art. VIII.B) (emphasis added); and (iii) enjoined all claims released or discharged pursuant to the Plan (Art. VIII.C). "Restructuring Transactions" was defined broadly to include all "corporate transactions necessary or appropriate to implement the Plan" and thus covered the Midstream Restructuring, which was crucial to obtaining the liquidity necessary to implement the Plan.

30. Pursuant to Article XI of the Plan, the Bankruptcy Court retained "exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" including to "resolve any matters related to…(c) the Debtors or the Reorganized Debtors **amending, modifying, or supplementing, after the Effective Date**, pursuant to the Plan, **any Executory Contracts** or Unexpired Leases[.]" Plan at 40 (Art. XI) (emphasis added). The Confirmation Order likewise provided that the Bankruptcy Court retained "exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of th[e] Confirmation Order." Confirmation Order at ¶ 43.

### A. Settlement Agreement with Carnero

31. Following confirmation of the Plan, the Debtors continued to work on identifying, finalizing, and implementing a strategy to restructure their midstream arrangements to reduce costs, rates, and fees. In early June 2020, the Debtors reached a settlement with a group of existing

midstream and marketing service providers, including Carnero. *Id.* at ¶ 4. The Carnero Settlement Agreement[14] provided, among other things, as follows:

a) Carnero would return $8 million from the proceeds of a $17 million letter of credit drawn by Carnero under the existing GGPA. *See* Carnero Settlement Agreement at § 2.1;

b) Seco Pipeline would contribute to the Debtors a nearly $2 million administrative expense claim it had asserted in connection with the Debtors' postpetition termination of an agreement between the parties. *Id.* at § 2.4;

c) The Debtors agreed during the term of the Carnero Settlement Agreement not to remove any executory contracts or unexpired leases from the Assumption Schedule, which at the same time included the GGPA (*id.* at § 2.2.1(d));

d) The settlement parties agreed to conditionally amend certain existing agreements (the "Carnero Agreement Amendments"), but only if certain transactions contemplated by the Settlement Agreement successfully closed. *Id.* at § 2.5; and

e) The Debtors agreed to pursue rejection of the Affirmative Covenant Agreements (as defined in the Carnero Settlement Agreement), including the Midstream Agency Agreements. *Id.* at § 2.2.1(a)(iii). The Carnero Agreement Amendments would take effect only if the Debtors succeeded in rejecting the Affirmative Covenant Agreements. *Id.* at § 2.5.2.

By its plain terms, the Carnero Settlement Agreement did not purport to determine a definitive path to restructure the Debtors' midstream operations. To the contrary, the parties had the option to terminate the Carnero Settlement Agreement at any time after October 1, 2020 (the "Closing Outside Date") if an order had not by then been entered rejecting the Affirmative Covenant Agreements. *See* Carnero Settlement Agreement at § 5.1.2. If the Debtors exercised their option to terminate instead of continuing to pursue rejection of the Affirmative Covenant Agreements, Carnero's sole remedy was to seek the return of all letter of credit amounts actually delivered by Carnero (*i.e.*, the $8 million). *Id.* at § 2.2.1(b). The Carnero Settlement Agreement specifically provided that return of the letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Affirmative Covenant

[14] The Carnero Settlement Agreement is attached as Exhibit A to the Carnero Settlement Motion.

Agreements. *Id*. Once the Settlement Agreement terminated, the Debtors were no longer required to continue to pursue rejection of the Affirmative Covenant Agreements. *See id.* at § 6.4.

32. Multiple parties, including UnSub and the WIPs, objected to the proposed Carnero Settlement Agreement, arguing that the settlement favored the Debtors' Catarina interests at the expense of the Comanche Assets.[15] The Court convened a hearing (at which Carnero's counsel appeared), ultimately approving the settlement without objection after all parties in interest agreed to substantial modifications to the settlement approval order. *See Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts* [Dkt. No. 1415] (the "Carnero Settlement Approval Order").

33. At the hearing, the Court and the parties extensively discussed the Carnero Settlement Approval Order's limited and conditional effect. More particularly, UnSub and the WIPs vigorously disputed any suggestion that the Carnero Settlement Approval Order would actually resolve the midstream restructuring of the Comanche Assets. The Court framed this question explicitly at the outset of the settlement hearing:

> THE COURT: Let me find out from the advocates again
> whether, if we approve this, there then becomes an irrevocable
> transaction that is set into motion where parties who could
> object today to it won't be able to object --

June 29, 2020 Hr'g Tr. at 18:15-18.[16]

---

15 *See Limited Objection of Venado Oil & Gas, LLC, And Its Direct and Indirect Subsidiaries, Eagle Ford TX LP, And Mitsui E&P Texas LP to Debtors' Settlement Motion* [Dkt. No. 1351]; *Objection of GSO ST Holdings LP, GSO ST Holdings Associates LLC, and SN EF UnSub, LP to Debtors' Settlement Motion* [Dkt. No 1373]; *Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Settlement Motion* [Dkt No. 1314]; *Preliminary Objection of Gavilan Resources, LLC to Debtors' Settlement Motion* [Docket No. 13200].

16 The June 29, 2020, hearing transcript is available at Dkt. No. 1418.

34. The parties' argument and colloquies with the Court—none of which Carnero's counsel disputed—repeatedly acknowledged that the Carnero Settlement Approval Order *would not* preordain the Debtors' ultimate midstream restructuring. Debtors' counsel stated as follows:

> Furthermore, Your Honor, as you will hear from Mr. Meghji, nothing in the settlement agreement, if approved, preordains a party's right with respect to any JOA, ADA, midstream contract, or any other contract. Again, it was the debtors' intent that all of their rights are preserved. And to the extent additional language should be crafted to add to the order to confirm that point, we are open and welcome that language.

June 29, 2020 Hr'g Tr. at 27:12-19. Counsel for the DIP lenders (which acquired the equity of the Reorganized Debtors pursuant to the Plan) agreed, explaining that the Carnero Settlement Agreement and resulting assumption of the GGPA was only the beginning of the midstream restructuring process:

> The settlement agreement itself does not effectuate a guarantee of midstream restructuring. It is only a roadmap; and frankly, a roadmap that was already signaled in the schedules filed before the plan was confirmed.

> successful. It's no guarantee that all the contracts can or will be assumed rejected. But that's not the issue for today. It gives the debtors a chance to work through this complicated midstream structure. They, at any time, can switch gears. They give back the $8 million. And if it's not done by October 1st, they don't have to give the $8 million. They can still terminate in 95 days or so.

June 29, 2020 Hr'g Tr. at 34:22 – 25; 41:5 – 11.

35. Notably, counsel for the DIP Lenders explained that the Debtors would have to renegotiate the Affirmative Covenant Agreements (which had unsustainable, above-market rates) if they were unable to reject them, and explicitly acknowledged the settlement parties' understanding that the Carnero Settlement Agreement and resulting assumption of the GGPA would not prevent the Debtors from exploring all their options in such negotiations:

> In any event, the settlement agreement already acknowledges that there may be a need to continue negotiations with all of these parties. There are many conditions precedent here. And if any one of them cannot be met, the debtors will need to renegotiate terms. The objecting parties simply want more leverage in those negotiations.
>
> In addition, there is nothing in the agreement that prevents the debtors from considering all their options in such negotiations. The settlement agreement allows the debtors to

June 29, 2020 Hr'g Tr. at 37:25; 28:1-8. Carnero's counsel did not object to this characterization of the parties' commercial understanding.

36. Following these exchanges, the Court confirmed what the parties had acknowledged: that the Carnero Settlement Approval Order did not constrain the Debtors' ultimate restructuring of the existing Comanche midstream contracts:

> THE COURT: No, that's -- I think I'm hearing everybody tell me that when it comes time to determine whether the contracts that affect the Comanche asset should be rejected, that I'm going to be asked to determine whether there's been a proper exercise of fiduciary duty with respect to the manager of those assets.
>
> And I -- that seems to say that everyone is agreeing to that, which means approval of this has only upside and no downside. But maybe I'm missing something and we'll hear --

June 29, 2020 Hr'g Tr. at 67:6 – 14.

37. At the conclusion of the hearing, the Court approved the settlement and entered the Carnero Settlement Approval Order. The Carnero Settlement Approval Order expressly and repeatedly reflected the settlement's limited and conditional nature. Specifically, the order (i) recognized that the Debtors *might not* ultimately reject the Affirmative Covenant Agreements (*id.* at ¶¶ 11, 13); (ii) preserved all rights and objections of UnSub and the WIPs to dispute rejection of the Affirmative Covenant Agreements (*id.* at ¶ 7); and (iii) preserved this Court's jurisdiction with respect to all matters "arising from or related to the [Carnero] Settlement Agreement or [the Carnero Settlement Approval Order]" (*id.* at ¶ 6).

38. Consistent with the terms of the Carnero Settlement Agreement and the Carnero Settlement Approval Order, Carnero returned the $8 million letter of credit proceeds to Mesquite, and Seco Pipeline contributed the $2 million administrative expense claim it had asserted against the Debtors. The Plan became effective on June 30, 2020. *See Notice of Effective Date* [Dkt. No. 1417].

39. As required by the Carnero Settlement Agreement, the Debtors diligently pursued rejection of the Affirmative Covenant Agreements via the adversary proceeding captioned

*Occidental Petroleum Corp., et al. v. Sanchez Energy Corp. et al.*, Adv. Pro. No. 20-03198 [MI] ("Sanchez/Oxy Adversary"). Certain counterparties to the Affirmative Covenant Agreements (collectively, the "Oxy/Wes Parties")[17] objected to the Debtors' proposed rejection of those agreements, arguing that the agreements created covenants running with the land or equitable servitudes and were thus not subject to rejection under Section 365 of the Bankruptcy Code. *See Plaintiff's Motion for Summary Judgment* [Sanchez/Oxy Dkt. No. 50] at ¶¶ 37-133.[18] The Debtors aggressively pursued their efforts to reject the Affirmative Covenant Agreements, litigating cross-motions for summary judgment and exchanging voluminous discovery with the Oxy / Wes Parties.

40. At no point did Carnero offer to reimburse the Debtors for either the fees and expenses they incurred attempting to reject the Affirmative Covenant Agreements, or for the rejection damages Mesquite (as successor to Sanchez Energy Corporation) would owe if it succeeded in rejecting the agreements. Ultimately, on June 24, 2021—nearly a full year after approval of the Carnero Settlement Agreement and nine months *after* the Carnero Settlement Agreement's Closing Outside Date—Mesquite exercised its contractual right to terminate the Settlement Agreement. Mesquite subsequently returned the $8 million in letter of credit proceeds to Carnero.

**B. Settlement Agreement with the Oxy/Wes Parties**

41. The Debtors then began to explore other options to reduce their midstream costs. In December 2021, Mesquite reached a settlement with the Oxy/Wes Parties, which resolved the parties' dispute in the Oxy/Wes Adversary and provided a framework for the Debtors to obtain

---

17 The Oxy/Wes Parties include Occidental Petroleum Corporation, Anadarko Petroleum, Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP.

18 For clarity, this Amended Complaint cites entries on the docket of the Sanchez/Oxy Adversary proceeding as "Sanchez/Oxy Dkt. No__."

rate relief and implement the Midstream Restructuring. The Oxy/Wes Settlement Agreement provided, among other things, as follows:

a) the Reorganized Debtors agreed to assume certain midstream contracts (the "Assumed Comanche Agreements") pursuant to the Plan, including certain of the Affirmative Covenant Agreements;

b) the parties agreed to amend certain of the Assumed Comanche Agreements to reduce the Reorganized Debtors' midstream cost structure;

c) the Reorganized Debtors agreed to reject certain midstream contracts (the "Rejected Comanche Agreements") pursuant to the Plan; and

d) the Oxy/Wes Parties agreed to dismiss the Oxy/Wes Adversary Proceeding.

42. The Midstream Restructuring did not extend the term of the Existing Commitments or otherwise expand their scope.

43. On December 21, 2021, Mesquite filed a stipulation and agreed order (the "Oxy/Wes Stipulation and Agreed Order") dismissing the Sanchez/Oxy Adversary and for assumption of the Assumed Comanche Agreements and rejection of the Rejected Comanche Agreements. *See Stipulation and Agreed Order* [Dkt. No. 2253]. The Oxy/Wes Stipulation and Agreed Order clearly states that certain of the Assumed Comanche Agreements would be amended pursuant to the Oxy/Wes Settlement Agreement. Carnero did not object.

44. At a hearing on that same day, the Court approved the Oxy/Wes Stipulation and Agreed Order. Carnero's counsel appeared at the hearing but raised no objection to the assumption of the Assumed Comanche Agreements as amended pursuant to the Oxy/Wes Settlement Agreement. Instead, Carnero has repeatedly sought to use state courts to upend these Chapter 11 Cases and extract additional value to which it has no contractual right.

### V. Carnero's Evolving Theories and Repeated Efforts to Upend the Debtors' Midstream Restructuring and Evade This Court's Jurisdiction

45. On July 30, 2021, Carnero filed a lawsuit (the "First Carnero Action") in the District Court of Harris County, Texas against Mesquite, UnSub, and the WIPs. The First Carnero Action sought, among other things, declarations that (i) the GGPA and the Ratification Agreements obligate Plaintiffs to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include requiring Mesquite to pursue rejection of the Midstream Agency Agreement, and (ii) after rejection of the Midstream Agency Agreement, Plaintiffs must deliver the gas from the Comanche Assets to Carnero. *See* Petition [Carnero Dkt. No. 1-4] at ¶36(k), (l).[19] The timing of the First Carnero Action was no accident. As paragraph 25 of the Petition acknowledged, Carnero filed the lawsuit upon coming to the belief that Oxy/Wes Parties were on the cusp of a global midstream settlement. The First Carnero Action was a last-ditch effort to derail this comprehensive deal.

46. On September 10, 2021, Mesquite, UnSub, and the WIPs filed a notice of removal, removing the First Carnero Action to this Court. *See Notice of Removal* [Carnero Dkt. No. 1]. On October 8, 2021, Carnero filed a motion to remand the action to state court or for abstention. *See Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero Dkt. No. 6].

47. At the December 7 hearing on the motion to remand, the Court observed that "the plain language" of paragraph 36(k) of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreement under] Section 365" (December 7, 2021 Hr'g Tr. at 18:10 – 11) and that paragraph 36 (l) asked the State Court to "declare the effect of rejection of a contract before it's ever rejected." *Id.* at 15:25 – 16:1. Carnero's counsel disclaimed

---

19 For clarity, this complaint cites entries on the docket of the First Carnero Action as "Carnero Dkt. No__." The Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

that understanding, stating that Carnero's "intent was not to dictate what . . . [Mesquite] was going to do with respect to § 365." *Id.* at 15:10 – 12. Rather, Carnero asserted, the purpose of paragraphs 36(k) & (l) was to "specifically deal with what happens in the event of rejection . . . if confusion about the language [of paragraphs 36(k) & (l)] is something that is causing the problem, this can be amended to make it clear. " *Id.* at 15:9 – 14. The Court suggested that Carnero amend the Petition to remove those paragraphs, explaining that doing so "certainly [would] make a different argument." *Id.* at 17:11 – 13.

48. Carnero agreed to file an amended complaint by December 10. *Id.* at 26:5 – 6. Rather than file an amended complaint, however, Carnero dismissed the lawsuit without prejudice. *See Plaintiff's Notice of Dismissal without Prejudice* [Carnero Dkt. No. 31]. Carnero's dismissal was explicitly without prejudice so that Carnero could continue to use state courts to extract value for itself as a result of these Chapter 11 Cases.

49. On December 21, Plaintiffs commenced this action (the "Adversary Proceeding") to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts. In response, on January 21, 2022, Carnero filed a motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") [Adv. Pro. Dkt. No. 8] in this Court and a new state court lawsuit against Plaintiffs in Harris County, Texas, seeking to evade this Court's jurisdiction for the second time (the "Second Carnero Action" and, together with the Carnero Action, the "Carnero Actions").

50. In the Motion to Dismiss, Carnero stated that it "is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA." Motion to Dismiss at ¶ 2. Plaintiffs

prepared and presented to Carnero a proposed stipulation to that effect.[20] Carnero, however, did not agree to either sign the stipulation or dismiss the First Carnero Action with prejudice. Nevertheless, the Second Carnero Action presses an entirely distinct (yet meritless) theory: that Plaintiffs breached the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring. This Amended Complaint seeks to confirm—free from doubt or further attempts by Carnero to use state courts to upend these Chapter 11 Cases—Debtors' rights under the Bankruptcy Code, the Plan, and the Confirmation Order, to restructure their midstream contracts.

## CLAIMS FOR RELIEF

## COUNT I

**(Plaintiffs Maverick and Mesquite Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That MCom Acquired Gavilan's Interest in the Comanche Assets Subject to the Existing Commitments**

51. Plaintiffs Maverick and Mesquite incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

52. An actual controversy exists as to whether MCom acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments.

53. The requested declaration from this Court would serve the important and much-needed purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether MCom acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments.

20 The proposed stipulation is attached hereto as Exhibit A.

54. Carnero argues "upon information and belief" that because Gavilan did not assign the Comanche PSA to Mesquite, "Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments." Amended Petition at ¶ 24 [Dkt. No. 2418-4]. However, as demonstrated above, (i) the Gavilan PSA explicitly provided that MCom acquired Gavilan's interest in the Comanche Assets subject to "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the Comanche PSA, including the requirement that MCom honor the Existing Commitments; (ii) the Gavilan Sale Order provided that the assets vested in MCom subject to the covenants in the Comanche PSA; (iii) the GPA Agency Agreement independently requires MCom to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments; and (iv) the Gavilan Marketing Agreements require MCom to sell its hydrocarbons to Maverick who is bound to honor the Existing Commitments. *See supra* ¶¶ 22-24.

55. Accordingly, Plaintiffs Maverick and Mesquite respectfully request a declaratory judgment that, (i) pursuant to the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments and (ii) the GPA Agency Agreement and Gavilan Marketing Agreements require Maverick to transport and sell all of Gavilan's hydrocarbons acquired by MCom subject to the Existing Commitments.

**COUNT II**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That Plaintiffs Did Not Breach the Terms of the GGPA by Agreeing to Amend Certain of the Debtors' Midstream Contracts in Connection with the Midstream Restructuring**

56. Plaintiffs incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

57. An actual controversy exists as to whether Plaintiffs breached the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring.

58. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code and the Plan to implement the Midstream Restructuring.

59. Carnero alleges that Plaintiffs breached the GGPA "by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they 'exist[ed] on the Effective Date' of the GGPA for the 'then-current term of such Existing Commitment.'" Amended Petition at ¶ 43 [Dkt. No. 2418-4]. Carnero is wrong.

60. As demonstrated above, the GGPA explicitly contemplates subsequent amendments to the Existing Commitments and incorporates those amendments by reference. *See supra* ¶ 20. Carnero's theory that the GGPA prohibits *all* amendments to the Existing Commitments is thus inconsistent with the plain terms of the GGPA. And even if the GGPA did prohibit *some* amendments to the Existing Commitments, it certainly does not prohibit the amendments and transactions at issue here, which did not deny Carnero of the benefit of its

prepetition contractual bargain to collect fees from gathering, processing, and purchasing the subject hydrocarbons per the terms of the GGPA.

61. Accordingly, Plaintiffs respectfully request a declaratory judgment that they did not breach the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring.

## COUNT III

### (All Plaintiffs Against Defendant Carnero)

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That—As Carnero Reads It—Section 3.1(b) of the GGPA is Unenforceable Under Bankruptcy Law)

62. Plaintiffs incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

63. An actual controversy exists as to whether—if Carnero's reading of Section 3.1(b) of the GGPA is correct—that provision would be unenforceable under bankruptcy law.

64. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether Mesquite may amend its midstream agreements to effectuate the Midstream Restructuring without incurring liability for breach of the GGPA.

65. Even if (as Carnero claims) the GGPA imposes liability on Plaintiffs for agreeing to amend certain of their midstream contracts, such a provision would be unenforceable under bankruptcy law. The authority to assume or reject an executory contract is a "vital part of the bankruptcy process." *In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001). Section 365 "expresses a clear Congressional policy favoring assumption…Such a policy… insure[s] that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors." *Matter of U. L. Radio Corp.*, 19 B.R. 537, 544

(Bankr. S.D.N.Y. 1982). Section 365 reflects the "fundamental bankruptcy policy allowing a debtor to realize maximum value from its [contracts] for the benefit of its estate and creditors." *In re Jamesway Corp.*, 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996).

66. Part and parcel of the federal bankruptcy policy underlying a debtor's power to assume or reject an executory contract is the ability to renegotiate the terms of an executory contract to be assumed. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984) (expressly endorsing "voluntary modification[s]" to preexisting contracts as a desirable alternative to rejection motions in the context of collective bargaining agreements); *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent."). Indeed, the practical effect of section 365 is to force all creditors doing business under executory contracts with the debtor to renegotiate their mutual rights. *See Bhd. of Ry., Airline & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. REA Exp., Inc.*, 523 F.2d 164, 169 (2d Cir. 1975); *see also In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 9 F.4th 1, 12 (1st Cir. 2021) (rejecting argument that renegotiation resulted in brand new contract because "adopting this reasoning would bar debtors from negotiating amendments to pre-petition contracts as a quid pro quo for assumption").

67. To effectuate this policy, bankruptcy courts routinely invalidate prepetition contractual provisions that restrict or condition the debtor's right to assume (and assign) its contracts. For example, courts have invalidated provisions that (i) condition consent to assignment upon payment by the debtor of an "assumption fee;"[21] (ii) provide for additional payments (*e.g.*, profit sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the

21 *See In re Howe*, 78 B.R. 226, 228 (Bankr. D. S. D. 1987).

non-debtor third party to such contract upon assignment;[22] (iii) provide for any rights of first refusal on a counterparty's part;[23] and (iv) provide for any recapture or termination rights in favor of the counterparty.[24]

68. Courts routinely invalidate such punitive provisions because they contravene the central purpose of Section 365 by restricting the debtor's ability to realize the value of its assets. A creditor cannot impose a penalty on the debtor for utilizing the tools of the Bankruptcy Code to negotiate better commercial terms that maximize the value of the estate, particularly where, as here, those terms do not injure said creditor. Awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to its prepetition status quo would violate the federal policy interests underlying section 365 of the Bankruptcy Code.

69. Accordingly, Plaintiffs respectfully request a declaratory judgment that (as Carnero reads it) Section 3.1(b) of the GGPA is unenforceable under bankruptcy law.

---

22 *See In re Golfsmith Int'l Holdings, Inc*., No. 16-12033 (LSS), 2017 WL 5564291, at *9 (Bankr. D. Del. Jan. 19, 2017); *see also In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996); *Robb v. Schindler*, 142 B.R. 589 (D. Mass. 1992); *South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.)*, 129 B.R. 200 (9th Cir. BAP 1991); *In re The National Sugar Refining Co*., 21 B.R. 196 (Bankr. S. D. N. Y. 1982).

23 *See In re Golfsmith Int'l Holdings, Inc*., 2017 WL 5564291, at *9.

24 *See In re Fairway Group Holdings Corp., et al.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 20, 2020); *see also In re Winn-Dixie, Inc.*, Case No. 05-03817 (M. D. Fla 2005); *In re Boscov's Inc., et al.*, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008)

## COUNT IV

**(Plaintiffs Mesquite and Maverick Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That Carnero's Breach of Contract Claims Are Barred by the Plan, the Confirmation Order, and the Oxy/Wes Stipulation And Agreed Order)**

70. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

71. An actual controversy exists as to whether Carnero's breach of contract claims are barred by the Plan and the Confirmation Order.

72. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Plan and Confirmation Order bar breach of contract claims arising out of the Debtors' implementation of the Midstream Restructuring.

73. Pursuant to Article IV.D of the Plan, on the Effective Date, all property of the estate vested in the Reorganized Debtors "free and clear of all Liens, Claims, charges, or other encumbrances." Article IV.F. of the Plan further provided that each assumed executory contract vested in the Reorganized Debtors with "all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter…the validity, priority, or amount of any Claims that may arise in connection therewith." Contract counterparties wishing to object to the Plan's vesting provision were "required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to [May 20, 2020]." Confirmation Order at ¶ 23. Carnero did not preserve its rights by filing a timely objection. Accordingly, Carnero is now barred from arguing that the amendments to certain of the Assumed Comanche Agreements breached the terms of the GGPA.

74. The Plan also (i) discharged all claims against the Reorganized Debtors as of the Effective Date (Art. VIII.A); (ii) exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] any Restructuring Transaction" (Art. VIII.B) (emphasis added); and (iii) enjoined all claims released or discharged pursuant to the Plan (Art. VIII.C). "Restructuring Transactions" was defined broadly to include all "corporate transactions necessary or appropriate to implement the Plan" and thus covers the Midstream Restructuring, which was crucial to obtaining the liquidity necessary to implement the Plan.

75. Moreover, the Oxy/Wes Stipulation and Agreed Order approved the assumption of the Assumed Comanche Agreements *as amended pursuant to the Oxy/Wes Settlement Agreement*. Carnero did not file a written objection to the Oxy/Wes Stipulation and Agreed Order. Nor did Carnero's counsel raise any objections at the hearing. Instead, in disregard of this Court's prior orders, Carnero filed an action in state court seeking (for the second time) to evade this Court's jurisdiction.

76. Plaintiffs Mesquite and Maverick respectfully request that the Court put an end to Carnero's repeated efforts to use state courts to upend these Chapter 11 Cases and seek a declaratory judgment that Carnero's breach of contract claims are barred by the Plan, Confirmation Order, and the Oxy/Wes Stipulation and Agreed Order.

## **COUNT V**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Section 365 Gives Mesquite the Power to Breach the Midstream Agency Agreements, Not The "Right or Option to Terminate" Those Agreements**

77. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

78. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, an actual controversy exists as to whether Mesquite's right under Section 365 to reject the Midstream Agency Agreements can be deemed a "right or option to **terminate**" those agreements. According to Carnero, because Section 365 provides Mesquite with a "right or option to terminate" the Midstream Agency Agreements (and the Existing Commitments contained therein), Mesquite's decision to assume (rather than reject) those agreements constitutes a breach of Section 3.1(b) of the GGPA, which requires that Mesquite exercise "any right or option to **terminate** such Existing Commitments . . . without out-of-pocket cost." GGPA, § 3.1(b) (emphasis added).

79. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code to assume the Midstream Agency Agreements.

80. The Bankruptcy Code is unequivocal that rejection of an executory contract such as the Midstream Agency Agreements does not present a "right or option to terminate" a contract; rather, rejection "constitutes a *breach* of such contract." 11 U.S.C. § 365(g) (emphasis added). Numerous courts, including the Fifth Circuit, have "held that this language does not mean that the

executory contract or lease has been terminated, but only that a breach has been deemed to occur." *Matter of Austin Dev. Co*., 19 F.3d 1077, 1082 (5th Cir. 1994) (citing *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993)); *In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir. 1990); *Leasing Serv. Corp. v. First Tenn. Bank, Nat'l Ass'n*, 826 F.2d 434, 436–37 (6th Cir.1987). The "decision to reject is thus correctly viewed only as a *power to breach the executory contract*" not as a right or option to terminate such contract. *Id.* (emphasis added). The Supreme Court recently reaffirmed this understanding, holding in *Mission Product Holdings, Inc. v. Tempnology, LLC* that "[r]ejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach." 139 S. Ct. 1652, 1661 (2019); *see also In re United DC,* Inc., No. 12-32620, 2013 WL 310311, at *4 (Bankr. S.D. Tex. Jan. 25, 2013) (Isgur, J.) (holding that rejection "is considered a breach rather than termination").

81. As the Fifth Circuit explained, "Congress knew how to authorize the termination of executory contracts and leases in § 365. 'Termination' is used in § 365(h), (i), and (n) as one option available respectively to the purchaser of an interest in a timeshare project, the vendee of real property, or the licensee from the debtor of a right to intellectual property *if* the trustee has rejected the executory contract." *Id.* (emphasis in original). Congress was "not confused in its differing usages of the terms rejection, breach and termination." *Id.* at 1083.

82. Moreover, "breach and termination of leases or executory contracts are not synonymous terms under state law." *Id.* (citing *Resolution Trust Corp. v. Cramer*, 6 F.3d 1102, 1108 (5th Cir.1993) (describing options available to landlords under Texas law)); *In re Storage Technology, supra; In re Picnic 'N Chicken, Inc*., 58 B.R. 523, 525 (Bankr. S. D. Cal. 1986) (California law). Congress "could have chosen to depart from the state law meanings of these terms, but taken as a whole, § 365 suggests that it did not do so." *Id.*

83. Accordingly, Section 365 gave the Debtors the statutory power to *breach* the Midstream Agency Agreements, not the "right or option to *terminate*" those contracts.

**<u>COUNT VI</u>**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Rejection Imposes "Out-of-Pocket Cost" On the Debtor**

84. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

85. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, an actual controversy exists as to whether rejection imposes "out-of-pocket cost" on the Debtors.

86. A declaration from this Court would serve the important purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Debtors may assume the Midstream Agency Agreements without incurring liability for breach of the GGPA.

87. Carnero has asserted that the Debtors can reject the Midstream Agency Agreements without incurring "out-of-pocket cost." Carnero is wrong. A "rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for **<u>damages</u>**." *Mission Product Holdings, Inc.*, 139 S. Ct. at 1661 (emphasis added). If Mesquite succeeded in rejecting the Midstream Agency Agreements, it would have owed its counterparties rejection damages for its failure to honor the Existing Commitments. Those damages would undoubtedly be substantial.

88. Accordingly, Mesquite would incur significant out-of-pocket cost if it rejected the Midstream Agency Agreements.

## COUNT VII

### (Plaintiffs Mesquite and Maverick Against Defendant Carnero)

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) that Carnero Breached the Settlement Agreement)

89. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

90. An actual controversy exists as to whether Carnero breached the Carnero Settlement Agreement.

91. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, a declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Carnero Settlement Agreement's provision for conditional assumption of the GGPA reflected the parties' intent to impose liability on Mesquite if, after validly terminating the Settlement Agreement, Mesquite ultimately assumed the Midstream Agency Agreements.

92. Section 2.2.1(d) of the Carnero Settlement Agreement required that the Debtors not remove any executory contracts from the Assumption Schedule, which included the GGPA. The Carnero Settlement Agreement thus caused the conditional assumption of the GGPA. The assumption of the GGPA, however, was not unqualified. The Carnero Settlement Agreement gave the Debtors the option to terminate that agreement if an order rejecting the Midstream Agency

Agreements had not been entered by October 1, 2020, and specifically provided that return of the $8 million letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Midstream Agency Agreements. *Id*. The obligation to pursue rejection was not among the enumerated provisions that would survive termination of the Carnero Settlement Agreement. *Id*. at § 6.4.

93. The parties repeatedly acknowledged at the June 29-30, 2020 hearing that the Settlement Approval Order (and resulting assumption of the GGPA) would not preordain the Debtors' midstream restructuring. Carnero's counsel did not dispute any of these statements. Nor did Carnero object to the language of the Carnero Settlement Approval Order, which expressly recognized that the Debtors *might not* ultimately reject the Midstream Agency Agreements. Settlement Approval Order at ¶¶ 11, 13. The parties' understanding was crystal clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Carnero Settlement Agreement and failing to continue to pursue rejection of the Midstream Agency Agreements. Carnero breached the Carnero Settlement Agreement by repudiating this clear understanding and initiating the First Carnero Action.

94. Moreover, the Carnero Settlement Approval Order and the Carnero Settlement Agreement both provided that the Bankruptcy Court would retain jurisdiction with respect to all matters arising from or relating to the Carnero Settlement Agreement, including any issues relating to the Debtors' assumption of the GGPA. Settlement Approval Order at ¶ 6; Settlement Agreement, § 6.2.1. This Court had jurisdiction over both Carnero Actions as a core proceedings because the actions (i) went to both Mesquite's rights and the Court's authority under Section 365 and (ii) involved rights created by bankruptcy law and required interpretation and enforcement of this Court's orders. Even if the Carnero Actions were not core proceedings, the Court—at a

minimum—had "related to" jurisdiction which requires only that the matter "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.)*, 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015).

95. Carnero was thus obligated to bring the Carnero Actions before this Court and breached this obligation by filing them in state court. Section 6.3 of the Carnero Settlement Agreement awards non-breaching parties "attorneys' fees and costs" as "a remedy for any such breach." Accordingly, Mesquite and Maverick respectfully request attorneys' fees for removing the Carnero Actions, defending them in Bankruptcy Court, and enforcing this lawsuit.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment as follows:

I. On Count II, declaring that Plaintiffs did not breach the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring;

II. On Count III, declaring that—if Carnero's reading were correct—Section 3.1(b) of the GGPA is unenforceable under bankruptcy law;

III. On Count V, declaring that, as a matter of bankruptcy law, Section 365 of the Bankruptcy Code gives Mesquite the power to breach the Midstream Agency Agreements, not the "right or option to terminate" those contracts;

IV. On Count VI, declaring that, as a matter of bankruptcy law, Mesquite would incur "out-of-pocket cost" if it chose to reject the Midstream Agency Agreements; and

V. Granting Plaintiffs such other and further relief as the Court deems just and proper.

**FURTHER,** Plaintiffs Maverick and Mesquite respectfully request that the Court enter judgment as follows:

I. On Count I, declaring Mesquite acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments;

II. On Count IV, declaring that Carnero's breach of contract claims are barred by the Plan, the Confirmation Order, and the Oxy/Wes Stipulation and Agreed Order;

III. On Count VII, declaring that Carnero breached the Carnero Settlement Agreement and awarding attorneys' fees for removing the Carnero Actions, defending them in Bankruptcy Court, and enforcing this lawsuit; and

IV. Granting Plaintiffs such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank.*]

Respectfully submitted on March 1, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Plaintiff SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Plaintiff Mitsui E&P Texas LP**

# EXHIBIT A

**Proposed Stipulation and Agreed Order Regarding the First Carnero Action**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-04419 (MI)** |

**STIPULATION AND AGREED ORDER**

This stipulation and agreed order (the "Stipulation and Agreed Order") is made and entered into by and between (a) Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"); and (b) Defendant Carnero G&P LLC

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

("Carnero"). Carnero and each of the Plaintiffs is a "Party" and collectively are the "Parties" to this Stipulation and Agreed Order.

**RECITALS**

**WHEREAS**, Maverick and Carnero are parties to that certain Firm Gas Gathering, Processing and Purchase Agreement, effective as of April 1, 2018 (as amended, the "GGPA");

**WHEREAS**, pursuant to Section 3.1(b) of the GGPA, the hydrocarbons subject to the Existing Commitments (as defined in the GGPA) are excluded from the dedication to Carnero until the earlier of (a) "the end of the then-current term of such Existing Commitment" or (b) the earliest time at which Maverick may exercise "any right or option to terminate such Existing Commitment . . . without out-of-pocket cost" to Maverick;

**WHEREAS**, on or about the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford and Javelin also each executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, effective as of April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Javelin ratification agreements are collectively, as amended, referred to as the "Ratification Agreements");

**WHEREAS**, on August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation and its affiliates (collectively, the "Debtors") each filed chapter 11 bankruptcy petitions in this Court;

**WHEREAS**, on June 6, 2020, the Debtors entered into the Settlement Agreement by and among (a) the Debtors, (b) Catarina Midstream LLC, (c) Carnero, (d) Seco Pipeline, LLC, (e) Sanchez Midstream Partners, LP, (f) Sanchez Midstream Partners GP, LLC, (g) SP Holdings, LLC, and (h) TPL SouthTex Processing Company LP (as amended, the "Settlement Agreement");

**WHEREAS**, on June 30, 2020, this Court entered an order approving the Settlement Agreement (the "Settlement Agreement Approval Order");

**WHEREAS**, pursuant to the Settlement Agreement, the Debtors agreed to pursue rejection of the Marketing Agency Agreement and the Midstream Agency Agreement (each as defined in the Settlement Agreement and referred to together herein as the "Midstream Agency Agreements") pursuant to the Plan (as defined in the Settlement Agreement) and 11 U.S.C. §365;

**WHEREAS**, Sections 5.1.2 and 5.1.3 of the Settlement Agreement provide that the parties thereto had the option to terminate the Settlement Agreement at any time after October 1, 2020 (the "Closing Outside Date") if an order had not by that date been entered rejecting the Midstream Agency Agreements and the other conditions of such provisions had been met;

**WHEREAS**, on June 24, 2021, Mesquite (as successor to Maverick) exercised its contractual right to terminate the Settlement Agreement pursuant to and in accordance with Section 5.1.2 and/or Section 5.1.3 thereof;

**WHEREAS**, on July 30, 2021, Carnero filed a lawsuit (the "First Carnero Action") in the District Court of Harris County, Texas against Plaintiffs seeking, among other things, declarations (collectively, the "Carnero Declarations") that (a) "[t]he GGPA and the respective Ratification Agreements obligate Mesquite, Unsub, Eagle Ford, and Javelin to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement[s] under 11 U.S.C. Section 365" (Plaintiff's Original Petition at ¶ 36(k)); and (b) "[a]fter rejection of the Midstream Agency Agreement[s] under 11 U.S.C. Section 365," Plaintiffs must deliver the gas from the Comanche Assets to Carnero (*id.* at ¶ 36(l));

**WHEREAS**, on September 10, 2021, Plaintiffs filed a notice of removal, removing the

First Carnero Action to this Court;

**WHEREAS**, on October 8, 2021, Carnero filed a motion to remand the First Carnero Action to state court or for abstention;

**WHEREAS**, at a December 7, 2021 hearing on the motion to remand, this Court suggested that Carnero amend the First Carnero Action to modify or remove the Carnero Declarations;

**WHEREAS**, on December 10, 2021, Carnero filed a notice of voluntary dismissal withdrawing the First Carnero Action without prejudice;

**WHEREAS**, on December 21, 2021, this Court approved a Stipulation and Agreed Order [Dkt. No. 2253][2] dismissing certain litigation and paving the way for a midstream restructuring of the Reorganized Debtors' gathering, transportation, processing, and marketing agreements pursuant to the Plan and global settlement among the following (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP, and (c) Mesquite Energy, Inc., SN EF Maverick, LLC, and Mesquite Comanche Holdings, LLC (the "December 2021 Stipulation and Agreed Order");

**WHEREAS**, pursuant to the December 2021 Stipulation and Agreed Order, the applicable Reorganized Debtors assumed, among other agreements, the Midstream Agency Agreements;

**WHEREAS**, on December 21, 2021, Plaintiffs commenced this adversary proceeding (this "Adversary Proceeding") seeking, among other relief, to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts;

---

2 For clarity, this Stipulation and Agreed Order cites entries on the docket of the main bankruptcy case as "Dkt. No. __" and entries on the docket of this Adversary Proceeding as "Adv. Pro. Dkt. No. __."

**WHEREAS**, on January 21, 2022, Carnero filed a motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") in this Court and a new state court lawsuit against Plaintiffs in Harris County, Texas, which was superseded by an amended complaint in state court on January 27, 2022 (the "Second Carnero Action");

**WHEREAS**, in the Motion to Dismiss, Carnero stated that it "is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA." Adv. Pro. Dkt. No. 8 at ¶ 2.

**NOW, THEREFORE, IT IS STIPULATED, ORDERED, ADJUDGED, AND DECREED**, as follows:[3]

1. This Court has jurisdiction to enter this Stipulation and Agreed Order pursuant to 28 U.S.C. §§ 157, 1334, and 1367, Article XI of the Plan [Dkt. No. 1205], paragraph 43 of the order confirming the Plan [Dkt. No. 1212], Section 6.2.1 of the Settlement Agreement, and paragraph 6 of the Settlement Agreement Approval Order [Dkt. No. 1415].

2. Pursuant to Sections 5.1.2 and 5.1.3 of the Settlement Agreement, the Debtors had the option to terminate the Settlement Agreement at any time after the Closing Outside Date if an order had not been entered rejecting the Midstream Agency Agreements. The Debtors validly exercised that option in accordance with the terms of Section 5.1.2 and/or Section 5.1.3 of the Settlement Agreement on June 24, 2021.

3. Following termination of the Settlement Agreement, the Debtors were not required (under the Settlement Agreement, the GGPA, the Ratification Agreements, or otherwise) to pursue

[3] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

or obtain rejection of the Midstream Agency Agreements. The Debtors have not breached any of their obligations under the Settlement Agreement.

4. The First Carnero Action is withdrawn with prejudice as to all defendants named therein. Carnero is forever barred, estopped, and enjoined from asserting in any forum or in any manner that (a) the GGPA and the Ratification Agreements obligate Plaintiffs to pursue or obtain rejection of the Midstream Agency Agreements or any of the Existing Commitments; (b) the Debtors' failure to continue seeking to reject the Midstream Agency Agreements or the Existing Commitments exposed Plaintiffs to damages or other liability for breach of the GGPA or any other agreement with Carnero; and/or (c) the Debtors' assumption of the Midstream Agency Agreements and the Ratification Agreements breached the GGPA or any other agreement with Carnero.

5. Each of the Parties reserves any and all of its rights and defenses with respect to this Adversary Proceeding and the Second Carnero Action.

6. This Court shall have exclusive jurisdiction to resolve any and all disputes arising from this Stipulation and Agreed Order or the interpretation or enforcement hereof.

**IT IS SO ORDERED.**

Signed: _________, 2022

__________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**ACCEPTED AND AGREED:**

*/s/ DRAFT*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
denkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. Washington,
DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff**
**Mesquite Energy, Inc.**

*/s/ DRAFT*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Plaintiff**
**SN EF UnSub, LP**

*/s/ DRAFT*
Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*s/ DRAFT*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ DRAFT*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

**Attorneys for Plaintiff Mitsui E&P Texas LP**

*/s/ DRAFT*
Joshua W. Wolfshohl
Aaron J. Power
Eugene M. Nettles
Amy C. Falcon
**Porter Hedges LLP**
100 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshol@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Carnero G&P, LLC**