12. **Miscellaneous**. In the event a court of competent jurisdiction determines that any provision contained in this Agreement is violative of any law or regulation, such provision shall be deemed stricken from the Agreement without affecting the enforceability of the remainder of the Agreement; provided, however, any such provision shall not be deemed stricken to the extent striking such provision would materially alter the economic benefits any Party derives from this Agreement; provided further, however, in the event striking any such provision would materially alter the economic benefits of this Agreement, the Parties agree to negotiate in good faith to amend such provision in order to maintain both the enforceability of this Agreement and the economic benefits derived by the Parties in substantially the same form and substantially to the same degree as derived from this Agreement in its original form. This Agreement, including any Exhibits hereto, may be amended only by a written instrument executed by all of the Parties to this Agreement. The Parties hereto agree that each and every of the Exhibits attached hereto are part of this Agreement. This Agreement shall be governed by the laws of the State of Texas, notwithstanding any conflicts of laws rules or principles that might require the application of the laws of another jurisdiction. This Agreement shall be binding upon the Parties hereto, and their permitted successors and permitted assigns; provided, however, that no transfer of this Agreement shall be made without the prior written consent of the other Party(ies) hereto, which consent may not be unreasonably withheld or delayed. If any transfer or assignment of this Agreement pertains to only a part, as opposed to the entirety, of the interest, rights and obligations of the transferring/assigning Party (a "Partial Transfer"), the transferring/assigning Party, as a condition precedent to any such transfer or assignment, will specifically declare in writing to the non-transferring/assigning Party the exact percentage of the transferring/assigning Party's interest, rights and obligations hereunder covered by any such Partial Transfer. Waiver by any Party of performance of any obligation or term or provision contained in this Agreement, or waiver by any Party of another Party's default hereunder will not operate as a waiver of performance of any other obligation or term or provision of this Agreement or a future waiver of the same obligation, term or provision or a waiver of any future default. In the event of a conflict between the terms and conditions of this Agreement and the Joint Exploration Agreement referenced in the first WHEREAS clause above, the terms and conditions of this Agreement shall prevail. Notwithstanding anything to the contrary contained herein, if any of the royalty payment provisions of the individual oil and gas leases pertaining to the Properties conflict with the terms and conditions of this Agreement, the royalty provisions of such leases will prevail. The headings contained in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement. Except as otherwise expressly set forth herein, this Agreement is intended only to benefit the Parties hereto and their respective permitted successors and permitted assigns. This Agreement may be executed in duplicate originals or counterparts, each of which, when taken with all other counterparts, shall constitute a binding agreement between the Parties hereto. An executed facsimile or .PDF counterpart of this Agreement shall be sufficient to bind a Party hereto to the same extent as an original. This Agreement, including all Exhibits hereto, contains the entire agreement and understanding between the Parties relating to the matters covered hereby, and any agreements, representations, correspondence, or other statements entered into or made by a Party prior to the Effective Date relating to the matters covered hereby shall be superseded by the terms and conditions hereof.

[redacted]

[redacted]

14. **Payment of Taxes and Royalties**. As to the payment by the Anadarko Parties of Owner's Proportionate Share of Taxes and Royalties, the **ANADARKO PARTIES DO NOT THEREBY ASSUME LIABILITY FOR OWNER'S TAXES OR ROYALTIES AND NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS AN ASSUMPTION BY THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY OR THEIR AFFILIATE(S) OF SUCH LIABILITIES.** Owner shall be responsible for any additional amounts owed for Taxes or Royalties on Owner's Residue Gas by virtue of specific lease or other contractual provisions or legal requirements. The Anadarko Parties, the Marketing Anadarko Party and their affiliate(s) make no representation or warranty regarding their/its methods of payment of Taxes and Royalties and shall not be liable to Owner or any third parties for any claims relating to such methods. **SUBJECT TO THE ANADARKO PARTIES' COMPLIANCE WITH THE LAST SENTENCE OF THIS SECTION 14, OWNER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND HOLD THE ANADARKO INDEMNITEES, AS THAT TERM IS DEFINED IN SECTION 9, ABOVE, OF THIS AGREEMENT, HARMLESS FROM AND AGAINST ALL CLAIMS THAT ARISE FROM OR OUT OF, OR ARE RELATED TO, THE PAYMENT BY THE ANADARKO PARTIES OF OWNER'S PROPORTIONATE SHARE OF TAXES AND ROYALTIES ON OWNER'S RESIDUE GAS FROM THE WELLS, INCLUDING, BUT NOT LIMITED TO, CLAIMS BY GOVERNMENT AUTHORITIES, OWNERS OF ROYALTY, OVERRIDING ROYALTY, RESIDUE GAS PAYMENTS, NATURAL GAS PRODUCTION PAYMENTS, WORKING INTERESTS, TRANSPORTERS OR OTHER CLAIMANTS, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE**

**UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE ANADARKO PARTIES ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE ANADARKO PARTIES SHALL IN ALL RESPECTS ACT IN GOOD FAITH AND IN A COMMERCIALLY REASONABLE MANNER IN THE CALCULATION AND PAYMENT OF TAXES AND ROYALTIES ON BEHALF OF OWNER PURSUANT TO THE TERMS OF THIS AGREEMENT.**

15. **Approvals and Authorities**. Each of the Parties to this Agreement hereby represents and warrants to the other Parties hereto that all approvals and authorities necessary for such Party to enter into this Agreement and be bound by its terms have been obtained. Each of the Parties to this Agreement further represents and warrants to the other Parties hereto that its execution of this Agreement does not breach or violate any contract, agreement, order or prohibition to which such Party is a party or bound.

16. **Dispute Resolution**. The Parties shall attempt to resolve any dispute arising out of or relating to this Agreement by good faith negotiation or mediation, as may be agreed at the time. The Parties consent to the exercise of jurisdiction in personam by the courts of the State of Texas for any dispute. Each Party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any dispute.

17. **Term**. This Agreement shall commence as of the Effective Date and shall remain in full force and effect through December 31, 2022 (the "Primary Term"), and thereafter the term shall continue on a year-to-year basis after the Primary Term unless terminated by either Party effective at the end of the Primary Term or any anniversary thereafter, upon the giving of a minimum of ninety (90) days prior written notice (the "Term"); provided, however, that notwithstanding the foregoing, this Agreement, and all of the rights and obligations of the Parties hereunder, shall, in any event, remain in full force and effect, and shall not terminate, until the termination date of the last to terminate of all Commitment Agreements entered into in compliance with this Agreement. Notwithstanding the foregoing, a Party will be entitled to cancel its obligations with respect to any volumes that are subject to a Commitment under a Commitment Agreement when such Commitment under such Commitment Agreement terminates. Notwithstanding the termination of this Agreement as provided in this Section 17, the terms and provisions of this Section 17, Sections 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, 18, 19 and 20, and all Sections pertaining in any way to the effectiveness and fulfillment of Section 6, and all indemnification obligations under this Agreement shall survive termination.

18. **Notices**. Any notice, termination or otherwise, to be sent to AEPC and/or AESC under this Agreement (a) shall be in writing, (b) shall be sent via U.S. Certified Mail, and (c) shall be deemed to have been duly given and received when received at the following address: Anadarko Petroleum Corporation, Attn: General Manager, Domestic Crude, NGL and Gas Marketing, 1201 Lake Robbins Dr., The Woodlands, Texas 77380; and any notice, termination or otherwise, to be sent to Owner under this Agreement (x) shall be in writing, (y) shall be sent via U.S. Certified Mail, and (z) shall be deemed to have been duly given and received when received at the following address: Mitsui E&P Texas LP, Attn: Marketing and Transportation Manager, 9 Greenway Plaza, Suite 1250, Houston, Texas 77046.

19. **Disclaimer of Certain Damages**. **NOTWITHSTANDING ANY OTHER PROVISION(S) OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, SECTION 9, ABOVE, OF THIS AGREEMENT, (a) OWNER AND THE OWNER INDEMNITEES WILL NOT BE LIABLE HEREUNDER TO THE ANADARKO PARTIES, OR ANY ONE OF THEM, OR TO THE ANADARKO INDEMNITEES, AND (b) THE ANADARKO PARTIES, OR EITHER OF THEM, AND THE ANADARKO INDEMNITEES WILL NOT BE LIABLE HEREUNDER TO OWNER OR TO THE OWNER INDEMNITEES , PURSUANT**



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

**TO ANY INDEMNITY OR ANY OTHER PROVISION HEREOF, FOR ANY OF THE OTHER'S(S') OWN CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES, HOWSOEVER ARISING UNDER OR HOWSOEVER RELATING TO OR PERTAINING TO THIS AGREEMENT, AND REGARDLESS OF THE EXISTENCE, OR ALLEGED EXISTENCE, OF NEGLIGENCE, WHETHER SIMPLE, GROSS, SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE OR OTHERWISE, WILLFUL MISCONDUCT, UNCURED MATERIAL BREACH, STATUTORY LIABILITY, STRICT LIABILITY OR OTHER FAULT.**

20. **Audit Rights**. A Party shall have the right, at its own expense, upon reasonable notice and at reasonable times, to examine, to audit and to obtain copies of the relevant portions of books and records of the other Party(ies) but only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, deduction or computation made or rendered under or pursuant to this Agreement. This right to examine, to audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to matters arising under this Agreement. All statements, charges, payments, deductions and computations made or rendered under or pursuant to this Agreement shall be conclusively presumed final and accurate, and all associated claims for under or overpayment(s) shall be deemed waived, unless the particular statement, charge, payment, deduction or computation in question is objected to in writing, with adequate explanation and documentation, within two (2) years after the receipt thereof by the objecting Party.

21. **Confidentiality**.

a. Except as otherwise expressly provided in this Section 21, each Party agrees that it shall maintain all terms and conditions of this Agreement, all terms and conditions of any Commitment Agreement or Rejected Commitment Agreement, and all non-public information, whether obtained orally or in writing and whether or not identified as confidential upon receipt by the receiving Party, concerning or relating to this Agreement or any Commitment Agreement or Rejected Commitment Agreement, and all non-public information, whether obtained orally or in writing and whether or not identified as confidential upon receipt by the Receiving Party, concerning or relating to any activities or operations under, in connection with or pursuant to this Agreement or any Commitment Agreement or Rejected Commitment Agreement (all of the foregoing hereinafter being referred to as the "Confidential Information") in strictest confidence, and that for so long as this Agreement remains in full force and effect, and for a period of two (2) years thereafter, it shall not cause or permit disclosure of any such Confidential Information without the prior written consent of the other Party, which consent may not be unreasonably withheld or delayed; *provided, however,* notwithstanding the foregoing and subject to Section 21.b, below, of this Agreement, no disclosure by a recipient of Confidential Information will be deemed a breach of this Section 21.a of this Agreement if such disclosure is required by law or applicable legal or regulatory process. Further notwithstanding anything herein to the contrary, the receiving Party has no obligations or liabilities under this Agreement with regard to any information which, other than by breach of this Agreement, is (i) already known or in its or its affiliates' or representatives' possession without restriction to disclosure; (ii) independently acquired or developed by the receiving Party or its affiliates or representatives without violating any of its or their obligations under this Section 21.a; (iii) in, or subsequently comes into, the public domain through no fault of the receiving Party; or (iv) becomes available to the receiving Party or its affiliates or representatives on a non-confidential basis from a person other than the disclosing Party or the disclosing Party's affiliates.

b. Subject to the restrictions set forth in this Section 21.b of this Agreement, the receiving Party may disclose Confidential Information to its affiliates and representatives. The receiving Party will require every person to whom Confidential Information is disclosed, and who is not an officer, director or employee of the receiving Party or who is not otherwise bound to hold and keep such Confidential Information confidential, to agree to keep confidential and not disclose Confidential Information to any unauthorized person and be bound by the terms of this Section 21. The receiving Party shall also limit access to the Confidential Information to those of its representatives and affiliates who have a need to review such Confidential Information and who are legally bound to hold such Confidential Information confidential. The receiving Party accepts responsibility for any breach of this Section 21 by the receiving Party or any of its representative or affiliates.

c. If a party to a Commitment Agreement or a Rejected Commitment Agreement so requires, or if the circumstances so require, Owner shall execute an appropriate Confidentiality Agreement or other confidentiality undertaking addressing Owner's non-disclosure of confidential information pertaining to, or the terms and conditions of, such Commitment Agreement or Rejected Commitment Agreement.

[The Remainder Of This Page Is Left Blank Intentionally.]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Effective Date.

**ANADARKO ENERGY SERVICES COMPANY**

By: ______________________

Name: A. Scott Moore

Title: President

**ANADARKO E&P ONSHORE LLC**

By: ______________________

Name: ______________________

Title: ______________________

**MITSUI E&P TEXAS LP**
By: MEPEF LLC, its General Partner
By: Mitsui E&P USA LLC, its Attorney-in-Fact

By: ______________________

Name: Toru Matsui

Title: SVP & COO



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

**Exhibit A**
**Maverick Residue Gas Marketing Agreement**
**Dated as of January 1, 2012**
**By and Among**

**ANADARKO E&P ONSHORE LLC ("AEPC"),**
**ANADARKO ENERGY SERVICES COMPANY ("AESC") and**
**MITSUI E&P TEXAS LP ("Owner")**

**POINTS OF DELIVERY AND COMMITMENT AGREEMENTS**

**POINTS OF DELIVERY:**

Copano:

Copano South Chupadera CDP, Webb County, Meter Number EF1-11716
Copano Hwy 83 CDP, Dimmitt County, Meter Number EF1-11717

Enterprise:

San Pedro Ranch, Dimmit County, Meter Number 783171
Garcia Wells, Dimmit County, Meter Number 793002
Briscoe Ranch, Dimmit County, Meter Number 793006
Briscoe Catarina, #1 Dimmit County, Meter Number 803943
Anadarko 20" Briscoe Ranch CDP, Dimmit County, Meter Number 793008
Briscoe Ranch CDP, Dimmit County, Meter Number 803352
Stanley Worthey CDP, Webb County, Meter Number 178955
Briscoe Cochina East CDFA, Meter 178112
Cochina #1, Meter 173099
Catarina West #1-H, Meter 178947
Boyd GG #1 H, Meter 173119

ETC:

Springfield CDP, Dimmit County, Meter Number 0969002L
Stanley-Worthey CDP, Webb County, Meter Number 0969004L
Rancho Encantado CDP, Dimmitt County, Meter Number 0969039

Texas Pipeline (Howard Energy):

Shape 2 Station, Meter T1010233780
San Pedro CDP, Meter T092712504
Tovar Ranch CDP, Meter 44682
FOGMT 6SH, Meter T104941726

WGR:

Springfield CDP #1, Dimmitt County, Meter Number 421000001
Springfield CDP #2, Dimmitt County, Meter Number 421000002
Diamond H CGFA, Dimmitt County, Meter Number 421000006



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

Cochina West CGFA, Dimmitt County, Meter Number 421000007
Cochina East CGFA, Dimmitt County, Meter Number 421000008
Cochina West CGFB, Dimmitt County, Meter Number 421000009
Cochina West CGFC, La Salle County, Meter Number 421000010
Brasada Plant Residue Gas into NET, LaSalle County

**COMMITMENT AGREEMENTS:**

1. Firm Gas Transportation Agreement for NGPA Section 311 Service dated October 1, 2010 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC, and associated amendments if any, Contract No. 9138E

2. Firm Gas Transportation Agreement for Intrastate Service dated October 1, 2010 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC, and associated amendments if any, Contract No. 9138A

3. Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP and associated amendments if any

4. Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any

5. Interim NGPA Section 311 Natural Gas Transportation Service Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any

6. Interim Intrastate Natural Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

*EXECUTION COPY*

## MAVERICK RESIDUE GAS MARKETING AGREEMENT

This Residue Gas Marketing Agreement ("Agreement") is entered into by and among **ANADARKO E&P ONSHORE LLC (f/k/a ANADARKO E&P COMPANY LP) ("AEPC"), ANADARKO ENERGY SERVICES COMPANY ("AESC")** (collectively, the foregoing entities may be referred to hereinafter as the "Anadarko Parties") and **SM ENERGY COMPANY ("Owner")**. **AEPC, AESC** and **Owner** may be referred to hereinafter individually as a "Party" and collectively as the "Parties". This Agreement shall be effective as of the 1st day of October, 2010 (the "Effective Date").

WHEREAS, AEPC and Owner own working interests in certain properties lying within the boundaries of the four specific counties in the State of Texas, USA, listed on Exhibit "A", attached hereto and by this reference made a part hereof (the "Properties"), which Properties are more fully described in an Exhibit to that certain Joint Exploration Agreement, dated March 1, 2008 (the "Joint Exploration Agreement"), by and among Anadarko E&P Company LP (n/k/a Anadarko E&P Onshore LLC) and Owner, which Joint Exploration Agreement is, by this reference, incorporated herein to the limited extent, and only to the limited extent, of further identifying the Properties; and

WHEREAS, the natural gas production from the Properties will be processed at one or more natural gas processing plants to extract the natural gas liquids and such processing will result in residue gas remaining after processing that is attributable, as determined under the terms of the gas processing agreement(s), to the natural gas production produced from all current and future wells located on the Properties (the "Wells") (the residue gas attributable to the Anadarko Parties', and the Anadarko Parties' affiliates', if any, and any other co-working interest owner's, including Owner's, and Owner's affiliates', if any, full proportionate share and gross working interest of and in the natural gas production produced from the Wells hereinafter being referred to as the "Residue Gas"); and

WHEREAS, Owner desires to sell and the Anadarko Parties desire to purchase the Residue Gas attributable to Owner's, and Owner's affiliates', if any, full proportionate share and gross working interest (hereinafter, collectively, "Owner's Proportionate Share") of and in the natural gas production produced from all current and future Wells ("Owner's Residue Gas") on the terms and conditions set forth in this Agreement; and

WHEREAS, subject to the terms and conditions set forth in this Agreement, the Anadarko Parties are willing to market Owner's Residue Gas at the same marketing points and under the same marketing arrangements under which the Residue Gas attributable to the Anadarko Parties', and the Anadarko Parties' affiliates', if any, full proportionate share and gross working interest (hereinafter, collectively, the "Anadarko Parties' Proportionate Share") of and in the natural gas production produced from all current and future Wells ("AEPC's Residue Gas") is marketed.

NOW, THEREFORE, in consideration of the premises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Sale of Owner's Residue Gas**. Subject to the terms and conditions of this Agreement, Owner hereby agrees to deliver and sell to one of the Anadarko Parties, as designated from time to time by the Anadarko Parties, and the Party so designated by the Anadarko Parties (the "Marketing Anadarko Party") hereby agrees to receive and purchase from Owner, at the specific points of delivery set forth on Exhibit B, attached hereto and by this reference made a part hereof, as the same may be amended from time to time (the "Delivery Points"), all of Owner's Residue Gas for the Term. The specific Delivery Points hereunder, as designated on said Exhibit B, shall be at the tailgate of the gas processing plant(s) or at such other Delivery Points as designated by the Marketing Anadarko Party and as set forth on Exhibit B, as the same may be amended from time to time. If the particular Delivery Point in question is

upstream of the particular gas processing point in question, then all right, title and interest in and to Owner's Proportionate Share of and in the raw natural gas production stream from the Wells, from which raw natural gas production stream Owner's Residue Gas will remain after processing, shall pass from Owner to the Marketing Anadarko Party at the inlet of the measuring facilities at such upstream Delivery Point. If the particular Delivery Point in question is downstream of the particular gas processing point in question, then all right, title and interest in and to Owner's Residue Gas remaining after the processing of Owner's Proportionate Share of and in the raw natural gas production stream from the Wells shall pass from Owner to the Marketing Anadarko Party at the inlet of the measuring facilities at such downstream Delivery Point.

2. **Marketing of Owner's Residue Gas**.

a. Owner acknowledges and understands that in the event AEPC is designated as the Marketing Anadarko Party, AEPC intends to market Owner's Residue Gas either on its own or to and through AESC, and, consistent with this intent, Owner hereby consents to AEPC's marketing of Owner's Residue Gas either by AEPC or to and through AESC. However, the Anadarko Parties may, from time to time during the Term and within their sole discretion, decide to market Owner's Residue Gas to and through one or more of the Anadarko Parties' affiliates other than AESC. Owner hereby consents to the Anadarko Parties' marketing of Owner's Residue Gas to and through any affiliate(s) of the Anadarko Parties other than AESC.

b. Subject to the other provisions of this Agreement (including, without limitation, the provisions of Section 7 hereof), during the Term of this Agreement, the Anadarko Parties or their affiliates shall obtain transport for and market Owner's Residue Gas in good faith and in a manner commercially reasonable under the circumstances, and shall obtain commercial terms and conditions that are no less favorable to Owner than the commercial terms and conditions under which the Anadarko Parties or their affiliates obtain transport for and market AEPC's Residue Gas; provided that Owner and each of the Anadarko Parties, including the Marketing Anadarko Party, hereby disclaim the existence of, and any intent to create, any type of fiduciary, trust, agency or partnership relationship with, among or between Owner, any affiliate(s) of Owner, AEPC, AESC, the Marketing Anadarko Party, the Anadarko Parties, or any other affiliate(s) of the Anadarko Parties pertaining to, resulting from, arising out of, pursuant to or in connection with the execution and/or performance of this Agreement.

c. Owner acknowledges, and the Parties agree, that one or both of the Anadarko Parties or their affiliate(s) has (or have) entered into certain existing agreements as set forth on Exhibit B, attached hereto and by this reference made a part hereof, as the same may be amended from time to time, covering, among other things, the gathering and/or treating and transportation of the raw natural gas stream from the Wells, the processing of the raw natural gas stream from the Wells, the transportation of Residue Gas and/or the sale of Residue Gas, and that, during the Term, the raw natural gas stream from the Wells will be gathered, treated, transported and/or processed, although not exclusively, and Owner's Residue Gas will be transported and/or resold, although not exclusively, under those existing agreements and any other such agreements provided to and approved in writing by Owner and entered into from time to time in the future by the Anadarko Parties or their affiliate(s) (all such existing and future agreements, as provided to and approved in writing by Owner, as set forth on Exhibit B, attached hereto, and as said Exhibit B may be amended from time to time, but excluding any "Rejected Potential

Major Agreement", as that term is defined in Section 2.g(vi), below, of this Agreement, hereinafter being referred to as the "Commitment Agreements"). The Anadarko Parties have provided Owner with true and complete copies of all existing Commitment Agreements as set forth on Exhibit B, all of which, upon the actual execution date of this Agreement by Owner (which actual execution date by Owner, pursuant to the mutual agreement of the Parties, will post-date the Effective Date of this Agreement), will be deemed to have been approved in writing by Owner as Commitment Agreements hereunder as of the Effective Date of this Agreement.

d. With respect to any such existing or future agreements as referenced in Section 2.c, above, of this Agreement, and subject to the provisions of the last sentence of Section 2.c, above, of this Agreement, Owner agrees that if it does not grant or reject in writing, within fifteen (15) days of its receipt of any written request for approval of any such existing or future agreement that would, if approved in writing by Owner, become a Commitment Agreement hereunder, Owner will be deemed to have rejected such existing or future agreement as a Commitment Agreement hereunder. If, for whatever reason, Owner timely rejects in writing or is deemed to have rejected any such existing or future agreement that would have become, if approved in writing by Owner, a Commitment Agreement hereunder, one or more of the Anadarko Parties or their affiliates shall be free to enter into or to continue as a party to such agreement, which agreement will not be a Commitment Agreement hereunder and will be considered to be a "Rejected Commitment Agreement" hereunder. Notwithstanding any such rejection or deemed rejection by Owner, and notwithstanding anything to the contrary in this Agreement, the raw natural gas stream from the Wells and Owner's Residue Gas will be gathered, treated, processed, transported and/or resold, in accordance with the provisions of this Agreement and the provisions of the particular Rejected Commitment Agreement(s) in question, by one or more of the Anadarko Parties or their affiliates unless and until, and then only to the extent that, Owner, in accordance with the provisions of this Agreement, begins to take in kind "Owner's Excess Residue Gas", as that term is defined in Section 7, below, of this Agreement, that is attributable to such Rejected Commitment Agreement(s). Subject to the provisions of Section 2.g, below, it is further understood and agreed by the Parties hereto that the Anadarko Parties, at their sole discretion, may elect not to provide an existing or future agreement as referenced in Section 2.c, above, and/or this Section 2.d for the approval of Owner as a Commitment Agreement hereunder. If the Anadarko Parties so elect, any such existing or future agreement not so provided to Owner for its approval, and, therefore, not approved in writing by Owner, will be deemed for all purposes of this Agreement to be a Rejected Commitment Agreement.

e. Notwithstanding anything to the contrary contained herein, it is agreed by the Parties that, in the event of an emergency, including (without limitation) the impending shut-in of one or more of the Wells, the unanticipated unavailability of previously-contracted third party services or the occurrence of any other event that could imminently impact the production, transportation and/or sale of the raw natural gas production stream and/or the Residue Gas from one or more of the Wells, one or both of the Anadarko Parties or their affiliate(s) shall have the right, without obtaining the prior written approval of Owner, to enter into new, short-term (that is, not in excess of thirty-one (31) days) agreements that are reasonably appropriate and necessary to fully respond to any such emergency; provided, that the Anadarko Parties will provide notice to Owner as soon as reasonably practicable (and in any event within ten (10) days of any such emergency) that such emergency agreement(s) has/have been entered into and the terms thereof. It is agreed that any such new agreement as described in this Section 2.e of this Agreement,

whether or not timely provided to, or ultimately rejected, approved or executed by, Owner, will be deemed for all purposes of this Agreement to be a Commitment Agreement.

f. Therefore, pursuant to the foregoing provisions of the entirety of this Section 2 of this Agreement but subject to the specific provisions of Section 2.g, below, of this Agreement, it is the intent of, and it is understood and agreed by, the Parties hereto that any of Owner's Proportionate Share of the raw natural gas stream from the Wells and/or any of Owner's Residue Gas that is not gathered, treated, processed, transported and/or resold, in accordance with the provisions of this Agreement, by one or more of the Anadarko Parties or their affiliates under either a Commitment Agreement or a Rejected Commitment Agreement will be taken in kind by Owner in accordance with the provisions of this Agreement. Conversely, it is understood and agreed by the Parties hereto that any of Owner's Proportionate Share of the raw natural gas stream from the Wells and/or any of Owner's Residue Gas that is not taken in kind by Owner in accordance with the provisions of this Agreement will be gathered, treated, processed, transported and/or resold, in accordance with the provisions of this Agreement, by one or more of the Anadarko Parties or their affiliates under either a Commitment Agreement or a Rejected Commitment Agreement. The gathering, treating, processing, transportation and/or resale, as the case may be, of Owner's Proportionate Share of the raw natural gas stream from the Wells and/or Owner's Residue Gas under the terms of any such existing or future Commitment Agreements or Rejected Commitment Agreements shall not give Owner any interest in or make Owner a party to any of said agreements. It is expressly agreed that the Anadarko Parties shall not have any power or authority to contract in the name of or on behalf of Owner.

g. Notwithstanding the foregoing provisions of the entirety of this Section 2 of this Agreement, if at any time after Owner's actual execution date of this Agreement the Marketing Anadarko Party, the Anadarko Parties, or their affiliates, or any of them, wish to enter into an agreement, or series of related and contemporaneous agreements with the same counterparty, which, if approved by Owner, would become a Commitment Agreement hereunder, and which agreement, over the primary term thereof, provides for fixed minimum "Commitments", as that term is defined in Section 6, below, of this Agreement, in excess of One Hundred Million Dollars ($100,000,000) (a "Potential Major Agreement"), the Parties hereto agree that the following provisions of this Section 2.g of this Agreement will apply.

(i) To the extent permitted by applicable law and regulation, the Anadarko Parties, before execution of the particular Potential Major Agreement in question, will provide a copy of same to Owner for Owner's review.

(ii) Owner shall have the right, but not the obligation, to make suggestions, if any, to the Anadarko Parties regarding the provisions of the particular Potential Major Agreement in question.

(iii) The Anadarko Parties shall have the right, but not the obligation, to use the suggestions of Owner in negotiating the particular Potential Major Agreement in question.

(iv) Notwithstanding the foregoing provisions of the entirety of this Section 2.g of this Agreement, with respect to each Potential Major



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

Agreement, Owner (A) will not have the right to attend any negotiating sessions, (B) will not have the right to contact or speak with the counterparty(ies) to the particular Potential Major Agreement in question regarding any aspect of same, (C) will not otherwise engage, interfere or intervene in any way in or with respect to the negotiation and/or finalization of the particular Potential Major Agreement in question, and (D) will hold confidential, pursuant to the confidentiality provisions of Section 12, below, of this Agreement, any and all terms and conditions of the particular Potential Major Agreement in question. Further with respect to each Potential Major Agreement, Owner agrees that if it does not grant or reject in writing, within fifteen (15) days of its receipt of any written request for approval of any such Potential Major Agreement, Owner will be deemed to have rejected such Potential Major Agreement.

(v) If according to the terms and conditions of Section 2.g(iv), above, of this Agreement, Owner approves the particular Potential Major Agreement in question, it will become, upon such approval, a Commitment Agreement hereunder and will be treated as such for all purposes of this Agreement.

(vi) If according to the terms and conditions of Section 2.g(iv), above, of this Agreement, Owner timely rejects in writing, or is deemed to have rejected, the particular Potential Major Agreement in question, it will become, as of the date of such rejection or deemed rejection, a "Rejected Potential Major Agreement" hereunder and the Parties hereto will commence on such date to deliberate in good faith and in a commercially reasonable manner to determine, in light of such rejection by Owner a mutually agreeable solution concerning the gathering, treating, processing, transportation, sale, resale and/or marketing of Owner's Residue Gas and Owner's Proportionate Share of and in the natural gas production from the Wells that is attributable to the particular Rejected Potential Major Agreement in question. Notwithstanding anything to the contrary contained in this Agreement, one or more of the Anadarko Parties or their affiliates shall be free to enter into or continue as a party to such Rejected Potential Major Agreement, which will not be a Commitment Agreement or Rejected Agreement hereunder but, instead, will be a Rejected Potential Major Agreement hereunder.

(vii) It is understood and agreed by the Parties hereto that at all times during and after the course of the Parties' deliberations as provided for in Section 2.g(vi), immediately above, and Section 2.g(viii), immediately below, of this Agreement, (A) the Anadarko entity then serving as the Operator of the Wells will continue to operate the Wells in a reasonably prudent manner and in accordance with good industry practice, (B) neither the Anadarko Parties nor the Marketing Anadarko Party nor any affiliated Anadarko entity will have any obligation or responsibility under this Agreement, the Joint Exploration Agreement, or any other agreement, law or regulation to purchase and resell, or market on Owner's behalf, Owner's Residue Gas or Owner's Proportionate Share of and in the natural gas production from the Wells attributable to the particular Rejected Potential Major Agreement in question, and (C) notwithstanding any other provision of this Agreement to the contrary, unless otherwise agreed by and among

the Parties hereto, Owner shall not be responsible for Owner's Proportionate Share of any Commitments arising under or pursuant to the particular Rejected Potential Major Agreement in question.

(viii) If, for whatever reason, the Parties hereto are unable to determine a mutually agreeable solution concerning the gathering, treating, processing, transportation, sale, resale and/or marketing of Owner's Residue Gas and Owner's Proportionate Share of and in the natural gas production from the Wells that would have been attributable to the particular Rejected Potential Major Agreement in question, then within ninety (90) days after commencing their deliberations as provided for in Section 2.g(vi), above, of this Agreement, the Anadarko Parties will have the right, but not the obligation, to provide notice to Owner of the Anadarko Parties' irrevocable election that, beginning two hundred and seventy-five (275) days from the date of such notice to Owner, Owner will be required to take in kind, and Owner hereby agrees that it will so take in kind, Owner's Residue Gas and Owner's Proportionate Share of and in the natural gas production from the Wells that would have been attributable to the particular Rejected Potential Major Agreement in question.

[redacted]

[redacted]

5. **Payment to Owner**. The consideration to be received by Owner pursuant to Section 3, above, of this Agreement shall be paid by the Anadarko Parties to Owner before the end of the second (2nd) full calendar month following the calendar month in which Owner's Residue Gas was purchased by the Anadarko Parties and resold pursuant to this Agreement.

6. **Owner's Responsibility For Owner's Proportionate Share of Obligations Under the Commitment Agreements and the Rejected Commitment Agreements**. In support of the obligations of the Anadarko Parties set forth herein, Owner acknowledges that the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) have/has entered into, are/is entering into and/or will be entering into the Commitment Agreements set forth on Exhibit B, attached hereto, as the same may be amended from time to time. Such Commitment Agreements contain contractual obligations that may include, without limitation, gathering fees, treating fees, processing fees, transportation fees, minimum

throughput/deficiency payment obligations, minimum volumetric supply commitments, demand charges, reservation fees, indemnities, representations and warranties, and other contractual undertakings (collectively, "Commitments"). Subject to Owner's right to approve any Commitment Agreement entered into by any of the Anadarko Parties after Owner's actual execution date of this Agreement, Owner hereby agrees to be bound by and responsible for Owner's Proportionate Share of all Commitments under or pursuant to each and every of the Commitment Agreements. As of the Effective Date and at all times thereafter during the Term, and through the then-remaining respective terms, if any, of the Commitment Agreements entered into in compliance with this Agreement, Owner shall be liable and fully responsible to the Anadarko Parties, the Marketing Anadarko Party and/or their affiliates for Owner's Proportionate Share of all Commitments incurred by the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) under or pursuant to such Commitment Agreements. Owner's Proportionate Share of any Commitments under any such Commitment Agreements shall be included as "Other Costs" under Section 3.c, above, of this Agreement, and shall be eligible for deduction from the payment hereunder to Owner of otherwise applicable proceeds thereunder; provided, however, the Anadarko Parties shall not deduct any unutilized demand charges or minimum throughput/deficiency charges and shall separately invoice Owner for such charges. If any Commitments are not so deducted from otherwise applicable proceeds payable to Owner, the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) shall invoice Owner for any amounts owed pursuant to Owner's Proportionate Share of any such Commitments. Owner shall pay any such invoice within thirty (30) days after receipt of such invoice. If the Anadarko Parties, the Marketing Anadarko Party and/or any of their affiliates receives any refund of any Commitment previously paid by Owner and the Anadarko Parties, the Marketing Anadarko Party and/or their affiliates, the Anadarko Parties shall promptly pay Owner, or cause Owner to be promptly paid, Owner's Proportionate Share of such refund. Within thirty (30) days after the end of each quarter during the Term (ending on March 31, June 30, September 30, and December 31 of each such year), the Anadarko Parties shall provide Owner with a written update regarding the status, including the partial or complete satisfaction of any deficiencies, of all outstanding Commitments. For the avoidance of doubt, for purposes of this Section 6, Owner's Proportionate Share shall be equal to Owner's, and Owner's affiliates', if any, full proportionate share and gross working interest of and in the natural gas production produced from all current and future Wells located on the Properties.

Each and every of the foregoing provisions of this Section 6 of this Agreement shall be equally applicable to all Rejected Commitment Agreements, if any; provided, however, that Owner shall no longer be bound by, liable and fully responsible for Owner's Proportionate Share of all Commitments under or pursuant to any such Rejected Commitment Agreement(s) if, as and when, but only to the extent that, Owner, in accordance with the provisions of this Agreement, begins to take in kind "Owner's Excess Residue Gas" (as that term is defined in Section 7, below, of this Agreement), if any, that is attributable to any such Rejected Commitment Agreement(s).

7. **Right to Take in Kind**. If and to the extent a portion of Owner's Residue Gas is not committed to the fulfillment of the Commitments under or pursuant to the Commitment Agreements and the Rejected Commitment Agreements, but excluding any Rejected Potential Major Agreement (such portion of Owner's Residue Gas hereinafter being referred to as "Owner's Excess Residue Gas"), Owner shall have the right, upon the delivery thereof to the applicable Delivery Point, to transport and market Owner's Excess Residue Gas at and from the Delivery Points; provided, however, such right may only be exercised by Owner if and to the extent the same is not prohibited by applicable law or the terms and conditions of the Commitment Agreements or the Rejected Commitment Agreements and if and to the extent Owner's exercise of such right will not cause the Anadarko Parties to fail to meet any Commitment(s) under any of the Commitment Agreements or the Rejected Commitment Agreements. In the event of any such exercise of entitlement, Owner will retain title to Owner's Excess Residue Gas at the Delivery Points, obtain its own transport for and market such Owner's Excess Residue Gas, and be



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

responsible for the payment of Royalties and Taxes, and any other taxes based on production, on such Owner's Excess Residue Gas, and all costs and expenses associated with the transportation and marketing of such Owner's Excess Residue Gas. Notice of Owner's intent to exercise its right to take in kind pursuant to the provisions of this Section 7 shall be in the form of a written notice from Owner to the Anadarko Parties given at least twelve (12) months before the date that Owner desires to take a specific amount of Owner's Excess Residue Gas in kind. If, pursuant to the provisions of this Agreement, any existing or future agreement that would become, if approved in writing by Owner, a Commitment Agreement hereunder is provided by the Anadarko Parties to Owner for Owner's approval, and Owner timely rejects in writing or is deemed to have rejected such existing or future agreement, which agreement would then be deemed to be a Rejected Commitment Agreement hereunder, the Anadarko Parties will have the right, but not the obligation, to provide notice to Owner that, beginning twelve (12) months from the date of such notice to Owner, Owner will have to take in kind, and Owner hereby agrees that it will so take in kind, pursuant to the provisions of this Section 7 of this Agreement, Owner's Excess Residue Gas, if any, that is attributable to such Rejected Commitment Agreement.

8. **Representations by Owner**. Owner represents and warrants to the Anadarko Parties that at all times during the Term:

a. the Anadarko Parties and/or the Marketing Anadarko Party, upon the purchase of Owner's Proportionate Share of the raw natural gas production stream from the Wells or Owner's Residue Gas, whichever is applicable, shall have good and merchantable title to Owner's Proportionate Share of the raw natural gas production stream from the Wells or Owner's Residue Gas, whichever is applicable, free and clear of all liens, encumbrances and claims;

b. its gross working interest is undedicated to or fully released from any marketing agreement(s) related to the Wells and/or Owner's Residue Gas and the Anadarko Parties and/or the Marketing Anadarko Party shall have the sole right to purchase and resell Owner's Residue Gas;

c. subject to Owner's right to approve any Commitment Agreement entered into by any of the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) after Owner's actual execution date of this Agreement, it will perform and/or be financially responsible to the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) for Owner's Proportionate Share of all Commitments under or pursuant to all Commitment Agreements and, subject to the provisions of Section 6, above, of this Agreement, Rejected Commitment Agreements made by the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) in compliance with this Agreement; and

d. there are no adverse claims to Owner's Proportionate Share of the raw natural gas production stream from the Wells or to Owner's Residue Gas, other than the pending claim by XTO Energy, Inc. in *XTO Energy, Inc. v. Briscoe Ranch, Inc., Anadarko Corporation, and SM Energy Corporation*, Webb County, Texas, District Court, 49th Judicial District, Case No. 2012CV7000673D4.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, OWNER SHALL RELEASE, INDEMNIFY, DEFEND AND HOLD THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY AND ALL OF THEIR AFFILIATES, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES, HARMLESS FROM AND AGAINST ALL SUITS, ACTIONS, DEBTS, ACCOUNTS, COSTS, DAMAGES (OF ANY KIND OR TYPE), CHARGES, FINES, PENALTIES, LOSSES, JUDGMENTS, LIABILITIES,**



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 021381

AND/OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) ARISING FROM OR OUT OF ADVERSE CLAIMS OF ANY PERSON OR ENTITY TO OWNER'S PROPORTIONATE SHARE OF THE RAW NATURAL GAS PRODUCTION STREAM FROM THE WELLS OR TO OWNER'S RESIDUE GAS.

9. Indemnification. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, OWNER SHALL BE LIABLE FOR, AND HEREBY RELEASES, INDEMNIFIES, DEFENDS AND HOLDS HARMLESS THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY, AND ALL OF THEIR AFFILIATES, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (THE "ANADARKO INDEMNITEES") FROM AND AGAINST, A PERCENTAGE ("OWNER'S SECTION 9 INDEMNIFICATION PERCENTAGE"), WHICH PERCENTAGE SHALL BE EQUAL TO ONE HUNDRED PERCENT (100%) OF OWNER'S PROPORTIONATE SHARE OF ALL NATURAL GAS PRODUCTION PRODUCED FROM THE WELLS ON THE PROPERTIES, OF ANY AND ALL SUITS, ACTIONS, DEBTS, ACCOUNTS, COSTS, CHARGES, DAMAGES OF ANY KIND OR TYPE (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR PERSONAL INJURY OR DEATH AND DAMAGES TO PROPERTY, ENVIRONMENTAL OR OTHERWISE, AND THIRD PARTY CONSEQUENTIAL DAMAGES), FINES, PENALTIES, LOSSES, JUDGMENTS, LIABILITIES AND/OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) (COLLECTIVELY, "CLAIMS") ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF OWNER ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, IN WHICH CASE OWNER'S INDEMNITY OBLIGATION UNDER THIS SECTION 9 OF THIS AGREEMENT SHALL INCREASE FROM OWNER'S SECTION 9 INDEMNIFICATION PERCENTAGE, AS DEFINED ABOVE IN THIS SECTION 9, TO ONE HUNDRED PERCENT (100%) OF ANY SUCH CLAIM OR CLAIMS.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THE ANADARKO PARTIES SHALL BE JOINTLY AND SEVERALLY LIABLE FOR, AND HEREBY RELEASE, INDEMNIFY, DEFEND AND HOLD HARMLESS OWNER, AND ALL OF ITS AFFILIATES, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (THE "OWNER INDEMNITEES") FROM AND AGAINST, A PERCENTAGE ("THE ANADARKO PARTIES' SECTION 9 INDEMNIFICATION PERCENTAGE"), WHICH PERCENTAGE SHALL BE EQUAL TO ONE HUNDRED PERCENT (100%) OF THE ANADARKO PARTIES' PROPORTIONATE SHARE OF ALL NATURAL GAS PRODUCTION PRODUCED FROM THE WELLS ON THE PROPERTIES, OF ANY AND ALL SUITS, ACTIONS, DEBTS, ACCOUNTS, COSTS, CHARGES, DAMAGES OF ANY KIND OR TYPE (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR PERSONAL INJURY OR DEATH AND DAMAGES TO PROPERTY, ENVIRONMENTAL OR OTHERWISE, AND THIRD PARTY CONSEQUENTIAL DAMAGES), FINES, PENALTIES, LOSSES, JUDGMENTS, LIABILITIES AND/OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) (COLLECTIVELY, "CLAIMS") ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE ANADARKO PARTIES ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, IN WHICH CASE THE ANADARKO PARTIES'



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

INDEMNITY OBLIGATION UNDER THIS SECTION 9 OF THIS AGREEMENT SHALL INCREASE FROM THE ANADARKO PARTIES' SECTION 9 INDEMNIFICATION PERCENTAGE, AS DEFINED ABOVE IN THIS SECTION 9, TO ONE HUNDRED PERCENT (100%) OF ANY SUCH CLAIM OR CLAIMS.

AS USED IN THIS AGREEMENT, THE TERM "REGARDLESS OF FAULT" MEANS WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, WITHOUT LIMITATION, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE, WHETHER SIMPLE, GROSS, SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE OR OTHERWISE, WILLFUL MISCONDUCT, UNCURED MATERIAL BREACH, STATUTORY LIABILITY, STRICT LIABILITY OR OTHER FAULT OF OWNER OR THE ANADARKO PARTIES. FURTHER, AS USED IN THIS AGREEMENT, THE TERM "UNCURED MATERIAL BREACH" SHALL MEAN A MATERIAL BREACH OF THIS AGREEMENT THAT IS NOT CURED BY THE BREACHING PARTY WITHIN THIRTY (30) DAYS FOLLOWING THE BREACHING PARTY'S RECEIPT OF WRITTEN NOTICE FROM THE NON-BREACHING PARTY OF THE ALLEGED MATERIAL BREACH IN QUESTION; PROVIDED, HOWEVER, THAT IF THE EXISTENCE OF AN ALLEGED MATERIAL BREACH IS DISPUTED BY THE ALLEGED BREACHING PARTY, THE ABOVE-REFERENCED 30-DAY CURE PERIOD SHALL BE TOLLED IN ITS ENTIRETY UNTIL SUCH DISPUTE IS RESOLVED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SECTION 16 OF THIS AGREEMENT.

10. **Disclaimer of Representations by Anadarko Parties**. Owner hereby acknowledges and agrees that no express or implied representation or warranty is or has been made by the Anadarko Parties, the Marketing Anadarko Party or their affiliate(s), or any of them, concerning or relating to the price to be paid for Owner's Residue Gas. Further, Owner hereby acknowledges and agrees that (i) it has not relied upon any statements, representations or warranties (whether written or oral) made by the Anadarko Parties, the Marketing Anadarko Party or their affiliate(s), or any of them, when entering into this Agreement, (ii) it has entered into this Agreement based upon its own independent business judgment and its own experience in energy markets and the energy industry, and (iii) this Agreement was a result of arm's length negotiations between the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) and Owner.

11. **Changes in Owner's Ownership**. Owner shall be solely responsible for notifying the Anadarko Parties in writing of any changes in the ownership of, or rights to, Owner's Residue Gas or the proceeds derived from the marketing thereof. The Anadarko Parties, the Marketing Anadarko Party and their affiliate(s) shall not be bound by any changes in such ownership or rights until they are so notified as provided in this Agreement and any such notice has actually been received.

12. **Miscellaneous**. In the event a court of competent jurisdiction determines that any provision contained in this Agreement is violative of any law or regulation, such provision shall be deemed stricken from the Agreement without affecting the enforceability of the remainder of the Agreement; provided, however, any such provision shall not be deemed stricken to the extent striking such provision would materially alter the economic benefits any Party derives from this Agreement; provided further, however, in the event striking any such provision would materially alter the economic benefits of this Agreement, the Parties agree to negotiate in good faith to amend such provision in order to maintain both the enforceability of this Agreement and the economic benefits derived by the Parties in substantially the same form and substantially to the same degree as derived from this Agreement in its original form. This Agreement, including any Exhibits hereto, may be amended only by a written instrument executed by all of the Parties to this Agreement. The Parties hereto agree that each and every of the Exhibits attached hereto are part of this Agreement. This Agreement shall be governed by the laws of the State of Texas, notwithstanding any conflicts of laws rules or principles that might require the application of the laws of



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

another jurisdiction. This Agreement shall be binding upon the Parties hereto, and their permitted successors and permitted assigns; provided, however, that no transfer of this Agreement shall be made without the prior written consent of the other Party(ies) hereto, which consent may not be unreasonably withheld or delayed. If any transfer or assignment of this Agreement pertains to only a part, as opposed to the entirety, of the interest, rights and obligations of the transferring/assigning Party (a "Partial Transfer"), the transferring/assigning Party, as a condition precedent to any such transfer or assignment, will specifically declare in writing to the non-transferring/assigning Party the exact percentage of the transferring/assigning Party's interest, rights and obligations hereunder covered by any such Partial Transfer. In the event of a conflict between the terms and conditions of this Agreement and the Joint Exploration Agreement referenced in the first WHEREAS clause above, the terms and conditions of this Agreement shall prevail. Notwithstanding anything to the contrary contained herein, if any of the royalty payment provisions of the individual oil and gas leases pertaining to the Properties conflict with the terms and conditions of this Agreement, the royalty provisions of such leases will prevail. The headings contained in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement. Except as otherwise expressly set forth herein, this Agreement is intended only to benefit the Parties hereto and their respective permitted successors and permitted assigns. Each Party agrees that it shall maintain all terms and conditions of this Agreement, all terms and conditions of any Commitment Agreement or Rejected Commitment Agreement or Potential Major Agreement or Rejected Potential Major Agreement, all non-public information, whether obtained orally or in writing and whether or not identified as confidential upon receipt by the receiving Party, concerning or relating to this Agreement or any Commitment Agreement or Rejected Commitment Agreement or Potential Major Agreement or Rejected Potential Major Agreement, and all non-public information, whether obtained orally or in writing and whether or not identified as confidential upon receipt by the Receiving Party, concerning or relating to any activities or operations under, in connection with or pursuant to this Agreement or any Commitment Agreement or Rejected Commitment Agreement or Potential Major Agreement or Rejected Potential Major Agreement (all of the foregoing hereinafter being referred to as the "Confidential Information") in strictest confidence, and that for so long as this Agreement remains in full force and effect, and for a period of two (2) years thereafter, it shall not cause or permit disclosure of any such Confidential Information without the prior written consent of the other Party, which consent may not be unreasonably withheld or delayed. If a party to a Commitment Agreement or a Rejected Commitment Agreement or a Potential Major Agreement or a Rejected Potential Major Agreement so requires, or if the circumstances so require, Owner shall execute an appropriate Confidentiality Agreement or other confidentiality undertaking addressing Owner's non-disclosure of confidential information pertaining to, or the terms and conditions of, such Commitment Agreement or Rejected Commitment Agreement or Potential Major Agreement or Rejected Potential Major Agreement. This Agreement may be executed in duplicate originals or counterparts, each of which, when taken with all other counterparts, shall constitute a binding agreement between the Parties hereto. An executed facsimile or .PDF counterpart of this Agreement shall be sufficient to bind a Party hereto to the same extent as an original. This Agreement, including all Exhibits hereto, contains the entire agreement and understanding between the Parties relating to the matters covered hereby, and any agreements (including, without limitation, that certain Natural Gas Marketing Agreement by and between Anadarko E&P Company LP (n/k/a Anadarko E&P Onshore LLC) and St. Mary Land & Exploration Co., effective as of March 1, 2008, which Natural Gas Marketing Agreement will be deemed terminated automatically, pursuant to the agreement of the Parties hereto, as of the Effective Date of this Agreement notwithstanding any prior notice of termination provisions contained in said Natural Gas Marketing Agreement), representations, correspondence, or other statements entered into or made by a Party prior to the Effective Date relating to the matters covered hereby shall be superseded by the terms and conditions hereof.

[redacted]

[redacted]

14. **Payment of Taxes and Royalties**. As to the payment by the Anadarko Parties of Owner's Proportionate Share of Taxes and Royalties, the **ANADARKO PARTIES DO NOT THEREBY ASSUME LIABILITY FOR OWNER'S TAXES OR ROYALTIES AND NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS AN ASSUMPTION BY THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY OR THEIR AFFILIATE(S) OF SUCH LIABILITIES.** Owner shall be responsible for any additional amounts owed for Taxes or Royalties on Owner's Residue Gas by virtue of specific lease or other contractual provisions or legal requirements. The Anadarko Parties, the Marketing Anadarko Party and their affiliate(s) make no representation or warranty regarding their/its methods of payment of Taxes and Royalties and shall not be liable to Owner or any third parties for any claims relating to such methods. **SUBJECT TO THE ANADARKO PARTIES' COMPLIANCE WITH THE LAST SENTENCE OF THIS SECTION 14, OWNER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND HOLD THE ANADARKO INDEMNITEES, AS THAT TERM IS DEFINED IN SECTION 9, ABOVE, OF THIS AGREEMENT, HARMLESS FROM AND AGAINST ALL CLAIMS THAT ARISE FROM OR OUT OF, OR ARE RELATED TO, THE PAYMENT BY THE ANADARKO PARTIES OF OWNER'S PROPORTIONATE SHARE OF TAXES AND ROYALTIES ON OWNER'S RESIDUE GAS FROM THE**



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

**WELLS, INCLUDING, BUT NOT LIMITED TO, CLAIMS BY GOVERNMENT AUTHORITIES, OWNERS OF ROYALTY, OVERRIDING ROYALTY, RESIDUE GAS PAYMENTS, NATURAL GAS PRODUCTION PAYMENTS, WORKING INTERESTS, TRANSPORTERS OR OTHER CLAIMANTS, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE ANADARKO PARTIES ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE ANADARKO PARTIES SHALL IN ALL RESPECTS ACT IN GOOD FAITH AND IN A COMMERCIALLY REASONABLE MANNER IN THE CALCULATION AND PAYMENT OF TAXES AND ROYALTIES ON BEHALF OF OWNER PURSUANT TO THE TERMS OF THIS AGREEMENT.**

15. **Approvals and Authorities**. Each of the Parties to this Agreement hereby represents and warrants to the other Parties hereto that all approvals and authorities necessary for such Party to enter into this Agreement and be bound by its terms have been obtained. Each of the Parties to this Agreement further represents and warrants to the other Parties hereto that its execution of this Agreement does not breach or violate any contract, agreement, order or prohibition to which the Anadarko Parties, the Marketing Anadarko Party and/or their affiliates, or any of them, or Owner are/is a party or bound.

16. **Dispute Resolution**. The Parties shall attempt to resolve any dispute arising out of or relating to this Agreement by good faith negotiation or mediation, as may be agreed at the time. The Parties consent to the exercise of jurisdiction in personam by the courts of the State of Texas for any dispute. Each Party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any dispute.

17. **Term**. This Agreement shall commence as of the Effective Date and shall remain in full force and effect through December 31, 2022 (the "Primary Term"), and thereafter the term shall continue on a year-to-year basis after the Primary Term unless terminated by either Party effective at the end of the Primary Term or any anniversary thereafter, upon the giving of a minimum of ninety (90) days prior written notice (the "Term"); provided, however, that notwithstanding the foregoing, this Agreement, and all of the rights and obligations of the Parties hereunder, shall, in any event, remain in full force and effect, and shall not terminate, until the termination date of the last to terminate of all Commitment Agreements entered into in compliance with this Agreement. Notwithstanding the foregoing, either Party will be entitled to cancel its obligations with respect to any volumes that are subject to a Commitment under a Commitment Agreement when such Commitment under such Commitment Agreement terminates. Notwithstanding the termination of this Agreement as provided in this Section 17, the terms and provisions of this Section 17, Sections 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, 19 and 20, and all Sections pertaining in any way to the effectiveness and fulfillment of Section 6, and all indemnification obligations under this Agreement shall survive termination.

18. **Notices**. Any notice, termination or otherwise, to be sent to AEPC and AESC under this Agreement shall be in writing and shall be sent via U.S. Certified Mail to Vice President, Gas Marketing, 1201 Lake Robbins Dr., The Woodlands, Texas 77380, and any notice to be sent to Owner under this Agreement shall be in writing and shall be sent via U.S. Certified Mail to Vice President – Marketing, 1775 Sherman Street, Suite 1200, Denver CO 80203.

19. **Disclaimer of Certain Damages**. **NOTWITHSTANDING ANY OTHER PROVISION(S) OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, SECTION 9, ABOVE, OF THIS AGREEMENT, (a) OWNER AND THE OWNER INDEMNITEES WILL NOT BE LIABLE HEREUNDER TO THE ANADARKO PARTIES, OR ANY ONE OF THEM, OR TO THE ANADARKO INDEMNITEES,**



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

**AND (b) THE ANADARKO PARTIES, OR EITHER OF THEM, AND THE ANADARKO INDEMNITEES WILL NOT BE LIABLE HEREUNDER TO OWNER OR TO THE OWNER INDEMNITEES , PURSUANT TO ANY INDEMNITY OR ANY OTHER PROVISION HEREOF, FOR ANY OF THE OTHER'S(S') OWN CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES, HOWSOEVER ARISING UNDER OR HOWSOEVER RELATING TO OR PERTAINING TO THIS AGREEMENT, AND REGARDLESS OF THE EXISTENCE, OR ALLEGED EXISTENCE, OF NEGLIGENCE, WHETHER SIMPLE, GROSS, SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE OR OTHERWISE, WILLFUL MISCONDUCT, UNCURED MATERIAL BREACH, STATUTORY LIABILITY, STRICT LIABILITY OR OTHER FAULT.**

20. **Audit Rights**. A Party shall have the right, at its own expense, upon reasonable notice and at reasonable times, to examine, to audit and to obtain copies of the relevant portions of books and records of the other Party(ies) but only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, deduction or computation made or rendered under or pursuant to this Agreement. This right to examine, to audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to matters arising under this Agreement. All statements, charges, payments, deductions and computations made or rendered under or pursuant to this Agreement shall be conclusively presumed final and accurate, and all associated claims for under or overpayment(s) shall be deemed waived, unless the particular statement, charge, payment, deduction or computation in question is objected to in writing, with adequate explanation and documentation, within two (2) years after the receipt thereof by the objecting Party.

[The remainder of this page is left blank intentionally.]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Effective Date.

**ANADARKO ENERGY SERVICES COMPANY**

By: ______________________

Name: A. Scott Moore

Title: President

**ANADARKO E&P ONSHORE LLC**

By: ______________________

Name: Daniel Hart for Danny Brown

Title: G.M.

**SM ENERGY COMPANY**

By: ______________________

Name: Dave Whitcomb

Title: Vice President – Marketing



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

*EXECUTION COPY*

**Exhibit A**

**Maverick Residue Gas Marketing Agreement**
**Dated as of October 1, 2010**
**By and Among**

**ANADARKO E&P ONSHORE LLC ("AEPC"),**
**ANADARKO ENERGY SERVICES COMPANY ("AESC") and**
**SM ENERGY COMPANY ("Owner")**

**<u>TEXAS COUNTIES</u>: Maverick, Dimmit, LaSalle and Webb Counties.**



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER