**FROM THE SOLE UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE ANADARKO PARTIES ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, IN WHICH CASE THE ANADARKO PARTIES' INDEMNITY OBLIGATION UNDER THIS SECTION 9 OF THIS AGREEMENT SHALL INCREASE FROM THE ANADARKO PARTIES' SECTION 9 INDEMNIFICATION PERCENTAGE, AS DEFINED ABOVE IN THIS SECTION 9, TO ONE HUNDRED PERCENT (100%) OF ANY SUCH CLAIM OR CLAIMS.**

**AS USED IN THIS AGREEMENT, THE TERM "REGARDLESS OF FAULT" MEANS WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, WITHOUT LIMITATION, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE, WHETHER SIMPLE, GROSS, SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE OR OTHERWISE, WILLFUL MISCONDUCT, UNCURED MATERIAL BREACH, STATUTORY LIABILITY, STRICT LIABILITY OR OTHER FAULT OF OWNER OR THE ANADARKO PARTIES. FURTHER, AS USED IN THIS AGREEMENT, THE TERM "UNCURED MATERIAL BREACH" SHALL MEAN A MATERIAL BREACH OF THIS AGREEMENT THAT IS NOT CURED BY THE BREACHING PARTY WITHIN THIRTY (30) DAYS FOLLOWING THE BREACHING PARTY'S RECEIPT OF WRITTEN NOTICE FROM THE NON-BREACHING PARTY OF THE ALLEGED MATERIAL BREACH IN QUESTION; PROVIDED, HOWEVER, THAT IF THE EXISTENCE OF AN ALLEGED MATERIAL BREACH IS DISPUTED BY THE ALLEGED BREACHING PARTY, THE ABOVE-REFERENCED 30-DAY CURE PERIOD SHALL BE TOLLED IN ITS ENTIRETY UNTIL SUCH DISPUTE IS RESOLVED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SECTION 16 OF THIS AGREEMENT.**

10. **Disclaimer of Representations by Anadarko Parties**. Owner hereby acknowledges and agrees that no express or implied representation or warranty is or has been made by the Anadarko Parties, the Marketing Anadarko Party or their affiliate(s), or any of them, concerning or relating to the price to be paid for Owner's NGLs. Further, Owner hereby acknowledges and agrees that (i) it has not relied upon any statements, representations or warranties (whether written or oral) made by the Anadarko Parties, the Marketing Anadarko Party or their affiliate(s), or any of them, when entering into this Agreement, (ii) it has entered into this Agreement based upon its own independent business judgment and its own experience in energy markets and the energy industry, and (iii) this Agreement was a result of arm's length negotiations between the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) and Owner.

11. **Changes in Owner's Ownership**. Owner shall be solely responsible for notifying the Anadarko Parties in writing of any changes in the ownership of, or rights to, Owner's NGLs or the proceeds derived from the marketing thereof. The Anadarko Parties, the Marketing Anadarko Party and their affiliate(s) shall not be bound by any changes in such ownership or rights until they are so notified as provided in this Agreement and any such notice has actually been received.

12. **Miscellaneous**. In the event a court of competent jurisdiction determines that any provision contained in this Agreement is violative of any law or regulation, such provision shall be deemed stricken from the Agreement without affecting the enforceability of the remainder of the Agreement; provided, however, any such provision shall not be deemed stricken to the extent striking such provision would materially alter the economic benefits any Party derives from this Agreement; provided further, however, in the event striking any such provision would materially alter the economic benefits of this Agreement, the Parties agree to negotiate in good faith to amend such provision in order to maintain both the enforceability of this Agreement and the economic benefits derived by the Parties in substantially the same form and substantially to the same degree as derived from this Agreement in its original form. This



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

Agreement, including any Exhibits hereto, may be amended only by a written instrument executed by all of the Parties to this Agreement. The Parties hereto agree that each and every of the Exhibits attached hereto are part of this Agreement. This Agreement shall be governed by the laws of the State of Texas, notwithstanding any conflicts of laws rules or principles that might require the application of the laws of another jurisdiction. This Agreement shall be binding upon the Parties hereto, and their permitted successors and permitted assigns; provided, however, that no transfer of this Agreement shall be made without the prior written consent of the other Party(ies) hereto, which consent may not be unreasonably withheld or delayed. If any transfer or assignment of this Agreement pertains to only a part, as opposed to the entirety, of the interest, rights and obligations of the transferring/assigning Party (a "Partial Transfer"), the transferring/assigning Party, as a condition precedent to any such transfer or assignment, will specifically declare in writing to the non-transferring/assigning Party the exact percentage of the transferring/assigning Party's interest, rights and obligations hereunder covered by any such Partial Transfer. Waiver by any Party of performance of any obligation or term or provision contained in this Agreement, or waiver by any Party of another Party's default hereunder will not operate as a waiver of performance of any other obligation or term or provision of this Agreement or a future waiver of the same obligation, term or provision or a waiver of any future default. In the event of a conflict between the terms and conditions of this Agreement and the Joint Exploration Agreement referenced in the first WHEREAS clause above, the terms and conditions of this Agreement shall prevail. Notwithstanding anything to the contrary contained herein, if any of the royalty payment provisions of the individual oil and gas leases pertaining to the Properties conflict with the terms and conditions of this Agreement, the royalty provisions of such leases will prevail. The headings contained in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement. Except as otherwise expressly set forth herein, this Agreement is intended only to benefit the Parties hereto and their respective permitted successors and permitted assigns. This Agreement may be executed in duplicate originals or counterparts, each of which, when taken with all other counterparts, shall constitute a binding agreement between the Parties hereto. An executed facsimile or .PDF counterpart of this Agreement shall be sufficient to bind a Party hereto to the same extent as an original. This Agreement, including all Exhibits hereto, contains the entire agreement and understanding between the Parties relating to the matters covered hereby, and any agreements, representations, correspondence, or other statements entered into or made by a Party prior to the Effective Date relating to the matters covered hereby shall be superseded by the terms and conditions hereof.

13. **Adjustment to Marketing Fee**. [Reserved]

14. **Payment of Taxes and Royalties**. As to the payment by the Anadarko Parties of Owner's Proportionate Share of Taxes and Royalties, the **ANADARKO PARTIES DO NOT THEREBY ASSUME LIABILITY FOR OWNER'S TAXES OR ROYALTIES AND NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS AN ASSUMPTION BY THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY OR THEIR AFFILIATE(S) OF SUCH LIABILITIES.** Owner shall be responsible for any additional amounts owed for Taxes or Royalties on Owner's NGLs by virtue of specific lease or other contractual provisions or legal requirements. The Anadarko Parties, the Marketing Anadarko Party and their affiliate(s) make no representation or warranty regarding their/its methods of payment of Taxes and Royalties and shall not be liable to Owner or any third parties for any claims relating to such methods. **SUBJECT TO THE ANADARKO PARTIES' COMPLIANCE WITH THE LAST SENTENCE OF THIS SECTION 14, OWNER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND HOLD THE ANADARKO INDEMNITEES, AS THAT TERM IS DEFINED IN SECTION 9, ABOVE, OF THIS AGREEMENT, HARMLESS FROM AND AGAINST ALL CLAIMS THAT ARISE FROM OR OUT OF, OR ARE RELATED TO, THE PAYMENT BY THE ANADARKO PARTIES OF OWNER'S PROPORTIONATE SHARE OF TAXES AND ROYALTIES ON OWNER'S NGLS FROM THE WELLS, INCLUDING, BUT NOT LIMITED TO, CLAIMS BY GOVERNMENT AUTHORITIES, OWNERS OF ROYALTY, OVERRIDING ROYALTY, NGLS PAYMENTS, NATURAL GAS PRODUCTION PAYMENTS,**

**WORKING INTERESTS, TRANSPORTERS OR OTHER CLAIMANTS, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE ANADARKO PARTIES ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE ANADARKO PARTIES SHALL IN ALL RESPECTS ACT IN GOOD FAITH AND IN A COMMERCIALLY REASONABLE MANNER IN THE CALCULATION AND PAYMENT OF TAXES AND ROYALTIES ON BEHALF OF OWNER PURSUANT TO THE TERMS OF THIS AGREEMENT.**

15. Approvals and Authorities. Each of the Parties to this Agreement hereby represents and warrants to the other Parties hereto that all approvals and authorities necessary for such Party to enter into this Agreement and be bound by its terms have been obtained. Each of the Parties to this Agreement further represents and warrants to the other Parties hereto that its execution of this Agreement does not breach or violate any contract, agreement, order or prohibition to which such Party is a party or bound.

16. Dispute Resolution. The Parties shall attempt to resolve any dispute arising out of or relating to this Agreement by good faith negotiation or mediation, as may be agreed at the time. The Parties consent to the exercise of jurisdiction in personam by the courts of the State of Texas for any dispute. Each Party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any dispute.

17. Term. This Agreement shall commence as of the Effective Date and shall remain in full force and effect through December 31, 2022 (the "Primary Term"), and thereafter the term shall continue on a year-to-year basis after the Primary Term unless terminated by either Party effective at the end of the Primary Term or any anniversary thereafter, upon the giving of a minimum of ninety (90) days prior written notice (the "Term"); provided, however, that notwithstanding the foregoing, this Agreement, and all of the rights and obligations of the Parties hereunder, shall, in any event, remain in full force and effect, and shall not terminate, until the termination date of the last to terminate of all Commitment Agreements entered into in compliance with this Agreement. Notwithstanding the foregoing, a Party will be entitled to cancel its obligations with respect to any volumes that are subject to a Commitment under a Commitment Agreement when such Commitment under such Commitment Agreement terminates. Notwithstanding the termination of this Agreement as provided in this Section 17, the terms and provisions of this Section 17, Sections 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, 18, 19 and 20, and all Sections pertaining in any way to the effectiveness and fulfillment of Section 6, and all indemnification obligations under this Agreement shall survive termination.

18. Notices. Any notice, termination or otherwise, to be sent to AEPC and/or AESC under this Agreement (a) shall be in writing, (b) shall be sent via U.S. Certified Mail, and (c) shall be deemed to have been duly given and received when received at the following address: Anadarko Petroleum Corporation, Attn: General Manager, Domestic Crude, NGL and Gas Marketing, 1201 Lake Robbins Dr., The Woodlands, Texas 77380; and any notice, termination or otherwise, to be sent to Owner under this Agreement (x) shall be in writing, (y) shall be sent via U.S. Certified Mail, and (z) shall be deemed to have been duly given and received when received at the following address: Mitsui E&P Texas LP, Attn: Marketing and Transportation Manager, 9 Greenway Plaza, Suite 1250, Houston, Texas 77046.

19. Disclaimer of Certain Damages. **NOTWITHSTANDING ANY OTHER PROVISION(S) OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, SECTION 9, ABOVE, OF THIS AGREEMENT, (a) OWNER AND THE OWNER INDEMNITEES WILL NOT BE LIABLE HEREUNDER TO THE ANADARKO PARTIES, OR ANY ONE OF THEM, OR TO THE ANADARKO INDEMNITEES,**



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

**AND (b) THE ANADARKO PARTIES, OR EITHER OF THEM, AND THE ANADARKO INDEMNITEES WILL NOT BE LIABLE HEREUNDER TO OWNER OR TO THE OWNER INDEMNITEES , PURSUANT TO ANY INDEMNITY OR ANY OTHER PROVISION HEREOF, FOR ANY OF THE OTHER'S(S') OWN CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES, HOWSOEVER ARISING UNDER OR HOWSOEVER RELATING TO OR PERTAINING TO THIS AGREEMENT, AND REGARDLESS OF THE EXISTENCE, OR ALLEGED EXISTENCE, OF NEGLIGENCE, WHETHER SIMPLE, GROSS, SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE OR OTHERWISE, WILLFUL MISCONDUCT, UNCURED MATERIAL BREACH, STATUTORY LIABILITY, STRICT LIABILITY OR OTHER FAULT.**

20. Audit Rights. A Party shall have the right, at its own expense, upon reasonable notice and at reasonable times, to examine, to audit and to obtain copies of the relevant portions of books and records of the other Party(ies) but only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, deduction or computation made or rendered under or pursuant to this Agreement. This right to examine, to audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to matters arising under this Agreement. All statements, charges, payments, deductions and computations made or rendered under or pursuant to this Agreement shall be conclusively presumed final and accurate, and all associated claims for under or overpayment(s) shall be deemed waived, unless the particular statement, charge, payment, deduction or computation in question is objected to in writing, with adequate explanation and documentation, within two (2) years after the receipt thereof by the objecting Party.

21. Confidentiality.

a. Except as otherwise expressly provided in this Section 21, each Party agrees that it shall maintain all terms and conditions of this Agreement, all terms and conditions of any Commitment Agreement or Rejected Commitment Agreement, and all non-public information, whether obtained orally or in writing and whether or not identified as confidential upon receipt by the receiving Party, concerning or relating to this Agreement or any Commitment Agreement or Rejected Commitment Agreement, and all non-public information, whether obtained orally or in writing and whether or not identified as confidential upon receipt by the Receiving Party, concerning or relating to any activities or operations under, in connection with or pursuant to this Agreement or any Commitment Agreement or Rejected Commitment Agreement (all of the foregoing hereinafter being referred to as the "Confidential Information") in strictest confidence, and that for so long as this Agreement remains in full force and effect, and for a period of two (2) years thereafter, it shall not cause or permit disclosure of any such Confidential Information without the prior written consent of the other Party, which consent may not be unreasonably withheld or delayed; *provided, however,* notwithstanding the foregoing and subject to Section 21.b, below, of this Agreement, no disclosure by a recipient of Confidential Information will be deemed a breach of this Section 21.a of this Agreement if such disclosure is required by law or applicable legal or regulatory process. Further notwithstanding anything herein to the contrary, the receiving Party has no obligations or liabilities under this Agreement with regard to any information which, other than by breach of this Agreement, is (i) already known or in its or its affiliates' or representatives' possession without restriction to disclosure; (ii) independently acquired or developed by the receiving Party or its affiliates or representatives without violating any of its or their obligations under this Section 21.a; (iii) in, or subsequently comes into, the public domain through no fault of the receiving Party; or (iv) becomes available to the receiving Party or its affiliates or representatives on



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

023706

a non-confidential basis from a person other than the disclosing Party or the disclosing Party's affiliates.

b. Subject to the restrictions set forth in this Section 21.b of this Agreement, the receiving Party may disclose Confidential Information to its affiliates and representatives. The receiving Party will require every person to whom Confidential Information is disclosed, and who is not an officer, director or employee of the receiving Party or who is not otherwise bound to hold and keep such Confidential Information confidential, to agree to keep confidential and not disclose Confidential Information to any unauthorized person and be bound by the terms of this Section 21. The receiving Party shall also limit access to the Confidential Information to those of its representatives and affiliates who have a need to review such Confidential Information and who are legally bound to hold such Confidential Information confidential. The receiving Party accepts responsibility for any breach of this Section 21 by the receiving Party or any of its representative or affiliates.

c. If a party to a Commitment Agreement or a Rejected Commitment Agreement so requires, or if the circumstances so require, Owner shall execute an appropriate Confidentiality Agreement or other confidentiality undertaking addressing Owner's non-disclosure of confidential information pertaining to, or the terms and conditions of, such Commitment Agreement or Rejected Commitment Agreement.

[The Remainder Of This Page Is Left Blank Intentionally.}

023707

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Effective Date.

**ANADARKO ENERGY SERVICES COMPANY**

By: ____________________

Name: A. Scott Moore

Title: President

**ANADARKO E&P ONSHORE LLC**

By: ____________________

Name: Daniel Brown

Title: VP S&A Operations

**MITSUI E&P TEXAS LP**

By: MEPEF LLC, its General Partner

By: Mitsui E&P USA LLC, its Attorney-in-Fact

By: ____________________

Name: Toru Matsui

Title: Senior Vice President & Chief Operating Officer



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

023708

**Exhibit A**
**Maverick Natural Gas Liquids Marketing Agreement**
**Dated as of January 1, 2012**
**By and Among**

**ANADARKO E&P ONSHORE LLC ("AEPC"),**
**ANADARKO ENERGY SERVICES COMPANY ("AESC") and**
**MITSUI E&P TEXAS LP ("Owner")**

**POINTS OF DELIVERY AND COMMITMENT AGREEMENTS**

**POINTS OF DELIVERY:**

Copano:

Copano South Chupadera CDP, Webb County, Meter Number EF1-11716
Copano Hwy 83 CDP, Dimmitt County, Meter Number EF1-11717

Enterprise:

San Pedro Ranch, Dimmit County, Meter Number 783171
Garcia Wells, Dimmit County, Meter Number 793002
Briscoe Ranch, Dimmit County, Meter Number 793006
Briscoe Catarina, #1 Dimmit County, Meter Number 803943
Anadarko 20" Briscoe Ranch CDP, Dimmit County, Meter Number 793008
Briscoe Ranch CDP, Dimmit County, Meter Number 803352
Stanley Worthey CDP, Webb County, Meter Number 178955
Briscoe Cochina East CDFA, Meter 178112
Cochina #1, Meter 173099
Catarina West #1-H, Meter 178947
Boyd GG #1 H, Meter 173119

ETC:

Springfield CDP, Dimmit County, Meter Number 0969002L
Stanley-Worthey CDP, Webb County, Meter Number 0969004L
Rancho Encantado CDP, Dimmitt County, Meter Number 0969039

Texas Pipeline:

Shape 2 Station, Meter T1010233780
San Pedro CDP, Meter T092712504
Tovar Ranch CDP, Meter 44682
FOGMT 6SH, Meter T104941726

WGR:

Springfield CDP #1, Dimmitt County, Meter Number 421000001
Springfield CDP #2, Dimmitt County, Meter Number 421000002
Diamond H CGFA, Dimmitt County, Meter Number 421000006



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

Cochina West CGFA, Dimmitt County, Meter Number 421000007
Cochina East CGFA, Dimmitt County, Meter Number 421000008
Cochina West CGFB, Dimmitt County, Meter Number 421000009
Cochina West CGFC, La Salle County, Meter Number 421000010
Brasada Plant Tailgate NGL Pipeline into Enterprise, LaSalle County

JSK Holding, Inc.:

Anadarko' Eagle Ford Catarina and other mutually agreed upon locations for truck loading

**COMMITMENT AGREEMENTS:**

1. Gas Gathering, Processing and Purchase Contract between Enterprise South Texas Gathering L.P. and Anadarko Petroleum Corporation dated September 1, 2008, and associated amendments if any

2. Gas Processing Agreement between Enterprise Hydrocarbons L.P. (Tranche I) and Anadarko E&P Company LP dated September 1, 2010, and associated amendments if any

3. Gas Services Agreement between Anadarko E&P Company LP and Eagle Ford Gathering LLC dated January 1, 2011, and associated amendments if any

4. Firm Gas Transportation Agreement for NGPA Section 311 Service dated October 1, 2010 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC, and associated amendments if any, Contract No. 9138E

5. Firm Gas Transportation Agreement for Intrastate Service dated October 1, 2010 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC, and associated amendments if any, Contract No. 9138A

6. Gas Processing Agreement between Enterprise Hydrocarbons L.P. (Tranche II) and Anadarko E&P Company LP dated February 1, 2011, and associated amendments if any

7. Gathering and Processing Agreement between ETC Texas Pipeline, Ltd. and Anadarko E&P Company LP dated April 1, 2011, and associated amendments if any, HPL Contract No. 9142-100

8. Base Contract for Sale and Purchase of Natural Gas between Houston Pipe Line Company LP, as assignee of ETC Texas Pipeline, Ltd. and Anadarko E&P Company LP, dated April 1, 2011, and associated amendments if any, HPL Contract No. 9142

9. Firm Transportation Agreement between Texas Pipeline LLC and Anadarko E&P Company LP, and associated amendments if any, with an effective date of first production in June, 2009

10. Gas Processing Agreement between WGR Operating, LP and Anadarko E&P Company LP, dated February 27, 2012 and associated amendments if any



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

11. Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko Energy Services Company dated March 1, 2012, and associated amendments if any

12. Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, dated March 1, 2012, and associated amendments if any

13. NGL Trucking Agreement between Anadarko Energy Services Company and JSK Holding, Inc. dated September 1, 2012, and associated amendments if any

14. Individual Transaction Confirmation to base Gathering and Processing Agreement between ETC Texas Pipeline, Ltd. and Anadarko E&P Onshore LLC (base dated April 1, 2011) dated January 1, 2014



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

# MAVERICK RESIDUE GAS MARKETING AGREEMENT

This Residue Gas Marketing Agreement ("Agreement") is entered into by and among **ANADARKO E&P ONSHORE LLC ("AEPC"), ANADARKO ENERGY SERVICES COMPANY ("AESC")** (collectively, the foregoing entities may be referred to hereinafter as the "Anadarko Parties") and **MITSUI E&P TEXAS LP ("Owner"). AEPC, AESC** and **Owner** may be referred to hereinafter individually as a "Party" and collectively as the "Parties". This Agreement shall be effective as of the 1st day of January, 2012 (the "Effective Date").

WHEREAS, AEPC and Owner own working interests in certain properties lying within the boundaries of Maverick, Dimmit, LaSalle and Webb Counties, Texas (the "Properties"), as more fully described in an Exhibit to that certain Joint Exploration Agreement, dated March 1, 2008 (the "Joint Exploration Agreement"), by and among AEPC and Owner's predecessor-in-interest, SM Energy Company, which Joint Exploration Agreement is, by this reference, incorporated herein to the limited extent, and only to the limited extent, of further identifying the Properties; and

WHEREAS, the natural gas production from the Properties will be processed at one or more natural gas processing plants to extract the natural gas liquids and such processing will result in residue gas remaining after processing that is attributable, as determined under the terms of the gas processing agreement(s), to the natural gas production produced from all current and future wells located on the Properties (the "Wells") (the residue gas attributable to the Anadarko Parties' and the Anadarko Parties' affiliates', if any, and any other co-working interest owners', including Owner's and Owner's affiliates', if any, full proportionate share and gross working interest of and in the natural gas production produced from the Wells hereinafter being referred to as the "Residue Gas"; and

WHEREAS, Owner desires to sell and the Anadarko Parties desire to receive and purchase the Residue Gas attributable to Owner's and Owner's affiliates', if any, full proportionate share and gross working interest (hereinafter, collectively, "Owner's Proportionate Share") of and in the natural gas production produced from all current and future Wells ("Owner's Residue Gas") on the terms and conditions set forth in this Agreement; and

WHEREAS, subject to the terms and conditions set forth in this Agreement, the Anadarko Parties are willing to market and resell Owner's Residue Gas at the same marketing points and under the same marketing arrangements under which the Residue Gas attributable to the Anadarko Parties', and the Anadarko Parties' affiliates', if any, full proportionate share and gross working interest (hereinafter, collectively, the "Anadarko Parties' Proportionate Share") of and in the natural gas production produced from all current and future Wells ("AEPC's Residue Gas") is marketed.

NOW, THEREFORE, in consideration of the premises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. <u>**Sale of Owner's Residue Gas**</u>. Subject to the terms and conditions of this Agreement, Owner hereby agrees to deliver, or cause to be delivered, and sell to one of the Anadarko Parties, as designated from time to time by the Anadarko Parties, and the Party so designated by the Anadarko Parties (the "Marketing Anadarko Party") hereby agrees to receive and purchase from Owner, at the specific points of delivery set forth on Exhibit A, attached hereto and by this reference made a part hereof, as the same may be amended from time to time (the "Delivery Points"), all of Owner's Residue Gas for the Term. The specific Delivery Points hereunder, as designated on said Exhibit A, shall be at the tailgate of the gas processing plant(s) or at such other Delivery Points as designated by the Marketing Anadarko Party and as set forth on Exhibit A, as the same may be amended from time to time. Subject to the terms and provisions of this Agreement, title to Owner's Residue Gas shall pass from



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

Owner to the Marketing Anadarko Party as the Residue Gas in question passes through the designated Delivery Points. The Anadarko Parties, or either of them, shall give Owner written notice of any Delivery Points amendment to Exhibit A made by the Anadarko Parties pursuant to this Section 1 and Owner will agree to, and approve in writing, any such Delivery Points amendment within five (5) business days of its receipt of any such notice(s) from the Anadarko Parties, or either of them. If the particular Delivery Point in question is upstream of the particular gas processing point in question, then all right, title and interest in and to Owner's Proportionate Share of and in the raw natural gas production stream from the Wells, from which raw natural gas production stream Owner's Residue Gas will remain after processing, shall pass from Owner to the Marketing Anadarko Party at the inlet of the measuring facilities at such upstream Delivery Point. If the particular Delivery Point in question is downstream of the particular gas processing point in question, then all right, title and interest in and to Owner's Residue Gas remaining after the processing of Owner's Proportionate Share of and in the raw natural gas production stream from the Wells shall pass from Owner to the Marketing Anadarko Party at the inlet of the measuring facilities at such downstream Delivery Point.

2. **<u>Marketing of Owner's Residue Gas</u>**.

a. Owner acknowledges and understands that in the event AEPC is designated as the Marketing Anadarko Party, AEPC intends to market and resell Owner's Residue Gas either on its own or to and through AESC, and, consistent with this intent, Owner hereby consents to AEPC's marketing and reselling of Owner's Residue Gas either by AEPC or to and through AESC. However, the Anadarko Parties may, from time to time during the Term and within their sole discretion, decide to market and resell Owner's Residue Gas to and through one or more of the Anadarko Parties' affiliates other than AESC. Owner hereby consents to the Anadarko Parties' marketing and reselling of Owner's Residue Gas to and through any affiliate(s) of the Anadarko Parties other than AESC.

b. Subject to the other provisions of this Agreement (including, without limitation, the provisions of Section 7 hereof), during the Term of this Agreement, the Anadarko Parties or their affiliates shall obtain transport for, market and resell Owner's Residue Gas in good faith and in a manner commercially reasonable under the circumstances, and shall obtain commercial terms and conditions that are no less favorable to Owner than the commercial terms and conditions under which the Anadarko Parties or their affiliates obtain transport for, market and resell AEPC's Residue Gas; provided that Owner and each of the Anadarko Parties, including the Marketing Anadarko Party, hereby disclaim the existence of, and any intent to create, any type of fiduciary, trust, agency or partnership relationship with, among or between Owner, any affiliate(s) of Owner, AEPC, AESC, the Marketing Anadarko Party, the Anadarko Parties, or any other affiliate(s) of the Anadarko Parties pertaining to, resulting from, arising out of, pursuant to or in connection with the execution and/or performance of this Agreement.

c. Owner acknowledges, and the Parties agree, that one or both of the Anadarko Parties or their affiliate(s) has (or have) entered into certain existing agreements as set forth on Exhibit A, attached hereto and by this reference made a part hereof, as the same may be amended from time to time, covering, among other things, the gathering and/or treating and transportation of the raw natural gas stream from the Wells, the processing of the raw natural gas stream from the Wells, the transportation of Residue Gas, and the marketing and/or sale of Residue Gas, and that, during the Term, the raw natural gas stream from the Wells will be, among other things, gathered, treated, transported, and/or processed, although not exclusively, and Owner's Residue Gas will be



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

transported, marketed and/or resold, although not exclusively, under those existing agreements and any other such agreements provided to and approved in writing by Owner and entered into from time to time in the future by the Anadarko Parties or their affiliate(s) (all such existing and future agreements, as provided to and approved in writing by Owner, as set forth on Exhibit A, attached hereto, and as said Exhibit A may be amended from time to time, hereinafter being referred to as the "Commitment Agreements"). The Anadarko Parties have provided Owner with true and complete copies of all existing Commitment Agreements as set forth on Exhibit A, all of which, upon the actual execution date of this Agreement by Owner (which actual execution date by Owner, pursuant to the mutual agreement of the Parties, will post-date the Effective Date of this Agreement), will be deemed to have been approved in writing by Owner as Commitment Agreements hereunder as of the Effective Date of this Agreement.

d. With respect to any existing or future agreements as referenced in Section 2.c, above, of this Agreement, and subject to the provisions of the last sentence of Section 2.c, above, of this Agreement, Owner agrees that if it does not grant or reject in writing, within ten (10) business days of its receipt of any written request from the Anadarko Parties for approval of any such existing or future agreement that would, if approved in writing by Owner, become a Commitment Agreement hereunder, Owner will be deemed to have approved such existing or future agreement as a Commitment Agreement hereunder (any such written request from the Anadarko Parties for approval of any such existing or future agreement shall be accompanied by a true and complete copy of such agreement). If any such existing or future agreement is with an affiliate of the Anadarko Parties, such existing or future agreement shall be on commercial terms and conditions that, in the Anadarko Parties' commercially reasonable judgment, are comparable to otherwise available arms-length transactions with non-affiliated third parties. If, for whatever reason, Owner timely rejects in writing any such existing or future agreement that would have become, if approved in writing, or if deemed to have been approved, by Owner, a Commitment Agreement hereunder, one or more of the Anadarko Parties or their affiliates shall be free to enter into or to continue as a party to such agreement, which agreement will not be a Commitment Agreement hereunder and will be considered to be a "Rejected Commitment Agreement" hereunder. Notwithstanding any such rejection by Owner, and notwithstanding anything to the contrary in this Agreement, the raw natural gas stream from the Wells and Owner's Residue Gas will be gathered, treated, processed, transported, marketed and/or resold in accordance with the provisions of this Agreement and the provisions of the particular Rejected Commitment Agreement(s) in question, by one or more of the Anadarko Parties or their affiliates unless and until, and then only to the extent that, Owner, in accordance with the provisions of this Agreement, begins to take in kind "Owner's Excess Residue Gas", as that term is defined in Section 7, below, of this Agreement, that is attributable to such Rejected Commitment Agreement(s). Notwithstanding anything to the contrary contained herein, it is further understood and agreed by the Parties hereto that the Anadarko Parties, in their commercially reasonable and good faith judgment, may elect not to provide an existing or future agreement, as referenced in Section 2.c, above, and/or this Section 2.d, for the approval of Owner as a Commitment Agreement hereunder. If the Anadarko Parties so elect, any such existing or future agreement not so provided to Owner for its approval, and, therefore, not approved in writing by Owner, will be deemed for all purposes of this Agreement to be a Rejected Commitment Agreement; provided, however, that at Owner's request, Owner and the Anadarko Parties, acting in their commercially reasonable and good faith judgment, shall discuss, in general terms and in the aggregate, any such existing or future agreements



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

that have not been previously addressed by both Parties, such discussion to occur at mutually-agreed, regularly-scheduled meetings between the Parties.

e. Further, notwithstanding anything to the contrary contained herein, it is agreed by the Parties that, in the event of an emergency, including (without limitation) the impending shut-in of one or more of the Wells, the unanticipated unavailability of previously-contracted third party services or the occurrence of any other event that could imminently impact the production, transportation and/or sale of the raw natural gas production stream and/or the Residue Gas from one or more of the Wells, one or both of the Anadarko Parties or their affiliate(s) shall have the right, without obtaining the prior written approval of Owner, to enter into new, short-term (that is, not in excess of thirty-one (31) days) agreements (and any extensions or renewals thereof) that are reasonably appropriate and necessary to fully respond to any such emergency. It is agreed that any such emergency agreements as described in this Section 2.e of this Agreement will be deemed for all purposes of this Agreement to be Commitment Agreements.

f. Therefore, pursuant to the foregoing provisions of the entirety of this Section 2 of this Agreement, it is the intent of, and it is understood and agreed by, the Parties hereto that any of Owner's Proportionate Share of the raw natural gas stream from the Wells and/or any of Owner's Residue Gas that is not taken in kind by Owner in accordance with the provisions of this Agreement will be gathered, treated, processed, transported, marketed and/or resold, in accordance with the provisions of this Agreement, by one or more of the Anadarko Parties or their affiliates under either a Commitment Agreement or a Rejected Commitment Agreement. The gathering, treating, processing, transportation, marketing and/or resale, as the case may be, of Owner's Proportionate Share of the raw natural gas stream from the Wells and/or any of Owner's Residue Gas under the terms of any such existing or future Commitment Agreements or Rejected Commitment Agreements shall not give Owner any interest in or make Owner a party to any of said agreements. It is expressly agreed that the Anadarko Parties shall not have any power or authority to contract in the name of or on behalf of Owner.

3. <u>**Proceeds Netback Price for Owner's Residue Gas**</u>. Subject to the other provisions of this Agreement, the consideration to be received by Owner hereunder for Owner's Residue Gas for any given calendar month during the term of this Agreement shall be an amount equal to the total quantity of Owner's Residue Gas for such calendar month (measured in MMBtus) multiplied by the weighted average sales price per MMBtu received by the Anadarko Parties, or either of them, for all Residue Gas sold by the Anadarko Parties, or either of them, or their affiliate(s) to non-affiliated third parties for such calendar month at all points of sale to non-affiliated third parties ("Sales Points"), less the following:

a. royalties, overriding royalties, production payments and other burdens on Residue Gas ("Royalties") for such calendar month paid by the Anadarko Parties, or either of them, on behalf of Owner for Owner's Proportionate Share of such Royalties,

b. severance taxes, if any, and all other taxes on or measured by Residue Gas ("Taxes") for such calendar month paid by the Anadarko Parties, or either of them, on behalf of Owner for Owner's Proportionate Share of such Taxes, and

c. Owner's Proportionate Share of any invoices (charges) for such calendar month paid by the Anadarko Parties, or either of them, on behalf of Owner under the Commitment Agreements and/or Rejected Commitment Agreements (if there are any Rejected Commitment Agreements) to third parties, including reasonable charges of

affiliates of the Anadarko Parties (which charges, in the commercially reasonable judgment of the Anadarko Parties, are comparable to otherwise available non-affiliated third party charges for comparable goods and/or services), at or prior to the Delivery Points and/or between the Delivery Points and the Sales Points, for gathering, treating, processing and/or transportation, including, without limitation, the following (collectively, "Other Costs"): fees and costs charged by any gatherer, treater, transporter, purchaser or processor, including fuel and lost and unaccounted for volumes, imbalances, scheduling or other penalties of any kind or character, unutilized firm transportation charges, deficiency payments or charges associated with gathering, treating and/or processing agreements, transportation agreements, term sales agreements, and third-party operator marketing charges. In regard to "third-party operator marketing charges", any such marketing charges shall pertain only to marketing services performed by a third-party operator of the particular Wells in question, and in all instances where, and for so long as, such third-party operator marketing services are being performed and are being proportionately charged to Owner, the Anadarko Parties, including the Marketing Anadarko Party, shall waive, with respect to Owner's Residue Gas from the particular Wells in question, the otherwise applicable Marketing Fee provided for in Section 4, below, of this Agreement.

Subject to the other provisions of this Agreement, the consideration to be received by Owner for each MMBtu of Owner's Residue Gas for such month pursuant to the preceding provisions of this Section 3 of this Agreement shall not be less than the consideration to be received by the Anadarko Parties, in the aggregate, for each MMBtu of AEPC's Residue Gas for such month pursuant to the preceding provisions of this Section 3 of this Agreement. Should the purchaser(s) of the Residue Gas at the Sales Points fail or refuse to pay for all or part of the Residue Gas sold and delivered for any reason, the Anadarko Parties will use commercially reasonable efforts to obtain payment but shall not be liable to Owner for any Residue Gas sold and delivered to such purchaser unless and until the Anadarko Parties receive payment for same. Notwithstanding the foregoing, in the event any Anadarko Party receives partial payment from such purchaser(s) for Residue Gas, then the Anadarko Parties shall promptly pay to Owner Owner's Proportionate Share of any such partial payment less the applicable amounts set forth in Sections 3.a, 3.b, and 3.c, above. The Anadarko Parties shall have no liability for any loss of Residue Gas at or prior to the Delivery Points and/or between the Delivery Points and the Sales Points and Owner shall have no recourse against the Anadarko Parties for the same. Owner shall at any and all times hereunder be responsible for and bear Owner's Proportionate Share of any and all costs, including, without limitation, Other Costs, and losses, attributable to, in connection with or pertaining in any way to the Residue Gas, from the wellhead to the Delivery Points and from the Delivery Points to the Sales Points.

4. <u>Marketing Fee</u>. Subject to the provisions of Section 13, below, of this Agreement, the Anadarko Parties, or either of them, as compensation for the Marketing Anadarko Party's performance of the marketing and related services described in this Agreement, shall be entitled to receive from Owner an aggregate monthly Residue Gas marketing fee of [redacted] per month for the period of time extending from January 1, 2012, through the final day that this Agreement remains in full force and effect pursuant to the provisions of Section 17, below, of this Agreement (the "Monthly Residue Gas Marketing Fee"). The Monthly Residue Gas Marketing Fee shall not be diminished by (i) any Royalties, Taxes or Other Costs set forth in Section 3, above, or (ii) any other fees, costs or charges addressed in this Agreement.

The Monthly Residue Gas Marketing Fee set forth in this Section 4 shall be paid by Owner and received by the Anadarko Parties, or either of them, via deductions from the amounts otherwise payable to Owner as consideration to be received by Owner under Section 3, above, of this Agreement.

5. **Payment to Owner**. The consideration to be received by Owner pursuant to Section 3, above, of this Agreement shall be paid by the Anadarko Parties to Owner before the end of the second (2nd) full calendar month following the calendar month in which Owner's Residue Gas was purchased by the Anadarko Parties and resold pursuant to this Agreement.

6. **Owner's Responsibility For Owner's Proportionate Share of Obligations Under the Commitment Agreements and the Rejected Commitment Agreements**. In support of the obligations of the Anadarko Parties set forth herein, Owner acknowledges that the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) have/has entered into, are/is entering into and/or will be entering into the Commitment Agreements set forth on Exhibit A, attached hereto, as the same may be amended from time to time. Such Commitment Agreements contain contractual obligations that may include, without limitation, gathering fees, treating fees, processing fees, transportation fees, minimum throughput/deficiency payment obligations, minimum volumetric supply commitments, demand charges, reservation fees, indemnities, representations and warranties, and other contractual undertakings (collectively, "Commitments"). Subject to Owner's right to approve (which approval shall be deemed to be given automatically with respect to the agreements addressed in Section 2.e, above, of this Agreement), in accordance with the terms and provisions of this Agreement, any Commitment Agreement entered into by any of the Anadarko Parties after Owner's actual execution date of this Agreement, Owner hereby agrees to bear and be responsible to the Anadarko Parties, the Marketing Anadarko Party and/or their affiliates for Owner's Proportionate Share of all Commitments, without duplication, under or pursuant to each and every of the Commitment Agreements. As of the Effective Date and at all times thereafter during the Term, and through the then-remaining respective terms, if any, of the Commitment Agreements entered into in compliance with this Agreement, Owner shall bear, and Owner shall be liable and fully responsible to the Anadarko Parties, the Marketing Anadarko Party and/or their affiliates for, Owner's Proportionate Share of all Commitments, without duplication, incurred by the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) under or pursuant to such Commitment Agreements. Owner's Proportionate Share of any Commitments under any such Commitment Agreements shall be included as "Other Costs" under Section 3.c, above, of this Agreement, and shall be eligible for deduction from the payment hereunder to Owner of otherwise applicable proceeds thereunder. If any such Commitments are not so deducted from otherwise applicable proceeds payable to Owner, the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) shall invoice Owner for any amounts owed pursuant to Owner's Proportionate Share of any such Commitments. Owner shall pay any such invoice within thirty (30) days after receipt of such invoice. If the Anadarko Parties, the Marketing Anadarko Party and/or any of their affiliates receives any refund of any Commitment previously paid by Owner and the Anadarko Parties, the Marketing Anadarko Party and/or their affiliates, the Anadarko Parties shall promptly pay Owner, or cause Owner to be promptly paid, Owner's Proportionate Share of such refund. Within thirty (30) days after the end of each quarter during the Term (ending on March 31, June 30, September 30, and December 31 of each such year), the Anadarko Parties shall provide Owner with a written update regarding the status, including the partial or complete satisfaction of any deficiencies, of all outstanding Commitments.

Each and every of the foregoing provisions of this Section 6 of this Agreement shall be equally applicable to all Rejected Commitment Agreements, if any; provided, however, that Owner shall no longer bear or be bound by, liable and fully responsible for Owner's Proportionate Share of all Commitments under or pursuant to any such Rejected Commitment Agreement(s) if, as and when, but only to the extent that, Owner, in accordance with the provisions of this Agreement, begins to take in kind "Owner's Excess Residue Gas" (as that term is defined in Section 7, below, of this Agreement), if any, that is attributable to any such Rejected Commitment Agreement(s).

7. **Right to Take in Kind**. Subject to the written notice requirements set forth, below, in this Section 7 of this Agreement, if and to the extent a portion of Owner's Residue Gas is not committed to



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

the fulfillment of, or is not being used to fulfill, the Commitments under or pursuant to the Commitment Agreements and the Rejected Commitment Agreements (such portion of Owner's Residue Gas hereinafter being referred to as "Owner's Excess Residue Gas"), Owner shall have the right, upon the delivery thereof to the applicable Delivery Point, to transport and market Owner's Excess Residue Gas at and from the Delivery Points; provided, however, such right may only be exercised by Owner if and to the extent the same is not prohibited by applicable law or the terms and conditions of the Commitment Agreements or the Rejected Commitment Agreements and if and to the extent Owner's exercise of such right will not cause the Anadarko Parties, the Marketing Anadarko Party or any of their affiliates to fail to meet any Commitment(s) under any of the Commitment Agreements or the Rejected Commitment Agreements. In the event of any such exercise of entitlement, Owner will retain title to Owner's Excess Residue Gas at the Delivery Points, obtain its own transport for and market such Owner's Excess Residue Gas, and be responsible for the payment of Royalties and Taxes, and any other taxes based on production, on such Owner's Excess Residue Gas, and all costs and expenses associated with the transportation and marketing of such Owner's Excess Residue Gas. Notice of Owner's intent to exercise its right to take in kind pursuant to the provisions of this Section 7 shall be in the form of a written notice from Owner to the Anadarko Parties given at least twelve (12) months before the date that Owner desires to take a specific amount of Owner's Excess Residue Gas in kind. If, pursuant to the provisions of this Agreement, any existing or future agreement that would become, if approved in writing by Owner, a Commitment Agreement hereunder is provided by the Anadarko Parties to Owner pursuant to Section 2.c. and/or Section 2.d. of this Agreement, for Owner's approval, and Owner timely rejects in writing or is deemed to have rejected such existing or future agreement, which agreement would then be deemed to be a Rejected Commitment Agreement hereunder, the Anadarko Parties will have the right, but not the obligation, to provide notice to Owner that, beginning twelve (12) months from the date of such notice to Owner, Owner will have to take in kind, and Owner hereby agrees that it will so take in kind, pursuant to the provisions of this Section 7 of this Agreement, Owner's Excess Residue Gas, if any, that is attributable to such Rejected Commitment Agreement.

Within ninety (90) days after the receipt by the Anadarko Parties of notice of Owner's intent to exercise its right to take in kind pursuant to the foregoing provisions of this Section 7, the Anadarko Parties and Owner shall meet to discuss in good faith the specifics of such exercise.

8. **Representations by Owner**. Owner represents and warrants to the Anadarko Parties that at all times during the Term:

a. the Anadarko Parties and/or the Marketing Anadarko Party, upon the purchase of Owner's Proportionate Share of the raw natural gas production stream from the Wells or Owner's Residue Gas, whichever is applicable, shall have good and merchantable title to Owner's Proportionate Share of the raw natural gas production stream from the Wells or Owner's Residue Gas, whichever is applicable, free and clear of all liens, encumbrances and claims;

b. its gross working interest is undedicated to or fully released from any marketing agreement(s) related to the Wells and/or Owner's Residue Gas and the Anadarko Parties and/or the Marketing Anadarko Party shall have the sole right to purchase and resell Owner's Residue Gas; and

c. subject to Owner's right to approve any Commitment Agreement entered into by any of the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) after Owner's actual execution date of this Agreement (which approval shall be deemed to be given automatically with respect to the agreements addressed in Section 2.e, above, of this Agreement), it will bear and be financially responsible to the Anadarko Parties, the



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

Marketing Anadarko Party and/or their affiliate(s) for Owner's Proportionate Share of all Commitments, without duplication, under or pursuant to all Commitment Agreements and, subject to the provisions of Section 6, above, of this Agreement, all Rejected Commitment Agreements made by the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) in compliance with this Agreement.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, OWNER SHALL RELEASE, INDEMNIFY, DEFEND AND HOLD THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY AND ALL OF THEIR AFFILIATES, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES, HARMLESS FROM AND AGAINST ALL SUITS, ACTIONS, DEBTS, ACCOUNTS, COSTS, DAMAGES (OF ANY KIND OR TYPE), CHARGES, FINES, PENALTIES, LOSSES, JUDGMENTS, LIABILITIES, AND/OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) ARISING FROM OR OUT OF ADVERSE CLAIMS OF ANY PERSON OR ENTITY TO OWNER'S PROPORTIONATE SHARE OF THE RAW NATURAL GAS PRODUCTION STREAM FROM THE WELLS OR TO OWNER'S RESIDUE GAS.**

9. <u>Indemnification</u>. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, OWNER SHALL BE LIABLE FOR, AND HEREBY RELEASES, INDEMNIFIES, DEFENDS AND HOLDS HARMLESS THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY, AND ALL OF THEIR AFFILIATES, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (THE "ANADARKO INDEMNITEES") FROM AND AGAINST, A PERCENTAGE ("OWNER'S SECTION 9 INDEMNIFICATION PERCENTAGE"), WHICH PERCENTAGE SHALL BE EQUAL TO ONE HUNDRED PERCENT (100%) OF OWNER'S PROPORTIONATE SHARE OF ALL NATURAL GAS PRODUCTION PRODUCED FROM THE WELLS ON THE PROPERTIES, OF ANY AND ALL SUITS, ACTIONS, DEBTS, ACCOUNTS, COSTS, CHARGES, DAMAGES OF ANY KIND OR TYPE (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR PERSONAL INJURY OR DEATH AND DAMAGES TO PROPERTY, ENVIRONMENTAL OR OTHERWISE, AND THIRD PARTY CONSEQUENTIAL DAMAGES), FINES, PENALTIES, LOSSES, JUDGMENTS, LIABILITIES AND/OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) (COLLECTIVELY, "CLAIMS") ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF OWNER ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, IN WHICH CASE OWNER'S INDEMNITY OBLIGATION UNDER THIS SECTION 9 OF THIS AGREEMENT SHALL INCREASE FROM OWNER'S SECTION 9 INDEMNIFICATION PERCENTAGE, AS DEFINED ABOVE IN THIS SECTION 9, TO ONE HUNDRED PERCENT (100%) OF ANY SUCH CLAIM OR CLAIMS.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THE ANADARKO PARTIES SHALL BE JOINTLY AND SEVERALLY LIABLE FOR, AND HEREBY RELEASE, INDEMNIFY, DEFEND AND HOLD HARMLESS OWNER, AND ALL OF ITS AFFILIATES, AND EACH OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (THE "OWNER INDEMNITEES") FROM AND AGAINST, A PERCENTAGE ("THE ANADARKO PARTIES' SECTION 9 INDEMNIFICATION PERCENTAGE"), WHICH PERCENTAGE SHALL BE EQUAL TO ONE HUNDRED PERCENT (100%) OF THE ANADARKO PARTIES' PROPORTIONATE SHARE OF ALL NATURAL GAS PRODUCTION PRODUCED FROM THE WELLS ON THE PROPERTIES, OF ANY AND ALL SUITS, ACTIONS, DEBTS, ACCOUNTS,**


HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

COSTS, CHARGES, DAMAGES OF ANY KIND OR TYPE (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR PERSONAL INJURY OR DEATH AND DAMAGES TO PROPERTY, ENVIRONMENTAL OR OTHERWISE, AND THIRD PARTY CONSEQUENTIAL DAMAGES), FINES, PENALTIES, LOSSES, JUDGMENTS, LIABILITIES AND/OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER COSTS OF LITIGATION) (COLLECTIVELY, "CLAIMS") ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE UNCURED MATERIAL BREACH, THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE ANADARKO PARTIES ARISING UNDER, IN CONNECTION WITH OR PERTAINING OR RELATING TO THIS AGREEMENT OR ANY COMMITMENT AGREEMENT OR ANY REJECTED COMMITMENT AGREEMENT, IN WHICH CASE THE ANADARKO PARTIES' INDEMNITY OBLIGATION UNDER THIS SECTION 9 OF THIS AGREEMENT SHALL INCREASE FROM THE ANADARKO PARTIES' SECTION 9 INDEMNIFICATION PERCENTAGE, AS DEFINED ABOVE IN THIS SECTION 9, TO ONE HUNDRED PERCENT (100%) OF ANY SUCH CLAIM OR CLAIMS.

AS USED IN THIS AGREEMENT, THE TERM "REGARDLESS OF FAULT" MEANS WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, WITHOUT LIMITATION, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE, WHETHER SIMPLE, GROSS, SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE OR OTHERWISE, WILLFUL MISCONDUCT, UNCURED MATERIAL BREACH, STATUTORY LIABILITY, STRICT LIABILITY OR OTHER FAULT OF OWNER OR THE ANADARKO PARTIES. FURTHER, AS USED IN THIS AGREEMENT, THE TERM "UNCURED MATERIAL BREACH" SHALL MEAN A MATERIAL BREACH OF THIS AGREEMENT THAT IS NOT CURED BY THE BREACHING PARTY WITHIN THIRTY (30) DAYS FOLLOWING THE BREACHING PARTY'S RECEIPT OF WRITTEN NOTICE FROM THE NON-BREACHING PARTY OF THE ALLEGED MATERIAL BREACH IN QUESTION; PROVIDED, HOWEVER, THAT IF THE EXISTENCE OF AN ALLEGED MATERIAL BREACH IS DISPUTED BY THE ALLEGED BREACHING PARTY, THE ABOVE-REFERENCED 30-DAY CURE PERIOD SHALL BE TOLLED IN ITS ENTIRETY UNTIL SUCH DISPUTE IS RESOLVED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SECTION 16 OF THIS AGREEMENT.

10. __Disclaimer of Representations by Anadarko Parties__. Owner hereby acknowledges and agrees that no express or implied representation or warranty is or has been made by the Anadarko Parties, the Marketing Anadarko Party or their affiliate(s), or any of them, concerning or relating to the price to be paid for Owner's Residue Gas. Further, Owner hereby acknowledges and agrees that (i) it has not relied upon any statements, representations or warranties (whether written or oral) made by the Anadarko Parties, the Marketing Anadarko Party or their affiliate(s), or any of them, when entering into this Agreement, (ii) it has entered into this Agreement based upon its own independent business judgment and its own experience in energy markets and the energy industry, and (iii) this Agreement was a result of arm's length negotiations between the Anadarko Parties, the Marketing Anadarko Party and/or their affiliate(s) and Owner.

11. __Changes in Owner's Ownership__. Owner shall be solely responsible for notifying the Anadarko Parties in writing of any changes in the ownership of, or rights to, Owner's Residue Gas or the proceeds derived from the marketing thereof. The Anadarko Parties, the Marketing Anadarko Party and their affiliate(s) shall not be bound by any changes in such ownership or rights until they are so notified as provided in this Agreement and any such notice has actually been received.

12. **Miscellaneous**. In the event a court of competent jurisdiction determines that any provision contained in this Agreement is violative of any law or regulation, such provision shall be deemed stricken from the Agreement without affecting the enforceability of the remainder of the Agreement; provided, however, any such provision shall not be deemed stricken to the extent striking such provision would materially alter the economic benefits any Party derives from this Agreement; provided further, however, in the event striking any such provision would materially alter the economic benefits of this Agreement, the Parties agree to negotiate in good faith to amend such provision in order to maintain both the enforceability of this Agreement and the economic benefits derived by the Parties in substantially the same form and substantially to the same degree as derived from this Agreement in its original form. This Agreement, including any Exhibits hereto, may be amended only by a written instrument executed by all of the Parties to this Agreement. The Parties hereto agree that each and every of the Exhibits attached hereto are part of this Agreement. This Agreement shall be governed by the laws of the State of Texas, notwithstanding any conflicts of laws rules or principles that might require the application of the laws of another jurisdiction. This Agreement shall be binding upon the Parties hereto, and their permitted successors and permitted assigns; provided, however, that no transfer of this Agreement shall be made without the prior written consent of the other Party(ies) hereto, which consent may not be unreasonably withheld or delayed. If any transfer or assignment of this Agreement pertains to only a part, as opposed to the entirety, of the interest, rights and obligations of the transferring/assigning Party (a "Partial Transfer"), the transferring/assigning Party, as a condition precedent to any such transfer or assignment, will specifically declare in writing to the non-transferring/assigning Party the exact percentage of the transferring/assigning Party's interest, rights and obligations hereunder covered by any such Partial Transfer. Waiver by any Party of performance of any obligation or term or provision contained in this Agreement, or waiver by any Party of another Party's default hereunder will not operate as a waiver of performance of any other obligation or term or provision of this Agreement or a future waiver of the same obligation, term or provision or a waiver of any future default. In the event of a conflict between the terms and conditions of this Agreement and the Joint Exploration Agreement referenced in the first WHEREAS clause above, the terms and conditions of this Agreement shall prevail. Notwithstanding anything to the contrary contained herein, if any of the royalty payment provisions of the individual oil and gas leases pertaining to the Properties conflict with the terms and conditions of this Agreement, the royalty provisions of such leases will prevail. The headings contained in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement. Except as otherwise expressly set forth herein, this Agreement is intended only to benefit the Parties hereto and their respective permitted successors and permitted assigns. This Agreement may be executed in duplicate originals or counterparts, each of which, when taken with all other counterparts, shall constitute a binding agreement between the Parties hereto. An executed facsimile or .PDF counterpart of this Agreement shall be sufficient to bind a Party hereto to the same extent as an original. This Agreement, including all Exhibits hereto, contains the entire agreement and understanding between the Parties relating to the matters covered hereby, and any agreements, representations, correspondence, or other statements entered into or made by a Party prior to the Effective Date relating to the matters covered hereby shall be superseded by the terms and conditions hereof.

13. **Adjustment to Marketing Fee**. In the event Owner assigns all or a portion of its interest, rights and obligations under this Agreement pursuant to the terms and conditions of Section 12 hereof, then the Monthly Residue Gas Marketing Fee provided for in Section 4 hereof shall be adjusted as follows:

a. If Owner assigns all of its interest, rights and obligations under this Agreement to one assignee, then the Monthly Residue Gas Marketing Fee shall remain unchanged;



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

b. If Owner assigns all of its interest, rights and obligations under this Agreement to more than one assignee, then the total Monthly Residue Gas Marketing Fee to be paid by the assignees shall be an amount equal to (x) the Monthly Residue Gas Marketing Fee multiplied by (y) the Total Assignment Escalation Factor;

c. If Owner assigns a portion of its interest, rights and obligations under this Agreement to one or more assignees, then (i) the aggregate Monthly Residue Gas Marketing Fee shall be split among and paid by the assignees and Owner; (ii) the assignees' share of the Monthly Residue Gas Marketing Fee (the "Assignees' Monthly Residue Gas Marketing Fee") shall be an amount equal to (x) the Assignees' Monthly Residue Gas Marketing Fee multiplied by (y) the Partial Assignment Escalation Factor; and (iii) Owner's share of the Monthly Residue Gas Marketing Fee (the "Owner's Monthly Residue Gas Marketing Fee") shall not be subject to any escalation fee; and

d. Notwithstanding the foregoing, if (A) Owner assigns a portion of its interest, rights and obligations under this Agreement in connection with a transfer or conveyance of an interest in the Properties that is not an undivided interest in all of the Properties, or (B) if the Owner seeks to assign all or a portion of its interest, rights and obligations under this Agreement to more than three assignees pursuant to a single assignment or a series of assignments, then the Anadarko Parties, the Owner, and the particular assignee(s) in question shall negotiate a new Monthly Residue Gas Marketing Fee in good faith based on market conditions in existence at the time of the particular assignment that triggers the good faith negotiation provisions of this Section 13.d.

e. For purposes of this Agreement, "Total Assignment Escalation Factor" shall mean an amount equal to the sum of (A) the product of (x) the number of assignees minus [redacted] *times* (y) [redacted] and (B) [redacted].

f. For purposes of this Agreement, "Partial Assignment Escalation Factor" shall mean an amount equal to the sum of (A) the product of (x) the number of assignees *times* (y) [redacted] and (B) [redacted]

14. __Payment of Taxes and Royalties__. As to the payment by the Anadarko Parties of Owner's Proportionate Share of Taxes and Royalties, the **ANADARKO PARTIES DO NOT THEREBY ASSUME LIABILITY FOR OWNER'S TAXES OR ROYALTIES AND NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS AN ASSUMPTION BY THE ANADARKO PARTIES, THE MARKETING ANADARKO PARTY OR THEIR AFFILIATE(S) OF SUCH LIABILITIES.** Owner shall be responsible for any additional amounts owed for Taxes or Royalties on Owner's Residue Gas by virtue of specific lease or other contractual provisions or legal requirements. The Anadarko Parties, the Marketing Anadarko Party and their affiliate(s) make no representation or warranty regarding their/its methods of payment of Taxes and Royalties and shall not be liable to Owner or any third parties for any claims relating to such methods. **SUBJECT TO THE ANADARKO PARTIES' COMPLIANCE WITH THE LAST SENTENCE OF THIS SECTION 14, OWNER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND HOLD THE ANADARKO INDEMNITEES, AS THAT TERM IS DEFINED IN SECTION 9, ABOVE, OF THIS AGREEMENT, HARMLESS FROM AND AGAINST ALL CLAIMS THAT ARISE FROM OR OUT OF, OR ARE RELATED TO, THE PAYMENT BY THE ANADARKO PARTIES OF OWNER'S PROPORTIONATE SHARE OF TAXES AND ROYALTIES ON OWNER'S RESIDUE GAS FROM THE WELLS, INCLUDING, BUT NOT LIMITED TO, CLAIMS BY GOVERNMENT AUTHORITIES, OWNERS OF ROYALTY, OVERRIDING ROYALTY, RESIDUE GAS PAYMENTS, NATURAL GAS PRODUCTION PAYMENTS, WORKING INTERESTS, TRANSPORTERS OR OTHER CLAIMANTS, REGARDLESS OF FAULT, UNLESS ANY SUCH CLAIM OR CLAIMS RESULT(S) FROM THE SOLE**