United States District Court
Southern District of Texas
**ENTERED**
February 22, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:23-CV-00587 |
| | § | |
| SN EF MAVERICK LLC, *et al.*, | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

This is an appeal from the United States Bankruptcy Court for the Southern District of Texas, bankruptcy case number 19-34508. This oil and gas contract dispute between appellant, Carnero G&P, LLC ("Carnero"), and the numerous appellees arises from SN EF Maverick, LLC's ("Maverick") Chapter 11 reorganization. After the reorganization plan was confirmed, Carnero sued the appellees in state court for contract claims based on actions connected to Maverick's reorganization plan. The appellees removed the case to the bankruptcy court, which granted the appellees' motion for judgment on the pleadings. Carnero now appeals pursuant to 28 U.S.C. § 158. This Court **AFFIRMS** the bankruptcy court.

## II.  FACTUAL BACKGROUND

*The Comanche Assets Under Anadarko*

This case concerns oil and gas assets in South Texas called the "Comanche Assets." Before 2017, the Comanche Assets were owned and operated by Anadarko[1] and other non-operating "Working Interest Parties," ("WIPs," including appellees Eagle Ford, Venado,[2] and Mitsui) who were parties to purchase and marketing agreements with Anadarko. As the operator, Anadarko flowed most of the Comanche gas to its affiliate, Springfield Pipeline, LLC for gathering. Springfield then sent the gas to either the Brasada Plant or the ETC Plant for processing. We call Anadarko's arrangements to operate the Comanche Assets the "Comanche Midstream Agreements."

In 2017, Anadarko sold its interests to Maverick, UnSub, and Gavilan Resources, LLC ("Gavilan").[3] The sale required the purchasers to assume the agreements with the WIPS or continue operating the Comanche Assets. Maverick also entered into additional marketing agreements with UnSub and Gavilan. But not everyone was pleased with the acquisition. Some counterparties to the gathering and process agreements under the old Anadarko regime did not consent to the assignment of their contracts to Maverick, Gavilan, and UnSub (we call these agreements between the parties the "Retained Agreements"). The solution was an agency agreement in which Maverick fulfilled Anadarko's obligations under the Retained Agreements. This effectively kept the old Anadarko regime in place with Maverick stepping in to operate it.

---

[1] Technically, the Comanche Assets were operated by Anadarko E&P Offshore LLC and Kerr-McGee Oil and Gas Onshore LP. But the parties and the bankruptcy court refer only to Anadarko, which is sufficient for purposes of this appeal.

[2] Now known as Javelin EF LP.

[3] Mesquite Energy, Inc. is the new name of the reorganized debtor, formerly Sanchez Energy Corporation; Appellee Mesquite Comanche Holdings, LLC inherited its position from Gavilan.

2

*The Carnero Agreement*

In 2018, Maverick entered into a "backup midstream agreement" for the Comanche Assets with Carnero (the "Carnero Agreement"). The Carnero Agreement dedicated to Carnero, Comanche gas that was not already committed to Brasada or ETC (we refer to gas already committed to Brasada or ETC as the "Existing Commitments," which include the Retained Agreements). In other words, any gas that the Comanche Assets produced that was not already committed to ETC and Brasada would go to Carnero, with two qualifications. Section 3.1(b) of the Carnero Agreement excludes oil and gas that is subject to the Existing Commitments only until: 1) the term of the Existing Commitment has expired; or 2) the earliest time at which the Existing Commitments may be terminated without out-of-pocket costs. Section 3.1(b) also gives Carnero an option to purchase certain natural gas processed by Brasada, on two conditions: 1) the existing purchase right has expired; and 2) purchase and delivery must occur at the same place where the former purchaser received delivery. UnSub, Maverick, Gavilan, Eagle Ford, and Venado ratified the Carnero Agreement, while Mitsui signed a letter agreement authorizing Maverick to process Mitsui's Comanche gas under the Carnero Agreement.

*Bankruptcy and The Plan*

Maverick and Sanchez (Mesquite's prebankruptcy moniker) both filed for Chapter 11 bankruptcy protection in August 2019. To avoid the threat of a Chapter 7 liquidation, Maverick proposed a reorganization plan (the "Plan") described by the parties and the bankruptcy court as "somewhat unorthodox," "unusual," and "unique." What made the Plan so different was a provision that allowed the debtors to assume or reject executory contracts after the Plan's effective date had passed. Although the decision would be made

3

post-confirmation, any amendments and assumptions would be effective as of the Effective Date of the Plan and would retain their prepetition nature. The debtors could move contracts back and forth from the "assumed" list to the "rejected" list until a specified objection deadline had passed or a timely objection was resolved. The bankruptcy court confirmed the Plan on April 30, 2020. The ultimate objection deadline was June 22, 2020. At no point did Carnero object to the Plan.[4]

### The Midstream Settlement and the First Carnero Lawsuit

Post-confirmation, various settlements and amendments affected the structure of the agreements surrounding the Comanche Assets. These agreements were eligible for the debtors' assumption thanks to the "unique" Plan provision permitting post-confirmation assumption. First, Gavilan sold its interests in the Comanche Assets to MCom.[5] Second, Maverick assumed the WIP Agreements as "an essential component of the reorganized debtors' decision to assume the Existing Commitments" in December 2021.

Third and most importantly, in June 2020, Carnero supported the debtors' entrance into the "Midstream Settlement." Under the Midstream Settlement, the debtors would amend and assume the Carnero Agreement and attempt to reject the Comanche Midstream Commitments. This would promote Carnero from backup to primary Comanche gas processor. But after the debtors tried and failed to reject the Comanche Midstream Agreements, the settlement fell apart.

With the Midstream Settlement defunct, the debtors set out to "negotiate improved terms with its primary midstream providers." This vexed Carnero, who believed that these

---

[4] As will be discussed later, neither Carnero nor anyone else objects to the Plan. Thus, the propriety of the Plan is not before the Court.
[5] Gavilan did not assign the Comanche Purchase Agreement to MCom.

4

negotiations would benefit Brasada and ETC at the expense of its own rights to Comanche gas. Carnero sued the appellees in Texas state court in July 2021, seeking a declaration that the Carnero Agreement obligated the appellees to pursue rejection of certain Comanche Midstream Agreements under Section 365 of the Bankruptcy Code. The appellees removed the case to the bankruptcy court. Carnero moved to remand or abstain. At a hearing, the bankruptcy court noted that it would likely deny Carnero's motion because the complaint specifically invoked the bankruptcy court's authority under Section 365. Carnero asked to amend its complaint. But instead of amending, Carnero voluntarily dismissed its complaint without prejudice.

*The Midstream Restructuring*

The midstream negotiations that perturbed Carnero culminated in the Master Settlement Agreement ("MSA"), effectuating the "Midstream Restructuring."[6] Under the Midstream Restructuring, the debtors assumed the Existing Commitments, along with "amendments designed to ensure the stability of the reorganized debtors." The Working Interest Parties joined in this settlement and consented to the MSA actions. Additionally, Maverick and MCom accepted an assignment of the Brasada Agreement from Anadarko.

As Carnero's first lawsuit indicates, these negotiations were not unknown to Carnero. In October 2021, the debtors announced that they had reached an agreement in principle to amend and assume the Comanche Midstream Agreements. On December 21, Carnero attended a hearing where the bankruptcy court considered the MSA. Carnero neither objected nor asked to view any documents, nor preserved its right to object later.

---

[6] Not to be confused with the failed Midstream Settlement.

5

The bankruptcy court approved the settlement, with several modifications. Ultimately, the settlement confirmed that the parties would dismiss pending litigation and assume the Comanche Midstream Agreements "as of the Effective Date of the Plan." The settlement specified assumed agreements and noted agreements that had been amended.

*The Second Carnero Lawsuit*

Despite its silence at the December 21 hearing, Carnero sued the appellees again in state court a few weeks later. Carnero brought claims under the Carnero Agreement, the Ratification Agreements, and the Mitsui Letter Agreement. As in its first lawsuit, the basis of Carnero's concern was a fear of losing gas to Brasada and ETC under the Midstream Restructuring. Again, the appellees removed the case to the bankruptcy court, and again, the court denied Carnero's motion to remand or abstain.

The appellees soon filed a motion for judgment on the pleadings. Seventeen of the attached exhibits were sealed and had not been viewed by Carnero. The bankruptcy court allowed only Carnero's counsel—including its in-house counsel—to access the sealed exhibits, while denying Carnero's request to have its business representatives view the redacted files. The bankruptcy court then permitted Carnero to amend its complaint. The appellees responded with their second motion for judgment on the pleadings. After a six-hour hearing, the bankruptcy court granted the appellees' motion and entered judgment in their behalf. Carnero now appeals.

*The Bankruptcy Court's Opinion*

The bankruptcy court wrote a thorough opinion explaining its decision. First, the court reaffirmed its jurisdiction, determining that it had both "core" and "related-to"

6

jurisdiction. Second, the court explained that neither mandatory nor permissive abstention applied. Third, the court concluded that the April 30, 2020, Reorganization Plan barred Carnero's claims because Carnero had not objected to the Master Settlement Agreement's assumption, or attempted to preserve its right to object. In the alternative, the court held that Carnero's claims failed as a matter of law; legally speaking, the restructuring and the Carnero Agreement's assumption occurred simultaneously, so the Midstream Restructuring could not have caused a default of the Carnero Agreement. Moreover, the court determined that the terms of the Carnero Agreement were unchanged by the Midstream Restructuring. Finally, the court held that Carnero's theory of an implied duty to cooperate does not apply to the contracts at issue. Accordingly, the bankruptcy court denied Carnero's requests for a declaratory judgment and attorney fees.

Carnero's appeal asks this Court to answer six questions: 1) Did the bankruptcy court err in denying Carnero's motion to remand the case to state court or abstain? 2) Did the bankruptcy court err in concluding that the Plan bars Carnero's claims? 3) Did the bankruptcy court err in refusing to allow Carnero's business representatives to review the sealed documents? 4) Did the bankruptcy court fail to properly apply the standards governing a motion for judgment on the pleadings? 5) Did the bankruptcy court err in granting judgment on the pleadings and holding there was no breach of the Carnero Agreement, nor a breach of the duties of good faith or cooperator, nor a right to declarative relief? 6) Did the bankruptcy court err in denying Carnero recovery of its attorney fees?

Because we answer questions 1 and 2 in the negative, we need not address questions 4 through 6.

7

### III.    CONTENTIONS OF THE PARTIES

Carnero insists that the bankruptcy court lacks jurisdiction over its claims. Carnero characterizes its suit as a "garden-variety" contract dispute between ordinary businesses in the ordinary course. Carnero emphasizes that the MSA was a post-confirmation agreement that could not affect a bankruptcy estate, since the estate no longer existed post-confirmation. Accordingly, Carnero concludes that the bankruptcy court lacked jurisdiction and should have remanded or abstained.

Furthermore, Carnero maintains that the Plan does not bar its claims because the MSA, which allegedly extended the Existing Commitments and "ensured Carnero would never receive gas," did not exist before confirmation. Thus, Carnero's claims could not have been raised at confirmation. Finally, Carnero asserts that the bankruptcy court abused its discretion by depriving Carnero of its business representatives' input regarding the sealed exhibits.

The appellees respond that the bankruptcy court has jurisdiction because Carnero's lawsuit directly implicates the Plan's terms. The appellees argue that Carnero also implicates the bankruptcy court's jurisdiction by threatening a fragile settlement that is allegedly crucial to the debtors' success. Because the court has core jurisdiction and the bankruptcy issues outweigh state law concerns, the appellees conclude that the bankruptcy court should not abstain.

The appellees maintain that the Plan bars Carnero's claims because Carnero did not object to the Plan's provision for post-confirmation assumptions. Nor did Carnero attempt to preserve its right to object as other parties did. Finally, the appellees insist that Carnero forfeited any basis for making objections to the bankruptcy court's decision

8

regarding the sealed exhibits by assenting to the bankruptcy court's proposal to defer consideration.

## IV.    STANDARD OF REVIEW

District courts review questions of fact for clear error and conclusions of law *de novo*. *Matter of Cowin*, 864 F.3d 344, 349 (5th Cir. 2017). Thus, a bankruptcy court's jurisdiction is reviewed *de novo*, as is denial of a motion to remand. *Bell v. Thornburg*, 743 F.3d 84, 87 (5th Cir. 2014). We review denials of mandatory and permissive abstention for abuse of discretion, with underlying legal determinations reviewed *de novo*. *Bank One, N.A. v. Boyd*, 288 F.3d 181, 183-184 (5th Cir. 2002); *In re TXNB Internal Case*, 483 F.3d 292, 299 (5th Cir. 2007). The merits of a motion for judgment on the pleadings are also reviewed *de novo*. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002). Motions to seal or unseal documents are reviewed for abuse of discretion, which is "violated 'when [the court's] ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.'" *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 450 (5th Cir. 2019) (quoting *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016)). Finally, we review the unambiguous terms of a bankruptcy plan and confirmation order *de novo*. We defer to the bankruptcy court's reasonable interpretation of "truly ambiguous" plan terms. *In re Nat'l Gypsum Co.*, 219 F.3d 478, 484 (5th Cir. 2000).

## V.    ANALYSIS & DISCUSSION

The contentious issues in this case involve jurisdiction, abstention, Plan preclusion, and the merits of Carnero's claims. The Court need not reach the merits.

### A. Jurisdiction

"Jurisdiction is always first." *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021). Because this Court's jurisdiction relies on the bankruptcy court's, the Court must first verify that the bankruptcy court had jurisdiction. A "federal court may not rule on the merits of a case without first determining its jurisdiction." *Daves v. Dallas County*, 64 F.4th 616, 623 (5th Cir. 2023) (en banc).

Bankruptcy courts have subject matter jurisdiction through 28 U.S.C. § 1334. Section 1334 grants federal district courts jurisdiction over "all civil proceedings . . . related to" bankruptcy cases. *In re U.S. Brass Corp.*, 301 F.3d 296, 303-304 (5th Cir. 2002). A proceeding relates to a bankruptcy case if "the outcome of that proceeding could conceivably have any effect" on the debtor's estate. *Bass v. Denney* (*In re Bass*), 171 F.3d 1016, 1022 (5th Cir. 1999) (quotations omitted). "Related-to jurisdiction" therefore includes "any litigation" that "could alter the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *Collins v. Sidharthan* (*In re KSRP, Ltd.*), 809 F.3d 263, 266 (5th Cir. 2015).

This broad jurisdictional grant narrows once a plan is confirmed. Post-confirmation, bankruptcy jurisdiction is limited to matters "pertaining to the implementation or execution of the plan." *Matter of Chesapeake Energy Corp.*, 70 F.4th 273, 281 (5th Cir. 2023) (quoting *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001)). However, this jurisdiction includes matters that "impact compliance with or completion of the reorganization plan," as well as "any claims that attempt to 'subvert' a confirmed plan." *U.S. Brass Corp.*, 301 F.3d at 305 & *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 (5th Cir. 2008).

A recent Fifth Circuit case guides this analysis. In *In re GenOn Mid-Atl. Dev.,
L.L.C.*, 42 F.4th 523, 534 (5th Cir. 2022), a seller of a letter of credit filed state law contract
claims against a buyer whose parent company was in bankruptcy. Critically, the defendant
(the buyer) had not filed for bankruptcy, yet its parent company had confirmed its
reorganization plan before the lawsuit was filed. The dispute therefore represented a
contract dispute between two parties, neither of was a debtor or creditor in the parent's
bankruptcy, or parties to the contract at the center of the case.

Nonetheless, the *GenOn* court determined that the suit imperiled the subsidiary's
ability to fulfill commitments related to a global settlement between several parties to the
parent's restructuring. Because the claims "threatened to destabilize the fragile consensus
around a settlement crucial to the success of [the parent's] plan," the claims implicated
the "implementation and execution" of the plan. *Id.* The parent had not "fully
consummated" its plan; hence, the suits threatened to stall out the reorganization "short
of the finish line." *Id.* This threat provided related-to jurisdiction.

*GenOn's* analysis was guided by *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388,
391 (5th Cir. 2001). In *Craig's Stores*, the Fifth Circuit held that the bankruptcy court
lacked jurisdiction over a debtor's state law contract claims against its collection agent.
The court reasoned that the dispute principally dealt with post-confirmation relations
between the parties, that no claims or antagonism existed at the time of reorganization,
and that no law or facts deriving from the plan were necessary to the claim.
Notwithstanding, the court distinguished the case from precedent that supported post-
confirmation jurisdiction, noting that "the post-confirmation dispute at issue in this
appeal has nothing to do with any obligation created by the debtor's reorganization plan."

*Craig's Stores*, 266 F.3d at 391. Thus, *GenOn* distilled *Craig's Stores* to one "overarching question": Does the dispute pertain to the implementation or execution of the plan? *GenOn*, 42 F.4th at 534.

The present dispute centers on whether the defendants breached the Carnero Agreement by entering into the Midstream Restructuring. The bankruptcy court determined that the MSA was "a complicated and essential settlement among parties that was effectuated in accordance with Plan provisions under [the bankruptcy court's] supervision."[7]  It further opined that Carnero sought "to unravel a key component of the debtor's reorganization," which was "integral to the plan itself." Thus, the MSA evokes *Genon's* holding that jurisdiction exists where litigation "threatened to destabilize the fragile consensus around a settlement crucial to the success of the debtor's reorganization." *GenOn*, 42 F.4th 523 at 534.

Carnero does not argue that the MSA was not integral to the debtors' restructuring or that the MSA was approved by the Bankruptcy Court's authority under Section 365 of the Bankruptcy Code. Instead, Carnero contests actions taken in accordance with the Plan and that are critical to the debtor's reorganization. What's more, Carnero's rancor existed at the time of reorganization; Maverick and Carnero reached a tentative settlement a little over a month after the Plan was confirmed, before the agreement to amend and assume the MSA was announced. Thus, this dispute fits squarely into the bankruptcy court's related-to jurisdiction. *Craig's Stores*, 266 F.3d at 391.

---

[7] For the sake of clarity, we remind the reader that the Midstream Settlement Agreement ("MSA") is the document effectuating the Midstream Restructuring.

12

### B.  Mandatory Abstention

Carnero argues that this case is subject to both mandatory and permissive abstention and should therefore be remanded. 28 U.S.C. § 1334(c)(2) governs mandatory abstention:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

The Fifth Circuit construes this statute to mandate abstention if four requirements are met: "(1) [t]he claim has no independent basis for federal jurisdiction, other than § 1334(b); (2) the claim is a non-core proceeding; (3) an action has been commenced in state court; and (4) the action could be adjudicated timely in state court." *Matter of Rupp & Bowman Co.*, 109 F.3d 237, 239 (5th Cir. 1997).

The majority of courts—especially in this circuit—hold that the third factor is satisfied only if the state court claim precedes the bankruptcy petition. *In re: Longview Power, LLC*, 516 B.R. 282, 295 (Bankr. D. Del. 2014) ("The clear majority of cases supports the position that the cause of action must be pending in state court prior to the bankruptcy for mandatory abstention to apply."); *In re Houston Regional Sports Network, L.P.*, 514 B.R. 211, 214 (Bankr. S.D. Tex. 2014) ("Section 1334(c)(2) requires that a state court action must be commenced prior to the bankruptcy proceeding . . . Because the state-court action was filed post-petition, mandatory abstention is not warranted."); *Doe v. Roman Cath. Church of Archdiocese of New Orleans*, 588 F. Supp. 3d 698 (E.D. La. 2022); 1 *Collier on Bankruptcy,* ¶ 3:05[2] ("[M]any courts have held that

13

for [mandatory abstention] to be applicable, the cause of action must have been commenced prior to the filing of the petition commencing the title 11 cases.").

Carnero's claim was filed after the petition date. Because Carnero must satisfy each factor to invoke mandatory abstention, the Court's analysis ends here. Although the bankruptcy court based its decision on the second factor—which we do not address—we nonetheless affirm its decision to deny mandatory abstention. "A reviewing court may 'affirm for any reason supported by the record, even if not relied on by the [lower] court.'" *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009).

### C. Permissive abstention

Maverick asserts that Carnero's permissive abstention argument "is so perfunctory that it is not properly presented." This is not an unfair characterization of Carnero's lone paragraph devoted to the argument, which does not articulate a single factor counseling abstention. Moreover, Carnero's reply brief does not develop the argument. Nevertheless, we review the bankruptcy court's decision not to abstain for an abuse of discretion. *Bank One, N.A. v. Boyd*, 288 F.3d 181, 183 (5th Cir. 2002).

Abstention is the exception, not the rule. *Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 813. Permissive abstention is governed by 28 U.S.C. § 1334(c)(1): "[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." Because permissive abstention is "informed by principles developed under the judicial abstention doctrines . . . courts have usually looked to these well-developed notions of judicial abstention when applying section 1334(c)(1)." *In re Pan Am. Corp.*,

950 F.2d 839, 845 (2d Cir.1991); *see Baumgart v. Fairchild Aircraft Corp.,* 981 F.2d 824, 833 (5th Cir.). These notions include:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.,* 6 F.3d 1184, 1189 (7th Cir. 1993) (quoting *In re Tucson Estates, Inc.,* 912 F.2d 1162, 1167 (9th Cir.1990)). "Courts should apply these factors flexibly, for their relevance and importance will vary with the particular circumstances of each case, and no one factor is necessarily determinative." *Id.*

The bankruptcy court examined the permissive extension factors during a hearing, explaining its reasoning for each factor. Carnero's only argument that the bankruptcy court erred in its refusal to permissively abstain, is based on the bankruptcy court's alleged misunderstanding of the relationship between Carnero's claims and the Plan. Assuming that fact to be true, that does not mean that the court abused its discretion by failing to balance the factors. Carnero has not identified any specific factors that the bankruptcy court weighed improperly; hence, there is nothing more to be said. The bankruptcy court did not abuse its discretion in refusing to permissively abstain.

*D. The Plan Bars Carnero's Claims*

This case strains the legal fiction of simultaneous assumption under Section 365. However, neither party objects to or addresses the source of the strain—the Plan's allowance of assumption and amendment post-effective date. Indeed, Carnero "does not contest the Plan or argue that confirmation of the Plan should be reversed." Instead, Carnero challenges only the "bankruptcy court's *interpretation* of the Plan."

Despite its characterizations, Carnero's challenges fundamentally attack the Plan rather than its interpretation. Indeed, adopting Carnero's theory compels the conclusion that the Plan is invalid—specifically, that the Plan's definition of executory contracts is improper. Carnero's argument cuts against the Plan when it argues that the Plan cannot redefine executory contracts. However, the Plan states that "each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract." Yet, Carnero argues that "Section 365 does not apply where the debtor-in-possession and the non-debtor party to an executory contract mutually and voluntarily modify the contract in the ordinary course of business"—a direct contradiction. The agreements at issue here fit within the Plan's definition of executory contracts. Carnero cannot now object to this conception of executory contracts, having waived its right to do so at the time. Now that the Plan is confirmed, Carnero must live with it. *See In re Burton Sec. S.A.*, 202 B.R. 411, 419 (S.D. Tex. 1996) ("[O]nce a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining the plan are entitled to res judicata effect."); *In re Optical Techs., Inc.*, 425 F.3d 1294, 1301 (11th Cir. 2005) ("[A]ppellants cannot raise objections to the actual terms of the Fourth

16

Amended Plan or the confirmation order, as these were deemed waived when they failed to object to confirmation.").

Carnero never objected to the assumption of any contract affecting its rights in the bankruptcy court. Nor did it attempt to preserve its right to object later. Carnero insists that the Plan's process for objections does not apply because the process applies only to objections regarding executory contracts, which the MSA is not. The most fundamental problem with this argument is that it does not matter; the bankruptcy court determined the contracts to be executory contracts, and Carnero knew that the bankruptcy court thought so and did not object. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (holding that a party with actual notice of the plan and its confirmation "forfeited its arguments regarding the . . . adequacy of the Bankruptcy Court's procedures by failing to raise a timely objection in that court."). An order predicated upon a legal error remains enforceable and binding if the party had notice of the error and failed to object or timely appeal. *Id.* Thus, even if the bankruptcy court did commit error regarding the Plan, Carnero cannot now obtain relief. For this reason, we need not address the bankruptcy court's analysis of the merits of Carnero's claims.

It is worth noting that Carnero's conduct contemporaneous with the confirmation of the Plan does not comport with its present view of executory contracts. Carnero had no qualms with the Plan's procedures when it benefitted Carnero. Indeed, Carnero attempted to leverage those procedures for its own advantage by supporting the Midstream Settlement post-confirmation. That agreement postdated confirmation and would have required the debtors to seek rejection of several midstream contracts and assume an amended Carnero Agreement. Now that the tables are turned, Carnero takes

17

issue. As the bankruptcy court wrote, "Carnero cannot strategically choose to not exercise its bankruptcy rights during the bankruptcy case and later reframe an objection to the assumption of a contract as a post-petition claim for breach."

Carnero's next argument that the bankruptcy procedures do not apply does not find favor. Carnero argues that the MSA could not have been assumed because it was not effective until after the petition. Carnero is correct that the Plan provides that agreements may stipulate around the Plan's default rule:

> Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

However, the Plan also states that:

> Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

Therefore, even if an agreement provides that it becomes effective sometime after the petition or the Effective Date, it does not change the agreement's prepetition nature, as long as they "in any manner affect" other executory contracts. To the extent that the effect of these combined provisions is ambiguous, we defer to the bankruptcy court's reasonable interpretation of "truly ambiguous" plan terms. *In re Nat'l Gypsum Co.*, 219 F.3d 478, 484 (5th Cir. 2000). Regardless, Carnero's failure to timely dispute these aspects of the Plan means that these objections are too late and cannot be revisited by this appeal. Carnero remains bound by the Plan.

18

E. *Due Process*

Next, Carnero argues that barring its claims violates "due process." Carnero, therefore, seeks relief under both FRCP 60(b)(4) and FRCP 60(d)(1). FRCP 60(b)(4) grants courts leave to "relieve a party or its legal representative from a final judgment, order, or proceeding" if "the judgment is void." A judgment is void if it violates due process. Note that "Rule 60(b)(4) does not provide a license for litigants to sleep on their rights." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010).

The Court holds that Carnero's arguments under FRCP 60(b)(4) do not avail. Carnero cites *Espinosa* for the proposition that "[d]ue process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Espinosa*, 559 U.S. at 272 (quoting *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314, (1950)). In that same case, the Supreme Court obstructs Carnero's argument. As explained above, in *Espinosa* the Court held that a party with "*actual* notice of the plan and its confirmation" "forfeited its arguments regarding the . . . adequacy of the Bankruptcy Court's procedures by failing to raise a timely objection in that court." *Espinosa*, 559 U.S. at 275. Hence, Carnero's due process rights were afforded and waived.

Here, the Plan states that Carnero's rights to object to the assumption of contracts are waived if Carnero fails to exercise them. Carnero does not allege that this notice was obscure or hidden. Carnero simply did not object or preserve its rights to object. What's more, Carnero knew that certain midstream agreements and amendments would be assumed; Carnero sued over the Midstream Settlement five months before the December 2021 hearing when the settlement was approved. Carnero had the right and opportunity

19

to see and object to the terms of the MSA. Carnero was present at the hearing when the Bankruptcy Court approved it. The need for finality of a judgment—Plan—is important to all parties to litigation. *See* FRCP 60(b)(4). In the Court's view,  the bankruptcy court satisfied the requirement that "notice [be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

Finally, Carnero's cursory argument for relief under FRCP 60(d)(1) must also fail. That rule permits a court to "entertain an independent action to relieve a party from a judgment." Contrary to Carnero's insistence, "equity and good conscience" do not demand that relief be granted. It appears that Carnero strategically sat on its bankruptcy rights so that it could sue in state court. It cannot now utilize Rule 60(d)(1) to escape its responsibilities in "a highly complex case" by arguing that its claims are a "garden variety" contract dispute. Equity aids the vigilant.

### F.   Business Documents

Carnero complains that it suffered harm from the bankruptcy court's refusal to permit its business representatives to review certain sealed exhibits. This review, Carnero argues, would have "help[ed] frame" Carnero's claims and its arguments against dismissal.

This question first arose at a hearing in which the bankruptcy court determined that it would first consider whether the Midstream Restructuring changed any of Carnero's legal rights under the Carnero Agreement. Only if the Midstream Restructuring affected Carnero's rights would the court consider whether the changes injured Carnero.

20

The court reasoned that Carnero's business representatives should opine only on the latter question of injuries. Thus, the court explained that it would allow Carnero's business representatives to view the documents only if the court determined that Carnero's rights were affected by the Midstream Restructuring. Carnero assented, with the bankruptcy court's assurance that future requests to share the confidential exhibits would not be prejudiced. Carnero did not raise the issue with the bankruptcy court again.

"The decision whether to allow public access to court records 'is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.'" *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 450 (5th Cir. 2019) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599, (1978)). Carnero assented to the bankruptcy court's reasonable treatment of the sealed documents, and never raised the issue again. Carnero's only now is that the bankruptcy court abused its discretion and such abused harmed Carnero's "framing" of certain issues. Carnero did not make this argument below, and cannot raise it for the first time on appeal. Moreover, there is no evidence of harm.

## VI.    CONCLUSION

Based on the foregoing reasons, the Court AFFIRMS the bankruptcy court's Judgment denying relief in all respects.

SIGNED on February 22, 2024, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge

21