# United States Court of Appeals for the Fifth Circuit

United States Courts
Southern District of Texas
FILED
December 29, 2025
Nathan Ochsner, Clerk of Court

No. 24-20207

United States Court of Appeals
Fifth Circuit
FILED
November 13, 2025
Lyle W. Cayce
Clerk

IN THE MATTER OF SANCHEZ ENERGY CORPORATION

*Debtor*,

CARNERO G&P, L.L.C.,

*Appellant*,

*versus*

SN EF MAVERICK, L.L.C.; MESQUITE ENERGY, INCORPORATED; MESQUITE COMANCHE HOLDINGS, L.L.C.; CROWN EAGLE ENERGY, L.P., *formerly known as* SN EF UNSUB, L.P.; EAGLE FORD TX, L.P.; JAVELIN EF, L.P., *formerly known as* VENADO EF, L.P.; MITSUI E & P TEXAS, L.P.,

*Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-587

Before KING, JONES, and OLDHAM, *Circuit Judges*.

BY EDITH HOLLAN JONES, CIRCUIT JUDGE:

The bankruptcy court granted a FED. R. CIV. P. 12(c) motion to dismiss on the pleadings a complex oil and gas production contract case filed

by a midstream services provider (Carnero) against a former Ch. 11 debtor (gas producer) and other parties. Carnero appeals, contending *inter alia* that the bankruptcy court lacked jurisdiction to decide a state law contract dispute that arose eighteen months after the debtor's reorganization plan had been confirmed and consummated. We agree with Carnero, REVERSE the judgment, and REMAND with instructions to REMAND to state court.

The debtors collectively known as Sanchez Energy (now Mesquite Energy, Inc. following reorganization) experienced full bore how the COVID pandemic roiled energy markets. Having already filed for Ch. 11 relief in 2019 because of outsized indebtedness, Sanchez's prospects seemed to collapse in early 2020 during the reorganization process. Still, Sanchez possessed valuable reserves of fossil fuels in the south Texas Comanche Field, although their market value temporarily cratered. To preserve the value of the estate and stave off liquidation, the bankruptcy court facilitated an "unorthodox" Plan of Reorganization whereby the company emerged from reorganization on April 30, 2020. The Plan left several important issues unresolved. One of these was the equity structure of Mesquite, which, following litigation, this court recently addressed. *See Ad Hoc Group of Senior Secured Noteholders v. Del. Trust Co. (In re Sanchez Energy Corp.)*, 139 F.4th 411, 420 (5th Cir. 2025) (noting rebound of fossil fuel energy market post-COVID).

Another critical issue left unresolved by the Plan was the debtors' high-cost contracts for taking their natural gas and natural gas liquids ("NGLs") from the wellheads to market. Carnero, a backup "midstream provider" in the congeries of such contracts, challenges the restructuring agreements that Mesquite arranged with the other defendants post-confirmation to lower its gathering, processing, transportation and marketing costs. Carnero asserts that the revised agreements conflict with and breach its pre-bankruptcy contract with Mesquite that survived the bankruptcy case intact.

Preceding the merits of Carnero's state law claims against Mesquite and its post-reorganization counterparties, however, is the question whether the bankruptcy court had jurisdiction to adjudicate this post-confirmation dispute. We conclude that the bankruptcy court lacked jurisdiction.

## BACKGROUND

As natural gas is produced from wells, it flows through gathering pipelines from the wellheads to a processing facility for separation into residue gas and NGLs. Those products are then transported via pipeline to market. Four types of contracts that further these activities cover the gathering, processing, transportation and marketing functions. Substantially all of the Comanche Field gas production was originally owned by Anadarko along with working interest partners, and Anadarko controlled downstream movement of the production with agreements for the four downstream functions. In January 2017, Maverick, a subsidiary of Sanchez, and two other entities entered into a Comanche Purchase and Sale Agreement with Anadarko and stepped into Anadarko's role as operator of the Comanche Field assets. The purchasers either assumed multiple entities' contracts or renegotiated with them to maintain the necessary downstream processing and movement.

Effective April 1, 2018, Carnero (an entity related to Maverick and Sanchez) entered into the Carnero Agreement with the Appellees[1] to gather, process and purchase oil, gas and NGLs. The Carnero Agreement entitled Carnero to serve as a backup provider of gathering and processing services because at the time it was executed, substantially all of the Comanche Field

---

[1] The Appellees include Maverick; Mesquite Energy; Mesquite Comanche Holdings; Crown Eagle Energy, LP, formerly known as SN EF Unsub, LP; Eagle Ford Tx, LP; Javelin EF, LP, formerly known as Venado EF, LP; and Mitsui E & P Texas, LP.

assets were *subject to* Existing Commitments, *i.e.,* the contracts that Maverick assumed or set up following the Comanche Purchase and Sale Agreement. The Existing Commitments included obligations to gas processors (WGR and ETC), contracts for gas gathering (Springfield), and a contract to purchase NGLs (Enterprise). Carnero interprets its rights under the Carnero Agreement as follows: "Appellees are obligated to terminate the delivery obligations under the Existing Commitments when they expire or the option to terminate arises." Carnero contends that as a matter of state law, Mesquite's post-confirmation agreements with the other Appellees activated Carnero's rights to the gas flowed under the Carnero Agreement.

After Sanchez/Maverick sought Chapter 11 relief, the Carnero Agreement remained intact as multiple creditors of the debtor jockeyed for precedence in recovering hundreds of millions of dollars in debt. Although the market for natural gas and NGLs nosedived during the COVID pandemic, Sanchez's hydrocarbon assets in the ground remained potentially very valuable. They were subject, however, to high-cost contracts for gathering, processing, transportation and marketing under the Existing Commitments. Renegotiating those Existing Commitments was imperative. But Carnero saw an opportunity to supplant the other providers by offering lower cost midstream services if the Existing Commitments expired or were terminated. The midstream providers who had the benefit of the Existing Commitments resisted alteration of their positions.

## PROCEDURAL BACKGROUND

Sanchez, Maverick and related entities sought Chapter 11 protection in August 2019. The reorganization Plan, confirmed on April 30, 2020, defined Executory Contracts as contracts that are subject to assumption under Section 365 of the Bankruptcy Code. Under the Code, most broadly, a debtor's assumption of a prepetition executory contract requires the

contracting parties to fulfill the contract's prepetition terms, subject to conditions designed to protect the non-debtor party. 11 U.S.C. § 365(a), (b). Rejection constitutes a breach of contract that entitles the counterparty to assert an unsecured claim for damages against the debtor's estate. 11 U.S.C. Sec 365(g).

Relevant to this appeal, and as discussed more fully herein, the Sanchez Plan provided that the court's Confirmation Order constituted an order approving the assumption or rejection of Executory Contracts listed in the Plan and related Schedules of Assumed and Rejected Leases. Further, unless otherwise provided or agreed, assumptions and rejections of Executory Contracts "are effective as of the [Plan's] Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract . . . may be after the Effective Date."

At the date of confirmation, Sanchez expressly assumed the Carnero Agreement in the pertinent Schedule of Assumed Agreements, and was thereby committed to perform under that Agreement. Carnero had no reason to object to the assumption of its own contract. At the same time, Sanchez scheduled the midstream contracts with the other Existing Commitment counterparties to be rejected. To all appearances, this benefitted Carnero, as it meant Carnero could succeed as the midstream services provider for the Comanche Field assets. In fact, before the Plan's Effective Date, Maverick and Mesquite (stepping in as the reorganized Sanchez) signed a settlement agreement with Carnero in which they agreed to pursue formal rejection of Existing Commitments contracts. The bankruptcy court approved the settlement under Bankr. Rule 9019, which requires notice to interested parties and an opportunity to object.

Other parties, unsurprisingly, were not satisfied with Sanchez's attempted rejected of their midstream contracts. Springfield, Anadarko and

Anadarko's counterparties to the Existing Commitments commenced the "Oxy Adversary" proceeding to object to any rejections. *Occidental Petroleum Corp. v. Sanchez Energy Corp.*, Adv. Pro. No. 20-03198 (S.D. Tex.). Eventually, the bankruptcy court issued a series of "partial rejection orders," which disabled Sanchez's rejection efforts. *See, e.g.*, *In re Sanchez Energy*, 631 B.R. 847 (Bankr. S.D. Tex. 2021). Shortly after the rejection effort failed, on June 24, 2021, Maverick and Mesquite terminated the settlement with Carnero.[2]

Maverick and Mesquite persisted in pursuing lower midstream costs by negotiating with the parties whose contracts it had previously sought to reject. Carnero was not included in the negotiations, but it was aware of their existence. Six months later, the Oxy Adversary plaintiffs, together with Maverick, Mesquite and UnSub (a party to certain provisions) executed a new Midstream Restructuring Agreement and a Master Settlement Agreement ("MSA"), which together incorporated well over a dozen subsidiary contracts, to settle the Oxy Adversary. These agreements also included working interest parties to the gas producers through a "WIP Side Letter." The Master Settlement Agreement resolved all of the Existing Commitments parties' interests. Maverick and Mesquite paid $50 million to Springfield in the settlement, but apparently it received cost concessions for midstream services going forward. The multiple revised and new contracts encompass hundreds of pages.

On December 21, 2021, the Oxy Adversary parties presented to the bankruptcy court their Stipulation and Agreed Order of Dismissal, together

[2] Carnero responded by filing its first state court lawsuit which, *inter alia*, sought to compel Sanchez to reject the Existing Commitments. That case was removed to bankruptcy court, Carnero's remand effort was denied by the court, and Carnero dismissed the case.

with the text of the Master Settlement Agreement, but not the text of the Master Restructuring Agreement or the underlying new contracts. The court's approval was sought solely to dismiss the adversary proceeding. The MSA additionally required the court to issue an order in the main bankruptcy case confirming Mesquite's "assumption" of eighteen Comanche agreements (seven of which were to be assumed "as amended" by the MSA) and its "rejection" of a half dozen other agreements.

The court did not review or approve the substantive terms of either the MSA or the assumption/rejection Order. As Mesquite/Maverick's counsel pointed out, the Plan specifically provided that future actions with regard to "executory contracts" or settlements of claims did not have to be supervised or approved by the bankruptcy court and were thus "free of any restrictions" imposed by the court or bankruptcy rules.[3] Notwithstanding the Oxy parties' "freedom" from bankruptcy court "restrictions," counsel characterized the court's order entering the Stipulation and Agreed Order of Dismissal as "really . . . an assumption and rejection order."

The only changes that the court required to the draft orders purported to limit their effect exclusively to the Oxy parties, as the court was aware that Mesquite had recently filed an adversary proceeding against Carnero. Carnero's counsel made a formal appearance in this hearing, after having received only two hours advance notice, but took no position on the pending matters and said nothing other than to agree with the court's modification for the benefit of third parties.

---

[3] To quote counsel's summary of this unusual process, "So, I believe we set up this precise process so that we didn't have to bother others, so long as those who have standing and a stake in it could agree that they would—to assumption or rejection."

Within a few weeks, Carnero filed its second state court lawsuit against Mesquite, Maverick and the Oxy Parties. Carnero asserted several state law claims asserting that the just-finalized agreements reached by the defendants interfered with its rights under the Carnero Agreement, and seeking declaratory and monetary relief. The suit was removed to federal bankruptcy court, as Carnero's earlier suit had been, and the court again refused to remand. More litigation wrangling ensued. *Inter alia*, the bankruptcy court refused to allow a Carnero business representative to review the hundreds of pages of revised and new midstream contracts on grounds of business confidentiality. Eventually, the court held a hearing and received substantial briefing on defendants' FED. R. CIV. P. 12(c) motion for judgment on the pleadings. The parties disputed the court's jurisdiction and the merits of the state law claims.

The bankruptcy court confirmed its jurisdiction to adjudicate this state law dispute that arose post-confirmation among parties none of which was still in bankruptcy. Pertinent parts of the bankruptcy court's jurisdictional reasoning must be explained in some detail. Citing 28 U.S.C. § 1334, the court relied on "related-to" jurisdiction under title 11 pursuant to *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987) (the bankruptcy court has jurisdiction over any dispute that could "*conceivably* have any effect" on the debtor's estate) (emphasis in original). The court acknowledged that after a reorganization plan is confirmed, the relevant question for jurisdiction becomes whether "the dispute 'pertain[s] to the implementation or execution' of the debtor's reorganization plan." *Natixis Funding Corp. v. GenOn Mid-Atl. L.L.C. (In re Mid-Atl. Dev., L.L.C.)*, 42 F.4th 523, 534 (5th Cir. 2022) (quoting *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002)). The court purported to rely on *GenOn* for the proposition that jurisdiction existed because Carnero's claims "threaten[ ] to destabilize the fragile consensus

around a settlement crucial to the success of" the debtors' reorganization. *See In re GenOn Mid-Atl. Dev. L.L.C.*, 42 F.4th at 536. It distinguished this court's seminal opinion on post-confirmation jurisdiction, which held that a former debtor's state law dispute that arose a year after confirmation was not within the bankruptcy court's "related-to" jurisdiction. *Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 391 (5th Cir. 2001). The bankruptcy court here asserted that Carnero's suit implicates a complex settlement "effectuated in accordance with Plan provisions under this Court's supervision." Unfortunately, as will be discussed, the court erred: the MSA was neither brought about in accordance with Plan provisions nor under the court's supervision.

Moving to the parties' contentions about Carnero's ability to challenge the MSA, the court concluded that Carnero was barred from pursuing its contract claims because it (a) failed to object to the terms of the Plan and (b) voiced no objection to the MSA during the December 2021 hearing. In sum, "Carnero is now barred from arguing that the debtors' Plan or exercise of its Section 365 rights violated the Carnero Agreement."

Just to be safe, the bankruptcy court alternatively discussed at length and rejected on the merits Carnero's state law contract claims against the Oxy parties.

Carnero appealed to the district court, which affirmed, and timely appealed to this court.

DISCUSSION

The same standards apply to this court's review of bankruptcy court decisions and the district court in its appellate function over those decisions. Findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. *In re Cowin*, 864 F.3d 344, 349 (5th Cir. 2017). A bankruptcy court's subject matter jurisdiction is reviewed *de novo*. *In re 804*

*Cong. L.L.C.*, 756 F.3d 368, 372–73 (5th Cir. 2014). Its interpretation of the terms of a plan and confirmation are reviewed *de novo*, although deference may be owed to the bankruptcy court's interpretation of ambiguous terms. *In re Nat'l Gypsum Co.*, 219 F.3d 478, 484 (5th Cir. 2000).

The bankruptcy court adjudicated this case under its "related-to" jurisdiction,[4] 28 USC § 1334(b), and the district court affirmed on that basis. Whether that exercise of jurisdiction was authorized is the dispositive issue, but it depends on the resolution of two issues. Those are: whether the MSA's Midstream Restructuring Agreement embodies contracts that were properly treated as "Executory Contracts" under Sanchez's Plan; and whether Carnero was barred by the Plan or its litigation strategy from challenging the MSA and Midstream Restructuring Agreement.[5]

Preliminary observations about the bankruptcy court's expansive post-confirmation jurisdictional holding are necessary to set the stage for further discussion. In general, "related-to" jurisdiction includes "any litigation" that "could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration

[4] The court claimed in passing that it had "core" jurisdiction to decide "whether Carnero's claims are barred by the Plan" because that "implicates" the confirmed Plan and the court's enforcement of its confirmation order. 28 USC § 157(b)(2). Bifurcating its jurisdiction, however, the court next relied only on "related-to" jurisdiction to decide the Rule 12(c) motion on the merits. It would have been more accurate to acknowledge that "related-to" jurisdiction encompassed the initial question about the Plan, because only if the Plan, properly construed, was relevant to the state court action would this post-confirmation litigation be "related to" the bankruptcy. *See GenOn*, 42 F.4th at 535–37.

[5] Carnero raised other issues, including due process, mandatory and permissive abstention, the court's refusal to permit a Carnero business representative (other than in-house counsel) to review the Midstream Restructuring Agreement's underlying contracts, and the merits of its state law claims. Based on our jurisdictional determination, we need not address these issues.

of the bankrupt estate." *Collins v. Sidharthan (In re KSRP, Ltd.)*, 809 F.3d 263, 266 (5th Cir. 2015) (quotation omitted). "Related-to" jurisdiction fosters efficient resolution of disputes during the pendency of a bankruptcy case. The scope of a bankruptcy court's related-to jurisdiction narrows, however, after a reorganization plan is confirmed, and the reorganized debtor is re-vested with its property and operates outside of bankruptcy court superintendence. *GenOn*, 42 F.4th at 534. As this court's seminal case observed, "bankruptcy court jurisdiction does not last forever." *In re Craig's Stores*, 266 F.3d at 389. We held that bankruptcy jurisdiction terminates after confirmation "other than for matters pertaining to the implementation or execution of the plan." *Id.* at 390.

A number of subsequent cases have explored the scope of post-confirmation jurisdiction, because reorganized debtors perceive advantage in returning to the bankruptcy court's protective womb. When jurisdiction has been found lacking, it was often because the post-confirmation disputes were between non-debtor parties[6] or because the relationship of the dispute to the preceding bankruptcy case was tenuous or non-existent.[7]

Here, both the bankruptcy court and the Appellees rely heavily on one recent decision that, as it cautioned, "lives at the limit of related-to jurisdiction." *GenOn*, 42 F.4th at 535. In *GenOn*, as here, the parties were non-debtors litigating state law claims. *Id.* But this court explained that the dispute in *GenOn* revolved around a settlement agreement that was expressly contemplated by the debtor's reorganization plan; the settlement had been "enshrined" in the plan by the bankruptcy court; and the settlement had not

---

[6] *See, e.g.*, *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589–90 (5th Cir. 2008).

[7] *See, e.g.*, *In re Chesapeake Energy Corp.*, 70 F.4th 273, 284 (5th Cir. 2023); *In re Galaz*, 665 F. App'x 372, 377 (5th Cir. 2016) (per curiam).

yet become final when the litigation ensued. *Id.* at 536. None of those circumstances is present in this case.

The bankruptcy court here overlooked these significant factual differences. Instead, it inaccurately described *GenOn* as holding simply that jurisdiction exists where litigation "'threaten[s] to destabilize the fragile consensus around a settlement crucial to the success of' the debtors' reorganization." On the contrary, this court squarely rejected that proposition and emphasized that post-confirmation jurisdiction exists "only where the dispute pertains to the plan's execution or implementation. Few disputes between non-debtors qualify." *GenOn*, 42 F.4th at 538. The bankruptcy court thus started off on the wrong foot in analyzing the scope of post-confirmation jurisdiction.

Nonetheless, post-confirmation jurisdiction requires a careful evaluation of the connection between a dispute and the plan of reorganization. We proceed to consider the subsidiary issues that underlie whether this post-confirmation dispute arising among non-debtors under state law fell within the bankruptcy court's related-to jurisdiction.

I. Executory Contracts

The bankruptcy court's jurisdictional decision depends on a conclusion that the MSA and Midstream Restructuring Agreement and their underlying contracts were in fact Executory Contracts under the Plan. To be sure, the Sanchez Plan created apparently limitless flexibility for the debtors to adjust their prepetition Executory Contracts. The court reasoned that although they evolved from the pre-bankruptcy Comanche Field arrangements among Maverick, other Appellees, and parties to the Existing Commitments, the MSA and Midstream Restructuring Agreement were Executory Contracts under the Plan. Carnero was allegedly obliged to lodge objections before the Plan's confirmation or Effective Date (a) to the Carnero

Agreement (despite that Sanchez scheduled it for assumption), or (b) possibly to Sanchez's rejections of other parties' midstream agreements (which rejections benefitted Carnero). Absent "timely" objections, Carnero could not challenge the post-confirmation agreements. If the bankruptcy court's conclusions are wrong, then it lacked jurisdiction because the Plan's terms and execution were immaterial to Carnero's contract dispute that arose with the other parties well after the debtors had exited bankruptcy protection. We consider first whether the Plan, carefully read, supports that the MSA and Midstream Restructuring Agreement are Executory Contracts.

A. Executory Contracts under the Sanchez Plan

The definition and treatment of Executory Contracts under the Bankruptcy Code serves as a backdrop for the "unique" provisions in this case. "Section 365(a) of the Code provides that a 'trustee [or debtor], subject to the court's approval, may assume or reject any executory contract.' A contract is executory if 'performance remains due to some extent on both sides.'" *Mission Prod. Holdings, Inc. v. Tempnology, L.L.C.*, 587 U.S. 370, 373, 139 S. Ct. 1652, 1658 (2019) (citation omitted) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6, 104 S. Ct. 1188 (1984)). Section 365 authorizes a debtor to assume (continue to perform) or reject (breach) executory contracts. 11 U.S.C. § 365(a). Importantly, either decision is subject to the court's approval and has ramifications in the claims and administrative process for both parties to the contract. *Id.* In a Chapter 11 reorganization, a debtor may assume or reject an executory contract "at any time before confirmation of a plan," but the court may order the debtor to make its decision "within a specified period of time." *Id.* § 365(d)(2). From a procedural standpoint, Section 365 motions to assume or reject are "contested matter[s]" under the Bankruptcy Rules, which are handled similarly to ordinary federal court litigation and require notice to all parties

in interest in the bankruptcy that may be affected. FED. R. BANKR. P. 6006(a), (c), 9014.[8]

The Sanchez Plan and Confirmation Order intentionally deviated from each of these provisions. First, as explained in the Procedural Background, the Confirmation Order did not require the debtor to assume or reject executory contracts when that Order was entered or on the Effective Date. Pre-confirmation, Sanchez had provided schedules of planned assumptions/rejections, which were subject to switching from one to the other treatment. In other words, the Confirmation Order was a prelude, not a deadline as in the statute, for final assumption/rejection decisions. Second, the Plan also dispensed with court approval and with the Bankruptcy Rules 6006/9014 "contested matter" requirements by authorizing the debtor to assume or reject executory contracts without any hearing, much less court supervision or approval. (The Confirmation Order provides at par. 17 that unresolved objections to a proposed assumption or rejection are not deemed final until entry of a court order *or* "as may be agreed upon" by debtors and a counterparty). The Plan itself provided that after its Effective Date, the reorganized debtor may "compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Plan IV.G. Third, the Plan inverted the normal sequence of assumption and rejection decisions by counterparties to executory contracts by deeming the debtor's assumptions or rejections retroactively "effective as of the Effective Date, notwithstanding . . . that the deadline to object to assumption or

[8] A debtor may also assume or reject contracts as part of a reorganization plan governed by 11 U.S.C. 1123(b)(2). When debtors proceed in this manner, they are subject to Section 365.

rejection of an Executory Contract . . . may be *after* the Effective Date." Art. V.A (emphasis added).[9]

B. The MSA and Master Restructuring Agreements

From the reorganized debtor's point of view, the contracts that comprise the MSA and Midstream Restructuring Agreement complied with the "unorthodox" procedures implemented by the Plan. Accordingly, Mesquite's counsel repeated several times during the December 21, 2021 court hearing that the Oxy Parties were not seeking court approval of the MSA or Midstream Restructuring Agreement. Nor, counsel added, was the hearing subject to Rule 9019, which would have meant a requirement to notify interested parties. The court did not substantively review the MSA or the Midstream Restructuring Agreement. It perfunctorily entered orders that dismissed the Oxy adversary proceeding and listed, in the main bankruptcy case, purported assumptions and rejections of midstream agreements covered by the MSA and Midstream Restructuring Agreement. Except when it required an express limitation of its orders to the Oxy parties, given its awareness that other parties had not been furnished notice of the hearing, nothing suggests that the court performed anything other than a ministerial function in entering the orders.

---

[9] This court takes no position on whether these patent discrepancies from the statutory criteria for resolution of executory contracts were permissible. The plan was confirmed; Carnero did not object to the Plan on these issues; and no party appealed confirmation. When Occidental sued in bankruptcy court to raise some of these issues, in connection with its objection to Sanchez's attempt to reject its midstream contracts, the court held that such contentions were barred after confirmation. *In re Sanchez Energy Corp., Occidental Petrol. Co. v. Sanchez Energy Corp.*, 631 B.R. 847, 857 (Bankr. S.D. Tex. 2021) (citing *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275, 130 S. Ct. 1367, 1379–80 (2010)).

It is ironic that, after crafting a reorganization Plan that intentionally divorced post-confirmation actions by the debtor from court oversight, Mesquite now clamors for bankruptcy court protection. Nevertheless, Mesquite persuaded the bankruptcy court that the revised and new midstream agreements were correctly characterized as Executory Contracts under the Plan. The bankruptcy court followed up by shielding the new and revised agreements from any scrutiny based on the Plan's "unique" provisions. We disagree that the MSA, Midstream Restructuring, and underlying agreements were Executory Contracts.

According to the Plan's definitional section, an "Executory Contract" is a contract that "is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code." Art. I.A (56). *Bildisco* and *Mission Products* both treat executory contracts under the Code as those where "performance is due . . . on both sides." *Bildisco*, 465 U.S. at 522 n.6, 104 S. Ct. at 1194(quoting H.R. REP. NO. 95-595, at 347 (1977); *see also Mission Prods.*, 587 U.S. at 373, 139 S. Ct. at 1658. *Bildisco* adds that "[s]hould the debtor-in-possession elect to assume the executory contract, . . . it assumes the contract *cum onere*." *Bildisco,* 465 U.S. at 531–32, 104 S.Ct. at 1199. *Bildisco* quoted *In re Italian Cook Oil Corp.,* 190 F.2d 994, 997 (3d Cir. 1951), which held that "[t]he [Debtor] . . . may not blow hot and cold. If he accepts the contract[,] he accepts it *cum onere*. If he receives the benefits he must adopt its burdens." Recently, this court restated that a contract is executory if "under the relevant state law governing the contract, each side has at least one material unperformed obligation *as of the bankruptcy petition date*." *In re Falcon V, L.L.C.*, 44 F.4th 348, 352 (5th Cir. 2022) (emphasis added) (quoting *In re Weinstein Co. Holdings, LLC*, 997 F.3d 497, 504 (3d Cir. 2021)). These holdings leave no doubt as to what the Plan meant by defining "executory contracts" under Section 365. Such contracts must have existed before the commencement of Chapter 11 bankruptcy proceedings; they exist

between the debtor and another party; and their assumption would be *cum onere*, bearing whatever costs to the debtor that existed pre-bankruptcy.

On their face, the MSA and Midstream Restructuring Agreement and the numerous agreements they embody vary from these criteria. The MSA and Midstream Restructuring Agreement did not exist until eighteen months post-confirmation. Even if some parts of the agreements pre-dated Sanchez's bankruptcy, they were assumed "as revised," not *cum onere*, because Mesquite made deals to restructure all the midstream relationships and lower its midstream costs. The preeminent fact is that these agreements are the product of integrated, multiparty, post-confirmation negotiations. Together, they significantly modified the relationships that existed pre-bankruptcy, and they are *in toto* a post-bankruptcy confection. Moreover, several of the underlying agreements do not qualify as statutory executory contracts at all because they did not exist before the Plan was confirmed. And the debtors were not parties to some of the contracts at the time of confirmation but only became bound post-confirmation. And most problematically, the debtors were not a party *at all* to some of the agreements.

The bankruptcy court and Mesquite, however, rationalize that all of the agreements are comprehended within one paragraph of the Plan's treatment of Executory Contracts. Art. V.F. That paragraph states:

> Unless otherwise provided in the Plan, each Executory Contract . . . that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that *in any manner affect* such Executory Contract . . . , *and* Executory Contracts . . . related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and *any other interests*, *unless* any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.
>
> Modifications, amendments, supplements, and restatements to prepetition Executory Contracts . . . that have been executed by the

> Debtors *during the Chapter 11 Cases*, shall not be deemed to alter the prepetition nature of the Executory Contract. (Emphases added.)

Mesquite's and the bankruptcy court's exegesis holds that all of the post-confirmation, non-debtor and revised contracts simply constitute modifications that "in any manner affect[ed]" the original midstream contracts. We disagree. First, the most natural reading of this provision is that it describes the scope of treatment of Executory Contracts *as previously defined in the Plan definitions.* This provision does not purport to redefine the Plan's definition of Executory Contract, and as shown, that definition incorporates the criteria recognized by the Supreme Court and this court.

Second, before reaching the "in any manner affect" adverbial clause, the Appellees and bankruptcy court overlooked how "modifications, amendments, supplements, and restatements" are described temporally in the provision's second sentence. In that sentence, such changes are those "executed by the Debtors *during* the Chapter 11 Cases" (emphasis added). *None* of the agreements underlying the MSA and Master Restructuring Agreement were executed *during* the Chapter 11 cases. Yet "during the Chapter 11 Cases" must have some meaning and may not be disregarded, as both the Appellees and bankruptcy court did. *All* the agreements that settled the Oxy adversary proceeding were negotiated and executed more than a year after Mesquite had emerged from bankruptcy, was re-vested with all its rights and privileges, and had moved forward to conduct business independently of the bankruptcy court. Applying this temporal limitation on "modifications," the post-confirmation agreements could not have been deemed "executory contracts" by the bankruptcy court.

But even ignoring the temporal limitation, the agreements involved in the MSA and Midstream Restructuring Agreement still may not fairly be described as "other agreements that *in any manner affect* such Executory Contract . . . ." Those "other agreements" follow a more specific sequence

of words ("modifications, amendments, supplements, and restatements") that identify subsidiary changes within a principal contract. Under the canon of construction *noscitur a sociis* ("it is known by its associates"), *see* A. Scalia & B. Garner, *Reading Law* (2012) at 195–98, "other agreements" that affect the Executory Contract under consideration must be subsidiary to or within that prime Executory Contract. Thus, the "in any manner affect" clause does not expand the definition of Executory Contract to embrace the full-scale revision of Sanchez's midstream gathering, processing, transportation and marketing agreements in the Comanche Field.[10]

Factually, all of the relevant agreements are outside the parameters of the "in any manner affect" language. These fall into several categories. First, the new or restructured agreements between non-debtors are plainly not subsidiary to or within any Executory Contract because the debtor is not a party. The court should have been cautioned by the *Purdue Pharma* case against interpreting the Plan here to bar from potential state court liability parties that were not debtors. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 224, 144 S. Ct. 2071, 2086 (2024). Second, the agreements that were confected post-confirmation, including the MSA and Midstream Restructuring Agreement, are not Executory Contracts under the Plan's statute-based definition, because they did not exist before the bankruptcy filing. Third, even the several agreements that predated bankruptcy and were

---

[10] The first sentence additionally provides that each assumed Executory Contract "shall include Executory Contracts . . . related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests *unless*" any of the foregoing agreements has been rejected or repudiated before or under the Plan. Neither the bankruptcy court nor Appellees rely on this lengthy clause. It incorporates to the assumed Executory Contract other Executory Contracts that were also prepetition contracts under Section 365 as defined in the Plan. The clause cannot refer to new, post-confirmation agreements, amendments to the principal Executory Contract, much less agreements involving no debtor.

assumed "as revised" by the MSA and Midstream Restructuring Agreement cannot be considered Executory Contracts, because, as Appellees' brief states, "The MSA integrates "Transaction Documents,' comprising assumed Comanche Commitments and other amendments and agreements affecting them. *See* MSA Secs. 1.3, 10.1." Appellees also represent that the Restructuring is a set of "interlocking" agreements, and "the deal was contingent on all of its component parts." Thus, the contracts that were "assumed as revised" were subsumed within and became contingent upon all the other agreements that constituted those global settlement documents. This court has acknowledged the practical reality that executory contracts, as defined in Section 365, are often assumed as amended. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310–11 (5th Cir. 1985) (per curiam). But the same case also noted that any wholesale revision of parties' relations cannot be handled by Section 365. *Id.* at 1311–12. A wholesale revision occurred here.

In sum, we reject the bankruptcy court's interpretation that the settlement agreements were "Executory Contracts" under the Plan. The MSA and Midstream Restructuring Agreement represented a new, fully integrated set of midstream agreements. Extending the "in any manner affects" clause to cover all manner of new, amended, post-confirmation, and even non-debtor contracts stretches the concept of executory contracts beyond any reasonable interpretation. If applied generally in bankruptcy reorganization practice, it would obliterate the distinction between pre- and post-confirmation related-to jurisdiction.

This settlement was a business deal that shuffled or replaced pre-bankruptcy agreements among various parties. It was made possible only because during the year and a half after the Plan was confirmed, the market price of Comanche Field hydrocarbons rebounded and made it possible for Mesquite to settle with the midstream interests on favorable terms. The

dispute between Carnero and the Appellees over the state law ramifications of the MSA and Master Restructuring Agreement did not "pertain[] to the plan's implementation or execution." *GenOn*, 42 F.4th at 538. This analysis resolves the first element of post-confirmation jurisdiction, because those agreements were not Executory Contracts covered by the Plan.

II. Was Carnero "barred" by the Plan or litigation strategy from raising its state law claims?

The bankruptcy court and Appellees insist that Carnero forfeited its state law claims because they were barred by the unusual terms of the Plan; Carnero failed to challenge the MSA and Midstream Restructuring Agreement in bankruptcy court; and the court "supervised and approved" the global settlement that Mesquite worked out with all of the other Oxy adversary parties and WIPs. We discuss each point.

A. The Plan

Despite the efforts of those who drafted the Plan, it is difficult to understand how it barred Carnero from raising state law claims that arose from contracts entered into by the debtors post-confirmation. To begin, the bankruptcy court predicated the bar on Carnero's failure to have objected to the Plan before it was confirmed. The court inaptly compared Carnero's position to *Occidental Petroleum*, 631 B.R. at 857. One of Occidental's arguments challenged the Sanchez Plan's treatment of Executory Contracts as a violation of the Bankruptcy Code, and the court held it untimely when raised after the deadline for objecting to or appealing the confirmation order had passed. The bankruptcy court relied on the Supreme Court's *Espinosa* decision. *United Student Aid Funds v. Espinosa*, 559 U.S. 260, 130 S. Ct. 1367 (2010) (party was required to challenge illegal plan provision before confirmation). Carnero does not wage the *Occidental* battle. Instead, it contends that under the Plan, it had no basis to file any objection to Sanchez's

proposed assumptions or rejections of midstream contracts at the time of confirmation. Carnero's claims, to the contrary, arose only eighteen months after confirmation when Mesquite worked out new midstream arrangements under the MSA and Master Restructuring Agreement. Until that moment, Mesquite remained committed to the pre-existing Carnero Agreement, whose terms had not been violated.

Responding to that common sense contention, the bankruptcy court emphasized that because the Plan made any post-confirmation assumption retroactive to the Effective Date, there is *ipso facto* no impairment of the Carnero Agreement because the Plan assumed all contracts simultaneously. Because contracts can only be assumed if the debtor is not in default, the Plan itself precluded any conflict among them. This is a strange conclusion. For one thing, it is not the Plan, but the underlying midstream agreements, that control the everyday relations among Mesquite, Carnero and the Oxy Adversary parties. If their agreements, significantly amended by the MSA and Master Restructuring Agreement, are in conflict, no good intentions of the Plan's concurrent Effective Date can ameliorate it.[11] Moreover, to say that Mesquite's acts of assumption necessarily whitewashed any potential conflicts is an assertion, not proof. After all, under the Plan and Confirmation Order and the procedures adopted to finalize the MSA and Master Restructuring Agreement, no court supervision or approval was needed or took place.

Finally, the bankruptcy court held that Carnero lost its opportunity to contest the MSA and Midstream Restructuring by failing to object before confirmation to (a) Sanchez's assumption of the Carnero Agreement or (b)

---

[11] It should be obvious that we take no position on the merits of the state law issues raised by Carnero.

Sanchez's proposed rejection of any other counterparties' midstream agreements. That *any* party in a bankruptcy would have to object to a debtor's post-confirmation bargains sight unseen, eighteen months before they were achieved, seems ludicrous. Likewise, it is most odd that any party would have to file objections to the debtors' assumption of a contract that benefited it or to the debtors' rejections of *other parties'* executory contracts that also benefited it.

Carefully read, that is not what this Plan demanded. Two provisions of the Confirmation Order are relevant. Paragraph 18 authorized the debtor (or reorganized debtor) to reschedule an executory contract from the assumed to the rejected category, or vice versa, subject to deadlines. Then it provides, "[a]ny counterparty to an Executory Contract ... that fails to object timely to the proposed assumption ... by the Contract Objection Deadline [June 30, 2020] shall be deemed to have assented to such assumption." Carnero, of course, had no reason whatever to object to the assumption of the Carnero Agreement, and it was deemed to have assented; Carnero forfeited nothing by failing to object. As to other counterparties' midstream agreements that Sanchez had proposed to reject, this sentence imposes only a deadline for objecting to "assumptions" and did not require Carnero to object to proposed "rejections." In any event, Carnero had no objection to proposed rejections that operated in its favor.

Paragraph 23, titled Executory Contract Counterparties, starts by promising in broad terms that nothing in the Plan or Confirmation Order shall eliminate, alter or impair the Counterparty from protecting its rights "to the extent relating to . . . any proposed assumption or rejection of any Executory Contract . . . *with such Counterparty* . . . ." But then it adds, "*provided* that each Counterparty" files objections or arguments on or before the Contract Objection deadline. Carnero is listed among twenty-two Counterparties in this provision. But again, the provision does not oblige Carnero to object,

much less object before June 30, 2020, to a proposed assumption of its Carnero Agreement, as to which its rights were, and according to Mesquite still are, unaltered and unimpaired.

Finally, the court states that the Plan gave Carnero "avenues to exercise its rights in a manner that would not upend the debtors' reorganization efforts . . . ." How are Sanchez/Mesquite's reorganization efforts upended? Thanks to the improvement in the oil and gas markets, Mesquite became a rich company again; it was able to cut a check for over $50 million in the Springfield settlement included in the MSA. There is no factual assessment that Carnero's state court lawsuit upends or endangers a 2020 reorganization Plan. The court's statement was exaggerated.

More to the point, at the date of confirmation Carnero seemed to be in the driver's seat with Mesquite. All parties were well aware that the midstream agreements' costs had been too high and must be renegotiated. Prior to confirmation, the court approved a Rule 9019-compliant settlement agreement that would have elevated Carnero's status as a midstream services provider, while lowering Sanchez's midstream costs, contingent on the court's rejection of the Oxy parties' midstream agreements. The stage was set for litigation by those parties when Sanchez attempted to reject their contracts. Why did Carnero have to do more, at the time of confirmation, while its Carnero Agreement remained intact? Did it have to file an objection because it could prognosticate that (a) Sanchez might lose the Oxy litigation; (b) the Oxy parties might in the future (after winning the Oxy litigation though the judgment was on appeal) agree to adjust their midstream charges to Mesquite; (c) the then-reorganized debtor would significantly modify all of the midstream agreements without including Carnero at the table; and finally, (d) the Plan would provide a rationale for forfeiture of its rights under state law even though the Plan and Confirmation Order repeated multiple times that post-confirmation settlements and resolution of executory

contracts could occur wholly outside the bankruptcy court's purview? This lengthy train of speculation renders it even more unlikely that the Plan actually barred Carnero from commencing state court litigation over purely state law issues that arose only on consummation of the MSA and the Master Restructuring Agreement.

B. The Oxy Adversary Settlement

The bankruptcy court, like Appellees, also asserted that Carnero forfeited its right to pursue state law claims in state court by failing to object, during or before[12] the December 21, 2021 hearing, to the settlement of the Oxy Adversary litigation. The general problem with this assertion is that Carnero was never a party to the litigation, the settlement, or the MSA or Master Restructuring Agreement that purportedly assumed or rejected numerous contracts. Nor was Carnero supposed to or obligated to participate in any of these matters. The Plan and Confirmation Order expressly excluded the bankruptcy court from further involvement in any of these matters; they authorized the debtor to compromise, settle, or handle litigation or executory contracts so long as the direct counterparties agreed. The Confirmation Order relieved Mesquite of any duties under Rule 9019 to provide notice and opportunity for a hearing to interested parties.

That the Appellees now contend otherwise is hypocritical. At the December 21 hearing, counsel for Mesquite explained all of this in detail. As he said, "let me start by putting out that we're not here on a 9019 motion to approve the settlement. And the reason for that is it's not necessary given

[12] It would have been impossible to object "before" that hearing, as counsel for Carnero received only two hours advance notice of the telephonic conference and had no ability to see beforehand the documents that comprised the MSA, Midstream Restructuring Agreement, and their hundreds of pages of underlying contracts.

the process that we've built into our plan of reorganization and confirmation order." A few pages later in the transcript, he says again, "[o]ur ability to settle this [without providing notice] is one that doesn't require coming to the Bankruptcy Court other than to just dismiss in the first place." When the court questioned counsel about entering the purported assumptions and rejections in the main bankruptcy case, counsel reminded that "we confirmed our plan of reorganization and we came up with a process that would, for lack of a better word, put off assumptions and rejections at—even after the effective date of the plan . . . . So, we can dismiss any positive action, resolve claims and interests without supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Court or Bankruptcy Rules." Counsel cites "Article 4(m) [*sic*] of the plan that says that we can compromise, release, withdraw, litigate to judgment any positive action (indiscernible) without the consent or approval of any third-party or further notice to or action order approval of the Bankruptcy Court."

Significantly, the bankruptcy court did not challenge these representations. In fact, it stated "I think you have the right at any point to jointly dismiss." In regard to the order in the main case, the bankruptcy court insisted that a stipulation be narrowed to the immediate parties to the MSA in order not to adversely affect third parties. The court expressly acknowledged the presence of counsel for Carnero and stated its intent not to affect any rights of Carnero in pending disputes with Mesquite.

For all these reasons, Carnero was not required to object to Plan confirmation for no good reason, nor was it obliged to intervene or participate or object to the MSA and Midstream Restructuring Agreement. Carnero forfeited nothing under the Plan or in connection with the settlement of the Oxy Adversary proceeding.

C. Bankruptcy Court Approval

To refute the proposition, repeatedly stated by both the court and Appellees, that the court "approved" the MSA and Midstream Restructuring Agreement, we turn to the Stipulation of Dismissal and Agreed Order entered on December 21, 2021. The first sentence states that it was "made, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure," made applicable by Bankruptcy Rule 7041. That rule covers "a stipulation of dismissal signed by all parties [to a suit] who have appeared" *without* court order. FED. R. CIV. P. 41(a)(1)(A)(ii). The Stipulation of Dismissal and Agreed Order, as well as the Stipulation and Agreed Order in the main case, were both presented to the court under that Rule, and the court so understood them.

Together with the facts that neither the Plan nor litigation strategy barred Carnero from suing in state court over post-confirmation state law claims, Mesquite may not sail under the false flag of bankruptcy court "approval" of its restructured midstream agreements.

## CONCLUSION

Returning to the criteria for related-to jurisdiction, as *GenOn* admonishes, post-confirmation jurisdiction exists "only where the dispute pertains to the plan's implementation or execution. Few disputes between nondebtors qualify." *GenOn*, 42 F.4th at 538. Sanchez's Plan did not explicitly incorporate changes to or seek to manage the debtors' midstream agreements. To the contrary, the Plan was agnostic on any immediate solution to the debtor's excessive midstream services provider costs. At the time of confirmation, the court had approved a tentative settlement that would have installed Carnero as Mesquite's midstream services provider. When the bankruptcy court's orders in the Oxy Adversary proceeding doomed that settlement, the Plan offered no solution. Instead, Mesquite

exploited its post-confirmation free rein to litigate, compromise, settle, and alter the midstream contracts without bankruptcy court involvement. It took eighteen months after confirmation, but Mesquite's handling of the MSA and Midstream Restructuring Agreement displayed its autonomy. The settlement orders were brought to the bankruptcy court only at the last minute for a ministerial entry of dismissal. Finally, Carnero had no clear claims to raise against the Appellees until the MSA and Midstream Restructuring Agreement were executed. These circumstances did not "live[] at the limit of related-to jurisdiction." *Id.* at 535.

The arguments that the MSA and Midstream Restructuring Agreement constituted Executory Contracts under the Plan are meritless, and the idea that Carnero was barred from litigating a post-confirmation dispute about a complex integrated contractual arrangement is factually and legally unsound. These two hooks for post-confirmation related-to jurisdiction have no substance. The bankruptcy court erred in assuming jurisdiction, and the district court erred in affirming. The judgments are REVERSED and REMANDED with instructions to REMAND to state court.